UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

IN RE SEPTEMBER 11 PROPERTY DAMAGE       :
AND BUSINESS LOSS LITIGATION             :          21 MC 101 (AKH)
                                         :
------------------------------------------------------------X

AEGIS INSURANCE SERVICES, INC., et al.,  :
                                         :
                          Plaintiffs,    :
             - against -                 :          02 Civ. 7188 (AKH)
                                         :
THE PORT AUTHORITY OF NEW YORK           :
AND NEW JERSEY, et al.,                  :
                          Defendants.    :
------------------------------------------------------------X

AEGIS INSURANCE SERVICES, INC., et al.,  :
                                         :          04 Civ. 7272 (AKH)
                          Plaintiffs,    :
             - against -                 :          **OPINION AND ORDER**
                                         :          **GRANTING MOTION**
7 WORLD TRADE CENTER COMPANY,            :          **FOR SUMMARY**
L.P., et al.,                            :          **JUDGMENT, AND**
                          Defendants.    :          **DISMISSING AND**
                                         :          **LIMITING COMPLAINTS**
------------------------------------------------------------X

ALVIN K. HELLERSTEIN, UNITED STATES DISTRICT JUDGE:

The terrorist-related aircraft crashes of September 11, 2001, brought

down, not only the Twin Towers of the World Trade Center, buildings One and Two, but

Seven World Trade Center ("7WTC") as well, an adjacent 47-story office tower. The

raging fires that caused Towers One and Two to collapse spread to Tower Seven,

presumably from the debris that rained down on 7WTC and the surrounding area. The

fires in 7WTC continued all that day, unquenched by water because of rupture of an

adjacent water main, unfought by New York City firemen many of whom had died in

Towers One and Two, and fueled by diesel fuel stored in tanks located in 7WTC.

Approximately seven hours after the fires at 7WTC were initiated by the collapse of

buildings One and Two, 7WTC itself collapsed. In marked contrast to the collapse of the Twin Towers, the collapse of 7WTC resulted in no loss of life. But there was substantial damage to property, giving rise to the set of lawsuits with which I now deal.

The Consolidated Edison Company of New York, Inc. ("Con Ed") operated a substation beneath 7WTC which the fires and building collapse heavily damaged. Nine transformers and considerable ancillary equipment housed in the substation were destroyed by the fire and the building collapse. Con Ed's insurers— Aegis Insurance Services, Inc., Liberty Insurance Underwriters, Inc., National Union Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, and Underwriters at Lloyds—reimbursed Con Ed for the damage it incurred, and became subrogated to and assignees of Con Ed to the extent of their reimbursement.

The insurers subrogated to Con Ed's claim allege that the negligence and fault of others involved with 7WTC proximately caused the collapse of the building and the consequent destruction of Con Ed's substation and, by this suit, seek damages to recover the sums they paid to, and incurred in defense of, Con Ed. Principally, plaintiffs claim that the Port Authority of New York and New Jersey (the "Port Authority"), the owner of the property, and 7 World Trade Company, the owner and manager of 7WTC, permitted Salomon Brothers, Inc. (since acquired by defendant Citigroup) and the City of New York to build and maintain large tanks of diesel fuel in their leased premises in 7WTC, and emergency generation systems powered by those fuel tanks, and that the tanks and generation systems caused the fires to grow out of control and consume the building. Plaintiffs claim also that the contractors, engineers and architects who designed and built 7WTC for the Port Authority and the leased premises for Salomon and the City,

designed the building and the respective premises negligently and in violation of applicable building and safety standards, and that their faults also proximately caused the collapse of the building.

Defendants all move to dismiss the complaint for failing to state a legally sufficient claim for relief: the City, by motion for summary judgment following limited discovery pursuant to Rule 56, Fed. R. Civ. P.; all other defendants, by motion in lieu of complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.[1] I hold, as discussed in this opinion, that the motion of the City should be granted and the complaint against it should be dismissed; that the motions by the Port Authority and by Citigroup both should be denied as premature; and that the motion, of some, but not all, the other defendants should be granted. The proceedings against the defendants who remain should continue.

## I. BACKGROUND

### A. The Development and Construction of Seven World Trade Center

In 1968, during the planning stage for the development of the World Trade Center and the twin 107-story towers, the Port Authority approached Con Edison about constructing a power substation to provide power to the proposed development. Con Ed agreed, and entered into a lease agreement with the Port Authority for the space below what would become 7WTC. The lease contemplated that the Port Authority might authorize the construction of an office tower above the premises housing Con Ed's substation and, in anticipation of such future construction, provided that the Port Authority would indemnify Con Ed for damage to its property resulting from the construction and maintenance of the building.

---

[1] Answers previously filed by various of the defendants were withdrawn in accordance with a stipulation of June 6, 2005 in <u>Civil Action</u> 04 Civ. 7272.

In 1987, approximately eleven years later, 7WTC was built by 7 World Trade Company and its agent, Silverstein Properties ("Silverstein"), on the premises above the Con Ed substation pursuant to 7 World Trade Company's lease of ground rights from the Port Authority. (<u>See</u> Agreement of Lease between the Port Authority of New York and New Jersey and 7 World Trade Company (the "7WTC Lease"), Bekker Dec. Ex. E.) In setting forth standards applicable to the construction of 7WTC, the 7WTC Lease expressly provided that "so long as title to the World Trade Center or the premises remains in the Port Authority the Lessee shall not be required to submit its design, construction and building plans and specifications for approval by the City of New York." (7WTC Lease, § 4.5.)

One original tenant, Salomon Brothers (later acquired by Citigroup and now part of Citigroup Global Market Holdings), and one later tenant, the City of New York, obtained authorization in their lease agreements with the Port Authority and Silverstein to construct and maintain diesel fuel tanks and generators for emergency power back-up systems. Salomon Brothers, now Citigroup, proposed to operate a large trading floor in 7WTC for continuous operation, 24 hours a day seven days a week, and wanted a back-up generator system to ensure continuity of its trading activities in the event of power failures. In 1998, the City of New York leased the 23rd floor of 7WTC for its Office of Emergency Management command center and additional space below the first floor and on the seventh floor for an emergency fuel and power back-up generator system to ensure continuity of command and control functions by that center should power failures be experienced during a condition of emergency.

*B. Procedural History of These Cases*

Plaintiffs filed Civil Action 02 Civ. 7188 on September 10, 2002 against the City and the Port Authority,[2] and Civil Action 04 Civ. 7272 on September 10, 2004 against the owners and lessees of 7WTC, and against the design and construction professionals who designed and built 7WTC and the leased floors of Salomon and the City. Plaintiffs seek to recover their damage, the amounts paid to Con Ed and costs incurred defending Con Ed.

In lieu of an answer, the City moved to dismiss, arguing that plaintiffs could not state a legally sufficient claim for relief because of statutory immunities enjoyed by the City. On December 1, 2004, I heard oral argument, and ruled at that time that the motion was premature, before an answer pleading the immunities as affirmative defenses was filed. I ordered limited discovery to create an appropriate record, and invited the motion then to be renewed. The parties have completed their limited discovery, and the City now renews its motion as a motion for summary judgment.

The Port Authority also moved to dismiss the Complaint in 02 Civ. 7188, arguing that the Port Authority's negligence was not the proximate cause of plaintiffs' damages and that the lease agreement between the Port Authority and Con Ed barred Con Ed's subrogated insurers from maintaining an action against the Port Authority. Following oral argument, I denied the Port Authority's motion without prejudice to resubmission after limited discovery. The Port Authority now renews its motion to dismiss, on essentially the same record as previously.

---

[2] In a separate action filed on September 11, 2002, 02 Civ. 7328, various plaintiffs, claiming rights as subrogees of Citigroup, asserted additional claims against the Port Authority. The Motion of the Port Authority to dismiss the claims in 02 Civ. 7328 will be addressed separately.

In addition to the City's motion, the defendants named in 04 Civ. 7272 have also moved to dismiss, arguing that the Complaint does not state a legally sufficient claim for relief on its face. Defendants argue that, as a matter of law, defendants did not owe a duty to plaintiffs, and that defendants' acts were not the proximate cause of Con Ed's damage. Defendants advance other grounds as well. Citigroup argues that it was released from liability as an intended beneficiary of the lease between Con Ed and the Port Authority, and that the Port Authority's exercise of control over the construction of the Citigroup premises precludes any negligence claims against Citigroup based on such construction. The design professionals (primarily the architects and engineers who designed 7WTC, and the design and construction contractors that built the premises leased by Citigroup and the City) argue that the Complaint should be dismissed because they did not owe a duty to plaintiffs and for various other reasons.

## II.  THE CITY OF NEW YORK'S MOTION FOR SUMMARY JUDGMENT

The Complaint of Con Ed's insurers against the City alleges that the City was a tenant of 7WTC, that its Office of Emergency Management ("OEM") occupied the 23rd floor of 7WTC to function as a command and control center for emergencies, that a 6,000-gallon diesel fuel tank located below 7WTC, and a 275-gallon day tank on the 7th floor of 7WTC, were used as an independent supply of power to the command and control center, and that the City's negligence in designing and maintaining the diesel fuel emergency backup generator system enabled the fires that consumed 7WTC to continue, causing the building to collapse and the Con Ed substation to be damaged. Plaintiffs sue to recover for damage to the substation.

On November 30, 2004, the City moved to dismiss the Complaint based

on the defense of sovereign immunity. I denied the motion at the time as premature,

ruling that the defenses were not supported by the pleadings or attached documents, and

ordered the parties to engage in limited factual discovery relevant to the issue of the

City's sovereign immunity defense. Having completed this discovery, the City now

renews its motion as a motion for summary judgment pursuant to Rule 56, Fed. R. Civ. P.

I now hold that under the New York Defense Emergency Act, N.Y. Unconsol. Law §

9101 et seq. (McKinney 2002) (the "DEA"), the City is immune from liability, and the

Complaint against it is dismissed.[3]

*A. The New York City Office of Emergency Management*

The City created OEM pursuant to Mayor Giuliani's Executive Order No.

30, dated March 19, 1996. See Exec. Order No. 30, dated March 19, 1996. Stating that a

primary purpose of the OEM was to oversee and implement the City's "civil defense"

and emergency preparedness functions, the Executive Order provided that the City "must

be prepared for and be able to coordinate rapid and effective responses to a wide range of

emergency situations." Id. The Order provided further that OEM was to be "headed by a

Director who shall serve as the local Director of Civil Defense, with the powers of a local

Director of Civil Defense under [the New York Defense Emergency Act]." Id. OEM's

functions, among others, were to establish and operate an emergency command center, to

respond to emergencies of any type, whether natural or man-made; to be an on-scene

coordinator; to ensure that the City was effective and efficient in using its resources; to

manage the moving of resources to emergency scenes more quickly; and to ensure that a

good recovery process was in place.

---

[3]        Because I hold that the City enjoys sovereign immunity under the New York Defense Emergency
Act, I decline to reach the issue of whether the City is also immune under the State and Local Natural and
Man-Made Disaster Preparedness Act, or under common law sovereign immunity.

In 1996, Mayor Giuliani appointed Jerome Hauer as Director of OEM and Director of Civil Defense. At the time of his appointment, OEM's facilities were housed at One Police Plaza. The City determined to relocate OEM from One Police Plaza because the facilities were believed to be inadequate for OEM's growing requirements and responsibilities. Initially, OEM's office space was moved to 100 Church Street, with the command center remaining at One Police Plaza, but this too was found to be inadequate. Mayor Giuliani then determined that OEM should build a new facility, including a command center, that would have the capacities that One Police Plaza and 100 Church Street lacked.

OEM developed criteria for its new office space and command center. The command center had to be within walking distance of City Hall. It had to have capabilities similar to that of a data center, with high ceilings to permit raised floors for wiring and with unobstructed interior space for sight lines. The facility needed backup generator capacity for an uninterruptible power supply and a fuel source for the backup system located above the flood plain.

OEM, along with outside consultants and employees of the Division of Real Estate Services ("DRES") and the New York City Department of Citywide Administrative Services ("DCAS"), reviewed potential properties that could satisfy these criteria. They determined that the command center could not be housed in any of the available City-owned spaces. DRES then enlisted the aid of tenant representatives to look for privately owned facilities, and selected the 23rd floor of 7WTC as best satisfying OEM's criteria.

On March 25, 1998, the City signed a lease agreement with Silverstein,

following a public hearing on its terms and approval by the Mayor. Among other things, the lease provided that Silverstein would make various interior, exterior, and structural repairs and alterations including the installation of diesel fuel storage tanks for backup generator systems.

DRES and OEM personnel attended meetings with the architects and engineers on the project with the goal of satisfying the design and technical requirements of OEM. One of the issues discussed was OEM's requirement for emergency backup power. The City personnel communicated both to Silverstein and to the architects and engineers that OEM needed backup power to support its emergency operations and related work in the command center, the watch command, the Mayor's office, and the press room, which together encompassed approximately half of OEM's floor space.

The potential fuel supply for the backup generator was also discussed. DRES and OEM explored using the underground tanks owned by Silverstein, but Silverstein rejected that option because of its own needs. DRES and OEM also explored sharing the tanks used by another tenant, but that option also was unavailable. Ultimately, the architect employed by the City and its consultants designed OEM's emergency backup system, including the size and location of the 6,000-gallon diesel tank beneath the first floor. They designed the system to have the 6,000-gallon tank refuel a 275-gallon day tank located on the 7th floor where the generators were located. The City reviewed final construction plans that the architect prepared, and DRES sent a letter to the architect, dated April 20, 1998, setting forth its comments to the proposed plans. Discussions continued as construction on the project began. The architect's first two designs for the proposed routes of the fuel lines were considered unworkable for

logistical reasons.  Another design was proposed placing the lines within an elevator

shaft.  DRES objected to that proposal on safety grounds.  Ultimately, the fuel lines were

placed outside the elevator shaft and in an elevated position below the first floor of

7WTC.

*B.  Standard of Review for Summary Judgment*

Summary judgment may granted only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears

the initial burden of demonstrating the absence of any genuine issue of material fact.

Celotex Corp. v. Cartrett, 477 U.S. 317, 317 (1986).  The court must view the evidence in

the light most favorable to the non-moving party, and must draw all reasonable inferences

in that party's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986).  However, the non-moving party may not rely simply on "mere conjecture as

to the true nature of the facts to overcome a motion for summary judgment."  Howard v.

Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1986).  Rule 56(e) provides that, when a

properly supported motion for summary judgment is made, the adverse party "must set

forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, (1986).

*C.  Application of The New York Defense Emergency Act*

The New York State Legislature passed the New York Defense

Emergency Act (the "DEA") in 1951 to establish procedures for emergency preparedness

and civil defense.  The statute establishes procedures and provisions for dealing with

emergencies such as an attack in the State.  DEA § 9102.  Section 9193(1) of the DEA provides for immunity for actions taken by "the state, any political subdivision, municipal or volunteer agency . . . in good faith carrying out, complying with or attempting to comply with any . . . order duly promulgated or issued" pursuant to the statute and relating to "civil defense."  Id. § 9193.  Pursuant to the DEA, these governmental entities "shall not be liable for any . . . damage to property."  Id.

The DEA defines "civil defense" as "all those activities and measures designed or undertaken (1) to minimize the effects upon the civilian population caused or which would be caused by an attack[.]"  DEA § 9103(5).  The DEA further defines "civil defense" to include "… measures to be taken in preparation for anticipated attack including . . . the construction or preparation of shelters and control centers."  Id.  OEM and its command center were created pursuant to this statute.  See Exec. Order No. 30.

The creation of the OEM command center and its backup generator system qualifies as a civil defense measure, namely, the "construction or preparation of … control centers," under the DEA.  DEA § 9103(5).  Although the DEA "reflect[s] what was perceived at the time to be the imminent threat of atomic conflict with communist nations and the concomitant need for a comprehensive plan to ensure the survival of the State's citizens in the event of foreign attack," Fitzgibbons v. County of Nassau, 541 N.Y.S.2d 845, 847 (2d Dep't 1989), the statute is not limited to a particular time or a particular threat.  Indeed, the legislative findings, incorporated into the text of the statute, show that the statute was based upon a broad notion of an "enemy attack" using any kind of weapon capable of inflicting mass injury.  Thus, the DEA defines "attack" broadly as:

> …[a]ny attack, actual or imminent, or series of attacks by an enemy or a foreign nation upon the United States causing, or which may cause, substantial damage or injury to civilian property or persons in the United States in any manner by sabotage or by the use of bombs, shellfire, or nuclear, radiological, chemical, bacteriological, or biological means or other weapons or processes."

DEA § 9103(2). As the New York Supreme Court held, the DEA "is not limited to a nuclear attack or a particular enemy." Daly v. Port Authority of New York and New Jersey, 793 N.Y.S.2d 712, 716 (Sup. Ct. N.Y. County 2005). So long as the action taken by the governmental or volunteer agency is one related to "civil defense" in anticipation of an "attack," liability for damage to property will not attach. DEA § 9193.

Here, it is clear that the City created its OEM command center in anticipation of an "attack" as defined by the statute. Although Mayor Giuliani may not have been aware of any particular imminent threat when he promulgated Executive Order 30, he nevertheless concluded, reasonably and with responsible foresight, that a terrorist attack of some sort in New York was foreseeable. The experiences of the 1993 World Trade Center bombing, the attempted bombing of the Atlantic Avenue subway station in Brooklyn, and other attacks in dense urban locations, such as the sarin attack in the Tokyo subways, impressed on the Mayor the need for a first-rate civil defense plan and a safe and accessible command center from which to coordinate a response, with independent sources of power to ensure reliable communications among City agencies and personnel and with the outside world the crucial aspect of such a command center. Indeed, the lack of an independent source of power was one problem with the original command center at One Police Plaza, for a power outage could make it impossible for Director Jerome Hauer and his team to use the phones during an emergency. (Hauer

Dep. at 28, 13-20.)  A backup generator system was considered essential to ensure that the center could continue to function even in the event of a general power outage.

The plaintiffs concede that the creation of OEM and the selection of 7WTC as a site for OEM and the command center were governmental activities. Plaintiffs argue, however, that the design and construction of the emergency backup generator system reflected the sort of ordinary business activities that City agencies normally perform and thus that these activities fall outside the scope of the DEA's grant of immunity.  I hold, to the contrary, that the design and installation of the emergency backup generator system for the OEM command center was a good faith effort undertaken by the City to facilitate civil defense.

There exist only a handful of cases in which New York courts have been called upon to construe the DEA.  In these cases, the courts have distinguished between routine conduct for which there is no immunity under the DEA, and conduct that a municipality performed while engaged in a civil defense function.  In keeping with this distinction, immunity did not attach to the routine and regularly scheduled patrolling duties of auxiliary police officers serving in a unit that was part of the Nassau County Office of Civil Preparedness.  Fitzgibbons, 541 N.Y.S.2d at 849-50.  Likewise, a helicopter company hired by a municipality to enable its civil defense director to survey damage caused during rioting was found to be "nothing more . . . than engaging in its regular business of providing air transportation for hire."  Abbott v. Page Airways, Inc., 245 N.E.2d 388, 391 (N.Y. 1969).

Unlike a helicopter company whose very business it was to provide air

transport, or an auxiliary police patrol exercising normal patrol activities, the City's design and installation of emergency backup generators for its command center was performed specifically for the purpose of enabling the City to be prepared against the danger of mass calamity. Clearly, this was not routine City business. The City was not merely buying office furniture for an office, or doing any of the other mundane activities of a City bureaucracy; it was making possible the continuation, maintenance, and operation of a command center, intended to lead the City and its population successfully through a catastrophic event. The record reflects the good faith effort by the City "to have self-sufficiency in the command center if something catastrophic happened so that we could function for a two-week period with electricity . . . so that we could survive a catastrophic event." (Hauer Dep. at 52, 9-15.)

Although the design and construction of the backup generator system did not occur in the rush of an actual occurring catastrophe, the very point of having a carefully designed OEM and command center was to ensure that these emergency facilities would be in place and operating *before* a disaster occurred. And when that is done, the municipality is immune from liability for negligence in relation to the maintenance and operation of such facilities. See Ard v. Oklahoma, 382 P.2d 728 (Okla. 1963) (finding that an Oklahoma statute similar to the New York DEA immunized the municipality from liability for injuries sustained by a child playing on the door of an underground fallout shelter in a city park).

As would be expected with such a specialized project, private architects and engineers were engaged to do the work, some directly by the City, and some by contractors who were themselves engaged by the City. They worked in response to the

City's stated needs and specifications, and under the ultimate direction and approval of the City. Mr. Hauer and other City officials testified that they attended meetings where they communicated the City's needs as they evaluated plans and proposals of the architects and engineers. Although these representatives of the City may not have had personal knowledge of how many gallons of fuel a system would need to generate power for a given period of time, they relied in good faith on the calculations of experts. The City's concern was that "it [the generator] worked, it was safe, it was compliant, and it followed all the codes." (Hauer Dep. at 77, 2-3.)

Although there may be some dispute in the record as to the details of how the OEM and generator system were designed and built in their particulars, the undisputed facts are clear: the Mayor decided that the City needed an OEM and command center to facilitate civil defense functions, and City officials, pursuant to that decision, engaged in a series of good faith negotiations and contracts with property holders, architects, engineers and outside consultants to design an effective and self-sufficient command center. Further, there is no allegation that the City acted in bad faith in carrying out its activities related to civil defense.

Accordingly, for the reasons stated, I hold that the City acted pursuant to the New York Defense Emergency Act, N.Y. Unconsol. Law § 9101, et seq., and is therefore entitled to the protections of that Act, including, under section 9193, immunity from suit. The Motion by the City is granted, and the Complaint against the City is dismissed.

### III. The Port Authority's Motion to Dismiss

The Amended Complaint of Con Ed's insurers against the Port Authority alleges that the Port Authority was the owner of the property located at Washington and Barclay Streets in New York City, that the property was part of the World Trade Center and the area where 7WTC was constructed, that the Port Authority entered into a lease with Con Ed pursuant to which Con Ed built a substation beneath the property that would become 7WTC, that the Port Authority retained final control over the design and construction of 7WTC, and that its negligence in approving the design and construction of 7WTC in general, and the maintenance of diesel fuel tanks housed in 7WTC in particular, proximately caused the collapse of 7WTC and the destruction of the Con Ed substation. The Amended Complaint also states a negligence per se claim against the Port Authority, claiming that the Port Authority failed to enforce New York City and State fire safety codes, regulations and practices, thus giving rise to the per se claim. Plaintiffs sue to recover for damage to the substation.

By motion of April 30, 2004, the Port Authority moved to dismiss the Amended Complaint filed by the plaintiffs on two grounds:  1) that the Port Authority's negligence was not the proximate cause of the destruction of the Con Ed substation; and 2) that the lease agreement between the Port Authority and Con Ed, naming the Port Authority as an insured, barred Con Ed's subrogated insurers from bringing the instant action. Following oral argument on November 30, 2004, I denied the Port Authority's motion to dismiss without prejudice to resubmission upon completion of limited discovery. See Summary Order, dated December 1, 2004.

Five months later, on April 20, 2005, the Port Authority, along with the "7WTC Ground Defendants" named in the Amended Complaint in 04 Civ. 7272, renewed its Motion to Dismiss (the "Renewed Motion") upon the same two grounds. I hold again that the Renewed Motion is premature and that, insofar as it states a negligence per se claim against the Port Authority, it should be dismissed. Fed. R. Civ. P. 12(b)(6).

*A. Standard for Motion to Dismiss*

A Rule 12(b)(6) motion requires the court to determine if plaintiff has stated a legally sufficient claim for relief, and may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Branum v. Clark, 927 F.2d 698,705 (2d Cir. 1991). The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). In evaluating whether plaintiff may ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994).

For purposes of Rule 12(b), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." See Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per

curiam) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.

1991)). "Even where a document is not incorporated by reference, a court may

nevertheless consider it where the complaint 'relies heavily upon its terms and effect,'

which renders the document 'integral' to the complaint." Chambers v. Time Warner, Inc.

282 F.3d 147, 152 -53 (2d Cir. 2002) (citing Int'l Audiotext, 62 F.3d at 72).

*B. Discussion of Issue of Proximate Cause*

   The Port Authority argues first that the Amended Complaint of Con Ed's

subrogated insurers should be dismissed because any alleged negligence by the Port

Authority was not, as a matter of law, the proximate cause of plaintiffs' damages. The

Port Authority asserts that the New York Fire Department's ("FDNY") decision to allow

7WTC to burn without intervention constituted a supervening cause, thus severing any

connection between the alleged negligence of the Port Authority and the subsequent

destruction of the Con Ed substation. In particular, the Port Authority contends that the

"World Trade Center Building Performance Study" issued by the Federal Emergency

Management Agency (the "FEMA Report") clearly establishes that the decision of the

FDNY to allow the fires at 7WTC to burn uncontrolled, coupled with the destruction of a

water main that weakened the 7WTC sprinkler system, were substantial factors leading to

the collapse of 7WTC. (See FEMA Report, 5-21, Jacob Dec., Ex. E.) Relying on the

findings set forth in the FEMA Report, the Port Authority urges that even if a fire at

7WTC was arguably foreseeable, the subsequent decisions of the FDNY and the

unprecedented character of the September 11 attacks were extraordinary events which

served to cut off the Port Authority's liability for any damages sustained to the Con Ed

substation.

In order to be liable to another in negligence, the alleged tortfeasor must have been both the but-for and proximate cause of the plaintiff's injury.  See Lee S. Kreindler, New York Law of Torts, § 6 (West 1997).  It is well established that intervening acts of an "extraordinary nature" may so distance the defendant's negligence from the injury sustained by the plaintiff as to preclude a finding of proximate cause, Kush v. City of Buffalo, 449 N.E.2d 725, 727 (N.Y. 1983).  Where such an intervening act separates the alleged tortfeasor from the injury sustained, the required causal link is absent as a matter of law.  See Derdiarian v. Felix Contracting Corp., 414 N.Ed.2d 666 (N.Y. 1980).

Proximate cause, and the determination of whether an intervening act will serve to cut off liability, necessitates a fact-intensive analysis.  See id.  Although the parties did engage in limited factual discovery relating to the cause of the collapse following my denial of the Port Authority's initial Motion to Dismiss, I decline at this stage in the proceedings to hold that the Port Authority "should be excused of all liability as a matter of policy and law[.]"  See In re September 11 Litigation, 280 F. Supp.2d 279, 302 (S.D.N.Y. 2003).  While the defendants may continue their efforts to prove that the conduct of the terrorists, the decision of the firefighters, and other independent causes so attenuates their negligence that liability may not attach, this is a determination that can emerge only after a full factual record has been developed.  See id.  Further, although the FEMA Report may be offered as proof of the causes of the 7WTC collapse, see Fed. R. Evid. 803(8), the FEMA Report is not conclusive proof, and the parties may be entitled to present their independent showings and explanations of the terrible events of September 11, 2001.

Accepting all facts alleged in the Amended Complaint as true as required by Rule 12(b)(6), Fed. R. Civ. P., I find that plaintiffs have set forth sufficient facts to defeat the Port Authority's motion to dismiss for absence of proximate cause.

*C. Discussion of the Lease Agreement between the Port Authority and Con Ed*

The Port Authority next argues that, under established New York law, the lease agreement between the Port Authority and Con Ed, expressly naming the Port Authority as insured, bars plaintiffs from asserting claims for reimbursement against the Port Authority. Determining what liability the Port Authority may have for damage sustained by Con Ed, however, is dependent upon an analysis of the lease agreement in its entirety and cannot depend upon an analysis of an isolated provision.

1. The Lease Agreement

In 1968, Con Ed and the Port Authority entered into an agreement for Con Ed to build a power substation beneath the space that would become 7WTC. (See Agreement of Lease between the Port Authority and Con Ed, dated May 29, 1968 (the "Con Ed Lease"), Bekker Dec. Ex. D, Jacob Dec. Ex. G.) In addition to specifically addressing the construction of the substation and the terms of Con Ed's Lease, the agreement also addressed the future construction of a commercial tower above the substation. Several provisions of the Con Ed Lease are relevant to my analysis of the pending motions to dismiss by the Port Authority and Citigroup, and these are addressed in detail below.

In anticipation of the future construction of a commercial tower, the Con Ed Lease defined the rights and obligations of the Port Authority and Con Ed with respect to such construction by specifically providing for the remedies available to Con

Ed in the event that any damages were sustained as a result of the construction. To this end, the Con Ed Lease expressly stated that, although the construction of the tower would not be such as to impair Con Ed's status as a lessee of the substation premises, the authority to design and construct the tower lay exclusively with the Port Authority and Con Ed would therefore have only limited remedies against the Port Authority in the event the construction did substantially interfere with or cause damage to the substation.

Section 8(a) of the agreement provided that the Port Authority could construct additional stories above the substation of "whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine," (Con Ed Lease, § 8(a)) but that such construction "shall [not] unreasonably impair, endanger or interfere with the continuous use of the Substation Building by [Con Ed] the Lessee." (Id.) Sections 8(b) and 16 limited the remedies available to Con Ed. Section 8(b) provided:

> The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be[,] or be construed to be[,] an eviction of the Lessee nor be made the grounds of any abatement of rental *nor any claim or demand for damages*, consequential or otherwise. (emphasis added)

Section 16 of the agreement amplified section 8 and provided that the measure of the Port Authority's liability would be to reimburse Con Ed for its repair and replacement expenses.

> The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing, or rebuilding the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof.

Thus, at the time that Con Ed agreed to build the Substation, it agreed that the Port Authority had the right to build a commercial tower over its substation and that any damage resulting from the Port Authority's exercise of its rights could not give rise to a suit for damages, but only for reimbursement of expenses incurred in "maintaining, replacing, or rebuilding the Substation." (Con Ed Lease § 16.)

In addition to sections 8 and 16 which set forth the rights and obligations of the Port Authority and Con Ed as to the construction of a commercial tower, the Con Ed Lease also provided that the Port Authority, at Con Ed's expense, would secure a fire insurance policy with proceeds of the policy to be "adjusted with and payable to" the Port Authority. Section 17(a) and (d) provides:

> During the term of this Agreement, *the Port Authority, at the Lessee's expense, shall insure and keep insured the Substation Building*[.] … All such policies of insurance and renewals thereof *shall be taken out in the name of the Port Authority and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority*. (emphasis added)
>
> *       *       *
>
> The policies of insurance under this paragraph (d) and renewals thereof shall insure the Port Authority and the Lessee as their interests may appear, and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority.

(The Con Ed Lease, § 17(a), (d).) Thus, under the terms of the Con Ed Lease, the Port Authority, in its own name but at the expense of Con Ed, was to obtain fire insurance on the substation building. In the event that the substation sustained fire damage covered by the policy, the proceeds of the policy would be paid to the Port Authority, as the named insured.

2.  New York Law on Subrogation Rights Against a Named Insured

The Port Authority, without reference to those provisions obligating it to reimburse Con Ed for damages incurred as a result of the construction of the 7WTC commercial tower, contends that plaintiffs are barred from asserting a claim for damages as the Port Authority is a named insured on the fire insurance policy obtained in accordance with section 17 of the Con Ed Lease.

Under established New York law, "[a]n insurer has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered."  Pennsylvania Gen. Ins. Co. v. Austin Powder Co., 502 N.E.2d 982, 983 (N.Y. 1986).  Further, an insurer may not "step into the shoes of its insured to sue a third-party tortfeasor—if that third party also qualifies as an insured under the same policy—for damages arising from the same risk caused by the policy."  ELRAC, Inc. v. Ward, 748 N.E.2d 1, 9 (N.Y. 2001).  Such a limitation on the subrogation rights of an insurer against its insured is essential as permitting such an action would allow an insurer to pass the risk of loss from itself to the very party it has undertaken to insure.  Pennsylvania Gen., 502 N.E.2d at 985.

The Port Authority urges that I dismiss the claims of plaintiffs as violating this established principle of New York subrogation law.  At this stage, however, final determinations as to the meaning of the agreement would be premature.  The Port Authority may be considered the insured under the policy paid by Con Ed, but it may also be considered Con Ed's insurer under section 16, which expressly provides that the Port Authority is obligated to reimburse Con Ed for expenses incurred in repairing and replacing damaged parts of its substation and equipment.  The Port Authority has not yet

filed an answer setting forth its affirmative defenses and the parties have engaged only in a limited course of discovery. In considering a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., I am limited to those documents incorporated by reference into the complaint or, in the alternative, documents "integral" to the complaint. Chambers v. Time Warner, Inc. 282 F.3d 147, 152 -53 (2d Cir. 2002) (citing Int'l Audiotext, 62 F.3d at 72). Here, the Amended Complaint asserts simply that the Port Authority, as the owner of the property where 7WTC was located, and as Con Ed's lessor, owed a duty of care to Con Ed and that this duty was breached. Although the agreement may prove critical to any defense asserted by the Port Authority, it is not integral to the substance of the Amended Complaint, and it would be a mistake to try to interpret its claims without an assured understanding of the entire relationship among the parties. The motion of the Port Authority is denied.

*D. The Cause of Action in Negligence Per Se is Dismissed for Failing to State a Claim*

In their second cause of action, plaintiffs claim that the Port Authority is negligent per se for its "failure to properly apply, interpret and enforce New York City and State fire and safety codes and regulations … in violation of its duty of care." (Am. Compl. 7188 ¶ 41.)

Under New York law, "violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability." Elliot v. City of New York, 747 N.E.2d 760, 762 (N.Y. 2001). However, "violation of a municipal ordinance constitutes only evidence of negligence." Id. In setting forth this distinction, Elliot adopted the rationale of Major v. Waverly & Ogden, 165 N.E.2d 181 (N.Y. 1960), that rules, ordinances and regulations of localities, municipalities or agencies are not

enactments of the state legislature, and that only violations of state statutes can constitute negligence per se, for only the legislature can modify the common law of the state. Elliot, 747 N.E.2d at 762.

Here, the plaintiffs have not alleged any violation of a state statute. The conclusory allegation set forth in the Amended Complaint that the Port Authority failed to abide by New York City and State fire and safety codes (Am. Compl., 02 civ. 7188, ¶ 41), without distinguishing a particular State statute that was violated, is not sufficient to invoke the negligence per se doctrine. See Major, 165 N.E.2d 181 (holding that a violation of the State Building Construction Code might be evidence of negligence, but not negligence per se). For these reasons, the Port Authority's motion is granted with respect to the plaintiffs' second cause of action, and that claim is dismissed.

## IV. CITIGROUP'S MOTION TO DISMISS

The Citigroup Defendants include Citigroup Inc. and its subsidiaries and predecessors in interest, including Salomon Brothers (now Citigroup Global Market Holdings) (collectively "Citigroup"), a tenant of 7WTC. The Amended Complaint in 04 Civ. 7272 alleges that the Citigroup Defendants breached their duty of care to Con Ed and others to design, construct, and maintain their leased premises in a reasonably safe manner. Specifically, plaintiffs allege that Citigroup "retained entities which designed, constructed, installed and used an emergency generator system that was unreasonably dangerous because it utilized an unreasonable amount of diesel fuel and because a breach of the system could provide a prolonged and substantial quantity of fuel to areas of fire close to critical structural supports in the building." (Am. Compl. 7272 ¶ 158.) In lieu of

an answer, Citigroup has filed a Rule 12(b)(6) motion to dismiss plaintiffs' complaint. Fed. R. Civ. P. 12(b)(6).

*A. Background*

In 1988, Salomon Inc., now Citigroup, entered into an agreement with Silverstein as 7 World Trade Company's managing agent, pursuant to which Citigroup leased floors 28-47 and portions of floors 1-5 of 7WTC. (<u>See</u> Agreement of Lease between 7 World Trade Company and Salomon Inc. (the "Citigroup Lease"), dated November 23, 1988, Bekker Dec. Ex. F.) Simultaneously with the Citigroup Lease, 7 World Trade Company and Citigroup executed a three party agreement with the Port Authority pursuant to which the Port Authority retained the right of final approval of Citigroup's design and construction of its leased premises at 7WTC. (<u>See</u> Three Party Agreement by the Port Authority, 7 World Trade Company, and Salomon (the "Three Party Agreement"), dated November 23, 1988, Bekker Dec. Ex. B, §§ 5.1(a)-(b), 5.3.)

In order to ensure that a power outage would not disrupt Citigroup's trading activities at 7WTC, the Citigroup Lease provided that Citigroup would have the right to install "diesel emergency power generators … together with all ancillary equipment therefor." (Citigroup Lease at C-10.) The Citigroup Lease included detailed provisions relating to the size and location of the generators and provided further that 7 World Trade Company would "arrange with the Port Authority for the installation of a diesel fuel storage tank on the property of the Port Authority and the installation of a fuel line from such facility running through the property of the Port Authority to the Tenant's emergency power generators." (Citigroup Lease at C-11.)

Citigroup engaged the architectural firm Skidmore, Owens and Merrill ("Skidmore"), the mechanical engineering firm Flack & Kurtz, and Irwin Cantor, P.C. as the structural engineer.  In accordance with the provisions of the Three Party Agreement, the work of the professionals retained by Citigroup was reviewed by both Silverstein and the Port Authority.  Upon completion of the Citigroup Premises, the Port Authority issued a Permit to Occupy which expressly stated that its design and construction requirements had been satisfied.  (See Permit to Occupy, Bekker Dec. Ex. A.)

*B. Discussion of Citigroup's Alleged Grounds for Dismissal*

Citigroup has set forth the following grounds for dismissal:  1) that Citigroup owed no duty of care to Con Ed; 2) that the Con Ed Lease prohibits the plaintiffs from asserting negligence claims against Citigroup; 3) that the Port Authority's exclusive control over the design and construction of the Citigroup premises bars the current action; 4) that the plaintiffs have failed to make out a claim for negligence per se; 5) that plaintiffs' claims are barred by the applicable statute of limitations; and 6) that the claimed damages are too remote and that, in any event, the actions of the terrorists and the decision of the FDNY to allow 7WTC to burn unimpeded were superseding causes.  I address each ground separately.

1.  Duty of Care

Citigroup argues first that the complaint against it should be dismissed because it had no duty to protect Con Ed against the criminal acts of third parties and because the events of September 11 were not reasonably foreseeable.

The scope of duty is a legal issue for the court to resolve.  Waters v. New York City Housing Authority, 505 N.E.2d 922, 923 (N.Y. 1987); see also Palsgraf v.

<u>Long Island R.R. Co.</u>, 248 N.Y. 339 (N.Y. 1928). Unlike a determination of causation, which is a fact-centered issue generally reserved for the trier of fact, the issue of duty generally requires "legal, policy-laden" decisions. <u>Palka v. Servicemaster Management Serv. Corp.</u>, 634 N.E.2d 189, 192 (N.Y. 1994). Duty is determined by balancing several factors including: (a) whether the relationship is such that it gives rise to a duty of care, (b) whether the plaintiff is within the zone of foreseeable harm; and (c) whether the accident was within the zone of reasonably foreseeable risks. <u>DiPonzio v. Riordan</u>, 679 N.E.2d 616, 618 (N.Y. 1997). However, foreseeability of harm alone does not define duty. <u>See</u> <u>Pulka v. Edelman</u>, 40 N.Y.2d 781, 785 (N.Y. 1976). "Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." <u>532 Madison Ave. Gourmet Foods, Inc. v. Tishman Construction Corp. et al.</u>, 750 N.E.2d 1097, 1101 (N.Y. 2001). A preliminary determination must therefore be made as to whether or not Citigroup owed a duty of care to Con Ed.

It is well established that landowners, and persons in possession of property, owe a duty to persons on their property to protect them from harm arising from conditions on the property. Kreindler, <u>supra</u>, at § 12.2. As a lessor of 7WTC, Citigroup exercised control over its premises and therefore owed a duty to "exercise reasonable care under the circumstances in maintaining its property in a safe condition," <u>Kush</u>, 449 N.E.2d at 727. The duty to maintain its premises in a reasonably safe condition included a duty to undertake reasonable fire-safety precautions. <u>Washington v. Albany Hous. Auth.</u>, 746 N.Y.S.2d 99, 101 (N.Y. App. Div. 2002). Although the duty owed by owners or occupiers of land is generally thought to extend only to tenants (or sub-tenants),

patrons or invitees, it is clear that "[a] landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring them." 532 Madison, 750 N.E.2d at 1102. Thus, Citigroup owed a duty of care with respect to its property that extended to tenants of adjoining properties, possibly including co-tenants in the same building. Since Con Ed in its leased premises was either a co-tenant or an adjacent tenant of Citigroup, Citigroup arguably owed a duty of care to Con Ed. Citigroup's Motion to Dismiss cannot properly be adjudicated in the absence of a record that develops the full context of its relationship with Con Ed and the surrounding circumstances.

Citigroup argues that, irrespective of any duty owed as to its own actions, it did not have a duty to protect Con Ed from the criminal acts committed by the terrorists on September 11. As a general rule, New York law does not impose upon persons the duty to protect others from injuries caused by third parties. See Purdy v. Public Administrator of County of Westchester, 526 N.E.2d 4, 7 (N.Y. 1988). However such a duty may be imposed where: 1) a special relationship exits between the defendant and the third party such that the defendant does have a duty to control the acts of the third party; or 2) a special relationship exists between the defendant and the plaintiff, creating an obligation on the part of the defendant to protect the plaintiff from harm inflicted by the third party. See Kreindler, supra, § 6.14. Thus, "[l]andowners have a duty to protect tenants, patrons, or invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises." Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055 (N.Y. 2001). This duty is imposed because the special relationship between landowner and tenant puts the landowner in the best position to protect against potential

risks.  <u>532 Madison</u>, 750 N.E.2d at 1101.  Liability is limited to only the class of persons

within the "special relationship."  <u>Id.</u>  Citigroup argues by its Motion that there was no

special relationship between it and Con Ed that would require Citigroup to protect Con

Ed from the actions of criminal, third party actors, and no special relationship was alleged

in the Amended Complaint.

However, the Amended Complaint alleged that Con Ed suffered damage,

not from the criminal acts of the September 11 terrorists, but from Citigroup's negligence

in the design, construction and maintenance of its premises in 7WTC.  (Am. Compl. 7272

¶¶ 155-160.)  Again, a motion to dismiss is not the proper procedure to test the legal

sufficiency of plaintiffs' allegation of duty and proximate cause.  While it is well

established that intervening acts of an "extraordinary nature" may so attenuate a

defendant's negligence from the injury sustained by the plaintiff as to preclude a finding

of proximate cause, <u>Kush</u>, 449 N.E.2d at 727, the issues of proximate, foreseeable,

intervening and independent causes are fact-laden, requiring a fully developed factual

record, and not the bare-bones motion to dismiss that Citigroup presents.  <u>See</u> <u>In re</u>

<u>September 11 Litigation</u>, 280 F. Supp. 2d at 302.  Accepting the facts alleged in the

complaint as true as I am require to do under Rule 12(b)(6), Fed. R. Civ. P., I hold that

plaintiffs have, at this stage, pleaded sufficient facts to allege duty and proximate cause.

Citigroup's motion to dismiss is denied.

<u>2.  Citigroup's Status as a Third Party Beneficiary of the Agreement between Con Ed and</u>

<u>the Port Authority</u>

Citigroup argues also that it is a third party beneficiary of the Con Ed

Lease and that, under the terms of that lease, Con Ed is barred from bringing an action against Citigroup and must instead seek relief in accordance with the remedies provided under its agreement with the Port Authority.[4]  Plaintiffs' Complaint, alleging negligence by Citigroup in the construction and maintenance of its leased premises, is not based on specific aspects of the Con Ed Lease.  Nevertheless, Citigroup sets out the Con Ed Lease to support its motion to dismiss the complaint on its face, and bases its argument on specific covenants of that Lease.  Plaintiffs and the Port Authority take issue with Citigroup's assertion, and argue that it is not entitled to third party beneficiary status.

Citigroup contends that sections 8 and 16 of the Con Ed Lease limit the remedies available to Con Ed in the event that the substation was damaged as a result of the construction of the 7WTC commercial tower.  Section 8(b) expressly stated that the Port Authority's exercise of its right to construct a commercial tower above the substation would not be "the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise."  (Con Ed Lease, § 8(b).)  Section 16 further limited the remedies available to Con Ed, providing that any damage resulting from the construction would only give rise to a claim for reimbursement of expenses incurred in "maintaining, replacing, or rebuilding the Substation."  (Con Ed Lease § 16.)  Con Ed's insurer's subrogation rights are limited in the same way that Con Ed's rights and remedies are limited by the Con Ed Lease.  See Restatement (Third) of Suretyship and Guaranty, § 27 (1996).  Thus, to the extent that Citigroup may be considered a third party beneficiary of the Con Ed Lease, Citigroup will have that same status with respect to Con Ed's subrogated insurers, the plaintiffs.

---

[4] For a complete discussion of the Con Ed Lease see discussion supra Part III.C.1.

Citigroup has "the burden of demonstrating that [it] has an enforceable right" as such an intended beneficiary of the Port Authority's contract with Con Ed. Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.,430 N.Y.S.2d 179, 186 (4th Dep't 1980). In order for Citigroup to show its status as an intended beneficiary, it "must establish: '(1) the existence of a valid and binding contract between the other parties, (2) that the contract was intended for [its] benefit and (3) that the benefit to [it] is sufficiently immediate rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" State of Cal. Public Employees' Ret. Sys. V. Shearman & Sterling (CALPERS), 741 N.E.2d 101, 104 (N.Y. 2000) (quoting Burns Jackson Miller Summit & Spitzer v. Lindner, 451 N.E.2d 459 (N.Y. 1983)).

Citigroup argues that the Con Ed Lease was intended for its benefit and that Con Ed is therefore limited to pursuing the remedies provided for in the Con Ed Lease. As a substantial tenant of the tower above Con Ed's substation, that may be so. The freedom of design and construction obtain by the Port Authority and acknowledged by Con Ed—to construct a tower of "whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine" (Con Ed Lease § 8(b))—almost necessarily had to benefit the tenants moving into a building so constructed. Thus it would seem that a fair reading of the lease, particularly sections 8 and 16, suggests that it was intended to benefit the Port Authority, and by necessary implication, those who might in the future acquire rights from the Port Authority with respect to building Seven.

However, Citigroup has not yet filed an answer with its affirmative

defenses, and the parties have not engaged in any discovery.  Further parsing of the

operative clauses and agreements, and the full context of the parties' dealings with one

another, should await a properly and fully developed record. The motion of Citigroup is

denied also for this set of reasons.

3.  The Exclusive Authority of the Port Authority as to the Design and Construction of

the Citigroup Premises

Pursuant to the Three Party Agreement, the Port Authority approved all

aspects of the design and construction of Citigroup's premises in 7WTC.  (See Three

Party Agreement, §§ 5.1(a)-(b), 5.3.)  Thus, Citigroup argues, again without having set

out proper allegations or defenses in a responsive pleading, plaintiffs are barred from

claiming that the design of its premises or of its emergency generator system could serve

as the basis of a damage suit by Con Ed, or any other tenant in the building.

The Port Authority was created by interstate compact between the States

of New York and New Jersey and with the consent of Congress,  and therefore is a

creature of, and is governed by, federal law.  N.Y. Unconsol. Law § 6601 (McKinney

2004), N.J. Stat. Ann. § 32:1 – 35.50 (West 2004); see Cuyler v. Adams, 449 U.S. 433,

438, 440 (1981).  Under the terms of the interstate compact, the Port Authority as an

entity, rather than either State, possesses the exclusive authority to set and enforce

appropriate standards.  N.Y. Unconsol. Law § 6601, N.J. Stat. Ann. § 32:1 – 35.61.

Indeed, so long as the facility is "owned, controlled or operated by the port authority …

no agency, commission or municipality of either or both of the two states shall have

jurisdiction over such facility."  N.Y. Unconsol. Law § 6612.  As such, all buildings at

the World Trade Center site owned and operated by the Port Authority, including 7WTC,

are and were exempt from regulation by New York City or State and are instead subject only to the exclusive jurisdiction of the Port Authority.  That jurisdiction extends, not only to the buildings under the control of the Port Authority, but also to the lessees of the Port Authority "implementing the functions of the Port Authority."  <u>New York v. Rodriguez</u>, 454 N.Y.S.2d 796 (Crim. Ct. Queens County 1982).

Citigroup contends that, in light of the Port Authority's exclusive authority to approve the design and construction of 7WTC and of the leased space therein, including the Citigroup space, it would be contradictory now to allow the exclusive authority of the Port Authority to be challenged in this suit against Citigroup, as a tenant of 7WTC.  Under this approach, the plaintiffs' negligence claims would be limited to allegations based on ongoing maintenance failures or on other actions taken by Citigroup that were not subject to the oversight and approval of the Port Authority.

Citigroup's motion to dismiss is premature.  It must first file an answer, setting out its defense by appropriate allegations, and develop a record to support the ruling it seeks from the court.  Citigroup's motion to dismiss pursuant to Rule 12(b)(6) is denied.

<u>4.  Negligence Per Se:  The Legal Insufficiency of Plaintiff's Fourth Claim</u>

In their fourth cause of action, plaintiffs allege negligence per se by Citigroup resulting from Citigroup's failure to "properly apply, interpret and enforce New York City and State fire and safety codes, regulations and practices."  (Am. Compl. 7272 ¶ 162.)  Citigroup moves to dismiss this claim.

As noted in my earlier discussion of the Port Authority's Motion to

Dismiss,[5] "violation of a municipal ordinance constitutes only evidence of negligence," Elliott, 747 N.E.2d at 762, and is not sufficient to sustain a cause of action for negligence per se. Major, 165 N.E.2d 181. Here, Con Ed has not alleged that a state statute has been violated. Plaintiffs' conclusory allegation alone, that Citigroup failed to construct and maintain its premises in accordance with the fire and safety codes, regulations and practices of New York City and New York State (Am. Compl. 7272 ¶ 162), is not sufficient to sustain their claim for negligence per se, particularly in light of the jurisdictional exclusivity of the Port Authority. Citigroup's motion is therefore granted with respect the plaintiffs' fourth claim for relief, and that claim is dismissed.

5. Statute of Limitations

Citigroup next argues that the Complaint should be dismissed for failure to file a timely claim, within the three year statute of limitations for claims relating to property damage. N.Y. C.P.L.R. § 214(d) (McKinney 2004). Citigroup argues that the three-year period begins to run, not from the date that 7WTC collapsed, but from the earlier date when damage from the negligent construction was allegedly foreseeable. Mark v. Eshkar, 598 N.Y.S.2d 255, 256 (1st Dep't 1993). There is nothing in the Complaint that can give rise to such an argument. The filing of the Complaint against Citigroup, on September 10, 2004, was timely. Citigroup's Motion to Dismiss for failure to satisfy the statute of limitations is denied, with leave granted to assert a well-pleaded defense based on specific and appropriate allegations.

6. The Remaining Arguments for Dismissal are Premature

Citigroup argues also that the Complaint should be dismissed on the ground that plaintiffs' claimed damages are too remote and speculative, and that the

---

[5] See discussion supra Part III.D.

terrorist attack on the World Trade Center and the decision of the FDNY to not fight the fire that consumed 7WTC were superseding causes.

These remaining grounds repeat the arguments made by the defendants against the plaintiffs and plaintiffs' representatives who filed suit against the airlines, the aircraft security companies, and the Port Authority for the deaths and injuries resulting from the crash of the terrorists into, and the collapse of, Towers One and Two of the World Trade Center. Defendant's motion on these grounds is denied for the same reasons that were discussed in my opinion in <u>In re September 11 Litigation</u>, 280 F. Supp. 2d 279, and as stated in brief in my earlier discussion denying Citigroup's motion based on issues of proximate cause.

## V.  THE DESIGN, CONSTRUCTION, AND OWNING AND MANAGING DEFENDANTS' MOTION TO DISMISS

All other defendants who were involved in the design, construction, operation and management of 7WTC move to dismiss the Amended Complaint for failure to allege a legally sufficient claim for relief against them. Fed. R. Civ. P. 12(b)(6). These defendants argue three general grounds for dismissal: (1) the absence of a duty of care owed to Con Ed and its insurers; (2) the absence of proximate cause; (3) the inappropriateness of the products liability claims. I address the first and third in turn, and the second in the margin. [6]

### A.  Procedural History

The initial Complaint lumped all defendants together, and alleged a

---

[6]    Defendants' argument based on lack of proximate cause requires a fact-intensive analysis. <u>See</u> <u>Derdiarian v. Felix Contracting Corp.</u>, 51 N.Y.2d 308, 312 (1980). Therefore, and in accordance with my findings in earlier sections of this Opinion, I deny defendants' motion on this ground as premature.

conclusory set of allegations against them.  On motion of Defendant Flack & Kurtz, Inc.,

a mechanical engineering firm employed by Citigroup, I held that the Complaint was

deficient.  By Order of January 7, 2005 (the "F&K Order"), I ruled:

> The complaint . . . mixes claims against numerous defendants labeled, "the Construction Defendants."  It is impossible . . . to understand what each such defendant purportedly did in the construction of 7 World Trade Center, a multi-storied office building that collapsed in the aftermath of the terrorist-related aircraft crashes into the Twin Towers, buildings One and Two World Trade Center, or why plaintiff is proceeding against each such defendant.  Plaintiff cannot lump together vague, impossible-to-understand allegations and claims that do not give proper notice to each specific defendant.  See Apollon Waterproofing & Restoration, Inc. v. Bergassi, 87 Fed. Appx. 757, 759 (2d Cir. 2004).

I ruled further that the Complaint was deficient in failing to satisfy special

New York pleading requirements for suits brought against design professionals who

performed services more than 10 years before the claim arose:

> New York CPLR 214-d, defines when a lawsuit may be brought, and before when it may not be brought, against a licensed architect or engineer and certain others who performed services more than 10 years before the claim arose.  Subsections 1 and 5 require a notice of claim 90 days before a lawsuit is instituted and for the notice to "identify the performance, conduct or omissions complained of."  Subsection 6 requires the plaintiff in its complaint to allege that it has complied with these requirements.

> These sections state an important policy of New York regarding the time and conditions for bringing suit.  Matters of pleading are generally governed by federal, not state, law.  Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100 (1941).  However, defendant F&K has shown enough, even though it is through an affidavit that I decline to consider, to place a Rule 11 burden on plaintiff that should be reflected in the pleadings.  See R. 11(b), Fed. R. Civ. P.

I gave plaintiffs leave to amend the Complaint to conform to my rulings.

*B.  The Categories of Defendants and Allegations Against Them*

The Amended Complaint divides the remaining defendants into the

following categories:[7] the "7 World Trade Center Defendants" (Am. Compl. 7272 ¶¶ 9-11); the "7 World Trade Center Construction Defendants" (Am. Compl. 7272 ¶¶ 15-25); the "City Office of Emergency Management Construction Defendants" (Am. Compl. 7272 ¶¶ 26-58); and the "Citigroup Construction Defendants." (Am. Compl. 7272 ¶¶ 59-70.)

1.  The 7 World Trade Center Defendants

The 7 World Trade Center Defendants—7 World Trade Company, L.P. and Silverstein Properties, Inc.—are alleged to have erected, operated, and managed 7WTC.  The Amended Complaint alleges that the 7WTC Defendants were negligent in the "design, approval, inspection, installation, maintenance, operation, conduct and control" of 7WTC and that this negligence led to the collapse of 7WTC and the destruction of the Con Ed substation.  (Am. Compl. 7272 ¶ 148.)  Plaintiffs also assert a negligence per se claim against these defendants.

2. The 7 World Trade Center Construction Defendants

The 7 World Trade Center Construction Defendants—Tishman Construction Corporation ("Tishman"), the general contractor; Emery Roth & Son, P.C. ("Emery Roth"), the architect; Syska & Hennessy Engineers ("Syska & Hennessy"), the design engineer; and Irwin G. Cantor P.C. ("Irwin Cantor"), the structural engineer—are alleged to have owed a duty of care to Con Ed to design and construct 7WTC in a reasonably safe manner (Am. Compl. 7272 ¶ 167).  Plaintiffs allege that they breached

---

[7]        Plaintiffs' Amended Complaint also names the "Airline Defendants" and the "Security Company Defendants." These defendants did not file motions.  Plaintiffs also allege claims against the "Public Entity Defendants," that is, the Port Authority and the City of New York; and against the "Citigroup Defendants" both in their general allegations in 04 Civ. 7272 and in 02 Civ. 7188.  I have stated my rulings with respect to these defendants in earlier sections of this opinion.

this duty of care by failing adequately to design and construct 7WTC so that it "would not weaken or sustain damage causing the building to collapse in the event of fire or other casualty." (Am. Compl. 7272 ¶ 169.) The Amended Complaint alleges generally that the defendants were negligent in the design of 7WTC, that they failed adequately to supervise the construction of 7WTC, and that they failed to comply with applicable statutes, regulations and industry standards. (Am. Compl. 7272 ¶ 170.)

3. The Construction Defendants for New York City's Office of Emergency Management

Construction Defendants for OEM's command center—Swanke Hayden Connell Architects ("Swanke"), the principal architect; Ambassador Construction Co. Inc. ("Ambassador"), the general contractor; Cosentini Associates, Inc. ("Cosentini"), the subcontractor engineer; Cantor Seinuk Group, P.C. ("Cantor Seinuk"), the structural engineer (a successor in interest to Irwin Cantor); H.O. Penn Machinery Co., Inc. "(H.O. Penn"), Kaback Enterprises ("Kaback"), Electric Power Systems, Inc. ("Electric Power"), and American Power Technologies, Inc. ("American Power") the manufacturers, suppliers, and installers of the backup generators and related fuel distribution apparatus; Preferred Utilities Manufacturing Corp. ("Preferred"), the manufacturer and/or installer of the oil pump cutoff switches and related fuel distribution apparatus associated with the backup generators; G.C. Engineering & Associates, P.C. ("G.C. Engineering"), the manufacturer, and/or installer of the fuel supply pipes and related fuel distribution apparatus associated with the backup generators; Firecom, Inc. ("Firecom"), the manufacturer, supplier and installer of the fire suppression system; Grace Construction Products ("Grace") and Fiberlock Technologies, Inc. ("Fiberlock"), the manufacturers, and/or installers of the fireproofing system; Rosenwach Tank Co., Inc. ("Rosenwach"),

the manufacturer, and/or installer of the fuel tank and related fuel distribution apparatus; All Fire Systems, Inc. ("All Fire"), the tester of the fire suppression system; and ABCO Peerless Sprinkler Corporation ("ABCO"), the manufacturer, and/or installer of the sprinkler system associated—are alleged to have been negligent in the design and construction of 7WTC. (Am. Compl. 7272 ¶¶ 174-79.) The allegations track those against the Construction Defendants.

4. The Citigroup Construction Defendants

The Citigroup Construction Defendants—AMEC PLC, the general contractor; Skidmore Owings and Merrill, L.L.P. ("Skidmore"), the architect; Flack & Kurtz ("Flack"), the mechanical engineer; Centrifugal Associates, Inc. ("Centrifugal"), the infrastructure and mechanical subcontractor; and Irwin Cantor, the structural engineer—are alleged, by the same general allegations as were used in the previous groupings of defendants, to have been negligent in the design and construction of 7WTC. (Am. Compl. 7272 ¶¶ 183-88.)

C. Motions Attacking Duty of Care

All categories of Design and Construction Defendants move to dismiss on the ground that they did not have a duty of care in favor of Con Ed. The Owning and Managing Defendants, 7 WTC Company and Silverstein Properties, move also to dismiss for lack of proximate cause. As to the latter group, I hold, for the reasons discussed in the previous section relating to the Citigroup Defendants, that the issue of proximate cause is fact laden and inappropriate for a motion to dismiss at the pleadings stage. As to the issue of duty of care, I hold, for the reasons stated below, that the design professionals, such as architects and engineers, and the construction and contractor

defendants did not owe Con Ed such a duty of care, and their motion is granted. The owning and managing defendants, however, did owe a duty of care to plaintiffs, and their motions are denied until after answer and the development of an evidentiary record. These remaining defendants are regrouped, for the sake of discussion, into Design Defendants, Construction Defendants, and Owning and Managing Defendants.

1.  The Design Defendants

Those who perform work, or deliver services or products, pursuant to a contractual or other commercial relationship owe duties of care and proper performance to those entitled to receive the benefit of their work or services or products. See Ultramares Corp. v. Touche, 174 N.E. 441 (N.Y. 1931). Absent such a defined relationship or other special circumstances, duties are not owed to the public at large or to those outside the limited class of people who, it is reasonable to believe, are entitled to expect the actor's due care to them. Waters, 505 N.E.2d at 924. Thus, accountants can be liable only to the limited class of persons whose reliance on an audited opinion is specifically foreseen or undertaken. Ultramares Corp., 174 N.E.2d 441; see also Credit Alliance Corp. v. Arthur Anderson & Co., 483 N.E.2d 110, 118 (N.Y. 1985)(reaffirming the principle of Ultramares that some form of privity, either actual or implied, must exist between the parties in order for liability to attach). And architects and engineers who owe a duty of care to the owner of a building who engaged them, do not owe such a duty to a later or successor owner who purchased that building, absent a special relationship or a covenant providing for such liability. Lanaro v. Bosman, 696 N.Y.S.2d 552, 553 (3d Dep't 1999); see also Melnick v. Parlato, 745 N.Y.S.2d 68 (2d Dep't 2002).

In Lanaro, the plaintiff purchased improved lots from the United States Land Acquisition and Development Corporation. Lanaro, 696 N.Y.S.2d at 553. The plaintiff subsequently sued the engineering firm that had performed work for the seller, alleging negligence in the design, installation, construction and development of the infrastructure of the lots, and alleging further that the defendant had failed properly to supervise the work. The Appellate Division held that "the work performed by defendant was intended to benefit U.S. Land Acquisition only and not plaintiff," and that, in the absence of any contractual or other special relationship, "nothing in the record justifie[d] inferring that [the defendant] owed plaintiff any legal duty." Id.

While it is true that Con Edison was a known occupant of the substation at the time that the Design Defendants performed their work in designing and building 7WTC, that does not mean that these defendants undertook a duty to Con Ed. The engineering firm in Lanaro was reasonably on notice that the owner of the land with which it was in contractual privity might sell the land with its improvements. Yet, the court in Lanaro held clearly that the duty of care ran only to the owner that had engaged the engineer, and not to a successor. The Court of Appeals has endorsed such "[p]olicy-driven line-drawing" even though it "invariably []cuts off liability to persons who foreseeably might be plaintiffs." 532 Madison, 750 N.E.2d at 1103.

In Melnick, 745 N.Y.S.2d 68, the Appellate Division reiterated that merely participating in the design, construction, and supervision of construction of a structure is not enough to give rise to a duty of care. Instead, the burden is on the plaintiff to show that "the functional equivalent of privity of contract arose between themselves and [defendant] as a result of [the defendant's] actions." The Court of

Appeals has held further that in order for such privity to arise, the defendants must take specific actions directed at the plaintiff: (1) the defendant must be aware that its work would be used for a particular purpose; (2) plaintiff must rely upon defendant's work; and (3) there must be some conduct by the defendant "linking" it to the plaintiffs and "evincing" its understanding of that reliance. Ossining Union Free School Dist. v. Anderson LaRocca Anderson, 539 N.E.2d 91, 95 (N.Y. 1989).

Plaintiffs have not alleged that the work done by defendants was for a specific purpose relating to Con Ed, nor that Con Ed was specifically intended as a beneficiary of defendants' work, nor that Con Ed specifically relied on defendants' work. The Amended Complaint alleges only that the Design Defendants did their work either for the owners of 7WTC, or the various tenants of 7WTC, such as the City or Salomon, now Citigroup. No special relationship to Con Edison is alleged.

New York has a stated policy restricting the duty of care owed by design professionals to those in privity with them or enjoying a particular special relationship when only property damage, and not personal injury, is alleged. See Eaves Brooks Costume Co. v. Y.B.H. Realty Corp., 556 N.E.2d 1093, 1094 (N.Y. 1990). Thus, in McGee v. City of Rensselaer, 666 N.Y.S.2d 949, 951 (Sup. Ct. Rensselaer County 1997), the engineers involved in the planning and design of a highway interchange were held not to owe a duty to an adjacent homeowner for negligently caused property damage. Noting that "[c]ourts . . . have long differentiated between causes of action for personal injury and other causes of action," the court recognized that "different public policy considerations are involved," Id. at 952, and ruled that that the engineers did not owe a duty of care to the homeowner. Id.

Plaintiffs' reliance on 532 Madison, 750 N.E.2d 1097, is misplaced. 532 Madison involved the collapse of a section of a wall of a 39-story office tower during a construction project. The collapse resulted in the closure of businesses along fifteen blocks of Madison Avenue for approximately two weeks, with some businesses remaining closed for even longer periods. See id. at 1100. Having sustained no personal injury or property damage, the plaintiffs in 532 Madison sued the ground lessee and managing agent of the construction sight for the economic damages resulting from the closure of Madison Avenue. The Court of Appeals dismissed the negligence claims, holding that claims for economic loss, "f[e]ll beyond the scope of the duty owed them by defendants[.]" Id. at 1103.

Plaintiffs cite the fact that the Court of Appeals expressly limited the scope of duty to those who "suffered personal injury or property damage," id., as authority for the proposition that a duty of care exists for their claim. However, 532 Madison solely addresses whether the particular plaintiffs alleging economic loss fell outside of the scope of the duty of care, and the Court of Appeals held that they fell outside such a duty. More important, the defendants in 532 Madison were the ground lessee and the managing agent of the construction site, the parties who were presently and immediately responsible for maintaining a safe structure. Id. at 1100; see also In Re September 11th Litigation, 280 F. Supp. 2d at 300 (applying the holding of 532 Madison to the owner and ground lessor of 1 and 2 WTC). Nowhere in the opinion does the Court of Appeals consider whether the architects, engineers, or other design professionals of an earlier time owed any duty of care to the plaintiffs. Given the strong policy considerations counseling against the imposition of a duty of care on design defendants

where no privity or special relationship exists as between the plaintiff and the defendants and where only property damage is alleged, the claims against the Design Defendants are dismissed.

## 2. The Construction and Contractor Defendants

Plaintiffs also make specific allegations against the Construction and Contractor Defendants, alleging that these defendants were negligent in the design and construction of 7WTC, and that this negligence caused structural defects that led to the collapse of 7WTC. As previously discussed, absent a special relationship between the parties, no duty is owed to the public at large or to those outside the class of people entitled to expect the actor's due care to them. Waters, 505 N.E.2d at 924. Where contractual privity is absent, the plaintiff must establish that "the functional equivalent of privity of contract arose between themselves and [defendant] as a result of [the defendant's] actions." Melnick, 745 N.Y.S.2d at 69. In this instance, Con Ed was not in either contractual or functional privity with the named defendants, and there is no allegation that would yield an inference of privity.

The Eaves Brooks case provides further insight as to the absence of such a duty. 556 N.E.2d 1093. Eaves Brooks involved an action by a commercial tenant against two companies under contract with the building's owners to inspect the sprinkler system and to maintain an alarm system to recover for property damage sustained when the building's fire sprinkler system malfunctioned. Id. at 1094. The court held that the companies that inspected the sprinkler system and maintained the fire alarm system did not owe the commercial tenant a duty of care. Id. The court recognized that such holdings "'may at times result in the exclusion of some who might otherwise have

recovered for losses or injuries if traditional tort principles had been applied,'" Id. at

1096 (quoting Tobin v. Grossman, 249 N.E.2d 419 (N.Y. 1969)), but concluded,

nonetheless, that public policy principles precluded finding a duty of care.  The court

reasoned:

> If [defendants] were answerable for property damage sustained by one not
> in contractual privity with them, they would be forced to insure against a
> risk the amount of which they may not know and cannot control, and as to
> which contractual limitations of liability may be ineffective. The result
> would be higher insurance premiums passed along through higher rates to
> all those who require sprinkler system and alarm services. In effect, the
> cost of protection for those whose potential loss is the greatest would be
> subsidized by those with the least to lose. In this setting, we see no reason
> to distribute the risk of loss in such a manner.

Id.

The defendants in Eaves Brooks provided inspection and maintenance

services to the building owner.  These services are like those alleged against the

Construction and Contractor Defendants in the Amended Complaint, which include

manufacturing, distributing, furnishing, and supplying services as well as installing

systems in 7WTC.  If anything, the Eaves Brooks defendants were even closer in

relationship to the commercial tenant than some of the defendants here, because the

Eaves Brooks defendants were engaged in an ongoing service of periodic inspections and

maintenance, whereas many of the 7WTC Construction and Contractor Defendants are

alleged to have completed any involvement with 7WTC years before the events of

September 11, 2001.  Further, as the Eaves Brooks court noted, "the owners and plaintiff

are both in a position to insure against losses" and "know or are in a position to know the

value of the goods stored and can negotiate the cost of the lease and limitations on

liability accordingly."  Id.  Con Ed was in similar position to look to its own insurers, or

to its lease agreement, to protect itself against loss.  The law does not extend liability to those providing design or construction services to others in 7WTC.

Accordingly, I hold that the Construction and Contractor Defendants do not owe a duty of care to Con Edison.  These defendants' motions to dismiss are granted, and the claims of Con Edison's subrogated plaintiffs against them are dismissed.

3.  The Owning and Managing Defendants

The Owning and Managing Defendants, 7 World Trade Company, L.P. and Silverstein Properties, Inc., are alleged to have erected, operated, and managed 7WTC, and thus fall squarely into the category of defendants contemplated by 532 Madison to owe a duty of care to plaintiff.  Plaintiffs claim also that the Owning and Managing Defendants are negligent per se.

As a general rule, in the absence of a special relationship between the parties, no duty is owed to the public at large or to those outside the class of people entitled to expect the actor's due care to them.  Waters, 505 N.E.2d at 924.  Where such a special relationship does exist, a duty of care may be imposed upon the defendant.  Id. Generally, landowners, or persons or entities exercising control over property, owe a duty to persons on their property to protect them from conditions on the property for they are in the best position to protect against risks inhering in the condition of the property.  See Kreindler, supra, at § 12.2.  As the entities charged with the management and operation of 7WTC, or succeeding to such entities, the Owning and Managing Defendants clearly exercised control over the design, construction, maintenance and operation of 7WTC, and potentially owe a duty of care to those persons entitled to expect such due care.

It is early in the case. The Owning and Managing Defendants have not yet filed answers, or alleged affirmative defenses. Discovery has not yet been pursued. The plaintiffs in this action, the subrogated insurers of Con Ed, potentially fall within the class of persons entitled to expect due care from the Owning and Managing Defendants. The extent of that duty, and its possible qualification by circumstance or by contract, or, for example, by the Con Ed Lease, and possible other contracts, must be explored.

Accordingly, the motion of the Owning and Managing Defendants to dismiss the negligence claims against them is denied. However, for the reasons stated in my discussion of the motions by the Port Authority and Citigroup, the count asserting negligence per se against the Owning and Managing Defendants is dismissed.

### D. The Motion to Dismiss the Products Liability Claims

Plaintiffs' Sixth, Eighth, and Tenth Causes of Action assert products liability claims against the Design and Construction Defendants. Under New York law, "no action in breach of implied warranty or strict product liability will lie for the negligent performance of professional services" in service-oriented contracts, such as agreements to render architectural or design services. Barnett v. City of Yonkers, 731 F. Supp. 594, 601 (S.D.N.Y. 1990) (citing Stafford v. International Harvester Co., 668 F.2d 142, 146 (2d Cir. 1981). Plaintiffs try to avoid this rule by alleging that certain of the Design and Construction Defendants provided more than mere "design services." The effect is without merit, at least for the most part.

The Court of Appeals has held that any professional "hybrid transactions along the sales-services continuum" must be assessed, "both legally and pragmatically," on a case-by-case basis. Milau Associates, Inc. v. North Avenue Development Corp.,

368 N.E.2d 1247, 1250 (N.Y. 1977). Where the transaction is "predominately service-oriented," neither the Uniform Commercial Code nor the common law will be read to establish an obligation to "guard against economic loss stemming from the nonnegligent performance" of obligations under the contract. Id. at 1251. The Amended Complaint alleges that all of the Design and Construction Defendants were somehow involved in the manufacture of products installed in 7WTC, and alleges, among other things, that these defendants were negligent in "manufacturing … structural systems at 7 World Trade Center." (Am. Compl. 7272 ¶ 173(b).) These allegations, plaintiffs argue, must be accepted on a Rule 12(b)(6) motion. Fed. R. Civ. P.

Plaintiffs' argument does not reflect the law. Lazy pleading will not create a cause of action that common sense suggests does not exist. Providers of services are not manufacturers of products and neither alchemy nor conclusory allegations can change that. My Order of January 7, 2005, pointed out to plaintiffs the strong New York policy protecting architects, engineers and performers of construction services. The specific notice that is a pre-requisite to suing providers of such services cannot be evaded.

Twelve defendants are not alleged to have engaged in *any* manufacture, beyond the broad allegations against groups of defendants in Counts Six, Eight, and Ten of the Amended Complaint. The allegations against Syska, Irwin Cantor, Cosentini, Cantor Seinuk, Flack & Kurtz, are that they served as engineers on the various projects. (Am. Compl. 7272 ¶¶ 21, 24, 32, 34, 63.) Defendants Emery Roth, Swanke, Ambassor, Skidmore, are alleged to have served as architects on the various projects. (Am. Compl. 7272 ¶¶ 18, 28, 30, 60.) Tishman, AMEC, Centrigufal, were alleged to have been

general or sub- contractors. (Am. Compl. 7272 ¶¶ 16, 66, 68.) All Fire is alleged to have "tested the fire suppression system associated with OEM." (Am. Compl. 7272 ¶ 56.) There are no allegations that these defendants manufactured anything, aside from the broad claims that the other defendants, with whom these defendants are grouped, manufactured products. These assertions are too vague to constitute factual allegations that, if true, would state a claim for products liability. Counts Six, Eight, and Ten are dismissed as against these defendants.

Only three of the Design and Construction Defendants are alleged to have manufactured *specific products* that were installed into 7WTC: Preferred Utilities is alleged to have "manufactured . . . the oil pump cutoff switches and related fuel distribution apparatus associated with the backup generators for the OEM center." (Am. Compl. 7272 ¶ 40); GC Engineering is alleged to have "manufactured . . . the fuel supply pipes and related fuel distribution apparatus associated with the backup generators for OEM." (Am. Compl. 7272 ¶ 46); Rosenwach is alleged to have "manufactured . . . the fuel tank and related fuel distribution apparatus associated with the OEM center." (Am. Compl. 7272 ¶ 54.) At this stage, where the pleadings are before me, I am constrained to deny the motion of these defendants to dismiss Counts Six, Eight, and Ten against them. However, plaintiffs will be required to set out, in future filings, precisely what defects in such alleged products were the proximate cause of Con Ed's damage.

Several defendants are alleged to have manufactured certain *systems* associated with 7WTC. Defendants H.O. Penn, Kaback, Electric Power, and American Power are alleged to have "manufactured . . . the backup generators and related fuel distribution apparatus for the OEM center." (Am. Compl. 7272 ¶¶ 36, 38, 42, 44.)

Defendants Grace Construction and Fiberlock are alleged to have "manufactured . . . the fireproofing system associated with the OEM center." (Am. Compl. 7272 ¶¶ 50, 52.) ABCO Peerless is alleged to have "manufactured . . . the sprinkler system associated with the OEM center." (Am. Compl. 7272 ¶ 58.) Though these allegations are less specific than those alleging manufacture of products, the allegations might be consistent with a products liability claim. In <u>Milau</u> for example, the defendant had designed and installed a sprinkler system. The Court of Appeals held that the transaction was predominantly a service contract, but did so only after a record was fully developed at trial. <u>See Milau</u>, 368 N.E.2d 1247. Plaintiffs will be required at the outset of discovery to set out their specific claims of defects, as was just stated. The motion to dismiss Counts Six, Eight, and Ten against these defendants is denied.

## VI. CONCLUSION

For the reasons stated, the motion of the City of New York to dismiss the Complaint in 02 Civ. 7188 is granted, and the motion of the Port Authority to dismiss the same is denied in part and granted in part. The Port Authority remains as a defendant in 02 Civ. 7188 as to Count One alleging negligence.

As to the Amended Complaint filed in 04 Civ. 7272 against the owners, lessors, and design and construction professionals who designed and built 7WTC, I hold as follows: the motion by Citigroup to dismiss Count Three is denied, and the motion to dismiss Count Four is granted; the motion by the Design and Construction Defendants to dismiss the negligence claims set forth in Counts Five, Seven and Nine is granted; the motion by the Design and Construction Defendants to dismiss the products liability claims set forth in Counts Six, Eight and Ten is granted in part and denied in part; and the

motion by the Owning and Managing Defendants to dismiss Count One is denied, and the motion to dismiss Count Two is granted.

Thus, the Port Authority, Citigroup, and the Owning and Managing Defendants remain as defendants in these actions to the extent that they are alleged to have acted negligently. Certain of the Design and Construction Defendants—Preferred Utilities, GC Engineering, Rosenwach, H.O. Penn, Kaback, Electric Power, American Power, Grace Construction, Fiberlock, and ABCO Peerless—also remain as parties as to those counts asserting products liability claims. Finally, those parties who did not move to dismiss, classified in the Amended Complaint as the Airline Defendants and the Security Company Defendants, and the counts against them, remain.

I will discuss further proceedings at a status conference on February 1, 2006 at 2:00. By noon two days before the conference, the parties will jointly tender a proposed agenda of the issues to be discussed, the discovery to be pursued, and such differences as may appear among the parties.

SO ORDERED.

Dated:      New York, New York
            January 12, 2006

ALVIN K. HELLERSTEIN
United States District Judge

52