UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- X

IN RE SEPTEMBER 11 LITIGATION

                                               21 MC 101 (AKH)
                                            :
                                            : This Document Relates to:
                                            :
                                            : 08 CIV 3719
                                            : 08 CIV 3722

----------------------------------------------------------------------- X

**AVIATION DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT DISMISSING ALL CLAIMS BY WORLD TRADE CENTER PROPERTIES FOR THE DESTRUCTION OF WTC 1, 2, 4, AND 5**

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, NY 10036
Telephone: (212) 490-9100
Fax: (212) 370-4453
dbarry@condonlaw.com

*Aviation Defendants' Liaison Counsel*

*Of Counsel*:

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
Tracy Burnett
Jacob Stahl

PERKINS COIE LLP
Thomas J. McLaughlin

RICHARDS KIBBE & ORBE LLP
Brian S. Fraser

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Robert A. Atkins

## TABLE OF CONTENTS

I.     Summary of Argument ............................................................................1

II.    The Aviation Defendants are entitled to summary judgment dismissing all claims for the destruction of WTC 1, 2, 4, and 5 ................................................................6

    A.  WTCP is only entitled to recover the diminution in fair market value of WTC 1, 2, 4, and 5 and is not entitled to recover replacement costs............................6

        1.  The Property is valued as a specialty only when there is no market for it ................................................................................................................8

        2.  WTC 1, 2, 4, and 5 are not specialty properties as a matter of law .........10

        3.  WTCP's reliance on its "obligation" to rebuild offers no basis to alter the legal rules of tort damages ..............................................................21

    B.  WTCP cannot recover lost profits in addition to fair market value ..................26

    C.  The Aviation Defendants have shifted the burden to WTCP to establish that the fair market value of WTC 1, 2, 4, and 5 is more than $2.8 billion and WTCP has failed to come forward with any probative evidence of a higher valuation.................................................................................................31

    D.  WTCP's efforts to delay the day of reckoning by relying on procedural aspects of CPLR 4545(c) are unavailing ..........................................................38

III.   Conclusion ...........................................................................................46

# TABLE OF AUTHORITIES

Page(s)

CASES

*Bates v. Holbrook,*
  89 A.D. 548, 85 N.Y.S. 673 (1st Dep't 1904) ........................................................................28

*Bessemer Trust Co. v. Branin,*
  544 F. Supp.2d 385 (S.D.N.Y. 2008)..............................................................................27, 32

*Bly v. Edison Elec. Illuminating Co. of N.Y.,*
  111 A.D. 170, 97 N.Y.S. 592 (1st Dep't 1906), *aff'd,* 188 N.Y. 582 (1907) ..........................28

*Boyce v. Soundview Technology Group, Inc.,*
  464 F.3d 376 (2d Cir. 2006)..............................................................................................32

*City of Rochester v. Ryan & McIntee, Inc.,*
  56 A.D.2d 715, 393 N.Y.S.2d 137 (4th Dep't 1977) ...............................................................12

*County of Nassau v. Colony Beach Club of Lido, Inc.,*
  43 A.D.2d 45, 349 N.Y.S.2d 422 (2d Dep't 1973) ............................................................11, 12

*Dyond v. Dunn,*
  148 A.D.2d 56, 543 N.Y.S.2d 230 (3rd Dep't 1989)..............................................................44

*Fisher v. Qualico Contracting Corp.,*
  98 N.Y.2d 534, 749 N.Y.S.2d 467 (2002) ..................................................................... passim

*Glasser v. Herman,*
  35 Misc. 2d 873, 231 N.Y.S.2d 232 (N.Y. Sup. Ct. 1962) ......................................................16

*Graceland Park Cemetery Co. v. City of Omaha,*
  173 Neb. 608, 114 N.W.2d 29 (1962)..................................................................................12

*Gramercy Boys' Club Assoc., Inc. v. City of New York,*
  141 A.D.2d 365, 529 N.Y.S.2d 476 (1st Dep't 1988), *aff'd,* 74 N.Y.2d 678, 543
  N.Y.S.2d 372 (1989).......................................................................................................10

*Great Atl. & Pac. Tea Co. v. Kiernan,*
  42 N.Y.2d, 397 N.Y.S.2d..............................................................................................2, 8, 9

*Hanna v. Plumer,*
  380 U.S. 460 (1965).........................................................................................................39

*Hartshorn v. Chaddock,*
  135 N.Y. 116 (1892) .....................................................................................................6, 30

*Heidorf v. Town of Northumberland,*
　　985 F. Supp. 250, 262 (N.D.N.Y. 1997) ..................................................................20

*In re City of Glen Cove,*
　　64 Misc. 2d 712, 317 N.Y.S.2d 423 (N.Y. Sup. Ct. 1970) ........................................8

*In re Poe Ctr.,*
　　250 A.D.2d 304, 680 N.Y.S.2d 533 (1st Dep't 1998) .............................................18

*In re Sept. 11 Litig.,*
　　265 F. Supp. 2d 208 (S.D.N.Y. 2003) .....................................................................33

*In re Sept. 11 Litig.,*
　　236 F.R.D. 174 (S.D.N.Y. 2006) .............................................................................39

*In re September 11 Litig.,*
　　No. 21 MC 101 (AKH) (S.D.N.Y. filed Aug. 28, 2008) .............................44, 45, 46

*In re World Trade Center Bombing Litigation,*
　　3 Misc. 3d 440, 443, 776 N.Y.S.2d 713, 716 (N.Y. Sup. Ct. 2004), *aff'd on opinion*
　　*below* 13 A.D.3d 66, 784 N.Y.S.2d 869 (1st Dep't 2004), 3 Misc.3d 460, 776
　　N.Y.S.2d 729; 3 Misc.3d. 460, 776 N.Y.S.2d 729 ....................................13, 15, 16

*Iridium IP LLC v. Motorola, Inc.,*
　　373 B.R. 283 (Bankr. S.D.N.Y. 2007) .....................................................................17

*Jenkins v. Ettinger,*
　　55 N.Y.2d 35, 39, 447 N.Y.S.2d 696, 698 (1982) ...................................................41

*Kozlowski v. Briggs Leasing Corp.,*
　　96 Misc. 2d 337, 408 N.Y.S.2d 1001 (N.Y. Sup. Ct. 1978) .....................................44

*Lewis v. Babcock Indus., Inc.,*
　　No. 88 Civ. 1120, 1992 U.S. Dist. LEXIS 8357 (S.D.N.Y. June 8, 1992) ................33

*Maier-Schule GMC, Inc. vs. Gen. Motors Corp.,* 154 F.R.D. 47, 52 (W.D.N.Y. 1994) ..............40

*Massachusetts Port Auth. v. Sciaba Constr. Corp.,*
　　54 Mass. App. Ct. 509, 766 N.E.2d 118 (Mass. App. Ct. 2002) .........................7, 12

*Newton Girl Scout Council v. Massachusetts Tpk. Auth.,*
　　335 Mass. 189, 138 N.E.2d 769 (1956) ...................................................................12

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.,*
　　315 F.3d 171 (2d Cir. 2003) ....................................................................................33

*Oden v. Chemung County Indus. Dev. Agency,*
　　87 N.Y.2d 81, 637 N.Y.S.2d 670 (1995) .................................................................40

*Sandoro v. Harlem-Genesee Market & Nursery, Inc.,*
  105 A.D.2d 1103, 1104, 482 N.Y.S.2d 165, 167 (4th Dep't 1984) ...................................27, 43

*Saratoga Harness Racing, Inc. v. Williams,*
  91 N.Y.2d 639, 646, 674 N.Y.S.2d 263, 266-67 (1998).............................................................9

*Schonfeld v. Hilliard,*
  218 F.3d 164 (2d Cir. 2000)...............................................................................17, 27, 32, 37

*Turnbull v. U.S. Air, Inc.,*
  133 F.3d 184 (2d Cir. 1998)............................................................................................42

*VFB LLC v. Campbell Soup Co.,*
  482 F.3d 624 (3d Cir. 2007)............................................................................................17

*Williams v. Hylan,*
  126 Misc. 807, 215 N.Y.S. 101 (N.Y. Sup. Ct. 1926) ...........................................................17

## STATUTES

N.Y. CPLR 4545(c) ................................................................................................... passim

## OTHER AUTHORITIES

1 Dan B. Dobbs, *Law of Remedies* § 3.3(7), at 312-313.............................................................30

Alvin L. Arnold, *Real Estate Transactions: Structure and Analysis*, App. 12.1 (West
  2008) ..................................................................................................................24

Federal Rule of Civil Procedure 56 ..................................................................... passim

Stuart M. Saft, *Commercial Real Estate Leasing* § 22:4 (West 2d ed. 2008) ..............................23

The Aviation Defendants[1] submit this Reply Memorandum of Law in further support of their Motion for Summary Judgment dismissing all claims by World Trade Center Properties ("WTCP")[2] for the destruction of World Trade Center buildings One ("WTC 1"), Two ("WTC 2"), Four ("WTC 4") and Five ("WTC 5").[3]

## I.    Summary of Argument.

In its opposition, WTCP effectively concedes that *Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 749 N.Y.S.2d 467 (2002), sets forth the general rule for measurement of damages for destruction of commercial property under New York law and that under *Fisher* a property owner's damages are limited to *the lesser of* fair market value or replacement cost. *See* WTCP Pls.' Mem. of Law at 33-34, 46-47.   WTCP further implicitly acknowledges that if the lesser-of-two rule applies, WTCP's damages will be restricted to recovery of the fair market value of its interests in WTC 1, 2, 4, and 5 as of September 11, 2001. *Id.*

---

[1]    For this Motion, the "Aviation Defendants" include American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Argenbright Security, Inc.; Globe Aviation Services, Inc.; Huntleigh USA Corp.; Burns International Services Corp.; Burns International Security Services Corp.; Pinkerton's Inc.; ICTS International NV; The Boeing Company; the Massachusetts Port Authority; the Metropolitan Washington Airport Authority; and the Port Authority of New York and New Jersey.

[2]    In this Memorandum, "WTCP" will refer to World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC.   These entities are all affiliated with Silverstein Properties, Inc. and have sometimes been referred to in the litigation as the "Silverstein interests."

[3]    This Motion does not address World Trade Center Building Seven ("WTC 7").

WTCP's main argument for recovery of replacement cost is that WTC 1, 2, 4, and 5 should be classified as "specialty" properties. Under New York law, arising principally in the areas of eminent domain or tax proceedings, property that lacks a fair market value is classified as a specialty and valued based on replacement costs. The specialty property rule reflects the unremarkable conclusion of the New York courts that if fair market value is not available, the alternative, less favored method of valuation must be applied. As the Court of Appeals explained in *Great Atlantic & Pacific Tea Co., Inc. v. Kiernan*, "[R]eproduction costs should be utilized only in those limited instances in which no other method of valuation will yield a legally and economically realistic value for the property." 42 N.Y.2d 236, 242, 397 N.Y.S.2d 718, 723 (1977). The specialty property rule thus arises not as an <u>exception</u> to *Fisher* but as an <u>application</u> of it. *Fisher* held that "[R]eplacement cost and diminution in market value are simply two sides of the same coin. Each is a proper way to measure lost property value, the lower of the two figures affording full compensation to the owner." 98 N.Y.2d at 540, 749 N.Y.S.2d at 471. Where no determinable market value exists, the market value option under *Fisher* disappears and the "lesser of two" rule becomes the "only of two" rule. Under those circumstances, *Fisher* itself calls for an award of replacement costs.

But neither *Fisher* nor any of the specialty cases cited by WTCP offer any support for an award of replacement costs to WTCP in this case. An essential pre-condition to classification of a property as a specialty is that the property in question have no measurable fair market value. WTC 1, 2, 4, and 5, however, were commercial office buildings in a prime downtown Manhattan location, and it ignores reality to suggest that

2

commercial office space in New York City has no determinable market value. That is especially true for WTC 1, 2, 4, and 5, which WTCP had acquired for $2.8 billion under 99-year net leases as the result of a commercial auction process less than two months before September 11, 2001. Not surprisingly, research has revealed no case in New York or elsewhere in which commercial office space has been treated as a specialty property.

WTCP urges that the World Trade Center complex in its entirety served a public purpose and that because rebuilding the complex will advance that purpose, WTCP should recover the costs of rebuilding rather than the value of the destroyed buildings. But WTCP is a private, for-profit commercial real estate developer that acquired its interest in the four buildings at issue to sub-lease the space to other, primarily commercial entities, including law firms, restaurants, and financial institutions. There is simply no basis on which to create an unprecedented departure from well-settled tort law to award a real estate mogul a higher measure of damages than New York law allows other commercial real estate owners or even the owner of a destroyed home.

WTCP's other major damages claim for alleged lost rental profits fares no better. In their opening Memorandum, the Aviation Defendants cited cases from the Appellate Division, the Second Circuit and this District holding that fair market value provides the controlling measure of damages for destruction of real property or a commercial business, that future lost profits are reflected in that fair market value and that, accordingly, future lost profits may not be recovered independently of fair market value. In its opposition, WTCP fails to mention this controlling authority and instead cites only

two inapposite, older cases permitting the recovery of lost profits (but not fair market value) for temporary disruption of access to a building or business.

Because damages in the form of replacement cost or lost rental profits (independent of fair market value) are thus unavailable as a matter of law to WTCP, the principal remaining issue on this Motion is whether WTCP has raised a triable issue of fact that the fair market value of WTC 1, 2, 4, and 5 exceeded the approximately $4.1 billion in insurance payments that it has received from its insurers.  But no such triable issue exists on this record.   In their moving papers, the Aviation Defendants demonstrated that, less than two months before September 11, 2001, WTCP acquired from the Port Authority of New York and New Jersey (the "Port Authority") a 99-year net lease interest in WTC 1, 2, 4, and 5 that the transacting parties themselves contemporaneously valued at $2.8 billion.  Under controlling authority from the Second Circuit, a recent arm's-length sale of the property constitutes the best evidence of its fair market value and shifts the burden to the party opposing the valuation to come forward with probative evidence why another valuation is more appropriate.

Speculation and conjecture alone will not defeat summary judgment.  But that is all that WTCP has offered here:

- WTCP speculates that the Port Authority did not have a profit maximizing motivation.  To the contrary, the Port Authority has admitted, in precisely those terms, that "the purpose of the competitive bidding process was to obtain the maximum value for the Port Authority."  Ex. Y, Charles Gargano Dep. at 54:21-

57:10.[4]  In any event, what matters is not what the Port Authority intended, but what it actually did.  The Port Authority sold the property to the winning bidder in an international competitive auction for a price that its investment banker J.P. Morgan determined to be fair.

- WTCP speculates that the selection of a different discount rate would have resulted in a different value for the properties than $2.8 billion.  Perhaps theoretically so, but the discount rate underlying the $2.8 billion valuation was the discount rate used by the Port Authority's financial advisers at the time of the transaction, employed by the Port Authority's board of directors in approving the transaction, and adopted by WTCP itself in its financial statements.  In its opposition, WTCP does not identify any alternative discount rate, does not attempt to explain why the unidentified post-litigation alternative rate is more appropriate than the rate actually used by the parties at the time of the transaction, and makes no effort to show that the hypothetical alternative rate would have resulted in the fair market value of the properties as of September 11, 2001 exceeding WTCP's insurance recoveries.

- WTCP speculates that the fair market value of the properties might have changed between the time the transaction was negotiated in April 2001 or closed in July 2001 and September 11, 2001.  Again, perhaps a theoretical possibility, but WTCP has come forward with no admissible evidence that the fair market value of the property did change in that very short time frame, let alone that it increased from $2.8 billion to more than $4.1 billion.

Nor did WTCP file a Rule 56(f) affidavit arguing that it needed more time or discovery to develop its position concerning fair market value.  Consequently, on this record, the Aviation Defendants have established that the fair market value of WTC 1, 2, 4, and 5 on September 11, 2001 was no greater than $2.8 billion.

Perhaps recognizing the weaknesses in its legal and factual positions on these issues, WTCP argues that offsets pursuant to New York Civil Practice Law & Rule

---

[4]  All citations "Ex. __" refer to the Exhibits to the Declaration of Desmond T. Barry, Jr., dated June 20, 2008 ("Barry Decl. I") (Exs. A-X) and the Declaration of Desmond T. Barry, Jr., dated September 15, 2008 ("Barry Decl. II") (Exs. Y-GG).

4545(c) cannot be taken into account on a motion for summary judgment. But WTCP cites no authority supporting this position and it misperceives the issue before the Court. CPLR 4545(c) provides the substantive basis for the insurance payment offsets but Federal Rule 56 determines the circumstances in which summary judgment is available in a federal court proceeding. Here the Aviation Defendants have established that the maximum legally recoverable damages that WTCP may receive for WTC 1, 2, 4, and 5 is no greater than $2.8 billion. Once the Aviation Defendants have established their entitlement to judgment as to fair market value, the Court may proceed to calculation of the offsets authorized by Rule 4545(c) since it would serve no purpose to hold a trial on the damages issue if the maximum legally recoverable damages have been entirely offset. Since WTCP apparently does not deny the accuracy of its counsel's calculations that it has received approximately $4.1 billion in insurance payments for WTC 1, 2, 4, and 5, summary judgment dismissing WTCP's claims for want of any legally recoverable damages is appropriate here.

**II.** **The Aviation Defendants are entitled to summary judgment dismissing all claims for the destruction of WTC 1, 2, 4, and 5.**

    **A.** **WTCP is only entitled to recover the diminution in fair market value of WTC 1, 2, 4, and 5 and is not entitled to recover replacement costs.**

As the Aviation Defendants established in their opening brief, for over 100 years, settled New York law has provided that an owner of destroyed property can recover only the "lesser of two" alternative measures of damages: fair market value or replacement costs. *Hartshorn v. Chaddock*, 135 N.Y. 116, 122 (1892). The rule was recently reaffirmed by the New York Court of Appeals in *Fisher v. Qualico Contracting Corp.*, 98

N.Y.2d at 540, 749 N.Y.S.2d at 471 (2002). It is applicable to residential property and to income-producing commercial property. Indeed, it applies to all forms of property, including personalty and businesses, and is so firmly entrenched that it is the subject of a pattern jury instruction. *See* Aviation Defs.' Mem. of Law at 14; NY PJI 2:311 at 1522 (West 2007).

WTCP contests none of these propositions. WTCP barely mentions *Fisher* or the other controlling New York precedents, and it concedes—indeed it proclaims—that the replacement costs of WTC 1, 2, 4, and 5 far exceed their fair market value. WTCP Pls.' Mem. of Law at 42, 44; *see also* Declaration of Michael L. Levy ("Levy Decl."), ¶ 16. Nor can WTCP deny the inevitable consequence that if the *Fisher* lesser of two rule applies, replacement costs become legally irrelevant and WTCP would be limited to recovery of fair market value.

Instead, WTCP bases its right to recover replacement costs on a single remarkable proposition: that WTC 1, 2, 4, and 5 (and their more than 10 million square feet of combined office space) fall into the category of "specialty" properties for which there is no determinable market value. But, as shown below, this is an indefensible position. The specialty property classification has never been applied to commercial office space.[5] Moreover, it is a prerequisite for a finding of a specialty that there exist no market for the

---

[5] All of the cases relied on by WTCP can be distinguished on this ground alone. For example, the court's decision in *Massachusetts Port Auth. v. Sciaba Constr. Corp.*, 54 Mass. App. Ct. 509, 766 N.E.2d 118 (Mass. App. Ct. 2002), which WTCP cites as "inconsistent" with the position taken in this case, did not involve a commercial office building but a pier in a public park.

property in question.  WTCP, however, had just acquired its net lease interest in WTC 1, 2, 4, and 5 for $2.8 billion by submitting the winning bid in an international auction involving some of the most sophisticated commercial real estate entities in the world. The transaction closed just 55 days before the September 11 terrorist attacks.   It is contrary to the undisputed record evidence to assert that there was no market for property *that had just been successfully marketed by competitive auction.*

> **1.**    **Property is valued as a specialty only when there is no market for it.**

The New York Court of Appeals defines a specialty as "a structure which is *uniquely* adapted to the business conducted upon it or use made of it *and* cannot be converted to other uses without the expenditure of substantial sums of money." *Great Atl. & Pac. Tea Co. v. Kiernan*, 42 N.Y.2d at 240, 397 N.Y.S.2d at 721 (emphasis in original).  As a New York court has explained, "There are of course certain properties which fall into this category, such as churches, schools and clubhouses, which are referred to as 'specialty properties.'  By that it is meant there is actually no true market for them in the generally accepted sense in that no others in the area would be interested in acquiring such property."  *In re City of Glen Cove*, 64 Misc. 2d 712, 714, 317 N.Y.S.2d 423, 425 (N.Y. Sup. Ct. 1970).

New York courts will go to great lengths to try to determine a market value before turning to replacement costs to value a property as a specialty, recognizing that a replacement cost methodology may substantially overvalue the property.  A Court of Appeals decision extensively (and incongruously, since it rejects an argument that

8

property is a specialty) quoted by WTCP emphasizes the courts' strong preference for the use of market value where any market value can be ascertained and their rejection of replacement costs as anything but a last resort method of valuation:

> The reproduction cost method of valuation may result in serious overvaluation of the property due to rising construction costs and its failure to adequately account for factors such as functional obsolescence and physical deterioration. Thus, reproduction cost should be utilized only in those limited instances in which no other method of valuation will yield a legally and economically realistic value for the property. Here, because of the lack of any local market and the existence of a broad regional market for appellant's type of property, it is proper to depart from the ordinary rule relating to the proximity of comparables in order to arrive at a more realistic value than would be obtained by the reproduction cost method.

*Great Atl. & Pac. Tea Co.*, 42 N.Y.2d at 242-43, 397 N.Y.S.2d at 723 (citations omitted). The Court held that although there was no local market for the property at issue (a food processing plant), the lower court should have arrived at a market value by looking at sales of comparable properties in other regions rather than resorting to a replacement cost method of valuation. *Id.*

The Court of Appeals has also held that sales of similar properties, as well as a sale of the same property even many years before the event at issue, confirm that there is a market for the type of property at issue and preclude its valuation as a specialty. In *Saratoga Harness Racing, Inc. v. Williams*, the Court concluded that a well-known horse racetrack was not a specialty, holding:

9

> With regard to the market and sales component of the test, Supreme Court weighed the "uncontroverted" evidence that there were 33 sales of horse racetracks in the United States and one in Canada between 1984 and 1992. Indeed, three of the sales were in New York state, namely Roosevelt Raceway, Vernon Downs, and the subject Saratoga Raceway itself (the subject property was transferred to its present owner in 1987 for $9 million). We agree with the trial court's realistic assessment and application of *Allied Corp.* and, correspondingly, we reject the Appellate Division's conclusory "specialty" slotting of this property. Saratoga Harness established the existence of a "market" for racetrack properties by admissible evidence sufficient to take it out of the "specialty" niche.

91 N.Y.2d 639, 646, 674 N.Y.S.2d 263, 266-67 (1998).

## 2.   WTC 1, 2, 4, and 5 are not specialty properties as a matter of law.

The question of whether a particular property constitutes a specialty is a legal one. *See Gramercy Boys' Club Assoc., Inc. v. City of New York*, 141 A.D.2d 365, 366, 529 N.Y.S.2d 476, 478 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 678, 543 N.Y.S.2d 372 (1989) ("conclud[ing] that the *court* properly deemed the demolished structure to have been a specialty building." (emphasis added)). WTCP's own authorities demonstrate that WTC 1, 2, 4, and 5 cannot be treated as a specialty property. WTCP cites a four-part test developed by the Appellate Division in condemnation cases (where, unlike this case, a constitutional imperative to provide full compensation for the highest use of the property is at issue). But even if fully applicable in a tort damages case (which the Aviation Defendants do not concede), the test at issue requires:

> (a) The improvement be *unique* and must be specially built for the specific purpose for which it is designed;

(b) There must be a *special use* for which the improvement is designed and the improvement must be so specially used;

(c) There must be *no market* for the type of property (a beach and cabana club) and no sales of property for such use; and

(d) The improvement must be an appropriate improvement at the time of the taking and its use must be *economically feasible and reasonably expected to be replaced.*

*County of Nassau v. Colony Beach Club of Lido, Inc.*, 43 A.D.2d 45, 49, 349 N.Y.S.2d 422, 427 (2d Dep't 1973) (emphasis added) (cited at pages 35-36 of WTCP Pls.' Mem. of Law). By WTCP's own criteria, WTC 1, 2, 4, and 5 are not specialty properties. Commercial office space leased to tenants is hardly a special use, and the World Trade Center required no particular design to serve that purpose. Even more fundamentally, WTCP cannot seriously contend that there is no market for commercial office space in a high-rise building in New York City and no sales of property for such a use. Not only is there a market for this "type of property," there is a market for the precise net lease interest in these buildings upon which WTCP bases its claim, as demonstrated by the transfer of those net leases in July 2001, just 55 days before the attacks.

The pattern jury instruction that WTCP cites further demonstrates the fallacy of its argument. *See* WTCP Pls.' Mem. of Law at 33. WTCP's pattern jury instruction is inapplicable on two fronts: it relates to personal, rather than real, property and it applies only to property "with no reasonable market value." NY PJI 2:312 at 1575. WTCP's preferred instruction even begins with the statement that "Generally, the measure of damages for (injury to, loss of) personal property is based upon the value of the property at the time of the (injury, loss)." *Id.* The comment to the pattern instruction goes on to

11

list examples of the types of property that have no market value including: apparel in use, household goods and effects owned for personal use, manuscripts, family portraits, heirlooms and antiques, artisans' tools, and second-hand clothing. *Id.* at cmt. This list of items likely to be left behind at a garage sale bears no resemblance to four office buildings that commanded multi-billion dollar bids from several of the most sophisticated commercial real estate developers in the world.

The cases cited by WTCP in which property was valued as a specialty property only highlight how inapposite its argument is. All involve properties for which there genuinely was no market, because their use was so specialized or because their location was inaccessible. This case is thus far different from the ones in which courts have—often with considerable reluctance—concluded that a property that had not itself been marketed at any recent time and that was unlikely to attract interest from commercial parties was a specialty property. *Cf., e.g., Graceland Park Cemetery Co. v. City of Omaha*, 173 Neb. 608, 611, 114 N.W.2d 29, 31-32 (1962) ("school yards, church yards, college campuses, buildings under construction, and cemeteries."); *Newton Girl Scout Council v. Massachusetts Tpk. Auth.*, 335 Mass. 189, 138 N.E.2d 769 (1956) (a Girl Scout camp taken for a highway); *Massachusetts Port Auth.*, 54 Mass. App. Ct. 509, 766 N.E.2d 118 (pier located in the midst of a public park); *City of Rochester v. Ryan & McIntee, Inc.*, 56 A.D.2d 715, 393 N.Y.S.2d 137 (4th Dep't 1977) (a funeral home with a chapel).

WTCP's arguments that WTC 1, 2, 4, and 5 are specialty properties thus fail as a matter of law for two paramount reasons. First, the buildings at issue were commercial

office towers. Commercial office space—existing in the many millions of square feet throughout New York City and traded on a near-constant basis—is the very opposite of the legal definition of a specialty. Second, the property at issue indisputably had a market value, since a scant 55 days before September 11, 2001, WTCP acquired its net lease interest via a highly competitive, international auction.

### a.     The towers were commercial office buildings.

The commercial nature of the office component of the World Trade Center was already established in the litigation arising out of the 1993 bombing of the World Trade Center. In that litigation, the New York courts rebuffed attempts to characterize the office towers portion of the World Trade Center as anything other than ordinary commercial space. Indeed, the Port Authority was denied sovereign immunity precisely because of the commercial nature of the office component of the World Trade Center. In *In re World Trade Center Bombing Litigation,* Justice Sklar described the World Trade Center as a "multi-building commercial and office complex." 3 Misc. 3d 440, 443, 776 N.Y.S.2d 713, 716 (N.Y. Sup. Ct. 2004), *aff'd on opinion below* 13 A.D.3d 66, 784 N.Y.S.2d 869 (1st Dep't 2004). He held that "contrary to the Port Authority's contentions, the WTC and its public parking garage were primarily commercial facilities." 3 Misc.3d. at 460, 776 N.Y.S.2d at 729. He then described the Port Authority as acting in the capacity of a "commercial landlord of an office and retail complex." *Id.* WTCP, a for-profit entity in the business of leasing office space, is even more obviously a commercial landlord.

### b.    The net lease transaction conclusively establishes the existence of a market.

WTCP and the Port Authority's own testimony in their insurance coverage litigation confirms that WTC 1, 2, 4, and 5 were not specialty properties without any determinable market value.

Michael Levy, Senior Vice President of World Trade Center Properties, 2 WTC LLC, 3 WTC LLC (formerly 5 WTC LLC), and 4 WTC LLC, and former Senior Vice President of 1 WTC LLC, testified to the robustness of the market process that produced the $2.8 billion value:

> Q.    So this was a fairly extensive bidding process; is that a fair characterization of it?
>
> A.    Yes.
>
> Q.    Was it a particularly competitive bidding process based on your experience?
>
> A.    Yes, it was.

Ex. Z, Michael L. Levy Dep. (Vol. 1) at 89:13-90:15.  Mr. Levy agreed that the price paid as a result of this highly competitive bidding process represented the market value of the buildings, quibbling only over the fact that the price was to be paid over time:

> Q.    Would you normally agree with me that when a price is set by competitive bidding process that's the market value of whatever it was that was purchased?

14

> A.      If you were going to write a check that day.  If you
> were going out and writing a check that day and said here's
> my check for the price, I would say that's correct.

*Id.* at 254:20-255:16.

Charles Gargano, the Vice-Chairman of the Port Authority, testified that the auction process was intended to yield a value that was at least equal to the fair market value of the buildings, and perhaps exceeded it:

> Q.      Was it your understanding that the competitive
> process was intended to provide on a present-value basis
> the fair market value of the property?
>
> A.      In my opinion, it was to obtain the maximum value
> of the property.
>
> Q.      So, in other words, if you could obtain more than
> the fair market value of the property, you would happily
> have done so?
>
> A.      Yes.

Ex.Y, Gargano Dep. at 54:21-57:10.

WTCP makes the surprising argument that there was no market for WTC 1, 2, 4, and 5 because the Port Authority could not sell the property, ignoring the undisputed fact that the Port Authority net leased the property for 99 years just a few weeks before September 11, 2001.  That the conveyance were net leases rather than the sale of a fee interest makes no difference.  What WTCP is suing for in this litigation is the loss of the property interest that it owns.  And that property interest was transferred, pursuant to a

highly competitive market auction, very shortly before the attacks. The public auction that resulted in the transfer of the 99-year net leases on WTC 1, 2, 4, and 5 to WTCP reflects the value that the market assigned to that property interest.

Moreover, by entering into 99-year net leases, the Port Authority essentially transferred the entirety of its ownership interest to WTCP for 99 years. In fact, the Port Authority's Vice-Chairman, Charles Gargano, and Mayor Giuliani both publicly described the transaction as a "sale." Ex. AA, Peter Slatin, *Infrastructure and Money: GRID Talks with Charles Gargano*, Grid, Jan. 2002, at 41-42. According to Port Authority Vice-Chairman Gargano, "one of the reasons why the World Trade Center was sold—well, it was a 99 year lease, but you could say that's a sale—is because [the Port Authority] want[ed] to be out of the real estate business." *Id.*; *see also* Ex. BB, Al Frank, *Silverstein Inks World Trade Center Deal*, The Star Ledger, Apr. 27, 2001, at 36 (Port Authority Chairman Eisenberg referring to the "buyer" and the "seller" in the transaction); Ex. CC, Natalie Keith, *Silverstein Wins 99-Year WTC Net Lease*, Real Estate Weekly, May 2, 2001, at 1 ("with a net lease, the agency can get out of the real estate business"). Concerning his own companies' interests under the lease agreements, Larry Silverstein commented: "We will be in control of a prized asset." Ex. CC, Natalie Keith, *Silverstein Wins 99-Year WTC Net Lease*, Real Estate Weekly, May 2, 2001.

Under New York law, long-term leases—like the 99-year net leases of the World Trade Center—are often considered equivalent to the sale of an interest in real property. *See, e.g.*, N.Y. Tax §1401(e) (McKinney 2008) (providing that a "[t]ransfer of an interest in real property" includes leases for a period exceeding forty-nine years); *Glasser v.*

*Herman*, 35 Misc. 2d 873, 875, 231 N.Y.S.2d 232, 234 (N.Y. Sup. Ct. 1962) ("By virtue of its 99-year lease . . . respondent corporation acquired virtually all of the attributes of ownership of the land and also of the building . . ."); *Williams v. Hylan*, 126 Misc. 807, 811, 215 N.Y.S. 101, 106 (N.Y. Sup. Ct. 1926) (suggesting that "the grant of a long-term lease, perhaps for 99 years" "might be tantamount to an actual sale").

That the July 2001 transaction were net leases rather than a sale does not change the fact that the transfer price reflects the market's valuation of WTCP's property interest. The legal principle here is that a recent transfer price offers the best evidence of fair market value, regardless of whether the transfer is a sale or a 99 year lease, since the transfer reflects a fair market valuation of the interest at issue, untainted by litigation interests arising after the fact. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("[M]arket price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses."); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) ("When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value at the time of breach-not the lost profits that the asset could have produced in the future."); *Iridium IP LLC v. Motorola, Inc.*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("[P]ublic markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view.").

        **c.**      **WTCP's arguments based on the alleged public purpose of the WTC are unavailing.**

Unable to raise a genuine issue, much less demonstrate that WTC 1, 2, 4, and 5 had no determinable market value, WTCP resorts to arguing that the buildings were specialty properties because they served a public purpose. The entire premise of WTCP's argument is groundless.

WTCP's argument that WTC 1, 2, 4, and 5 are specialty properties relies heavily on their history as part of a unified complex—including both public-use transportation elements and commercial elements—that WTCP contends was intended to serve a critical role in the revitalization of downtown Manhattan in the 1970s. But WTCP had nothing to do with any such public interest served by the complex: WTCP acquired its net lease interest, which is the only property interest at issue in this Motion, in July 2001 in order to serve its own commercial purposes. As WTCP concedes, "Unlike the Port Authority, WTCP is in the commercial real estate business." *See* WTCP Pls.' Mem. of Law at 9 (citing Levy Decl. ¶ 3). And WTC 1, 2, 4, and 5 were commercial office towers that WTCP leased for profit to primarily commercial tenants, not public transportation sites. As the First Department has held, transacting with a public entity does not transform property leased for commercial gain into a specialty. *See In re Poe Ctr.*, 250 A.D.2d 304, 308, 680 N.Y.S.2d 533, 536 (1st Dep't 1998) (rejecting claim that property leased to the Board of Education and renovated for use by Lehman College was a specialty because "claimant is not the Board of Education and has *not* been placed in the position of replacing the school but rather has used the property solely for commercial ends. . . .

property designed or used primarily for commercial ends may not merit specialty treatment" (emphasis in original)).

Moreover, WTC 1, 2, 4, and 5 were not part of a unified complex once they came under WTCP's control as a result of the net leases.  One of the primary rationales for the July 2001 transaction was to sever the connection between the public use transportation hubs, which remained under the Port Authority's control, and the commercial aspects of the World Trade Center complex.  Statements by the key players at the time that WTCP acquired its net leasehold interest in WTC 1, 2, 4, and 5 make clear that the purpose of the transaction was to separate those office towers from the public-use space that remained under the Port Authority's control and effectively treat them as ordinary commercial property—the very opposite of a specialty.

Although WTCP objects to the term "privatization," the term is not a litigation invention of the Aviation Defendants.  It was the term used by Governor Pataki to accurately describe the net lease transaction at the time the deal was announced.  "This is the largest real estate transaction in New York City history, and one of the largest privatizations ever of a government asset," New York Gov. George E. Pataki said in a statement.  "This agreement allows the private sector to bring its expertise to managing this landmark, and it frees Port Authority resources for improvements in airports, tunnels and bridges, and other parts of the region's transportation network."  Ex. DD, Ryan McKaig, *On Top of the World*, Bond Buyer, Apr. 30, 2001 at 41.  Governor Pataki explained, "When I came into office in 1995, the Port Authority had hotels, shopping malls, industrial parks and we asked why…We have worked hard to put those

developments in the hands of the private sector experts who pay taxes.  And today the Port Authority returns to the core mission of dealing with transportation."  Ex. EE, Ronald Smothers, *Leasing of Trade Center May Help Transit Projects, Pataki Says*, N.Y. Times, July 25, 2001, at 7 (quoting Gov. Pataki).  The public and transportation elements of the World Trade Center are not at issue in this Motion, which addresses only claims relating to the destruction of WTC 1, 2, 4, and 5.

> **d.**     **WTCP's arguments based on the buildings' alleged landmark status are unavailing.**

WTCP's remaining arguments boil down to a contention that because the World Trade Center was a well-known landmark, it constitutes a specialty property.  But courts have rejected an attempt to draw a parallel between a property's alleged landmark status and its use; to qualify as a specialty, property must have, and be designed and configured specially for, a unique use, not simply a landmark status.  In *Heidorf v. Town of Northumberland*, the district court rejected plaintiff's argument that an old church building that he planned to convert to a museum was a specialty based upon a "strained argument [that] continues to miss the point that the Church's *status* as an historic building is not, in itself, a 'use.'"  985 F. Supp. 250, 262 (N.D.N.Y. 1997) (emphasis in original). The court therefore disallowed any testimony about the replacement costs of the building.

Moreover, to the extent there was any iconic value to the buildings that inured to the lessee, WTCP and the other bidders who participated in the auction necessarily factored that value into their bids.  By WTCP's reasoning, much of Manhattan's real estate – *e.g.*, the Chrysler Building, the Empire State Building, Trump Tower, the Plaza

Hotel – would have no determinable value because of its "special" historical, cultural or economic significance. If there was economic value to the buildings' recognizability and tourist appeal, that value would be reflected in the net present value of the anticipated rentals. WTCP has adduced no evidence that the fair market value of WTC 1, 2, 4, and 5 fails to take account of any value conferred by the buildings' prominence. *See, e.g.,* Ex. HH to the Barry Decl. II, Lloyd Goldman Dep. (majority investor) (Vol. 2) at 465:12-466:17 ("There are certain properties that people are willing to pay more for to say that they owned, and they are willing to sacrifice return for pride . . . [and that he considered doing so in this instance] to some degree, although the returns were still higher than what most people thought that a property like this should sell for.").

For all these reasons, it is clear that WTC 1, 2, 4, and 5 were not specialty properties under New York law. As commercial office towers, they were subject to the general rule applicable under *Fisher v. Qualico*. Consequently, WTCP is limited to recovering the buildings' fair market value, if that value is less than their replacement costs.

### 3. WTCP's reliance on its "obligations" to rebuild offers no basis to alter the legal rules of tort damages.

WTCP's secondary argument in favor of its entitlement to replacement costs in excess of fair market value is that the higher measure of damages is justified in light of its purported obligation—whether moral or legal—to rebuild WTC 1, 2, 4, and 5. Strikingly, WTCP fails to cite a single case in support of the special exception it claims. There is simply no doctrinal basis for awarding WTCP, a sophisticated, for profit-entity

engaged in commercial real estate, damages beyond those that would be available to other commercial property owners or homeowners.

Anticipating that WTCP might attempt to frame its argument as a claim for consequential damages under the net leases, the Aviation Defendants demonstrated in their opening Memorandum that any such argument could not be sustained. *See* Aviation Defs.' Mem. of Law at 18-24. WTCP did not contest, much less rebut, the Aviation Defendants' legal arguments and authorities. Instead, WTCP falls back on arguments that have no basis in any recognizable New York caselaw. WTCP argues, without any precedent, that the terms of its leases and the public interest in restoration of the World Trade Center site justify its claim for damages many billions of dollars exceeding the usual and proper legal measure.

While the September 11 attacks were unprecedented and unique, the community's and property owner's desire to rebuild the destroyed property surely is not. Mr. Fisher apparently desired to rebuild his family home, and his community probably preferred that he do so, but his damages were limited to the lesser of fair market value or replacement cost. *See Fisher*, 98 N.Y.2d at 539-40, 749 N.Y.S.2d at 471.

WTCP misconstrues the Aviation Defendants' argument and suggests that the Aviation Defendants have urged that WTCP not rebuild the World Trade Center or made a poor economic choice by doing so. [6] The Aviation Defendants do not contend that

---

[6]    In response, WTCP argued that it would lose its $500 million up-front payment if it were to forego rebuilding; it also complains that it has incurred $1.2 billion in ongoing lease payments. But both of those components are part of the $2.8 billion fair market value and are amply covered by the $4.1 billion in insurance recoveries

WTCP necessarily made a poor economic choice in determining to work with the Port Authority and rebuild the site, just that in doing so, WTCP did not and could not increase the damages recoverable from the Aviation Defendants.

The decision to build a new complex on the site at the World Trade Center is a complicated one, entailing many policy considerations, some of which may point in opposing directions (the desire for healing versus concerns for security at the site, for example). WTCP asserts that many political, social, and economic benefits will flow from doing so, and it may well be correct. Neither the Aviation Defendants nor the Court need weigh in on that decision, however. What is not complicated is the question of whether WTCP can rebuild *at the Aviation Defendants' expense*, and that is the only question concerning rebuilding put before the Court by this Motion. The answer to that question is clear: not a single case under New York law provides that WTCP can recover the greater, rather than the lesser, of fair market value or replacement costs for property that is demonstrably not a specialty.

The lease terms on which WTCP places such heavy reliance are not so unusual as to warrant a departure from the century-old law of damages. In a standard long-term lease, the tenant bears the risk of casualty, including complete destruction, of the improvements on the land. *See* Stuart M. Saft, *Commercial Real Estate Leasing* § 22:4 (West 2d ed. 2008) ("Ground leases usually require the tenant to restore the

---

that WTCP has already received. They are not additional or supplemental damages to WTCP. WTCP also will not incur the costs of operating the buildings that it would have, had the buildings not been destroyed.

improvements after a casualty or condemnation."); Ann Peldo Cargile, *Digging into Ground Leases*, 20 APR Prob. & Prop. 42 (March/April 2006) ("In a ground lease, the tenant bears the brunt of the risk of a casualty to the improvements, even though the landlord retains a reversionary interest in the improvements that grows in value as the ground lease nears expiration."). Indeed, the obligation to rebuild in WTCP's lease with the Port Authority is quite similar to sample clauses for long-term leases contained in form treatises.[7]

---

[7]     The treatise *Real Estate Transactions: Structure and Analysis*, provides a rebuilding clause that reads:

> Should the whole or any part or parts of the building(s) or improvements then on the Demised Premises be partially or wholly damaged or destroyed by fire or other insured casualty after the commencement of the term of this Lease, such destruction or damage shall not operate to terminate this Lease, but this Lease shall continue in full force and effect, except as otherwise provided in this Lease. Tenant, at its own cost and expense, agrees to restore, rebuild, or repair said building(s) and improvements to a condition at least equal in value to the value immediately prior to a loss caused by fire or other insured casualty . . . .

Alvin L. Arnold, *Real Estate Transactions: Structure and Analysis*, App. 12.1 (West 2008).

Section 15.1 of the WTCP leases reads:

> If the Premises (other than the Appurtenances) or any structures, improvements, fixtures and equipment, furnishings and physical property located thereon, or any part thereof, shall be damaged or destroyed by fire, the elements, the public enemy or other casualty, or by reason of any cause whatsoever and whether partial or total, the Lessee, at its sole cost and expense, and whether or not such damage or destruction is covered by insurance proceeds sufficient for the purpose, shall remove all debris resulting from such damage or destruction, and shall rebuild, restore, repair and replace the Premises (other than the Appurtenances) and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, to the extent feasible, prudent and commercially reasonable, with the plans and specifications for the same as they existed prior to such damage or destruction . . . .

The effect of the provision is to make the net lessee more like a fee owner and to recognize the near exclusive control the lessee enjoys over the property during the term of the lease—not to make the net lessee different from the fee owner such that the net lessee should be entitled to recover a far higher measure of damages than the owner would be able to collect.  As the Aviation Defendants pointed out in their opening Memorandum, it is indisputable that before the Port Authority leased WTC 1, 2, 4, and 5 to WTCP, the *Fisher* lesser-of-two rule would have applied to any claim arising from their destruction.  *See* Aviation Defs. Mem. Of Law at 21.  Even if the Port Authority wanted to rebuild—and even if the very same social, political, and economic benefits that WTCP asserts will flow from the current rebuilding project also would have resulted—it would not have been able to collect damages in excess of fair market value to fund its rebuilding efforts.  By choosing to net-lease the buildings, the Port Authority could not have increased the damages recoverable in a tort action; WTCP and the Port Authority cannot increase their aggregate recoverable damages by dividing the property interests between themselves.  Nor is there any conceivable reason why New York law should so dramatically favor net lessees of commercial property over residential homeowners or owners of commercial fee simple interests for purposes of calculating tort damages.  In its opposition, WTCP made no response to these arguments at all.

WTCP undertook the rebuilding project because it saw advantages to doing so.  It was an investment choice, and the return on that investment is a net lease interest in a brand new, state of the art complex, not enhanced damages in this litigation.  Indeed, the lease obligation on which WTCP relies requires only the replacement of the buildings as

they existed at the time of destruction.  But as WTCP details in the affidavits in support of its opposition, WTCP has made a deliberate and considered decision not to rebuild WTC 1, 2, 4, and 5 as they previously existed.  Instead, WTCP has employed world-renowned architects and designers with the intent of creating something newer, better, and perhaps more inspiring, but undoubtedly more expensive, on the site of the destroyed buildings.  *See* WTCP Pls.' Mem. of Law at 15-16 (noting that the Freedom Tower, as well as Towers 2, 3 and 4 are being designed by "world-renowned" architects and that when completed, the Freedom Tower will be the second tallest building in the United States).  WTCP's choice to spend far more money than the value of the destroyed buildings is an investment decision, not a source of higher damages.  WTCP's conduct since September 11, 2001 strongly suggests that WTCP regards what it now likes to term an "obligation" as a highly valuable benefit or right.  *See, e.g.*, Ex. FF, Anthony Cracchiolo Dep. at 126-27 (Port Authority Corporate Designee) ("I presented to the commissioners of the subcommittee, which included directors of the LMDC . . . what Mr. Silverstein and Westfield America were entitled to rebuild under the leases"); *Id.* at 78-79 (Port Authority Corporate Designee referring to the potential requirement to "compensate Silverstein if he could not redevelop all that he is entitled to redevelop . . . his 11 or 12 million square feet").

**B.      WTCP cannot recover lost profits in addition to fair market value.**

In addition to its claim for replacement costs, WTCP is claiming $3.9 billion in lost profits.  The claimed lost profits consist of the rents from subtenants and/or return on its management activities that WTCP contends it would have received absent the

buildings' collapse until the replacement buildings are completed (projected by WTCP to be 2014). The Aviation Defendants established in their opening Memorandum that under New York law, the owner of destroyed property cannot recover lost profits in addition to fair market value. The Aviation Defendants cited recent New York appellate authority, *Sandoro v. Harlem-Genesee Market & Nursery, Inc.*, which analyzed the issue as follows:

> [G]enerally when a building is damaged the owner is entitled to damages for loss of rent during such time as may reasonably be required to make necessary repairs. **However, where a building is destroyed, the usual measure of damages is the difference between the market value of the building before and after the injury** (see *36 N.Y. Jur 2d, Damages,* § 76, p. 137; 22 *Am. Jur 2d, Damages* § 155, p. 225). **Since damages measured by market value takes rental value into account, where a building is totally destroyed there is no separate allowance for damages for loss of rent.**

105 A.D.2d 1103, 1104, 482 N.Y.S.2d 165, 167 (4th Dep't 1984) (emphasis added).

The Aviation Defendants additionally cited very recent authority from the Second Circuit and the Southern District of New York (applying New York law) further explaining that because market value already includes expected future profits, it would be duplicative to award lost profits in addition to market value. *See Schonfeld*, 218 F.3d at 176 (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) and 1 Dan B. Dobbs, *Law of Remedies* § 3.3(7)); *Bessemer Trust Co. v. Branin,* 544 F. Supp.2d 385, 390 (S.D.N.Y. 2008) (citing *Schonfeld*, 218 F.3d at 176, and *Sharma*, 916 F.2d at 826).

WTCP's response to these authorities was:  silence.  WTCP made no attempt in its opposition to distinguish or explain these recent, binding and very pertinent authorities.  Instead, WTCP relies on two very old cases, both of which address *temporary* disruptions in access to property, for the proposition that WTCP should be permitted to recover lost profits on top of fair market value.  *See Bly v. Edison Elec. Illuminating Co. of N.Y.*, 111 A.D. 170, 97 N.Y.S. 592 (1st Dep't 1906), *aff'd,* 188 N.Y. 582 (1907); *Bates v. Holbrook*, 89 A.D. 548, 85 N.Y.S. 673 (1st Dep't 1904).  Neither of these cases addresses whether a property owner can recover both fair market value for destruction of property and lost profits.  Rather, in both cases, the fair market value of the property had not been lost because the property had survived intact.  The courts ruled merely that the operator of a business located at the site was entitled to lost profits for the time that his customers were unable to access the business.  This is precisely the situation distinguished by *Sandoro*:  where a property is partially damaged (or temporarily unavailable for its intended use), the owner is entitled to lost profits.  But where property is completely destroyed, the owner is entitled to an award of the lost market value of the property and is not separately entitled to an additional award of lost profits because fair market value necessarily incorporates the expected profits.  *See also* NY PJI 2:311 cmt at 1573.  ("In case of total destruction of the property, the measure of damages is its reasonable market value just prior to its destruction.") (citing *Gass v. Agate Ice Cream, Inc.*, 264 N.Y. 141 (1934)).

WTCP was not operating a separate business—a restaurant like Windows on the World or a law firm or brokerage house—in WTC 1, 2, 4, and 5.  Rather, it was

subleasing the buildings and its expectations of profits from the subleases factored directly into the market value that it paid for its net leases.  Professor Dan B. Dobbs, who is cited by the Second Circuit in *Schonfeld* and hailed as the author of an "authoritative treatise" on damages by WTCP (WTCP Pls.' Mem. of Law at 46), explains why an award of lost profits on top of fair market value constitutes a double recovery, by using the analogy of a racehorse.  He notes that "Duplication can also occur if the plaintiff is allowed to recover both general damages and lost profits for the same underlying loss," and succinctly explains:

> The market measure attempts to give the plaintiff damages based on what other buyers would pay for the horse.  That measure reflects the possibility that the plaintiff could buy the horse, then turn around and sell it at market price.  However, market damages also reflect what buyers generally think about the horse's future prospects.  The market price would be very low indeed if the potential buyers thought the horse was suffering from a serious disease, or had no prospects for winning a race.  The market price would be much higher if buyers thought the horse was likely to win the Triple Crown and earn millions when put to stud.  This means the market value is some kind of estimate about future earnings.

> When you give the plaintiff a recovery calculated by using market value figures, you have given a recovery that is based on future profits as estimated by potential buyers who form the 'market.'  If you then give an award of future profits as estimated by the jury, you are giving part of the profits twice.  It is true that the yardsticks are different because one estimate is made by looking at the market and one made by looking at individual forecasts of hoped-for profit.  It is also true that the people doing the measurement are different; the buyers' estimates and the jury's estimates may be quite different.  You might for these reasons prefer

29

> one estimate over another, but you can't give the plaintiff
> both without duplication.

1 Dan B. Dobbs, *Law of Remedies* § 3.3(7), at 312-313.

A further useful analogy may be drawn to a farm.  The purchaser of a farm may hope that the combination of the land and the efforts he expects to expend will yield profits for many future years.  But if the farm is flooded and becomes unusable, in whole or in part, what the farmer is entitled to recover is the lost market value of the farm, not the profits he hoped to collect from harvests never reaped from seeds never sown.  *See Hartshorn,* 135 N.Y. at 122.

Moreover, the undisputed record evidence reveals that WTCP, as well as the other bidders, made precisely the calculations the courts and Professor Dobbs expect.  WTCP projected the future income stream that it expected to receive and paid a price for the net leases that reflected its anticipation of receiving that revenue.  Statement of Undisputed Facts ("SUF") ¶ 17; Ex. A to the Barry Decl. I, Minutes of the Bd. of Comm'rs of the Port Auth. at 164-65.  Once WTCP is awarded the fair market value of the buildings as of September 11, 2001, it will have been returned to the position it was in before it made the investment in these buildings.  Put another way, an award of fair market value gives WTCP what a third party would have paid it for the right to receive the projected income stream.  To award WTCP the lost profits it expected to earn from the investment in addition to fair market value would result in a windfall to WTCP.  In effect, WTCP would earn the return even though its principal has been returned and it was excused

from investing the managerial efforts that it hoped would produce the profits from that principal.

WTCP dwells at length on the concept that there are two interests at issue in WTC 1, 2, 4, and 5, one belonging to WTCP and one to the Port Authority. WTCP Pls.' Mem. of Law at 27-29, 50-54. In WTCP's view, that means that WTCP is entitled to sue for the Port Authority's interest as the owner of the buildings *and* for its own interest in earning rental profits. For 99 years, however, WTCP enjoyed the exclusive rights to the property, because the Port Authority had effectively transferred all of its ownership interest to WTCP for that time period. It is that status that entitles WTCP to sue for the lost market value of the buildings, which (as discussed above) includes the lost rental profits. While it is true that the Port Authority has a reversionary interest under the net leases that would vest after year 99, that interest is simply not at issue in this Motion. There has been no allegation – and, of course, no evidence – that the Port Authority's reversionary interest in WTC 1, 2, 4, and 5 was damaged by the September 11 attacks. At the end of the 99-year leases absent the attacks, the Port Authority would have owned a parcel of land encumbered by four 127-year-old buildings. There is no evidence that what would have reverted to the Port Authority under that scenario is more valuable than what its reversionary interest will now encompass, or even more valuable than vacant land.

31

**C.**     **The Aviation Defendants have shifted the burden to WTCP to establish that the fair market value of WTC 1, 2, 4, and 5 is more than $2.8 billion and WTCP has failed to come forward with any probative evidence of a higher valuation.**

As the Aviation Defendants established in their opening Memorandum, courts have universally recognized that "a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." *Schonfeld,* 218 F.3d at 178-79 (citing, among other cases, *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 741-42 (1997); *Silverman v. Comm'r*, 538 F.2d 927, 932 n.7 (2d Cir. 1976); *Grill v. United States*, 303 F.2d 922, 927 (Ct. Cl. 1962)).  For that reason, the price agreed upon in an arm's-length transaction should determine the value of the property, unless explained away as abnormal in some fashion. *Bessemer Trust Co.*, 544 F. Supp. 2d at 391 ("Since an arms-length transaction is the best evidence of fair market value, the Court finds that the actual purchase price is the most appropriate reflection of Brundage's value." (internal citations omitted)).  WTCP appears to concede this point by citing *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 387 (2d Cir. 2006), which recognizes that "[A]n arm's length transaction – the so-called "willing buyer-willing seller" test  – is the best evidence of (and often the easiest method to determine) fair market value." WTCP Pls.' Mem. of Law at 59.

Once a party has produced evidence of a recent sale price, the burden is shifted to the opposing party to demonstrate special circumstances that would negate the relevance of the prior arm's-length purchase price. *Schonfeld*, 218 F.3d at 179.  That burden-shifting parallels the parties' respective burdens on summary judgment.  Under Rule 56,

once the moving party has demonstrated that there is no genuine issue of material fact upon a particular point, the onus shifts to the non-moving party to "provide 'concrete particulars' showing that a trial is needed." *See Lewis v. Babcock Indus., Inc.*, No. 88 Civ. 1120, 1992 U.S. Dist. LEXIS 8357, at *9 (S.D.N.Y. June 8, 1992). As this Court has explained:

> Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, *Harlen Assocs. v. Village of Mineola,* 273 F.3d 494, 498 (2d Cir. 2001), the non-moving party must raise more than a "metaphysical doubt" as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L.Ed. 2d 538, 106 S.Ct. 1348 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs.*, 273 F.3d at 499.

*In re Sept. 11 Litig.*, 265 F. Supp. 2d 208, 209-10 (S.D.N.Y. 2003) (dismissing the City of Portland from the litigation); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) ("Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact. The mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment." (internal quotations and citations omitted)).

Here, the Aviation Defendants have demonstrated that there is no dispute of material fact:  WTCP acquired its interest in WTC 1, 2, 4, and 5 via a net lease transaction that closed just 55 days before the attacks. The purchase price was the result of a highly competitive bidding process involving some of the most successful commercial real estate investors in the world. WTCP is itself a highly sophisticated real

estate investor.  For its part, the Port Authority retained multiple advisors, including J.P. Morgan, to review the terms of the transaction on its behalf.  And J.P. Morgan confirmed that the financial terms of the transaction were fair to the Port Authority.  The Aviation Defendants have more than made out a prima facie case that the fair market value of WTC 1, 2, 4, and 5 at the time of their destruction was no more than $2.8 billion.  WTCP has offered no alternative: if the $2.8 billion figure was not the fair market value, what was it?  If J.P. Morgan was not opining that the price represented fair market value, what was its opinion?  WTCP does not, and cannot, answer those questions.

To defeat summary judgment, WTCP bears the burden of presenting admissible evidence sufficient to raise a triable issue about whether the valuation of $2.8 billion arrived at after a competitive auction and sophisticated arm's-length negotiation—that culminated in a deal that closed just 55 days before September 11, 2001—is not the controlling measure of market value.  WTCP has come forward with zero admissible evidence of an alternative higher market value for WTC 1, 2, 4, and 5, let alone an alternative market value that exceeds the $4.1 billion in insurance recoveries that WTCP has already collected.  Instead, WTCP has chosen to rely on precisely the type of speculation and conjecture that courts have found insufficient to defeat summary judgment.[8]

---

[8]  WTCP also has raised hair-splitting objections to the facts as presented by the Aviation Defendants.  For example, WTCP objects to the characterization of the auction as a "worldwide" auction.  According to WTCP, "worldwide" means "extending through the entire world" while the appraisal that the Aviation Defendants cite merely states that requests for bids were sent to potential investors

WTCP's proposed expert argues that the value of the World Trade Center cannot be assessed using standard market methodologies. *See* Declaration of Sheldon Gottlieb ("Gottlieb Decl.") ¶¶ 19-26. Notably, he fails to offer any alternative valuation reached via any other methodology. Moreover, his argument ignores the undisputed fact that sophisticated commercial actors had just used a standard market methodology to arrive at the $2.8 billion price for a transaction that closed just 55 days before September 11, 2001. Not only *could* the property be valued using standard market methodologies, it just *had* been so valued.

WTCP also makes the incongruous argument that the $2.8 billion figure represents the value of the net leases to the Port Authority, but not to WTCP. *See* WTCP Pls.' Mem. of Law at 58; WTCP's Counter-Statement of Material Facts at 17. This argument fundamentally misconceives what market value is: the price agreed upon by the buyer and the seller is the market value of the property for all parties, regardless of what side of the transaction they are on. In arriving at a mutually acceptable price, the buyer and seller have converged on a value. If a purchaser buys a share of IBM stock for $100, that is not merely the value of the stock to the seller. It is also the value to the purchaser. And if an art aficionado buys a Rembrandt, the price he pays represents the Rembrandt's value to the seller as well as to him.

WTCP argues that the $2.8 billion valuation fails to take account of non-monetary terms of the leases. WTCP Pls.' Mem. of Law at 58. The only specific obligation WTCP

---

"both domestically and internationally." WTCP's Counter Statement of Material Facts at 7-8.

cites is the obligation to rebuild.  But the obligation to rebuild was not lost upon the

destruction of the buildings; to the contrary, the obligation only took effect at that point.

An award of fair market value therefore need not be increased to compensate WTCP

(really the Port Authority, the beneficiary of the obligation to rebuild) for what it has not

lost.[9]

In addition to these general arguments, WTCP raises three specific arguments as

to the fair market value of WTC 1, 2, 4, and 5:

- First, WTCP posits that the Port Authority was not a profit maximizing entity and
therefore the price paid by WTCP may be somehow an inadequate reflection of
the buildings' market value.  It offers no evidence in support of this contention,
relying exclusively on a conclusory statement in an expert declaration.  WTCP
Pls.'s Mem. of Law at 59; Declaration of Kerry D. Vandell ¶ 11.  But the Port
Authority did not give away the buildings to a worthy recipient so that they could
be used for a charitable purpose.  The Port Authority conducted an expensive,
thorough, competitive and yes, worldwide auction seeking the highest qualified
bidder among sophisticated commercial real estate developers.  *See* Ex.Y to the
Barry Decl. II, Gargano Dep. at 54:21-57:10 (agreeing that "purpose of the
competitive bidding process was to obtain the maximum value for the Port
Authority."); *see also* Ex. A to the Barry Decl. I, Minutes of the Bd. of Comm'rs
of the Port Auth. at 161 (Port Authority Board Minutes authorizing the July 2001
transaction describing consideration of "three options for maximizing the value of
the WTC to the Port.").  J.P. Morgan determined that the price WTCP paid was
fair to the Port Authority.  WTCP has presented no evidence that its winning bid
undervalued the fair market value of WTC 1, 2, 4, and 5.

- Second, WTCP speculates that the $2.8 billion price may not reflect fair market
value—again based on nothing more than conclusory statements in an expert
affidavit—because a different discount rate might have been chosen to discount

---

[9]   Other non-monetary terms in the net leases were rendered moot by the destruction of
the buildings.  For example, the obligation to restrict signage becomes academic
when the property to which the signs would be affixed is gone.  (*See* Gottlieb Decl. ¶
17(b)).

the value of the future rental payments, which would yield a different total. WTCP Pls.'s Mem. of Law at 59; Gottlieb Decl. ¶15.   WTCP fails to come forward with any evidence (including expert evidence) of a specific discount rate that should apply or any calculation of how that discount rate would change the market value of WTC 1, 2, 4, and 5.   The discount rate that yielded the $2.8 billion total was (1) recommended by the Port Authority's advisors; (2) accepted by the Port Authority's Board; and (3) accepted by WTCP and used in its financial statements to explain the value of the net leases at the time of the transaction to WTCP's own investors. *See Schonfeld* 218 F.3d at 176 ("When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value at the time of the breach -- not the lost profits that the asset could have produced in the future."); SUF ¶ 13; Ex. B to the Barry Decl. I, World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation; SUF ¶ 12; Ex. A to the Barry Decl. I, Minutes of the Bd. of Comm'rs of the Port Auth. (Apr. 26, 2001); SUF ¶ 15; Ex. P to the Barry Decl. I, Silverstein Properties, Inc., World Trade Center Office Complex Brochure at 1; SUF ¶ 17; Ex. W to the Barry Decl. I, World Trade Center Properties LLC and Subsidiaries Consolidated Financial Statements as of December 31, 2001 at 2-3 (Apr. 22, 2002).   WTCP has offered no basis to discard the discount rate selected by the parties at the time to value the transaction in favor of an unspecified alternative discount rate for which no rationale is offered.

- Third, WTCP conjectures that the market value of WTC 1, 2, 4, and 5 might have changed between when the deal was negotiated (April 2001) and closed (July 2001) and when the buildings were destroyed (September 11, 2001). But WTCP offers no evidence that the market value *did* increase over that time, let alone any evidence that it increased sufficiently to bring the $2.8 billion market value above the $4.1 billon that WTCP has received in insurance payments.   To the contrary, WTCP's proffered expert asserts that there were no comparable transactions during the interval after the closing but before September 11, 2001. *See* Gottlieb Decl. ¶ 25.   WTCP's own evidence, if credited, therefore establishes that the market did not change after WTCP acquired the net leases.

WTCP launched this litigation over four years ago.   Over an even longer period, it has been engaged in highly contentious litigation with its insurers affecting many of the same valuation issues.   It has not submitted a Rule 56(f) affidavit because it simply could not:   WTCP has in its possession all of the information from which the market value of

WTC 1, 2, 4, and 5 could be determined.  Its failure to come forward with any evidence that the $2.8 billion figure fails to capture the fair market value of WTC 1, 2, 4, and 5 constitutes an implicit admission and fully warrants a grant of summary judgment.

As discussed below, WTCP raises several procedural arguments against the application of the offset for collateral sources contained in CPLR 4545(c).  Even if they were meritorious—and they are not—those arguments offer no basis for denying summary judgment dismissing WTCP's claims for replacement costs in excess of fair market value and for lost rental profits.  Offsets aside, the record warrants issuance of partial summary judgment that the fair market value of WTC 1, 2, 4, and 5 as of September 11, 2001 was no greater than $2.8 billion.

### D.    WTCP's efforts to delay the day of reckoning by relying on procedural aspects of CPLR 4545(c) are unavailing.

WTCP acknowledges that CPLR 4545(c) requires that its damages be offset by the amounts of its insurance recoveries.  The crux of its arguments is that while the offset must be made, it should not be made *now*.  WTCP offers three arguments in support of its play for more time:

- WTCP argues that CPLR 4545(c) requires that any offset be applied only after a final award of damages has been made, precluding pretrial disposition of the issue;

- WTCP argues that its insurance recoveries encompassed multiple claims and the Aviation Defendants have failed to identify what portions of the insurance payments were allocated to the destruction of the buildings; and

- WTCP argues that the Aviation Defendants have not come forward with admissible evidence of the amount of its insurance payments, although it does not

dispute that the $4.1 billion figure contained in the charts prepared by its counsel is accurate.

WTCP considers these arguments so central that it made them Point I of its opposition. But none of these arguments presents any obstacle to granting summary judgment now.

WTCP's first contention confuses the substantive aspects of CPLR 4545(c) with the statute's procedural elements. Under the Air Transportation Safety and System Stabilization Act ("ATSSA"), the substantive law of decision in these cases is derived from New York law—that is, a federalized version of New York law applies to the exclusive federal cause of action created by ATSSSA. But the procedural rules in the litigation are supplied by the Federal Rules of Civil Procedure, as the Court and the parties have always recognized. *See Hanna v. Plumer*, 380 U.S. 460, 473 (1965) (Congress has the "long-recognized power . . . to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules"); *see also In re Sept. 11 Litig.*, 236 F.R.D. 174, 175 (S.D.N.Y. 2006) (under ATSSSA, "[a]n inherent aspect of this jurisdictional grant is the right and obligation to regulate pre-trial and trial procedures"). New York law therefore determines the Aviation Defendants' substantive entitlement to an offset but federal procedure regulates when the offset can be calculated.

WTCP's argument that the CPLR 4545(c) offset is meant to be applied after a trial misses the point. None of the cases cited by WTCP addresses the question of the availability of summary judgment where a defendant has established the maximum

legally recoverable damages on motion. This case happens to present a rare situation where plaintiffs have obtained billions in insurance recoveries but the fair market value of the property at issue was conclusively established by a very recent sale. Under those circumstances, the maximum legally recoverable damages become the putative award in applying the offset. *See Maier-Schule GMC, Inc. vs. Gen. Motors Corp.*, 154 F.R.D. 47, 52 (W.D.N.Y. 1994) ("Where the non-moving party cannot show that material issues regarding damages exist, a summary judgment proceeding is the functional equivalent of a trial. Under such circumstances a full-scale trial [on the issue of monetary damages] is neither necessary or helpful." (quotation omitted)).

There is nothing unusual about summary judgment resolving an issue that would otherwise be determined at or after trial. Federal Rule of Civil Procedure 56 provides a mechanism that results in the accelerated resolution of issues that would otherwise be left for a trial. As long as the Aviation Defendants have demonstrated that they have met the requirements of Rule 56, the fact that New York law ordinarily contemplates the application of the collateral source offset after a trial should not bar the grant of summary judgment.

Moreover, under CPLR 4545(c), the application of the collateral source offset is a question for the Court, rather than a jury, to decide. *See Fisher,* 98 N.Y.2d at 538, 749 N.Y.S.2d at 470 (noting that CPLR 4545(c) "*instructs the court* to reduce the amount of damages award by the collateral source payment" (emphasis added)); *Oden v. Chemung County Indus. Dev. Agency*, 87 N.Y.2d 81, 83-88, 637 N.Y.S.2d 670, 671 (1995) ("CPLR 4545(c) *authorizes the court* . . . to reduce the amount of the plaintiff's award if it finds

that any element of the economic loss encompassed in the award was or will be replaced, in whole or in part, from a collateral source." (emphasis added)).  This issue is arguably therefore even more appropriate than most for resolution on a summary judgment motion, because there is no need to fear that the Court may usurp a question that is properly the province of a jury.  Thus, even if the Court concludes that there are factual issues regarding the application of CPLR 4545(c), there is still no need for a full-blown trial. Instead, the Court can hold a hearing on the limited issues to be resolved.

Nor would any legitimate interest be served by forcing the Aviation Defendants to undertake costly and time-consuming discovery and a trial on issues and claims that cannot be sustained.  For example, proof of the replacement costs expended on the construction of the new complex at Ground Zero will be incredibly complicated and involve extensive discovery.  But the Aviation Defendants have demonstrated that, as a matter of law, that measure of damages is unavailable here because it exceeds the fair market value of WTC 1, 2, 4, and 5 as of September 11, 2001.

WTCP asserts, that pursuant to *Jenkins v. Ettinger*, it has a right to prove replacement costs at trial and does not have to limit its proof to the fair market value of the destroyed buildings.  55 N.Y.2d 35, 39, 447 N.Y.S.2d 696, 698 (1982).  But where, as here, the Aviation Defendants have proven that there is no dispute of material fact as to the fair market value of the property, any higher replacement cost value becomes unrecoverable and thus, legally irrelevant.  *See Fisher*, 98 N.Y.2d at 539-40, 749 N.Y.S.2d at 470-71.

41

WTCP's second argument depends on the premise that the Court cannot compare WTCP's damages for the destruction of WTC 1, 2, 4, and 5 to the total of its insurance recoveries for WTC 1, 2, 4, and 5 but must match, item by specific item, each component of its damages claim to the portion of its insurance recovery intended as recompense for that claim. But the law requires no such tedious reconciliation. Instead, as the cases WTCP itself cites make clear, all that is required is that the damages at issue and the insurance recoveries apply to the same category of loss.

The Second Circuit, interpreting the New York Court of Appeals rule set forth in *Oden*, helpfully explained:

> We conclude that *Oden* does not require USAir to prove a correspondence between the specific disorders on which the jury based its award of lost earnings and the specific disorders on which the SSA based its award of disability benefits. *Oden* requires a correspondence between *categories of loss*: . . . .We conclude that the "category of loss" is lost earnings, and that every dollar of the Social Security disability payments, paid in respect of a period for which the jury awarded lost earnings, is reimbursement to Turnbull for the same category of loss.

*Turnbull v. U.S. Air, Inc.*, 133 F.3d 184, 187 (2d Cir. 1998) (emphasis in original).

The damages that WTCP seeks to recover fall within the same "category of loss" as the insurance payments WTCP has recovered. WTCP advances two main claims here: a claim for replacement costs (amounting to $8.4 billion) and a claim for lost profits (amounting to $3.9 billion). WTCP does not deny that its insurance coverage extends to replacement costs and lost profits from the interruption of its business. WTCP Pls.' Mem. of Law at 25. Instead, it argues that its insurance coverage is not limited to the fair

market value of WTC 1, 2, 4, and 5. Under *Fisher*, it is clear that replacement cost insurance payments are to be offset against damages calculated on a fair market value theory. 749 N.Y.S.2d at 470-71, 98 N.Y.2d at 539-40. Under *Sandoro*, it is clear that lost profits are included within fair market value and so are embedded in the same loss: the destruction of WTC 1, 2, 4, and 5. 105 A.D.2d at 1104, 482 N.Y.S.2d at 167. Therefore, the *Turnbull* requirement that the insurance coverage and damages relate to the same category of loss has been met.

WTCP also argues that the Aviation Defendants have failed to show what portion of the insurance proceeds related to claims for the destruction of WTC 1, 2, 4, and 5 as opposed to other miscellaneous items, such as the loss of office equipment and personal effects of employees. WTCP Pls.'s Mem. of Law at 25 n.22, 26. There can be no question but that the vast majority of the insurance proceeds provided on WTCP's claims relating to WTC 1, 2, 4, and 5 were intended to recompense WTCP for the loss of the buildings rather than miscellaneous items like computers and office furniture. Moreover, although WTCP asserts in a footnote that it has suffered damages from the loss of these miscellaneous items, it makes no effort to show (1) the value of these incidentals or (2) that the value of these incidentals is so great that it is in any way likely to make up the $1.3 billion dollar gap between the $2.8 billion fair market value of WTC 1, 2, 4, and 5 and the net present value of the $4.1 billion in insurance payments received by WTCP.

WTCP proclaims, "none of the settlement agreements [with WTCP's insurers] allocate any specific dollar amount of the Settlement Payments or insurance proceeds to any specific category of loss." WTCP Pls.'s Mem. of Law at 26 (citing Levy Decl. Exs.

6-11, 13-18).  WTCP thus urges that the Aviation Defendants must show that some portion of the insurance payments are allocated to the loss of WTC 1, 2, 4, and 5 when WTCP itself chose to enter into settlements without any such allocations.  Courts recognize that it makes no sense to put in parties' hands the ability to defeat a collateral offset by failing to allocate the insurance proceeds.  *See Dyond v. Dunn*, 148 A.D.2d 56, 58, 543 N.Y.S.2d 230, 231 (3rd Dep't 1989) ("Allowing plaintiffs to manipulate the characterization of damages would effectively abrogate the lien. . . . [B]y allocating the proceeds of the settlement . . . it appears that plaintiffs have purposely attempted to avoid [the insurerers'] statutory lien." (internal quotations and citations omitted)); *Kozlowski v. Briggs Leasing Corp.*, 96 Misc. 2d 337, 343, 408 N.Y.S.2d 1001, 1004-05 (N.Y. Sup. Ct. 1978) ("By ingeniously (and perhaps disingenuously) characterizing his settlement as compensation for 'pain and suffering' only, petitioner, by clever taxonomy, is attempting to eliminate GEICO's right of subrogation.  The court, finding that the intent of the parties was that the settlement should encompass all items of recoverable damages, including economic loss, cannot allow petitioner to recover the $15,798.44 as fruits of his attempted utilization of descriptive phrases.  To do so would be to hallow semantics over the parties' intent and justice.").  The potential for mischief is particularly pronounced here, where the party resisting application of the collateral source offset entered into the settlements with its insurers while this litigation was pending.

WTCP's final procedural argument has largely been resolved by the Court in its rejection of WTCP's Cross-Motion to Strike Inadmissible Materials in the Aviation Defendants' Motion for Summary Judgment based on CPRL 4545(c).  *See In re*

*September 11 Litig.*, No. 21 MC 101 (AKH) (S.D.N.Y. filed Aug. 28, 2008) (order regulating admissible evidence on motion for summary judgment).  WTCP asserted that the Aviation Defendants should not have been permitted to introduce evidence in the form of charts prepared by WTCP's counsel as to the amount of the insurance proceeds WTCP had received, even though WTCP itself provided the charts and raised no issue as to their accuracy.  (Indeed, while it is possible that the charts omit some insurance payments, it seems highly unlikely that they record non-existent payments.  The charts thus seem to reflect the minimum of total insurance payments WTCP may have received).

WTCP's desire to keep out—at least for a little longer—the evidence of its insurance recoveries is understandable.  The black letter legal principles limiting WTCP's damages to the fair market value of no more than the $2.8 billion that it paid for its net lease interest in WTC 1, 2, 4, and 5 just 55 days before September 11, 2001 leave a yawning gap when compared to the $4.1 billion in insurance payments that WTCP has recovered.

Prejudgment interest, even if it were allowed here, would not close that gap.  As the Aviation Defendants demonstrated in their opening Memorandum:

- Because WTCP's insurance payments, discounted to their value on September 11, 2001, exceed the maximum recoverable damages for its losses, there is no base against which to assess interest. Aviation Defs.' Mem. of Law at 31-32.

- Adding interest and discounting the insurance payments to present value would result in improper double counting. *Id.* at 32.

- Under ATSSSA, the federal rule calling for application of a discretionary interest rate rather than New York State's mandatory nine percent interest rate applies. *Id.* at 33-34.

- At any of the potentially applicable interest or discount rates, WTCP's insurance recoveries still exceed its damages by hundreds of millions of dollars. *Id.* at 31-32; Declaration of Rajiv Gokhale ¶¶ 3-5.

Rather than offering any counter-arguments, WTCP has challenged the admissibility of the Gokhale Declaration (without identifying any inaccuracies in the straightforward mathematical calculations it contains). The Court has rejected that challenge. *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH) (S.D.N.Y. filed Aug. 28, 2008) (order regulating admissible evidence on motion for summary judgment). It is clear that prejudgment interest does not raise WTCP's $2.8 billion in damages to its $4.1 billion in insurance recoveries.

## III.   Conclusion

As the Aviation Defendants set forth in their opening Memorandum, this Motion turns on a "four by four" matrix: the application of four black-letter propositions of New York law to four incontrovertible facts. The four legal propositions are:

A       An owner of destroyed property is restricted to recovering **the lesser of** fair market value as of the date of destruction or the costs of restoring the building to its prior condition.

B       A property damage plaintiff is not permitted to recover lost profits in addition to fair market value, because fair market value already takes into account projected future profits.

**C**     The best evidence of the fair market value of property is a recent sale between a willing and informed seller and buyer.  Proof of a recent sale shifts the burden to the opposing party to demonstrate by compelling, nonspeculative evidence that the fair market value is something other than the value established by the sale.

**D**     Claims for property damage must be reduced by the amount of the claimant's insurance recoveries.

The four incontrovertible facts are:

**A**     As a result of the terrorist attacks of September 11, 2001, WTC 1, 2, 4, and 5 were entirely destroyed.

**B**     WTCP has claimed replacement costs that far exceed the fair market value of the buildings.

**C**     Just 55 days before September 11, WTC 1, 2, 4, and 5 were net leased to WTCP for $2.8 billion as the result of a worldwide competitive auction.

**D**     WTCP has recovered or will receive insurance proceeds of at least $4.1 billion for the destruction of the buildings.

WTCP's insurance recoveries far exceed the fair market value of the destroyed buildings on September 11, 2001, which is the maximum measure of recovery available to it under New York law.  Therefore, as a matter of law, no compensable claim for the destruction of WTC 1, 2, 4, and 5 remains, and the Court should dismiss WTCP's claims as to those four buildings.

Dated: New York, New York
      September 15, 2008

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
      Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, NY 10036
Telephone:  (212) 490-9100
Facsimile:  (212) 370-4453
dbarry@condonlaw.com

*Aviation Defendants' Liaison Counsel*

*Of Counsel*:

| DEBEVOISE & PLIMPTON LLP | PERKINS COIE LLP |
|---|---|
| Roger E. Podesta | Thomas J. McLaughlin |
| Maura K. Monaghan | |
| Tracy Burnett | RICHARDS KIBBE & ORBE LLP |
| Jacob Stahl | Brian S. Fraser |
| | |
| | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
| | Robert A. Atkins |