UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                          :
IN RE SEPTEMBER 11TH LITIGATION            :     **OPINION GRANTING IN PART**
                                                          :     **AND DENYING IN PART**
                                                          :     **MOTION FOR SUMMARY**
                                                          :     **JUDGMENT REGARDING**
                                                          :     **DAMAGES**
                                                          :
                                                          :     21 MC 101 (AKH)
                                                          :
                                                          :
------------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

          In April 2001, the Port Authority of New York and New Jersey, Inc. accepted the

bid of a New York real estate developer, Larry Silverstein, to purchase 99-year net leases to four

of the World Trade Center towers.  In July 2001, the Port Authority executed net leases and

related agreements, and conveyed the four net leaseholds to Towers One, Two, Four and Five to

corporations formed by Silverstein to hold the net leases.  Silverstein paid, and the Port

Authority accepted, consideration valued at $2.805 billion.

          Two months after Silverstein took possession, the towers became rubble,

destroyed by the terrorist-related aircraft crashes of September 11, 2001.  Towers One and Two

were turned into raging infernos and collapsed, bringing down and destroying Tower Four,

Tower Five, and additional buildings and properties in and around the World Trade Center.

Silverstein's company, World Trade Center Properties LLC, and his several holding companies,

1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5

World Trade Center LLC (collectively, "WTCP"), filed suit against American Airlines and

United Airlines alleging that, but for the airlines' negligence, the terrorists would not have

gained entrance into the aircrafts they hijacked and flew into Towers One and Two.  WTCP also

sued other aviation defendants, alleging that, because of their negligence and causation, they too are jointly and severally liable for WTCP's damages.  WTCP's lawsuit seeks recovery of $16.2 billion, the alleged replacement value of Towers One, Two, Four and Five.

The Aviation Defendants[1] deny liability, and allege defenses.  This motion for summary judgment seeks a ruling on one defense: whether liability, if found, can exceed the market value of the leaseholds.  I am asked to decide whether the lesser of the market value on September 11, 2001 of the four 99-year leaseholds, or the four towers' replacement value, is the proper measure of recoverable damages in this case.

I hold that market value as of September 11, 2001 is the limit of permissible recovery; that the value fixed by the parties a few months earlier is probably, but not necessarily, the market value of the four leaseholds as of September 11, 2001, and that a question of fact therefore is presented as to what was that market value; and that an issue of diminution of recovery pursuant to N.Y. C.P.L.R. section 4545, because of insurance and other possible recoveries, presents additional issues of fact.  Thus, I grant the substantive ruling that the Aviation Defendants seek, and deny the balance of the motion.  Additional proceedings consistent with my rulings are required.

## FACTUAL BACKGROUND

I. The Sale of World Trade Center Buildings One, Two, Four and Five

On July 16, 2001, fifty-five days before September 11, 2001, WTCP and the Port Authority executed the four 99-year net leases for World Trade Center Towers One, Two, Four and Five.  The lease executions culminated a worldwide competitive bidding process that the

---

[1]  The moving defendants, collectively referred to as "the Aviation Defendants," are: American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; and the Massachusetts Port Authority.

2

Port Authority had initiated to implement a decision, reached several years earlier, to privatize the World Trade Center.  Four finalists emerged from the bidding process.  When Vornado Realty Trust, the high bidder, was not able to complete its negotiations with the Port Authority, WTCP, the second finalist, entered the negotiations and, in April 2001, executed an agreement with the Port Authority to net lease the four towers.  The net leases were priced at $3.211 billion, of which $395 million was allocated to a commercial space ("Retail Mall") that was leased by The Westfield Group, and $2.805 billion was allocated to the towers.[2]  WTCP was to pay $491 million, and Westfield, $125 million, at the closings; the balance of the consideration was in the form of a 99-year stream of fixed future rental payments from the four towers, having a present value of $2.419 billion, a 99-year stream of participating future rental payments, having a present value of approximately $65 million, and a stream of additional base rental payments valued at $111 million.[3]  J.P. Morgan, engaged by the Port Authority as a consultant, found the consideration fair.  WTCP valued its net leaseholds to Towers One, Two, Four and Five at $2.84 billion on its books and records.

II.      A Brief History of the World Trade Center

In 1962, New York and New Jersey, through coordinated legislation, directed that the World Trade Center be built by the Hudson Tubes railway system for "the single object of preserving . . . the economic well-being of the northern New Jersey-New York metropolitan area [which] is found and determined to be in the public interest."  N.Y. UNCONSOL. LAW at § 6601(7), (9); see Courtesy Sandwich Shop, Inc. v. Port of N.Y. Auth., 190 N.E.2d 402, 404 (N.Y. 1963) (recognizing World Trade Center's public purpose).  The Port of New York was suffering economically and the complex's construction was seen as a way to revitalize the area.

---

[2] WTCP's claim for property damage does not include any claim for any portion of the Retail Mall.
[3] The record does not distinguish between WTCP and Westfield as to the future consideration payable by each.

Specifically, the legislators intended through building the World Trade Center to improve transportation between New York and New Jersey; centralize, enable, and attract port-related activity; and provide an optimal platform upon which to conduct international trade.

The Port Authority of New York and New Jersey, Inc., a nonprofit, bi-state agency, had been created in 1921 to carry out a public trust "benefiting the nation, as well as the States of New York and New Jersey." Id. at § 6401 (preamble). The Port Authority was formed "by agreement of the two states as their joint agent for the development of the transportation and terminal facilities and other facilities of commerce of the port district and for the promotion and protection of the commerce of their port." Id. at § 6601(8). The two states granted the Port Authority control of the World Trade Center's construction and operation. Construction commenced in 1965 and cost approximately one billion dollars.

It took time before the World Trade Center brought about substantial changes to the downtown business area. During the 1970s, the World Trade Center struggled to fill its space, relying heavily on government tenants. By the early 1980s, the towers began to enjoy commercial success, replacing government tenants with a variety of higher paying commercial tenants, among them premier law, accounting and financial services firms.

By September 11, 2001, the World Trade Center had become a profit center. Forty thousand workers, and many more tourists, came into the towers daily. Shopping arcades beneath the towers served tenants and visitors, and were themselves profit centers. The towers were a symbol of the city and an integral part of its skyline. New York City's downtown area flourished. If it was not the equal of the city's midtown, the downtown area was nevertheless profitable and full of businesses and residents.

4

WTCP argues that the World Trade Center buildings were built and used for a special and specific purpose.  That may have been so, but clearly a market had developed for the buildings by the 1990s, and buyers were ready, willing, and able to pay full and fair prices.  The World Trade Center may have had a unique size, design, and location, as WTCP argues, and it may have been built years ago to achieve a public benefit purpose, but nothing suggests that the bids Port Authority received did not reflect the towers' full and fair price, including their symbolic value.

III.   <u>Insurance and Repair Provisions of the Net Leases</u>

WTCP covenanted by the terms of the leases to insure the buildings against loss from fire and other causes for the lesser of $1.5 billion or "actual replacement cost."  <u>See, e.g.</u>, Agreement of Lease: One World Trade Center, § 14.1.1 (requiring insurance "equal to the lesser of (x) an amount sufficient to insure . . . the items of property described in this Subsection, except for the footings and foundations, to the extent of not less than the [actual replacement cost], and (y) One Billion Five Hundred Million and 00/100 Dollars . . . per occurrence").  The leases provide that there is to be no exclusion for terrorist acts, so long as such a policy term is available "at commercially reasonable rates."  <u>Id.</u>

In addition, the leases require WTCP to remove "all debris" from fire or destruction, and to "rebuild, restore, repair and replace" the premises to the extent "feasible, prudent and commercially reasonable" in accordance with the pre-existing plan and specifications or as modified by mutual consent.  The lease provides:

> If the Premises . . . or any structures, improvements, fixtures and equipment, furnishings and physical property located thereon, or any part thereof, shall be damaged or destroyed by fire, the elements, the public enemy or other casualty, or by reason of any cause whatsoever and whether partial or total, the Lessee, at its sole cost and expense, and whether or not such damage or

> destruction is covered by insurance proceeds sufficient for the purpose, shall remove all debris resulting from such damage or destruction, and shall rebuild, restore, repair and replace the Premises . . . and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, to the extent feasible, prudent and commercially reasonable, with the plans and specifications, for the same as they existed prior to such damage or destruction or with the consent in writing of the Port Authority, which consent shall not be unreasonably withheld, conditioned, or delayed, make such repairs, replacements, changes or alterations as is mutually agreed to by the Port Authority and the Lessee.

Id. at § 15.1.

WTCP insured the World Trade Center for $3.5468 billion per occurrence, an amount higher than that required by the lease. The term "occurrence" was defined variously in the insurance agreements and binders; one common definition insured "all losses or damages that are attributable directly or indirectly to one cause or to one series of similar causes" and provided that "[a]ll such losses will be added together and the total amount of such losses will be treated as one occurrence irrespective of the period of time or area over which such losses occur." World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 160 (2d Cir. 2003). Under the net leases, and subject to various modifying agreements, the proceeds obtained by WTCP were intended to cover losses, to defray expenses, and to fund such replacement structures as the Port Authority, New York State, New York City, other governmental and quasi-governmental authorities, and WTCP agree to build. After extensive litigation against its insurers, and judicial determinations interpreting the varying insuring policy agreements, WTCP recovered an aggregate of approximately $4.1 billion from its insurers.[4]

---

[4] WTCP may also be a beneficiary of a one billion dollar capitalization by the U.S. Federal Emergency Management Authority of a captive insurance company, intended to fund the defense of the city and the contractors whom it had engaged, and to pay such liability as they might incur from the September 11th terrorist-related aircraft crashes. See WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co., 549 F. Supp. 2d 555 (S.D.N.Y. 2008).

There has been an extensive post-recovery history, not part of the record of this motion, concerning the towers, the extensive negotiations of interested parties and government, and the manner and design of one or more replacement towers for those that previously stood.

IV.   September 11 Litigation and the Instant Motion

Congress provided that all claims arising from, or in connection with, the terrorist-related aircraft crashes into the World Trade Center were to be brought exclusively in the United States District Court for the Southern District of New York.  See Air Transportation Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101.  The law governing such suits was to be the law of the state where the crash occurred, that is, New York State law, unless preempted by, or inconsistent with, federal law.  Id.  The Aviation Defendants' insurance limited their potential liability.  Id.

The great bulk of wrongful death and personal injury claims against the airlines was paid and discharged without affecting these liability policies.  Pursuant to another provision of ATSSSA, claimants suffering deaths or personal injuries from the September 11th aircraft crashes could opt to bring their claims to the Special Master of the Victim Compensation Fund ("Fund").  Ultimately, 97% of all potential individual wrongful death claimants presented their claims to the Special Master, Kenneth Feinberg.  The fund disbursed $7.049 billion in congressionally appropriated funds to wrongful death and personal injury claimants.[5]  The Special Master's success meant that these many claims were not paid from the Aviation Defendants' limited insurance pool.

Ninety-six wrongful death and personal injury claimants filed suits in this court, seeking recovery of substantial but unquantifiable damages.  Seventeen other claimants filed

---

[5]  Department of Justice, Kenneth R. Feinberg, Esq., Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001, at 1 (2004), available at http://www.usdoj.gov/final_report.pdf.

suits against the Aviation Defendants alleging property damages aggregating to approximately $6.8 billion.  In addition, WTCP filed a claim for $12.3 billion ($8.4 billion of replacement cost and $3.9 billion of lost rental income).  It was uncertain when ATSSSA was passed and when all of these lawsuits were filed that there was sufficient insurance to pay all the claims existing against the Aviation Defendants.

The parties have advanced their cases by extensive discovery proceedings. Ninety-three of the original ninety-six wrongful death and personal injury claims have settled. According to the residual claimants—three wrongful death claimants and all of the property claimants, including WTCP—significantly more discovery remains.  The parties' contentions regarding much of the remaining discovery will be the subjects of rulings soon to be issued, and these rulings may determine how much discovery actually remains to be conducted.

The Aviation Defendants' pending motions for summary judgment seek rulings that would limit WTCP's potential recovery on the following issues:  (1) whether WTCP is entitled only to the fair market value of the destroyed towers, rather than the higher replacement value; (2) whether WTCP is entitled to recover, in addition to market value or replacement value, its lost rental income, plus expenses in relation to preserving such rental income; (3) whether the fair market value of WTCP's leaseholds to Towers One, Two, Four and Five, as of September 11, 2001, was $2.8 billion, the amount WTCP agreed to pay in April, 2001 or some different value yet to be determined; and (4) whether, pursuant to N.Y. C.P.L.R. section 4545, WTCP's claim for damages for market value is diminished, and offset, by the $4.1 billion in insurance payments, and by other payments, that it received.  The discussion that follows, essentially granting the motion of the Aviation Defendants but finding issues of fact, amplifies and explains the rulings I expressed at the argument of the motion on September 24, 2008.

**DISCUSSION**

I.      Summary Judgment Standard

Summary judgment may be granted if there are "no genuine issues as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to come forward with competent evidence:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. P. 56(e).  Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001), that party must raise more than just a "metaphysical doubt" as to a material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion."  Harlen, 273 F.3d at 499.  Accordingly, if the "evidence favoring the nonmoving party" "is merely colorable

or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at

249-50 (citations omitted).


II.     Fair Market Value Is the Proper Measure of Damages.

        The Aviation Defendants argue that, under New York law, WTCP cannot recover

$8.4 billion in replacement costs, because the diminution of the properties' market value limits

recovery.

        *A.  The "Lesser of Two" Rule*

        New York courts follow the "lesser of two" rule: a plaintiff whose property has

been injured may recover the lesser of the diminution of the property's market value or its

replacement cost.  Hartshorn v. Chaddock, 31 N.E. 997, 998 (N.Y. 1892).  This rule applies even

when the property in question has been completely destroyed.  Sandoro v. Harlem-Genesee

Market & Nursery, Inc., 482 N.Y.S.2d 165, 167 (N.Y. App. Div. 1984).

        The New York Court of Appeals recently affirmed the lesser of two rule in Fisher

v. Qualico Contracting Corp., 779 N.E.2d 178 (N.Y. 2002).  In Fisher, plaintiff's Long Island

home, an 8,000 square foot Victorian residence on 1.5 acres of land, was destroyed in a fire

negligently started by defendant, a contractor hired by plaintiff to do work on the home.  The

plaintiff filed a homeowner's insurance claim and received $1,050,000 from his insurers. The

subrogated insurer, as plaintiff, then sued defendant for negligence and prevailed.  In the

damages phase of the trial, the parties proved that the replacement cost was $1,033,000, but that

the diminution in the property's market value was $480,000.  The jury was instructed to award

$480,000, the lesser of the two amounts.  On appeal, the Court of Appeals affirmed, holding that

"[r]eplacement cost and diminution in market value are simply two sides of the same coin."  Id.

at 181-82.  "Each is a proper way to measure lost property value, the lower of the two figures

affording full compensation to the owner" yet "avoiding uneconomical efforts."  Id.


### B.  Specialty Property Exception

WTCP acknowledges that the lesser of two rule generally applies to property

damage cases.  However, WTCP argues that there is an exception for specialty properties, and

that the World Trade Center towers, because of their history and purpose, fit that exception.

In most cases, WTCP acknowledges, damages for destroyed or "taken" property

will be fixed by market value.  Rochester Urban Renewal Agency v. Patchen Post, Inc., 379

N.E.2d 169, 171 (N.Y. 1978) (noting that in a taking, an owner is ordinarily compensated for the

amount that "it can reasonably be anticipated a prudent buyer would be willing to pay in an open

market"); Great Atl. & Pac. Tea Co. v. Kiernan, 366 N.E.2d 808, 811 (N.Y. 1977) (holding, in

tax certiorari proceedings that "generally, it is 'market value' which provides the most reliable

valuation for assessment purposes").  However, in some cases where the property is of a type

"seldom traded" and for which there is no "market price," a different kind of valuation must be

used.  Rochester Urban Renewal Agency, 379 N.E.2d at 171.  In such a circumstance where the

market value cannot be measured, the property is considered "specialty property" and

replacement cost is considered the proper measure of fixing damage.  Commonly falling within

this category are churches, hospitals, clubhouses and spaces held by nonprofit organizations for

use as community centers.  Id.  The rule for specialty properties generally arises in condemnation

and tax certiorari proceedings.  See Consol. Edison Co. v. City of New York, 823 N.Y.S.2d 451

(N.Y. App. Div. 2006); Niagara Mohawk Power Corp. v. Town of Moreau Assessor, 762

N.Y.S.2d 847 (N.Y. App. Div. 2003).

In <u>In re Lido Boulevard, Town of Hempstead, Lido Beach, Nassau County</u>, 349

N.Y.S.2d 422 (N.Y. App. Div. 1973), a condemnation proceeding concerning a cabana club on

oceanfront property used for public recreational facilities, the New York Appellate Division,

Second Department, stated the test for valuing specialty properties without market value:

> 1.  The improvement must be unique and must be specially built for the specific purpose for which it was designed;
> 2.  There must be a specific use for which the improvement is designed and the improvement must be so specially used;
> 3.  There must be no market for the type of property and no sales of property for such use; and
> 4.  The improvement must be an appropriate improvement at the time of the taking and its use must be economically feasible and reasonably expected to be replaced.

349 N.Y.S.2d at 427.

WTCP argues that, because the World Trade Center buildings were unique and

served a public function, they should be considered specialty properties, like churches,

community centers, and hospitals, and that their replacement value should therefore be

considered the proper measure of damages for their destruction.  WTCP contends that the World

Trade Center's unique and special nature flows from its history, from the reasons that caused the

New York and New Jersey legislatures to establish it, and from the Port Authority's mission to

use the towers to promote local commerce and industry, public transportation, and the

surrounding regions of New Jersey and New York.

However, the time for measuring damages is not the 1960s, as WTCP's argument

proposes, but September 11, 2001.  By then, the World Trade Center buildings had been

privatized.  They were flourishing profit centers—offices and retail spaces filled with tenants

paying market rates.  A world-wide public auction established prices for the towers' privatization

and the bids that private companies presented, and that they were ready, willing, and able to pay,

fully reflected the symbolic, as well as the commercial character, of the buildings.  Unlike a

clubhouse or church, which "may be regarded by the organization that owns and utilizes it as

worth everything that it cost to construct it and more, yet . . . may not be 'marketable' because no

similar group would have sufficient need for the property to be willing to purchase it even at its

reproduction value," Rochester Urban Renewal Agency, 379 N.E.2d at 171, the World Trade

Center towers had a determinable and verifiable value in the marketplace.  The Lido Beach test

for specialty properties is not satisfied.

Heidorf v. Town of Northumberland, 985 F. Supp. 250, 262 (N.D.N.Y. 1977),

considered an analogous issue: whether a building once used for a specialty purpose and without

a market value should remain a specialty building for the purpose of calculating damages when it

was then intended to serve a different use but was not yet being so used.  In Heidorf, the plaintiff

owned a church that state and national organizations had recognized as historically noteworthy,

but was no longer being used as a church.  Plaintiff was in the process of converting the church

into a military history museum.  However, the local building inspector determined that the

building was in imminent danger of collapsing and had it demolished.  The court held that

neither the church's historic status nor the fact that it was soon to be a museum could justify

damages totaling more than the diminution in the property's market value.  Citing Lido Beach,

the court held that the church building was not yet being used as a military history museum, and

that its status as an historic building "is not, itself, a 'use.'"  Id. at 262 n.6.

The World Trade Center buildings were filled with a wide variety of commercial

tenants—law firms of every size and character, large national and international public accounting

firms, investment banking, insurance and financial institutions of every description, public

restaurants, clubs and gyms, and the like.  Thousands of visitors frequented the retail shops and

restaurants throughout the day.  But the test for specialty properties is not whether there are, or were, special or unique aspects to the property, but rather whether the <u>use</u> to which the property is put at the time of the tort is a unique use, suitable only to the owner, and without a fair market value.  <u>Cf.</u> <u>Great Atl. & Pac. Tea Co.</u>, 366 N.E.2d at 811 (finding that a 1.5 million square foot food processing plant customized to meet plaintiff company's specific production and delivery needs does not qualify as a specialty property because it is not "uniquely adapted to the business conducted upon it or use made of it and [because it can] be converted to other uses without the expenditure of substantial sums of money").

Clearly, the price WTCP paid for the 99-year leases it acquired from the Port Authority reflected a full and fair market price for the property.  If WTCP is entitled to recover, recovery of the properties' market value would fully compensate it.  WTCP is not entitled to recover the larger value of replacement cost.

### C.  *The Covenants of WTCP's Net Leases Do Not Authorize a Larger Recovery.*

WTCP argues that it is entitled to recover the costs of its contractual obligations to "rebuild, restore, repair and replace" the destroyed World Trade Center buildings.  The Aviation Defendants argue, in opposition, that they cannot be held responsible in tort for WTCP's contractual undertakings, and that, even if they could be held responsible, the new buildings that are envisioned as replacements for the destroyed buildings represent radical improvements and differences and cannot be considered replacement structures within the meaning of the contract.

When a party commits a tort that results in damage to property, the wronged party may recover damages for injuries which flow directly from that tort and are its natural and probable consequences.  The tortfeasor is not responsible for damages which are remote from the

14

wrong or indirectly related to it.  Rose Lee Mfg., Inc. v. Chem. Bank, 588 N.Y.S.2d 408, 410-11

(N.Y. App. Div. 2002).  Stated differently, the tortfeasor is responsible only for injuries that are

the direct, natural and proximate result of the tortfeasor's actions, and that the parties would have

foreseen, contemplated or expected.  Palsgraf v. Long Island R. Co., 248 N.Y. 339, 352-53

(1928); see In re September 11 Litig., 280 F. Supp. 2d 279, 292 (S.D.N.Y. 2003) (noting that the

court determines extent of duty).

         If proved at trial, the direct, natural and proximate cause of the Aviation

Defendants' alleged negligence in allowing the terrorists to enter and hijack the Boeing 767

airplanes and fly them into Towers One and Two of the World Trade Center would be the

destruction of the two towers, and the related destruction of Towers Four and Five.  The market

value of the towers is the measure of recovery for their destruction.  If WTCP bears a special or

different burden, it flows directly from WTCP's contract clauses, not the Aviation Defendants'

negligence.  See Rose Lee Mfg., Inc., 588 N.Y.S.2d at 411.  The particular features of WTCP's

contracts cannot be made the special responsibility of the Aviation Defendants, nor the natural

and probable result of their negligence, nor the foreseeable consequence of their acts and

omissions.  See id.

         Accordingly, for the reasons discussed, the Aviation Defendants are entitled to

summary judgment that WTCP's potential recovery against them is limited to the September 11,

2001 market value of the destroyed net leases for Towers One, Two, Four and Five.

   III.    WTCP May Not Recover Damages in Addition to Destroyed Market Value.

         WTCP argues that it is entitled to recover, as separate components of damages,

the rental payments that it did not receive and the towers' residual value after expiration of the

99-year net leases.  I grant the Aviation Defendants' motion to dismiss both these claims.

A.   *Lost Rental Payments*

WTCP argues that its tenants stopped paying their rents because the four buildings were destroyed.  WTCP alleges that the present value of its lost rentals since September 11, 2001 is $3.9 billion.  It seeks this amount over and above the value of the destroyed buildings, whether measured by market value or replacement value.

WTCP's claim is without merit.  The price that WTCP paid to the Port Authority included the value of anticipated rentals.  In April 2001, WTCP purchased the net leases to the four towers for $2.805 billion (not including the amount paid for the Retail Mall), thus gaining the right to future rental income from the towers.  The price it paid fully reflected the present value of those rental streams.  If it recovers that market value, it necessarily regains the present value of the rental streams that were destroyed.  WTCP cannot recover twice, once in the form of the property's market value, which fully includes the rental streams reasonably expected from the property, and again for the separate value of the rental streams.  See Sandoro v. Harlem-Genesee Market & Nursery, Inc., 105 A.D.2d 1103, 1104 (N.Y. App. Div. 1984) ("Since damages measured by market value take rental value into account, where a building is totally destroyed there is no separate allowance for damages for loss of rent.").

Accordingly, the Aviation Defendants' motion dismissing WTCP's claim for lost rental income is granted.

B.   *Residual Value of World Trade Center Towers*

WTCP argues that it is entitled to recover, in addition to the destroyed value of its four 99-year net leases, the theoretical value of the four buildings at the expiration of its

leaseholds.  It argues that it has standing to make that claim because a life tenant has standing to recover the value of the fee as well as the life estate, and must hold that portion of the recovery in trust for the fee-holder.  See Rogers v. Atlantic, G & P Co., 107 N.E. 661 (N.Y. 1915).  New York Real Property Actions and Proceedings Law, section 833, provides:

> When the ownership of land is divided into a possessory estate for life or for years and one or more future interests, and a person having none of these interests causes damage to such land, the damages recoverable by the owner of such possessory interest from the wrongdoing third person may include damages caused to interests in the affected land other than those owned by parties to the action or proceeding when, but only when, all living persons who have either a possessory or a future interest in the affected land are parties thereto.  The court in which any such recovery of damages occurs shall make such direction from the distribution of the damages recovered among the persons who are parties to the action or proceeding and for the protection of the interests of persons who are not parties thereto, as justice may require.

The Port Authority, a party to this lawsuit and the property owner entitled to possession at the expiration of WTCP's tenancy, represents that it relies on WTCP's recovery, and WTCP's covenant in its net leases to repair and/or replace the buildings, and therefore makes no separate claim for residual value.

The record contains no proof of the present value, as of September 11, 2001, of the residual, or reversionary, interest of Towers One, Two, Four and Five in the year 2100, when WTCP's 99-year net leases expire.  If such a value can be proved, the proofs might be relevant. In the absence of such proofs, and in the absence of any expressed intention by the Port Authority as fee owner to seek recovery of such a residual value, WTCP's claim for a recovery beyond the market value of its net leases is dismissed.

Therefore, this aspect of the Aviation Defendants' motion is granted.

*C.  Limitation of Recovery Under ATSSSA*

There is another, important reason for enforcing the traditional New York law limiting property damage recoveries to the lesser of market value or replacement value. ATSSSA limits the liability of each Aviation Defendant to its insurance coverage. § 408(a)(1), 49 U.S.C. §§ 40101. The limit applies to all claims, whether wrongful death, personal injury or property damage.

> Notwithstanding any other provision of law, liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity, arising from the terrorist-related aircraft crashes of September 11, 2001, against an air carrier, aircraft manufacturer, airport sponsor or person with a property interest in the World Trade Center, on September 11, 2001, whether fee simple, leasehold or easement, direct or indirect, their directors, officers, employees or agents, shall not be in an amount greater than the limits of liability insurance coverage maintained by that air carrier, aircraft manufacturer, airport sponsor, or person.

Id.

ATSSSA provided for liability caps to preserve the United States' aviation industry, to protect the airlines and aircraft manufacturers from the potential of crushing liability, and to ensure that plaintiffs would be able to recover damages without bankrupting the airlines. See 147 Cong. Rec. S9589-01, S9594 (Sept. 21, 2001) (Senator McCain) ("In addition to removing the specter of devastating potential liability from the airlines, and guaranteeing that the victims and their families will receive compensation regardless of the outcomes of the tangle of lawsuits that will ensue, the bill attempts to provide some sense to the litigation by consolidating all civil litigation arising from the terrorist attacks of September 11 in one court.").

As it turned out, 97% of eligible wrongful death claimants and an overwhelming number of personal injury claims came before the Special Master of the Victim Compensation

Fund.[6]  Litigation challenging the legality of such a Fund was heard and dismissed by this Court. Colaio v. Feinberg, 262 F. Supp. 2d 273 (S.D.N.Y. 2003), aff'd, Schneider v. Feinberg, 345 F.3d 135 (2d Cir. 2003).  I devised special procedures to assure claimants that they could take full advantage of the time given them by Congress to submit claims to the Special Master, while preserving their rights to sue in this court if they chose not to seek redress from the Special Master.  See ATSSSA § 408(b)(3), 49 U.S.C. § 40101; In re September 11 Litig., No. 21 MC 97 (S.D.N.Y. July 22, 2003) (order creating suspense docket for period allowed by Special Master to file and perfect claims to Fund).  I emphasized this right of claimants to choose between the Victim Compensation Fund and a traditional lawsuit in conferences with the lawyers and many of the claimants.  See, e.g., Transcript of Oral Argument at 4, In re September 11 Litig., No. 21 MC 97 (S.D.N.Y. Dec. 18, 2003) (No. 264); Transcript of Status Conference at 5, In re September 11 Litig., No. 21 MC 97 (S.D.N.Y. Feb. 6, 2004) (No. 330).

The Victim Compensation Fund paid $7.0494 billion of congressionally appropriated funds in full settlement and discharge of claimants' wrongful death and personal injuries.[7]  Only ninety-five wrongful death and personal injury lawsuits were filed in this court by claimants killed in the hijacked aircraft or killed or injured in or around the World Trade Center or the Pentagon.  The three remaining suits are now consolidated with all the property damage suits.  The plaintiffs will be eligible to recover, to the extent that they are severally and lawfully entitled to recover from particular Aviation Defendants, up to the aggregate of insurance funds available to such defendants.

The limitation on recovery (measured at the date ATSSSA was enacted, September 22, 2001) creates a federal interest, over and above any New York State interest, to

---

[6]  Department of Justice, Kenneth R. Feinberg, Esq., Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001, at 1 (2004), available at http://www.usdoj.gov/final_report.pdf.
[7]  Id.

protect against unreasonable and excessive claims by particular claimants.  Thus, I ruled against the right to recover punitive damages, see Transcript of Oral Argument at 147-83, In re September 11 Litig., No. 21 MC 97 (S.D.N.Y. June 14, 2007); Opinion and Order Regarding Punitive and Compensatory Damages, 494 F. Supp. 2d 232 (S.D.N.Y. 2007), and I refused to approve, and invalidated, settlements that were excessive, or which awarded unreasonable attorneys' fees.  In re September 11 Litig., 567 F. Supp. 2d 611 (S.D.N.Y. 2008); In re September 11 Litig., No. 21 MC 101 (S.D.N.Y. Aug. 28, 2008) (Order Denying Motion For Reconsideration and Motion to Vacate).  The federal interest, arising from ATSSSA's liability ceiling, provides an additional rationale supporting the New York law of damages limiting property damages to the lesser of market value or replacement cost.  See ATSSSA § 408(b)(2), 49 U.S.C. § 40101 ("The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.").  A limited pool of funds should not be dissipated by liberality to a few at many others' expense.

IV.    WTCP Will Have an Opportunity To Make a Showing Regarding the Fair Market Value of Its Leases.

The Aviation Defendants ask me to rule that the $2.8 billion consideration that WTCP paid to acquire its four net leases on July 16, 2001 also should be considered the September 11, 2001 market value, and the limit of WTCP's potential recovery.  The fair market value of a property is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551 (1973).

Generally, "a recent sale price for the subject asset, negotiated by the parties at arm's length, is the 'best evidence' of its market value." Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000).

  The parties, as ready, willing and able buyers and sellers, agreed to a $2.805 billion consideration for the four net leases on April 26, 2001, when their contract was signed and delivered.  They conveyed the net leases on July 16, 2001, when the transactions closed. The time lapse to September 11, 2001 is short enough to be entitled to a presumption of equivalence as the "best evidence" of market value.  Id.  However, the parties may introduce proof to overcome the presumption, for market values can fluctuate rapidly, and the value of property privately owned and managed by an experienced real estate developer may enjoy a different market value than property owned and managed by a governmental bureaucracy.

  Thus, I deny summary judgment.  WTCP shall have until February 28, 2009 to show, by motion, that the towers' value changed between April 26, 2001 and September 11, 2001.  Failing such a motion or an adequate showing, the court will issue an appropriate amended order.

V. Diminutions of Recovery Under N.Y. C.P.L.R. Section 4545(c)

  The Aviation Defendants argue under N.Y. C.P.L.R. section 4545(c) that WTCP's insurance recoveries should reduce the amounts it could recover from the Aviation Defendants for destruction of its property.  WTCP has recovered or will recover $4.1 billion from its insurers because of the destruction of Towers One, Two, Four and Five.  The Aviation Defendants suggest that WTCP or the Port Authority may have received additional collateral source payments.  These recoveries, the Aviation Defendants argue, may be considered by the court to reduce the damages that WTCP may recover from the Aviation Defendants.  Since WTCP's recoveries from insurance exceed the $2.805 billion that is the limit of its recovery from the

Aviation Defendants, WTCP's potential recovery, the Aviation Defendants argue, is nil.  I rule, for the reasons stated below, that summary determinations cannot now be made on these issues.

Section 4545(c) allows the court to reduce a damage recovery for injury to property where a plaintiff, with reasonable certainty, can replace that property or be indemnified for past or future cost or expense with respect to that property from collateral source payments like insurance:

> In any action brought to recover damages for . . . injury to property . . . , where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source such as insurance . . . .  If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to the projected future cost to the plaintiff of maintaining such benefits.  In order to find that any future cost or expense will, with reasonable certainty, be replaced or indemnified by the collateral source, the court must find that the plaintiff is legally entitled to the continued receipt of such collateral source, pursuant to a contract or otherwise enforceable agreement, subject only to the continued payment of a premium and such other financial obligations as may be required by such agreement.

N.Y. C.P.L.R. § 4545(c).

WTCP argues, first, that section 4545(c) cannot be applied until there is a judgment of recovery.  WTCP is technically correct, for that is the literal term of the statute:  The court is to "consider" such "evidence" of collateral source payments on the issue of whether to "reduce the amount of the award."  First, there would have to be an award in favor of WTCP, and then the court would consider the proof of WTCP's recoveries from collateral sources.

However, the technical distinction is unimportant, for the issue of diminution can be tried and determined immediately following the jury verdict, on the same record or a supplemented record.

Second, WTCP argues that the insurance proceeds it has recovered must be shown to correspond to the damages it seeks.  See Oden v. Chemung County Indus. Dev. Agency, 661 N.E.2d 142 (N.Y. 1995) (holding that, to apply an offset pursuant to section 4545, a correspondence must be shown between the collateral source payment and the item of pecuniary loss to be replaced).  This correspondence issue presents a number of questions.  The parties will have to inquire into the nature of the insurance recoveries, how they are to be applied, how they compare to a potential damage award, whether issuers of collateral source payments have subrogation rights, and other such issues.  The present record is inappropriate for summary determinations.

Further, the case law interpreting N.Y. C.P.L.R. section 4545 is far from clear. Compare Humbach v. Goldstein, 229 A.D.2d 64 (2d Dep't 1997) (denying insurer's right to seek subrogation under N.Y. C.P.L.R. § 4545), with Kelly v. Seager, 163 A.D.2d 877 (4th Dep't 1990) (finding insurer's subrogation right unaffected by N.Y. C.P.L.R. § 4545).  Are subrogation rights of insurers affected and, if so, how is the statute to be applied where, as here, some or all of the insurers claiming, or potentially claiming, subrogation rights are parties?  Much more has to be known about the statute, its development, the developing case law, and the factual questions previously stated before I consider summary judgment on this issue.

I deny without prejudice the Aviation Defendants' motion with respect to N.Y. C.P.L.R. section 4545(c).

## **Conclusion**

For the reasons stated in this opinion, I grant the Aviation Defendants' motion in

part and deny it in part.

SO ORDERED.

Date:        December **10**, 2008
             New York, New York

ALVIN K. HELLERSTEIN
United States District Judge