UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IN RE SEPTEMBER 11 LITIGATION         :        **<u>OPINION AND ORDER
                                      :        GRANTING SUMMARY
                                      :        JUDGMENT DISMISSING
                                      :        WORLD TRADE CENTER
                                      :        PROPERTIES, LLC TOWER-
                                      :        TWO CLAIMS AGAINST
                                      :        AMERICAN AND GLOBE</u>**
                                      :
                                      :        21 MC 101 (AKH)
-------------------------------------------------------x
ALVIN K. HELLERSTEIN, U.S.D.J.:

        Defendants American Airlines, Inc. and AMR Corp. (collectively "American") and Globe Aviation Services Corp. ("Globe") move for summary judgment to dismiss the property damage claims of World Trade Center Properties, LLC ("WTCP") arising from the destruction of World Trade Center Tower Two by the terrorists who hijacked United Air Lines Flight 175 and crashed the jumbo jet into the 110-story tower. The terrorists who had boarded United Air Lines Flight 175 had passed through security administered by Huntleigh USA Corp. ("Huntleigh") under the aegis of United Air Lines, Inc. and UAL Corp. (collectively "United"). Huntleigh and United do not move to dismiss the case against them.

        American and Globe, the moving parties, contend that they had nothing to do with security for United flights at Logan Airport, where the United flight originated. WTCP, the plaintiff and respondent in this motion, sued the airline, airport, and security companies for the damage to World Trade Center Towers One and Two arising from the September 11 terrorist attacks. WTCP alleges that the defendants[1] had negligent security

---

[1] The defendants in the litigation are: American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc. and US Airways, Inc. (collectively "US Airways"); Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Globe Aviation Services

1

procedures that permitted the terrorists to board, hijack, and crash two airplanes into Towers One and Two.  Although American and Globe had responsibility for the American, and not the United flights, departing from Logan Airport, and United and Huntleigh had responsibility for the United, and not the American flights, departing from Logan Airport, WTCP sued all four defendants and others, alleging that all are jointly and severally liable for the destruction of Towers One and Two.  American and Globe move to dismiss claims relating to Tower Two, alleging that they had no duty for the Tower Two property damage and did not cause, or contribute to the cause, of that damage.

WTCP makes essentially two arguments to support its complaint: American's and Globe's negligence with respect to American Airlines Flight 11 set in motion the series of events that led to the four September 11 hijackings; and American's negligence in waiting twenty-one minutes before notifying federal authorities that its Flight 11 had been hijacked deprived the Federal Aviation Administration ("FAA") and United Air Lines of vital information that could have been used either to prevent the hijacking of United Air Lines Flight 175, or its crash into Tower Two.

I hold that American and Globe, having played no part in the screening or transporting of passengers with respect to United Airlines flight 175, had no duty to United's passengers or other victims of the United crash.  I grant defendants' motion, and order the complaint dismissed against American and Globe.

I.      Related Proceeding

On June 26, 2007, I heard oral arguments in this case for a similar summary judgment motion brought by other defendants, US Airways, Continental, and

---

Corporation; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; and the Massachusetts Port Authority.

Colgan Air, regarding damages caused by the Flight 175 crash. Those defendants also did not own, operate, or perform security for United Air Lines Flight 175. Plaintiffs alleged that the defendants' negligently screened passengers who connected to American Airlines Flight 11 and who then passed through American's independent security screening process before boarding Flight 11. Plaintiffs argued against granting the motion on the grounds that statutory, regulatory, and common laws create a duty to defendants to report any aviation threats to authorities, that the behavior the defendants observed ought to have been considered an aviation threat, and that the hijacking and damage caused by United Airlines Flight 175 could have been prevented had the defendants alerted authorities to threats to American Airlines Flight 11. I held that any such duty to alert authorities to the threat of a hijacking does not create liability to those injured by another hijacking, at least without an additional showing of a relationship that could create a duty to those who were injured. Transcript of Oral Argument at 59-66 (June 26, 2007); Summary Order, In re September 11 Litig., In re September 11 Prop. Damage & Bus. Loss Litig., Nos. 21 MC 97, 21 MC 101 (June 27, 2007). I now write to set out my reasoning.

## II.     Statement of Undisputed Facts

The 9/11 Commission investigated and reported the relevant facts of the September 11, 2001 terrorists' hijackings and the events following those hijackings.[2] The parties have accepted the reported version as it relates to the facts of this case, and I do as well.

---

[2] See 9/11 Commission Records, Staff Monograph "Four Flights and Civil Aviation Security" (September 12, 2005) ("Staff Monograph"), available at http://www.archives.gov/legislative/research/9-11/staff-report-sept2005.pdf; THE 9/11 COMMISSION REPORT, FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES (2004) ("COMMISSION REPORT").

### A. American Airlines Flight 11

On September 11, 2001 at 5:43 a.m., two of the terrorists who would soon hijack American Airlines Flight 11 checked in for Colgan Air Flight 5930 at the US Airways counter in the Portland Jetport in Maine. At 5:45 a.m., they passed through the airport's security screening checkpoint without incident. The security checkpoint was under Delta Airlines' custodial responsibility, with Delta having delegated security screening services to Globe Aviation Services. The 19-seat regional airliner departed on time at 6:00 a.m. and landed in Boston at 6:45 a.m.

The two men, Mohammed Atta and Abdul Aziz al Omari, as well as three other terrorists, checked in and boarded American Airlines Flight 11 between 6:45 a.m. and 7:40 a.m. All five hijackers were required to submit to security screening at one of two checkpoints at Logan Airport, both of which were operated by Globe under contract with American.[3] At 7:59 a.m., American Airlines Flight 11 departed from Boston's Logan International Airport. Terrorists began to hijack the plane at 8:14 a.m.

At 8:19 a.m., an on-board flight attendant, Betty Ong, used one of the airplane's telephones to call American's reservations office. Ong told the employee who answered that she thought the flight was being hijacked and that someone had been stabbed on board. By 8:21 a.m., Ong's call was transferred to another employee who triggered an emergency button alerting Nydia Gonzales, the reservations office supervisor, to pick up the line. Gonzales reported the emergency to Craig Marquis, the manager on duty at American's System Operation Control ("SOC") in Fort Worth, Texas.

---

[3] "Telephone records show that a phone call was placed from a payphone in the gate area from which Flight 175 departed to Atta's cell phone at 6:52 a.m." Staff Monograph, supra note 2, at 4.

4

At 8:22 a.m., Marquis acknowledged the emergency and told Gonzalez that he would contact American Airlines Air Traffic Control.

At 8:23 a.m. and 8:25 a.m., Craig Marquis, American's System Operation Control manager, Nydia Gonzales, American's reservation office supervisor, and Betty Ong, one of American's flight attendants aboard Flight 11 spoke. Among the phrases uttered were: "don't spread this around" and "We don't want this getting out." At 8:29 a.m., Bill Halleck, an American Airlines air traffic control specialist, spoke with the FAA's Boston Office and asked what information the FAA had regarding Flight 11, but did not pass on what he had learned from Ong. He did not tell the FAA about the ongoing conversation with Ong or what Marquis had learned from that conversation. By then, ten minutes had expired since the time Ong placed her call. At 8:41 a.m., Marquis instructed an SOC colleague to "[t]ell [air traffic control] to handle this as an emergency." The colleague answered: "They have in there it's been hijacked."

Meanwhile, shortly before 8:25 a.m., just six minutes after the Ong call, the FAA independently learned of the hijacking. FAA's Boston Center Air Traffic Control overheard two announcements in short succession from the cockpit of Flight 11, advising passengers on the plane that they, and passengers on other planes, had been hijacked, that they were "returning to the airport," and to stay quiet so as "not to endanger yourself and the airplane."[4]

---

[4] At 8:25 a.m., the terrorists announced:

> We have some planes. Just stay quiet and you'll be okay. We're returning to the airport. [And, seconds later:] Nobody move. Everything will be okay. If you try to make any moves, you'll endanger yourself and the airplane. Just stay quiet.

Staff Monograph, supra note 2, at 10.

5

The FAA, believing that Flight 11 had been hijacked, promptly notified the government's chain of command. At 8:28 a.m., Boston Center advised FAA Air Traffic Control System Command Center in Herndon, Virginia that it believed Flight 11 was hijacked and "heading toward New York Center's airspace," and provided "situational awareness" to New York and Cleveland centers via teleconference. At 8:31 a.m., the Herndon Command Center communicated news of the hijacking to FAA headquarters in Washington, D.C. The notifications took place between 8:25 a.m. and 8:32 a.m.[5] At 8:37 a.m., FAA Boston Center notified the U.S. military, causing the latter, at 8:40 a.m., to order two F-15 fighter jets at a Massachusetts air force base to battle stations. At 8:46 a.m., the Weapons Director at the Northeast Air Defense Sector, who had just been passed the order to scramble the fighter jets, sent the jets to air space near Long Island while army personnel were establishing the hijacked plane's precise location. At 8:46 a.m., Flight 11 crashed into World Trade Center Tower One.

### B. United Air Lines Flight 175

United Air Lines Flight 175 departed Logan Airport at 8:14 a.m., fifteen minutes after American Airlines Flight 11 and from a different hanger. At 8:42 a.m., twenty-eight minutes into the flight, and twenty-eight minutes after the hijacking of Flight 11 had begun, the five terrorists aboard Flight 175 began its hijacking. By 8:46 a.m., the terrorists took control of the plane. At 9:03 a.m., Flight 175 crashed into World Trade Center Tower Two.

---

[5] "Between 8:25 a.m. and 8:32 a.m., in accordance with the FAA protocol, Boston Center managers started notifying their chain of command that Flight 11 had been hijacked." Staff Monograph, supra note 2, at 11. At 8:29, "the air traffic control specialist in American's operations center contacted the FAA's Boston Air Traffic Control Center about the flight." COMMISSION REPORT, supra note 2, at 5.

### III.  The Legal Standards Governing This Motion

#### A.  Summary Judgment

Summary judgment may be granted if there are "no genuine issues as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to come forward with competent evidence:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. P. 56(e).  Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001), that party must raise more than just a "metaphysical doubt" as to a material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion."  Harlen, 273 F.3d at 499.  Accordingly, if the "evidence favoring the

7

nonmoving party" "is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

### B.      Whether a Duty Extends to Plaintiffs

"The duty of an air carrier [is] to provide service with the highest possible degree of safety in the public interest." 49 U.S.C. § § 44701(d)(1)(A), 44702(b)(1)(A). The air carrier's duty extends, beyond those aboard the aircraft to "individuals and property on the ground." Williams v. Trans World Airlines, 509 F.2d 942, 946 (2d Cir. 1975) ("This duty has both a statutory and common law basis."); In re September 11 Litig., 280 F. Supp. 2d 279, 296 (S.D.N.Y. 2003) (holding aviation defendants could have foreseen that "death and destruction on the ground was a hazard that would arise should hijackers take control of a plane"). Thus, Aviation employees are required to promptly notify the Secretary of Transportation in the event of "a threat to civil aviation." 49 U.S.C. § 44905(a). The Regulations do not define the conditions that should be considered "a threat to civil aviation" or the consequences if airline employees fail "to promptly notify."

## IV.    Discussion

### A.      Absence of Factual Causation

The issue of this motion is whether duty exists between the companies responsible for screening passengers for American Airlines flights departing from Logan Airport on September 11, 2001, and those suffering injuries arising from the terrorists who hijacked a United flight that had departed that morning from Logan. WTCP alleges that because American Airlines officials were told at 8:21 a.m. by Flight Attendant Ong's call that a hijacking of Flight 11 had occurred, but did not inform the FAA of that fact for

twenty minutes, not until 8:41 a.m., "key American personnel ma[de] an immediate and callous decision" to "conceal" the hijacking, in breach of their duty "to promptly notify the Secretary of Aviation that a threat to civil aviation" had occurred.  Opp. Memo 5. "American cho[se] to suppress this critical information and then to mislead the Boston ATC," WTCP argues.  Id.  WTCP claims that Halleck, American's air traffic control specialist, knew information that the FAA did not know and intentionally failed to disclose it to them.  Id. at 7.  WTCP asserts that it was not until Marquis, the SOC manager on duty, reported the hijacking at 8:41 a.m., that the hijacking was reported. American's failure to disclose, WTCP charges, amounted to concealment.  Id. at 6, 8.

WTCP's charges are immaterial and unjustified.  The undisputed facts make clear that the FAA knew of the hijacking at 8:25 a.m., just six minutes after Flight Attendant Ong made her call, only three minutes after American's SOC manager acknowledged the emergency, and only two minutes after American tried and failed for the first time to communicate with the cockpit.  Even if American was slow to notify the FAA pending confirmation of their concerns, and I am not willing to find this on the facts presented, any such slowness could not have affected the hijacking or the tragic consequences of the United flight.  The FAA reported the Flight 11 hijacking to its Herndon Command Center at 8:31 a.m., causing a scrambling of Air Force jets at 8:40 a.m., twenty-three minutes before United Flight 175 crashed into Tower Two at 9:03 a.m. Nothing in the tragic recount of events involving Flight 11 could have avoided the hijacking of Flight 175.  I am unwilling to entertain the notion that history would have been any different had American told government authorities what they had already known.

### B. Absence of Legal Causation and Duty

"To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." Solomon v. City of New York, 66 N.Y.2d 1026 (N.Y. 1985). The general rule regarding duty provides that when

> one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

Stagl v. Delta Airlines, 52 F.3d 463, 469 (2d Cir. 1995); In re September 11 Litig., 280 F. Supp. 2d 279, 295 (S.D.N.Y. 2003) ("New York cases emphasize that courts must closely examine the nature of the duty owed and the injury sustained in order to determine if the injury was within a class of foreseeable risks."); Vetrone v. Ha Di Corp., 803 N.Y.S.2d 156, 160 (N.Y. App. Div. 2005) ("The determination of the existence and scope of a duty may involve, not only consideration of the wrongfulness of a defendant's conduct, but also an examination of a plaintiff's own informed estimate of the possible risks, viewed in light of what people may reasonably expect of one another.") While a duty may be imposed to prevent a set of harms, if that duty's breach leads to a harm far beyond the contemplated set, the harm is considered unforeseeable and no duty is found to exist in that circumstance. Di Ponzio v. Riordan, 679 N.E.2d 616, 619 (N.Y. 1997) (holding defendant not liable because duty to shut off car's engine at a gas station was to prevent fires not physical injuries resulting from rolling cars); Palsgraf v. Long Is. R.R. Co., 162 N.E. 99, 100 (N.Y. 1928) ("The risk reasonably to be perceived defines the duty to be

obeyed."). At bottom, "no liability will result when the occurrence is not one that is normally associated with such hazards." Palsgraf, 162 N.E. at 100.

There are situations where one airline may fairly owe a duty to the passengers of another. In Stanford v. Kuwait Airways, for example, one airline wrote tickets to passengers for a through ticket on a second airline, "with the revenues to be allocated pro tanto between the airlines." 89 F.3d 117, 120 (2d Cir. 1996). One screening process for carry-on luggage prior to the initiating flight sufficed for the connecting flight as well. Id. The first carrier's inadequate screening process allowed four terrorists to board both the initiating and connecting flights, thus skirting the more elaborate screening in the second airport. In this manner, they boarded the connecting flight with pistols and explosives, and then hijacked the airplane. The court held the first air carrier liable to the victims' estates, because the initiating airline, "in the exercise of ordinary care, should have recognized that under these circumstances, knowing what it knew, there was an unreasonable risk of hijacking to passengers aboard its flight and other connecting flights." Id. at 124 (remanding for trial).

The present case is different. American Airlines did not undertake a ticketing responsibility for United and did not check bags intended for the United flight. Furthermore, neither American nor Globe undertook a screening responsibility for the United flight. American could not reasonably have foreseen that any breach it may have committed that led to a crash of an American Airlines airplane would have also led to injuries from a crash of a United Airlines airplane. In addition, a generalized duty of all airlines and all aviation personnel to report aviation threats to federal authorities does not establish under these circumstances a duty of one airline to those injured by another

11

airline's crash. As I observed at oral argument, the imposition of such a sweeping duty "to general aviation everywhere and to the public everywhere . . . would, in effect, eliminate every conception of the notion of duty in tort law." See Transcript of Oral Argument at 60, In re September 11 Litig. (June 26, 2006).

## V.     Conclusion

For the reasons stated, I grant the motions of American and Globe to dismiss the claims of WTCP against them relating to World Trade Center Tower Two.

SO ORDERED.

Dated: New York, New York
       January 16, 2009

ALVIN K. HELLERSTEIN
United States District Judge