UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

IN RE SEPTEMBER 11 LITIGATION       :     **ORDER ACCEPTING**
                              :     **MEDIATOR'S REPORT**
                              :     **AND PROVIDING THAT**
                              :     **IT BE FILED**
                              :
                              :     21 MC 101 (AKH)

---------------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

       I write in this opinion to accept the report of the mediator, Sheila L.

Birnbaum, Esq., to comment on her invaluable work, and to summarize the proceedings

of the ninety-five wrongful death and personal injury cases that led to her appointment.

Because of her work, described in her report attached to this opinion, the cases have all

but been resolved and master calendar 21 MC 97 has been closed.

       On September 11, 2001, terrorists killed 2,752 people and injured scores

more.  As with every mass tragedy, the victims could sue to recover their damages.

However, this tragedy was different, for it seared the nation and threatened its institutions

like no other.  Hence, just eleven days after the attacks, Congress enacted the Air

Transportation Safety and System Stabilization Act ("ATSSSA" or "the Act") which

limited the traditional remedy, provided an alternative remedy, and required the claimant

to choose between them.  49 U.S.C. §§ 40101, 44302-06.

       Those who sued had to file in federal court, not state court, and only in

one particular federal court, the Southern District of New York.  ATSSSA § 408, 49

U.S.C. § 40101.  Under ATSSSA, the defendants, primarily the airlines and other

aviation-related companies, could not be liable beyond their insurance coverages.  Id.  As

interpreted, the Act provided that neither punitive damages, nor excesses of state-

authorized recoveries, would be available.  494 F. Supp. 2d 232 (S.D.N.Y. 2007).  The vast number of claimants and the scope of their claims threatened the integrity of the American aviation industry and the availability of sufficient resources to satisfy all eligible claimants.  An exclusive jurisdiction in a single district court, it was thought, could coordinate all litigation, assure equity among claimants and defendants, and avoid ruin to the American aviation industry.  See 147 Cong. Rec. S9589-01, S9595 (Sept. 21, 2001) (Senator Hatch: "For those who seek to pursue the litigation route, I am pleased that we consolidated the causes of action in one Federal court so that there will be some consistency in the judgments awarded."); 147 Cong. Rec. S9589-01, S9594 (Sept. 21, 2001) (Senator McCain: "In addition to removing the specter of devastating potential liability from the airlines, and guaranteeing that the victims and their families will receive compensation regardless of the outcomes of the tangle of lawsuits that will ensue, the bill attempts to provide some sense to the litigation by consolidating all civil litigation arising from the terrorist attacks of September 11 in one court."); 567 F. Supp. 2d 611, 619-20 (S.D.N.Y. 2008); 2008 WL 5205971 (S.D.N.Y. Dec. 11, 2008).

ATSSSA balanced these limitations with a largely unprecedented right, the right to file a claim with a Special Master appointed to administer a Victim Compensation Fund, and to recover on that claim without having to prove fault or to endure the risks, costs, and travails of a court suit.  § 402-07, 49 U.S.C. § 40101; see Department of Justice, Kenneth R. Feinberg, Esq., Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001, at 83-84 (2004).[1]  Five thousand

---

[1] I encouraged litigants to file claims with the Special Master of the Victim Compensation Fund as an easier and more expedient remedy.  See, e.g., Arg. Tr. at 35-36, Virgilio v. City of New York, 2004 WL 4333789 (S.D.N.Y. March 10, 2004) ("[T]he law originally gave people like you a choice.  It's very unusual to have a choice like this, but people have a choice . . . , and it's written into the law.  You have a

five hundred and sixty claimants participated in the Fund, receiving more than $7.049 billion in full satisfaction of their claims, all within thirty-three months of the attack. The Fund was open only to those victims who died or incurred their injuries within twelve hours after the terrorist crashes on September 11, 2001.[2]  Those who filed claims with the Special Master were forbidden to file or pursue a court suit. ATSSSA § 405(c)(3)(b), 49 U.S.C. § 40101.

Not all families participated in the Victim Compensation Fund. Some, the successors of victims with very high incomes or income potential, believed that the Fund would not compensate them adequately in relation to lost income, and filed suits instead. Others filed suits to avoid having to deduct their life insurance recoveries and other collateral-source payments from awards given by the Special Master – only ATSSSA required such deductions. ATSSSA § 405(b)(6), 49 U.S.C. § 40101.  Still others wanted to tell their stories, participate in forcing facts into the public domain, or avail themselves of traditional remedies for other reasons.  And some could not free themselves from the shadows and despair of the September 11 tragedy to do anything on a timely basis, even though the Special Master made special efforts to reach such people and relaxed the Fund's requirements to accommodate such claimants.  See Order at 4 (Dec. 19, 2003); Conf. Tr. at 5-7 (Feb. 6, 2004).

---

choice.  You can take the easy way and go to the Victim Compensation Fund and get a good recovery, maybe not the best, but you don't have to prove anything. . . . I also know from many years as a lawyer and years as a judge that lawsuits are not really effective in letting people get to what the real problems were. They're not good tools for investigation.  They're good tools in giving awards or dismissing cases, but people are often frustrated in trying to find out the real reason for this."), aff'd,  407 F.3d 105 (2d Cir. 2005).

[2] Regulations permit the Fund to compensate rescue workers who were injured or killed within three days of the crashes.

In all, ninety-five suits were filed, seeking recoveries for ninety-six claimants.[3]  I collected the cases for coordinated management in 21 MC 97.  Proceedings began after the Victim Compensation Fund closed, so that the litigation did not compete with the workings of the Fund.

Two parallel, but competing, interests quickly emerged.  Some claimants wished to negotiate settlements as quickly as possible, with discovery to be deferred for a reasonable time to allow settlement negotiations to proceed.  Others pressed to proceed with discovery expeditiously.  I determined that both pursuits should go forward, simultaneously.  I set a period during which counsel for defendants could focus on settlement negotiations, but ordered the aviation defendants also to gather responsive documents and ready them for production.  I appointed liaison counsel to lead and organize the discovery and arranged executive committees of interested lawyers.  Plaintiffs' and Defendants' Joint Statement Report Regarding Formation of Committees and Subcommittees (Oct. 7, 2002).  I granted the motion of the United States Transportation Security Administration ("TSA") to intervene and to develop a procedure to filter production by the Aviation defendants to avoid making public Sensitive Security Information ("SSI").  Stipulated Protective Order Governing Access to, Handling of, and Disposition of Potential Sensitive Security Information (Mar. 21, 2007).  Under TSA regulations, SSI is information that, if it were to be made public, "would continue to expose vulnerabilities."  <u>See</u> Order (Mar. 31, 2006).[4]

---

[3] One complaint listed two members of the same family who were injured in the attacks.

[4] 49 C.F.R. § 1520.5 (2005) ("SSI is information obtained or developed in the conduct of security activities, including research and development, the disclosure of which TSA has determined would (1) Constitute an unwarranted invasion of privacy (including, but not limited to, information contained in any personnel, medical, or similar file); (2) Reveal trade secrets or privileged or confidential information obtained from any person; or (3) Be detrimental to the security of transportation.").

I also established procedural rules to govern settlements.  Because each settlement recovery would erode a limited pool of insurance resources, a procedure of court approvals was provided to assure fairness.  Settlements were to be vetted in groups to guard the privacy interests of the plaintiffs and the contributing defendants (essentially, the Aviation defendants).  See Conf. Tr. at 10 (Nov. 18, 2005); Conf. Tr. at 13, 21 (Mar. 3, 2006); Stipulation and Order Regarding Settlements (Apr. 10, 2006).  Contingent fees were to be limited to 15% of recoveries.  See Conf. Tr. at 31-32 (Mar. 3, 2006). Litigants and attorneys were told that settlements would be evaluated as to distributive fairness, so that like parties should expect like settlements, without regard to whether they entered into negotiations early or late in the settlement process.  Leveraging for higher amounts often paid to those settling first, or last, would not be permitted.  Each settlement negotiation would hinge on the case's merits, and not piggy-back on the values of other settled cases.  Id. at 7; see also Conf. Tr. at 5 (Sept. 8, 2005).

Thirteen cases were settled within a relatively short space of time, but then settlements stopped.  Discovery proceedings also slowed, for it took long periods of time for the TSA to develop protocols for sifting defense-produced information.  The TSA had to distinguish between that which properly should be characterized as SSI and that which could be produced in original or in redacted form.  See Opinion and Order Regulating Testimony at Depositions When Answers Might Contain SSI at 6-8 (Mar. 31, 2006).  The TSA also had to develop procedures to provide security clearances for attorneys who would need to review disclosed information.  Rather than the normal manner of rulings by district courts on discovery disputes, discovery disputes with the TSA required administrative procedures leading to final determinations and judicial review by the

Courts of Appeals.  <u>See</u> Memorandum and Order Regulating Deposition Protocol and Supplementing Orders of March 31 and May 5, 2006 (May 16, 2006).  Then, the discovery proceedings relating to TSA and SSI disputes portended longer than anticipated delays, even for complex lawsuits.  <u>See, e.g.</u>, Conf. Tr. at 16 (May 12, 2006) (discussing number of attorneys who could represent parties at depositions involving SSI).  The complexity of discovery and the inevitable long delays prompted me to urge the parties to pursue settlements.  I suggested assistance by a Board of Mediators whom I proposed to appoint.  I told litigants and counsel that vindication by litigation, in addition to being uncertain and probably unsatisfactory, would consume a very long time because of the problems posed by the TSA filters of SSI.  <u>See</u> Conf. Tr. at 8 (Jan. 27, 2006).

The parties proposed Sheila L. Birnbaum, Esq., a widely respected practitioner in the field of mass torts and a partner of Skadden, Arps, Slate, Meagher & Flom LLP, to be the mediator.  <u>Id.</u> at 12-14 (Jan. 27, 2006).  I accepted immediately.  Her Report summarizes her work and that of Thomas E. Fox, Esq., also of Skadden, Arps.  Their efforts directly led to the settlement of seventy-two cases.[5]  Only three cases remain.  Without her patience, skill, empathy, and persistence, these results would not have been achieved.  I accept her report, and order it to be filed with this opinion and the court records of this litigation.  <u>See</u> Report of the Mediator on the Mediation and Settlement Efforts of the Parties in the Cases Previously Docketed under 21 MC 97 (Mar. 3, 2009) (attached).

Ms. Birnbaum's involvement initially led to a spate of settled cases, but negotiations then seemed to stall, just as they had done before her appointment.  The attorneys reported sharp differences between the perceived values of cases that their

---

[5] Six other cases settled without mediation during this time and one case was dismissed.

discussions were not able to bridge.  Without a way to obtain a more objective

assessment, additional settlements became unlikely.

Nevertheless, litigants still wished to settle in preference to the risks and

long waits inherent in discovery and trial.  I determined that the problems of discovery

delay arose in connection with issues of liability, not damages.  The liability issues

required extensive discovery of witnesses whom the government did not want to produce

and of documents and information permeated with SSI.  The damages litigation required

discovery of limited facts – a decedent's past and potential income, the pain and suffering

just prior to death, perhaps the pain and suffering of near relatives, and the reasonable

income expectations of successors from decedents.  Although also difficult, these issues

could be discovered and tried in a relatively short time.  I ordered damages-only

discovery and damages-only jury trials in six cases, a sample of the field, that were to be

identified jointly by plaintiffs and defendants, or by me if the parties could not agree.

Order Scheduling Damages Trial and Pretrial Proceedings (July 2, 2007); <u>see</u> Opinion

Supporting Order to Sever Issues of Damages and Liability in Selected Cases, and to

Schedule Trial of Issues of Damages, 2007 WL 1975559 (S.D.N.Y. July 5, 2007).  Both

sides objected because of the absence of precedents, but they acquiesced upon

reconsideration, and when it became clear that I was determined to proceed.

The experiment was successful.  After some discovery, and without the

need of any trials, all six cases settled and more followed.  The values were moderately

higher than previous settlements, but acceptably so.  In a few cases, I approved

contingent fees of 20% of recoveries in recognition of the additional work that the

attorneys performed and the exceptional quality of that work.  Sealed Orders (Jan. 31 and

Mar. 13, 2008); <u>see</u> 567 F. Supp. 2d 611, 617 (S.D.N.Y. 2008).

   One additional problem was encountered.  There were, by now, relatively

few cases left of the original ninety-five.  One law firm, after rejecting the mediator's

offer of assistance, succeeded in negotiating settlements for a group of four cases.  These

settlements were larger than similarly situated earlier cases and higher than the

recommendations of the mediator.  The law firm, having successfully leveraged on a

group settlement that would have left very few cases remaining on the calendar,

demanded a fee of 25% citing their success and their clients' written agreements.

Defendants were willing to pay these larger sums to settle, I believed, because of

significant balance sheet benefits they could obtain by clearing loss reserves set aside for

administering trial, given how few cases would have remained against the insurers' loss

reserves.

   I disapproved the settlements and the fees as disproportionately large.  567

F. Supp. 2d 611 (S.D.N.Y. 2008) (vacating four settlements and fees); 2008 U.S. Dist.

LEXIS 103894 (Aug. 28, 2008) (denying counsel's motion to reconsider).  The litigants

then accepted the assistance of the mediator and agreed to settlements that were

consistent with previous settlements.  They also agreed to a 15% contingency fee.  I then

approved the settlements.

   At this point, there are only three cases left of the original ninety-five.  I

ordered 21 MC 97 closed, and transferred the three wrongful death cases to 21 MC 101,

to conduct discovery, and to be tried, according to procedures in relation to all the

property-damage cases.  Ms. Birnbaum and Mr. Fox have completed their assignment.

Ms. Birnbaum, assisted by Mr. Fox, has performed extraordinary work to settle the September 11 wrongful death and personal injury litigation.  In her report, Ms. Birnbaum describes the settlement process and the factors that most influenced settlement values.  She allowed each of the plaintiffs' families to express their loss and the quality of the lives lost on September 11.  She absorbed their losses and their pain with empathy and brought opposing counsel and high officers of the airlines to sit in their presence and hear their stories.  She gained plaintiffs' confidence.  Without her assistance, most of these cases, in my opinion, would not have settled.

Equality among similarly situated claimants is a concept difficult to quantify.  Ms. Birnbaum describes the affects on settlements of different future earning potentials, of different dependencies among family members, of different laws governing the recovery for pain and suffering, of different relevant state and foreign laws, and of other variables.  Plaintiffs' lawyers were vigorous in pressing these differences to the advantage of their clients – that, indeed, was their duty.  Defendants' lawyers, just as avidly, resisted.  The process was difficult.  Fortunately, Ms. Birnbaum and Mr. Fox were suited for the task, for their tireless work produced settlements satisfactory to plaintiffs and defendants, on a consistent, fair, and just basis.  Ms. Birnbaum and Mr. Fox merit the great praise expressed by litigants, counsel, and the court.

SO ORDERED.

Dated: New York, New York
        March 4, 2009

ALVIN K. HELLERSTEIN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE: SEPTEMBER 11 LITIGATION          : 21 MC 101 (formerly 21 MC 97) (AKH)


--------------------------------------------------------x


### REPORT OF THE MEDIATOR
### ON THE MEDIATION AND SETTLEMENT EFFORTS OF THE PARTIES IN
### THE CASES PREVIOUSLY DOCKETED UNDER 21 MC 97

COMES NOW Sheila L. Birnbaum, Esquire, a member of the bar of this

Court and the mediator agreed to by the parties and approved by the Court, to report to

the Court on the mediation efforts of the parties and the resulting settlements in

connection with the claims brought against passenger airline carriers, airport security

companies, and others for wrongful death because a person was present on one of the

various flights or was located at the World Trade Center or the Pentagon at the time of

the terrorist attacks on the morning of September 11, 2001. These mediation efforts also

included several personal injury claims brought by people who were present in or near

the World Trade Center or in the Pentagon at the time of the terrorist attacks on those

locations on the morning of September 11, 2001. The terms of the settlements that were

negotiated as a result of these efforts are confidential. Therefore, this report cannot go

into the specific amounts of the individual settlements that occurred.

## THE CONTEXT OF THESE CASES AND THE MEDIATION

Shortly after the terrorist attacks of September 11, 2001, the Air Transportation Safety and System Stabilization Act, 49 U.S.C. §§40101 et seq. (hereinafter the "Act"), was enacted and signed into law. The Act expressly was intended to preserve the continued viability of the air transportation system in the United States. Among the Act's provisions was the establishment of the September 11th Victim Compensation Fund of 2001 (hereinafter the "Fund") to be administered by a Special Master. The Act established the Fund as an administrative alternative to litigation for the immediate victims of the terrorist attacks of September 11, 2001. As set forth in the Special Master's report, the participation in the Fund included approximately 97% of the claims by families of the victims of the attacks. The Fund paid out approximately $7.049 billion in compensation and completed its operation in about 33 months. Therefore, those participating in the Fund received their compensation payments no later than early in 2004, fulfilling one of the goals of the Act by providing financial assistance to the victims of the attacks without the delay, cost, and uncertainty of traditional litigation.[1]

For those foregoing the administrative alternative of the Fund and choosing traditional litigation, the Act provided a federal cause of action as the exclusive remedy for damages arising out of the September 11, 2001 attacks. The Act also provided that the exclusive jurisdiction for this federal cause of action is the United States

---

[1]    Department of Justice, Kenneth R. Feinberg, Esq., Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001 (2004), which is available at http://www.usdoj.gov/final_report.pdf

2

District Court for the Southern District of New York. The Act further limited the liability of the air carriers and other aviation defendants to the limits of their insurance coverages. The Act also mandated that the choice of law rules of the state where a particular flight crashed would govern the claims emanating from that flight.

Approximately 3% of the potential claimants filed traditional litigation cases in the United States District Court for the Southern District of New York pursuant to the exclusive federal cause of action created by the Act in lieu of participation in the Fund. These cases formerly were part of docket 21 MC 97. These cases consisted of 95 wrongful death and personal injury cases arising from the death or injury of 96 people. There were 85 wrongful death claims and 11 personal injury claims. Fifteen different law firms represented one or more of the various plaintiffs in these cases.

The 95 cases in total involved decedents on each of the four flights that were the targets of the terrorist attacks and some decedents who had been located on the ground. The 95 cases were distributed among the flights as follows: American Airlines flight 11, which crashed into 1-WTC involved 27 cases, of which six were filed on behalf of people who were located on the ground; American Airlines flight 77, which crashed into the Pentagon involved 30 cases, of which seven were filed on behalf of people who were located on the ground; United Airlines flight 175, which crashed into 2-WTC involved 20 cases, of which six were filed on behalf of people located on the ground; and United Airlines flight 93, which crashed in an open field in Pennsylvania involved 14 cases. In addition, four cases were filed by plaintiffs who allegedly sustained personal injuries in the vicinity of the World Trade Center Towers in New York. One of these cases was previously dismissed by the Court.

3

As anticipated by the Act, these litigated cases have been subject to extensive delays due in part to broad discovery efforts, costs, and uncertainty not only of that inherent in any litigated matter, but also due to the unique and complex discovery and substantive law issues raised by litigating the events and circumstances surrounding that fateful morning.  This Court has issued numerous opinions in these cases over the ensuing years, which provide greater detail of the complex and time consuming issues raised in these litigated cases.

Approximately 13 cases were settled prior to the commencement of these mediation efforts.  Thus, 82 cases remained to be mediated.  Given the likelihood of continued delays in these litigated cases and the slow pace of the negotiated settlements between the parties, the Court encouraged the parties to engage in mediation efforts.  Representatives of both plaintiffs and defendants contacted me in or about January of 2006 to see if I would be willing to serve as a neutral mediator in an effort to facilitate settlements among the parties in these cases.  I agreed to do so and my role as mediator was approved by the Court in February of 2006.  With the approval of the Court and the parties, I also arranged for Thomas Fox, Esq. of my office and also a member of the bar of this Court to assist me in connection with these mediation efforts.

**THE PROCESS OF THIS MEDIATION**

The mediation process began with an orientation session conducted by the parties' counsel to review the issues raised by these unique cases.  We became familiar with the substantive legal and factual claims and defenses being raised by the parties.  To this end, lawyers for all of the parties to the mediation attended a two-day mediation

4

session in New York in February 2006. Representatives of plaintiffs and defendants discussed the unique substantive legal and factual issues involved in these cases.

In addition, we were provided detailed briefing booklets prepared by the various plaintiffs' counsel providing the personal details of each of the decedents and injured plaintiffs whose cases were included in the mediation process. Without doubt and without exception, the personal stories of the decedents and the circumstances surrounding their deaths were compelling on a personal level and the devastating loss to family and friends surrounding them was quite moving.

Following the initial mediation sessions, we began a series of meetings between representatives of defendants and individual plaintiffs' law firms to mediate specifically the cases represented by that plaintiffs' law firm. In fact, we scheduled multiple tracks of these meetings so that more than one plaintiffs' law firm was involved in mediated settlement discussions during the same general period of time. We employed standard mediation techniques. Often we held a joint meeting of the parties' representatives initially and then met with those representatives separately to discuss the issues and the respective settlement positions of the parties. As the parties' positions narrowed, we sometimes would make recommendations on how a gap should be resolved. In every instance, it was ultimately the choice of the individual clients whether to accept a settlement or not.

5

Settlements were reached in approximately 12 cases during the period from March through May of 2006. All of these settlements were approved by the Court.[2] However, it became clear following these early mediation sessions that one obstacle to reaching settlements was the sense on the part of many of the families that either (i) they had not had an opportunity to tell the story of their loss and express their feelings to a representative of the Court, and/or (ii) they had not had an opportunity to tell the story of their loss to a representative of the airlines and to personally receive expressions of condolences for their loss from the airlines. In addition, some families had difficulty accepting a monetary settlement to resolve the claims over the loss of their loved ones because of the tendency to equate the amount of any monetary settlement of a legal claim with the value of the actual lives of their family members who were lost.

We decided that if the mediations were to have a better chance of succeeding, the families would have to be present and have an opportunity to express themselves. Mediation sessions were then scheduled and held involving representative of the defendant airlines and security companies and the individual families of those killed or injured in the attacks. These meetings occurred over a period of months and took place in Washington, D.C., New York City, and Boston. Needless to say, the meetings with the families were a heart-wrenching and emotionally draining experience for all involved.

---

[2]     Because the Act limits the pool of recovery to the available liability insurance limits, all settlements were subject to the approval of the Court following review by parties in the property damage and other related litigations pursuant to protocols agreed to by the parties to facilitate settlements.

These meetings with the families provided a confidential mechanism to meet some of the needs of the families involved as well as providing an appropriately focused environment within which to resolve cases. Families were able to convey to the mediator and to representatives of the airlines and security companies – both legal counsel and company officers – personal details about their loss and the difficulties they have faced subsequently. Families also were able to personally hear from the mediator and representatives of the airlines and security companies sincere expressions of condolences for their loss on both an official and personal level. In addition, these sessions provided an opportunity for me as the mediator to explain the limitations of our imperfect tort system and how the system of monetary recovery in wrongful death cases does not even try to value a person's life because that simply cannot be done. These lengthy and emotionally draining meetings were critical in being able to reach settlements in many of the cases. Further, as the Court is aware, at my request and with the consent of the parties, the Court itself participated in some of these mediation sessions, which were held at the federal courthouse in Manhattan. Some of the cases involved uniquely difficult issues.

Some of the cases also presented difficult issues concerning the value of the economic claims at issue in the case. Often this involved a decedent who had a high income when he or she died and/or who had a claim of high future earnings. The mediation efforts in these cases at times involved the preparation and discussion of conflicting expert economic reports and analyses in an effort to define more precisely a reasoned value of a plaintiff's economic loss claim in order to permit negotiations to succeed.

7

These efforts persisted over a period of 19 months and resulted in settlements in 53 cases, including eight cases that were settled during a prolonged mediation session held on September 24, 2007. The settlements reached on September 24, 2007 included cases that had been set for damages-only trials by the Court. Each of these settlements were approved subsequently by the Court. These negotiations also laid the ground work for additional settlements that were reached directly between the parties on October 4, 2007. Following these settlements, additional conference calls and discussions were held separately with representatives of the parties to further assist in the resolution of the remaining cases. However, no further mediation meetings occurred, although representatives of the parties continued discussions and reached some additional settlements outside of the mediation.

The four cases represented by the Azrael Gann & Franz firm that were subject to this Court's Order dated July 24, 2008 disapproving the settlements and rejecting a request for higher attorney fees were cases that reached an impasse during the mediation and settlement was attempted subsequently by the parties outside of the mediation. Following the Court's decision to disapprove these settlements, the parties sought my assistance to try to resolve the cases in a manner consistent with the Court's Order dated July 24, 2008. As a result of numerous conference calls and discussions with the lawyers for the parties that occurred from August to October, 2008, new settlements were reached in these four cases consistent with the Court's Order dated July 24, 2008. These settlements were subsequently approved by the Court.

Following these settlements, there remained only 4 unsettled cases out of the original docket. Given all of the prior settlements and the guidance that could be

8

gleaned from the Court's Order of July 24, 2008, we endeavored to have one last mediation session at the courthouse in Manhattan involving the decision makers in each case. Of these 4 remaining cases, only the decision makers in 1 case had been previously involved in the mediation. The courthouse was selected as the site of the mediation session to facilitate the Court's participation in the mediation of the cases. These 4 cases were mediated over the days of December 3 and 4, 2008. It resulted in the settlement of one of the cases. Productive conversations in good faith occurred in the other 3 cases, but no settlements were reached. It is not my position or the purpose of this report to speculate on or disclose the specific reasons why the 3 remaining cases have not settled.

In summary, there were 95 cases (covering 96 claims) that originally made up the Court's docket. Of these, 72 cases (covering 73 claims) were settled directly as a result of the mediation efforts, 6 cases were settled directly between the parties separately during the period of the mediation, 13 cases were settled prior to the mediation, 1 case was dismissed by motion, and there are 3 remaining cases.

## THE SUMMARY OF SETTLEMENT STATISTICS BY FLIGHT/LOCATION

| American Airlines Flight 11 | Settled Claims | Remaining Claims Pending |
|---|---|---|
| Passengers (15) | 14 | 1 |
| Crew (6) | 5 | 1 |
| 1 WTC Ground Death Claimants (5) | 5 | 0 |
| 1 WTC Personal Injury Claimants (1) | 1 | 0 |
| Total | 25 | 2 |

| American Airlines Flight 77 | Settled Claims | Remaining Claims Pending |
|---|---|---|
| Passengers (23) | 23 | 0 |
| Crew (0) | 0 | 0 |
| Ground Death Claimants (4) | 4 | 0 |
| Ground Personal Injury Claimants (4) | 4 | 0 |
| Total | 31 | 0 |

9

| United Airlines Flight 175 | Settled Claims | Remaining Claims Pending |
|---|---|---|
| Passengers (13) | 12 | 1 |
| Crew (1) | 1 | 0 |
| 2 WTC Ground Death Claimants (4) | 4 | 0 |
| 2 WTC Personal Injury Claimants (2) | 2 | 0 |
| Total | 19 | 1 |

| United Airlines Flight 93 | Settled Claims | Remaining Claims Pending |
|---|---|---|
| Passengers (14) | 14 | 0 |
| Crew (0) | 0 | |
| Total | 14 | 0 |

| Unknown Location at Ground Zero | Settled/Dismissed Claims | Remaining Claims Pending |
|---|---|---|
| 1 & 2 WTC Personal Injury Claimants (4) | 4 | 0 |
| 1 & 2 WTC Ground Death Claimants (0) | 0 | |
| Total | 4 | 0 |

Statistics by Carrier Airline:

| Airline | Settled Claims | Remaining Claims Pending |
|---|---|---|
| American Airlines Claims (58) | 56 | 2 |
| United Airlines Claims (34) | 33 | 1 |
| American/United Claims (4) | 4 | 0 |
| Total | 93 | 3 |

Thus, the 92 cases previously settled involved 93 claims.

## FACTORS AFFECTING SETTLEMENT VALUES

Cases were evaluated and negotiated on an individual basis in the

mediation. However, certain demographic factors were often looked at in making rough

comparisons among cases with regard to people who were, in a very general sense,

similarly situated. These factors included marital status, age, number and age of children

and other dependents, income level, and working life expectancy.

Beyond these demographic and income factors, consideration had to be

given in each case to other factors. These included, for example, variations in the laws of

the various States pertaining to the availability and calculation of damages in wrongful

10

death cases, whether a claim was governed by International Treaty, and the presence of any individualized facts worthy of special consideration.

Under the Act, the substantive law to be applied to a given case would be determined by the choice of law rules of the jurisdiction in which the flight crashed. With respect to the three flights that crashed into New York and Pennsylvania, applicable choice of law rules required an analysis in which the domicile of the victim was an important factor. As a result, the claims of victims on the same flight with differing domiciles could vary depending on the different substantive law that might govern the elements of damage or differing methods of calculating damages. For example, under the law of New York, wrongful death damages are determined by calculating the pecuniary loss suffered by those economically dependent on the decedent. On the other hand, Connecticut law places the decedent's estate into the shoes of the decedent and his or her likely future income would be considered to determine the economic damages under the wrongful death statute without regard to whether there are economic dependents of the decedent. Differences in the various state laws, including disputes over domicile in some cases, is an example of how cases that were similarly situated in terms of basic demographics or income data could nonetheless result in differing settlement amounts.

With respect to American Airlines flight 77 that crashed into the Pentagon, the choice of law rule of the Commonwealth of Virginia applied. Under Virginia law, *lex loci delecti* is the operative choice of law rule. This meant that for cases emanating from American Airlines flight 77, the substantive law of Virginia would apply regardless of the domicile of the decedent. Under the Virginia wrongful death statute, the grief of surviving family members is an independent element of damages, unlike the law of many

11

other states, such as New York for example. While reported cases in Virginia explain that grief damages are subject to an objective standard and are not without reasonable limits, it is an element of damages that introduced a level of uncertainty into the evaluation of these cases, especially given the unique nature of the September 11, 2001 attacks. This substantive law difference in Virginia was somewhat tempered by the inability under Virginia law to recover for pre-impact conscious pain and suffering (even if provable), which is an element of damages recoverable under the laws of other states, including New York.

Again these examples are meant to illustrate how the potential application of the laws of the different States could affect the ultimate valuation of a given case beyond the age, income, and other family demographics of the decedents.

Furthermore, several cases involved victims who were traveling on tickets for international passage and therefore were covered by International Treaty (*i.e.*, the Warsaw Convention and related protocols). Coverage under Treaty provisions raised other issues that affected the value of cases, including strict liability and pre-judgment interest issues.

In addition, beyond the application of different domestic or international laws, there were individual circumstances in cases that simply required different treatment by the parties in settlement negotiations. Examples of some of these special individual factors include: surviving parents or spouses of the decedent having serious health conditions that were going to have required additional support from the decedent; children and/or siblings of the decedent having severe permanent physical or emotional disabilities pre-dating the decedent's death where the decedent offered financial or other

12

valuable support to that child or sibling; and very high incomes and the presence and likely future growth of stock options.

Therefore, cases could legitimately be viewed differently for settlement as a result of the presence of one or more of these factors. This is why each case had to be looked at and negotiated individually in the mediation. However, these individual factors notwithstanding, the age, income and family situation of the decedent provided a basis to make a rough comparison of the range of settlements of decedents who were in a general sense similarly situated as well as permitting the identification of settlements that might seem outside of that range.

The settlements arrived at in this process are confidential. Without disclosing actual numbers, but in order to give some sense of scale of these efforts, the aggregate total of the settlements, both those made previously (as advised by the court) and those reached directly due to the mediation efforts, were approximately $500 million. As indicated previously, some of these cases involved decedents with extremely high earnings and/or other exceptional circumstances, life insurance and other collateral source payments did not have to be (and were not) deducted, and many different aspects of law played significant roles. Therefore, a straight per case average of this amount would be misleading. Furthermore, and ever more importantly, no figure can affect the personal loss and painful anguish suffered by the families who lost loved ones in this national tragedy.

13

## THE CASES REMAINING

Of the 3 cases remaining that were formerly part of 21 MC 97, 2 cases arise from American Airlines flight 11 and 1 case arises from United Airlines flight 175. All of these remaining cases are wrongful death cases.

## FINAL COMMENTS

The settlement of these cases was made possible only because of the existence of the Fund and the fact that 97% of the claims participated in the Fund. Absent the Fund, the thousands of traditional tort cases that would have been filed likely would have created an enormous burden on the courts. Moreover, those claims may have forced several airline and other companies to file for protection under the bankruptcy law. Absent the Fund, most, if not all, of the thousands of families, would not have received any compensation as a result of litigation even these 7 years later.

One question that invariably will be asked is whether those who chose not to participate in the Fund secured greater compensation than those who participated in the Fund. Even in hindsight, this is an impossible question to completely answer. Those who participated in the Fund obtained recoveries that were without the uncertainty of the litigation and were obtained rapidly. Many of those who participated in the Fund also obtained those recoveries having to pay little or no attorneys' fees.

The reasons families did not choose the Fund, but decided to litigate were varied. Some believed that there would have been substantial reductions in their recovery in the Fund due to collateral sources of recovery (e.g., insurance) or a recovery formula that did not account for very high income levels.

14

These mediated settlements occurred years after the recoveries were obtained from the Fund and with a great deal of uncertainty along the way. Further, the recoveries here were subject to the payment of attorneys fees. The families of decedents with very high incomes probably achieved settlements that would have been unlikely achievable through the Fund because of the rules governing the Fund, including deductions for collateral sources of recovery such as life insurance policies. These deductions typically are not made in traditional litigation cases. Therefore, given the lengthier passage of time for these settlements to be negotiated, approved and paid, the added physical burden and emotional toll of the prolonged and uncertain litigation and settlement process, and the delay in achieving some measure of closure and financial security because of the ongoing litigation, it is impossible to judge whether people similarly situated who pursued the traditional litigation track and settled their cases pursuant to mediation did better overall than those who participated in the Fund, regardless of any differences in gross settlement amounts.

This situation nonetheless picks up on a question raised by the Special Master of the Fund. In the event of a future tragic event like that of September 11, 2001, does it make good public policy to have a fund similar to the Fund in this instance? However, if there were to be a fund established in the future in response to such an event, the question also must be asked whether the fund should be the exclusive remedy. Obviously, it only would be by making recovery from such a fund the exclusive remedy that would guarantee the use of consistently applied criteria to value and compensate like claims without the serendipity of factors such as in what state did the fatality occur or the domicile of the decedent. On the other hand, since we live and are governed by the laws

15

of the several states and their variations, the fact that different outcomes -- or for that matter different settlement resolutions -- can result due to the application of different state laws is an inevitable consequence of our legal system.

I would be remiss if this report did not recognize the outstanding professionalism and good faith exercised by the respective counsel for all of the parties in those cases where settlement was achieved during our mediation efforts. Similarly, the support and cooperation of the Court in the conduct of these mediation efforts was extensive and unfailing. These circumstances combined to enable the mediation efforts to succeed as well as they did. It has been a privilege and honor meeting with the families in this process and working with counsel on both sides and the Court.

DATED: March 3, 2009

Respectfully submitted,

Sheila L. Birnbaum
Thomas E. Fox
**Skadden, Arps, Slate, Meagher & Flom LLP**
4 Times Square
New York, NY 10036
(212)735-3000

16