**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | 21-MC-101 (AKH) |
| | : | |
| | : | This Response to Motion relates to: |
| IN RE SEPTEMBER 11 LITIGATION | : | 04-CV-7318 |
| | : | |
| | : | Oral Argument Requested. |

**RESPONSE OF CANTOR FITZGERALD PLAINTIFFS**
**TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**
**PURSUANT TO LOCAL RULE 56.1**

Pursuant to Rule 56.1 of the Local Rules of Practice for the United States District Court

for the Southern District of New York, Cantor[1] submits this Response to the Statement of

Undisputed Facts by defendants American Airlines, Inc. and AMR Corporation (collectively

"American Airlines") and Statement of Additional Material Facts in Opposition to American

Airlines' Motion.

**Cantor Fitzgerald, L.P. and Its Affiliates**

1.      Admit.

2.      Admit.

3.      Admit.

4.      Admit.

5.      Admit.

6.      Admit.

---

[1]      Plaintiffs Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald, L.P., Cantor Index Limited, CO2e.com, LLC, eSpeed Government Securities, Inc., eSpeed, Inc., eSpeed Securities, Inc., and TradeSpark, L.P. (collectively, "Cantor").

7.      Admit in part, deny in part.  Deny to the extent that Mr. Thaler also testified that Cantor's success was based upon ███████████████████████████ ███████████ Ex. F to Stoviak Decl., deposition of Cantor's damages expert, Gregory S. Thaler, dated June 3, 2010 ("Thaler Dep."), at 12.

8.      Admit.

9.      Admit.

10.     Admit.

11.     Admit in part, deny in part.  Deny to the extent that the statement implies that "human capital" is the only factor that enables Cantor to deliver its services.  Cantor relies on human capital, among numerous other factors, such as a strong technological infrastructure, to deliver its services. *See, e.g.,* Ex. M to Stoviak Decl., eSpeed 10K for the Fiscal Year ended December 31, 2001 ("eSpeed 10K"), at 11 ("We devote substantial efforts to the development and improvement of our electronic marketplaces and licensed software products."); Thaler Dep., at 25-27, 38-39, 250, 287 (discussing the broad range of injuries Cantor suffered as a result of American Airlines' negligence).

12.     Admit in part, deny in part.  Deny to the extent that the statement fails to acknowledge the full range of factors that account for the success of Cantor's business.  In addition to the skill, dedication, and resolve of its employees, Cantor can credit its success to its reputation as the place to go for excellent liquidity in the U.S. treasury securities market and many other markets.  Ex. I to the Stoviak Decl., Declaration of Stephen M. Merkel ("Merkel Decl.") ¶ 4.  Cantor can also credit its success to its technological development, such as the eSpeed "technology platform," which consisted of several proprietary and customized

components that enabled its clients "to effect transactions in real-time, with straight-through processing." eSpeed 10K, at 3-4.

13.     Admit in part, deny in part.  Deny to the extent that the statement implies that eSpeed is based primarily on relationships, to the exclusion of other factors.  eSpeed's technological platform is what allows it to complete transactions, and thus, to provide service to its customers and build relationships.  *See id.* at 13-15 (discussing eSpeed's dependence on technological infrastructure, noting that eSpeed "experienced systems and telecommunications failures in connection with the terrorist attacks of September 11, 2001," and noting that future system failures were possible and "could damage our reputation, business, and brand name."); *see also id.* at 15-16 (discussing the need for eSpeed to be improving its technology continuously, and warning, "If we are unable to keep up with rapid technological changes, we may not be able to compete effectively.")

14.     Admit in part, deny in part.  Deny to the extent that the statement fails to take into account the full range of factors leading to Cantor's success.  In addition to Cantor's personnel and their books of business, many other factors are important to Cantor's successful business operations, such as its technological infrastructure, its technological innovation, and its reputation as a preeminent interdealer broker.  *See, e.g.,* Ex. J to the Stoviak Decl., Submission of Cantor Fitzgerald, L.P., eSpeed, Inc., and TradeSpark L.P. to the Special Master of the September 11th Victim Compensation Fund of 2001 and to the United States Department of Justice ("VCF Submission"), at 10 (Sept. 12, 2002) (discussing Cantor's "reputation as a technological pioneer" and the patented software algorithm it developed in connection with eSpeed); *id.* at 16 (discussing Cantor's "philosophy of using technology and capital to create dynamic new marketplaces"); Thaler Dep., at 12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

15.     Admit in part, deny in part.  Deny to the extent that the statement fails to account for other factors leading to the continued success of Cantor.  Cantor depends on the continued service of its officers and employees, along with its technological infrastructure and innovation and its brand, for its continued success.  *See, e.g.,* VCF Submission, at 16 (discussing the "sophisticated electronic trading execution" the equities division provided); *id.* at 10 (discussing Cantor's "reputation as a technological pioneer" and the patented software algorithm it developed in connection with eSpeed); *id.* at 16 (discussing Cantor's "philosophy of using technology and capital to create dynamic new marketplaces").

16.     Admit in part, deny in part  Deny to the extent that the statement carries an implication that Cantor is unusual in this regard.  Cantor, like any successful business, must be selective in determining whom it hires because, in order to survive, it must gain as much value as possible from the resources it spends on personnel.

17.     Admit in part, deny in part.  Deny to the extent that the statement carries an implication that Cantor is unusual in this regard.  Cantor, like any successful business, is committed to choosing the best personnel possible from the pool of applications it receives, and training its personnel as extensively as it can.

18.     Admit in part, deny in part.  Deny to the extent that the statement implies that Cantor faced no limitations on its recruiting ability.  Cantor must compete with numerous other financial firms to recruit and develop talent.

19.     Admit in part, deny in part.  Deny to the extent that the statement implies that Cantor's compensation is out of line for its industry.  *See id.* at 6 ("In order to retain its employees in the highly competitive environment of brokerage and technology firms, Cantor Fitzgerald compensated its employees well.").

20.     Admit.

21.     Admit.

**The Impact of the Events of September 11, 2001 on Cantor**

22.     Admit.

23.     Admit.

24.     Admit.

25.     Admit.

26.     Admit.

27.     Admit.

28.     Admit in part, deny in part.  Deny to the extent that the statement implies that the London and Rochelle Park sites formed an adequate, full-scale replacement for Cantor's destroyed technological infrastructure.  Cantor's London office was designed to supplement Cantor's overall capability, not to serve as a full-scale replacement for the technology that was destroyed in the World Trade Center offices.  Routing transactions through London and Rochelle

Park allowed Cantor to conduct transactions, but at a lower rate of speed and efficiency. *See* Ex. N to Stoviak Decl., Tom Barbash, *On Top of the World: Cantor Fitzgerald, Howard Lutnick, and 9/11: A Story of Loss and Renewal* 33 (HarperCollins Publishers 2003) ("Barbash") (stating that in order to resume bond trading, Cantor personnel were "improvising" means of connecting to the London offices, and that this arrangement was "an entirely new way of doing business, conducted in large part by Brits who know little about the U.S. bond market"); *id.* at 33-34 (stating that Cantor was "asking [its] London operations staff to *build* a U.S. Treasuries clearing system" and that this request "was, on the face of it, absurd") (emphasis added); *id.* at 44 (noting that "with the back-office systems in pieces . . . clearing anything was an ordeal" upon Cantor's resumption of trading); eSpeed 10K, at 13 (noting that as of March 2002, Cantor was "not currently trading many of the financial products" it customarily did prior to the destruction of its offices).

29.    Admit in part, deny in part.  Deny to the extent that the statement implies that Cantor's trading operations had returned to full strength as of September 13, 2001.  Cantor resumed trading bonds on September 13, 2001, but its efficiency was substantially diminished. For instance, despite routing functions through London and Rochelle Park, eSpeed would still have been unable to function if another electronic trading company, ICI/ADP, had not volunteered to clear and settle eSpeed's transactions through its own connections. Ex. O to Stoviak Decl., Jack Lyne, *Cantor Fitzgerald Finds Permanent NYC HQ, Will Add 200 Jobs*, Site Selection Online Insider, August 2, 2004; *see also* Ex. P to Stoviak Decl., Paul Maidment, *The Electronic Future of Cantor Fitzgerald*, Forbes.com, October 5, 2001 (noting that eSpeed's competitors had "eroded some of eSpeed's market share.  In part, this has been because eSpeed's trading platform has suffered several outages, brokers say."); Ex. Q to Stoviak Decl., Noelle

Knox, *Cantor Battles Back from Tragedy*, USA Today, November 12, 2001, at 1B (quoting Cantor client who said, "The easy flow that used to be Cantor getting trades done is not there yet"); Barbash, at 56 (discussing re-opening and stating, "One major problem was the phone system. You'd get busy signals all day. . . . And when you finally got it through, everything was delayed."); *id.* at 44 (noting that "with the back-office systems in pieces . . . clearing anything was an ordeal" upon Cantor's resumption of trading). Moreover, Cantor's market share began to decline very shortly after the events of September 11, 2001. Ex. E to Stoviak Decl., report of Cantor's damages expert, Gregory S. Thaler, dated May 25, 2010 ("Thaler Report") ¶ 22 (representing the decline of Cantor's market share in four main business lines as of September, 2001).

30.    Admit.

31.    Admit.

32.    Admit.

**Cantor's Proffered Expert Report and its Methodology**

33.    Admit.

34.    Deny. This Court instructed American Airlines to withdraw the motion to modify the Confidentiality and Restrictions Upon Use and Admissibility. *See* Ex. R to Stoviak Decl., Transcript of Proceedings in Open Court at 12, *In re September 11 Litigation*, No. 21-MC-101 (AKH) (S.D.N.Y. July 30, 2010). References by American Airlines to settlement-related documents produced in connection with the Court-ordered confidential mediation process are improper.

35.    Admit.

36.    Admit.

37.    Admit.

38.    Admit.

39.    Admit.

40.    Admit in part, deny in part.  Deny as to the dollar amounts in the statement. Cantor's property damage claim was approximately ██████████ and Cantor received an insurance payout of approximately ████████. Thaler Report ¶ 74.

41.    Admit.  To clarify, Cantor's claimed business interruption losses include, among other things, the costs associated with Cantor's loss of its headquarters, its loss of its main technology platforms, its loss of records, and the decline in its market share due to the damage to its reputation as a result of the grievous losses it suffered on September 11, 2001.  *See* Thaler Dep., at 25 ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

42.    Admit.

43.    Admit.

44.    Admit.

45.    Admit.

## Business Impact from the Deaths of Personnel

46.    Deny.  Mr. Thaler calculated damages for the overall losses Cantor suffered as a result of American Airlines' negligence.  Mr. Thaler did not attribute Cantor's losses separately to each variety of harm it suffered due to American Airlines' negligence on September 11, 2001. *See id.* at 33-34 ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████. Mr. Thaler's testimony provides no basis for the assertion that a "significant portion of the business interruption damages calculated" in his report "resulted from the deaths of Cantor's officers and its employees." *See generally id.*

47.    Admit.

48.    Deny.   Cantor did not state that the deaths of its personnel were more economically important than the loss of its office space to its ability to continue its business operations. The words "more importantly" were meant to reflect the value of Cantor's employees as human beings, and to acknowledge the horrific impact of their deaths on their thousands of loved ones.  It was not a clinical assessment of the damage to the Cantor enterprise.  Ex. S to Stoviak Decl., January 2002 ESDC Letter, at p. 1.

49.    Admit.

50.    Admit in part, deny in part.  Deny to the extent that the statement claims the Barbash quote indicates that the deaths of Cantor personnel had a greater impact than the other losses Cantor suffered.  The statement is an accurate quote from the Barbash book, but does not serve as an assertion that the deaths of Cantor personnel had a greater impact than the other

losses Cantor suffered.    On its face, the statement shows the challenges Cantor faced in continuing its business in the face of multiple problems caused by American Airlines' negligence; it does not rank any one factor as having a greater impact. *See* Barbash, at 31.

51.    Deny.    Deny to the extent that the statement claims that deaths of Cantor employees accounted for "most of the Extra Expenses" set forth in Mr. Thaler's report.    The categories of extra expenses were: ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

Thaler Report ¶¶ 27-41.

### A. The IDB Voice Business

52.    Admit.

53.    Admit.

54.    Admit.

55.    Admit.

56.    Deny.    Certain transactions could not be accomplished on the eSpeed interface. This was not due to the fact that these transactions were "complicated," but to the fact that eSpeed simply did not support certain types of financial instruments such as municipal bonds or corporate bonds. *See* Thaler Dep. at 255 (stating that for municipal bonds, ███████████████
████████████████████████████). eSpeed was a highly advanced platform, but was unable to process every single variety of instrument which Cantor's customers might want to transact. *Id.*

57.     Admit.

58.     Admit.

59.     Deny.  The statement sets forth a hypothetical situation as fact without citing any probative evidence.  There is no way to know what individual employees would have done if they had not been killed due to American Airlines' negligence.  Accordingly, Mr. Thaler's report only analyzes what did occur and its impact on Cantor.  *See id.* at 33 █████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.

60.     Admit in part, deny in part.  Deny to the extent that while the statement accurately acknowledges the devastating effect of the deaths of the brokers, it fails to acknowledge the full range of significant harm Cantor suffered on September 11, 2001, as a result of American Airlines' negligence.  *See* Thaler Dep., at 38-39 █████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██ ██████.

61.     Admit.

62.     Deny.  Cantor attempted to add interdealer voice brokers in the period shortly after September 11, 2001.  *See* Ex. T to Stoviak Decl., Rich Blake, *Miracle on Wall Street,* Institutional Investor, September, 2009, at 113 (noting that as of 2002, Cantor was "aggressively

recruiting new [interdealer] brokers," and discussing a new broker who had started in the fall of 2001).  However, given the overall damage to Cantor's enterprise, recruiting efforts ultimately proved unsuccessful in restoring the business.  *See* Thaler Dep. at 259 (stating that replacing brokers ███████████████ ).

63.    Admit.

64.    Admit.

65.    Admit.

### B. The ITD Business

66.    Admit.

67.    Admit.

68.    Deny.  The ITD brokers did not provide a service "essentially the same" as the IDB voice brokers.  The service was ████████ *id.*, at 285, but the customers and financial instruments were distinct., *id.* at 284-85.

69.    Admit in part, deny in part.  "Quality of service," as related to the clients of the ITD voice broker business, depends not only on the quality of the employee, but also on the capability of the firm's physical and technological infrastructure to process transactions.  *See* Barbash, at 56 (discussing problems in re-opening ITD trading after September 11, and quoting a Cantor employee as saying, "One major problem was the phone system.  You'd get busy signals all day. . . . It was controlled mayhem – you knew what you needed to do, but you couldn't get it done.  And when you finally got it through, everything was delayed.").

70.    Admit in part, deny in part.  Deny to the extent that the statement disregards numerous other factors upon which the ITD equities business depended for success.  The ITD

business depended not only on the quality of its employees, but also on the capability of the firm's physical and technological infrastructure to process transactions. *See id.* (discussing problems in re-opening ITD trading after September 11, and quoting a Cantor employee as saying, "One major problem was the phone system. You'd get busy signals all day. . . . It was controlled mayhem – you knew what you needed to do, but you couldn't get it done. And when you finally got it through, everything was delayed.").

71.    Admit.

72.    Admit in part, deny in part. Deny to the extent that the statement fails to present Mr. Thaler's complete testimony, which was: ███████████████████████

█████████████████████████████████████████████████████

██████ Thaler Dep., at 291-92.

73.    Admit.

74.    Admit in part, deny in part. Deny that fewer than 4 percent of entire ITD business line survived. In addition to the brokers in the World Trade Center offices, roughly 4 percent of whom survived, the ITD line had brokers elsewhere in the country. *See* Barbash, at 56 (discussing "traders in L.A." and the role they played when Cantor resumed equities trading); *id.* at 245-47 (discussing operations at Cantor's equities desk in Los Angeles).

75.    Admit.

### C. The Matched Book or "Repo" Desk

76.    Admit.

77.    Admit.

78.    Admit.

79.     Admit.

80.     Admit in part, deny in part.  Deny as to the contention that "poor decision-making" resulted in the loss of revenue.  The matched book transactions were highly complex and loss of revenue was a possibility even with fairly sound decision-making.  The Thaler deposition furnishes no basis to assess the decisions that led to the loss of revenue that occurred in 2004. *See generally id.*

### D. The IDB Electronic Business: eSpeed

81.     Admit.

82.     Admit in part, deny in part.  Deny to the extent that the statement presents this quote as an exhaustive description of eSpeed's personnel.  The quote is taken from a discussion of the competitive employment market in the financial services industry, not a broad description of eSpeed's workforce as a whole.  eSpeed 10K, at p. 16; *see also* VCF Submission, at 20 ("The eSpeed employees who were lost in the attack performed a broad range of functions, ranging from customer support to technology programming and administration.").

83.     Admit in part, deny in part.  Deny to the extent that the statement mischaracterizes Mr. Thaler's testimony to present eSpeed as a "relationship-based business." eSpeed was a business based on providing high-value service to its clients in a very efficient manner.  *See* eSpeed 10K, at 1 (discussing the importance of the firm's ability to "transact trading 24 hours a day, around the world," and for its transaction processing system to be "instantaneous and reliable").  eSpeed's objective was "to be the world's leading provider of interactive electronic marketplaces and related software solutions to a broad range of industries and vertical marketplaces." *Id.* at 9.  By meeting this objective, eSpeed sought to win return business from

clients, thus creating an ongoing relationship.   In this sense, any business with clients is "relationship-based."   Mr. Thaler's testimony reflects this reality.   Thaler Dep., at 256-57; *see also* Thaler Dep., at 66 ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████ ).

84.   Admit.

85.   Admit.

86.   Admit.

87.   Admit in part, deny in part.   Deny to the extent that the statement fails to acknowledge the full range of harm Cantor suffered on September 11, 2001, as a result of American Airlines' negligence.   *See* Thaler Dep., at 38-39 ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ ████████ .

88.   Admit.

**Failure to Disaggregate Damages Resulting from Employee Deaths**

89.     Admit in part, deny in part.  Deny to the extent that the statement carries an implication that Mr. Thaler was required to distinguish between damages attributable to property damage/loss of infrastructure and damages resulting from the deaths of Cantor personnel.  Mr. Thaler was required to determine the extent to which American Airlines' negligence harmed Cantor, and he did so.  *See id.* at 33-34 ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.

90.     Admit.

91.     Admit in part, deny in part.  Deny to the extent that the statement carries an implication that Mr. Thaler was required to distinguish between business interruption damages resulting from the deaths of Cantor employees and business interruption damages resulting from the destruction of Cantor's offices and infrastructure.  Mr. Thaler was required to determine the extent to which American's negligence harmed Cantor, and he did so.  *See id.* ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████.

92.     Admit in part, deny in part.  Deny to the extent that the statement carries an implication that Mr. Thaler was required to quantify what portion of Cantor's total business damages was attributable to the deaths of Cantor personnel.  Mr. Thaler was required to determine the extent to which American's negligence harmed Cantor, and he did so.  *See id.*

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ ████████.

**Extra Expenses**

93.      Admit.

94.      Admit in part, deny in part.  Deny to the extent that the statement does not include

all categories of Extra Expenses that Mr. Thaler calculated for Cantor.  The categories of extra

expenses  were:  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████.  Thaler

Report ¶¶ 27-41.

95.      Admit.

**STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

**Cantor Before 9/11**

1.      As of September 10, 2001, Cantor had a reputation as the preeminent interdealer

brokerage firm.  Cantor also was a major marketplace for so-called third market transactions in

exchange-listed stocks off the floor of the exchange.  *See* Merkel Decl. ¶ 3.

2.      As of September 10, 2001, a substantial portion of Cantor's revenue came from

providing brokerage services to institutional buyers and sellers of a broad range of financial

products.  *See* Thaler Report ¶ 13.

3.      Cantor's services included, among other things, traditional voice bond brokerage services and electronic bond brokerage services via eSpeed.[2] eSpeed is an electronic trading marketplace that allows buyers and sellers to purchase and sell financial and non-financial products without the use of a traditional voice broker. *Id.* ¶ 15.

4.      As of September 10, 2001, (1) Cantor and eSpeed together had become the world's largest wholesale marketplace for United States Treasuries; (2) Cantor had become the largest third-market equities broker in the United States; (3) Cantor had established itself as the world's leading non-exchange intermediary of financial instruments; (4) Cantor was transacting over $45 trillion in financial securities annually; and (5) Cantor's major investments in technology throughout the 1990s had culminated in the creation of eSpeed, the leading electronic global fixed income marketplace technology company. *See* VCF Submission, at 9.

5.      As an interdealer broker, much of Cantor's success was based on its ability to provide a competitive marketplace where willing sellers of financial instruments could be anonymously matched with willing buyers. *See id.* at 16. The success of an interdealer brokerage firm and a third market depends on its ability to sustain a diverse marketplace that includes as many active potential counterparties as possible – a factor usually called liquidity. Liquidity results in more competitive prices and quicker executions. Merkel Decl. ¶ 4. Maintaining such a competitive marketplace obviously depends on the brokerage firm's capacity to smoothly and quickly handle as many transactions as its clients require, as well as the firm's reputation for handling many large transactions effectively. A brokerage firm's preeminent

---

[2]      As a result of a merger between BGC Partners and eSpeed, Inc. in 2008, eSpeed, Inc. is now known as BGC Partners, Inc., but it still provides electronic brokerage services through its eSpeed® system. *See* Thaler Report ¶ 14.

status and reputation within the industry is an invaluable asset because it drives key dealers or institutional traders to use the brokerage firm in search of competitive transactions. *Id.* ¶ 5.

6.      Before American Airlines' Flight 11 destroyed Cantor's world headquarters, Cantor had a proven brand as a preeminent interdealer broker and third marketplace that attracted key customers to use Cantor. *Id.*  As one author commenting on Cantor's pre-9/11 market position explained, "If you wanted to do a big trade, to cross a billion bonds, you called Cantor." *See* Barbash, at 94.

### The Impact of 9/11 on Cantor

7.      The crash of American Airlines Flight 11 into Cantor's headquarters on September 11, 2001 injured Cantor in at least the following ways: (1) it destroyed Cantor's main offices in Tower One of the World Trade Center; (2) it substantially impaired Cantor's infrastructure and records; (3) it crippled the ability of a number of Cantor's trading and brokerage desks (business units) to operate; (4) it damaged Cantor's books of business and customer relationships; (5) it forced what was left of Cantor's management to devote almost all of its collective energies and skills to the task of defensively trying to preserve what little remained of the businesses; and (6) it devastated Cantor's brand and position as a dominant force within its industry. *See* Thaler Dep. at 9, 15, 17, 25-26, 38-39, 64-65, 227-30, 290-91.

8.      The complete destruction of Cantor's flagship office and technology and the loss of its personnel created the perception that Cantor could no longer host a diverse and competitive market for financial instruments. *Id.* at 14-15, 25-26, 249-50; *see also* Merkel Decl. ¶ 6.

9.      Although Cantor aggressively replaced its destroyed equipment and offices and rehired necessary personnel over a number of years, trading inevitably shifted to other brokerage

firms that had the instant capacity to host a large competitive market as soon as trading resumed after 9/11. *See, e.g.,* Thaler Report ¶¶ 21 ████████████████████████████████████, 29 ████████████████████████████████████████████; 72 ████████ ████████████████████████████. As a result of Cantor's lost status and reputation, Cantor lost its dominant market share in the industry. *See generally* Thaler Report.

10.    Prior to September 11, 2001, Cantor had a reputation as the preeminent source of U.S. Treasury security market data. After the damage Cantor suffered as a result of American Airlines' negligence on September 11, 2001, the cumulative effect of Cantor's losses led to a perception that Cantor was no longer able to provide the best market data product from its U.S. Treasury Securities operations. *See id.; see also* Merkel Decl. ¶¶ 3,6.

## The Thaler Report

11.    In calculating Cantor's business interruption damages, Mr. Thaler used a "but for" approach to determine what Cantor's business profits would have been if Flight 11 had not destroyed Cantor's business and flagship office and severely damaged Cantor's technology infrastructure and its brand as the dominant player in both the voice and interdealer broker businesses. *See* Thaler Report ¶ 53.

12.    In determining Cantor's business interruption damages, Mr. Thaler used a market share methodology, which is based on historic Cantor financial and accounting records, competitors' financial data, and industry data and takes into account trends affecting the entire industry. *See id.* ¶¶ 11, 53.

13.    For three of the four business lines that Mr. Thaler concluded were negatively affected by the events of September 11, 2001, Mr. Thaler identified Cantor's key competitors

which comprise the "market" in that business line. *Id.* ¶ 57. Mr. Thaler assumed that Cantor would have maintained its pre-9/11 share of this market even though Cantor's pre-9/11 success and growth suggested that Cantor would have continued to gain market share but for the failure of American Airlines to secure Flight 11. *See id.* ¶¶ 52, 54. For the electronic business, Mr. Thaler assumed that Cantor's market share would have declined slightly over time absent 9/11. *See id.* ¶ 52. Mr. Thaler then compared Cantor's projected revenues to the overall markets in each business line to determine an expected revenue for Cantor if Cantor's flagship office had not been destroyed. *See id.* ¶ 57. For the fourth business line (matched book/MMI), Mr. Thaler determined the business did not have any true competitors. Accordingly, Mr. Thaler assumed this business line would have produced the same revenues going forward then applied the balance of the methodology applied to the other three business lines. *See id.* ¶ 63.

14.     Once Mr. Thaler identified Cantor's projected net revenue with reasonable certainty, he then adjusted this revenue by deducting Cantor's actual earned revenues and saved expenses to determine lost profits from September 11, 2001 through the end of June 2009. *Id.* ¶¶ 10, 66-69.

15.     Mr. Thaler's model assumed that Cantor would have maintained comparable costs associated with employing all of its pre-9/11 personnel. This includes salary costs paid to staff, as well as commissions paid to brokers. *See* Thaler Dep. at 285-86.

16.     Mr. Thaler concluded that Cantor has suffered business interruption damages of ███████. Cantor's total loss amount as calculated by Mr. Thaler is ███████, including ███████ in extra expenses, ███████ in property damage, and a ███████ offset for insurance proceeds received. Thaler Report ¶ 10. Cantor's damages are comprised of: ███████ for interdealer broker electronic; ███████ for interdealer broker voice;

██████████ for third market equities; and ██████████ for matched book/MMI.   Ex. K to

Stoviak Decl., loss calculation model of Cantor's damages expert, Gregory S. Thaler, dated May

25, 2010 ("Loss Calculation Model"), at Sch. 2.

### Cantor's Support of its Employees

17.    Compensation to the dependents of deceased Cantor employees for lost earnings

has been paid for by the United States (not American Airlines) through the Victim Compensation

Fund ("VCF"), which was created as part of the Air Transportation Safety and System

Stabilization Act of 2001 (the "ATSSSA").    *See* Air Transportation Safety and System

Stabilization Act of 2001, Pub. L. No. 107-42, 115 Stat. 230 (codified at 49 U.S.C.       § 40101,

*et. seq.* (2001)).

18.    None of Cantor's deceased employees' dependents elected to seek recovery

against American Airlines.  *See* Merkel Decl. ¶ 9.  All of them elected to settle their claims

through the VCF.  *Id.* ¶ 8.

19.    Throughout the VCF process, Cantor vigorously advocated on behalf of its

employees, providing a lengthy submission designed to assist the Special Master in calculating

the appropriate amount of recovery for each of the families.  *See* VCF Submission, at 5-6.

Cantor also provided each of the families with assistance from an economic analysis and

consulting firm in preparing their individual VCF submissions.  *Id.* at 6 & n.1.

20.    Even before Congress established the VCF process, Cantor established The

Cantor Fitzgerald Relief Fund, which has provided the families with over $180 million,

including 25% of the firm's profits from 2001 to 2006 and ten years' of healthcare benefits for

each of the impacted families.  *See* Ex. L to Stoviak Decl., Cantor Fitzgerald: Supporting Our

Families and Helping Others, http://www.cantor.com/public/charities (last visited Aug. 17, 2010); *see also* VCF Submission, at 8, 22, 53.

21.     Although these losses were the direct result of American Airlines' negligence, Cantor does not seek reimbursement for any of its efforts or financial contributions on behalf of its employees. *See* Thaler Dep. at 342-43.

Dated:  September 15, 2010                    Respectfully submitted,

                                             **SAUL EWING LLP**

                                                 /s/ John F. Stoviak
                                             John F. Stoviak, Esq. (*pro hac vice*)
                                             Charles N. Curlett, Jr., Esq. (SDNY Bar No. C2423)
                                             Jennifer L. Beidel, Esq. (*pro hac vice*)
                                             Centre Square West
                                             1500 Market Street, 38th Floor
                                             Philadelphia, PA 19102
                                             Phone: 215.972.1095
                                             Fax: 215.972.1921
                                             jstoviak@saul.com
                                             ccurlett@saul.com
                                             jbeidel@saul.com

                                             Counsel for Cantor Fitzgerald Plaintiffs:
                                             Cantor Fitzgerald & Co., Cantor Fitzgerald
                                             Associates, L.P., Cantor Fitzgerald Brokerage, L.P.,
                                             Cantor Fitzgerald Europe, Cantor Fitzgerald
                                             International, Cantor Fitzgerald Partners, Cantor
                                             Fitzgerald Securities, Cantor Fitzgerald, L.P.,
                                             Cantor Index Limited, CO2e.com, LLC, eSpeed
                                             Government Securities, Inc., eSpeed, Inc., eSpeed
                                             Securities, Inc., and TradeSpark, L.P.