UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: No. 21 MC 101 (AKH)
:
: This document relates to :
IN RE SEPTEMBER 11 LITIGATION : *Bavis v. United Airlines Inc.et al.,*
: 02 CV 7154
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO ENFORCE LITIGATION AGREEMENT AND FOR DISMISSAL OF CLAIMS ASSERTED IN BAVIS ACTION AGAINST GLOBE AVIATION SERVICES CORPORATION**

Plaintiff Bavis respectfully submits this memorandum in opposition to defendants motion to enforce litigation agreement and for dismal of all claims against it filed in this action Bavis v. United Airlines, Inc., et al., , case no. 02 CV 7154 (AKH) 21 MC 101 (AKH)

**PRELIMINARY STATEMENT**

Defendant Globe's Motion and Memorandum in support of its motion, and all supporting affidavits, are directed to the issue of the court's previous order entered from the bench on June 26, 2006 and with further discussion in another order on January 16, 2009, and a letter setting forth agreement to be bound by that court order.

As counsel for defendant Globe was advised on multiple occasions, the agreement to be bound by the court order is irrelevant and moot. The Bavis plaintiffs and their counsel have always followed the orders of this Honorable Court, with or without any letter agreement. There is no reason to assume this Honorable Court would not similarly rule on an identical issue of law

with identical issues and facts in the Bavis case as this Honorable Court ruled in the property cases.

What the defendant now attempts to do is to **expand** the court's order to cover any and all theories of liability against Globe not previously briefed, indeed not even discussed by Globe or other parties at the time of the previous hearing and the court's ruling.  At the June 26, 2006 hearing and in its rulings, this Honorable Court specifically left open the possibility that there will be other theories of liability against Globe as the case and discovery develops.  Counsel for defendant Globe was advised on multiple occasions (as amply shown in the 44 pages of emails and letters defendant Globe attached to its Motion as Exhibits A through N), the issue this Plaintiff intends to advance at trial against Globe does not concern the timeliness of reporting of the commencement of the hijack plan on September 11, 2001.  Despite repeated responses to counsel for Globe, Defendant still attempts to remake plaintiff's agreement to be bound by the court's previous order to an agreement to dismiss Globe on all theories of liability.  That is not plaintiffs' understanding and certainly not the plain meaning of the purported letter agreement.

I.        NO MEETING OF THE MINDS

Plaintiff's theory of liability does not present the court with the same set of facts and arguments against Globe as was presented to the court on June 26, 2006.  The previous issue and theory of liability concerned the performance of Globe security <u>on September 11, 2001</u> and the tardy notification by American Airlines to the FAA of the hijacking <u>on September 11, 2001</u>.  If the defendants now wish to argue the agreement goes beyond the limited ruling and words of this Honorable Court's order then clearly there is no meeting of the minds on the essential terms of the purported letter agreement.  Defendant Globe should be amply familiar with the court's

ruling on impact of a lack of meeting of the minds, which defendant Globe cited in both 2008 and in 2010 as reasons for disavowing settlement agreements in 3 cases in this litigation. This Honorable Court in those cases found a meeting of the minds <u>on all essential terms</u> is a required prerequisite and a fundamental basis of a valid and enforceable contract. See 21 MC 97 Order Denying Motion to Enforce the Settlement, at pg. 3, Doc. No. 1414 (02/27/08) and 21 MC 101 Order Denying Motion to Enforce Agreement for Settlement, at p 4, 5, Doc. No. 99 (02/04/10). It is abundantly apparent from Globe's attachment's to its instant motion that plaintiff did not agree to anything other than what was contained in this Honorable Court's order. Defendant attached a year of correspondence documenting the debate and disagreements on the issue, 44 pages documenting no meeting of the minds in Exhibits A through N of the Westerberg Declaration. It is clear the sides do not agree to the meaning of the agreement. It is equally clear from the plain wording of the letter agreement itself that Plaintiffs only agreed to be bound to the extent of the actual order of this Honorable Court.

II.     **THE COURT'S PREVIOUS ORDER**

On June 26, 2006, the court held oral argument on the motion by Globe and others on a cross-claim by property plaintiffs against Globe and others. See Oral Argument on June 26, 2006; Summary Order In Re September 11 Litigation, In Re September 11 Property Damage and Business Loss Litigation, 21 MC 97 and 21 MC 101, attached to the Schiavo Declaration as Exhibit 1. This Honorable Court ruled from the bench, but on January 16, 2009, issued a written order further explaining or clarifying the ruling. The order in pertinent part, stated as follows:

> The issue of this motion is whether duty exists between the companies responsible for screening passengers for American Airlines flights departing from Logan Airport on September 11, 2001, and those suffering injuries arising from

> the terrorists who hijacked a United flight that had departed that morning from Logan.
>
> The undisputed facts make clear that the FAA knew of the hijacking at 8:25 a.m., just six minutes after Flight Attendant Ong made her call, only three minutes after American's SOC manager acknowledged the emergency, and only two minutes after American tried and failed for the first time to communicate with the cockpit. Even if American was slow to notify the FAA pending confirmation of their concerns, and I am not willing to find this on the facts presented, any such slowness could not have affected the hijacking or the tragic consequences of the United Flight. The FAA reported the Flight 11 hijacking to its Herndon Command Center at 8:31 a.m., causing a scrambling of Air Force jets at 8:40 a.m., twenty-three minutes before United Flight 175 crashed into Tower Two at 9:03 a.m. Nothing in the tragic recount of events involving Flight 11 could have avoided the hijacking of Flight 175. I am unwilling to entertain the notion that history would have been any different had American told government authorities what they had already known.

*In re Sept. 11 Litig.*, 594 F. Supp. 2d 374,377 (S.D.N.Y. 2009) See Schiavo Declaration Ex. 2.

Thus, this Honorable Court has already ruled on the issue of the delay in reporting events that occurred on <u>September 11, 2001</u> to the FAA on <u>September 11, 2001</u>.

### III.     PLAINTIFF'S THEORY OF LIABILITY AGAINST GLOBE CONCERNS EVENTS ON <u>MAY</u> 11, 2001

On May 11, 2001, Defendant Globe had in its clutches hijacker Atta and most likely hijacker al-Omari. They were caught by a maintenance man at Logan Airport, with two pilot flight bags, three still cameras, a movie camera and notes. They appeared to be middle eastern, they conversed in Arabic, and they filmed the Globe checkpoint. The maintenance man made this known to Globe, pointed out the hijackers, followed them, told Globe they were surveying the checkpoints and told Globe the two middle eastern looking and Arabic speaking suspects were up to no good. Globe did nothing---made no report to the FAA, made no note of names, took no photos, did not make sure all the screeners looked at them so they could spot them again, did not look at tickets--nothing. The kingpin of the hijacking conspiracy was allowed to breeze through Globe security with no record, report, notations, action, warning, questioning, secondary

4

screening, ticket check, passenger name record check or anything else. That action, or inaction, violated federal aviation security laws and allowed the most deadly terror plot to succeed despite dozens of warnings and citations which evidence plaintiff certainly intends to present at trial. The maintenance man also told a law enforcement officer at the Globe checkpoint, but the federal aviation regulations place the duty on Globe to "protect the traveling" public. Mark Bavis was a member of the traveling public on September 11, 2001. While these facts are astonishingly absent from the 9/11 Commission Report, Globe had delivered to them two of the hijackers. Globe let them go without taking any required security actions four months before September 11, 2001.

### A. THE DEPOSITION OF STEVEN J. WALLACE

Mr. Wallace worked for American Airlines between May of 1973 and November 1973 as a ramp worker and from 1977 through and including September 11, 2001, as maintenance personnel. See Schiavo Declaration, Exhibit 3, Depostion of Steven Wallace 18:9-30:9, July 17, 2007. In 1990 he became the technical crew chief in facility maintenance at Logan airport and became responsible for technical issues and troubleshooting assistance for the other mechanics. He remained in that position through September 11, 2001, (Schiavo Decl., Ex. 3 at 32:6-24). He was not a security screener, a security supervisor, or a preboard screener, nor did he ever hold any post associated with screening travelers.

On May 11, 2001, he was putting together a display in a showcase he entitled "These Things Don't Fly." (Schiavo Decl., Ex. 3 at 97). He purchased things to put in his glass display case such as a dummy car battery, rat poison, insecticide, starter fluid, and "all sorts of dangerous goods." He dumped the poisonous materials down the toilet and filled the containers with water

or other fake materials and put these items in the display case. (Schiavo Decl., Ex. 3 at 98:24-101:14). On May 11, 2001 as he was putting together the display case he noticed two individuals taking pictures of the security checkpoint. (Schiavo Decl., Ex. 3 at 104:5-21). It was a Globe security checkpoint. They were also talking very loudly on a cell phone. They were videotaping the checkpoint, the monitors and the flight information display screens. (Schiavo Decl., Ex. 3 at 104:19-21). The men were speaking Arabic and appeared to be of middle eastern origin. (Schiavo Decl., Ex. 3 at 104:24-105:2). The maintenance worker watched and observed the two persons of middle eastern descent speaking Arabic and watched them photograph the checkpoint for about 45 minutes. (Schiavo Decl., Ex. 3 at 105:14-106:19). He was concerned about what they were doing and approached them. No one from the Globe checkpoint apparently paid any attention to them. The maintenance worker was concerned about the fact that they were videotaping and taking pictures of the Globe checkpoints. (Schiavo Decl., Ex. 3 at 108:23-109:15). When the maintenance worker approached the two men and attempted to speak to them, they made an obscene gesture to him and called him a nasty name in Arabic. (Schiavo Decl., Ex. 3 at 109:17-22). Thereafter, the maintenance worker became even more concerned. The two middle eastern Arabic speaking men who had been photographing the Globe checkpoint for 45 minutes packed their bags and then headed to the south Globe checkpoint. This worker followed them in hot pursuit. He kept them in his sight the whole time and kept them under his surveillance. (Schiavo Decl., Ex. 3 at 110). Two Arabic men who had been photographing the checkpoint for 45 minutes, swearing in Arabic and tailed by the American Airlines maintenance man were pointed out to the Globe checkpoint. At the Globe checkpoint, the maintenance man also advised the Massachusetts State Trooper and the State Trooper also told the Globe personnel of the middle eastern men. The Trooper and the Globe

6

personnel at the checkpoint were advised by the maintenance man that "these two clowns are up to something. They have been taking pictures and videos down at the checkpoint, down across from the main checkpoint." (Schiavo Decl., Ex. 3 at 113). The maintenance man told the police and the personnel at the Globe security checkpoint. Despite the ability of a maintenance man to detect activity at Globe checkpoints, and report the activity and the individuals to a Globe checkpoint, Globe personnel failed to report the incident to the Federal Aviation Administration (FAA) despite myriad warnings from the FAA about the targeting by middle eastern terrorists of United States aviation and U. S. airlines. The Globe security screeners without making note of names, tickets, appearance, security camera surveillance or inspection of their two pilot carry on bags, allowed the kingpin and ringleader of the deadliest terrorist attack on U. S. soil to walk freely through Globe security, not only on September 11, 2001, <u>but on May 11, 2001</u>, after being alerted to their activities by a maintenance man. One of the people was positively identified as Mohammed Atta.

Reasonable inferences can be drawn from that evidence which may explain why hijackers Atta and al-Omari went to Portland, Maine on September 11, 2001, to pass through security and a jury may also reasonably infer that is why the hijackers were so angry when they found out they would have to re-clear security at the Globe checkpoint at Logan. The Globe checkpoint at Logan is where they had been caught by a maintenance man and pointed out to Globe security. A reasonable inference may be drawn that the hijackers mistakenly assumed that perhaps that Globe might have done something to report them and might have alerted authorities as to their presence as required by law. A reasonable assumption is that Globe might have taken action and recorded the hijackers' faces, made note of their names and tickets, or made reasonable records of them photographing for 45 minutes Globe security checkpoints. But, as we have learned, in

7

violation of federal regulations, as explained by a Globe employee in her deposition on February 20, 2009, Globe did nothing. Although there have been other reports by other persons of suspicious activity, for example actor James Woods, and other flight attendants and pilots who observed suspicious activities on aircraft, what makes Globe unique is that Globe was a security contractor which had the benefit of security briefings and threat warnings and Globe had a duty to report these events and act on them. On May 11, 2001, there was time for Globe, the FAA, and other security companies and airlines including United to act. A jury may reasonably infer that had Globe acted on May 11, 2001, as was reasonable and required, the plot for September 11, 2001, would not have happened.

We do not have to speculate about that duty to report the activity and act on the information. Globe employees testified about the duty.

### B.  THE DEPOSITIONS OF THERESA SPAGNUOLO AND JAMES MILLER

The surveillance by hijackers was also corroborated by Globe employee Theresa Spagnuolo. She told the FBI about Atta's surveillance which she also saw <u>four months prior to September 11, 2001</u>. She saw a middle eastern man, she later identified as hijacker Atta, filming a Globe checkpoint at Logan airport. She reported it to her Globe supervisor, James Miller, who did nothing about it. See the Deposition of James Miller attached to the Schiavo Declaration, Exhibit 6, at 109-111 and the Schiavo Declaration Exhibit 7, Deposition exhibit 812, statement of Theresa Spagnuolo to the FBI, FBI 149-151, See also the Schiavo Declaration Exhibit 8, Deposition of Theresa Spagnuolo at 19-24. Ms. Spagnuolo herself explained that this activity should have been reported to the FAA and that action could have been taken and the plot stopped.

19

3    Q. It's true, is it not, Ms. Spagnuolo, that
4  you told the FBI that four months prior to this
5  occurrence, you saw an Arabic man videotaping the
6  checkpoint operated by Globe at Logan airport?

20

3  that you reported to them you saw
4  an Arabic man videotaping the checkpoint at Logan
5  that was operated by Globe?
6    A. Yes.
7    Q. And that's something you saw with your own
8  eyes.
9    A. Yes.
10    Q. And as you sit here now, it's true that
11  the man you saw with the video camera was Mohammed
12  Atta.

20

22  And you told the FBI affirmatively he was
23   the man you saw videotaping the checkpoint; is that
24   right?
25    A. Yes.

21

2    Q. At that time, were you a checkpoint
3  security supervisor with Globe?
4    A. Yes, I was.

21

19  And being a checkpoint security
20   supervisor, you understood that the details of the
21   procedures you employed at the checkpoint were
22   secret to a certain extent; is that right?
23    A. Yes.
24    Q. Did that concern you that a man was
25  videotaping these procedures?

22

2    A. Well, as what I got told, I got told that
3  the FAA made it that it's okay -- because when I
4  first got employed, it wasn't okay for anybody to
5  videotape the sterile area of the airport or the
6  checkpoint; then I got told that now they're
7  allowed to do it.

                                22
18  But you saw him actually videotaping the
19  magnetometer and the x-ray machine?
20     A.  Yes.
21     Q.  You reported this to your manager, James
22  Miller.
23     A.  Yes, I did.
24     Q.  And you reported it because as a
25  checkpoint security supervisor, it raised a concern

                                23

2  in your eyes.
3     A.  Yes.
                                23
5  And Mr. Miller, what did he tell you?
6     A.  That's when he told me that they are
7  allowed to do it.
                                23
21  Would it be accurate to say that at no
22  time prior to the date you saw Mohamed Atta
23  videotaping the checkpoint did anybody from Globe
24  tell you to report that sort of activity to them
25  immediately?

                                24

.
3     Q.  Nobody ever told you that, did they?
4     A.  No.
5     Q.  Had somebody told you that it was a
6  responsibility of yours to bring it to a supervisor
7  and contact FAA about somebody videotaping the
8  checkpoint, you would have done that on that date.
9     A.  Yes, I would.
10    Q.  You have ensured that the FAA was
11  notified.
12    A.  Yes, I would have.

Globe Security had Mohammed Atta in their clutches on two occasions four months before September 11, 2001. Contrary to the duty and responsibility to report the actions and to act on this apprehension as testified to by their own employee Theresa Spagnuolo in her deposition on February 20, 2009, Globe let them go through without so much as a notation,

report, photograph, passenger name check, ticket check, question or even a peek in any of their bags loaded with surveillance equipment. None of these facts or issues were addressed by this Honorable Court's limited previous order. The testimony is corroborated by the witnesses' reports to the FBI, attached to the Schiavo Declaration as Exhibits 4 and 7, as well as the testimony of Mr. Carter Bibbey, checkpoint supervisor, deposition transcript attached as Exhibit 5 to the Schiavo declaration.

**WHEREFORE**, Plaintiff respectfully requests defendant Globe's Motion to Enforce Litigation Agreement and for Dismissal of Claims Asserted in Bavis Action Against Globe Aviation Services Corporation be dismissed as moot because this Plaintiff has at all times be, and continues to be, compliant with this Honorable Court's order, but instead is proceeding on a theory of liability against Globe which has not been the subject of any motion or any ruling by this Honorable Court.

Dated:  November 23, 2010
       Mount Pleasant, South Carolina

                                                     Respectfully submitted,

                                                     MOTLEY RICE LLC

                                    By:    /s/Mary F. Schiavo
                                            Mary F. Schiavo
                                            28 Bridgeside Boulevard
                                            Post Office Box 1792
                                            Mount Pleasant, SC 29465
                                            Telephone:   (843) 216-9000
                                            Facsimile:    (843) 216-9450
                                            *Counsel for Bavis Plaintiff*