UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
                                                :      21 MC 101 (AKH)
IN RE SEPTEMBER 11 LITIGATION           :
                                                :      This Document Relates to:
                                                :      *Bavis v. United Air Lines, Inc.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   (02 CV 7154)


**THE MASSACHUSETTS PORT AUTHORITY'S
STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

       Pursuant to Local Rule 56.1, Defendant The Massachusetts Port Authority ("Massport") respectfully submits this Statement of Material Facts in support of its Motion for Summary Judgment seeking dismissal of Plaintiff's claims against Massport. There is no genuine issue as to the following material facts:

**Massport Owns Logan Airport, Providing the
Ground Environment for Airline Operations.**

       1.     Massport is an independent public authority that owns and manages transportation facilities and infrastructure in Massachusetts, including Logan Airport; Hanscom Field, a regional airport in Bedford, Massachusetts; Worcester Regional Airport; and the Port of Boston. (*See* Exhibit A to the May 27, 2011 Declaration of Joseph Lawless ("Lawless Decl.") at I-1; Lawless Decl. ¶ 4.)

       2.     Logan Airport occupies roughly 2,400 acres in Boston—the equivalent of more than 1,800 American football fields—and is surrounded by water on three sides. The airport property includes runways and taxi areas, a control tower, cargo facilities, hangars, a

general aviation terminal for private and corporate aircraft, an office complex, two hotels, parking and car rental facilities, a fire station, and passenger terminals. (Lawless Decl. ¶ 5.)

3. As owner of Logan Airport, Massport's primary role is to develop, promote, and maintain a federally regulated facility that supports and encourages safe, secure, efficient, and cost-effective travel. (Lawless Decl. ¶ 6.)

4. On September 11, 2001, Logan Airport maintained five passenger terminals in which airlines served over 25 million passengers per year. Logan's terminals permitted access to more than eighty boarding gates. (Lawless Decl. ¶ 7.)

5. On September 11, 2001, Logan Airport's terminals had a total of fifteen screening checkpoints. (Lawless Decl. Ex. A at I-2–I-3.)

6. On September 11, 2001, Terminal C—from which the United Air Lines ("United") Flight 175 passengers boarded the aircraft—had twenty-five gate positions, three security checkpoints, and three piers. (Lawless Decl. Ex. A at I-3; Lawless Decl. ¶ 8.)

7. Airlines operating at Logan Airport maintained and controlled all aspects of their operations, including ticket sales, check-in counters, passenger screening checkpoints, boarding gates, and baggage handling. (Ex. D to the May 27, 2011 Declaration of Allen W. Burton ("Burton Decl.") at 20, 76–78; Lawless Decl. ¶¶ 10–15.)

8. The airlines handled passengers and property allowed aboard their planes. (Burton Decl. Ex. E, at 14; Lawless Decl. ¶¶ 11, 14–15.)

9. Massport did not receive passenger manifests or involve itself in any way in the airlines' in-flight services or operations. (Lawless Decl. Ex. A.)

2

10. As owner of Logan Airport, Massport's role was to provide the on-the-ground airport environment for the airlines to operate in and carry out its specific federally assigned security duties. (Lawless Decl. ¶¶ 9, 16–18.)

**The Pre-9/11 Federal Airport Security System Divided Security Responsibilities**

*Airlines Were Responsible for Screening Passenger and Property.*

11. On September 11, 2001, United, like other airlines, had its own Air Carrier Standard Security Program ("ACSSP"), which set forth the security measures and procedures that the Federal Aviation Administration ("FAA") required air carriers to implement. The ACSSP contained detailed procedures on, among other things, screening passengers and their belongings. (Burton Decl. Ex. D at 20, 40; Burton Decl. Ex. Q at 1.)

12. Airlines were responsible for securing their own aircraft, which would be serviced between flights by mechanics, catering staff, and cleaning crews hired by the airlines. Massport had no responsibility for sweeping the interior of the aircraft between flights. While security badges allowed certain personnel to enter and exit through various access points on airport property, the airlines were ultimately responsible for screening and detecting items carried aboard planes. (Burton Decl. Ex. D at 40, 50–51, and 60; Lawless Decl. ¶ 15.)

13. At Logan Airport, United contracted with Huntleigh to operate screening checkpoints in Terminal C, and through Huntleigh, selected, hired, trained, and paid checkpoint screeners. (Burton Decl. Ex. Q at 2; Burton Decl. Ex. D at 20.)

14. United supervised and conducted periodic audits of screeners, and the screening was conducted subject to direct oversight and regulation by the Federal Aviation Administration ("FAA"). (Burton Decl. Ex. M at 104:21–111:2; Burton Decl. Ex. S at 27:4–23.)

*Airport Operators Had Separate Non-Screening Security Responsibilities.*

15. On September 11, 2001, Massport implemented its assigned responsibilities under FAR Part 107 (applicable to airport operators) by following the procedures set forth in Logan Airport's Airport Security Program ("ASP"), which was specifically approved by the FAA. (Lawless Decl. Ex. A; Lawless Decl. ¶ 9; Burton Decl. Ex. F at 32:6–24.)

16. The ASP outlined Massport's three federally mandated ground security duties: (i) securing the Security Identification Display Area (SIDA), which included the Air Operations Area (AOA) where airplanes take off, land, and park, and adjacent secured locations not open to the general public; (ii) issuing badges to persons authorized to enter the SIDA; and (iii) providing a police presence and support for incidents at the checkpoints. (Lawless Decl. Ex. A; Lawless Decl. ¶ 9.)

17. The ASP did not alter the delineation of duties set forth in the Federal Aviation Act so as to impose on Massport duties that were exclusively assigned to the airlines under FAR Part 108, such as passenger screening. (Lawless Decl. Ex. A at III, IV, and VI; Lawless Decl. ¶ 10.)

18. With respect to police, Massport provided law enforcement support at Logan Airport through Troop F of the Massachusetts State Police, Massport's designated law enforcement agency. The State Police, who were not Massport employees, patrolled Massport premises, including Logan Airport. (*See* Burton Decl. Ex. K at 244:5–16; Lawless Decl. ¶ 16.)

19. State Police officers were not stationed in fixed posts at passenger screening checkpoints. Instead, Massport employed a "flexible response," in which the State Police dispatched officers to checkpoints when alerted by airline and security company personnel. The State Police would be called to a checkpoint where a screener identified an

illegal weapon passing through the x-ray machine, a screener was confronted with an unruly passenger, or a person breached security and entered the sterile area. The "flexible response" approach enabled officers to have visibility throughout the airport and to observe activity in both the sterile and non-sterile areas, and facilitated quick responses to incidents throughout the airport. (Lawless Decl. ¶ 17.)

20. The FAA approved Massport's "flexible response" approach, as reflected in the ASP, and other Category X airports employed the same "flexible response" technique. (Lawless Decl. ¶ 18.)

21. Massport also initiated other FAA-approved Part 107 airport security projects. (Burton Decl. Ex. K at 221:8–222:8.)

22. At all times, Massport acted within its jurisdiction under Part 107, as required by the Federal Aviation Act and the Federal Aviation Regulations ("FARs"). (Burton Decl. Ex. F at 166:8–17.)

23. Consistent with the FARs' and pre-9/11 FAA statements confirming that airport operators did not have responsibility for performing or overseeing the screening function, Massport had no role in checkpoint security performance, selecting screening companies hired by airlines, or hiring, training, or supervising checkpoint screeners. (Burton Decl. Ex. F at 109:9–14, 159:8–10, 148:9–24; Burton Decl. Ex. C at 66:22–67:15; 104:6–10; 194:4–5; Burton Decl. Ex. K at 185:13–15, 248:12–249:2, 266:18–19; Burton Decl. Ex. E at 10; Lawless Decl. ¶ 12.)

24. Massport had no involvement or responsibility for the calibration or sensitivity of magnetometers, and never conducted tests to determine magnetometers' capabilities. (Lawless Decl. ¶ 13.)

25. Massport did not determine which particular passenger carry-on items were permitted on board airplanes. (Lawless Decl. ¶ 14.)

26. Prior to 9/11, the FAA specifically considered and ultimately opted against transferring airline security responsibilities to airport operators or the federal government. (Burton Decl. Ex. E at 4, 20–30, 51.)

*The FAA Supervised Airlines and Airport Operators, and Gathered and Disseminated Threat Information.*

27. On September 11, 2001, the FAA-appointed Federal Security Manager ("FSM") at Logan Airport oversaw the day-to-day operations of all aviation personnel to ensure that they complied with the FARs. (Burton Decl. Ex. K at 189:8–14.)

28. Each airline also was assigned an FAA Principal Security Inspector ("PSI") who provided the airline with threat information, approved airlines' Part 108 security measures, and oversaw implementation of training and performance measures, including the airlines' procedures for screening passengers at checkpoints. (Burton Decl. Ex. MM at 18:5–19:3.)

29. In addition, the FAA assigned special agents to audit aviation security, including checkpoint security. (Burton Decl. Ex. S at 17:7–20:8, 26:25–29:24; Burton Decl. Ex. D at 139f-g.)

30. If issues were identified during checkpoint audits, airlines worked with the FAA and the security companies to address them. (Burton Decl. Ex. N at 97:3–17; *cf.* Burton Decl. Ex. F at 164:24–165:7, 159:20–25.)

31. The FAA alone determined if and when to impose penalties. (*See* Burton Decl. Ex. S at 10:12–11:2; Burton Decl. Ex. T at 36:7–11.)

32. Massport had no authority to supervise screening or sanction airlines in the event of poor screening performance. (Burton Decl. Ex. E at 10; Lawless Decl. ¶ 12.)

**The 9/11 Attack Did Not Involve Any Breach of Massport's Security Responsibilities.**

33. September 11, 2001, began as a normal day at Logan Airport, without any unusual or suspicious activity to suggest that a terrorist attack was underway. (Burton Decl. Ex. U at 45:10–12; Lawless Decl. ¶ 19.)

34. Later that morning, terrorists hijacked United Flight 175, which had departed from Logan Airport bound for Los Angeles International Airport, and diverted the plane more than 200 miles, intentionally crashing it into the South Tower of the World Trade Center in New York City. (Burton Decl. Ex. V at 7–8.)

35. The 9/11 Commission concluded that the terrorists did not target particular airports or airlines; instead, they selected fully fueled transcontinental flights of Boeing airplanes departing at around the same time. (Burton Decl. Ex. V at 451 n.1.)

36. On September 11, 2001, the Flight 175 hijackers checked in at the ticket counter as ordinary, ticketed passengers. (Burton Decl. Ex. V at 1–2, 451 n.1; Burton Decl. Ex. W at 14.)

37. Upon checking in, the hijackers were questioned by United ticket agents. (Burton Decl. Ex. X at 50:16–51:13, 58:17–25; Burton Decl. Ex. Y at 78:24–79:17.)

38. To gain access to Flight 175, all five men passed through a checkpoint operated by Huntleigh under contract to United. (Burton Decl. Ex. V at 2; Burton Decl. Ex. Q at 2.)

39. All five terrorists cleared the United checkpoint without incident, along with the other passengers. (Burton Decl. Ex. V at 1–4; Burton Decl. Ex. Z at 83:7–9, 84:24–89:3; Lawless Decl. ¶¶ 20–21.)

40. None of the hijackers was reported to a checkpoint supervisor, or to an airline representative, or to the State Police. Neither United nor Huntleigh requested any law enforcement assistance at the checkpoint. (Burton Decl. Ex. V at 2; Burton Decl. Ex. F at 227:15–20; Burton Decl. Ex. U at 162:2–23; Lawless Decl. ¶¶ 20–21.)

41. The 9/11 attack was an intentional, highly organized, and unprecedented act of mass murder, which the terrorist carried out after years of planning and with the help of an enormous logistical and financial network. (Burton Decl. Ex. BB at 125:9–126:18, 137:24–138:19; Burton Decl. Ex. CC at 66:22–67:19, 74:10–75:2, 145:3–146:9, 157:17–158:25; Burton Decl. Ex. V at xvi, 153–173, and 215–253.)

42. There is no evidence that any terrorist improperly penetrated an AOA fence or door at Logan Airport to gain access to Flight 175 in connection with the September 11 attack. (Burton Decl. Ex. F at 38:6–41:4; Burton Decl. Ex. K at 311:11–312:3; Lawless Decl. ¶¶ 20, 23.)

43. There is no evidence that any terrorist improperly received a Massport-issued badge and used that badge to gain access to Flight 175 or to any secure area of Logan Airport, or gained access to Flight 175 or a secure area through other access points for which Massport was responsible in connection with the September 11 attack. (Burton Decl. Ex. O at 144:17–145:10; Burton Decl. Ex. V at 2, 451 n.1; Burton Decl. Ex. K at 311:11–312:3; Lawless Decl. ¶¶ 20, 23.)

8

44. There is no evidence that Massport failed to provide police support for a reported incident at the checkpoint as required under FAR Part 107 on September 11, 2001. (Burton Decl. Ex. F at 227:15–20; Burton Decl. Ex. U at 162:2–23; Lawless Decl. ¶¶ 21, 23.)

Dated:  May 27, 2011

                                                    Respectfully submitted:

                                            By: /s/ Mark Wood_____

                                                  Mark Wood
                                                  Allen W. Burton
                                                  Shiva Eftekhari
                                                  O'MELVENY & MYERS LLP
                                                  Times Square Tower
                                                  7 Times Square
                                                  New York, New York  10036
                                                  Tel: (212) 326-2000
                                                  Fax: (212) 326-2061
                                                  E-mail:  mwood@omm.com

                                                  *Attorneys for The Massachusetts Port Authority*