UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
:
IN RE SEPTEMBER 11 LITIGATION    :    21 MC 101 (AKH)
:
:    This Document Relates to:
:    *Bavis v. United Air Lines, Inc.*
:    (02 CV 7154)
------------------------------------x

### DECLARATION OF JOSEPH LAWLESS IN SUPPORT OF DEFENDANT THE MASSACHUSETTS PORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

JOSEPH LAWLESS declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am an employee of The Massachusetts Port Authority ("Massport"). I submit this declaration in support of Defendant Massport's Motion for Summary Judgment seeking dismissal of all claims against Massport. Unless otherwise noted, I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, I could and would do so competently and to the same effect.

2. From 1993 to 2001, I served as Director of Public Safety for Massport. As Director of Public Safety, I was responsible for overseeing security at Boston-Logan International Airport ("Logan Airport"), Hanscom Field, and all other Massport properties, including the waterfront, the shipping terminals and the Tobin Bridge. I currently serve as Massport's Director of Maritime Security.

3. In connection with the *In re September 11 Litigation* matter, I was deposed on March 30, 2007 and May 22, 2007.

**The Logan Airport Premises and Operations**

4. Massport is an independent public authority that owns and manages various transportation facilities in Massachusetts. Those facilities include Logan Airport; Hanscom Field, a regional airport in Bedford, Massachusetts; Worcester Regional Airport; and the Port of Boston.

5. Logan Airport occupies roughly 2,400 acres in Boston and is surrounded by water on three sides. The airport property includes aircraft movement areas, such as runways and taxi areas, a control tower, cargo facilities, hangars, a general aviation terminal for private and corporate aircraft, an office complex, two hotels, parking and car rental facilities, a fire station, and passenger terminals.

6. As owner of Logan Airport, Massport's primary role is to develop, promote, and maintain a federally regulated facility that supports and encourages safe, secure, efficient and cost-effective travel. In passenger terminals, airlines such as United Airlines lease space from Massport to operate their businesses.

7. As of September 11, 2001, Logan Airport maintained five passenger terminals operated by the airlines to serve over 25 million passengers per year. Logan's terminals permitted access to more than eighty boarding gates.

8. As of September 11, 2001, Terminal C had twenty-five gate positions, three security checkpoints, and three piers.

**Part 107 Security at Logan Airport**

9.  As Director of Public Safety between 1993 and 2001, I oversaw the implementation of Massport's FAA-approved Airport Security Program ("ASP"), which reflected the responsibilities of Logan Airport under Part 107 of the Federal Aviation Regulations ("FARs"). Under the ASP and FAR Part 107, Massport had three main security responsibilities: (1) securing non-public areas of the airport that required an airport-approved badge for entry, known as the Security Identification Display Area ("SIDA"), which included the Air Operations Area ("AOA") where airplanes take off, land, and park; (2) issuing security badges to personnel permitted to enter secure areas depicted in the ASP; and (3) providing a law enforcement presence and support. Attached to this declaration as Exhibit A is a true and correct redacted copy of the operative FAA-approved ASP for Logan Airport in effect on September 11, 2001.

**Passenger Screening Checkpoints**

10. The FAA assigned passenger screening responsibilities to the airlines under FAR Part 108. Massport's FAA-approved ASP therefore did not include passenger screening responsibilities for Massport. Each airline operating at Logan Airport had its own FAA-approved security program called the Air Carrier Standard Security Program (the "ACSSP"), and Massport was not aware of each airline's specific screening policies. In addition, airlines and security screening companies also maintained the Checkpoint Operations Guide (the "COG"), which provided guidelines for the operators of the passenger screening checkpoints. Massport never received a copy of the COG.

11. Under FAR 108, airlines, not airport operators, were responsible for screening of passengers and property being carried aboard planes. That screening occurred at

3

designated security checkpoints. Federal law did not impose on airport operators and airlines joint responsibility for screening and did not require Massport to undertake any screening at the checkpoint or any other area, such as secondary screening in the sterile or non-sterile areas of the concourse. Thus, if a weapon passed through the checkpoint, Massport would have no responsibility under its ASP to detect that weapon before the passenger boarded the plane.

12. Under FAR Part 108, airlines were responsible for the integrity of the passenger screening checkpoint operations. Massport was not responsible for the selection of screening companies hired by airlines, including United, and was not responsible for the hiring, training, or supervision of the checkpoint screeners. Massport was not responsible for auditing airlines' compliance with FAR Part 108 airline security responsibilities or imposing penalties for violations. It is my understanding that the FAA and airlines conducted periodic audits of security checkpoint screening operations, including screener proficiency.

13. Massport had no involvement or responsibility for the calibration or sensitivity of magnetometers, and never conducted tests to determine magnetometers' capabilities.

14. Massport did not determine which particular passenger carry-on items were permitted on board airplanes. It was my understanding that the FAA provided guidelines to airlines with respect to prohibited passenger carry-on items.

15. Airlines secured their own aircraft, which would be serviced between flights by mechanics, catering staff, and cleaning crews hired by the airlines. Massport had no responsibility for sweeping the interior of the aircraft between flights. While security badges allowed certain personnel to enter and exit through various access points on airport property, the airlines were ultimately responsible for screening and detecting items carried aboard planes.

## Law Enforcement Support at Logan Airport

16.     Massport provided law enforcement support at Logan Airport through Troop F of the Massachusetts State Police, Massport's designated law enforcement agency. The State Police, who were not Massport employees, patrolled all Massport premises, including Logan Airport.

17.     State Police officers were not stationed in fixed posts at passenger screening checkpoints. Instead, Massport employed a "flexible response," in which the State Police dispatched officers to checkpoints when alerted by airline and security company personnel. The State Police would be called to a checkpoint, for example, where a screener identified an illegal weapon passing through the x-ray machine, a screener was confronted with an unruly passenger, or a person breached security and entered the sterile area. The "flexible response" approach enabled officers to have visibility throughout the airport and to observe activity in both the sterile and non-sterile areas, and facilitated quick responses to incidents throughout the airport.

18.     The FAA approved Massport's "flexible response" approach, as reflected in the ASP, and it is my understanding that other Category X airports employed the same "flexible response" technique.

**September 11, 2001 - Flight 175**

19. On the morning of September 11, 2001, I received no reports of any unusual or suspicious activity in the airport before the reported hijackings.

20. I also received no reports of any calls from airport or screening company personnel for law enforcement support at the Terminal C checkpoints before the attacks on September 11. Nor did I receive any report of any breach of AOA or SIDA security.

21. I first learned of a suspected hijacking from the FAA Federal Security Manager, Stephen Luongo, who called me at approximately 8:30 a.m. and inquired whether I was aware of a hijacking on an American Airlines flight departing from Logan. I then called the State Police dispatch office and inquired of the desk officer whether or not a hijacking had been reported at American Airlines or any airline within the airport. He responded that the State Police had no such report. I then asked the desk officer to check with the officers in Terminal B to see if there was any suspicious activity occurring that morning. I overheard the desk officer's radio transmission and the officer's reply that there was none.

22. At approximately 9 a.m., Mr. Luongo called me again and reported the first attack. I summoned all Massport aviation and public safety managers to an emergency meeting and initiated Logan's FAA-approved emergency plan. I also activated the Massport family assistance center, which was a meeting area for families of victims and representatives of the Red Cross, federal agencies, airlines, and the airport in the event of an aviation disaster.

23. After the attacks, I worked closely with the FBI and the 9/11 Commission. At no time was I ever informed of any evidence indicating that the terrorists breached any security layer that was a Massport airport security responsibility under FAR Part 107.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _May 27_, 2011 at Boston, Massachusetts.

_____
Joseph M. Lawless