UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| IN RE SEPTEMBER 11 LITIGATION | : No. 21 MC 101 (AKH) |
|  | : |
|  | : This document relates to: |
|  | : *World Trade Center Properties LLC, et* |
|  | : *al. v. United Airlines, Inc., et al.*, 08 CV |
|  | : 3719; *World Trade Center Properties* |
|  | : *LLC, et al. v. American Airlines, Inc., et* |
|  | : *al.*, 08 CV 3722 |
|  | : |
|  | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO THE MASSACHUSETTS PORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP
Richard A. Williamson
Cathi A. Baglin
Jason T. Cohen
One Liberty Plaza
New York, New York 10006
Telephone: (212) 412-9500
Fax: (212) 964-9200
*Attorneys for the WTCP Plaintiffs*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

MATERIAL, INDISPUTABLE FACTS ABSENT FROM MASSPORT'S
MOTION ............................................................................................................ 1

ARGUMENT ...................................................................................................... 5

I:   SUMMARY JUDGMENT MUST BE DENIED BECAUSE MASSPORT
     MISSTATES THE LEGAL DUTIES THAT ESTABLISH ITS
     NEGLIGENCE ON 9/11 ............................................................................. 6

II   THE EVIDENCE SHOWS THAT MASSPORT UNDERSTOOD THAT
     ITS DUTY TO PROTECT PASSENGERS AND PROPERTY AT LOGAN
     AIRPORT REQUIRED THAT IT CORRECT THE ABSYMAL
     PASSENGER SCREENING AT SECURITY CHECKPOINTS ..................... 8

CONCLUSION ................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Cases**                                                                **Page(s)**

*Derdiarian v. Felix Contracting Corp.*,
    51 N.Y.2d 308, 434 N.Y.S.2d 166 (1980).................................................. 8

*FAA v. Landy*,
    705 F.2d 624 (2d Cir. 1983)................................................................ 2

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003)............................................................... 6

*U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984)........................................................................ 2

*In re Sept. 11 Litig.*,
    594 F.Supp.2d 374 (S.D.N.Y. 2009)................................................. 2, 5

*In re Sept. 11 Litig.*,
    621 F.Supp.2d 131 (S.D.N.Y. 2009)................................................. 8

*Williams v. Trans World Airlines*,
    09 F.2d 942 (2d Cir.1975)................................................................ 2

**Administrative Decisions**

*In re Trans World Airlines, Inc.*,
    FAA Docket Nos. CP97SO0016 and CP97SO0017, 1999 WL 1125387
    (F.A.A. Oct. 7, 1999)....................................................................... 5

**Statutes and Regulations**

49 U.S.C. § 44701(a)(5)............................................................................ 2

49 U.S.C. § 44701(b)(1)............................................................................ 2

49 U.S.C. § 44701(d)(1)(A)........................................................................ 2

49 U.S.C. § 44702(b)(1)(A)........................................................................ 2

14 C.F.R. § 107.3(a)(1)............................................................................. 1, 4

Federal Aviation Administration's Airworthiness Inspector's Handbook,
Order 8300.10, dated August 13, 1993............................................ 2-3, 5

## INTRODUCTION

Plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World

Trade Center LLC, 3 World Trade Center LLC (formerly known as 5 World Trade Center LLC),

4 World Trade Center LLC, and 7 World Trade Company, L.P. (collectively the "WTCP

Plaintiffs") submit this Memorandum of Law in opposition to the motion of defendant The

Massachusetts Port Authority ("Massport") for summary judgment to dismiss the complaint

against it in *Bavis v. United Air Lines, Inc.*, 02 CV 715 (AKH).  The WTCP Plaintiffs also rely

upon the opposition to this motion submitted by the plaintiff in *Bavis*.

## MATERIAL, INDISPUTABLE FACTS ABSENT FROM MASSPORT'S MOTION

Federal Aviation Administration ("FAA") Regulation 107.3(a)(1) requires Massport, as

the owner-operator of Logan International Airport in Boston, Massachusetts ("Logan Airport"),

to "adopt[] and carr[y] out a security program that [p]rovides for the safety of persons and

property traveling in air transportation and intrastate air transportation against acts of criminal

violence and aircraft piracy."  14 C.F.R. 107.3(a)(1).

Pursuant to this regulatory obligation, Massport adopted in 1999 an "Airport Security

Program" (the "Massport ASP") to protect passengers and property against air piracy,

acknowledging its responsibility as "[t]he Airport Operator at Logan Airport" to serve as the

"primary contact for [Logan Airport's] security-related activities with the FAA."  Massport ASP,

a copy of which is attached as Exhibit 1 to the Declaration of Jason T. Cohen, Esq. in Opposition

to The Massachusetts Port Authority's Motion for Summary Judgment (the "Cohen

Declaration"), at MP 100538.

Massport's specific obligations under the FAA regulations ("FAR") and the ASP are only

the minimum standards that Massport was required to satisfy under federal law in the discharge

of its duty to protect passengers and property from the risk of air piracy.  *See* 49 U.S.C.

§ 44701(a)(5), (b)(1); *see also U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig*

*Airlines),* 467 U.S. 797, 804, 806 (1984) (FAA Regulations establish *minimum standards*); *FAA*

*v. Landy*, 705 F.2d 624, 636 (2d Cir. 1983) (FAA Regulations, while extensive, are "minimum

standards of safety").

> As this Court has already determined, the federal statutory
>
> duty of an air carrier [is] to provide service with the highest possible degree of
> safety in the public interest."  49 U.S.C. §§ 44701(d)(1)(A), 44702(b)(1)(A).  The
> air carrier's duty extends, beyond those aboard the aircraft to "individuals and
> property on the ground."  *Williams v. Trans World Airlines*, 509 F.2d 942, 946
> (2d Cir.1975) [applying the federal statutory duty of highest possible degree of
> safety to the threat of air piracy].

*In re Sept. 11 Litig.*, 594 F. Supp. 2d 374, 380 (S.D.N.Y. 2009).  However, the duty to provide

service "with the highest possible degree of safety in the public interest" is not limited only to air

carriers.  FAA Handbooks instruct that all private sector participants in the field of aviation,

including pilots, mechanics, air agencies, manufacturers, *airport operators* and air carriers, are

subject to the federal duty to provide service with the highest possible degree of safety in the

public interest:

> **THE PRIVATE SECTOR RESPONSIBILITIES.**  The term "private sector",
> when applied to aviation, includes all individuals and organizations participating
> in air commerce. . . .
>
> A.  The FAA, which represents part of the "public sector", has the duty as
> authorized by the FAAct . . . to establish minimum standards, rules, and national
> policy that provide for national security and safety in air commerce.  This
> responsibility for aviation safety, however, does not rest entirely with the FAA.
>
> B.  Persons or *organizations of the "private sector" also have an obligation to
> provide for public safety*.  All airmen, air carriers, aircraft owners and operators,
> air agencies, and *certain airport operators* who qualify and accept an FAA
> certificate assume these "private sector" responsibilities.

*          *          *

> [P]ublic safety and national security must be among the FAA's highest priorities.
> FAA inspectors must therefore maintain an "action attitude" with respect to any
> *air operator that does not or cannot fulfill its duty to perform its services with the*
> *highest possible degree of safety.*

Federal Aviation Administration's Airworthiness Inspector's Handbook, Order 8300.10, dated

August 13, 1993, a copy of an excerpt of which is attached as Exhibit 9 to the Cohen Declaration

(the "FAA Handbook"), at 8300.10 CHG 10, pp. 6-5, 6-6 to 6-7 (emphases added).

"Airlines and airports may exceed those minimum standards by implementing more

stringent security requirements." March 13, 1996 letter from Cathal L. Flynn, FAA Associate

Administrator for Civil Aviation Security to Robert Ellis Smith (a copy of which is attached as

Exhibit 2 to the Cohen Declaration), *Privacy Journal* at 1 ("[s]ecurity countermeasures issued by

the FAA in a Security Directive establish security minimums for adoption by airlines and

airports.").

Massport's ASP specifically mandated that Massport identify the security threat level at

Logan Airport and increase security measures as it determined to be appropriate under the

circumstances: "[t]he FAA or *Logan Airport* and affected airlines *will determine when increased*

*security measures are necessary in response to recognized threat conditions or situations and*

*will identify the appropriate threat level. The airport shall then take the applicable measures*

*specified in the plan. The measures may be applied to the airport facilities or to a particular*

*flight, a series of flights, or all flights arriving or departing from the airport, as appropriate.*"

Massport ASP at § V-1, at MP100457 (emphasis added).

On September 11, 2001, when ten hijackers passed through security at Logan Airport

with deadly and dangerous weapons to board, hijack, and take control of two airplanes, Logan

Airport was a Category X airport (an airport "liable to the highest threat" of air piracy (*see* The

9/11 Commission Report (Final Report of the National Commission on Terrorist Attacks upon

the United States), a copy of an excerpt from which is attached as Exhibit 3 to the Cohen

Declaration, at n.1), and was at security level AVSEC III ("information indicates a terrorist

group or other hostile entity with a known capability of attacking civil aviation is likely to carry

out attacks against U.S. targets"), *see* United Airlines' Air Carrier Standard Security Program,

dated May 31, 2000, a copy of which is attached as Exhibit 4 to the Cohen Declaration, at UAL

026550.

Massport learned in May 2001 from Logan Airport personnel that persons -- later

identified as the September 11 terrorists -- had engaged in surveillance activities at airport

security checkpoints. *See* July 17, 2007 Deposition of Stephen J. Wallace, a copy of which is

attached as Exhibit 5 to the Cohen Declaration, pp.103-16.  Massport also knew in the Spring

2001 that Logan Airport security checkpoints were "weak" and consistently failed to detect

weapons successfully carried through the security checkpoints. *See, e.g.,* April 27, 2001

Confidential Memo from Joseph M. Lawless, Massport's Director of Public Safety, to Virginia

Buckingham, Massport's CEO, a copy of which is attached as Exhibit 6 to the Cohen

Declaration (the "4/27/2001 Lawless Memo"), pp. 2-3 ("[r]ecent efforts to sneak contraband

beyond security by a local news media outlet have shown extremely poor job performances by

the security checkpoint operators"); Transcript of the March 30, 2007 Deposition of Joseph M.

Lawless, a copy of which is attached as Exhibit 7 to the Cohen Declaration (the "3/30/07

Lawless Deposition"), p. 65 (investigative reporters ability to sneak weapons through

checkpoints in Spring of 2001 demonstrated "the security checkpoints were the weakest link").

Nevertheless, despite (1) Massport's federal duty under 14 C.F.R. § 107.3(a)(1) to protect

passengers and property from air piracy; (2) the Massport's ASP's requirement that Massport

increase security as the threat level increased (*see* Massport ASP, at § V-1), and (3) Massport's

independent federal duty to operate Logan Airport with the highest possible degree of safety in

the public interest (*see supra*, pp. 2-3),. Massport failed to effectively counter the known crucial

vulnerabilities in checkpoint security at Logan Airport through September 11.

The FAA has repeatedly warned and reminded all participants in commercial aviation,

including airport operators, that satisfying the minimum standards set in the FAR does not satisfy

the independent federal duty to protect passengers and property with the "highest possible degree

of safety in the public interest":[1]

> The meaning of Section 601(b) of the FAAct [49 U.S.C. § 44702(b), should be
> clearly understood.  It means that this responsibility [to provide service with the
> highest possible degree of safety in the public interest] rests directly with the air
> carrier [and airport operator], irrespective of any action taken or not taken by an
> FAA inspector or the FAA.

FAA Handbook, 8300.10 CHG 9, at p. 6-5.

Against the backdrop of these legal duties, we now show that the argument Massport

makes in an effort to evade legal responsibility for the events of 9/11 -- that it had no

responsibility whatsoever for deficiencies at checkpoint screening or any other security failures

resulting in the events of 9/11 -- has no merit.  At a minimum, there are material issues of fact

precluding summary judgment on this important question.

## ARGUMENT

"Summary judgment is only warranted upon showing 'that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.'  The

burden is on the moving party to establish the absence of any material factual issues.  In

determining whether there are genuine issues of material fact, [the court is] 'required to resolve

---

[1]  *See In re Trans World Airlines, Inc.*, FAA Docket Nos. CP97SO0016 and CP97SO0017, 1999
WL 1125387, at *3-4 (F.A.A. Oct. 7, 1999) (applying federal duty of highest possible degree of
safety in the public interest to provide security against air piracy); *see also In re Sept. 11 Litig.*,
594 F.Supp.2d 374, 380 (S.D.N.Y. 2009).

all ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought.'"  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citations

omitted).  Massport is not entitled to judgment as a matter of law because both the law upon

which it relies for judgment is flawed, *see* Point I, as is its recitation of the supposed material

"facts", *see* Point II.

**POINT I**

**SUMMARY JUDGMENT MUST BE DENIED BECAUSE
MASSPORT MISSTATES THE LEGAL DUTIES THAT
<u>ESTABLISH ITS NEGLIGENCE ON 9/11</u>**

Massport essentially argues that it has no liability to plaintiffs, as a matter of law, even

though the indisputable facts show that Massport consciously ignored checkpoint screening

deficiencies at Logan Airport at a time of high risk in the months preceding September 11.[2]  *See*

Memorandum of Law in Opposition to the Massachusetts Port Authority's Motion for Summary

Judgment ("Massport Mem."), at p. 22 ("Congress itself explicitly assigned passenger screening

responsibilities to the airlines [pursuant to FAR Part 108], not the airports"; "even if Massport

became aware of substandard screening performance by any of the air carriers or security

companies, it had no authority to alter the division of responsibilities related to the screening of

passengers and their bags.  Not even the FAA Administrator -- let alone Massport, state

legislatures or courts -- had the authority to change the assignment of screening responsibilities";

"[a]llowing claims to proceed against Massport based on . . . [its] failures to improve passenger

screening at Logan Airport . . . would undoubtedly 'frustrate [the] specific objectives of federal

legislation'").  That argument fails because Massport had the authority, ability, and legislatively-

---

[2]  We show in Point II, *infra*, that Massport was quite aware of substandard screening of
passengers at Logan Airport.

mandated duty to act with the highest degree of safety in the public interest to protect passengers and property from hijackings.

The claims of negligence against Massport are based upon Massport's failure to formulate and carry out an airport security plan that effectively protected passengers and property travelling through Logan Airport from the risks of hijacking and its failure to operate Logan Airport with the highest possible degree of safety in the public interest.

Massport could have complied with its federal duties even without direct control or supervision of the security checkpoint operations of airlines and security companies.  For example, Massport, the acknowledged primary contact with the FAA with respect to security at Logan Airport, could have reported the documented failures of airlines and security companies in screening passengers for prohibited weapons to the FAA or shut down or penalized the airlines with substandard performance.  Massport could have increased its own surveillance over the Logan Airport security checkpoints based on reports that suspicious persons were "casing" the checkpoints.  If Massport had done so, they might have recorded the pre-September 11 activities of the terrorists, and their photographs could have been given to United Airlines and American Airlines as persons requiring extra scrutiny at Logan Airport security checkpoints.  None of these actions would have frustrated federal objectives.  Massport's suggestions that federal regulations provide instead for a compartmentalized security system in which no one works together is just wrong.

Also wrrong is Massport's alternative argument is wrong that plaintiff's negligence claim must be summarily dismissed because, even if Massport breached a duty owed to plaintiff, that breach cannot be, as a matter of law, the proximate cause of plaintiff's injury because the fact that terrorists would hijack and crash aircraft was not foreseeable. *See* Massport Mem., p. 28.

Because "questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve." *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 170 (1980).  The cases cited by Massport concerning the foreseeability of criminal acts by third parties on college campuses or in apartment buildings are not germane to the issue of the foreseeability that terrorists could exploit the well-publicized weaknesses in airport security at a high risk target airport such as Logan Airport.

Furthermore, this Court has already ruled in *In re September 11 Litig.*, 621 F.Supp.2d 131 (S.D.N.Y. 2009), that the Aviation Defendants can be held responsible for the consequences of their negligent failure to prevent terrorists from boarding aircraft with weapons because "it was entirely foreseeable 'that a [terrorist could] enter the . . . site and cause injury to a [passenger or others.]'". *Id.* at 148 (citation omitted).

Consequently, because Massport's argument is fatally deficient -- that it has no legal responsibility for injuries to passengers and property resulting from checkpoint screening failures at Logan Airport -- its summary judgment motion, on this basis alone, should be denied.

### POINT II

### THE EVIDENCE SHOWS THAT MASSPORT UNDERSTOOD THAT ITS DUTY TO PROTECT PASSENGERS AND PROPERTY AT LOGAN AIRPORT REQUIRED THAT IT CORRECT THE ABSYMAL PASSENGER SCREENING AT SECURITY CHECKPOINTS

Overwhelming evidence demonstrates that -- contrary to the argument that Massport makes here that it had only the narrowest of security duties that did not include checkpoint security -- Massport acknowledged its duty to ensure the overall security of Logan Airport (including checkpoint security and screening) and exercised authority pursuant to that duty with respect to Logan's notoriously abysmal checkpoint screening operations.

The evidence plainly shows that Massport understood that it had both the duty and authority to increase security measures -- including those related to checkpoint screening and security -- based on Massport's security threat assessments. Indeed, Massport's own Airport Security Program specifically provided that:

> "[t]he FAA or *Logan Airport* and affected airlines *will determine* when increased security measures are necessary in response to recognized threat conditions or situations and will identify the appropriate threat level. *The airport shall then take the applicable measures specified in the plan. The measures may be applied to the airport facilities or to a particular flight, a series of flights, or all flights arriving or departing from the airport, as appropriate.*"

Massport ASP (Exhibit 1 to the Cohen Declaration), § V-1, at MP100457 (emphases added); *see also* Transcript of the January 25, 2011 Deposition of Massport's Director of Aviation, Thomas J. Kinton (the "Kinton Deposition", a copy of which is attached as Exhibit 8 to the Cohen Declaration), pp. 131-32 (acknowledging "Massport's authority to increase security measures on an airport-wide basis given Massport's assessment of current terrorist threats"). That express duty to prescribe increased security measures in response to recognized threat conditions demonstrates that Massport's attempt to distance itself from checkpoint security is baseless and that summary judgment should be denied on that basis alone.[3]

---

[3]  Evidence of Massport's breach of its duties at Logan Airport is not limited to checkpoint operations. On May 11, 2001, two Middle Eastern men -- one of whom was later *positively identified as the lead hijacker Mohammed Atta* -- were observed by an American Airlines employee conducting surveillance of security checkpoints at Logan Airport, including taking videotape and still pictures of the checkpoints. *See* Wallace Deposition (Exhibit 5 to the Cohen Declaration), pp.103-16 (describing his observations of the May 11, 2001 surveillance of the Logan security checkpoints and his report of same to a state trooper under the control of the Massport that had been stationed a nearby checkpoint that the two men later passed through) and p. 140 (testifying that, when presented by the FBI with a photo array on September 12, 2001, he identified Atta as one of the men performing the checkpoint surveillance). These facts alone are sufficient to create a triable issue of fact whether Massport failed in its duties and whether those failures were a proximate cause of the 9/11 hijackings.

Massport's actions demonstrate that it knew its duty extended throughout Logan Airport, including to checkpoint security. Massport identified both the threat that terrorist organizations posed to United States civil aviation and Logan's vulnerability because of deficient checkpoint screening:

> Airports have historically been targets of terrorism. . . . There are no specific threats to Logan Airport., [sic] however, several incidents occurring over the last few years indicate existing vulnerabilities. The lack of a significant negative consequence, or the loss of a life, does not diminish the seriousness of the vulnerabilities. There was one ingredient missing from those events that defined them as a minor security problem instead of a catastrophic terrorist event. That ingredient was malicious intent. The effect of those incidents would have been drastically different if the perpetrators had malicious intent.
>
> Unfortunately, a paradigm shift is occurring within the world of terrorism. Federal security and intelligence agencies are predicting an increase in the likelihood of a terrorist attack occurring on U.S. soil in the next few years. . . .
>
> The best defense is a good offense. A good offense in the security arena is to harden the potential target. Identifying and eliminating vulnerabilities is the methodology employed to harden the target . . .
>
>          \*             \*             \*
>
> Screening of passengers and baggage - the performance of screeners at the security checkpoints is inconsistent. Recent covert efforts to sneak contraband beyond security by a local news media outlet have shown extremely poor job performance by the security checkpoint operators. There are four companies operating screening checkpoints at the airport. All four companies allowed the media personnel to sneak items through the checkpoints. This is an air carrier responsibility. *The screening companies* [sic] *job performance damages the entire security environment at the airport.*

4/27/2001 Lawless Memo (Exhibit 6 to Cohen Declaration), pp. 1, 2-3 (emphasis added); *see also* 3/30/07 Lawless Deposition (Exhibit 7 to Cohen Declaration), p. 140 (describing circumstances under which he wrote the 4/27/2001Lawless Memo). Thus, consistent with Massport's regulatory obligation to operate Logan Airport (including its security operations) in the "highest possible degree of safety in the public interest", *see supra*, pp. 2-3, 5 & n.1, the

identification of the threat together with identification of the vulnerabilities presented by the inadequate screening being performed at Logan obligated Massport to invoke its right and duty under the Massport ASP to prescribe enhanced security measures at the checkpoints. Massport failed to do so.

Furthermore, the 4/27/2001 Lawless Memo was not the first or last time that Mr. Lawless, as Massport's Director of Public Safety, acknowledged the need to "enhance" the performance of the security checkpoints operated by the airlines and their designees. Having identified the screening checkpoints as the "weakest link" in Logan Airport's security, *see* 3/30/07 Lawless Deposition, p. 65, and that such checkpoints were "the last and only line of defense before aircraft boarding", *see id.*, pp. 64-65; *see also* Transcript of the December 15, 2006 Deposition of Virginia Buckingham Lowy, a copy of which is attached as Exhibit 11 to the Cohen Declaration (the "Buckingham Deposition"), pp. 148-49 (acknowledging having written that "security checkpoints represent the front door to any commercial aircraft in the nation's aviation system, and function as the main line of defense against potential threats to public safety"), Lawless made repeated efforts from 1997 through 2001 to improve checkpoint security. *See* 3/30/07 Lawless Deposition, pp. 20-21 ("[t]hat was my goal, to enhance the security operation of the checkpoints"), 38 (acknowledging the he "specifically" recommended having state troopers under his direction "involved in the checkpoint screening process at Logan prior to 9/11"); 72 (Lawless was "doing everything in his power" to "enhance checkpoint security at Boston Logan" for five years prior to 9/11), 101-02 (uniformed state troopers "standing at the security checkpoints at certain times" as part of Massport's Logan Airport Security Enhancement and Review program), 102 (Public Safety department provided screeners with training related to recognizing explosive weapons), and 285-86 (discussing explosive detection training provided to

screeners by Massport).  These efforts in the face of the acknowledged screening deficiencies belie Massport's repeated canard that only the airlines -- and not Massport -- undertook responsibility for checkpoint security.  If that were so, why was Massport's Director of Public Safety working so hard to improve screening?

      Lawless redoubled those efforts in the spring of 2001 when investigative reporters from a local news program successfully evaded detection at the security checkpoints of contraband items contained in their carry-on luggage.  *See id.*, p. 65 (in 2001, following investigative reporters' ability to carry weapons through security checkpoints, Lawless knew that "the security checkpoints were weak"); 4/27/2001Lawless  Memo, p. 2 ("[r]ecent covert efforts to sneak contraband beyond security by a local news media outlet have shown extremely poor job performance by the security checkpoint operators"); *see also* Kinton Deposition, p. 97 (aware of media reports that prohibited materials were "getting through" Logan security checkpoints).  In response to and aware of the increasing threat of terrorist acts against civil commercial aviation, Lawless proposed a program in which undercover state troopers under his direction would attempt to get weapons past checkpoint security and would otherwise "monitor" the screeners' performance.  *See* 3/30/07 Lawless Deposition, pp. 129-37.  Unfortunately, however, Lawless' proposed program to "test" and "monitor" the security screeners was "rejected" in July 2001 because the airlines and the FAA objected.  *See id.*, pp. 146 and 157.  Nevertheless, the mere fact that Mr. Lawless proposed a program to "test" and "monitor" the screeners' performance contradicts Massport's claim that it had no "jurisdiction" to improve checkpoint security.  *See* Kinton Deposition, p. 97 ("Q. . . .  Why did you want to test the checkpoint?  A. *Because we wanted to make it as secure as possible.*  That there were reports of -- in the local media of some stuff getting through, and not only here, but other airports across the country, and we were

concerned with that. *They're our passengers, and we want to do whatever we could to help, even though it was not our jurisdiction.*" (emphases added)).

Nor was Mr. Lawless the only Massport official to recognize that the permeable security checkpoints impacted the overall safety of Logan Airport and that Massport as the airport operator had an obligation to improve the operations of those checkpoints.  For example, Mr. Kinton -- Logan Airport's Director of Aviation, the person charged with the overall operation of the Airport -- identified the extremely high screener turnover at Logan as a security concern *to Massport* and made efforts to reduce that turnover rate even though primary responsibility for the day-to-day operation of those checkpoints was committed to the air carriers.  *See* Kinton Deposition, p. 112 (worked to improve screener turnover "[b]ecause, again, *we were concerned with security,* the performance, and as I stated earlier, these are our passengers, and there was absolute concern, but there was also a line. *And we didn't take the position we're not crossing that line, not our problem.*" (emphases added)).

This demonstration that Massport had an obligation to -- and did (albeit ineffectively and negligently) -- work to improve the known deficiencies in Logan's checkpoint screening is not overcome by Massport's repeated reliance on the explicit (but not implicit) "division of responsibilities" in Part 107 and 108 of the FAR.  *See, e.g.*, Massport Mem., pp. 21-23.  As the testimony of Massport's officials demonstrates, where Massport's duty to "provide for the safety of persons and property" using Logan Airport "against acts of criminal violence and aircraft piracy" with "the highest possible degree of safety in the public interest" (*see supra*, pp. 2-3, 5 & n.1) required Massport to exceed the "minimum standards" of Part 107 and involve itself directly in the operations of the screening checkpoints, Massport did exceed those minimum standards to ensure the safety of the passengers using the airport.  *See* Kinton Deposition, p. 88 (concerning

background checks on screening employees to be issued access badges by Massport: "We did what the FAA required us to do, and then we went over and above and did our own criminal history check so that we not only satisfied what the FAA was concerned with, but we wanted to be overly cautious and checked for other things, as well, that weren't on the list of issues"); 3/30/07 Lawless Deposition, pp. 140-45 (describing Massport's use of background checks in excess of that required under FAA regulations despite the FAA's and the airline's resistance to such enhanced background checks because, unlike the airlines, he was not "*satisfied with meeting the minimum requirements of the law*" (emphasis added)); *see also* Kinton Deposition, pp. 34 (referring to Logan Airport Security Plan: "It's -- what I would refer to as sort of minimum standard that we had to comply with. *We certainly went above and beyond in many instances,* but there were certain things you had to comply with in order to be certificated by the Federal Aviation Administration, and that is what was in these plans." (emphasis added)), and 134 (acknowledging that "Massport ha[d] the discretion to increase security at the airport above and beyond what's provided for in the Federal Aviation Act and under Federal Aviation Regulations").

Indeed, as Massport's actions in the aftermath of the 9/11 attacks demonstrated, Massport always had the ability (despite its current disclaimer) under the FAR to force the air carriers to properly perform their screening duties:

> Q.      And then you also understood that you could and, in fact, you did go on to do extra precautions before opening up Logan Airport after September 11th, correct?
>
>         *            *            *
>
> A.      Yes.  After September 11th, that is true.
>
> Q.      And if you go to the top of that same page, but on the other column, it says, "We decided to go one step further by requiring the airlines to certify that they had complied with their own safety directives from the FAA -- their own new safety directives from the FAA.  If an airline refused to

produce proof, complaining that only the FAA had the authority to demand it, Kinton said bluntly, 'Fine, we'll open, but you're not operating.'"

First of all, you wrote that, correct?

A.      I wrote that, yes.

Q.      And that was a safeguard that you at Massport instituted above and beyond what the FAA required, correct?

*                              *                              *

A.      We hoped to institute it.

Q.      Okay.  Well, you certainly thought that you had a -- an ability to exercise influence over the airlines to certify that they were complying with the new safety directors [sic] post-9/11, correct?

A.      Well, as it says, and I'll read it to you,

"If an airline refused to produce proof, complaining that only the FAA had the authority to demand it, Kinton then went on to say bluntly.." *So we weren't asserting.  We had authority.  We were just exercising it.*

Q.      Okay.  And you weren't waiting for an okay from the FAA for you to exercise that authority, correct?

A.      Not after 9/11.

Buckingham Deposition, pp. 126-27 (emphasis added).

Similarly, Massport's claim that it lacked the power under the FAR to cause the air

carriers to improve their notoriously poor checkpoint screening operations, *see, e.g.*, Massport

Mem., pp. 3-4, is also shown to be false by the facts.  As the Report of the Special Advisory

Task Force on Massport (which was established by acting Governor Jane Swift in the aftermath

of the 9/11 attacks) recognized:

> *As owner/landlord of [Logan A]irport, Massport has extensive but long underutilized powers.*  By exercising this authority, Massport can raise the standard of security by requiring that all passenger screeners receive a living wage, even if this wage is beyond the minimum floor established by the FAA. Increased wages will attract higher caliber screeners and therefore, improve job performance.  This program has been effectively implemented in San Francisco.

December 4, 2001 Report of The Special Advisory Task Force on Massport, a copy of which is

attached as Exhibit 12 to the Cohen Declaration, p. ii (emphasis added).  The Special Advisory

Task Force went on to note that various airports, including San Francisco, JFK, La Guardia, Newark, Miami and even Logan itself, had -- prior to September 11th -- utilized those powers to improve airport safety even in areas not specifically committed to airport operators under Part 107 of the FAR. *See id.*, pp. 7-8. Thus, the Special Advisory Task Force recommended that, in the aftermath of 9/11, Massport now use those powers to improve the quality of checkpoint security:

> *In asserting its rights as a landlord and **its responsibilities for the security of passengers using its facilities**, Massport must develop procedures to ensure effective screening of passengers and baggage and must go well beyond federal requirements to restore the traveling public's faith in Logan.*

*Id.*, p. 14 (ascending emphases added).

As landlord and owner of Logan Airport , Massport's powers to influence air carrier behavior did not come into being after September 11th; those powers existed before the attacks. Indeed, Massport used those very powers prior to 9/11 to coerce the air carriers to meet certain *customer service* standards under Massport's Guaranteed Passenger Standards Program ("GSP"). Kinton Deposition, pp. 148-54 (discussing GSP); Buckingham Deposition, pp. 106-113 (same). Failure to meet the standards of the GSP, including the requirement that passengers complete checkpoint screening in five minutes or less, could result in adverse effects on the air carrier's lease with Massport, "including rescinding access and use of gates, waiting areas, ticket counters and offices at Logan Airport."[4] *See* Kinton Deposition, pp. 148-49, 152; *see also* Buckingham Deposition, p. 117 (discussing escalating penalties under GSP).

---

[4]  The pre-9/11 implementation of the GSP may also provide a separate basis on which to hold Massport liable for the failures of checkpoint security on September 11, 2001.  If the jury finds that the coercive penalties contained in the GSP caused the Logan screeners to rush passenger screening in order to meet the five-minute standard and if the jury finds that such hurried screening was a proximate cause of the checkpoint failures leading to the hijackings, then legal responsibility for those failures cannot be laid only at the feet of air carriers and their screening

If Massport used those powers to influence the air carriers to meet customer service standards, Massport could most certainly have used those same powers to influence and coerce air carrier behavior as to the notoriously deficient passenger checkpoint screening. But, Massport did not do so. Indeed, in light of Massport's duty to provide for the safety of persons and property using Logan Airport against acts of criminal violence and aircraft piracy with the highest possible degree of safety in the public interest (*see supra*, pp. 2-3, 5 & n.1), the use of those owner/landlord powers to influence and coerce air carrier behavior as to customer *service* but not to influence and coerce air carrier behavior as to passenger *safety* borders on negligence *per se*.

A jury, on the basis of the foregoing evidence, could reasonably conclude that Massport did not carry out an effective airport security plan to protect passengers and property from the September 11 hijackers, and that Massport did not act reasonably, under the circumstances that existed on September 11, to operate Logan Airport with the level of security commensurate with the highest possible degree of safety in the public interest. Consequently, Massport's motion for summary judgment must be denied.

---

companies -- it must be shared by Massport, whose actions in implementing the GSP contributed to such shoddy and rushed passenger screening at the checkpoint.

## **CONCLUSION**

On the basis of the foregoing, Massport's motion for summary judgment should be

denied in its entirety.

Dated: New York, New York
        June 24, 2011

                  Respectfully submitted,

                  FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

                  By: _____

                         Jason T. Cohen, Esq.
                  One Liberty Plaza
                  New York, New York 10006
                  (212) 412-9500

                  Attorneys for Plaintiffs:
                  World Trade Center Properties LLC
                  1 World Trade Center LLC
                  2 World Trade Center LLC
                  3 World Trade Center LLC
                  4 World Trade Center LLC
                  7 World Trade Company, L.P.

660735