UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | No. 21 MC 101 (AKH) |
| | : | |
| | : | This document relates to : |
| IN RE SEPTEMBER 11 LITIGATION | : | *Bavis v. United Airlines Inc.et al.,* |
| | : | 02 CV 7154 |
| | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MASSACHUSETTS PORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STANDARD OF REVIEW ............................................................................................... 2

ARGUMENT ..................................................................................................................... 3

    A.   The standard of care is reasonable care under the circumstances, not strict compliance with the far's, although a genuine issue of material fact exists whether massport complied with the minimum standards of the far's .............................................................................. 3

    B.   There are genuine issues of material fact whether massport breached its duty under a reasonable care standard ........................................................................................................ 6

    C.   Massport had a duty under far part 107 to correct known security deficiencies at logan airport, including deficiencies at the security checkpoints and there are genuine issues of material fact whether massport did so ............................................................................... 9

    D.   Massport had a duty as a landlord to ensure that its facility was safe and secure .............. 10

    E.   A genuine issue of fact exists regarding whether the hijackers breached the sida or aoa in furtherance of the september 11, 2001 attacks ........................................................................ 13

RESPONSE TO MASSPORT'S STATEMET OF UNDISPUTED FACTS ............................ 16

WHAT THE EVIDENCE HEREIN HAS SHOWN ................................................................. 29

SELECTION OF MASSPORT'S BOSTON LOGAN AIRPORT .............................................. 40

RESPONSE TO PRELIMINARY STATEMENT ..................................................................... 41

CONCLUSION ....................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ...................................................... 2

*B.F. Goodrich v. Betkoski*, 99 F.3d 505, 521 (2d Cir. 1996) ...................................................... 3

*Basso v Miller*, 40 N.Y.2d 233, 352 N.E.2d 868, 386 N.Y.S.2d 564 [1976]............................. 11

*FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983)................................................................................ 5

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-289 (1968).................. 2

*Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994) ............................... 3

*In re Air Disaster at Lockerbie Scotland,* 37 F.3d 804, 815 (2d Cir. 1994)............................... 5

*In the Matter of World Trade Center Bombing Litigation,* 776 N.Y.S.2d 713 (2004) ...................... 11, 12

*Jacqueline S. v City of New York*, 81 N.Y.2d 288, 295, 614 N.E.2d 723, 598 N.Y.S.2d 160 ................... 11

*Japan Airlines Company, Ltd., v. Port Authority of New York and New Jersey*, 178 F.3d 103 (2d Cir. 1999) ......................................................................................................................... 9

*Jiggetts v. Tristar Patrol Serv.*, 2011 U.S. App. LEXIS 10528 at 2 (2d Cir. 2011) ...................... 3

*Kush v City of Buffalo*, 59 N.Y.2d 26, 449 N.E.2d 725, 462 N.Y.S.2d 831 [1983]...................... 11

*McNally v. Port Auth. (In re WTC Disaster Site)*, 414 F.3d 352, 379-80 (2d Cir. 2005) .......................... 4

*Nallan v Helmsley-Spear, Inc.*, 50 N.Y.2d at 519-520 ............................................................. 11, 13

*Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) ...................................................... 3

*Sanchez v State of New York*, 99 N.Y.2d 247, 784 N.E.2d 675, 754 N.Y.S.2d 621 (2002) ...................... 11

*Torres v. United States*, 2011 U.S. Dist. LEXIS 38939 (S.D.N.Y. 2011) .................................... 2

## Statutes

49 U.S.C. § 44701 .................................................................................................................. 4

49 U.S.C. § 44702 .................................................................................................................. 4

ATSSSA.................................................................................................................................. 3

## Other Authorities

9/11/01 Commission Report .............................................................................................. 40, 41

## Regulations

14 C.F.R. §107 .............................................................................................................. passim

FAR 108............................................................................................................................... 1

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MASSACHUSETTS PORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Mary Bavis, respectfully submits this memorandum of law in opposition to Defendant Massachusetts Port Authority's ("Massport") Motion for Summary Judgment.

### INTRODUCTION

On September 11, 2001, Massport had the overarching responsibility for security at Boston Logan airport. Massport was required to adopt and carry out a security program that provided;

> **for the safety and security of persons and property travelling in air transportation and intrastate air transportation against an act of criminal violence and aircraft piracy.**

14 C.F.R. §107.3(1). Massport itself states in its security program that it is responsible for the security of the airport, and that it would conduct periodic inspections to ensure that proper security was maintained. *See* Logan Airport Security Program ("ASP") (attached to the declaration of Joseph Lawless ("Lawless Decl.") as Exhibit A) at I-1(A)(3). Massport was also required to provide Law Enforcement Officers "in numbers and in a manner adequate to support the Logan International Airport Security Program and each passenger-screening system (security checkpoint) required by FAR 108.5(a)(1) and 129.25." *Id.* at IV-1(A). In addition, Massport was responsible for securing the SIDA and the AOA to ensure that no unauthorized persons gained access to these areas.

Massport had notice that security at the checkpoints and other areas of Logan Airport was abysmal.[1] Despite having this notice and having the overarching responsibility for security at the

---

[1] Exhibit 1, Deposition Transcript of Joseph Lawless, p. 136, ln 10-22 ("I knew that security checkpoint were weak"); Exhibit 2, AVSEC Dep. Exhibit 213, April 27, 2001 Memorandum from Joseph Lawless to Virginia Buckingham (outlines weaknesses in Massport's checkpoints, SIDA and AOA security systems).

1

airport, the evidence shows that Massport failed to adequately remedy Logan's security weaknesses. This failure proximately caused the September 11, 2001 attacks and the death of Mark Bavis. The evidence demonstrates that a genuine dispute exists regarding the facts of Massport's liability, and its motion must be denied.

Also submitted in support of Plaintiff's Opposition is the Affidavit of Michael Pilgrim. Mr. Pilgrim has more than 30 years of experience in management, design, installation and establishing and reviewing airport security systems from the standpoint of their level of protection against terrorist threats. Both before and after September 11, 2001, he analyzed the aviation security systems at Dulles and Logan airports.

## STANDARD OF REVIEW

Summary judgment may not be granted unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a) (2011). The moving party has the burden of showing the absence of a genuine issue of material fact. *Torres v. United States*, 2011 U.S. Dist. LEXIS 38939 (S.D.N.Y. 2011). The dispute as to an issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) *citing First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-289 (1968). In determining whether a material fact exists, the court must resolve all ambiguities in the non-moving party's favor." *Jiggetts v. Tristar Patrol Serv.*, 2011 U.S. App. LEXIS 10528 at 2 (2d Cir. 2011).

> When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the nonmovant's favor. . . . The trial court must bear in mind that 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'
>
> The trial court's task is 'carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'

*B.F. Goodrich v. Betkoski*, 99 F.3d 505, 521 (2d Cir. 1996) citing *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995), *Anderson*, 477 U.S. at 255 (1986), and *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Plaintiff has already provided briefing to this Honorable Court in Plaintiff's Memorandum of Law on the Applicable Standard of Care, Document #1458 and incorporates by reference that memorandum which also applies herein.

## ARGUMENT

### A.   THE STANDARD OF CARE IS REASONABLE CARE UNDER THE CIRCUMSTANCES, NOT STRICT COMPLIANCE WITH THE FAR'S, ALTHOUGH A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER MASSPORT COMPLIED WITH THE MINIMUM STANDARDS OF THE FAR'S

Nothing in ATSSSA suggests that Defendants' liability for the United Flight 175 hijacking and crash should be adjudicated by applying a standard of care different from the traditional state-law standard of reasonable care under the circumstances, which had long been applied in pre-September 11th cases involving negligent aviation security.

Section 408(b)(2) of ATSSSA makes clear that "[t]he substantive law for decision in any such . . . suit shall be derived from the law, including choice of law principles, of the State in

which the crash occurred unless such law is inconsistent with or preempted by Federal law."  As explained by the Second Circuit, "what ATSSSA itself displaces is not the substantive standards governing liability, but only the state-law damages remedies."  *McNally v. Port Auth. (In re WTC Disaster Site),* 414 F.3d 352, 379-80 (2d Cir. 2005).

Neither Congress nor the Second Circuit has suggested that the standard of care of reasonableness under the circumstances is inconsistent with or preempted by the Federal Aviation Regulations (FARs)' minimum security standards.[2]   Indeed, federal statutory law required Defendants to act reasonably in providing the highest possible degree of security in the public interest.  49 U.S.C. § 44701(d)(1)(A); 49 U.S.C. § 44702(b)(1)(A).  And to act reasonably

---

[2] While Defendants argue that FAA regulations are not minimum safety standards, but rather mandatory, inviolate requirements that prohibited Defendants from providing greater safety, Defendants' position is irreconcilable with the plain text of the Federal Aviation Act ("FAAct"), which provides, among other things, that:

(a)      ... The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—

   (1)      *minimum standards* required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers;

   (2)      regulations and *minimum standards* in the interest of safety for— (A) inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances; ....

   (5)      regulations and *minimum standards* for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

(b)      Prescribing minimum safety standards. The Administrator may prescribe *minimum safety standards* for—

   (1)      an air carrier to whom a certificate is issued under section 44705 of this title [49 U.S.C. § 44705]; and

   (2)      operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats.

                            ***

(d)      ... When prescribing a regulation or standard under subsection (a) or (b) of this section ..., the Administrator shall—

   (1) consider

      (A)      *the [federal statutory] duty of an air carrier to provide service with the highest possible degree of safety in the public interest* .

49 U.S.C. § 44701 (emphasis added)

in providing the highest degree of security is consistent with the state-law standard to act reasonably under the circumstances.

It is a matter of law in the Second Circuit that compliance with FAA regulations does not, in and of itself, establish due care.  Although the majority of the cases deal with airline operators who are defendants, it does not make the law inapplicable under the facts of the present case. Massport, as an airport operator, falls under the same regulatory scheme as the airlines, albeit two separate sections Federal Aviation Regulation (FAR) sections, with overlapping responsibilities. It is law that compliance with Federal Aviation Regulations, specifically in regard to aviation security, is not the end -all with regard to standard of care.

In *FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983), the Second Circuit made quite clear that, "the regulations outline minimum standards of safety," *id*. at 636.

> Although the FAA regulations occupy a key role in the trial of this case, it must be kept in mind that Pan Am and Alert's compliance with them is not dispositive of the outcome.  As . . . the court instructed the jury, proof of full compliance with the ACSSP would not necessarily provide appellants with a complete defense against a claim of willful misconduct.  FAA regulations only establish minimum requirements for air carriers.  A jury could conceivably find certain circumstances under which an air carrier had committed willful misconduct even though it followed FAA regulations to the letter.

*In re Air Disaster at Lockerbie Scotland,* 37 F.3d 804, 815 (2d Cir. 1994) *("Lockerbie")*.

Massport personnel concede the FAA requirements were minimums.

11    Q.   And they develop that security plan in,

12   what, response to their local or area needs and

13   conditions?

14        A.   Yes.  It's -- what I would refer to as

15   sort of minimum standard that we had to comply with.

16   We certainly went above and beyond in many instances,

17   but there were certain things you had to comply with

18   in order to be certificated by the Federal Aviation

19   Administration, and that is what was in these plans[3]

Additionally, prior to September 11, 2001, Massport had implemented a Guaranteed Passenger Service Initiative.  This program gave Massport the authority to not only regulate checkpoint operations but also to punish the airlines for non-compliance. Exhibit 3 at pp. 148:15-25, 149:1-12.  This program was authored and instituted by Massport.  Massport stressed to the air carriers at Boston Logan that Massport had the authority to implement such a program. Massport's Airport Security Program recognized Massport's authority to increase security measures on an airport-wide basis given Massport's assessment of current terrorist threats. *Id.* at pp. 131:21-25, 132:1-2. Massport had broad discretion to increase security at the airport above and beyond what was stated in the Federal Aviation Act and under the Federal Regulations. *Id.* at 134:11-17.

As such Massport's duty was not confined to the Federal Aviation Regulation but is governed by a reasonable care under the circumstances standard.

## B.   THERE ARE GENUINE ISSUES OF MATERIAL FACT WHETHER MASSPORT BREACHED ITS DUTY UNDER A REASONABLE CARE STANDARD

There are questions of material fact of Massport's compliance with both its regulatory and reasonable care obligations in regard to security.  Massport, as the airport operator, was required to provide adequate law enforcement presence to support its security program and the airline passenger checkpoints.

---

[3] Exhibit 3, Deposition of Thomas Kinton, at p. 34

Each airport operator shall provide law enforcement officers in the number and in a manner adequate to support-
(1) Its security program; and
(2) Each passenger screening system required by part 108 or Sec. 129.25 of this chapter.

14 C.F.R. § 107.15(1-2)

Massport misstates their security duty was limited to response to incidents at a passenger screening checkpoints and fences, doors and badges.  It is clear from the Federal Aviation Regulation language that Massport was to provide both quantity and quality to adequately support the passenger screening system.  On the morning of September 11, 2001, there was not a permanently stationed law enforcement officer at the Terminal C checkpoint.  Instead, Massport directed its law enforcement officers to be a "flex response" meaning the officers would only respond to the checkpoint if there was an incident or request from the airline. Massport concedes a high visibility of law enforcement was important.[4] Yet at the only point in the terminal where all passengers must travel before entering the sterile area, there were no law enforcement officers present.  Massport could have had officers at the checkpoints and after the checkpoints, and in fact Massport at times previous did post law enforcement officers at the checkpoints.  An officer certainly could have recognized Mohammed Atta whom Massport police saw on May 11, 2001, and who was identified immediately to the Massport police as surveilling and videotaping security.  Massport officers could have engaged in random checks of bags and identification of passengers after the passengers had passed the checkpoint.  Massport instituted these procedures following the events of September 11, 2001, even though they had not been given any additional mandate from the Federal Aviation Administration.[5]  The lack of a law enforcement presence at the security checkpoint and the limited deployment of officers before September 11, 2001,

---

[4] Exhibit 3, at. p. 56:5-16
[5] Exhibit 4, Deposition of Virginia Buckingham, p. 144:21-25; Exhibit 5, AVSEC 218 - MP10150- MP10153

creates a genuine issue of material fact whether Massport adequately supported the passenger screening checkpoint on September 11, 2001.

Additionally, whether Massport acted reasonably under the circumstances to protect its passengers from acts of criminal violence and air piracy is a highly disputed fact. Massport had the ability and authority to increase its security based on its perception of threat to safety.[6] Throughout the year 2001 prior to September 11th, Massport was well aware of a growing and real threat to aviation. Massport personnel were warned by the FBI and FAA. With this knowledge of increased threat to aviation, Massport did nothing different in terms of increased security other than make a lot of plans which were awaiting implementation on September 11, 2001. Massport's failure to increase its security protocols with the knowledge of an increased threat creates a genuine issue of material fact whether Massport acted reasonably in light of the circumstances.

Massport on the morning of September 11, 2001, did not own nor utilize closed circuit television at Logan Airport. The Federal Aviation Administration well before September 11, 2001 had recommended to airports that, "the use of closed-circuit television systems in an airport can enhance and increase the level of security. Depending upon the airport's needs, this system may be focused primarily on the terminal or may be airport-wide...."[7] The Director of Aviation from Massport told the staff of the 9/11 Commission that cameras could act as a deterrent.[8] Armed with the recommendation and knowledge of the deterrent effect of cameras, Massport failed to install them. Without a doubt if Massport had checkpoint cameras they would have had surveillance tape of Mohammed Atta and other hijackers surveilling the airport on May 11 and at

---

[6] Exhibit 6, AVSEC EX 220, "Report of the Special Advisory Task Force on Massport"
[7] Exhibit 7, AVSEC EX 774, Recommended Security Guidelines for Airport Planning Design and Construction, at p. 115
[8] *See* Exhibit 3, at p. 233:18-23

other times.   They could have reviewed the tapes after employees at Boston Logan Wallace, Spagnoulo and Miller reported hijacker Atta surveilling Boston Logan months before September 11, 2011.  Atta's picture and name could have been known and posted at every checkpoint.  He could have been placed on no fly lists and watchlists.  He could have been stopped from flying by Massport.  Kinton testified thatMassport had that power.

Massport did not comply with FAR 107.15, by failing to adequately support the screening checkpoint. Massport did not act reasonably under the circumstances in failing to enhance security to include the installation and use of closed circuit television.  On that point alone, Massport's Motion for Summary Judgment should be denied because the facts not only show a lack of reasonableness, but an abject failure to do its statutory law enforcement duties.

### C.   MASSPORT HAD A DUTY UNDER FAR PART 107 TO CORRECT KNOWN SECURITY DEFICIENCIES AT LOGAN AIRPORT, INCLUDING DEFICIENCIES AT THE SECURITY CHECKPOINTS AND THERE ARE GENUINE ISSUES OF MATERIAL FACT WHETHER MASSPORT DID SO

Massport claims that it had no duties with regard to the checkpoints and, thus, cannot be held liable for the checkpoint failures.  However, the same argument was advanced by the Port Authority as the owner and operator of JFK airport and was rejected by the Second Circuit. *Japan Airlines Company, Ltd., v. Port Authority of New York and New Jersey*, 178 F.3d 103 (2d Cir. 1999).  In *Japan Airlines*, the Plaintiff sued the Port Authority for damages inflicted on one of its aircraft by ice and snow on or near the runway at JFK, claiming the Port Authority failed to properly clear the ice and snow.  *Id.*  The Port Authority argued that it could not be found negligent for failing to clear the ice and snow beyond the edges of the runway because it was not specifically required to do so.  *Id.* at 109.  The Second Circuit disagreed, citing to the Port Authority's overall duty to maintain the airport in a safe manner:

> The Port Authority's status as an airport operator required it to maintain JFK in a reasonably safe manner for the benefit of passengers and carriers using the airport. It is obligated to ensure that the airport conditions are safe for landing and departing aircraft, and to give proper warning of any condition that would affect the safe operation of an aircraft.

*Id.* The Port Authority then tried to claim that it met this standard, but it was not required to clear the sides of the runways beyond the edge. The court stated that since the Port Authority was aware of the narrowness of its runways in relation to the size of the aircraft landing at JFK, it should have assumed responsibility for the areas beyond the edge of the runways, and its failure to do so was "a violation of their duty to provide carriers and their passengers with safe operating conditions." *Id.* at 110.

Although Massport claims here that it had no specific duties regarding the checkpoints, its overarching duty to provide for the "safety of persons travelling in air transportation" is paramount. 14 C.F.R. 107.3(1). Massport knew the checkpoints were failing, yet it did little or nothing to remedy these failures. As in Japan Airlines, this is a violation of Massport's duties, for which it can be found negligent.

### D.  MASSPORT HAD A DUTY AS A LANDLORD TO ENSURE THAT ITS FACILITY WAS SAFE AND SECURE

Massport owned Logan Airport including the terminals, parking garages, aprons, taxiways, runways, and surrounding land. Massport leased space to various commercial enterprises at Logan including the various airlines and other commercial vendors such as restaurants and other retail shops. Massport is the landlord of Logan Airport and as such owed a duty to Mark Bavis to protect him from acts of criminal violence and air piracy. A landowner or landlord who holds its land open to the public is under a legal duty to exercise reasonable care under the circumstances to maintain the premises in a reasonably safe condition. *In the Matter of*

*World Trade Center Bombing Litigation,* 776 N.Y.S.2d 713 (2004), citing *Kush v City of Buffalo,* 59 N.Y.2d 26, 449 N.E.2d 725, 462 N.Y.S.2d 831 [1983]; *Basso v Miller*, 40 N.Y.2d 233, 352 N.E.2d 868, 386 N.Y.S.2d 564 [1976].) The duty includes taking minimal security precautions against reasonably foreseeable criminal acts by third parties. *Nallan v Helmsley-Spear, Inc*., 50 N.Y.2d at 519-520; see also *Jacqueline S. v City of New York*, 81 N.Y.2d 288, 295, 614 N.E.2d 723, 598 N.Y.S.2d 160.   The criminal act perpetrated by the hijackers, namely the carriage of weapons and subsequent hijacking were not only foreseeable but foreseen by Massport. Massport was aware of the threat of terrorist attacks against civil aviation.[9]   Further, Massport was aware the passenger screening being conducted by the screeners was woefully inadequate.[10]

The hijacking of an aircraft and/or criminal violence was foreseeable to the entire traveling public, and certainly to Massport.  The reason passenger screening was implemented was to prevent violence and hijacking, as well as prevent the carriage of dangerous weapons on board an aircraft.  Foreseeability includes what a landlord actually knew, as well as what it reasonably should have known.  *Sanchez v State of New York*, 99 N.Y.2d 247, 784 N.E.2d 675, 754 N.Y.S.2d 621 (2002).  Massport knew of the increased threat of a hijacking or terrorism against civil aviation.  Massport had been briefed an attack was not a question of if "but a question of when".[11]   On September 11, 2001, Massport was operating under AVSEC Threat Level III which meant there was information to indicate a terrorist group or other hostile entity with a known capability of attacking civil aviation was likely to carry out attacks against U.S. targets.  Massport takes the position the use of the airplane as a bomb was not foreseeable, however, this position is misplaced, for two reasons.  First, under the Federal Aviation Regulations Massport has to prevent against criminal violence and air piracy, of which on

---

[9] *See* Pilgrim Affidavit ¶ 11,12, 26, 41, 42
[10] *See* Pilgrim Affidavit ¶ 40, 44, 46
[11] Exhibit 8, Meeting Minutes, at p. MP100706

September 11, 2001, Massport failed to do so, despite a wealth of information such a hijacking or attack was foreseeable.  To establish foreseeability in New York there is <u>not</u> a requirement to demonstrate that the criminal activity be at the exact location or be of the same type of criminal conduct to which a plaintiff was subjected.  See *In the Matter of World Trade Center Bombing Litigation* at 735.  Massport had specific knowledge of the threat and based on the evidence of their knowledge, a genuine issue of material fact exists.  Second, Mark Bavis was a passenger on the hijacked plane.  Whether or not the plane was crashed into a building or stormed by special forces to regain control, passengers are harmed and sometimes die when planes are hijacked.  The argument that Massport didn't know the plane would be used as a bomb is especially meritless in a passenger case.  Passengers are put at risk of death any hijacking.

As an airport operator and landlord, Massport had a duty to assure the airlines were providing adequate screening.  Massport knew the airlines were doing a poor job.[12]  Massport's Director of Public Safety, informed the head of Massport in April 2001, about security vulnerabilities including the checkpoints.[13]  In May, 2001, a local FOX newscast demonstrated the weakness of the checkpoints.[14]  Massport was so concerned with checkpoint screening, they proposed their own testing procedures of the checkpoints.[15]  Based on Massport's knowledge of the screening deficiencies, a genuine issue of material fact is present regarding the foreseeability of a breach of the security checkpoint.

Since there is a genuine issue of material fact as to whether a hijacking and/or attack was foreseeable, the inquiry now turns to whether Massport acted reasonably in regards to their safety precautions.  "The reasonableness of safety precautions is almost always a factual issue

---

[12] *See* Pilgrim Affidavit ¶ 40
[13] *See* Pilgrim Affidavit ¶ 41
[14] *See* Pilgrim Affidavit ¶ 37-40
[15] *See* Pilgrim Affidavit ¶ 47

for the jury." *Id.* at 726.   The type of safety measures that building operators and managers are reasonably required to provide is almost always a question of fact for the jury *Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507, 520, 522 (1980).   Massport argues they were constrained to the Federal Aviation Regulations, however, as previously discussed, the Federal Regulations establish minimum standards.   Massport had the ability to install close circuit television which they admitted would act as a deterrent.   Massport could have placed officers permanently at the passenger checkpoints and had officers beyond the checkpoints conduct random identification checks and baggage searches, as they did post September 11, 2001.   The reasonableness of Massport's actions or inactions is a genuine issue of fact, negating Massport's Motion for Summary Judgment.

### E.   A GENUINE ISSUE OF FACT EXISTS REGARDING WHETHER THE HIJACKERS BREACHED THE SIDA OR AOA IN FURTHERANCE OF THE SEPTEMBER 11, 2001 ATTACKS

To the extent that United or Huntleigh claim that the hijackers were able to obtain their weapons by breaching the Security Identification Display Area ("SIDA") or the Air Operations Area ("AOA"), or by working in concert with others who breached these areas, or by buying their weapons in the airport or by obtaining the weapons from a Red Carpet Club or restaurant after clearing security, there is a genuine dispute as to material facts, and Massport's motion must be denied.   United and Huntleigh advanced this claim before this Honorable Court in myriad hearings and in depositions and arguments.   As Massport acknowledged in its brief, it had the duty under federal law to secure the SIDA and the AOA and to issue badges to persons authorized to enter the SIDA.   *See* Memorandum of Law in Support of the Massachusetts Port Authority's Motion for Summary Judgment, p. 4.   It was Massport's responsibility to ensure that no unauthorized person gained access to these areas.   Furthermore, Massport's ASP required all

Massport employees to notify the Massachusetts State Police if a suspicious, unknown, or unauthorized person was located within the AOA or SIDA.[16]   Massport was further required to maintain records of unauthorized persons who were apprehended in the AOA.  *Id.*

The evidence shows that breaches to the SIDA and AOA were commonplace at Logan prior to September 11, 2001.  In April of 2001, Joseph Lawless, then Director of Public Safety at Massport, wrote a memo to Virginia Buckingham, director of Massport at the time, regarding vulnerabilities at the airport that could subject it to terrorist attacks, including problems with AOA security and the access control system.[17]   The memo stated, "Airports have historically been targets of terrorism" and "there are existing vulnerabilities that must be addressed." *Id.* at p. 1. With regard to the AOA, the memo stated that "the variety of perimeter control barriers and the lack of perimeter controls in other areas make it extremely difficult, if not impossible to defend." *Id.* The following incident is noted:

> A fourteen (14) year old climbed the security fence in the North cargo area of the airport and in broad daylight, traversed the AOA for one half mile, undetected. The youth unscreened, illegally boarded a British Airways 747, and flew to London.  The youth could have easily introduced an explosive device or weapon onto that aircraft. *Id.*

The memo further stated "There have been numerous instances of clam diggers, fishermen, hunters and boatsmen entering the AOA from the waterside.  An intrusion detection system combined with CCTV and a reengineered perimeter line would greatly enhance today's security." *Id.* at p. 2.  As of September 11, 2001, Massport had not instituted such an intrusion detection system.

Mr. Lawless' memo also notes serious problems with the access control system at Logan:

---

[16] *See* ASP (attached to Lawless Decl. as Exhibit A) at III-13, ¶4.
[17] *See* Exhibit 2

> When the access control system was installed more than ten years ago, a decision was made to allow tenants to control access to the AOA, through their controlled space.  That decision has resulted in an inconsistent and sometimes ineffective control of access to the AOA…alarms are supposed to be monitored by the air carriers.  Indications are the carriers are not performing these security functions.   On numerous occasions, these doors can be compromised because the alarms have been bypassed, or, no one responds to the alarm…Emergency doors, rooftop hatches, crawl spaces and utility tunnels are additional areas that require access controls.   Massport installed access control equipment, anti-piggybacking technology and CCTV are the most likely solutions to these problems. *Id.*

Again, as of September 11, 2001, Massport had not installed any of these measures.[18]

> Finally, the memo notes vulnerabilities in Logan's identification and control procedures:

> The airport is responsible to granting AOA unescorted access privileges to employees…Employees of the airport can come and go freely after they have received their unescorted access privileges.   Vendors are allowed to be escorted onto the AOA without being screened.  Limiting employees to certain entrances and screening all employees and vendors through metal detectors and x-rays would enhance the overall security of the airport.[19]

Notably, Mr. Lawless mentions here that other airports were exceeding the requirements in this area, stating "Other airports do screen all employees entering the AOA.  There is no requirement to do this." *Id.*

In May of 2001, Counter Technologies, Inc. (CTI) began an extensive study on the security vulnerabilities at Logan.[20]  A few months later, a report from CTI consulting was issued, outlining a number of deficiencies that were in existence on and before September 11, 2001:

- The access control and alarm intrusion detection system is extremely slow and is not being used to its fullest capabilities.

---

[18] Exhibit 3, Deposition of Thomas Kinton at p.167 ln. 18-24
[19] *See* Exhibit 2, at p. 2
[20] Exhibit 9, AVSEC Dep. Exhibit 42, Report, "Physical Security Assessment:  Boston Logan International Airport," First Draft, November 6, 2011, Section III. A.

- Poor perimeter access control measures have allowed several detected breaches that could have resulted in very serious incidents.  One can only speculate as to the number of undetected breaches of security since BOS lacks both a perimeter access control system and a CCTV system.
- Before September 11, there was no LEO [law enforcement officer] presence along the perimeter and the AOA.
- Unauthorized access to the property can be easily obtained via watercraft from the Boston Channel…
- Before September 11, trees and foliage found along the perimeter fence hindered monitoring of the perimeter and facilitated undetected and easy access to the airside…
- Before September 11, several sections of the perimeter fence were in need of repair…
- Gate guards assigned to control access to perimeter construction projects do not properly enforce BOS rules and regulations regarding proper SIDA access or proper escorting of personnel.
- Emergency doors, rooftop hatches, crawl spaces and utility tunnels are not integrated in the access control system.
  *Id.* at Section III. D

Certainly, this evidence shows that a genuine issue of material fact exists regarding whether Massport failed to carry out its responsibilities to secure the SIDA and AOA and whether these failures contributed to the September 11th attacks.  The jury should be allowed to hear this evidence and determine Massport's liability for the death of Mark Bavis.

### RESPONSE TO MASSPORT'S STATEMET OF UNDISPUTED FACTS

Plaintiff submits herewith its required paragraph by paragraph response to Massport's statement, but also wishes to discuss some serious factual disagreements herein.  In its Statement of Undisputed Material Facts, Massport declares it did not "involve itself in the any way with the airlines'...operations" and that "[a]irlines operating at Logan Airport maintained and controlled all aspects of their operations...."[21]  That statement simply isn't true.  Massport, developed

---

[21] Airlines operating at Logan Airport maintained and controlled all aspects of their operations, including ticket sales, check-in counters, passenger screening checkpoints, boarding gates, and baggage handling. (Ex. D to the May 27, 2011 Declaration of Allen W. Burton ("Burton Decl.") at 20, 76–78; Lawless Decl. ¶¶ 10–15.)

security initiatives that directed air carriers to improve open additional security lanes to reduce security lines and passenger's vulnerability to attack while waiting in line, and enhance their security operations.  Air carrier leasing terms and Massport's Airport Security Plan ("ASP") provided the authority for Massport to act and dictate air carrier operations, including security operations.

In February 2001, Massport instituted a series of checkpoint actions called the Guaranteed Passenger Standards program, which among other mandates, required air carriers operating at Logan to clear passengers through security in 5 minutes from the time the passenger entered the security queue.  This program was created in response to growing passenger frustrations at Logan.[22]  Massport stated that it took data and goals from the air carriers and developed the performance goals, and did so without regard to its effect on security.[23]  Joseph Lawless, who was Massport's Director of Public Safety on 9/11, told the 9/11 Commission he was not consulted about the customer service program and no one considered its impact on security:

> Lawless was asked about the Customer Service Program that Logan sought to launch in early 2001 that would assure that customers got through the various stages of the traveling process, including checkpoint security, in a timely fashion. Lawless said he was never asked his opinion about the program or how it might impact security. He didn't know whether the intent of the program was to increase staffing at the checkpoints to expedite the process, or simply to make the process faster no matter what.   He remembers observing people with stopwatches timing various aspects of passenger processing, but did not notice anyone timing the checkpoints.[24]

---

Massport did not receive passenger manifests or involve itself in any way in the airlines' in-flight services or operations. (Lawless Decl. Ex.)

[22] Exhibit 10, AVSEC EX 340, MP102162-MP102163
[23] Exhibit 11, AVSEC EX 500, MP102159-MP102160
[24] Exhibit 12, 9/11 Commission Staff Memorandum for the Record, November 5, 2003 Interview with Joseph Lawless

Air carriers objected to the program believing Massport's actions to be "unlawful." Massport believed otherwise and cited its "proprietary rights as owner and operator of the airport" for its authority to institute changes to air carrier operations. It noted the Logan lease terms required tenant air carriers to provide a "reasonable level of customer service."[25] Massport's CEO on 9/11, Virginia Buckingham, told the 9/11 Commission that after "... Massport staff observed the [pre-boarding] process, they realized the problem was inadequate staffing at the checkpoints and the goal [of the Guaranteed Passenger Standards Program] was to 'embarrass' the airlines into hiring more staff, with a potential threat of removal of gates for those who did not comply."[26] Her statement also contradicts Massport's assertion in ¶ 23 of its Undisputed Facts that "it had no role in checkpoint security performance, selecting screening companies hired by airlines, or hiring, training, or supervising checkpoint screeners."

More importantly, about the same time that Massport instituted its checkpoint wait and additional checkpoint lanes initiatives, local news reports were documenting how ineffective Logan checkpoint screening was and how easy it was to gain access to restricted areas of the airport including access to airplanes.[27] Massport had been previously informed by the FBI that known terrorists had worked in and around Logan Airport and had likely conducted surveillance of the airport.[28] In response, Massport sought to enhance checkpoint screening effectiveness by conducting independent weapons testing of checkpoints. In April 2001, Massport proposed the beginning of the testing of checkpoints, seemingly unconcerned that its No More than 5 Minute Checkpoint Wait program ran counter to efforts to enhance security.[29] The program encountered

---

[25] Exhibit 13, AVSEC EX 215, MP102166-MP102167
[26] Exhibit 14, 9/11 Commission Staff Memorandum for the Record, November 5, 2003 Interview with Virginia Buckingham
[27] *See* Exhibit 2; Exhibit 15, AVSEC EX 398, "February 2001 Transcript of Fox News Report"
[28] *See* Exhibit 2; Exhibit 12
[29] Exhibit 16, AVSEC EX 221, MP100789- MP100792; Exhibit 1, at p. 19-21

objections from the air carrier, which included charges Massport had overstepped its regulatory role.   According to Lawless, air carrier objections (but not FAA objections) led Massport senior executives to cancel the testing program.[30]  Despite the program being canceled, Massport firmly believed it could test and direct air carriers to enhance checkpoint screening, and that belief was backed by the FAA approval of its plan and the plan's implementation immediately after September 11, 2001.

Other Massport actions show it intended to dictate security operations to the air carriers. For example, Massport refused to accept the background checks for new air carrier employees after it became aware that air carrier's security background checks were woefully inadequate.  In its place, Massport, at the direction of Lawless, instituted with the FBI more thorough background checks for airline and security contractor employees.  Thus, Massport had direct influence on who could work at Logan.[31]  The enhanced background checks also contradict ¶ 23 of Massport's Undisputed Facts claiming it "had no role in checkpoint security performance, selecting screening companies hired by airlines, or hiring, training, or supervising checkpoint screeners."

Additionally, in its day-to-day operations Massport's own actions in 2001contradict its assertions in 2011 that it had limited involvement in air carrier security operations.  Massport held regular security meetings with Logan air carriers and screening companies.  The meetings, involving the Logan International Airport Security Consortium ("LIASC") and the Logan Airlines Manager's Council ("LAMCO"), discussed air carrier, screening, and airport security operations and problems.  See for example meeting minutes at Exhibit 8, AVSEC EXs 382, 350, 494, 345, and 344.  If Massport truly did "not involve itself" with air carrier security operations,

---

[30] Exhibit 1, at p. 146.
[31] Exhibit 17, AVSEC EX 388 at MP101026

no meetings would be necessary.   Massport's concern about air carrier security operations, its attempts to correct air carrier security operations demonstrates it was "involved" and took an active role in air carrier security operations, as it should have as owner and operator of the airport, and as clearly required by FAR 107.

Massport's authority to direct air carrier operations and security stemmed not only from its overarching duties set forth in FAR 107, but also from the air carrier lease sign by United. The lease specifically states the air carrier, in the course of taking all "security precautions and provid[ing] all personnel and equipment necessary to comply with all applicable laws and regulations for passenger screening and other security services for passengers using the Gates, including, without limitation, laws, rules and regulations promulgated by the Federal Aviation Administration ("FAA") …shall use contractors acceptable to the Authority."   Authority meaning Massport - (emphasis added.)   This lease term is the specific authority with which Massport rejected incomplete background checks for some air carrier employees.   The lease also required air carriers "take such security precautions, at Tenant's sole expense with respect to the Premises and Ramp Area and the Tenant's operations and service personnel, related thereto, as the Authority in its sole and absolute discretion may, from time to time, require." (Emphasis added.)[32].   In fact, the tenant would be in default if it failed "to comply with any applicable law, rule or regulation concerning security, and such failure continues for 48 hours after written notice from the Authority…."   *Id.* at MP100121.   These lease terms clearly show Massport possessed the contractual authority to approve of its tenant's security contractors, to dictate security operations to the air carriers as necessary and to terminate the agreement based on security failures it found.   Confirming this interpretation of Massport's power as landlord, The

---

[32] Exhibit 18, "Logan International Airport Terminal Lease between The Massachusetts Port Authority and United Airlines, Inc. December 1, 1998" at MP100085

Special Task Force on Massport in its post 9/11 recommendations specifically argued Massport should "vigorously enforce" its authority as landlord to raise security beyond what the FAA may establish.[33]

The general suggestion throughout Massport's Undisputed Facts that it could do no more than those meager duties it claimed were delineated to it is contradicted by several instances which went beyond its FAR 107 obligations.[34]   Massport developed the "Laser Program" in which Logan officers audited critical areas on a random basis. This added security procedure exceeded existing regulatory requirements.  Massport also developed an advanced K-9 program and created a custom firefighting protocol specific to Massport.   Both of these programs exceeded existing regulatory standards.  *Id.* at p. 7. As it should have, Massport acted to ensure the safety of its passengers and not to simply meet a regulatory responsibility.  This point was made by Buckingham when she explained to the 9/11 Commission that even though regulation had separated security duties between the air carrier and airport, the flying public saw ultimate security responsibility falling to the airport, which is why Massport began reviewing air carrier security operations.[35]

Similarly, ¶10 of Massport's Undisputed Facts also claims Massport's regulatory duties were limited to providing an "on-the-ground airport environment for the airlines to operate in and carry out its specific federally assigned security duties."[36]   And yet, Massport's Airport Security Program shows Massport had a greater role to play in determining the necessary

---

[33] Exhibit 6, at p. ii

[34] For example, see Massport Undisputed Facts ¶ 15: "15. On September 11, 2001, Massport implemented its assigned responsibilities under FAR Part 107 (applicable to airport operators) by following the procedures set forth in Logan Airport's Airport Security Program ("ASP"), which was specifically approved by the FAA. (Lawless Decl. Ex. A; Lawless Decl. ¶ 9; Burton Decl. Ex. F at 32:6–24.)

[35] "Buckingham was frustrated that the legal framework was clear on who was responsible for what with respect to airport security, but to the public it was all the airport's responsibility. That was why Massport was concerned with matters such as screening vulnerabilities, baggage handling and passenger waiting time at the gate."; *See* Exhibit 9

[36] 10. As owner of Logan Airport, Massport's role was to provide the on-the-ground airport environment for the airlines to operate in and carry out its specific federally assigned security duties. (Lawless Decl. ¶¶ 9, 16–18.)

security for its operations under the Contingency Security Plan: "The FAA or Logan International Airport and affected airlines will determine when increased security measures are necessary in response to recognized threat conditions or situations and will identify the appropriate threat level."[37]   Massport's regulatory duties went beyond providing a suitable premise in which air carriers could operate.

Massport's Undisputed Facts labors to leave the impression its duties were distinct and separate from the air carriers.[38]  This notion runs counter to the repeated industry mantra that aviation security was a collaborative effort between the airport, air carrier and FAA with overlapping roles and responsibilities—a "layered" system of defense.[39]  A "layered system of systems" security philosophy was known to Massport.  Lawless' security files included the FAA's Alexis M. Stefani March10, 1999 testimony before Congress, in which Strefani stated:

> An important message of our testimony today is that aviation security is a layered and integrated system of systems, and effective security relies on a careful blend of technology, procedures, a well-trained security work force, and oversight. FAA and industry need to continue to work cooperatively to maximize the use of explosives detection equipment, improve the proficiency of explosives detection equipment operators, and increase and support training on security awareness.[40]

One security task that both Massport and the air carriers shared, and which Massport utterly, completely, and disastrously failed to perform was an awareness and investigation of suspicious behavior occurring at the airport.   Even though Massport stated the "flexible

---

[37] Exhibit 19, Massport's Airport Security Program, § V-1, MP10045
[38] For example, Massport's Undisputed Facts ¶ 17: "17. The ASP did not alter the delineation of duties set forth in the Federal Aviation Act so as to impose on Massport duties that were exclusively assigned to the airlines under FAR Part 108, such as passenger screening. (Lawless Decl. Ex. A at III, IV, and VI; Lawless Decl. ¶ 10.)"
[39] Exhibit 20, 9/11 Commission Final Report, p.83: The FAA set and enforced aviation security rules, which airlines and airports were required to implement. The rules were supposed to produce a "layered" system of defense. This meant that the failure of any one layer of security would not be fatal, because additional layers would provide backup security. But each layer relevant to hijackings—intelligence, passenger prescreening, checkpoint screening, and onboard security—was seriously flawed prior to 9/11. Taken together, they did not stop any of the 9/11 hijackers from getting on board four different aircraft at three different airports.
[40] Exhibit 21, AVSEC EX 391, MP103636

response" of LEOs in the airport allegedly allowed for high "visibility throughout the airport and to observe activity in both the sterile and non-sterile areas,"[41] Massport LEOs were not present, or not aware, or ignored that the 9/11 hijackers openly and repeatedly surveyed Logan checkpoint operations in the spring and summer of 2001.[42]

In May 2001, air carrier employees and checkpoint screeners became aware that two Middle Eastern men outside the main security checkpoint were acting suspiciously. Stephen Wallace, an American Airlines employee, noticed on May 11, 2001 that he was being observed by two men with pilot's bags. At the time, Wallace was setting up an information kiosk identifying dangerous items not permitted on planes. Wallace noticed that one of the men was videotaping and taking pictures of the checkpoint while the other was on a cell phone. Wallace was so suspicious of the men's behavior that he asked if they had any of the dangerous goods in their bags. The men spoke only Arabic and moved away from Wallace. Wallace then followed the men as they left toward the American Eagle checkpoint where they proceeded through the screening. Wallace left the suspicious men at the checkpoint and assumed they flew to Washington, D. C. Wallace would later identify American Air carrier Flight 11 Hijacker Mohammed Atta as one of the two men he saw that day. And according to Wallace's deposition, he informed two Massport employees including Massport law enforcement and a checkpoint screener about the two suspicious men.[43]

---

[41] Massport's Undisputed Facts ¶ 19: "19. State Police officers were not stationed in fixed posts at passenger screening checkpoints. Instead, Massport employed a "flexible response," in which the State Police dispatched officers to checkpoints when alerted by airline and security company personnel. The State Police would be called to a checkpoint where a screener identified an illegal weapon passing through the x-ray machine, a screener was confronted with an unruly passenger, or a person breached security and entered the sterile area. The "flexible response" approach enabled officers to have visibility throughout the airport and to observe activity in both the sterile and non-sterile areas, and facilitated quick responses to incidents throughout the airport. (Lawless Decl. ¶ 17.)
[42] Interestingly, the Report of the Special Task Force on Massport suggests that union rules prevented Massport from fielding the most qualified, best trained officers for airport duty. *See* Exhibit 15, pp. 8-9.
[43] Exhibit 22, "FBI Interview of Stephen Wallace," FBI0370-FBI0371; Exhibit 23, Deposition of Stephen Wallace, July 17, 2007 at p. 103-13, 118-21, 143-44

Similarly, Theresa Spagnuolo, who was a checkpoint screener for Huntleigh on the morning of September 11th and formerly a pre-boarding for Globe Aviation Services ("Globe"), told the FBI that she observed a Middle Eastern man some "four month ago" (corresponding to May 2001) videotaping the main security checkpoint.  Finding the behavior highly suspicious she told her supervisor.  Spagnuolo later identified the Middle Eastern man she saw as American Air carrier Flight 11 hijacker Mohammed Atta.[44]

Likewise, sometime before September 11, 2001, James Miller, a former Globe duty manager at Logan Airport, observed one or more Muslim-appearing persons photographing the "whole checkpoint setup."  He reported their activities.[45]

Even passengers at Logan noticed the hijackers' odd behavior.  Jan Shineman told the FBI that she spotted Mohammed Atta at Logan on September 9th "checking out" flights. Shineman thought Atta was "so out of place," --he had no luggage, asking repeated questions and acting arrogantly.[46]  Even though Massport understood that the airport itself was a target[47] and was previously under surveillance by terrorists who worked in and around the airport, [48] the testimony of AA employee Wallace and checkpoint screeners Miller and Spagnuolo and recollections of passengers like Shineman demonstrate Massport did not train or otherwise

---

[44] Exhibit 24, "FBI Interview of Theresa Spagnuolo," FBI0150-FBI0151

[45] Exhibit 25, Deposition of James Miller, May 23, 2008, pp. 85-90

[46] Exhibit 26, AVSEC EXHIBIT 498, "Hijackers' ringleaders scouted out airports," Boston Herald, May 29, 2002

[47] Exhibit 1, pp. 151-152.

[48] *See* Exhibit 12, "In February 1996, the FBI again approached Lawless, this time about a U.S. Airways baggage handler who was a member of Hezbollah who had been trained at a paramilitary camp in Lebanon, The subject had been issued an airport badge that gave him access to the Air Operations Area (AOA). Again, the FBI requested that Lawless terminate the individual's access and employment. He contacted US Airways and both access and employment were terminated." AND "In 1999/2000 Lawless was contacted by the Mass. State Police regarding a cab driver who frequented Logan. He later read in the newspaper that the person was connected to the Cole attack and a plan to bomb an embassy. MASSPORT was asked to search records on him. Lawless said he felt as though the cabbie was surveying the airport. The individual's name is Riad Hijazzi. He believes he is now in Jordanian custody." AND "Early in 1994 Lawless was approached by a special agent out of the FBI's Boston field office who wanted to talk about an employee at MASSPORT who officials suspected was a member of Hezbollah. The subject was working (temporary) as an interpreter greeting passengers at the international terminal. The agent recommended that MASSPORT rescind the subject's access pass and fire him. Lawless looked in to the matter, consulted his counsel, and did exactly as suggested by the FBI within two days of the initial meeting."

sufficiently inform its employees or its air carrier tenants and screening contractors how to spot suspicious behavior and did not have procedures in place to report and fully investigate suspicious behavior when spotted. On May 11, when spotted and pointed out to them, Massport stood by and watched Mohammed Atta pass through security and did nothing – not even a glance at his name or a ticket or drivers license.

Compounding Massport's inability to spot and inability, ignorance or unwillingness to investigate or otherwise act on suspicious activity was Massport's failure to implement CCTV in critical areas of the airport. The lack of CCTV, particularly at the checkpoints, is further evidence of Massport's failure to provide "on-the-ground airport environment for the airlines to operate in and carry out its specific federally assigned security duties." While not required by regulations to have CCTV, Massport failed to install closed circuit TV to monitor checkpoints and other sensitive public areas despite its knowledge that terrorists had surveyed the airport previously and had worked in and near the airport. Lawless saw the need for CCTVs in 1996 but his requests were not funded. By September 11, 2001 Massport had only agreed to a feasibility study for their use.[49] The decision to not have CCTV and to use a "flexible response" approach with LEOs left sensitive areas of a large airport out of view and was an obvious security concern. Kinton admitted both would have had a deterrence effect.[50]

In paragraph 10 of Lawless' Declaration[51] in support of Massport's motion, he stated "Massport was not aware of each airline's specific screening policies…. air carrier and security screening companies also maintained the Checkpoint Operations Guide (the"COG"), which

---

[49] *See* Exhibit 12
[50] Exhibit 3, at pp. 238: 18-23
[51] 10. The FAA assigned passenger screening responsibilities to the airlines under FAR Part 108. Massport's FAA-approved ASP therefore did not include passenger screening responsibilities for Massport. Each airline operating at Logan Airport had its own FAA-approved security program called the Air Carrier Standard Security Program (the "ACSSP"), and Massport was not aware of each airline's specific screening policies. In addition, airlines and security screening companies also maintained the Checkpoint Operations Guide (the "COG"), which provided guidelines for the operators of the passenger screening checkpoints. Massport never received a copy of the COG.

provided guidelines for the operators of the passenger screening checkpoints." And "Massport never received a copy of the COG," despite the fact that Massport was tasked with responding to the checkpoint to opine and decide on weapons and other prohibited items passing through the checkpoint into the sterile area.[52]

Yet, when asked by Plaintiffs at his March 30, 2007 deposition, Lawless testified that as part of his duties, he "familiarized" himself with the screening companies at Logan.[53] Further still, weeks after 9/11 Massport was able to make detailed recommendations to Secretary Mineta's Rapid Response Team about checkpoint screening requirements: the FAA should "[i]mmediately standardize items restricted from the secured areas - The FAA and the air carriers are using inconsistent standards in determining which items are restricted from the secured areas." The recommendation further stated "[t]here must be a standardized list between the FAA and carriers to avoid confusion among law enforcement personnel and security checkpoint personnel about the types of items that should be confiscated during the screening process."[54] Clearly, Massport was aware of the federal screening requirements and the different screening procedures its tenant air carrier's used and its obligation to see that they met the requirements of FAR 107 and 108.

More importantly, despite what Massport may or may not have known about specifically screening procedures, Massport was aware that ultimately screening was ineffective at Logan.[55] Knowing that, Massport had an obligation to correct the screening deficiencies, which it tried to do, initially, but then "dropped the ball." Massport started several initiatives but failed to follow through.  Some Massport security programs languished until after September 11, 2001 when they

---

[52] *Id.* at pp 47:14-25, 48:1-25, 49:1-18; Exhibit 27, Checkpoint Operations Guide, pp. 5-8 to 5-10
[53] Exhibit 1, at p. 19
[54] Exhibit 5, AVSEC EX 218, MP10150- MP10153
[55] *See* Exhibit 2

were quickly implemented. The fact Massport did not follow through is a reason for and a substantial cause of the screening failures on 9/11.

Finally, Lawless claims in ¶ 23 of his declaration that he was never "informed of any evidence indicating that the terrorists breached any security layer that was a Massport airport security responsibility under FAR Part 107."  Massport's inability to deter the hijackers from surveying the airport and its inability to take true corrective action and adequately address its numerous well publicized security vulnerabilities contributed to the ease with which the Flight 175 and Flight 11 hijackers operated at Logan on 9/11.

Two independent studies of Massport's vulnerabilities (published after 9/11) found significant security failures at the airport.  The first study, conducted by CTI and begun before 9/11 at Massport's insistence, found in its first draft that Massport had failed to address a number of well known security vulnerabilities: "[a] major challenge facing Massport and BOS will be the understanding of why no action has apparently occurred on the many previous safety and security recommendations submitted from multiple sources, including its own Department of Public Safety, and what can be done to ensure constructive change move forward."[56]  The report further found that before September 11, Logan "lacked the majority of elements required to meet recommended minimum safety and security standards established by the FAA, the Department of Transportation, the U.S. Secret Service, the Federal Bureau of Investigation and the U.S. Department of Defense." *Id.* at MP100647.  From the a long list of identified deficiencies, CTI citied specific regulatory obligations associated with control of the airport as missing and deficient, "[t]here is no security CCTV surveillance system.… access control and alarm intrusion detection system is extremely slow and is not being used to its fullest capabilities…." and

---

[56] Exhibit 9 at  MP100645

"[p]oor perimeter access control measures have allowed several detected breaches that could have resulted in very serious incidents."  The report rightfully wonders, "[o]ne can only speculate as to the number of undetected breaches of security since BOS lacks both a perimeter access control system and a CCTV system."  *Id*.  Later drafts of the CTI study were subsequently softened after Massport executives met with their lawyers after September 11, 2001 and commanded CTI change its conclusions.[57]

The other study, conducted by the Special Advisory Task Force on Massport, also known as the Carter Commission, found that similar security failures, "[s]ecurity at Boston Logan International Airport has suffered many of the weaknesses found throughout the U.S. system, although some other airports have been more aggressive about implementing enhanced security measures."[58]  Massport's inability to effectively improve security was in large part a result of what the Task Force identified as poor leadership and ineffective management, namely "that Massport suffers from a certain degree of "mission creep", poor leadership, a lack of accountability to the public, and an inefficient organizational structure."  Citing this as "common threads running through virtually all of our findings" the Task force found these leadership deficiencies "central to our thought process in formulating recommendations to correct these weaknesses."  *Id.*, at p. i.

Soon after 9/11, Lawless was demoted to Massport's Director of Maritime Security.  The change in job suggests an unsatisfactory performance as Massport's Director of Public Safety.

---

[57] Exhibit 3, at pp.62:1-25, 63:1-25, 64:1-25, 65:1-25, 66:1-7; Exhibit 28, Memorandum for the Record, Thomas Kinton Interview with 9/11 Commission, November 6, 2003
[58] Exhibit 6, at p. 5

## WHAT THE EVIDENCE HEREIN HAS ESTABLISHED

It is indisputable that pursuant to Federal Aviation Regulations Massport as the airport operator was responsible for airport security under 14 CFR Part 107.  Pilgrim Aff. ¶ 19.  Under 14 CFR §107.3 Massport could not operate Logan airport unless it adopted and carried out a security program that provided for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy and is in writing and signed by the airport operator or any person to whom the airport operator has delegated authority.  Pilgrim Aff. ¶ 19.  The law makes it abundantly clear that the airport operator, and in this case Massport, is responsible for the security of the entirety of the airport. The Federal Aviation Regulations, in clear unequivocable language allowed them to delegate, but not escape, their responsibility for security.  Pilgrim Aff. ¶ 19-21.  It is obvious that Massport retains responsibility for the entirety of Boston Logan airport when one considers 14 CFR 107.3.b.5 provides that an air carrier having security responsibility delegated to it by an airport, over an exclusive area that the airport uses, must have a procedure in place to notify the airport when the procedures, facilities and equipment it uses are not adequate to perform the security control functions in the airport.  If the airport did not retain overarching security responsibility, even though it delegated to the airlines certain responsibilities such as operating the checkpoints (which United Airlines further delegated to Huntleigh), then the provision concerning notification would be meaningless.  The fact that Massport retained security responsibilities for all parts of Boston Logan Airport, including the checkpoints, is evidenced by various Massport efforts.  Those efforts of Massport which were required by 14 CFR Part 107, included for example holding security meetings at the airport, receiving notices of not only their own security violations but also those of the airlines as well, commissioning a study well before September

11, 2001, to tell Massport how to improve its security, which study included the checkpoints in the concourses, and having the responsibility for law enforcement including law enforcement at the checkpoints throughout the airport.

On September 11, 2001, and at all times relevant before September 11, 2001, Logan was classified as a Category X Airport.  Pilgrim Aff. ¶ 22; Exhibit 3, at pp. 8.  Category X Airports are the nation's largest and busiest airports which are considered potentially attractive targets for criminal and terrorist activity.  Pilgrim Aff. ¶ 22; Exhibit 3, at pp. 8.  As a  Category  X airport on and before September 11, 2001, Logan was subject to and required to comply with more stringent security policies and procedures than non- Category X airports.  Pilgrim Aff. ¶ 23; Exhibit 3, at pp. 8.

Despite it being a Category X airport, and having the overarching responsibility for all the security at the airport including to ascertain that the security which was delegated to airlines was adequate to meet its part 107 responsibilities, officials at Massport, knew, personally discovered, were advised of, and even commissioned studies to further examine the vast security weaknesses at Logan airport.  Pilgrim Aff. ¶ 26; Exhibit 3, at pp. 9-10  In particular from 1999 to 2000, Logan had the fifth  highest number of security breaches in the nation despite the fact it is the 18th busiest airport.  From 1997 to 1999 there were 136 security violations at Logan.  During 1997-1999 screeners at Logan failed to detect 102 guns, 49 dynamite bombs, 10 hand grenades and 9 toy pistols.  Pilgrim Aff. ¶ 25.  It is obvious that the FAA certainly recognized FAR §107 as requiring Massport to have the overarching responsibility for security including that which Massport delegated to airlines, and that Massport maintained a duty to ensure itself that all of Boston Logan was adequately secured, because the FAA sent to Massport notices of the

violations of the airlines serving Massport as well as the violations of Massport.[59]   Based upon

FAA data Boston Logan was by a substantial margin the nation's most porous airport, amply

evidenced by tests by FAA agents posing as passengers while attempting to carry weapons

through security checkpoints. Pilgrim Aff. ¶ 25.  After a security breach in 1999, the citations for

security violations at Massport ballooned to more than 42, more than any other airport authority

in the United States.  Pilgrim Aff. ¶ 25.

　　　Massport tries in its brief to depict Massport's role in airport security on September 11,

2001, as miniscule—nothing more than issuing badges, making sure the airport fences and doors

were locked and sending Massport police if someone called.  The falsity of the picture painted by

Massport in its Motion for Summary Judgment is clearly exposed by the fact that in March 2001,

Massport hired Counter Technologies, Inc. (CTI) to review the airport security.   Massport

assigned CTI to conduct a top to bottom security audit of all Massport facilities.  Pilgrim Aff.

¶26.  Massport clearly had the power, responsibility and regulatory authority to do so--- they did

it.  CTI worked very closely with Joseph Lawless, Director of Public Safety for Massport at

Logan.  Pilgrim Aff. ¶ 26; Exhibit 1, at pp. 9-10, Exhibit 3, at pp. 62-66 .  No one took issue with

CTI work, interviews, findings, or conclusions until after September 11, 2001, and then not until

after Thomas J. Kinton, Jr., Acting Director of Massport, met with Massport lawyers after

September 11, 2001.  *Id.*.  At that late date (and with his team of defensive lawyers), then Kinton

took issue with the CTI work.  *Id.* at p. 62-63.  In the initial report issued on November 6, 2001,

concerning airport operations before September 11, 2001, the report concluded the public safety

authority responsibility manpower and objectives must be clearly enhanced, delineated and

expressed without ambiguity to all Massport entities in an effort to bring Boston (Logan) up to a

---

[59] Exhibit 29, Examples of Violation letters

minimum of security standards as quickly as possible.  Pilgrim Aff. ¶ 26.  But the security lapses at Massport's Logan airport, which compromised security on and before September 11, 2001, were not limited to the checkpoint screening operations.  That is a very important point which the defendant Massport chooses to ignore in its brief.  The Federal Aviation Regulations require that both Massport and the airlines not only prohibit and or detect any weapon or prohibited item from entering the sterile area, but also places the burden on Massport <u>and</u>  (not or) the airlines to deter hijackers, terrorists, and saboteurs.  Deterrence is also included not only in the duties of the defendants on or before September 11, 2001, but is a crucial part of an effective security program.

There were many parts of the security program that Massport did not delegate to any other entity and in fact could not delegate to any other entity.  First and foremost is Massport's FAR required law enforcement presence.  Law enforcement officers play a key role not only in the airport generally, but as specified in the FARs and in the Checkpoint Operations Guide (COG) also at the security checkpoint.   When any weapon or item of contraband is found, suspected or failed to be stopped and allowed to enter the sterile area, it was the Massport law enforcement office that responded to the security checkpoint.  For a period of time before September 11, 2001, Massport had law enforcement officers at each checkpoint for deterrence and to help in the assessment of items as weapons.  However that presence was eliminated before September 11, 2001, and Massport no longer provided law enforcement officers at each checkpoint. By September 11, 2001, Massport officers had to be called to the checkpoint if something came up.  *Id.* at. 45-47.  That law enforcement presence at the checkpoint was part and parcel of the intended effectiveness of the COG.

At Logan Airport, Massport was responsible for the law enforcement presence which they assigned to F Troop. *Id.* at. p. 30. F Troop was assigned to the terminals and other areas of the airport property. *Id.* at p. 31. F Troop responded to, answered to, reported to and was under the authority of Massport. *Id.* at pp. 31-32. F Troop's duties were set forth in the security plan developed by Massport. *Id.* at p. 33. The Logan airport security plan was unique to Logan. *Id.* at p. 34. Logan developed their unique security plan in response to local area needs or conditions. Kinton testified that they developed the plan not only to respond to the minimum FAA standards that they had to comply with but with the goal for Boston Logan and Massport to go above and beyond the minimums. *Id.* at p. 34. Many of their plans were unique to Logan location including what Kinton called the "flex response "to security checkpoints. *Id.* at p. 34. Furthermore, F Troop was supposed to look for and address anything in the airport that was out of the ordinary that would lead them to believe that there was something suspicious was going on. "That is what they were trained to do and that is what they were looking for ." *Id.* at p. 40-41. In times gone by when Massport staffed each security checkpoint with a law enforcement officer, *Id.* at p. 45, the law enforcement officer was supposed to respond to any issue concerning a security incident. *Id.* at p. 46. In years gone by when law enforcement officers were at the checkpoint they would obviously have had better knowledge of persons who attempted to take items through the checkpoint, of prohibited items and of surveillance by hijackers of checkpoints. However, because by September 11, 2001, Massport no longer staffed the checkpoints with their law enforcement offices, Massport created an additional vulnerability for security because the F Troop had no knowledge of attempts to take prohibited items through the security checkpoint unless the checkpoint security screeners called them to the checkpoint. The lack of security officers at the checkpoint, the lack of the involvement of law enforcement

officers in the search for weapons or other prohibited items and the ignorance of F Troop officers and Massport about surveillance by Atta and other terrorists was clearly caused or contributed to by Massport's Flex Plan.  Logical conclusion based upon Exhibit 3, at p. 46.

Even under the F Troop Flex Plan, when officers were called to the checkpoint, they were supposed to "deal with the situation." If the situation warranted arresting the person, they were supposed to do it, or they could "clear the person to fly if it warranted that."  "They could deny them the right to fly" and they could have them "go re-book"  *Id.* at p. 47.  The law enforcement officer made the decision to deny someone the right to fly.  *Id.* at p. 47-48.  Therefore when they were at the checkpoint Massport F Troop made the decision on who got to fly based on their alleged (but not in evidence) professional training to ascertain whether the person was a threat.  F Troop could deny such persons the right to fly.  *Id.* at p. 48.  By removing the law enforcement officers from the security checkpoints, which Massport had in prior years when the terrorist threat was not as high as on September 11, 2001, and before many security violations at Massport Logan had come to public light, Massport removed a key component not only from airport security but specifically from checkpoint security.   Kinton himself admitted the law enforcement presence would have been deterrence.

According to the COG and Kinton, F Troop made the determination of what weapons would be allowed into the sterile area and what items were or were not menacing or were weapons.  The COG makes it clear that it was law enforcement officers who handled deadly or dangerous weapons and prohibited item.  The screeners were merely to "ensure that deadly or dangerous weapons and other prohibited objects are not handled until the LEO/GSC arrives." Furthermore, they were to "collect witness information and retain evidence pending the arrival of the LEO."  Furthermore, F Troop was to be called to handle and make decisions about prohibited

items such as knives, razors, grenades, automatic weapons, guns, blasting caps, stun guns, dynamite, explosives and other weapons.[60]   The security screeners were to "freeze the [image on a screen] for the law enforcement officers and others to look at so we could see if something warranted shutting the concourse down and having people re-screened and going to look for the individual to search for the carry-on or personal items if there was a weapon."[61]   Therefore the security screeners relied in whole or in part on the Massport's F Troop to tell them what did and did not fly.

By September 11, 2001, the lack of law enforcement presence at the checkpoints had clearly degraded the efficacy of checkpoint screening. Since hijackers Atta and others conducted surveillance and tested Boston Logan security, it is an unassailable fact, as evident by the outcome, that Massport failed to deter the hijack plot.  It is reasonable to assume a jury will likely logically conclude those failures were both a violation of FAR 107 and likely caused or contributed to Boston Logan being selected for the September 11, 2001 hijackings.   Law enforcement officers were called to the checkpoint to make decisions and whether to confiscate items.  *Id*. at p. 49.  Law enforcement officers made decisions whether to confiscate something that was illegal in the state of Massachusetts and they could even do more based on what the item was.   *Id*. at p. 49. Unfortunately however, the F Troop officers shared a common shortcoming with the security screeners.  Therefore under the Flex Plan, since Massport's officers were not at the checkpoints, and the screeners were unable to identify weapons and had no idea what mace was.  Massport's officers could not adequately perform their jobs because they were not called to evaluate missed items.

---

[60] *See* Exhibit 27, at p. 5-8 to 5-10
[61] See Exhibit 3 at p. 44

Kinton acknowledged that the visibility of law enforcement officers, besides assisting at the security checkpoint, was part and parcel of an important component of security at the airport *Id*. at p. 56.  Being seen at the airport, in the terminals at the curbs and on the ramps was an important part of Massport's security at Logan because it went to another component of airport security -- deterrence.  *Id*. at p. 56.  It was sadly apparent there was no deterrence at Massport on September 11, 2001.

Massport had no one on its staff responsible for reviewing what items were sold behind security in the concourse at Massport.  United Airlines has at several depositions in this litigation (for example Mr. Malotky) argued that the hijackers could have purchased their weapons after clearing security in the terminal areas or obtained knives from restaurants, stores, etc., in the concourse.  Massport did not concern itself with what was sold in the sterile areas of Boston Logan airport.  No one from Massport was responsible to review what items vendors sold.  *Id*. at p. 73.  Massport was merely concerned about street pricing meaning they did not want Massport customers to pay more for products at the airport than they paid for products outside of the airport, but no one was tasked to review what was actually sold.  *Id*. at p. 74.  Massport had no idea if anyone sold knives or box-cutters at the airport on or before September 11, 2001.  *Id*. at p. 76.  Kinton said if he was walking through the airport and happened to notice a big knife like a machete, he would certainly do something about it, or maybe if the vendors were selling bullets he would do something because it is not "stuff you sell in an airport" but there was no procedure at Massport's Boston Logan to weed out or to stop the sale of prohibited items such as weapons, mace, box cutters razors, tools, or Swiss army knives, in the sterile area of the airport.  Massport was clueless about what was being sold unless someone happened to notice machetes, bullets or

gasoline being sold in the concourse.  *Id.* at p. 77-78.  The only thing Massport was checking about goods for ale in the concourse was price.  *Id.* at p. 78.

While September 11, 2001 is the saddest day in aviation security history, May 11, 2001 is a close second, because on May 11, 2001, Massport and its F Troop failed to do their job at the security checkpoint, which without a doubt permitted September 11, 2001 to occur.  Massport breached its unequivocal statutory duties and its duties to carry out its law enforcement function.  On September 11, 2001, at least two airport employees reported to the security checkpoint and to Massport police officers that Mohammed Atta and another terrorist had been spotted at Logan airport surveilling airport security.  They were photographing airport security and were caught doing so.  That fact was reported to Massport's F Troop.  Massport's F Troop did nothing.[62] Massport had the obligation to investigate suspicious events at Logan airport.  *Id.* at p. 93.  Airport personnel were trained to report suspicious activities to Massport's F Troop.  *Id.* at p. 94.  F Troop was supposed to "show up and investigate."  *Id.* at p. 94.  Looking at and photographing a checkpoint was an event that was supposed to be reported to F Troop.  *Id.* at p. 94.  That event was reported to F Troop.[63]   However, when Mohammed Atta went through the security checkpoint after being reported to F Troop that he was photographing, videotaping and surveilling the checkpoint, Massport F Troop did nothing.

Massport's F Troop permitted Atta to pass through security without stopping him, asking his name, checking his ticket, writing down his name, taking a picture, looking at a drivers license or passport, opening his bags, doing a secondary screen, or stop and frisk-- nothing.  According to Kinton's own testimony they had the authority to stop a passenger, prohibit a passenger from boarding, cause a passenger to have to re-book, investigate suspicious activities

---

[62] *See* Exhibit 23 at 112: 1-25,Exhibit 3, at p. 95
[63] *See* Exhibit 1; Exhibit 3, at p. 94

and certainly and without a doubt unequivocally investigate someone surveilling a checkpoint. *Id.* at p. 94.  However, Kinton never learned of such events.  Kinton claimed he never even heard of the event until preparation for his deposition in January 2011, and had no personal knowledge of any response or investigation by F Troop.  He only knew what his lawyers told him in preparation for his deposition.  *Id.* at p. 95.  He had no knowledge until preparing for his deposition in 2011 that the worst hijacker terrorist in the history of the world walked past Massport's F Troop without so much as a request for identification.  Had Massport been equipped with close circuit television, which Thomas Kinton admitted was a deterrent effect and would have been a deterrent to criminal activity, there would have been video surveillance of Atta and his surveillance activities.  Massport could have installed the television surveillance at any time.  The Massport lease with United Air Lines expressly permitted and gave Massport the authority at any time to enter upon any of United areas to install cables and wiring or other such equipment.[64]

Despite their disavowing any responsibility for checkpoint security in their motion for summary judgment, the actions of Massport clearly show that they realized FAR 107 only permitted them to delegate the operation of its checkpoint equipment but not Massport's responsibilities for security in all areas of Boston Logan.  For example, Massport knew of the weaknesses of their security and came up with the idea to use undercover police to do checkpoint testing.  Such activities are clearly not those of an entity who has no responsibility for checkpoint security (and of course that it is impossible because the COG clearly required the checkpoint operator to call the law enforcement office to the checkpoint when any weapon is found.) Massport devised a plan well before September 11, 2001, with F Troop to test airport security.

---

[64] *See* Exhibit 18

Massport came up with this plan, jointly with the FAA, so obviously it was not a renegade plan for which Massport had no authority or jurisdiction.[65]  While the plan was devised well before September 11, 2001, Massport didn't get around to effectuating its plan until after September 11, 2001.  After September 11, 2001, the plan went quickly into place. *Id.* at pp. 100-101, 104-105. The airline's complaints which before September 11, 2001 put Massport on pause, after September 11, 2001 were ignored—because Massport always had the authority and duty to act.

Massport's duty and authority at the checkpoints is evident by another plan hatched by Massport. In this plan, Massport was going to penalize airlines that allowed security lines to back up more than 5 minutes. Massport informed the airlines that if there were additional security lanes that were available but not open, and the passenger line had backed up so that the wait times exceeded 5 minutes, the airlines had to open those additional security lanes and get the security lines moving so passengers did not stand in line more than 5 minutes. If the airlines did not do it, Massport would punish the airlines. *Id.* at pp. 123-125. Massport told the airlines that they would impose a fine or penalty on the airlines, including potentially taking away gates. *Id.* at pp. 123-125.  Again with that plan the airlines "pushed back" and despite Massport's public pronouncements, Massport did not follow through on its plan, but clearly Massport had the authority, Massport understood it had a duty, and Massport clearly affected the operations of checkpoints.  Kinton also testified that lines at the security checkpoint also posed a security risk because hijackers and terrorists had bombed and killed persons standing in lines at airports. Therefore Massport could command airlines to take actions at the checkpoints because it endangered Massport's passengers.

---

[65] *See* Exhibit 3, at p. 100

In his statement to the 9/11 Commission Kinton, revealed the <u>FBI had approached Massport about members of Hamas and Hezbollah working at Logan for Massport and an airline, as well as a cab driver at the airport associated with the U.S.S. Cole bombing by terrorists).</u>  See Exhibit 28, Kinton 911 Interview pg. 1-2.  The FAA came to Kinton five or less times pre-September 11, 2001, and provided him with security threat information.  So important was that information that Kinton stated he had to read it in front of the FAA and sign for it.  He recalled those warnings referenced al Qaeda.  Id  pg 2.  Astonishly erroneous, Kinton told the 9/11Commission there were no instances of surveillance at BostonLogan by the hijackers. Id. Pg.7.

## <u>SELECTION OF MASSPORT'S BOSTON LOGAN AIRPORT</u>

Defendant Massport claims that the only reason Massport's Boston Logan Airport was selected by Mohammed Atta and the other September 11, 2001 masterminds and hijackers, was because it had 757s and 767s.  Their cited authority for such a statement is the 9/11 Commission Report.  However the 9/11 Commission Report's footnotes reveal that the 9/11 Commission's source of information about the hijackers selection of airports is an FAA report on high risk Category X airport(of which Boston was one), a newspaper article, a visit to the Portland airport and the statement of none other than Thomas J. Kinton, Jr., Boston Logan's Acting Executive Director on September 11, 2001.  Kinton did not testify before the 9/11 Commission and he stated in 2011 he did not know about Mohammed Atta and others were surveilling Logan airport. He stated he was first told by his lawyers in preparation for his deposition in 2011—ten years after the fact.  The 9/11/01 Commission Report footnote which Defendants cites as its source about Boston Logan's selection notes only a public newspaper article published after September 11, 2001, and the 1999 FAA handbook and FAA testing and assessment data bearing the date

October 24, 2001.  Thus, the sources cited by the 9/11 Commission report all point to Boston

Logan as having security deficiencies.   See Kinton Statement to 9/11 Commission, 9/11

Commission Report, pg. 451, footnote 11.  The most logical conclusion based on the facts, and

which a jury will likely conclude, was that Boston Logan's lax security caused or contributed to

the hijackers' selection of Boston Logan airport.

## RESPONSE TO PRELIMINARY STATEMENT

Although Plaintiff has shown myriad disputed facts herein above, Plaintiff wishes to

correct the mischaracterizations in Massport's preliminary statement.  Defendant attempts in its

motion for summary judgment to characterize this case as solely about what the United Airlines

and its subcontractor Huntleigh did at the security checkpoint.  But, Massport was responsible

for the entirety of security at its airport. 14 CFR § 107.  The FARs allowed them to delegate to

airlines.  Part of the operation of checkpoints security screening provided of course that the

airline had adequately performed that function. That is clearly set forth in 14 CFR §107.3.

Massport attempts to divert the attention from the totality of the security picture by claiming

Massport could only be responsible if a terrorist climbed an airport fence or got an airport badge,

or F Troop failed to come to the checkpoint on the morning of Sept. 11, 2001, to look at a

weapon.   Massport would have this Honorable Court believe that despite being charged by the

United States Federal Aviation Administration and Federal Aviation Regulations with the overall

security of Boston Logan Airport that when faced with actual knowledge that security was

inadequate at Boston Logan, Massport could escape responsibility by claiming it did not have to

act because federal law did not <u>require</u> it.  Regulations in no way permit, condone, support or

suggest such a hapless excuse by Massport to its security responsibilities.  Plaintiff does not rely

solely on the negligence of the screening of Huntleigh or United Airlines in this litigation, but

41

instead, and completely in accordance with federal regulations, looks at the totality of the security picture.   Most notably on page 11 of its brief, Massport cites no federal law for the proposition which they advance that Massport was not responsible for the overall security at Boston Logan.

Massport argues that attorney Mark Moller who represented a small number of plaintiffs in this case conceded at oral argument that if discovery revealed that passenger screening were separated from Massport's managerial duties the "airport operator may be out as a defendant."  It is important to note that former liaison counsel Moller made that statement in May 2003.  At that time this Honorable Court had seized from the plaintiffs the Checkpoints Operations Guide, the Air Carrier Standard Security Program and the Massport CTI report.  The court locked up the same in the courthouse, and no discovery had been yet allowed in the case. Since that time, the discovery has revealed as discussed herein that Massport played an integral role in checkpoint operations and had command additional programs that affected passenger screening.  Massport's F Troop was called to evaluate and determine what could and could not go through security checkpoints, to decide what was a weapon, and to decide if certain passengers could be allowed to go through the checkpoint, could be denied boarding, or would be sent back to ticketing to rebook, as testified by Thomas J. Kinton of Massport.

Furthermore on page 11 of defendant's preliminary statement Massport argued that since Massport escaped paying for its negligence in any settlements to date, and that all but two plaintiffs voluntarily dismissed their cases against Massport, that suggests Massport is not liable. All other plaintiffs have dismissed Massport <u>and every other defendant because they have settled</u>.  All defendants denied liability in the settlements.  The fact that Massport has not to date

paid for its negligence is better explained by the indemnity provisions in its leases with United and American Airlines than on a lack of duty, knowledge, causation, failure and liability.[66]

Defendant claims this case is just about failure to detect weapons at the passenger checkpoint.  Plaintiff in no way argues this case is merely about a failure to detect weapons, but instead is about the failure to have an effective security program to protect passengers from terrorist hijackers who completed their plan, not started their plan, on Sept. 11, 2001.  Massport would have this court believe that the Sept. 11 2001, plan started and finished with the hijackers transporting weapons through the security checkpoint on that day.  The hijackers surveilled and tested Massport (and United and American Airlines ) before completing their terrorist plots on Sept. 11, 2001.  Contrary to Massport's assertion on page 13 of their brief,  the federal law did not assign passenger screening or responsibility solely to the airlines, leaving no room to assign duties to other industry participants, because in the airlines' own Checkpoints Operation Guide, discussed herein, which guide was at every checkpoint at Boston Logan airport, Massport was assigned checkpoint duties which included screening weapons and opining on what  and who could enter the security screening area.

Furthermore FAR  §107 made it clear that Massport had the overarching security responsibility and could delegate but only to the extent that the airline had adequate security in placed to perform its duties.   Massport found out long before September 11, 2001, that security was inadequate and it developed its own plans to assist at the checkpoints, including testing and punishment. Massport concluded on page 13 and 14of its brief that the jurors could not find Massport negligent for  carrying  out  its  federally mandated security responsibilities because there's no showing that the hijackers penetrated a Massport fence or door, had a Massport badge

---

[66] See Exhibit 18, at p.43

or that the police failed to respond <u>on September 11, 2001</u>.  Massport's claims of miniscule responsibilities are overwhelmingly disputed by 14 CFR  §107, by Massport's own security plans, by the testimony of Massport's own officials, by the plans Massport put in place with the concurrence of the FAA to test the key security checkpoints, by jobs assigned to Massport's F Troop at the checkpoints, by Massport's failure to have surveillance cameras in place and by the failure to have an adequate presence of police officers at the security checkpoints as Massport had in years past.  Massport, at page 14, argued plaintiff's res ipsa loquitur briefing concerning the application of res ipsa loquitur to United Airlines defeats its own argument when it states res ipsa loquitur can only apply when plaintiff can demonstrate the injuries were caused by instrumentalities which were in defendant's exclusive control.  Plaintiffs did not argue that the checkpoint was in the exclusive control of United Airlines but rather argued United Airlines was in the exclusive control of United's and of the United security program and aircraft.  Weapons could not be on board a United Aircraft without negligence of United.  That is why Plaintiff argued res ipsa should be applied to United Airlines.  Finally Massport argues that summary judgment is appropriate as no material facts are in dispute.[67]

---

[67] Massport also argues that because of the joint stipulation of facts states the airlines were responsible for the checkpoint screening and Massport was not responsible for passenger checkpoint screening, Massport should be dismissed.  As Massport's counsel well knows, after months and perhaps years being unable to agree, this Honorable Court ordered all parties to agree to a Statement of Facts.  Counsel for all parties gathered in New York and even though many drafts had been circulated before the meeting, we still spent 2 days arguing.  We reduced the statement to the barest bones—no explanatory or qualifying statements were included, including on this point, as the sides could not agree—which counsel surely ought to remember. Defendants would not agree to Plaintiff's explanation of how the checkpoint responsibilities were parceled and vice versa, including that Massport also had responsibilities.  Thus, we agreed to submit only the very limited statement with the explanation to the court in the cover letter that both sides would later submit to the court their own alternative proposals for the inclusion in the narrative.  A letter so explaining the situation accompanied the preliminary statement of facts.

## **CONCLUSION**

Clearly there are facts are in dispute, unless Massport agrees with the following:

1. Massport's Five Minute Checkpoint Plan and threatened sanctions on airlines weakened checkpoint security and pressured screeners to rush.

2. Massport's commissioning of the CTI report in March 2001 showed Massport had and knew it had an overarching responsibility for the totality of security at Boston Logan Airport including failures at security checkpoints.

3. Massport knew it could exceed the FARs and did so taking actions it perceived would improve checkpoint operations and overall security at Logan.

4. Massport devised its Checkpoint Five Minute Rule without evaluation of the effect on security.

5. Massport's F Troop was responsible under the COG to evaluate knives, razors, guns, explosives and other weapons at the checkpoints. According to the COG, checkpoint screeners were not to touch them—F Troop was called to do so. The September 11, 2001, hijackers tested security at Boston Logan several times before September 11, 2001. It is reasonable to conclude the hijackers tested security with their weapons (which Massport claims went through the checkpoints). It is F Troop which would have evaluated anything that was detected and Massport which would have had the opportunity to investigate as the hijackers tested and surveilled the airport..

6.   Massport was to have police throughout the airport as a deterrent to hijackers and terrorists.   Before September 11, 2001, they changed their staffing and took officers away from the checkpoints in favor of the "Flex Plan."   This was one of several ways in which Massport failed to meet the FAR 107 requirement for deterrence.

7.   Massport with the FAA, devised a plan to have F Troop test security.   The airlines objected but Massport moved ahead.   Massport had the authority and the responsibility to do so because Massport was aware security was inadequate at Boston Logan.   Massport did not get around to actually doing the testing before September 11, 2001, but did so immediately after September 11, 201, without asking the airlines.   That action shows Mass port could have and should have acted before September 11, 2001.

8.   Massport was responsible through its F Troop to investigate suspicious activity at Boston Logan including hijacker surveillance of the airport including at security checkpoints.   The FBI told Massport about possible connections at Logan to Hamas, Hezbollah, and a U.S.S. Cole bombing terrorist.   At least 3 airport employees spotted Atta and other hijackers at Boston Logan before September 11, 2001.   On May 11, 2001, Massport's F Troop watched Atta go through security. There was no investigation as required.   This security failure weakened security at the checkpoint in two ways—exhibiting to employees that no action would be taken when they reported surveillance of Massport's security, and exhibiting to hijacker Atta that his plan was working and even Massport's F Troop law

enforcement would do nothing even when <u>told</u> Atta was conducting surveillance and photographing the checkpoints.

9. Before September 11, 2001, Massport knew closed circuit television coverage of checkpoints had a deterrent effect.  Massport knew it was Massport's job to install it.  Massport knew it had the authority to install it.  Massport's lease with the carriers, including but not limited to United,  allowed Massport to do so. Massport just never got the job done before September 11, 2001, but it did so immediately did so after September 11, 2001—too late to help passenger and Massport customer Mark Bavis. If Massport had installed the CCTV, on May 11, 2001, United, Huntleigh, the FBI, the CIA the FAA, the INS, Customs, the Department of State, and anyone else on which Massport seeks to unload its egregious negligence, would have had a picture, name or a ticket and passenger indentification of the most deadly hijacker in history surveilling an airport checkpoint.  Massport failed and F Troop did not even look at his ticket or driver's license.   On that evidence alone a jury will reasonably and overwhelmingly find Massport shares liability for the death of passenger Mark Bavis.

WHEREFORE Massport's Motion for Summary Judgment should be denied.

Dated:  June 24, 2011                               Respectfully submitted,

**MOTLEY RICE LLC**

**By:**       /s/ _____
               Mary Schiavo
               Ronald L. Motley
               Joseph F. Rice
               Donald A. Migliori
               Vincent I. Parrett
               Elizabeth Smith
               James R. Brauchle
               Motley Rice LLC
               28 Bridgeside Boulevard
               Post Office Box 650001
               Mount Pleasant, SC 29465
               Telephone:  (843) 216-9000
               Facsimile:  (843) 216-9450
               *Attorneys for Plaintiff Bavis*