UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

      :  No. 21 MC 101 (AKH)
      :
      :  This document relates to :
IN RE SEPTEMBER 11 LITIGATION      :  *Bavis v. United Airlines Inc.et al.,*
      :  02 CV 7154
      :
      :

------------------------------------- x

## AFFIDAVIT OF MICHAEL K. PILGRIM

I, Michael K. Pilgrim, being duly sworn, depose and say that the following facts are true to the best of my knowledge, information, and belief:

1. I have more than 30 years of experience in management, design, installation and establishing and reviewing airport security systems from the standpoint of their level of protection against terrorist threats.  Both before and after September 11, 2001, I analyzed the aviation security systems at Dulles and Logan airports.

2. Most recently I was a Senior Project Manager at Science Applications International Corporation Surveillance and Security Division specializing in design, installation and management of program effort in port and aviation security and communications systems. Through my work as a senior project manager I was involved in the development of systems specifications, design, installation and management of security programs, including aviation, government and private sector security systems.  My experience in the specification, design and management of security systems and access-control systems helps me review and analyze the effectiveness of any given security system configuration.

3. Since 1975, I have designed and implemented automated security programs for airports, harbors, private buildings and governments.

4. For numerous airports, I conducted surveys, risk assessments, threat analyses, user requirements analyses, security systems designs, system specifications, and developed emergency and security plans and programs for airports. These airports include Metropolitan Washington Airports  Authority (or "MWAA"), (1994-1996) – systems design, specifications and emergency plans; Sea-Tac Airport, (2000-2001, 1989-1991) – Systems designs, specifications, Security Plans; The Port of Los Angeles, (2007-2009) – Specifications surveys, risk assessments, threat analyses, requirements analyses, systems designs, specifications; Southwest China (23 airports) (2004-2005) – surveys, risk assessments, threat

analyses, user requirements analyses, security systems specifications security plans; King Hussein International Airport, three international border crossings, and the Economic Zone border control points, (2004-2006) – surveys, risk assessments, threat analyses, user requirements analyses, security systems design; San Diego International Airport, (1989-1991) – user requirements, systems designs, specifications; Spokane Airport, (1989-1991) – systems designs, specifications, user requirements, Security plans and programs; Pasco Airport, (1989-1991) – systems designs, specifications, user requirements, Security plans and programs; NATO C3I aviation facilities in Europe, (2005-2006) – surveys, risk assessments, user requirements analyses, system specifications; Prague International Airport, (2007) – survey, risk assessment, requirements analyses, system specification, security plans; Afghanistan Presidential Protection Academy, (2002-2003) – surveys, risk assessments, threat analyses, user requirements analyses, security systems designs, system specifications, and developed emergency and security plans and programs; Howard Hughes Medical Institute Janelia Farm Research Campus, (2000-2001) – security system design, survey, risk assessment, requirements analyses, system specification; National Park Service and the Department of the Interior, (2000) – surveys, risk assessments; Kuala Lumpur International Airport, (1997-1999) – surveys, user requirements analyses, security systems designs, system specifications; Boise International Airport, Santa Barbara Municipal Airport and seven Michigan airports, (AZO, DET, FNT, LAN, TVC, GRR, & MBS), (1989-1991) – Security Plans and Programs; Federal Emergency Management Agency, U.S. Continuity of Government Program (1981-1982) – surveys, risk assessments, user requirements analyses; Department of Energy,  (1978 – 1980) - surveys, risk assessments, user requirements analyses, security systems evaluations, emergency and security plans and programs.

5.  At Dulles International Airport, I exercised direct responsibility for a $3.5 million access-control, aviation system-installation and maintenance program.  My responsibilities included complete subcontract management and scheduling, development and implementation of all security system tests and evaluation, system design evaluation and approval, and subcontractor management.  I managed the review and approval of all system specification, submittal, change orders, field orders and directives.

6.  I served as project manager for the security upgrade projects at Seattle-Tacoma International Airport, Dulles International, San Diego International Airport, Spokane International Airport and Pasco Tri-Cities Airport.  I have conducted security systems analysis and design for Anchorage Alaska International Airport, Boise International Airport, Santa Barbara Municipal Airport and seven Michigan airports (AZO, DET, FNT, LAN, TVC, GRR, & MBS).

7.  Between 1992 and 1994, I provided independent analysis and security system consultancy for airport security system installation programs.  These include Atlanta Hartsfield, Salt Lake

City, Cincinnati, Raleigh Durham, Nashville, Knoxville and Charleston. From 2000 to 2001, I served as program manager for the design management and implementation of the Seattle-Tacoma International Airport Security Master Plan Program for URS Corp.

8. Between 1999 and 2000, I directed the Continuity and Contingency Planning Activities for the Metropolitan Washington Airports Authority. In that capacity I was directly responsible for the development of Contingency Plans and Policies and coordination of the Continuity Program with all elements of Airport Management, Airport Operations and Public Safety.

9. From 1997 to 1999, I was directly responsible for the design, engineering, and installation of an airport security system at the new Kuala Lumpur International Airport. In that capacity I was responsible for the day-to-day interface and coordination of the entire airport security systems project, managing a team of security of over 180 security engineering specialists, including local technicians, expatriate systems experts, and foreign Close Circuit Television (or "CCTV") specialists. I was ultimately responsible for the design and installation of the airport security network, which included over 1,800 access control devices, more than 1,400 CCTV cameras, a complete on-line video badging system, perimeter intrusion systems and 47 remote monitoring stations.

10. I have also worked on a study of the vulnerabilities of eight U.S. resource systems to terrorist attacks. These resources included energy transportation systems and infrastructures, financial systems and telecommunications system. Between the years of 1998 and 1999, I analyzed these operating systems for their potential vulnerabilities to threats employing conventional explosives and sophisticated chemical, biological and nuclear weapons. My Curriculum Vitae is attached as Exhibit A.

11. Before September 11, 2001, it was commonly known, accepted and recognized among the aviation industry that terrorism posed a significant threat to aviation security at U.S. airports. It was not a matter of if an attack would occur, but when it would occur. The systemic weaknesses and vulnerabilities within the aviation security industry in the United States were apparent and well documented. In his testimony before the Subcommittee on Aviation, Committee on Transportation and Infrastructure, House of Representatives, Gerald L Dillingham correctly stated: "A single lapse in aviation security can result in hundreds of deaths, destruction of equipment worth hundreds of millions of dollars, and have immeasurable negative impacts on the economy and the public's confidence in air travel." [1]

---

[1] Dr. Dillingham at the time of his testimony was serving as the Director of Civil Aviation Issues for the U.S. General Accounting Office (GAO) in Washington, D.C. The General Accounting Office is the investigative and research arm of the U.S. Congress. He is responsible for directing program evaluations and policy analyses related to all aspects of civilian aviation, including safety, environment, air traffic control, airport development and international aviation issues. Dr. Dillingham received his Masters and Doctorate degrees from the University of Chicago and was a postdoctoral scholar at the University of California-Los Angeles. Recognized as a national

12. That imminent threat was clearly recognized by the aviation community before and on September 11, 2001. For example, in 1999, the U.S. government, through the FAA, publicly stated in a proposed rules that:

> Over the past several years, the Federal Aviation Administration (or "FAA") has recognized that the threat against civil aviation has changed and grown. In particular, recent terrorist activities within the United States have forced the FAA and other federal agencies to reevaluate their assessment of the threat against civil aviation. For example, investigations into the February 1993 attack on the World Trade Center uncovered a foreign terrorist threat in the United States more serious than previously known. In addition, in 1995 a conspiracy was discovered involving Ramzi Ahmed Yousef and coconspirators who intended to bomb twelve American airliners over the Pacific Ocean. This conspiracy showed that: (1) foreign terrorists conducting future attacks in the United States may choose civil aviation as a target, despite the many more easily accessible targets equally symbolic of America; (2) foreign terrorists have the ability to operate in the United States; and (3) foreign terrorists are capable of building and artfully concealing improvised explosive devices that pose a serious challenge to aviation security.... [In light of that threat,] the White House Commission on Aviation Safety and Security (the Commission) ... made several recommendations that were published on February 12, 1997, in its "Final Report to President Clinton." In reviewing civil aviation security, the Commission stated that "the threat of terrorism is changing ... it is no longer just an overseas threat from foreign terrorists. People and places in the United States have joined the list of targets, and Americans have joined the ranks of terrorists." [2] The intent to cause mass casualties was evident.[3] In response to the history of attacks such as the 1985 Air India Bombing, the 1988 Pan Am 103 Bombing and other related attacks on Civil Aviation, The Baseline Working Group, created by the FAA Aviation Security Advisory Committee met on July, 17, 1996 to examine the vulnerability of domestic Civil Aviations systems and the consequences of successful attacks.

---

authority on aviation issues, he has testified as an expert witness before numerous committees of the U.S. Congress. Statement of Gerald L. Dillingham to the National Commission on Terrorist Attacks Upon the United States April 1, 2003 SP3514, MRAVSEC00087846- MR_AVSEC00087859.

[2] Id, A5000303, MR_AVSEC00135498-MR_AVSEC00135566; *see also*, Notice of Proposed Rulemaking Docket No. FAA-1999-5536/Notice No. 99-05; Security of Checked Baggage on Flights Within the United States on 04/16/1999/ Vol. 64, No. TSA10358-TSA1040.

[3] See, e.g., UA Security Bulletin 98-34, TSAUAL 019652-RR-RRV; UA Security Bulletin 98-34 TSAUAL019645-RR-RRV (underscoring and chronicling the FAA and Civil Aviation Community's knowledge of and concern for these threats to aviation security, including "...OBL Conduct further attacks against American interest including Civil Aviation...").

4

13. On September 11, 2001, those well-known vulnerabilities and weaknesses in U.S. aviation security were exploited by the hijackers to devastating effect: "All 19 hijackers were able to pass successfully through checkpoint screening to board their flights. They were 19 for 19. They counted on beating a weak system."[4]

14. Boston Logan International Airport ("Logan") is the nation's nineteenth busiest airport. In 2001, it serviced about 24 million passengers.[5] Throughout its history the airport has been managed by five different operators: the U.S. Army, the City of Boston, the Commonwealth's Department of Public Works, and Airport Management Board set up by the Commonwealth in 1948 and, beginning in 1956, the Massachusetts Port Authority ("Massport").

15. In 1956, the State Legislature created Massport. The new entity was given authority to manage Logan airport, as well as other facilities in the state. Massport was designed to be self-sustaining, supporting itself with revenue bonds, income from investments, and user charges.

16. Additional terminals were constructed and runways were extended by adding landfill in order to accommodate larger aircraft. A new control tower was built in 1973 and roadways were improved. By 1980, the annual number of passengers serviced by Logan reached more than 15 million. In the late 1990's, passenger travel at the airport peaked at about 25 million.

17. Logan airport comprises approximately 2,400 acres in the City of Boston and serves as the aviation gateway to New England. Small planes and regional traffic represent 45 percent of the airport's traffic and eight percent of its passengers.[6] The airport has five passenger terminals - A through E. Each terminal contains its own ticketing, baggage claim, and ground transportation facilities. The airport has 84 gate positions, which are available for scheduled and non-scheduled service. Daily 75,000 passengers travel through its doors and 1,400 flights off its runways.

18. On September 11, 2001, the hijackers of United Airlines ("United") Flight 175 passed through the checkpoint at Logan at Terminal C. United was delegated custodial responsibility of that checkpoint. United had contracted its screening duties to Huntleigh USA Corporation ("Huntleigh").[7] Under the aviation security system in effect at Logan on September 11, 2001, United and its agent Huntleigh, as well as Massport as the airport

---

[4] 9/11 Commission Staff Statement No. 3, 2004, p. 9: MR_AVSEC00165145, SP80465.
[5] Boston-Logan International Airport, Monthly Airport Traffic Summary – December 2001 (1st Revision) SP54577.
[6] "Rush-Hour Rates Urged To Cut Delays." Cox News. September 10, 2001. SP53899
[7] 9/11 Commission Records, Staff Monograph "Four Flights and Civil Aviation Security" (September 12, 2005 version); MR_AVSEC00131595-MR_AVSEC00131715, SP19912.

operator, failed to fulfill their security obligations as set forth in the Federal Aviation Regulations, the ASP, the ACSSP and the COG, as I will now explain in detail.

19. Federal Aviation Regulations ("FAR") are found within the Code of Federal Regulations and govern the aviation industry in the United States.  Some of those regulations in effect on September 11, 2001, were set forth by the Federal Aviation Administration ("FAA") in FARs 107 and 108[8].  At Logan airport, Massport as the airport operator was responsible for airport security under FAR 107 as follows:

107.3  Security Program.

(a) No Airport operator may operate an airport subject to this part unless it adopts and carries out a security program that:

(1) provides for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and aircraft piracy;

(2) is in writing and signed by the airport operator or any person whom the airport operator has delegated authority in this matter;

(3) includes the items listed in paragraphs (b), (f), or (g) of this section as appropriate; and (4) has been approved by the director of civil aviation security.

(b) for each airport subject to this part regularly serving scheduled passenger operations conducted in airplanes having a passenger seating configuration (as defined in 108.3 of this section of this chapter) of more than 60 seats, the security program required by paragraph (a) of this section must include at least the following:

(1) a description of each air operations area, including its dimensions boundaries and pertinent features;

(2) a description of each area on or adjacent to the airport which affects the security of any air operations area;

---

[8] 14 CFR 107 Airport Security provides Specific Requirement for Airport Security Programs; Physical Security; Access Control Systems and Methods and Local Law Enforcement Support. 14 CFR 108 Airplane Operator Security identifies requirements for air carriers to adopt and carry out approved Security Programs.  14 CFR 109 Indirect Air Carrier Security identifies Aviation Security rules governing each air carrier; freight forwarders; and cooperative shippers associations. 14 CFR 129 Operations Foreign Air Carriers and Operators of US Registered Aircraft covers the security requirements and responsibilities of these carriers.  PDD 39 United States Policy on Counter Terrorism (6-21-95) Directs the Secretary of Transportation to reduce vulnerabilities affecting the security of all airports in the US and all aircraft and passengers.

6

(3) a description of each exclusive area, including its dimensions boundaries, and pertinent features, and the terms of the agreement establishing the area;

(4) the procedures, and a description of the facilities and equipment used to perform the control functions specified in Section 107.13(a) by the airport operator and by each air carrier having security responsibility over an exclusive area;

(5) the procedures each air carrier having security responsibility over an exclusive area will use to notify the airport operator when the procedures, facilities, and equipment it uses are not adequate to perform the control functions described in Sec. 107.13 (a).[9]

20. The Airport Security Program is submitted in compliance with Part 107 of the Federal Aviation Administration Regulations. On September 11, 2001, Massport was the custodial operator of Logan International Airport, and was responsible not only under FAR Part 107 to the Federal Aviation Administration for security of the airport, but also to oversee the procedures, facilities and equipment used by each carrier having security responsibilities in Logan. Thus Logan was much like a landlord. The fact that airline tenants leased gates and were delegated to operate checkpoints within Logan did not excuse Logan from its responsibilities under FAR Part 107. Because it had already discovered through FAA citations, media reports, in meetings with airlines, and by its own observations, that the airlines were not meeting the security requirements delegated to them by Massport, Boston Logan airport was not providing for the safety of persons traveling in air transportation and interstate air transportation against acts of criminal violence and air piracy.

21. Under 14 C.F.R. § 107.13 Massport delegated checkpoint security to the airlines. Then the airlines further delegated one airline to operate the checkpoint and then that airline contracted with a security company. But that delegation was conditional – Massport could delegate only if the air carrier's procedures, facilities and equipment were adequate to perform the security control functions. While 14 C.F.R. § 107.13 (b)(2) requires the checkpoint operator to notify the airport if its procedures, facilities and equipment were not adequate to meet the requirements, the fact that Logan ascertained the non-performance of the contractor through LAMCO meetings, FAA citations, media reports and its own observations and those of a CTI audit team, rather than official notification by a carrier, it is indisputable and overwhelmingly documented by the evidence that Massport knew the airlines' security programs were not adequate.

---

[9] FAR 107.3 (Security Program), MR_AVSEC00131398-MR-AVSEC00131426, SP81211.

22. In fact, on September 11, 2001, Logan was classified as a Category X airport.[10] Category X airports represent the nation's largest and busiest airports as measured by the volume of passenger traffic and as such are potentially attractive targets for criminal and terrorist activity, especially given their international and national significance. Each Category X airport has a federal security manager and is required to have an FAA approved security plan to maintain its operating certificate.[11]

23. Airport security systems are designed to work based on passenger flow through particular areas. Some airports require more stringent security measures than others. Category X airports are the largest and considered to be the most attractive for targets of terrorism.[12] As a Category X airport on September 11, 2001, Logan was subject to and was required to comply with *more* restrictive and stringent security policies and procedures. Yet, in spite of that duty to provided enhanced security at Logan as a Category X airport, the United States General Accountability Office (or "GAO) had long reported that "numerous security deficiencies existed ... at the nation's highest risk airports ... labeled 'category X.'. . . Among the deficiencies we found were inadequate controls over air operations access points and over personnel identification systems, and ineffective passenger screening."[13] In my opinion, those deficiencies existed at Logan on September 11, 2001.

24. In designing the layout and security for the airport, one requirement is to ensure the security system and equipment used at the airport is supported. The lifespan of security system for an airport is roughly three to five years in my experience. With changes in security and technology, it is imperative to have the most up to date system available to ensure property safety for the airports.

25. Yet not only did Logan not have the most up-to-date security system available, but rather it was well known that security at Logan on and before September 11, 2001 was inadequate:

  • "From 1991 to 2000, Logan - the nation's 18th busiest airport - had the
    fifth-highest number of security breaches. In the period 1997 through
    early 1999, there were at least 136 security violations at Logan, including
    easy access to parked planes and lax baggage inspections"[14] During this

---

[10] Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority, MP104126-MP104142, SP 42537.
[11] Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority, MP104126-MP104142, SP 42537.
[12] Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority, MP104126-MP104142, (SP42537).
[13] Aviation Security, Corrective Actions Underway, but Better Inspection Guidance Still Needed, at pg. 12, August 1988, MR_AVSEC00088696- MR_AVSEC00088698.
[14] "Aviation Insecurity";"Boston's Logan International: A Case Study in Compromise" by Andrew R. Thomas (SP70052)

period, screeners at Logan failed to detect "102 hidden guns, 49 dynamite bombs... 10 hand grenades,[15]... and 9 toy pistols."[16]

- Logan Airport had one of the nation's worst records for serious violations, as defined by the number of times federal agents slipped guns and dummy bombs through security checkpoints. Based on FAA data, Logan was, "by a substantial margin, the nation's most porous when FAA agents test[ed] airport defenses periodically, by posing as passengers while trying to carry weapons and dummy bombs through security checkpoints."[17]

- Indeed, in 1999, a local teenager was able to climb an airport security fence, walk 2 miles across the tarmac, get through an unlocked jetway door, and travel as a stowaway on a British Airways 747 to London. Shortly after this, and "probably as a result of increased scrutiny, citations for security violations by Massport ballooned to 42, more than any other airport authority in the United States."[18]

- From 1999 to 2000, FAA special agents on at least 60 occasions over 17 months were able to slip through open doors, sneak behind an employee walking through a door, gain access to restricted baggage and ramp areas and even board unattended airlines.[19]

26. Long before September 11, 2001, Logan knew it had problems with security. The public knew it too as it had been widely reported by the media. Acknowledging the need for upgrading aviation security at Logan, in March 2001 Counter Technology Inc. (CTI) was hired to review the airport security. CTI signed a $192,000 contract with Massport to conduct a "top-to-bottom security audit of all Massport facilities."[20] *The Boston Globe* stated

---

[15] "A Tale of Two Airports." *Providence Journal-Bulletin* (Rhode Island). October 2, 2001, SP53909.

[16] "Safety in Numbers: Airlines Have Been Hiring Security Companies That Offer The Service at Rock-Bottom Prices; Economy Is Numbers." *Dollars &Sense.* November 1, 2001, SP 53913. See also, TSA 7417 ACS-50 RESULTS (10/10/01)

[17] "FAA Finds Logan Security Among Worst In Us FAA Data Show Security At Logan Ranks With Nation's Worst." *The Boston Globe.* September 26, 2001, XC088408, SP43055. See also, U.S. General Accounting Office, *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), 2. MR_AVSEC00087947, SP81682 (discussing longstanding, serious security violations at Logan)

[18] *Id.*

[19] "Facing Terror/Air Travel/Safety Issues; Massport Records Detail Security Breaches." *The Boston Globe.* September 16, 2001, SP53908. See also U.S. General Accounting Office, *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), 2. MR_AVSEC00087947, SP81682

[20] "Facing Terror/Air Travel/Safety Issues; Massport Records Detail Security Breaches." *The Boston Globe.* September 16, 2001, (SP 53908).

that CTI was hired by Joseph Lawless, Director of Public Safety for Massport at Logan.[21] In its initial report issued on November 6, 2001 CTI found that, "Public Safety authority, responsibility, manpower and objectives must be clearly enhanced, delineated and expressed without ambiguity to all Massport entities in an effort to begin to bring BOS up to a level at minimum security standards as quickly as possible"[22]

27. CTI identified problems with the security ID badging process for which Massport bore responsibility, and specifically recommended that Massport, "should conduct a comprehensive study of the ID badging office operation and current hardware/software systems and capabilities [and] BOS ID badges should be reviewed for redesign and clearer delineation of authorized access areas [and] Massport should consider the development of an ID badging ad access control policy and procedures manual for system users."[23]

28. Specifically regarding security ID badges for security checkpoint personnel at Logan, on and before September 11, 2001, both Massport and the airlines bore responsibility for conducting background checks on those personnel before issuing the appropriate security credentials. As explained by Joe Lawless: "I had a program in place to make sure that everyone had appropriate credentials [e.g.., security badges] and that they received appropriate background checks Q: Did you do additional background checks over and above what the airlines and the screening companies were doing? A: Yes, I did."[24]  Having taking on that responsibility to "screen the screeners," Massport (as well as United) bore responsibility for their failures on September 11, 2001.

29. On September 11, 2001, Federal Aviation Regulation 108.9 required air carriers "to conduct screening. . . to prevent or deter the carriage aboard airplanes of any explosive, incendiary or a deadly or dangerous weapon on or about each individual's person or accessible property and the carriage of any explosives of incendiary in check baggage."[25] Persons wanting to pass through a screening point or board an airplane must undergo checkpoint screening.[26]

30. On September 11, 2001, the hijackers for United Airlines Flight 175 passed through the checkpoint at Logan at Terminal C. Massport under FAR 107 was responsible for all parts of Logan Airport. Logan delegated checkpoint duties to carriers. That checkpoint operator was United Air Lines, Inc. ("United"), who had contracted its screening duties to Huntleigh USA

---

[21] "Security Study Called into Question." The Boston Globe. March 9, 2002, MR_AVSEC00095162-MR_AVSEC00095163 (SP 4569).
[22] "Physical Security Assessment: Boston Logan International Airport for Massport" November 6, 2001, MP100646. (SP 8709)
[23] Id. MP100649 (SP 8709)
[24] Lawless Deposition Transcript, pg. 133, lns. 11-21.
[25] Aviation Security System and the 9/11 Attacks Staff Statement No. 3, MR_AVSEC00165137-MR_AVSEC00165147, (SP 80465)
[26] ACSSP as of 9/11/01, Air Carrier Standard Security Program, UAL026328-UAL026583. (SP10184)

Corporation ("Huntleigh").[27]   By failing to stop the hijackers from carrying deadly and dangerous weapons through that checkpoint, United and Huntleigh violated FAR 108.9, and Massport violated FAR 107.3.

31. To meet the requirements of FARs 107 and 108, the Air Carrier Standard Security Program ("ACSSP") was supposed to prevent or deter aircraft hijacking, sabotage, and related criminal acts.  The security procedures, capabilities and facilities required by FARs 107 and 108 relate to the "screening of all passengers and other persons and all property intended to be carried in the cabin of airplanes or into a sterile area by weapon detecting procedures or facilities to prevent or deter the carriage of any explosive, incendiary, or other deadly or dangerous weapon aboard airplanes or into a sterile area."[28] The UAL ACSSP in effect on 9/11/01 states that United, as the air carrier, is responsible for the screening of persons, carry-on items and when required, checked baggage.[29]

32. The Checkpoint Operations Guide (or "COG") is a standard operating procedures manual published by the Air Transport Association and the Regional Airlines Association to comply with the FAA's ACSSP.  The COG is designed to provide technical and administrative guidance for passenger screening personnel, which in this case were hired by Huntleigh as United's agent for checkpoint security at Logan airport.[30]  The COG establishes duties and job instructions for individuals running and supervising the checkpoints. The guide also establishes a list of restricted items that are not allowed in the sterile area.

33. According to the COG on September 11, 2001, pocket utility knives with blades less than four inches long were not unconditionally allowed to be carried by a passenger on a U.S. commercial flight. If a screener detected a knife, either on the person or in the hand-held luggage, they were required, pursuant to the COG, to evaluate whether the knife was "menacing" and to use "common sense" to make a determination whether that knife could be a dangerous or deadly weapon.[31]  At no time was a passenger to be allowed to bring a knife on board a plane, even a utility knife, unless that knife was first evaluated and reasonably determined to be not menacing. The COG in no way prohibited the airlines themselves or the security companies from taking extra or additional precautions to safeguard the passengers they were required to protect.

34. Screening of the hijackers who boarded United Flight 175 on September 11, 2001, occurred at Terminal C at Logan Airport.  This terminal possesses twenty-five gate positions, three

---

[27] 9/11 Commission Records, Staff Monograph "Four Flights and Civil Aviation Security" (September 12, 2005 version); MR_AVSEC00131595-MR_AVSEC00131715, SP19912.

[28] ACSSP as of 9/11/01, Air Carrier Standard Security Program, UAL026328-UAL026583, SP10184.

[29] UAL ACSSP, TSA UAL 0000001-256

[30] Checkpoint Operations Guide Standard Operating Procedures, H029589-H029710, SP7101.

[31] Checkpoint Operations Guide, Section 5 – Weapons and Explosive Devices, UAL027329- UAL027490, SP9027.

security checkpoints and three piers.  There was no CCTV system in place at Logan on September 11, 2001 to provide views of the screening checkpoints.[32] Nothing would have prevented Logan from putting such additional safeguards in place.  Mr. Thomas Kinton, Acting Executive Director of Massport on September 11, 2001, testified that closed circuit TV surveillance has a deterrent effect, but Logan had none – not just none at United 175's checkpoint, but throughout Logan.[33] Logan could have installed it, but did not. There is a wealth of documentation that Massport and United Airlines -- who was under custodial responsibility for the screening checkpoint -- were aware of the ineffective operations of the screening at these checkpoints being operated by Huntleigh at Terminal C and that they had repeatedly directed to improve screening performance prior to September 11, 2001.[34]

35. Issues with efficiency and effective checkpoint security screening at Logan were well known among the aviation community prior to the events of September 11, 2001.  In the months prior to September 11, conflict ensued at Logan between managers who sought to reduce delays and boost economic development and security personnel seeking to reduce risks, especially at screening checkpoints.

36. Security at Logan's checkpoints was abysmal.  At Logan, comprehensive assessments conducted by the FAA in 2000 at two of the checkpoints used by the hijackers found an undisclosed number of "security weakness or violations" and determined that metal-detection screening at those points fell "below the norm."  That same year it was reported that airline screening failed to detect dangerous devices at least 20 percent of the time. Such tests were conducted with staged FAA approved test items.[35]  Deficiencies of the checkpoint security and airport security were widely known and published in GAO reports by the U.S. government, FAA test reports and FAA inspections.

37. In May 2001, Boston's Fox 25 News Channel conducted a series of videotaped tests of the security systems in place at Logan.  On May 6 2001, only days after Lawless sent the memo to Buckingham, WFXT broadcast the investigative report - *Getting Past Airport Security* - by Deborah Sherman. Brian Sullivan, a retired FAA Risk Management Specialist, and Steve Elson, a retired FAA Red Team leader, assisted in the investigation. After retiring from the FAA in January 2001, Sullivan said he sought to expose what he called "the façade of aviation security that existed at Logan prior to the terrorist attacks."[36] With a hidden camera, the news team recorded 65 serious security failures and violations at Logan.

---

[32] See Massport ASC – TSA11222
[33] Deposition of Thomas Kinton, pgs. 238-240
[34] See SSI Exhibit # 60 (no Bates stamp) Email from Rich Davis 5/22/01; TSA UAL 019174-RR; TSAUAL 019175 RR Letter from Kevin Nolan.
[35] SSI Exhibit # 60/ TSAUAL 019174-RR; TSAUAL 019175-RR; TSAUAL 019176-RR.
[36] *Aviation Insecurity*. Andrew R. Thomas. Amherst: Prometheus Books, 2003, (SP70052) (p. 61).

38. "A Channel 25 employee with a knife under his clothing got through all security checkpoints at Logan Airport," *The Boston Herald* reported. "Screeners thought his belt buckle was setting off the detectors. Another employee in a wheelchair had a metal box strapped to her back that went undetected. It could have been a bomb."[37]

39. In the Channel 25 investigative report, Lawless declared something would be done immediately in response to the security deficiencies, and he said he would bring the concerns to the attention of the airline companies.

40. Indeed Joe Lawless, Director of Public Safety for Massport at Logan on September 11, 2001, specifically testified in his deposition in this case that he was, "motivated. . . to enhance the security operation of the security checkpoint . . .because I knew that security checkpoints were weak, and I knew that Fox 25 broadcast it and put this information out into the public realm."[38]   Hence Boston's Fox 25 News Channel report in May 2001 contributed to his, "growing sense of concern about aviation security from terrorist" targeting Logan. [39]

41. Lawless attempted to enhance the security at Logan on multiple occasions. Recognizing the obvious flaws in the security system at Logan, Lawless voiced his concerns regarding the possibility of a terrorist attack with officials at Logan. Lawless worked extensively with various organizations to attempt to enhance security at Logan.[40]  He would often hold consortium meetings to make the air carriers and screening companies aware of current events and changes in security issues at Logan. These consortium meetings were attended by representatives from United. In fact, Lawless was so concerned with security at Logan that he sent a detailed memo to Executive Director Virginia Buckingham on April 27, 2001, warning that airports were historical targets of terrorists and pointed to an increasing threat to Logan. Lawless "called for immediate attention to vulnerabilities at Logan, including at security checkpoints, according to airport officials."[41]

42. As evidence of a growing terrorist threat, Lawless cited the thwarted plan to bomb Los Angeles International Airport during the millennium celebration and law enforcement information about suspected terrorists operating in Boston, including some with links to the airport.

---

[37] "TV Plus; Clickers; Security Reports Find New Life." *The Boston Herald.* October 7, 2001 (SP53903).
[38] Lawless Deposition Transcript, pg 136, ln 10-22.
[39] Lawless Deposition Transcript, pg 137, ln 2-3.
[40] Deposition of Joseph Lawless, March 30, 2007, pg 87, ln 13-21.
[41] Letter to Virginia Buckingham from Joseph M. Lawless Subject: Airport vulnerabilities , 4/27/2001, MP100700-MP100702 (SP12971) "See also SSI Exhibit # 60 HUSA 004355 (6/1/01); TSA 7056 (3/27/00); MP100714 ACS-50 Results (10/10/01); Email from Hussey to Julie Tejeda re meeting with FAA, UAL, HUNTLIEGH, appearing immediately after TSAUAL 019176-RR (discussing security failures at Logan); See also, TSA UAL1019174-RR (explaining that security failure rates at Logan "continue at an industry high").

43. Lawless requested a meeting with Director Buckingham to discuss the security vulnerabilities. But she declined to meet with Lawless and handed off the meeting to her deputy, Russell Aims.[42] Instead of focusing on security problems at the airport, Aims chastised Lawless for putting his security concerns in a written memo, according to *The Boston Globe*. Aims also reportedly stated the security issues raised by Lawless were being addressed in the security assessment by CTI.

44. It was widely known that the existing checkpoint screening efforts were inefficient and ineffective.   The airport attempted to conduct its own checkpoint security tests and inspections – but the airlines objected to these tests so the practice was discontinued.  For instance, as discussed above, Joe Lawless specifically proposed taking steps to enhance checkpoint security at Logan after the May 2001, Fox News Report exposing weaknesses in those security checkpoints—but that proposal was blocked because the airlines and others objected.[43]  Even after the findings of tests such as the – GAO reports, the Gore Commission findings and other professional commentary – were published, the security screening efficacy declined.

45. The hijackers on September 11, 2001, took the path of least resistance within the airport, through the checkpoint security.  The fundamental problem is that United and its agent Huntleigh failed to conduct effective checkpoint screening to stop the hijackers from bringing deadly and dangerous weapons through the checkpoint and aboard Flight 175.  As United's agent, Huntleigh employed the screeners who were the last line of defense at the checkpoint to thwart the terrorists and prevent any deadly or dangerous weapons from entering the sterile area or the aircraft.  Huntleigh's training of the checkpoint screeners was sub-par at best.[44]  Testimony in this case shows that the employees on duty at Logan airport on September 11, 2001 were working for slightly above minimum wage.  In breach of FAR 108 and therefore also 107, many of these personnel had limited English language skills.  Many exhibited a lack of understanding of what constituted a threat or prohibited device.  Those industry screeners with limited experience were widely known by me, and others in the aviation security industry, to fail to recognize weapons at the checkpoints in tests performed by the FAA time and time again.[45]

46. In fact, Logan's screener turnover rate of 207 percent was fourth among the 19 major airports studied by the GAO from in 1998 and 1999, behind St. Louis, Atlanta, and Houston.[46]  It is important to note that the GAO correctly and in accordance with FAR 107, evaluated the airport's turnover rate. Massport officials recognized the systemic security issues at Logan

---

[42] Virginia Buckingham-Lowy Deposition, pg. 88, ln. 4 – 18
[43] Joseph Lawless Deposition, pg 146, ln 11-13.
[44] TSAUAL 019175-RR; TSAUAL 019176-RR
[45] Id.
[46] "Airport Screeners Must Be Federalized." The Boston Globe. October 5, 2001, SP53905.

and wanted to enhance checkpoint security operations.  Mr. Lawless observed the poor performance that was occurring at the security screening checkpoints. "Airlines are not in the security business. They award security contract service to the lowest bidders.  Security employees are generally low wage, low skilled."[47]  As discussed above, in mid-May 2001, Lawless and Massachusetts State Police Major John Kelly had announced at a public safety staff meeting that they were going to conduct undercover tests of security checkpoints.

47. Specifically, Lawless proposed using four or five plainclothes police and staff to try to sneak weapons past the screeners. Although FAA had conducted standard tests to measure the performance of the screeners; Special Assessments using red teams had not been conducted the previous two years, according to *The 9/11 Commission Report.*[48] Standard tests can be of dubious value because screeners are often tipped off about the tests and the test items - a gun encased in plastic, a dummy grenade, and three sticks of dynamite wrapped with wire and a clock - are overly obvious.

48. Ample reasons exist for Lawless wanting to collect current data on the airport screeners. WFXT had recently recorded dozens of security failures and violations. In 1999, Massport was fined $178,000 for 136 security violations at Logan Airport—three times the national average. Most of the violations involved baggage and passenger screeners, who routinely failed to detect test items, such as pipe bombs and guns, hidden in bags carried by special agents. Again, it is important to note that the FAA fined <u>Massport</u> for security violations at Logan. Obviously the FAA considered Massport (in addition to the airlines) to be responsible for security, including screener performance at Logan.

49. The tests proposed by Lawless would have provided critical new data to determine if the weaknesses still existed. Lawless may also have been concerned about the impact of the Guaranteed Passenger Standards program on airport security. The airlines faced retribution if passengers waited in line more than five minutes at checkpoints.  To me, as an aviation security expert, the questions arise:  were the airlines therefore only minimally checking passengers? Was security being compromised for efficiency?  The answer to those questions require an examination of the facts and I conclude the answer is yes to each of those questions.

50. Before the tests at Logan could proceed, Lawless' plan had to be reviewed by the Logan Airlines Managers Council (LAMCO) - an organization consisting of airlines' representatives and airport security personnel. In 1996, President Clinton signed an executive order requiring the nation's largest <u>airports</u> to create independent "security consortiums" to

---

[47] Joseph Lawless deposition at p. 67, line 17.
[48] The 9/11 Commission Report (p. 451). MR-AVSEC80834. SP 80834

identify and act on security and safety concerns. Logan did not create such a consortium and instead received permission from the FAA to use LAMCO instead.

51. At a meeting on July 11, 2001, LAMCO objected to checkpoint testing by Massport.

52. "They were very vocal in their disapproval," said Jose Juves, Massport Director of Media Relations.[49]

53. Carter Bibbey, manager of Globe Aviation Services, which at the time provided screeners for American Airlines, said his company did not want its employees to be forced to detect test weapons that were different than the standard test items used periodically by FAA agents to measure screener performance. "We didn't want everyone testing us without knowing what to look for exactly," Bibbey explained in an interview. "We don't need people improvising test pieces to purposely make people fail."[50]  This leads me to the conclusion that the screeners were not really screening, but rather only looking for items that conformed to the outdated FAA test objects - - thus not really performing screening.

54. The airlines also were worried about who would have access to the results of the tests and whether they would be shared with the FAA, *The Boston Globe* reported. As a result of the protests by the airline managers, despite knowing of the airport-wide weaknesses in security, Logan did not act.

55. Indeed, in addition to the well-known security weaknesses at Logan, the aviation security industry was well aware that civil aviation in the United States throughout the 1980s and 1990s was a target of terrorists, e.g., the 1994 plot to attack Philippines Airlines Flight 434, the 1995 Bojinka plot to blow up 12 airliners, and Osama Bin Laden's declaration of war against America in 1996.

56. Any person in the aviation security community prior before September 11, 2001 knew of that threat by terrorists bent on attacking U.S. civil aviation.  My involvement with various airports and the FAA charged me with responsibility for the development, design, and implementation of aviation security systems.  The threat posed to U.S. civil aviation by terrorists in particular was well known to me at the time and also well documented throughout the civilian aviation community.[51]  There was a threat of terrorists hijacking planes as well as bombing planes and using planes as weapons. Furthermore, there were many cases in which terrorists attacked the airport itself, including the February 10, 1970

---

[49] "Massport Rejected Security Request; Airlines Dismissed Tougher Measures." *The Boston Globe.* December 7, 2001, MR_AVSEC00145280-MR_AVSEC00145281.

[50] "Fighting Terror Sense of Alarm; Airlines Foiled Police Logan Probe," *The Boston Globe.* October 17, 2001. SP4892

[51] See footnote 34 above.

attack at Munich Airport, the 1972 attack at the Lod Airport in Israel, the 1975 attack at LaGuardia Airport, in New York City, the 1983 attack at Orly Airport in Paris, France, the December 27, 1985 attacks at Leonardo da Vinci-Fiumincino Airport outside of Rome, Italy and at Vienna International Airport in Vienna, Austria, the December 15, 1990 attack at the Villagarzon Airport in Mocoa, Colombia, the October 30, 1996 attack at the Haouari Boumedienne International Airport in Algiers, the February 2, 1998 attack at Tokyo's Narita Airport in Japan, the July 8, 1999 attack at a Pakistan International Airlines Office, the October 31, 1999 attack at the Camilo Daza Airport in Cucuta, Colombia and the February 16, 2000 attack at Urrao Airport in Colombia. Additionally, terrorists planned to attack LAX in the 2000 Millennium Plot. Moreover, much was discussed in the aviation security community in the 1990s about the changing goals of terrorists – their plots were becoming more deadly. Terrorists were becoming more deadly as shown by the foiled LAX airport bombing plot.

57. Indeed, Joe Lawless, as Director of Public Safety for Massport at Logan, testified that he received Information Circulars (as did others in the aviation community) regarding Islamic extremist terrorists. These circulars increased his awareness of the need for security at Logan.[52] Consortium meetings were called to discuss prevalent issues relating to security at the airport. For instance, Joe Lawless announced at the Logan Airport Manager's Council (LAMCO), consisting of airline managers and tenants at Logan, at a meeting in April 2001 that he intended to begin testing checkpoints to enhance security at Logan.[53]

58. The weaknesses in the system at Logan were well documented. "When things start breaking down like that, then you're breaking down the security of the airport."[54] Most of the information regarding airport and aviation security was open source, public information. Deficiencies in Logan's checkpoint security and airport security were widely known. The GAO reports, FAA tests, FAA inspections and reports from aviation safety commissions all showed that checkpoint security at airports, including Logan, were so deficient as to constitute systemic failures of civil aviation security.

59. Indeed, just two weeks before September 11, 2001, Ben Hartman, a reporter with *The Boston Phoenix,* a weekly Boston publication, tested the security at Logan Airport. Twice he was able to walk through metal detectors with his cell phone; once at a United Airlines gate, and the other time at the gate for Delta Airlines. The reporter also handed a guard his cell phone, then cleared the metal detector. Without checking the phone by turning it on or sending it through the X-ray machine, the guard handed it back to the reporter.[55]

[52] Joseph Lawless Deposition, pg. 81, ln 17.
[53] Joseph Lawless Deposition, pg 130, ln 3-25
[54] Fox News report – 13 investigations after 65 violations. (SP42389)
[55] "Logan Airport Security? What Security? *The Phoenix.* September 11, 2001, (SP53912).

17

60. Pursuant to 14 U.S.C. § 107.15 on and before September 11, 2001, Massport was required to provide law enforcement support to the security program for Logan and specifically to the checkpoint passenger screening, as follows, in relevant part:

    107.15 Law enforcement support

    (a) Each airport shall provide law enforcement officers in the number and in a manner adequate to support –
    (1) Its security program, and
    (2) Each passenger screening system required by Part 108 or § 129.25 of this chapter.

61. Massport's law enforcement presence was also responsible for investigation of suspicious activity at airports.[56] American Airlines employee at Logan, Stephen Wallace, testified that he caught Mohammed Atta and another hijacker at Massport's Boston Logan Airport on May 11, 2001, four months before the September 11, 2001 attacks.[57] He reported it to the checkpoint and the law enforcement officer at the checkpoint.[58]

62. But Massport, through its "security agent"[59] did not investigate the suspicious activity of Mohammed Atta surveilling and photographing Logan Airport, and specifically security checkpoints on May 11, 2001. All Massport's security agents did was watch with the checkpoint operator to see if Atta set off the metal detector or if prohibited items were detected as he passed through a checkpoint on May 11, 2001. Massport did not question Atta and the other hijacker, ask for his identification, look at his ticket, take down his name, or examine the contents of his bag. Even though most investigators at the barest minimum of a first step in an investigation would request identification of those engaging in suspicious activity, Massport failed to do so and the worst terrorist hijacker in the history of the world was allowed by Massport, who was responsible to investigate, to walk through security without so much as an ID check or making note of his name. That failure is a violation of FAR 107 and would have without the slightest doubt detected, deterred and stopped the September 11, 2001 hijackings.

63. In light of those known weaknesses and threats to aviation security at Logan on and before September 11, 2001, security at Logan was insufficient and ineffective. Logan officials knew it. They had a duty and a responsibility to correct those deficiencies and they did not. Airport security at Logan was in such an abysmal state on September 11, 2001, as to constitute a systemic failure.

---

[56] Testimony of Thomas J. Kinton, pgs. 94-96
[57] Testimony of Stephen Wallace, pgs. 108-111
[58] Id. at 112-113
[59] Testimony of Thomas J. Kinton, pg. 32

This 22nd day of June, 2011.

Sworn to before me this

22 day of June, 2011.

_____Virginia_____, Notary Public

My Commission Expires: 4/30/12

Michael K. Pilgrim

Barry K. Bedford
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 292225
My Commission Expires
April 30, 2012

19