```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :    No. 21 MC 101 (AKH)
                                            :
                                            :    This document relates to :
IN RE SEPTEMBER 11 LITIGATION               :    Bavis v. United Airlines Inc.et al.,
                                            :    02 CV 7154
                                            :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**PLAINTIFF MARY BAVIS'S STATEMENT OF DISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, Plaintiff Mary Bavis respectfully submits this response to Massport's Statement of Undisputed Material Facts:

**RESPONSE**

1. Uncontested

2. Uncontested

3. Massport's primary role and federally mandated job as an airport operator was to provide for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and aircraft piracy.  14 C.F.R. § 107.3.

4. Uncontested

5. Uncontested

6. Uncontested

7. Massport's lease with United and Massport's Airport Security Program provided the authority for it to act and to dictate air carrier operations, including security operations.  Although the lease states that the Tenant (Untied) had to take "all security precautions and provide all personnel and equipment necessary to comply with all applicable

laws and regulations for passenger screening" it also provided Massport with the ability to review and veto the contractors selected by United to carry these responsibilities out, stating that the tenant "shall use contractors acceptable to the Authority." (Logan International Airport Terminal Lease between The Massachusetts Port Authority and United Airlines, p. 22, ¶6.8, at Exhibit 18.)  The lease goes on to require air carriers "take such security precautions, at Tenants sole expense with respect to the Premises and Ramp Area and the Tenant's operations and service personnel, related thereto*, as the Authority in its sole and absolute discretion may, from time to time require*. (Id.) (emphasis added).  In fact, a tenant would be in default if it failed "to comply with any applicable law, rule, or regulation concerning security, and such failure continues for 48 hours after written notice from the Authority." (Id. at p. 56)  These lease terms clearly show Massport possessed the contractual authority to approve of its tenant's security contractors, to dictate security operations to the air carriers as necessary and to terminate the agreement based on security failures it found.

   Massport's Logan Airport Security Program makes clear that Massport could inspect the air carriers' operation of the checkpoints to ensure they were effective.  It states, "Massport requires all tenants who lease areas on or abutting the AOA to be active participants in the Airport Security Plan.  Periodic inspections are conducted by Massport personnel to ensure that proper security is maintained." (Logan Airport Security Program, Section I-1 A. 3)  In fact, Massport did institute independent testing of checkpoints in April of 2001 order to enhance checkpoint screening effectiveness.  (AVSEC Dep. Exhibit 221 at MP100789-100792 attached at Exhibit 16.)

   Defendant cites here to paragraph 10 of the Lawless declaration, wherein he states "Massport was not aware of each airline's specific screening policies" and "Massport never

received a copy of the COG."  However, in his deposition, Lawless testified that as part of his duties, he "familiarized" himself with the screening companies at Logan.  (Deposition of Joseph Lawless, March 30, 2007, p. 19 at Exhibit 1.)  Furthermore, Massport obviously had awareness of screening policies and COG procedures because weeks after 9/11, Massport was able to make detailed recommendations to Secretary Mineta's Rapid Response Team about checkpoint screening requirements, stating that the FAA should "[i]mmediately standardize items restricted from the secured areas - The FAA and the air carriers are using inconsistent standards in determining which items are restricted from the secured areas."  The recommendation further stated "[t]here must be a standardized list between the FAA and carriers to avoid confusion among law enforcement personnel and security checkpoint personnel about the types of items that should be confiscated during the screening process." (See AVSEC Dep. Exhibit 218 at MP101051 attached at Exhibit 5.)

      Massport's ability to control aspects of the airlines operations is further evidenced by the fact that Massport instituted customer service reforms called the Guaranteed Passenger Standards program which required air carriers operating at Logan to clear passengers through security in 5 minutes from the time the passenger entered the security queue.  (AVSEC Dep. Exhibit 340, Memo from Virginia Buckingham to Ed Freni regarding "Meeting with United Airlines – May 9, 2001"attached at Exhibit 10.)  In creating this standard, Massport took data and goals from the air carriers and developed the performance standards.  (AVSEC Dep. Exhibit 500, e-mail re Guaranteed Passenger Standards Program press release, attached at Exhibit 11.) In developing and defending the program, Massport cited to its "proprietary rights as owner and operator of the airport" for its authority to institute changes to air carrier operations, and it noted

that the Logan leasing terms required tenant air carriers to provide a "reasonable level of customer service." (AVSEC Dep. Exhibit 215 at MP102166 attached at Exhibit 13.)

8. Massport also undertook efforts to "handle" passengers allowed aboard aircraft. The declaration of Joseph Lawless, cited by Defendants in this paragraph, states that "Federal law did not impose on airport operators and airlines joint responsibility for screening and did not require Massport to undertake any screening." However, Massport involved itself in the checkpoint screening operations when it began to test checkpoints itself, after a news story ran on the local Fox news channel showing how easily the checkpoints could be breached by individuals carrying prohibited items. (AVSEC Dep Exhibit 221, Public Safety Staff Meeting Minutes, April 13, 2001, Exhibit 31; Affidavit of Michael Pilgrim ¶¶37-43). Mr. Lawless stated in his deposition that he tried to implement programs to improve the efficiency of checkpoint security between 1997 and 2001. (Deposition of Joseph Lawless, March 30, 2007, p. 19-21, Exhibit 1.)

9. Massport could review passenger manifests if it chose to and could involve itself in any airline operation that affected the safety of Boston Logan airport or any of its passengers or customers. (Deposition of Thomas Kinton attached at Exhibit 3; Logan International Airport Terminal Lease between The Massachusetts Port Authority and United Airlines, p. 22, ¶6.8, attached at Exhibit 18; 14 C.F.R. 107.3 attached at Exhibit 32.)

10. As owner of Logan airport, Massport's role was to "adopt and carry out a security program that…provide[d] for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and aircraft piracy." (Affidavit of Michael Pilgrim, ¶19-21; 14 C.F.R. §107.3 attached as Exhibit 32.) In addition, under 14 C.F.R. 107.13, Massport delegated checkpoint security to the airlines.

4

However, Massport could only delegate checkpoint security to the airlines if the airline's procedures facilities and equipment were adequate to perform the security control functions. (Affidavit of Michael Pilgrim, ¶ 21; 14 C.F.R. 107.13). Massport had notice that the checkpoint screening was inadequate through LAMCO meetings, FAA citations, media reports, its own observations, and the CTI audit team. (Affidavit of Michael Pilgrim, ¶ 21; AVSEC Dep. Exhibits 382 (Logan Security Consortium Meeting Minutes, March 5, 1999) attached at Exhibit 8; 344 (LAMCO Meeting Minutes, April 11, 2001) attached at Exhibit 8; FAA violation letters AALTSA061003, AALTSA060950, AALTSA060953 attached at Exhibit 29; Memo from Joseph Lawless to Virginia Buckingham, April 27, 2001 attached at Exhibit 2; "Physical Security Assessment: Boston Logan International Airport" November 6, 2001, attached at Exhibit 9.)

    11. On and before September 11, 2001, United Airlines had its own Air Carrier Standard Security Program (ACSSP) which United developed and proposed to the FAA for approval. It contained procedures required by the FAA but could also contain procedures unique to the carrier's locations of operations. The ACSSP contained some procedures for screening passengers but additional procedures were contained in the Checkpoint Operations Guide and airport security procedures in place at the various airports at which United operated.

    12. Plaintiff does not contest that airlines were responsible for securing their own aircraft and that Massport had no responsibility for sweeping the interior of the aircraft between flights. With regard to screening and detecting items carried aboard planes, under 14 C.F.R. 107.13, Massport delegated checkpoint security to the airlines. However, Massport could only delegate checkpoint security to the airlines if the airline's procedures facilities and equipment were adequate to perform the security control functions. (Affidavit of Michael

Pilgrim, ¶ 21; 14 C.F.R. 107.13). Massport had notice that the checkpoint screening was inadequate through LAMCO meetings, FAA citations, media reports, its own observations, and the CTI audit team. (Affidavit of Michael Pilgrim, ¶ 21; AVSEC Dep. Exhibits 382 (Logan Security Consortium Meeting Minutes, March 5, 1999) attached at Exhibit 8; 344 (LAMCO Meeting Minutes, April 11, 2001) attached at Exhibit 8; FAA violation letters AALTSA061003, AALTSA060950, AALTSA060953 attached at Exhibit 29; Memo from Joseph Lawless to Virginia Buckingham, April 27, 2001 attached at Exhibit 2; "Physical Security Assessment: Boston Logan International Airport" November 6, 2001, attached at Exhibit 9.)

   13. Massport refused to accept background checks for new air carrier employees after it became aware that the air carrier's security background checks were woefully inadequate. In its place, Massport, at the direction of Mr. Lawless, instituted with the FBI more thorough background checks for airline and security contractor employees. Mr. Lawless wrote a letter the the FBI stating, "The air carriers do not have the resources or the desire to go beyond the minimum requirement of the law and conduct further investigation into the applicant. In exercising our option under the fingerprinting law, under Title 14, Code of Federal Regulations, Part 107, that allows airports not to accept air carrier certification for an applicant criminal background check we have prevented applicants with disqualifying crimes from gaining unescorted access privileges." As such, Massport was involved in selecting and hiring checkpoint screeners. (AVSEC Dep Exhibit 388 at MP101026 attached as Exhibit 17; Affidavit of Michael Pilgrim, ¶ 28; Lawless Deposition Transcript, p. 133, ln 11-21 attached as Exibit 30.)

   14. Massport also audited checkpoints after a news story ran on the local Fox news channel in April of 2001 showing how easily the checkpoints could be breached by individuals carrying prohibited items. (AVSEC Dep Exhibit 221, Public Safety Staff Meeting

6

Minutes, April 13, 2001, Exhibit 31; Affidavit of Michael Pilgrim, ¶¶37-44).  The FAA also conducted security tests and audits and provided copies of violation letters to the airport operators on whose premises the violations occurred.  Massport received notice of many violations by both United and American Airlines and by Massport in the months preceding September 11, 2001.  (Affidavit of Michael Pilgrim, ¶48).

        15.    Massport's security program for Logan airport states that it is responsible for the security of the airport, and that it would conduct periodic inspections to ensure that proper security was maintained.  *See* Logan Airport Security Program ("ASP") (attached to the declaration of Joseph Lawless ("Lawless Decl.") as Exhibit A) at I-1(A)(3).  On September 11, 2001, Massport did not implement its assigned responsibilities under FAR Part 107, as its assigned responsibilities included providing "for the safety and security of persons on an aircraft…against an act of criminal violence, aircraft piracy, and the introduction of deadly or dangerous weapon…onto an aircraft."  (14 C.F.R.  107.3 at Exhibit 32.)

        16.    Massport's security program for Logan airport states that it is responsible for the security of the airport, and that it would conduct periodic inspections to ensure that proper security was maintained.  *See* Logan Airport Security Program ("ASP") (attached to the declaration of Joseph Lawless ("Lawless Decl.") as Exhibit A) at I-1(A)(3).  Massport's Security Program also demonstrates that Massport had a greater role to play in determining the necessary security for its operations under the Contingency Security Plan: "The FAA *or* Logan International Airport and affected airlines will determine when increased security measures are necessary in response to recognized threat conditions or situations and will identify the appropriate threat level." (emphasis added)  See Massport's Airport Security Program, § V-1 attached as Exhibit 19.)

17. The airlines were not exclusively assigned to checkpoint screening. Under 14 C.F.R. 107.13, Massport delegated checkpoint security to the airlines. However, Massport could only delegate checkpoint security to the airlines if the airline's procedures facilities and equipment were adequate to perform the security control functions. (Affidavit of Michael Pilgrim, ¶ 21; 14 C.F.R. 107.13 attached as Exhibit 32.) Massport had notice that the checkpoint screening was inadequate through LAMCO meetings, FAA citations, media reports, its own observations, and the CTI audit team. (Affidavit of Michael Pilgrim.) Massport's security program for Logan airport states that it is responsible for the security of the airport, and that it would conduct periodic inspections to ensure that proper security was maintained. *See* Logan Airport Security Program ("ASP") (attached to the declaration of Joseph Lawless ("Lawless Decl.") as Exhibit A) at I-1(A)(3).

18. Massport was required to provide law enforcement that was adequate to support its security program and the passenger screening system. (14 C.F.R. 107.15 at Exhibit 32). The Special Advisory Task Force on Massport, convened after September 11, 2001 to review Massport in the aftermath of September 11th attacks, found "one specific problem with security at Logan is the staffing of the State Police Troop F. Under the current union rules, seniority is the basis for staffing, per the collective bargaining agreement. This protocol fails to acknowledge the specific law enforcement requirements needed by a major international airport like Logan and provides no mechanism to select the most qualified, capable and highly trained officers to enforce security procedures at the airport." (Report of The Special Advisory Task Force on Massport, p. 8-9, AVSEC Dep Exhibit 220, attached as Exhibit 6.)

19. Massport alleges here that the "flexible response" of LEOs in the airport allowed for "high visibility throughout the airport and to observe activity in both the sterile and

non-sterile areas."  However, Massport LEOs were not present or aware that the 9/11 hijackers openly and repeatedly surveyed Logan checkpoint operations in the spring and summer of 2001. American Airlines employee at Logan, Steven Wallace, testified that he caught Mohammed Atta and another hijacker at Massport's Logan Airport on May 11, 2001 and reported it to the checkpoint and the law enforcement officer at the checkpoint.  (Affidavit of Michael Pilgrim, ¶61-62; Deposition of Steven Wallace, p.103-113, 118-121, 143-144  attached at Exhibit 23; FBI Interview of Wallace; 265A-NY-280350-302-39589," FBI0370-FBI371 attached as Exhibit 22.)  Similarly, Theresa Spagnuolo, a checkpoint screener for Huntleigh on the morning of September 11th, told the FBI that she observed a Middle Eastern man videotaping the checkpoints in approximately May of 2001 and identified the man as Flight 11 hijacker Mohammed Atta.  (Report on Theresa Spagnuolo on 9/29/01, FBI0150-FBI0151 at Exhibit 24.) Likewise, sometime before September 11, 2001, James Miller, a former Globe duty manager at Logan Airport, observed one or more Muslim-appearing persons photographing the "whole checkpoint setup."  He reported their activities.  (See Deposition of James Miller, May 23, 2008, pp. 85-90 at Exhibit 25.)

      20.    Massport's flexible response approach, like Massport's entire security plan, was developed by Massport, was required to be unique to its local conditions and security threats as a Category X airport, and was submitted by Massport to the FAA for approval.  No other Category X airports have been shown in the evidence herein with the same threat environment, known threats, and documented security weaknesses, to have adopted such an approach.

21. Massport initiated other FAA approved security projects and some for which it did not seek FAA approval. (Deposition of Thomas Kinton, p. 153 attached as Exhibit 28.)

22. 14 C.F.R. Part 107 were minimum standards (Deposition of Thomas Kinton, p. 34 ln 11-19 attached at Exhibit 28.) Thus, to the extent Massport acted at all, it was within its jurisdiction under Part 107.

23. Massport had a role in checkpoint security performance, selecting screening companies hired by airlines, hiring and supervising checkpoint screeners. (Affidavit of Michael Pilgrim, ¶ 20, 21, 39-41, 44, 46, 47, 60) Massport's activities including the following:

   a) Massport instituted independent testing of checkpoints in April of 2001 order to enhance checkpoint screening effectiveness. Mr. Lawless stated in his deposition that he tried to implement programs to improve the efficiency of checkpoint security between 1997 and 2001. (Deposition of Joseph Lawless, March 30, 2007, p. 19-21, Exhibit 1.)

   b) Under the lease, Massport had the authority to veto the airlines' selection of security companies. The lease states that the Tenant (Untied) had to take "all security precautions and provide all personnel and equipment necessary to comply with all applicable laws and regulations for passenger screening," but it also provided Massport with the ability to review and veto the contractors selected by United to carry these responsibilities out, stating that the tenant "shall use contractors acceptable to the Authority." (Logan International Airport Terminal Lease between The Massachusetts Port Authority and United Airlines, p. 22, ¶6.8, at Exhibit 18.)

   c) Massport, at the direction of Mr. Lawless, instituted with the FBI more thorough background checks for airline and security contractor employees. Mr. Lawless

wrote a letter to the FBI stating, "The air carriers do not have the resources or the desire to go beyond the minimum requirement of the law and conduct further investigation into the applicant. In exercising our option under the fingerprinting law, under Title 14, Code of Federal Regulations, Part 107, that allows airports not to accept air carrier certification for an applicant criminal background check we have prevented applicants with disqualifying crimes from gaining unescorted access privileges." Thus, Massport was involved in selecting and hiring checkpoint screeners. (AVSEC Dep Exhibit 388 at MP101026 attached as Exhibit 17; Affidavit of Michael Pilgrim, ¶ 28; Lawless Deposition Transcript, p. 133, ln 11-21 attached as Exhibit 1.)

    d) Massport was required to provide law enforcement support to the security checkpoints under 14 C.F.R. 107.15. (14 C.F.R. 107.15 attached as Exhibit 32; Affidavit of Michael Pilgrim, ¶ 60-62.).

    24. Massport claims that it strived to provide the most up to date security equipment and that it exceeded federal requirements. In truth it had no idea how sensitive or effective Boston Logan's magnetometers were because it never tested them—until after September 11, 2001. Massport does know that on occasion they were unplugged and Massport does know that in such event there was no real checkpoint security. (Deposition of Virginia Buckingham, p. 133-134 attached at Exhibit 4.)

    25. Massport thought its F Troops served an active role at the checkpoints in determining whether items were weapons and whether they could pass through security. (Checkpoint Operations Guide attached at Exhibit 27; Deposition of Thomas Kinton attached at Exhibit 3.)

    26. At several times over many years prior to September 11, 2001, the FAA considered and decided not to transfer all or some of airline security responsibilities to airport

operators or the government. Many changes had occurred over the years, but airlines and airports both still had responsibilities on September 11, 2001.

27. Massport's statement is not supported by its citation. According to the deposition citation, Mr. Lawless's point of contact for dealing with the FAA was Steven Longo. He was assigned to Logan as a federal security manager, he reported directly to the FAA headquarters in Washington, and he facilitated intelligence meetings. Plaintiff does not contest these statements from Mr. Lawless's deposition. Otherwise, Defendant's statement is unsupported.

28. Again, Massport's cited deposition transcript states that the PSI would have routine contact with the corporate office for the airline, they had crisis management responsibilities, some compliance review, and they would work with the carrier on "certain issues, compliance with the regulations" and providing guidance and interpretation on the FARs, ACSSP, and Security Directives, acting as a go-between. Plaintiff does not dispute the above statements as they appear in the transcript.

29. Uncontested

30. If issues were identified during checkpoint audits, the FAA sent a letter to Massport notifying it that a checkpoint violation had occurred. (*See* for example, AALTSA061003, AALTSA060950, AALTSA060953 attached at Exhibit 29.) If the FAA issued a fine for a checkpoint violation, that fine was levied against Massport. (Affidavit of Michael Pilgrim, ¶ 48). Thus, Massport was involved in working with the FAA to address issues identified during checkpoint audits.

31.     The FAA proposed penalties for security violators.  Thereafter, Massport and/or the airlines at Logan could agree and pay the fine, dispute the charge and oppose the fine, or negotiate the fine.

32.     Under 14 C.F.R. 107.13, Massport delegated checkpoint security to the airlines.  However, Massport could only delegate checkpoint security to the airlines if the airline's procedures facilities and equipment were adequate to perform the security control functions.  (Affidavit of Michael Pilgrim, ¶ 21; 14 C.F.R. 107.13 attached as Exhibit 32.) Massport had notice that the checkpoint screening was inadequate through LAMCO meetings, FAA citations, media reports, its own observations, and the CTI audit team.  (Affidavit of Michael Pilgrim.)  Massport instituted independent testing of checkpoints in April of 2001 in order to enhance checkpoint screening effectiveness.  (AVSEC Dep. Exhibit 221 at MP100789-100792 attached at Exhibit 16.)  Mr. Lawless stated in his deposition that he tried to implement programs to improve the efficiency of checkpoint security between 1997 and 2001.  (Deposition of Joseph Lawless, March 30, 2007, p. 19-21, Exhibit 1; Affidavit of Michael Pilgrim, ¶39-44).

33.     September 11, 2001 began with 10 hijackers passing uninterrupted and unhindered, through Logan airport and onto two airplanes with weapons – hardly a normal day. *See* 9/11 Commission Report, August 26, 2004, p. 2-6, 17-19 attached at Exhibit 20.)  Massport employees, United employees, and Huntleigh employees did not identify any suspicious activity to suggest that a terrorist attack was underway, although they missed many opportunities to do so.  (See Affidavit of Michael Pilgrim in its entirety).

34.     Uncontested

35. The 9/11 Commission Report in a footnote stated it did not have evidence of the hijackers' selection of airports and surmised it was because of the availability and location of 767s and 757s.  (See Burton Decl. Ex. V at 451 n.1).

36. On September 11, 2001, two of the flight 175 hijackers checked in at the ticked counter appearing less than ordinary.  They were "obviously unused to travel…they had trouble understanding the standard security questions, and [the ticket agent] had to go over them slowly until they gave the routine, reassuring answers."  Burton Decl. Ex. V at 1-2.

37. Uncontested

38. Uncontested

39. Uncontested

40. On September 11, 2001, none of the hijackers were reported, but prior to September 11, 2001 at least two of the hijackers had been reported including to Massport police. (Deposition of Stephen Wallace, p.103-113, 118-121, 143-144 attached at Exhibit 23.)

41. The September 11, 2001 attack was carried out by hijackers who had devoted substantial time to surveillance of Boston Logan and other airports as well as United and American Airlines.  The hijackers were noted by the 9/11 Commission report to be poor pilots and not particularly careful as shown by their activities at Boston Logan in the months before the hijackings.  They did not hide their identities or resort to disguises and were able to kill over 3000 people by taking advantage of the negligence of Boston Logan airport, United Airlines, American Airlines, and their subcontractor screeners.

42. Uncontested

43. Uncontested

44. There is evidence that Massport failed to provide police presence at the checkpoints and failed to investigate one or more repeated instances of September 11, 2001 hijackers conducting surveillance at Boston Logan Airport. (Deposition of Steven Wallace, p.103-113, 118-121, 143-144 attached at Exhibit 23; Report on Theresa Spagnuolo on 9/29/01, FBI0150-FBI0151 at Exhibit 24; Deposition of James Miller, May 23, 2008, pp. 85-90 at Exhibit 25.)

Dated: June 24, 2011

                          Respectfully submitted:

                          By: /s/ Mary Schiavo_____
                              Mary Schiavo
                              Ronald L. Motley
                              Joseph F. Rice
                              Donald A. Migliori
                              Vincent I. Parrett
                              Elizabeth Smith
                              James R. Brauchle
                              Motley Rice LLC
                              28 Bridgeside Boulevard
                              Post Office Box 650001
                              Mount Pleasant, SC 29465
                              Telephone: (843) 216-9000
                              Facsimile: (843) 216-9450
                              *Attorneys for Plaintiff Bavis*

                          *Attorneys for the Plaintiff Mary Bavis*