# Exhibit D

# REPORT OF MICHAEL K. PILGRIM

In Re September 11 Litigation, 21 MC 101

*Bavis v. United Airlines, Inc. et al., 02-CV-7154(AKH)*

May 23, 2011

Table of Contents

I.      Background and Experience...........................................................................1

II.     Compensation ..............................................................................................3

III.    Opinion ........................................................................................................4

IV.     Logan Airport:  Background ..........................................................................5

V.      Security responsibilities and failures of Massport at Logan Airport

        under FAR 107 on September 11, 2001 .......................................................6

VI.     Security responsibilities and failures of United and Huntleigh at Logan

        Airport under FAR 108 on September 11, 2001 ...................................11

VII.    Known Weaknesses and Threats to Aviation Security at Logan Airport

        and in the United States on and before September 11, 2001 ...........................18

Exhibit A

Exhibit B

Exhibit C

**Background and Experience**

I have more than 30 years of experience in management, design, installation and establishing and reviewing airport security systems from the standpoint of their level of protection against terrorist threats.  Both before and after September 11, 2001, I analyzed the aviation security systems at Dulles and Logan airports.

I currently hold the position of Senior Project Manager at Science Applications International Corporation Surveillance and Security Division specializing in design, installation and management of program effort in port and aviation security and communications systems.  Through my work as a senior project manager I was involved in the development of systems specifications, design, installation and management of security programs, including aviation, government and private sector security systems.   My experience in the specification, design and management of security systems and access-control systems helps me review and analyze the effectiveness of any given security system configuration.

Since 1975, I have designed and implemented automated security programs for airports, harbors, private buildings and governments.

For numerous airports, I conducted surveys, risk assessments, threat analyses, user requirements analyses, security systems designs, system specifications, and developed emergency and security plans and programs for airports. These airports include Metropolitan Washington Airports  Authority (or "MWAA"), (1994-1996) – systems design, specifications and emergency plans; Sea-Tac Airport, (2000-2001, 1989-1991) – Systems designs, specifications, Security Plans; The Port of Los Angeles, (2007-2009) – Specifications surveys, risk assessments, threat analyses, requirements analyses, systems designs, specifications; Southwest China (23 airports) (2004-2005) – surveys, risk assessments, threat analyses, user requirements analyses, security systems specifications security plans; King Hussein International Airport, three international border crossings, and the Economic Zone border control points, (2004-2006) – surveys, risk assessments, threat analyses, user requirements analyses, security systems design; San Diego International Airport, (1989-1991) – user requirements, systems designs, specifications; Spokane Airport, (1989-1991) – systems designs, specifications, user requirements, Security plans and programs; Pasco Airport, (1989-1991) – systems designs, specifications, user requirements, Security plans and programs; NATO C3I aviation facilities in Europe, (2005-2006) – surveys, risk assessments, user requirements analyses, system specifications; Prague International Airport, (2007) – survey, risk assessment, requirements analyses, system specification, security plans; Afghanistan Presidential Protection Academy, (2002-2003) – surveys, risk assessments, threat analyses, user

1

requirements analyses, security systems designs, system specifications, and developed emergency and security plans and programs; Howard Hughes Medical Institute Janelia Farm Research Campus, (2000-2001) – security system design, survey, risk assessment, requirements analyses, system specification; National Park Service and the Department of the Interior, (2000) – surveys, risk assessments; Kuala Lumpur International Airport, (1997-1999) – surveys, user requirements analyses, security systems designs, system specifications; Boise International Airport, Santa Barbara Municipal Airport and seven Michigan airports, (AZO, DET, FNT, LAN, TVC, GRR, & MBS), (1989-1991) – Security Plans and Programs; Federal Emergency Management Agency, U.S. Continuity of Government Program (1981-1982) – surveys, risk assessments, user requirements analyses; Department of Energy,  (1978 – 1980) - surveys, risk assessments, user requirements analyses, security systems evaluations, emergency and security plans and programs.

At Dulles International Airport, I exercised direct responsibility for a $3.5 million access-control, aviation system-installation and maintenance program.  My responsibilities included complete subcontract management and scheduling, development and implementation of all security system tests and evaluation, system design evaluation and approval, and subcontractor management.  I managed the review and approval of all system specification, submittal, change orders, field orders and directives.

I served as project manager for the security upgrade projects at Seattle-Tacoma International Airport, Dulles International, San Diego International Airport, Spokane International Airport and Pasco Tri-Cities Airport.  I have conducted security systems analysis and design for Anchorage Alaska International Airport, Boise International Airport, Santa Barbara Municipal Airport and seven Michigan airports (AZO, DET, FNT, LAN, TVC, GRR, & MBS).

Between 1992 and 1994, I provided independent analysis and security system consultancy for airport security system installation programs.  These include Atlanta Hartsfield, Salt Lake City, Cincinnati, Raleigh Durham, Nashville, Knoxville and Charleston.  From 2000 to 2001, I served as program manager for the design management and implementation of the Seattle-Tacoma International Airport Security Master Plan Program for URS Corp.

Between 1999 and 2000, I directed the Continuity and Contingency Planning Activities for the Metropolitan Washington Airports Authority.  In that capacity I was directly responsible for the development of Contingency Plans and Policies and coordination of the Continuity Program with all elements of Airport Management, Airport Operations and Public Safety.

2

From 1997 to 1999, I was directly responsible for the design, engineering, and installation of an airport security system at the new Kuala Lumpur International Airport.  In that capacity I was responsible for the day-to-day interface and coordination of the entire airport security systems project, managing a team of security of over 180 security engineering specialists, including local technicians, expatriate systems experts, and foreign Close Circuit Television (or "CCTV") specialists.  I was ultimately responsible for the design and installation of the airport security network, which included over 1,800 access control devices, more than 1,400 CCTV cameras, a complete on-line video badging system, perimeter intrusion systems and 47 remote monitoring stations.

I have also worked on a study of the vulnerabilities of eight U.S. resource systems to terrorist attacks.  These resources included energy transportation systems and infrastructures, financial systems and telecommunications system.  Between the years of 1998 and 1999, I analyzed these operating systems for their potential vulnerabilities to threats employing conventional explosives and sophisticated chemical, biological and nuclear weapons.  My Curriculum Vitae is attached as Exhibit A.

**<u>Compensation</u>**

I am being compensated at the rate of $275.00 per hour for research, writing, consultation and testimony in regards to this expert report. I am being compensated at the rate of $200.00 per hour for travel and other travel related requirements.

## Opinion

I have been asked to offer my opinions on the state of airport security at Logan Airport on and before September 11, 2001.  The opinions I provide below are based on the totality of my experience as set forth in my curriculum vitae, attached as Exhibit B, and in this report.  My opinions are also based, in part, on a review of the documents identified in Exhibit C.

Before September 11, 2001, it was commonly known, accepted and recognized among the aviation industry that terrorism posed a significant threat to aviation security at U.S. airports.  It was not a matter of if an attack would occur, but when it would occur.  The systemic weaknesses and vulnerabilities within the aviation security industry in the United States were apparent and well documented.  In his testimony before the Subcommittee on Aviation, Committee on Transportation and Infrastructure, House of Representatives, Gerald L Dillingham correctly stated:  "A single lapse in aviation security can result in hundreds of deaths, destruction of equipment worth hundreds of millions of dollars, and have immeasurable negative impacts on the economy and the public's confidence in air travel." [1]

That imminent threat was clearly recognized by the aviation community before and on September 11, 2001.  For example, in 1999, the U.S. government, through the FAA, publicly stated in a proposed rules that:

> Over the past several years, the Federal Aviation Administration (or "FAA") has recognized that the threat against civil aviation has changed and grown. In particular, recent terrorist activities within the United States have forced the FAA and other federal agencies to reevaluate their assessment of the threat against civil aviation. For example, investigations into the February 1993 attack on the World Trade Center uncovered a foreign terrorist threat in the United States more serious than previously known.  In addition, in 1995 a conspiracy was discovered involving Ramzi Ahmed Yousef and

---

[1] Dr. Dillingham at the time of his testimony was serving as the Director of Civil Aviation Issues for the U.S. General Accounting Office (GAO) in Washington, D.C. The General Accounting Office is the investigative and research arm of the U.S. Congress. He is responsible for directing program evaluations and policy analyses related to all aspects of civilian aviation, including safety, environment, air traffic control, airport development and international aviation issues.  Dr. Dillingham received his Masters and Doctorate degrees from the University of Chicago and was a postdoctoral scholar at the University of California-Los Angeles. Recognized as a national authority on aviation issues, he has testified as an expert witness before numerous committees of the U.S. Congress.  Statement of Gerald L. Dillingham to the National Commission on Terrorist Attacks Upon the United States April 1, 2003, MRAVSEC00087846- MR_AVSEC00087859.

coconspirators who intended to bomb twelve American airliners over the Pacific Ocean. This conspiracy showed that: (1) foreign terrorists conducting future attacks in the United States may choose civil aviation as a target, despite the many more easily accessible targets equally symbolic of America; (2) foreign terrorists have the ability to operate in the United States; and (3) foreign terrorists are capable of building and artfully concealing improvised explosive devices that pose a serious challenge to aviation security.... [In light of that threat,] the White House Commission on Aviation Safety and Security (the Commission) ... made several recommendations that were published on February 12, 1997, in its "Final Report to President Clinton." In reviewing civil aviation security, the Commission stated that "the threat of terrorism is changing ... it is no longer just an overseas threat from foreign terrorists. People and places in the United States have joined the list of targets, and Americans have joined the ranks of terrorists." [2]  The intent to cause mass casualties was evident.[3]  In response to the history of attacks such as the 1985 Air India Bombing, the 1988 Pan Am 103 Bombing and other related attacks on Civil Aviation, The Baseline Working Group, created by the FAA Aviation Security Advisory Committee met on July, 17, 1996 to examine the vulnerability of domestic Civil Aviations systems and the consequences of successful attacks.

On September 11, 2001, those well-known vulnerabilities and weaknesses in U.S. aviation security were exploited by the hijackers to devastating effect:  "All 19 hijackers were able to pass successfully through checkpoint screening to board their flights. They were 19 for 19. They counted on beating a weak system."[4]

## Logan Airport:  Background

Boston Logan International Airport ("Logan") is the nation's nineteenth busiest airport. In 2001, it serviced about 24 million passengers.[5]  Throughout its history the airport has been managed by five different operators: the U.S. Army, the City of Boston, the Commonwealth's

---

[2] Id, White House Commission on Aviation Safety and Security Final Report To President Clinton- Vice President Al Gore, Chairman, A5000303, MR_AVSEC00135498-MR_AVSEC00135566; *see also*, Notice of Proposed Rulemaking Docket No. FAA-1999-5536/Notice No. 99-05; Security of Checked Baggage on Flights Within the United States on 04/16/1999/ Vol. 64, No. TSA10358-TSA1040.

[3] See, e.g., UA Security Bulletin 98-34, TSAUAL 019652-RR-RRV; UA Security Bulletin 98-34 TSAUAL019645-RR-RRV (underscoring and chronicling the FAA and Civil Aviation Community's knowledge of and concern for these threats to aviation security, including "...OBL Conduct further attacks against American interest including Civil Aviation...").

[4] 9/11 Commission Staff Statement No. 3, 2004, p. 9: MR_AVSEC00165145.

[5] Boston-Logan International Airport, Monthly Airport Traffic Summary – December 2001 (1st Revision)

Department of Public Works, and Airport Management Board set up by the Commonwealth in 1948 and, beginning in 1956, the Massachusetts Port Authority ("Massport").

In 1956, the State Legislature created Massport.  The new entity was given authority to manage Logan airport, as well as other facilities in the state.  Massport was designed to be self-sustaining, supporting itself with revenue bonds, income from investments, and user charges.

Additional terminals were constructed and runways were extended by adding landfill in order to accommodate larger aircraft.  A new control tower was built in 1973 and roadways were improved.  By 1980, the annual number of passengers serviced by Logan reached more than 15 million. In the late 1990's, passenger travel at the airport peaked at about 25 million.

Logan airport comprises approximately 2,400 acres in the City of Boston and serves as the aviation gateway to New England. Small planes and regional traffic represent 45 percent of the airport's traffic and eight percent of its passengers.[6]  The airport has five passenger terminals - A through E.  Each terminal contains its own ticketing, baggage claim, and ground transportation facilities. The airport has 84 gate positions, which are available for scheduled and non-scheduled service. Daily 75,000 passengers travel through its doors and 1,400 flights off its runways.

On September 11, 2001, the hijackers of United Airlines Flight 175 passed through the checkpoint at Logan at Terminal C.  That checkpoint was under custodial responsibility of United Airlines ("United"), who had contracted its screening duties to Huntleigh USA Corporation ("Huntleigh").[7]  Under the aviation security system in effect at Logan on September 11, 2001, United and its agent Huntleigh, as well as Massport as the airport operator, failed to fulfill their security obligations as set forth in the Federal Aviation Regulations, the ASP, the ACSSP and the COG, as I will now explain in detail.

## Security responsibilities and failures of Massport under FAR 107 at Logan Airport on September 11, 2001

Federal Aviation Regulations ("FAR") are found within the Code of Federal Regulations and govern the aviation industry in the United States.   Some of those regulations in effect on September 11, 2001, were set forth by the Federal Aviation Administration ("FAA") in FARs

---

[6] "Rush-Hour Rates Urged To Cut Delays." Cox News. September 10, 2001.
[7] 9/11 Commission Records, Staff Monograph "Four Flights and Civil Aviation Security" (September 12, 2005 version); MR_AVSEC00131595-MR_AVSEC00131715.

107 and 108[8].  At Logan airport, Massport as the airport operator was responsible for airport security under FAR 107 as follows:

107.3  Security Program.

(a) No Airport operator may operate an airport subject to this part unless it adopts and carries out a security program that:

(1) provides for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and aircraft piracy;

(2) is in writing and signed by the airport operator or any person whom the airport operator has delegated authority in this matter;

(3) includes the items listed in paragraphs (b), (f), or (g) of this section as appropriate; and (4) has been approved by the director of civil aviation security.

(b) for each airport subject to this part regularly serving scheduled passenger operations conducted in airplanes having a passenger seating configuration (as defined in 108.3 of this section of this chapter) of more than 60 seats, the security program required by paragraph (a) of this section must include at least the following:

(1) a description of each air operations area, including its dimensions boundaries and pertinent features;

(2) a description of each area on or adjacent to the airport which affects the security of any air operations area;

(3) a description of each exclusive area, including its dimensions boundaries, and pertinent features, and the terms of the agreement establishing the area;

---

[8] 14 CFR 107 Airport Security provides Specific Requirement for Airport Security Programs; Physical Security; Access Control Systems and Methods and Local Law Enforcement Support. 14 CFR 108 Airplane Operator Security identifies requirements for air carriers to adopt and carry out approved Security Programs. 14 CFR 109 Indirect Air Carrier Security identifies Aviation Security rules governing each air carrier; freight forwarders; and cooperative shippers associations. 14 CFR 129 Operations Foreign Air Carriers and Operators of US Registered Aircraft covers the security requirements and responsibilities of these carriers. PDD 39 United States Policy on Counter Terrorism (6-21-95) Directs the Secretary of Transportation to reduce vulnerabilities affecting the security of all airports in the US and all aircraft and passengers.

(4) the procedures, and a description of the facilities and equipment used to perform the control functions specified in Section 107.13(a) by the airport operator and by each air carrier having security responsibility over an exclusive area;

(5) the procedures each air carrier having security responsibility over an exclusive area will use to notify the airport operator when the procedures, facilities, and equipment it uses are not adequate to perform the control functions described in Sec. 107.13 (a).[9]

The Airport Security Program is submitted in compliance with Part 107 of the Federal aviation Administration Regulations.   The procedures contained in the program are designed to prevent or deter persons and vehicles from unauthorized access to the Air Operations Area.  Hence, on September 11, 2001, Massport was the custodial operator of Logan International Airport, and was responsible under FAR Part 107 to the Federal Aviation Administration for security of the airport.

In fact, on September 11, 2001, Logan was classified as a Category X airport.[10]  Category X airports represent the nation's largest and busiest airports as measured by the volume of passenger traffic and as such are potentially attractive targets for criminal and terrorist activity, especially given their international and national significance. Each Category X airport has a federal security manager and is required to have an FAA approved security plan to maintain its operating certificate.[11]

Having responsibility for the security of the airport, Massport had implemented some procedures and equipment to control access and prevent and/or deter unauthorized entry to the Airport Operations Area ("AOA") and the more restricted Security Identification Display Area (or "SIDA").[12]  The AOA is defined as a security area of the airport which has restricted access.[13]  The AOA at Logan is controlled by a variety of barriers with access gates, automatic key card gates and lock and key controls.  Massport controlled the outside barrier and all access points other than the checkpoint screening on September 11, 2001. The variety of perimeter control barriers and the lack of perimeter controls in other areas make it vulnerable to attack, and requires utmost due diligence.[14]  Access control to the

---

[9] FAR 107.3 (Security Program), MR_AVSEC00131398-MR-AVSEC00131426.

[10] Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority, MP104126-MP104142.

[11] Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority, MP104126-MP104142.

[12] Airport Security Program Restrictions and Changes, MP100399-MP100638.

[13] Airport Security Program Restrictions and Changes, MP100399-MP100638.

[14] April 27, 2001, Letter to Virginia Buckingham from Joseph M. Lawless Subject: Airport vulnerabilities, Massachusetts Port Authority, MP100700-MP100702.

AOA at Boston Logan allowed tenants to control access to the AOA through secured areas, as described in the ASP.

At Logan, Massport utilized two specific types of control systems to monitor and restrict access to security areas at the airport on September 11, 2001. These systems were set in place pursuant to FAR 107.14. The two types of control systems are the Security Access Control System (or "SACS") and the Lock and Key System (or "LAKS"). The SACS and LAKS systems are supposed to meet the requirements of FAR Part 107.14 by ensuring that only persons authorized to have access to the security area are able to obtain access and that the system is capable of denying access to individuals whose authority to have access changes.[15] The Lock and Key System for Logan provides hardware and procedures necessary to achieve compliance with FAA mandates and Massport operating criteria.

Airport security systems are designed to work based on passenger flow through particular areas. Some airports require more stringent security measures than others. Category X airports are the largest and considered to be the most attractive for targets of terrorism.[16] As a Category X airport on September 11, 2001, Logan was subject to and was required to comply with *more* restrictive and stringent security policies and procedures. Yet, in spite of that duty to provided enhanced security at Logan as a Category X airport, the United States General Accountability Office (or "GAO") had long reported that "numerous security deficiencies existed … at the nation's highest risk airports … labeled 'category X.'. . . Among the deficiencies we found were inadequate controls over air operations access points and over personnel identification systems, and ineffective passenger screening."[17]   In my opinion, those deficiencies existed at Logan on September 11, 2001.

Designing a security system for an airport, especially a Category X airport, including the physical boundaries and layout is critical. Separations of certain types of areas are established by badging/credentialing systems. These access points for the airport are critical. These types of areas are designed to facilitate permitting and immediately denying individuals' access to certain areas of the airport, specifically the AOA and the SIDA. The locations of the access points are designed to permit undisruptive flow and security to certain areas. A matrix of various regulations set forth by organizations such as the FAA and the RTCA, establish guidelines when setting up the security systems for the airports. RTCA, Incorporated is a not-for-profit corporation formed to advance the art and science of aviation and aviation electronic systems for the benefit of the public. The organization functions    as    a    Federal    Advisory    Committee    and    develops    consensus    based

---

[15] Airport Security Program Restrictions and Changes, Massachusetts Port Authority, MP100399-MP100638.
[16] Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority, MP104126-MP104142.
[17] Aviation Security, Corrective Actions Underway, but Better Inspection Guidance Still Needed, at pg. 12, August 1988, MR_AVSEC00088696- MR_AVSEC00088698.

recommendations on contemporary aviation issues. The organizations' recommendations are often used as the basis for government and private sector decisions as well as the foundation for many FAA Technical Standard Orders.

In designing the layout and security for the airport, one requirement is to ensure the security equipment used at the airport is supported. The lifespan of security system for an airport is roughly three to five years in my experience. With changes in security and technology, it is imperative to have the most up to date system available to ensure property safety for the airports.

Yet not only did Logan not have the most up-to-date security system available, but rather it was well known that security at Logan on and before September 11, 2001 was a sieve:

- "From 1991 to 2000, Logan - the nation's 18th busiest airport - had the fifth-highest number of security breaches. In the period 1997 through early 1999, there were at least 136 security violations at Logan, including easy access to parked planes and lax baggage inspections"[18] During this period, screeners at Logan failed to detect "102 hidden guns, 49 dynamite bombs... 10 hand grenades,[19]... and 9 toy pistols."[20]

- Logan Airport had one of the nation's worst records for serious violations, as defined by the number of times federal agents slipped guns and dummy bombs through security checkpoints. Based on FAA data, Logan was, "by a substantial margin, the nation's most porous when FAA agents test[ed] airport defenses periodically, by posing as passengers while trying to carry weapons and dummy bombs through security checkpoints."[21]

- Indeed, in 1999, a local teenager was able to climb an airport security fence, walk 2 miles across the tarmac, get through an unlocked jetway door, and travel as a stowaway on a British Airways 747 to London. Shortly after this, and "probably as a result of increased scrutiny,

---

[18] "Aviation Insecurity";"Boston's Logan International: A Case Study in Compromise" by Andrew R. Thomas
[19] "A Tale of Two Airports." *Providence Journal-Bulletin* (Rhode Island). October 2, 2001.
[20] "Safety in Numbers: Airlines Have Been Hiring Security Companies That Offer The Service at Rock-Bottom Prices; Economy Is Numbers." *Dollars &Sense.* November 1, 2001. See also, TSA 7417 ACS-50 RESULTS (10/10/01)
[21] "FAA Finds Logan Security Among Worst In Us FAA Data Show Security At Logan Ranks With Nation's Worst." *The Boston Globe.* September 26, 2001, XC088408. See also, U.S. General Accounting Office, *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), 2. MR_AVSEC00087947 (discussing longstanding, serious security violations at Logan).

citations for security violations by Massport ballooned to 42, more than any other airport authority in the United States."[22]

- From 1999 to 2000, FAA special agents on at least 60 occasions over 17 months were able to slip through open doors, sneak behind an employee walking through a door, gain access to restricted baggage and ramp areas and even board unattended airlines.[23]

Acknowledging the need for upgrading aviation security at Logan, in March 2001 Counter Technology Inc. (CTI) was hired to review the airport security.  CTI signed a $192,000 contract with Massport to conduct a "top-to-bottom security audit of all Massport facilities."[24] *The Boston Globe* stated that CTI was hired by Joseph Lawless, Director of Public Safety for Massport at Logan.[25] In its final report issued on November 6, 2001 CTI found that, "Public Safety authority, responsibility, manpower and objectives must be clearly enhanced, delineated and expressed without ambiguity to all Massport entities in an effort to begin to bring BOS up to a level at minimum security standards as quickly as possible"[26]  CTI specifically noted that, "***poor perimeter access control measures have allowed several detected breaches that could have resulted in serious incidents***."[27]

CTI's report identified problems with the security ID badging process for which Massport bore responsibility, and specifically recommended that Massport, "should conduct a comprehensive study of the ID badging office operation and current hardware/software systems and capabilities [and] BOS ID badges should be reviewed for redesign and clearer delineation of authorized access areas [and] Massport should consider the development of an ID badging ad access control policy and procedures manual for system users."[28]

Specifically regarding security ID badges for security checkpoint personnel at Logan, on and before September 11, 2001, both Massport and the airlines bore responsibility for conducting background checks on those personnel before issuing the appropriate security credentials.   As explained by Joe Lawless:  "I had a program in place to make sure that

---

[22] *Id.*
[23] "Facing Terror/Air Travel/Safety Issues; Massport Records Detail Security Breaches." *The Boston Globe.* September 16, 2001. See also U.S. General Accounting Office, *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), 2. MR_AVSEC00087947.
[24] "Facing Terror/Air Travel/Safety Issues; Massport Records Detail Security Breaches." *The Boston Globe.* September 16, 2001.
[25] "Security Study Called into Question." The Boston Globe. March  9, 2002, MR_AVSEC00095162-MR_AVSEC00095163.
[26] "Physical Security Assessment: Boston Logan International Airport for Massport" November 6, 2001, MP100646.
[27] "Physical Security Assessment: Boston Logan International Airport for Massport" November 6, 2001, MP100647.
[28] Id. MP100649

everyone had appropriate credentials [e.g., security badges] and that they received appropriate background checks  Q:  Did you do additional background checks over and above what the airlines and the screening companies were doing? A:  Yes, I did."[29]  Having taking on that responsibility to "screen the screeners," Massport (as well as United) bore responsibility for their failures on September 11, 2001.

## Security responsibilities and failures of United and Huntleigh under FAR 108 at Logan Airport on September 11, 2001

On September 11, 2001, Federal Aviation Regulation 108.9 required air carriers "to conduct screening. . . to prevent or deter the carriage aboard airplanes of any explosive, incendiary or a deadly or dangerous weapon on or about each individual's person or accessible property and the carriage of any explosives of incendiary in check baggage."[30] Persons wanting to pass through a screening point or board an airplane must undergo checkpoint screening.[31]

On September 11, 2001, the hijackers for United Airlines Flight 175 passed through the checkpoint at Logan at Terminal C.  That checkpoint was under custodial responsibility of United Air Lines, Inc. ("United"), who had contracted its screening duties to Huntleigh USA Corporation ("Huntleigh").[32]  By failing to stop the hijackers from carrying deadly and dangerous weapons through that checkpoint, United and Huntleigh violated FAR 108.9.

More specifically, as required by FAR 108, the purpose of the Air Carrier Standard Security Program ("ACSSP") was to prevent or deter aircraft hijacking, sabotage, and related criminal acts.  The security procedures, capabilities and facilities established by FAR 108 relate to the "screening of all passengers and other persons and all property intended to be carried in the cabin of airplanes or into a sterile area by weapon detecting procedures or facilities to prevent or deter the carriage of any explosive, incendiary, or other deadly or dangerous weapon aboard airplanes or into a sterile area."[33] The ACSSP states that United, as the air carrier, is responsible for the screening of persons, carry-on items and when required, checked baggage.

The Checkpoint Operations Guide (or "COG") is a standard operating procedures manual published by the Air Transport Association and the Regional Airlines Association to comply with the FAA's ACSSP.  The COG is designed to provide technical and administrative

---

[29] Joseph Lawless Deposition Transcript, pg. 133, lns.  11-21.
[30] Aviation Security System and the 9/11 Attacks Staff Statement No. 3, MR_AVSEC00165137-MR_AVSEC00165147.
[31] ACSSP as of 9/11/01, Air Carrier Standard Security Program, UAL026328-UAL026583.
[32] 9/11 Commission Records, Staff Monograph "Four Flights and Civil Aviation Security" (September 12, 2005 version); MR_AVSEC00131595-MR_AVSEC00131715.
[33] ACSSP as of 9/11/01, Air Carrier Standard Security Program, UAL026328-UAL026583.

guidance for passenger screening personnel, which in this case were hired by Huntleigh as United's agent for checkpoint security at Logan airport.[34]  The COG establishes duties and job instructions for individuals running and supervising the checkpoints. The guide also establishes a list of restricted items that are not allowed in the sterile area.

According to the COG on September 11, 2001, pocket utility knives with blades less than four inches long were not unconditionally allowed to be carried by a passenger on a U.S. commercial flight. If a screener detected a knife, either on the person or in the hand-held luggage, they were required, pursuant to the COG, to evaluate whether the knife was "menacing" and to use "common sense" to make a determination whether that knife could be a dangerous or deadly weapon.[35]  At no time was a passenger to be allowed to bring a knife on board a plane, even a utility knife, unless that knife was first evaluated and reasonably determined to be not menacing. The COG in no way prohibited the airlines themselves or the security companies from taking extra or additional precautions to safeguard the passengers they were required to protect.

Critically, under that regulatory framework, security checkpoint personnel are the last line of defense to stop hijackers with weapons from being introduced into the sterile area and boarding the aircraft.

Screening of the hijackers on September 11, 2001, occurred at Terminal C at Logan Airport. This terminal possesses twenty-five gate positions, three security checkpoints and three piers.  There was no CCTV system in place at Logan on September 11, 2001 to provide views of the screening checkpoints.[36] Nothing would have prevented those in charge of security at Logan from putting such additional safeguards in place.  There is a wealth of documentation that Massport and United Airlines -- who was under custodial responsibility for the screening checkpoint -- were aware of the ineffective operations of the screening at these checkpoints being operated by Huntleigh at Terminal C and that they had repeatedly directed to improve screening performance prior to September 11, 2001.[37]

Issues with efficiency and effective checkpoint security screening at Logan were well known among the aviation community prior to the events of September 11, 2001.  In the months prior to September 11, conflict ensued at Logan between managers who sought to reduce delays and boost economic development and security personnel seeking to reduce risks, especially at screening checkpoints.

---

[34] Checkpoint Operations Guide Standard Operating Procedures, H029589-H029710.
[35] Checkpoint Operations Guide, Section 5 – Weapons and Explosive Devices, UAL027329- UAL027490,.
[36] See Massport ASC – TSA11222
[37] See SSI Exhibit # 60 (no Bates stamp) Email from Rich Davis 5/22/01; TSA UAL 019174-RR; TSAUAL 019175 RR Letter from Kevin Nolan.

Security at Logan's checkpoints was abysmal.  At Logan, comprehensive assessments conducted by the FAA in 2000 at two of the checkpoints used by the hijackers found an undisclosed number of "security weakness or violations" and determined that metal-detection screening at those points fell "below the norm."  That same year it was reported that airline screening failed to detect dangerous devices at least 20 percent of the time. Such tests were conducted with staged FAA approved test items.[38]  Deficiencies of the checkpoint security and airport security were widely known and published in GAO reports by the U.S. government, FAA test reports and FAA inspections.

In May 2001, Boston's Fox 25 News Channel conducted a series of videotaped tests of the security systems in place at Logan.  On May 6 2001, only days after Lawless sent the memo to Buckingham, WFXT broadcast the investigative report - *Getting Past Airport Security* - by Deborah Sherman. Brian Sullivan, a retired FAA Risk Management Specialist, and Steve Elson, a retired FAA Red Team leader, assisted in the investigation. After retiring from the FAA in January 2001, Sullivan said he sought to expose what he called "the façade of aviation security that existed at Logan prior to the terrorist attacks."[39] With a hidden camera, the news team recorded 65 serious security failures and violations at Logan.

"A Channel 25 employee with a knife under his clothing got through all security checkpoints at Logan Airport," *The Boston Herald* reported. "Screeners thought his belt buckle was setting off the detectors. Another employee in a wheelchair had a metal box strapped to her back that went undetected. It could have been a bomb."[40]

In the investigative report, Lawless declared something would be done immediately in response to the security deficiencies, and he said he would bring the concerns to the attention of the airline companies.

Indeed Joe Lawless, Director of Public Safety for Massport at Logan on September 11, 2001, specifically testified in his deposition in this case that he was, "motivated. . . to enhance the security operation of the security checkpoint . . .because I knew that security checkpoints were weak, and I knew that Fox 25 broadcast it and put this information out into the public realm."[41]  Hence Boston's Fox 25 News Channel report in May 2001 contributed to his, "growing sense of concern about aviation security from terrorist" targeting Logan. [42]

Lawless attempted to enhance the security at Logan on multiple occasions.  Recognizing the obvious flaws in the security system at Logan, Lawless voiced his concerns regarding the possibility of a terrorist attack with officials at Logan.  Lawless worked extensively with

---

[38] SSI Exhibit # 60/ TSAUAL 019174-RR; TSAUAL 019175-RR; TSAUAL 019176-RR.
[39] *Aviation Insecurity*. Andrew R. Thomas. Amherst: Prometheus Books, 2003 (p. 61).
[40] "TV Plus; Clickers; Security Reports Find New Life." *The Boston Herald*. October 7, 2001.
[41] Lawless Deposition Transcript, pg 136, ln 10-22.
[42] Lawless Deposition Transcript, pg 137, ln 2-3.

various organizations to attempt to enhance security at Logan.[43]   He would often hold consortium meetings to make the air carriers and screening companies aware of current events and changes in security issues at Logan.  These consortium meetings were attended by representatives from United.  In fact, Lawless was so concerned with security at Logan that he sent a detailed memo to Executive Director Virginia Buckingham on April 27, 2001, warning that airports were historical targets of terrorists and pointed to an increasing threat to Logan. Lawless "called for immediate attention to vulnerabilities at Logan, including at security checkpoints, according to airport officials."[44]

As evidence of a growing terrorist threat, Lawless cited the thwarted plan to bomb Los Angeles International Airport during the millennium celebration and law enforcement information about suspected terrorists operating in Boston, including some with links to the airport.

Lawless requested a meeting with Director Buckingham to discuss the security vulnerabilities. But she declined to meet with Lawless and handed off the meeting to her deputy, Russell Aims. Instead of focusing on security problems at the airport, Aims chastised Lawless for putting his security concerns in a written memo, according to *The Boston Globe.* Aims also reportedly stated the security issues raised by Lawless were being addressed in the security assessment by CTI.

It was widely known that the existing checkpoint screening efforts were inefficient and ineffective.   The airport, while not required to do so, attempted to conduct its own checkpoint security tests and inspections – but the airlines objected to these tests so the practice was discontinued.   For instance, as discussed above, Joe Lawless specifically proposed taking steps to enhance checkpoint security at Logan after the May 2001, Fox News Report exposing weaknesses in those security checkpoints—but that proposal was blocked because the airlines and others objected.[45]  Even after the findings of tests such as the – GAO reports, the Gore Commission findings and other professional commentary – were published, the security screening efficacy declined.

The hijackers on September 11, 2001, took the path of least resistance within the airport, through the checkpoint security.   The fundamental problem is that United and its agent Huntleigh failed to conduct effective checkpoint screening to stop the hijackers from

---

[43] Deposition of Joseph Lawless, March 30, 2007, pg 87, ln 13-21.
[44] Letter to Virginia Buckingham from Joseph M. Lawless Subject: Airport vulnerabilities , 4/27/2001, MP100700-MP100702 "See also SSI Exhibit # 60 HUSA 004355 (6/1/01); TSA 7056 (3/27/00); MP100714 ACS-50 Results (10/10/01); Email from Hussey to Julie Tejeda re meeting with FAA, UAL, HUNTLIEGH, appearing immediately after TSAUAL 019176-RR (discussing security failures at Logan); See also, TSA UAL1019174-RR (explaining that security failure rates at Logan "continue at an industry high").
[45] Joseph Lawless Deposition, pg 146, ln 11-13.

bringing deadly and dangerous weapons through the checkpoint and aboard Flight 175. As United's agent, Huntleigh employed the screeners who were the last line of defense at the checkpoint to thwart the terrorists and prevent any deadly or dangerous weapons from entering the sterile area or the aircraft.  Huntleigh's training of the checkpoint screeners was sub-par at best.[46]  Testimony in this case shows that the employees on duty at Logan airport on September 11, 2001 were working for slightly above minimum wage.  In breach of FAR 108, many of these personnel had limited English language skills. Many exhibited a lack of understanding of what constituted a threat or prohibited device.  Those industry screeners with limited experience were widely known by me and others in the aviation security industry, to fail to recognize weapons at the checkpoints in tests performed by the FAA time and time again.[47]

In fact, Logan's screener turnover rate of 207 percent was fourth among the 19 major airports studied by the GAO from in 1998 and 1999, behind St. Louis, Atlanta, and Houston.[48] Massport officials recognized the systemic security issues at Logan and wanted to enhance checkpoint security operations.  Mr. Lawless observed the poor performance that was occurring at the security screening checkpoints. "Airlines are not in the security business. They award security contract service to the lowest bidders.  Security employees are generally low wage, low skilled."[49]  As discussed above, in mid-May 2001, Lawless and Massachusetts State Police Major John Kelly had announced at a public safety staff meeting that they were going to conduct undercover tests of security checkpoints.

Specifically, Lawless proposed using four or five plainclothes police and staff to try to sneak weapons past the screeners. Although FAA had conducted standard tests to measure the performance of the screeners; Special Assessments using red teams had not been conducted the previous two years, according to The 9/11 Commission Report.[50] Standard tests can be of dubious value because screeners are often tipped off about the tests and the test items - a gun encased in plastic, a dummy grenade, and three sticks of dynamite wrapped with wire and a clock - are overly obvious.

Ample reasons exist for Lawless wanting to collect current data on the airport screeners. WFXT had recently recorded dozens of security failures and violations. In 1999, Massport was fined $178,000 for 136 security violations at Logan Airport—three times the national average. Most of the violations involved baggage and passenger screeners, who routinely failed to detect test items, such as pipe bombs and guns, hidden in bags carried by special agents.

---

[46] TSAUAL 019175-RR; TSAUAL 019176-RR
[47] Id.
[48] "Airport Screeners Must Be Federalized." The Boston Globe. October 5, 2001.
[49] Joseph Lawless deposition at p. 67, line 17.
[50] The 9/11 Commission Report (p. 451). MR-AVSEC80834.

The tests proposed by Lawless would have provided critical new data to determine if the weaknesses still existed. Lawless may also have been concerned about the impact of the Guaranteed Passenger Standards program on airport security. The airlines faced retribution if passengers waited in line more than five minutes at checkpoints. To me, as an aviation security expert, the questions arise: were the airlines therefore only minimally checking passengers? Was security being compromised for efficiency? The answer to those questions is: yes.

Before the tests at Logan could proceed, Lawless' plan had to be reviewed by the Logan Airlines Managers Council (LAMCO) - an organization consisting of airlines' representatives and airport security personnel. In 1996, President Clinton signed an executive order requiring the nation's largest airports to create independent "security consortiums" to identify and act on security and safety concerns. Logan did not create such a consortium and instead received permission from the FAA to use LAMCO instead.

At a meeting on July 11, 2001, LAMCO objected to checkpoint testing by Massport. "They were very vocal in their disapproval," said Jose Juves, Massport Director of Media Relations.[51]

Carter Bibbey, manager of Globe Aviation Services, which at the time provided screeners for American Airlines, said his company did not want its employees to be forced to detect test weapons that were different than the standard test items used periodically by FAA agents to measure screener performance. "We didn't want everyone testing us without knowing what to look for exactly," Bibbey explained in an interview. "We don't need people improvising test pieces to purposely make people fail."[52] This leads me to the conclusion that the screeners were not really screening, but rather only looking for items that conformed to the outdated FAA test objects - - thus not really performing screening.
The airlines also were worried about who would have access to the results of the tests and whether they would be shared with the FAA, *The Boston Globe* reported. As a result of the protests by the airline managers, this proposed testing program by Lawless was scuttled.

Effectiveness of the checkpoints hinged on the efficacy of the screeners and their training. Airlines contract the security portion of their duties to third party contractors, who in turn hired people who were not sufficiently trained to be screeners for security. These were unskilled, untrained personnel.

---

[51] "Massport Rejected Security Request; Airlines Dismissed Tougher Measures." *The Boston Globe.* December 7, 2001, MR_AVSEC00145280-MR_AVSEC00145281.
[52] "Fighting Terror Sense of Alarm; Airlines Foiled Police Logan Probe," *The Boston Globe.* October 17, 2001.

Notable causes for screeners' performance problems include the rapid turnover rates. At Logan, the turnover rate for screeners was at one point, 400%. High turnover in some cases was attributable to low wages. Many screeners went to work for airport concessions because the wages were higher. Repetitive, monotonous yet stressful tasks have been documented to degrade screener performance. [53]

One of the most basic tools of checkpoint security is the ability to question passengers. On September 11, 2001, this was supposed to be one of the primary skills possessed by screeners. The Federal Aviation Regulations had been modified to require a minimum fluency in English. Specifically, under FAR108.31 a(2)(v), screeners must have: "The ability to read, speak, and write English well enough to: (i) Carry out written and oral instructions regarding the proper performance of screening duties; (ii) Read English language identification media, credentials, airline tickets, and labels on items normally encountered in the screening process; (iii) Provide direction to and understand and answer questions from English-speaking persons undergoing screening."[54] After reviewing the various depositions of the screeners that were on duty, it is obvious that many of the screeners who were working the checkpoint at Terminal C at Logan on September 11, 2001 had difficulty communicating in basic English.

In sum, United and Huntleigh violated their security-checkpoint screening duties under FAR 108 at Logan on September 11, 2001.

## Known Weaknesses and Threats to Aviation Security at Logan Airport and in the United States on and before September 11, 2001

Indeed, in addition to the well-known security weaknesses at Logan, the aviation security industry was well aware that civil aviation in the United States throughout the 1980s and 1990s was a target of terrorists, e.g., the 1994 plot to attack Philippines Airlines Flight 434, the 1995 Bojinka plot to blow up 12 airliners, and Osama Bin Laden's declaration of war against America in 1996. In light of that known threat, United and Huntleigh had the duty to act reasonably in implementing effective checkpoint screening at Logan. They failed at this duty as the terrorist were able to carry weapons through the screening checkpoint and ultimately aboard United Flight 175.

Any person in the aviation security community prior before September 11, 2001 knew of that threat by terrorists bent on attacking U.S. civil aviation. My involvement with various

---

[53] See U.S. General Accounting Office, *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), 2. MR-AVSEC00087947.("Screeners are not adequately detecting dangerous objects, and long-standing problems affecting screeners' performance remain, such as the rapid screener turnover and the inattention to screener training.")
[54] FAR §108.31 (in effect on September 11, 2001) MR_AVSEC00168366-MR_AVSEC00168458.

airports and the FAA charged me with responsibility for the development, design, and implementation of aviation security systems. The threat posed to U.S. civil aviation by terrorists in particular was well known to me at the time and also well documented throughout the civilian aviation community.[55] There was a threat of terrorists hijacking planes as well as bombing planes and using planes as weapons. Moreover, much was discussed in the aviation security community in the 1990s about the changing nature of terrorists – their capabilities going from hijacking an aircraft with a knife to using sophisticated explosives. Moreover, as shown by their ability to take over aircraft, like the TWA aircraft, like the Bojinka plan, like the Air France hijacking, we knew that terrorists were gaining knowledge throughout the 1980s and 1990s on how to operate aircraft. Indeed, United Airlines, as a member of that AVSEC committee, knew that the terrorists were learning how to operate aircraft and had the clear desire to attack aviation targets in America.

Indeed, Joe Lawless, as Director of Public Safety for Massport at Logan, testified that he received Information Circulars (as did others in the aviation community) regarding Islamic extremist terrorists. These circulars increased his awareness of the need for security at Logan.[56] Consortium meetings were called to discuss prevalent issues relating to security at the airport. For instance, Joe Lawless announced at the Logan Airport Manager's Council (LAMCO), consisting of airline managers and tenants at Logan, at a meeting in April 2001 that he intended to begin testing checkpoints to enhance security at Logan.[57]

The weaknesses in the system at Logan were well documented. "When things start breaking down like that, then you're breaking down the security of the airport."[58] Most of the information regarding airport and aviation security was open source, public information. Deficiencies in Logan's checkpoint security and airport security were widely known. The GAO reports, FAA tests, FAA inspections and reports from aviation safety commissions all showed that checkpoint security at airports, including Logan, were so deficient as to constitute systemic failures of civil aviation security.

Indeed, just two weeks before September 11, 2001, Ben Hartman, a reporter with *The Boston Phoenix,* a weekly Boston publication, tested the security at Logan Airport. Twice he was able to walk through metal detectors with his cell phone; once at a United Airlines gate, and the other time at the gate for Delta Airlines. The reporter also handed a guard his cell phone, then cleared the metal detector. Without checking the phone by turning it on or sending it through the X-ray machine, the guard handed it back to the reporter.[59]

---

[55] See footnote 37 above.
[56] Joseph Lawless Deposition, pg. 81, ln 17.
[57] Joseph Lawless Deposition, pg 130, ln 3-25
[58] Fox News report – 13 investigations after 65 violations.
[59] "Logan Airport Security? What Security? *The Phoenix.* September 11, 2001.

In light of those known weaknesses and threats to aviation security at Logan on and before September 11, 2001, security at Logan was insufficient and ineffective. Indeed, it is my opinion that airport security at Logan was in such an abysmal state on September 11, 2001, as to constitute a systemic failure.

**Affirmation**

The discussion and analysis above and supporting exhibits constitute my expert report and my expert opinions.

This expert report and the opinions stated herein are subject to refinement or revision based on any other new information that may be discovered or provided to me. This includes, but is not limited to the opinions of other experts, additional documents and data, and/or further analysis of the documents, data, facts, or materials described above.

Respectfully Submitted,


Michael K. Pilgrim

EXHIBIT A

**_Michael Kent Pilgrim_**
**1744 Atoga Ave.**
**McLean, VA 22101**
**(703) 536-1962**
**e-mail mkpilgrim2011@gmail.com**

**SPECIFIC RELATED EXPERIENCE:**

Mr. Pilgrim is an independent consultant specializing in design, installation and management of program efforts in security and communications systems. He has over 35 years experience managing design, installation and construction of complex multi-disciplinary systems projects.   In the last 10 years he has been responsible for the management and support for over $100 million in systems installation and construction projects.

Mr. Pilgrim is a recognized industry expert in the development of specifications and bid documents, specification evaluation, design and installation management of major automated security programs, including aviation, port and harbor, government and private sector security systems.   Mr. Pilgrim has extensive experience in conducting surveys, user requirements analyses and the development of security plans for airports.

I currently hold the position of Senior Project Manager at Science Applications International Corporation Surveillance and Security Division specializing in design, installation and management of program effort in port and aviation security and communications systems.

Mr. Pilgrim served as a Senior Project Manager for SAIC Surveillance and Security Division specializing in design, installation and management of program efforts in security systems.  He was actively engaged in the development and modification of the Port of Los Angeles Prot Police Security Surveillance System Concept of Operations.   He has extensive experience in the specification, design and installation management of major automated security programs, including aviation, port and harbor, government and private sector security systems.  He most recently developed security specifications for the Ras Laffan LNG facility perimeter and internal security systems.  Based upon the approved specification design, Mr. Pilgrim developed a bid package for completive procurement.   He then headed a team to evaluate and recommend award to the successful bidder.

Mr. Pilgrim served as Senior Security Consultant to the Director, Homeland Security Division for the Port of Los Angeles.  He was responsible for the review and integration of CCTV and access control elements of the Port's Waterside Security Surveillance System. This project involved the implementation of a complete situational awareness center including CCTV video analytics employing analytics at the edge camera devices and the development and application of video management storage methodologies and technologies for over 60 Terabytes of storage.  He was also

responsible for the development of Performance Based Specifications for additional CCTV and security related systems in support of DHS grants for the Port's Homeland Security Division.

Mr. Pilgrim served as Director of Security Assessments for Unisys World Wide Public Sector. Prior to this assignment he completed a security analysis for the government of Jordan and the Aqaba Special Economic Zone including the eight separate port facilities comprising the Port of Aqaba, the King Hussein International Airport, three international border crossings and the Economic Zone border control points. Mr. Pilgrim developed high level system requirements for the security infrastructure including providing rough order of magnitude cost ($200M+) and delivery schedules. Mr. Pilgrim's work led to an audience with King Abdullah II during which the program deliverables were briefed and funding strategy developed. He was also involved in an analysis of the security of selected NATO $C^3I$ aviation facilities in Europe.

As Director, Aviation Security Programs, for Unisys he served as the lead technical consultant for the development of a national-level Aviation Security Master Plan for 23 airports in Southwest China. Mr. Pilgrim was the project director for the evaluation and improvement design for airport security systems for the Prague International Airport. He was also the lead technical security analysts for a confidential Transportation Security Agency (TSA) research and development project at Centennial Airport.

Mr. Pilgrim was responsible for the design, engineering and installation of a $34 million (US) airport security system at the new Kuala Lumpur International Airport. He managed of a team of expatriates & local security engineering specialist, including over 180 local technicians, systems experts, and CCTV specialists. He was responsible for the day-to-day interface and coordination with more than 50 independent Contractors, Consultants, and Client representatives, on the $2.6 Billion (US) construction project. In this capacity Mr. Pilgrim was responsible for the design and installation of the airport security network, which includes over 1,800 access control devices, more than 1,400 CCTV cameras, a complete on-line video badging system, perimeter intrusion systems, and 47 remote monitoring stations.

The Security network operates over a complete redundant fiber backbone security network, with connectivity to 54 buildings, integrating 286 satellite equipment rooms with 1200 km of cabling. He was directly responsible for the overall supervision and approval of all electrical, mechanical, security system submittals, shop drawings and final test and acceptance programs. Mr. Pilgrim exercised full administrative and operational responsibility for project budget and schedule management as well as the management of all subcontractor-client scheduling.

Mr. Pilgrim served as Program Manager for the design, management and implementation of the Seattle-Tacoma (Sea-Tac) International Airport Security Master Plan Program for URS Corp. He was directly responsible for development of system specifications and design for the five year, $21 million, airport Access Control System renovation program. Mr. Pilgrim served as the primary point of contact for the airport regarding the system upgrade and managed a team of aviation systems engineers. He was responsible for all program management activities.

Mr. Pilgrim previously directed Continuity and Contingency Planning Activities for the Metropolitan Washington Airports Authority, which manages DCA and IAD. He was responsible for the design of exercises and drills to test and validate continuity programs for both airports and the Authority. He was directly responsible for the development of Contingency Plans and Policies and coordination of the Continuity Program with all elements of Airport Management, Airport Operations and Public Safety. He was also involved in the conduct of systems analysis of Security, Passenger Screening and Airport Operations Systems for Y2K Compliance. Mr. Pilgrim directed the development of Renovation, Validation and Contingency Plans and Programs for system remediation and compliance.

Prior to this assignment he was responsible for the design, engineering and installation of a $34 million (US) airport security system at the new Kuala Lumpur International Airport. Mr. Pilgrim managed of a team of expatriates & local Malaysian security engineering specialist, including over 140 local technicians, 17 expatriate systems experts, and 28 foreign CCTV specialists. He was responsible for the day-to-day interface and coordination with 35 Contractors, 21 Consultants, and the Client's representatives on the $2.6 Billion (US) construction project.
Mr. Pilgrim was responsible for the design and installation of the airport security network, which includes over 1,800 access control devices, more than 1,400 CCTV cameras, a complete on-line video badging system, perimeter intrusion systems, and 47 remote monitoring stations. The Security network operates over a complete redundant fiber backbone security network, with connectivity to 54 buildings, integrating 286 satellite equipment rooms with 1200krn of cabling. In this capacity he was directly responsible for the overall supervision and approval of all electrical, mechanical, and security system submittals, shop drawings and final test and acceptance programs. Mr. Pilgrim exercised full administrative and operational responsibility for project budget and schedule management as well as the management of all subcontractor-client scheduling.

At Dulles International Airport (lAD), Mr. Pilgrim exercised direct responsibility for $3.5 million system installation and maintenance program. His responsibilities included complete subcontract management and scheduling, development and implementation of all system test and evaluation, system design evaluation and approval, and subcontractor management.

He was also responsible for the on-site Operations and Maintenance program and O & M staffing. Mr. Pilgrim managed the review and approval of all system specifications, submittals, change orders, field orders and directives. He was responsible for CCTV system design, installation and maintenance, intrusion system design and installation, security system programming and integration and the supervision of the Security System Quality Control program.

Mr. Pilgrim managed a $1.2 million airport system upgrade and system maintenance project at Washington National Airport (DCA). This project included system design, integration and installation, subcontract management, scheduling and system test and evaluation. He was directly responsible for all system design evaluation and approval, subcontractor management and approval of all system specifications, submittals, change orders, field orders and directives. Mr. Pilgrim also managed the CCTV system upgrade design, installation and maintenance and was responsible for the management of prime contractor and subcontractor Quality Control programs.

Additional Airport experience includes serving as Project Manager for the FAA mandated, FAR 107.14 security upgrade projects at Seattle-Tacoma International Airport (Sea-Tac) , Dulles International Airport, San Diego International Airport, Spokane International Airport, and Pasco Tri-Cities Airport. These assignments included management of systems design, the development, publication and competitive, public bidding of the installation and construction programs and coordination of FAA approval of the projects.

He has also been involved in security systems analysis and design for Anchorage Alaska International Airport, Boise International Airport, Santa Barbara Municipal Airport, and seven (AZO, DET, FNT, LAN, TVC, GRR, & MBS) Michigan airports. This experience includes the development, submission and FAA approval of nine Airport Security Plans, Programs and Amendments. Mr. Pilgrim has also provided independent analysis and served as a security system consultant and expert analyst for several litigation efforts involving airport security system installation programs including, Atlanta Hartsfield (ATL) , Salt Lake City (SLC), Cincinnati (CVG), Raleigh Durham (RDU), Nashville (BNA), Knoxville, (TYS) and Charleston (CHS).

Mr. Pilgrim has extensive experience in project management, engineering proposal development and marketing.

Mr. Pilgrim has served as Vice President, Security Systems for Smith Automation Systems, Inc. In this capacity he was directly responsible for the development and start-up of a basic engineering systems company. In the first twelve months of operation, Mr. Pilgrim was responsible for the marketing and execution of programs totaling more than $2.3 million in revenues and engineering design and construction projects totaling more than $7 million. Mr. Pilgrim also managed the day to day operations of all airport projects, engineering and design staff personnel, construction budgets and installation schedules. This experience included the development, publication and competitive, public bidding of four construction projects and the development of materials for AIP funding and FAA approval of airport construction projects. In similar capacity, Mr. Pilgrim has served as Manager, Security Systems and Analysis for the BDM Engineering Services Company and West Coast Manager for Ross & Baruzzini, Inc., Engineers & Architects.

In related program areas, Mr. Pilgrim was responsible for assisting the Department of Energy, in evaluation of a wide range of systems requirements, plans, and procedures necessary to evaluate security effectiveness. He also directed a dedicated project team to support the development of computer security programs and policies for the Office of Safeguards and Security. Mr. Pilgrim has provided support for the design, evaluation, and implementation of security programs and techniques to protect special nuclear materials and classified data against diversion, theft, sabotage and espionage.

Mr. Pilgrim was also responsible for a study of the vulnerabilities of eight U. S. resource systems to terrorist attack. These resources included energy systems (i.e., electrical and nuclear power, petroleum and natural gas), financial systems, and telecommunications systems. He analyzed these systems for their potential vulnerabilities to threats employing conventional explosives and

4

sophisticated chemical, biological, and nuclear weapons. In the course of this study, performed for the Federal Emergency Management Agency, Mr. Pilgrim also analyzed the U.S. Continuity of Government program and the capabilities and state of readiness of U.S. Executive Branch agencies to mitigate the consequences of terrorist activities.

Mr. Pilgrim directed efforts to develop a national personnel database system for the Department of Defense, Defense Investigative Service, under direction of the Personnel Security Research Center (PERSEREC). Mr. Pilgrim also designed and developed an executive-level training program in Computer Systems Security for Senior State Department personnel worldwide.

He was responsible for directing program efforts for the design, development, and certification of automated systems for the Department of Energy, Deputy Assistant Secretary for Intelligence. He also managed the design, development and integration of several internationally distributed data base systems.

Mr. Pilgrim was responsible for a hardware and software analysis program for the Air Force Office of Special Investigations. This program included conducting an overall requirements analysis and the analysis and development of a variety of specialized systems including message handling, security, database management and electronic mail systems and their related hardware and software requirements.

Mr. Pilgrim managed a program to analyze the application of content analysis methodologies to specific political risk situations and analysis of the feasibility of computerization of existing content analysis methodologies.

He has applied specialized experience in database design and development on a variety of projects including the development of an extensive database on the effects of the Caribbean Basin Initiative on foreign investment in the area. This program developed a methodology for identifying and analyzing key indicators of elements that contribute to foreign investment attractiveness and developed a series of economic profiles of the Caribbean Basin countries.

Mr. Pilgrim also has extensive experience in the identification, tracking and disruption of international money laundering operations.

In other areas Mr. Pilgrim was involved in the development and presentation of a wide variety of training courses related to the inspection and monitoring of Chemical and Biological agents for the Chemical Biological Weapons Treaty. These activities include the development and testing of inspection procedures in support of the U.S. On Site Inspection Agency. Mr. Pilgrim also served as the Project Task Leader for a program requiring the identification, testing and procurement of state-of-the-art Chemical Weapons Security Systems.

Mr. Pilgrim participated in initial analysis of the security of European weapons storage facilities and ready sites. He was involved in the development of security upgrades and improvements for these facilities. He has also been involved in the subsequent analysis and development of Operations Security procedures for these and other critical weapons systems and logistics elements.

5

Mr. Pilgrim was a senior analyst for a special access program where he developed a training program in Consequence Management for the Federal Emergency Management Agency. This program required coordination with all federal government agencies from the White House through the DOD and major elements of the Intelligence community.

He was the principal author of the chapters of Indicators and Warnings (I&W) for Terrorism and I&W Methodologies for the Defense Intelligence School's Indicators and Warning textbook. He was also involved in the development of a security training program and SWAT training for a 300-man security force employed at the Department of Energy's Savannah River Plant.

As Program Manager for a joint Navy-DNA study of U.S. and Soviet Navy Theater Nuclear Warfare (TNW), doctrine and training Mr. Pilgrim was responsible for analysis of U.S. TNW tactics, doctrine and policy, as well as Soviet nuclear and chemical warfare (CW) threats. The objectives of this study included the development of a Navy/Marine Corps TNW awareness and training program. This program also addressed fleet vulnerabilities to TNW/CW environments and development of a systems approach to battle group tactics and operations in TNW/CW environments.

Mr. Pilgrim served as the Program Manager for a Department of Energy (DOE) program to evaluate the security of critical facilities and to develop deterrence strategies. This project represents a pioneer effort in the application of behavior analysis of adversary characteristics to the development of deterrents. In addition, he served as principal investigator for a program to analyze and implement a computerized sabotage vulnerability methodology for the Idaho National Engineering Laboratory.

He has also been engaged in the development of measures of effectiveness and testing procedures for shipboard nuclear weapons security systems, and has developed recommendations for alternative equipment to be employed by shipboard nuclear security response teams.

Mr. Pilgrim has also directed the development of a series of security and contingency plans and procedures for a Nuclear Generating Station. In addition, he provided expert opinion for litigation including other sensitive aspects of the facility's security program and training. He also served as the project director for the development of another facility's Nuclear Power Plant Security Plan. Mr. Pilgrim has also served as program and project director for a wide spectrum of security and terrorism related studies.

He developed threat and vulnerability analyses for a program to identify security aspects of the Strategic Petroleum Reserve (SPR) facilities. He was also responsible for the analysis of policy issues and legal restraints involving the use of deadly force in the implementation of an integrated security system for SPR storage complexes. Mr. Pilgrim also contributed to threat spectrum and security analyses of the Nonproliferation Alternative Systems Assessment Program (NASAP) for the Department of Energy. He also developed diversion scenarios for potential light water reactor spent-fuel storage facilities, and has examined the potential for diversion of spent nuclear fuel and high level waste from long-term geologic repositories.

Mr. Pilgrim has been responsible for several feasibility studies in the security training field and the development of security and counter-terrorism training programs. He has also participated in several criminal justice seminars dealing with the legal aspects of the use of force, federal civil rights programs, and federal regulations concerning physical security for nuclear facilities.

Mr. Pilgrim has extensive experience in the conceptualization, design and evaluation of physical security plans and systems. He has assisted in the development of security design requirements for an international combined Theater Headquarters facility. He was also a key technical contributor to the preparation of the Site Security Personnel Training Manual (NUREG 0464) and several threat analysis studies for the Nuclear Regulatory Commission.

**EDUCATION:**
Georgetown University, Graduate study 1980 - 1982, 1987
Franconia College, Graduate study 1972- 1974
College of William and Mary 1969 - 1972
Old Dominion University 1968-1969
Petroleum Security Program ASIS Certification
Nuclear Quality Assurance Auditor Certification

**Years of Related Professional Experience: 35**

**Corporate Affiliations:**

**Corporate Affiliations:**

| | |
|---|---|
| Dynamis | 2010 - Present |
| Science Applications International Corporation | 2008 - 2011 |
| Unisys Corp | 2003 - 2008 |
| PSI (State Dept. Contract Afghanistan) | 2002 - 2003 |
| Gage Babcock, Inc. | 2001 - 2002 |
| URS Corporation (Consultant) | 2000 - 2001 |
| Big Sky, Inc. | 1997 - 2000 |
| Securacom, Inc | 1994 - 1996 |
| Smith Automation Services. | 1991 – 1994 |
| EAI | 1990 - 1991 |

| | |
|---|---|
| Ross & Baruzzini, Inc., | 1989 - 1990 |
| BDM Engineering Services Company, | 1987 - 1989 |
| ISC/MMPA, Inc., | 1986 - 2008 |
| Defense Systems, Inc., | 1984 - 1986 |
| The BDM Corporation, | 1980 - 1983 |
| Science Applications, Inc., | 1978 - 1980 |
| Operational Systems, Inc., | 1977 – 1978 |

**PROFESSIONAL AFFILIATIONS:**
American Association of Airport Executives
American Society for Industrial Security
American Association for the Advancement of Science
American Defense Preparedness Association
Association of Former Intelligence Officers
Internal Association of Chiefs of Police
Military Operations Research Society
U.S. Naval Institute

EXHIBIT B

**M. K. Pilgrim**

**BIBLIOGRAPHY OF DIRECTLY RELATED MATERIALS:**

## Publications

"Financing International Terrorism," International Security Review, Volume VII, Number I (Spring 1982).

## Testimony and Conference Presentations

"SPETSNAZ - Soviet Special Purpose Forces," USMC Security and Terrorism Counteraction Conference, September 1986.

"SPETSNAZ - Soviet Special Purpose Forces," USMC Terrorism Counteraction Workshop, April 1986.

"Low Intensity Warfare - Terrorism and SPETSNAZ," DNA Threat Seminar, February 1986.

"Domestic Terrorism" Testimony before the Subcommittee on Security and Terrorism of the Committee on the Judiciary, United States Senate, February 1982.

"Effects of the Privacy and the Freedom of Information Acts on Law Enforcement Activities," National Workshop on Privacy, American Society for Industrial Security, July 1982.

"Establishing Audit Trails," Seminar on Hotel and Restaurant Security, American Society for Industrial Security, June 1982.

"Terrorism and Political Violence," a series of 6 lectures, 32 World Affairs Conference, Boulder, Colorado, April 1980.

"Terrorism and Law Enforcement Intelligence," University of Maryland, 1978.

## Corporate Projects

"Special Training Program for Shift Security Agents," Defense Systems, Inc., March 1986.

"Data Files and Code Books for DESIST System: State Support for Terrorism Database," Defense Systems, Inc., March 1986. (DESIST is an intelligence community computer system on terrorism.)

"Data Files and Code Books for DESIST System: Terrorist Groups Database," Defense Systems, Inc., March 1986.

"State Involvement in Terrorism Database," Defense Systems, Inc., April 1986.

"Security Plan and Program, DOE Intelligence Computer System," Defense Systems, Inc., August 1985.

"Security Plan for Shoreham Nuclear Facility," Defense Systems, Inc., June 1985.

"Caribbean Investment Patterns," Defense Systems, Inc., June 1985.

**M. K. Pilgrim**

**BIBLIOGRAPHY (CONTINUED)**

Page 2

"A Psychiatric-Political Analysis of Italian Left-Wing Terrorists," Defense Systems, Inc., May 1985.

"Functional Requirements Analysis, AFOSI," Defense Systems, Inc., May 1985.

"Analysis of Management Objectives in the Study of ADPE General Systems Design," Defense Systems, Inc., April 1985.

"Transition from Terrorist Event Management to Consequence Management," BDM/W-82-115-TR, The BDM Corporation, March 1982.

"Terrorism Indicators and Warnings (U)," (Chapter 11 Defense Intelligence School I&W Textbook), The BDM Corporation, March 1982.

"I&W Methodology (U)," (Chapter 6 Defense Intelligence School I&W Textbook), The BDM Corporation, March 1982.

"The PACOM TNF S3 Threat Handbook (U)," The BDM Corporation, January 1982.

"Development of Deterrence Strategies," BDM/W-81-470-TR, The BDM Corporation, September 1981.

"Measures of Effectiveness for Shipboard Nuclear Weapons Security Systems: Data Requirements for the

Shipboard Environmental Simulation Facility Systems (U)," Science Applications, Inc., 1980.

"Vulnerabilities of Financial Systems to Terrorism (U)," Science Applications, Inc., May 1980.

"Vulnerabilities of Natural Gas Systems to Terrorism (U)," Science Applications, Inc., April 1980.

"Strategic Petroleum Reserve Program, Security Aspects of SPR Crude Oil Storage Complex (U)," Science Applications, Inc., 1979.

"South Texas Generating Station Security Plans," Operational Systems, Inc., 1978.

"Site Security Personnel Training Manual (NUREG 0464)," Operational Systems, Inc., 1978.

EXHIBIT C

| Bates Page | Title |
|---|---|
| MRAVSEC00087846-<br>MRAVSEC00087859 | Statement of Gerald L. Dillingham to the National Commission on Terrorist Attacks Upon the United States April 1, 2003 |
| MR_AVSEC00135498-<br>MR_AVSEC00135566 | White House Commission on Aviation Safety and Security Final Report to President Clinton- Vice President Al Gore, Chairman |
| TSA10358-TSA1040 | Notice of Proposed Rulemaking Docket No. FAA-1999-5536/Notice No. 99-05 ; Security of Checked Baggage on Flights within the United States on 04/16/1999/ Vol. 64, No. |
| MR_AVSEC00131398-<br>MR-AVSEC00131426 | FAR 107.3 |
| UAL026328-UAL026583 | ACSSP as of 9/11/01, Air Carrier Standard Security Program |
| H029589-H029710 | Checkpoint Operations Guide Standard Operating Procedures |
| UAL027329- UAL027490 | Checkpoint Operations Guide, Section 5 – Weapons and Explosive Devices |
|  | Rush-Hour Rates Urged To Cut Delays |
| MR_AVSEC00131595-<br>MR_AVSEC00131715 | 9/11 Commission Records, Staff Monograph "Four Flights and Civil Aviation Security" |
| MP100399-MP100638 | Airport Security Program Restrictions and Changes |
| MP104126-MP104142 | Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority |
| MP100700-MP100702 | April 27, 2001, Letter to Virginia Buckingham from Joseph M. Lawless Subject: Airport vulnerabilities, Massachusetts Port Authority |
| TSA11222 | Massport ASC |
|  | SSI Exhibit # 60 (no Bates stamp) Email from Rich Davis 5/22/01; TSA UAL 019174-RR; TSAUAL 019175 RR Letter from Kevin Nolan. |
| MP104126-MP104142, | Massport - Impact Report Aviation Public Safety: State of Security for Logan International Airport, Massachusetts Port Authority |
|  | Tough Service Plan at Logan Causing Major Fallout with Carriers |
|  | DC Flight Delays Down; Area Airport Raise On-Time Figures." The Washington Times |
| MP102181-MP102182 | Boston Airlines' Airport Affairs Committee, February 23, 2001 Letter to Ed Freni, |
|  | Aviation Insecurity";"Boston's Logan International: A Case Study in Compromise |
|  | Facing Terror/Air Travel/Safety Issues; Massport Records Detail Security Breaches." The Boston Globe. September 16, 2001 |
| MR_AVSEC00095162-<br>MR_AVSEC00095163 | Security Study Called into Question." The Boston Globe. March 9, 2002, |
| MP100646 | Massport" November 6, 2001 |
|  | SSI Exhibit # 60/ TSAUAL 019174-RR; TSAUAL 019175-RR; TSAUAL 019176-RR. |
|  | TV Plus; Clickers; Security Reports Find New Life |

| | |
|---|---|
| MR_AVSEC00145258-<br>MR_AVSEC00145260 | Logan Security Head Issued Warning April Memo Noted Terrorist Activity |
| | SSI Exhibit # 60 HUSA 004355 (6/1/01); TSA 7056 (3/27/00); MP100714 ACS-50 Results (10/10/01); Email from Hussey to Julie Tejeda re meeting with FAA, UAL, HUNTLIEGH, appearing immediately after TSAUAL 019176-RR (discussing security failures at Logan); See also, TSA UAL1019174-RR (explaining that security failure rates at Logan "continue at an industry high"). |
| | Joseph Lawless Deposition Transcript, March 30, 2007 |
| | Fox News report – 13 investigations after 65 violations |
| MR_AVSEC00165137-<br>MR_AVSEC00165147 | Aviation Security System and the 9/11 Attacks Staff Statement No. 3 |
| UAL026328-UAL026583. | ACSSP as of 9/11/01, Air Carrier Standard Security Program |
| | TSAUAL 019175-RR; TSAUAL 019176-RR |
| | Airport Screeners Must Be Federalized." The Boston Globe. October 5, 2001 |
| MR-AVSEC80834 | The 9/11 Commission Report |
| MR_AVSEC00145280-<br>MR_AVSEC00145281 | Massport Rejected Security Request; Airlines Dismissed Tougher Measures." *The Boston Globe.* December 7, 2001 |
| MR_AVSEC00142611-<br>MR_AVSEC00142613 | Fighting Terror Sense of Alarm; Airlines Foiled Police Logan Probe," *The Boston Globe.* October 17, 2001 |
| MR_AVSEC00087947 | *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), |
| MR_AVSEC00168366-<br>MR_AVSEC00168458, | FAR §108.31 (in effect on September 11, 2001) |
| | A Tale of Two Airports." *Providence Journal-Bulletin* (Rhode Island) |
| | Safety in Numbers: Airlines Have Been Hiring Security Companies That Offer The Service at Rock-Bottom<br><br>Prices; Economy Is Numbers." *Dollars & Sense.* November 1, 2001 |
| MR_AVSEC00087947 | U.S. General Accounting Office, *Aviation Security: Vulnerabilities Still Exist in the Aviation Security System* (Washington, D.C.: U.S. General Accounting Office, 2000), |
| XC088408 | FAA Finds Logan Security Among Worst In Us FAA Data Show Security At Logan Ranks With Nation's Worst." *The Boston Globe.* September 26, 2001 |
| | Facing Terror/Air Travel/Safety Issues; Massport Records Detail Security Breaches." *The Boston Globe.*<br><br>16-Sep-01 |
| | SSI Exhibit # 60 HUSA 004355 |
| MR_AVSEC00131427-<br>MR_AVSEC00131459 | 14 CFR §108.9 |

| MR_AVSEC00088696-<br>MR_AVSEC00088698. | Aviation Security, Corrective Actions Underway, but Better Inspection Guidance Still Needed |
|---|---|
| MR_AVSEC00091010 | GAO Report – Aviation Security: Immediate Action Needed to Improve Security, August 1, 1996 |
| MR_AVSEC00165145 | 9/11 Commission Staff Statement No. 3, 2004 |
| | Boston-Logan International Airport; Monthly Airport Traffic Summary - December 2001 (1st Revision) |

# Exhibit E

# In The Matter Of:

*IN RE  SEPTEMBER 11  LITIGATION*

_____

### ROBERT J. CAMMAROTO
*February 11, 2008*

_____

# *HIGHLY CONFIDENTIAL/ CONFIDENTIAL SSI MATERIAL TC REPORTING in affliation with Merrill*

*25 West 45TH Street - Suite 900*

*New York, NY 10036*

*PH: 516-795-7444 / FAX: 212-692-9171*


**CAMMAROTO, ROBERT J. - Vol. 1**

HIGHLY CONFIDENTIAL

Page 126

1       ROBERT J. CAMMAROTO - CONFIDENTIAL SSI MATERIAL

11:34:14    2       A.    I don't recall any.

11:34:20    3       Q.    To the best of your recollection

11:34:21    4   was the domestic aviation security system on

11:34:25    5   Alert Level III throughout the year 2000?

11:34:28    6       A.    I believe it was, yes, sir.

11:34:31    7       Q.    Was the domestic aviation security

11:34:32    8   system also on Alert Level III throughout the

11:34:36    9   year 2001 prior to the morning -- prior to the

11:34:41    10  events of 9/11, 2001?

11:34:43    11      A.    I believe so, yes, sir.

11:34:44    12      Q.    Is it fair to say in the years

11:34:47    13  prior to 9/11 Alert Level III had as a practical

11:34:52    14  matter become the normal AVSEC operating level

11:34:55    15  for aviation security in the United States?

11:34:56    16          MS. HESSION:  Objection.

11:34:57    17          MS. VARGAS:    Objection to the

11:34:58    18  form.

11:35:00    19      A.    It had become the environment in

11:35:01    20  which we were operating for a prolonged period,

11:35:05    21  yes, sir.

11:35:07    22      Q.    What were the purposes or goals of

11:35:11    23  the AVSEC plan as set forth in Appendix XV to

11:35:15    24  the ACSSP?

11:35:18    25          MS. HESSION:  Objection.

HIGHLY CONFIDENTIAL

Page 127

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | ROBERT J. CAMMAROTO - CONFIDENTIAL SSI MATERIAL      |
| 11:35:18 | 2  | A.      There were several goals of having           |
| 11:35:20 | 3  | a contingency plan in the security program.  And     |
| 11:35:25 | 4  | this existed both in the Air Carrier Standard        |
| 11:35:28 | 5  | Security Program as well as in the individual        |
| 11:35:30 | 6  | airport security programs which were all             |
| 11:35:32 | 7  | different, whereas the carriers were largely the     |
| 11:35:34 | 8  | same.                                                |
| 11:35:34 | 9  | It was intended to give both                         |
| 11:35:37 | 10 | parties, the air carriers and airports insights      |
| 11:35:43 | 11 | into what measures the opposite party could          |
| 11:35:46 | 12 | potentially be called on by FAA to implement at      |
| 11:35:48 | 13 | various alert levels so they can be prepared to      |
| 11:35:52 | 14 | cooperate.                                           |
| 11:35:52 | 15 | It was intended to give each party                   |
| 11:35:54 | 16 | insight as to what sorts of measures they could      |
| 11:35:56 | 17 | be called upon at those alert levels to              |
| 11:35:58 | 18 | implement so that there could be allowances for      |
| 11:36:01 | 19 | budgeting for resource management, for training,     |
| 11:36:03 | 20 | for testing of capabilities, for establishing        |
| 11:36:09 | 21 | communications with off airport support such as      |
| 11:36:12 | 22 | EOD teams or law enforcement support.                |
| 11:36:17 | 23 | And it was intended to give                          |
| 11:36:18 | 24 | everybody, including the FAA, a good picture of      |
| 11:36:25 | 25 | about what level you could expect to go to in        |

85e00f9e-9052-4dce-91c1-83bd7bd4c8b6

HIGHLY CONFIDENTIAL

Page 128

|  |  |  |
|---|---|---|
|  | 1 | ROBERT J. CAMMAROTO - CONFIDENTIAL SSI MATERIAL |
| 11:36:28 | 2 | terms of measures vis-a-vis a specific |
| 11:36:30 | 3 | intelligence based alert level. |
| 11:36:32 | 4 | Q.    Was one goal of the AVSEC plan |
| 11:36:34 | 5 | system to ensure the FAA, airport operators and |
| 11:36:39 | 6 | air carriers would be able to respond on short |
| 11:36:41 | 7 | notice to civil aviation threats? |
| 11:36:42 | 8 | A.    Yes, sir. |
| 11:36:44 | 9 | Q.    Was the FAA, was the AVSEC plan |
| 11:36:48 | 10 | program designed to permit the FAA to target the |
| 11:36:53 | 11 | application of antiterrorist countermeasures to |
| 11:36:57 | 12 | perceived threats? |
| 11:36:58 | 13 | A.    Yes, sir. |
| 11:36:58 | 14 | Q.    Under Appendix XV of the ACSSP, who |
| 11:37:07 | 15 | had the responsibility to determine which alert |
| 11:37:09 | 16 | level should be in effect? |
| 11:37:11 | 17 | MS. HESSION:  Objection to the |
| 11:37:12 | 18 | form. |
| 11:37:12 | 19 | MS. VARGAS:   Objection to the |
| 11:37:13 | 20 | form.  Do you mean who person or what entity? |
| 11:37:16 | 21 | MR. PODESTA:   What entity? |
| 11:37:17 | 22 | A.    Within FAA we had an intelligence |
| 11:37:21 | 23 | function.  And it was their job to gather |
| 11:37:25 | 24 | intelligence from the intelligence community, to |
| 11:37:27 | 25 | analyze it as it relates to civil aviation and |

85e00f9e-9052-4dce-91c1-83bd7bd4c8b6

HIGHLY CONFIDENTIAL

Page 129

1        ROBERT J. CAMMAROTO - CONFIDENTIAL SSI MATERIAL
11:37:30    2    to determine where on the continuum of AVSEC
11:37:32    3    alert levels we fell at that point.  And then an
11:37:35    4    alert level would be established under authority
11:37:38    5    of the assistant administrator for Civil
11:37:41    6    Aviation Security.
11:37:41    7        Q.    Was it the FAA's responsibility to
11:37:43    8    determine which alert level should be in effect
11:37:46    9    not the airports or airports?
11:37:48    10    A.    Yes, sir, that's correct.  It was
11:37:49    11    the FAA's responsibility.
11:37:50    12        Q.    Under Appendix XV did the FAA also
11:37:54    13    have the responsibility to determine the
11:37:58    14    countermeasures to be applied under the AVSEC
11:38:01    15    contingency plans?
11:38:02    16            MS. HESSION:  Objection to the
11:38:03    17    form.
11:38:03    18            MS. VARGAS:   Objection to the
11:38:03    19    form.
11:38:03    20    A.    Yes, sir.
11:38:10    21        Q.    Under the AVSEC contingency plan
11:38:13    22    which entity had responsibility to determine
11:38:14    23    where and for how long those countermeasures
11:38:17    24    should be applied?
11:38:18    25            MS. HESSION:  Objection to the

HIGHLY CONFIDENTIAL

Page 130

| | | |
|---|---|---|
| | 1 | ROBERT J. CAMMAROTO - CONFIDENTIAL SSI MATERIAL |
| 11:38:18 | 2 | form. |
| 11:38:18 | 3 | A.    The Federal Aviation Administration |
| 11:38:21 | 4 | did that, sir. |
| 11:38:22 | 5 | Q.    In implementing the countermeasures |
| 11:38:25 | 6 | did the FAA consult with the airports and air |
| 11:38:28 | 7 | carriers to the extent it deemed appropriate? |
| 11:38:30 | 8 | MS. VARGAS:    Objection to the |
| 11:38:31 | 9 | form. |
| 11:38:33 | 10 | A.    Yes.  More so as the process went |
| 11:38:36 | 11 | on as you may know, Security Directive would be |
| 11:38:39 | 12 | issued in its initial state and then there would |
| 11:38:42 | 13 | be various iterations of it later on as a result |
| 11:38:44 | 14 | of discussions with the regulated parties in |
| 11:38:48 | 15 | terms of how effective the measures were, how |
| 11:38:50 | 16 | capable they were of sustaining those measures |
| 11:38:52 | 17 | and as we refine measures based on additional |
| 11:38:56 | 18 | intelligence that was developed. |
| 11:38:57 | 19 | Q.    Now was it the FAA that made the |
| 11:38:59 | 20 | final determination of what the countermeasures |
| 11:39:02 | 21 | should be? |
| 11:39:04 | 22 | A.    Yes, sir. |
| 11:39:07 | 23 | Q.    Now, I would like to refer you to |
| 11:39:08 | 24 | the second sentence of the third paragraph on |
| 11:39:13 | 25 | page of Appendix XV, AAL 06225 -- 060256 which |

TC REPORTING in affliation with Merrill Corp.,
(516) 795-7444

85e00f9e-9052-4dce-91c1-83bd7bd4c8b6

# Exhibit F

# In The Matter Of:

*IN RE: SEPTEMBER 11 LITIGATION  No. 21 MC 101 (AKH)*

_____

**THOMAS J. KINTON, JR.**
*January 25, 2011*

_____

## *CONFIDENTIAL*
## *TC REPORTING in Affiliation with Merrill Corp.*
### *1 DEERFIELD EAST - 1850*
### *QUOGUE, N.Y. 11959*

**KINTON, JR., THOMAS J. - Vol. 1**

THOMAS J. KINTON, JR. - 1/25/2011

Page 28

09:39:04  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

09:39:10  2   Lawless and Ed Freni, director of public safety and

09:39:14  3   director of aviation operations, as to what they knew

09:39:22  4   so far in the course of the investigation.

09:39:25  5        Q.   I just want to focus on that, sort of that

09:39:28  6   very beginning information, that first meeting.  What

09:39:31  7   did they tell you?

09:39:33  8             MR. WOOD:  Objection.

09:39:39  9        A.   I remember reviewing the manifest from

09:39:45 10   both flights, where they had highlighted the

09:39:51 11   perpetrators of the event.  Also, telling me they

09:39:55 12   had -- and state police were present, as well, I

09:39:59 13   believe -- that they had Mohamed Atta's bag that did

09:40:04 14   not connect on a flight from Portland, U.S. Airways

09:40:08 15   flight from Portland to Boston, connecting to 11.

09:40:13 16        So within an hour or so, they had Atta's bag,

09:40:18 17   and they told me the contents referencing the Quran and

09:40:24 18   two flight manuals for a 757 and 767, Boeing-type

09:40:24 19   aircraft.

09:40:27 20        Q.   Did they tell you anything else in the --

09:40:29 21   among the contents of the bag?

09:40:37 22        A.   That's all I recall.

09:40:39 23        Q.   And you said they had a manifest and had

09:40:43 24   highlighted the perpetrators.  Did they tell you how

         25   they knew?

THOMAS J. KINTON, JR. - 1/25/2011

Page 29

09:40:44  1         THOMAS J. KINTON, JR. - CONFIDENTIAL

09:40:46  2             MR. WOOD:  Objection.  Objection to the

09:40:51  3    form on the grounds that it's a compound question.

09:40:53  4         Q.   Just so you know, this will happen

09:40:57  5    periodically, and they will just state -- they have to

09:41:00  6    state objection, and we just keep going, unless your

09:41:02  7    counsel instructs you not to answer.

09:41:02  8         A.   I understand.

09:41:06  9         Q.   Okay.

09:41:07  10        A.   Question?

09:41:10  11        Q.   On the -- I can remember what it was.  On

09:41:12  12   the manifest, you mentioned that the perpetrators were

09:41:19  13   highlighted.  And you said somebody, either Mr. Freni

09:41:22  14   or Mr. Lawless, one of those gentlemen told you that

09:41:25  15   those were the perpetrators?

09:41:26  16        A.   Yes.

09:41:34  17        Q.   Did they tell you how they knew that?

09:41:37  18        A.   No.  Not specifically, other than, you

09:41:40  19   know, in conversations with the FBI.

09:41:43  20        Q.   Okay.  Now, you mentioned somebody from the

09:41:45  21   state police was there.  Do you recall who that was at

09:41:46  22   that meeting?

09:41:50  23        A.   No.  I really don't recall.  There were

09:41:54  24   many.  This briefing took place just outside the

          25   emergency operations center, so there were dozens of

THOMAS J. KINTON, JR. - 1/25/2011

Page 49

10:09:23  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

10:09:29  2   passenger left the screening checkpoint, did they?

10:09:30  3             MR. ROSS:  Objection to form.

10:09:31  4        A.   This was in the case where they lost

10:09:33  5   control of the passenger.  This would be a case where

10:09:38  6   the passenger left and a screener called their

10:09:42  7   supervisor, I think something was in that bag, and the

10:09:46  8   person looks like this, and is a female, male,

10:09:49  9   whatever, and has left the security checkpoint.  So,

10:09:51 10   yeah, that was certainly possible.

10:09:52 11        Q.   Were law enforcement officers called to the

10:09:55 12   checkpoint to make decisions on whether to confiscate

10:10:02 13   items?

10:10:08 14        A.   They very well could have been.  Yes.  If

10:10:12 15   something was illegal in the state of Massachusetts,

10:10:18 16   and it was seen, they certainly would confiscate the

10:10:23 17   item.  And, as I say, may even do more, based on what

10:10:36 18   the item was.

10:10:40 19        Q.   Well, you used brass knuckles as an example

10:10:44 20   a moment ago.  If a screener found brass knuckles, were

10:10:47 21   they supposed to call a law enforcement officer?

10:10:48 22             MR. FEAGLEY:  Object to the form and

10:10:48 23   foundation.

10:10:49 24             MR. WOOD:  Objection.

         25        A.   I don't know.

THOMAS J. KINTON, JR. - 1/25/2011

Page 112

12:09:34   1        THOMAS J. KINTON, JR. - CONFIDENTIAL

12:10:26   2        Q.   Okay.  In 2001 -- actually, I don't think

12:10:30   3   the data was all in before 9/11.  Let's use 2000.

12:10:35   4        In the year 2000, do you know the screener

12:10:40   5   turnover rate for Massport, Boston Logan Airport?

12:10:41   6             MR. WOOD:  Objection.

12:10:41   7             MR. BURTON:  Objection.  Form.

12:10:43   8             MR. FEAGLEY:  Objection.

12:10:44   9             MR. ELLIS:  Objection.

12:10:44  10        A.   No, I do not.

12:10:47  11        Q.   Do you know it for 2001?

12:10:47  12             MR. WOOD:  Same objection.

12:10:50  13        A.   I do not.

12:10:52  14        Q.   Is screener turnover rates something that

12:11:01  15   you examined before September 11, 2001?

12:11:04  16        A.   I -- personally, no.

12:11:06  17        Q.   How about anybody on your staff?

12:11:09  18        A.   My staff may have looked at it.  Yes.

12:11:10  19        Q.   Do you know why?

12:11:14  20        A.   Because, again, we were concerned with

12:11:19  21   security, the performance, and as I stated earlier,

12:11:21  22   these are our passengers, and there was absolute

12:11:27  23   concern, but there was also a line.  And we didn't

12:11:30  24   take the position we're not crossing that line, not

          25   our problem.

Page 113

12:11:30    1        THOMAS J. KINTON, JR. - CONFIDENTIAL

12:11:33    2        We attempted to do whatever we could to help

12:11:42    3    improve the situation through the proper channels.

12:11:46    4        Q.   Do you know what your staff did or tried to

12:11:50    5    do regarding the screener turnover rate before

12:11:53    6    September 11, 2001?

12:11:55    7             MR. FREIRE:  Note my objection to facts not

12:11:55    8    in evidence.

12:11:56    9             MR. WOOD:  Objection.

12:11:57   10        A.   I'm not sure they could have done

12:12:02   11    anything, other than repeat maybe what was in media

12:12:08   12    stories already, that it was high.

12:12:11   13        Q.   By the way, I asked what you did, but I

12:12:17   14    neglected to ask:  After the Fox News report when they

12:12:22   15    tested security at Logan, the news report in early

12:12:27   16    2001, did you direct your staff to talk with the

12:12:32   17    airlines?

12:12:35   18        A.   As it pertained to the joint testing

12:12:40   19    program, yes.

12:12:44   20        Q.   How about as pertains to the -- to the

12:12:49   21    breaches of security reported by Fox News?

12:12:50   22        A.   That would be one and the same.

12:13:07   23        Q.   Okay.  And before September 11, 2001, did

12:13:11   24    your office, meaning you or any of your staff, become

           25    involved in the issue of screener pay?

THOMAS J. KINTON, JR. - 1/25/2011

Page 114

```
12:13:16  1          THOMAS J. KINTON, JR. - CONFIDENTIAL
12:13:18  2          A.   No.
12:13:22  3          Q.   Were you aware, up through and including
12:13:26  4  September 11, 2001, what screeners made, generally?
12:14:03  5          A.   I was not.
12:14:08  6          Q.   When the FAA, Federal Aviation
12:14:13  7  Administration, when they were coming -- either the Red
12:14:18  8  Team or the regular FAA inspectors, when they were
12:14:27  9  coming to Logan to inspect or to test, were you given
12:14:32 10  advance notice of when they were coming?
12:14:33 11          MR. BURTON:  Objection.
12:14:33 12          Q.   And this is just generally before
12:14:36 13  September 11, 2001.
12:14:38 14          A.   No.
12:14:40 15          Q.   Were you ever advised in advance when they
12:14:43 16  were coming to test?
12:14:45 17          A.   Never.
12:14:47 18          Q.   Do you know if the airlines were advised in
12:14:48 19  advance?
12:14:50 20          A.   I do not know that.
12:14:55 21          Q.   Was it, oh -- when they would come to test
12:14:59 22  the security -- again, the FAA.  Let's talk about the
12:15:02 23  FAA, not Fox News.  When the FAA came to test security
12:15:06 24  at Logan Airport, did they have an exit interview?  In
         25  other words, when they were done, did they come talk to
```

THOMAS J. KINTON, JR. - 1/25/2011

Page 116

12:16:19   1         THOMAS J. KINTON, JR. - CONFIDENTIAL

12:16:19   2         A.   No.

12:16:28   3         Q.   Okay.  When the FAA found something which

12:16:32   4    they wrote up as a potential violation, did they send

12:16:36   5    letters to you, talk to you?  How did they transmit

12:16:37   6    that to you?

12:16:38   7         A.   They would send letters.

12:16:40   8         Q.   Okay.  And then you'd have an opportunity

12:16:41   9    to respond?

12:16:41  10         A.   That's correct.

12:16:44  11         Q.   Okay.  Do you know if those were called

12:16:45  12    LOIs?

12:16:48  13         A.   I don't.  I only know letters of intent.

12:16:49  14         Q.   Okay.

12:16:53  15         A.   Because it meant money.

12:17:03  16         Q.   All right.  Did you receive -- not you,

12:17:09  17    personally, but did Massport receive letters -- get

12:17:13  18    copies of the letters that the FAA issued about airline

12:17:18  19    violations at Massport before September 11, 2001?

12:17:18  20              MR. BURTON:  Objection.

12:17:26  21         A.   Not to my knowledge, no.

12:17:38  22         Q.   Okay.  Now, when Massport -- and let's

12:17:40  23    focus on Massport, not the airlines.  Now, when

12:17:46  24    Massport got these letters from the FAA about

          25    violations or potential violations -- by the way, I

THOMAS J. KINTON, JR. - 1/25/2011

Page 132

13:12:10  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

13:12:16  2        A.   Yes.

13:12:19  3        Q.   And I'll call your attention to the next

13:12:24  4   page of the exhibit, and there's -- it's on Page VI of

13:12:29  5   the exhibit or the Bates range is MP100457.  Do you see

13:12:30  6   that page?

13:12:31  7        A.   I do.

13:12:33  8        Q.   And do you see the section on the top of

13:12:38  9   that page entitled "Plan Implementation"?

13:12:40  10        A.   Yes.

13:12:42  11        Q.   And do you see that it says, "The FAA or

13:12:46  12   Logan Airport and affected airlines will determine when

13:12:49  13   increased security measures are necessary in response

13:12:53  14   to recognized threat conditions or situations and will

13:12:56  15   identify the appropriate threat level"?  Do you see

13:12:57  16   that sentence?

13:12:58  17        A.   I do.

13:13:00  18        Q.   And do you see the next sentence, which

13:13:02  19   says, "The airport shall then take applicable measures

13:13:06  20   specified in the plan, the measures may be applied to

13:13:10  21   the airport facilities or to a particular flight, a

13:13:14  22   series of flights, or all flights arriving or departing

13:13:16  23   from the airport, as appropriate."  Do you see that?

13:13:17  24        A.   Yes, I do.

          25        Q.   And is it -- does that section give

THOMAS J. KINTON, JR. - 1/25/2011

Page 133

13:13:24  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

13:13:33  2   Massport discretion to take security actions to protect

13:13:35  3   persons and property traveling in air transportation,

13:13:39  4   who pass through Massport -- who pass through Massport?

13:13:40  5            MR. WOOD:  Objection.

13:13:41  6            MR. FEAGLEY:  Object to form and

13:13:44  7   foundation.

13:13:50  8            MR. BURTON:  Calls for a legal conclusion.

13:13:58  9        A.   Yes.

13:14:01 10        Q.   And given that passage, did Massport have

13:14:08 11   the right to instruct an air carrier to increase

13:14:11 12   security at a checkpoint?

13:14:13 13            MR. WOOD:  Objection.

13:14:14 14            MR. FEAGLEY:  Object to form and

13:14:15 15   foundation.

13:14:22 16        A.   I wouldn't interpret it that way.  No.

13:14:23 17        Q.   And with regard to the section that says,

13:14:30 18   "Measures may be applied to a particular flight, a

13:14:34 19   series of flights or all fights arriving or departing

13:14:36 20   from the airport, as appropriate," do you have an

13:14:37 21   understanding of what that means?

13:14:38 22        A.   Yes.

13:14:40 23        Q.   What is your understanding?

13:14:42 24        A.   My understanding is that if there's a

         25   specific threat or intelligence that we may be party

THOMAS J. KINTON, JR. - 1/25/2011

Page 143

13:27:59  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

13:28:05  2        Q.   Who was your point person in addressing

13:28:09  3   these issues with the airlines regarding closed lanes

13:28:11  4   and lack of personnel?

13:28:33  5        A.   Ed Freni, my director of operations.

13:28:42  6        Q.   When Massport first began to explore the

13:28:45  7   possibility -- let me take a step back.

13:28:49  8        When did Massport first begin to explore the

13:28:53  9   possibility of developing a program to use undercover

13:28:57 10   state police to check the test points with various

13:28:58 11   prohibited items?

13:29:09 12        A.   I believe it was in the summer of 2001.

13:29:14 13        Q.   When did Massport first discuss or approach

13:29:18 14   the FAA regarding that program?

13:29:28 15        A.   I don't know the exact date.

13:29:30 16        Q.   Am I correct that that program was

13:29:35 17   instituted after September 11, 2001?

13:29:36 18             MR. BURTON:  Objection.

13:29:38 19        A.   Yes.  Joint testing program was

13:29:38 20   implemented.

13:29:42 21        Q.   And do you have any knowledge today whether

13:29:47 22   or not that joint testing program that was instituted

13:29:54 23   after September 11, 2001 was approved by the FAA?

13:29:56 24        A.   To my knowledge, it was approved by the

         25   FAA.

THOMAS J. KINTON, JR. - 1/25/2011

Page 153

13:45:01   1          THOMAS J. KINTON, JR. - CONFIDENTIAL

13:45:05   2          Q.   Did -- before and -- the Guaranteed

13:45:08   3   Passenger Standards Program was a program that was,

13:45:10   4   indeed, put into effect; is that correct?

13:45:11   5          A.   That's correct.

13:45:15   6          Q.   And before it was put into effect, did

13:45:19   7   Massport seek the approval of the Federal Aviation

13:45:25   8   Administration?

13:45:47   9          A.   I don't recall.  I don't believe so.  No.

13:45:49  10          Q.   And before implementing the Guaranteed

13:45:56  11   Passenger Standards Program, did Massport undertake any

13:46:00  12   study or analysis to determine whether or how this

13:46:07  13   program may impact on security at the checkpoint?

13:46:09  14          A.    Not specifically security, but we did meet

13:46:12  15   with the airlines and basically asked them what their

13:46:16  16   standards were.  And this is -- these were their

13:46:20  17   standards, essentially, that we put into place.

13:46:22  18          Q.   So then is that a "no" to the question as

13:46:26  19   to whether or not before implementing the Guaranteed

13:46:31  20   Passenger Standards Program did Massport undertake any

13:46:34  21   study or analysis to determine whether or how this

13:46:37  22   program may impact on security at the checkpoint?

13:46:40  23          MR. WOOD:  Objection.  Asked and answered.

13:46:47  24          A.   No.  We didn't feel it was necessary.

          25          Q.   And the aim of the Guaranteed Passenger

THOMAS J. KINTON, JR. - 1/25/2011

Page 154

13:46:51   1          THOMAS J. KINTON, JR. - CONFIDENTIAL

13:46:59   2    Standards Program was to provide for basic and quality

13:47:02   3    service for Logan passengers; is that correct?

13:47:07   4          A.   Yes.

13:47:11   5          Q.   Does Logan Airport or Massport consider

13:47:16   6    safety and security to be a basic service for Logan

13:47:19   7    passengers and Logan customers?

13:47:23   8          A.   I certainly do.  It's my No. 1 priority.

13:47:25   9          Q.   Was it your No. 1 priority prior to

13:47:27  10    September 11th, 2001?

13:47:46  11          A.   Yes, it was.

13:47:47  12          Q.   Am I correct that the Guaranteed Passenger

13:47:55  13    Standards Program was, in fact, implemented in -- prior

13:48:00  14    to September 11th, 2001, and the proposal to test

13:48:02  15    checkpoints with undercover state police was not

13:48:07  16    implemented prior to September 11th, 2001?

13:48:07  17               MR. WOOD:  Objection.

13:48:11  18               MR. BURTON:  Objection.

13:48:11  19               MR. ELLIS:  Objection.

13:48:12  20          A.   Yes.

13:48:15  21          Q.   And am I correct that the -- that Logan or

13:48:18  22    Massport got a lot of pushback on the Guaranteed

13:48:20  23    Passenger Standards Program, as well?

13:48:46  24          A.   Yes.

          25          Q.   Did you personally have discussions with

THOMAS J. KINTON, JR. - 1/25/2011

Page 159

13:56:51  1          THOMAS J. KINTON, JR. - CONFIDENTIAL

13:57:05  2   BY MR. COHEN:

13:57:10  3          Q.   Mr. Kinton, were you aware, prior to the

13:57:17  4   Fox News report in the spring of 2001, that

13:57:21  5   Logan Airport was heavily fined for security failures

13:57:26  6   by the airlines and their security companies?

13:57:34  7          MR. ROSS:   Objection to form.

13:57:36  8          A.   I was aware of fines levied by the FAA,

13:57:39  9   but not by the airlines -- to the airlines and the

13:57:39  10  security company.

13:57:42  11         Q.   Were you -- let me try and understand that

13:57:47  12  a little better.  You were aware of certain fines that

13:57:51  13  were imposed on Massport, itself, prior to 2001; is

13:57:52  14  that correct?

13:57:53  15         A.   That's correct.

13:58:00  16         Q.   And generally, what were those fines for?

13:58:03  17         MR. WOOD:   Objection.

13:58:06  18         A.   I don't know.  I'd be guessing if I

13:58:06  19  answered it.

13:58:14  20         Q.   Okay.  Were you aware of fines of the

13:58:17  21  airlines, themselves, for security failures -- for

13:58:24  22  checkpoint security failures, prior to 2000?

13:58:26  23         A.   Only through an article that was in the

13:58:30  24  Boston Globe, I believe.  I'm not sure of the date of

          25  that.

THOMAS J. KINTON, JR. - 1/25/2011

Page 161

14:00:08 1        THOMAS J. KINTON, JR. - CONFIDENTIAL

14:00:08 2        A.    Yes, I do.

14:00:13 3        Q.    And did you see a little bit farther down

14:00:18 4    in the article that, as a result, the FAA has fined

14:00:22 5    major airlines and the Massachusetts Port Authority

14:00:28 6    $178,000 during that period, which is the period that's

14:00:30 7    described as 1997 through the beginning of this year,

14:00:35 8    which is 1999?  So a two-year period?

14:00:37 9        A.    Yes.

14:00:44 10       Q.    Did you consider that to be alarming?

14:00:48 11       A.    Absolutely.  The first thing I did is

14:00:54 12   looked at it and broke it down, and I believe we were

14:00:58 13   lumped in together.  The article lumps us in together

14:01:01 14   with the airlines, but I believe the vast majority of

14:01:04 15   these violations were 108s.

14:01:05 16       Q.    By --

14:01:06 17       A.    But still concerning to me.

14:01:09 18       Q.    By 108, you mean fines imposed upon the

14:01:13 19   airlines, as opposed to fines imposed upon Massport?

14:01:13 20       A.    Correct.

14:01:20 21       Q.    Okay.  And putting aside Massport's

14:01:24 22   violations and the fines imposed on Massport, did you

14:01:32 23   find it alarming that over 100 security violations at

14:01:38 24   Logan for a two-year period as a result of airline

         25   security failures?

THOMAS J. KINTON, JR. - 1/25/2011

Page 208

15:28:31   1        THOMAS J. KINTON, JR. - CONFIDENTIAL

15:28:34   2        Q.   Do you know who Michael Tuohey is?

15:28:35   3        A.   No.

15:28:38   4        Q.   Are you familiar with a ticket agent at

15:28:42   5   Portland who checked in Mohamed Atta on September 11th?

15:28:48   6        A.   No.

15:28:52   7        Q.   Are you aware of any specific security

15:28:56   8   procedures that were implemented the morning of

15:29:01   9   September 11th at Logan Airport?

15:29:01  10             MR. WOOD:  Objection.

15:29:03  11             MR. BURTON:  Objection.

15:29:04  12             MR. ELLIS:  What?

15:29:06  13        Q.   Any additional specific procedures, beyond

15:29:07  14   what --

15:29:09  15        A.   What we were normally doing?

15:29:09  16        Q.   Yes.

15:29:09  17        A.   No.

15:29:12  18        Q.   Okay.  Do you know of any specific

15:29:17  19   additional procedures that were implemented at any time

15:29:22  20   in 2001, prior to September 11th, beyond what you were

15:29:23  21   normally doing?

15:29:24  22             MR. BURTON:  Objection to form.

15:29:25  23             MR. WOOD:  Objection.

15:29:31  24        A.   Yes.  And, again, it would depend upon the

          25   intelligence we were receiving, and beefing up certain

THOMAS J. KINTON, JR. - 1/25/2011

Page 226

16:05:56   1          THOMAS J. KINTON, JR. - CONFIDENTIAL

16:06:02   2     from 1993 through 2010, specifically defining what the

16:06:04   3     purpose of the red team was and what their role was

16:06:05   4     supposed to be?

16:06:05   5                MS. SCHIAVO:  Objection.

16:06:34   6          A.   No.  I did not.

16:06:35   7                MR. ELLIS:  I have no further questions.

16:06:38   8     Thank you, Mr. Kinton.

16:06:39   9                THE WITNESS:  You're welcome.

16:06:44  10                MR. COHEN:  Go ahead.

16:06:45  11                MR. WOOD:  He'll have redirect.

16:06:46  12                     CROSS-EXAMINATION

16:06:54  13     BY MR. BURTON:

16:06:55  14          Q.   Good afternoon, Mr. Kinton.

16:06:58  15          A.   Good afternoon.

16:07:02  16          Q.   On or before September 11th, did Massport

16:07:05  17     have control or responsibility for the passenger

16:07:07  18     screening checkpoints at Logan Airport?

16:07:08  19                MR. COHEN:  Objection.

16:07:08  20          A.   No.

16:07:10  21          Q.   Who did?

16:07:12  22          A.   The airlines.

16:07:14  23          Q.   And who supervised the airlines in their

16:07:17  24     operation of the checkpoint security -- passenger

          25     screening checkpoints?

THOMAS J. KINTON, JR. - 1/25/2011

Page 227

16:07:18  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

16:07:20  2        A.    The FAA.

16:07:22  3        Q.    Without FAA direction, did you believe that

16:07:26  4    Massport could alter that division of responsibilities?

16:07:27  5             MS. SCHIAVO:  Objection.

16:07:27  6             MR. COHEN:  Objection.

16:07:29  7        A.    No.

16:07:31  8        Q.    On or before September 11th, did the

16:07:33  9    Massachusetts State Police have responsibility for

16:07:37 10    determining whether items discovered at the checkpoints

16:07:40 11    were allowed under the airline security plans or

16:07:44 12    Checkpoint Operations Guide, as far as you know?

16:07:44 13             MS. SCHIAVO:  Objection.

16:07:47 14        A.    No.  Not to my knowledge.

16:07:49 15        Q.    And are you aware of any calls from

16:07:52 16    airlines or checkpoint security companies on

16:07:55 17    September 11th, seeking a law enforcement officer

16:07:59 18    response, prior to the time that the two planes that

16:08:02 19    were hijacked departed from Logan Airport?

16:08:06 20        A.    I am not aware of any.  No.

16:08:10 21             MR. BURTON:  I have nothing further.

16:08:11 22             MR. COHEN:  A quick second.

16:08:11 23                REDIRECT EXAMINATION

16:08:23 24    BY MR. COHEN:

        25        Q.    Did Mr. Hussey object to the undercover

THOMAS J. KINTON, JR. - 1/25/2011

Page 238

16:24:30  1        THOMAS J. KINTON, JR. - CONFIDENTIAL

16:24:33  2        A.   Where are you?  Where the arrow is?

16:24:35  3        Q.   Yes.  And I will apologize, that was a

16:24:38  4   sticky.  That was my arrow on a sticky note.

16:24:41  5        A.   I just want to make sure I'm reading the

16:24:44  6   right thing.  "CCTV enhances and increases security."

16:24:48  7        Q.   Yes.  Do you have any information that

16:24:53  8   indicates that is not correct, that CCTV does not

16:25:00  9   increase security?

16:25:02 10        A.   If you're a suicide bomber intent on

16:25:05 11   killing yourself, it doesn't help.

16:25:10 12             MS. SCHIAVO:  No further questions.

16:25:11 13             MR. COHEN:  One follow-up on the same

16:25:11 14   issue.

16:25:12 15

16:25:12 16             REDIRECT EXAMINATION

16:25:13 17   BY MR. COHEN:

16:25:15 18        Q.   Do you recall telling the 9/11 Commission

16:25:18 19   staff that "the cameras can also act as a deterrent"?

16:25:19 20        A.   Yes.

16:25:20 21        Q.   You believed that at the time that you

16:25:21 22   spoke with them?

16:25:21 23        A.   Yes.

16:25:26 24             MR. COHEN:  Okay.  Thank you.

         25             MR. BURTON:  Give me one second, okay?

THOMAS J. KINTON, JR. - 1/25/2011

Page 239

16:25:28  1          THOMAS J. KINTON, JR. - CONFIDENTIAL

16:26:17  2               (Discussion off the record.)

16:26:18  3                  RECROSS-EXAMINATION

16:26:24  4    BY MR. BURTON:

16:26:32  5          Q.   Mr. Kinton, Ms. Schiavo and Mr. Cohen just

16:26:34  6    asked you questions about CCTV.  Do you recall those

16:26:34  7    questions?

16:26:37  8          A.   Yes.

16:26:40  9          Q.   Prior to 9/11, what was your understanding

16:26:46 10    of what CCTV was primarily designed to address from a

16:26:50 11    security standpoint?

16:26:53 12          A.   Well, it could act as a deterrent, if it

16:26:57 13    was -- a certain individual didn't want to be detected

16:27:00 14    in doing something, and knew that there were

16:27:07 15    surveillance cameras present.  And it -- it's very

16:27:15 16    helpful in -- in going back forensically after an

16:27:20 17    event has occurred to see who, indeed, the perpetrator

16:27:20 18    was.

16:27:24 19          And it's very helpful when there's a breach

16:27:27 20    at the security checkpoint, rather than having to dump

16:27:30 21    an entire concourse, you could go and look for the

16:27:33 22    individual or individuals if you had a picture of them.

16:27:38 23          And so, you know, it's also -- when I say a

16:27:42 24    deterrent for certain crimes, that people are concerned

         25    with being spotted, and others that don't care, it's

THOMAS J. KINTON, JR. - 1/25/2011

Page 240

| | | |
|---|---|---|
| 16:27:47 | 1 | THOMAS J. KINTON, JR. - CONFIDENTIAL |
| 16:27:48 | 2 | not going to matter. |
| 16:27:52 | 3 | Q.   And was, prior to 9/11, was CCTV required |
| 16:27:53 | 4 | by the FAA? |
| 16:27:53 | 5 | MS. SCHIAVO:  Objection. |
| 16:27:55 | 6 | A.   No. |
| 16:27:57 | 7 | MR. BURTON:  No further questions. |
| 16:27:57 | 8 | MR. COHEN:  One question. |
| 16:27:58 | 9 | |
| 16:27:58 | 10 | REDIRECT EXAMINATION |
| 16:27:59 | 11 | BY MR. COHEN: |
| 16:28:02 | 12 | Q.   Can CCTV also be used to evaluate screener |
| 16:28:05 | 13 | performances? |
| 16:28:06 | 14 | A.   Yes. |
| 16:28:07 | 15 | MR. COHEN:  Thank you.  No further |
| 16:28:11 | 16 | questions. |
| 16:28:13 | 17 | MR. WOOD:  Thank you very much, Mr. Kinton. |
| 16:28:15 | 18 | THE VIDEOGRAPHER:  This concludes the |
| 16:28:19 | 19 | January 25, 2011 deposition of Thomas J. Kinton.  Going |
| 16:28:23 | 20 | off the record.  This is the end of Tape 3 of three |
| 16:28:26 | 21 | tapes used today, and the time is 4:28 p.m. |
| | 22 | (Deposition concluded at 4:28 p.m.) |
| | 23 | |
| | 24 | |
| | 25 | |

# Exhibit G

352KSEPA.txt

                                                                    1
352ksepa
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE SEPTEMBER 11 LITIGATION        21 MC 97
3
4  ------------------------------x
4
5                                       New York, N.Y.
5                                       May 2, 2003
6                                       1:15 p.m.
6
7  Before:
7
8                  HON. ALVIN K. HELLERSTEIN,
8
9                                       District Judge
9
10
10
11
11
12
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    2
352ksepa
1           THE COURT:  I am sorry that I caused you to wait, but
2  this morning's calendar did not end when I was ready to end.
3  We are up to the motion by the airport operator defendants,
4  Massachusetts Port Authority, Metropolitan Washington Airport
5  Authority, City of Portland, Maine, Port Authority of New York
6  and New Jersey.  Mr. Wood and Mr. Dumbroff will be arguing for
7  the defendants and Mr. Moller will be arguing for the
8  plaintiffs.  Mr. Wood.
9           MR. WOOD:  Thank you, your Honor, and I will be the
10  only person arguing for the airport operators.  May it please
11  this honorable court and counsel, I am Mark Wood.  I am
12  presenting the argument in support of the motions, your Honor,
13  that have been brought by the airport operators of all the
14  airports involved in this litigation.  Your Honor has ordered
15  that some issues raised by Portland, those concerning lack of
16  notice, be handled as a Rule 56 motion at another time, but my
17  remarks this afternoon will deal with matters which also apply
18  to Portland, but not any of those matters.
19           In addition, Newark has raised certain matters in its
20  papers.  Plaintiffs did not separately respond to those, and
                          Page 1

352KSEPA.txt
(212) 805-0300

18

352ksepa
1  words, if the facts show it is entirely a problem of airline
2  screening and the deleguees of airline screening.
3       MR. MOLLER:  The answer to your question is yes, if
4  the proof is that it was entirely the fault of an airline.
5  Then the airport operator may be out if this regulation and the
6  plan so state.  If the responsibilities are so clearly
7  separated that there is no overlap --
8       THE COURT:  Your point is that you can't know what the
9  responsibilities really were until you have discovery of the
10 airport managers.
11      MR. MOLLER:  That is number one.  Number two --
12      THE COURT:  Let me stop you a moment.  Mr. Wood, is
13 that a fair point, until you have the discovery of the airport
14 managers, you really can't know what the responsibilities were?
15      MR. WOOD:  Not as to passenger screening, your Honor,
16 because Congress passed a statute, and you could not
17 conceivably legally have a security plan that would change the
18 statutory obligation of the airlines to conduct the passenger
19 screening, any more than you could have a federal air
20 regulation that did that or anything else.  So the answer to
21 that is no.
22      This motion was filed and then your Honor asked
23 counsel if they needed any discovery after we filed these
24 motions.  They said no.  I think the reason for that is, at
25 least on our motion, which is a matter of law on passenger
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

352ksepa
1  screening, there isn't anything that discovery could
2  conceivably show you that would change this duty decision.
3       THE COURT:  Let's suppose the choice of the screeners
4  was a joint activity for the airport and the airline.
5       MR. WOOD:  Under the law it cannot be.  Under section
6  108, I could cite it to you, your Honor, it cannot be.  It's
7  illegal, is what I am saying.
8       THE COURT:  You may be right, but it may have been
9  done that way and it may have some type of restrictive effect.
10 We don't know.
11      I think you are making good points, Mr. Wood, but I
12 need to be cautious at this time because we don't know how the
13 facts will develop.  Maybe at this time I should thank you for
14 the education that you have provided to me and to be alert to
15 the points that arise but to deny your motion without prejudice
16 to renew it.
17      MR. WOOD:  Your Honor, if you would grant our motion
18 as to the passenger screening, certify for an interlocutory
19 appeal --
20      THE COURT:  I am not going to do that at this point,
21 but I may do it later.
22      Your clients, if they deserve to get out of the case,
23 should not have to wait and be involved in all the extensive
24 discovery that will go on.  So you have to legitimately,
25 clarify your legal exposure at a relatively early time.  I am
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

352ksepa
1  alert to that.  You are alert to it.  But I do feel that at
2  this time it is premature for me to rule.
Page 9

352KSEPA.txt

3      MR. WOOD:  It may be premature on the duties that we
4  actually have, but on the face of these statutes and
5  regulations, your Honor, you could help a great deal with the
6  management of this case by giving us a ruling on the legal
7  duty, because we either have that legal duty or we don't,
8  and --
9      THE COURT:  I hesitate to do it because I don't think
10 I have enough of a record built up at this particular point.
11 But we may not be far away.
12     Mr. Moller, do you have any more to tell me?
13     MR. MOLLER:  The answer is yes, I wanted to touch on a
14 point that I left unanswered yesterday.  But I will cooperate
15 and my committee will cooperate fully to try and resolve this
16 issue and develop a discovery modus to try to get to that
17 question.  I know from other cases that there are meetings
18 among all members of all occupants and tenants of airports.
19     THE COURT:  That doesn't seem to be too persuasive
20 because everyone needs to know what everyone else is doing.
21     MR. MOLLER:  You are right, but it will help us find
22 out enough to respond promptly to these concerns.  We don't
23 want to spend any more money as plaintiffs on needless
24 discovery and getting the issues clarified is in our interests
25 as well as their interest.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                21
352ksepa
1      MR. WOOD:  Maybe like Newark yesterday, we can agree
2  on something that will be expeditious in terms of pointing out
3  if there is anything about the activities of these airports
4  which would be inconsistent with federal statutory law and if
5  not, quickly come back, because this case, as you know, will
6  involve a massive amount of discovery.
7      THE COURT:  I wouldn't phrase the issue as you did,
8  but I take your point.  I will deny this motion without
9  prejudice to renew it.
10     MR. MOLLER:  May I fill in the gap that I
11 inadvertently left in an argument to you yesterday on the issue
12 of public policy, which obviously concerns you and concerned
13 us.  It will take me one minute to go through it.
14     THE COURT:  And probably another minute to get
15 somebody else's response, but go ahead.
16     MR. MOLLER:  And I have taken the time to try to
17 formulate these brief remarks as much as possible.
18     You said yesterday that the Air Transportation Safety
19 and Systems Stabilization Act was irrelevant to the duty
20 analysis because the statute was enacted after 9/11.  I believe
21 the conclusion is wrong and I blame myself really for not
22 clarifying it adequately to overcome your concerns.
23     The statute is not irrelevant for several reasons, and
24 let me show you why.
25     THE COURT:  You made the point yesterday.  You made
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                22
352ksepa
1  the point that the limitation of aggregate liability under the
2  act answered some of the policy concerns expressed by the New
3  York Court of Appeals, so that by limiting aggregate liability
4  you are affecting the prospect of unreasonably large exposures.
5      MR. MOLLER:  I said that, but what I failed to say was
6  that the ATSSA federalized the issue of duty, because it
7  substituted Congress's understanding of how the duty issue as
                          Page 10

# Exhibit H

# In The Matter Of:

*IN RE SEPTEMBER 11 LITIGATION*

_____

**JOSEPH M. LAWLESS**
*March 30, 2007*

_____

# *CONFIDENTIAL*
# *TC REPORTING in affliation with Merrill Legal Solutions*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 516-795-7444 / FAX: 212-692-9171

**LAWLESS, JOSEPH M. - Vol. 1**

Page 38

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | JOSEPH M. LAWLESS - CONFIDENTIAL                   |
| 10:31:37 | 2  | MR. CAMPBELL:  Object to form.                     |
| 10:31:38 | 3  | MR. KELLY:  Objection.                             |
| 10:31:38 | 4  | BY MR. MOTLEY:                                      |
| 10:31:38 | 5  | Q.   Is that a correct statement, to the best      |
| 10:31:40 | 6  | of your recollection?                              |
| 10:31:44 | 7  | A.   I can't say I personally recall him making    |
| 10:31:46 | 8  | that statement.                                    |
| 10:31:49 | 9  | Q.   But is the essence of it true?                |
| 10:31:51 | 10 | A.   Yes.                                          |
| 10:31:53 | 11 | MR. CAMPBELL:  Object to the form.                 |
| 10:31:53 | 12 | Q.   The answer is yes?                            |
| 10:31:54 | 13 | A.   Yes.                                          |
| 10:31:55 | 14 | Q.   And you, yourself, advocated your             |
| 10:32:03 | 15 | organization, Massport, being involved in the      |
| 10:32:07 | 16 | checkpoint screening process prior to 9/11, did you|
| 10:32:10 | 17 | not?                                               |
| 10:32:11 | 18 | A.   Yes, I did.                                   |
| 10:32:13 | 19 | Q.   And specifically you sought to have state     |
| 10:32:19 | 20 | troopers, among others, involved in the checkpoint |
| 10:32:23 | 21 | screening process at Logan prior to 9/11, correct? |
| 10:32:29 | 22 | MR. MOORE:  Objection to form and                  |
| 10:32:29 | 23 | foundation.                                        |
| 10:32:30 | 24 | Q.   Well, you were there.  Did you make that      |
| 10:32:32 | 25 | recommendation or not?                             |

ac3a2a4e-3cc3-49dc-ab5f-c5ae7e183ad1

Page 56

```
                        1           JOSEPH M. LAWLESS - CONFIDENTIAL
10:55:49                2           A.   Yes, I did.
10:55:52                3           Q.   No. 8 is 389, Tab 89.  On Page 102955,
10:56:25                4      sir, it is reported that a program called LASER,
10:56:41                5      L-A-S-E-R, was started up in 1996; is that correct?
10:56:47                6                MR. DWYER:  What page are we on?
10:56:49                7                MR. MOTLEY:  102955.
10:56:54                8           A.   That's correct.
10:56:54                9      BY MR. MOTLEY:
10:56:54               10           Q.   And in fact did you implement LASER in
10:57:00               11      1996?
10:57:01               12           A.   Yes, I did.
10:57:02               13           Q.   And would you describe for the jury what
10:57:04               14      LASER was?
10:57:08               15           A.   LASER was a program that I developed at
10:57:11               16      Logan Airport, based upon my experiences traveling to
10:57:19               17      Israel, traveling to Paris.
10:57:20               18                It's a program I adopted from those
10:57:22               19      practices, which I considered best practices.  And
10:57:26               20      LASER was an acronym for "Logan Airport Security
10:57:28               21      Enhancement and Review."
10:57:30               22                But the LASER team was more of a group
10:57:33               23      of state police officers that would saturate various
10:57:37               24      parts of the airport to enhance security at those
10:57:41               25      different locations, and it was done on a random basis.
```

ac3a2a4e-3cc3-49dc-ab5f-c5ae7e183ad1

Page 101

1          JOSEPH M. LAWLESS - CONFIDENTIAL

12:51:34   2    the cab driver we were discussing before lunch?

12:51:36   3          A.   Yes.   Actually, my memory is starting to

12:51:39   4    be refreshed by looking at this.

12:51:42   5          Q.   Okay.   What do you -- do you recall what

12:51:45   6    Mr. Kinton was concerned about?   The same thing you

12:51:48   7    were?

12:51:49   8          A.   Yes.   We were very concerned about the

12:51:51   9    growing terrorist threat, the Millennium, and the

12:51:56   10   association with a cab driver who was arrested in

12:52:00   11   connection with the Millennium plot.

12:52:03   12         Q.   Now, I've asked you -- now we're up to,

12:52:06   13   we're about to start on the year 2000.   And I've asked

12:52:09   14   you, and you've expressed your heightening concern.   I

12:52:14   15   believe that is a correct characterization of it.

12:52:17   16         Now, what were you doing to try to improve

12:52:20   17   the security situation throughout the '97, '98, '99

12:52:27   18   period?   Do you remember specific things that you did?

12:52:31   19         A.   I can, yes.   I did a number of things to

12:52:35   20   improve the security at Logan Airport.   Certainly, the

12:52:39   21   keystone program I had was the LASER program, where we

12:52:43   22   went out and we saturated the various portions of the

12:52:46   23   airport that were -- we did this at random, to bring

12:52:53   24   peoples' alertness, security awareness levels up.

12:52:57   25         We had state troopers standing at the

ac3a2a4e-3cc3-49dc-ab5f-c5ae7e183ad1

Page 102

1          JOSEPH M. LAWLESS - CONFIDENTIAL

12:52:59  2   security checkpoints on certain times.  We had state

12:53:03  3   troopers standing in uniform at the check-in counters,

12:53:06  4   at the gate areas, on the curbside, on the ramp, down

12:53:14  5   under the planes, on the tarmac.

12:53:17  6          We also did some other things.  We did

12:53:21  7   some training with the security screeners.  We -- I

12:53:24  8   made available the state police explosive ordinance

12:53:29  9   team, the bomb squad, who are experts in the weapons

12:53:33  10  that were currently being used by terrorist

12:53:36  11  organizations, and I had them conduct a familiarization

12:53:39  12  briefing for the security screening companies.

12:53:43  13         In addition to that, I developed some

12:53:46  14  protocols for security companies to follow during

12:53:49  15  security breaches.

12:53:51  16         So, while the threat was growing, we

12:53:55  17  maintained a positive reaction, a growing -- addressed

12:54:02  18  and stressed through a variety of operations, training

12:54:07  19  regimens and so forth.

12:54:24  20      Q.   Now, do you recall, sir, there was an

12:54:28  21  incident involving an attempted hijacking of an All

12:54:33  22  Nipponese Airways plane, where a passenger slit the

12:54:39  23  throat of a pilot with a knife and took over the

12:54:43  24  control of the airplane in the late '90s?

12:54:49  25      A.   I recall reading about that.  I don't

ac3a2a4e-3cc3-49dc-ab5f-c5ae7e183ad1

Page 135

                          1          JOSEPH M. LAWLESS - CONFIDENTIAL

13:39:18      2          Q.   Okay.  And you say down at the bottom,

13:39:24      3    "Joe said the tests will consist of trying to sneak

13:39:27      4    weapons past the checkpoint and also observing response

13:39:31      5    time to alarms."

13:39:34      6          Now, what does response time to alarms mean?

13:39:43      7          A.   Response times to, if the alarm went off

13:39:45      8    when someone walked through a magnetometer.

13:39:50      9          Q.   In other words, if the magnetometer picked

13:39:55     10    up metal, an alarm would go off, and you wanted to

13:39:58     11    measure how long it took the screeners to react to the

13:40:01     12    alarm going off?

13:40:06     13          MR. CAMPBELL:  Object to the form.

13:40:06     14          A.   Yes.

13:40:07     15          Q.   And it was recommended that the airlines

13:40:11     16    be notified generally.  Now, you had already notified

13:40:14     17    them by this time, we've already established that,

13:40:16     18    correct?  But you were intending to do it?

13:40:18     19          A.   Yes.

13:40:19     20          Q.   At a LAMCO meeting, that testing will

13:40:21     21    begin next week at unspecified times.  So, sometime

13:40:25     22    during the week of July 18th?

13:40:27     23          A.   Yes.

13:40:28     24          Q.   Now, if my math is -- serves me, that's

13:40:35     25    two, four, six -- eight weeks before 9/11, you wanted

Page 136

```
                      1            JOSEPH M. LAWLESS - CONFIDENTIAL
13:40:40              2      to get the state police involved in making checkpoint
13:40:46              3      screening more secure?
13:40:51              4                  MR. MOORE:  Objection to form.
13:40:53              5                  MR. CAMPBELL:  Object to the form.
13:40:54              6                  MR. CONNORS:  Object to the form.
13:40:54              7      BY MR. MOTLEY:
13:40:56              8            Q.    Put it this way:  Why did you want to do
13:40:58              9      this?
13:41:00             10            A.    It was my intention to enhance the
13:41:01             11      security operation of the security checkpoint --
13:41:05             12            Q.    And that --
13:41:05             13            A.    -- and the overall security of the
13:41:07             14      airport.  And this program, I thought, would enhance --
13:41:11             15      as well as other things we were doing, would enhance
13:41:14             16      that operation.
13:41:17             17            Q.    And you were motivated to do this because
13:41:19             18      of what?
13:41:22             19            A.    I was motivated to do this because I knew
13:41:25             20      the security checkpoints were weak, and I knew that
13:41:31             21      Fox 25 broadcast it and put this information out into
13:41:37             22      the public realm.  And I was concerned that this
13:41:40             23      information was out there in the public realm, and I
13:41:42             24      wanted to do something to enhance that security.
13:41:46             25            Q.    Is this another example of your ongoing
```

ac3a2a4e-3cc3-49dc-ab5f-c5ae7e183ad1

Page 157

```
                    1        JOSEPH M. LAWLESS - CONFIDENTIAL
14:28:29            2                 CROSS-EXAMINATION
14:28:31            3   BY MR. MOORE:
14:28:32            4        Q.   Mr. Lawless, before we took the most
14:28:36            5   recent break, do you recall testifying that one of the
14:28:44            6   reasons that your checkpoint testing initiative did not
14:28:50            7   go forward prior to September 11th, 2001, was in part
14:28:54            8   the reaction of the airlines?
14:28:56            9        A.   Yes.
14:28:59           10        Q.   Is it also correct that the reason the
14:29:03           11   initiative did not go forward prior to September 11th,
14:29:05           12   2001, was in part the FAA's refusal to approve that
14:29:10           13   program?
14:29:11           14        A.   Yes, it was.
14:29:13           15             MR. MOORE:  Thank you.
14:29:17           16             (Discussion off the record.)
14:29:21           17             MR. DWYER:  Next?
14:29:24           18             MR. KELLY:  Can we take a five-minute
14:29:25           19   break?  Off the record.
14:29:28           20             THE VIDEOGRAPHER:  Going off the record.
14:29:28           21   The time is 2:29.
14:29:31           22                  (A recess was taken.)
14:54:06           23             THE VIDEOGRAPHER:  We're back on the
14:54:07           24   record.  The time is 2:54.
14:54:12           25             MR. KELLY:  This is Paul Kelly.  I
```

TC REPORTING in affliation with Merrill Corp.,
(516) 795-7444

# Exhibit I

# In The Matter Of:

*IN RE SEPTEMBER 11 LITIGATION*

_____

**JOSEPH M. LAWLESS**
*May 22, 2007*

_____

## *CONFIDENTIAL*
## *TC REPORTING in affliation with Merrill Corp.*
### *25 West 45th Street - Suite 900*
### *New York, NY 10036*
*PH: 212-931-6571 / FAX: 212-692-9171*

**LAWLESS, JOSEPH M. - Vol. 2**

Page 186

1           JOSEPH M. LAWLESS - CONFIDENTIAL

09:52:03    2    carrier's ACSSP.

09:52:04    3           Q.   Okay.  Did you have any copies from any of

09:52:06    4    the carriers available to you in 2001?

09:52:10    5           A.   No.

09:52:11    6           Q.   So, if you wanted to refer from time to

09:52:13    7    time to something in the ACSSP -- well, let me ask you

09:52:17    8    this:  Did that ever happen that you wanted to refer to

09:52:20    9    some portion of the ACSSP in connection with your

09:52:22    10   duties as the Director of Public Safety?

09:52:25    11          A.   The -- we were not provided copies of the

09:52:27    12   ACSSP.  So, I couldn't refer to their plans.

09:52:31    13          Q.   Okay.  In connection with the training

09:52:38    14   sessions that you may have received from the FAA, did

09:52:43    15   that ever involve a review of what is known as the

09:52:46    16   Checkpoint Operations Guide?

09:52:48    17          A.   No.

09:52:49    18          Q.   Okay.  Are you familiar with the

09:52:52    19   Checkpoint Operations Guide or what is often referred

09:52:54    20   to as the "COG"?

09:52:57    21          A.   I'm familiar that it does exist, yes.

09:53:00    22          Q.   Okay.  Do you believe you've ever seen a

09:53:04    23   copy of it?  I mean read a copy of it?

09:53:07    24          A.   No.  I have not.

09:53:08    25          Q.   Okay.  What is your understanding as to

d0ea3b07-c99b-4540-be60-fc9067269lf3

Page 187

1            JOSEPH M. LAWLESS - CONFIDENTIAL

09:53:15    2    what that guide is intended for, if you have such an

09:53:18    3    understanding?

09:53:24    4         A.   My understanding of the COG is it's a

09:53:27    5    document that was available to the airlines and the

09:53:33    6    screeners who worked the security checkpoints, and it's

09:53:38    7    providing guidelines and guidance for the operators of

09:53:41    8    those checkpoints.

09:53:45    9         Q.   Would I be correct that you did not have

09:53:48   10    a -- for example, in 2001, that you did not have a copy

09:53:51   11    of the COG in your office at Logan Airport?

09:53:55   12         A.   I did not.

09:53:55   13         Q.   Okay.  And would I also be correct that

09:54:04   14    during your term as the Director of Public Safety, you

09:54:07   15    don't recall any occasion where you needed to consult

09:54:10   16    with a copy of the COG in connection with your duties?

09:54:13   17         A.   No.  I did not.

09:54:15   18         Q.   Okay.

09:54:17   19              MR. MOORE:  So, is that Paul is correct?

09:54:21   20              THE WITNESS:  Excuse me.

09:54:23   21              MR. MOORE:  Could you just reask the

09:54:24   22    question?  I think it was --

09:54:25   23    BY MR. KELLY:

09:54:25   24         Q.   You're agreeing with my proposition that

09:54:27   25    you never had occasion to refer to the COG in

d0ea3b07-c99b-4540-be60-fc90672691f3

Page 188

1          JOSEPH M. LAWLESS - CONFIDENTIAL

09:54:31   2    connection with your duties as the Director of Public

09:54:33   3    Safety?

09:54:34   4          A.   You are correct that I never referred to

09:54:36   5    those.

09:54:37   6          Q.   Thank you.

09:54:36   7          A.   To the COG.

09:54:38   8          Q.   Okay.  You can remove that from the front

09:54:41   9    of you there, Mr. Lawless, just so we don't get too

09:54:43   10   many papers lined up.

09:54:45   11         MR. MOORE:  Thank you.

09:54:45   12         MR. KELLY:  Thanks.

09:54:59   13   BY MR. KELLY:

09:54:59   14         Q.   Mr. Lawless, while you were serving as the

09:55:01   15   Director of Public Safety, what, if any, intelligence

09:55:06   16   briefings did you receive from the FAA concerning the

09:55:12   17   threat of terrorism against the aviation industry?

09:55:21   18         A.   I received numerous briefings from the FAA

09:55:24   19   on the threat of terrorism against civil aviation.

09:55:29   20         Q.   And can you describe first the frequency

09:55:32   21   of these briefings?

09:55:39   22         A.   I would characterize the briefings as

09:55:43   23   conducted as needed.  So, if an occasion arose where

09:55:48   24   there was specific intelligence that came up, then a

09:55:53   25   briefing would be held by the FAA.  And there were --

Page 244

1          JOSEPH M. LAWLESS - CONFIDENTIAL

11:26:15    2    menacing or posed a threat, that that person had the

11:26:18    3    discretion to stop the item from being carried?

11:26:21    4         A.   Yes.

11:26:23    5         Q.   And what role, if any, to your knowledge,

11:26:25    6    did the law enforcement officers of the state police

11:26:28    7    that were standing there by the checkpoint, what role

11:26:33    8    did they play in making any of those judgments, if you

11:26:37    9    know?

11:26:38   10         A.   Well, the state police officers assigned

11:26:40   11    to the terminals would respond if they were called over

11:26:44   12    to the checkpoint.  They wouldn't stand there looking

11:26:48   13    at the screen, let's say.

11:26:50   14              If they were called, they were called

11:26:53   15    to investigate the possibility of a crime.  And if they

11:26:58   16    determined it to be a crime, they would take action.

11:27:01   17         Q.   Do you know whether or not during your

11:27:02   18    term as the Director of Public Safety there were

11:27:04   19    occasions when either a ground service coordinator or a

11:27:08   20    supervisor at a checkpoint would call one of the

11:27:12   21    troopers over and ask for certain input or advice from

11:27:15   22    that trooper as to whether a particular object could be

11:27:18   23    carried through the checkpoint?  Whether that ever

11:27:22   24    happened is my question.

11:27:24   25         A.   Well, the state police weren't -- didn't

d0ea3b07-c99b-4540-be60-fc90672691f3

Page 245

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | JOSEPH M. LAWLESS - CONFIDENTIAL                   |
| 11:27:27 | 2  | make a determination of what went through or what  |
| 11:27:29 | 3  | didn't go through.                                  |
| 11:27:30 | 4  | Q.   Do you know whether or not they were ever     |
| 11:27:31 | 5  | asked for their advice or opinion in regard to those |
| 11:27:35 | 6  | matters?                                           |
| 11:27:38 | 7  | A.   I don't know.                                 |
| 11:27:39 | 8  | Q.   Did you, in connection with the training      |
| 11:27:41 | 9  | program that you earlier described for us for kind of |
| 11:27:44 | 10 | the new incoming troopers to Troop F, were they ever |
| 11:27:48 | 11 | given any kind of training or input concerning whether |
| 11:27:50 | 12 | to offer advice or support if they were asked to give |
| 11:27:56 | 13 | their opinion about whether something could be carried |
| 11:27:58 | 14 | through or not?                                     |
| 11:27:59 | 15 | A.   I don't believe they were.                    |
| 11:28:01 | 16 | Q.   Okay.  During your term as the Director of    |
| 11:28:07 | 17 | Public Safety, did you ever write a memo to the FAA |
| 11:28:16 | 18 | advising the FAA that at Logan Airport all knives were |
| 11:28:20 | 19 | to be considered menacing and should be carried --  |
| 11:28:23 | 20 | should be prohibited from being carried through the |
| 11:28:26 | 21 | checkpoints at Logan Airport?                       |
| 11:28:29 | 22 | A.   Actually, I supported the ALEAN group and     |
| 11:28:34 | 23 | their desire to have all knives prohibited from any |
| 11:28:37 | 24 | sterile area in any airport in the U.S.  To do it in |
| 11:28:41 | 25 | Boston would only solve the problem in Boston.  It  |

d0ea3b07-c99b-4540-be60-fc9067269lf3

Page 286

1          JOSEPH M. LAWLESS - CONFIDENTIAL

12:29:02    2          A.    Yes.

12:29:03    3          Q.    That the state police EOD did in fact

12:29:05    4    present a training program in the year 2000 to

12:29:09    5    checkpoint personnel that dealt with the proper

12:29:16    6    procedures for discovering suspicious items and how to

12:29:20    7    handle them?

12:29:24    8          A.    No.  You added a little extra adjectives

12:29:27    9    there.

12:29:27   10          Q.    Okay.  Why don't you tell me what that

12:29:29   11    training was?

12:29:30   12          A.    Actually, it was not a training.  It was

12:29:32   13    more of an orientation.

12:29:33   14          Q.    Okay.

12:29:33   15          A.    And it was an orientation about the latest

12:29:35   16    and greatest explosive devices that had been used, that

12:29:42   17    had appeared in those EOD circles.  And it was just a

12:29:47   18    familiarization of -- a hands-on familiarization of

12:29:50   19    those items.

12:29:50   20          Q.    And who was that training program provided

12:29:52   21    to?

12:29:53   22          A.    It was provided to security companies at

12:29:57   23    Logan Airport.

12:29:57   24          Q.    Okay.  And is that a program that you

12:30:02   25    sponsored or endorsed?

d0ea3b07-c99b-4540-be60-fc9067269lf3

Page 293

1           JOSEPH M. LAWLESS - CONFIDENTIAL

12:37:39    2    documents that you have reviewed in preparation for

12:37:42    3    your deposition?

12:37:43    4           A.   No.  I have not.

12:37:45    5           Q.   When is the last time you saw a copy of

12:37:47    6    it?

12:37:49    7           A.   2001.

12:37:49    8           Q.   Okay.  Do you recall whether that written

12:37:52    9    plan specifically listed the test items that you

12:37:55   10    proposed to use as part of your testing proposal?

12:38:02   11           A.   I don't recall.

12:38:03   12           Q.   Okay.  Do you know who drafted the written

12:38:08   13    plan?  Was that done by yourself or a member of your

12:38:11   14    staff?

12:38:11   15           A.   It was drafted by a member of the state

12:38:13   16    police.

12:38:17   17           Q.   Now, is it fair to say, Mr. Lawless, as I

12:38:21   18    think you've previously testified, that this plan for

12:38:27   19    testing using undercover state troopers met with

12:38:31   20    resistance from the FAA?

12:38:33   21               MR. MOTLEY:  Objection.  You're leaving

12:38:37   22    out the other part.

12:38:38   23               MR. KELLY:  You'll have your opportunity,

12:38:40   24    Mr. Motley.

12:38:42   25               MR. PODESTA:  These kind of speaking

Page 294

```
              1        JOSEPH M. LAWLESS - CONFIDENTIAL
12:38:45      2     objections are totally inappropriate.
12:38:47      3             MR. MOTLEY:  That is just so unfair,
12:38:48      4     Roger.  We all know what he said.  He was asked a
12:38:51      5     question by Mr. Moore at the end of the day.  You're
12:38:54      6     wasting time now.
12:38:55      7     BY MR. KELLY:
12:38:55      8        Q.   Do you understand my question,
12:38:57      9     Mr. Lawless?  Did your proposed plan meet with
12:39:00     10     resistance from the FAA?
12:39:04     11             MR. MOTLEY:  Same objection.
12:39:04     12        A.    In part.
12:39:13     13        Q.   I mean do you recall specifically being
12:39:15     14     asked by Mr. Moore the following question:
12:39:19     15             "QUESTION:  Is it also correct that" -- this
12:39:21     16     is at your previous deposition, Page 157.
12:39:24     17             "QUESTION:  Is it also correct that the
12:39:26     18     reason the initiative did not go forward prior to
12:39:29     19     September 11th, 2001, was in part the FAA's refusal to
12:39:33     20     approve that program?"
12:39:35     21             And your answer being:
12:39:37     22             "ANSWER:  Yes, it was."
12:39:40     23        A.   Yes.
12:39:41     24        Q.   Do you recall that prior testimony?  And
12:39:43     25     would I be accurate, Mr. Lawless, that that program was
```

Page 295

1        JOSEPH M. LAWLESS - CONFIDENTIAL

12:39:47    2    placed on hold and never put into effect prior to 9/11?

12:39:52    3        A.   That's correct.

12:39:53    4        Q.   Notwithstanding your very strong desire to

12:39:55    5    have done so?

12:39:57    6        A.   That's correct.

12:40:02    7        Q.   Now, am I also correct that there was --

12:40:04    8    in or around the same time frame, there was another

12:40:09    9    program which was being discussed, which was known as

12:40:13    10   the joint testing program, which was different than the

12:40:19    11   checkpoint testing program that I've just been asking

12:40:22    12   you about?

12:40:26    13       A.   I'm not sure about the name, but, yes,

12:40:28    14   there was.

12:40:28    15       Q.   Okay.  And this other program, whether

12:40:30    16   they called it the joint testing program or whatever

12:40:31    17   the name was, that program was -- would it be fair to

12:40:39    18   say that that was a creation of the FAA?

12:40:42    19       A.   Yes.

12:40:43    20       Q.   And that program was under discussion for

12:40:48    21   a period of time of many months prior to April of 2001?

12:41:00    22       A.   Just a point of clarification, I'm not

12:41:03    23   sure which program you're talking about.

12:41:04    24       Q.   I'm talking about this joint testing

12:41:06    25   program of the FAA's.  Do you know over what period of

# Exhibit J

# In The Matter Of:

*IN RE: SEPTEMBER 11 LITIGATION*

_____

**VIRGINIA BUCKINGHAM LOWEY**
*December 15, 2006*

_____

# *HIGHLY CONFIDENTIAL*
## *TC REPORTING in affliation with Merrill Corp.,*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 516-795-7444 / FAX: 212-692-9171*

**LOWEY, VIRGINIA BUCKINGHAM - Vol. I**

HIGHLY CONFIDENTIAL

Page 194

```
 1              VIRGINIA BUCKINGHAM LOWY
 2   Logan under the FAA regulations?
 3              MR. MOORE:  Objection to the form.
 4        A.   Again, the checkpoints were not within our
 5   responsibility under federal law.  So I don't believe
 6   it was required that we test them, no.
 7        Q.   Okay.  Were you aware that as part of
 8   Joe's initiative with respect to testing the
 9   checkpoints, that he asked of the laser team to start
10   trying to breach the checkpoints at Logan Airport
11   sometime around April of 2001?
12        A.   No, I'm not aware of that.
13        Q.   Were you aware that as part of
14   Joe Lawless's initiative, he intended to use
15   plainclothes detectives to conduct investigations and
16   to submit reports to him, documenting any reports of
17   successful breachings of security?
18        A.   I was made aware of the plainclothes man
19   being part of the program, yes.
20        Q.   And was that initiative actually
21   implemented, that plainclothes man testing of
22   checkpoint security?
23        A.   It was still being vetted before
24   September 11th.
25        Q.   And in being vetted, was it tested?  What
```

HIGHLY CONFIDENTIAL

```
 1               VIRGINIA BUCKINGHAM LOWY
 2    reading.
 3          Q.   Sure.  I'm sorry.  This is in the second
 4    sentence, it says --
 5               MR. MOORE:  He's in this paragraph.
 6          A.   Okay.
 7          Q.   -- we are pleased that the BAC shares
 8    Massport's view that customer service is critical to
 9    our mission to provide world class transportation
10    services to our customers.  Do you see that?
11          A.   Yes, I do now.
12          Q.   Is that -- was that -- was customer
13    service critical to the mission of Massport --
14               MR. CAMPBELL:  Objection to form.
15          Q.   -- in providing world class transportation
16    services?
17          A.   Yes.
18          Q.   And did Massport undertake the largest
19    capital program in the authority's history, including
20    the $1 billion Logan modernization program to upgrade
21    the land side facilities at Logan Airport during your
22    tenure as CEO?
23               MR. AMSTER:  Object to the form.
24          A.   That program began before my tenure but it
25    was ongoing during my tenure.
```

1              VIRGINIA BUCKINGHAM LOWY

2         Q.   Okay.  And it was a program that you

3    supported and continued during your tenure, correct?

4         A.   Yes.

5         Q.   And did it continue to be, during your

6    tenure, the purpose of the program to reduce delay at

7    Logan Airport?

8              MR. MOORE:  Objection to form.

9         A.   Could you repeat the question, please?

10        Q.   Was it part of the goal of the program to

11   reduce delays at Logan Airport?

12        A.   The air side -- what program are you

13   referring to?

14        Q.   The Air Side Improvements Program.

15        A.   And do you know what that is?  That had to

16   do with the -- a new runway and taxiway system at

17   Logan.

18        Q.   Right.  That's in that sentence?

19        A.   Yes.

20        Q.   Okay.  That was also the goal of the

21   Guaranteed Passenger Standards program, too, correct?

22   In part?

23        A.   What was?

24        Q.   To reduce delay?

25        A.   To reduce delay waiting for various -- in

HIGHLY CONFIDENTIAL

```
 1              VIRGINIA BUCKINGHAM LOWY
 2   various lines at the airport, yes.
 3         Q.   One of the lines being bags, for example?
 4   If under the Guaranteed Passenger Standards program at
 5   Massport, if the airlines couldn't get the bags from
 6   the plane to the passengers within five minutes, there
 7   was a fine assessed to the airlines, correct?
 8         A.   I don't remember the exact time frame, but
 9   I don't think you're correct with the characterization
10   of if it didn't happen one time.
11         Q.   Okay.  Why don't we go to Exhibit 212.
12   Just so I understand the program?
13         A.   Okay.
14         Q.   Let's do one example.
15         A.   Okay.
16         Q.   If you go to Page 102267.
17         A.   I'm -- okay.
18         Q.   Was it the goal of the program, according
19   to this PowerPoint presentation that you reviewed in
20   preparation for today, was one of the goals of this
21   program to reduce passenger wait time for security to
22   be processed through the security checkpoints, to
23   reduce that to five minutes?
24              MR. MOORE:  Objection.
25              MR. PODESTA:  Are you reading from
```

HIGHLY CONFIDENTIAL

1              VIRGINIA BUCKINGHAM LOWY

2    something?

3              MR. MIGLIORI:  The document.

4              MR. PODESTA:  You're back on the other

5    exhibit?

6              MR. MIGLIORI:  Yes.  I mentioned that, but

7    I'll mention it again.  It's Exhibit 212,

8    Page MP102267.

9              MR. PODESTA:  Thank you.

10             MR. MIGLIORI:  Sure.

11   BY MR. MIGLIORI:

12        Q.   Do you see these performance standards?

13        A.   Yes.  It did --

14        Q.   It says maximum wait, processing time

15   through security checkpoint.  Do you see that?

16        A.   I do.  You're not correct that the goal

17   was to reduce the time.  It was to hold the airlines to

18   the time standard they had established.

19        Q.   Okay.  So the time that the airlines had

20   established was five minutes --

21        A.   Right.

22        Q.   -- at this time, correct?

23        A.   Right.

24        Q.   And the goal, in part at least, of the

25   Guaranteed Passenger Standards program was to make sure

HIGHLY CONFIDENTIAL

```
 1              VIRGINIA BUCKINGHAM LOWY
 2    that the airlines stuck to that five-minute time for
 3    completion of security screening per passenger,
 4    correct?
 5           A.   It was the amount of time the people had
 6    to wait in the line was what we were focused on.
 7           Q.   Okay.  And what, if any, penalty was
 8    assessed at Logan to the airlines if they could not
 9    meet that established wait time?
10              MR. PODESTA:  Objection to form.
11           Q.   Go ahead.
12           A.   There were a series of procedures that
13    would kick in if they were not meeting the time
14    standard.
15           Q.   And if you can recall, what are some of
16    the procedures that kicked in?
17           A.   That would have kicked in?  Would have
18    been a letter to the station manager, pointing out the
19    problem.  Secondly, would be a letter to the next layer
20    of the corporate entity.  I don't recall the third
21    layer.
22              And the final layer would be our
23    ability to have some sway over their leases, if the
24    problem wasn't corrected, but we never expected it
25    would get to that point.  And during my tenure it
```

# Exhibit K

# In The Matter Of:

*IN RE: SEPTEMBER 11 LITIGATION  No. 21 MC 101 (AKH)*

_____

### EDWARD C.  FRENI
*January 25, 2011*

_____

*CONFIDENTIAL*
## *TC REPORTING in affiliation with Merrill Corp.*
### *1 DEERFIELD EAST - 1850*
### *QUOGUE, NY 11959*
*PH: 516-795-7444 / FAX: 212-692-9171*

**FRENI, EDWARD C.  - Vol. 1**

CONFIDENTIAL
EDWARD C.  FRENI - 1/25/2011

Page 59

1           EDWARD C. FRENI - CONFIDENTIAL

17:43:32   2   security checkpoint standard requiring a passenger to

17:43:38   3   pass through checkpoint security in five minutes or

17:43:41   4   less.  Is that correct?  And you could -- I'll call

17:43:45   5   your attention to Page 102267.

17:43:59   6          A.   Could you repeat the question.

17:44:02   7          Q.   Yes.  Is one of the features of the

17:44:06   8   Guaranteed Passenger Standards Program a requirement

17:44:12   9   that passengers pass through checkpoint security within

17:44:18   10  five minutes or less?

17:44:22   11         A.   I didn't categorize it as a requirement.

17:44:25   12  It was a measurement.

17:44:27   13         Q.   It says, "maximum wait/processing time."

17:44:30   14  Correct?

17:44:32   15         A.   Yes.

17:44:34   16         Q.   Were the airlines that were tenants of

17:44:38   17  Massport at Logan Airport instructed that they should

17:44:46   18  have their passengers pass through a security

17:44:50   19  checkpoint within five minutes?

17:44:53   20             MR. BURTON:  Objection to the form.

17:44:54   21         A.   That wasn't the intent of the program.

17:44:56   22  The intent of the program was to utilize the resources

17:44:59   23  available.  If passengers were in line and there was

17:45:03   24  another machine available, and can be manned, then

17:45:06   25  that's what the intent of the program was.

CONFIDENTIAL
EDWARD C.  FRENI - 1/25/2011

Page 66

```
          1              EDWARD C. FRENI - CONFIDENTIAL
17:54:16  2              (Discussion off the record.)
17:54:35  3              MR. COHEN:  I have no further questions.
17:54:37  4    Thank you very much.
17:54:42  5              MR. BURTON:  We have just one.
17:54:45  6                   CROSS-EXAMINATION
17:54:47  7    BY MR. BURTON:
17:54:48  8         Q.   Mr. Freni, was -- do you recall if the
17:54:49  9    Guaranteed Passenger Standards Program was in effect --
17:54:51 10    still in effect on 9/11?
17:54:55 11         A.   Yes.
17:54:56 12         Q.   Was it in effect on 9/11?
17:54:58 13         A.   No.
17:55:01 14              MR. BURTON:  No further questions.
17:55:01 15                   REDIRECT EXAMINATION
17:55:02 16    BY MR. COHEN:
17:55:04 17         Q.   How do you know that?
17:55:04 18         A.   It disbanded before 9/11.
17:55:06 19         Q.   When did it disband?
17:55:07 20         A.   I don't know the exact date.
17:55:09 21         Q.   How was it disbanded?
17:55:10 22         A.   Well, we withdrew from our -- our
17:55:12 23    observations.
17:55:17 24         Q.   And how were -- were the airlines notified
17:55:19 25    of that?
```

CONFIDENTIAL
EDWARD C.  FRENI - 1/25/2011

Page 68

1           EDWARD C. FRENI - CONFIDENTIAL

17:56:14  2   were aware of changes or the disbandment of the

17:56:17  3   Guaranteed Passenger Standards Program?

17:56:21  4           MR. BURTON:  Objection to the form.

17:56:21  5       A.   No.

17:56:27  6       Q.   Did the Guaranteed Passenger Standards

17:56:28  7   Program continue to exist in any other form prior to

17:56:37  8   9/11?

17:56:38  9       A.   Not that I'm aware of.

17:56:46 10       Q.   Who made the executive decision to disband

17:56:48 11   the program?

17:56:51 12       A.   It was a collective decision, based on

17:56:54 13   discussions with the airlines.

17:56:56 14       Q.   Who at Massport made the ultimate decision

17:57:02 15   to disband the program?

17:57:06 16           MR. BURTON:  Objection to the form.

17:57:06 17       A.   I believe --

17:57:09 18           MR. BURTON:  You can go ahead.

17:57:10 19       A.   I believe it was Tom Kinton and myself.

17:57:12 20       Q.   And what makes you -- what date was the --

17:57:16 21   was the program disbanded?

17:57:17 22       A.   I don't recall.

17:57:19 23       Q.   And how is it that you recall that it was

17:57:21 24   before September 11th, rather than after

17:57:23 25   September 11th?

CONFIDENTIAL
EDWARD C.   FRENI - 1/25/2011

Page 69

          1        EDWARD C. FRENI - CONFIDENTIAL

17:57:24   2        A.   My recollection is it was well before

17:57:28   3   9/11.

17:57:28   4        Q.   How long do you think the program was in

17:57:30   5   operation?

17:57:32   6        A.   A few months.

17:57:48   7        Q.   Was the program in effect on May 11, 2001?

17:57:51   8        A.   I don't recall.

17:58:01   9             MR. COHEN:  All right.  I have no further

17:58:02  10   questions.

17:58:05  11             MR. BURTON:  Thank you.

17:58:07  12             THE VIDEOGRAPHER:  This concludes the

17:58:08  13   January 25, 2011 deposition of Ed Freni.  Going off the

17:58:12  14   record.  This is the end of Tape 1 of one tape used

17:58:16  15   today.  The time is 5:58 p.m.

17:58:18  16        (Deposition concluded at 5:58 p.m.)

          17

          18

          19

          20

          21

          22

          23

          24

          25

# Exhibit L

# In The Matter Of:

*In Re: SEPTEMBER 11 LITIGATION,*

_____

### MARK K. HUSSEY
*March 14, 2007*

_____

## *HIGHLY CONFIDENTIAL*
## *TC REPORTING in affliation with Merrill Legal Solutions*

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 516-795-7444 / FAX: 212-692-9171

**HUSSEY, MARK K. - Vol. I**

```
              1            MARK K. HUSSEY - CONFIDENTIAL
12:50:52  2   Massport about the appropriateness of establishing a
12:50:57  3   standard for security screening in terms of time?
12:51:03  4        A.   No.  Not -- not that I am aware of, that I
12:51:07  5   recall.
12:51:09  6        Q.   Did you ever receive a letter from
12:51:11  7   Mr. Duval indicating that United was exceeding the
12:51:16  8   five-minute standard that had been set to complete
12:51:19  9   security screening?
12:51:21 10        A.   Not that I recall.  Again, it wasn't a
12:51:27 11   measurement that we were focused on internally.
12:51:39 12        Q.   Do you know whether Massport monitored
12:51:43 13   your security check operations for compliance with the
12:51:49 14   GPS standards?
12:51:52 15        A.   I don't recall.
12:52:33 16        Q.   Are you familiar with the Logan Airlines
12:52:35 17   Management Council?
12:52:38 18             MR. FEAGLEY:  Excuse me, before we enter a
12:52:41 19   new topic.  Can you tell me whether you're planning to
12:52:43 20   take a lunch break today or to work through?
12:52:46 21             MS. HESSION:  Yes.  No.  I think we should
12:52:47 22   take a lunch break.  Would you like to do that now
12:52:49 23   before I go on to a new topic?
12:52:51 24             MR. FEAGLEY:  It's your deposition.  I
12:52:53 25   don't know if the food is here or not, and I don't know
```

# Exhibit M

# In The Matter Of:

## IN RE:  SEPTEMBER 11 LITIGATION

_____

### MOHAMED A. SHARRIF
*December 14, 2006*

_____

## *HIGHLY CONFIDENTIAL*
## *TC REPORTING in affliation with Merrill Corp.,*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 516-795-7444 / FAX: 212-692-9171*

### SHARRIF, MOHAMED A. - Vol. 1

HIGHLY CONFIDENTIAL

Page 164

12:33:10 1    plane on September 11th?

12:33:31 2        A.    No.

12:33:35 3        Q.    At any time prior to September 11th, 2001,

12:33:38 4    while you worked for Huntleigh, were you ever given any

12:33:42 5    instruction or training regarding the length of time it

12:33:46 6    should take for passengers to get through the

12:33:47 7    checkpoints?

12:33:51 8        A.    No.

12:33:54 9        Q.    Were you ever given any instruction as to

12:33:59 10   how quickly a passenger should get through a

12:34:00 11   checkpoint?

12:34:01 12       A.    No.

12:34:03 13       Q.    Were you ever given any instruction as to

12:34:10 14   how long it should take to inspect a bag using an x-ray

12:34:12 15   machine?

12:34:14 16       A.    No.

12:34:16 17       Q.    Were you ever given any instruction as to

12:34:22 18   how much time you should spend doing a hand wanding?

12:34:23 19       A.    Can you again, please?

12:34:25 20       Q.    Yes.  Were you ever given any instruction

12:34:29 21   or training as to how much time you should spend doing

12:34:32 22   a hand wand of a passenger?

12:34:34 23       A.    No.

        24        Q.    How much time did you usually spend doing

HIGHLY CONFIDENTIAL

Page 165

| | | |
|---|---|---|
| 12:34:38 | 1 | a hand wand of a passenger? |
| 12:34:43 | 2 | A.   Actually, as long as I finish.  As long as |
| 12:34:47 | 3 | I finish hand wand, there is no limit.  I have to make |
| 12:35:26 | 4 | sure of everything. |
| 12:35:29 | 5 | Q.   Were you ever given any training to |
| 12:35:33 | 6 | observe and watch the passengers to determine if |
| 12:35:39 | 7 | they're trying to conceal or hide a weapon? |
| 12:35:40 | 8 | MR. ROSS:  You're saying just by looking |
| 12:35:41 | 9 | at them? |
| 12:35:43 | 10 | A.   What do you mean by that, please? |
| 12:35:43 | 11 | MR. ROSS:  Hold on a second.  Objection, |
| 12:35:47 | 12 | because I'm not quite sure what you mean by the |
| 12:35:48 | 13 | question. |
| 12:35:48 | 14 | BY MR. COHEN: |
| 12:35:50 | 15 | Q.   By looking at the passenger, were you ever |
| 12:35:53 | 16 | given any training -- |
| 12:35:54 | 17 | A.   Give me? |
| 12:35:56 | 18 | Q.   -- as to try to determine from looking at |
| 12:36:00 | 19 | the passengers whether they're trying to hide or |
| 12:36:05 | 20 | conceal a weapon? |
| 12:36:06 | 21 | COUNSEL:  Object. |
| 12:36:08 | 22 | MR. GERSTNER:  Object to the form. |
| 12:36:08 | 23 | THE WITNESS:  No. |
| | 24 | BY MR. COHEN: |

# Exhibit N

# In The Matter Of:

## IN RE SEPTEMBER 11 LITIGATION

_____

### MOHAMED A. OSMAN
*May 23, 2007*

_____

## *CONFIDENTIAL*
## *TC REPORTING in affliation with Merrill Corp.*
### *25 West 45th Street - Suite 900*
### *New York, NY 10036*
*PH: 212-931-6571 / FAX: 212-692-9171*

### OSMAN MOHAMED A. - Vol. I

Page 99

1            MOHAMED A. OSMAN - CONFIDENTIAL

14:16:51    2            MR. ROSS:  Hold on.  Hold on.  Are we

14:16:52    3    talking when he was a PBS or as a CSS?

14:16:55    4            Q.  Either.  If you were as a CSS at the

14:16:57    5    checkpoint?

14:16:57    6            A.  Yes.

14:16:58    7            Q.  If you're a PBS at that checkpoint, prior

14:17:01    8    to September 11th, your testimony is that the

14:17:03    9    checkpoint supervisor would be called?

14:17:05   10            A.  I have to call the supervisor.

14:17:07   11            Q.  Every knife you see, you call the

14:17:09   12    supervisor?

14:17:10   13            A.  Absolutely right.

14:17:10   14            Q.  Okay.  The checkpoint supervisor comes to

14:17:12   15    look at the knife?

14:17:13   16            A.  Look at the knife, yes.

14:17:13   17            Q.  And how does the checkpoint supervisor

14:17:15   18    know whether the knife is four inches?

14:17:16   19            A.  First, he's going to look at it.

14:17:18   20            Q.  Right.

14:17:18   21            A.  The second, he's going to measure.

14:17:20   22            Q.  So, every knife that came through security

14:17:22   23    was checked by a CSS and measured with a ruler?

14:17:26   24            A.  Correct.

14:17:39   25            Q.  When you were a PBS or a CSS, prior to

7771ae11-cf58-4ed4-bc1d-4632710bfedd

Page 100

1          MOHAMED A. OSMAN - CONFIDENTIAL

14:17:42    2     September 11th, was there ever a time when anyone

14:17:46    3     complained about security taking too long at the

14:17:48    4     checkpoint?

14:17:51    5          A.   Security taking too long?

14:17:52    6          Q.   Yes.  About lines getting too long at the

14:17:56    7     checkpoint?

14:17:58    8          A.   I don't remember.

14:18:00    9          Q.   Did you ever have -- did anyone ever have

14:18:03    10    a conversation with you specifically about speeding up

14:18:05    11    the security at the checkpoint?

14:18:07    12         A.   Mm-mmm.  No.

14:18:16    13              MR. KAPLAN:  Take like a one- or

14:18:17    14    two-minute break.  I just want to check.  I may be

14:18:20    15    done.

14:18:20    16              THE VIDEOGRAPHER:  Going off the record.

14:18:21    17    The time is now 2:18 p.m.

14:18:24    18              (A recess was taken.)

14:24:40    19              THE VIDEOGRAPHER:  Back on the record.

14:24:41    20    The time is now 2:24 p.m.

14:24:44    21              MR. KAPLAN:  Mr. Osman, thank you for your

14:24:46    22    testimony.  I have nothing further at this time,

14:24:48    23    subject to Mr. Ross having some questions.

14:24:51    24              MR. ROSS:  I might have a few, but anybody

14:24:52    25    else before I start?

7771ae11-cf58-4ed4-bc1d-4632710bfedd

# Exhibit O

# Expert Report
# <u>Bavis v. United Airlines, Inc. et al.</u>
# 02-CV-7154(AKH)

## Evan F. Kohlmann
### May 2011

My full name is Evan Francois Kohlmann. I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements. I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School. I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University. I currently work as an investigator with the NEFA Foundation and as an on-air analyst for NBC News in the United States. I also run an Internet website Globalterroralert.com that provides information to the general public relating to international terrorism. I am author of the book <u>Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network</u> (Berg/Oxford International Press, London, 2004) which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites. I have testified on eleven occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, and Bosnia-Herzegovina. I have testified twice as an expert witness in U.S. civil cases, <u>Gates v. Syrian Arab Republic</u> and <u>Amduso v. Sudan</u> before the U.S. District Court for the District of Columbia. I have additionally testified as an approved expert witness in United States federal and military courts in seventeen criminal cases; including:

- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2004)
- <u>United States v. Ali Timimi</u> (Eastern District of Virginia, 2005)
- <u>United States v. Uzair Paracha</u> (Southern District of New York, 2005)
- <u>United States v. Ali Asad Chandia</u> (Eastern District of Virginia, 2006)
- <u>United States v. Yassin Aref</u> (Northern District of New York, 2006.
- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2007)

1

- United States v. Rafiq Sabir (Southern District of New York, 2007)
- United States v. Emaddedine Muntasser (District of Massachusetts, 2007)
- United States v. Hassan Abu Jihaad (District of Connecticut, 2008)
- United States v. Mohammed Amawi et al. (Northern District of Ohio, 2008)
- United States v. Salim Hamdan (Guantanamo Bay Military Commissions, 2008)
- United States v. Ali Hamza al-Bahlul (Guantanamo Bay Military Commissions, 2008)
- United States v. Mohamed Shnewer et al. (District of New Jersey, 2008)
- United States v. Oussama Kassir (Southern District of New York, 2009)
- United States v. Syed Haris Ahmed (Northern District of Georgia, 2009)
- United States v. Ehsanul Sadequee (Northern District of Georgia, 2009)
- United States v. Pete Seda et al. (District of Oregon, 2010)

In United States v. Uzair Paracha, Federal District Judge Sidney Stein held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding: "Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and… Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence."

Likewise, in United States v. Hassan Abu Jihaad, Federal District Judge Mark Kravitz held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding, "Mr. Kohlmann is certainly qualified to provide expert testimony… Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism… Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda… and the other subjects on which he will offer testimony. Indeed… it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects… Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded."

Similarly, during United States v. Syed Haris Ahmed, Federal District Judge William S. Duffey Jr. held a Daubert hearing on my qualifications as an expert witness, and noted in his published ruling, "Kohlmann has developed an understanding of terrorist organization structures, operations, and membership, allowing him to speak with authority about Al-Qaeda in Iraq, Lashkar-e-Taiba, and Jaish-e-Mohammed. His research and experience have provided him a base of understanding far greater, and far more sophisticated, than of the Court or of jurors… A person lacking Kohlmann's advanced knowledge of JeM and LeT essentially would not be able to recognize the information on Khan's hard drive as information that might link a person to JeM or LeT."

Most recently, on February 4, 2011, the U.S. 2nd Circuit Court of Appeals issued a formal ruling regarding the admissibility of my testimony during United States v. Rafiq Sabir (2007): "Kohlmann has, in fact, been qualified as an expert on al Qaeda and terrorism in a number of federal prosecutions… Kohlmann's proposed expert testimony

2

had a considerable factual basis... We conclude that the district court acted well within its discretion in concluding that Kohlmann's testimony satisfied the enumerated requirements of Rule 702... Such testimony was plainly relevant to mens rea."

A complete copy of my curriculum vitae is attached as Exhibit 1 and I am being compensated at the hourly rate of $225.00 per hour.

## I.) Research and Archival Methodology

The methodology employed in formulating this report is derived from techniques taught to me by the late Dr. Joseph Lepgold, a senior faculty member from the Department of Government of the Edmund A. Walsh School of Foreign Service (SFS) at Georgetown University, as part of official coursework towards the completion of my Georgetown University Senior Honors Thesis, "The Legacy of the Arab-Afghans: A Case Study." Sources of research in the field of terrorism and terrorist organizations can loosely be divided into three sub-categories: primary sources, secondary sources, and tertiary sources. Primary sources are generally considered to be the most credible and most authentic sources of information for objective analysis. Examples of primary sources would include a face-to-face interview with the leader of a terrorist organization, an in-person visit to a training camp, or directly witnessing a terrorist attack. However, because international terrorist organizations are, by their very nature, secretive organizations which operate clandestinely, access to primary sources is rare and inconsistent. As such, frequently, terrorism analysts must instead turn to secondary sources in order to gain a deeper understanding of these groups. Examples of secondary sources would include an original video or audio recording of a terrorist leader, published written communiqués, or an official magazine/website created by a terrorist organization. Secondary sources can occasionally be self-authenticating (i.e. a high-resolution video of an unmasked individual speaking) or can require deductive reasoning in order to determine their authenticity. Beyond primary and secondary sources, there is one further category of research: tertiary sources. Examples of tertiary sources would include a newspaper article, a television news report, or a book or magazine published by a reputable third party. However, because the information offered in tertiary sources often comes through a convoluted or unclear chain of custody, I limit my own use of tertiary sources to add additional context to information already confirmed by primary or secondary sources.

In order to determine the provenance of particular secondary or tertiary sources, I engage in a traditional social science method known as "comparative analysis." This requires me to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes. By drawing from a wide assortment of primary and secondary sources, I establish a single, objective narrative—while simultaneously noting any significant factual discrepancies or conflicting data. During a May 2009 *Daubert* hearing before Judge William S. Duffey Jr. in the Northern District of Georgia, I explained the process of "comparative analysis" and how I rely upon it when making determinations of fact. This testimony was subsequently summarized by Judge Duffey in his own published ruling qualifying me as an expert:

"The basis for Kohlmann's testimony, generally, is his years of research and tracking of terrorist information, through websites, primary interviews, books, news articles, and journals, and other information. His testimony essentially synthesizes these concepts, and through the use of the comparative analysis methodology, Kohlmann has developed an understanding of terrorist organization structures, operations, and membership... Kohlmann testified in detail regarding the methodology of comparative analysis, how it is relied upon by experts in social sciences, and how the particular information he gathers allows him to perform reliable analysis. He specifically testified to how he gathers and analyzes information from primary, secondary, and tertiary sources, and he explained the difference between the sources and why and how he relies on each differently. He further explained how comparative analysis is performed, assimilating the relevant information and comparing and contrasting sources against one another to form a cohesive whole. The sources Kohlmann uses and the methodology he employs to analyze those sources, are identical to those used by other experts in his field. Kohlmann explained his methodology and how he used the methodology to arrive at his opinions in this case. The defendants did not offer any evidence at the hearing or subsequent to it to suggest that Kohlmann's methodology is not sound or is not the same methodology typically relied upon by other social scientists... Mr. Kohlmann's ability to synthesize that information through comparative analysis establishes his qualification as an expert."

## II.)   Applying Research Methodology to Plaintiffs' Case

In March 2011, Plaintiff's attorneys in the above-entitled action requested that I draft an expert report addressing responses to two central questions:

1.) Did the nineteen men who hijacked four planes on the morning of September 11th act together as part of a common plan or scheme? If so, what was the plan on the morning of September 11th and how was the attack carried out?

2.) Prior to September 11th was there publicly available information to indicate whether Al-Qaida had an intent and ability to attack civil aviation in the United States?

I will address these questions in turn below.

## III.)   The Plot Behind the September 11, 2001 Suicide Hijackings

In short, there is voluminous, overwhelming evidence that the nineteen men who hijacked four planes on September 11, 2001 were acting together as part of a common plan or scheme. Apart from circumstantial and corroborative evidence recovered in the form of telephone and e-mail records, airline tickets, customs forms, and international financial transfers, both the terrorist organization Al-Qaida itself and those individual commanders responsible for masterminding the 9/11 terrorist attacks on the United States have repeatedly acknowledged—and even boasted of—the level of coordination and planning behind the suicide hijackings.

Lead 9/11 hijacker Mohammed Atta's lost luggage from his earlier connecting flight to Boston offers strong evidence of the planning and preparation undertaken by the hijackers in the hours leading up to the suicide hijackings. Inside a black bag that Atta

4

intended to be loaded on American Airlines Flight 11 was a four-page handwritten Arabic-language letter titled, "The Last Night."[1]  Copies of the same letter were also found at the Flight 93 crash site in Shanksville, Pennsylvania and in Flight 77 hijacker Nawaf al-Hazmi's car left at Dulles.[2]  The letter appears to be instructions and guidance for the hijackers, whose words are strongly reflected in the subsequent events on 9/11. The letter urges readers to "embrace the will to die and renew allegiance... familiarize yourself with the plan well from every aspect, and anticipate the reaction and resistance from the enemy... Spray on yourself, the suitcase, clothes, the knife, your tools, your Ids, your (Tick), your passport, and all your documents.  Examine your weapon before departure, and it was said before the departure, 'Each of you must sharpen his blade and go out and wound his sacrifice."[3]

The letter then gives a proposed step-by-step itinerary for the hijackers, including boarding a flight, and then "storming" the cockpit:

> When you board the 'P' [plane], when you first place you foot in it, recite the prayers and remember, it is a raid/invasion for the sake [of Allah]... If the 'P' makes a movement and begins to head towards Qaf [the runway] then you recite the prayer of travel... Then you will see it stop, then take off... Pray that you and all your brothers will conquer, win, and hit the target without fear... When the storming begins, strike like heroes who are determined not to return to this world.  Glorify [Allah] because this cry will strike terror in the hearts of the infidels... It is necessary to give precedence to the mission and the group, because this is each individual's duty ... When the time of truth and the Zero Hour arrives, then rip open your clothes, and bare your chest to embrace death for the same of Allah!  ...Seconds before the target... your last words should be: 'There is no god but Allah. Mohammed is His messenger.'"[4]

[1] "Memorandum for the Record: Review of investigation conducted by the FBI of Atta's suitcases at Boston, MA," prepared by: Quinn John Tamm, Jr., dated February 10, 2004.
[2] "Four page hand-written letter with Arabic writing, found in luggage recovered at Logan Airport, Boston, Massachusetts - RE: The Last Night (Translation) (BS01101T)," MR_AVSEC00119901. See also: "Four (4) page handwritten letter with Arabic writing, found in outermost pouch of bag from K124 (item 1, 1B3) (Barcode E02092446); The following specimens were obtained from recovered luggage and were personally delivered to the FBI Laboratory by SA Kenneth Heitkamp of the Boston Field Office (010917003HCHLHOEZEAGQFY)," FBI23301-FBI23304; "Two (2) sheets of paper stapled together bearing possible Arabic writing (your 1B340, barcode E02060209); The following items were recovered from the search of a Toyota Corolla on September 12, 2001, located at Dulles International Airport," FBI23736-FBI23739; "Small pieces of burned paper with possible Arabic writing (1B292, barcode E0191583); The following specimens were recovered from the Shanksville, PA crash site and personally delivered to the Laboratory by SA Steven N. Beilich, from the Pittsburgh Field Office (010919042HCHLHFYEZEAAI)," FBI24009; "Small pieces of burned paper w/ possible Arabic writing (1B292, Barcode E01991583); The following specimens were recovered from the Shanksville, PA crash site and personally delivered to the Laboratory by SA Steven N. Beilich, from the Pittsburgh Field Office (010919042 HC HL H FY EZ EA AI)," FBI26553-FBI26554; "Paper fragments with Arabic text (your 1B2315, barcode E01991806); The following specimens were recovered from the United Airlines flight 93 crash site in Somerset County, Pennsylvania and submitted to the Laboratory under cover of communication dated October 5, 2001 (011012010HCHLHOEZEA)," FBI28782-FBI28783.
[3] "Four page hand-written letter with Arabic writing, found in luggage recovered at Logan Airport, Boston, Massachusetts - RE: The Last Night (Translation) (BS01101T)," United States v. Zacarias Moussaoui, MR_AVSEC00119901 – MR_AVSEC00119911.
[4] "Four page hand-written letter with Arabic writing, found in luggage recovered at Logan Airport, Boston, Massachusetts - RE: The Last Night (Translation) (BS01101T)," United States v. Zacarias Moussaoui, MR_AVSEC00119901 – MR_AVSEC00119911.

5

In a series of statements offered as a "substitution for testimony" by the U.S. government in U.S. v. Zacarias Moussaoui, professed 9/11 mastermind Khalid Shaykh Mohammed (a.k.a. "Mukhtar" and hereby reffered to as "KSM") claimed that the hijackers were largely aware from the outset that they were intended as participants "in a martyr operation in which aircraft would be flown into unspecified targets."[5] This claim was later corroborated by Al Qaida in its propaganda video, "Knowledge is for Acting Upon," which intended to serve as an approved retelling from Al-Qaida's perspective of the planning and description of how the 9/11 attacks were carried out.[6] According to KSM, even the "muscle" hijackers— who would take control of the plane until the moment of impact and who were deliberately kept out of the loop for security reasons— "knew that they were involved in a martyrdom operation and that it involved traveling to the U.S."[7] As for the "brother pilots," -- who were responsible for continuing their training and preparation inside the U.S. throughout the months leading up to the attack – each of them was allegedly "informed of the details of the planned attack when they agreed to participate":

> "Nawaf al-Hazmi and Khalid al-Mihdhar, who were the first members chosen to participate in the operation, learned the planned method of attack in October or November 1999... The Hamburg cell, Atta, al-Shehhi, Jarrah, and Bin al-Shibh, learned the details of the method of attack and the planned targets when they were chosen to be pilots in late 1999 or early 2000. Similarly, Hani Hanjour was informed of all these details when he was chosen as a pilot."[8]

Flight 11 Hijacker Wael al-Shehri calmly recounted on camera in footage released by Al-Qaida, "when I and my brothers carried out research and asked the people of knowledge about what will weaken them and upset their plans, we found that the martyrdom operation is the best way to wound the enemies and terrorize them, especially when confronting them with regular, conventional tactics is not feasible."[9] In another propaganda video about 9/11 produced separately by As-Sahab Media, Flight 11 hijacker Abdelaziz al-Omari was shown speaking in front of superimposed images of the damaged Pentagon in Washington D.C. and appealing for "Allah to reward those who trained me on this path and have been instrumental in this great work. I mention in particular the Mujahid leader Shaykh Usama Bin Muhammad Bin Ladin–may Allah protect him from the plots of the plotters... May Allah place this act with his good deeds and reward him well on our behalf."[10]

---

[5] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973.
[6] "As-Sahab Presents 9-11 Videos," September 10, 2006.
[7] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973. See also: "As-Sahab Presents 9-11 Videos," September 10, 2006.
[8] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973. See also: "As-Sahab Presents 9-11 Videos," September 10, 2006.
[9] "As-Sahab Presents 9-11 Videos," September 10, 2006.
[10] As-Sahab Media Foundation. "The Will of Abu al-Abbas al-Junoobi." Released: September 2002.

6

The hijackers received critical training from "Abu Turab the Jordanian," an individual "with long experience in al-Qaeda" who "had full knowledge [of 9/11] because of his job as trainer of ten of the 'muscle' hijackers at the al-Matar complex during late 2000-early 2001."[11]  Strongly substantiating the account offered in the video "Knowledge is for Acting Upon", KSM described how "Abu Turab trained them in conducting hijackings – including how to take over the navigation cabin, enabling the pilots to fly the planes towards the targets and ensuring protection for the pilots until the moment of impact – and in the use of basic English words and phrases":

> "At al-Faruq camp, Abu Turab also had each hijacker butcher a sheep and camel with a Swiss knife to prepare them for using their knives during the hijackings.  Abu Turab, in consultation with Sheikh Mohammed, instructed the muscle hijackers to focus on seizing the cockpit first and then worry about seizing control over the rest of the plane.  The hijackers were told to storm the cockpit at the moment that the pilot cabin door opened, and to avoid trying to break down the door if necessary."[12]

Usama Bin Laden "personally supervised all stages of the plan, even keeping tabs on the stage which the teams of pilots had reached through the coordinator of the attack and the head of logistical support.[13]  However, although Al-Qaida's leadership, had come up with a suggested list of targets on the east coast of the U.S., KSM emphasized that "the final decisions to hit which target with which plane was entirely in the hands of the pilots."[14]  Indeed, according to Al-Qaida, "Once the hijacker pilots 'completed the training stage and became ready to execute their missions, the surveillance team finished gathering the necessary data on the preliminary targets which had been determined previously. And following consultation and exchange of opinions according to the results of the surveillance, four strategic targets were chosen for the military, psychological and economic impact their hitting would have on the American government and people.'"[15]

In order to make these "final decisions" as the date September 11 approached, "the operatives had to contact each other in order to organize their final details."[16]  There are records of communication between the hijackers as late as the morning of 9/11, confirming that the hijacking teams were in precise contact with one another in order to coordinate last-minute preparations and planning. According to a staff report by the bi-partisan Congressional 9/11 Commission dated August 26, 2004, telephone records indicate that a three-minute call was placed at 6:52am from a pay phone in a gate area of Terminal C at Boston's Logan Airport to Atta's cell phone.[17]  The 9/11 Commission staff

---

[11] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973.

[12] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973.  See also: "As-Sahab Presents 9-11 Videos," September 10, 2006.

[13] "As-Sahab Presents 9-11 Videos," September 10, 2006.

[14] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973.

[15] "As-Sahab Presents 9-11 Videos," September 10, 2006.

[16] "Substitution for the Testimony of Khalid Sheikh Mohammed," United States v. Zacarias Moussaoui, MR_AVSEC00130916 - MR_AVSEC00130973.

[17] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131599.

report concluded that the call "was most likely a last-minute check between Flight 11 hijacker Atta, who had just arrived in Boston, and Flight 175 hijacker Marwan al-Shehhi." It further noted that "this call strongly suggests that the two hijacking teams engaged in tactical communications, such as situational reporting and possible 'go' or 'no go' determinations, at the last moment."[18]

Rather than directly boarding his target, American Airlines Flight 11, at its point of origin in Boston, Atta made the curious decision of connecting with another hijacker via a commuter flight from Portland, Maine. According to the 9/11 Commission staff report from August 2004, Atta's choice was evidently influenced by security concerns, given how many hijackers would be passing through the ticket counters of Logan Airport in such a short span of time: "the hijackers did not want to make themselves conspicuous by congregating."[19]

As noted by the August 26, 2004 staff report from the Congressional 9/11 Commission, the events of 9/11 and the testimony of eyewitnesses from that day shows substantial evidence of both strategic and tactical planning on the part of the hijackers. The four hijacking teams consisted of four to five Middle Eastern men in their twenties. Strategically, the hijackers had carefully selected "early morning departures from East Coast airports aboard large Boeing 757 and 767 for which they had trained. The planes carried large amounts of fuel for their transcontinental flights, maximizing the destructive power of the crash." Not only did all of the hijackers purchase their airline tickets in the same narrow window between mid and late August, but moreover, they all selected seats in the first or business-class section within the first 10 rows of seats. These seating arrangements "facilitated the isolation of the front of the aircraft and the hijacker pilot's entry into the cockpit."[20] Once the cockpits had been seized, nearby passengers were herded up and confined to the back of each of the aircraft.

Conversely, the actual tactics that would be employed by the four hijacking teams onboard the aircraft were remarkably similar. Three of the four hijackings all began in the same precise 30-minute window between 8:24am and 8:54am on September 11. The lone outlier, United Airlines Flight 93, was seized by Ziad Jarrah and his team at 9:28am, approximately 45 minutes later than the others. However, it should be noted in this regard that "because of typical local air traffic congestion," the original departure of Flight 93 from Newark Airport was unexpectedly delayed by exactly 42 minutes.[21] Had the flight left on time, it is very likely that the hijackers on this flight would not have deviated from the others in this respect.

The 9/11 hijackers used knives, boxcutters and mace to hijack the four aircraft. The simplicity of these weapons was an intentional tactic employed by Al-Qaida at its

---

[18] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131598.
[19] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131598.
[20] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131642.
[21] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131630.

camps in Afghanistan.[22]   Records of purchases by the hijackers, as well as evidence discovered at the crash sites indicate that the primary weapons of choice were knives. The use of knives was cited on all four flights by flight crew and passengers.   Merchant records subsequently recovered by U.S. law enforcement show multiple purchases of knives boxcutters and "multi-tool" instruments by 9/11 hijackers all between July 8 and August 30, 2001.[23]

What is known about the 9/11 hijackers' training, their weapons purchases, and plot instructions, including how to pack weapons in their carry-ons, how they choose to dress for the flights, the types of weapons they choose, their repeated surveillance of checkpoints, and their test runs earlier in the summer, suggest, in my opinion, that the hijackers targeted the checkpoints as the weak point in the security system through which to bring their weapons.   There is no convincing evidence in their training or activities leading up to the attacks that they intended to sneak weapons through other access points at the airports.

On each flight, the use of mace and weapons to storm the cockpit and maintain control of the aircraft was employed in a relatively precise, parallel manner.

- Flight 11: flight attendant for American Airlines Flight 11, Betty Ong, described in a telephone call, "Our first class... galley flight attendant and our purser has been stabbed."[24]   Betty Ong also told airline personnel, "we can't breathe in business class.  Somebody's got mace or something."[25]   A third individual on Flight 11, passenger Daniel Lewin—seated in business class directly in front of hijacker Satam al-Suqami—was also attacked and reportedly had his throat slashed.[26]

- Flight 175: the hijacking of United Airlines Flight 175 "unfolded in much the same manner as on Flight 11."[27]   The final published report of the 9/11 Commission noted, "given similarities to American 11 in hijacker seating and in eyewitness reports of tactics and weapons, as well as the contact between the presumed team leaders, Atta and Shehhi, we believe the tactics were similar on both flights."[28]   The specific events of Flight 175 will be described in detail at the end of this section.

---

[22] As part of their training "to properly prepare them to join their brothers who preceded them to the land of the enemy, where the battle would be fought", the hijackers were expected to practice killing using knives and blades "by slaughtering camels."  "As-Sahab Presents 9-11 Videos," September 10, 2006.
[23] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131611, MR_AVSEC00131695, MR_AVSEC00131707.
[24] "Betty Ong to Vanessa Minter, Winston Sadler, and Nydia Gonzalez (AA Raleigh Reservations Office)," AAL017745 - AAL017748.
[25] "Betty Ong to Vanessa Minter, Winston Sadler, and Nydia Gonzalez (AA Raleigh Reservations Office)," AAL017745 - AAL017748.
[26] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131602.
[27] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131615.
[28] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093420.

9

- Flight 77: while there were no eyewitness reports of actual stabbings onboard American Airlines Flight 77, passenger Barbara Olson called her husband and reported that the flight had been hijacked by individuals "wielding knives and box cutters."[29]

- Flight 93: According to telephone calls from passengers aboard United Airlines Flight 93, at least one flight attendant had been reportedly stabbed "and the captain and first officer were lying on the floor of the first-class cabin and were injured or possibly dead."[30]   Passenger Tom Burnett told his wife over the telephone, "The hijackers have already knifed a guy... The guy they knifed is dead... I tried to help him, but I couldn't get a pulse."[31]  The August 2004 staff report by the 9/11 Commission noted that passenger eyewitnesses aboard Flight 93 "provided information very similar to that received from the other hijacked aircraft, including the hijackers' use of knives, violence... relocation of passengers to the back of the aircraft and cockpit intrusion."[32]

When it was later seized and searched by law enforcement authorities, Mohammed Atta's lost luggage confirmed the weapons described in the passenger accounts.  The bags contained flight training materials, a folding knife and a container of "Brand name 'First Defense' Cayenne (red pepper) spray."[33]

Testimonials from passengers, along with other evidence, show how the hijackers also relied on fear and threats, in addition to physical violence and murder, to maintain control over the aircraft.  Several passengers reported that hijackers had donned "red bandanas" as they were storming the aircraft cabin.[34]  Rather than sneaking an actual explosive device through security, "the hijackers used the threat of bombs to fight and control the passengers.  This was reported on all flights except Flight 77."[35]  According to passengers, at least one of the hijackers wore a purported device attached to his waist with a red belt.[36]  Not even the passengers held hostage in the rear of the aircraft fully believed the hijackers' dubious claim regarding the "bomb."  Aboard United Flight 93,

---

[29] Deposition of Theodore Olsen, October 12, 2007, Pages 22-23.  See also: "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131626.

[30] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131626.

[31] "Phone Call From Tom to Deena Burnett During the Hijacking on 9/11/2001," MR_AVSEC00119881 - MR_AVSEC00119883.

[32] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131634.

[33] "Memorandum for the Record: Review of investigation conducted by the FBI of Atta's suitcases at Boston, MA." Prepared by: Quinn John Tamm, Jr. Dated February 10, 2004.

[34] "Stipulation [Regarding flights hijacked on September 11, 2001; September 11, 2001 deaths; al Qaeda; chronology of hijackers' activities; Zacarias Moussaoui; and the Computer Assisted Passenger Pre-screening System (CAPPS)] (ST00001)," MR_AVSEC00130974 – MR_AVSEC00131139.

[35] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131642.

[36] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131637.

10

Tom Burnett asked his wife, "What is the probability of their having a bomb on board? I don't think they have one. I think they're just telling us that for crowd control."[37]

On both American Airlines Flight 11 and United Flight 93, hijacker pilots made remarkably similar announcements over the PA system designed "to make passengers believe they were in no immediate danger if they cooperated."[38] At approximately 8:25am, a voice with a foreign accent was recorded on the radio frequency assigned to Flight 11. It appears that the speaker intended to broadcast the message to passengers aboard Flight 11 and not air traffic control: "We have some planes. Just stay quiet and you'll be okay. We're returning to the airport."[39] This was followed by a second transmission: "Nobody move. Everything will be okay. If you try to make any moves, you'll endanger yourself and the airplane. Just stay quiet."[40] Likewise, at 9:32am, flight controllers in Cleveland, Ohio recorded a radio transmission meant as an internal message for passengers aboard United Flight 93. A hijacker, probably Ziad Jarrah, stated: "Ladies and Gentlemen: Here the captain, please sit down keep remaining sitting. We have a bomb on board. So, sit."[41] Seven minutes later, Cleveland Center controllers recorded a follow-up broadcast from Flight 93: "Uh, is the captain. Would like you all to remain seated. There is a bomb on board and are going back to the airport, and to have our demands [unintelligible]. Please remain quiet."[42]

Despite these various efforts at subterfuge, passengers aboard the doomed aircraft were apparently themselves aware that they were the victims of a larger coordinated plot to suicide crash commercial airliners into buildings and other targets. On United Flight 93, at least two different passengers reported that the hijackers openly spoke of their intention to suicide-crash the aircraft. In a phone call to his wife, Tom Burnett explained, "They're in the cockpit... They're talking about crashing this plane. Oh my God. It's a suicide mission... They're talking about crashing this plane into the ground."[43] Passenger Jeremy Glick told his own wife that "the hijackers had indicated if they were unable to crash the plane into the World Trade Center, they were going to blow up the plane. One of the hijackers told the passengers to call their loved ones."[44]

In light of the wealth of overwhelming evidence from an array of independent, credible sources—including physical evidence recovered from the hijackers, eyewitness accounts from passengers, admissions from detained co-conspirators, and even testimonials from Al-Qaida itself—I conclude that the nineteen men who hijacked four planes on September 11, 2001 were clearly acting together as part of a common plan or scheme.

---

[37] "Phone Call From Tom to Deena Burnett During the Hijacking on 9/11/2001," MR_AVSEC00119881 - MR_AVSEC00119883.

[38] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131642 – MR_AVSEC00131643.

[39] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131604.

[40] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131604.

[41] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093425.

[42] "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131636.

[43] "Phone Call From Tom to Deena Burnett During the Hijacking on 9/11/2001," MR_AVSEC00119881 - MR_AVSEC00119883.

[44] "Summary of Penttbom Investigation," 000003844-000003961.

Based on the reconstruction of the hijackers' common scheme described above, it is possible to draw several conclusions regarding the pre-flight and in-flight events of Flight 175 on the morning of September 11, 2001. The five hijackers on Flight 175 were Marwan al-Shehhi, Hamza al-Ghamdi, Ahmed al-Ghamdi, Fayez Banihammad and Mohand al-Shehri.[45]  In the days leading up to 9/11, the hijackers purchased a Cliphanger Viper, an Imperial Tradesman Dual Edge, a Stanley two piece knife snap set and a Leatherman Wave Multi-Tool.[46]  Each of the hijackers passed undetected through the United Airlines checkpoint at Logan Airport and boarded the aircraft with the weapons in their carry-on luggage.

Using these knives, multi-tools and boxcutters, mace and the threat of a bomb, the men began their hijacking and seized the cockpit approximately half an hour after takeoff.[47]  Between 8:42 a.m. and 8:46 a.m., Flight 175's muscle hijackers, stormed the cockpit and gained entry.  The hijackers stabbed a flight attendant, killed both Pilots and maintained control of the aircraft.[48]

The flight crew on 175 was aware that suspicious activity may have occurred onboard another aircraft.  In the last message air traffic controllers received from Flight 175 at 8:42 a.m., the pilots indicated: "we heard a suspicious transmission [from another aircraft] on our departure from Boston – like someone keyed the mike and said everyone stay in your seats."[49]

The first sign of Flight 175's deviation from the perspective of controllers on the ground occurred at 8:47 a.m., when the aircraft changed transponder codes twice in one minute period.[50]  At 8:51 a.m., Flight 175 deviated from its assigned altitude.[51]  The aircraft continued to climb as it turned to the southeast, reaching an altitude of 33,500 feet before it turned to the northeast and headed in the direction of New York City. Between 8:52 a.m. and 8:58 a.m., a span of only six minutes, the aircraft descended an overwhelming 32,500 feet to an altitude of 1,000 feet.[52]  Flight 175 passengers were aware that the cockpit had been seized due to the plane's erratic, "jerky" movements.[53] In addition, people were getting sick.[54]

---

[45] "Bomb; List of United Airlines 175 hijackers," FBI8188–FBI8195.

[46] One of the hijackers on Flight 77 also purchased a Leatherman Wave Multi-Tool.  "Summary of Penttbom Investigation," 000003896-000003897.

[47] Passenger Peter Hanson reported the presence of Mace in a phone call to his father. "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131616 – MR_AVSEC00131617.

[48] "Report on Marc R. Policastro on 9/11/01 - Reference Lead Control Number SF29," FBI0184.

[49] "Air Traffic Control Recording - United Airlines Flight 175," MR_AVSEC00094132. See also: "Stipulation [Regarding flights hijacked on September 11, 2001; September 11, 2001 deaths; al Qaeda; chronology of hijackers' activities; Zacarias Moussaoui; and the Computer Assisted Passenger Pre-screening System (CAPPS)] (ST00001)," MR_AVSEC00130978.

[50] "Flight Path Study - United Airlines Flight 175," MR_AVSEC00094138. See also: "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131615.

[51] "Flight Path Study - United Airlines Flight 175," MR_AVSEC00094138. See also: "Staff Report; 8/26/04; Part 1 "We Have Some Planes": The Four Flights-a Chronology and Part 2. Civil Aviation Security and the 9/11 Attacks; (2005 release)," MR_AVSEC00131615.

[52] "Flight Path Study - United Airlines Flight 175," MR_AVSEC00094138.

[53] "Federal Bureau of Investigation Report on Lee Hanson on 9/11/01," FBI0208.

[54] "United States of America vs. Zacarias Moussaoui - April 10, 2006 9:30 am Transcript of Jury Trial Volume XVI."

The hijackers left the passengers alone in the back of the plane for periods of time, during which they were able to discuss their options together and communicate with family and colleagues on the ground. The passengers discussed amongst themselves the option of "storming the cockpit."[55] In addition, a total of eleven phone calls were placed to people on the ground, four of which were successful.[56]

Some passengers exercised caution while informing their family members of events occurring onboard the aircraft via phone, while others did not. Passenger Peter Hanson spoke in a "low tone" but did not whisper, indicating that he did not attempt to conceal his phone call from the hijackers.[57] On the other hand, passenger Brian Sweeney spoke in a "quiet and very calm" voice, but hurried to get off the phone lest his communication be discovered by the hijackers.[58] In a phone call answered by Marc Policastro, a United Air Lines technician on duty at the San Francisco maintenance office, an unknown male flight attendant also rushed to end the call, stating "that he was scared for his life and that he had to go."[59]

Although Flight 175 was hijacked before any news of the larger conspiracy could filter through the public media, passengers were aware that the hijackers intended to crash the plane into a landmark as a suicide mission. At 9:00 am, only 14 minutes after American Airlines Flight 11 crashed into the north tower of the World Trade Center, passenger Peter Hanson called his father and told him, "It's getting bad, Dad—A stewardess was stabbed... I think we are going down—I think they intend to go to Chicago or someplace and fly into a building."[60]

During a call placed at approximately 9:00 a.m., Lee Hanson heard the sound of a woman screaming in the background. This marked the rapid descent of Flight 175 and its ultimate crash into the second tower of the World Trade Center minutes later at approximately 9:03 a.m. The impact of the crash killed all 51 passengers, 9 members of the flight crew and 5 hijackers onboard.

## IV.)  Al-Qaida's Intent to Attack U.S. Civil Aviation Prior to 9/11

The terrorist organization Al-Qaida has had a longstanding and well-known desire to launch catastrophic terrorist attacks targeting the United States. In fact, they have succeeded on more than one occasion in carrying out attacks on U.S. soil and on U.S. forces and interests abroad. Consequently, even prior to September 11, 2001, there was

---

[55] "Federal Bureau of Investigation Report on Louise Sweeney on 3/25/04," FBI0242. "Report on Louise Sweeney on 9/28/01," FBI0239.
[56] "United States of America vs. Zacarias Moussaoui - April 6, 2006 9:00 am Transcript of Jury Trial - Volume XV."
[57] "Federal Bureau of Investigation Report on Lee Hanson on 9/11/01," FBI0208.
[58] Passenger Brian Sweeney informed his mother, Louise Sweeney, that "they [the hijackers] might come back and he might have to hang up quickly." "Federal Bureau of Investigation Report on Louise Sweeney on 3/25/04," FBI0241.
[59] "Report on Marc R. Policastro on 9/11/01 - Reference Lead Control Number SF29," FBI0184.
[60] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093421. See also: "Stipulation [Regarding flights hijacked on September 11, 2001; September 11, 2001 deaths; al Qaeda; chronology of hijackers' activities; Zacarias Moussaoui; and the Computer Assisted Passenger Pre-screening System (CAPPS)] (ST00001)," MR_AVSEC00130979.

13

substantial publicly-available information indicating that Al-Qaida had the intent and capability of attacking the United States.    In August 1996, Usama bin Laden issued a fatwa against the United States entitled "Declaration of War Against the Americans Occupying the Land of the Two Holy Places."[61]    The fatwa was first published in *Al Quds Al Arabi*, a London-based newspaper, but was later republished and analyzed in many mainstream English language sources prior to September 11, 2001.[62]    As early as 1997, bin Laden publicly declared jihad against the United States to U.S. audiences on CNN, calling for attacks on the U.S. and its citizens. One year later, in an interview with John Miller of ABC News in 1998, bin Laden publicly explained his fatwa "calling on all Muslims to kill Americans where they can, when they can," stating:

> "We do not differentiate between those dressed in military uniforms and civilians; they are all targets of this fatwa. Especially since American officials were released after the Khobar bombing, asking all American citizens to contact the security department in the embassy with information on Muslims and activists. The fatwa included all that share or take part in killing of Muslims, assaulting holy places, or those who help the Jews occupy Muslim lands.[63]"

In a lead-up to the airing of this segment on ABC News, then-National Security Advisor Sandy Bergen declared, "Osama bin Laden may be the most dangerous non-state terrorist in the world and we certainly have discussed this with the Saudis...This is a man who has a demonstrated capacity and will to carry out acts of terrorism and we take this seriously."[64]

Bin Laden's interest in striking the U.S. was particularly poignant when it came to commercial air transport, seen as a key economic lifeline for globalized Western nations. Recognizing the value of spreading fear amongst the American public, Al-Qaida and its jihadist allies have made no secret of their shared interest in passenger aircraft and airports as potential terrorist targets.

### A. The Broader Context: The Al-Qaida Threat to Western Civil Aviation

The threat of criminal attacks on Western civil aviation saturated the American public sphere throughout the years leading up to September 11, 2001.  This information was trumpeted by academics and civil aviation industry employees alike.  In 1985, Brian Michael Jenkins of the Rand Corporation's "The Future Course of International

---

[61] "Bin Laden's Fatwa; declaration of war, by Osama bin Laden first published in Al Quds Al Arabi, in August 1996," PBS.org, MR_AVSEC00168020.

[62] See e.g.: "Jurors hear bin Laden threats to kill Americans," CNN, February 15, 2001.

[63] Al-Qaida targeted U.S. troops stationed at the Khobar Towers in Saudi Arabia on June 25, 1996. "To Terror's Source: John Miller's 1998 Interview With Osama Bin Laden," ABC News, Interview conducted on May 28, 1998.

[64] "America's Most Dangerous Enemy--John Miller's 1998 Interview with Osama Bin Laden," John Miller, ABC News, Transcript, June 10, 1998. For additional public warnings about al Qaida in 1998, see also: "Osama Bin Laden is preparing for war," Adrian Levy and Cathy Scott-Clark, The Sunday Times, London, December 20, 1998: "Intelligence and Diplomatic Sources in Pakistan fear that Al Qaida may be about to send teams of militants on missions to bomb American targets in the Middle East...'the region has never been more unstable,' said an ISI [Pakistan's Inter-Services Intelligence Agency] source.  Bin Laden has never been more dangerous.'"

14

Terrorism," advised that airplanes both offered terrorists "unprecedented worldwide mobility" and were themselves particularly vulnerable to terrorist attacks. Notably, the paper acknowledged that the United States was among "the favorite targets of terrorists."[65]  Also beginning in 1985, the Federal Aviation Administration's ("FAA") annual publication, *Criminal Acts Against Civil Aviation*, recorded incidents that took place against civil aviation worldwide.  The reports were available to the public on the FAA's website.  The 2000 issue, which recorded 42 criminal incidents, demonstrated that attacks against civil aviation were on the rise, stating: "the sharp increase in incidents in 2000 was the result of more hijackings (20 vice 11 in 1999) and airport attacks (13 vice 0)."[66]  Moreover, the report stated that "as in years past, hijackings accounted for the highest percentage of incidents (47.6%) in 2000."[67]

The threat of al-Qaida specifically to the civil aviation industry of Western nations was also recognized prior to September 11, 2001.  In December 1994, a group of militants loyal to the Algerian Armed Islamic Group (GIA)—a group supported and financed by Al-Qaida—seized control of an Air France jetliner in Algiers in an unsuccessful bid to suicide crash it into the Eiffel Tower on Christmas Day.[68]  The group demanded "the release of Dr. Omar Abdel Rahman and [Shaykh] Salman al-Awdah."[69] Rahman, known as the "Blind Shaykh", was imprisoned in the U.S. for his role in the "New York Jihad Plots" case; likewise, al-Awdah was a prominent Saudi Islamist whose arrest by authorities in Saudi Arabia was the subject of public condemnations from Usama Bin Laden.

The Air France hijacking was eventually foiled by French counter-terrorist commandos who stormed the airliner after it stopped for additional fuel in Marseilles.[70] Both during and after the hijacking, the GIA issued a number of communiqués addressed to their supporters concerning the failed operation.[71]  The group boasted of its responsibility "for this first Martyrdom operation and for its original plan to blow up the Air France flight with its two groups of passengers over Paris... The operation is the start of a new phase which is the Martyrdom phase in which the enemy will be completely overwhelmed by the attacks.  This is a result of an organized Mujahideen army which now includes a huge number of Muslim youths."  In its final public statement on the hijacking, the GIA also acknowledged two critical errors that the group had made which "would have saved precious time (as time is crucial for strength of Mujahideen)."  First, the terrorists "announced the hijacking after closure of doors and before the ladders were moved off the plane."  Second, "they landed in Marseille, under the reason of taking on more fuel, although the plane had enough fuel... Mujahideen may have wanted to fill up

---

[65] "The Future Course of International Terrorism," Brian Michael Jenkins, MR_AVSEC00086333 - MR_AVSEC00086334.
[66] "2000 Criminal Acts Against Civil Aviation," MR_AVSEC00097497 - MR_AVSEC00097574.
[67] "2000 Criminal Acts Against Civil Aviation," MR_AVSEC00097497 - MR_AVSEC00097574.
[68] "Anatomy of a Hijack," Thomas Sanction, Time Magazine.  January 9, 1995.  MR_AVSEC00132723.
[69] "Islam Report (Urgent! Air France Incident-Part 1)," American Islamic Group (AIG).  December 31, 1994, MR_AVSEC00089116 - MR_AVSEC00089121.
[70] "Four Hijackers Die as Police Storm Plane."  Houston Chronicle.  December 27, 1994.  See also: "Anatomy of a Hijack," Thomas Sanction, Time Magazine.  June 24, 2001.
[71] At the time, the communiqués were translated into English and posted publicly on the Internet by the San Diego-based "American Islamic Group."

15

the tanks of the plane for later blowing it up over Paris... These will be lessons learned for future operations."[72]

In the year 1999, there were at least two separate incidents which reinforced public concerns about attacks on Western commercial aviation by jihadist groups, particularly Al-Qaida. On October 31, 1999, Egypt Air Flight 990 from New York to Cairo crashed in the Atlantic Ocean approximately 60 miles south of Nantucket Island. Though the exact cause is unknown, as noted by the final report of the Congressional 9/11 Commission, "the most plausible explanation that emerged was that one of the pilots had gone berserk, seized the controls, and flown the aircraft into the sea."[73] The theory of a religiously-motivated suicide crash by First Officer Gameel Al-Batouti—accurate or not—was widely aired on nationally-televised news programs.[74] According to the 9/11 Commission, it was one of the principle reasons that National Security Council (NSC) Counterterrorism Czar Richard Clarke convened a meeting of his Counterterrorism Security Group in early 2000 "devoted largely to the possibility of a possible airplane hijacking by al Qaeda."[75]

In December 1999, a splinter faction of Pakistani Islamic militants loyal to radical cleric Maulana Masood Azhar hijacked Indian Airlines Flight 814 and eventually flew the aircraft to Taliban-controlled Kandahar, Afghanistan in a bid to win freedom for Azhar from an Indian prison cell.[76] During the protracted week-long ordeal, the five hijackers fatally stabbed one passenger, and wounded several others. Eventually, Azhar and two other imprisoned extremists were freed by the Indian government in exchange for the lives of the remaining hostages.[77] Although the Taliban denied any involvement in the hijacking, suspicions were raised over the friendly reception given to the hijackers in Kandahar and the undeniable fact that the Taliban had helped them to escape from the airport afterwards.[78]

### B. The Al-Qaida Threat to U.S. Civil Aviation

The threat al-Qaida posed directly to the United States was also known and broadcast widely to the American public prior to 9/11. This was largely due to the fact that al-Qaida and its affiliates succeeded in carrying out several attacks against the U.S. at home and abroad. Following the Pan Am 103 bombing over Lockerbie, Scotland in

---

[72] "Islam Report (Urgent! Air France Incident-Part 1)," American Islamic Group (AIG). December 31, 1994, MR_AVSEC00089116 - MR_AVSEC00089121. See also: "Bombing Flight in Hijack Plan." Associated Press. December 28, 1994.
[73] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093756.
[74] See e.g.: "Sources: EgyptAir voice recorder doesn't change theory of deliberate crash." CNN. December 8, 1999. See also: "U.S. officials: Egyptians 'privately accept' co-pilot role in crash." CNN. June 25, 2001; "I Put my Trust in God." Newsweek. November 29, 1999.
[75] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093756.
[76] "Indian Pilot Tells Why He Had to Obey Hijackers." The New York Times. January 5, 2000.
[77] "Hijack Over as Rebels Traded for Hostages." The Independent. January 1, 2000.
[78] Maulana Masood Azhar. "From Imprisonment to Freedom." Released: 2000. See also: "2000 Criminal Acts Against Civil Aviation." MR_AVSEC00097543.

16

1988, the U.S. Congress authorized the Department of State to publicly offer rewards of up to $5 million for information regarding international terrorism.

On February 26, 1993, Ramzi Yousef, the nephew of admitted 9/11 mastermind Khalid Shaykh Mohammed ("KSM"), orchestrated an attack on the World Trade Center in New York City. The truck bombing, which killed 6 people and injured more than 1,000, was considered by Congress to be a "watershed event" in U.S. history.[79] Ramzi's attack was but a precursor to larger operations which would target civil aviation, and set the stage for the 9/11 operation, which would again strike at the World Trade Center. After the 1993 World Trade Center bombing, the Air Transport Association, of which United Air Lines was a part, offered a reward of $5 million for the capture of Yousef.[80] This public offer ultimately resulted in Yousef's arrest in February 1995.[81]

Five years later, on August 7, 1998, al-Qaida once more attacked the U.S., this time successfully executing two nearly simultaneous suicide truck bombings at U.S. embassies in Kenya and Tanzania. These attacks killed 224 people and wounded thousands.[82] Testimony of al-Qaida affiliates in this trial, which revealed al-Qaida's interest in training pilots and familiarizing operatives with air traffic control procedures, also served to foreshadow larger operations to come.[83]

In addition to the publicity surrounding al-Qaida's successful attacks throughout the years leading up to September 11, 2001, the FAA issued public warnings of bin Laden's continued threat to U.S. civil aviation. The FAA's 1999 issue of *Criminal Acts Against Civil Aviation* stated that Usama bin Laden was a threat to civil aviation, citing a May 1998 interview in which "Bin Laden implied that he could use a shoulder-fired surface-to-air missile to shoot down a military passenger aircraft transporting U.S. military personnel. He reiterated that his attacks would not distinguish between U.S. civilians and military personnel." Additionally, the 1999 issue reported that an exiled Islamic leader in the United Kingdom warned in August 1998 that "Bin Laden would 'bring down an airliner, or hijack an airliner to humiliate the United States.'"[84] One year later, the 2000 issue of *Criminal Acts Against Civil Aviation* once more heralded Usama bin Laden and his followers "a significant threat" to U.S. civil aviation, citing his indictment for the 1998 U.S. embassy bombings in Tanzania and Kenya; his "anti-Western and anti-American" attitudes; and his "motivation and wherewithal."[85]

### *1. Plots Targeting U.S. Civil Aviation*

---

[79] "Foreign Terrorists in America: Five Years after the World Trade Center," 1998 Congressional Hearings Intelligence and Security, February 24, 1998, MRAB00064880. See also: "World Trade Center Suspect Linked to Plan to Blow Up 2 Planes," New York Times. March 26, 1995.
[80] "Rewards for Justice: Mission of the Rewards Program."
http://www.rewardsforjustice.net/english/index.cfm?page=Mission.
[81] "Re: United States of America vs. Ramzi Ahmed Yousef, Abdul Hakim Murad, Wali Khan Amin Shah, dated August 12, 1996."
[82] "Bin Laden Linked to Embassy Blast By an Ex-Soldier," October 21, 2000. See also: "Embassy Bombing Trial Witness Recounts Birth of Terror Group," Vitrade. February 6, 2001.
[83] USA v. Usama Bin Laden, Trial Transcript, Day 8, 1153, 1164. See also: USA v. Usama Bin Laden, Trial Transcript, Day 10, 1353-1355; USA v. Usama Bin Laden, Trial Transcript, Day 37, 5256-5258.
[84] "1999 Criminal Acts Against Civil Aviation," MR_AVSEC00097457.
[85] "2000 Criminal Acts Against Civil Aviation," MR_AVSEC00097543.

As early as 1994, the first evidence began to emerge of an interest among extremist Arab-Afghan veterans in attacking aircraft within U.S. borders. A group of Islamic militants in the New York metropolitan area linked to the 1993 World Trade Center bombing were caught by the FBI planning a new wave of terrorist attacks on local landmarks, including the United Nations building, 26 Federal Plaza, and the Holland and Lincoln Tunnels. The "New York Jihad Plots" case received intense media attention, and was eventually adjudicated in federal court—where much of the government's case against the conspirators was revealed to the public. Part of that evidence included FBI wiretaps of conversations involving lead plotter Siddig Ali and his associates, who had—among other things—carefully studied the security routes taken by world political leaders during visits to New York. The men discussed the prospect of using mobile anti-aircraft weapons to assassinate global leaders, including President Clinton and former Egyptian leader Hosni Mubarak. Siddig explained in one FBI wiretap:

"When Clinton comes here, how he comes? They come, this is their system now, he comes with a helicopter from the airport, La Guardia Airport… or there are private airports, there is an airport in New Jersey called Outerboro. It is a small private airport, right here, aircraft like U.S. 1, U.S. Air Force 1… So there are small helicopters which pick them up from the airport and take them to… the one next to the [South] Ferry."[86]

In 1995, another group of Arab-Afghan jihadists with close links to KSM were also conspiring to attack Western commercial airliners, including by suicide crashing them into targets inside the United States. The plot in this case was led by KSM's nephew Ramzi Yousef, who was already on the run from law enforcement due to his involvement in the February 1993 World Trade Center bombing.[87] Working directly with KSM while hiding in the Philippines, Yousef conceived an elaborate plot to bomb twelve U.S. airliners carrying over 4,000 civilians simultaneously over the Pacific, which would become known as "Operation Bojinka."[88] The primary target of Operation Bojinka was United Airlines, which was the largest airline in the region with the most flights departing from the region. Evidence found on Yousef's computer and in his room at the time of his arrest in Islamabad, Pakistan included flight times, itineraries, stopover cities, timer settings and explosion times for United Airlines.[89]

Assisting in the "Bojinka" conspiracy was another intimate confidant of Usama Bin Laden, Wali Khan Amin Shah (a.k.a. Usama Azmarai). Bin Laden's former personal secretary described Wali Khan as "very close friends to [Bin Laden] and he has most of

---

[86] FBI Transcript of conversation between Emad Salem and Siddig Ibrahim Siddig Ali. United States v. Omar Ahmad Ali Abdel Rahman et al. S3 93 Cr. 181(MBM). Government Exhibit 308-T. May 19, 1993.
[87] "Web of Terrorism Targeted U.S. Jets Foiled Plan Would Have Blown Up 11 Planes in One Day," Toronto Sun. May 28, 1995. See also: "Retracing the Steps Of a Terror Suspect; Accused Bomb Builder Tied to Many Plots." The Washington Post. June 5, 1995.
[88] "United States of America v. Ramzi Ahmed Yousef, Eyad Ismoil, Abdul Hakim Murad, Walikhan Amin Shah," May 29, 1996. Page 22. See also: "2000 Criminal Acts Against Civil Aviation," MR_AVSEC00097543; "1999 Criminal Acts Against Civil Aviation," MR_AVSEC00097457; "1998 Criminal Acts Against Civil Aviation," MR_AVSEC00097277; "1997 Criminal Acts Against Civil Aviation," MR_AVSEC00097209; "1996 Criminal Acts Against Civil Aviation," MR_AVSEC00097144.
[89] "United States of America vs. Ramzi Ahmed Yousef, Abdul Hakim Murad, Wali Khan Amin Shah, dated August 12, 1996." Pages 4058, 4093-4094.

18

his secrets, most of Mr. Bin Laden's secrets."[90]  Testimony leading up to Yousef's public trial in 1997 revealed that although Yousef was able to carry out a successful test detonation of a bomb on board a Philippine Airlines flight, the plot was later aborted when Yousef and his comrades botched the fabrication of explosives and were forced to flee their wrecked hideout in Manila.[91]  According to testimony given in 1996 by Secret Service Agent Brian Parr, Yousef informed him he had learned about airport security and its limitations in detecting explosives from a CNN Special Report.[92]

In preparing Operation Bojinka, Khalid Shaykh Mohammed, Ramzi Yousef, and other conspirators also arrived at other possible terror schemes, including suicide crashing commercial aircraft into the CIA Headquarters in Langley, Virginia and various nuclear power plants around the U.S.  Detailed information about "Operation Bojinka" and these accompanying terror plots was offered to police by a co-conspirator, trained pilot Abdelhakim Murad, and was widely published in global media outlets.[93]  To emphasize the role played by Philippine police in thwarting the plot, authorities in Manila even shared copies of Murad's debriefing report with American journalists.[94]  The report laid out a precise blueprint for a 9/11-style suicide mission targeting the CIA in Langley:

> "With regards to their plan to dive-crash a commercial aircraft at the CIA Headquarters in Virginia, [Murad] alleged that the idea of doing same came out during his casual conversation with [Ramzi Yousef] and there is no specific plan yet for its execution. What the subject have [sic] in his mind is that he will board any American commercial aircraft pretending to be an ordinary passenger.  Then he will hijack said aircraft, control its cockpit and dive it at the CIA Headquarters.  There will be no bomb or any explosive that he will use in its execution.  It is simply a suicidal mission that he is very much willing to execute.  That all he need is to be able to board the aircraft with a pistol so that he could execute the hijacking."[95]

Murad further claimed that, while together in Pakistan, Ramzi Yousef had discussed with him his intense desire to "attack any nuclear facilities in the US."[96]  Long before Usama Bin Laden had become a household name, Murad was also insistent about a connection

---

[90] United States v. Usama bin Laden, et al.  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 15, 2001.  Page 811.

[91] "United States of America v. Ramzi Ahmed Yousef, Eyad Ismoil, Abdul Hakim Murad, Walikhan Amin Shah," May 29, 1996.  Pages 16-18.

[92] "Re: United States of America vs. Ramzi Ahmed Yousef, Abdul Hakim Murad, Wali Khan Amin Shah," dated August 12, 1996," Page 4095.

[93] See e.g.: "Philippine Leader Calls For Joint Campaign Against Terrorism."  The Washington Post. October 26, 1995.  See also: "3 Convicted Of Plotting to Bomb U.S. Jets; Trial Opened Window On High-Tech Terror."  The Washington Post.  September 6, 1996.

[94] See e.g.: "CIA Said to be Aim of Suicide Plot: Islamic Militants' Plans Involve Alleged N.Y. Bomb Mastermind."  Reuters.  May 27, 1995.

[95] "After Intelligence Operation Report re Neutralization of International Terrorists."  Memorandum sent to the Chief of the Philippine National Police.  Republic of the Philippines, Department of the Interior and Local Government; National Police Commission, National Headquarters Philippine National Police Intelligence Command.  Camp Crame, Quezon City.  February 27, 1995.  See also: "After Debriefing Report," January 17, 1995, Page 5.

[96] "After Intelligence Operation Report re Neutralization of International Terrorists."  Memorandum sent to the Chief of the Philippine National Police.  Republic of the Philippines, Department of the Interior and Local Government; National Police Commission, National Headquarters Philippine National Police Intelligence Command.  Camp Crame, Quezon City.  February 27, 1995.

between the "Operation Bojinka" plots and Bin Laden's terror network. During interrogations by Philippine police and intelligence officials in 1995, Murad admitted that he always felt Ramzi Yousef was "hiding something from him. He suspects that [Ramzi] is connected with OSAMA BIN LADIN since he remember that he had once asked [Ramzi] if the latter is connected with or receiving financial support from BIN LADIN, he had observed that [Ramzi] is avoiding the question."[97]

On December 14, 1999, Algerian national Ahmed Ressam was stopped by U.S. border patrol agents at the Port Angeles crossing near Vancouver. In his car, investigators found the pre-cursors to terror: 100 pounds of explosives and simple timing devices.[98] One Customs agent recalled, "I was looking right at him, had my weapon pointed in his direction... He quickly darted into traffic, bounced off a car, continued to run hard. And that was what really triggered me, caused me to get very nervous, when he came up to a passenger vehicle and tried to commandeer it or open the car door. I thought, 'This guy really wants to get away, and he's dangerous.'"[99] Ressam's attempt at escape failed and he eventually agreed to cooperate with U.S. law enforcement.

Ressam conceded to investigators that the explosives in his trunk were destined for a "terrorist attack on a U.S. airport."[100] Specifically, under orders from Al-Qaida-linked terrorist commanders in Pakistan and Europe, Ressam had been instructed to set off a massive explosion at Los Angeles International Airport coinciding with the start of the new millennium. According to Ressam, the choice was made because "an airport is sensitive politically and economically."[101] During the early summer of 2001, Ressam testified as a cooperating witness in federal court and revealed the chilling details of his plan: "I will go to the city of Los Angeles. I will surveil the airport. I will survey the airports until I find one—a good one, and then I will bring a cart that is used for luggage. I will put the cart in a place that is not suspicious and then I will observe the reaction of security, how long it took them to observe it... this was for rehearsal only." Upon the execution of the actual plot, "I will first try to put the explosives in one suitcase and if there was not enough room in one suitcase, then I would use another suitcase."[102] Ressam's intention of targeting Los Angeles International Airport with a suitcase bomb was the subject of intense media coverage for many months following his arrest and subsequent appearance in federal court.[103] Additionally, during his public sworn testimony in the summer of 2001, Ressam recalled conversations with his Millennium

---

[97] "After Intelligence Operation Report re Neutralization of International Terrorists." Memorandum sent to the Chief of the Philippine National Police. Republic of the Philippines, Department of the Interior and Local Government; National Police Commission, National Headquarters Philippine National Police Intelligence Command. Camp Crame, Quezon City. February 27, 1995.

[98] "U.S. Puts Border on High Alert; Hunt for Terrorists Shifts from Abroad After Seattle Arrest." The Washington Post. December 19, 1999.

[99] McKenna, Terence. "Trail of a Terrorist" - Program #2004. Canadian Broadcasting Company (CBC). October 25, 2001.

[100] Cross-examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. Page 649.

[101] Direct Examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. Page 572.

[102] Direct Examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. Pages 573-574.

[103] See e.g.: "Bomb Plot Insider Details Training." New York Times. July 4, 2001. See also: "Los Angeles Airport Intended Target, Terrorism Plot Defendant Tells Jury." Washington Post. July 4, 2001.

Plot accomplice, Mokhtar Haouari, regarding the 1998 Embassy Bombings. He stated that that the two were in agreement that an attack inside the U.S. itself was preferable to an attack on U.S. interests abroad: "The bombing against America, it was a good thing; however, it would have been preferable to have carried out in the country itself."[104]

Ahmed Ressam also offered an inside glimpse into the type of terrorist training being given Al-Qaida operatives in Afghanistan during his testimony.[105] He explained that, at the Khalden training camp in southeastern Afghanistan, "the main training that we got was the explosives with T.N.T. with the usage of timing devices…. We learned the kind of putting the compounds together… How to use those… in a place where there are airplanes." Ressam recounted in court how students enrolled at Khalden learned "how to blow up the infrastructure of a country", including targeting railroads and airports—"we were speaking about America as an enemy of Islam."[106]

### 2. Religious Edicts Encouraging the Targeting of U.S. Civil Aviation

The Al-Qaida threat to civil aviation also took the form of public religious edicts issued by jihadist clerics, such as the Blind Shaykh Omar Abdel Rahman. In response to retaliatory U.S. missile strikes on Al-Qaida camps in Afghanistan in August 1998, Rahman issued a new call to arms, smuggled out of his American prison cell. The fatwah urged all Muslims:

> "[The Jews and Christians] are the ones that are fighting every Muslim resurrection in the whole world, they act to spread prostitution, usury, and other kinds of corruption all over the land. Oh, Muslims everywhere! Cut the transportation of their countries, tear it apart, destroy their economy, burn their companies, eliminate their interests, sink their ships, shoot down their planes, kill them on the sea, air, or land. Kill them when you find them, take them and encircle them, paralyze their every post. Kill those infidels… Allah will torment by your hands those who wish to kill you; Allah will put shame upon them, he will blow wind in the chests of the believers and show the anger of their hearts."[107]

Al-Qaida terrorist Ahmed Ressam later recalled the same fatwah distributed widely in the Afghan military training camps in 1998-1999 "issued by Sheikh Omar Abdel Rahman with his picture on it… It said it was a fatwah by Omar Abdel Rahman from prison. It says fight Americans and hit their interest everywhere."[108]

---

[104] Direct Examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. Pages 590-591.

[105] "Testimony at Bomb Trial Outlines Recipe for Mayhem." New York Times. July 6, 2001. See also: "Ressam Reveals Terrorist Camp Plans, Training." National Post. July 4, 2001.

[106] Cross-examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. Page 626. See also: "Bomb Plot Insider Details Training." New York Times. July 4, 2001; "Los Angeles Airport Intended Target, Terrorism Plot Defendant Tells Jury." Washington Post. July 4, 2001.

[107] Excerpted from the will and testament of Shaykh Omar Abdel Rahman, written in an American prison cell. Al-Minhai. Page 27. http://www.badr.com. Dated: 1997. Excerpts of Rahman's will and testament, including his plea to followers to "'extract the most violent revenge' should he die in U.S. custody," were also circulated widely in U.S. newspapers, See e.g.: "Long Awaited Witness in Plot to Bomb LA Airport Takes Stand," The Associated Press, July 4, 2001.

[108] Direct Examination of Ahmed Ressam. United States v. Mokhtar Haouari. United States District Court Southern District of New York. Case: 00CR15. June 27-July 6, 2001. Page 552.

21

The London-based Abu Hamza al-Masri—Imam at the Finsbury Park Mosque—was another outspoken clerical supporter of jihadi terrorist attacks on American civil aviation. In 1999, Abu Hamza was profiled in a primetime Channel 4 U.K. documentary by reporter Deborah Davies. The documentary included video footage of Abu Hamza at a jihadi conference explaining a diagram for the "Muslim Anti-Aircraft Net"—a proposed design for a floating net laced with mines intended to randomly entrap and destroy civilian passenger aircraft in Great Britain and the U.S.[109] In a later press release about the conference, Abu Hamza's representatives acknowledged that the anti-aircraft net he was promoting had actually been "designed by our Brothers in Afghanistan":

> "These nets will increase the hazard and risk to flying, and are a response to the destructive inventions of the infidel West... These nets, if mass produced, can cost less than £10, and are undetected by radar. They can be launched from any point, and move to anywhere in the world. We urge all brothers and sisters to also begin thinking of designs and techniques such as these, because the time for talking has long since passed."[110]

### 3. Al-Qaida's Final Warnings

In the final months leading up to the September 11, 2001 terrorist attacks on the United States, there were a handful of additional public warnings regarding the Al-Qaida terrorist threat to U.S. aviation interests. During the spring of 2001, Al-Qaida's main media wing—the As-Sahab Media Foundation—released its first official propaganda video, titled "State of the Ummah" (a.k.a. "The Destruction of the U.S.S. Cole.") Since its release, this video recording has been widely and repeatedly publicized and aired on Arabic and English-language news channels.[111] It includes memorable speeches by Usama Bin Laden and classic extended footage of the Al-Faruq and Tarnak Farms training camps near the Afghan city of Kandahar. Amidst the scenes of training and calls for attacks on the United States, the music suddenly fades out and the camera focuses for several minutes on a masked instructor giving recruits a step-by-step lesson in the operation of a SA-7 shoulder-fired surface-to-air missile launcher.[112]

In May 2001, intelligence reports began circulating in the U.S. regarding a "possible hostage plot against Americans abroad to force the release of prisoners, including Sheikh Omar Abdel Rahman, the 'Blind Sheikh'... The reporting noted that operatives might opt to hijack an aircraft or storm a U.S. embassy."[113] Usama Bin Laden and other Al-Qaida leaders had been deeply angered by the conviction and imprisonment of the "Blind Shaykh." According to Al-Qaida turncoat Jamal al-Fadl, "they talk about Sheikh Omar he arrest[ed] and we have to do something, and that's very sad and that's very bad... They talk about what we have to do against America because they arrest

[109] Davies, Deborah. "Kill or be Killed." Dispatches. Channel 4 UK. 1999.
[110] "Supporters of Shariah" Newsletter. Vol. 2; Issue 2. March/April 1999, MR_AVSEC00094353 - MR_AVSEC00094360.
[111] See e.g.: "A Claim For The Cole." CBS News. June 20, 2001; "Bin Laden troops brag about Cole Recruitment tape claims disciples bombed U.S. ship." Chicago Tribune. June 20, 2001; Elias, Diana. "Followers of bin Laden boast of bombing Cole on videotape." Associated Press. June 20, 2001.
[112] As-Sahab Media Foundation. "The State of the Ummah." Released: 2001.
[113] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093668.

22

Sheikh Omar Abdel Rahman."[114]  This threat reporting regarding the "Blind Shaykh" was serious enough for the FAA to issue an information circular to airlines specifically warning of the potential for "an airline hijacking to free terrorists incarcerated in the United States."[115]  Al-Qaida has since boasted of how, in the lead-up to 9/11, Bin Laden's increasing public threats to the U.S. homeland "motivated the enemy to declare a state of high alert."[116]

Thus, as demonstrated by the above analysis and a litany of available evidence—even prior to September 11, 2001—there was substantial publicly-available information to indicate that the Al-Qaida terrorist network had both the sharply-focused intent and the necessary resources to launch terrorist attacks on civil aviation in the United States. Moreover, the sources of this information are highly visible, credible, and influential—including the sworn testimonials of confessed Al-Qaida members, propaganda video recordings and public magazines produced by Al-Qaida and its allies, stories published in major newspapers and television media, and even official formal warnings from the U.S. government.

Respectfully submitted,

Evan F. Kohlmann
New York, New York

May 23, 2011

---

[114] United States v. Usama bin Laden, et al.  S(7) 98 Cr. 1023 (LBS).  United States District Court, Southern District of New York.  Trial Transcript, February 6, 2001.  MRSBG000089 - MRSBG000462.
[115] "The 9/11 Commission Report," July 22, 2004, MR_AVSEC00093668.
[116] "As-Sahab Presents 9-11 Videos," September 10, 2006.

23

# Exhibit 1

# Curriculum Vitae

# Evan Francois Kohlmann

(206)202-4911 – evan@flashpoint-intel.com – http://www.flashpoint-intel.com

## EDUCATION

**University of Pennsylvania Law School,** Philadelphia, Pennsylvania
J.D. (Juris Doctor) 2004; James Wilson Scholarship Recipient.

**Georgetown University,** Washington, DC
Edmund A. Walsh School of Foreign Service, BSFS 2001, *Magna Cum Laude*

- <u>Major</u>: International Politics, concentration in International Security Studies.
  - o <u>Minor</u>: Islamic Studies (Center for Muslim Christian Understanding, Georgetown University)
- <u>Honors & Awards</u>: Honors in International Politics; Georgetown University Rhodes Scholar Nominee, 2000.
- Research assistant for Dr. Mamoun Fandy in the Center for Contemporary Arab Studies (CCAS) (Fall 2000).

## EXPERIENCE

*Founder, Senior Partner*                                                  February 2004 – December 2010
**Flashpoint Global Partners,** New York, NY

- Flashpoint Global Partners was first established in early 2010 as the corporate heir to the former Internet website Globalterroralert.com (which itself was founded in early 2004). Flashpoint functions as an international security consulting firm, with a principle focus on international terrorist recruitment, financing, and communications. Flashpoint Global Partners is regularly cited as a source by prominent worldwide media outlets—including NBC News, ABC News, the BBC, the New York Times, the Washington Post, the Los Angeles Times, Reuters, and the Associated Press. Flashpoint counts among its clients the U.S. Department of Justice and the U.S. military, as well as law enforcement agencies across North America and Western Europe.
- Researched terrorist fundraising and recruitment networks using sources including declassified intelligence documents, exhibits submitted in terror-related legal cases, Lexis-Nexis, the World Wide Web, the Foreign Broadcast Information Service (FBIS), and other information retrieval sources. Interviewed alleged terrorist recruiters, terrorist facilitators, and cooperating defendants in criminal cases. Drafted public news articles and unclassified memoranda for international law enforcement and intelligence agencies examining international terrorism, its sponsors, and its causes. Worked as a liaison to government agencies and non-governmental organizations (NGOs).

*Senior Investigator*                                                         August 2005 – present
**The Nine/Eleven Finding Answers (NEFA) Foundation,** New York, NY

- The NEFA Foundation is a non-profit organization created after the attacks of September 11, 2001. The Foundation strives to help prevent future tragedies in the U.S. and abroad by independently tracking those responsible for planning, funding, and executing terrorist activities, with a particular emphasis on Islamic militant organizations. The Foundation plays a role in the fight against terror through cohesive and comprehensive efforts to research, analyze, and disseminate information pertaining to past and current terrorist activities.

*On-Air Terrorism Analyst*                                                 October 2004 – present
**NBC News / MSNBC,** New York, NY

- NBC News is the news division of the U.S. television network NBC Universal. It has ranked as the top-rated broadcast news division in the United States for over ten years. MSNBC is NBC Universal's 24-hour cable news and information network. Provided frequent on-air analysis and discussion regarding ongoing news stories relating to international terrorism. Assisted in the production of both evening news segments and full-length television documentaries relating to international terrorism.

*Consultant*                                                                May 2005 – June 2005
**Office of the High Representative (OHR),** Sarajevo, Bosnia-Herzegovina

- The OHR is the chief civilian peace implementation agency in Bosnia-Herzegovina. I was hired as a short-term consultant by OHR to personally travel to Sarajevo and give briefings to intelligence analysts based at Camp Butmir on the status of foreign mujahideen veterans in the Balkans and the ongoing role of foreign charitable organizations. Assisted in the analysis of confidential intelligence documents, and provided original documentation to add to their records. Gathered firsthand intelligence data in various regions of central Bosnia-Herzegovina concerning suspect corporate entities under criminal investigation by local authorities.

*Senior Terrorism Consultant*                                              February 1998 – January 2004
**Investigative Project,** Washington, DC

- The Investigative Project is an open source counterterrorism think-tank and policy group founded in 1995.
- Researched terrorist fundraising and recruitment networks using sources including Lexis-Nexis, the World Wide Web, FOIA requests, Foreign Broadcast Information Service (FBIS), etc. Interviewed alleged terrorist recruiters and terrorist facilitators for Al-Qaida, Hamas, and other groups (including notorious UK-based clerics Abu Hamza Al-Masri and Shaykh Omar Bakri Mohammed).

| INVOLVEMENT IN U.S. CRIMINAL CASES: | HIRED AS EXPERT CONSULTANT | TESTIFIED AS FACT WITNESS | TESTIFIED AS EXPERT |
|---|---|---|---|
| U.S. v. JEFFREY BATTLE ET AL. (DISTRICT OF OREGON, 2003) | X | | |
| U.S. v. MASOUD KHAN ET AL. (EASTERN DISTRICT OF VIRGINIA, 2004) | X | X | |
| U.S. v. RANDALL ROYER (EASTERN DISTRICT OF VIRGINIA, 2004) | X | | |
| U.S. v. SABRI BENKHALA (EASTERN DISTRICT OF VIRGINIA, 2004) | X | | X |
| U.S. v. ALI TIMIMI (EASTERN DISTRICT OF VIRGINIA, 2005) | X | | X |
| U.S. v. UZAIR PARACHA (SOUTHERN DISTRICT OF NEW YORK, 2005) | X | | X |
| U.S. v. AHMED OMAR ABU ALI (EASTERN DISTRICT OF VIRGINIA, 2005) | X | | |
| U.S. v. HAMID HAYAT (EASTERN DISTRICT OF CALIFORNIA, 2006) | X | | |
| U.S. v. ALI ASAD CHANDIA (EASTERN DISTRICT OF VIRGINIA, 2006) | X | | X |
| U.S. v. YASSIN AREF ET AL. (NORTHERN DISTRICT OF NEW YORK, 2006) | X | | X |
| U.S. v. SABRI BENKHALA (EASTERN DISTRICT OF VIRGINIA, 2007) | X | | X |
| U.S. v. RAFIQ SABIR (SOUTHERN DISTRICT OF NEW YORK, 2007) | X | | X |
| U.S. v. JOSE PADILLA ET AL. (SOUTHERN DISTRICT OF FLORIDA, 2007) | X | | |
| U.S. v. NURADIN ABDI (SOUTHERN DISTRICT OF OHIO, 2007) | X | | |
| U.S. v. EMADEDDINE MUNTASSER ET AL. (DISTRICT OF MASSACHUSETTS, 2007) | X | | X |
| U.S. v. HASSAN ABU JIHAAD (DISTRICT OF CONNECTICUT, 2008) | X | | X |
| U.S. v. MOHAMMED AMAWI ET AL. (NORTHERN DISTRICT OF OHIO, 2008) | X | | X |
| U.S. v. CHRISTOPHER PAUL (SOUTHERN DISTRICT OF OHIO, 2008) | X | | |
| U.S. v. SALIM HAMDAN (GUANTANAMO BAY MILITARY COMMISSIONS, 2008) | X | | X |
| U.S. v. ALI HAMZA AL-BAHLUL (GUANTANAMO BAY MILITARY COMMISSIONS, 2008) | X | | X |
| U.S. v. MOHAMED SHNEWER ET AL. (DISTRICT OF NEW JERSEY, 2008) | X | | X |
| U.S. v. ZUBAIR AHMED ET AL. (NORTHERN DISTRICT OF OHIO, 2009) | X | | |
| U.S. v. WESAM DELAEMA (DISTRICT OF COLUMBIA, 2009) | X | | |
| U.S. v. OUSSAMA KASSIR (SOUTHERN DISTRICT OF NEW YORK, 2009) | X | | X |
| U.S. v. MOHAMMED ABDULLAH WARSAME (DISTRICT OF MINNESOTA, 2009) | X | | |
| U.S. v. SYED HARIS AHMED (NORTHERN DISTRICT OF GEORGIA, 2009) | X | | X |
| U.S. v. EHSANUL SADEQUEE (NORTHERN DISTRICT OF GEORGIA, 2009) | X | | X |
| U.S. v. ABDUL TAWALA IBN AL-ISHTARI (SOUTHERN DISTRICT OF NEW YORK, 2009) | X | | |
| U.S. v. SYED HASHMI (SOUTHERN DISTRICT OF NEW YORK, 2009) | X | | |
| U.S. v. AL-HARAMAIN FOUNDATION ET AL. (DISTRICT OF OREGON, 2010) | X | | X |
| U.S. v. OMAR KHADR (GUANTANAMO BAY MILITARY COMMISSIONS, 2010) | X | | |
| U.S. v. ISLAMIC AFRICAN RELIEF AGENCY ET AL. (WESTERN DISTRICT OF MISSOURI, 2011) | X | (UPCOMING) | |
| U.S. v. BABAR AHMED (DISTRICT OF CONNECTICUT, 2011) | X | (UPCOMING) | |
| U.S. v. DANIEL PATRICK BOYD ET AL. (EASTERN DISTRICT OF NORTH CAROLINA, 2011) | X | (UPCOMING) | |
| U.S. v. TAREK MEHANNA (DISTRICT OF MASSACHUSETTS, 2011) | X | (UPCOMING) | |

| INVOLVEMENT IN INTERNATIONAL LEGAL CASES: | HIRED AS EXPERT CONSULTANT | TESTIFIED AS FACT WITNESS | TESTIFIED AS EXPERT |
|---|:---:|:---:|:---:|
| INTERNATIONAL PROSECUTORS v. ABDULADHIM MAKTOUF (SUPREME COURT OF BOSNIA-HERZEGOVINA, 2005) | X | | X |
| REGINA v. MOHAMMED AJMAL KHAN AND PALVINDER SINGH (SNARESBROOK CROWN COURT, U.K., 2006) | X | | X |
| REGINA v. AL BASHIR MOHAMMED AL-FAQIH (WOOLWICH CROWN COURT, U.K., 2007) | X | | |
| REGINA v. TSOULI, DAOUR, AND MUGHAL (WOOLWICH CROWN COURT, U.K., 2007) | X | X | |
| REGINA v. RAJA, MALIK, IQBAL, ZAFAR, AND BUTT (OLD BAILEY, U.K., 2007) | X | | |
| H.M.A. v. MOHAMMED ATIF SIDDIQUE (GLASGOW HIGH COURT, SCOTLAND, 2007) | X | | X |
| REGINA v. SAMINA MALIK (OLD BAILEY, U.K., 2007) | X | | X |
| REGINA v. HASSAN MUTEGOMBWA (OLD BAILEY, U.K., 2007) | X | | X |
| REGINA v. DITTA AND BILAL (LEEDS CROWN COURT, U.K., 2008) | X | | |
| PROSECUTOR FOR SERIOUS ECONOMIC CRIMES v. AL-AQSA ASSOCIATION (THE HIGH COURT, COPENHAGEN, DENMARK, 2007) | X | | X |
| REGINA v. BILAL KHAZAAL (SUPREME COURT OF NEW SOUTH WALES, AUSTRALIA, 2008) | X | | X |
| REGINA v. AABID KHAN ET AL. (BLACKFRIARS CROWN COURT, U.K., 2008) | X | | |
| REGINA v. IMAD SHOUBAKI ET AL. (SOUTHWARK CROWN COURT, U.K., 2008) | X | | X |
| PUBLIC PROSECUTOR v. HAMMAD KHURSHID ET AL. (COURT OF GLOSTRUP, COPENHAGEN, DENMARK, 2008) | X | | X |
| INTERNATIONAL PROSECUTORS v. RASIM DELIC (INTERNATIONAL CRIMINAL TRIBUNAL FOR THE FORMER YUGOSLAVIA, 2008) | X | | |
| REGINA v. ABDUL NACER BENBRIKA ET AL. (SUPREME COURT OF VICTORIA, AUSTRALIA, 2009) | X | | |
| PUBLIC PROSECUTOR v. HAMMAD KHURSHID ET AL. (RETRIAL) (COURT OF GLOSTRUP, COPENHAGEN, DENMARK, 2009) | X | | X |
| INTERNATIONAL PROSECUTORS v. RIJAD RUSTEMPASIC ET AL. (SUPREME COURT OF BOSNIA-HERZEGOVINA, 2010) | X | | X |

## BOOKS AND PAPERS

- Author - *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, (Berg Publishers, September 2004)
  - o *[Dr. Marko Hoare, History Faculty, University of Cambridge and author of How Bosnia Armed]: "Written by a genuine expert in the subject...this is a lucid and informed account of the involvement of the mujahedin in Bosnia, one that lays the myths to rest... This excellent book is essential reading for anyone wishing to understand the truth about an episode of the Bosnian war that is so frequently misrepresented by those with a political motive for doing so."[1]*
  - o *[Political Science Quarterly (PSQ)]: "About [Al-Qaida's] operations in Europe, Evan F. Kohlmann has written an illuminating book... Kohlmann is at his best in exhaustively reporting the details of such terrorist episodes. He has compiled prodigious research about the perpetrators and their support networks. Moreover, he never loses sight of the strategy behind the individual attacks... [a] genuine historical analysis."[2]*
  - o *[Studies in Conflict and Terrorism]: "This book is a pathbreaking piece of research... Kohlmann addresses the issue in unprecedented detail, exploiting a wide variety of available sources to piece together a largely neglected segment of contemporary Bosnian history... [which] provide critical insights into terrorist preferences, motives, and interests... The book... is descriptive and empirically rich."*
  - o *Al-Qaida's Jihad in Europe has consistently been used as a required or recommended course text in numerous undergraduate and graduate courses in North America, Europe, and Australia, including the following courses:*
    - (Spring 2005) - "Terrorism, Security, and Intelligence"
      - Course taught by former NSC counterterrorism czar Richard Clarke and former White House Senior Director for Combating Terrorism Rand Beers at Harvard University's Kennedy School of Government.[3]
    - (Fall 2006) - "South Asia, Al Qaeda and the Rise of International Terrorism"
      - Course taught by Peter Bergen at the School of Advanced International Studies at Johns Hopkins University.[4]
    - (Spring 2007) – "Terrorism and Modern Society"
      - Course taught by Dr. Keith Hayward and Professor Frank Furedi at the School of Social Policy, Sociology, and Social Research at the University of Kent (Canterbury campus).[5]

---

[1] http://www-hjs.pet.cam.ac.uk/sections/balkans/document.2005-04-28.6595030101
[2] http://www.ciaonet.org/olj/psq/psq_fal05/
[3] http://ksgnotes1.harvard.edu/degreeprog/courses.nsf/webnumber/ISP213
[4] http://eres.sais-jhu.edu/coursepage.asp?cid=165

- ▪ (Fall 2007) – "Jihad and the End of the World."
  - • Course taught by Dr. David Cook (author of <u>Understanding Jihad</u>) at Rice University.
- ▪ (Spring 2008) – "Militant Islamism."
  - • Course taught by Dr. Thomas Hegghammer (currently a fellow at Harvard's Kennedy School of Government) at Princeton University.

- • <u>Major Papers</u>:
  - o *"Trends in Anti-American Terrorism."* Co-authored with John Eubanks. <u>Journal of Counterterrorism and Security International</u>. January 1999.
  - o *"The Legacy of the Arab-Afghans: A Case Study."* Georgetown University International Politics Honors Thesis, April 2001.
  - o *"Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations, and Charities."* Testimony before the U.S. House Committee on Financial Services, Subcommittee on Oversight and Investigations. March 11, 2003.
  - o *"Gulbuddin Hekmatyar and Ahmad Shah Massoud: Islamic Patriots or Ambitious Opportunists?"* Final course paper for Dr. Brian Spooner's graduate seminar in "Afghanistan and Islamism" at the University of Pennsylvania. April 2004.
  - o *"The Bosnian Mujahideen: Origins, Training and Implications."* Published as a chapter in The Making of a Terrorist, edited by Director of Terrorism Studies at the United States Military Academy Dr. James JF Forest. Praeger Security International, 2005.
  - o *"Al-Qaida in Saudi Arabia: 2002-2003."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. December 2005.
  - o *"The Role of Islamic Charities in International Terrorist Recruitment and Financing."* Danish Institute for International Studies (DIIS) Working Paper 2006; January 2006.
  - o *"The Afghan-Bosnian Mujahideen Network in Europe."* Paper presented before the Swedish National Defence College Center for Asymmetric Threats (CATS) Workshop; May 2006.
  - o *"The Jihadists of Pakistan: Jaish-e-Muhammad (JEM), Harakat ul-Mujahideen (HUM), and Anjuman Sipah-e-Sahaba (SSP)."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. August 2006.
  - o *"The Real Online Terrorist Threat."* <u>Foreign Affairs</u>. Vol. 85; No. 5. September/October 2006.
  - o *"The North African Mujahideen Network of the Western Balkans."* <u>Bosnian Security After Dayton: New Perspectives</u>. Edited by Michael Innes. Routledge; October 2006.
  - o *"Two Decades of Jihad in Algeria: the GIA, the GSPC, and Al-Qaida."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. May 2007.
  - o *"State of the Sunni Insurgency in Iraq: August 2007."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. September 2007.
  - o *"Dossier: The Libyan Islamic Fighting Group (LIFG)."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. October 2007.
  - o *"Al-Qaida's 'MySpace': Terrorist Recruitment on the Internet."* <u>CTC Sentinel</u>. Vol 1. No. 2. January 2008. Combating Terrorism Center, United States Military Academy (West Point).
  - o *"Dossier: Shaykh Mustafa Abu al-Yazid (a.k.a. 'Shaykh Saeed')."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. June 2008.
  - o *"An Interview with Ahmad Said al-Hamed, Spokesman for the Political Wing of 'Hamas al-Iraq.'"* Exclusive NBC News interview, a transcript of which was later published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. June 2008.
  - o *"An Interview with the Al-Rashideen Army."* Exclusive NBC News interview, a transcript of which was later published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. June 2008.
  - o *"An Interview with 'the Islamic Army in Iraq' (IAI)."* Exclusive NBC News interview, a transcript of which was later published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. July 2008.
  - o *"Jihad Networks in Pakistan and Their Influence in Europe."* Presentation before the III International Course on "Jihad Terrorism: Contingency Plans and Response", organized by the Pablo Olavide University and the Granada University in Spain; subsequently published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. July 2008.
  - o *"'Homegrown' Terrorists: Theory and Cases in the War on Terror's Newest Front."* <u>Terrorism: What the Next President Will Face</u>. The ANNALS of the American Academy of Political and Social Science. Vol. 618; No. 1. July 2008.
  - o *"Anatomy of a Modern Homegrown Terror Cell: Aabid Khan et al."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. September 2008.
  - o *"Inside As-Sahaab: The Story of Ali al-Bahlul and the Evolution of Al-Qaida's Propaganda."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. December 2008.
  - o *"Pakistani militants deny role in Mumbai terror attacks: An Interview with Lashkar-e-Taiba."* <u>NBC News</u>. December 4, 2008.
  - o *"'The Eleven': Saudi Guantanamo Veterans Returning to the Fight."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. February 2009.
  - o *"Shabaab al-Mujahideen: Migration and Jihad in the Horn of Africa."* Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. May 2009.

---

- o *"Sunni spokesman open to better ties with U.S.: An Interview with the Islamic Army of Iraq (IAI)."* <u>NBC News</u>. August 13, 2009. http://www.msnbc.msn.com/id/32404074/ns/dateline_nbc-the_hansen_files_with_chris_hansen.
- o *"A Web of Lone Wolves."* <u>Foreign Policy</u>. November 13, 2009. http://www.foreignpolicy.com/articles/2009/11/13/a_web_of_lone_wolves
- o *"No, Madam Secretary: The System Is Not Working."* <u>Foreign Policy</u>. December 28, 2009. http://www.foreignpolicy.com/articles/2009/12/28/no_madam_secretary_the_system_is_not_working
- o *"A Beacon for Extremists: The Ansar al-Mujahideen Web Forum."* <u>CTC Sentinel</u>. Vol 3.; No. 2. February 2010. Combating Terrorism Center, United States Military Academy (West Point).
- o *"The Role of Saudi Arabian State-Sponsored Charitable Fronts in Providing Material Support to Foreign Paramilitary and Terrorist Organizations."* Testimony before the U.S. Senate Committee on the Judiciary, Subcommittee on Crime and Drugs. July 15, 2010.
- o *"Al-Qaida Branches Out: A New Threat Evolves in Yemen."* Paper presented before a workshop organized by the National Committee on American Foreign Policy (NCAFP); New York, NY. September 2010.
- o *"Bringing Global Jihad to the Horn of Africa: al Shabaab, Western Fighters, and the Sacralization of the Somali Conflict."* (with Rafaello Pantucci and Lorenzo Vidino). <u>African Security</u>. Vol. 3; Issue 4. October 2010. Pages 216–238.

- • <u>Online Blogs and Social Networking</u>:
  - o *The Counterterrorism Blog.* http://counterterrorismblog.org/experts/evan-kohlmann/.
  - o *IntelTweet.* http://www.twitter.com/IntelTweet.