UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
                                          :      21 MC 101 (AKH)
IN RE SEPTEMBER 11 LITIGATION             :
                                          :      This Document Relates to:
                                          :      *Bavis v. United Air Lines, Inc.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x      (02 CV 7154)


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE MASSACHUSETTS PORT AUTHORITY'S
MOTION FOR SUMMARY JUDGMENT**



Superseding Version



O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York  10036
(212) 326-2000

*Attorneys for The Massachusetts Port
Authority*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

    I.     PLAINTIFF CANNOT CREDIBLY DISPUTE THAT MASSPORT HAD
           NO RESPONSIBILITY OR AUTHORITY TO CONDUCT, OVERSEE,
           OR CHANGE PASSENGER SCREENING AS A MATTER OF LAW ............ 3

           A.     Massport Did Not Have "Overarching Responsibility" For
                    Aviation Security Under Controlling Federal Law ................................... 4

           B.     There Is No Basis for a Claim Based on State-Law Standards ................. 9

    II.    THE SUPPOSED BREACHES OF MASSPORT'S PART 107
           RESPONSIBILITIES ARE UNSUPPORTED, IMMATERIAL, AND
           BASED ON INADMISSIBLE EVIDENCE ........................................................ 12

           A.     There Is No Evidence of Access Control Violations on 9/11 ................. 13

           B.     There Is No Evidence of Airport Law Enforcement Failures on
                    9/11 .......................................................................................................... 14

    III.   PLAINTIFF COMPLETELY FAILS TO DEMONSTRATE ANY
           CAUSAL CONNECTION BETWEEN MASSPORT'S CONDUCT AND
            THE ATTACK ......................................................................................................... 18

    IV.   WTCP'S BRIEF ADDS NOTHING EXCEPT ADDITIONAL
           MISREPRESENTATIONS AND SPECULATION ........................................... 23

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## CASES

*Air Transport Association of America, Inc. v. Cuomo*,
  520 F.3d 218 (2d Cir. 2008) ........................................................................ 9, 10

*Aldana v. Air East Airways, Inc.*,
  477 F. Supp. 2d 489 (D. Conn. 2007)................................................................ 10

*Antonmarchi v. Consolidated Edison Company of New York, Inc.*,
  No. 03 Civ. 7735, 2009 WL 1069161 (S.D.N.Y. Apr. 17, 2009)............................ 16

*Aretakis v. Federal Express Corp.*,
  2011 WL 1226278 (S.D.N.Y. Feb. 28, 2011),
  *report and recommendation adopted by* 2011 WL 1197596 (S.D.N.Y. Mar. 25, 2011) ........ 14

*Arlio v. Lively*,
  474 F.3d 46 (2d Cir. 2007) ........................................................................ 14

*Aronson v. Hyatt International Corp.*,
  202 A.D.2d 153 (1st Dep't 1994) .................................................................. 11

*Cann v. Ford Motor Co.*,
  658 F.2d 54 (2d Cir. 1981) ........................................................................ 15

*City of New York v. Pullman, Inc.*,
  662 F. 2d 910 (2d Cir. 1981) ....................................................................... 8

*Colarossi v. University of Rochester*,
  2 A.D.3d 1272 (4th Dep't 2003), *aff'd* 812 N.E.2d 1250 (N.Y. 2004) ................... 19

*Crawford v. Department of Investigation*,
  324 Fed. Appx. 139 (2d Cir. 2009)................................................................ 13

*Cretella v. Liriano*,
  633 F. Supp. 2d 54 (S.D.N.Y. 2009) ............................................................. 21

*Curtin v. Port Auth. of New York & New Jersey*,
  183 F. Supp. 2d 664 (S.D.N.Y. 2002) ............................................................. 9

*D'Amico v. City of New York*,
  132 F.3d 145 (2d Cir. 1998) ....................................................................... 19

*Di Benedetto v. Pan Am. World Service*,
  359 F.3d 627 (2d Cir. 2004) ................................................................... 10, 11

*Drake v. Laboratory Corporation of America Holdings*,
  290 F. Supp. 2d 352 (E.D.N.Y. 2003),
  *aff'd* 458 F.3d 48 (2d Cir. 2006)............................................................. 10, 11

*Ewane-Sobe v. Rochester City School District*,
  07-CV-616T, 2011 WL 231795 (W.D.N.Y. Jan. 24, 2011) ................................... 16

# TABLE OF AUTHORITIES
### (continued)

Page

*Flynn v. Esplanade Gardens, Inc.*,
   76 A.D.3d 490 (1st Dep't 2010) ........................................................ 19

*Geier v. American Honda Motor Co.*,
   529 U.S. 861 (2000) ........................................................................... 15

*Giles v. Thodes*,
   No. 94 Civ 6385, 2000 WL 1425046 (S.D.N.Y. Sep. 27, 2000) ............................ 14

*Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Commission*,
   634 F.3d 206 (2d Cir. 2011) ............................................................... 9

*Heard v. City of New York*,
   82 N.Y.2d 66 (1993) ........................................................................... 12

*In re Air Crash at John F. Kennedy International Airport*,
   635 F.2d 67 (2d Cir. 1980) ....................................................... 10, 11

*In re Air Disaster at Lockerbie Scotland*,
   37 F.3d 804 (2d Cir. 1994) ................................................................. 10

*In re September 11 Litigation*,
   594 F. Supp. 2d 374 (S.D.N.Y. 2009) ....................................... 22, 23, 24

*In the Matter of New York Asbestos Litigation*,
   840 N.E.2d 115 (N.Y. 2005) ............................................................... 23

*Japan Airlines Company v. Port Authority of New York and New Jersey*
   178 F.3d 103 (2d Cir. 1999) ..................................................... 10, 11

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005) ............................................................. 19

*Jones v. Southern Pacific Railroad*,
   962 F.2d 447 (5th Cir. 1992) ............................................................. 14

*Leyva v. Riverbay Corp.*,
   206 A.D.2d 150 (1st Dep't 1994) ..................................................... 11

*In re Omnicom Group, Inc. Securities Litigation*,
   597 F.3d 501 (2d Cir. 2010) ............................................................. 14

*Mayer v. Cornell University*,
   1997 U.S. App. LEXIS 669 (2d Cir. Jan. 8, 1997) ............................. 12

*Patterson v. County of Oneida, NY*,
   375 F.3d 206 (2d Cir. 2004) ............................................................. 14

*Perez v. McFarlane*,
   794 N.Y.S.2d 359 (1st Dep't 2005) ................................................. 19

**TABLE OF AUTHORITIES**
(continued)

Page

*Piazza v. Regeis Care Center, LLC*,
　47 A.D.3d 551 (1st Dep't 2008) ............................................................. 12

*PLIVA, Inc. v. Mensing*,
　--- S.Ct. ----, 2011 WL 2472790 (June 23, 2011) ................................. 12

*Ravner v. Autun*,
　No. 9556/06, 2008 N.Y. Misc. LEXIS 7885 (Sup. Ct. N.Y. Cnty. Feb. 27, 2008),
　*aff'd* 60 A.D.3d 1030 (2d Dep't 2009) ................................................. 19

*Rosenthal v. Nierenberg*,
　09 Civ. 8237, 2010 WL 3290994 (S.D.N.Y. Aug. 10, 2010) .................... 8

*Sakellaridis v. Polar Air Cargo, Inc.*,
　104 F. Supp. 2d 160 (E.D.N.Y. 2000) ...................................................... 10

*Shupert v. Continental Airlines, Inc.*,
　2004 U.S. Dist. LEXIS 6214 (S.D.N.Y. Apr. 12, 2004) ............................. 9

*Silkwood v. Kerr-McGee Corp.*,
　464 U.S. 238 (1984) ................................................................................ 10

*Stanford v. Kuwait Airways Corp.*,
　89 F.3d 117 (2d Cir. 1996) ..................................................................... 11

*Terry v. Ohio*,
　392 U.S. 1 (1968) ..................................................................................... 6

*Torbet v. United Airlines*, No. 99-CV-12354 (C.D. Cal. Dec. 21, 2000) (AHM),
　*aff'd on other grounds*, 298 F.3d 1087 (9th Cir. 2002), *overruled on other grounds* ............... 9

*Trinidad v. American Airlines, Inc.*,
　932 F. Supp. 521 (S.D.N.Y. 1996) ............................................................ 9

*Travelers Casualty & Surety Co. v. Dormitory Authority State of New York*,
　735 F. Supp. 2d 42 (S.D.N.Y. 2010) ....................................................... 14

*Tweed-New Haven Airport Authority v. Town of East Haven*,
　582 F. Supp. 2d 261 (D. Conn. 2008) ...................................................... 9

*U.S. v. Aukai*,
　497 F.3d 955 (9th Cir. 2007) .................................................................... 9

*Weinstock v. Columbia University*,
　224 F.3d 33 (2d Cir. 2000) ...................................................................... 21

*Williams v. Citibank, N.A.*,
　247 A.D.2d 49 (1st Dep't 1998) ............................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page

## STATUTES

49 U.S.C. § 40113(a) ............................................................................. 4, 8

49 U.S.C. § 44701(d)(1)(A) ....................................................................... 10

49 U.S.C. § 44702(b)(1)(A) ....................................................................... 10

49 U.S.C. § 44904 ............................................................................. 4, 6, 8

49 U.S.C. § 44933(b)(3) .............................................................................. 4

49 U.S.C. § 46301 ..................................................................................... 4

49 U.S.C. § 44901(a) ................................................................................. 4

## OTHER AUTHORITIES

The National Commission on Terrorist Attacks Upon the United States, THE 9/11
    COMMISSION REPORT (2004) ...................................................... 13, 17, 18, 21

FEDERAL AVIATION ADMIN., U.S. DEPARTMENT OF TRANSP., STUDY AND REPORT TO
    CONGRESS ON CIVIL AVIATION SECURITY RESPONSIBILITIES AND FUNDING (1998) ................4

Federal Aviation Administration's Airworthiness Inspector's Handbook, Order 8300.10
    CHG 9, August 13, 1993 .......................................................... 23, 24

## RULES

Fed. R. Civ. P. 56(c)(4) ............................................................................ 14

Fed. R. Evid. 402 .............................................................................. 14, 15

Fed. R. Evid. 404(b) ................................................................................. 14

Fed. R. Evid. 407 .................................................................................... 16

Fed. R. Evid. 801 .................................................................................... 14

Fed. R. Evid. 802 .................................................................................... 14

Fed. R. Evid. 803 .................................................................................... 14

Local Rule 56.1(d) .................................................................................... 13

## REGULATIONS

14 C.F.R. pt. 107 ............................................................................... passim

14 C.F.R. § 107.13 ..................................................................................... 5

14 C.F.R. § 107.21 ..................................................................................... 6

14 C.F.R. § 107.3(a) ................................................................................... 5

14 C.F.R. § 107.3(b)(5) ................................................................................ 5

**TABLE OF AUTHORITIES**
(continued)

Page

14 C.F.R. § 107.31 .......................................................................................... 5

14 C.F.R. § 108 ............................................................................................... 4

14 C.F.R. § 108.18 .......................................................................................... 4

14 C.F.R. § 108.25 .......................................................................................... 4

14 C.F.R. § 108.7 ............................................................................................ 4

14 C.F.R. pt. 13 ............................................................................................... 4

42 Fed. Reg. 30766 ....................................................................................... 15

43 Fed. Reg. 60786 ....................................................................................... 15

59 Fed. Reg. 57846 ....................................................................................... 24

60 Fed. Reg. 65832 ....................................................................................... 24

65 Fed. Reg. 560 ............................................................................................. 4

66 Fed. Reg. 37274 ......................................................................................... 4

66 Fed. Reg. 63474 ......................................................................................... 4

70 Fed. Reg. 58796 ....................................................................................... 24

Defendant The Massachusetts Port Authority ("Massport") respectfully submits this reply memorandum in further support of its Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Because neither the law nor the facts remotely supports any credible claim to hold Massport liable for the events of 9/11, Plaintiff's only response to Massport's summary judgment motion is to rewrite the law and misrepresent the record.  After previously proposing a number of flawed theories to the Court, Plaintiff has now settled on a remarkable revision of the nation's aviation security system, arguing that Massport had an "overarching responsibility" for security for all security functions at the airport, including passenger screening.  But that argument flies in the face of clear and controlling federal law that explicitly assigned passenger screening duties "solely to air carriers," as well as the parties' own agreed factual narrative, approved by the Court, which confirms:  "Massport was not responsible for passenger checkpoint screening."

The grounds for dismissal are simple and unavoidable.  The following facts are now undisputed by Plaintiff:

- The Flight 175 hijackers boarded the aircraft through the screening checkpoint operated by Huntleigh under contract with United;

- There is no evidence that any terrorist improperly penetrated an airport fence or door at Logan Airport to gain access to Flight 175 in connection with the September 11 attack, or improperly received a Massport-issued badge in connection with the 9/11 attack;

- There is no evidence that Massport failed to provide police support for a reported incident at the checkpoint as required under Federal Aviation Regulation ("FAR") Part 107 on 9/11.

Accordingly, there is no material issue of fact as to whether the hijackers carried out their attack by breaching a security responsibility assigned to Massport.  Plaintiff relies on misleading and inadmissible evidence to throw on the proverbial wall a variety of supposed complaints about general security issues at Massport in the hopes that something might stick.  But Plaintiff

offers no actual evidence establishing any connection between Massport's supposed conduct and the hijackers' success on the morning of 9/11.  Indeed, Plaintiff's arguments are undercut completely by her own theory of the case, which depends on alleged negligence by parties other than Massport, as she laid out in her motion for the application of a *res ipsa* charge against United:

- "[T]he instrumentality that caused the injury to Mark Bavis—United's aircraft and security procedures—was under United's exclusive control."[1]

- "[T]he 'sterile area' at and past the security checkpoint was in the exclusive control of United."[2]

- "[There is] no evidence indicating that hijackers managed to board its aircraft without passing through [United's] security or that they retrieved weapons from a location past the security checkpoint."[3]

Plaintiff cannot explain how these representations to the Court just two weeks ago can square with a claim against Massport.

Simply put, Plaintiff has not presented a single triable issue of material fact indicating that Massport was negligent on 9/11 or that alleged negligence caused the attack.  Plaintiff may not pursue claims against Massport based purely on speculation and conjecture, as this Court has already explained.[4]  Here, Plaintiff's collection of unsubstantiated statements and irrelevant assertions against Massport would do nothing but inevitably complicate and prolong any trial because of the need to challenge such speculation through cross-examination and presentation of

---

[1]   Pl.'s Res Ipsa Mem. at 9.

[2]   *Id.* at 13.

[3]   *Id.* at 11.

[4]   5/16/11 Tr. (attached to the Declaration of Shiva Eftekhari ("Eftekhari Decl.") as Ex. P) at 12:23–24 ("Why should I leave Massport in the case. I can't just speculate."); *id.* at 16:22–17:2 ("[I]f the defendants or the plaintiffs do not present some evidence in response to your motion [for summary judgment] that there was some activity over which Massport had a duty to act and a failure to act, I will not permit speculation that maybe the weapons came on in some other fashion between the screening and the airport.").

lay and rebuttal witnesses.  For these reasons, and all the reasons explained in Massport's

opening brief, Massport respectfully submits that summary judgment is appropriate.[5]

## ARGUMENT

## I.   PLAINTIFF CANNOT CREDIBLY DISPUTE THAT MASSPORT HAD NO RESPONSIBILITY OR AUTHORITY TO CONDUCT, OVERSEE, OR CHANGE PASSENGER SCREENING AS A MATTER OF LAW

Massport was not responsible for passenger checkpoint screening on 9/11.  This is an

inescapable conclusion under controlling federal law and confirmed by the stipulated narrative,

Plaintiff's other submissions, and even Plaintiff's expert reports.[6]  Nonetheless, Plaintiff now

attempts to distance herself from these concessions and rewrite federal aviation law and history

by ascribing to airport operators "overarching responsibility" for all aspects of aviation security

at airports, including checkpoints, under federal and state law.  There is no basis for doing so and

such a holding would turn both the pre- and post-9/11 nationwide aviation system on its head.

### A.   Massport Did Not Have "Overarching Responsibility" For Aviation Security Under Controlling Federal Law

Plaintiff does not even attempt to explain how it is possible for an airport operator to have

"overarching responsibility" in view of the clear statutory and regulatory assignment of

---

[5]   Plaintiff's counsel's filing demonstrates a continued disregard for this Court's rules and pretrial procedures.  First, without consulting Massport, and several days after the Court's filing deadline, Plaintiff filed on the docket several documents designated as confidential in flagrant disregard of this Court's Stipulated Protective Order.  *See* Confidentiality Protective Order § 7.3 (March 30, 2004).  Massport objects to this conduct and reserves all rights and objections under the Stipulated Protective Order.  Second, Plaintiff is now apparently trying to disavow the parties' stipulated narrative (Pl.'s Opp. at 44 n.67), even though this Court so-ordered it as a statement of fact in an effort to streamline the trial.  The Court should not permit Plaintiff to unilaterally reverse the parties' work in arriving at that narrative simply because it now does not fit with Plaintiff's latest theory.

[6]   *See* Preliminary Partial Joint Fact Narrative (attached to the Declaration of Allen W. Burton, filed with Massport's Motion for Summary Judgment on May 27, 2011, Dkt. No. 1436 ("Burton Decl.") as Exhibit Q) at 2 ("Massport was not responsible for passenger checkpoint screening"); Pl.'s Res Ipsa Mem. at 7–9 (conceding United Airlines had exclusive control over its security procedures); Expert Report of Michael Pilgrim, May 23, 2011 (Eftekhari Decl. Ex. D) at 8 ("Massport controlled the outside barrier and access points *other than the checkpoint screening* on September 11, 2001") (emphasis added).

responsibilities and related FAA pronouncements prior to 9/11.  As explained in Massport's

opening brief, federal law "assign[ed] <u>solely</u> to aircraft operators the responsibility for passenger

screening."[7]   Air carriers, in turn, carried out their federally mandated screening procedures

subject to direct oversight by the FAA.[8]  The FAA was "responsible for establishing and

enforcing regulations, policies and procedures; identifying potential threats and countermeasures;

deploying Federal Air Marshals on selected U.S. air carrier flights; and providing overall

guidance to ensure the security of passengers, crew, baggage, cargo, and aircraft . . ."[9]  This

responsibility included correcting any deficiencies in the domestic air transportation system.[10]

To now assign airport operators "overarching responsibility" would render meaningless

Congress's explicit division and the assignment of screening and oversight duties to other

entities and completely undermine the Federal Government's authority at airports and rewrite

airport operators' responsibilities even today.  It also would have no logical end.  Passenger

screening is and was no more an airport operator function than flight crew performance and

---

[7]    Airport Security, 66 Fed. Reg. 37274, 37286 (2001) (emphasis added) (Burton Decl. Ex. AA); *accord* 49 U.S.C. § 44901(a) (Burton Decl. Ex. SS) (requiring screening of passengers and property by weapon-detecting facility or procedure used or operated by an employee or agent of air carrier); 14 C.F.R. § 108 (Burton Decl. Ex. H) (same); Certification of Screening Companies, 65 Fed. Reg. 560, 565 (proposed Jan. 5, 2000) (Burton Decl. Ex. FF) ("The responsibility of air carriers and foreign air carriers to ensure that screening is conducted on persons and property to be carried in the cabin of an aircraft is in the statute (49 U.S.C. 44901(a)) and cannot be changed by the FAA."); *see also* Criminal History Records Checks, 66 Fed. Reg. 63474, 63477 (2001) (Burton Decl. Ex. R) ("airport operators [were] not responsible for screening").

[8]    *See* 49 U.S.C. § 44933(b)(3) (Burton Decl. Ex. UU) (federal security managers shall oversee and enforce security requirements); *id*. § 44904 (Burton Decl. Ex. TT) (FAA shall assess and monitor threats, conduct threat and vulnerability assessments, and take necessary corrective actions to improve security); *id*. § 40113(a) (Burton Decl. Ex. G) (inspection authority); *id*. § 46301 (Burton Decl. Ex. PP) (penalty provision); 14 C.F.R. pt. 13 (Burton Decl. Ex. OO) (investigative and enforcement procedures); 14 C.F.R. § 108.7 (Burton Decl. Ex. H) (requiring submission and FAA approval of security program); *id*. § 108.25 (Burton Decl. Ex. H) (allowing FAA to amend security program); *id*. § 108.18 (Burton Decl. Ex. H) (requiring air carrier response to FAA security directives and information circulars).

[9]    FEDERAL AVIATION ADMIN., U.S. DEP'T OF TRANSP., STUDY AND REPORT TO CONGRESS ON CIVIL AVIATION SECURITY RESPONSIBILITIES AND FUNDING 9–10, 14 (1998) (Burton Decl. Ex. E).

[10]    49 U.S.C. § 44904 (Burton Decl. Ex. TT) (assigning to the Administrator of the FAA and the Director of the FBI the responsibility "to assess current and potential threats to the domestic air transportation system" and to "correct[] any deficiencies" in that system).

aircraft maintenance.  If Plaintiff's argument is accepted, it will impose on airport operators unlimited responsibility for these other purely airline functions as well.

Plaintiff twists selective portions of FAR Part 107, the Logan Airport Security Program ("Logan ASP"), and the record, none of which imposes on Massport responsibility for passenger screening operations, much less "overarching responsibility" for all aspects of security at Logan, to mischaracterize both the law and the facts:

- FAR 107.3(a) required an airport operator to maintain a security program addressing those areas of responsibility assigned to it, but did not impose an "overarching security responsibility" anymore than the airline's parallel FAR 108 obligation to maintain a security program did.[11]

- FAR 107.3(b)(5) and 107.13—a supposed source for Massport's "overarching responsibility" and under which Plaintiff and her "expert" claim "Massport [conditionally] delegated checkpoint security to the airlines"[12]—concern exclusive use agreements related to access control in the Air Operations Area (AOA) (the portion of the airport where airplanes take off, land, and park) and have nothing to do with checkpoints.[13]

- FAR 107.31's provisions addressing an airport operator's performance of its Part 107 badging function—including any criminal history checks for individuals with Security Identification Display Area (SIDA) access—was *not* an exercise of lease power and provided an airport operator no authority or ability to review screener standards or performance.[14]

---

[11]   14 C.F.R. § 107.3(a) (requiring airport operator to have an FAA-approved security program detailing access control procedures and descriptions and law enforcement support) (Burton Decl. Ex. I).

[12]   Pilgrim Aff. ¶¶ 19–21; *accord* Pl.'s Opp. at 29, 38, 41.

[13]   14 C.F.R. §§ 107.3(b)(5), 107.13 (allowing airport operator and airline to enter into an agreement whereby the airline takes on exclusive security responsibility for controlling access to the AOA in the airline's exclusive area) (Burton Decl. Ex. I).

[14]   14 C.F.R. § 107.31 (requiring criminal background checks on qualifying applicants before issuing SIDA badges) (Burton Decl. Ex. I).  While Part 107 allowed Massport to accept airlines' certification that they had completed necessary background checks on their own employees and agents, Massport chose to conduct additional local criminal background checks as an added precaution pursuant to Part 107 before issuing badges to secure areas.  Letter from Joseph Lawless to Michael Canavan, dated June 4, 2001 (Eftekhari Decl. Ex. AA). These checks, which were aimed at identifying criminal records of prospective employees, had nothing to do with the training, supervision, or testing of screeners that were hired and did not and could not involve Massport in screener performance.

- FAR 107.21's prohibition on weapons possession before entering or in the sterile area applied to individuals without imposing any obligations on the *airport operator*.[15] Indeed, as explained in Massport's opening brief, the FAA confirmed shortly before 9/11 that this provision imposed no screening responsibility on the airport because "***control of the sterile area, and performance of screening are the air carriers' responsibility***."[16]

- Contrary to Plaintiff's claims, the Logan ASP provided only for periodic inspections relating to *access control* in the AOA—not checkpoint inspections.[17]

- There is no basis to conclude the AVSEC Plan allowed Massport to instruct airlines to take countermeasures related to checkpoint screening.[18]  Federal law, the security programs, and FAA testimony in this case make clear that the FAA, not Massport, was responsible for assessing the AVSEC Alert Level and determining which countermeasures to apply.[19]  And there is nothing in the Logan ASP that authorized Massport to direct how air carriers engaged in passenger screening operations regardless of AVSEC threat levels.

Grasping at other straws, Plaintiff incorrectly claims Massport's supposed responsibility for "overall security" and involvement in passenger screening also can be demonstrated by such matters as FAA-issued violations to airlines, an alleged Massport-commissioned study of

---

[15]   14 C.F.R. § 107.21 (stating "no person may have" weapons before entering or in the sterile area) (Burton Decl. Ex. I); *cf.* Pl.'s Res Ipsa Mem. at 13 (claiming "the 'sterile area' at and past the security checkpoint was in the exclusive control of United").  In addition to the statutory assignment of passenger screening to airlines, Plaintiff's conclusory claim that there should have been supplemental police screening also fails to take into account Fourth Amendment restrictions on unreasonable search and seizure.  *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1 (1968) (requiring reasonable suspicion of criminal activity for investigative stop).

[16]   *See* Massport Mem. Supp. Summ. J. at 23 (citing Burton Decl. Ex. II) (emphasis added).

[17]   Logan ASP (attached to the Declaration of Joseph Lawless, filed with Massport's Motion for Summary Judgment on May 27, 2011, Dkt. No. 1436  ("Lawless Decl.") as Exhibit A) at I.A.3.

[18]   Logan ASP (Lawless Decl. Ex. A) at V-I (identifying AVSEC Alert Levels and typical FAA-mandated countermeasures to be implemented by air carriers and airport authorities consistent with the federally mandated division of responsibilities); *see also* Deposition of Thomas Kinton, Jan. 25, 2011 ("Kinton Dep.") at 132:18–133:16 (Eftekhari Decl. Ex. F) (testifying the Logan ASP did not give Massport authority "to instruct an air carrier to increase security at a checkpoint").

[19]   *See* 49 U.S.C. § 44904 (Burton Decl. Ex. TT) (FAA shall assess and monitor threats, conduct threat and vulnerability assessments, and take necessary corrective actions to improve security); Logan ASP (Lawless Decl. Ex. A) at V-I (providing that the FAA "will determine, on a case-by-case basis, which countermeasures to require in response to a specific threat condition"); United Airlines Air Carrier Standard Security Program ("ACSSP") (Eftekhari Decl. Ex. C) at App. XV (providing that "[i]t is the FAA's responsibility to identify the appropriate AVSEC Alert Level and to determine which countermeasures to apply, and where"); Deposition of Robert Cammaroto, Feb. 11, 2008 (Eftekhari Decl. Ex. E) at 126:22–130:22 (testifying that "an alert level would be established under authority of the assistant administrator for Civil Aviation Security" and determining the alert level and appropriate countermeasures "was the FAA's responsibility").

checkpoints, meetings that Massport attended, and initiatives suggested by the airport.  First,

there is no evidence that Massport was either notified of FAA violations issued to airlines for

screening breaches or penalized for them.  Plaintiff blatantly mischaracterizes the record with

citations to (i) FAA letters Plaintiff claims were sent to Massport when plainly they were *not*;[20]

(ii) redacted FAA letters sent to Massport, which, contrary to Plaintiff's assertion, concern access

control in the AOA, not checkpoint screening operations;[21] and (iii) a conclusory "expert"

declaration seemingly based on inaccurate press reports.[22]  In reality, the uncontradicted record

shows Massport neither was notified of nor fined for checkpoint violations.[23]  Second, there is no

evidence Massport ever commissioned a study of checkpoints.  The cited study—which is both

inadmissible and irrelevant—concerned Part 107 airport security, and there is no evidence to

support Plaintiff's conclusory assertion.  Third, recognizing that meetings among various entities

with security functions within an airport does not make everyone liable for everything, this Court

previously rejected the notion that meetings among Massport and air carriers at Logan could alter

the statutory and regulatory assignment of passenger screening duties.[24]

     Plaintiff also attempts to ignore the federal division of security responsibilities by

suggesting Massport's leases gave it power to control checkpoint security, citing a customer

---

[20]  *See* Pl.'s Opp. at 30–31; Pl.'s Rule 56.1 Response ¶¶ 14, 30; Pl.'s Ex. 29 (containing FAA correspondence with American Airlines and United Air Lines concerning checkpoint performance without copy to Massport).

[21]  *See* Pl.'s Opp. at 30–31; Pl.'s Rule 56.1 Response ¶¶ 14, 30; Pl.'s Ex. 29 (containing FAA correspondence with Massport concerning access control without any connection to checkpoint performance).  These letters are available to Plaintiff in unredacted form in the Reading Room and, in many instances, by later versions produced by the TSA.

[22]  *See* Pl.'s Opp. at 30–31; Pl.'s Rule 56.1 Response ¶¶ 14, 30; Pilgrim Aff. at 48.

[23]  *See* Kinton Dep. at 104:9–14, 159:8–10, 159:20–25, 164:24–165:7 (Burton Decl. Ex. F) (Massport was not notified of FAA testing of checkpoints or fines assessed against airlines before 9/11 because of jurisdictional limits).

[24]  5/2/03 Tr. at 20:3–25 (Eftekhari Decl. Ex. G) ("That doesn't seem to be too persuasive because everyone needs to know what everyone else is doing").

service initiative implemented by Massport.[25]  However, the Guaranteed Passenger Standards Program (GPSP) did not, as Plaintiff contends, have anything to do with how passengers were screened on 9/11.  The GPSP, which was discontinued before 9/11,[26] was a customer-service program designed to address passengers' waiting-time at baggage claim, ticket counters, and checkpoints using the airlines' own standards.[27]  The GPSP was intended to address waiting-time through proper staffing by airlines.[28]  And, as shown below, the program had no effect on screening on 9/11.[29]  Thus, the program fails to demonstrate Massport could or did use its leases or any other authority to usurp the airline's or FAA's authority in the area of passenger screening under federal law.  There is no validity to Plaintiff's claim the leases can override federal law.

Plaintiff also claims a proposed initiative by Massport's Public Safety Director to use plainclothes police officers to test Logan's checkpoints evidences Massport's belief that it could control or supervise screeners' performance.  The proposal simply involved adding tests to those the FAA was already conducting; it did not (and could not) impose on Massport any responsibility for the screeners' performance.[30]  Moreover, it is undisputed that the FAA *did not*

---

[25]   Plaintiff relies on conclusory statements made by a post-9/11 task force recommending that Massport use landlord powers to improve security performance.  Pl.'s Opp. at 8, 20–21, and 28.  However, the task force's statements are clearly insufficient to redefine well-established federal law.  Moreover, the task force's report is inadmissible on several grounds, including hearsay, and therefore cannot be considered on summary judgment.  *See, e.g.*, *City of New York v. Pullman, Inc.*, 662 F. 2d 910, 915 (2d Cir. 1981) (rejecting a "so-called government report which in fact was incomplete and based largely on hearsay") (citation omitted).

[26]   Deposition of Edward Freni, Jan. 25, 2011 ("Freni Dep.") at 66:8–18; 68:20–69:3 (Eftekhari Decl. Ex. K).

[27]   *See* Deposition of Virginia Buckingham Lowy, Dec. 15, 2006 ("Buckingham Dep.") at 114:10–117:6 (Eftekhari Decl. Ex. J); Kinton Dep. at 153:1–154:4 (Eftekhari Decl. Ex. F); Freni Dep. at 59:6–25 (Eftekhari Decl. Ex. K).

[28]   *See* Buckingham Dep. at 114:10–117:6 (Eftekhari Decl. Ex. J); Kinton Dep. at 153:1–154:4 (Eftekhari Decl. Ex. F); Freni Dep. at 59:6–25 (Eftekhari Decl. Ex. K).

[29]   *See infra* at 20–21.

[30]   *See* 49 U.S.C. § 44904 (Burton Decl. Ex. TT) (tasking FAA with taking any necessary corrective actions to improve security); *id*. § 40113(a) (Burton Decl. Ex. G) (inspection authority); *see also Rosenthal v. Nierenberg*, 09 Civ. 8237, 2010 WL 3290994, at *6 n.7 (S.D.N.Y. Aug. 10, 2010) (holding commencement of performance is necessary element of a voluntary assumption of duty theory).

*approve* the proposal prior to September 11.[31]  Accordingly, there is simply no way this proposal

that was never accepted by the FAA can provide a basis to alter the controlling federal scheme

assigning passenger screening responsibility solely to the airlines.

## B.    There Is No Basis for a Claim Based on State-Law Standards

In apparent recognition that there is no basis to impose a responsibility for "overall

security" on Massport under federal law, Plaintiff tries to argue that state law somehow applies

to Massport and imposes duties on Massport to control passenger screening.  Yet Plaintiff offers

no explanation for the overwhelming body of case law demonstrating that federal rules must

control in the context of aviation safety and security.[32]  Notably, Plaintiff does not respond to

*Torbet v. United Airlines*—the only decision specifically addressing and finding preemption in

the context of pre-9/11 passenger screening responsibilities—and can cite no case holding that an

airport's security responsibilities can be established by state law.[33]  Instead, Plaintiff cites

---

[31]    Deposition of Joseph Lawless, Mar. 30, 2007 ("March Lawless Dep.") at 38:14–39:2, 157:10–14 (Eftekhari Decl. Ex. H); Buckingham Dep. at 194:20–24 (Eftekhari Decl. Ex. J); *cf.* Pl.'s Opp. at 19.  Any testing activity during a short period *after* 9/11 has no bearing on Massport's authority *on* 9/11.  The 9/11 attack upended the entire aviation security system, and the evidence shows the FAA approved any testing only after 9/11.  *See, e.g.,* Kinton Dep. at 104:15–19 (Burton Decl. Ex. F) ("The approval to do such a [joint testing] program came after September 11, 2001."); *id.* at 143:16–25 (Eftekhari Decl. Ex. F) (stating that joint testing was "approved by the FAA").

[32]    *See*, *e.g.*, *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011) ("[*Air Transport Association of America, Inc. v. Cuomo*] stopped short of formally holding that Congress intended to occupy the field of air safety . . . . Today we join our sister circuits."); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 224 (2d Cir. 2008) ("The FAA was enacted to create a 'uniform and exclusive system of federal regulation' in the field of air safety") (internal citations or quotations omitted); *Tweed-New Haven Airport Auth. v. Town of East Haven*, 582 F. Supp. 2d 261, 268 (D. Conn. 2008) (finding Congress intended to occupy the entire field of airline safety); *Curtin v. Port Auth. of New York & New Jersey*, 183 F. Supp. 2d 664, 671 (S.D.N.Y. 2002) (standard of care applicable to airline in negligence action arising out of emergency evacuation is preempted); *Torbet v. United Airlines*, No. 99-CV-12354 (C.D. Cal. Dec. 21, 2000) (AHM) (Burton Decl. Ex. QQ), *aff'd on other grounds*, 298 F.3d 1087 (9th Cir. 2002), *overruled on other grounds*, *U.S. v. Aukai*, 497 F.3d 955, 960–61 (9th Cir. 2007).  *Trinidad v. Am. Airlines, Inc.*, 932 F. Supp. 521, 524, 526–27 (S.D.N.Y. 1996), cited by Plaintiff, predates key preemption decisions in this Circuit and has been criticized by more recent authority.  *See, e.g., Shupert v. Continental Airlines, Inc.*, 2004 U.S. Dist. LEXIS 6214, at *17–19 (S.D.N.Y. Apr. 12, 2004).

[33]    No. 99-CV-12354, at *10 (C.D. Cal. Dec. 21, 2000) (holding that federal law preempted state-law standards of care in the context of aviation security because if "state law claims challenging defendants' screening

inapposite cases that do not reach the question of preemption,[34] or stand for the uncontroversial and irrelevant principle that state-law tort remedies (not standards) are not preempted by federal law.[35]  It is not surprising that Plaintiff cannot cite a case actually supporting her position because the notion that a Boston airport would be governed by New York common law standards in the face of clear and specific federal regulations governing security makes no sense.

Plaintiff also misstates the law by suggesting Massport somehow had screening responsibility because it had a duty to act "with the highest possible degree of safety in the public interest," 49 U.S.C. §§ 44701(d)(1)(A), 44702(b)(1)(A).[36]  Those statutory provisions on their face speak only to the duty of *air carriers* and Plaintiff can cite no case expanding the standard to airport operators.  And with respect to Plaintiff's continuous refrain that the FARs were merely "minimum standards," even assuming an airport operator were required to exceed FAA airport regulations, there is absolutely no basis to conclude it could exceed its jurisdiction

---

procedures were permitted, airports across the country could be forced to abandon the security standards prescribed by Congress").

[34]  *Di Benedetto v. Pan Am. World Service*, 359 F.3d 627, 631 n.2 (2d Cir. 2004) (concluding defendants were not negligent under state law without reaching preemption issue)*; Japan Airlines v. Port Authority of New York and New Jersey*, 178 F.3d 103, 107–08 (2d Cir. 1999) (finding airport negligent based on breach of applicable FAR without explicitly addressing preemption); *In re Air Disaster at Lockerbie Scotland*, 37 F.3d 804, 812 (2d Cir. 1994) (addressing liability for "wilful misconduct" under Warsaw Convention).

[35]  *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221–22 (2d Cir. 2008); *Drake v. Lab. Corp. of Am. Holdings*, 290 F. Supp. 2d 352 (E.D.N.Y. 2003), *aff'd* 458 F.3d 48 (2d Cir. 2006).  Plaintiff's reliance on *Drake* is particularly misplaced because the Second Circuit, while allowing plaintiff to "seek state-law remedies for violations of the federal regulations," emphasized that "state law cannot enlarge or enhance the regulations to impose burdens more onerous than those of the federal requirements on matters addressed by the federal regulations."  458 F.3d at 65 (internal quotation marks omitted).  *See also In re Air Crash at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d 67, 74–75 (2d Cir. 1980) (observing that parties stipulated to application of NY law and holding that "federal statute does not preclude common law *remedies*") (emphasis added); *accord Aldana v. Air East Airways, Inc.*, 477 F. Supp. 2d 489, 493 (D. Conn. 2007) (following *Abdullah*); *Sakellaridis v. Polar Air Cargo, Inc.*, 104 F. Supp. 2d 160, 163 (E.D.N.Y. 2000).

[36]  Pl.'s Standard of Care Mem. at 5–6.

and take over airline responsibilities.[37]  *Japan Airlines Company v. Port Authority of New York and New Jersey*, on which Plaintiff relies, only proves that point.  That case addressed the scope of an airport's duty clearly within Part 107—the removal of snow and ice from an airport runway.  The issue was whether the airport's snow removal duty should have been expanded to require removal of snow from other areas of the airfield.  But that case in no way stands for the proposition that an airport can unilaterally take responsibility for duties assigned to others, such as passenger screening or any other duties assigned to air carriers under Part 108.[38]

Even if federal law did not preempt state-law standards in the area of security responsibilities (and it does), Plaintiff's arguments based on landlord liability and assumed duties fare no better.  Under New York law, a landlord that opens its property to the public is not an insurer of the public's safety and has no duty to control its tenants for the benefit of third parties.[39]  Rather, it has responsibility only if (i) the landlord controlled the area where the harm occurred, and (ii) the harm was foreseeable.[40]  Regardless of whether the specific harm to Mark Bavis was foreseeable, Massport lacked control over the checkpoints and the aircraft.

Nor is there a basis to hold Massport liable for voluntarily assuming a duty relative to the screeners' performance on 9/11.  In New York, a voluntary assumption of duty gives rise to

---

[37]  *See* Kinton Dep. at 133:10–16, 226:16–227:14 (Eftekhari Decl. Ex. F).  Plaintiff's authority is not to the contrary.  *See Di Benedetto*, 359 F.3d at 630 (addressing scope of airline's screening duties); *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 124 (2d Cir. 1996) (holding that airline had burden of showing it could not have implemented secondary screening measures); *In re Air Crash at John F. Kennedy Int'l Airport*, 635 F.2d at 75 (in action against airline for crash during landing in thunderstorm, holding that FARs were "minimum standards" where monitoring weather conditions was an airline responsibility).

[38]  178 F.3d 103 (2d Cir. 1999); *see also Drake*, 458 F.3d at 65.  The L.A.S.E.R. and K-9 programs, which Plaintiff cites as examples of Massport's ability to "exceed" federal requirements, demonstrate the point:  those initiatives clearly fell within Part 107's law enforcement function.

[39]  *Williams v. Citibank, N.A.*, 247 A.D.2d 49, 51 (1st Dep't 1998); *Aronson v. Hyatt Int'l Corp.*, 202 A.D.2d 153, 154, 608 N.Y.S.2d 187, 188 (1st Dep't 1994); *see also Leyva v. Riverbay Corp.*, 206 A.D.2d 150, 155 (1st Dep't 1994) (a landlord only has a duty to provide reasonable security, not to use the best or most advanced security system imaginable).

[40]  *Williams*, 247 A.D.2d at 51.

liability only when (1) the defendant undertakes a course of conduct; (2) the plaintiff relied on

that conduct; and (3) the defendant "placed [the plaintiff or decedent] in a *more vulnerable*

*position than he would have been in had the defendant[ ] done nothing*."[41]  Inasmuch as Plaintiff

implies Massport assumed a duty simply by *proposing* to test checkpoints, the contention does

not give rise to a claim under the voluntary assumption of a duty doctrine because there is no

evidence supporting any of the requisite elements.  In addition, the absence of necessary federal

approval precludes finding that Massport undertook any conduct as required by state law.[42]

Accordingly, there is no basis to impose liability on Massport for alleged deficiencies in

screening the passengers of Flight 175 on the morning of 9/11.

## II.  THE SUPPOSED BREACHES OF MASSPORT'S PART 107 RESPONSIBILITIES ARE UNSUPPORTED, IMMATERIAL, AND BASED ON INADMISSIBLE EVIDENCE

Plaintiff's rhetoric similarly attempts to misguide with respect to Massport's Part 107

security responsibilities.  Massport has never claimed its responsibilities are "miniscule."  To the

contrary, Massport had important security duties in areas other than passenger screening.  Those

duties fell into three broad categories: (i) access control to the AOA where airplanes take off,

land, and park; (ii) issuing badges to persons authorized to enter the SIDA; and (iii) providing a

law enforcement presence to support the airport security plan and capacity to respond to the

screeners when called to check on incidents at the checkpoints.  Plaintiff's complaints

---

[41] *See Mayer v. Cornell Univ.*, 1997 U.S. App. LEXIS 669, at *9–10 (2d Cir. Jan. 8, 1997); *see also Piazza v. Regeis Care Ctr., LLC*, 47 A.D.3d 551, 553–54 (1st Dep't 2008) (affirming summary judgment for defendant nursing home where plaintiff whose mother was attacked in the nursing home "failed to raise any triable issue of fact as to whether she was lulled into any false sense of security as a result of defendant's alleged promises" to provide security); *Heard v. City of New York*, 82 N.Y.2d 66, 73 (1993) (holding that lifeguard's action did not "enhance[ ] the risk [plaintiff] faced, create[] a new risk nor induce[] him to forego some opportunity to avoid risk") (citation omitted).

[42] *PLIVA, Inc. v. Mensing*, --- S.Ct. ----, 2011 WL 2472790, at *12 (June 23, 2011) ("[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes").

concerning these areas within Massport's responsibility do not create a triable issue of fact.

### A.    There Is No Evidence of Access Control Violations on 9/11

Plaintiff fails to present any triable issue of material fact as to whether the 9/11 attack involved breaching Massport's ground security responsibilities under Part 107.  Plaintiff does not dispute that the 9/11 hijackers boarded Flight 175 after passing through checkpoint security and has identified no evidence of any access control violation contributing to the attack.  In fact, Plaintiff has affirmatively argued there is no evidence that the hijackers boarded without passing through checkpoint security, or that they retrieved weapons beyond the checkpoint.[43]  Indeed, Plaintiff produced expert reports with similar conclusions.[44]  Plaintiff's assertion that United or Huntleigh *contend* the hijackers obtained weapons by other means is insufficient to raise an issue of fact.[45]  Equally unavailing is Plaintiff's unsubstantiated and speculative assertion that Logan Airport was targeted because of Part 107 security vulnerabilities.[46]  Plaintiff has no credible basis to dispute the 9/11 Commission's conclusion that there is no evidence of Part 107 access control violations at Logan related to the 9/11 attack.[47]

---

[43]   Pl.'s Res Ipsa Mem. at 11.

[44]   *See* Expert Report of Evan Kohlmann, May 23, 2011, at 9 (Eftekhari Decl. Ex. O) ("[I]n my opinion, [ ] the hijackers targeted the checkpoints as the weak point in the security system through which to bring their weapons.  There is no convincing evidence in their training or activities leading up to the attacks that they intended to sneak weapons through other access points at the airports."); Expert Report of Michael Pilgrim, May 23, 2011, at 12 (Eftekhari Decl. Ex. D) ("On September 11, 2001, the hijackers for United Airlines Flight 175 passed through the checkpoint at Logan at Terminal C.").

[45]   5/16/11 Tr. at 16:22–17:5 (Eftekhari Decl. Ex. P) (warning by Court to Plaintiff that speculation that weapons came on the aircraft between screening and the aircraft would not be permitted).

[46]   *See* Local Rule 56.1(d) ("Each statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible"); *Crawford v. Dep't of Investigation*, 324 Fed. Appx. 139, 142–43 (2d Cir. 2009) (granting summary judgment to employer where plaintiffs "fail[ed] to point to anything more than speculation, hearsay and other inadmissible rumor, and conclusory allegations").

[47]   In fact, the 9/11 Commission concluded that the terrorists did not target particular airports or airlines and "simply booked heavily fueled east-to-west transcontinental flights of the large Boeing aircraft they trained to fly that were scheduled to take off at nearly the same time."  9/11 Report at 2 and 451 n.1 (Burton Decl. Ex. V).

Plaintiff nonetheless offers an *ad hominem* critique of Logan's access control security prior to 9/11. Much of the evidence is inadmissible based on hearsay and other grounds,[48] and Plaintiff cannot use unsupported and conclusory "expert" testimony in place of admissible factual evidence and then rely upon it to create issues of fact.[49] Moreover, under Plaintiff's own theory of the case, evidence concerning unrelated access control violations is totally irrelevant and cannot defeat summary judgment.[50]

### B.    There Is No Evidence of Airport Law Enforcement Failures on 9/11

Plaintiff's claim that Massport breached its obligation to provide adequate police support also cannot succeed. There is no evidence to show that Massport did not provide a police presence in support of the Logan ASP and to respond to reported incidents at checkpoints. The

---

[48]   For example, Plaintiff relies on a *draft* report prepared by Counter Technologies, Inc. ("CTI") in November 2001 assessing physical security at Logan. In addition to constituting hearsay, the report confirms access control has nothing to do with the events of September 11. Thus, it is irrelevant and inadmissible for the purposes offered. Fed. R. Evid. 402, 404(b), 801–803; *cf. Giles v. Thodes*, No. 94 Civ 6385, 2000 WL 1425046, at *4 (S.D.N.Y. Sep. 27, 2000) (excluding medical report where the content of the report is entirely irrelevant to the actual claims of the case).

[49]   *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511–12 (2d Cir. 2010) (finding summary judgment appropriate because expert testimony "[did] not suffice to draw the requisite causal connection); *Patterson v. County of Oneida, NY*, 375 F.3d 206, 221–22 (2d Cir. 2004) (applying Rule 56(c)(4) and holding statement in affidavit that "the Department had such a custom, practice and policy is entirely conclusory . . . [and therefore] insufficient to support the proposition advanced or to show the existence of a genuine issue to be tried"); *Aretakis v. Federal Exp. Corp.*, No. 10 Civ. 1696, 2011 WL 1226278, at *2 (S.D.N.Y. Feb. 28, 2011), *report and recommendation adopted by* 2011 WL 1197596 (S.D.N.Y. Mar. 25, 2011) ("[Rule 56(c)(4)] means that neither hearsay assertions made in an affidavit that would be inadmissible at trial, if testified to by the affiant, nor conclusory assertions are sufficient to create genuine issues for trial."); *Travelers Casualty & Surety Co. v. Dormitory Auth. State of New York*, 735 F. Supp. 2d 42, 65 (S.D.N.Y. 2010) (expert opinion was insufficient to raise question of fact in absence of other admissible evidence).

[50]   Fed. R. Evid. 402, 404(b); *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) ("To open the doors of relevance so wide as to allow a plaintiff to recite facts concerning claims he is *not* making or damages he is *not* seeking would violate the spirit of the Federal Rules and 'hamper rather than advance the search for truth.'") (citations omitted); *Jones v. Southern P. Railroad*, 962 F.2d 447, 449 (5th Cir. 1992) (evidence of train engineer's prior safety infractions, nearly all of which occurred several years before accident at issue, was properly excluded in personal injury suit by passenger of truck struck by train since they had little to do with what actually happened on day of accident).

police were stationed throughout the airport.[51]  At times, the State Police stood near checkpoints to raise awareness.[52]  However, officers were not routinely stationed there.  Instead, the State Police patrolled the airport and responded to checkpoints when screeners determined a problem existed and requested assistance.[53]  Contrary to Plaintiff's conclusory assertion, the "flexible response" was not unique to Logan but was commonly used at Category X airports.[54]  The FAA specifically approved the "flexible response" (generally and at Logan) in place of a rigid requirement for a permanent police presence at checkpoints.[55]  At the time of the rule's adoption, the FAA explained that the flexible response was necessary to ensure that there was an adequate police presence in other areas of the airport.[56]  Thus, imposing a duty now to have fixed-stationed law enforcement officers would clearly be inconsistent with federal law.[57]

Plaintiff also mischaracterizes the police role in support of checkpoints.  Massport had no duty to conduct secondary screening in the sterile area.[58]  Nor is there any support for Plaintiff's

---

[51]  *See, e.g.*, Logan ASP at IV-1-2, 5–6 (Lawless Decl. Ex. A); Lawless Decl. ¶¶ 16–18.

[52]  March Lawless Dep. at 101:19–102:2 (Eftekhari Decl. Ex. H).

[53]  *See* Deposition of Joseph Lawless, May 22, 2007 ("May Lawless Dep.") at 244:5–16 (Eftekhari Decl. Ex. I); Lawless Decl. ¶¶ 16–17.

[54]  Lawless Decl. ¶ 18.

[55]  *See* Revision of Part 107, 43 Fed. Reg. 60786, 60789–90 (Eftekhari Decl. Ex. Q); 42 Fed. Reg. 30766, 30767 (Proposed Revision) (Eftekhari Decl. Ex. R); Logan ASP at IV-2 (Lawless Decl. Ex. A).

[56]  42 Fed. Reg. at 30767 (Proposed Revision) (Eftekhari Decl. Ex. R) ("The FAA also believes that flexibility should be provided in the airport operator's system of law enforcement. . . . the law enforcement officer could patrol and support, if necessary, other sensitive areas of a terminal, while at all times remaining ready to respond promptly to the screening point should the need arise.  Considerations such as the complexity of a terminal, the volume of traffic, and the ever-changing nature of the security threat would affect whether the officer could patrol a terminal and, if so, how promptly a response should occur.").

[57]  *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (imposition of duty under state tort law requiring automobile manufacturers to install airbags would impose conflicting obligations and present obstacle to installation of a variety of restraint systems sought by federal regulation).

[58]  Lawless Decl. ¶ 11.  Any such emergency measures implemented in the aftermath of the unprecedented terrorist attack on September 11 shed no light on whether it was appropriate or permissible before 9/11.  Evidence of any measures adopted at airports *after* 9/11—a watershed event that changed the entire aviation system—are improper and irrelevant.  *See* Fed. R. Evid. 402, 407; *Cann v. Ford Motor Co.*, 658 F.2d 54, 59 (2d Cir. 1981) (under Rule 407, evidence of subsequent remedial measures is inadmissible to establish negligence or other

assertion that the State Police were responsible for determining whether items discovered at checkpoints were allowed under airline security plans or the COG.[59]  There is no evidence that Massport (or the State Police) even had access to the COG.[60]  The State Police would be called to deal with a weapon that was illegal under local law.[61]  Ultimately, these claims are immaterial because it is undisputed the State Police were not called to the Flight 175 checkpoint on September 11.[62]

There also is no evidence that Massport failed to satisfy its obligation to provide a police presence, including addressing reports of suspicious activity, in connection with the 9/11 attack. To the contrary, the State Police were visible and effectively monitored the airport through routine assignments and supplemental L.A.S.E.R. patrols consistent with Part 107.[63]

Perhaps most outrageous is Plaintiff's claim that somehow Massport can be liable based on an unsubstantiated post-9/11 account of a supposed May 11, 2001 sighting of Flight 11 hijacker Mohamed Atta in a different terminal from United's operation.[64]  This Court has already

---

culpable conduct).  Post-9/11 security practices therefore cannot create a triable question of fact.  *See Ewane-Sobe v. Rochester City School Dist.*, No. 07-CV-616T, 2011 WL 231795, at *4 (W.D.N.Y. Jan. 24, 2011); *Antonmarchi v. Consolidated Edison Company of New York, Inc.*, No. 03 Civ. 7735, 2009 WL 1069161, at *2 (S.D.N.Y. Apr. 17, 2009) (denying plaintiff's motion to reconsider summary judgment decision where proffered testimony was irrelevant to whether there were genuine issues of material fact to support plaintiff's claims).

[59]  *See* Kinton Dep. at 227:8–14 (Burton Decl. Ex. F).

[60]  *See* Lawless Decl. ¶ 10 (testifying that Massport never received a copy of the COG).

[61]  Kinton Dep. at 49:11–18 (Eftekhari Decl. Ex. F); Lawless Decl. ¶ 17.

[62]  *See* Kinton Dep. at 227:15–20 (Burton Decl. Ex. F) (testifying that no one called for police at relevant checkpoints before the hijackings); Deposition of Mohammed Sharrif, Dec. 14, 2006 ("Sharrif Dep.") at 162:2–23 (Burton Decl. Ex. U) ("Q. Do you recall at any time on September 11, 2001, at the checkpoint a law enforcement official being brought to the checkpoint? A. No, actually."); Lawless Decl. ¶ 20.

[63]  Lawless Decl. ¶ 16; March Lawless Dep. at 56:22–25, 101:16–102:5 (Eftekhari Decl. Ex. H) (describing the L.A.S.E.R. program); Public Safety Staff Meeting Minutes, Jan. 3, 2001 (Eftekhari Decl. Ex. S); May Lawless Dep. at 244:5–16 (Eftekhari Decl. Ex. I).

[64]  As to the other three alleged sightings, there is no evidence they were called to the attention of the State Police or anyone at Massport.

rejected this absurd theory of liability, and for good reason.[65]  Even if the person Mr. Wallace

saw on May 11 was in fact Mohamed Atta—which is highly doubtful considering that FBI

evidence suggests he was in Florida at the time[66]—no one other than his co-conspirators knew in

May that he would be involved in the 9/11 attack in September.  Even if the testimony could be

considered credible, it avails Plaintiff naught because if anything it demonstrates that the State

Police immediately took action to investigate the situation, accompanying the alleged witness

and observing activities of the suspect at the screening checkpoint.[67]  Plaintiff's speculation that

the State Police allegedly did not ask this person for identification (which by all accounts each

hijacker had in any event)[68] clearly does not create a material issue worthy of a jury's

consideration.  If this supposed failure could serve as a basis for liability, Massport obviously

would need to revisit every other "missed opportunity" the Government (and others) had to stop

and deter the terrorists in the years and months leading up to 9/11, which will result in a

significant expansion of discovery and any trial.

---

[65]  *See* Order Dismissing Globe Aviation Services, No. 02 Civ.7154 (S.D.N.Y. Dec. 22, 2010) (Docket No. 1369) (dismissing Globe Aviation Services from the *Bavis* action because Globe's distinct aviation security responsibilities, including "screening activities, and any duties arising from them, do not give rise to a duty to the aviation industry generally, or to all people that travel in airplanes"); 12/21/10 Tr. (Eftekhari Decl. Ex. CC) at 14:4–7 (noting Plaintiff's argument that alleged May 11 sighting of Atta gave rise to a supposed duty to report so there would be "notice systemwide" had already previously been "made and rejected" by the Court).

[66]  *See* FBI Timeline at MR_AVSEC00161096–1108 (Eftekhari Decl. Ex. BB) (excerpt of the FBI Chronology of Hijacker Events indicating that Atta was in Florida and did not leave the state in May 2001).

[67]  Deposition of Stephen Wallace, July 17, 2007 ("Wallace Dep.") at 112:5–113:19 (Eftekhari Decl. Ex. T). Photographing, videotaping, or observing the checkpoints and other public places in the airport was not prohibited under federal law; even today, the TSA does not prohibit photographing, videotaping or filming at screening locations that does not interfere with the screening process.  *See* January 1, 2001 LAMCO minutes (Eftekhari Decl. Ex. U) (confirming photography and video were allowed in Terminal E at Logan); "Taking Pictures at the Checkpoint," Transportation Security Administration, available at: http://www.tsa.gov/travelers/airtravel/taking_pictures.shtm (last viewed June 29, 2011) (Eftekhari Decl. Ex. V) ("TSA does not prohibit the public, passengers or press from photographing, videotaping or filming at security checkpoints, as long as the screening process is not interfered with or slowed down.  We do ask you not to film or take pictures of the monitors.").

[68]  *See, e.g.,* 9/11 Report at 231, 524 n.82  (Eftekhari Decl. Ex. B) (noting that Atta properly presented an international driver's license to law enforcement during a traffic stop in April 2001 and later obtained a Florida driver's license).

Finally, Plaintiff's contention that Massport breached a duty by failing to install and monitor closed-circuit television ("CCTV") at checkpoints also lacks merit.  CCTV was not a feature of Massport's FAA-approved ASP and it was not a federal aviation security requirement.[69]  Even if CCTV had been in place, it would not have been used to monitor the 24,000,000 passengers using Logan in 2001 as suggested by Plaintiff.[70]  Instead, as seen at the airports which did have CCTV before 9/11, it was used for forensic purposes to identify persons who had disappeared into the terminal after a security breach, as well as respond to accidents and theft accusations after the fact.[71]  CCTV at the United checkpoint would not have deterred the suicidal terrorists on 9/11, but only would have served to provide later pictures of them passing through the checkpoint, which is what was captured on 9/11 by CCTV at Dulles and Portland airports.[72]  It is the rankest speculation to suggest CCTV "could have" resulted in Atta's earlier placement on a watch list and somehow prevented the attack on United Flight 175 which he did not board.  Thus, a claim predicated on FAR 107.15 is baseless.

## III.   PLAINTIFF COMPLETELY FAILS TO DEMONSTRATE ANY CAUSAL CONNECTION BETWEEN MASSPORT'S CONDUCT AND THE ATTACK

Plaintiff's opposition points to no evidence on which a reasonable juror could base a finding that Massport caused Mark Bavis's tragic death.  Well-established New York law requires Plaintiff to point to concrete evidence that Massport's conduct was both the cause-in-

---

[69]   Deposition of Lyle Malotky, Jan. 7, 2011 ("Malotky Dep.") at 188:8–11 (Eftekhari Decl. Ex. W) ("I don't believe FAA had ever required cameras.  They were generally put in place to address issues of civil suits, pilferage and so forth at the checkpoint."); Kinton Dep. at 240:3–6 (Eftekhari Decl. Ex. F).

[70]   Kinton Dep. at 239:9–240:2 (Eftekhari Decl. Ex. F); Malotky Dep. at 188:8–11 (Eftekhari Decl. Ex. W).

[71]   Kinton Dep. at 239:9–240:2 (Eftekhari Decl. Ex. F).

[72]   *See*, *e.g*., Deposition of John Bentley, July 24, 2007 ("Bentley Dep.") at 132:7–134:19 (Eftekhari Decl. Ex. X) (on the morning of September 11, at Dulles International Airport there were three surveillance cameras focused on the checkpoints serving Flight 77); Deposition of Charles C. Severance, July 25, 2007, at 15:3–9 (Eftekhari Decl. Ex. Y) (implicitly acknowledging there was CCTV at Portland checkpoints on 9/11); *see also* 9/11 Report (Eftekhari Decl. Ex. B) at 3 (noting that the Dulles checkpoint "featured closed-circuit television that recorded all passengers, including the hijackers, as they were screened").

fact and a substantial factor in bringing about her damage.[73]  As explained in Massport's opening brief, courts routinely grant summary judgment to the defendant where, as here, a plaintiff can point to nothing more than sheer speculation, conclusory allegations, and expressions of hope that other security measures may have prevented a tragic event.[74]

Yet conjecture is all that Plaintiff has offered.  Plaintiff speculates that additional security measures by Massport within its Part 107 jurisdiction—*e.g.*, permanently stationing law enforcement officers at checkpoints,[75] installing CCTV at the screening checkpoints,[76] increasing the number of law enforcement officers patrolling the airport on and before 9/11[77]—would have changed the result or thwarted the hijackers in some way.  For example, Plaintiff surmises that if Massport had installed CCTV at the screening checkpoints, the following chain of events "could have" happened:  (1) the CCTV could have captured an image of a supposed hijacker who allegedly appeared at a different terminal to board another airline months before 9/11;

---

[73]  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (affirming summary judgment for the defendant and stating that the nonmoving party must point to some "hard evidence" in responding to summary judgment motion) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)); *see also Perez v. McFarlane*, 794 N.Y.S.2d 359, 359–360 (1st Dep't 2005) ("Absent any proof other than plaintiff's unsupported and speculative claim that the intruder . . . gained access to the premises through a window in an adjacent garage/office that had been left open two occasions several months earlier, the claim that defendants' negligence or inadequate security measures permitted the intruder to gain entry is insufficient to defeat defendants' motion for summary judgment") (citation omitted).

[74]  *See Colarossi v. University of Rochester*, 2 A.D.3d 1272, 1273–74 (4th Dep't 2003), *aff'd* 812 N.E.2d 1250, 1250 (N.Y. 2004) (affirming summary judgment because "plaintiff presented no evidence other than mere conclusions, expressions of hope or unsubstantiated allegations that alleged insufficient security" proximately caused plaintiff's shooting) (internal quotation marks omitted); *Ravner v. Autun*, No. 9556/06, 2008 N.Y. Misc. LEXIS 7885, at *6 (Sup. Ct. N.Y. Feb. 27, 2008), *aff'd* 60 A.D.3d 1030 (2d Dep't 2009) (granting summary judgment because "[p]laintiff's expert's conclusion, that enactment and enforcement of a comprehensive security plan would have prevented this accident, is simply speculation"); *see also Flynn v. Esplanade Gardens, Inc.*, 76 A.D.3d 490, 492 (1st Dep't 2010) (granting summary judgment for landlord where "the specifically targeted criminal assault perpetrated upon plaintiff by the companion of a visitor he knew . . . constituted an unforeseeable, intervening force that severed any causal nexus between [the landlord's] alleged negligence and plaintiff's injuries, since it is most unlikely that reasonable security measures would have prevented an attack of this kind").

[75]  Pl.'s Opp. at 7.

[76]  *Id.* at 8–9.

[77]  *Id.* at 7.

(2) Massport employees "could have reviewed the tape[]" recordings and picked out from tens of millions of passengers this individual who was unknown to law enforcement authorities and was violating no laws; (3) the captured images "could have been known and posted at every checkpoint;" (4) the hijacker then somehow "could have been placed on no fly lists and watch lists"; and (5) finally the hijacker inexplicably "could have been stopped from flying by Massport."[78]  Plaintiff also speculates that Massport failed to consider the effect of the GPSP program—which was primarily designed to get passengers bags delivered on time—on security, implying it had a negative impact.[79]  But there is no evidence suggesting that it had *any* effect on screening performance, let alone a negative effect on the morning of 9/11.  Plaintiff's complaint is riddled with tenuous, conclusory, and unsubstantiated allegations, which simply cannot establish causation under the law.

If anything, the record and Plaintiff's own admission reveal that Plaintiff cannot establish the requisite causal link between Massport's actions and the terrorist attack:

- The Flight 175 hijackers passed through the checkpoint without arousing any suspicions and were not reported to the State Police on the morning of 9/11;[80]

- State Police maintained a presence throughout Logan, and officers were available to investigate immediately and appropriately when alerted to an alleged surveillance activity months before 9/11;[81]

- CCTV in place at Portland and Dulles did not stop the terrorists from boarding flights at those airports; it merely provided a picture of them after the fact.[82]  And while the

---

[78]  *Id.* at 8–9.

[79]  Pl.'s Opp. at 17.

[80]  *See* Pl.'s Rule 56.1 Response at ¶¶ 38–39; *see* 9/11 Report at 1–4 (Eftekhari Decl. Ex. B); Preliminary Partial Joint Fact Narrative at 2 (Burton Decl. Ex. Q); *see also* Deposition of Trandafile Bala, Dec. 14, 2006 at 83:7–9, 84:24–89:3 (Burton Decl. Ex. Z) (testifying that 9/11 was "a regular day" and that he did not recall any suspicious people walking through the Huntleigh checkpoint); Lawless Decl. ¶¶ 19–21.

[81]  Wallace Dep. at 112:5–113:19 (Eftekhari Decl. Ex. T) (testifying that, contrary to Plaintiff's conclusory assertion that Massport did not respond when alerted to suspicious behavior, a State Trooper joined Wallace when alerted to observe the individuals and went behind the x-ray machine to "watch[] their bags").

presence of CCTV may have deterred individuals from committing petty crimes who would not want their images captured, it would not have dissuaded hijackers on a suicide mission.  Plaintiff offers yet another mischaracterization by suggesting that Massport official Thomas Kinton testified that CCTV would have been a deterrent to the 9/11 attack.  To the contrary, he explained that CCTV does not increase security if one is "a suicide bomber intent on killing [him]self."[83]

- There is no evidence the GPSP had a negative impact on screening procedures by rushing screeners, or that screeners were even aware it existed.[84]  To the contrary, airline and security company witnesses have testified consistently that the GPSP had no effect on their performance.[85]  In addition, the program was discontinued before 9/11.[86]

Furthermore, although Plaintiff attempts to create a genuine issue of fact by again suggesting—despite repeated warnings from this Court against doing so[87]—that the hijackers *may* have been able to obtain their weapons "by working in concert with others who breached the [AOA and SIDA area], or by working in concert with others who breached these areas, or by buying their weapons in the airport or by obtaining the weapons [through membership in

---

[82]   *See*, *e.g*., Bentley Dep. at 132:7–134:19 (Eftekhari Decl. Ex. X) (on the morning of September 11, at Dulles International Airport there were three surveillance cameras focused on the checkpoints serving Flight 77); Severance Dep. at 15:3–9 (Eftekhari Decl. Ex. Y) (implicitly acknowledging there was CCTV at Portland checkpoints on 9/11); *see also* 9/11 Report at 3 (Eftekhari Decl. Ex. B) (noting that the Dulles checkpoint "featured closed-circuit television that recorded all passengers, including the hijackers, as they were screened").

[83]   Kinton Dep. at 238:7–11 (Eftekhari Decl. Ex. F).

[84]   Pl.'s Opp. at 18; *see Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact") (citations omitted); *Cretella v. Liriano*, 633 F. Supp. 2d 54, 76 (S.D.N.Y. 2009) (granting summary judgment to defendant on state-law discrimination claims where plaintiff offered "nothing more than conclusory denials and rampant speculation").

[85]   *See, e.g.*, Deposition of Mark Hussey, Mar. 14, 2007, at 143:10–11 (Eftekhari Decl. Ex. L) (testifying that Massport's standards were "not a measurement that we were focused on internally"); Sharrif Dep. (Eftekhari Decl. Ex. M) at 164:3–165:4 (testifying he was never given instruction prior to 9/11 on how quickly passengers should pass through a checkpoint); Deposition of Mohammed Osman, May 23, 2007 at 99:25–100:12 (Eftekhari Decl. Ex. N) (same).

[86]   Freni Dep. at 66:8–18; 68:20–69:3 (Eftekhari Decl. Ex. K).

[87]   5/16/11 Tr. (Eftekhari Decl. Ex. P) at 12:23–24 ("Why should I leave Massport in the case. I can't just speculate."); *id.* 16:22–17:2 ("[I]f the defendants or the plaintiffs do not present some evidence in response to your motion [for summary judgment] that there was some activity over which Massport had a duty to act and a failure to act, I will not permit speculation that maybe the weapons came on in some other fashion between the screening and the airport.").

United's] Red Carpet Club or restaurant after clearing security,"[88] Plaintiff's unequivocal admission from her most recent submissions confirms that there is absolutely "no evidence indicating that hijackers managed to board [United's] aircraft without passing through its security or that they retrieved weapons from a location past the security checkpoint."[89]  Plaintiff does not, because she cannot, explain how she can possibly maintain a causation theory against Massport when as recently as two weeks ago, Plaintiff told this Court that "***the instrumentality that caused the injury to Mark Bavis—United's aircraft and security procedures—was under United's exclusive control***."[90]

Plaintiff attempts to side-step her inability to prove causation by arguing that Massport should have foreseen the criminal acts perpetrated by the hijackers.[91]  But beyond a half-hearted contention that the events of 9/11 at Logan were foreseeable (which they were not), Plaintiff fails to establish or even address causation-in-fact, without which she cannot establish negligence by Massport.[92]  As this Court has recently held, summary judgment and dismissal is appropriate when there is an absence of factual causation establishing that something Massport should have done "could have avoided the hijacking of Flight 175."[93]  Plaintiff fails to provide this necessary connection beyond rank speculation.

---

[88]  Pl.'s Opp. at 13; *see also id.* at 36 (discussing possibility that "the hijackers could have purchased their weapons after clearing security in terminal areas or obtained knives from restaurant, stores, etc. in the concourse").

[89]  Pl.'s Res Ipsa Mem. at 11; *see also* Pl.'s Rule 56.1 Response ¶¶ 42–44 (not contesting the factual statements indicating that there is no evidence any terrorist depended on negligence or breach of any of Massport's Part 107 security responsibilities on 9/11).

[90]  Pl.'s Res Ipsa Mem. at 9.

[91]  Pl.'s Opp. at 11–13.

[92]  Massport Mem. Supp. Summ. J. at 24–28.

[93]  *In re September 11 Litig.*, 594 F. Supp. 2d 374, 380–381 (S.D.N.Y. 2009) (dismissing American Airlines and Globe from claims relating to property damages stemming from United Flight 175).

## IV.    WTCP'S BRIEF ADDS NOTHING EXCEPT ADDITIONAL MISREPRESENTATIONS AND SPECULATION

Massport moved for summary judgment dismissing the claims against it in the Bavis action so that the Court could resolve Massport's role before a trial of the case begins on November 7, 2011.[94]  WTCP is not a party to the Bavis action, and neither requested nor received permission to make a submission.[95]  Thus, the submission is improper.  In any case, WTCP's arguments all fail for the same reasons as Plaintiff's.  Moreover, as explained in its opening brief, Massport has additional grounds for the dismissal of WTCP's claims, including that Massport lacked any duty to WTCP, a property lessee in New York.[96]  That and other WTCP-specific deficiencies can be briefed separately, if necessary, at the appropriate time.  In the meantime, however, it is important to address several legal and factual mischaracterizations in WTCP's submission:

- **The FAA Handbook does not impose on Massport responsibility for screening.** WTCP argues the FAA's Airworthiness Inspector's Handbook imposes on Massport a duty to act "with the highest possible degree of safety" by assuming passenger screening responsibilities.[97]  However, WTCP's reliance on an FAA handbook (which WTCP concedes does not have the force of law)[98] is misplaced because it refers to "*air operators*," rather than "airport operators."[99]  The term "air operators" refers to "air carriers" as demonstrated by the FAA handbook's explicit reference to the statutory

---

[94]    5/16/11 Tr. at 11–18, 30 (Eftekhari Decl. Ex. P); Summary Order, 02 Civ. 7154 (S.D.N.Y. May 18, 2011).

[95]    *See* Summary Order, 02 Civ. 7154 (S.D.N.Y. May 18, 2011).

[96]    New York law imposes legal duties on a defendant to protect a plaintiff from harm caused by third parties only where the defendant has a special relationship to the plaintiff or the third-party tortfeasor.  *See In the Matter of New York Asbestos Litig.*, 840 N.E.2d 115, 118–19 (N.Y. 2005).  Massport had no special relationship with WTCP or with the terrorists.  Finding an airport in Massachusetts had a legal duty to prevent harm to a property owner over 200 miles away would expand New York law beyond recognition.  This Court has previously observed that "the imposition of such a sweeping duty to general aviation everywhere and to the public everywhere would, in effect, eliminate every concept of the notion of duty in tort law."  *In re September 11 Litig.*, 594 F. Supp. 2d at 382.

[97]    WTCP Opp. at 2–5.

[98]    6/14/07 Tr. at 134:17–25 (Eftekhari Decl. Ex. Z).

[99]    WTCP Opp. at 3.

provisions that on their face speak only to air carriers' duties.[100] And other federal rulemaking also makes clear that "air operators" means air carriers, not airport operators.[101] Thus, far from supporting WTCP's argument that a "highest degree of safety standard" applies to airport operators, the FAA Handbook flatly contradicts it.

- **Massport's security initiatives did not reflect recognition of a duty to undertake or supervise screening.** WTCP makes additional misstatements of fact and conclusory assertions about Massport initiatives that cannot alter the federal scheme in place on 9/11. For example, as WTCP acknowledges, Massport sought and did not receive the necessary FAA approval for its testing initiative before 9/11.[102] Given that the FAA never approved the plan, it is nonsensical to argue that Massport's *proposal* to conduct testing demonstrates that it had the authority to do so.[103] WTCP also incorrectly claims that Massport CEO Thomas Kinton testified that he or his staff took any measures to reduce screener turnover. While speculating that his staff may have looked at turnover issues, Kinton never stated that they could or did take any steps to affect the turnover rate.[104] WTCP's reference to an explosives awareness orientation to familiarize screeners with handling such materials after detection also is irrelevant because that program was conducted by State Police and fell within the established Part 107 law enforcement function. It had nothing to do with screeners' methods for detecting such materials or small weapons carried by passengers.[105]

- **The cited post-9/11 measures are improper and irrelevant.** WTCP attaches additional significance to a requirement by Massport for airlines to certify their compliance with FAA security rules in the immediate aftermath of 9/11. However, the certification has no bearing on what Massport was allowed to do *before* 9/11.[106] As explained above, reference to post-9/11 measures is improper and irrelevant because the 9/11 attack changed the entire federal aviation security system.

---

[100] *See* Federal Aviation Administration's Airworthiness Inspector's Handbook, Order 8300.10 CHG 9, at 6-6, August 13, 1993 (attached to the Declaration of Jason Cohen as Exhibit 9) (citing 49 USC 44702(b)).

[101] *See, e.g.,* Hazardous Materials Training Requirements, 70 Fed. Reg. 58796, 58796 (2005) (Eftekhari Decl. Ex. DD) (FAA amendment stating "For the purposes of this rulemaking, the terms 'air carrier,' 'operator,' 'air operator,' 'carrier,' and 'airline' are used synonymously to refer to part 121 or part 135 operators."); Department Regulatory Plan and Semiannual Regulatory Agenda, 59 Fed. Reg. 57846, 57912 (1994) (Eftekhari Decl. Ex. EE) (considering requirement for "*air operators* to establish a program to ensure that flight attendants are able to communicate effectively in English . . . .") (emphasis added); Commuter Operations and General Certification and Operations Requirements, 60 Fed. Reg. 65832, 65881 (1995) (Eftekhari Decl. Ex. FF) (discussing payloads and "*air operator*" certification requirements for aircraft carrying cargo) (emphasis added).

[102] WTCP Opp. at 12.

[103] *Id.*

[104] WTCP Opp. at 13; *cf.* Kinton Dep. at 112:14–113:12 (Eftekhari Decl. Ex. F) (testifying that his staff "may have looked at [turnover issues] . . . [but] I'm not sure they could have done anything[.]").

[105] March Lawless Dep. at 102:6–12 (Eftekhari Decl. Ex. H); May Lawless Dep. at 286:3–23 (Eftekhari Decl. Ex. I).

[106] WTCP Opp. at 14–15.

- **WTCP relies on nothing more than speculation to attempt to draw a causal connection between Massport and the 9/11 attack.** Like Plaintiff, WTCP has no evidence to justify allowing this case to go to the jury.  WTCP is simply guessing with "what if's," which is woefully inadequate and should be rejected. This is insufficient to create a triable issue of fact.

In sum, like Plaintiff's opposition, WTCP fails to raise a triable issue of material fact as to any of these issues.

## CONCLUSION

The record is now clear that Massport should be dismissed from this case before trial. Plaintiff has no basis to assert a passenger screening case against Massport as a matter of law, and effectively concedes the 9/11 attack did not implicate Massport's Part 107 responsibilities. Speculation that Massport should have done something more and the failure to do so caused Plaintiff harm is insufficient.  There is no causal connection between any of Massport's responsibilities and the events of 9/11.  For all of these reasons, and all the reasons in this memorandum and Massport's opening memorandum, the Court should grant summary judgment dismissing all claims against Massport.

Dated: New York, New York
        July 5, 2011

Respectfully submitted:

O'MELVENY & MYERS LLP

By:  /s/ Mark Wood_____

Mark Wood
Allen W. Burton
Shiva Eftekhari
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail:  mwood@omm.com

*Attorneys for The Massachusetts Port Authority*

-25-