UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  | : | 21 MC 101 (AKH) |
|  | : |  |
| IN RE SEPTEMBER 11 LITIGATION | : | This document relates to: |
|  | : | *Bavis v. United Airlines Inc. et al.*, |
|  | : | 02 CV 7154 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW OF AMERICAN AIRLINES, INC. AND AMR CORPORATION CONCERNING APPLICABLE STANDARD OF CARE

CONDON & FORSYTH LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 490-9100
Desmond T. Barry, Jr. (DB 8806)

-and-

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000
Roger E. Podesta (RP 1749)

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

*Of Counsel:*

Maura K. Monaghan
Jacob W. Stahl
Johanna N. Skrzypczyk

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................2

ARGUMENT...............................................................................................2

   I.   ATSSSA Determines the Applicable Standard of Care ..........................................2

   II.  The "Preempted By" Language of ATSSSA Mandates Applying an
       Exclusively Federal Standard of Care ....................................................5

       A.  Federal Aviation Act Preemption under *ATA* and *Goodspeed* ........................5

       B.  Bavis' Other Authorities Do Not Withstand Analysis ......................................9

   III.  The "Inconsistent With" Language of ATSSSA Mandates Applying an
       Exclusively Federal Standard of Care ....................................................11

   IV.  The Federal Aviation Act and Its Implementing Regulations Set Forth
       the Legal Obligations of the Airlines and Security Companies for
       Aviation Security; Defendants May Not Be Subjected to Liability for
       Failing to Exceed Those Obligations .......................................................14

   V.  The Security Measures Plaintiffs Suggest Defendants Should Have
       Adopted Would Conflict with FAA Regulations and Policy Judgments
       or Violate Federal Law ..........................................................................19

CONCLUSION ...........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdullah v. Am. Airlines, Inc.,*
   181 F.3d 363 (3d Cir. 1999)..................................................................................8, 10

*Air Transport Ass'n of American, Inc. v. Cuomo,*
   520 F. 3d 218 (2d Cir. 2008)................................................................................. *passim*

*Aldana v. Air E. Airways, Inc.,*
   477 F.Supp. 2d 489 (D. Conn. 2007) ..................................................................10

*Cleveland v. Piper Aircraft Corp.,*
   985 F.2d 1438 (10th Cir. 1993) ...........................................................................11

*Comm'r of Internal Revenue v. Keystone Consol. Indus., Inc.,*
   508 U.S. 152 (1993)..............................................................................................14

*Corcoran v. New York Power Auth.,*
   935 F. Supp. 376 (S.D.N.Y. 1996) .......................................................................13

*Crosby v. National Foreign Trade Council,*
   530 U.S. 363 (2000)...........................................................................................7, 22

*Curtin v. Port Authority,*
   183 F. Supp. 2d 664 (S.D.N.Y. 2002)................................................................8, 10

*Di Benedetto v. Pan Am World Service, Inc.,*
   359 F.3d 627 (2d Cir. 2004).................................................................................10

*Drake v. Laboratory Corp.,*
   458 F.3d 48 (2d Cir. 2006)............................................................................8, 15, 22

*French v. Pan Am Express, Inc.,*
   869 F.2d 1 (1st Cir. 1989) ......................................................................................8

*Geier v. American Honda Motor Co., Inc.,*
   529 U.S. 861 (2000)..............................................................................................22

*Goodspeed Airport, LLC v. East Haddam Inland Water Courses Comm'n,*
   634 F.3d 206 (2d Cir. 2011)................................................................................ *passim*

*Greene v. B.F. Goodrich Avionics Sys., Inc.,*
   409 F.3d 784 (6th Cir. 2005) ..............................................................................7, 8

*In re Air Crash at John F. Kennedy Int'l Airport*,
635 F.2d 67 (2d Cir. 1980).................................................................9

*In re Air Disaster at Lockerbie, Scotland*,
37 F.3d 804 (2d Cir. 1994)...........................................................9, 10

*In re Hanford Nuclear Reservation Litig.*,
534 F.3d 986 (9th Cir. 2008) .........................................................13

*In re Sept. 11 Litig.*,
594 F. Supp. 2d 374 (S.D.N.Y. 2009).............................................12

*In re TMI Litig. Cases Consol. II.*
940 F.2d 832 (3rd Cir. 1991) .........................................................13

*In re Trans World Airlines, Inc.*,
FAA Order No. 1999-12, 1999 W.L. 1125387...............................17

*Margolis v. United Airlines, Inc.*,
811 F. Supp. 318 (E.D. Mich. 1993)................................................8

*McNally v. Port Authority (In re WTC Disaster Site)*,
414 F.3d 352 (2d Cir. 2005)...........................................................10

*Merrill Lynch Pierce Fenner & Smith, Inc. v. Dabit*,
547 U.S. 71 (2006)..........................................................................14

*Montalvo v. Spirit Airlines*,
508 F. 3d 464 (9th Cir. 2007) ...........................................................7

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)........................................................................14

*O'Conner v. Commonwealth Edison Co.*,
13 F.3d 1090 (7th Cir. 1994) .........................................................13

*Platt v. Union Poe. R.R. Co.*,
99 U.S. 48 (1879)...............................................................................4

*Pliva, Inc. v. Mensing*,
No. 09–993, 2011 WL 2472790 (June 23, 2011) ...........................22

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)...........................................................................4

*Rowe v. New Hampshire Motor Transp. Ass'n*,
552 U.S. 364, 370 (2007)................................................................14

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    2011 U.S. LEXIS 3542 (May 16, 2011) ...............................................................12

*Shupert v. Continental Airlines, Inc.*,
    No. 00 Civ. 2743, 2004 WL 784859 (S.D.N.Y. Apr. 12, 1994) ............................10

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984) .............................................................................................13

*Stanford v. Kuwait Airways Corp.*,
    89 F.3d 117 (2d Cir. 1996) ...................................................................................10

*Sunbird Airlines, Inc. v. Beech Aircraft Corp.*,
    789 F. Supp. 360 (D. Kan. 1992) ............................................................................8

*U.S. Airways, Inc. v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) .......................................................................6, 8, 11

*United States v. Locke*,
    529 U.S. 89 (2000) ..................................................................................................7

*Williams v. Trans World Airlines*,
    509 F. 2d 942 (2d Cir. 1975) ............................................................................16, 17

**STATUTES**

49 U.S.C. § 1511 ........................................................................................................17

49 U.S.C. § 44701 ................................................................................................15, 16

49 U.S.C. § 40101 ............................................................................................*passim*

49 U.S.C. § 41713(b)(1) ............................................................................................5

49 U.S.C. 40120(c) ..........................................................................................*passim*

49 U.S.C. § 44903 *et seq.* .............................................................................*passim*

42 U.S.C. § 2014(hh) ......................................................................................*passim*

The liability issues in this case should be determined by a federal standard of care based on the Federal Aviation Regulations ("FARs"), the Air Carrier Standard Security Program ("ACSSP") and the Security Directives issued by the Federal Aviation Administration ("FAA"). While Defendants American Airlines, Inc. and AMR Corporation (collectively, "American") are not parties to *Bavis*, they have an important interest in the Court's determination of these issues because of the possible application of that determination to the property damage cases in which American remains a defendant.[1]

The Aviation Defendants thoroughly briefed these issues in the Aviation Defendants' Memorandum of Law in Support of Motion for a Determination of Applicable Law Regarding the Standard of Care (the "2007 Memorandum") and the Aviation Defendants' Reply Memorandum of Law (the "2007 Reply Memorandum") in support of the same motion.[2] American submits this Memorandum of Law together with the accompanying Declaration of Desmond T. Barry, Jr., dated July 8, 2011, and the exhibits attached thereto in order to (i) respond to the Bavis and WTCP Plaintiffs' latest arguments, (ii) call the Court's attention to the Second Circuit's definitive recent rulings in support of federal occupation of the field of aviation safety and security, and (iii) highlight the important intervening deposition testimony of FAA officials Robert Cammaroto and Claudio Manno.  These developments have removed any doubt that a federal standard of care must apply.

---

[1]   American remains a defendant in *World Trade Center Properties LLC. et al v. American Airlines, Inc. et al*, 08-cv-03722 (AKH) and *Cantor Fitzgerald & Co. et al v. American Airlines, Inc. et al*, 04-cv-7318 (AKH).

[2]   Certain Aviation Defendants (Boeing and Massport) filed standard of care briefs addressing issues pertinent to their circumstances.

1

## PRELIMINARY STATEMENT

Before 9/11, the FAA, exercising the authority delegated to it by Congress, established a detailed set of standards and procedures governing virtually every aspect of aviation security, including passenger pre-screening, checkpoint screening of passengers and their carry-on baggage, and in-flight security. In developing these standards and procedures, the FAA drew upon classified terrorist threat information that it regularly received from the Federal Bureau of Investigation, the Central Intelligence Agency and other intelligence agencies, and made complex policy judgments balancing competing considerations of security, passenger convenience, maintenance of an efficient air transportation system, and protection of passenger privacy and civil liberties.

Prior to 9/11, American and the other Aviation Defendants were governed by these FAA standards and procedures and applied them on a daily basis in conducting their security operations. The Bavis and WTCP Plaintiffs' allegations that American and the other Aviation Defendants should be held liable for the 9/11 terrorist attacks should be evaluated by reference to the same federal standards and procedures that governed their conduct on and before that tragic morning. Applying a *post hoc*, hindsight-influenced standard of care based on generalities of state law having no particular application to aviation security would not only lack legal foundation but also would be manifestly unfair and unjust.

## ARGUMENT

**I.      ATSSSA Determines the Applicable Standard of Care.**

Apart from a passing reference on pages one and two, Plaintiff Bavis devotes virtually no attention to the language of the Air Transportation Safety and System Stabilization Act, Section 408, 49 U.S.C. § 40101 *et seq.* ("ATSSSA"), the controlling statute under which she brings her

claims.  (Pl. Mem. at 1-2).  This disregard of the controlling statutory language leads Plaintiff into at least three fundamental legal errors:

- To support applying a state law standard of care, Bavis repeatedly relies upon the so-called savings clause in the Federal Aviation Act, 49 U.S.C. 40120(c) (Pl. Mem. at 32, 34 and 35).  She fails to recognize, however, that the application of the savings clause to cases arising out of the 9/11 terrorist attacks has been expressly abrogated by the second sentence of Section 408(b)(1) of ATSSSA.

- Bavis' arguments consistently proceed on the assumption that she is asserting causes of action defined by state law.  But this argument again ignores the express language of Section 408(b)(1) which creates a new federal cause of action that supersedes state law claims for damages arising out of the hijacking and subsequent crashes of Flights 11 and 175.

- The most important provision of ATSSSA concerning standard of care is Section 408(b)(2) which provides in its entirety as follows:

  > **The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.**

  Bavis, however, makes no effort to interpret or give meaning to the crucial qualifying phrase "unless such law is inconsistent with or preempted by Federal law" and instead reads Section 408(b)(2) as if it simply ended with the words "the law, including choice of law principles, of the State in which the crash occurred."

This last error is perhaps the most critical.  Congress, having decided to create a new exclusive federal cause of action to govern 9/11 claims, was faced with two competing considerations in defining the substance of the new cause of action.  First, Congress had no generally applicable preexisting body of federal tort law upon which to draw and apparently decided not to create any from scratch in the immediate aftermath of 9/11.  Second, Congress knew that 9/11-related litigation would largely turn on issues of passenger and baggage screening and, to a lesser extent, in-flight security.  Having enacted such statutes as the Federal Aviation Act and the Aviation Security Improvements Act and having regularly exercised

3

oversight of the aviation security regulations issued by the FAA, Congress was well aware that aviation security was the subject of detailed and exclusive federal regulations before 9/11.  In Section 408(b)(2) of ATSSSA, Congress reconciled these two competing considerations by adopting and federalizing state tort law principles but making them subordinate to preexisting federal law (such as the FARs, ACSSP and FAA Security Directives) either (a) under ordinary principles of preemption or (b) whenever the newly federalized state tort law principles were inconsistent with preexisting federal law.

The "unless such law is inconsistent with or preempted by Federal law" language of Section 408(b)(2) is a uniquely powerful provision.  American's research has disclosed no other pre-9/11 federal statute in which the two phrases "inconsistent with" or "preempted by" are used in combination.  Under established principles of statutory construction, each of these phrases must be given its own independent meaning.  *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."); *Platt v. Union Poe. R.R. Co.*, 99 U.S. 48, 58 (1879) ("Courts are to accord a meaning, if possible, to every word in a statute.").  By its express language, Section 408(b)(2) thus provides that preexisting federal law must supplant federalized state tort principles not only whenever ordinary principles of preemption (such as field or conflict preemption) would apply, but whenever that preexisting federal law is substantively inconsistent with federalized state tort law.

As shown below, each of these phrases "inconsistent with" or "preempted by" independently dictates that the federal aviation security regulations in effect on 9/11 (including the FARs, ACSSP and FAA Security Directives) supplant tort law reasonable care standards whenever the two cover the same subject matter and would impose different requirements.

4

## II.     The "Preempted By" Language of ATSSSA Mandates Applying an Exclusively Federal Standard of Care.

The legal landscape concerning interpretation of the "preempted by" language of Section 408(b)(2) has clarified dramatically since its initial briefing in 2007.  Controlling decisions by the Second Circuit Court of Appeals have now confirmed that the Federal Aviation Act and the FAA regulations promulgated thereunder occupy the field of aviation safety and security and displace differing state tort law standards of care.  *Goodspeed Airport, LLC v. East Haddam Inland Water Courses Comm'n*, 634 F.3d 206, 208 (2d Cir. 2011); *Air Transport Ass'n of American, Inc. v. Cuomo*, 520 F. 3d 218, 225 (2d Cir. 2008) ("ATA").[3]

### A.     Federal Aviation Act Preemption under *ATA* and *Goodspeed*.

The *ATA* and *Goodspeed* decisions have settled the question of whether the Federal Aviation Act and its implementing regulations occupy the field of aviation security and displace state tort law standards of care (even if, in the absence of ATSSSA, they may allow for the continued existence of state tort remedies).

In *ATA*, the Second Circuit considered a challenge to the New York State Passenger Bill of Rights ("PBR") which sought to regulate treatment of airline passengers exposed to lengthy runway delays.  520 F.3d at 220.  The Court held that the PBR was preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1).  *Id.* at 223.  However, in an extended discussion, the Court also found that the Federal Aviation Act "was enacted to create a 'uniform and exclusive system of federal regulation' in the field of air safety."  520 F.3d at 224.  The

---

[3]  American joins in the arguments of United, Huntleigh and Massport, as set forth in their memorandum on Standard of Care, that the *ATA* decision also establishes that federal aviation security regulations set the standards governing Bavis' claims by virtue of the express preemption provision of the Airline Deregulation Act of 1978.  *See* 520 F.3d at 224-25.  American does not develop this argument further in this Memorandum because Section 408(b)(2) of ATSSSA and Federal Aviation Act preemption are dispositive of the standard of care issue.

Court observed that "[i]nsofar as the PBR is intended to prescribe standards of airline safety, we note, finally, that it may also be impliedly preempted by the FAA and regulations promulgated thereunder." *Id.* The Court then cited with approval numerous decisions from other circuits and a decision from the Southern District holding that "Congress intended to occupy the entire field and thereby preempt state regulation of air safety". *Id.* at 225.[4]

The Second Circuit's subsequent decision in *Goodspeed* erased any remaining doubt regarding the preemptive effect of the Federal Aviation Act on air safety claims in this Circuit. In *Goodspeed*, the Second Circuit converted *ATA*'s extended analysis of federal preemption of the field of air safety into an express holding that Congress had occupied the entire field of air safety and preempted state regulation of that field.  The language of the *Goodspeed* opinion is dispositive of this issue:

> In *Air Transport Ass'n of America, Inc. v. Cuomo (ATA)*, 520 F. 3d 218, 225 (2d Cir. 2008), this Court observed that several of our sister circuits, and several district courts within our own circuit, have concluded that Congress intended to occupy the entire field of air safety and thereby preempt state regulation of that field. *ATA* examined evidence of Congressional "intent to centralize air safety authority and the comprehensiveness of [ ] regulations pursuant to that authority," under both the Aviation Act and the ADA. *Id.* However, as the district court was careful to observe, *ATA* stopped short of formally holding that Congress intended to occupy the field of air safety. *See Goodspeed*, 681 F. Supp. 2d at 199.  Today we join our sister circuits.[5]

634 F.3d at 210.

Plaintiff Bavis attempts to distinguish *ATA* and *Goodspeed* by arguing that *ATA* recognizes that the Federal Aviation Act does not preempt all state law tort claims (Pl. Mem. at 21) and that *Goodspeed* did not itself involve state tort claims for negligent aviation security.

---

[4]  These pre-*ATA* and pre-*Goodspeed* decisions are discussed in detail in the 2007 Memoranda.  *See* Ex. A, 2007 Memo at 22-29; Ex. B, 2007 Reply Memo at 24-34.

[5]  *ATA* collects the relevant circuit cases through 2008.  520 F. 3d at 225.  Since then, at least one additional circuit has held that Congress intended to occupy the field of air safety. *U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010).

6

(Pl. Mem. at 29-31.)   Both observations are true, but neither impacts the conclusion that the Federal Aviation Act and the regulations thereunder occupy the entire field of air safety and displace any contrary state tort law substantive standards.   In non-ATSSSA situations (as noted in *ATA*, 520 F.3d at 225) the savings clause of the Federal Aviation Act, 49 U.S.C. 40120(c), preserves state law remedies.   But state tort substantive standards covering the same subject matter as federal aviation standards are nonetheless displaced.   That latter conclusion flows inevitably from the holding that Congress has occupied the entire field of air safety.[6]  *See, e.g., Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("When Congress intends federal law to 'occupy the field,' state law in that area is preempted."); *United States v. Locke*, 529 U.S. 89, 103 (2000) (there is a "longstanding rule that the enactment of a uniform federal scheme displaces state law").

Moreover, the reasoning of both *ATA* and *Goodspeed* extinguishes any hope that Plaintiff may have that the principles set forth in these decisions are inapplicable to substantive state tort law standards of care.   Both cases cite with express approval decisions from other circuits holding that the Federal Aviation Act and its regulations preempt state tort law standards. *Goodspeed*, 634 F.3d at 210 n. 5, citing *Montalvo v. Spirit Airlines*, 508 F. 3d 464, 468 (9th Cir. 2007) (holding that the "FAA preempts the entire field of aviation safety from state and territorial regulation" and dismissing plaintiffs' failure to warn claim because there were no applicable federal regulations requiring warning); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005) (affirming summary judgment on state law failure to warn claim, holding "federal law establishes the standards of care in the field of aviation safety and

---

[6]   Plaintiff Bavis also rather facetiously dismisses *Goodspeed* as a case involving only a permit for cutting down trees. (Pl. Mem. at 29.)  But the pointed breadth of the Court's holding, quoted above, rules out any such narrow reading of the opinion.

thus preempts the field from state regulation."); *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367-68 (3d Cir. 1999) (holding in negligence action that it was an error to rely upon territorial standard of care because "federal law establishes the applicable standards of care in the field of air safety generally, thus preempting the entire field from state and territorial regulation"); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) (holding state drug-testing law preempted because federal "statutory and regulatory mosaic" occupied the field of air safety in regulating pilot qualifications); *ATA*, 520 F.3d at 225, citing the same authorities as well as *Curtin v. Port Authority*, 183 F. Supp. 2d 664, 671 (S.D.N.Y. 2002) (holding that federal law, not state law, standards of care apply to air safety, noting that "limiting the FAA preemption calculus to the ADA unduly circumscribes the examination.").[7]   Furthermore, even before *ATA* and *Goodspeed*, the Second Circuit had held that drug testing regulations under the Federal Aviation Act preempted state law tort claims based on state judge-made rules that sought to impose state requirements more onerous than the federal regulations.  *Drake v. Laboratory Corp.*, 458 F.3d 48, 65 (2d Cir. 2006).[8]

Notably, neither Bavis nor WTCP seeks to distinguish *ATA* and *Goodspeed* by drawing a line between aviation safety and aviation security.  Any such distinction would be untenable because Plaintiffs themselves rely on an equation of aviation safety with aviation security for their own "minimum standards" argument (Pl. Mem. at 5-8 & n. 2) and because the role of the

---

[7]   WTCP makes no mention at all of either *ATA* or *Goodspeed*.  Rather, unhelpfully, it cites two district court decisions, *Sunbird Airlines, Inc. v. Beech Aircraft Corp.*, 789 F. Supp. 360 (D. Kan. 1992), and *Margolis v. United Airlines, Inc.*, 811 F. Supp. 318 (E.D. Mich. 1993), holding that the Federal Aviation Act does not preempt state tort law standards, without noting that these decisions have been superseded by subsequent contrary holdings of the Courts of Appeals for their respective circuits.  *See O'Donnell*, 627 F. 3d at 1326 (10th Cir. 2010) and *Greene*, 409 F. 3d at 795 (6th Cir. 2005).

[8]   Curiously, Bavis relies primarily on the district court decision in *Drake*, 290 F. Supp. 2d 352 (E.D.N.Y. 2003), not the Second Circuit's ruling that remanded it for further consideration.  (Pl. Mem. at 33, 35.)

federal government in aviation security has been at least as comprehensive and exclusive as its role in aviation safety. Since its inception in 1973, checkpoint screening of passengers and baggage has been exclusively the subject of federal regulation without any state involvement at all. Nor have the states even attempted to play any role in establishing requirements for in-flight security.

Finally, the differences between an analysis of preemption under ATSSSA as compared to preemption under the Federal Aviation Act in non-ATSSSA situations all weigh in favor of displacement of state law under ATSSSA. As noted above, Section 408(b)(1) declares the savings clause in the Federal Aviation Act inapplicable to claims asserted under ATSSSA. Moreover, Section 408(b)(2) of ATSSSA contains an express "preempted by" clause as well as an even broader "inconsistent with" displacement provision. The conclusion that the FARs, ACSSP, and FAA Security Directives displace state substantive standards of care is inescapable under Section 408(b)(2) in light of *ATA* and *Goodspeed*.

### B.     Bavis' Other Authorities Do Not Withstand Analysis.

Plaintiff Bavis cites several other Second Circuit decisions in an effort to avoid application of a federal standard of care. Each of these decisions is plainly inapposite.

Amazingly, Plaintiff continues to assert that *In re Air Crash at John F. Kennedy Int'l Airport*, 635 F.2d 67 (2d Cir. 1980), and *In re Air Disaster at Lockerbie, Scotland*, 37 F.3d 804 (2d Cir. 1994), require the application of state reasonable care liability standards to the 9/11 terrorist attacks. (Pl. Mem. at 6, 26, 29, 31, 34.) However, this position is indefensible in view of the wording of Section 408(b)(2) of ATSSSA, the Second Circuit's subsequent decisions in *ATA* and *Goodspeed*, and the utter absence of any preemption analysis in either *JFK* or *Lockerbie*. Moreover, even prior to *ATA*, several district courts in this Circuit held that *JFK* and

9

*Lockerbie* were not binding authority on preemption issues.  *See Aldana v. Air E. Airways, Inc*., 477 F.Supp. 2d 489, 493 (D. Conn. 2007) (endorsing *Abdullah* and noting that "the Second Circuit has not meaningfully addressed the issue of tort preemption"); *Curtin*, 183 F. Supp. 2d at 669-70 (following *Abdullah* and noting that because the parties in *JFK* stipulated to the application of New York law, "the Court of Appeals did not address whether the FAA preempts state law tort claims"); *Shupert v. Continental Airlines, Inc.*, No. 00 Civ. 2743, 2004 WL 784859, at *5-6 (S.D.N.Y. Apr. 12, 1994) (following *Abdullah* and noting that the court in *JFK* merely accepted the parties' stipulation to the application of New York law).

Nor do *Di Benedetto v. Pan Am World Service, Inc.*, 359 F.3d 627 (2d Cir. 2004), or *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996), support the application of a state law standard of care in our situation.  (Pl. Mem. at 7, 26-28.)  *Di Benedetto* did not reject defendants' preemption arguments; it merely found it unnecessary to reach them because that plaintiff had so clearly failed to establish a breach of any state law duty.  359 F.3d at 631. *Stanford* involved the transportation of passengers by a foreign flag carrier from Lebanon to Dubai; neither the Federal Aviation Act nor any FAA regulation was even remotely at issue.  89 F.3d at 122.

Plaintiff's reliance on *McNally v. Port Authority (In re WTC Disaster Site)*, 414 F.3d 352, 379-380 (2d Cir. 2005), for the proposition that "what ATSSSA displaces is not the substantive standards governing liability, but the state-law damages remedies" is also misplaced.  (Pl. Mem. in Opposition to Massport Motion for Summary Judgment at 4.)  That observation was entirely correct in the context in which it was made – lawsuits by rescue and clean-up workers as to which no claim or defense based on any federal standard of care was asserted – but has no application here.  *McNally* involved construction only of Section 408(b)(1) and the first clause of

Section 408(b)(2) of ATSSSA and did not address the meaning of the "inconsistent with or preempted by Federal law" clause of Section 408(b)(2).

Finally, the authority of one of Plaintiff's favorite out-of-circuit decisions, *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993) (Pl. Mem. at 24, 29, 36), has been fatally undermined by the Tenth Circuit's subsequent decision in *O'Donnell*, 628 F.3d 1318 (cited with approval in *Goodspeed*, 634 F.3d at 210, n. 5). *Cleveland* concluded that the Federal Aviation Act did not preempt state tort law standards. *O'Donnell*, however, overturned that ruling, concluding instead that Congress had occupied the entire field of aviation safety and displaced all state law substantive standards in that field. 627 F.3d at 1326.[9]

## III. The "Inconsistent With" Language of ATSSSA Mandates Applying an Exclusively Federal Standard of Care.

As explained in Parts I and II of this Memorandum, Congress, in enacting Section 408(b)(2) of ATSSSA, subordinated general principles of tort law derived from the law of the State of the crash to preexisting federal law under ordinary principles of field and conflict preemption. But Congress went even further. The "inconsistent with" language of Section 408(b)(2) mandates that the federal aviation security regulations in effect on 9/11 (as set forth in the FARs, ACSSP and FAA Security Directives) supersede tort law reasonable care standards whenever the two are inconsistent (*i.e.*, whenever the two standards cover the same subject matter and one would require a different course of conduct than the other).[10]

---

[9]   *O'Donnell*, 627 F.3d at 1326, did agree with *Cleveland*, 985 F.2d at 1442-43, and *ATA*, 520 F.3d at 225, that the savings clause of the Federal Aviation Act may preserve certain state tort law remedies. But the savings clause has no application to ATSSSA claims.

[10]   The issues addressed in this Part III are discussed in greater detail in the 2007 Memoranda. *See* Ex. A, 2007 Memo at 10-11 and 30-43; Ex. B, 2007 Reply Memo at 11-23.

Under standard canons of statutory construction, when a phrase such as "inconsistent with" is not defined in the statute itself, the phrase is to be given its ordinary English meaning. *See, e.g. Schindler Elevator Corp. v. United States ex rel. Kirk*, 2011 U.S. LEXIS 3542 at *11 (May 16, 2011) ("Because the statute does not define 'report,' we look first to the word's ordinary meaning."). The Oxford English Dictionary (2nd Ed. 1989) defines "inconsistent" as "not agreeing in substance, spirit, or form . . . not consonant or in accordance; at variance, discordant, incompatible, incongruous." Under this definition, the "inconsistent with" language of Section 408(b)(2) would preclude applying a generalized reasonable care standard where that application would vary the Aviation Defendants' obligations under the applicable provisions of an FAR, the ACSSP or a Security Directive.

Because the Court has exclusive jurisdiction of property damage and wrongful death claims under ATSSSA and has not yet ruled on the governing standard of care,[11] there is no precedent directly construing the "inconsistent with" language of Section 408(b)(2). However, Section 408(b)(2) has its closest federal analog in the Price-Anderson Amendments Act of 1988, 42 U.S.C. § 2014(hh) ("Price-Anderson Act") (creating exclusive federal cause of action governed by law "derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions" of federal law). Like ATSSSA, the Price-Anderson Act created a new exclusive cause of action that superseded any previously existing state law rights of action.

---

[11] The suggestion by Bavis and WTCP that the Court already has ruled on the standard of care issue in granting the motion by American and Globe for summary judgment as to the Flight 175 property damage claims is specious. (Pl. Mem. at 1; WTCP Mem. at 1.) American and Globe successfully moved for summary judgment on state law duty and proximate cause grounds; they asserted no preemption or standard of care defense and no issues concerning the proper interpretation of Section 408(b)(2) of ATSSSA were presented. *In re Sept. 11 Litig.*, 594 F. Supp. 2d 374 (S.D.N.Y. 2009).

The federal courts consistently have concluded that the analogous language in the Price-Anderson Act means that an exclusively federal standard of care applies to any claims brought pursuant to the newly created federal cause of action.  *See, e.g., In re TMI Litig. Cases Consol. II.* 940 F.2d 832, 854 (3rd Cir. 1991) (holding that phrase "unless inconsistent with" federal law means "[a] claim arising out of any nuclear incident is compensable under the terms of the Amendments Act *or it is not compensable at all*") (emphasis in original); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1003 (9th Cir. 2008) (holding "federal law preempts states from imposing a more stringent standard of care than federal safety standards"); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) (holding, under same statute, that "[i]mposing a standard of care other than the federal regulations would disturb the carefully crafted balance between private involvement and safety that Congress has achieved"); *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 386 (S.D.N.Y. 1996) (holding that "imposing any other standard of care would contravene the federal interest in occupying the field of nuclear safety"); *see also* Ex. A, 2007 Memo at 32 n. 7 (citing numerous additional authorities to the same effect).

As the *O'Conner* court further observed, the Price-Anderson Act legislatively overruled *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) (cited in Pl. Mem. at 24, 32, 33), and "makes pointedly clear that any tension between federal standards and state liability standards is to be resolved so as to avoid inconsistency with the Price-Anderson Act." 13 F.3d at 1105 n. 13

Congress opted to include the phrase "inconsistent with" in ATSSSA against the backdrop of an existing body of precedent interpreting a virtually identical provision in the Price-Anderson Act.  In choosing to so closely model Section 408(b)(2) on the Price-Anderson Act, Congress must be presumed to have intended courts to construe Section 408(b)(2) in the same

way. As the Supreme Court has explained on multiple occasions, there is a "presumption that Congress is aware of 'settled judicial and administrative interpretation[s]' of terms when it enacts a statute." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 993 (2005) (citing *Comm'r of Internal Revenue v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993); *see also* Ex. A, 2007 Memo at 33-34 (citing additional authorities). Or, as the Court put it in *Rowe v. New Hampshire Motor Transp. Ass'n*, "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretation as well." 552 U.S. 364, 370 (2007) (citing *Merrill Lynch Pierce Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006). In sum, the "inconsistent with" language in ATSSSA should be given the same meaning as its counterpart language in the Price-Anderson Act.

## IV.   The Federal Aviation Act and Its Implementing Regulations Set Forth the Legal Obligations of the Airlines and Security Companies for Aviation Security; Defendants May Not Be Subjected to Liability for Failing to Exceed Those Obligations

In their standard of care briefs (Pl. Mem. at 5-8; WTCP Mem. at 2-3) and in their opposition to Massport's motion for summary judgment (Pl. Massport Mem. at 3-6; WTCP Massport Mem. at 1-3), Bavis and WTCP contend that the Federal Aviation Act and implementing regulations set forth only "minimum standards" that the Aviation Defendants may be required to exceed, on pain of tort liability, either under a state reasonable care standard or a federal duty to provide service with the highest possible degree of safety in the public interest. This argument fails for multiple reasons.

First, as to state tort law standards, Plaintiffs' "minimum standards" argument represents an attempted end run around the language of ATSSSA and controlling judicial decisions on conflict and "occupation of the field" preemption. It is foreclosed by the "inconsistent with or

14

preempted by" clause of Section 408(b)(2) of ATSSSA and by the Second Circuit's decisions in *ATA*, *Goodspeed* and *Drake*.  State tort law cannot impose liability for failing to exceed federal standards where, as here, federal law has occupied the entire field and the governing statute expressly displaces inconsistent state law.[12]

Second, the FARs, ACSSP and FAA Security Directives are mandatory, binding requirements that have the force and effect of law; these regulations tell the airlines and their security companies what they are legally required to do and provide for fines and other penalties if they are violated.[13]  It makes scant sense to impose tort liability on the Aviation Defendants for failing voluntarily to exceed what the law governing their conduct specifically requires them to do.

Third, the "minimum standards" argument confuses the statutory provisions governing aviation safety with those governing aviation security.  49 U.S.C. § 44701, upon which the "minimum standards" argument is based, pertains to issues of aviation safety, not aviation security.  Ex. B, 2007 Reply Memo at 4-7.  This fact is confirmed by the multiple references to "safety" in the text of Section 44701 itself.  The FAA's authority over aviation security was conferred by the Air Transportation Security Act of 1974 and later reconfirmed by the Aviation Security Improvements Act of 1990.  Those statutes, now codified in a separate chapter of the

---

[12]   Minimum standards arguments have been consistently rejected under the Price-Anderson Act.  *See* Part III, *supra*.

[13]   Ex. C, Deposition Transcript of Robert J. Cammaroto ("Cammaroto Dep.") Volume I at 17:8-15, 35:3-36:11; Volume II at 232:14-19; Ex. D, Deposition Transcript of Claudio Manno ("Manno Dep.") at 277:14-278:3.  On 9/11, Mr. Cammaroto was serving as the chief of the FAA's Security Directives Working Group and testified as the FAA's Rule 30(b)(6) representative on pre-9/11 aviation security standards and procedures. Ex. C, Cammaroto Dep. Volume I at 16:21-25.  On 9/11, Mr. Manno was director of the FAA's Office of Civil Aviation Intelligence and testified as a fact witness concerning the FAA's assessment of the pre-9/11 terrorist threat.  Ex. D, Manno Dep. at 9:2-7.  The 2007 Memorandum identifies additional authority concerning the legally binding and mandatory nature of the ACSSP and FAA Security Directives.  *See* Ex. A, 2007 Memo at 6-7 and 13-18.

Federal Aviation Act at 49 U.S.C. § 44903 *et seq.*, make no reference to "minimum standards" but instead stress the need for implementation of uniform security procedures.

Fourth, even assuming that 49 U.S.C. § 44701 applies to aviation security procedures, the standards the FAA adopts under that section already incorporate the objective of providing service with "the highest possible degree of safety in the public interest." They are by no means "minimum standards" in the sense of being minimally adequate. To the contrary, in promulgating its safety standards, the FAA is statutorily required to take into account "the duty of an air carrier to provide service with the highest possible degree of safety in the public interest." 49 U.S.C. § 44701(d); *Williams v. Trans World Airlines*, 509 F. 2d 942, 946 n. 8 (2d Cir. 1975). The FAA's aviation security regulations are similarly not designed to meet minimal standards of adequacy. Appendix III to the ACSSP expressly states that ACSSP standards and procedures for screening persons and carry-on baggage "are designed to effect uniform application, *optimum safety*, and the courteous and efficient treatment of all persons subject to preboard screening." Ex. E, American ACSSP at Appendix III (emphasis added). A standard designed to promote "optimum safety" is not in any meaningful sense a "minimum standard." FAA Rule 30(b)(6) designee Robert Cammaroto confirmed this fact at his deposition, testifying that in promulgating the ACSSP and issuing Security Directives, the FAA sought to adopt security measures that were as effective as possible in meeting the perceived threat. Ex. C, Cammaroto Dep. Volume I at 195:5-196:10.

If, as 49 U.S.C. § 44701(d) mandates, the FAA's so-called "minimum standards" are themselves designed to effectuate the duty of an air carrier "to provide service with the highest possible degree of safety in the public interest," an air carrier cannot be found in breach of that duty if it complies with the federal standard. Even in the safety arena, when the federal standard

16

is viewed as preemptive, an air carrier which complies with an FAA safety standard cannot be found liable in tort for failure to "provide service with the highest possible degree of safety" as to the conduct covered by the federal safety standard.[14]  Similarly, in the aviation security arena, an air carrier or security company fulfills any federal duty it may owe when it complies with applicable FARs, Security Directives or ACSSP provisions.

Fifth, even assuming *arguendo* that state tort standards are not preempted or displaced by ATSSSA and the Federal Aviation Act, nothing in New York tort law suggests that it would impose aviation security procedures more stringent than those adopted pre-9/11 by the FAA. Plaintiffs talk blithely about the Aviation Defendants' ability to do more than the federal security procedures require.  But the real question is not whether the Aviation Defendants could have voluntarily exceeded the federal requirements but rather whether a legal basis exists for holding them liable in tort if they chose not to do so.  Plainly, if the Aviation Defendants complied with their screening obligations under the FARs, ACSSP and any applicable Security Directives, no basis exists in federal law for holding them liable in tort.  And as the Bavis Defendants effectively demonstrate in their April 29, 2011 Memorandum of Law in Support of Draft Jury Instructions, New York law imposes only a duty of ordinary care on air carriers (*id.* at 19), and requires the adoption of only "minimal security measures" to prevent the commission of intentional criminal acts by third parties.  *Id.* at 5-6 & n. 12, 20-21 & n. 40.  Even Bavis characterizes New York's reasonable care standard as imposing only a duty to take "minimal

---

[14]  Neither *In re Trans World Airlines, Inc.*, FAA Order No. 1999-12, 1999 W.L. 1125387, at *3 (WTCP Mem. at 1), nor *Williams v. Trans World Airlines*, 509 F.2d 942 (2d Cir. 1975) (Pl. Mem. at 1, 8), support Plaintiffs' position.  *Trans World* was a civil penalty case in which the fine was based on violations of two FARs requiring TWA to comply with FAA Security Directives.  TWA's responsibility for providing service with the highest degree of safety was cited only to justify imposing vicarious liability on TWA for the inattention of its employees.  *Williams* is even more off-point.  It upheld an air carrier's refusal under 49 U.S.C. § 1511 and its implementing regulations to transport a potentially dangerous passenger.  509 F.2d at 949.

security precautions against reasonably foreseeable criminal acts by third parties." (Pl. Massport Mem. at 11.)   Compliance with the federal security procedures for passenger and carry-on baggage screening would far exceed any security procedures that might have been required before 9/11 under New York common law.

Bavis also suggests that state reasonable care standards have been interjected through the back door because some provisions of the ACSSP or the Checkpoint Operations Guide ("COG")[15] require aviation security personnel to exercise elements of judgment or common sense. (Pl. Mem. at 4, 16-18.)   This argument misunderstands the effect of federal preemption. Any judgment or common sense that aviation security personnel exercise under the ACSSP or the COG must be evaluated exclusively in the context of the federal regulatory requirements themselves, not in the context of an ill-defined and perhaps hindsight-influenced state common law standard.

Finally, Bavis and WTCP vastly oversimplify what it means to exceed federal security standards or to do more than the ACSSP or FAA Security Directives require.   The FAA's pre-9/11 security procedures represented the end product of a series of policy judgments and trade-offs between competing systemic objectives including security, passenger convenience, the maintenance of an efficient and on-time air transportation system, and the protection of passenger privacy and civil liberties.   *See* Ex. E, American ACSSP at Appendix III; Ex. C, Cammaroto Dep. Volume I at 100:14-20, 141:11-142:4, 143:14-25; Ex. F, FAA Information

---

[15]   Unlike the ACSSP, the COG was not issued by the FAA and did not have the binding force of a federal regulation.   Ex. C, Cammaroto Dep. Volume I at 271:13-19.   Before 9/11, the FAA did not consider the COG to be a document with which the airlines were required to comply as a matter of federal law and would not impose fines or penalties for failure of an air carrier to comply with provisions of the COG.   Ex. C, Cammaroto Dep. Volume II at 231:15-232:9; Volume I at 271:20-25. Rather, the COG was a practical working guide to the operation of the ACSSP that was developed by the Air Transport Association and the Regional Airways Association and that the FAA reviewed to ensure that it did not contain any provisions inconsistent with the requirements of the ACSSP or other FAA regulations.   Ex. C, Cammaroto Dep. Volume I at 272:2-273:23.

Circular 99-13.  A policy unilaterally adopted by an air carrier to single mindedly advance one of these objectives may very well disserve others.  Moreover, even the selection of security measures requires an assessment (often based on classified information) of the most serious and realistic threats and a prioritization of the available security resources among those threats (*e.g.*, should checkpoint screeners be directed to focus their attention toward detection of improvised explosive devices or toward seizure of small knives?).  Ex. C, Cammaroto Dep. Volume I at 228:5-231:5; Ex. D, Manno Dep. at 128:8-19.  These complexities undoubtedly influenced Congress to delegate the authority to prescribe aviation security measures to an expert administrative agency (the FAA, with the assistance of the FBI as to threat assessment) and to mandate the development, to the maximum extent possible, of uniform nationwide security procedures.  *See* 49 U.S.C. § 49904(a) (amended 2001); 49 U.S.C. § 49903(b) (amended 2001).

In sum, nothing in Plaintiffs' "minimum standards"/"doing more" argument warrants a departure from the federal standard of care mandated by the "inconsistent with or preempted by Federal law" clause of Section 408(b)(2) of ATSSSA and the Second Circuit's "occupation of the field of air safety" decisions in *ATA* and *Goodspeed*.

## V.   The Security Measures Plaintiffs Suggest Defendants Should Have Adopted Would Conflict with FAA Regulations and Policy Judgments or Violate Federal Law.

While repeatedly proclaiming that the Aviation Defendants should have done more than FAA required, Plaintiffs have been singularly recondite in revealing their theories as to what more the Aviation Defendants actually should have done.  However, based on their deposition questions, what Plaintiffs most likely regard as "doing more" frequently would conflict with specific provisions of FAA screening regulations or violate other provisions of federal law.

19

For example, Plaintiffs' questions suggest that they believe that the Aviation Defendants, apprised of the threat posed by Islamic terrorists, should have subjected passengers, especially young males, appearing to be of Arabic or Middle Eastern extraction to greater security scrutiny than other passengers. However, an Aviation Defendant that adopted such an approach would find quickly that it had violated FAA policy and federal law. Before 9/11, the FAA did not permit airlines or checkpoint screening companies to select passengers for more intensive screening procedures based on their race, religion or national or ethnic origin. Ex. C, Cammaroto Dep. Volume I at 102:15-22. FAA policy prohibited security personnel from singling out passengers of Arabic or Middle Eastern origin for more intensive security searches than other passengers, such as special physical hand searches of their carry-on bags or hand-held metal detector or pat-down searches of their persons if they failed to alarm the walk-through metal detector. *Id.* at 102:23-103:10. Before 9/11, the Aviation Defendants used the computer-assisted passenger pre-screening program ("CAPPS"), developed by the FAA, to identify passengers warranting additional security scrutiny. Because of civil liberties concerns expressed by the Gore Commission, the Department of Justice and the American Civil Liberties Union, CAPPS deliberately did not take into consideration factors such as race, religion or ethnic origin. *Id.* at 83:9-89:20. It would have been impermissible for an airline unilaterally to modify the CAPPS algorithm to give special scrutiny to Arabs or Moslems or persons of Middle Eastern appearance. *Id.* at 89:21-96:11.[16]

---

[16]   In an attempt to provide some legal basis for their "doing more" arguments, Plaintiffs grossly overread the powers of airline ground security coordinators ("GSCs") under Section 6.1 of the COG (Pl. Mem. at 17). GSCs are not policymakers; they are service personnel typically assigned responsibility for ensuring that FAA security procedures are followed as to particular flights. Section 6.1 (entitled "Exceptional Screening") permits a GSC to direct the use of intensified security procedures to address emergency situations such as the receipt of a bomb threat directed toward a specific flight. As explained in note 15, *supra*, the COG is not a federal regulation and has no legal

As a second example of "doing more," Plaintiffs appear to suggest that checkpoint screeners should have seized all short-bladed knives or at least those that appeared capable of causing physical harm. But the FAA's rule, set forth in Appendix I to the ACSSP (Ex. G) that prohibited only knives with blades four inches long or longer (or illegal under local law) from entering the sterile area represented a considered policy judgment.[17] Ex. C, Cammaroto Dep., Volume I at 204:15-213:8, 246:4-19. Before 9/11, the FAA regarded bombs and explosives (especially improvised explosive devices) as the principal threat to domestic aviation security (Ex. D, Manno Dep. at 34:12-55:11), and did not regard knives with blades under four inches long as high-priority threat items. *Id.* at 589:18-599:12; Ex. C, Cammaroto Dep., Volume I at 229:8-230:3, Volume II at 235:2-12. Indeed, in 1993, the FAA considered whether to modify the four-inch knife rule and decided not to do so. Ex. C, Cammaroto Dep., Volume I at 218:15-231:5. Among the many factors influencing the FAA's decision to reaffirm the four-inch knife rule were that (1) many passengers carried these items for legitimate reasons; (2) relatively few hijackings had occurred in which the hijacker's principal weapon had been a short-bladed knife and those few hijackings generally had benign outcomes; (3) would-be hijackers could obtain or improvise equally dangerous items once inside the sterile area; (4) the difficulty of detecting short-bladed knives at the checkpoint; and (5) the desire to focus screener attention and resources on higher-priority threat items such as explosive devices and firearms. *Id.* at 218:15-239:13, 247:2-250:12; Ex. D, Manno Dep. at 589:18-599:12. Before 9/11, the FAA did not conceive of a

---

force. Nothing in Section 6.1 authorizes GSCs to order regular and systematic departures from the screening procedures set forth in the ACSSP or as required by Security Directives.

[17]   The FAA was, of course, aware before 9/11 that even short-bladed knives could be used to kill or injure. Ex. C, Cammaroto Dep., Volume I at 218:3-14.

hijacking by multiple suicidal hijackers armed only with short-bladed knives.  Ex. D, Manno Dep. at 145:3-146:9, 183:17-185:13, 589:18-590:13.[18]

Section 408(b)(2) of ATSSSA does not permit Plaintiffs to overturn considered policy judgments such as the four-inch knife rule through invocation of state tort law to impose hindsight-oriented security measures specifically tailored to prevent what happened on 9/11.

Moreover, many of Plaintiffs' "doing more" theories would fail to pass muster under well-established principles of conflict preemption.  *See, e.g., Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) (finding implied preemption where state-law airbag standards imposed requirements beyond those mandated by federal airbag regulations); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (finding conflict preemption where it is impossible for a private party to comply with both state and federal law).  Conflict preemption principles definitely would apply if the Aviation Defendants could not have independently implemented the proposed "improvements" on the federal standards without first obtaining FAA approval.  As the Supreme Court recently held in *Pliva, Inc. v. Mensing*, No. 09–993, 2011 WL 2472790, at *12 (June 23, 2011):

> [W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for preemption purposes.

Even more fundamentally, Plaintiffs' "doing more"/"minimum standards" arguments falter under the "inconsistent with or preempted by Federal law" clause of Section 408(b)(2) of ATSSSA and the Second Circuit's decisions in *ATA, Goodspeed* and *Drake*.  The conduct of the

---

[18]    Several more examples of inconsistencies or conflicts between Plaintiffs' "doing more" liability theories and the actual provisions of, and policy judgments underlying, the ACSSP, FAA Security Directives and other provisions of federal law are set forth in the 2007 Reply Memorandum.  *See* Ex. B, Reply Memo at 20-23.

air carriers and security companies on 9/11 must be evaluated according to the federal standards set forth in the FARs, ACSSP and FAA Security Directives.  Any state common law that would impose a different standard of care is either preempted or displaced by federal law.  Furthermore, Plaintiffs have provided no basis for concluding that New York tort law, even if it applied, would have required aviation security procedures any more stringent than those imposed by the FAA.

## CONCLUSION

For the foregoing reasons, American respectfully requests that the Court enter an order (a) that the standard of care for evaluating the conduct of the airlines and security companies in connection with the 9/11 terrorist attacks is set forth in the FARs, ACSSP and FAA Security Directives (the "Federal Regulations") and (b) that New York tort law standards are preempted or displaced whenever they cover the same subject matter as the Federal Regulations and would require defendants to engage in different conduct than that required under those regulations.

Dated: New York, New York
       July 8, 2011

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
       Desmond T. Barry, Jr. (DB 8066)
Times Square Tower
7 Times Square
New York, New York  10036
Tel:  (212) 490-9100
Fax:  (212) 370-4453

-and-

23

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta (RP 1749)
919 Third Avenue
New York, New York  10022
Tel:  (212) 909-6000
Fax:  (212) 909-6836

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

*Of Counsel:*

Maura K. Monaghan
Jacob W. Stahl
Johanna N. Skrzypczyk

24