UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                        :   21 MC 101 (AKH)
                                                        :
IN RE SEPTEMBER 11 LITIGATION                           :   This Document Relates to:
                                                        :   *Bavis v. United Air Lines, Inc.*
                                                        :   (02-CV-7154)
-----------------------------------------------------------------------X

### DEFENDANTS' STATEMENT OF UNDISPUTED
### MATERIAL FACTS PURSUANT TO RULE 56.1

        Pursuant to Local Rule 56.1, Defendants United Air Lines, Inc., United Continental

Holdings, Inc. (collectively "United") and Huntleigh U.S.A. Corp. ("Huntleigh") respectfully

submits this Statement of Material Facts in support of their Motion for Summary Judgment

seeking dismissal of Plaintiff's claims against them.  There is no genuine issue as to the

following material facts:

        1.      On September 11, 2001, 19 men involved in the 9/11 attack passed through five

passenger screening checkpoints operated by security companies hired by United Air Lines,

American Airlines, and other air carriers at four airports – Logan International Airport in Boston,

Massachusetts ("Logan"), Portland International Jetport in Portland, Maine, Washington Dulles

International Airport in Sterling, Virginia, and Newark International Airport in Newark,

New Jersey.  They boarded four flights which they hijacked: American Airlines Flight 11, United

Air Lines Flight 175, American Airlines Flight 77 and United Air Lines Flight 93. *See* ¶1 of the

Joint Fact Narrative (*Bavis* Docket Doc. No.137), Exhibit "WW" to the Declaration of Jeffrey J.

Ellis.[1] *See also* pp. 2-4 of *The 9/11 Commission Report*, Exhibit "C".

        2.      On September 11, 2001, United Flight 175 was a non-stop flight scheduled to

depart from Boston Logan International Airport ("Logan") and to arrive at Los Angeles

---

[1] Citations to Exhibits refer to Exhibits to the accompanying Declaration of Jeffry J. Ellis, dated August 26, 2011.

International Airport. *See* ¶ 2 on page 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

3.     United Flight 175 was deliberately crashed into the South Tower of the World Trade Center, American Flight 77 was deliberately crashed into the North Tower of the World Trade Center, American Flight 77 was deliberately crashed into the Pentagon, and United Flight 93 was crashed into a field near Shanksville, Pennsylvania after passengers stormed the cockpit. No one aboard the planes survived. *See* page 7-8, 10, 14 of *The 9/11 Commission Report,* Exhibit "C"; *See also* Exhibit "WW", ¶ 3 of the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

4.     United was and is a certified air carrier operating domestic flights. *See* ¶ 6 on page 1 of the Joint Fact Narrative. *See also* Exhibit "K", United's air carrier certificate.

5.     The Air Carrier Standard Security Program was a standard compilation of requirements that the Federal Aviation Administration ("FAA") under the authority of 14 CFR Part 108 imposed on certain commercial air carriers. *See* p. 35 of Exhibit "E", Robert J. Cammaroto deposition.

6.     United had an Air Carrier Standard Security Program ("ACSSP") approved by the FAA. *See* Exhibit "A"; *see also* p. 35 of Exhibit "E", Cammaroto deposition.

7.     On September 11, 2001, air carriers were permitted to hire contractors to conduct the screening. *See* ¶ 1, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis,* Docket Doc. No. 137).

8.     United hired Huntleigh to conduct screening, on United's behalf of United flights departing from Logan, including Flight 175 on September 11, 2001. *See* ¶ 1, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis,* Docket Doc. No. 137).

9.     Huntleigh was the highest bidder for that job when United hired Huntleigh to staff the checkpoint at Logan.  *See* p. 308:11-18, of Deposition of United Customer Service Manager, Exhibit "CC".

10.    The Huntleigh contract stated that screeners were to be paid above minimum wage and offered health benefits.  *See* pp. 94-95 of United Customer Service Manager deposition, Exhibit "CC"; *see also* Exhibit "DD", Huntleigh Contract.

11.    United Flight 175 was scheduled to depart at 8:00 a.m.  *See* ¶ 3, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

12.    The United Flight 175 aircraft was a Boeing 767.  It had two aisles and three different sections of cabin service, First Class, Business Class and Economy Class.  *See* ¶ 3, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

13.    On September 11, 2001, there were 65 people on board:  2 pilots, 7 flight attendants, 51 passengers, and 5 men who later hijacked the airplane.  *See* ¶ 3, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

14.    Mark Bavis was a passenger on United Flight 175.  *See* ¶ 4, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).  *See also*, UAL001809 of Exhibit "Y", United's ACI Report for Flight 175.

15.    Mark Bavis was given a boarding pass with seat assignment 19F, the fifth row of the coach cabin of the airplane.  *See* ¶ 4, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).  *See also*, UAL001809 of Exhibit "Y", United's ACI Report for Flight 175.

16.     The five terrorist hijackers of United Flight 175, as later identified by the FBI, were Marwan al Shehhi, who piloted the aircraft, Mohand al Shehri, Hamza al Ghamdi, Fayez

Ahmed [Banihammad], and Ahmed al Ghamdi. *See* ¶ 4, p. 2 of Exhibit "WW", the Joint Fact

Narrative (*Bavis* Docket Doc. No. 137). *See also*, p.2 of Exhibit "C", *The 9/11 Commission*

*Report. See also*, UAL001773-UAL001776 of Exhibit "Y", United's ACI Report for Flight 175.

17.     The United Flight 175 terrorists had purchased tickets for Flight 175 prior to

arriving at Logan Airport. *See* p.81 of Exhibit "X", deposition of United Customer Service

Representative.

18.     On September 11, 2001, the United Flight 175 terrorists had government issued

identification. *See* pp. 31-32 of Exhibit "BB", 9/11 Terrorist Travel, Staff Report, and photos of

the identification retrieved post 9/11.

19.     United's ACSSP states the air carrier request that a passenger present government

issued identification at the initial contact with the passenger. *See* p. 76, TSAUAL0000065, of

Exhibit "A", United's ACSSP.

20.     The ACSSP required that passengers were only profiled using the FAA-approved

Computer Assisted Passenger Pre-Screening System ("CAPPS"). *See* p. 75 (TSAUAL0000064)

of Exhibit "A", United's ACSSP. *See also*, p. 30-32 of Cammaroto deposition, Exhibit "E".

21.     If a passenger was identified as a CAPPS selectee, only the passenger's checked

bags were screened for explosives. *See* pp. 57, 62-65 of Cammaroto deposition, Exhibit "E".

22.     As of 9/11, based upon the available intelligence information, CAPPS selectees

were not subject to any different or additional screening of their person or carry-on bags. *See* pp.

57:8-17, 57:20, 63:11-24, 64:18-24, 65:9-14, 79:14-80:8 of Cammaroto deposition, Exhibit "E".

23.     Air carriers were not permitted to change the CAPPS criteria or supplement their

own profiling measures for CAPPS. *See* pp. 31-36, 42, 55, 79-80, 87-96 of Cammaroto

deposition, Exhibit "E".

24.     Air carriers were not permitted to profile passengers based upon race, religion or ethnic origin.  *See* pp. 87-96 of Cammaroto deposition, Exhibit "E".

25.     None of the Flight 175 terrorists were identified by the FAA's CAPPS program. *See* p. 2 of Exhibit "C"; *see also The 9/11 Commission Report*, p. 18, 9/11 Commission Monograph, Exhibit "M".

26.     The ACSSP required two baggage control questions to be asked of passengers at check-in.  *See* pp. 78-79 of Exhibit "A", United's ACSSP.

27.     FAA permitted air carriers to ask passengers the baggage control questions in written form if the passenger had difficulty understanding orally.  *See* p. 79 of Exhibit "A", United's ACSSP; *see also*, p. 80 of Exhibit "E", Cammaroto deposition.

28.     If a passenger was unable to answer the two baggage control questions, then the suspect items identified through questioning or the passenger's carry-on items and checked baggage were to be screened at that location by using Explosives Detection System ("EDS") or Advanced Technology ("AT") equipment.  If EDS or AT equipment was not available for use at that location, then the suspect item or carry-on items or checked baggage were to be examined with an Explosive Trace Detection Device ("ETD") only.  *See* pp.11-12, 79d of Exhibit "A", United's ACSSP.  A manual search of the contents of the bags is not part of those examinations. *See* p. 79d of Exhibit "A", United's ACSSP.

29.     EDS or AT equipment and an ETD examines bags only for explosive materials. *See* pp. 190-191 of Exhibit "E", Cammaroto deposition.

30.     At 6:20 a.m., Ahmed al-Ghamdi and Hamza al-Ghamdi were checked in by a United Customer Service Representative.  *See* p. 116:14-16 of Exhibit "X", deposition of United Customer Service Representative.  *See also*, UAL001775-UAL001775 of Exhibit "Y".

31.     Ahmed Al-Ghamdi and Hamza Al-Ghamdi presented their government issued identification to the United Customer Service Representative. *See* pp.82-83of Exhibit "X", deposition of United Customer Service Representative.

32.     Ahmed Al-Ghamdi checked two bags. *See* p. 91 of Exhibit "X". *See also*, UAL 027940-027941, Exhibit "AA".

33.     The United Customer Service Representative asked the baggage control questions to Ahmed and Hamza Al-Ghamdi, used the written form of the questions and received the correct responses to the question. *See* pp. 81:2-19, 83:22-87:7, 88:9-22, 88:23-89:9, 111:10-112:8 of deposition of United Customer Service Representative, Exhibit "X".

34.     At 6:45 a.m., Marwan Al Shehhi was checked in by another United Customer Service Representative. *See* 175:9-12 of Exhibit "Z", deposition of United Customer Service Representative. *See also* UAL001733-1734 of Exhibit "Y".

35.     Marwan Al Shehhi checked in one bag. *See* UAL027940-027941, Exhibit "AA".

36.     At 6:53 a.m., Fayez Ahmed [Banihammad] and Mohand alShehri both checked in. *See* UAL001733-1734 of Exhibit "Y".

37.     Fayez Ahmed [Banihammad] checked in two bags. *See* UAL027940-027941, Exhibit "AA".

38.     The terrorists boarded Flight 175 after checking in at the ticket counter and receiving their boarding passes and passing through a security checkpoint operated by Huntleigh on behalf of United. *See* ¶ 4, p. 2 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

39.     United implemented a new FAA screener training program known as TIPS (Threat Image Protection System), a computerized training tool installed at the United checkpoint in the summer of 2001.  *See* HUSA 003452-55, Exhibit"EE".

40.     On the morning of 9/11, Huntleigh's Duty Manager, Francesco DiGirolamo arrived at the checkpoint at 4:15 am.  *See* FBI Interview Statement of DiGirolamo (FBI130), Exhibit "FF".

41.     Mr. DiGirolamo had a normal routine to test the equipment in the morning.  On September 11, 2001, both Walk Through Metal Detectors (WTMD) and x-rays passed the tests. The X-rays, Walk Through Metal Detectors and hand-held wands were tested at 4:30 a.m.  The Explosive Trace Detection Device ("ETD") was tested at 5:30 a.m.  *See* pp. 114; 243-245 of Huntleigh Duty Manager, Francesco DiGirolamo deposition; *see also*, HUSA 3562; 3312, Exhibit "GG".

42.     According to the daily log sheet, the two lanes of the checkpoint were open at 5:15 am.  Each lane had a WTMD and an x-ray machine.  There was one ETD.  *See* Huntleigh sign in sheets, Exhibit  "HH"; *see also*, Thomas Dep. p. 116, Exhibit "II";  *see also* Exhibit "GG".

43.     Both Huntleigh and United conducted screener tests the morning of 9/11.  All four FAA test objects were found by the Huntleigh screeners who were tested.  *See* HUSA 4351, Exhibit "JJ".

44.     Items were confiscated that morning, specifically box cutters.  *See* pp. 123-35 of the Thomas Dep., Exhibit "II".

45.     There is no evidence of the WTMD alarming on any of the terrorists.  *See* p. 2 of Exhibit "C", *The 9/11 Commission Report.*

46.     The terrorist who took over the controls of Flight 175, Marwan Al Shehhi, was made to pass through the WTMD twice because he had his hands in his pockets the first time: neither time did the WTMD alarm. *See* pp. 81-82 & 88-93 of the Richey Dep., Exhibit "OO".

47.     The only incident at the United checkpoint on 9/11/01 was noted in the Security Report/Control Log, and involved a passenger traveling with two laser pointers who did not want to give up the batteries powering them. The United GSC was called over to the checkpoint and resolved the issue. *See* the 9/11/01 Security Report/Control Law, Exhibit "LL".

48.     At 7:58 a.m., Flight 175 pushed back from Gate 19. *See* ¶ 1, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

49.     At 8:14 a.m., the airplane took off. *See* ¶ 1, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

50.     At 8:19 a.m., Flight 175 made routine radio contact with an air traffic controller at Air Traffic Control Boston Center. *See* ¶ 1, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

51.     At 8:37 a.m., air traffic controllers at the Boston Center asked the flight crew to look for American Airlines Flight 11. *See* ¶ 1, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137); s*ee also* NTSB Report, Exhibit "T".

52.     At 8:38 a.m., the crew of Flight 175 contacted Air Traffic Control at the Boston Center and stated that they had spotted the aircraft at 28,000 or 29,000 feet. *See* ¶ 1, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137); *see also* NTSB Report, Exhibit "T".

53.     Between 8:41 a.m. and 8:42 a.m., the flight crew of Flight 175 had its last communication with air traffic control. They reported that they heard a "suspicious

transmission" from another aircraft during their departure from Boston that sounded like "someone keyed the mike and said everyone stay in your seats." *See* ¶ 1, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137). *See also* pp. 7, 32 of Exhibit "C", *The 9/11 Commission Report;* see also, NTSB report Exhibit "T".

54.     The ATC recording for American Flight 11 indicates that at 8:24:38, one of the terrorists stated, "*we have some planes – just stay quiet and you'll be ok - we are returning to the airport.*" Just 18 seconds later, the Flight 11 terrorist states "*nobody move – everything will be ok – if you try to make any moves, you'll endanger yourself and the airplane – just stay quiet.*" *See* NTSB report, Flight 11, Exhibit "S"; *see also, The 9/11 Commission Report,* "We Have Some Planes" Ch.1, p. 19, Exhibit "C".

55.     The ATC recording for United Flight 93 indicates that at 9:39:10, the hijacker stated, "*ah this is the captain - uh would like to all remain seated - there is a bomb aboard and we go back to the airport to have our demands so please be quiet.*" *See* NTSB report, Flight 93, Exhibit "U"; *see also, The 9/11 Commission Report,* "We Have Some Planes" Ch.1 p. 29, Exhibit "C".

56.     Between 8:42 a.m. and 8:46 a.m., the terrorists took control of Flight 175. See ¶ 2, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

57.     At 8:51 a.m., Flight 175 deviated from its assigned altitude. See ¶ 2, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

58.     At 8:52 a.m., a flight attendant on Flight 175 contacted United's maintenance office in San Francisco and reported that the aircraft had been hijacked. The phone call was made from the back of the aircraft. The flight attendant reported a flight attendant had been stabbed and both pilots had been killed. *See* ¶ 2, p. 3 of Exhibit "WW", the Joint Fact Narrative

(*Bavis* Docket Doc. No. 137).  *See also* Exhibit "QQ", statement and deposition testimony of United Mechanic Employee.

59.     At 9:03 a.m. the terrorist hijackers crashed United Flight 175 into the South Tower of the World Trade Center.  *See* ¶ 3, p. 3 of Exhibit "WW", the Joint Fact Narrative (*Bavis* Docket Doc. No. 137).

60.     Later on 9/11/01, FAA Agent Denise Roussin tested all the equipment at the United checkpoint and found it all to be in compliance with FAA regulations and calibrations. *See* pages of redacted SSI Exhibit 1, TSA7851-7852, (re-reviewed July 11, 2011), Exhibit "KK", redacted version of SSI 1.  *See* pp. 56-58, 75-76, 80-81 of Roussin deposition, Exhibit "I".

61.     The equipment passed all the tests and no "weaknesses" were noted at the checkpoint.  *See* Exhibit "JJ" (HUSA4351); *see also*, pp. 56-58, 68-69, 75-76 and 80-81 of Roussin deposition, Exhibit "I".

62.     The FAA Walk Through Metal Detector ("WTMD") calibration standard  in effect on September 11, 2011 did not detect small knives or items with less metal content than a .22 handgun.  *See* pp. 35, 54-55, 61-65, 79-80 of Malotky deposition, Exhibit "G"; *see* p. 2 of *The 9/11 Commission Report*, Exhibit "C".

63.     The FAA stated that, on September 11, 2001, the weapons allegedly used by the terrorists were not detectable by the WTMDs as calibrated by the FAA and its calibration standard.  *See*, Former SSI Exhibit 55, Exhibit "H"; *see also*, pp. 63-65, 79, 91-92 of Malotkey deposition, Exhibit "G".

64.     The FAA WTMD calibration standard in effect on September 11, 2001 for the certification of a WTMD at a checkpoint was for the WTMD to alarm 30 out of 36 passes with

FAA test pieces. *See* p. 46-49 of Malotkey deposition, Exhibit "G"; *see also* pp. 17-18 of Roussin deposition, Exhibit "I".

65.     Various knives and tools were found by the FBI after 9/11 at hotels and rental cars used by the terrorists and reportedly in Atta's luggage. *See*, photos of items left behind at Exhibit "TT" and Exhibit "UU".

66.     Records of purchase of knives were also recovered by the FBI after 9/11. *See* invoices, Exhibit "SS".

67.     All of the purchased items by the Flight 175 terrorists had blades that were under four inches long. *See* Appendix I of United's ACSSP, Exhibit "A"; *see* photographs of exemplars and deposition testimony, Exhibit "VV".

68.     The FAA had no credible intelligence that any terrorist group, including al Queda, was contemplating a suicide attack on a U.S. airliner. *See* pp. 113:11-114:4 and 135:6-14 of Claudio Manno deposition, Exhibit "D".

69.     The FAA had no credible intelligence suggesting that al Queda intended to hijack commercial airliners and use them as guided missiles in suicide attacks against American ground targets. *See* pp. 141:25-142:9 of Manno deposition, Exhibit "D".

70.     The FAA had no credible intelligence that al Queda would use short bladed knives or other small, sharp cutting implements to hijack multiple commercial passenger aircraft, pilot the planes themselves and crash them into ground targets. *See* pp. 145:3-146:2 of Manno deposition, Exhibit "D".

71.     The FAA made the final determination of countermeasures for the aviation security system. *See* pp. 128:14-129:6, 130:19-22, 132:11-133:4, of Cammarato deposition., Exhibit "E".

72.     The FAA determined the appropriate countermeasures to address a particular security threat. *See* pp. 133:20-135:10 of Cammaroto deposition, Exhibit "E".

73.     The FAA did not prohibit knives with blades less than four inches long and that were legal under local law from entering the sterile area beyond the checkpoint. *See* pp. 205:15-20, 212:14-213:9 of Cammaroto deposition, Exhibit "E".

74.     The Common Strategy was described in the ACSSP. It was mandatory crew training and procedures to follow in the event of a hijacking as well as a label applied to the underlying doctrine for handling a hijacking. *See* pp. 18:14-19:7, 31:21-25, 35:5-14 of Michael Morse deposition, Exhibit "R" .

75.     The basic element of The Common Strategy tactics in the ACSSP include "Stay calm" and "Do not try to overpower hijacker." *See* p. 6-8 of Appendix XIII, of Exhibit "A", United's ACSSP. *See also* pp. 29:3-24, 31:5-31:15, of Morse deposition, Exhibit "R".

76.     Prior to 9/11, the FAA did not make any changes to the Common Strategy. *See* Morse deposition pp. 115:7-116:10, Exhibit "R".

77.     Rohan Gunaratna, identified by plaintiff as an expert in terrorism, stated that *"by extensive planning and preparation, particularly surveillance and reconnaissance, can a terrorist organization identify those gaps and loopholes to penetrate and strike in the aviation or any other domain"* and that the planning for the 9/11 attacks took more than 2½ years. *See* pp. 49-50 of Gunaratna deposition, Exhibit "NN".

78.     Mr. Gunaratna stated that the 9/11 terrorists would have preferred to use a weapon permitted to be taken on board the airplane so as not to compromise the operation by one of their group being detained. *See* p. 300 of Gunaratna deposition, Exhibit "NN".

79.    In the Federal Register it stated after 9/11/01 that "before September 11, however, no one had envisioned a hijacking situation in which a hijacker would take control of a commercial aircraft and successfully use that aircraft as a weapon."   *See* Transponder Continuous Operation, 68 Fed. Reg. 1942 (January 14, 2003).

Dated: New York, New York
       August 26, 2011

                                        Respectfully submitted,
                                        QUIRK AND BAKALOR, P.C.

                                        By:
                                            Jeffrey J. Ellis (JJE 7796)
                                        A Member of the Firm
                                        845 Third Avenue, 15th Floor
                                        New York, New York 10022
                                        Telephone: (212) 319-1000
                                        Facsimile: (212) 319-1065

                                                and

                                        MAYER, BROWN, LLP
                                        71 South Wacker Drive
                                        Chicago, Illinois  60606
                                        Telephone: (312) 701-7065
                                        Facsimile:  (312) 706-8623

                                        *Attorneys for Defendants*
                                        *UNITED AIR LINES, INC. and*
                                        *UNITED CONTINENTAL*
                                        *HOLDINGS, INC., (f/k/a*
                                        *UAL CORP.)*

                                        -and-

                                        Edwin W. Green, Esq.
                                        Couyssels
                                        82150 Roquecor
                                        France
                                        Phone:  (33) 563 95 21
                                        E-mail:  ed.green@la-taupe.net

- and -

Jonathan J. Ross
SUSMAN GODFREY, LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile:  (713) 654-6666

*Counsel for HUNTLEIGH USA*
*CORPORATION*