# CONDON & FORSYTH LLP

*Handwritten annotation by Judge:* Cantor's objections are denied. The parties shall agree to a fair sampling of identities to be disclosed, sufficient in American's view to allow a fair sampling to test Cantor's theory, at least initially. Interviews, if they occur, may be conducted by American's counsel, without advising, or [in the] presence of, Cantor's counsel. See *In re Agent Orange*, 76 F.R.D. 363 (1990).

So Ordered
5/22/12
/s/ A.K. Hellerstein

May 18, 2012

**BY HAND**

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1050
New York, New York 10007

Direct Dial: (212) 894-6770
Direct Fax: (212) 370-4453
dbarry@condonlaw.com

Re: In re September 11 Litigation, 21 MC 101
*Cantor Fitzgerald & Co. et al. v. American Airlines, Inc. et al.*, 04-CV-7318
C & F Ref: DTB/CRC/28079

Dear Judge Hellerstein:

We write pursuant to the Court's Individual Rule 2(E) to seek your assistance in resolving a dispute between American Airlines, Inc. and AMR Corporation ("American") and Cantor Fitzgerald, L.P. and its affiliates ("Cantor").[1]

This dispute relates to Cantor's redaction of customer names from certain documents that it has produced concerning its damages claims. The parties have conferred in good faith, including holding a meet and confer teleconference on April 16, 2012, but have been unable to reach agreement on this issue. Accordingly, the parties now submit the issue to the Court for resolution.

## I.   American's Position

Cantor has produced numerous Excel spreadsheets that contain important trading information during the extended eight year period for which Cantor seeks damages. However, Cantor has redacted all customer names from the spreadsheets, which greatly reduces their utility

---

[1] The Cantor Fitzgerald Plaintiffs are Cantor Fitzgerald & Co., Cantor Fitzgerald Associates, L.P., Cantor Fitzgerald Brokerage, L.P., Cantor Fitzgerald Europe, Cantor Fitzgerald International, Cantor Fitzgerald Partners, Cantor Fitzgerald Securities, Cantor Fitzgerald, L.P., Cantor Index Limited, CO2e.com, LLC, eSpeed Government Securities, Inc., and Tradespark, L.P.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 2

concerning the core issue of Cantor's damages claim – that these same customers diverted their business to Cantor's competitors over the next eight years as the result of temporary loss of office space in New York and damage to its computer equipment in that office on September 11, 2001.

American has been requesting unredacted versions of these documents since March 27, explaining that the missing customer names are critical to conducting an analysis of Cantor's damages claims. Whatever confidentiality concerns Cantor may have about the potential unauthorized disclosure of decade-old trading information is already covered by the Court's March 30, 2004 and August 12, 2005 Confidentiality Protective Orders (the "21 MC 101 Protective Order").[2] Cantor's refusal to produce this information lacks any legal basis and impedes American's ability to defend itself in this litigation.

Cantor has refused to produce unredacted versions of the spreadsheets unless American agrees to forgo its right to conduct interviews or other informal discovery of Cantor's customers or agrees to conduct such discussions only in the presence of Cantor's counsel. Cantor's position lacks any legal basis. American has responded that it is not willing to give up its right to conduct one type of legitimate factual investigation in order to procure Cantor's agreement to produce directly relevant information that Cantor is required to produce under the Federal Rules of Civil Procedure and the Court's March 22, 2012 Order Regulating Discovery. The right to informally interview potential third-party witnesses is long-established in American jurisprudence. *See, e.g., IBM v. Edelstein*, 526 F.2d 37, 41-43 (2d Cir. 1975) (recognizing a party's "time-honored and decision-honored . . . right to interview an adverse party's witnesses (the witness willing) in private, without the presence or consent of opposing counsel"). It would be extraordinary, if not unprecedented, to permit Cantor to condition American's access to legitimate, highly relevant information on a requirement that it forgo its right to interview third-party witnesses.

Moreover, American has specifically represented that it will not disclose the unredacted customer-specific trade information in any interviews or informal discussions with other Cantor customers. We also have emphasized that the 21 MC 101 Protective Order explicitly protects this type of information from unauthorized disclosure. *See* Exhibit A, Excerpt of March 30, 2004 Confidentiality Order ¶ 2.1 ("Confidential Information" includes "non-public information about existing and potential customers."). Where adequate protective orders exist, confidentiality concerns cannot justify a refusal to produce relevant documents. *See, e.g., BSN Med., Inc. v. Parker Med. Assocs., LLC*, No. 10 Misc. 15, 2011 WL 197217, at *3 (S.D.N.Y. Jan. 19, 2011) (ordering production of customer lists because protective order would sufficiently protect customers' identities from unauthorized disclosure); *Dynacore Holdings Corp. v. U.S. Philips*

---

[2] The Court's March 30, 2004 Order was issued in the former 21 MC 97 docket and was incorporated in the 21 MC 101 docket by the Court's August 12, 2005 Order.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 3

*Corp.*, Nos. 01 Civ. 5012, 01 Civ. 10798, 2002 WL 31233246, at *4 (S.D.N.Y. Oct. 4, 2002) (stating that "[t]he normal and expected reluctance of business firms to disclose sales information . . . is in itself an insufficient basis on which to deny discovery" where adequate protection from unauthorized disclosure, such as a confidentiality order, exists). The 21 MC 101 Protective Order, together with American's commitment not to discuss the contested information in its conversations with customers, should be more than sufficient to enable Cantor to produce unredacted versions of its customer-specific trade information. Nevertheless, Cantor has refused to do so.

The importance of this customer-specific trade information cannot be overstated. At the heart of Cantor's damages claims is its argument that certain of its customers transferred some or all of their business from Cantor to Cantor's competitors as a result of Cantor's temporary loss of office space and disruption of connectivity for a relatively brief period following the September 11 terrorist attacks. Cantor claims that the effects of this alleged shift in customer trading activities lasted for eight years, from September 11, 2001 through at least June 30, 2009.

In cases where, as here, a damages claim is based on an alleged loss of customer business, the party making the lost business claim must present direct customer evidence of the volume of lost business and the reason for the loss of business. *See, e.g., Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 784-85 (2d Cir. 1994) (holding evidence insufficient as a matter of law where no customers were called to testify and where "[n]o evidence was presented as to the reason for any company's failure to place recent orders"; agreeing that plaintiff's internal company witnesses "were properly prevented from giving their own views as to the reasons any customers might have had for not placing recent orders"; and determining that "[w]ithout some proof as to the [customers'] reason for not placing new orders, a jury could not with reasonable certainty attribute the lack of recent orders to" the acts of defendant and that plaintiff's "effort to attribute the lack of such orders to [defendant's conduct] is speculative"); *Hangzhou Silk Imp. & Exp. Corp. v. P.C.B. Int'l. Indus., Inc.*, No. 00 Civ. 6344, 2002 WL 2031591, at *8 (S.D.N.Y. Sept. 5, 2002) (rejecting claim where party did not offer any documentary or testimonial evidence from its customers explaining the reasons for their decisions to terminate their business, and stating that "[i]nstead of calling witnesses from each customer to testify as to why it chose to terminate the business relationship, [the party] chose to rely on inadmissible hearsay and speculation to make its case"); *Moran v. Standard Oil Co.*, 211 N.Y. 187, 194-95 (1914) (finding evidence of alleged lost business insufficient where "plaintiff did not place before the jury the volume of his business with each customer, and the circumstances tending to show the reason for the breaking off of their dealings"). Cantor cannot hope to present customer-specific trade information at trial without producing customer-specific trade information during discovery.

American also is entitled to gather and present evidence of alternative causes for Cantor's market share declines, including evidence regarding the reasons Cantor's customers increased their

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 4

business with Cantor's competitors in the years after 9/11. Such alternative causes include the effects of normal price and service competition and customer preferences unrelated to 9/11, such as the documented negative reactions by customers to Cantor's Price Improvement Program. *See, e.g.*, Exhibit B, Steven Vames, *Traders Cry Foul Over eSpeed's New Bond Broking Service*, Dow Jones Newswires, Nov. 20, 2002 (noting that eSpeed "is facing harsh criticism from some of its biggest Wall Street customers" over Price Improvement). These customer/owners had an obvious independent reason to conduct trades through BrokerTec, eSpeed's primary competitor, rather than eSpeed. Competition became that much more intense after the May 2003 merger of BrokerTec and ICAP, Cantor's primary competitor in the voice broker business, and the implementation of a three-year commissions cap for the 14 banks and investment banks that created and owned BrokerTec. *See, e.g.*, Exhibit C, Richard Lindsay and George Matlock, *UK's ICAP poised for $290 million BrokerTec deal*, Reuters, Jan. 16, 2003 (as part of the deal, BrokerTec's 14 owning banks "will get shares once ICAP's takeover goes through as well [as] a cap on commission charges for three years").

Another alternative cause for which American is entitled to discovery is regarding Cantor's alleged loss of market share arising from the deaths of its employees. *See In re Sept. 11 Litig.*, 760 F. Supp. 2d 433, 445 (S.D.N.Y 2011) ("New York law is clear that Cantor Fitzgerald may not [] claim a legal injury" arising out of "the economic loss resulting from the loss of Cantor Fitzgerald's employees, and from the loss of the interpersonal client relationships nurtured by its highly talented brokers.") American is entitled to interview Cantor's customers concerning these and other alternative causes and to ask them about their reactions to the Price Improvement Program, their reasons for choosing to use BrokerTec or ICAP rather than eSpeed for their trades in general, the pricing practices of eSpeed and its competitors, their assessment of the quality of service provided by eSpeed versus its competitors (particularly in the immediate aftermath of 9/11), and whether they shifted business away from Cantor because of the loss of a relationship with a Cantor employee who died in the attacks.

Not only is American entitled to pursue alternative causes for Cantor's decline in market share, but Cantor is required to control for alternative causes as part of its damages analysis. *See, e.g., Schonfeld v. Hilliard*, 218 F.3d 164, 174 (2d Cir. 2000) (affirming district court's holding that plaintiff "'failed to establish a foundation for the existence of lost profits'" and agreeing that plaintiff's "[f]ailure to control for adverse market conditions," including "(1) the entry of competitors; (2) technological developments; (3) regulatory changes; or (4) general market movements . . . 'allows the false inference that plaintiff's venture was an assured success'") (internal citation omitted). It is insufficient for Cantor to allege that because it lost market share after 9/11, such losses must have been caused by the effects of 9/11. It is equally insufficient for Cantor to put forth a general assertion that some customers shifted their business away from Cantor after 9/11 without providing proof of which customers did so, when, why, in what quantities, and for how long. These types of holistic or conclusory assertions of damages already

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 5

have been rejected by the Court. *In re Sept. 11 Litig.*, 760 F. Supp. 2d at 445; *accord* Exhibit D, Status Conf. Tr. 4:20-5:2, *In re Sept. 11 Litig.*, 21 MC 101 (S.D.N.Y. March 6 2012).

Cantor must prove that its alleged loss of market share was proximately caused by the property damage and disruption to connectivity that it experienced on and immediately after 9/11 rather than by other factors. *See, e.g., In re Sept. 11 Litig.*, 760 F. Supp. 2d at 442 ("Cantor Fitzgerald is entitled to claim damages naturally and probably resulting from the damage it suffered. These damages can include injuries to property, and to lost profits naturally and probably flowing from the injury to its property. But Cantor Fitzgerald cannot bootstrap this entitlement into a wholesale claim of business interruption damages not matching the corresponding duty of the alleged tortfeasor."); *In re Sept. 11th Litig.*, 590 F. Supp. 2d 535, 543 (S.D.N.Y. 2008) ("The tortfeasor is not responsible for damages which are remote from the wrong or indirectly related to it."). The exclusion of alternative causes is particularly important in this case, given that Cantor's damages period extends for many years and that its largest alleged losses are in the years that are farthest from 9/11.

Because Cantor has put its customer trading activities at issue, American has a right to receive through discovery customer-specific trade information in order to determine (1) whether customers, in fact, changed their trading activities after 9/11, and, if so, (2) which customers transferred business to Cantor's competitors; (3) when those customers transferred their business; (4) how much of their business they transferred; (5) for how long the shift in customer trading activities lasted; and (6) the reasons why the customers chose to conduct their trades through competitors rather than Cantor. *See, e.g., BSN Med., Inc.*, 2011 WL 197217, at *3 (requiring disclosure of customer identities as "directly relevant to [the] damages claim" and "essential" to conducting "the kind of detailed tracking required to prove that [plaintiff's] damages were caused by [defendant] as opposed to adverse market conditions or the actions of [a competitor]"); *Moran*, 211 N.Y. at 194-95 (finding evidence of alleged lost business insufficient where "plaintiff did not place before the jury the volume of his business with each customer, and the circumstances tending to show the reason for the breaking off of their dealings"). American is entitled to use the unredacted customer trade information to conduct its own damages analyses and to determine which, if any, customers should be deposed regarding whether and why they chose to conduct trades with competitors rather than with Cantor during the damages period.[3]

---

[3] Where, as here, information possessed by non-party customers is relevant to the claims and defenses of the parties, the parties have a right to conduct customer depositions. *See, e.g., Gucci Am., Inc. v. Ashley Reed Trading, Inc*, No. 00 Civ. 6041, 2001 WL 1173503, at *3 (S.D.N.Y. Oct. 4, 2001) (permitting depositions of customers likely to possess relevant information over the customers' objections that the discovery was intended to disrupt their relationships with the defendant and could instead be obtained from the defendant directly).

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 6

## II.   Cantor's Position

Cantor produced the US Treasury Revenue Analysis spreadsheets itemizing various customer trades in response to Defendants' Second Request For Production of Documents with the names of the customers redacted because one of the fundamental reasons that the interdealer brokerage ("IDB") market exists is to preserve anonymity of the participants' trading positions. Moreover, during our discussions with counsel for American, we learned that they were going to use the client identities to conduct interviews of the Cantor Fitzgerald Plaintiffs' customers. This struck us as directly contravening the discovery limitations and directions articulated by the Court at the March 6, 2012 status conference. At that conference, Your Honor:

- ordered Cantor to produce its "books and records relating to the damages naturally and probably flowing from the lost property" (*See* Exhibit E, Tr. of Mar. 6, 2012 Status Conference, at 11:11-14);[4]
- specified that American did not need to propound requests for discovery because the order to produce books and records "is the request for discovery" (id.);
- stated that after the books and records production and "one or two depositions" on damages, "we'd be finished with the whole damages issue" (id. at 7:22-25);
- suggested that an accountant-to-accountant discussion may be more helpful than depositions or other forms of non-documentary discovery in assisting American with its evaluation of Cantor's damages claims (id. at 13:11-14:16 ("If you need explanations of various theories that are used, it is much more effective to get your accountant to talk with their accountant.")); and
- requested that the parties keep the transaction expenses regarding damages to a minimum (id. ("There is no need to keep running up the transaction expense in this case.")).

The clandestine interview process requested by American is overreaching, going beyond the one or two depositions on damages envisioned by the Court. The nature of Cantor's business as described in its damages claim is such that Cantor did not lose all of its customers' trades as a result of 9/11. Instead, Cantor's damages theory is based on a loss of market share as measured by comparing Cantor's actual revenue in a given line of business against what Cantor's revenue would have been in that line of business *but for* the total destruction of Cantor's headquarters and its technology infrastructure, among other things, in the context of the growth of the overall market in that line of business after 9/11. Cantor lost some, but not all, individual trades that would have been made but for 9/11. Among the thousands of decisions made by each trader at each customer, is the individual decision as to which interdealer broker to use for a particular

---

[4] In compliance with Your Honor's Order, Cantor has produced 36,178 pages of books and records since the March 6, 2012 status conference. When added to the 74,330 pages of discovery that Cantor produced prior to that status conference, Cantor's total production to date exceeds 110,000 pages.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 7

trade. The idea that "customer interviews" will yield admissible, reliable results is suspect. Who is the customer for such "customer interviews"? If the customer is high-level management, the interviews will not bear fruit as there is no suggestion that there were institutional policies post-9/11 not to trade with Cantor. If the customer is the individual trader, it is highly unlikely that such traders will remember why he or she made trades years ago through a particular interdealer broker as opposed to another.

Even if a few traders did remember, the appropriateness of extrapolating that informal sampling to the broader marketplace is questionable at best and will likely yield only anecdotal, disjointed data. *See, e.g., E.S. Originals Inc. v. Stride Rite Corp.*, 656 F. Supp. 484, 490 (S.D.N.Y. 1987) (party's proffer of testimony from one executive that in several instances one type of sneaker was passed off as the other by store clerks in response to customer requests was deemed to be an "informal survey" that was "not a legally sufficient basis" to prove actual confusion in trademark dispute).[5]

Beyond the over-breadth and marginal utility of the requested interview campaign, the discovery sought poses a real danger to Cantor's business, the fundamental premise of which is customer anonymity. As Cantor explained to American in an April 3, 2012 letter:

> [Cantor] do[es] not have an issue with Defendants' attorneys having access to this information so much as the use to which you propose to put it beyond the use of disclosing same to your rebuttal damages expert. To have an agent of Defendants seek discovery from the Cantor Fitzgerald Plaintiffs' customers armed with each customer's detailed trading activity would most certainly be viewed with alarm by those customers. It would suggest that their very reason for dealing with the Cantor Fitzgerald

---

[5] Presumably American will seek to use selected quotes from its customer interviews to mount a challenge to the market share-based report that Cantor's damages expert prepared. Parties seeking to bolster their arguments using evidence of customers' viewpoints, as American Airlines is seeking to do here, are required to take precautions to ensure that such data is collected in a manner that supports its reliability. *See, e.g., Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983) ("The trustworthiness of surveys depends upon foundation evidence that (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey.") American has not indicated any willingness to undertake such precautions with regard to its gathering of evidence from Cantor's customers.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 8

>Plaintiffs for IDB market trades had been compromised. It will cause damage to the Cantor Fitzgerald Plaintiffs' business and is really not necessary for the bulk of the use to which you state you intend to put the information – cross-examination of the Cantor Fitzgerald Plaintiffs' damages expert and the formulation of a rebuttal expert witness report.

Cantor has offered the following compromises that would provide American with access to the trading information requested while minimizing the harm to Cantor and its customers:

- Cantor has agreed to produce the unredacted spreadsheets in return for the assurance that American will maintain the information as attorneys' and experts' eyes only and agree not to informally interview Cantor's customers or at least seek Court approval before doing so;
- Cantor has proposed during an April 16, 2010 phone call to produce the unredacted spreadsheets in return for the assurance that American will maintain the information as attorneys' and experts' eyes only and permit Cantor to attend any resultant interviews with its damages expert; or
- Cantor has agreed to produce the redacted spreadsheets with the names of the customers coded (*i.e.*, substituting "Customer 1", "Customer 2", etc. for individual customer names) to increase the utility of the spreadsheets to American's damages expert.

American has rejected all three proposals. Yet, if American received the information offered by Cantor and shared that information with its damages expert, American may determine that the proposed interviews are unnecessary, obviating the risk to Cantor and minimizing the transaction expenses regarding discovery as directed by the Court. If, on the other hand, American still felt that the interviews were necessary after reviewing the information, Cantor seeks only the ability to attend the interviews with its expert. This approach is consistent with the Court's suggestion that the most efficient mechanism for American to determine the damages information it seeks is an accountant-to-accountant meeting.

Cantor is prepared to produce unredacted, native versions of the spreadsheets at issue as soon as its concerns regarding American's clandestine interview proposal are addressed. Cantor asks only that, consistent with Your Honor's previous rulings, American be prevented from taking interviews of Cantor's customers or, in the alternative, that Cantor be permitted to attend such interviews with its damages expert. If the purpose of the interviews is to test Cantor's damages claims, such testing would be just as effective, if not more so, in the presence of Cantor and its damages expert. Transparency fosters cooperation; secrecy invites mischief. Cantor asks that the Court prevent American from engaging in a closed-door interview program that could harm Cantor's client relationships.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 9

Finally, American's comments above about Cantor's burden of proof based on citations to cases involving claims for damages caused by the delivery of non-conforming goods (*see, e.g., Toltec Fabrics, Inc.* and *Hangzhou Silk Imp. & Exp. Corp.*), are besides the point and simply not pertinent to the issue at hand. The issue to be resolved is Cantor's reluctance to produce unredacted versions of the US Treasury Revenue Analysis spreadsheets because of American's refusal to agree not to proceed with secret interviews of those Cantor customers, which is inconsistent with this Court's expectations and directions regarding discovery in this case. Cantor's disinclination to be drawn into a discussion of its burden of proof at time of trial in the present context is not an admission that it agrees with or subscribes to American's views on the burden of proof issue. That will be dealt with, to the extent necessary, at the appropriate time and place.[6] Suffice it to say for the present that Cantor is under no obligation to, "categorically exclude each and every possible alternative cause in order to render the proffered [expert] testimony admissible." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 287-88 (S.D.N.Y. 2011). *See also, Discover Fin. Services v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 506 (S.D.N.Y. 2008) ("Plaintiff is not required to prove that defendant's alleged antitrust violation was the sole cause of its injury; nor need plaintiff eliminate all other possible causes of injury. It is enough if plaintiff has proved that the alleged antitrust violation was a material cause of its injury.") (internal quotations omitted).

\* \* \*

Respectfully submitted,

___s/Desmond T. Barry, Jr.___
Desmond T. Barry, Jr.
*Counsel for American Airlines, Inc. and AMR Corporation*

___s/John F. Stoviak___
John F. Stoviak
*Counsel for the Cantor Fitzgerald Plaintiffs*

Enclosures

---

[6] Cantor will, of course, address this issue sooner, if the Court so directs.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
May 18, 2012
Page 10

cc: <u>Via E-mail</u>
Roger E. Podesta, Esq.
Wendy B. Reilly, Esq.
Jennifer L. Beidel, Esq.
Timothy W. Callahan, II, Esq.

Judge wrote:

"Cantor's objections are denied. The parties shall agree to a fair sampling of identities to be disclosed, sufficient in American's view to allow a fair sampling to test Cantor's theory, at least initially. Interviews, to the extent witnesses consent, may be conducted by American's counsel, without advising, or the attendance of, Cantor's counsel. See Niesig v. Team I, 76 N.Y. 2d 363 (1990).

So Ordered.

5/22/12
Alvin K. Hellerstein"