UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CEDAR & WASHINGTON ASSOCIATES, LLC,    :

                            Plaintiff,    :

                  -against-    :

THE PORT AUTHORITY OF NEW YORK AND    :
NEW JERSEY, et al.,    :

                    Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21 MC 101 (AKH)
This Document Relates to:
08 CV 9146 (AKH)

## SUPPLEMENTAL MEMORANDUM OF LAW OF AMERICAN AIRLINES, INC. AND UNITED AIR LINES, INC. IN FURTHER SUPPORT OF JOINT DEFENSE MOTION TO DISMISS THE COMPLAINT UNDER RULE 12(c) BECAUSE THE SEPTEMBER 11 ATTACKS WERE ACTS OF WAR

QUIRK AND BAKALOR, P.C.
Jeffrey J. Ellis
Anoushka Sharifi Bayley
845 Third Avenue, 15th Floor
New York, New York 10022
Tel:  (212) 319-1000
Fax:  (212) 319-1065
jellis@quirkbakalor.com

-and-

MAYER BROWN, LLP
Michael R. Feagley
71 South Wacker Drive
Chicago, Illinois 60606
Tel:  (312) 782-0600
Fax:  (312) 701-7711
mfeagley@mayerbrown.com

*Attorneys for Defendants*
UNITED AIR LINES, INC. AND UNITED
CONTINENTAL HOLDINGS, INC. (F/K/A
UAL CORPORATION)

CONDON & FORSYTH LLP
Desmond T. Barry, Jr.
7 Times Square
New York, New York 10036
Tel:  (212) 490-9100
Fax:  (212) 370-4453
dbarry@condonlaw.com

-and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, New York 10022
Tel:  (212) 909-6000
Fax:  (212) 909-6836
repodesta@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. AND
AMR CORPORATION, INC.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I.  The September 11 Attacks Were Indisputably Acts of War ............................................. 4

II.  The Release Was Caused Solely by the September 11 Attacks .......................................... 14

CONCLUSION ......................................................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Coeur D'Alene Tribe v. Asarco, Inc.*,
    Nos. CV91-0342, CV96-0122, 2001 WL 34139603 (D. Idaho Mar. 30, 2001)......................6

*Conard and Twenty Others v. United States*,
    25 Ct. Cl. 433 (1890) ................................................................................................5

*El-Shifa Pharmaceutical Industries. v. United States*,
    55 Fed. Cl. 752 (Fed. Cl. 2003), *aff'd*, 378 F.3d 1346 (Fed. Cir. 2004),
    *cert. denied*, 545 U.S. 1139 (2005)................................................................................9

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006).............................................................................................7, 8

*In re Sept. 11 Litig.*,
    No. 10-4197-cv, slip op. (2d Cir. May 23, 2012) ..........................................................4

*Montoya v. United States*,
    180 U.S. 261 (1901).............................................................................................9

*New York Life Insurance. v. Bennion*,
    158 F.2d 260 (10th Cir. 1946) ................................................................................6

*Padilla v. Hanft*,
    432 F.3d 582 (4th Cir. 2005) ..................................................................................8

*The Prize Cases*,
    67 U.S. (2 Black) 635 (1862).................................................................................7, 9

*R.E. Goodson Constr. Co. Inc. v. Int'l Paper Co.*,
    No. C/A 4:02-4184, 2005 WL 2614927 (D.S.C. Oct. 13, 2005) ....................................5

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)............................................................................................6

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011)...................................................................................8

*United States v. Shell Oil Co.*,
    841 F. Supp. 962 (C.D. Cal. 1993), *aff'd in relevant part*, 294 F.3d 1045 (9th
    Cir. 2002), *cert. denied,* 537 U.S. 1147 (2003) ..............................................4, 5, 10, 15

*Weiss v. Arab Bank, PLC,*
    No. 06 CV 1623, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)............................................14

**STATUTES**

Comprehensive Environmental Response, Compensation, and Liability Act,
    42 U.S.C. § 9601 *et seq.*.................................................................................. *passim*

Joint Resolution to Authorize the Use of United States Armed Forces Against
    Those Responsible for the Recent Attacks Launched Against the United
    States, Pub. L. No. 107-40, 115 Stat. 224 (2001) ................................................2, 7

North Atlantic Treaty art. 5, Apr. 4, 1949,
    63 Stat. 2241 ...................................................................................................10

S.C. Res. 1368, U.N. Doc. S/RES/1368 (Sept. 12, 2001)..............................................12

S.C. Res. 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001)..............................................13

The Anti-Terrorism Act,
    18 U.S.C. §§ 2331 *et seq.*................................................................................13

U.N. Charter art. 51...............................................................................................12, 13

**OTHER AUTHORITIES**

2 The Law of Hazardous Waste:  Management, Cleanup, Liability, Litigation
    § 14.01[8][b] (Susan M. Cooke, ed.) .....................................................................5

4 William H. Rodgers, Jr., Environmental Law:  Hazardous Wastes and
    Substances § 8.13(C)(3)(c) (1992).........................................................................5

Br. for United States, *Hamdan v. Rumsfeld*,
    No. 05-184, 2006 WL 460875 (Feb. 23, 2006) .......................................................8

Fed. R. Civ. P. 12(c) ...........................................................................................3, 16

Jack M. Beard, *America's New War on Terror: The Case for Self-Defense under
    International Law*, 25 Harv. J. L. & Pub. Pol'y 559 (2002).....................................13

Letter dated 7 October 2001 from the Permanent Representative of the United
    States of America to the United Nations addressed to the President of the
    Security Council, U.N. Doc. s/2001/946 (Oct. 7, 2001)..........................................11

Lord Robertson, Secretary General, NATO,
  Opening Statement at Press Conference on Most Recent Developments
  Following the Terrorist Attacks of 11th September (Oct. 2, 2001) ........................................11

*Osama bin Laden, Al Queda's 1996 Fatwa, Declaration of War against the
  Americans Occupying the Land of the Two Holy Places* (Aug. 1996) ....................................1

*Osama bin Laden, Al Queda's 1998 Fatwa* (Feb. 23, 1998)............................................................1

Press Release (2001)124,
  Statement by the North Atlantic Council (Sept. 12, 2001) ......................................................11

Press Release of Address to a Joint Session of Congress and the American People
  (Sept. 20, 2011)..............................................................................................................................1

Press Release of Remarks by the President on Strengthening Intelligence and
  Aviation Security (Jan. 7, 2010) ..................................................................................................2

Sean D. Murphy, *Terrorism and the Concept of "Armed Attack" in Article 51 of
  the U.N. Charter*, 43 Harv. Int'l L. J. 41 (2002).......................................................................7

American Airlines, Inc., and AMR Corporation, United Air Lines, Inc., and United Continental Holdings, Inc., f/k/a/ UAL Corporation (collectively the "Aviation Defendants") submit this Supplemental Memorandum of Law at the direction of the Court of Appeals of the Second Circuit, to address the applicability of the "act of war" defense under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA").

## PRELIMINARY STATEMENT

The terrorist attacks on September 11 were indisputably an act of war: they represented the consummation of the murderous plans of a group so consumed by hatred of the United States that it had declared a holy war against this country and its people. *See Osama bin Laden, Al Queda's 1998 Fatwa* (Feb. 23, 1998)[1] ("The ruling to kill the Americans and their allies—civilians and military—is an individual duty for every Muslim . . . ."), attached as Ex. A to the Decl. of Desmond T. Barry, Jr., dated June 20, 2012 ("Barry Decl."); *see also Osama bin Laden, Al Queda's 1996 Fatwa, Declaration of War against the Americans Occupying the Land of the Two Holy Places* (Aug. 1996),[2] attached as Ex. B to Barry Decl. Two Presidents, one from each party, have characterized the attacks as acts of war. President George W. Bush declared on September 20, 2011 in an Address to a Joint Session of Congress and the American People that on September 11 "enemies of freedom committed an act of war against our country." Press Release of Address to a Joint Session of Congress and the American People (Sept. 20, 2011)[3] ("Bush Address"). President Obama later agreed: "We are at war. We are at war against al

---

[1]   *Available at*
      http://www.pbs.org/newshour/terrorism/international/fatwa_1998.html (English translation).

[2]   *Available at*
      http://www.pbs.org/newshour/terrorism/international/fatwa_1996.html (English translation).

[3]   *Available at*
      http://georgewbush-whitehouse.archives.gov/news/releases/2001/09/20010920-8.html.

1

Qaeda, a far-reaching network of violence and hatred that attacked us on 9/11, that killed nearly 3,000 innocent people, and that is plotting to strike us again. And we will do whatever it takes to defeat them." Press Release of Remarks by the President on Strengthening Intelligence and Aviation Security (Jan. 7, 2010).[4]

Congress and the U.S. Supreme Court concur. On September 18, 2001, Congress passed a joint resolution pursuant to the War Powers Act authorizing the use of "all necessary and appropriate force against those nations, organizations or persons [who] planned, authorized, committed or aided" the September 11 attacks. *See* Joint Resolution to Authorize the Use of United States Armed Forces Against Those Responsible for the Recent Attacks Launched Against the United States, Pub. L. No. 107-40, 115 Stat. 224 (2001) (sometimes referred to as the "AUMF"). The Supreme Court has said that its analysis does not depend on a formal declaration of war but "[o]ur focus is instead on the September 11, 2001[] attacks that the Government characterizes as relevant act[s] of war, and on the measure that authorized the President's deployment of military force—the AUMF. . . . [W]e do not question the Government's position that the war commenced with the events of September 11, 2001 . . . ." *Hamdan v. Rumsfeld*, 548 U.S. 557, 599 n.31 (2006) (internal quotations omitted).

The executive and legislative branches, the highest court of the United States and even al Qaeda itself thus all agree that the September 11 attacks were acts of war. This circumstance fundamentally differentiates Cedar & Washington's ("C&W") CERCLA claim from the run-of-the-mill hazardous waste disposal case. As the Aviation Defendants have previously argued, this circumstance means that C&W has an ATSSSA claim rather than a CERCLA claim in the first instance. (Joint Defense Mem. of Law in Support of Mot. to Dismiss under Rule 12(c), Jan. 29,

---

[4]  *Available at*
http://www.whitehouse.gov/the-press-office/remarks-president-strengthening-intelligence-and-aviation-security.

2

2010 at 14–18.) But even if C&W had a CERCLA claim, that claim would not succeed because CERCLA provides that there is no liability for "a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act of war."   42 U.S.C. § 9607(b)(2).

Here, there can be no doubt that the release was caused solely by an act of war.  The question before the Court is not whether the hijackings were caused solely by an act of war; the issue is whether *the release* was caused solely by an act of war.  And the release here was entirely the byproduct of al Qaeda's quintessential act of war:  deliberately slamming two aircraft into the World Trade Center, a target chosen by the terrorists to achieve their own belligerent aims. (*See* C&W Amplification, Oct. 23, 2009 at 9 (alleging that "as a direct result of the events of September 11, 2001" WTC Dust and other substances were released onto 130 Cedar).)  The Aviation Defendants did nothing to participate in that act, and had nothing but horror at its execution.

## **BACKGROUND**

On September 22, 2010, this Court dismissed all of C&W's claims against all defendants pursuant to Federal Rule of Civil Procedure 12(c).  The Court held that C&W, a post-9/11 purchaser of property it alleged was contaminated with dust from the September 11, 2001 crashes in lower Manhattan, could not state a claim pursuant to CERCLA for the attenuated after-effects of the worst terrorist attack in the history of the United States.  The Court correctly held that the extraordinary events of September 11, 2001 did not give rise to liability under CERCLA, stating "I do not believe . . . that CERCLA was intended to deal with a situation where inert property was caused to be other than inert, and to flow through the air or the water

3

because of an incident like we had at 9/11." (Tr. of Oral Argument, Sept. 21, 2010 at 46; Summ. Order Granting Defs.' Mot. to Dismiss, Sept. 21, 2010 ("Order") (granting motion to dismiss "for reasons stated on the record").) The Court further found that "to hold that CERCLA liability should attach where something that is otherwise not releasable, nor dischargeable, but becomes so because of the events of September 11, 2001 would be to stretch CERCLA into areas which it was not intended to reach. That is my holding." (Tr. at 47.)

C&W appealed the dismissal to the Court of Appeals for the Second Circuit. At oral argument held on April 25, 2012, the Second Circuit raised whether the "act of war" defense under CERCLA applied, offering another ground for affirmance of the dismissal. (Tr. of 2d Cir. Oral Argument, Apr. 25, 2012 at 5, 22, 31–33, Exhibit C to Barry Decl.) On May 23, 2012, the Second Circuit issued an order remanding the case for the limited purpose of addressing the act of war defense under CERCLA, while otherwise retaining jurisdiction over the appeal. *In re Sept. 11 Litig.*, No. 10-4197-cv, slip op. at 5 (2d Cir. May 23, 2012), Exhibit D to Barry Decl.

## ARGUMENT

### I.    The September 11 Attacks Were Indisputably Acts of War

Section 107(b)(2) of CERCLA provides an exemption from liability for an otherwise liable party where the defendant can establish by a preponderance of the evidence that the release at issue was caused solely by an act of war. *See* 42 U.S.C. § 9607(b)(2). The statute was enacted in 1980, at a time when the U.S. had not been engaged in a war within its borders since the attack on Pearl Harbor, and the legislative history is devoid of any explanation of what Congress meant by its use of the term "act of war."

CERCLA imposes a strict liability regime and has an "overall slant in favor of imposing liability." *United States v. Shell Oil Co.*, 841 F. Supp. 962, 971 (C.D. Cal. 1993), *aff'd in relevant part*, 294 F.3d 1045 (9th Cir. 2002), *cert. denied*, 537 U.S. 1147 (2003). Because of the

4

expansive liability resulting from that strict liability regime, however, Congress recognized that there are some circumstances so exceptional that it would be fundamentally unfair to hold a party liable for the resulting environmental cleanup. If the CERCLA defendant is just a pawn caught in the crossfire of some larger conflict, CERCLA exempts that defendant from liability.

Commentators quoted by the Central District of California and the Ninth Circuit have pointed to "the environmental terrorism inflicted on the air and water of the Persian Gulf by the troops of Saddam Hussein" as an archetypal example of an act of war and have expressed the view that the defense contemplates "man-made catastrophes beyond the control of any responsible party" and acts of "massive violence." *See* 4 William H. Rodgers, Jr., Environmental Law: Hazardous Wastes and Substances § 8.13(C)(3)(c) (1992); 2 The Law of Hazardous Waste: Management, Cleanup, Liability, Litigation § 14.01[8][b] at 14-160.3 (Susan M. Cooke, ed.), *as quoted in Shell Oil*, 841 F. Supp. at 971; 294 F.3d at 1061; *see also R.E. Goodson Constr. Co. Inc. v. Int'l Paper Co.*, No. C/A 4:02-4184, 2005 WL 2614927, at *19 (D.S.C. Oct. 13, 2005) (holding that the act of war defense does not apply to cleanup of unexploded ordnance left behind on a former World War II bombing range because the alleged release was not predicated on "massive violence," "use of force," or "military action").

The September 11 attacks were just such a man-made catastrophe inflicting massive violence: a coordinated, vicious attack on targets chosen by the enemy for strategic value, including the Pentagon, the headquarters of the U.S. Department of Defense. *See Shell Oil*, 841 F. Supp. at 972 (describing cases where property is destroyed "for the purpose of injuring or weakening the enemy" as acts of war) (citing *Conard and Twenty Others v. United States*, 25 Ct. Cl. 433, 436–37 (1890) (taking of property characterized as act of war where primary purpose was not to supply the military, but rather to injure enemy)). In denying the act of war defense

raised by operators of a mining operation, the district court in *Coeur D'Alene Tribe v. Asarco, Inc.*, Nos. CV91-0342, CV96-0122, 2001 WL 34139603 (D. Idaho Mar. 30, 2001) explained that "the act of war defense is not relevant.  This was intended to cover releases occurring solely because of war (i.e. bomb dropped during a war on mining site and hazardous substances are released)." *Id.* at *10.  Here, that is just what al Qaeda did, only its "bomb" was the fuel-laden aircraft it had seized and turned into weapons.  Indeed, if the act of war defense does not apply to the September 11 attacks, it is difficult to conceive of a circumstance in which it would apply. The defense would become meaningless verbiage, against all canons of legislative construction. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").

The September 11 attacks were plainly acts of war against the United States.  Indeed, 9/11 represented the worst attack on U.S. soil since Pearl Harbor.  Sean D. Murphy, *Terrorism and the Concept of "Armed Attack" in Article 51 of the U.N. Charter*, 43 Harv. Int'l L. J. 41, 47 (2002) (arguing that the 9/11 attacks were "armed attacks" under Article 51 of the U.N. Charter, noting that the extent of destruction and loss of life were greater than from Pearl Harbor).  Like Pearl Harbor, 9/11 precipitated the United States into an armed conflict; that armed conflict persists today.  In *New York Life Insurance. v. Bennion*, the Tenth Circuit determined that Pearl Harbor was an "act of war, which did, but not necessarily, eventuate in a state of war."  158 F.2d 260, 262 (10th Cir. 1946).  Notwithstanding the absence of a declaration of war when the Japanese attacked, the court found that when an attacker "attacks another [nation] with premeditated and deliberate intent to wage war against it, and that nation resists the attacks with all the force at its command, we have war in the grim sense of reality."  *Id.* at 264.  This is precisely what occurred on September 11.

6

In analyzing whether an act of war has taken place, the courts rely heavily on the determinations of the political branches of the government. *The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862) ("Whether the President in fulfilling his duties, as Commander-in-chief . . . has met with such armed hostile resistance . . . as will compel him to accord to them the character of belligerents, is a question to be decided *by him*, and this Court must be governed by the decisions and acts of the political department of the Government . . . .") (emphasis in the original); *see also Hamdan*, 548 U.S. at 599 n.31 ("[W]e do not question the Government's position that the war commenced with the events of September 11, 2001."). Here, both the executive and legislative branches have determined that the September 11 terrorist attacks were acts of war against the United States. In the immediate aftermath of the attacks, the President addressed a Joint Session of Congress and announced—in carefully selected and by no means casual language—that the United States had been the target of an act of war. Bush Address ("On September the 11th, enemies of freedom committed an act of war against our country.") Congress responded by authorizing the President to use all military force available under the War Powers Act, against the nation, organization or individuals responsible for the 9/11 attacks. AUMF, 115 Stat. 224.

In *Hamdan v. Rumsfeld*, the Supreme Court considered whether an enemy combatant could be tried before a military commission. In concluding that he could not, the Court grappled with the requirements of the "law of war." 548 U.S. at 613 (finding military commission procedures violate the law of war and the law of nations). Hamdan was captured in Afghanistan in November 2001 and turned over to the U.S. military. The Court accepted the Government's contention that war had started with the September 11, 2001 attacks, endorsing the Government's position that the events of September 11, 2001 were an "act of war" that "triggered a right to deploy military forces abroad to combat al Qaeda." The Court indicated that

"we do not question the Government's position that the war commenced with the events of September 11, 2001." 548 U.S. at 599 n.31; *see* Br. for United States, *Hamdan v. Rumsfeld*, No. 05-184, 2006 WL 460875, at *24 (Feb. 23, 2006) (arguing that despite the fact that al Qaeda is not a sovereign power "al Qaeda has repeatedly declared itself an enemy of the United States, and has inflicted damage on a scale that exceeds previous attacks on our soil by nation-states, and in a manner that, by any common-sense understanding, constitutes an act of war").

The Second Circuit has also concluded that the September 11 attacks were acts of war. In *United States v. Farhane*, the court noted that although al Qaeda is indisputably a terrorist organization, "the United States' response to al Qaeda has not, however, been limited to such designation. Two successive administrations have indicated that the nation is at 'war' with al Qaeda." 634 F.3d 127, 135 n.7 (2d Cir. 2011); *see also Padilla v. Hanft*, 432 F.3d 582, 586 (4th Cir. 2005) (acknowledging the President's authority to detain al Qaeda supporters who "having engaged in acts of war against the United States abroad, have crossed our borders with the avowed purpose of attacking this country and its citizens from within").

Moreover, the entire U.S. (and especially those located in New York and Washington, the cities encompassing al Qaeda's targets) felt viscerally that the September 11 attacks were acts of war. Headlines in newspapers all over the country, television broadcasts and private conversations all confirmed what the President and the Congress officially declared shortly thereafter: the United States was under attack by a committed enemy and had been catapulted into its first 21st century war. A sample of headlines, national and international, trumpeting that the 9/11 attacks were acts of war, are attached as Ex. E to the Barry Decl.

It is immaterial that some might argue that the 9/11 attacks were not made by a state actor (notwithstanding the U.S.'s conclusion as to the involvement of Afghanistan and the Taliban) or

pursuant to a formal declaration of war (other than Osama bin Laden's incoherent but inimical fatwa). Recognizing the evolution of warfare, the courts have not required such formalities where, as here, the nature of the hostilities is clear. If a terrorist organization makes war on the U.S., that is still war. In *El-Shifa Pharmaceutical Industries v. United States*, for example, the Court of Claims addressed a claim arising out of President Clinton's bombing of a pharmaceutical plant in Sudan, which had been identified as a chemical weapons facility. 55 Fed. Cl. 752 (Fed. Cl. 2003), *aff'd*, 378 F.3d 1346 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005). The plaintiff brought a takings claim, and the court held that the Takings Clause did not extend to military operations "against enemy war-making instrumentalities." 55 Fed. Cl. at 755–56. The Court of Claims recognized that even non-nation state entities could be military targets because "[t]here is no compensation for property destroyed as part of the fortunes of war." *Id.* at 764 (quotation marks omitted). The court noted that the President had authority to destroy the plant rooted in "the President's power to defend the Nation by military means against threats of attack by enemy forces; in this case, a threat of attack by chemical weapons from a terrorist group." *Id.* at 766.

The court in *El-Shifa* relied on a series of Civil War era cases from the Supreme Court known as The Prize Cases in support of its position that the plant constituted enemy property. It stated that the Supreme Court "saw no difference between the nature of that war-between nations or between a nation and insurgents. Similarly, we are not bound by formality here. And we do not regard a war against a non-state, non-insurgent group-stateless terrorists to be any less a war." *Id.* at 771; *see also The Prize Cases,* 67 U.S. (2 Black) at 668 ("And whether the hostile party be a foreign invader, or States organized in rebellion, it is none the less a war, although the declaration of it be *'unilateral'*.") (emphasis in original); *see also Montoya v. United States*, 180

U.S. 261, 267 (1901) ("We recall no instance where Congress has made a formal declaration of war against an Indian nation or tribe; but the fact that Indians are engaged in acts of general hostility to settlers, especially if the Government has deemed it necessary to dispatch a military force for their subjugation, is sufficient to constitute a state of war.").

Moreover, any attempt to avoid the conclusion that the September 11 attacks were acts of war based on the fact that al Qaeda is not a state actor represents an effort to import precepts of international law into CERCLA. *Shell Oil*, 294 F.3d at 1061 ("borrow[ing] from international law" the definition that an act of war is the "use of force or other action by one state against another which the state acted against recognizes...as an act of war, either by use of retaliatory force or a declaration of war") (internal citations omitted). The Aviation Defendants submit that principles of international law do not override the express determinations of the President and Congress, which the Supreme Court has repeatedly held are controlling as to what constitutes an act of war against the United States. As the Supreme Court has repeatedly recognized, it is the intent and understanding of U.S. lawmakers that define the meaning of U.S. statutes.

Here, however, the international community resoundingly agreed that the September 11 attacks were acts of war. For the first time in its history, NATO invoked Article 5 of the North Atlantic Treaty, which provides:

> The Parties agree that an armed attack against one or more of them in Europe or North America shall be considered an attack against them all and consequently they agree that, if such an armed attack occurs, each of them, in exercise of the right of individual or collective self-defence recognised by Article 51 of the Charter of the United Nations, will assist the Party or Parties so attacked by taking forthwith, individually and in concert with the other Parties, such action as it deems necessary, including the use of armed force, to restore and maintain the security of the North Atlantic area.

North Atlantic Treaty art. 5, Apr. 4, 1949, 63 Stat. 2241.

On September 12, 2001, the North American Council issued a statement that "if it is determined that this attack was directed from abroad against the United States, it shall be regarded as an action covered by Article 5 of the Washington Treaty. . . Accordingly, the United States' NATO allies stand ready to provide assistance that may be required as a consequence of these acts of barbarism." Press Release (2001)124, Statement by the North Atlantic Council (Sept. 12, 2001).[5]

On October 2, 2001, the NATO Secretary General, Lord Robertson, announced that "it has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the Washington Treaty, which states that an armed attack on one or more of the allies in Europe or North America shall be considered an attack against them all. I want to reiterate that the United States of America can rely on the full support of its 18 NATO Allies in the campaign against terrorism." Lord Robertson, Secretary General, NATO, Opening Statement at Press Conference on Most Recent Developments Following the Terrorist Attacks of 11th September (Oct. 2, 2001).[6]

The United Nations similarly recognized the nature of the attacks on the United States on 9/11. The U.S. expressly invoked the September 11, 2001 attacks as acts of war justifying an invasion of a sovereign state under international law. By letter to the Security Council dated October 7, 2001, the U.S. invoked Article 51 of the UN Charter and advised the UN that it was exercising its "inherent right of individual and collective self-defence following the armed attacks that were carried out against the United States on 11 September 2001." Letter dated 7 October 2001 from the Permanent Representative of the United States of America to the United

---

[5]   *Available at* http://www.nato.int/docu/pr/2001/p01-124e.htm.
[6]   *Available at* http://www.nato.int/docu/speech/2001/s011002a.htm.

11

Nations addressed to the President of the Security Council, U.N. Doc. s/2001/946 (Oct. 7, 2001).[7]

> Article 51 provides:

>> Nothing in the present Charter shall impair the inherent right of individual or collective self-defence if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security.  Measures taken by Members in the exercise of this right of self-defence shall be immediately reported to the Security Council and shall not in any way affect the authority and responsibility of the Security Council under the present Charter to take at any time such action as it deems necessary in order to maintain or restore international peace and security."

U.N. Charter art. 51.

The United States' right to self-defense was also implicitly recognized after the September 11 attacks in a number of U.N. Security Council resolutions.  The Security Council passed Security Council resolution 1368 (2001), stating that

>> The Security Council,

>> Reaffirming the principles and purposes of the Charter of the United Nations,

>> Determined to combat by all means threats to international peace and security caused by terrorist acts,

>> Recognizing the inherent right of individual or collective self-defence in accordance with the Charter,

>> 1.  Unequivocally condemns in the strongest terms the horrifying terrorist attacks which took place on 11 September 2001 in New York, Washington (D.C.) and Pennsylvania and regards such acts, like any act of international terrorism, as a threat to international peace and security;

---

[7]  *Available at* http://daccess-ods.un.org/access.nsf/Get?Open&DS=S/2001/946&Lang=E

2.  Expresses its deepest sympathy and condolences to the victims and their families and to the People and Government of the United States of America;

3.  Calls on all States to work together urgently to bring to justice the perpetrators, organizers and sponsors of these terrorist attacks and stresses that those responsible for aiding, supporting or harbouring the perpetrators, organizers and sponsors of these acts will be held accountable;

4.  Calls also on the international community to redouble their efforts to prevent and suppress terrorist acts including by increased cooperation and full implementation of the relevant international anti-terrorist conventions and Security Council resolutions, in particular resolution 1269 of 19 October 1999;

5.  Expresses its readiness to take all necessary steps to respond to the terrorist attacks of 11 September 2001, and to combat all forms of terrorism, in accordance with its responsibilities under the Charter of the United Nations;

6.  Decides to remain seized of the matter.

S.C. Res. 1368, U.N. Doc. S/RES/1368 (Sept. 12, 2001); *see also* S.C. Res. 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001) (affirming the right of individual or collective self defense as recognized by the U.N. Charter).[8]

Two Presidents, Congress, the Supreme Court, the Second Circuit, NATO, the United Nations and virtually every witness to the September 11 attacks recognize:  the attacks constituted an act of war.   Nothing in CERCLA requires this Court to turn its back on that undeniable reality.[9]

---

[8]   These resolutions, combined with the United States' express invocation of Article 51 of the U.N. Charter have been recognized as legalizing the war in Afghanistan under international law. *See, e.g.,* Jack M. Beard, *America's New War on Terror: The Case for Self-Defense under International Law*, 25 Harv. J. L. & Pub. Pol'y 559 (2002)

[9]   The Anti-Terrorism Act ("ATA") cases do not remotely support a different conclusion. The Anti-Terrorism Act was enacted to give victims of terrorist organizations a cause of action for damages; it distinguishes between acts of war that conform to the established norms of warfare and armed conflict under international law and those that do not. *See* 18 U.S.C. §§ 2331 *et seq.* An "act of war"—that is, an act that is an authorized military action under the international law of war—does not give rise to a claim for damages, while an act of terrorism does. *Id.* § 2331 (defining "act of war" as occurring in

13

## II.     The Release Was Caused Solely by the September 11 Attacks

The September 11 attacks were also plainly the sole cause of the release of which C&W

complains, as even its pleadings make clear.  C&W alleges that on the morning of September 11,

2001 "terrorists associated with the violently anti-American Al Qaeda organization" hijacked

and crashed two airplanes into World Trade Center Towers 1 and 2.  (Compl. ¶ 3.)  Later in its

Complaint it further elaborates:

> On the morning of September 11, 2001, terrorists hijacked AA
> Flight 11 and UA Flight 175, loaded with tens of thousands of
> gallons of jet fuel, and crashed them into the North and South
> Towers of the WTC Complex.  These crashes, among other things,
> **caused the exposure of multiple floors of the interior of the
> buildings to the environment, and the release of toxic and
> hazardous substances from the airplane into the WTC
> Complex and the surrounding environment, including into and
> onto 130 Cedar.**

(*Id.* ¶ 43 (emphasis added).)  Perhaps the clearest statement is contained at page 9 of C&W's

"Amplification" which alleges:

> Thus, **as a direct result of the events of September 11, 2001,**
> including the destruction of and extensive damage to the Facilities,
> both the interior and exterior of 130 Cedar were exposed to the
> impact of fire, heat and tremendous force, allegedly driving the
> pulverized particles of those Facilities, which later became known
> as WTC Dust, deep into 130 Cedar's concrete frame and alleged
> building cavities.  Also, **as a direct result of September 11,** other
> materials and substances from the Facilities were released onto,
> into, within and around 130 Cedar.

(C&W Amplification at 9 (emphasis added).)

---

the course of "(A) declared war; (B) armed conflict, whether or not war has been declared, between
two or more nations; or (C) armed conflict between military forces of any origin."); *see also Weiss v.
Arab Bank, PLC*, No. 06 CV 1623, 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007) (finding that
the purpose of the Anti-Terrorism Act, "which was enacted to deter terrorist activity and hold liable
those who engage in it" would be undermined if terrorist organizations were not distinguished from
military forces under the statute).  But it would make no sense at all to transpose that distinction from
the ATA into CERCLA:  in creating an "act of war" exemption to otherwise applicable strict liability
under CERCLA, Congress surely did not intend to distinguish between a defendant victimized by a
lawful act of war and one victimized by an even more egregious unlawful act of war perpetrated by a
terrorist organization so that the former was exempted from liability and the latter was not.

The statute considers only whether **"the release"** was solely caused by an act of war. Under CERCLA, a release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."   42 U.S.C. § 9601(22).   Here, nothing would have been emitted into the environment but for the terrorists' act of war.

One of the only cases to address the act of war defense under CERCLA involved far different circumstances than those presented by the September 11 attacks.   But those very differences are instructive in shedding light on when an act of war is the sole cause of a CERCLA release.   In *United States v. Shell Oil Co.*, a group of oil companies that had freely contracted with the U.S. government to produce aviation fuel during World War II and then disposed of the fuel at locations of their own choosing sought to invoke the act of war defense. 841 F. Supp. at 966–67.   In rejecting the defense, the district court emphasized that "[n]otwithstanding the government's intrusive regulatory power over the oil companies during the war, it is beyond dispute that the oil companies entered into their contracts to supply the federal government with aviation fuel volitionally."   *Id.*   Similarly, the court highlighted that "[a]lthough the government was aware, and in some measure approved, of the oil companies' disposal of the acid sludge, the choice to arrange for waste disposal in the manner described was made by the oil companies."   *Id.* at 967.

The Ninth Circuit sounded the same theme.   In affirming that the oil companies could not show that the release at issue was caused solely by an act of war, the court emphasized that "the Oil Companies had other disposal options for their acid waste, that they dumped acid waste from operations other than avgas production at the McColl site, and that they were not compelled by the government to dump waste in any particular manner."   294 F.3d at 1062.

15

The courts thus recognize that although CERCLA imposes strict liability without regard to fault or willfulness, it nonetheless requires a volitional act—some choice—over the waste disposal that leads to the release. Here, it is precisely that volitional element that is completely absent. Neither the Aviation Defendants (nor in fact any of the defendants) was able to choose the time, place or manner of the release. Instead, it was al Qaeda's act of war against the U.S. by driving two aircraft into the World Trade Center that was the sole cause of the release.

Indeed, although the issue was not framed with specific reference to the act of war defense, this Court essentially has already ruled that the release at issue was solely caused by the events of September 11. At oral argument on the Rule 12(c) motion, the Court stated that "I do not believe . . . that CERCLA was intended to deal with a situation where inert property was caused to be other than inert and to flow through the air or the water because of an incident like we had at 9/11." (Tr. at 46.) The Court further found that "to hold that CERCLA liability should attach where something that is otherwise not releasable or dischargeable, but becomes so because of the events of September 11, 2001 would be to stretch CERCLA into areas which it was not intended to reach." (*Id.* at 47.)

C&W does not—and cannot—allege that the Aviation Defendants *voluntarily* participated in the atrocities that led to the release of which it complains. By the time the aircraft were deliberately crashed into the buildings, the Aviation Defendants had no control over the planes, which had become nothing more than the terrorists' weapon of choice.

The Court's dismissal of C&W's claims is therefore fully supported by an alternative rationale. CERCLA's Act of War defense precludes liability.

## CONCLUSION

This case offers multiple routes but the same inescapable conclusion:  it is legally insupportable to treat the attenuated after-effects of the worst terrorist attacks in U.S. history as

nothing more than a routine incident of hazardous waste disposal. This Court took the view that CERCLA simply did not reach so far. The Aviation Defendants argued that the Air Transportation Safety and System Stabilization Act provides the exclusive remedy for claims arising out of the crashes of September 11, 2001 to the exclusion of a CERCLA claim. The Second Circuit seems predisposed to say that the act of war defense precludes CERCLA liability. But what is most striking is not the diversity of means but the unanimity of the end: judgment on the pleadings is appropriate, dismissing C&W's case.

Dated: New York, New York
      June 20, 2012

Respectfully submitted,

CONDON & FORSYTH LLP

By:_____/s/ Desmond T. Barry, Jr._____
      Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, New York 10036
Telephone:  (212) 490-9100
Fax:  (212) 370-4453
dbarry@condonlaw.com

-and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, New York 10022
Tel:  (212) 909-6000
Fax:  (212) 909-6836
repodesta@debevoise.com
mkmonaghan@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. AND AMR
CORPORATION, INC.

QUIRK AND BAKALOR, P.C.
Jeffrey J. Ellis
Anoushka Sharifi Bayley
845 Third Avenue, 15th Floor
New York, New York 10022
Tel: (212) 319-1000
Fax: (212) 319-1065
jellis@quirkbakalor.com
abayley@quirkbakalor.com

    -and-

MAYER BROWN, LLP
Michael R. Feagley
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
mfeagley@mayerbrown.com

*Attorneys for Defendants*
UNITED AIR LINES, INC. AND UNITED
CONTINENTAL HOLDINGS, INC. (F/K/A
UAL CORPORATION)

Of Counsel:
Maura K. Monaghan