UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CEDAR & WASHINGTON ASSOCIATES, LLC, :
                                    :
                    Plaintiff,      :
                                    :
        -against-                   :
                                    :
THE PORT AUTHORITY OF NEW YORK AND  :
NEW JERSEY, et al.,                 :
                                    :
                    Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21 MC 101 (AKH)
This Document Relates to:
08 CV 9146 (AKH)

### SUPPLEMENTAL REPLY MEMORANDUM OF LAW OF AMERICAN AIRLINES, INC. AND UNITED AIR LINES, INC. IN FURTHER SUPPORT OF JOINT DEFENSE MOTION TO DISMISS THE COMPLAINT UNDER RULE 12(c) BECAUSE THE SEPTEMBER 11 ATTACKS WERE ACTS OF WAR

QUIRK AND BAKALOR, P.C.
Jeffrey J. Ellis
Anoushka Sharifi Bayley
845 Third Avenue, 15th Floor
New York, New York 10022
Tel: (212) 319-1000
Fax: (212) 319-1065
jellis@quirkbakalor.com

-and-

MAYER BROWN, LLP
Michael R. Feagley
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
mfeagley@mayerbrown.com

*Attorneys for Defendants*
UNITED AIR LINES, INC. AND UNITED
CONTINENTAL HOLDINGS, INC. (F/K/A
UAL CORPORATION)

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, New York 10036
Tel.: (212) 490-9100
Fax: (212) 370-4453
dbarry@condonlaw.com

-and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Fax: (212) 909-6836
repodesta@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. AND
AMR CORPORATION, INC.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I.    The September 11 Attacks Were Indisputably Acts of War ............................................. 3

      A.    An Act of Terrorism Can Be An Act of War ................................................................ 3

      B.    The Court Can Take Judicial Notice of Presidential and Congressional Determinations ............................................................................................................. 8

II.    C&W's Reliance on the Anti-Terrorism Act Is Misplaced ................................................ 10

III.    Insurance Policy Interpretation Is Irrelevant ................................................................... 13

IV.    The Parade of Horribles C&W Invokes Is Illusory .......................................................... 14

V.    The September 11 Attacks Were the Sole Cause Of The Release ..................................... 15

CONCLUSION ..................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bulgartabac Holding AD v. Republic of Iraq,*
  No. 08 civ. 6502, 2010 WL 3633501 (S.D.N.Y Sept. 20, 2010) ............................................9

*El-Shifa Pharmaceutical Industries v. United States,*
  55 Fed. Cl. 751 (Ct. Cl. 2003).................................................................................3, 4, 10

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ................................................................................... *passim*

*Hamdi v. Rumsfeld,*
  296 F. 3d 278 (4th Cir. 2002) ......................................................................................15

*Harber v. St. Paul. Guardian Insurance Co.,*
  137 F.3d 691, 698 (2d Cir. 1998)..................................................................................13

*In re Lo Dolce,*
  106 F. Supp. 455 (W.D.N.Y. 1952) ........................................................................9, 15

*Insurance Company of North America v. Godwin,*
  46 A.D.2d 154 (4th Dep't 1974).....................................................................................13

*Japanese Gov't v. Commercial Cas. Ins. Co.,*
  101 F. Supp. 243 (S.D.N.Y. 1951) ..................................................................................9

*Krichman v. United States,*
  263 F. 538 (2d Cir. 1920)..............................................................................................8

*Montoya v. United States,*
  180 U.S. 261 (1901).....................................................................................................12

*Morgan Guar. Trust Co. of N.Y. v. Palau,*
  924 F.2d 1237 (2d Cir. 1991).........................................................................................9

*Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,*
  505 F. 2d 989 (2d Cir. 1974)........................................................................................14

*The Prize Cases,*
  67 U.S. (2 Black) 635 (1862).................................................................................7, 12, 15

*United States v. Belmont,*
  301 U.S. 324 (1937).......................................................................................................8

*United States v. Farhane,*
  634 F.3d 127 (2d Cir. 2011)............................................................................................4

*Weiss v. Arab Bank, PLC*,
No. 06-cv-1623, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)............................12

STATUTES

The Anti-Terrorism Act,
18 U.S.C. §§ 2331 *et seq.*.........................................................................10, 11, 12

Comprehensive Environmental Response, Compensation, and Liability Act,
42 U.S.C. § 9601 *et seq.*......................................................................... *passim*

Oil Pollution Liability and Compensation Act of 1980 (not enacted) ...........................5

OTHER AUTHORITIES

Nat. Comm'n on Terrorist Attacks Upon the United States,
9/11 Commission Report (2004)........................................................................6, 7

*Black's Law Dictionary*,
296 (5th ed. 1989)..........................................................................................13

Br. for United States, *Hamdan v. Rumsfeld*,
No. 05-184, 2006 WL 460875 (Feb. 23, 2006) ........................................................10

H.R. 10363, 94th Cong. (1976)..................................................................................4

H.R. 2222, 102d Cong. (1992)............................................................................10, 11

H.R. Rep. No. 102-1040 (1992)................................................................................11

Lord Robertson, Secretary General, NATO
Opening Statement at Press Conference on Most Recent Developments
Following the Terrorist Attacks of September 11th (Oct. 2, 2001) ...........................8

Presidential Statement on Signing the Federal Courts Administration Act of 1992,
28 Weekly Comp. Pres. Doc. 2212 (Oct. 29, 1992) .................................................11

S.C. Res. 1368,
U.N. Doc. S/RES/1368 (Sept. 12, 2001).................................................................8, 9

S.C. Res. 1373,
U.N. Doc. S/RES/1373 (Sept. 28, 2001).................................................................8, 9

Defendants American Airlines, Inc., AMR Corporation, United Air Lines, Inc., and United Continental Holdings, Inc., f/k/a/ UAL Corporation (collectively, the "Aviation Defendants") submit this Supplemental Reply Memorandum of Law at the direction of the Court of Appeals for the Second Circuit in support of the applicability of the "act of war" defense under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA").

## PRELIMINARY STATEMENT

Cedar and Washington's ("C&W") Opposition is premised upon a false dichotomy: that a hostile act must be either an act of war or an act of terrorism, but never both. C&W attempts to demonstrate — on the basis of the legislative history of oil spill legislation that Congress never enacted — that Congress did not intend to create an exception from CERCLA for acts of terrorism. (C&W Mem. in Opp'n to Defs.' Submissions on the Act of War Defense 5-7 (hereinafter "C&W Opp'n").) But that argument misses the point. CERCLA indisputably *does* contain an exception for acts of war. And the September 11 attacks were no less an act of war because they were also an act of terrorism.

There have been acts of terrorism that have not amounted to acts of war, such as the bombing of the Murrah Building in Oklahoma City, the attacks by the Weathermen in the 1960s and 1970s, and perhaps even the 1993 bombing of the World Trade Center. None of those incidents had the character or provoked the responses that differentiate and define the September 11 attacks as acts of war, including:

- President Bush's address to a joint session of Congress just days after the attacks declaring that "[o]n September the 11th, enemies of freedom committed an act of war against our country";

- The Authorization to Use Military Force ("AUMF") enacted by Congress authorizing the President to use all military force available under the War Powers

Act against the nation, organization or individuals responsible for the 9/11 attacks;

- The Supreme Court's assurance that "we do not question the Government's position that the war commenced with the events of September 11, 2001";

- NATO's invocation of Article 5 of the North Atlantic Treaty for the first time in its history, recognizing that the alliance's mutual defense obligations had been triggered; and

- The military invasion of Afghanistan pursuant to the AUMF, launching an 11-year war that continues even today.

The September 11 attacks were plainly something more than a garden-variety terrorist attack, even though the tactics chosen by al Qaeda were terrorist tactics.

C&W also misapprehends the fundamental distinction between a lawful act of war and an unlawful act of war. The former may give rise to an exemption from damages under the Anti-Terrorism Act and afford combatants certain rights under the Geneva Convention. An unlawful act of war does not entail the same consequences. Al Qaeda's sneak attack on thousands of innocent civilians (as well as the military headquarters of the U.S.) is a quintessentially unlawful act of war, but no less an act of war.

C&W then makes the baseless argument that if the Court rules that the September 11 attacks were acts of war to which CERCLA does not apply, a parade of horribles will result. There can be no threat to U.S. security interests if this Court — like the Supreme Court in *Hamdan* — defers to the pronouncements of the President and the actions of Congress in deciding the question.

On September 11, 2001, implacable enemies of the United States committed an act of war that galvanized not just the country, but the entire world and led the President, Congress, and NATO to launch retaliatory military action in Afghanistan. In addition to those enormous consequences, C&W alleges that the attacks also caused contaminated dust to fall on 130 Cedar,

which C&W would later come to purchase.  Under CERCLA, there is no liability for such an attenuated byproduct of an act of war.

## ARGUMENT

### I.    The September 11 Attacks Were Indisputably Acts of War

C&W's opposition brief reflects the insurmountable task it faces:  to demonstrate that the September 11 attacks, which the President, Congress and the entire nation responded to as acts of war, were nothing of the kind.  C&W first argues that the September 11 attacks were terrorist attacks, as to which CERCLA does not exclude liability.  But that argument misses the point:  the September 11 attacks were terrorist attacks, but they were also, as the President and Congress determined, acts of war.  Unable to grapple with the Congressional and Presidential responses, C&W resorts to asking the Court to ignore them as outside the pleadings.  But not only *can* the Court take judicial notice of what Congress and the President did in response to 9/11, the caselaw is clear that it *must*.

### A.    An Act of Terrorism Can Be An Act of War

The core assumption underlying C&W's Opposition is that an act of terrorism is not and can never be an act of war.  The September 11 attacks were terrorist attacks.  Therefore, C&W's syllogism goes, they were not acts of war.  But courts have readily accepted that a single act can be both a terrorist tactic and an act of war.  In *El-Shifa Pharmaceutical Industries v. United States*, for example, the Court of Claims addressed a claim arising out of President Clinton's bombing of a pharmaceutical plant in Sudan, which had been identified as a terrorist chemical weapons facility.  55 Fed. Cl. 751 (Ct. Cl. 2003), *aff'd*, 378 F.2d 1346 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005).  In holding on a motion to dismiss that the owner of the plant could not recover for property damage lost due to the "fortunes of war," the court expressly stated that "we do not regard a war against a non-state, non-insurgent group-stateless terrorists to

be any less a war." *Id.*, 55 Fed. Cl. at 771.  The Second Circuit similarly recognized that al Qaeda is both a terrorist organization and an enemy waging war against the United States.  In *United States v. Farhane*, the court noted that although al Qaeda is indisputably a terrorist organization, "the United States' response to al Qaeda has not, however, been limited to such designation.  Two successive administrations have indicated that the nation is at 'war' with al Qaeda." 634 F.3d 127, 135 n.7 (2d Cir. 2011).

C&W urges that the war against al Qaeda is mere rhetoric like the "war on drugs" or the "war on poverty." (C&W Opp'n 19 n.10.)  But in fact, this is a real war, not a rhetorical device, involving actual Congressionally-authorized military action supported by our NATO allies.  Since the invasion of Afghanistan in 2001, the Congressional Record Office reports that 2,000 American soldiers have been killed, another 16,000 have been injured, many grievously, and the war in Afghanistan has cost approximately $433 billion.  No slogan has that type of impact; this is combat.  Nor is it significant that only the President, and not Congress or NATO, used the actual words "act of war."  Congress authorized the use of all available military force under the War Powers Act, and has made regular appropriations to cover the costs of war in Afghanistan.

C&W goes to considerable lengths and dubious sources in its attempt to demonstrate that Congress did not intend to create an exception to CERCLA for terrorist attacks.  C&W cites hearings on H.R. 10363, a bill aimed at prohibiting the discharge of oil in harmful quantities that provides for a civil fine.  But the bill was never reported out of Committee nor voted upon.  It is hard to see how the statement by the director of the American Maritime Association in 1976, about a bill that was never enacted, proves anything at all about CERCLA.  (C&W Opp'n  5-6.)

Next, C&W refers to a proposed amendment to an early version of the CERCLA bill considered by the Senate, which was ultimately dropped from the Senate bill.  The amendment

4

contemplated a separate CERCLA section relating, once again, to oil spills.  But the "Oil Pollution Liability and Compensation Act of 1980" was not passed.  Contrary to what C&W seems to assume, the amendment did not seek to amend the provisions of CERCLA relating to general liability, but rather to add an additional scheme of liability for oil spills which contemplated that there would be no liability for "an act of war, civil war, insurrection or terrorism."  Congress did not reject the language relating to limitations on liability for terrorist acts, but rather never adopted the entire regime of liability for oil spills at all.  Once again, moreover, there is no indication in the legislative history that the Act proposed was ever voted on.

Finally, C&W relies on the Comprehensive Oil Pollution Liability and Compensation subsection of the so-called 1985 Superfund Amendment to CERCLA, which again was intended to address liability for oil spills and once again excluded liability for oil spills caused by acts of war, hostilities, civil war, or insurrection.  The oil spill subsection as a whole — not just the exception — was not included in the version passed by the Senate, or in the Superfund Amendment ultimately adopted by Congress.  In other words, Congress did not create any new liability for oil spills and therefore did not have to consider what exceptions to that liability would be appropriate.

C&W's strained efforts are unavailing:  the legislative history (or more accurately, non-legislative history since none of the cited proposals were ever passed) of proposed oil spill legislation sheds no light on whether Congress intended CERCLA to include an exception for terrorist attacks.  But that simply does not matter because CERCLA indisputably does contain an exception for acts of war.  The question before the Court therefore is not whether a terrorist attack that does not rise to the level of an act of war gives rise to an exception to CERCLA, but

whether the September 11 attacks amounted to an act of war.  The inescapable conclusion is that on September 11, the United States was victimized by an act of war.

The September 11 attacks were different from other, lesser terrorist attacks in critical ways:

- They were intended to and did inflict massive casualties, in excess of the losses suffered even in the attack on Pearl Harbor;

- They were aimed at targets selected for their central importance to the U.S. military (the Pentagon) and economy (the World Trade Center);

- They involved multiple coordinated strikes carried out with military precision;

- They prompted a military response that The 9/11 Commission Report termed "homeland defense" as fighter jets were scrambled to thwart potential further attacks on September 11 itself. *See* Nat. Comm'n on Terrorist Attacks Upon the United States, 9/11 Commission Report, 14-46 (2004) (hereinafter "The 9/11 Commission Report");[1] and

- They raised such significant concerns about the territorial security of the United States that for the first time in U.S. history the entire national airspace was shut down for several days, military jets were ordered to patrol the island of Manhattan constantly, and the National Guard was stationed at every airport. Matthew Wald, *A Nation Challenged: The National Guard; Guardsmen at Airports to Increase by 1,800*, N.Y. Times, Nov. 10, 2001, at B7 (noting more National Guard members will be added to patrol airports for holiday travel season);[2] Serge Schmemann, *Hijacked Jets Destroy Twin Towers and Hit Pentagon*, N.Y. Times, Sept. 12, 2001, at A1 (describing security steps after the attacks, including that air traffic was halted, federal buildings across the country shut down, and public sites evacuated);[3] Elaine Sciolino, *After the Attacks: The Overview; Long Battle Seen*, N.Y. Times, Sept. 16, 2001, at 11 ("In the skies of Washington, New York and other cities, F-15 and F-16 fighter jets continued to fly patrols they began on Tuesday after the attacks.").[4]

---

[1]  *Available at* http://www.9-11commission.gov/report/911Report.pdf.

[2]  *Available at* http://www.nytimes.com/2001/11/10/us/a-nation-challenged-the-national-guard-guardsmen-at-airports-to-increase-by-1800.html.

[3]  *Available at* http://www.nytimes.com/learning/general/onthisday/big/0911.html.

[4]  *Available at* http://www.nytimes.com/2001/09/16/us/after-the-attacks-the-overview-long-battle-seen.html.

More than anything, what made the September 11 attacks acts of war was that the President and Congress (and the Supreme Court and NATO) said they were and responded accordingly, authorizing the use of military force and launching an invasion of the enemy nation that harbored the attackers. Strikingly, C&W does not — and could not — offer any contrary statements or actions by the political branches of the government. As every court to consider the issue has emphasized, the elected branches are entitled to extraordinary deference concerning the question of whether the nation is at war or at peace. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862) ("Whether the President in fulfilling his duties, as Commander-in-chief . . . has met with such armed hostile resistance . . . as will compel him to accord to them the character of belligerents, is a question to be decided *by him*, and this Court must be governed by the decisions and acts of the political department of the Government . . . .") (emphasis in the original); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 559 n.31 (2006) ("[W]e do not question the Government's position that the war commenced with the events of September 11, 2001.").[5] Here, both the executive and legislative branches have determined that the September 11 terrorist attacks were acts of war against the United States.[6]

---

[5] C&W attempts to dismiss the *Hamdan* court's statement as dicta. But the fact that the U.S. is at war was an underlying premise to the entire holding (and a premise on which both the majority and dissent agreed). *See generally, Hamdan*, 548 U.S. at 596 (finding that military commissions were convened "as an incident to the conduct of war when there is a need to seize and subject to disciplinary measures those enemies who in their attempts to thwart or impede our military effort have violated the law of war") (internal quotations omitted); *see also id.* at 678 (Thomas, J., dissenting) ("Our review of petitioner's claims arises in the context of the President's wartime exercise of his Commander in Chief authority in conjunction with the complete support of Congress."); *id.* at 725-26 (Alito, J., dissenting) (arguing that military commissions satisfied the law of war and did not violate the Geneva Conventions). The issue received little discussion because the Court was so certain that the Government's position was both correct and entitled to full deference.

[6] Al Qaeda also considered the September 11 attacks acts of war. Osama Bin Laden's fatwa declared "holy war" on the United States, and The 9/11 Commission Report notes that 10,000 to 20,000 jihadists underwent instruction in the bin Laden-sponsored camps in Afghanistan. The 9/11 Commission Report, 67.

**B.     The Court Can Take Judicial Notice Of Presidential and Congressional Determinations**

Unable to counter the unequivocal actions and statements by the President and Congress, C&W asks the Court to disregard them, urging that because they were not mentioned in C&W's Complaint, they are somehow a nullity.   But the caselaw is clear:   not only *can* courts take judicial notice of what the President and Congress said and did, courts *must* take judicial notice of Presidential proclamations and Acts of Congress.  *See, e.g. Krichman v. United States*, 263 F. 538, 543-44 (2d Cir. 1920) (taking judicial notice of an Act of Congress and subsequent Presidential proclamation taking possession of railroad system, noting that the "proclamation referred to is a public act, of which all courts of the United States are bound to take notice, and to which all courts are bound to give effect."), *rev'd on other grounds*, 256 U.S. 363 (1921) (also referring to President's proclamation nationalizing railroads); *United States v. Belmont*, 301 U.S. 324, 330 (1937) (taking judicial notice of the fact that the "President recognized the Soviet government, and normal diplomatic relations were established between that government and the government of the United States").

As the Aviation Defendants pointed out in their opening brief, NATO and the United Nations concluded that the September 11 attacks were acts of war against the United States. Lord Robertson, Secretary General, NATO, Opening Statement at Press Conference on Most Recent Developments Following the Terrorist Attacks of 11th September (Oct. 2, 2001)[7] (stating that the attacks were to be regarded as covered by Article 5 of the Washington Treaty, and therefore considered as an attack against all NATO members, and reiterating the commitment of NATO in the campaign against terrorism); S.C. Res. 1368, U.N. Doc. S/RES/1368 (Sept. 12, 2001); S.C. Res. 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001) (affirming the right of individual

---

[7] *Available at* http://www.nato.int/docu/speech/2001/s011002a.htm.

8

or collective self defense under the U.N. Charter following the attacks).   Courts also have properly taken judicial notice of the actions of the United Nations.  *Morgan Guar. Trust Co. of N.Y. v. Palau*, 924 F.2d 1237, 1244 (2d Cir. 1991) ("We take judicial notice of the fact that the United Nations Security Council has approved the termination of the trusteeship arrangement as to the Northern Mariana Islands" in considering whether Palau was sovereign for purposes of Foreign Sovereign Immunities Act); *see also Bulgartabac Holding AD v. Republic of Iraq*, No. 08 civ. 6502, 2010 WL 3633501, at *5 (S.D.N.Y Sept. 20, 2010) (taking judicial notice of the fact of timing of U.N. sanctions against Iraq for purposes of statutes of limitations defense in motion to dismiss, based on newspaper clippings), *aff'd*, 451 Fed. App'x 9 (2d Cir. 2011).

Indeed, the law requires that judicial notice be taken of the existence of a state of war where the President and Congress have drawn that conclusion.  *In re Lo Dolce*, 106 F. Supp. 455, 460 (W.D.N.Y. 1952) ("It is also well settled that the existence of a condition of war must be determined by the political department of the government; that the Courts take judicial notice of such determination and are bound thereby."); *see also Japanese Gov't v. Commercial Cas. Ins. Co.*, 101 F. Supp. 243, 245 (S.D.N.Y. 1951) (taking judicial notice of war between the United States and Japan because "proclamation ending hostilities provided that the state of war continued to exist" and "the recent treaty signed by representatives of the United States Government and the Japanese Government on September 8, 1951 has not as yet been ratified.  There has been no presidential proclamation declaring the war ended").

It would be a perverse result if C&W, having alleged that the release at issue was the "direct result" of the September 11 attacks, could avoid judgment on the pleadings simply by not referring to the September 11 attacks as acts of war.  (C&W Opp'n 15-16.)  The Court is not bound by whether C&W used a magic word or craftily avoided it.  However, the Court is bound

9

by the pronouncements of the President and the actions of Congress. *See, e.g., Hamdan,* 548 U.S. at 599 n.31 ("We do not question the Government's position that the war commenced with the events of September 11, 2001."); Br. for United States, *Hamdan v. Rumsfeld,* No. 05-184, 2006 WL 460875, at *24 (Feb. 23, 2006) (arguing that despite the fact that al Qaeda is not a sovereign power "al Qaeda has repeatedly declared itself an enemy of the United States, and has inflicted damage on a scale that exceeds previous attacks on our soil by nation-states, and in a manner that, by any common-sense understanding, constitutes an act of war"); *see also El-Shifa,* 55 Fed. Cl. at 771-72 (granting motion to dismiss because, *inter alia,* Public Papers of the President and well-known events including the September 11 attacks are "sufficient to confirm the President's assertion that a state of war exists between the United States and those same terrorists determined to have been operating a weapons-related factory in Khartoum").[8]

## II.    C&W's Reliance on the Anti-Terrorism Act Is Misplaced

C&W relies heavily on the Anti-Terrorism Act ("ATA") in support of its arguments. (C&W Opp'n 11-13.) But the ATA has nothing to do with the CERCLA question before this Court.[9] The purpose of the ATA was "[t]o provide a new civil cause of action in Federal law for

---

[8] Those pronouncements also formed the backdrop to the Congressional enactment of ATSSSA, which was enacted just days after the AUMF was passed and was signed into law the day after the President declared that an act of war had been committed against the United States. The contemporaneous recognition of the executive and legislative branches that an act of war had been committed against the United States offers further support for why ATSSSA, which supplies the exclusive remedy for a claim arising out of the 9/11 attacks, does not contemplate a strict liability claim for environmental clean-up costs. If CERCLA is not intended to impose liability for cleanups resulting from an act of war, still less is ATSSSA intended to do so via derivative incorporation of CERCLA, especially since the primary purpose of ATSSSA was to protect the airlines against far-reaching liability arising from the September 11 attacks. (Joint Defense Mem. of Law in Support of Mot. to Dismiss under Rule 12(c), 14-18, Jan. 29, 2010.)

[9] Indeed, the ATA does not even apply to terrorist attacks within the United States. The text provides:

(1) the term "international terrorism" means activities that –

    (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

international terrorism that provides extraterritorial jurisdiction over terrorist acts abroad against United States nationals." H.R. 2222, 102d Cong. (1992) (enacted). The Senate Report adds that "Title X would allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed." S. Rep. No. 102-342, at 22 (1992).

The ATA therefore contains an exception for acts of war that is necessarily distinct from acts of terrorism. The House Report discusses the statute's limitation for "acts of war": "The intention of this provision is to bar actions for injuries that result from military action by recognized governments as opposed to terrorists, even though governments also sometimes target civilian populations. Injuries received by non-combatants as a result of open, armed conflict, including civil war, *should not be actionable*." H.R. Rep. No. 102-1040, at 7 (1992), *available at* 1992 WL 322485 (emphasis supplied); *compare* Presidential Statement on Signing the Federal Courts Administration Act of 1992, 28 Weekly Comp. Pres. Docs 2212 (Oct. 29, 1992) ("This will ensure that, if needed, *a remedy will be available* for Americans injured abroad by senseless acts of terrorism.") (emphasis supplied). The act of war exception within the ATA therefore excludes terrorist attacks.

---

(B) appear to be intended--
    (i) to intimidate or coerce a civilian population;
    (ii) to influence the policy of a government by intimidation or coercion; or
    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum. . .

If the ATA exception were extended to terrorist attacks, al Qaeda would in effect receive a pass exempting it from damages — and the entire purpose of the statute would be eviscerated. Courts have found that permitting terrorists to rely on the ATA "act of war" limitation would undermine the entire purpose of the statute as a means to combat terrorism. *See, e.g., Weiss v. Arab Bank, PLC*, No. 06-cv-1623, 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007) ("To find otherwise would pervert the very purpose of the ATA, which was enacted to deter terrorist activity and hold liable those who engage in it.").

For the specific purposes of the ATA, therefore, an act of war is one committed by a recognized government.[10]   Outside that specialized context, however, courts have long acknowledged that acts of war are not so limited, especially where, as here, the President and Congress have responded to the non-state actor's attacks as acts of war.  The court in *El-Shifa* held that, dating back to the Civil War, the Supreme Court "saw no difference between the nature of that war-between nations or between a nation and insurgents.  Similarly, we are not bound by formality here. . . And we do not regard a war against a non-state, non-insurgent group-stateless terrorists-to be any less a war." 55 Fed. Cl. at 771; *see also The Prize Cases,* 67 U.S. (2 Black) at 668 ("And whether the hostile party be a foreign invader, or States organized in rebellion, it is none the less a war, although the declaration of it be *'unilateral'*.") (emphasis in original); *see also Montoya v. United States*, 180 U.S. 261, 267 (1901) ("We recall no instance where Congress has made a formal declaration of war against an Indian nation or tribe; but the fact that Indians are engaged in acts of general hostility to settlers, especially if the Government has deemed it necessary to despatch a military force for their subjugation, is sufficient to constitute a state of war.").

---

[10]   Indeed, were this not the exception, the United States might find itself as the primary defendant under the ATA, given its status as the world's most significant military power.

12

### III.    Insurance Policy Interpretation Is Irrelevant

C&W similarly relies on cases within the context of insurance policy interpretation to argue that the September 11 attacks were not an act of war for CERCLA purposes. (C&W Opp'n 13-14.) Notably, none of the cases on which C&W relies involves a situation in which the President, Congress, the Supreme Court, NATO and the U.N. have declared the attack to be an act of war and taken or authorized military action in response. The question before the Court is not one of insurance policy construction, and a determination by the Court that the CERCLA act of war exception applies does not speak to coverage issues.

In insurance policy interpretation, the specialized canon of *contra proferentem*[11] applies. For that reason, the courts have long recognized that interpretation of statutory terms does not control the interpretation of an insurance policy containing the same term. For example, in *Harber v. St. Paul. Guardian Insurance Co.*, an insurance company argued that applying the rule of *contra proferentem* would result in a construction of the insurance contract that would contravene a statute. 137 F.3d 691, 698 (2d Cir. 1998). The Second Circuit disagreed with this attempt to cross-pollinate statutory and insurance policy interpretations, stating "this Court will not use section 3420(j)(1) to reject an interpretation of an ambiguous Endorsement that was accepted after applying well-established rules of contract law." *Id.* at 699. The court in *Harber* relied on the Appellate Division decision in *Insurance Company of North America v. Godwin*, 46 A.D.2d 154 (4th Dep't 1974) in which the court refused to use a statutory definition of "motor vehicle" to interpret the same term in an insurance policy. *Id.* at 157 ("We are here interpreting a policy of insurance and [the insured] is entitled to have it construed as a contract and *not necessarily according to the statutory definition*.") (emphasis supplied).

---

[11]    An ambiguous provision in a written document is construed most strongly against the person who selected the language. *Black's Law Dictionary* 296 (5th ed. 1989)

Indeed, one of the "act of war" insurance cases that C&W prominently trumpets explicitly relies on the rule of *contra proferentem* to construe applicable insurance policies in favor of coverage. In *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, the court stated that it was giving the maxim *contra proferentem* "added force" in interpreting policies to require coverage for risks of terrorism notwithstanding an act of war exclusion:

> The maxim contra proferentem receives added force in this case because the all risk insurers knew that their exclusions were ambiguous in the context of a political hijacking. . . Contra proferentem has special relevance as a rule of construction when an insurer fails to use apt words to exclude a known risk.

505 F. 2d 989, 999-1000 (2d Cir. 1974). The Second Circuit affirmed the District Court's determination that none of the potential policy exclusions applied to the Pan Am hijacking because ambiguities in the language of the policies required the issue to be resolved "in the manner least favorable to the insurer." *Id.* at 997. The burden on the insurer was to "demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion." *Id.* at 1000 (holding that insurers had "failed to discharge their burden of proof").

## IV.  The Parade of Horribles C&W Invokes Is Illusory

C&W argues that if the Court rules that the September 11 attacks were acts of war for purposes of the CERCLA exclusion, national security would be threatened: Al Qaeda would gain an exalted status and entitlement to the protections of the Geneva Convention; American soldiers could be prosecuted for unlawful acts against terrorists; and plaintiffs would be unable to recover damages under the ATA. (C&W Opp'n 25-29.) WTCP urges the same conclusion in its separate brief arguing against the application of the act of war exclusion. (WTCP Br. 13-15.)

This is nonsense. C&W is in the incongruous position of arguing that national security is enhanced if the Court disregards the findings of the President and Congress that the 9/11 attacks

were acts of war and undermined if the Court defers to those determinations.  Precisely the reverse is true, as the courts that have held that the political branches control this question. *The Prize Cases*, 67 U.S. (2 Black) at 670 (in the context of war "this Court must be governed by the decisions and acts of the political department of the government"); *see also Hamdi v. Rumsfeld*, 296 F. 3d 278, 281 (4th Cir. 2002) ("In accordance with this constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs."); *In re lo Dolce*, 206 F. Supp. at 460 (war "must be determined by the political department of the government").

Indeed, the Supreme Court already has ruled on the rights of combatants in the Afghanistan war — and in doing so, gave full deference to the determination by the President and Congress that September 11 marked the start of the war. *Hamdan*, 548 U.S. at 599 n.31 (deferring to the President's determination of when the war commenced).  C&W's parade of horribles is not implicated by this Court's ruling on whether the act of war defense offers an alternative basis for the dismissal of C&W's CERCLA claim against non-terrorist defendants who were themselves victims of the 9/11 attacks.

## V.      The September 11 Attacks Were The Sole Cause Of The Release

C&W acknowledges that the proper question before the Court is whether "the release" — not the hijacking or any other event — was caused by the September 11 attacks.  (C&W Opp'n 21.)  And C&W nowhere takes issue with the fact that at the time of the release, the Aviation Defendants were no longer in control of the aircraft which had become nothing more than instrumentalities of al Qaeda's war against the United States.  C&W merely argues that questions of fact preclude a determination that the act of war at issue was the sole cause of the release,

15

because the Aviation Defendants may have been what C&W terms a "concurrent cause." (*Id.* at

23.)

C&W misses the point.  No issue of fact exists as to whether acts of the Aviation

Defendants were a concurrent cause of the release.  Even the hijacked aircraft was not a risk to

the environment or to C&W's property but for the terrorists' quintessential act of war: slamming

that aircraft into the World Trade Center in pursuit of their own belligerent ends.  This Court

correctly recognized as much when it held:

> I do not believe . . . that CERCLA was intended to deal with a
> situation where inert property was caused to be other than inert and
> to flow through the air or the water because of an incident like we
> had at 9/11. . . . . [T]o hold that CERCLA liability should attach
> where something that is otherwise not releasable, nor
> dischargeable, but becomes so because of the events of September
> 11, 2001 would be to stretch CERCLA into areas which it was not
> intended to reach.

(Tr. of Oral Argument, Sept. 20, 2010 at 46:1 – 47:6; Summ. Order Granting Defs.' Mot. to

Dismiss, Sept. 21, 2012 (granting "for reasons stated on the record").)

C&W also fails to explain how it can avoid its own pleadings.  C&W alleges that on the

morning of September 11, 2001 "terrorists associated with the violently anti-American Al Qaeda

organization" hijacked and crashed two airplanes into World Trade Center Towers 1 and 2.

(Compl. ¶ 3.)  Later in its Complaint it further elaborates:

> On the morning of September 11, 2001, terrorists hijacked AA
> Flight 11 and UA Flight 175, loaded with tens of thousands of
> gallons of jet fuel, and crashed them into the North and South
> Towers of the WTC Complex.  These crashes, among other things,
> **caused the exposure of multiple floors of the interior of the
> buildings to the environment, and the release of toxic and
> hazardous substances from the airplane into the WTC
> Complex and the surrounding environment, including into and
> onto 130 Cedar.**

(*Id.* ¶ 43 (emphasis added).)  C&W's "Amplification" then alleges:

16

> Thus, **as a direct result of the events of September 11, 2001**, including the destruction of and extensive damage to the Facilities, both the interior and exterior of 130 Cedar were exposed to the impact of fire, heat and tremendous force, allegedly driving the pulverized particles of those Facilities, which later became known as WTC Dust, deep into 130 Cedar's concrete frame and alleged building cavities.  Also, **as a direct result of September 11**, other materials and substances from the Facilities were released onto, into, within and around 130 Cedar . . .

(C&W Amplification at 9 (emphasis added).)  C&W has thus alleged that the terrorists hijacked and crashed the planes, and it was those actions that caused the release.  Those actions constituted an act of war, eliminating liability under CERCLA as a matter of law.  42 U.S.C. § 9607(b)(2).

## CONCLUSION

The dismissal of C&W's claim is further supported by the act of war defense under CERCLA § 9607(b)(2).   The September 11 attacks were indisputably acts of war (indeed, atrocities of war).   Those acts of war were the sole cause of the release that C&W alleges contaminated its building at 130 Cedar Street.  The Aviation Defendants continue to believe that this is an (untimely) ATSSSA case dressed up as a CERCLA claim, because ATSSSA provides the sole remedy for damages arising out of the 9/11 attacks.[12]  However, if CERCLA applies, the act of war defense mandates dismissal as a matter of law.

Dated: New York, New York
July 13, 2012

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, New York 10036
Tel.:  (212) 490-9100
Fax:  (212) 370-4453
dbarry@condonlaw.com

-and-

---

[12]   C&W urges that CERCLA requires no proof of fault or causation as applied to acts of terrorism. (C&W Opp'n 4-5, 8.)  That argument offers further confirmation that Congress did not intend to incorporate CERCLA into ATSSSA — a statute designed to protect the airlines and others against far-reaching liability arising out of the September 11 attacks — as one of the federal laws that displace inconsistent state law under Section 408(b)(2) of ATSSSA.

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Fax: (212) 909-6836
repodesta@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. AND AMR
CORPORATION, INC.


QUIRK AND BAKALOR, P.C.
Jeffrey J. Ellis
Anoushka Sharifi Bayley
845 Third Avenue, 15th Floor
New York, New York 10022
Tel: (212) 319-1000
Fax: (212) 319-1065
jellis@quirkbakalor.com

-and-

MAYER BROWN, LLP
Michael R. Feagley
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
mfeagley@mayerbrown.com

*Attorneys for Defendants*
UNITED AIR LINES, INC. AND UNITED
CONTINENTAL HOLDINGS, INC. (F/K/A
UAL CORPORATION)

*Of Counsel*:
Maura K. Monaghan
Johanna N. Skrzypczyk

19