UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
:
IN RE SEPTEMBER 11 LITIGATION : 21 MC 101 (AKH)
:
------------------------------------------------------------- x
:
WORLD TRADE CENTER PROPERTIES LLC et al., : **OPINION AND ORDER DENYING MOTION TO CREDIT INSURANCE RECOVERIES AGAINST POTENTIAL TORT RECOVERIES**
:
Plaintiffs, :
:
-against- :
:
:
UNITED AIRLINES, INC. et al., :
: 08 Civ. 3719 (AKH)
Defendants. :
:
------------------------------------------------------------- x
:
WORLD TRADE CENTER PROPERTIES LLC et al., :
:
Plaintiffs, :
: 08 Civ. 3722 (AKH)
-against- :
:
:
AMERICAN AIRLINES, INC., et al., :
:
Defendants. :
:
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

On July 16, 2001, plaintiffs World Trade Center Properties, LLC and affiliated companies (collectively "WTCP") purchased 99-year leases to four World Trade Center buildings, Towers One, Two, Four, and Five, from the Port Authority of New York and New Jersey, Inc., the owner of the properties. Plaintiffs paid $2.805 billion. Two months later, the terrorist air crashes of September 11 caused the Twin Towers (Towers One and Two) to become raging infernos and collapse. And their collapse caused Towers Four and Five (and Tower

1

Seven) to collapse. WTCP sued United Airlines, American Airlines, and others (collectively, the "Aviation Defendants" or "Defendants"), alleging that but for the Aviation Defendants' negligence, the terrorists could not have boarded and hijacked the aircraft and flown them into the Twin Towers.

WTCP also recovered $4.091 billion from insurance.[1] The Defendants now move for "collateral setoff," alleging that insurance recoveries more than compensated WTCP for potential tort recovery. See N.Y. C.P.L.R. § 4545.

Defendants' motion is denied. The overlap between WTCP's insurance recovery and its potential tort recovery presents issues of fact requiring trial.

## I. Factual and Procedural Background

The issue presented by this motion follows from my earlier opinions in this matter. In December 2008 I limited WTCP's recovery to the lesser of fair market value or replacement cost. In re September 11th Litig., 590 F. Supp. 2d 535 (S.D.N.Y. 2008). In a follow-up order, after separate briefing and argument, I fixed the limit of tort recovery at $2.805 billion. The price paid for the leases, I found, was equivalent to their fair market value on September 11, 2001. In re September 11th Litig., 2009 WL 1181057 21 MC 101 (April 30, 2009, S.D.N.Y.). The Aviation Defendants then moved for collateral setoff, and I denied the motion as premature. In re September 11th Litig., 21 MC 101, Doc. No. 945 (Sep. 30, 2009, S.D.N.Y.). I assume familiarity with this background.

### A. WTCP's Insurance Coverage

By the terms of its leases, WTCP covenanted, in the event of damage or destruction to the leasehold, to "rebuild, restore, repair and replace" the premises to the extent

---

[1] The exact amount of recovery was $4,091,364,034, inclusive of a payment of $563 million to GMAC, one of WTCP's creditors. See In re September 11th Litig., 21 MC 101, Doc. No. 945 (Sep. 30, 2009, S.D.N.Y.).

2

"feasible, prudent and commercially reasonable." See, e.g., Agreement of Lease: One World Trade Center, § 15.1.[2] WTCP agreed also to insure the buildings against property damage for the lesser of "actual replacement cost" or $1.5 billion "per occurrence." Id. § 14.1.1. The leases provided that there was to be no exclusion for "terrorist acts," so long as such a policy term was available "at commercially reasonable rates." Id.

Additionally, to ensure that WTCP would be able to continue to make its lease payments to the Port Authority in the event that a building was "out of operation," WTCP agreed also to insure against "Loss of Revenue/Business Interruption" in such amounts as "reasonably required by the Port Authority," to cover a three-year period of no building operation. Id. § 14.1.2.

Upon signing the 99-year leases, WTCP procured twelve-layer, multiple-company insurance coverage aggregating $3,546,800,000 "per occurrence." The coverage, defined by different insurance forms and binders, included Property Damage and Business Interruption coverage, as required by the leases. The Property Damage coverage insured the "interest of the Insured in all property of every kind and description owned or used . . . ." The Business Interruption insurance covered lost revenues resulting from the "necessary interruption or reduction of business operations . . . caused by loss, damage, or destruction . . . ."

---

[2] The lease provides: "If the Premises . . . or any structures, improvements, fixtures and equipment, furnishings and physical property located thereon, or any part thereof, shall be damaged or destroyed by fire, the elements, the public enemy or other casualty, or by reason of any cause whatsoever and whether partial or total, the Lessee, at its sole cost and expense, and whether or not such damage or destruction is covered by insurance proceeds sufficient for the purpose, shall remove all debris resulting from such damage or destruction, and shall rebuild, restore, repair and replace the Premises . . . and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, to the extent feasible, prudent and commercially reasonable, with the plans and specifications, for the same as they existed prior to such damage or destruction or with the consent in writing of the Port Authority, which consent shall not be unreasonably withheld, conditioned, or delayed, make such repairs, replacements, changes or alterations as is mutually agreed to by the Port Authority and the Lessee." Agreement of Lease: One World Trade Center, § 15.1.

3

After the Towers collapsed, WTCP filed Preliminary Proofs of Partial Loss ("PPOPL"s), of approximately $8 billion dollars.[3] WTCP and the insurers engaged in litigation over whether the 9/11 attacks on the Trade Towers constituted one "occurrence" or two, as defined by the definitions in the various binders and policies. See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107 (2d Cir. 2006)). Ultimately, the parties settled at $4.091 billion, and the insurers paid that amount to WTCP. The parties did not allocate the settlement between Property Damage and Business Interruption.

### B. WTCP's Lawsuit Against the Aviation Defendants

In its lawsuit, WTCP alleged that it suffered damages of $8.4 billion, the estimated cost of replacing the Towers, and sought recovery against the Aviation Defendants for their negligence. The Aviation Defendants denied that they were negligent and denied that they could be liable beyond the fair market value of the leasehold. On Defendants' motion for summary judgment, I held that a tort recovery was limited to the lesser of fair market value or replacement cost, and ruled that the loss in market value of WTCP's 99-year leasehold, valued as of September 11, 2001, was the most that it could recover. In re September 11th Litig., 590 F. Supp. 2d at 536. I ruled that WTCP could not recover in tort, in a suit for negligence, the damages flowing from its contractual obligations to "rebuild, restore, repair and replace" the Trade Center buildings. I held that the "particular features of WTCP's contracts cannot be made the special responsibility of the Aviation Defendants . . . ." Id. at 544.

After further submissions by the parties, I determined the value of WTCP's destroyed leasehold on September 11, 2001 to be $2.805 billion—the price WTCP agreed to pay the Port Authority for the leasehold only a few months earlier. In re September 11 Litig., 21 MC 101 (AKH), 2009 WL 1181057 at *4 (S.D.N.Y. Apr. 30, 2009). I rejected WTCP's argument

---

[3] Plaintiffs' expert found the total to be approximately $7.846 billion; Defendants' expert found it to be $8.531.

that its leasehold, measured by its value as burdened by its covenant to rebuild the Trade Center, had taken on a negative value. Id. at *3.

Defendants now argue that since WTCP recovered $4.091 billion from insurance, it cannot recover the lesser amount of $2.805 billion, the fair market value of its destroyed leasehold.[4] In order to make such a finding, I would have to find, to a "reasonable certainty," that the categories of insurance payments received by WTCP "correspond" to the categories of potential damages WTCP could recover in its lawsuit against the Aviation Defendants. On this record, before trial, I am not able to make such findings.

## II.  New York C.P.L.R. Section 4545 and Its Judicial Interpretation

New York's C.P.L.R. Section 4545 is known as a "collateral source law." Essentially, it provides that if a plaintiff has been compensated for economic loss by some "collateral source," such as insurance, the plaintiff cannot recover compensation again in a tort lawsuit against a defendant. The statute provides:

> In any action brought to recover damages for personal injury, injury to property or wrongful death, where the plaintiff seeks to recover for . . . loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source such as insurance (except for life insurance) . . . . If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to the projected future cost to the plaintiff of maintaining such benefits.

N.Y. C.P.L.R. § 4545(c) (2008).[5]

---

[4] WTCP argues that the $2.805 billion represents the value of the leases to the Port Authority, not WTCP. WTCP's value, it argues, should be measured by the profit (or loss) WTCP would expect from the lease. For litigation purposes, however, value is not subjective, but rather the "fair market value," the value that a ready, willing, and able buyer and seller would agree to exchange for the specific property, on the open market and in an arm's length transaction. See Black's, 8th Ed., at 1587. WTCP engaged in just that transaction on July 16, 2001.

[5] Section 4545(c) has since been amended, effective November 12, 2009, and redesignated Section 4545(a). However, actions filed before the effective date are governed by the earlier language, quoted in the text.

Importantly, Section 4545(c) does not provide for a reduction in damages based on any and all of the plaintiff's collateral recoveries. Rather, "reduction is authorized only when the collateral source payment represents reimbursement for a particular category of loss that *corresponds* to a category of loss for which damages were awarded." Oden v. Chemung County Indus. Dev. Agency, 87 N.Y.2d 81, 84 (1995) (emphasis added). And correspondence must be proven by a "reasonable certainty." Turnbull v. USAir, Inc., 133 F.3d 184, 188 (2d Cir. 1998). The purpose of the law is "to eliminate windfalls and double recoveries for the same loss." Fisher v. Qualico Contr. Corp., 98 N.Y.2d 534, 537 (2002). Achieving this goal "is served by subtracting from the total award those collateral source payments that duplicate or correspond to a particular item of economic loss." Oden, 87 N.Y.2d at 88. But subtraction of all, even non-duplicative payments, would "produce results beyond those necessary to remedy the [windfalls to plaintiffs] at which the legislation was aimed" and "would confer an undeserved windfall on tort defendants and their insurers . . . ." Id. at 88.

## III. Application of Correspondence between WTCP's Losses and Insurance Recoveries

### A. WTCP's Potential Recovery of Damages

By reason of the events of 9/11, WTCP lost its revenue stream, until the leasehold property could be restored. However, pursuant to its lease, it was obligated to continue to pay rents to the Port Authority. The lease required WTCP to procure Property Damage insurance to facilitate the rebuilding of the towers should they be damaged or destroyed, and Business Interruption insurance to facilitate WTCP's ability to continue to pay rent should its anticipated revenues be disrupted. Agreement of Lease: One World Trade Center, § 14.1.1, § 14.1.2. The anticipated expenses of procuring such insurance are subsumed in a real estate developer's

calculation of a leasehold's anticipated net income and, hence, the price it is willing to pay for the property. Thus, the fair market value of the WTCP leasehold, as of September 11, 2001, reflected all these revenue and expense ingredients. These factors may enter into the calculation of fair market value that ready, willing, and able buyers and sellers are willing to pay and to receive. I would assume that the price paid by WTCP, and accepted by the Port Authority—$2.805 billion—and the competitive bids that preceded the agreement, reflected all the ingredients of anticipated revenue and expense.

### B. WTCP's Insurance Recoveries

WTCP settled its litigation against its insurers for $4.091 billion, a little more than half its PPOPL total of approximately $8 billion. WTCP's claim mainly fell into two categories: Property Damage insurance to defray the cost of rebuilding the leased properties, and Business Interruption insurance to compensate for WTCP's lost revenue stream and to defray the burden of WTCP's continuing obligation to pay rent to the Port Authority. The proportions of each category to the whole were 84.2 to 15.8, respectively.[6] If those proportions were to be applied to the insurance recovery (and the relevance of taking such proportions is far from clear), $3,444,622,000 would be allocable to property damage, and $646,378,000 to business interruption. The legal question is whether or not there is correspondence between WTCP's insurance recovery, or any part of it, and WTCP's potential damage recovery in this lawsuit. Oden, 87 N.Y.2d at 84.

---

[6] This proportion was calculated by examining WTCP's PPOPLs. However, as these PPOPLs never turned into claims evaluated in the adjustment process, this proportion may be arbitrary, and thus unsatisfactory.

7

### C. Correspondence Between Insurance and Tort Recoveries Has Not Been Shown to a Reasonable Certainty

As stated by the New York Court of Appeals in Oden, "reduction [of damages] is authorized only when the collateral source payment represents reimbursement for a particular category of loss that corresponds to a category of loss for which damages were awarded." 87 N.Y.2d at 84. And correspondence must be proved to a "reasonable certainty." Turnbull, 133 F.3d at 188. The Aviation Defendants argue that both aspects of WTCP's insurance recovery—Property Damage and Business Interruption—should correspond to WTCP's tort loss of the value of its leasehold, thereby subsuming all of WTCP's tort claims. But that is not clear. The proof of the experts, seeking to relate, or not to relate, a gross insurance recovery to various amounts of damage, raises many questions of correspondence. WTCP suffered different categories of loss on the morning of September 11, and the issue of correspondence between them and WTCP's insurance recoveries presents issues of complexity and nuance that will require a trial to clarify.

### IV. Conclusion

Defendants' motion to credit insurance recoveries against potential tort recoveries is denied. The issue is not suitable for summary disposition on the record presented. The clerk shall terminate the motions (08 Civ. 3719, Doc. No. 153; 08 Civ. 3722, Doc. No. 169).

SO ORDERED.

Dated: August 3/, 2012
New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge

8