Richard A. Williamson, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, NY 10006
Tel:  (212) 412-9500
*Attorneys for Plaintiff 7 World Trade Company, L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IN RE SEPTEMBER 11 LITIGATION              :        21 MC 101 (AKH)
                                                            :
------------------------------------------------------------X
                                                            :
WORLD TRADE CENTER PROPERTIES         :
LLC, et al.,                                                 :
                                                            :
                             Plaintiffs,              :        08 CIV 3722 (AKH)
                                                            :
AMERICAN AIRLINES, INC., et al.,              :
                                                            :
                             Defendants.            :
                                                            :
------------------------------------------------------------X

**7WTCo.'S COUNTER-STATEMENT OF MATERIAL FACTS IN
OPPOSITION TO UNITED'S MOTION FOR SUMMARY JUDGMENT
DISMISSING ALL CLAIMS OF THE "WTCP PLAINTIFFS" RELATING TO 7 WTC**

Plaintiff 7 World Trade Company, L.P. ("7WTCo.") submits this counter-statement of

material facts pursuant to Civil Rule 56.1(b) of the Local Rules of the United States District

Courts for the Southern and Eastern Districts of New York in response to United's Statement of

Undisputed Facts Pursuant to Local Rule 56.1 ("United's Statement").

7WTCo.'s responses to United's Statement in which it contests certain of United's

individual statements are set forth in Section I, below.

7WTCo.'s affirmative statements of material facts as to which there exists a genuine

dispute, and thus warrant denial of United's motion, are set forth in Section II, below.

# I

## 7WTCo.'s RESPONSES TO EACH OF THE
## SEVEN PARAGRAPHS IN UNITED'S STATEMENT

**United's Statement Paragraph No. 1:**

The damage to Building 7 of the World Trade Center ("7 WTC") resulted from hijackers intentionally crashing American Airlines Flight 11 (AA Flight 11) into One World Trade Center (also known as the North Tower) on September 11, 2001.  (WTCP Complaint filed on April 7, 2008, 08 CIV 3722 ("WTCP Complaint"), at ¶ 1 and *passim*).

**7WTCo.'s Response to Paragraph No. 1:**

7WTCo. disputes the factual allegation of Paragraph No. 1 because it omits the fact that

United caused or contributed to the destruction of 7 World Trade Center by, among other things,

breaching its duty to prevent two hijackers, one of which was trained as a pilot, from passing

through its checkpoint security at Portland International Jetport ("Portland Jetport") with

prohibited, deadly and dangerous weapons, boarding connecting flight American Airlines Flight

11 at Boston Logan International Airport ("Logan Airport") with those same weapons, entering

the cockpit and taking control of American Airlines Flight 11 and crashing it into the World

Trade Center complex on September 11, 2001.  United's Paragraph No. 1 seeks to give a false

impression that there was only one cause of damages to 7WTCo.

**United's Statement Paragraph No. 2:**

WTCP Plaintiffs have never alleged that the damages to 7 WTC were caused by the hijacking and intentional crash of United Flight 175.

**7WTCo.'s Response to Paragraph No. 2:**

7WTCo. disputes the allegation of Paragraph No. 2 because World Trade Center

Properties LLC, 1 World Trade Center LLC, and 3 World Trade Center LLC (formerly known as

"5 World Trade Center LLC") (collectively the "WTCP Plaintiffs") are not suing for damages

suffered by 7WTCo.  The only entity suing for damages suffered by 7WTCo. is 7WTCo.

**United's Statement Paragraph No. 3:**

On 9/11, AA Flight 11 was operated by American Airlines, Inc., (at ¶ 35) and departed from Boston's Logan International Airport from the American Airlines Terminal, B. (*See* WTCP Complaint and Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Commission Report, ¶ 2 (2004) (the "9/11 Commission Report")).

**7WTCo.'s Response to Paragraph No. 3:**

7WTCo. does not dispute the allegations of Paragraph No. 3.

**United's Statement Paragraph No. 4:**

The hijackers who boarded AA Flight 11 underwent security screening at American's checkpoint at Logan.  (9/1 [sic] Commission Report, at p. 2).

**7WTCo.'s Response to Paragraph No. 4:**

7WTCo. does not dispute the factual allegation of Paragraph No. 4, except that it omits the fact that, on the morning of September 11, 2001, two of the hijackers who boarded AA Flight 11 – ringleader and Flight 11 pilot Mohammed Atta and his cohort Abdul Aziz Al-Omari – were allowed to pass through the security checkpoint at Portland Jetport for which United was legally responsible and which United had a non-delegable federal statutory duty to secure with the highest possible degree of safety in the public interest.

**United's Statement Paragraph No. 5:**

United did not screen any of the AA Flight 11 hijackers and United's Air Carrier Standard Security Program ("ACSSP") only required it to screen passengers boarding flights operated by United. (United ACSSP, p. 10, Section I.B., entitled "APPLICABILITY").

**7WTCo.'s Response to Paragraph No. 5:**

7WTCo. disputes the factual allegations of Paragraph No. 5.  Paragraph No. 5 erroneously states that United did not screen any of the Flight 11 hijackers.  Contrary to United's assertion, United did, in fact, have responsibility for screening two of the American Airlines Flight 11 hijackers on the morning of September 11, 2001.  It had delegated the

performance of that responsibility to Delta.  Just hours prior to boarding American Airlines

Flight 11 at Logan Airport, Atta and Omari passed through the single security checkpoint at

Portland Jetport (for which United had shared responsibility) in order to take Colgan Flight 5390

to Logan Airport as part of their ticketed travel from Portland to Los Angeles on September 11,

2001.  United was responsible for screening Atta and Omari, who were allowed by United's

agents to pass through the Portland security checkpoint with their weapons.  In August of 2001,

just a month before 9/11, United and the other carriers had signed a Shared Responsibility

Agreement.  (*See* Shared Responsibility Agreement, dated August 9, 2001 (the "Shared

Responsibility Agreement"), attached as Exhibit 3 to the Declaration of Richard A. Williamson,

dated September 11, 2012 ("Williamson Decl.").)  Under that Agreement, Delta Air Lines agreed

to carry out the signatories' responsibility for the checkpoint.  *Id.*  Delta used Globe Aviation

Services Corp. ("Globe"), a private security company, to carry out the airlines' – including

United's – mandatory checkpoint security obligations.  As a result, federal statutes and

regulations imposed upon United a non-delegable duty to inspect all individuals entering sterile

areas at screening checkpoints "*for which it is responsible.*"  14 C.F.R. § 108.9(c) (emphasis

added).

Paragraph No. 5 also erroneously states that United's ACSSP required it to screen only

those passengers boarding flights operated by United.  United cites to Section I.B. of its ACSSP, entitled

"APPLICABILITY," for its false assertion.  However, Section I.B. states, in pertinent part: "This

program is applicable to scheduled and public charter operation(s) conducted by the air carrier. . .

."  This provision says nothing of United's being required to screen only those passengers boarding

the flights that it operates.

**United's Statement Paragraph No. 6:**

On 9/11, United Airlines flights departing from Boston were operated from a different terminal, United's Terminal C at Boston's Logan International Airport. 9/11 Commission Report at 2, and Staff Monograph on the Four Flights and Civil Aviation Security (the "*Aviation Monograph*") at 18.

**7WTCo.'s Response to Paragraph No. 6:**

7WTCo. does not dispute the allegation of Paragraph No. 6, but denies that it is a material or relevant fact.

**United's Statement Paragraph No. 7:**

Passengers boarding United flights on 9/11 underwent security screening at United's Checkpoint at Logan. *Id.*

**7WTCo.'s Response to Paragraph No. 7:**

7WTCo. does not dispute the allegation of Paragraph No. 7, but denies that it is a material or relevant fact.

## II

## 7WTCo.'s COUNTER-STATEMENT OF MATERIAL FACTS

### Mohammed Atta:  9/11 Ringleader and Pilot of Flight 11

1.      Mohammed Atta is described in the 9/11 Commission Report as the "operational leader" or "tactical commander" of the 9/11 hijackings and the "presumed team leader" for American Airlines Flight 11.  (*See The 9/11 Commission Report*, at 7, 88, 167, Ex. 5 to the Williamson Decl.)

2.      Atta was the only hijacker of American Airlines Flight 11 with the ability to fly the aircraft and it was Atta who did, in fact, take the flight controls of Flight 11.  (*See id.* at 5.)

5

**The Portland Connection**

3.      Unlike all other 9/11 hijackers, ringleader and pilot Atta and one other Flight 11

hijacker, Omari, bought tickets from Portland, Maine to Los Angeles, California, connecting

from Colgan Flight 5390 out of Portland to American Flight 11 at Logan Airport.  (9/11

Commission Staff Monograph on the Four Flights and Civil Aviation Security ("Staff

Monograph"), at 2-4, Ex. 1 to the Williamson Decl.; Copies of Atta and Omari's tickets from

Portland to Boston and Passenger List for Flight 5930 from Portland to Boston, Ex. 4 to the

Williamson Decl.)

4.      The 9/11 Commission found the "most plausible" reason why Atta and Omari chose

to fly from Portland was "to avoid suspicion that might have been aroused if they had arrived at

Logan at approximately the same time as eight other young Middle Eastern males to check in for

Flight 11 and Flight 175."  (Staff Monograph, at 3, Ex. 1 to the Williamson Decl.)

5.      On September 10, 2001, Atta picked up Omari at the Milner Hotel in Boston.  (*A

Careful Sequence of Mundane Dealings Sows a Day of Bloody Terror for Hijackers*, Wall Street

Journal, Oct. 16, 2001, Ex. 6 to the Williamson Decl.)

6.      Atta and Omari then drove a rented Nissan to Portland, Maine, and arrived at the

Comfort Inn Hotel that evening.  (*See id.*; David Connerty-Marin and Josie Huang, *The Night

Before Terror,* Portland Press Herald, Oct. 5, 2001, Ex. 7 to the Williamson Decl.)

7.      Once in Portland, Atta and Omari made withdrawals from an ATM and purchased

weapons used in the hijacking from an area Wal-Mart.  (*Final Hours of Hijack Monster-He

Waited Until Last Minute to Buy Boxcutters*, N.Y. Post, Oct. 12, 2001, Ex. 8 to the Williamson

Decl.)

8.      On the morning of September 11, 2001, leaving themselves little time to make their flight, which departed at 6:00 a.m., Atta and Omari left their hotel at 5:33 a.m. for the seven-minute drive to the Portland Jetport. (*Id.*) They checked in at the ticket counter at 5:43 a.m. for their ticketed travel from Portland to Los Angeles, with a connecting stop in Boston. (Staff Monograph, at 1-2, Ex. 1 to the Williamson Decl.)

9.      At the time US Airways' ticket agent Michael Tuohey checked the terrorists in, Atta and Omari had only *17 minutes* to spare to successfully navigate Portland Jetport's security operations and to board Colgan Flight 5390 to Logan Airport for connection to American Airlines Flight 11. (*See* Staff Monograph, at 2, Ex. 1 to the Williamson Decl.; *see also* Transcript of Michael Tuohey ("Tuohey Tr.") at 165:25-166:15, Ex. 2 to the Williamson Decl.)

10.     At the ticket counter, Mr. Tuohey said to himself about Atta, "'If this guy doesn't look like an Arab terrorist, nobody does.'" (*See* Touhey Tr., at 195:7-13, Ex. 2 to the Williamson Decl.)

11.     Mr. Touhey decided not to give Atta and Omari their boarding passes for the second leg of their journey. (Staff Monograph, at 2-4, Ex. 1 to the Williamson Decl.) Atta appeared to become angry and complained that he had been assured he would have "one-step check-in." (*Id.*) Mr. Touhey told them they would have to obtain the boarding passes for the second leg of their journey in Boston and that "they better get going if they were to make their flight." (*Id.*)

12.     Atta and Omari passed through the Portland Jetport security screening checkpoint at 5:45 a.m., leaving only minutes for them to board Colgan Flight 5930 for their trip to Los Angeles, connecting in Boston to American Flight 11. (*See In re Sept. 11th Litig.*, 594 F. Supp. 2d 374, 378 (S.D.N.Y. 2009.); *An Untold Story of 9/11*, Newsday (Apr. 17, 2006), Ex. 9 to the Williamson Decl.)

**Atta and Omari Passed Through The**
**Single Security Checkpoint At Portland Jetport**

13.     The Portland Jetport had only one checkpoint through which all Portland Jetport

passengers were required to pass and for which all air carriers operating out of Portland shared

responsibility. (*See* Staff Monograph, at 3, Ex. 1 to the Williamson Decl.)

14.     United was one of the air carriers operating out of Portland. (*See* Portland Airport

Security Program, at COP000045-46, Ex. 10 to the Williamson Decl.)

15.     United and the other air carriers with shared responsibility assigned overall

responsibility for the checkpoint to Delta Air Lines. (*See* 8/9/01 Shared Responsibility

Agreement, Ex. 3 to the Williamson Decl.)  The Shared Responsibility Agreement governs under

what circumstances Delta and the other air carriers will be responsible for civil penalties levied

against them as a result of failing FAA testing at the checkpoint.  (*Id.*)  However, the Shared

Responsibility Agreement does not address issues concerning Delta's and the other air carriers'

potential civil liability for the negligent operation of the checkpoint.  (*See id.*)

16.     Delta used Globe Aviation Services Corporation ("Globe"), a private security

company, to carry out the airlines' mandatory shared checkpoint security obligations at Portland

Jetport. (*See* Staff Monograph, at 3, Ex. 1 to the Williamson Decl.)

17.     United knew that many travelers flying out of Portland, a regional airport, were

bound for destinations that required them to connect to other flights in Boston.  United also

knew, based upon its own operations at Logan, that its screening of passengers in Portland was

especially critical because screening at Logan Airport was notoriously lax and ineffective and

ranked among the worst in the country. (*See* Matthew Brelis & Matt Carroll, *FAA Finds Logan*

*Security Among Worst,* Boston Globe (Sept. 26, 2001), Ex. 11 to the Williamson Decl.;

Uncertified Transcript, Fox 25 News (Boston) Investigative Report on Airport Security (May 6,

2001), Ex. 12 to the Williamson Decl.; Staff Monograph, at 4, Ex. 1 to the Williamson Decl.; *see also* Deposition Transcript of Joseph Lawless ("Lawless Tr."), at 44:11-46:24, Ex. 13 to the Williamson Decl.)

18.     At approximately 5:45 a.m., Atta and Omari proceeded without incident or impediment through the Portland security checkpoint before boarding Colgan Flight 5390. (*See* Staff Monograph, at 3, Ex. to the Williamson Decl.)

19.     Surveillance cameras recorded events at the checkpoint that morning, including Atta's and Omari's movement through the checkpoint. (*See* Staff Monograph, at 3, Ex. 1 to the Williamson Decl. The video is in the possession of the U.S. Government and incorporated into the record by reference.)

20.     At Portland, Atta was designated by the government-approved "CAPPS" system[1] as a "selectee," *i.e.*, a potential threat to the aircraft. (Staff Monograph, at 2, Ex. 1 to the Williamson Decl.; *see also The 9/11 Commission Report*, at 451 n.2, Ex. 5 to the Williamson Decl.; Deposition Transcript of Doreen Carbone, ("Carbone Tr."), at 148:16-149:17, Ex. 17 to the Williamson Decl.)

21.     As a "selectee," Atta was required under the minimum security standards to receive "enhanced vigilance" and to be given heightened checkpoint scrutiny. (*See generally* Deposition Transcript of Anthony Genovese ("Genovese Tr.") at 63:18-64:10, 74:8-75:12, Ex. 18 to the Williamson Decl.; Deposition Transcript of Paul Burrows ("Burrows Tr.") at 88:11-90:12, Ex.

---

[1] Staff Monograph, at 2, Ex. 1 to the Williamson Decl.; *The 9/11 Commission Report*, at 451 n.2, Ex. 5 to the Williamson Decl. ("CAPPS was an FAA-approved automated system run by the airlines that scored each passenger's profile to identify those who might pose a threat to civil aviation.").

19 to the Williamson Decl.; Tuohey Tr. at 122:7-123:7, Ex. 2 to the Williamson Decl. (CAPPS selectees were supposed to receive "enhanced vigilance").)

22.     Despite his designation as a "selectee," neither Atta nor his companion Omari were subjected to a hand-wanding, or a pat-down, or had their carry-on bags physically inspected by anyone at the Portland checkpoint as the security standards required.  (*See* Staff Monograph, at 2, Ex. 1 to the Williamson Decl.; United Air Carrier Standard Security Program (Ex. 40 to the Williamson Decl.), Appendix XV, at 5-6) .

23.     At least two Globe screeners who were on duty at the checkpoint at Portland on the early morning of September 11, 2001 have admitted that CAPPS "selectees" were supposed to have their carry-on bags searched. (*See* Genovese Tr., 63:15-64:10, Ex. 18 to the Williamson Decl.; Burrows Tr., at 88:11-90:16, Ex. 19 to the Williamson Decl.)

24.     In addition to his designation as a "selectee," Atta also set off the walk-through metal detector at the Portland checkpoint.  (*See* Deposition Transcript of Barbara Foster ("Foster Tr.") at 80:2-18, Ex. 21 to the Williamson Decl.)

25.     As Atta and Omari proceeded through the Portland checkpoint, none of the Globe screeners interrogated them and none appeared to be watching or otherwise scrutinizing their behavior. (*See* Foster Tr. at 71:13-72:3, 79:13-25, Ex. 21 to the Williamson Decl.)

26.     The only observation that one of the Portland checkpoint screeners was able to recall was that she and another screener noticed that Atta was wearing a "beautiful blue shirt." (Foster Tr. at 71:3-5, 90:24-25, 91:10, Ex. 21 to the Williamson Decl.)

27.     Still photographs from the video of the Portland checkpoint operations show another Globe screener, who was supposed to be responsible for monitoring the walk-through metal detector, leaning up against the x-ray machine and staring off into space as Atta and Omari

passed through the Portland checkpoint. (*U.S. v. Moussaoui* Trial, Government Exhibits FO07021-4 (stills from a security camera at the Portland airport security checkpoint on Sept. 11, 2001), Ex. 22 to the Williamson Decl.)

28.     As of September 11, 2001 all passengers' carry-on items were routinely searched by x-ray machine. (*See* United's Checkpoint Operations Guide § 5: Hand-Carried Items, at 5-1, Ex. 15 to the Williamson Decl.)  In addition, the FAA's minimum standards on September 11, 2001 required, in addition to the x-ray, "random and continuous" physical searches of carry-on bags as they passed through the x-ray machine. (Staff Monograph, at 75, 80, Ex. 1 to Williamson Decl.)

29.     The Globe checkpoint screeners failed to employ the FAA-mandated "random and continuous" physical searches of carry-on bags, which would have increased the screeners' opportunities to search Atta's and Omari's carry-on bags for weapons. (*See id.*)

30.     It is a fair inference that Atta, Omari or both passed through the security checkpoint in possession of deadly and prohibited weapons on their persons or in their carry-on baggage. (*See, e.g.*, Staff Monograph at 4, 17, 72, and 113 n. 566, Ex. 1 to the Williamson Decl.; Transcript of the Testimony of J. Fitzgerald in *United States v. Moussaoui*, Ex. 41 to the Williamson Decl., at 305:2-22; Staff Report of the National Commission on Terrorist Attacks Upon the United States, Staff Statement No. 4: The Four Flights, at 6-8, Ex. 42 to the Williamson Decl.; *U.S. v. Moussaoui* Prosecution Trial Exhibit, *Hijackers' True Name Usage 2001*, Government Exhibit OG 00013, at 25, Ex. 43 to the Williamson Decl.; *U.S. v. Moussaoui* Prosecution Trial Exhibit; *Hijackers' Purchase or Possession of Knives Business Record Chart*, Government Exhibit OG00015, Ex. 44 to the Williamson Decl.; *U.S. v. Moussaoui* Trial, Government Exhibits NT0211.1-7, Ex. 46 to the Williamson Decl; and Cindy Adams & John

Lehmann, *Final Hours of Hijack Monster-He Waited Until Last Minute to Buy Boxcutters*, New York Post, Oct. 12, 2001, Ex. 8 to the Williamson Decl.)

31.     Had the screeners properly identified these weapons, they would have been required to notify a GSC and/or a law enforcement official.  (*See* Checkpoint Operation Guide § 5: Hand-Carried Items, at 5-1, Ex. 15 to the Williamson Decl.)

32.     Had the screeners properly identified these weapons, Atta and Omari would have been prevented from proceeding through the Portland checkpoint with such weapons in time for Colgan Flight 5390 or from making their connecting flight at Logan Airport.  (*See* Deposition Transcript of Pauline A. Cloudman ("Cloudman Tr.") at 63:1-64:22, Ex. 20 to the Williamson Decl.)

**Atta And Omari Connected
To Flight 11 At Logan Airport**

33.     Colgan Flight 5390 departed Portland Jetport at approximately 6:00 a.m. and arrived at Terminal B at Logan Airport at approximately 6:45 a.m.  (*See In re Sept. 11 Litig.*, 594 F. Supp. 2d at 378; Staff Monograph, at 2, Ex. 1 to the Williamson Decl.)

34.     Timing was tight for Atta and Omari to connect to American Flight 11, which departed at 7:59 a.m.  (*See* Staff Report of the National Commission on Terrorist Attacks Upon the United States – Staff Statement No. 16: Outline of 9/11 Plot ("Staff Statement No. 16"), Ex. 16 to the Williamson Decl.)

35.     After their flight from Portland Jetport arrived at Terminal B at Logan Airport, Atta and Omari had to exit one secure area of the terminal and re-enter another, passing through American Airlines' security checkpoint along the way, in order to board American Airlines Flight 11.  (*See* Staff Monograph, at 4-5, Ex. 1 to the Williamson Decl.)

36.     Atta and Omari checked in for their connecting American Airlines flight and passed through American Airlines' security checkpoint at Terminal B between 6:45 a.m. and 7:40 a.m. (*See In re Sept. 11 Litig.*, 594 F. Supp. 2d at 378)

37.     Before boarding Flight 11 at Logan Airport, Atta spoke on the phone for several minutes to the hijacker-pilot of United Flight 175, Marwan Al-Shehi, before each proceeded to board his flight at Logan Airport. (*See* Staff Monograph, at 4, Ex. 1 to the Williamson Decl.)

38.     9/11 Commission investigators believe that the call between Atta and Al-Shehi was to confirm that everything and everyone was in place for the hijacking plan to proceed. (*Id.*) Atta was the only Flight 11 hijacker who knew how to pilot the plane, so his presence on that flight was crucial to the plan. (*See The 9/11 Commission Report*, at 5, Ex. 5 to the Williamson Decl.)

39.     Investigators found that the call between Atta and Al-Shehi "strongly suggests that the two hijacking teams engaged in tactical communications, such as situational reporting and possible 'go' or 'no go' determinations, at the last moment." (*See* Staff Monograph, at 4, Ex. 1 to the Williamson Decl..)

40.     American Airlines Flight 11 departed Logan Airport at 7:59 a.m. and the hijacking of Flight 11 began at 8:14 a.m. (*In re Sept. 11 Litig.,* 594 F. Supp. 2d at 378.)

41.     Thirty-two minutes later, at 8:46 a.m., Atta flew Flight 11 into the North Tower of the World Trade Center, causing the loss of thousands of lives and the destruction of billions of dollars of property, including 7 WTC. (*See* Staff Monograph, at 15, Ex. 1 to the Williamson Decl.)

**Logan Airport's Notoriously**
**Lax and Ineffective Security**

42.     The lax security at Logan Airport was well-publicized from at least 1999, at which

time the checkpoint security personnel were so poorly selected, paid, motivated, and trained that

there was an astounding 207% turnover rate.  (GAO Report, *Aviation Security: Vulnerabilities*

*Still Exist in the Aviation Security System*, at 8, 16 (Apr. 6, 2000), Ex. 23 to the Williamson

Decl.; *see also* Mathew Brelis, *Security Lapses Revealed at Logan: Federal Agents Report at*

*Least 136 Violations*, Boston Globe (Sept. 19, 1999), Ex. 24 to the Williamson Decl.)

43.     In summarizing the FAA security statistics regarding Logan Airport, the Boston

Globe reported that: "The most worrisome numbers for Logan Airport are the most serious

violations.  The FAA security statistics suggest that Boston's airport is—by a substantial

margin—the nation's most porous when FAA agents test airport defenses periodically, by posing

as passengers while trying to carry weapons and dummy bombs through security checkpoints."

(*See* Matthew Brelis and Matt Carroll, *FAA Finds Logan Security Among Worst,* Boston Globe

(Sept. 26, 2001), Ex. 11 to the Williamson Decl.)

44.     In February and May of 2001, the Boston Fox News television station aired two

exposés about Logan's abysmal security.  (*See* Staff Monograph, at 4, Ex. 1 to the Williamson

Decl.)

45.     In one of the two broadcasts, a Fox News investigation was able to breach

checkpoints in each of Logan's terminals by carrying knives and other prohibited items through

every single checkpoint at Logan.  (*See* Uncertified Transcript, Fox 25 News (Boston)

Investigative Report on Airport Security (May 6, 2001), at 3, Ex. 12 to the Williamson Decl.) A

knife of the same brand and type as one bought by Atta just before September 11th set off the

alarms on each of the walk-through metal detectors, but went undetected by the screeners every

single time. (*Id.*; *see also* Letter from Deborah Sherman, Apr. 11, 2001, Ex. 25 to the

Williamson Decl. (explaining that the knife used to breach security by Fox News investigators

was a leatherman pocket knife); William F. Jasper, *Unfriendly Skies*, New American (Oct. 18,

2004), at 13, Ex. 26 to the Williamson Decl.; *The 9/11 Commission Report*, Ch. 1, at 451 n.1, Ex.

5 to the Williamson Decl.)

46.     One of the screening companies exposed by the Fox news reports was Globe, the

same screening company hired to carry out the airlines' shared checkpoint responsibilities in

Portland and the same company responsible for American's checkpoint security at Logan

Airport. (Uncertified Transcript, Fox 25 News (Boston) Investigative Report on Airport Security

(May 6, 2001), at 1, Ex. 12 to the Williamson Decl.)

47.     The Fox news investigation exposed Globe's "huge loopholes in security where

people could easily smuggle dangerous weapons on board an airplane without getting caught."

(*Id.*) One expert commented that "I think they [the public] should be aware of the fact that when

they do go through security or board an aircraft, that possibly they could be on an airplane that

may be hijacked or detained by terrorists." (*Id.* at 4.)

48.     After the broadcasts, Mr. Lawless alerted Logan air carriers, including United, of

his belief that the Logan Airport air carriers had not been taking security seriously because: (1)

the Fox news investigation had successfully brought contraband undetected through airport

checkpoints (with an exposé on those security breaches to be aired on local television), and (2)

an FAA agent had been able to completely bypass gate security and board a United Airlines

plane. (*See* Massport Public Safety Staff Meeting Minutes, MD 100789-792 (Apr. 13, 2001),

Ex. 27 to the Williamson Decl.; Lawless Tr., at 129:17-130:7, Ex. 13 to the Williamson Decl.)

49.     At his deposition, Mr. Lawless testified that he tried to address the deplorable state

of Logan's checkpoint security by instituting various programs and initiatives in the summer of

2001, but the airlines resisted those efforts, stating in at least one instance that they did "not have

the resources or desire to go beyond the minimum requirement of the law." (*See* Lawless Tr. at

101:12-102:19, 140:3-142:23, 144:5-145:25, 146:2-13, 153:14-154:3, Ex. 13 to the Williamson

Decl.)

50.     As of September 11th, Mr. Lawless remained firm in his belief that Logan's

checkpoint security was still the airport's "weak link." (*Id.* at 46:14-24, 91:2-9, 93:17-22.)

**The Imminent Threat Of Domestic**
**Hijackings Was Well Known To United**

51.     On the morning of September 11, 2001, the FAA's terrorist alert level for civil

aviation was Level 3, a heightened threat level. (Staff Monograph, at 54-57, Ex. 1 to the

Williamson Decl.; *see also U.S. v. Moussaoui* Trial Tr., March 22, 2006, Testimony of Robert J.

Cammaroto, FAA/TSA Chief of Commercial Airport Policy, and, around 9/11/01, chief of the

Security Directives Working Group, at 1794-1797, Ex. 28 to the Williamson Decl.; United States

Department of Transportation ("DOT"), *Changing Face of Transportation*, "Threats to Aviation

Security" at 7-15 to 7-17, Ex. 29 to the Williamson Decl.)

52.     Threat Level 3 means that "[i]nformation indicates a terrorist group or other hostile

entity with a known capability of attacking civil aviation is likely to carry out attacks against

U.S. targets; or civil disturbances with a direct impact on civil aviation have begun or are

imminent." (Staff Statement No. 3: The Aviation Security System and the 9/11 Attacks, at 5, Ex.

30 to the Williamson Decl.)

53.     The airlines were again warned by the FAA in 2000 that the "Usama Bin Laden

network is considered the single most serious threat to the United States ... at the present time,"

that "Usama bin Laden allegedly issued a communiqué that threatened, in part, '… to bring

down … aircraft and hijack them'" and that "instruction in hijacking techniques is being

provided in Bin Laden's Afghanistan training camps." (FAA, *Memorandum: Worldwide Threat

Questions and Answers*, TSA UAL 00000705 at 722 (Oct. 30, 2000), Ex. 31 to the Williamson

Decl.)

54.     The terrorist threat to civil aviation grew astronomically in 2001.  In early 2001, the

United States Department of Transportation ("DOT") reported on then-CIA Director George

Tenet's testimony before Congress that "the most serious threat overall … that the United States

faces worldwide comes from Islamic extremists, most notably Usama Bin Laden" and concluded

that "it is believed that the threat *within* the United States has increased." (FAA, *Terrorist

Threat Overview for the United States*, AAL021018 at 3, Ex. 32 to the Williamson Decl.)

55.     In the spring of 2001, the FAA traveled to the country's largest airports, including

Logan, to give a presentation to the airlines, including United, dramatizing the clear and present

danger of possible multiple attacks to civil aviation by terrorists.  (*See The 9/11 Commission

Report*, at 264, Ex. 5 to the Williamson Decl.; *see also* Deposition Transcript of Richard Davis,

United's Corporate Director of Security ("Davis Tr."), at 282:2-287:4, Ex. 14 to the Williamson

Decl.)

56.     This FAA presentation specifically discussed the 1994 Bojinka plot to blow up

twelve U.S. airliners simultaneously and the 2000 "Millennium Plot" by Middle Eastern

terrorists for simultaneous attacks on several United States airports during the millennial

celebrations.  (Civil Aviation Security Intelligence PowerPoint Presentation: the Transnational

Threat to Civil Aviation, at XC 095774-77, Ex. 33 to the Williamson Decl.)

57.    With respect to potential domestic hijackings by Middle East terrorists, the FAA advised that such hijackings would "likely result in a greater number of American hostages but would be operationally more difficult ... if however, the intent of the hijacker is not to exchange hostages for prisoners, but to commit suicide in a spectacular explosion, a domestic hijacking would probably be preferable." (*Id.* at XC.095781; *see also* Staff Monograph, at 59, Ex. 1 to the Williamson Decl.)

58.    In July 2001, the FAA, as part of proposed rulemaking, publicly reinforced its repeated warnings that Middle Eastern terrorist groups were present in the United States; that, as a result, the threat level would likely rise in the future; that terrorists were willing to conduct attacks intended to bring about indiscriminate casualties; and that civil aviation was an attractive target for them because of the known weaknesses in the airlines' security operations. (*See* Final Rule on Airport Security for Department of Transportation and Federal Aviation Administration, 66 Fed. Reg. 37274, at 37313 (July 17, 2001) (to be codified at 14 C.F.R. pts. 107 and 139), XC061373 at 413, Ex. 34 to the Williamson Decl.)

59.    The FAA's July 2001 warning explicitly warned that the "extremists operate in small groups," specifically citing the Bojinka plot as evidence that terrorists might attempt simultaneous, grand scale attacks on commercial aviation. (*Id.*)

60.    The FAA also issued a succession of security directives and information circulars in the final days and months leading up to September 11th concerning the risk to civil aviation of terrorism. For example, at the end of July 2001, the FAA warned of "reports of possible near-term terrorist operations." (DOT/FAA, *Civil Aviation Security Information Circular: Continued Middle Eastern Threats to Civil Aviation*, at 1 (July 31, 2001), Ex. 37 to Williamson Decl.) Although the FAA's warning mentioned the "Arabian Peninsula and/or Israel" as a possible

target of these near-term attacks, the warning stated explicitly that the "threat is not solely confined to the Middle East." (*Id.* at 1-2)

61.     The FAA repeatedly encouraged all U.S. carriers to exercise prudence and "demonstrate a high degree of alertness." (DOT/FAA, *Civil Aviation Security Information Circular: Possible Terrorist Threat – Arabian Peninsula*, at 1 (July 18, 2001), Ex. 38 to the Williamson Decl.)

62.     The rapidly growing domestic threat also was publicly recognized by Massport public safety director, Joe Lawless. (*See* Lawless Tr. at 69:15-25, 73:19-74:12, 75:4-76:5, 81:12-82:17, 108:8-109:9, 124:3-15, 151:19-154:3, Ex. 13 to the Williamson Decl.)

63.     Just six days prior to September 11th at a Massport security meeting attended by United, Mr. Lawless distributed copies of recent FAA information circulars concerning the Middle Eastern terrorist threat and specifically warned that all airline security personnel needed to be "*extra vigilant.*" (Massport Public Safety Staff Meeting Minutes, XC103650 at 2 (Sept. 5, 2001), Ex. 39 to the Williamson Decl.)

64.     Based on these FAA warnings, United was aware that the Middle Eastern terrorist threat was "foremost in the minds of FAA security officials during the summer of 2001" and a clear and present danger. (Staff Monograph, at 55, Ex. 1 to the Williamson Decl.)

65.     However, the heads of security for United, although aware of the heightened threat during the summer of 2001, did not take that threat seriously, preferring to believe that, if any attacks were to occur, they would occur someplace else in the world. (*See id.* at 54-56; *see also* Deposition Transcript of Timothy Ahern ("Ahern Tr.") at 166:21-167:22, 182:2-183:7, 218:13-

219:5, Ex. 35 to the Williamson Decl.; Deposition Transcript of Edmond Soliday ("Soliday Tr.")

at 121:16-124:6, Ex. 36 to the Williamson Decl.)

Dated: New York, New York
       September 11, 2012

                Respectfully submitted,

                FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

                By:

                     Richard A. Williamson
                One Liberty Plaza
                New York, New York 10006
                (212) 412-9500
                rwilliamson@fzwz.com

                *Attorneys for Plaintiff 7 World Trade Company, L.P.*