UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
IN RE SEPTEMBER 11 LITIGATION        : 21 MC 101 (AKH)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
WORLD TRADE CENTER PROPERTIES LLC, et :
al.,                                 : 08 CIV 3722 (AKH)
:
            Plaintiffs,              :
:
    v.                               :
:
AMERICAN AIRLINES, INC., et al.,     :
:
            Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM IN SUPPORT OF SUPPLEMENTAL MOTION BY
UNITED FOR SUMMARY JUDGMENT DISMISSING ALL CLAIMS OF THE
<u>WTCP PLAINTIFFS RELATING TO 7 WTC</u>**

# Table of Contents

PRELIMINARY STATEMENT ..................................................................................................1

I.  THE PORTLAND AIRPORT CHECKPOINT AGREEMENT DOES NOT HOLD UNITED LIABLE FOR AN ALLEGED SECURITY VIOLATION TRACED TO A FLIGHT OPERATED BY ANOTHER CARRIER OR THE PASSENGERS BOARDING THAT FLIGHT..................................................................................................................3

II. FEDERAL LAW GOVERNS LIABILITY FOR ALLEGED SECURITY VIOLATIONS; NOT CASES DECIDED UNDER COMMON LAW PRINCIPLES ...................4

III. FEDERAL LAW CLEARLY ESTABLISHES THAT UNITED HAD AN OBLIGATION TO SCREEN ITS OWN PASSENGERS, NOT THOSE ON A FLIGHT OPERATED BY ANOTHER CARRIER ...............................................................................9

CONCLUSION.................................................................................................................................11

# Table of Authorities

**Cases**

*Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367-68 (3d Cir. 1999) ............................................. 5

*Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960) ...................................... 5

*Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) (per curiam) 5

*Bavis v. UAL Corp. (In re September 11 Litig.)*, 811 F. Supp. 2d 883, 893 (S.D.N.Y. 2011)....5,6

*City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639, 93 S. Ct. 1854, 36 L. Ed. 2d 547 (1973) .................................................................................................................................. 5

*Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934 (9th Cir. Cal. 2002) ......................................... 5, 6

*French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) ....................................................... 5

*Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005) .......................... 5

*In re Sept. 11 Litig.*, 594 F. Supp. 2d 374, 377 (S.D.N.Y. 2009) .................................................. 8

*Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) .................................................. 5, 6

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. N.Y. 1996) ............................... 6, 7, 8, 9

*U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010) ........................................ 5

**Other Authorities**

49 U.S.C. § 40105 ............................................................................................................................. 6

14 C.F.R. § 108.9 ......................................................................................................................... 9, 10

## PRELIMINARY STATEMENT

United's four page motion presents one simple issue: is an air carrier responsible for the security of flights operated by other carriers. As Plaintiff knows from the Court's prior ruling on the standard of care and the numerous appellate decisions that were cited therein, federal law exclusively governs the resolution of this issue. Nonetheless, Plaintiff frames its opposition by citing to cases decided on common law grounds and a checkpoint agreement that specifically contradicts Plaintiff's core argument.

Plaintiff's extraordinarily voluminous opposition to this motion sets forth no legal or factual basis for denying the relief requested. It is instead intended to obfuscate the only issue raised in this motion. It also seeks to impose a liability regime that is both impossibly broad and well beyond the scope of what applicable law allows.

Plaintiff wants this Court to rule that every air carrier that operates just one flight from Portland can be held responsible for the security of every other flight that departs from that airport. Plaintiff further contends that each Portland carrier can also be held responsible for the security of flights that Portland passengers board at other airports; even when the Portland passengers leave the sterile area and have to be completely re-screened prior to boarding their connecting flights. No case, no statute, no regulation and not even the "shared responsibility agreement"[1] that Plaintiff relies upon supports such a broad liability scheme.

The last paragraph of the one page "shared responsibility" checkpoint agreement specifically states that each carrier is **"solely responsible"** for security violations traced to a particular carrier or its passengers. There is no dispute that the passengers at issue in the case at bar are the two Flight 11 hijackers who were passengers on a flight from Portland to Boston that

---

[1] *See* Plaintiff's Opp., Williamson Decl. Exhibit 3.

1

was operated by another carrier. If those passengers were improperly screened, the Portland checkpoint agreement specifically holds that carrier, not United, "solely responsible." That result is wholly consistent with the federal regulatory scheme and the specific mandates of United's own FAA security program.

The attorneys for Plaintiff fully participated in last year's extensive briefing and oral argument to decide the standard of care. They know that federal law governs the outcome of this motion, not cases decided under common law principles. Nonetheless, their opposition is based on a Ninth Circuit case that used common law principles to decide liability for theft under the Warsaw Convention and a Second Circuit case that used New York common law to determine a transporting carrier's duty to warn a connecting carrier of allegedly suspicious information revealed during the check-in of passengers boarding a flight in Beirut, Lebanon.

As this Court and numerous appellate courts have recognized, federal law governs the resolution of an air carrier's safety and security responsibilities both during check-in and during the screening process at issue in this motion. The security responsibilities imposed on carriers during this process logically focus on the flights they operate and the passengers they carry. These responsibilities do not extend to flights operated by other carriers or the passengers that board those flights. In accordance with these principles and the case law set forth herein, United respectfully submits that it should be dismissed from the action instituted against it by Plaintiff. This result is wholly consistent with the dismissal of all other carriers from the United Flight 175 claims and consistent with United never disputing the right of those carriers to not be held liable for the security of the flights that United operates.

I.

**THE PORTLAND AIRPORT CHECKPOINT AGREEMENT
DOES NOT HOLD UNITED LIABLE FOR AN ALLEGED
SECURITY VIOLATION TRACED TO A FLIGHT OPERATED
BY ANOTHER CARRIER OR THE PASSENGERS BOARDING
THAT FLIGHT.**

United does not deny that it is responsible for the security of the flights that it operates, including United Flight 175 that terrorist hijackers intentionally crashed into the South Tower of the World Trade Center. But that flight did not cause any damage to 7 WTC. There is no dispute that American Flight 11 caused that damage. United has never sought to hold any other carrier responsible for the security of United Flight 175 and no party seeks to hold United responsible for the security of American Flight 11 except this Plaintiff and its related entities.

The fulcrum for Plaintiff's argument against United is set forth on the second page of its memorandum of law in opposition:

> United's non-delegable federal statutory duty to secure the Portland security checkpoint with the highest possible degree of safety in the public interest arose because that checkpoint, and the responsibility for it, was shared by all airlines operating out of Portland . . .

Plaintiff attaches a copy of the Portland airport "Shared Responsibility Agreement" as Exhibit 3 to the Williamson Declaration and uses that agreement as the foundation for its entire argument. However, that simple one page agreement squarely contradicts the argument that Plaintiff makes.

The airport in Portland, Maine is relatively small and has just one screening checkpoint. That checkpoint had to be used for all flights that departed from the Portland airport. The carriers that offered flights from Portland signed a one page agreement titled, "Shared Responsibility Agreement." However, what Plaintiff fails to mention is that agreement specifically provides that if the alleged security violation can be traced to a specific flight or its

3

passengers, the "sole responsibility" for those violations would be with the carrier operating the flight at issue.

It is difficult to comprehend how the Plaintiff could omit reference to the one paragraph of a one page agreement that specifically addresses the one issue asserted in a four page motion. Irrespective of Plaintiff's motivation, it is relevant for this Court to note that the paragraph directly above the signature lines in the checkpoint agreement states the following:

> **Each air carrier** shall remain **solely responsible** for any civil penalties levied against it individually resulting from violations of that air carrier's ACSSP or resulting from any alleged specific violation of the ACSSP. Specific violations are those which can be **traced to a particular air carrier or its passengers**.

Plaintiff's entire argument against United is based on alleged violations of its ACSSP. However, the violations which Plaintiff alleges, can clearly be traced to a "particular air carrier" and "its passengers." Pursuant to the unambiguous terms of this agreement, the "sole responsibility" for these alleged violations would lie with the carrier that transported those passengers, not United.

## II.

### FEDERAL LAW GOVERNS LIABILITY FOR ALLEGED SECURITY VIOLATIONS; NOT CASES DECIDED UNDER COMMON LAW PRINCIPLES.

Plaintiff's attorneys fully briefed and argued the standard of care motion that the Court decided last year. Plaintiff's attorneys know very well that the Court carefully considered hundreds of pages of briefs and heard lengthy oral argument from all sides before ultimately holding that uniform federal standards govern the standard for determining the liability of an air carrier for an alleged security violation. In this regard, the Court stated:

> **Congress created a comprehensive federal scheme to provide for aviation security** specifically designed to protect persons and property of passengers against violence and terrorism. **The detailed, comprehensive regulatory security regime sets out a uniform system of duties and requirements**, not minimum standards to be interpreted in different ways, in different cases.

4

*Bavis v. UAL Corp. (In re September 11 Litig.)*, 811 F. Supp. 2d 883, 893 (S.D.N.Y. 2011).

The Court's holding recognizing a federal standard of care was wholly consistent with numerous prior holdings of various Circuit Courts of Appeal, specifically including recent holdings of the Second Circuit.[2] The two main cases that Plaintiff relies upon to support its argument do not even address a federal standard of care. Instead, those decisions rely on State common law standards that this Court (and the cases that it cited) specifically rejected in favor of the "comprehensive federal scheme" that exclusively governs aviation security. 811 F. Supp. 2d at 893.

The primary issue that was addressed in the Ninth Circuit's decision in *Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934 (9th Cir. Cal. 2002) was whether the Warsaw Convention

---

[2] The Court's standard of care ruling set forth the rulings that it considered and relied upon in reaching its decision. 811 F. Supp. 2d at 890-891 ("In *Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) (per curiam), the Court of Appeals ruled, in dicta, that "[t]he FAA was enacted to create a uniform and exclusive system of federal regulation in the field of air safety." n3 *Id.* at 224 (quoting *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639, 93 S. Ct. 1854, 36 L. Ed. 2d 547 (1973). The Act "was passed by Congress for the purpose of centralizing in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960). As *Air Transport Association* noted, "[t]he intent to centralize air safety authority and the comprehensiveness of these regulations pursuant to that authority have led several other circuits (and several courts within this Circuit) to conclude that Congress intended to occupy the entire field and thereby preempt state regulation of air safety." 520 F.3d at 225. The rule of preemption reflects a dominant view in the federal courts. *See U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005); *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367-68 (3d Cir. 1999); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989).")

applied to the theft of jewelry at a security checkpoint.[3] That issue of treaty interpretation was resolved by the Ninth Circuit pursuant to an apparent stipulation of the parties and the use of California common law agency principles. *Dazo, supra*, 295 F.3d at 939.

Nowhere in the *Dazo* decision does the Ninth Circuit even consider the "comprehensive federal scheme" of security requirements that this Court recognized to be controlling. When, however, the Ninth Circuit did later consider whether federal or State common law governs the standards for liability related to FAA regulated activities, it specifically held that federal law preempts all State common law standards.[4]

Plaintiff's reliance on the Second Circuit's decision in *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. N.Y. 1996), is similarly misplaced. The decision in that case is also based on common law standards and it is not even remotely similar to the facts or holding at issue in the case at bar.

Like *Dazo, Stanford* never considers the "comprehensive federal scheme" of security regulation. Instead, *Stanford* specifically states that the parties did not even address the law that should be used to resolve the question of liability:

> **The parties' briefs and arguments do not discuss choice of law principles.** None of the parties claims the application of Virginia, New York, or Lebanese law. Rather, **each seems to have assumed that generally accepted tort principles apply, indiscriminately citing federal and state cases from a variety of jurisdictions but not including Lebanese law.** The parties do not

---

[3] "We address the reach of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), reprinted in note following 49 U.S.C. § 40105 (the "Warsaw Convention" or the "Convention"), which applies to international, not domestic, air transportation. . . According to Dazo's complaint, one of the stolen carry-on bags contained jewelry with a wholesale value of approximately $100,000." *Dazo, supra*, 295 F.3d at 936, 937.

[4] *See Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007); cited by this Court in *Bavis, supra*, 811 F. Supp. 2d at 890-891.

6

suggest that there are any substantive differences in the law of tort liability of Virginia, New York, or Lebanon that would be outcome-determinative in this case. **Consequently, we will apply familiar concepts of common law tort liability to determine the rights of the parties**.

89 F.3d at 122.

Not only was *Stanford* decided under different legal standards, the holding in *Stanford* actually contradicts Plaintiff's argument against United. *Stanford* held only the operating carrier liable; not all the other airlines that operated flights out of the Beirut Airport. That holding was based on the following:

> MEA's employees at the Beirut airport were responsible for selling and examining passengers' tickets, checking the information on the tickets against visas and passports, and receiving baggage from the passengers.

89 F.3d at 120. Nothing in *Stanford* states or even suggests that a carrier like United could be held liable for a security breach that is alleged to have occurred on a different flight. Unlike MEA, the airline held liable in *Stanford*, United did not "sell and examine" the hijackers' tickets, issue them boarding passes for their flight, or share in the ticket revenue. Even this Court has recognized that *Stanford* does not support holding non-carrier airlines responsible for the security of the hijacked flights.

This Court has specifically held that *Stanford* cannot be used to hold non-carrier airlines responsible for the hijacking of United Flight 175. When it dismissed the claims asserted against other carriers, it stated:

> There are situations where one airline may fairly owe a duty to the passengers of another. In *Stanford v. Kuwait Airways*, for example, one airline wrote tickets to passengers for a through ticket on a second airline, "with the revenues to be allocated pro tanto between the airlines." 89 F.3d 117, 120 (2d Cir. 1996). One screening process for carry-on luggage prior to the initiating flight sufficed for the connecting flight as well. *Id*. **The first carrier's inadequate screening process allowed four terrorists to board both the initiating and connecting flights, thus skirting the more elaborate screening in the second airport. In this manner, they boarded the**

7

> **connecting flight with pistols and explosives, and then hijacked the airplane.** The court held the first air carrier liable to the victims' estates, because the initiating airline, "in the exercise of ordinary care, should have recognized that under these circumstances, knowing what it knew, there was an unreasonable risk of hijacking to passengers aboard its flight and other connecting flights." *Id.* at 124. (remanding for trial).
>
> The present case is different. **American Airlines did not undertake a ticketing responsibility for United and did not check bags intended for the United flight.** Furthermore, neither American nor Globe undertook a screening responsibility for the United flight. **American could not reasonably have foreseen that any breach it may have committed that led to a crash of an American Airlines airplane would have also led to injuries from a crash of a United Airlines airplane.** In addition, a generalized duty of all airlines and all aviation personnel to report aviation threats to federal authorities does not establish under these circumstances a duty of one airline to those injured by another airline's crash. **As I observed at oral argument, the imposition of such a sweeping duty "to general aviation everywhere and to the public everywhere . . . would, in effect, eliminate every conception of the notion of duty in tort law.**

*In re September 11 Litig.*, 594 F. Supp. 2d 374, 381-382 (S.D.N.Y. 2009).

Not only did this Court hold that *Stanford* could not be used to impose a "**sweeping duty**" on a carrier that "**did not undertake a ticketing responsibility . . . and did not check bags**," it also pointed out that the hijackers' plan in *Stanford* was to "**skirt the more elaborate screening in the second airport.**" *Id.* In this case, Plaintiff argues just the opposite, *i.e.* that carriers at Portland should have been alert that terrorists were traveling to a "less secure" airport, Logan Airport in Boston.[5]

Although there are numerous other facts that further distinguish *Stanford* and render the prospect of holding any Portland defendant liable for the hijacking of American Flight 11 a

---

[5] The Final Report of the 9/11 Commission completely refutes the notion that the terrorists had any such intent. It states in the first footnote on the first page of its Final Report that the terrorists chose Logan because that was where trans-continental flights loaded with fuel departed from early in the morning of September 11, 2001, not because of anything having to do with the security at either airport. *See*, The 9/11 Commission's Final Report Chapter 1, p.1 , fn.1, annexed as Exhibit "A" to the Ellis Reply Decl.

fatally flawed proposition,[6] none of those issues are germane to the resolution of the single issue raised in this motion of defendant, United. That issue is simply United's alleged liability for the security of American Flight 11. As set forth in United's initial motion papers and further explained herein, the resolution of that issue is governed by federal law and United's FAA mandated security plan which specifically defines United's security responsibilities as limited to the flights which it operates.

### III.

### FEDERAL LAW CLEARLY ESTABLISHES THAT UNITED HAD AN OBLIGATION TO SCREEN ITS OWN PASSENGERS, NOT THOSE ON A FLIGHT OPERATED BY ANOTHER CARRIER.

United cited one regulation in its four page moving brief. That regulation was 14 C.F.R. § 108.9(a). Consistent with its overall approach to this motion, Plaintiff addresses only §

---

[6] The Second Circuit also notes in *Stanford* that neither the x-ray machines nor metal detectors were working when the terrorists boarded their flight in Beirut. *Stanford*, 89 F.3d at 120. In the case at bar, no such allegation can be made. In addition, there are numerous misleading and/or erroneous statements contained in Plaintiff's Opposition including the assertion that a selectee passenger was subject to the countermeasures identified in Appendix XV under Level III. The list of countermeasures identified in Appendix XV were only used if the FAA directed. (*See* Appendix XV of the ACSSP annexed as Exhibit "B" to the Ellis Reply Decl., and testimony of Robert J. Cammaroto, the FAA's designated Rule 30(b)(6) Representative, at pgs. 125-136, annexed as Exhibit "C" to the Ellis Reply Decl. Plaintiff also misstates FAA requirements for the screening of CAPPS selectees. Plaintiff states that CAPPS selectees such as Atta were subject to special checkpoint screening requirements such as hand-wanding or pat-down of their persons or hand-searching of their carry-on luggage. Opp. Br. at 11-13. This is demonstrably incorrect. Under FAA regulations in effect on 9/11, CAPPS, which was the only acceptable profiling method, identified selectees who were required to be treated no differently than all other passengers for the purposes of checkpoint screening; there were no special or enhanced requirements on 9/11 for the checkpoint screening of the persons or carry-on baggage of CAPPS selectees. Only the checked baggage of CAPPS selectees was subject to special security requirements in the form of a bag match that would hold the selectee's checked baggage off the plane until the selectee had boarded (as at Portland) or the use of an explosive detection device to determine if the checked baggage contained explosives (as at Logan). The FAA did not require that checkpoint screeners be notified of the identity of CAPPS selectees and the screeners had no practical way to identify such selectees. This is confirmed by the text of the ACSSP itself, ¶VII(e) at 79(a)-(c), annexed as Exhibit "B" to the Ellis Reply Decl.; the testimony of R. Cammaroto at pgs. 62-67, annexed as Exhibit "C" to Ellis Reply Decl.; the 9/11 Commission Report at p. 84, annexed as Exhibit "A" to the Ellis Reply Decl.; and the Aviation Staff Monograph at pages 2 and 5, annexed as Exhibit "D" to the Ellis Reply Decl.

108.9(c). Although Plaintiff is correct to state that subsection (c) does require an air carrier to use the security procedures identified in its FAA security program to conduct screening at checkpoints for which "it is responsible," that subsection does not define which checkpoints it is responsible for. That information is provided by reference to what is stated in subsection (a).

As set forth in United's initial motion, § 108.9(a) states the following:

> **Each certificate holder** required to conduct screening under a security program **shall use the procedures** included, and the facilities and equipment described, **in its approved security program** to prevent or deter the carriage aboard airplanes of any explosive or incendiary in checked baggage. (emphasis added).

Subsection (a) clearly designates each carrier's approved security program or ACSSP, as the touchstone for carrying out its security responsibilities. In that regard, United's ACSSP specifically sets forth at page 10, under section I.B., entitled, "APPLICABILITY," that "**this program is applicable to scheduled and public charter operations conducted by the air carrier . . .**"[7] Since United did not operate American Flight 11, it had no obligation to provide screening for the passengers boarding that flight.

The "sole responsibility" provision of the Portland checkpoint agreement is entirely consistent with United's ACSSP and § 108.9. As the Court will note, the first lines of that one page agreement indicate that it is addressed to the FAA.[8] The agreement specifically states that security violations traced to a particular flight or passenger are the "sole responsibility" of the carrier that operates the flight associated with same. Thus, the relief requested by United is not only mandated under the relevant provisions of federal law, it is also required under the terms of

---

[7] United's Air Carrier Standard Security Program, I.B. at p. 10, annexed as Exhibit "B" to the Ellis Decl.

[8] *See* Plaintiff's Opp., Williamson Declaration, Exhibit 3

10

the Portland checkpoint agreement that Plaintiff wrongly interprets as supporting a contrary conclusion.

## CONCLUSION

United stands ready to defend the claims arising out of Flight 175 but it should not be held responsible for defending the claims arising out of American Flight 11. There is no legal or practical reason to require United to defend the actions of another carrier operating out of a wholly different airport just because United offered flights out of a small airport in Maine that only had space for one security checkpoint. That fact is not a trigger for liability and neither is the checkpoint agreement that Plaintiff erroneously uses as the foundation for its entire opposition argument. For the reasons stated herein and in its initial moving papers, United's motion should be granted in its entirety.

Dated: New York, New York
September 21, 2012

QUIRK AND BAKALOR, P.C.

By: /s/ Jeffrey J. Ellis
Jeffrey J. Ellis (JJE 7796)
845 Third Avenue – 15th Floor
New York, New York 10022
(212) 319-1000

-and-

MAYER BROWN LLP
Michael R. Feagley
71 South Wacker
Chicago, Illinois 60606
(312) 701-7065

Counsel for UNITED AIR LINES, INC. and UNITED CONTINENTAL HOLDINGS, INC., (f/k/a UAL CORPORATION)

11