UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE SEPTEMBER 11 LITIGATION  :  21 MC 101 (AKH)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WORLD TRADE CENTER PROPERTIES LLC, et : al.,

               Plaintiffs,  :  08 CIV 3719 (AKH)

     v.  :

UNITED AIRLINES, INC., et al.,  :

         Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WORLD TRADE CENTER PROPERTIES LLC, et : al.,

               Plaintiffs,  :  08 CIV 3722 (AKH)

     v.  :

AMERICAN AIRLINES, INC., et al.,  :

         Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE AVIATION DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, New York 10036
Telephone: (212) 490-9100
Fax: (212) 370-4453
dbarry@condonlaw.com

*Aviation Defendants' Liaison Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENTS OF FACTS ................................................................................................. 9

ISSUE TO BE TRIED ......................................................................................................... 9

DEFENSE POSITION AND RELIEF SOUGHT ................................................................ 9

PRIOR RULINGS OF THIS COURT ............................................................................... 10

ARGUMENT ...................................................................................................................... 13

I.   Correspondence Under C.P.L.R. § 4545(c) Is Established When Both The Tort Damage Award And The Collateral Source Insurance Payments Compensate The Plaintiff For The Same Category Of Loss. ........................................................ 13

II.  Correspondence Exists Here Because Both The Potential Tort Damage Award And The $4.9 Billion In Insurance Recoveries Compensate The WTCP Plaintiffs For The Same Category Of Economic Loss. ................................................................... 17

    A.   *Fisher v. Qualico* Sets Forth The Controlling Legal Principles For Determining Correspondence in Cases Involving Damage To Real Property Interests.................. 17

    B.   The Category Of Loss Sustained By The WTCP Plaintiffs Is Economic Damage To Their Net Leasehold Interests In the Complex And WTC 7 Resulting From Destruction Of The Leased Buildings In The 9/11 Terrorist Attacks................................................................................................................ 20

    C.   The Potential Tort Damages Award Compensates The WTCP Plaintiffs For Their Loss............................................................................................................. 21

    D.   The Replacement Cost And Business Interruption/Time Element Insurance Payments Compensated The WTCP Plaintiffs For The Same Category Of Loss........ 26

III. The WTCP Plaintiffs' Efforts To Distinguish *Fisher* And Deny Or Limit Correspondence Rest On Erroneous Factual And Legal Assumptions. ............................... 29

    A.   The WTCP Plaintiffs' First Argument Against Correspondence—That This Court Has Denied It Any Recovery For Replacement Cost—Flagrantly Misreads The Court's Prior Rulings.......................................................................... 29

    B.   The WTCP Plaintiffs' Alleged Contractual Obligation To Rebuild Affects Neither The Tort Damages Side Nor The Insurance Payments Side Of The C.P.L.R. § 4545(c) Correspondence Equation. ............................................................ 35

    C.   The WTCP Plaintiffs' "Two Losses" Argument Misapprehends Both The Court's Prior Rulings And The Nature of Business Interruption Insurance. ............... 38

IV.  Whether Or Not To Allocate The Insurance Payments Is Academic Because Complete Correspondence Exists Under The Only Practicable Allocation. ......................... 41

A.   The Insurance Payments Correspond In Their Entirety To The WTCP Plaintiffs' Tort Damages Award. ............................................................. 42

B.   The Only Practicable Allocation Would Split The Insurance Payments Between Replacement Cost And Business Interruption Proportionately To The Documented And Quantified Insurance Claims........................................... 45

V.   The WTCP Plaintiffs' Insurance Payments Offset And Fully Extinguish Their Tort Damages.................................................................................................. 46

CONCLUSION............................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Benavie v Baker*,
    72 A.D.2d 541 ................................................................................................................30

*Bryant v. N.Y.C. Health & Hospitals Corp.*,
    93 N.Y.2d 592 (1999) .............................................................................................15, 16

*Dilapi v. Empire Drilling & Blasting, Inc.*,
    880 N.Y.S.2d 115 (2d Dep't 2009) ...............................................................................22

*Dymond v. Dunn*,
    148 A.D.2d 56 (3d Dep't 1989) .....................................................................................43

*Fisher v. Qualico Contracting Corp.*,
    98 N.Y.2d 534 (2002) ......................................................................................... *passim*

*Gass v. Agate Ice Cream, Inc.*,
    264 N.Y 141 (1934) .................................................................................................22, 30

*Hartshorn v. Chaddock*,
    135 N.Y. 116 (1892) .......................................................................................18, 22, 24

*Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*,
    No. 07-cv-4175 (NGG) (RLM), 2008 WL 4693246 (E.D.N.Y. Oct. 17, 2008) .....................24

*In re Sept. 11 Litig.*,
    2009 WL 1181057 (S.D.N.Y. Apr. 30, 2009)................................................... *passim*

*In re Sept. 11 Litig.*,
    590 F. Supp. 2d at 544 ...................................................................................... *passim*

*In re Sept. 11 Litig.*,
    723 F. Supp. 534 (S.D.N.Y. 2010) ..............................................................................9, 21

*In re Sept. 11 Litig.*,
    889 F. Supp. 2d 616 (S.D.N.Y. 2012)...............................................................6, 7, 11, 19

*In re Sept. 11 Litig.*,
    908 F. Supp. 2d 442 (S.D.N.Y. 2012)................................................................ *passim*

*In re Sept. 11 Litig.*,
    No. 21 MC 101 (AKH) (S.D.N.Y. Sept. 24, 2009) ...........................................................16

*In re Sept. 11 Litig.,*
    No. 21 MC 101 (AKH) (S.D.N.Y. Sept. 30, 2009) ........................................................ *passim*

*In the Matter of the Petition of 1 World Trade Center LLC, et al.,* TAT(H)07-34(CR)36 (N.Y.
    Tax Appeals Tribunal Dec. 3, 2009) ..........................................................................36

*Jenkins v. Etlinger,*
    55 N.Y.2d 35 (1982) ..............................................................................22, 25

*Johnson v. Scholz,* 276, App. Div. 163 ..........................................................................30

*Kozlowski v. Briggs Leasing Corp.,*
    408 N.Y.S.2d 1001 (N.Y. Sup. Ct. 1978) .......................................................................43

*Nichols v. Lehigh Valley R. Co.,*
    114 N.Y.S. 942 (N.Y. Cnty. Ct. 1908) ..........................................................................24

*Oden v. Chemung County Industrial Development Agency,*
    87 N.Y.2d 81 (1995) ..............................................................................14, 15, 40

*Price v. Luhrs,*
    952 N.Y.S.2d 391 (N.Y. Civ. Ct. 2012) .........................................................................24

*Sandoro v. Harlem-Genesee Market & Nursery, Inc.,*
    482 N.Y.S.2d 165 (4th Dep't 1984) ..........................................................11, 24, 26, 39

*Schonfeld v. Hilliard,*
    218 F.3d 164 (2d Cir. 2000) ..................................................................................24

*Slavin v. State,*
    152 N.Y. 45 (1897) ..............................................................................24

*SR International Business Insurance Co., Ltd. V. World Trade Center Properties LLC,*
    No. 01 CV 9291 (JSM) (S.D.N.Y.) .........................................................................27, 35

*Turnbull v. USAir, Inc.,*
    133 F.3d 184 (2d Cir. 1998) ..................................................................................14, 15

*World Trade Ctr. Props. LLC v. Certain Underwriter's at Lloyd's (In re Sept. 11 Litig.),*
    2012 WL 5954585 (S.D.N.Y. Nov. 27, 2012) ..................................................................31

**Statutes**

N.Y. C.P.L.R. Section 4545(c) .............................................................................. *passim*

Federal Rule of Civil Procedure 54(b) ..........................................................................10

**Other Authorities**

New York Pattern Jury Instructions, 1 N.Y. PJI Civil 2:311 at 929 (3d ed.) ...............................30

The Aviation Defendants[1] submit this Pretrial Memorandum of Law in support of the positions they intend to advance at the non-jury trial limited to the issue of damages correspondence under N.Y. C.P.L.R. Section 4545(c).

## PRELIMINARY STATEMENT

The purpose of this non-jury trial is to determine whether the $4.9 billion in insurance proceeds that World Trade Center Properties and its affiliates (collectively "WTCP") and 7 World Trade Company, L.P. ("7WTCo.") (together, the "WTCP Plaintiffs") received correspond to the same category of loss for which they seek compensation in this tort litigation. Under New York C.P.L.R. Section 4545(c), this issue is for the Court to decide. If the Court determines that there is proof to a reasonable certainty that WTCP's and 7WTCo.'s recoverable tort damages compensate them for the same category of loss for which the insurance proceeds were paid, those payments must be offset against the potential tort damages that WTCP and 7WTCo. could recover if they were to prevail at a liability trial. The key concept is loss. Correspondence exists if the insurance payments redress the same category of loss for which tort damages could be awarded, even if the insurance payments and tort damages are measured differently.

There could scarcely be a clearer case for correspondence than this one. Just 55 days before September 11, WTCP entered into net lease agreements pursuant to which it obtained its net leasehold interests in World Trade Center Towers 1, 2, 4, and 5 (collectively, the "WTC Complex" or "Complex"), which was valued at $2.805 billion. As part of the net lease

---

[1]   The Aviation Defendants are American Airlines, Inc.; AMR Corp.; United Airlines, Inc.; United Continental Holdings (f/k/a UAL Corporation); US Airways, Inc.; US Airways Group, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Huntleigh USA Corporation; The Boeing Company; and Massachusetts Port Authority.

agreements, WTCP agreed to obtain insurance against the possibility of property damage or destruction of the buildings. WTCP went out into the insurance market and obtained that insurance. The policies provided coverage for property damage (including business interruption resulting from property damage) arising from a terrorist attack. When the events of September 11, 2001 occurred, and the very risk insured against materialized, the insurers paid WTCP a total of $4.091 billion in compensation for the loss WTCP suffered due to the destruction of the Complex by the terrorists. While certain insurers litigated with WTCP over whether the attacks constituted one occurrence or two, none ever denied that the loss at issue was the loss insured against: the damage to WTCP's net leasehold interests that resulted from the destruction of the buildings.

That loss is precisely the same one for which WTCP seeks compensation in the form of tort damages in this litigation. WTCP would not have received the $4.091 billion in insurance payments if the buildings had not collapsed as a result of the September 11 attacks. But that is the very same loss that provides WTCP with standing to sue in this litigation. We literally would not be here if it were not for the destruction of the buildings in which WTCP held net leasehold interests on September 11, 2001. The correspondence question is as simple as that.

The situation with respect to 7 World Trade Center ("WTC 7") is no different or more complicated. 7WTCo. was the net lessee of WTC 7 pursuant to a lease entered into back in the 1980s, but the net leasehold had been appraised (by Cushman & Wakefield) at the request of 7WTCo.'s lenders in March 2001 at a market value of $700 million. Nonetheless, for the purposes of the correspondence trial, the Aviation Defendants have accepted 7WTCo.'s own expert's determination of the market value of 7WTCo.'s leasehold interest as of September 11, 2001 at $737 million. The property was insured against loss (including temporary loss of rental

2

income) due to destruction by terrorists; that is precisely the loss that the insurance policies covered and is the loss that formed the basis of the $831 million in insurance payments that 7WTCo. received after September 11, 2001.  Once again, it is that same loss for which 7WTCo. seeks compensation in this litigation.  For both WTCP and 7WTCo., recovery of the full fair market value of their leasehold interests immediately prior to the terrorist attacks provides them with full compensation for the economic damage to their property interests in the leased buildings.  The insurance payments they received for the same property loss (whether measured by replacement cost for the buildings and/or by temporary loss of rental income) fully offset their potential tort recovery.

The Aviation Defendants' case at trial will be a simple one.  We plan to call only two witnesses:  Professor Daniel Fischel, an expert on law and economics, and Michael Beach, an expert in the adjustment of insurance claims.[2]  We will introduce deposition testimony from the WTCP Plaintiffs' sole fact witness, Michael Levy, and from the WTCP Plaintiffs' expert witnesses, Professor Steven Shavell, Professor Patrick Connors, Mr. Edward Reilly and Mr. Jeffrey McKinley. The Aviation Defendants' documentary evidence is likewise straightforward, consisting of the Complaint and Damages Disclosure Forms on the tort award side of the

---

[2]  With respect to the issue of pre-judgment interest, the Aviation Defendants intend to offer two declarations prepared by Rajiv Gokhale, of Compass Lexecon: the Declaration of Rajiv Gokhale in Support of Aviation Defendants' Memorandum of Law in Support of Their Motion For Summary Judgment Dismissing All Claims for the Destruction of WTC 1, 2, 4 and 5 (June 20, 2008) ("Gokhale Complex Decl."); and the Declaration of Rajiv Gokhale re: WTC 7 (Feb. 28, 2013) ("Gokhale WTC 7 Decl.") (together, the "Gokhale Declarations") attached as Exs. MM and NN to the July 8, 2013 Declaration of Desmond T. Barry, Jr. The parties have stipulated to the admissibility of the Gokhale Declarations.  The calculations performed therein demonstrate that at any federal rate of interest, WTCP's and 7WTCo.'s insurance proceeds exceed their maximum recoverable tort damages plus prejudgment interest. *See* Gokhale Complex Decl. ¶¶ 8, 9; Gokhale WTC 7 Decl. ¶¶ 3–5, 8–10, 13.  For the Complex, the insurance payments exceed tort damages plus interest even at the inapplicable New York state rate of nine percent. *See* Gokhale Complex Decl. ¶ 10.

correspondence equation. On the insurance payments side of the correspondence equation, the Aviation Defendants plan to introduce the net leases, the insurance policies, proofs of loss, communications between the WTCP Plaintiffs and their insurers, and financial statements reported by the WTCP Plaintiffs.

The Aviation Defendants will prove that:

- The category of loss for which WTCP, 7WTCo. and their affiliates seek recovery in tort is the economic damage to their net leasehold interests in the Complex and WTC 7 that resulted when the terrorists destroyed those buildings.

- As the Court has ruled already, the maximum damages WTCP and 7WTCo. can recover for those losses are $2.805 billion for the Complex and $737 million for WTC 7.

- The category of loss for which WTCP and 7WTCo. sought and received insurance payments of approximately $4.091 billion for the Complex and $831 million for WTC 7 was the economic damage to their net leasehold interests in the Complex and WTC 7 that resulted when the terrorists destroyed those buildings.

- As a matter of law and economics, insurance payments made to WTCP and 7WTCo. for the damage to their economic interest in the destroyed buildings correspond to and fully extinguish the tort damages that WTCP and 7WTCo. are claiming.

The WTCP Plaintiffs concede that the insurance payments that they received for business interruption correspond to their tort damages and must be deducted. Declaration of Desmond T. Barry, Jr. (July 8, 2013) ("Barry Decl.") Ex. A, Expert Report of Steven Shavell ¶ 24 (Aug. 12, 2011) ("2011 Shavell Rep."). Their arguments against correspondence are all directed at the

4

portion of their insurance payments that they say were made for replacement costs. However, those arguments are fatally flawed.

All of the WTCP Plaintiffs' arguments against correspondence rest on a fundamental misconception—that replacement cost insurance proceeds can only correspond to a tort damages award for replacement cost and not to a tort recovery measured by diminution in fair market value. This reflects a misunderstanding of the nature of correspondence under C.P.L.R. Section 4545(c), which provides for offset when the same *category of loss* is compensated for by a collateral source and a tort damages award. Replacement cost and diminution in fair market value both compensate for the same category of loss: lost property value. The WTCP Plaintiffs' precise argument—that replacement cost insurance proceeds and a tort damages award measured by diminution in fair market value compensate for different categories of loss—was rejected by the New York Court of Appeals in *Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 540 (2002), when the Court of Appeals unanimously held that replacement cost and reduction in fair market value are simply two different ways of measuring the same loss: lost property value. *Id.* at 540 (concluding that replacement cost and diminution in market value are each a proper way to measure lost property value and holding that the "collateral source payment—the Fishers' replacement cost insurance proceeds—thus *corresponds* to their property loss  and was properly offset against the damages award").

The WTCP Plaintiffs' remaining arguments against correspondence all flow from the same fundamental misconception that replacement cost insurance proceeds can only correspond to a replacement costs tort damages award. Thus, the WTCP Plaintiffs first argue that the Court has denied them any tort recovery for replacement costs, rather than permitting the WTCP Plaintiffs to recover replacement costs up to the amount of diminution in fair market value of

their net leasehold interests. This argument depends entirely upon a flagrant misreading of the Court's prior rulings. Although the WTCP Plaintiffs' experts inexplicably insisted that the Court did not apply the "lesser of two" rule to limit WTCP's and 7WTCo.'s damages, the plain text of the Court's rulings shows the erroneous nature of this contention. *See, e.g., In re Sept. 11 Litig.*, 590 F. Supp. 535, 541 (S.D.N.Y. 2008) ("a plaintiff whose property has been injured may recover the lesser of the diminution of the property's market value or its replacement cost."); *see also In re Sept. 11 Litig.*, 889 F. Supp. 2d 616, 620 (S.D.N.Y. 2012) ("I held that a tort recovery was limited to the lesser of fair market value or replacement cost . . . ."); *In re Sept. 11 Litig.*, 908 F. Supp. 2d 442, 447 & n.9 (S.D.N.Y. 2012) (reciting lesser of two ruling, and noting that "[i]f it were proven that the replacement cost is in fact the lesser amount, the lesser of two rule would limit Aviation Defendants' potential tort liability to that amount").

The Court did not bar the WTCP Plaintiffs from recovering even one dollar of replacement costs, but simply applied the lesser of two rule to the WTCP Plaintiffs' claims, just as the New York Court of Appeals did to the plaintiffs' claims in *Fisher v. Qualico*. The lesser of two rule limits the *amount* of the WTCP Plaintiffs' damages; it does not change *the category of their loss,* as the *Fisher* court explained. *See Fisher*, 98 N.Y.2d at 540 ("[R]eplacement cost and diminution in market value are simply two sides of the same coin. Each is a proper way to measure lost property value, the lower of the two figures affording full compensation to the owner.").

The WTCP Plaintiffs' second argument against correspondence of the replacement cost portion of their insurance recoveries recycles a frequently raised—and just as frequently rejected—fallacy: that somehow the WTCP Plaintiffs' alleged contractual obligation to rebuild the destroyed buildings changes the rules that otherwise would apply to a case for property

damage.  But the alleged contractual obligation to rebuild affects neither the tort side nor the insurance side of the correspondence equation.  As the Court already has held, the WTCP Plaintiffs' voluntarily undertaken contractual rebuilding provision does not and cannot change the measure of the tort damages available to them under New York law.  *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544 ("The particular features of WTCP's contracts cannot be made the special responsibility of the Aviation Defendants, nor the natural and probable result of their negligence, nor the foreseeable consequence of their acts and omissions."); *In re Sept. 11 Litig.*, 889 F. Supp. 2d at 620–21 (noting prior ruling "that WTCP could not recover in tort, in a suit for negligence, the damages flowing from its contractual obligations to 'rebuild, restore, repair and replace' the Trade Center buildings").  As to the insurance side of the correspondence analysis, nothing in the insurance policies in any way makes insurance payments contingent or dependent upon any alleged contractual obligation to rebuild.  The WTCP Plaintiffs' own insurance experts, Mr. Reilly and Mr. McKinley, readily acknowledged that the WTCP Plaintiffs' insurance policies and insurance payments had nothing whatsoever to do with any alleged contractual obligation to rebuild.

The WTCP Plaintiffs' third argument against correspondence of their replacement cost insurance payments maintains that they have suffered two losses—the loss of the buildings and the loss of rental income derived from the buildings—while the Fishers suffered only one loss— the loss of their home.  The WTCP Plaintiffs argue that only their business interruption/lost rental income insurance payments correspond to their tort loss, but this argument misapprehends both the nature of business interruption insurance and the Court's prior rulings.  As the Court previously ruled, lost rental income from business interruption is not a separate, additive loss apart from the loss of the buildings that generated the rental income.  Rather, a tort award equal

to the amount of the fair market value of the buildings makes the WTCP Plaintiffs whole for all their damages—including the lost rental income—resulting from the destruction of the buildings. *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544 ("If [WTCP] recovers that market value, it necessarily regains the present value of the rental streams that were destroyed. WTCP cannot recover twice, once in the form of the property's market value, which fully includes the rental streams reasonably expected from the property, and again for the separate value of the rental streams."). Perhaps even more fundamentally, however, the fact that the WTCP Plaintiffs had business interruption insurance that compensated them for the temporary loss of rental income during the period of rebuilding does not eliminate the correspondence between replacement cost insurance and property damage as measured by diminution in fair market value. Barry Decl. Ex. B, Dep. of Steven Shavell Tr. 284:7–16 (Nov. 30, 2012) ("Shavell Dep. Tr.") ("If the Fishers were renting their home, and they could buy an equivalent property—equivalent now in terms of its—their ability to rent it—and the cost of replacing that rental property were higher than the— the market value of this equivalent property, then there should be, under these assumptions, complete setoff of replacement cost insurance coverage from a tort award equal to the market value of the property."); Barry Decl. Ex. A, 2011 Shavell Rep. ¶ 31 ("The *Fisher* case would have more closely resembled this case if the Fishers rented their house to tenants, and if they had purchased insurance coverage for destruction of the house and additional coverage for lost tenant rental income. Then, the correspondence analysis would have had to address each of the separate categories of insurance coverage in relation to those two possible categories of damages."). The fact that the WTCP Plaintiffs had additional insurance for lost rental income for the period of rebuilding makes them better off, not worse off, and tightens rather than

minimizes correspondence.  Barry Decl. Ex. C, Supplemental Declaration of Daniel R. Fischel re: WTC 7 ¶¶ 13, 14 (March 1, 2013) ("2013 Fischel Rep.").

Thus, the full amount of the insurance proceeds received by the WTCP Plaintiffs therefore must be offset against any potential tort damages award in favor of the WTCP Plaintiffs.  As demonstrated below, the offset fully extinguishes the WTCP Plaintiffs' claims under any applicable federal rate of prejudgment interest.

## STATEMENT OF FACTS

The parties have stipulated to many of the relevant facts, and the Court already has granted partial summary judgment establishing the maximum amount of the WTCP Plaintiffs' damages and the amounts of the insurance payments they received.  *See, e.g., In re Sept. 11 Litig.*, 590 F. Supp. 2d at 536, 543–44; *In re Sept. 11 Litig.*, 723 F. Supp. 534, 540–41 (S.D.N.Y. 2010); *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 445, 447–48.  The Aviation Defendants' accompanying proposed Findings of Fact and Conclusions of Law outline the limited facts that are relevant under the applicable law to the Section 4545(c) correspondence analysis.

## ISSUE TO BE TRIED

Do the insurance proceeds that WTCP and 7WTCo. received for the WTC Complex and WTC 7, respectively, correspond to the same category of loss as, and offset, any tort damages that WTCP and 7WTCo. can claim in this litigation?

## DEFENSE POSITION AND RELIEF SOUGHT

Yes.  The insurance proceeds received by the WTCP Plaintiffs compensate the WTCP Plaintiffs for the same category of loss—economic loss to their net leasehold interests in the WTC Complex and WTC 7 arising from the destruction of those buildings, which generated rental income—that any tort damages award in this litigation would.

Even with allowances for WTCP's and 7WTCo.'s insurance premiums and claims preparation expenditures (which serve to reduce the total amount of their insurance recoveries), and pre-judgment interest properly applied at any applicable federal rate, any potential tort recoveries by the WTCP Plaintiffs in this action are completely offset by their insurance recoveries. The WTCP Plaintiffs' damages claims relating to the WTC Complex and WTC 7 should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 54(b).[3]

## PRIOR RULINGS OF THIS COURT

Several of the Court's prior rulings are relevant to the correspondence analysis. These rulings are the law of the case and make a finding of correspondence inevitable.

This Court has already held that "New York courts follow the 'lesser of two' rule:  a plaintiff whose property has been injured may recover the lesser of the diminution of fair market value or its replacement cost." *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 541. Thus, the Court held that any recovery by WTCP or 7WTCo. against the Aviation Defendants is governed by the lesser of two rule. *See In re Sept. 11 Litig.*, 590 F. Supp. 2d 544, 544-48 (S.D.N.Y. 2008); *In re Sept. 11 Litig.*, 2009 WL 1181057, at *3 (S.D.N.Y. Apr. 30, 2009); *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447.

The Court further determined, for purposes of this correspondence trial, the amount of potential tort damages that WTCP or 7WTCo. could recover in this action. With respect to the WTC Complex, the Court held that the fair market value of WTCP's net leasehold interest in the

---

[3]  Any potential tort recoveries by WTCP in this action are completely offset by WTCP's insurance recoveries, and WTCP's damages claims relating to the WTC Complex should be dismissed with prejudice. 7WTCo.'s potential tort recoveries in this action are entirely offset by its insurance recoveries, except for $300,000 in fine arts claims relating to two pieces of artwork. Accordingly, 7WTCo.'s damages claims relating to WTC 7 (except for its $300,000 fine arts claim) should be dismissed with prejudice.

Complex as of September 11, 2001 was $2.805 billion. *See In re Sept. 11 Litig.*, 590 F. Supp. 2d at 547; *In re Sept. 11 Litig.*, 2009 WL 1181057, at *4; *In re Sept. 11 Litig.*, 889 F. Supp. 2d at 622. Because the parties have agreed that the replacement cost of the WTC Complex would be in excess of $2.805 billion, the Court has ruled that under the lesser of two rule, WTCP's maximum potential tort damages award is $2.805 billion. *See In re Sept. 11 Litig.*, 590 F. Supp. 2d at 547; *In re Sept. 11 Litig.*, 2009 WL 1181057, at *4; *In re Sept. 11 Litig.*, 889 F. Supp. 2d at 622.[4] However, if the replacement cost of the WTC Complex were shown to be less than $2.805 billion, WTCP would be allowed to recover damages up to an amount equal to its replacement costs. *See id.*; *see also In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447, n.9.

With respect to WTC 7, for the purposes of this trial, the Aviation Defendants have accepted 7WTCo.'s expert's valuation of 7WTCo.'s net leasehold interest in WTC 7 at $737 million. The parties have also assumed, for the purposes of the correspondence trial, that the replacement cost of WTC 7 would be in excess of $737 million. Therefore, under the lesser of two rule, for purposes of this correspondence trial, 7WTCo.'s maximum potential tort damages award relating to its net leasehold interest in WTC 7 is $737 million. *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448.

The Court has further held that the market value of WTCP's and 7WTCo.'s net leasehold interests in the WTC Complex and WTC 7 fully includes their anticipated rental streams from the buildings' tenants. *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544 (citing *Sandoro v. Harlem-Genesee Market & Nursery, Inc.*, 482 N.Y.S.2d 165, 167 (4th Dep't 1984)). And the Court has also held that the WTCP Plaintiffs cannot recover damages for replacement costs based on their

---

[4]    For purposes of this correspondence trial, the Aviation Defendants have agreed to treat $2.805 billion as the amount to use as a maximum in determining whether WTCP's insurance recoveries offset its potential tort damages award.

alleged contractual obligation to rebuild the WTC buildings after their destruction. *Id.*; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447–48. Specifically, the Court ruled that the particular features of WTCP's contracts cannot be made the special responsibility of the Aviation Defendants, nor the natural and probable result of their negligence, nor the foreseeable consequence of their acts and omissions. *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544.

The Court has also ruled on the total amount of WTCP's insurance recoveries for the damage to WTCP's net leasehold interest in the WTC Complex on September 11, 2001— $4,091,364,034, which includes $563 million of WTCP's recovery paid to GMAC, as creditor of WTCP-related interests. *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 1 (S.D.N.Y. Sept. 30, 2009).[5] In light of the evidence put forward by the Aviation Defendants, the Court established a presumption that the insurance proceeds WTCP received relating to the destruction of the Complex are properly allocable to business interruption and replacement costs, subject to WTCP pleading and proving specific facts supporting an allocation to additional components. *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 1 (S.D.N.Y. Sept. 30, 2009). The Court has also ruled that the total amount of 7WTCo.'s insurance recovery for damage to its net leasehold interest in WTC 7 on September 11, 2001 is $830,936,584.28. *Id.* at *4.

---

[5] Despite prior judicial admissions concerning the total amount of the insurance payments made by WTCP's insurers, WTCP now seeks to argue that its insurance recoveries were less than the $4,091,364,034 held by the Court, because the $17.5 million it received from the Royal and Sun Alliance Insurance Group plc was not an insurance payment. *See e.g.*, Barry Decl. Ex. OO, Declaration of Michael L. Levy ¶ 14 (Aug. 18, 2009) ("Levy 2009 Decl.") ("The total of all insurance payments made and to be made by insurers participating in the WTC Insurance Program is $4,581,794,674 (the 'Total Insurance Payments'), including payments that were made to Westfield insureds ($490,430,635), and proceeds paid to insured GMAC ($563,000,000)."). Notwithstanding the foregoing, the distinction WTCP seeks to draw is one without a difference under C.P.L.R. § 4545(c), which applies to any type of collateral source payment.

Although WTCP and 7WTCo. have asserted various claims for consequential damages, the Court has rejected those claims. Specifically, the Court ruled that the cost of tenanting a replacement building is a replacement cost and therefore its separate recovery in tort is barred by New York's lesser of two rule. *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448. The Court has further ruled that 7WTCo. cannot recover certain alleged mortgage carrying costs incurred after WTC 7's destruction because 7WTCo. would have incurred these costs whether or not WTC 7 had been destroyed, and therefore, the costs cannot be recovered in tort. *Id.* The Court also held that the cost of replacing destroyed tenant improvements in WTC 7 is a replacement cost, and therefore its recovery in tort is barred by New York's lesser of two rule. *Id.*

Finally, the Court has also ruled that the WTCP Plaintiffs may not recover attorneys' fees incurred in litigating with their insurers over the extent of their coverage for damage to the WTC Complex or WTC 7. *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 1–2 (S.D.N.Y. Sept. 30, 2009). Instead, insurance premiums paid by the WTCP Plaintiffs during the two years prior to September 11, 2001 and the WTCP Plaintiffs' claim preparation fees incurred in connection with their insurance claims are proper reductions to arrive at WTCP's and 7WTCo.'s net insurance recoveries for purposes of application of the Section 4545(c) offset. *Id.*; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448–49.

## ARGUMENT

**I.    Correspondence Under C.P.L.R. § 4545(c) Is Established When Both The Tort Damage Award And The Collateral Source Insurance Payments Compensate The Plaintiff For The Same Category Of Loss.**

Correspondence is established under C.P.L.R. Section 4545(c) when the tort damage award and the insurance payments at issue compensate the plaintiff for the same category of loss. The question under C.P.L.R. Section 4545(c) is not whether the ***remedies*** are the same but

whether ***the category of loss for which the remedies compensate*** is the same.  Put graphically, the issue to be tried is not:



But rather:

The Second Circuit made this distinction crystal clear in *Turnbull v. USAir, Inc.*, 133 F.3d 184 (2d Cir. 1998), where it explained that a court is not supposed to look behind the award or the insurance payments to see on what basis they were calculated; instead, the only correspondence required by C.P.L.R. Section 4545(c) is correspondence between the categories of loss:

> We conclude that *Oden* does not require USAir to prove a correspondence between the specific disorders on which the jury based its award of lost earnings and the specific disorders on which the SSA based its award of disability benefits.  *Oden* requires a correspondence between *categories of loss*: under the facts of this case, USAir was required to show with reasonable certainty (1) that the judgment includes an award for damages that falls within a certain category of loss, and (2) that Turnbull receives collateral source payments that reimburse him for a corresponding category of loss that he suffered as a result of the USAir incident. We conclude that the "category of loss" is lost earnings, and that every dollar of the Social Security disability payments, paid in respect of a period for which the jury awarded lost earnings, is reimbursement to Turnbull for the same category of loss.

14

*Id.* at 187.  *Turnbull* relied on *Oden v. Chemung County Industrial Development Agency*, 87 N.Y.2d 81 (1995), which set the standard for correspondence.  *See Turnbull*, 133 F.3d at 186–88. As the WTCP Plaintiffs' proposed expert on correspondence acknowledged, *Oden* "allows a reduction of a damages award 'only when the collateral source payment represents reimbursement for a particular category of loss that corresponds to a category of loss for which damages were awarded.'"  Barry Decl. Ex. D, Expert Report of Patrick Connors ¶ 3 (Apr. 12, 2013) ("Connors Rep.") (quoting *Oden*, 87 N.Y.2d at 84).  The New York Court of Appeals similarly has eschewed the WTCP Plaintiffs' approach of requiring duplication of the elements underlying the tort award and the insurance payment, focusing instead on the category of loss that the collateral source and damages address.  In *Bryant v. N.Y.C. Health & Hospitals Corp.*, 93 N.Y.2d 592 (1999), the court held that "[b]ecause child survivor benefits are intended to compensate for a parent's lost earnings, there is a 'close correspondence'" between the two.  *Id.* at 608.

The WTCP Plaintiffs' efforts to establish some distinction between the components of the measure of damages they would receive in a tort litigation and the components of their insurance payments are therefore misplaced.  The question is not whether the precise components of damages are replicated as components of the insurance payments, but whether the tort award and the insurance payments compensate the WTCP Plaintiffs for the same category of loss.

The plain language of the statute further confirms that the proper focus is on whether the collateral source and the tort award will repay costs or expenses associated with the same loss. The version of C.P.L.R. Section 4545(c) applicable to this case provides:

> In any action brought to recover damages for personal injury, *injury to property* or wrongful death, where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or

> rehabilitation services, *loss of earnings or other economic loss*,
> evidence shall be admissible for consideration by the court to
> establish that any such past or future cost or expense was or will,
> with reasonable certainty, be replaced or indemnified, in whole or
> in part, from any collateral source such as insurance (except for life
> insurance), social security (except those benefits provided under
> title XVIII of the social security act), workers' compensation or
> employee benefit programs (except such collateral sources entitled
> by law to liens against any recovery of the plaintiff).   If the court
> finds that any such cost or expense was or will, with reasonable
> certainty, be replaced or indemnified from any collateral source, it
> shall reduce the amount of the award by such finding. . . .

N.Y. C.P.L.R. § 4545(c) (effective on Sept. 11, 2001) (emphases added).

Lost earnings, as *Bryant* notes, is one of the categories of loss enumerated by C.P.L.R.

Section 4545(c).  Another category is "economic loss" arising from "injury to property."  Here,

the WTCP Plaintiffs' insurance recoveries and their potential tort award both correspond to the

economic loss arising from the injury to their property that occurred on September 11, 2001.  But

for that economic loss, the WTCP Plaintiffs would not be suing the Aviation Defendants in this

litigation.  And but for that economic loss, the WTCP Plaintiffs would not have received their

insurance payments.

The Court established a presumption that the WTCP Plaintiffs received their insurance

payments exclusively for property damage (in the form of replacement costs) and business

interruption resulting from the property damage that occurred on September 11, 2001. Barry

Decl. E, Hr'g. Tr. at 6–7, *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH) (S.D.N.Y. Sept. 24, 2009);

*In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 2 (S.D.N.Y. Sept. 30, 2009).  Far from

coming forward with any proof to disturb that presumption, the WTCP Plaintiffs confirmed that

their insurance payments were received exclusively for replacement costs and business

interruption resulting from property damage. Barry Decl. Ex. F, Dep. of Michael Levy Tr. 25:6–

15 (June 2, 2009) ("2009 Levy Dep. Tr.") ("Q. What damage did World Trade Center Properties

16

suffer on 9/11 that was covered by its insurance policies?   A. The buildings, business interruption/rental value losses."); Barry Decl. Ex. G, Decl. of Michael Levy ¶ 30 (Aug. 14, 2012) ("2012 Levy Decl."); Barry Decl. Ex. H, Dep. of Edward R. Reilly, Jr. Tr. 57:24–58:10 (Jan. 4, 2013) ("Reilly Dep. Tr.") ("The claims that arose out of the incident were part of—were the claim.  The claims were as a result of the destruction of the properties, yes."); Barry Decl. I, Dep. of Jeffrey McKinley Tr. 68:9-11 (May 22, 2013) ("McKinley Dep. Tr.") ("World Trade Center 7 was insured for the damage that was caused on September 11, 2001, and the claims they made were the result of that damage.").  That property damage is the very same loss for which the WTCP Plaintiffs seek compensation in this litigation.  The evidence in this case is both reasonably certain and inescapable:  the billions of dollars that the WTCP Plaintiffs received in insurance payments correspond to and entirely offset the loss for which they now seek a tort recovery.

II.     **Correspondence Exists Here Because Both The Potential Tort Damage Award And The $4.9 Billion In Insurance Recoveries Compensate The WTCP Plaintiffs For The Same Category Of Economic Loss.**

       A.     *Fisher v. Qualico* **Sets Forth The Controlling Legal Principles For Determining Correspondence in Cases Involving Damage To Real Property Interests.**

The New York Court of Appeals has addressed the application of Section 4545(c) to cases involving property damage in a case that the WTCP Plaintiffs' own expert has acknowledged is the "leading case in the area."  Barry Decl. Ex. J, Dep. of Patrick Connors Tr. 92:2–3 (May 10, 2013) ("Connors Dep. Tr.").  In that case, the Court of Appeals indicated that "[t]he present appeal for the first time calls upon us to determine whether collateral source payments correspond to plaintiffs' real property loss so as to require setoff.  We conclude that they do." *Fisher*, 98 N.Y.2d at 539.

In *Fisher*, the New York Court of Appeals determined that replacement costs and fair

market value are two different measures of the same loss:  lost property value resulting from

damage or destruction of real property.  The court held that:

> As recognized in our case law, however, replacement cost and
> diminution in market value are simply two sides of the same coin.
> Each is a proper way to measure lost property value, the lower of
> the two figures affording full compensation to the owner.  In this
> case, the collateral source payment--the Fishers' replacement cost
> insurance proceeds--thus *corresponds* to their property loss, and
> was properly offset against the damages award.

*Id.* at 540.  Thus, the *Fisher* court held that the collateral source payment received by plaintiffs in

the form of replacement cost insurance proceeds corresponded to their property loss and was

properly offset against the damages award for diminution in market value.  *Id.* at 539–40.  The

court made this determination by examining case law related to real property losses and

negligence, and determining that if a plaintiff only is entitled to recover one of two measures of

damages under tort law, *see Hartshorn v. Chaddock*, 135 N.Y. 116, 122 (1892), then insurance

payments for one measure should offset an award for the other under Section 4545(c).  *Fisher*,

98 N.Y.2d at 539–40.

The WTCP Plaintiffs' argument, that replacement cost and diminution in fair market

value represent two different categories of loss, is the precise argument rejected by the Court of

Appeals in *Fisher v. Qualico.*  As the court recounted:

> [T]he Fishers contend that for the purpose of the CPLR 4545(c)
> offset, cost of restoration and diminution in market value represent
> two different categories of loss, and replacement cost insurance
> proceeds correspond only to the first.

*Fisher*, 98 N.Y.2d at 539.  The Court of Appeals unanimously rejected that argument in no

uncertain terms, holding that the relevant category of loss was the Fishers' lost property value

18

and that replacement cost and reduction in fair market value were simply two different ways of measuring that loss. Indeed, the WTCP Plaintiffs' position is indistinguishable from that of the homeowners in *Fisher*. Just like the Fishers, the WTCP Plaintiffs assert that they will spend more money in rebuilding than the fair market value of the property they seek to replace. *See id.* at 537 (noting that the diminution in value of the Fishers' destroyed home was $480,000, while the replacement costs were $1,330,000). Just like the Fishers, the WTCP Plaintiffs have received insurance payments based on replacement costs. *Id.* at 539–40 (holding that the insurance company paid the Fishers $862,770 for replacement costs). Just like the Fishers, the WTCP Plaintiffs would be fully compensated by an award of diminution in fair market value. *Id.* at 540 (holding that the Fishers were entitled to recover damages in an amount equal to diminution in fair market value under the lesser of two rule). And just like the Fishers' insurance recoveries, the WTCP Plaintiffs' insurance recoveries, although calculated on a replacement cost basis, fully correspond to and entirely offset their tort damages, even though those damages are limited to fair market value. *Id.*

As the WTCP Plaintiffs' own expert acknowledged, nothing in *Fisher* limits the holding in that case to residential or owner-occupied property. Barry Decl. Ex. J, Connors Dep. Tr. 104:15–19.[6] Moreover, the case is a unanimous New York Court of Appeals decision affirming an Appellate Division decision affirming a trial court decision. The parameters of New York law concerning the application of Section 4545(c) to cases involving property damage are both clear and uncontroversial. Under those principles: (1) fair market value and replacement costs are

---

[6]   Nor can any distinction be drawn between the Fishers' fee simple interest and the WTCP Plaintiffs' long-term leasehold interests. As this Court has repeatedly held, the *Fisher* lesser of two rule squarely applies to the WTCP Plaintiffs' claims for damages to their leasehold interests. *E.g.*, *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447; *In re Sept. 11 Litig.*, 889 F. Supp. 2d at 620.

two measures of the same loss—property damage—with the lesser of the two making a plaintiff whole; and (2) replacement cost insurance proceeds correspond to and offset the same property damage loss as a tort damages award measured by diminution in fair market value.

**B.    The Category Of Loss Sustained By The WTCP Plaintiffs Is Economic Damage To Their Net Leasehold Interests In the Complex And WTC 7 Resulting From Destruction Of The Leased Buildings In The 9/11 Terrorist Attacks.**

The category of loss sustained by the WTCP Plaintiffs on September 11, 2001 is economic damage to their net leasehold interests resulting from the destruction of the Complex and WTC 7 by the terrorists.  In the first paragraph of their Master Complaint (April 17, 2008), for example, the WTCP Plaintiffs alleged that the 9/11 "hijacking and crash of Flight 175 into Two World Trade Center proximately caused the total destruction of" the WTC buildings "and thereby damaged the WTCP Plaintiffs' leasehold interests in those buildings."  Barry Decl. Ex. K, Flight 175 Master Compl. ¶ 1 (Apr. 17, 2008).  The WTCP Plaintiffs further alleged that as a consequence of the Aviation Defendants' alleged breach of duty to the WTCP Plaintiffs, the WTCP Plaintiffs "have been deprived, and continue to be deprived, of the use and benefit of their property interests, including but not limited to, the ability to use the buildings and to collect rent, from September 11 until the buildings are replaced and re-rented."  Barry Decl. Ex. K, Flight 175 Master Compl. ¶ 44.

The Damages Disclosure Forms ("DDFs") that the WTCP Plaintiffs filed in the litigation similarly confirm the obvious:  the loss that the WTCP Plaintiffs sustained on September 11 is the economic damage to their net leasehold interests that resulted from the destruction of the Complex and WTC 7.  In its DDF for WTC 7, 7WTCo. described its loss as the "complete destruction of 7 World Trade Company's revenue-generating property, including the building, tenant spaces, infrastructure and common areas."  Barry Decl. Ex. L, Updated Damages

20

Disclosure Form for 7 World Trade Center (Apr. 23, 2007). In its DDF for the Complex, WTCP asserted that the September 11 crashes "resulted in the complete destruction of WTCP's revenue-generating properties . . . ." Barry Decl. Ex. M, Updated Damages Disclosure Form 1, 2, 4 and 5 World Trade Center (April 23, 2007). As Professor Fischel will confirm, the loss the WTCP Plaintiffs suffered on September 11 is properly understood to be the economic loss to their net leasehold interests caused by the destruction of the buildings on September 11. Barry Decl. Ex. N, Expert Report of Daniel R. Fischel ¶ 8 (July 8, 2011) ("2011 Fischel Rep.") ("The economic loss that the Plaintiffs suffered on September 11, 2001 was the reduction in value of their net leasehold interests in the WTC Buildings as a result of the destruction of those Buildings in the terrorist attacks."); *see also* Barry Decl. Ex. C, "2013 Fischel Report" ¶ 9.

The subrogation claims brought by the WTCP Plaintiffs' insurers further confirm the nature of the WTCP Plaintiffs' loss. As the *Fisher* court explained, Section 4545(c) does not permit an alleged tortfeasor to benefit from the victim's foresightedness in procuring insurance, because upon payment of the insurance to the property owner, the claim passes to the subrogated insurers. *See Fisher*, 98 N.Y.2d at 540. That is precisely what happened here, and the subrogated insurers' claims against the Aviation Defendants confirmed that: (1) the loss the WTCP Plaintiffs sustained on September 11 was the loss to their net leasehold interests resulting from the destruction of the buildings that generated income under the net leases; and (2) the measure of damages for that loss was limited to the amount of the diminution of fair market value under the lesser of two rule. *See In re Sept. 11 Litig.*, 723 F. Supp. 2d at 540.

## C. The Potential Tort Damages Award Compensates The WTCP Plaintiffs For Their Loss.

In a series of prior opinions, this Court addressed the nature of the WTCP Plaintiffs' loss and how the tort damages that the WTCP Plaintiffs would receive if they prevailed on liability

would reimburse them for that loss.  In an April 30, 2009 decision, for example, the Court held

for the Complex that:

> [T]he measure of tort damages for destroyed property is the lesser
> of the diminished value of the property (i.e., the leaseholds) or its
> replacement value.

*In re Sept. 11 Litig.*, 2009 WL 1181057, at *3.  The Court thus described both the loss—

destroyed property—and the measure of damages.  *See also In re Sept. 11 Litig.*, 590 F. Supp. 2d

at 544–48 (limiting WTCP's potential recovery to the *lesser* of the fair market value or

replacement cost of WTCP's net leasehold interests in the Complex on September 11); *In re*

*Sept. 11 Litig.*, 908 F. Supp. 2d at 447 & n.9 (reciting lesser of two ruling, and noting that "[i]f it

were proven that the replacement cost is in fact the lesser amount, the lesser of two rule would

limit Aviation Defendants' potential tort liability to that amount").

       These rulings are correct from a legal perspective.  A lengthy cavalcade of New York

case law confirms that the proper measure of damages for the destruction of property is the

"lesser of two": a plaintiff can recover an amount equal to its replacement cost or the diminution

in its fair market value, whichever is less.  *Hartshorn*, 135 N.Y. at 122; *see also Gass v. Agate*

*Ice Cream, Inc.*, 264 N.Y. 141, 143–44 (1934); *Jenkins v. Etlinger*, 55 N.Y.2d 35, 39 (1982);

*Fisher*, 98 N.Y.2d at 538–40; *Dilapi v. Empire Drilling & Blasting, Inc.*, 880 N.Y.S.2d 115, 117

(2d Dep't 2009) ("[I]t is a long-established rule that the proper measure of damages for

permanent injury to real property is the lesser of the decline in market value and the cost of

restoration . . . ." (internal quotation marks omitted)).

       As the New York Court of Appeals recognized in *Fisher v. Qualico*, an award measured

either in the amount of diminution in fair market value or replacement cost will make a plaintiff

whole for the economic loss it suffers upon the destruction of a building in which it holds a

property interest.  98 N.Y.2d at 540 (replacement cost and diminution in market value are both "a proper way to measure lost property value, the lower of the two figures affording full compensation to the owner").  An award of diminution in fair market value makes a plaintiff whole by providing the plaintiff with the value of the destroyed building as of the date of its destruction.  It is, in effect, a refund.  An award of replacement cost is more like an exchange: the plaintiff is made whole by receiving the means to create a substitute for the property that was destroyed.

The rulings were also correct from an economic perspective.  As Professor Fischel has explained in his reports and will testify at the trial, replacement cost and diminution in fair market value are two different ways of measuring the same loss—property damage.  Professor Fischel also will testify that an award equal in amount to the lesser of diminution in fair market value or replacement cost will make a tort plaintiff whole.  But in either case, the tort award is intended to compensate the plaintiff for the damage to the property interest that allegedly resulted from the tort.

Similarly, an award equal to the diminution in fair market value fully compensates the WTCP Plaintiffs for the lost rental income resulting from the destruction of the income-generating properties.  In its December 2008 opinion, the Court explained that WTCP could not pursue a separate claim for lost rental income because:

> The price that WTCP paid to the Port Authority included the value of anticipated rentals.  In April 2001, WTCP purchased the net leases to the four towers for $2.805 billion (not including the amount paid for the Retail Mall), thus gaining the right to future rental income from the towers.  The price it paid fully reflected the present value of those rental streams.  If it recovers that market value, it necessarily regains the present value of the rental streams that were destroyed.

*In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544.  The Court did not limit WTCP to an award of its lost income streams.  Rather, the Court held that under New York law an award equal to the amount of the destroyed property's diminution in fair market value is full compensation for property damage, including lost rental income resulting from the destruction of the income-generating property.

With respect to WTC 7, there was not a recent transaction just before September 11.  The closest proxy would be a $700 million appraisal of 7WTCo.'s leasehold interest in March of 2001, conducted at the request of 7WTCo.'s lenders.  Nonetheless, for the purposes of this correspondence trial, the Aviation Defendants have accepted the valuation of 7WTCo.'s expert, which had been calculated on a discounted cash flow basis at $737 million, as representing the maximum amount that 7WTCo. could recover.  Just like the fair market value of the Complex, the fair market value of WTC 7 reflected the rental income that the destroyed building would have generated.  *See, e.g.*, *Sandoro*, 482 N.Y.S.2d at 167; *see also Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000); *Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07-cv-4175 (NGG) (RLM), 2008 WL 4693246, at *8 (E.D.N.Y. Oct. 17, 2008).[7]

---

[7]    Temporary loss of rental income also can be taken into account when there is an award of replacement costs.  While lost rental income for the entire 99-year net lease is embedded in an award of fair market value, if replacement costs are calculated to be less than the diminution in fair market value, lost rents for the reasonable period of time necessary to restore the destroyed property also would be allowed under New York law.  *Slavin v. State*, 152 N.Y. 45, 49 (1897) (holding that plaintiff was allowed to recover both the costs of repairing his property as well as "any loss of rental value during the time required to make the necessary reparations"); *see also Price v. Luhrs*, 952 N.Y.S.2d 391, 393 (N.Y. Civ. Ct. 2012) (where plaintiff recovers the cost of replacement, he "may also recover for resulting consequential losses because the property cannot be used during repair or replacement, such as lost profits"); *Nichols v. Lehigh Valley R. Co.*, 114 N.Y.S. 942, 944 (N.Y. Cnty. Ct. 1908) (interpreting *Hartshorn* to mean that "[i]t is the rule ordinarily that where the cost of repairing the injury, or the expense of restoration of the land to its former condition, is less than the diminution in value of the whole property, the cost of restoration is the proper

What the Court has permitted WTCP and 7WTCo. to recover in this litigation is no more and no less than full compensation for the loss of the properties that provided value to the net leases. The tort award does not exclude replacement cost and is not limited to a mechanistic calculation of lost rental income. Instead, under well-established New York law, the tort award is reduced to an amount no greater than the diminution in fair market value, which fully compensates for the loss of income-generating property, including the rental streams reasonably expected from the property. The Aviation Defendants cannot state it any better than the Court did in April 2009:

> The WTCP Plaintiffs argue that I mistakenly treated the WTCP/Port Authority lease as destroyed and that I confused the value of the World Trade Center Towers with the value of the lease. These are false arguments. I set out the terms of the WTCP/Port Authority lease extensively, and held that the properties providing value to the lease were destroyed, not the lease itself. With the destruction of the properties, the rents being paid to WTCP ended, and therefore the value of WTCP's lease ended. That was why the WTCP Plaintiffs sued, to recover the value it lost because of the Aviation Defendants' alleged fault.

2009 WL 1181057, at *2. The Court was perfectly correct: the loss that WTCP and 7WTCo. sued for and for which a tort award in this litigation would compensate is the destruction of the buildings that provided value to their net leases. An award limited to the diminution of fair market value embodies both replacement cost (as the other side of the same coin under *Fisher*)

---

measure of damages, to which might be added the loss of the use of the property in the meantime. . . ."). However, the combined total of replacement costs and temporary lost rental income to be awarded cannot exceed the fair market value of the destroyed property, because an award of fair market value makes a property damage plaintiff whole. No tort plaintiff is allowed to recover more than necessary to make it whole; that is the crux of the lesser of two rule. *See, e.g., Jenkins*, 55 N.Y.2d at 39.

and lost rental income during the rebuilding period (as an inextricable component of fair market value under *Sandoro*).

### D.     The Replacement Cost And Business Interruption/Time Element Insurance Payments Compensated The WTCP Plaintiffs For The Same Category Of Loss.

The WTCP Plaintiffs' replacement cost and business interruption/time element insurance payments compensated them for the exact same loss as a tort damages award would:  the economic loss resulting from the destruction of the buildings in which they held a net leasehold, including lost rental income.  The WTCP Plaintiffs argue that their insurance was "for" replacement costs and rental income and not "for" the market value of the destroyed buildings. But those items are not the loss that WTCP and 7WTCo. suffered on September 11, 2001; rather, those are elements of the insurance coverage that WTCP and 7WTCo. purchased and elements of the insurance claims that WTCP and 7WTCo. presented to their insurers. *See, e.g.*, Stipulated Facts ¶¶ 47, 49, 51–82, 98–123 (demonstrating that the payment direction letters and proofs of loss that the WTCP Plaintiffs submitted to their insurers were for property damage and business interruption/lost rental income).  The loss that WTCP and 7WTCo. insured against was the damage or destruction of the property, as their own experts fully acknowledged:

> Q:     Sir, is it fair to say that all of the losses for which WTCP sought payment from its property insurers arose out of the destruction of the World Trade Center complex as a result of the terrorist attacks on September 11, 2001?
>
> A:     The claims that arose out of the incident were part of – were the claim.  The claims were as a result of the destruction of the properties, yes.
>
> Q:     Is it fair to say that under both the property damage and rental value/business interruption coverages obtained by WTCP, coverage was only triggered if there was a loss, damage or destruction to physical property?

> A:     Yes.

Barry Decl. Ex. H, Reilly Dep. Tr. 57:24–58:4, 58:8–10, 62:17–21, 62:25.  Plaintiffs' other insurance expert, Mr. McKinley, agreed, stating in the 2003 report he prepared for WTCP's coverage litigation with its first-party insurers that "commercial property insurance is designed to compensate the insured for losses to its property which is typically defined to include the insured's real property (including the buildings and fixtures) its personal property, including machinery, equipment, furniture and the like, and the lost net income and continuing operating expenses resulting from the destruction of its property."  Barry Decl. Ex. O, Expert Report of Jeffrey G. McKinley § 6.1 (June 2, 2003), in *SR International Business Insurance Co., Ltd. V. World Trade Center Properties LLC*, No. 01 CV 9291 (JSM) (S.D.N.Y.); *see also* Barry Decl. Ex. I, McKinley Dep. Tr. 31:9–23 (agreeing that the statement remains true today).

The insurance policies at issue in this case are quite clear that the insurance provided was designed to compensate WTCP and 7WTCo. for the economic losses that would occur in the event of the damage or destruction of their property.  Although the policy terms differ slightly in nuances, all are clear that the category of loss to which they are addressed is economic loss arising from property damage.[8]

As Mr. Levy testified, WTCP and 7WTCo. never documented claims for anything other than replacement cost and business interruption, other than a very small claim for fine

---

[8]     Barry Decl. Ex. P, WilProp Insurance Form [WTCP0010393–429], at WTCP0010401, 403, 413;  Barry Decl. Ex. Q, Travelers Insurance Form [WTCP0238536–625], at WTCP0238547; Barry Decl. Ex. R, Hartford All Risk Form [HA003021–31], at HA003023; Barry Decl. Ex. S, Tokio Marine Policy Form [TM00735–99], at TM00747; Barry Decl. Ex. T, TIG Policy Form [WTCP0356217–27], at WTCP0356219; Barry Decl. Ex. U, ISO Policy Form [WTCP0356228–67], at WTCP 0356228; Barry Decl. Ex. V, Industrial Risk Insurers Policy No. 31-3-67626 [WTCP 0389345–465], at WTCP0389388.

arts/personal property located in WTC 7. *See, e.g.*, Barry Decl. Ex. F, 2009 Levy Dep. Tr. 48:13–49:5; 92:19–94:17; Barry Decl. Ex. W, Dep. of Michael Levy Tr. 110:15–111:6; 166:11–167:10 (Jan. 5, 2012) ("2012 Levy Dep. Tr."); *see also* Barry Decl. Ex. X, Revised Expert Report of Edward R. Reilly ¶ 11 (Apr. 23, 2013) ("2013 Reilly Rep.") (explaining that WTCP's insurance adjustment process focused "on the major and most crucial components of the loss— replacement cost of the structures and WTCP's loss of rental income" and ultimately did not calculate the amounts of other losses); Barry Decl. Ex. Y, Expert Report of Jeffrey G. McKinley 15 (Apr. 12, 2013) ("McKinley Rep.") (describing 7WTCo.'s submission of claims for replacement costs, time element (rental), and a $1.8 million claim for personal property losses). The WTCP Plaintiffs recorded all of the amounts of the payments they received from their insurers as replacement costs and business interruption/lost rental payments in their financial statements. *See* Barry Decl. Ex. Z, World Trade Center Props. LLC & Subsidiaries Consolidated Financial Statements (Income Tax Basis) Years Ended Dec. 31, 2007 & 2006, and Independent Auditors' Report, July 17, 2008 [WTCP 0362721–41] at WTCP0362732; Barry Decl. Ex. AA, 7 World Trade Company, L.P., Consolidated Financial Statements (Income Tax Basis), Year Ended December 31, 2005 and Independent Auditors' Report [WTCP0258284–99]; Barry Decl. Ex. BB, 7 World Trade Company, L.P. Consolidated Financial Statements with Supplementary Information (Income Tax Basis) Year Ended December 31, 2007 and Independent Auditors' Report [WTCP0374469–88].

The evidence is overwhelming that the WTCP Plaintiffs' insurance payments were made to compensate them for the economic loss resulting from the destruction of the buildings they had net leased, measured either in terms of property damage/replacement cost or business

interruption/lost rental income. That economic loss is the very same loss for which the WTCP Plaintiffs seek a tort damages award in this litigation.

## III.    The WTCP Plaintiffs' Efforts To Distinguish *Fisher* And Deny Or Limit Correspondence Rest On Erroneous Factual And Legal Assumptions.

The WTCP Plaintiffs admit that the insurance payments that they received for business interruption and lost rental income correspond to the same loss for which they are seeking tort damages. Barry Decl. Ex. A, 2011 Shavell Rep. ¶¶ 22, 24 (acknowledging that rental income "is the category of loss for which tort damages might be awarded to WTCP in the form of the fair market value of its leaseholds" and that "insurance payments proven to a reasonable certainty to have been received for lost rental income correspond to, and should be subtracted from, WTCP's tort damages, because those tort damages are for lost rental income"); *see also* Barry Decl. Ex. CC, Expert Report of Steven Shavell ¶ 20 (Apr. 12, 2013) ("2013 Shavell Rep."). Their arguments against correspondence relate only to whether the insurance payments they allocate to replacement cost correspond to the same loss for which tort damages would be awarded. But those arguments are fatally flawed and rest on the fundamental misconception that replacement cost insurance payments can only correspond to a tort damages award for replacement costs. To the contrary, the WTCP Plaintiffs' replacement cost insurance payments correspond to the very same loss for which a tort damages award in this litigation would compensate them.

### A.    The WTCP Plaintiffs' First Argument Against Correspondence—That This Court Has Denied It Any Recovery For Replacement Cost—Flagrantly Misreads The Court's Prior Rulings.

The WTCP Plaintiffs' first argument against correspondence depends on a fallacy. The WTCP Plaintiffs insist that they have not been permitted to recover *any* replacement costs in this litigation as part of a tort award; thus, they argue, because replacement cost insurance recoveries can only correspond to a tort damages award for replacement costs, and because they are not

permitted to recover a tort damages award for replacement costs, there can be no correspondence. But this argument is a mischaracterization of the lesser of two rule and the Court's prior rulings in this case.

The WTCP Plaintiffs and Professor Shavell urge that the WTCP Plaintiffs have not been permitted to recover even one dollar of replacement costs. But the lesser of two rule is not a categorical exclusion of replacement costs. Instead, the lesser of two rule imposes a dollar cap on damages for destruction of property; the cap is equal to replacement costs or diminution in fair market value, whichever is less. The New York Pattern Jury Instructions (for which the WTCP Plaintiffs' own expert, Professor Connors, served as the reporter), make this point clearly:

> Cost of the repairs necessary to restore the property to its former condition is available as a measure of damages subject to the limitation that the cost of repairs not exceed either (1) the diminution in value, or (2) the value of the property itself, Grass v. Agate Ice Cream, Inc., 264 N.Y. 141, 190 N.E. 323; *see Benavie v Baker*, 72 A.D.2d 541, 420 N.Y.S.2d 735 (damages for injury to shade trees); *Johnson v. Scholz*, 276 App. Div. 163, 93 N.Y.S.2d 334.

1 N.Y. PJI Civil 2:311 at 929 (3d ed.). Here, the WTCP Plaintiffs have alleged that the replacement cost of the Complex was $7,183,441,908 and that the replacement cost of WTC 7 was $1,058,600,213. *See* Stipulated Facts ¶¶ 61, 62, 100, 106. The WTCP Plaintiffs also claimed $1,347,805,679 in business interruption and lost profits for the Complex and $441,698,256 in business interruption and lost profits for WTC 7. *See* Stipulated Facts ¶¶ 51, 70–81, 102, 121, 127. The Aviation Defendants proved, however, that the maximum diminution in fair market value for the Complex was $2.805 billion and agreed to a maximum diminution in fair market value of $737 million for WTC 7. Under the lesser of two rule, the WTCP Plaintiffs only are entitled to recover damages up to those amounts. The Court's prior rulings did not change the *category* of the loss for which the WTCP Plaintiffs would be compensated by a tort

award in this litigation.   Instead, those rulings simply limited the *amount* that the WTCP Plaintiffs could claim.

The fundamental premise of the WTCP Plaintiffs' argument is incorrect.  The Court did not rule that the WTCP Plaintiffs could not recover replacement costs *at all* with respect to the Complex or WTC 7.   Instead, the Court applied New York's well-established "lesser of two" rule and held that the WTCP Plaintiffs can only recover replacement costs up to the amount of the diminution in fair market value because an award equal to the diminution in fair market value of a plaintiff's net leasehold interest in a destroyed building fully compensates an alleged tort victim for its loss.

The plain text of the Court's earlier rulings demonstrates the WTCP Plaintiffs' misconception.  In its April 30, 2009 ruling, for example, the Court held:

> [T]he WTCP Plaintiffs' recovery against the Aviation Defendants, under New York law, would be limited to the lesser of the diminution in value of the WTCP leaseholds, or the buildings' replacement value.

*In re Sept. 11 Litig.*, 2009 WL 1181057, at *1; *see also id.* at *3 ("I held in the Opinion that the measure of tort damages for destroyed property is the lesser of the diminished value of the property (i.e., the leaseholds) or its replacement value."); *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 541, 543 (same).  Perhaps the clearest expression of the Court's application of the lesser of two rule came in its order granting partial summary judgment with respect to WTC 7, in which the Court stated that "[i]f it were proven that the replacement cost is in fact the lesser amount, the lesser of two rule would limit Aviation Defendants' potential tort liability to that amount."  *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447, n.9; *see also World Trade Ctr. Props. LLC v. Certain Underwriter's at Lloyd's (In re Sept. 11 Litig.)*, 2012 WL 5954585, at *2 (S.D.N.Y. Nov. 27, 2012) ("In addition to claims against their insurers, [WTCP] brought tort claims against Aviation

31

Defendants.  With respect to these claims, I held that any tort recovery by [WTCP] would be limited to the lesser of the loss in the fair market value of the leaseholds (from their value immediately prior to the Towers' destruction) or the leaseholds' replacement costs, and that the loss in fair market value was the lesser of these amounts.  I then determined that loss to be $2.805 billion as [WTCP] failed to submit a showing that the fair market value changed between execution of the leases and September 11.  [WTCP's] maximum tort recovery is therefore $2.805 billion." (citations omitted)).

The Aviation Defendants have never challenged the WTCP Plaintiffs' ability to recover replacement costs.  Instead, the Aviation Defendants argued, and the Court agreed, that the WTCP Plaintiffs are entitled to recover replacement costs, but they are only entitled to recover replacement costs up to a maximum of $2.805 billion for the Complex and $737 million for WTC 7.

The WTCP Plaintiffs have argued that they were barred from recovering any replacement costs at all due to lack of proximate cause.  *See, e.g.*, Barry Decl. Ex. DD, WTCP Pls.' Mem. of Law in Opp'n to the Aviation Defs.' Renewed Mot. for Collateral Setoff Against WTCP's Claims Pursuant to N.Y. C.P.L.R. § 4545(c) and for Summ. J. Dismissing WTCP's Damages Claims at 25–26 (Dec. 5, 2011).  Not so.  The Court rejected an argument by the WTCP Plaintiffs that they were entitled to an exemption from the lesser of two rule and a greater recovery than other property damage plaintiffs by virtue of their alleged contractual obligation to rebuild the destroyed buildings.  *See, e.g.*, Barry Decl. Ex. EE, WTCP Pls.' Mem. of Law in Opp'n to the Aviation Defs.' Mot. for Summ. J. Based on C.P.L.R. 4545(c), at 27, 33–50 (Aug. 18, 2008), ECF No. 601 (arguing that a tort damages award of market value would not make WTCP whole, and that replacement costs are the "appropriate measure of damages"); Barry

Decl. Ex. FF, WTCP Pls.' Supp. Submission in Opp'n to the Aviation Defs.' Mot. for Summ. J.

Dismissing WTCP Pls.' Claims for Damages, at 13–27 (Mar. 31, 2009), ECF No. 777 (arguing

that WTCP's alleged contractual obligation to rebuild must be considered in determining the

leases' fair market value).  The Court held that even if the WTCP Plaintiffs had a contractual

obligation to rebuild, the Aviation Defendants could not be held liable for their voluntarily

undertaken contractual arrangements, stating that the WTCP Plaintiffs' contract in that event,

rather than the alleged tort, was the proximate cause of the greater damages that the WTCP

Plaintiffs sought.

> The market value of the towers is the measure of recovery for their
> destruction.  If WTCP bears a special or different burden, it flows
> directly from WTCP's contract clauses, not the Aviation
> Defendants' negligence.

*In re Sept. 11 Litig.*, 590 F. Supp. 2d at 543–44; *see also In Sept. 11 Litig.*, 908 F. Supp. 2d at

447–48.  But the rejection of the WTCP Plaintiffs' argument for replacement costs in excess of

fair market value did not change the Court's application of the lesser of two rule, which

permitted the WTCP Plaintiffs to recover an amount equal to either replacement costs or

diminution of fair market value, whichever is less, in compensation for the loss of property value

they suffered on September 11, 2001.[9]

---

[9]    Indeed, the WTCP Plaintiffs themselves consistently have contended that they could seek
replacement cost recoveries based on their status as 99-year net lessees with the right to
repair or rebuild the leased premises or based on their standing in the shoes of the Port
Authority of New York and New Jersey as fee owner of the premises.  *See, e.g.*, Barry Decl.
DD, WTCP Pls.' Memo. of Law in Opp'n to the Aviation Defs.' Mot. for Summ. J. Based
on C.P.L.R. 4545(c), at 27–28 ("New York law allows WTCP, as the lessee of the WTC
Buildings, to recover the full damages for tortious injury to the property caused by a third
party, including the damages suffered by the fee owner."); *id.* at 50 ("WTCP—as lessee of
the WTC Buildings—is entitled to sue for the replacement cost damages required to redress
the injuries to the Port Authority's fee interest."); *cf.* Stipulated Facts ¶¶ 2, 20 (confirming

The WTCP Plaintiffs' argument against correspondence of their replacement cost insurance payments is not only without foundation, it also would lead to anomalous results. Under their theory, if WTCP incurred replacement costs of $2.804 billion, so that replacement costs became the measure of their damages under the lesser of two rule, there would be complete correspondence and the award would be fully offset by replacement cost insurance.  But if WTCP incurred one dollar more than the $2.805 billion fair market value in replacement costs, correspondence evaporates.  It is only by spending more on its redevelopment initiatives than its leasehold interests were worth—an investment choice the Aviation Defendants have no control over—that the WTCP Plaintiffs purport to escape correspondence.  Nothing in New York law permits such an absurd result.

Indeed, if the WTCP Plaintiffs' theory that replacement cost insurance recoveries do not correspond to their potential tort damages award were correct, WTCP would be entitled to recover both $4.091 billion in insurance recoveries *and* $2.159 billion[10] for diminution in tort damages.  Thus, WTCP would receive a total recovery of $6.25 billion for the damage to their net leasehold interests in the Complex.  Similarly, 7WTCo. would be entitled to recover $831 million in insurance recoveries for its leasehold interest in WTC 7 and an additional $593

---

that there were almost 99 years remaining in WTCP's net leases of the WTC Complex as of September 11, 2001).

[10]  WTCP's maximum tort damages award for diminution in the fair market value of the WTC Complex, minus the portion of WTCP's insurance payments allocated to business interruption/lost rental income, $646 million, which WTCP's expert acknowledges corresponds to a tort award of diminution in fair market value. *See* Barry Decl. Ex. A, 2011 Shavell Rep. ¶ 24.

million[11] tort award, for a total recovery of $1.424 billion for damage to its net leasehold interest in WTC 7. This is precisely the type of double recovery that C.P.L.R. Section 4545(c) aims to prevent.

> **B.      The WTCP Plaintiffs' Alleged Contractual Obligation To Rebuild Affects Neither The Tort Damages Side Nor The Insurance Payments Side Of The C.P.L.R. § 4545(c) Correspondence Equation.**

The alleged contractual obligation to rebuild pops up again in the WTCP Plaintiffs' second argument against correspondence. Professor Shavell argues that the WTCP Plaintiffs should not be subject to an offset for their replacement cost insurance payments because, unlike the Fishers, who supposedly had a choice to rebuild, the WTCP Plaintiffs were contractually obligated to rebuild. Of course, nothing in *Fisher* itself remotely suggests this choice-versus-compulsion distinction, as Professor Shavell admitted. *See* Barry Decl. Ex. B, Shavell Dep. Tr. 165:20–166:4. As a practical matter, the "choice" to embrace homelessness hardly seems attractive; a family like the Fishers might feel just as compelled to rebuild by virtue of their need for a family home as the WTCP Plaintiffs profess to have felt constrained by their alleged contractual obligations.[12] Moreover, as Professor Fischel has noted, the WTCP Plaintiffs'

---

[11]   7WTCo.'s maximum tort damages award for diminution in the fair market value of WTC 7, $737 million, minus the portion of 7WTCo.'s insurance payments allocated to business interruption/lost rental income, $144 million, which 7WTCo.'s expert acknowledges corresponds to a tort award of diminution in fair market value. *See* Barry Decl. Ex. CC, 2013 Shavell Rep. ¶ 29(d).

[12]   In fact, this alleged contractual obligation to rebuild was far from absolute, as Mr. Levy admitted. Barry Decl. Ex. GG, Dep. of Michael Levy Tr. 545: 17–546:5 (June 4, 2002) ("2002 Levy Dep."), in *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, No. 01 CV 9291 (S.D.N.Y.) ("Q. Is it your understanding of – is it you understanding of the terms of the REOA that if the proceeds are insufficient and if the Port determines not to fund the deficiency, Silverstein has a – is relieved of its obligation to participate in rebuilding? A. I think the answer is yes."). The WTCP Plaintiffs are indisputably not rebuilding WTC 1, for example, and in other fora have aggressively (and successfully) argued that they were not

contractual obligation to rebuild cannot be fairly regarded as a compulsion. It was a voluntary contractual undertaking, for which the WTCP Plaintiffs presumably received fair consideration from the Port Authority of New York and New Jersey.

Even more fundamentally, however, the alleged contractual obligation to rebuild—even if it did exist—is completely irrelevant to either side of the correspondence equation. As the Court has ruled, the WTCP Plaintiffs' alleged contractual undertakings are not something for which the Aviation Defendants are legally responsible. *See In re Sept. 11 Litig.*, 590 F. Supp. 2d at 543–44; *In Sept. 11 Litig.*, 908 F. Supp. 2d at 447–48 . As Professor Connors acknowledged, that ruling means that the contractual obligation to rebuild cannot give rise to a tort damage award, and thus, plays no part in the tort side of the correspondence equation. Barry Decl. Ex. J, Connors Dep. Tr. 54:24–55:5 ("If the court has ruled that a party is not entitled to a certain category of damages, then those damages could not be awarded by a jury. And then there would not be an award in that category to offset against a collateral source payment.").

---

contractually obligated to rebuild the destroyed buildings. *See, e.g.*, Barry Decl. Ex. HH, *In the Matter of the Petition of 1 World Trade Center LLC, et al.*, TAT(H)07-34(CR), et al., slip op. at 6–10, 17, 23, 24, 30 (N.Y.C. Tax Appeals Tribunal Dec. 3, 2009). Under the net lease applicable to the Complex, the WTCP Plaintiffs were obligated to rebuild the Complex *as it was* only to the extent prudent, feasible and commercially reasonable. If it were not prudent, feasible and commercially reasonable to rebuild the Complex as it existed prior to the destruction, WTCP had no obligation other than to enter into discussions with the Port Authority. *See* Barry Decl. Ex. GG, 2002 Levy Dep. Tr. 541:18–542:2 ("Q. What are the – to your understanding, what are the terms and conditions to which your obligation to rebuild are subject? A. The two that come to mind is number one, whether the Port Authority approves of a commercially reasonable project. Number two, how much insurance money you ultimately receive and under what section of the REOA and the net lease you would fall under at that point."). Similarly, 7WTCo.'s only obligation (if any) was to rebuild WTC 7 as it was; but 7WTCo. indisputably has not done that. It has instead built a new, state of the art "green" building that bears little resemblance to the office building that collapsed as a result of the September 11 terrorist attacks.

The alleged contractual obligation to rebuild is equally irrelevant to the insurance side of the correspondence equation. As WTCP's and 7WTCo.'s insurance experts testified, the contractual obligation to rebuild had absolutely nothing to do with the insurance policies or insurance payments.[13] The WTCP Plaintiffs have confirmed this in the parties' Stipulated Facts.[14] WTCP and 7WTCo. received insurance payments due to the destruction of their property, not the terms of their lease agreements. Barry Decl. Ex. Y, McKinley Rep. 1 (explaining that McKinley was retained to review 7WTCo.'s property insurance program "and the insurance claims asserted by 7WTCo. as a result of the complete destruction of the 7 World Trade Center building on September 11, 2001"); id. at 11 ("Insurance claims are coverage-specific and are linked to the specific risk insured against."); Barry Decl. Ex. II, Supplemental Declaration of Michael S. Beach re: WTC 7 ¶ 52 (Mar. 1, 2013) ("2013 Beach Rep.") ("I have seen no reference in the IRI policy to any contractual obligation to rebuild on the part of

---

[13]   Barry Decl. Ex. H, Reilly Dep. Tr. 92:24–93:11 (Jan. 4, 2013) ("Q. The question I have is, does anything in the language of WTCP's insurance forms or binders et cetera, condition its access to replacement cost, or actual cash value on it having a contractual obligation to rebuild the buildings? A. No. Q. Are you aware of anything written in the replacement cost provision of the forms or binders that referenced [any] contractual obligation to rebuild on the part of WTCP? . . . A. No."); see also id. Tr. 129:12–20 ("Q. Sir, would you agree that the replacement cost payments would have been available to WTCP under its insurance if it elected to rebuild the World Trade Center properties even if it had no contractual obligation to do so? . . . . A. The contractual obligations to do so had nothing to do with any payments made by the insurers."); Barry Decl. Ex. I, McKinley Dep. Tr. 223:6–18 ("Q. Okay. Does that policy make any reference to or in any way address or discuss a contractual obligation to rebuild on the part of 7WTCo.? . . . A. No, it does not.").

[14]   See Stipulated Facts ¶ 18 ("The WTC Insurance Program obligated the insurers to make payments in response to losses caused by or resulting from physical loss or damage to covered property. Replacement cost coverage under the WTC Insurance Program was not contingent on any provision in the Net Leases requiring WTCP to rebuild the WTC Buildings."); id. ¶ 90 ("The insurance policy that 7WTCo. purchased for WTC 7 obligated IRI to make payments in response to losses caused by physical loss or damage to covered property arising out of covered property damage. IRI's obligation to pay was not contingent on any provision in the WTC 7 Lease requiring 7WTCo. to rebuild WTC 7.").

7WTCo., and there is nothing in that policy that suggests the insurance payments were in any way dependent upon 7WTCo. having a contractual obligation to rebuild.").[15]

### C.   The WTCP Plaintiffs' "Two Losses" Argument Misapprehends Both The Court's Prior Rulings And The Nature of Business Interruption Insurance.

The WTCP Plaintiffs' third argument against correspondence of their replacement cost insurance payments urges that they suffered two losses—property damage and lost rental income—while the Fishers suffered only one loss, the destruction of their home. Barry Decl. Ex. B, Shavell Dep. Tr. 187:16–188:10 (explaining that WTCP differs from the Fishers "because WTCP at a very general level of description suffered two losses, one being that they couldn't rent property their property.  And the other was due to their contractual obligation to replace").  Professor Shavell urges that only the insurance payments the WTCP Plaintiffs allocate to lost rental income correspond to their tort damages, which Professor Shavell asserts have been limited to lost rental income streams.  Barry Decl. Ex. A, 2011 Shavell Rep. ¶ 21 ("WTCP's potential tort damages must be considered to be damages for its streams of lost rental income,

---

[15]   The correspondence analysis would not change if the insurance payments had been made for actual cash value rather than replacement costs.  As all the insurance experts agreed, actual cash value is simply a subset of replacement costs (it is replacement costs minus depreciation; essentially it represents the cost to rebuild the structures as they were before the destruction).  Barry Decl. Ex. II, 2013 Beach Rep. ¶ 14 ("Generally, Actual Cash Value represents the Replacement Cost Value of the building less a reasonable allowance for observable physical deterioration but not less than market value or the cash value of a reasonable offer from a willing buyer had no loss occurred, less reasonable allowance for the post-loss market value."); Barry Decl. Ex. H, Reilly Dep. Tr. 80: 9–20 ("Replacement cost?  It's the basis – it's the basis of the calculation for actual cash value."); Barry Decl. Ex. Y, McKinley Rep. 7 (explaining that "Actual Cash Value" basis is "'Replacement Cost' minus depreciation"); *see also* Barry Decl. Ex. F, 2009 Levy Dep. Tr. 70:3–10 ("As it is defined in the insurance, my understanding is it is replacement cost less an allowance of appreciation obsolescence.").  Actual cash value payments would therefore also compensate the WTCP Plaintiffs for the damage to their leasehold interests caused by the destruction of the buildings and correspond to the same loss as a tort damages award in this litigation.

not replacement costs."); *see also id.* ¶ 9. Likewise, Professor Connors' testimony relies on the same foundational error: that the Court has ruled (without reference to the lesser of two rule) that the WTCP Plaintiffs could only recover lost rental income.[16]

The WTCP Plaintiffs have held up a funhouse mirror to the Court's prior rulings. Far from ruling that the WTCP Plaintiffs could *only* recover lost rental income, the Court has refused to allow the WTCP Plaintiffs to pursue a separate claim for lost rental income. In 2008, the Court rejected the WTCP Plaintiffs' argument that they suffered a separate, additive loss in the form of lost rental income. Instead, as described more fully above, the Court held that an award in the amount of fair market value would fully compensate the WTCP Plaintiffs for the losses they sustained as a result of the destruction of income-generating property, including the loss of any rental income. *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544 ("WTCP cannot recover twice, once in the form of the property's market value, which fully includes the rental streams reasonably expected from the property, and again for the separate value of the rental streams." (citing *Sandoro*, 482 N.Y.S.2d at 165 ("Since damages measured by market value take rental value into account, where a building is totally destroyed there is no separate allowance for damages for loss of rent."))). The Court thus ruled that the measure of the WTCP Plaintiffs' tort

---

[16]   Barry Decl. Ex. D, Connors. Rep. ¶ 10(n); Barry Decl. Ex. J, Connors Dep. Tr. 138:3–6 ("The court has said that the plaintiffs cannot recover as a matter of proximate cause the replacement costs that they sustained, based on their contractual obligation to rebuild."); *id.* at 140:14–18; 140:23–141:8 ("Q. So is it your understanding that the court is permitting, under its rulings, 7 World Trade Company to seek recovery of replacement costs, up to the amount of reduction in fair market value under the lesser of two rule? A. No. I don't think I can say this any more clearly -- but I have here in sub-paragraph 10(n) the court's ruling, as a matter of law, that 7 World Trade Center cannot recover damages for the costs incurred to rebuild the building. It's not at all tied to the lesser of two rule. Q. That's part of the basis for your opinion, sir? A. Yes, it is."); *see also id.* at 158:9–19; 158:24–159:12.

damages was the same as the Fishers':  an award limited to the amount of the diminution in fair market value of the destroyed property under the lesser of two rule.

Even more fundamentally, however, the WTCP Plaintiffs do not and cannot explain why the fact that the WTCP Plaintiffs had business interruption insurance that compensated them for the temporary loss of rental income during the period of rebuilding would eliminate the correspondence between replacement cost insurance and property damage as measured by fair market value.  The WTCP Plaintiffs argue that they have a second loss, but that does not change the fact that what the WTCP Plaintiffs would characterize as the first loss—property damage measured by fair market value under the lesser of two rule—is required to be offset by replacement cost insurance payments under *Fisher*.  Indeed, as Professor Fischel points out, if the WTCP Plaintiffs were correct that they have both a second category of loss and a second species of insurance coverage, that would only tighten the correspondence equation.

As WTCP's own experts conceded, the portion of the insurance payments that the WTCP Plaintiffs allocate to replacement cost must be compared to the award for lost property value separately from the business interruption payments.  Barry Decl. Ex. J, Connors Dep. Tr. 129:5–15; *see also* Barry Decl. Ex. A, 2011 Shavell Rep. ¶ 28 ("Under *Oden*, there must be a separate correspondence analysis for each category of loss.").  As Professor Connors acknowledged, replacement cost insurance offsets a lesser of two damages award for destruction of the buildings measured by the reduction in fair market value of the leasehold interest.  Barry Decl. Ex. J, Connors Dep. Tr. 123:18–126:15 ("Q.  And let's assume there is $3.4 billion in replacement cost insurance.   A.   There is 3.4 bill [sic] in replacement cost insurance.   Then under that

hypothetical, that would duplicate the lost property value of 2.8 billion.").[17]   The WTCP Plaintiffs' insurance recoveries for lost rental income, which compensated them for lost profits during the period of rebuilding, only strengthen the correspondence between the WTCP Plaintiffs' insurance recoveries and potential tort damages award.   Barry Decl. Ex. C, 2013 Fischel Rep. ¶¶ 13, 14.

## IV.   Whether Or Not To Allocate The Insurance Payments Is Academic Because Complete Correspondence Exists Under The Only Practicable Allocation.

The Court need not spend much time at the upcoming trial on allocation issues.   While the Aviation Defendants submit that no allocation is necessary or appropriate, the allocation method advanced by the WTCP Plaintiffs (allocating the payments proportionately to the dollar amounts of the claims documented and quantified) does not change the outcome of the correspondence analysis.

---

[17]   Attached as Appendix A to this brief are excerpts from the Deposition of Patrick M. Connors, 7WTCo.'s proposed expert on correspondence, that support correspondence between the WTCP Plaintiffs' insurance recoveries for business interruption and replacements costs and their potential tort damages award for the reduction in economic value of their net leasehold interests in the WTC Complex and WTC 7.

These excerpts demonstrate that 7WTCo.'s own expert concedes that (1) when replacement cost of property is valued at $8.4 billion and the fair market value of the property owner's interest in that property is valued at $2.8 billion, under the lesser of two rule, the property owner is only entitled to recover $2.8 billion (see App'x A, Connors Dep. Tr. 111:22–117:8); (2) if the same property owner received $3.4 billion in replacement cost insurance recoveries, the replacement cost insurance proceeds would duplicate the $2.8 billion lost property value to be awarded to the property owner (see App'x A, Connors Dep. Tr. 117:19–118:19); (3) if the same property owner suffers both property damage and lost income due to the property damage, a replacement cost insurance recovery of $3.4 billion would still entirely offset and extinguish the plaintiff's $2.8 billion damages for property damage (see App'x A, Connors Dep. Tr. 118:20–126:15); and (4) if the same property owner suffers both property damage and lost income due to the property damage, and the property owner has insurance coverage for business interruption and replacement costs, the business interruption coverage corresponds to a potential tort damages award for lost rental income (see App'x A, Connors Dep. Tr. 126:24–129:15).

A.     **The Insurance Payments Correspond In Their Entirety To The WTCP Plaintiffs' Tort Damages Award.**

The WTCP Plaintiffs only quantified, documented, and submitted business interruption and property damage claims to their insurers. *See* Stipulated Facts ¶¶ 47, 49, 51–82, 97–123; *see also* Barry Decl. Ex. JJ, Mem. of Law in Support of the Aviation Defs.' Mot. for Summ. J. Dismissing All Claims of Plaintiffs 7 World Trade Company, L.P. Relating to 7 World Trade Center, at 21–24 (June 29, 2012). The WTCP Plaintiffs ultimately received insurance recoveries of approximately $4.091 billion for the Complex and $831 million for WTC 7. *See In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 1 (S.D.N.Y. Sept. 30, 2009) ("The total value of WTCP's insurance recovery is $4,091,364,034"); *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 445 ("Thus 7WTCo.'s total insurance recovery is $830,936,584.28."). Insurers do not issue payments based upon losses that are not claimed, well founded, and documented; thus, because the WTCP Plaintiffs' only documented, quantified, and submitted claims for property damage/replacement cost and business interruption losses, all of the insurance payments they received were indisputably for property damage/replacement costs and business interruption occasioned by the destruction of the WTC buildings on September 11.[18]

No allocation is necessary between the replacement cost and business interruption components of the WTCP Plaintiffs' insurance payments. Both forms of insurance recovery compensate the WTCP Plaintiffs for the damage to their net leasehold interests caused by the

---

[18]   *See* Barry Decl. Ex. KK, Expert Report of Michael S. Beach (July 8, 2011) ("2011 Beach Rep.") ¶ 8 ("It is my opinion that the payments issued by WTCP's insurers totaling $4,091,364,040 represented a combination of the loss of property in form of buildings 1, 2, 4 & 5, and loss of Rental Value and Business Income from these buildings."); *id.* ¶ 27 ("[I]t is my opinion that the payments issued by WTCP's insurers were on the basis of the PPOPLs presented . . . ."); *see also* Barry Decl. Ex. II, 2013 Beach Rep. ¶ 6, 7, 10 (concluding that the payments that 7WTCo. received were for property damage and business interruption exclusively); *id.* ¶¶ 48–51.

destruction of the buildings, which is the same category of loss covered by the tort damages award.  As Professor Fischel explains, there is no need to allocate between types of insurance coverage where all the coverages correspond to the same loss for which a tort damages award would reimburse the plaintiffs.  Barry Decl. Ex. C, 2013 Fischel Rep. ¶ 13 ("From an economic standpoint, whether insurance receipts are intended to compensate for loss of business or to facilitate replacement, they are in either case compensation that returns to 7WTCo. value it would have had but for the loss.").

WTCP and 7WTCo. state that none of the insurance payments were allocated to any particular item of damage,[19] and appear to argue that this lack of allocation precludes a finding of correspondence.[20]  But the WTCP Plaintiffs cannot defeat correspondence by showing that there was not an allocation of the insurance proceeds by their insurers.  A tort plaintiff cannot avoid C.P.L.R. Section 4545(c)'s offset requirement by settling with its insurers without specifying an allocation of the payments.  *See Dymond v. Dunn*, 148 A.D.2d 56 (3d Dep't 1989); *Kozlowski v. Briggs Leasing Corp.*, 408 N.Y.S.2d 1001, 1004–05 (N.Y. Sup. Ct. 1978).  Such a requirement would render Section 4545(c) a dead letter, since, as 7WTCo.'s insurance expert testified, it is

---

[19]   Barry Decl. Ex. F, 2009 Levy Dep. Tr. 48:13–49:5 ("And no one ever made a determination as to what insurance proceeds went for what."); *id.* at 44:14–45:5 ("There was no allocation to business interruption or any other type.  The losses under the policies -- sorry, the actual losses incurred far exceeded the amount recoverable under the insurance policies or binders.  And there were losses, we incurred losses on all kinds of items of coverage.  So there was no one particular item of coverage that I could identify or allocate it to."); Barry Decl. Ex. W, 2012 Levy Dep. Tr. 182:13-183:12 (explaining that 7WTCo. never allocated its insurance proceeds); Stipulated Facts ¶¶ 84, 138.

[20]   *See, e.g.*, Barry Decl. Ex. EE, WTCP Pls.' Mem. of Law in Opp'n to Aviation Defs.' Mot. For Summ. J. Based on C.P.L.R. 4545(c), at 26 (Aug. 18, 2008) (citing Declaration of Michael Levy (Aug. 11, 2008) Exs. 6-11, 13-18) ("none of the settlement agreements [with WTCP's insurers] allocate any specific dollar amount of the Settlement Payments or insurance proceeds to any specific category of loss.").

rare for there to be an allocation of payments among claim elements when there is a policy limits loss. *See* Barry Decl. Ex. I, McKinley Dep. Tr. 196:7–17 ("A:  An agreement about allocation? That's right, you would not normally see that.").  Instead, all of the WTCP Plaintiffs' insurance payments were made in satisfaction of all of the claims documented, quantified, and submitted by the WTCP Plaintiffs for economic loss arising from the destruction of the buildings.  *See* Barry Decl. Ex. II, 2013 Beach Rep. ¶ 6, 10; Barry Decl. Ex. C, 2013 Fischel Rep. ¶ 9.

Thus, the insurers of the Complex paid WTCP $4.091 billion for all the claims documented and quantified by WTCP as a result of the destruction of the Complex.  The insurers of WTC 7 paid 7WTCo. a total of nearly $831 million for all the claims documented and quantified by 7WTCo. as a result of the destruction of WTC 7.   The proper calculation for Section 4545(c) purposes should compare WTCP's and 7WTCo.'s maximum recoverable damages of $2.805 billion and $737 million, respectively, to the total insurance payments of $4.091 billion for the Complex and $831 million for WTC 7.  As Professor Fischel has recounted in his report, this calculation is the appropriate one where, as here, the entirety of the insurance payments correspond to the economic loss that also forms the basis of the tort award.  *See* Barry Decl. Ex. N, 2011 Fischel Rep. ¶ 8; Barry Decl. Ex. C, 2013 Fischel Rep. ¶ 9.  This holistic approach is also fully consistent with the testimony of Mr. Levy, who testified that WTCP and 7WTCo. were allowed to use the insurance proceeds to reimburse any cost or expense, agreeing with the proposition that WTCP generally "can use the proceeds of insurance to pay any individual item of loss it chooses, it is not limited to pay for one over the other."  Barry Decl. Ex. F, 2009 Levy Dep. Tr. 155:10–15; *see also id.* 142:13–23 ("I can recognize [the insurance proceeds] into income and not use it for rebuilding. . . . I have no restrictions on the use of that money once it is in my accounts."); Barry Decl. Ex. GG, 2002 Levy Dep. Tr. 470:4–12 ("Q.

There is no overlap between the amount you've claimed for reconstruction and the amount you are claiming for actual cash value, correct?  A.  No.  Once I get the funds on a business interrupt claim, I'm not restricted as to its use.  Q.  So to the extent you have profits from your business interruption you could invest them in rebuilding, is that correct?  A.  Yes.").

> **B.    The Only Practicable Allocation Would Split The Insurance Payments Between Replacement Cost And Business Interruption Proportionately To The Documented And Quantified Insurance Claims.**

If the Court believes that allocation of the insurance payments is necessary, the only practicable method for allocating the insurance payments would be the one advanced by the WTCP Plaintiffs, which divides the payments proportionately to the dollar amounts of the documented and quantified insurance claims for replacement costs of the buildings and business interruption.[21]  Under the proofs of loss for the Complex, about 85% of WTCP's documented and quantified claim was for replacement costs and approximately 15% of the claim was for business interruption expenses, according to Professor Shavell, Mr. Reilly, and WTCP's own prior briefing.  *See* Barry Decl. Ex. A, 2011 Shavell Rep. ¶ 14; Barry Decl. Ex. X, 2013 Reilly Rep. ¶ 4; Barry Decl. Ex. DD, WTCP Pls.' Mem. of Law in Opp'n to the Aviation Defs.' Renewed Mot. for Collateral Setoff Against WTCP's Claims Pursuant to N.Y. C.P.L.R. § 4545(c) and for Summ. J. Dismissing WTCP's Damages Claims, at 3 n.4 (Dec. 5, 2011).  According to Professor Shavell's breakdown of 7WTCo.'s insurance recoveries for WTC 7, approximately 76% of 7WTCo.'s claims were for property damage and 24% of its claims were

---

[21]   WTCP's insurers did not accept the proofs submitted and retained consultants that came up with different estimates of the recoverable costs to replace the buildings.  With respect to the Complex, WTCP and its insurers agreed that the Replacement Cost Value for the Core and Shell and certain tenant improvements was $4,217,385,085.  While resolved by settlements before any further final determinations were made, it was reasonably understood that the additional value for tenant improvements would substantially increase this number.

for lost rents for the period of reconstruction.[22]  Barry Decl. Ex. CC, 2013 Shavell Rep. ¶¶ 16, 22.

If that allocation method were followed, after reduction of the WTCP Plaintiffs' insurance premiums and claims preparation fees pursuant to Section 4545(c), WTCP would have received approximately $3.4 billion in replacement costs and $639 million in lost rental income for the Complex, and 7WTCo. would have received roughly $630 million in replacement costs and $199 million in lost rental income for WTC 7.

## V.   The WTCP Plaintiffs' Insurance Payments Offset And Fully Extinguish Their Tort Damages.

For all the reasons set forth above, WTCP's and 7WTCo.'s insurance proceeds, whether viewed as a unitary whole or as allocated between replacement costs and business interruption/lost rental income, fully correspond to the same loss compensated by any tort award WTCP and 7WTCo. could receive in this litigation.  As the Aviation Defendants previously argued, if the Court decides to award any prejudgment interest in this case governed by ATSSSA, the appropriate rate of interest to be applied would be the risk-free federal rate of interest.  *See* Barry Decl. Ex. LL, Aviation Defs.' Mem. of Law in Supp. of their Renewed Mot. for Collateral Setoff Against WTCP's Claims Pursuant to N.Y. C.P.L.R. § 4545(c) and for Summ. J. Dismissing WTCP's Damages Claims, at 12–16 (Nov. 9, 2011); Barry Decl. Ex. JJ, Mem. of Law in Support of the Aviation Defs.' Mot. for Summ. J. Dismissing All Claims of

---

[22]   This breakdown removes an allocation for mortgage carrying costs, per this Court's prior ruling that 7WTCo. may not recover mortgage carrying costs. *See In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448.  Although Professor Shavell treats re-tenanting costs as a subset of business interruption/time element insurance recoveries, this allocation also properly treats re-tenanting costs as a subset of replacement costs, in accordance with this Court's prior ruling. *See id.*

Plaintiffs 7 World Trade Company, L.P. Relating to 7 World Trade Center, at 28–31 (June 29, 2012).[23]

As Rajiv Gokhale previously calculated and submitted—calculations that the WTCP Plaintiffs have never challenged in the four years since the Complex calculations were first submitted—at any federal rate of interest, WTCP's and 7WTCo.'s insurance payments more than completely offset their maximum recoverable tort damages with respect to their real property claims.[24]  Barry Decl. Ex. C, 2013 Fischel Rep. ¶ 20; Barry Decl. Ex. N, 2011 Fischel Rep. ¶ 17; Barry Decl. Ex. MM, Gokhale Complex Decl. ¶¶ 8-10; Barry Decl. Ex. NN, Gokhale WTC 7 Decl. ¶¶ 3–5, 8–10.

New York law permits a plaintiff to exclude from the Section 4545(c) offset "an amount equal to the [insurance] premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action."  N.Y. C.P.L.R. § 4545(c) (effective Sept. 11, 2001).  The Court has also ruled that the fees the WTCP Plaintiffs incurred in preparing and

---

[23]  Once underlying damages are paid off, interest ceases to run; thus, prejudgment interest, properly calculated, runs only to the date on which the insurance payment is made to the WTCP Plaintiffs.  *See* Barry Decl. Ex. QQ Aviation Defs.' Reply Mem. of Law in Further Supp. of Renewed Mot. For Collateral Setoff Against WTCP's Claims Pursuant to N.Y. C.P.L.R. § 4545(c) & for Summ. J., at 18 (Dec. 15, 2011).

[24]  7WTCo. has also asserted a claim for damages of $1,846,139.43 for personal property in WTC 7 that was destroyed on 9/11.  Stipulated Facts ¶ 128.  This claim is offset by 7WTCo.'s insurance recoveries.  Mr. Levy has admitted that 7WTCo.'s personal property losses were covered by its insurance payments.  Barry Decl. Ex. W, 2012 Levy Dep. Tr. 165:13–21.

7WTCo. has a very small claim for fine arts remaining after the Section 4545(c) offset is applied.  7WTCo. claimed $1 million in fine arts damages, of which it acknowledges $700,000 was covered by a separate insurance policy.

Thus, 7WTCo.'s potential tort recoveries in this action are entirely offset by its insurance recoveries, except for $300,000 in claims relating to fine arts.

submitting insurance claims are proper offsets to arrive at net insurance recoveries.  *See In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 2 (S.D.N.Y. Sept. 30, 2009).  With respect to these figures, the parties have stipulated as follows:

- During the two-year period immediately preceding September 11, 2001, WTCP paid a total of $5,898,714 in insurance premiums for property insurance.  Stipulated Facts ¶ 5.

- During the two-year period immediately preceding September 11, 2001, 7WTCo. paid a total of $482,793 in insurance premiums for property insurance coverage for, among others, WTC 7 and paid a total of $3,500.17 in insurance premiums for fine arts coverage for paintings and other artwork at WTC 7.  Stipulated Facts ¶ 95.

- After September 11, 2001, WTCP paid $10,352,540 in claims preparation fees (exclusive of amounts of fees and costs expended in appraisal proceedings involving certain of WTCP's insurers) relating to the destruction of the WTC Complex.  Stipulated Facts ¶ 87.[25]

---

[25]   After September 11, 2001, WTCP also incurred $31,030,471 in fees and costs associated with appraisal proceedings involving certain of WTCP's insurers.  *See* Stipulated Facts ¶ 87(a).  While "[a]ttorneys' fees that WTCP incurred in preparing and submitting insurance claims . . . are proper offsets to arrive at net insurance recoveries" for purposes of C.P.L.R. Section 4545(c), *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), slip op. at 2 (S.D.N.Y. Sept. 30, 2009), this Court has made clear that the costs that WTCP incurred in litigating with its insurers are not proper reductions under Section 4545(c).  *See* Barry Decl. Ex. E, Sept. 24, 2009 Hr'g. Tr. 32:6–16.  The fees WTCP incurred as part of the appraisal proceeding necessarily fall into the same category as WTCP's coverage litigation expenses and are, therefore, not proper insurance reductions under Section 4545(c).  It is clear that the appraisal hearing was inextricably linked to the coverage litigation.  In fact, the result of the appraisal proceeding gave rise to the coverage litigation settlement agreement.  Barry Decl. Ex. PP, Dep. of Lois Thompson Tr. 126:20–127:3 (July 2, 2013) ("Thompson Dep. Tr.") ("[The settlement] resolved those litigations.  And in the process resolved the valuation claim -- or I should put it the other way.  Resolved the valuation claim making it possible to resolve the one-occurrence two-occurrence.").  Moreover, the appraisal process was an adversarial proceeding that required 99 days of hearings across several years, complete with opening and closing statements, depositions, expert reports, discovery, the examination of witnesses, and intervening mediations.  Barry Decl. Ex. PP, Thompson Dep. Tr. 96:1–7, 106:6–14, 112:7–113:2.  A multi-year adversarial proceeding is not the type of "claims preparation" work contemplated by either this Court or by Section 4545(c).  *See* Barry Decl. Ex. E, Sept. 24, 2009 Hr'g Tr. 32:12–16 ("But to the extent it was necessary to prepare the proofs of loss, to gather information, to make an application for recovery and perhaps to negotiate with the insurance company, those would seem to me to be recoverable.").  In light

- After September 11, 2001, 7WTCo. paid a total of $1,587,410 in claims preparation fees relating to the destruction of WTC 7.  Stipulated Facts ¶ 141.

The insurance premiums and claims preparation fees paid by WTCP and 7WTCo. should be subtracted from WTCP's and 7WTCo.'s respective insurance recoveries of $4.091 billion and $831 million.  Thus, the total collateral source offset under Section 4545(c) for the Complex becomes $4.044 billion (even assuming that appraisal-related fees are considered reductions under Section 4545(c), *see* note 25), which still greatly exceeds WTCP's $2.805 billion potential tort damages award—even after accounting for prejudgment interest.  *See* Barry Decl. Ex. MM, Gokhale Complex Decl. ¶¶ 8–10.  Similarly, the total collateral source offset for WTC 7 becomes $828.86 million, which also fully offsets and extinguishes 7WTCo.'s potential $739 million tort damages award plus prejudgment interest.  *See* Barry Decl. Ex. NN, Gokhale WTC 7 Decl. ¶¶ 3–5, 8–10.  Attached as Appendix B is a simple chart to demonstrate the calculations necessary to apply the WTCP Plaintiffs' insurance recoveries as offsets under C.P.L.R. Section 4545(c).

Thus, the WTCP Plaintiffs' claims for insurance premiums and claims preparation costs are too small to affect the analysis of whether the WTCP Plaintiffs' insurance recoveries correspond with and exceed their potential tort damages award.  Even after adjusting the WTCP Plaintiffs' insurance recoveries for their insurance premiums and claims preparation costs, and adding prejudgment interest properly calculated at any applicable federal rate, the WTCP

---

of the foregoing, the WTCP Plaintiffs are not entitled to any reductions in their insurance recoveries for any fees incurred in connection with the appraisal hearing.

Nonetheless, even if these appraisal-related fees were applied as reductions to WTCP's net insurance recoveries, WTCP's insurance recoveries are still well in excess of its maximum potential tort damages award.

Plaintiffs' insurance recoveries still offset the WTCP Plaintiffs' potential tort damages award in entirety.

## CONCLUSION

Under C.P.L.R. Section 4545(c), the WTCP Plaintiffs' insurance recoveries for business interruption and property damage correspond, as a matter of law, to the WTCP Plaintiffs' maximum recoverable tort damages.  Even with allowances for the WTCP Plaintiffs' insurance premiums and claims preparation expenditures, and pre-judgment interest properly applied at any applicable federal rate, the WTCP Plaintiffs' potential tort recoveries in this action are entirely offset by their insurance recoveries.  Accordingly, the WTCP Plaintiffs' damages claims relating to the WTC Complex and WTC 7 should be dismissed with prejudice.

Dated: New York, New York
     July 8, 2013

                        Respectfully submitted,

                        CONDON & FORSYTH LLP

                        By_____
                            Desmond T. Barry, Jr. (DB 8066)
                            Times Square Tower
                            7 Times Square
                            New York, New York 10036
                            Tel.: (212) 490-9100
                            Fax: (212) 370-4483

                        *Aviation Defendants' Liaison Counsel*