UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

IN RE SEPTEMBER 11 LITIGATION                   :
                                                :     21 MC 101 (AKH)
--------------------------------------------------------------- X

WORLD TRADE CENTER PROPERTIES LLC, et al.,      :
                                                :
                            Plaintiffs,         :     08 CIV 3719 (AKH)
             v.                                 :
                                                :
UNITED AIRLINES, INC., et al.,                  :
                                                :
                            Defendants.         :
                                                :
--------------------------------------------------------------- X

WORLD TRADE CENTER PROPERTIES LLC, et al.,      :
                                                :
                            Plaintiffs,         :     08 CIV 3722 (AKH)
             v.                                 :
                                                :
AMERICAN AIRLINES, INC., et al.,                :
                                                :
                            Defendants.         :
                                                :
--------------------------------------------------------------- X

## PLAINTIFFS' PRETRIAL MEMORANDUM FOR THE JULY 15, 2013 TRIAL

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Richard A. Williamson
Megan P. Davis


*Attorneys for Plaintiffs*
World Trade Center Properties LLC
 1 World Trade Center LLC
 2 World Trade Center LLC
 3 World Trade Center LLC (formerly known as 5
     World Trade Center LLC)
 4 World Trade Center LLC
 7 World Trade Company, L.P.

## TABLE OF CONTENTS

**Page(s)**

Table Of Authorities ................................................................................... iii

Preliminary Statement.................................................................................1

Statement Of Facts......................................................................................5

Argument ....................................................................................................5

I.  The Aviation Defendants Must Prove To A Reasonable Certainty That A Particular Collateral Source Payment "Replaced Or Indemnified" A Particular Category Of Loss For Which Plaintiffs May Be Awarded Damages .......................................5

II. The Aviation Defendants Cannot Establish That The Payments Plaintiffs Received From Their Insurers Were Allocated To Any Specific Categories Of Loss.................................................8

III. Any Replacement Cost Insurance Proceeds Cannot Correspond To Plaintiffs' Potential Tort Damages Because This Court Has Precluded Plaintiffs, As A Matter Of Tort Law, From Recovering Costs Relating To The Replacement Of The World Trade Center Buildings .......................................17

    A.  Plaintiffs Suffered Two Principal Distinct Categories Of Loss On 9/11 .................................18

    B.  Even Assuming That The Costs Of Replacing The World Trade Center Buildings Were Less Than The Diminished Value Of Plaintiffs' Leasehold Interests, Plaintiffs Could Not Recover Replacement Cost Damages Under This Court's Rulings ...............................21

    C.  Any Replacement Cost Insurance Proceeds Do Not "Duplicate" Plaintiffs' Lost Rental Income Damages Even If By Facilitating The Rebuilding Of The World

## TABLE OF CONTENTS

**Page(s)**

Trade Center Buildings Years Later,
Those Proceeds Will Allow Plaintiffs
To Again Collect Tenant Rents Someday..........................24

IV.   Additional Reasons Why The Aviation Defendants
Cannot Establish Correspondence ...........................................26

     A.   The Aviation Defendants Cannot Prove
Correspondence With Respect To The
Payments That Plaintiffs Received
From Their Insurers For The Release
Of Extra-Contractual Claims .............................................26

     B.   The Aviation Defendants Cannot Prove
Correspondence With Respect To The
Payments For Excess Re-Tenanting
Costs, Mortgage Carrying Costs, And
Tenant Improvements .......................................................26

     C.   There Can Be No Offset For The
WTCP Plaintiffs' Initial Rent Payment
Of $491.3 Million ...............................................................27

     D.   There Can Be No Offset Against
Personal Property Damages .............................................27

     E.   $300,000 Of 7WTCo.'s Fine Arts
Damages Are Not Subject To Offset .................................27

     F.   Plaintiffs' Claims For Prejudgment
Interest Are Not Subject To Offset ...................................28

     G.   Under This Court's Prior Rulings, The
Amount Of Total Insurance Recoveries
Potentially Subject To Offset Must Be
Reduced By Plaintiffs' Insurance
Premiums And Claims Preparation Costs..........................32

Conclusion ......................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Alfano v. CIGNA Life Ins. Co.*,
   07 Civ. 9661, 2009 WL 890626 (S.D.N.Y. Apr. 2, 2009) ............................................ 31

*Bryant v. New York City Health & Hospitals Corp.*,
   93 N.Y.2d 592, 695 N.Y.S.2d 39 (1999) ............................................................. 4, 7, 24

*Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*,
   335 F.3d 52 (2d Cir. 2003) ............................................................................................. 29

*Chandler v. Bombardier Capital, Inc.*,
   44 F.3d 80 (2d Cir. 1994) ............................................................................................... 28

*Coal. To Defend Affirmative Action v. Granholm*,
   473 F.3d 237 (6th Cir. 2006),
   *motion to vacate stay denied*, 127 S. Ct. 1146 (2007) .................................................. 30

*Den Norske Ameriekalinje Actiesselskabet v. Sum Printing & Publishing Ass'n*,
   226 N.Y. 1 (1919) .......................................................................................................... 25

*Derdiarian v. Felix Contracting Corp.*,
   51 N.Y. 2d 308, 434 N.Y.S.2d 166 (1980) .................................................................... 22

*Dymond v. Dunn*,
   148 A.D.2d 56, 543 N.Y.S.2d 230 (3d Dep't 1989) ...................................................... 11

*Fisher v. Qualico Contracting Corp.*,
   98 N.Y.2d 534, 749 N.Y.S.2d 467 (2002) ............................................................. passim

*Hartshorn v. Chaddock*,
   135 N.Y. 116 (1892) ...................................................................................................... 22

*Kihl v. Pfeffer*,
   47 A.D.3d 154, 848 N.Y.S.2d 200 (2d Dep't 2007) .................................................... 6, 8

*Kozlowski v. Briggs Leasing Corp.*,
   96 Misc. 2d 337, 408 N.Y.S.2d 1001 (Sup. Ct. Kings Co. 1978) ................................. 11

*Mason Tenders Dist. Council of Greater N.Y. v. G & C Constr. Safe, Inc.*,
   10 Civ. 3399, 2011 WL 744918 (S.D.N.Y. Feb. 8, 2011),
   *report & rec. adopted*, 2011 WL 744914 (S.D.N.Y. Mar. 2, 2011) ............................ 31

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.,*
   423 F.3d 1056 (9th Cir. 2005),
   *aff'd,* 127 S. Ct. 1513 (2007) ................................................................. 30

*Nipponkoa Ins. Co., Ltd. v. Watkins Motor Lines, Inc.,*
   431 F. Supp. 2d 411 (S.D.N.Y. 2006) ......................................... 31

*Oden v. Chemung County Indus. Dev. Agency,*
   87 N.Y.2d 81, 637 N.Y.S.2d 670 (1995) ............................. passim

*S.R. Intern. Business Ins. Co. Ltd. v. World Trade Center Properties, LLC,*
   445 F. Supp. 2d 230 (S.D.N.Y. 2006) ......................................... 34

*Schwimmer v. Allstate Ins. Co.,*
   176 F.3d 648 (2d Cir. 1999) ........................................................ 30

*In re Sept. 11 Litig.,*
   21 MC 101, 2009 WL 1181057 (Apr. 30, 2009) ................... 17, 19

*In re Sept. 11 Litig.,*
   280 F. Supp. 2d 279 (S.D.N.Y. 2003) ......................................... 29

*In re Sept. 11 Litig.,*
   567 F. Supp. 2d 611 (S.D.N.Y. 2008) ......................................... 31

*In re Sept. 11 Litig.,*
   590 F. Supp. 2d 535 (S.D.N.Y. 2008) ................................... 17, 19

*In re Sept. 11 Litig.,*
   640 F. Supp. 2d 323 (S.D.N.Y. 2009),
   *aff'd in part, vacated in part and remanding,*
   435 Fed. Appx. 18, 2011 WL 2449494 (2d Cir. 2011) ......................... 28, 30

*In re Sept. 11 Litig.,*
   889 F. Supp. 2d 616 (S.D.N.Y. 2012) ............................... 4, 8, 19

*In re Sept. 11 Litig.,*
   906 F. Supp. 2d 295 (S.D.N.Y. 2012) ......................................... 23

*In re Sept. 11 Litig.,*
   908 F. Supp. 2d 442 (S.D.N.Y. 2012) ............................... passim

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Sheehan v. Metropolitan Life Ins. Co.*,
   No. 01 Civ. 9182, 2005 WL 1020874 (S.D.N.Y. Apr. 29, 2005) ................................ 31

*Strobl v. N.Y. Mercantile Exch.*,
   590 F. Supp. 875 (S.D.N.Y. 1984),
   *aff'd*, 768 F.2d 22 (2d Cir. 1985) ............................................................................. 31

*Taaffe v. Life Ins. Co. of N. Am.*,
   769 F. Supp. 2d 530 (S.D.N.Y. 2011) ........................................................................ 30

*Terranova v. New York City Transit Auth.*,
   No. 13946/02, 2005 WL 2219685 (Sup. Ct. Richmond Co. Aug. 23, 2005) ................ 6

*Turnbull v. USAir, Inc.*,
   133 F.3d 184 (2d Cir. 1998) ........................................................................................ 6

**Statutes**

ATSSSA § 408(b)(2) ............................................................................................... 29

CPLR 4545 ......................................................................................................... passim

CPLR 5001 ................................................................................................................. 31

CPLR 5004 ................................................................................................................. 31

N.Y. Ins. Law § 3404(e) ........................................................................................... 33

N.Y. Ins. Law § 3408(c) ........................................................................................... 34

**Other Authorities**

1 New Appleman Insurance Law Practice Guide § 12.23[3] ........................................ 33

6 Appleman's Insurance Law and Practice § 3929 (1987) .......................................... 33

70A N.Y. Jur. 2d Insurance § 2239 ............................................................................ 33

Couch on Insurance § 209:8 (3d ed. 1995) ................................................................. 33

# TABLE OF AUTHORITIES

**Other Authorities**                                                          **Page(s)**

N.Y. Pattern Jury Instr. -- Civil 2:311 (Damages -- Property with Market Value)............ 22

Robert E. Keeton & Alan I. Widiss, Insurance Law 1079 (1988) .................................... 33

In accordance with Rule 3.B.i of this Court's Individual Rules and paragraph C.1.xiii of the Joint Case Management Plan and Order, dated March 20, 2013, plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as 5 World Trade Center LLC), 4 World Trade Center LLC, and 7 World Trade Company, L.P.[1] (collectively, "Plaintiffs") submit this pretrial memorandum for the July 15, 2013 trial.

## PRELIMINARY STATEMENT

The Aviation Defendants[2] have made four prior motions to dismiss Plaintiffs' claims based on CPLR 4545, three with respect to the WTCP Plaintiffs and one with respect to 7WTCo. Each of those motions was denied on the ground that the Aviation Defendants had not met their heavy burden of proof. The Aviation Defendants still cannot meet that burden now.

After more than four years of litigating the issue of collateral offsets, the Aviation Defendants still cannot produce one shred of evidence – much less clear and convincing evidence, as is required under CPLR 4545 – that any of the payments that Plaintiffs received from their insurers were allocated to any specific categories of loss. The reason for that is simple: *there was no agreed upon allocation.* The payments that Plaintiffs received from their insurers were made almost exclusively pursuant to Settlement

---

[1] Plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC will be referred to collectively as the "WTCP Plaintiffs," and 7 World Trade Company, L.P. will be referred to as "7WTCo."

[2] The "Aviation Defendants" refer to American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; United Continental Holdings (f/k/a UAL Corporation); US Airways, Inc.; US Airways Group, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Huntleigh USA Corporation; The Boeing Company; and Massachusetts Port Authority.

Agreements (or they were advances that became final only under the terms of the Settlement Agreements) that covered "all claims," which had been or could have been asserted by Plaintiffs, including both claims for covered losses and extra-contractual claims such as claims for bad faith. *It is undisputed that those Settlement Agreements did not allocate the payments to any specific categories of loss. See* Agreed Statement of Stipulated Facts, ¶¶ 84, 138.[3]

The Aviation Defendants seem to recognize that the Settlement Agreements doom their efforts to prove correspondence because they now want to run as far away from the agreements as possible. In their recent opposition to the motion *in limine* filed by 7WTCo., they ask the Court to disregard the plain language of the Settlement Agreements and suggest (without any proof) that Plaintiffs tricked their insurers into not allocating the payments in the Settlement Agreements and including broad releases of "all claims" that were or could have been brought by Plaintiffs because Plaintiffs wanted to deprive the Aviation Defendants of the evidence that they would need to establish their entitlement to collateral offsets. That is nonsense. Plaintiffs – who were represented by counsel other than Flemming Zulack Williamson Zauderer LLP in the coverage litigation and in connection with the settlements (all of which preceded the Aviation Defendants' motions for collateral offsets in this case) – were not thinking about CPLR 4545. Plaintiffs' only concern was settling with their insurers. It was *Plaintiffs' insurers* who

---

[3] In addition to filing their respect pretrial briefs, the parties today will be filing a proposed pretrial order, which includes an Agreed Statement of Stipulated Facts, which is referenced herein. At or prior to trial, the parties also will be providing the Court with their respective proposed exhibits. Exhibits that are referenced herein with the prefix "JX-" refer to proposed exhibits that have been jointly designated by the parties, and exhibits that are referenced herein with the prefix "PX-" refer to proposed exhibits that have been designated by Plaintiffs.

insisted that the Settlement Agreements include broad releases because they wanted to know that they would not face future claims.  And it was *Plaintiffs' insurers* that had no need to allocate the payments in the Settlement Agreements (and, indeed, no interest in doing so) because they were paying all or nearly all of their policy limits and an allocation would have shown they were paying to release extra-contractual claims.

Unable to avoid the Settlement Agreements, we expect that the Aviation Defendants will fall back on the same two principal losing arguments that they made in each of their prior motions.  As they have done before, the Aviation Defendants will claim that (1) all of the payments that Plaintiffs received from their insurers were paid to reimburse only the costs of replacing the World Trade Center Buildings[4] or Plaintiffs' lost rental income because those allegedly were the only losses for which Plaintiffs submitted claims to their insurers; and (2) there is no need for the Aviation Defendants to prove which insurance payments were made to reimburse which category of loss because Plaintiffs allegedly suffered a single "economic loss" on 9/11 and both replacement cost insurance proceeds and lost rental income insurance proceeds allegedly correspond to that one "economic loss."  Neither claim is supported by the facts or the law.

The Aviation Defendants' first argument ignores the fact that neither the Settlement Agreements nor the claims that Plaintiffs submitted to their insurers prior to settlement were limited to claims for only replacement costs and lost rental income, as is shown in Point II below.  But even assuming that the Aviation Defendants could prove that all of the payments that Plaintiffs received from their insurers were made exclusively

---

[4]  The term "World Trade Center Buildings" refers collectively to the Main Site Buildings (One World Trade Center, Two World Trade Center, Four World Trade Center, and Five World Trade Center) and the 7WTC Building (Seven World Trade Center).

for replacement costs or lost rental income (and they cannot), as is explained in Point III

below, this Court has held that Plaintiffs suffered "different categories of loss" on 9/11,

including both the costs of replacing the World Trade Center Buildings and lost rental

income. *In re Sept. 11 Litig.*, 889 F. Supp. 2d 616, 623 (S.D.N.Y. 2012).  By holding that

the Aviation Defendants did not proximately cause Plaintiffs to incur the costs of

replacing the World Trade Center Buildings, however, this Court has limited Plaintiffs'

leasehold damages to only their lost rental income.  Any replacement cost insurance

proceeds do not correspond to Plaintiffs' lost rental income damages because any such

proceeds were paid to "replace or indemnify" the costs of replacing the World Trade

Center Buildings, not Plaintiffs' lost rental income.

      In mischaracterizing Plaintiffs' losses as a single category of "economic loss" and

claiming that any replacement cost insurance proceeds should be offset against Plaintiffs'

potential lost rental income damages, the Aviation Defendants urge this Court not only to

ignore its own prior rulings but also the plain language of CPLR 4545, the purposes

underlying the statute, and the New York State Court of Appeals' decisions applying it.

As the Court of Appeals has explained, the goal of CPLR 4545 is to eliminate double

recoveries for plaintiffs without providing defendants and their insurers with an

"undeserved windfall." *See Bryant v. New York City Health & Hospitals Corp.*, 93

N.Y.2d 592, 607, 695 N.Y.S.2d 39, 47 (1999) ("CPLR 4545 was intended to eliminate

double recoveries, not provide defendants and their insurers with an 'undeserved

windfall.'").  To give the Aviation Defendants "a credit" for any replacement cost

insurance proceeds – even though "they are [not] being called upon to reimburse"

Plaintiffs for their replacement cost damages – would provide the Aviation Defendants

with exactly the undeserved windfall that the Court of Appeals cautioned against. *Oden v. Chemung County Indus. Dev. Agency*, 87 N.Y.2d 81, 88, 637 N.Y.S.2d 670, 673 (1995). By contrast, denying the Aviation Defendants any offset for replacement cost insurance proceeds would not result in a double recovery for Plaintiffs because under this Court's prior rulings, Plaintiffs will receive no compensation from the Aviation Defendants for their actual replacement cost losses, which far exceed the amount of the payments that they have received from their insurers.

For all of these reasons, the Court should find – as it has done every time before – that the Aviation Defendants have not satisfied their burden of proving correspondence.

## STATEMENT OF FACTS

The relevant facts are set forth in detail in Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Proposed Findings of Fact"), which are being filed simultaneously with this trial brief, and those proposed findings and the related citations to proposed exhibits are incorporated by reference herein.

## ARGUMENT

**I.    The Aviation Defendants Must Prove To A Reasonable Certainty That A Particular Collateral Source Payment "Replaced Or Indemnified" A Particular Category Of Loss For Which Plaintiffs May Be Awarded Damages**[5]

The Aviation Defendants bear the burden of proof at this trial. *Oden*, 87 N.Y.2d 81, 89, 637 N.Y.S.2d 670, 674 (1995). Under CPLR 4545, the Aviation Defendants must

---

[5]   Although Plaintiffs maintain that under the CPLR, offsets may not be applied until there has been a damages award in their favor, the Court has rejected that position. *See In re Sept. 11 Litig.*, 908 F. Supp. 2d 442, 449 n.14 (S.D.N.Y. 2012). Since there has not yet been a jury award, the Court's analysis at the July 15, 2013 trial necessarily will focus on whether a particular collateral source payment corresponds to a category of damages that Plaintiffs might be awarded against the Aviation Defendants when these cases ultimately proceed to an all-issues trial.

prove their entitlement to collateral offsets to a "reasonable certainty," a standard that requires "proof of such a high degree of certainty that it amounts to clear and convincing evidence." *Terranova v. New York City Transit Auth.*, No. 13946/02, 2005 WL 2219685, at *5 (Sup. Ct. Richmond Co. Aug. 23, 2005); *see also Kihl v. Pfeffer*, 47 A.D.3d 154, 164, 848 N.Y.S.2d 200, 207 (2d Dep't 2007) ("Each of the four judicial departments has interpreted 'reasonable certainty' as akin to the clear and convincing evidence standard . . . ."); *accord In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449.

Although, as explained *infra*, the Aviation Defendants' expert, Professor Daniel R. Fischel, will try to treat all of Plaintiffs' damages as falling into a single category of loss – all one big undifferentiated "economic loss" resulting from the destruction of the World Trade Center Buildings on 9/11 – and all insurance payments that Plaintiffs received as indistinguishable, the Court of Appeals has rejected that very approach. *See Oden*, 87 N.Y.2d at 87, 637 N.Y.S.2d at 672-73 (collateral source payments and categories of loss cannot be treated as "as fungible"). *See also id.* at 86, 637 N.Y.S.2d at 672 (rejecting argument that "total award for economic loss" could be reduced "by the total amount of collateral source payments").

CPLR 4545 requires that Plaintiffs' potential tort damages award and any collateral source payments must be broken down into categories. *Id.* at 86, 89, 637 N.Y.S.2d at 672, 674; *see also Turnbull v. USAir, Inc.*, 133 F.3d 184, 187 (2d Cir. 1998) (party seeking offset must show "that the judgment includes an award for damages that falls within a certain category of loss"). Once the categories of loss and the categories of collateral source payments have been determined, then offsets may be applied only to the extent that the Aviation Defendants prove to a reasonable certainty that a particular

collateral source payment "replace[s] or indemnifie[s]" a particular category of loss. CPLR 4545(c); *see also Oden*, 87 N.Y.2d at 87, 637 N.Y.S.2d at 673 ("only those collateral source payments that *actually replace* a particular category of awarded economic loss may be used to reduce the injured's judgment" (emphasis added)).

Because CPLR 4545 is a statute that was enacted in derogation of the common law, the New York State Court of Appeals has held that it must be "strictly construed . . . in the narrowest sense that its words and underlying purposes permit . . . ." *Oden*, 87 N.Y.2d at 86, 637 N.Y.S.2d at 672. Consistent with that principle of statutory construction, the Court of Appeals has narrowly interpreted CPLR 4545's requirement that a collateral source payment be shown to "replace[] or indemnif[y]" a particular category of economic loss. That language, the Court of Appeals has explained, requires proof to a reasonable certainty that the collateral source payment at issue "duplicate[d]," "t[ook] the place of," "represent[ed] reimbursement for," was "paid in lieu of," or "match[es] up" to the particular category of economic loss. *Id.* at 84, 87-89, 637 N.Y.S.2d at 671, 673-74. Only upon proof of such a "match" between the collateral source payment and a category of loss is there the kind of "close" or "direct" correspondence that justifies the application of collateral offsets. *Id.*

Strictly construing CPLR 4545 to require proof that the collateral source payment at issue "duplicate[d]," "t[ook] the place of," "represent[ed] reimbursement for," was "paid in lieu of," or "match[es] up" to the particular category of economic loss is consistent with the goal of the statute to eliminate double recoveries for plaintiffs without providing defendants and their insurers with an "undeserved windfall." *See Bryant*, 93 N.Y.2d at 607, 695 N.Y.S.2d at 47 ("CPLR 4545 was intended to eliminate double

recoveries, not provide defendants and their insurers with an 'undeserved windfall.'");

*Kihl*, 47 A.D.3d at 167, 848 N.Y.S.2d at 210 (purpose of CPLR 4545 "is to eliminate

double recoveries, not to provide defendants and their insurers with an undeserved

windfall relieving them of the obligation to pay damages awards for economic loss").

Subtracting from a tort damages award all collateral source payments "*regardless of*

*whether they duplicate an awarded item of pecuniary loss* . . . would confer an

undeserved windfall on tort defendants and their insurers by permitting them to obtain a

credit for collateral source payments that do not correspond to the items of economic loss

that they are being called upon to reimburse." *Oden*, 87 N.Y.2d at 88, 637 N.Y.S.2d at

673 (emphasis added); *accord In re Sept. 11 Litig.*, 889 F. Supp. 2d at 622.  CPLR 4545

"prefers double recoveries in favor of plaintiffs over the polar alternative of depriving

plaintiffs of a compensatory award for economic losses to which the trier of fact found

them entitled." *Kihl*, 47 A.D.3d at 168, 848 N.Y.S.2d at 210.

     As a matter of law, the Aviation Defendants have not satisfied their heavy burden

here.  That failure of proof does not produce an unjust result because the tort damages

that this Court has allowed will not make Plaintiffs whole for their actual economic

losses.

## II.    The Aviation Defendants Cannot Establish That The Payments Plaintiffs Received From Their Insurers Were Allocated To Any Specific Categories Of Loss

     There is *no evidence* that Plaintiffs and their insurers ever mutually agreed as to

how each of the payments by each individual insurer would be allocated.  To the

contrary, all but four of the payments that Plaintiffs received were made pursuant to

Settlement Agreements that did not allocate the payments to any particular categories of

loss (and all prior advance payments by those insurers – which had been "without prejudice" and "on an interim, on-account basis" – were covered by the Settlement Agreements). *See* Agreed Statement of Stipulated Facts, ¶¶ 84, 138; Proposed Findings of Fact, ¶¶ 56-59, 127-28, 131, 150-52, 174-76, 200; Expert Report of Jeffrey McKinley, CPCU, dated Apr. 12, 2013 ("McKinley Report") (JX-173), at pp. 11-12, 19-20.  Nor were the Settlement Agreements limited to only claims for replacement costs or lost rental income. *See* Proposed Findings of Fact, ¶¶ 170-72, 201.  Rather, in accordance with industry custom and practice, almost all of the Settlement Agreements included broad releases of all possible claims that were asserted or could have been asserted by Plaintiffs, including bad faith and other extra-contractual claims. *See* Proposed Findings of Fact, ¶¶ 70, 170-72, 201; McKinley Report (JX-173), at pp. 13-18.[6]

Three insurers – Hartford Fire Insurance Company ("Hartford"), Lexington Insurance Company ("Lexington"), and The Copenhagen Reinsurance Company (UK) Ltd. ("Copenhagen Re") – acknowledged soon after 9/11 that covered losses would exceed the amount of insurance that they had contracted to provide, and they paid the WTCP Plaintiffs their policy limits. *See* Proposed Findings of Fact, ¶¶ 187-90; Agreed Statement of Stipulated Facts, ¶ 53.  As is the custom and practice in the insurance industry where there is a policy limits loss, there was no agreed allocation of the payments by Hartford, Lexington, and Copenhagen. *See* Proposed Findings of Fact, ¶¶

---

[6]  The Aviation Defendants concede that 7WTCo.'s settlement with its insurer, Industrial Risk Insurers ("IRI"), included the settlement of 7WTCo.'s claims for personal property coverage (Agreed Statement of Stipulated Facts, ¶ 137; Proposed Findings of Fact, ¶ 171).  At a minimum, therefore, some portion of the settlement payment that 7WTCo. received from IRI must be allocated to personal property coverage, and not to coverages for the costs of replacing the 7 World Trade Center building or lost rental income.

58-59, 189, 191; McKinley Report (JX-173), at p. 12.  Indeed, consistent with that custom and practice, in the letter transmitting its $32 million payment, Hartford explicitly denied any allocation, stating that its payment "was not made with respect to any particular element of loss incurred by the insureds."  *See* Proposed Findings of Fact, ¶ 189; Dec. 4, 2001 letter from Hartford (JX-62).  A fourth payment of $17,500,000 was made by Royal & SunAlliance Group plc ("R&SAIG plc"), the foreign parent of one of the WTCP Plaintiffs' insurers, to settle a separate lawsuit that had been brought by the WTCP Plaintiffs in state court.[7]  That settlement provided that the $17,500,000 payment was made "expressly for the purpose of settling and compromising" the state court action, not "in connection with any insurance contract, binder or advice of insurance issued."  Proposed Findings of Fact, ¶¶ 196-97; Agreed Statement of Stipulated Facts, ¶ 45; Royal & Sun Alliance Insurance Group plc, RSA Overseas Holdings (No. 1 & No. 2) Settlement Agreement & Release, July 13, 2007 (JX-37), at WTCP0258116.

Because they know that the plain language of the Settlement Agreements makes it impossible for them to prove correspondence, the Aviation Defendants want those agreements to just disappear.  The Aviation Defendants will urge the Court to disregard the Settlement Agreements entirely, claiming that it would be unfair for the Court to consider the agreements in finding that there was no allocation of any insurance payments.  In support of that argument, the Aviation Defendants will rely upon inapposite cases in which insureds were found to have "manipulated" the characterization

---

[7]  The lawsuit was brought at a time when it seemed that the WTCP Plaintiffs' insurer, Royal, might be going out of business.  Royal, however, ultimately settled with the WTCP Plaintiffs in full pursuant to a separate Settlement Agreement.  Agreed Statement of Stipulated Facts, ¶¶ 43-44; Summons and Complaint, World Trade Center Properties, LLC, et al. v. Royal and SunAlliance Insurance Group plc, et al. (JX-45), at ALLI 27-020616-22.

of a settlement payment in order to thwart the rights of their insurers, and where the courts, therefore, looked beyond the plain language of the settlement in order to determine the true intent of the parties. *See Dymond v. Dunn*, 148 A.D.2d 56, 57-58, 543 N.Y.S.2d 230, 231-32 (3d Dep't 1989) (finding plaintiff allocated majority of settlement with tortfeasor to wife's loss of consortium claim in order to avoid insurer's statutory lien on payments paid to reimburse plaintiff for his medical expenses and loss of earnings); *Kozlowski v. Briggs Leasing Corp.*, 96 Misc. 2d 337, 338-43, 408 N.Y.S.2d 1001, 1002-05 (Sup. Ct. Kings Co. 1978) (finding that plaintiff's intent was to settle all claims with tortfeasor notwithstanding language in settlement suggesting it did not cover claims as to which insurer had right of subrogation). That desperate speculation, of course, is not what happened here.

Plaintiffs did not trick their insurers into agreeing to settlements in which Plaintiffs were required to release "all claims," whether covered by insurance or not, as part of a scheme to avoid collateral offsets in this litigation. Nor did Plaintiffs give one thought to CPLR 4545 or to whether the settlement payments were allocated or not. The only concern of Plaintiffs, and of the lawyers who were representing them in connection with the coverage litigation and the settlements, was settling with Plaintiffs' insurers. The broad releases that are found in the Settlement Agreements were included *at the insistence of the insurers* because the insurers wanted certainty that they were buying total peace through the settlements. *See* McKinley Report (JX-173), at 13 ("It is the industry's custom and practice in insurance settlements for the settlement terms to include a release of all possible claims under the policy, as well as any extra-contractual claims that may have been asserted by the insured, such as bad faith and pre-judgment

11

interest claims."). And there was no allocation in the Settlement Agreements because none was needed (or requested) by the insurers since they were essentially paying their policy limits and also releasing extra-contractual claims. *See* McKinley Report (JX-173), at 12, 19-20.

Notwithstanding the absence of any evidence in the Settlement Agreements or anywhere else of an agreement between Plaintiffs and their insurers that all of the payments were made to reimburse only replacement cost and rental income losses, the Aviation Defendants will argue at trial that the payments nonetheless should be treated as though they relate exclusively to those two coverages. The Aviation Defendants will inaccurately tell the Court that Plaintiffs only submitted claims to their insurers for replacement cost and lost rental income losses. That is factually incorrect, as the Aviation Defendants know. The evidence does not support that contention, and even if it did, the Aviation Defendants could not establish correspondence because any insurance proceeds that were paid to reimburse Plaintiffs for their replacement cost losses do not correspond to any element of Plaintiffs' potential leasehold damages, which this Court has limited to lost rental income.

The Aviation Defendants' argument depends on Preliminary Proofs of Partial Losses ("PPOPLs"), Proofs of Partial Losses ("POPLs"), and Interim Proofs of Loss ("IPOLs") that were submitted by Plaintiffs to their insurers as part of a claims adjustment process that was interrupted by coverage litigation that led to final litigation settlements. According to the Aviation Defendants, the only claims that were fully documented and quantified in the PPOPLs, POPLs, and IPOLs were claims for replacement costs and lost rental income, and the Aviation Defendants claim that insurers

only make payments for claimed losses that are fully documented and quantified. That argument is wrong for at least three reasons.

First, as noted above, except for the policy limits payments by Hartford, Lexington, and Copenhagen Re and the non-insurance policy payment made by R&SAIG, all of the payments that were made by Plaintiffs' insurers were made pursuant to Settlement Agreements (and as advances that only became final under the Settlement Agreements) – not pursuant to the PPOPLs, POPLs, and IPOLs. Those Settlement Agreements – almost all of which included broad releases that released all claims, *regardless* of whether they had been previously documented and quantified – superseded the claims adjustment process and all prior communications between Plaintiffs and their insurers. The PPOPLs, POPLs, and IPOLs all became irrelevant and moot as a result of Plaintiffs' lawsuits and the Settlement Agreements. *See* Proposed Findings of Fact, ¶¶ 68-70, 170-72, 201-03; McKinley Report (JX-173), pp. 13, 18. Furthermore, any advance payments that were made by Plaintiffs' insurers prior to settlement were made "without prejudice," "on an interim, on-account basis," and were "subject to final adjustment." Proposed Findings of Fact, ¶¶ 55-57, 128-31, 149-52; McKinley Report (JX-173), pp. 11-12. Indeed, in making those advances, some insurers rejected the proofs of loss, otherwise claimed them to be deficient or inapplicable, or expressly stated that the payment was *not* being made based on the PPOPLs, POPLs, or IPOLs. *See* Proposed Findings of Fact, ¶ 153. It was only under the broad coverage of the Settlement

Agreements that any "on account" advance was made "final and without reservation."

Proposed Findings of Fact, ¶ 203.[8]

Second, the Aviation Defendants' entire factual premise is wrong. The PPOPLs,

POPLs, and IPOLs show that 7WTCo. documented and quantified claims for more than

just replacement costs and lost rental income, namely, its claim for personal property

losses. See Proposed Findings of Fact, ¶ 117-18; Agreed Statement of Stipulated Facts,

¶¶ 123-24. Although the Aviation Defendants will try to minimize the significance of

7WTCo.'s claim for personal property losses by characterizing it as small, that claim

nonetheless is a quantified claim that cannot be ignored. Thus, even if the Court were to

accept the Aviation Defendants' theory, that only the quantified claims that Plaintiffs'

submitted to their insurers count as evidence of the coverages for which the insurers

ultimately made payments, the Aviation Defendants would have to prove to a reasonable

certainty (i) which payments were made to reimburse Plaintiffs' replacement costs; (ii)

---

[8]   In their financial statements and other financial records, Plaintiffs may have
recorded the payments that they received from their insurers as relating to "replacement
costs" or "business interruption" because they were required to do so under accounting
rules. That is not evidence that the payments correspond to a specific loss. To the
contrary, Plaintiffs recorded the insurance proceeds as required under the income tax
basis of accounting used in preparing their tax returns and maintaining their books and
records. Under the income tax method of accounting, a taxpayer who may want to use
property insurance proceeds to rebuild has a certain period of time during which such
proceeds need not be recognized as current income. Plaintiffs identified certain insurance
proceeds as "replacement" proceeds for that purpose; all other proceeds were recognized
as current income and recorded under the general category of "business interruption"
proceeds to comply with the Internal Revenue Code. However, proceeds booked as
"replacement" proceeds can be recognized as current income at any time, upon an
election not to use the funds to rebuild, and funds categorized as "business interruption"
can be (and have been) used to fund any current expense of the Plaintiffs, including
rebuilding or other business expenses. Proposed Findings of Fact, ¶¶ 206-10; Declaration
of Michael Levy, dated Aug. 18, 2001 ("Aug. 18, 2009 Levy Decl.") (JX-92), ¶¶ 23-24.
This accounting treatment all relates to how the payments were used – which is irrelevant
under CPLR 4545 – not to what they were for.

which were for personal property losses; and (iii) which were for lost rental income.  The Aviation Defendants cannot satisfy that burden.[9]

  <u>Third</u>, Plaintiffs submitted unquantified claims to their insurers for other covered losses, in addition to replacement cost and lost rental income losses.  The Aviation Defendants' expert Michael Beach (an insurance adjuster) will testify that he thinks that insurers do not make payments on claims that are not quantified.  But the fact that the dollar amounts were never finalized – because, as explained below, they did not need to be – does not mean that Plaintiffs did not incur such losses or that they were not real claims that the insurers were being called upon by Plaintiffs to pay.  For example, in the claims that they submitted to their insurers, both the WTCP Plaintiffs and 7WTCo. identified the amount of certain covered losses as "TBD" or "To Be Determined."  Those losses included, among others, the WTCP Plaintiffs' personal property losses, 7WTCo.'s Extra Expense losses (which included excess re-tenanting costs), Debris Removal, and Accounts Receivable.  *See* Proposed Findings of Fact, ¶¶ 121-22, 140; Agreed Statement of Stipulated Facts, ¶¶ 64, 103.[10]  Plaintiffs also asserted extra-contractual claims, including claims for bad faith and prejudgment interest in lawsuits they commenced

---

  [9]  If the Court were to accept the Aviation Defendants' theory that Plaintiffs' insurers only paid on claims that were quantified in the PPOPLs, POPLs, and IPOLs, then the Court also would have to accept that more than 84% of the claims submitted by the WTCP Plaintiffs and more than 71% of the claims submitted by 7WTCo. sought coverage for the costs of replacing the World Trade Center Buildings.  Proposed Findings of Fact, ¶¶ 178, 205; Expert Report of Edward Reilly, dated Apr. 23, 2013 (JX-1), ¶ 15; Expert Report of Steven Shavell, dated Apr. 12, 2013 (JX-221), Exh. S-3.

  [10]  The PPOPLs, POPLs, and IPOLs were "interim" or "preliminary," they were submitted "without prejudice," and they explicitly preserved Plaintiffs' rights to submit future claims for other losses, and, thus, were known by all not to be the complete, final, or conclusive proof of the extent of Plaintiffs' losses.  *See* Proposed Findings of Fact, ¶¶ 106, 112-15, 119-20, 141, 143-47; McKinley Report (JX-173), p. 14.

against the insurers. *See* Proposed Findings of Fact, ¶¶ 133, 165-66. The insurers had to defend those lawsuits and faced substantial exposure on the extra-contractual claims beyond the aggregate limits of the insurance they sold.

Plaintiffs did not relinquish any claims merely because they had not been quantified at the time of the settlements. To the contrary, the evidence at trial will show that, when it is clear that one category of covered loss constitutes a policy limits loss, an insurer generally will not require the insured to quantify each and every other category of covered loss because it would be an unnecessary exercise. *See* Proposed Findings of Fact, ¶¶ 52-54, 148; McKinley Report (JX-173), at pp. 11-12. That is precisely what occurred here. Because it was clear early on in the claims adjustment process that Plaintiffs' replacement cost and lost rental income losses by themselves would exhaust or nearly exhaust policy limits, the insurers never required further quantification of all of Plaintiffs' losses. *See* Proposed Findings of Fact, ¶¶ 52-54, 148; McKinley Report (JX-173), pp. 11-12; Reilly Report (JX-1), ¶¶ 11-12. As anticipated, Plaintiffs' insurers ultimately agreed to pay all or almost all of their policy limits, and those policy limit payments included payment for *all* losses, whether quantification as to dollar amounts of any particular losses had been provided or not. *See* Proposed Findings of Fact, ¶¶ 54, 70, 170-72, 201; McKinley Report (JX-173), at pp. 11, 13, 18. Thus, there is no factual support for the Aviation Defendants' specious theory.

16

**III.    Any Replacement Cost Insurance Proceeds Cannot Correspond
To Plaintiffs' Potential Tort Damages Because This Court Has
Precluded Plaintiffs, As A Matter Of Tort Law, From Recovering Costs
<u>Relating To The Replacement Of The World Trade Center Buildings</u>**

Because this Court has held that the Aviation Defendants did not proximately

cause and, therefore, cannot be held liable in tort for Plaintiffs' replacement cost

damages, *See In re Sept. 11 Litig.*, 590 F. Supp. 2d 535, 543-44 (S.D.N.Y. 2008); *In re*

*Sept. 11 Litig.*, 21 MC 101, 2009 WL 1181057, at *3 (Apr. 30, 2009); *In re Sept. 11*

*Litig.*, 908 F. Supp. 2d at 447, any award for leasehold damages issued by a jury in this

case will not include any compensation for the costs of replacing the World Trade Center

Buildings.  As a result, even assuming that the Aviation Defendants could prove that all

of the payments that Plaintiffs received from their insurers were only for either

replacement costs or lost rental income, the Aviation Defendants still cannot establish

correspondence because any replacement cost insurance proceeds do not "replace or

indemnify" any category of loss for which this Court has held Plaintiffs may recover tort

damages.  CPLR 4545; *Oden*, 87 N.Y.2d at 87-88, 637 N.Y.S.2d at 672-73.

The Aviation Defendants will try to avoid this required, straightforward result at

trial by attempting to lump together all of Plaintiffs' damages into a single category of

"economic loss" – in contravention of *Oden*'s teaching that losses are not "fungible" –

and then claiming that either replacement cost insurance proceeds or lost rental income

insurance proceeds correspond to that one purported category of loss.  Next, the Aviation

Defendants will deny the inconvenient truth that Plaintiffs have been precluded as a

matter of tort law from recovering replacement cost damages.  Third, to get to their

desired result, the Aviation Defendants will suggest that replacement cost insurance

proceeds correspond to Plaintiffs' lost rental income damages on the theory that by

funding the replacement of the World Trade Center Buildings years after the fair market value of their leasehold interests was fixed, replacement cost payments might help Plaintiffs to restore their lost rental stream. All of those arguments fail.

### A.      Plaintiffs Suffered Two Principal Distinct Categories Of Loss On 9/11

The Aviation Defendants and their expert Professor Fischel will stubbornly claim at trial that Plaintiffs suffered a single category of loss – all "economic loss" arising from the destruction of the World Trade Center Buildings on September 11, 2001 – and that both replacement cost insurance proceeds and lost rental income insurance proceeds correspond to that one "economic loss." That argument flies in the face of *Oden* and directly contradicts this Court's prior rulings. If the Aviation Defendants' position were accepted, and all of a plaintiff's "economic losses" were deemed to fall into a single category as long as they all derived from the tort that is the subject of the action, CPLR 4545 would be rendered entirely meaningless. *Oden* prohibits precisely the approach advocated by the Aviation Defendants and their expert Professor Fischel.

*Oden* teaches that in conducting the required CPLR 4545 analysis, the Court must look beyond broad labels, like "economic loss," and determine the "essential elements" of the plaintiff's tort award. *Oden*, 87 N.Y.2d at 89, 637 N.Y.S.2d at 674. Thus, in *Oden*, even though all of the plaintiff's "economic loss" arose from the injuries that he suffered in an accident while working as an ironworker, the Court of Appeals specifically rejected the defendant's argument – which is identical to the argument being advanced by the Aviation Defendants and their expert Professor Fischel here – that "the total award for economic loss" should be reduced "by the total amount of collateral source payments for economic loss." *Id.* at 86, 637 N.Y.S.2d at 672; *see also id.* at 87, 637 N.Y.S.2d at 673

18

("The proposition that a payment from 'any' collateral source 'replace[s] or indemnifie[s]' 'any' accident-related cost or expense thus cannot be sustained."). The Court recognized that the plaintiff suffered different categories of economic loss – including both lost pension benefits and lost future earnings – and held that only those categories of loss that were "duplicate[d]" by plaintiff's disability retirement pension benefits were subject to collateral offset. *See id.* at 88-89, 637 N.Y.S.2d at 673-74.[11]

Just as in *Oden*, the Court here must identify the "essential elements" of Plaintiffs' potential tort award for leasehold damages in conducting its correspondence analysis. In that respect, although the Aviation Defendants just ignore it, this Court already has recognized that Plaintiffs "suffered different categories of loss on the morning of September 11," *see In re Sept. 11 Litig.*, 889 F. Supp. 2d 616, 623 (S.D.N.Y. 2012), principally the costs of replacing the destroyed World Trade Center Buildings and the loss of their rental income. At the same time, the Court has held that Plaintiffs may recover only one of those categories of loss – lost rental income – as part of their leasehold damages. *See In re Sept. 11 Litig.*, 590 F. Supp. 2d at 543-44 (denying the WTCP Plaintiffs' claim to recover replacement cost damages based on lack of proximate cause and stating that diminished market value of lease "fully includes the rental streams reasonably expected from the property"); *In re Sept. 11 Litig.*, 2009 WL 1181057, at *3; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447. Thus, the question for the Court at trial is

---

[11]  Even in *Fisher v. Qualico Contracting Corp.*, the case that the Aviation Defendants claim is indistinguishable from this one, the trial court treated all of the Fishers' consequential damages – including, for example, architect fees, landscaping fees, construction management fees, the public adjustor's fees, and mortgage carrying costs – as separate categories of economic loss, subject to an independent offset analysis, even though those damages all arose from the destruction of the Fishers' home. Decision After Hearing, *Fisher v. Qualico Contracting Corp.*, at 4-6 (Dec. 20, 1999) (a copy of which is annexed hereto).

not whether any replacement cost insurance proceeds correspond to Plaintiffs' "economic loss" but, rather, whether replacement cost insurance proceeds correspond to Plaintiffs' lost rental income – the only category of economic loss that this Court has held Plaintiffs can recover as part of their leasehold damages. The distinct damages that Plaintiffs suffered as a result of the loss of their rental income were not indemnified or "actually replaced" by their insurance for the replacement costs of the buildings, and, thus, any replacement cost insurance payments that Plaintiffs may have received cannot correspond to Plaintiffs' potential leasehold damages.

The Court of Appeals' decision in *Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 749 N.Y.S.2d 467 (2002), does not suggest anything different. Because the Court of Appeals held that the Fishers' replacement cost insurance proceeds corresponded to the jury's award for the diminished value of the Fishers' destroyed home, *Id.* at 540, 749 N.Y.S.2d at 471, the Aviation Defendants will say that any replacement cost insurance proceeds should be found to correspond to any potential jury award for the diminished value of Plaintiffs' leasehold interests here. That argument ignores critical distinctions between this case and *Fisher*, which this Court has recognized.

The costs of replacing the World Trade Center Buildings and Plaintiffs' lost rental income are not alternative measures of damages for the same loss, as replacement costs and diminished market value of the home were in *Fisher*. Lost rental income and replacement costs are entirely separate economic injuries – "two different coins" – covered by separate insurance. *See* Proposed Findings of Fact, ¶¶ 37-49; Aug. 12, 2011 Shavell Report (JX-52), ¶¶ 8, 18-20, 29-30; McKinley Report (JX-173), pp. 4, 6-8, 10,

26; Reilly Report (JX-1), ¶¶ 4, 7.  Lost rental income or other business income damages were never at issue in *Fisher*.  As a result, nothing in that case suggests that business income losses can be offset by replacement cost insurance (which insures against a totally different risk).  *See* Proposed Findings of Fact, ¶¶ 37-49; McKinley Report (JX-173), pp. 4, 6-8, 10, 26.  Unlike in *Fisher*, where the replacement cost insurance payments reimbursed the homeowners for the loss of their home, regardless of whether that loss was measured in terms of the cost to rebuild it or its diminished market value, in this case, Plaintiffs' replacement cost insurance reimbursed Plaintiffs only for the cost of rebuilding the World Trade Center Buildings, not for their lost rental income.  *See* Proposed Findings of Fact, ¶¶ 37-49; McKinley Report (JX-173), pp 4, 6-8, 10, 26.

For that reason, this Court has recognized that this case is *not* like *Fisher*.  As this Court has explained, "unlike the plaintiffs in *Fisher*, [Plaintiffs'] insurance recovery was not only compensation for lost property value, but also compensation for [Plaintiffs'] contractual obligation to rebuild . . . .  Because Aviation Defendants are not liable in tort for [Plaintiffs'] contractual obligation to rebuild, [Plaintiffs'] insurance recovery does not perfectly correspond to Aviation Defendants' potential tort liability." *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 450.

> **B.    Even Assuming That The Costs Of Replacing The World Trade Center Buildings Were Less Than The Diminished Value Of Plaintiffs' Leasehold Interests, Plaintiffs Could Not Recover Replacement Cost Damages Under This Court's Rulings**

Finding themselves in a predicament for correspondence purposes, the Aviation Defendants will deny that the Court has precluded Plaintiffs from recovering their replacement cost damages as a matter of tort law.  Instead, the Aviation Defendants will

say that Plaintiffs theoretically could have recovered replacement cost damages under the rule articulated in *Fisher* if only those replacement costs were less than the diminished value of their leasehold interests, and that any replacement cost insurance proceeds should, therefore, be treated as corresponding to Plaintiffs' potential leasehold damages. But if the Aviation Defendants did not proximately cause Plaintiffs' replacement cost damages – as this Court has held – then Plaintiffs cannot recover those damages in tort, regardless of their magnitude. The requirement of showing proximate cause as a prerequisite to recovering damages is a basic tenet of tort law. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y. 2d 308, 315, 434 N.Y.S.2d 166, 169 (1980).

The Aviation Defendants' argument also misstates the relevant inquiry under *Fisher*. Assuming arguendo that *Fisher* applies in the commercial leasehold context, as this Court has held, the proper comparison is between (1) the diminished fair market value of the leasehold; and (2) the cost of restoring the lease to its prior condition (*not* the cost of replacing the buildings, which Plaintiffs do not own). *See Fisher*, 98 N.Y.2d at 536-37, 749 N.Y.S.2d at 469 (court charged jury that it would award damages equal to "the difference between [the property's] market value immediately before and immediately after it was damaged, or the reasonable cost of repairs necessary to *restore* it to its former condition, whichever is less" (emphasis added)); *Hartshorn v. Chaddock*, 135 N.Y. 116, 122 (1892) (measure of damages to injured property is generally the lesser of the diminution in market value and "the cost of *restoring* the [property] to its former condition" (emphasis added)); *accord* N.Y. Pattern Jury Instr. – Civil 2:311 (Damages – Property with Market Value).

In describing its prior decisions in these cases, this Court has articulated the *Fisher* comparison in exactly that manner:

> I held that any tort recovery by Plaintiffs would be limited to the lesser of the loss in the fair market value of the leaseholds (from their value immediately prior to the Towers' destruction) or *the leaseholds' replacement costs*, and that the loss in fair market value was the lesser of these amounts.

*In re Sept. 11 Litig.*, 906 F. Supp. 2d 295, 300 (S.D.N.Y. 2012) (emphasis added). And although it has taken years, the Aviation Defendants, too, finally have acknowledged that under *Fisher*, the two alternative measures of Plaintiffs' leasehold damages are (1) the diminution in market value of the leases; and (2) the "replacement cost of [Plaintiffs'] net leasehold interest in the destroyed buildings," *not* the replacement cost of the buildings. *See* Mem. of Law in Support of the Aviation Defendants' Motion for Summary Judgment Dismissing All Claims of Plaintiff 7 World Trade Company, L.P. Relating to 7 World Trade Center, dated June 29, 2012 (08 CIV 3722, Docket No. 188, 21 MC 101, Docket No. 1649), at p. 6.

Thus, under *Fisher*, even if the cost of replacing the destroyed World Trade Center Buildings had been less than the diminished value of Plaintiffs' leasehold interests, the cost of replacing the buildings would not have been the appropriate measure of leasehold damages. The alternative measure of Plaintiffs' leasehold damages, under *Fisher*, would be the cost of restoring the leases to their pre-9/11 value – an amount on which the Aviation Defendants have offered no evidence.[12]

---

[12]  The Aviation Defendants also may point out that the WTCP Plaintiffs sought in the past to be permitted to recover the value of the buildings on behalf of the owner of the buildings, the Port Authority of New York and New Jersey (the "Port Authority"). However, the Court has foreclosed that possibility, finding that the only non-duplicative damages that the WTCP Plaintiffs may recover on behalf of the Port Authority are "the

**C.** **Any Replacement Cost Insurance Proceeds Do Not
"Duplicate" Plaintiffs' Lost Rental Income Damages
Even If By Facilitating The Rebuilding Of The World
Trade Center Buildings Years Later, Those Proceeds Will
Allow Plaintiffs To Again Collect Tenant Rents Someday**

Finally, the Aviation Defendants may argue at trial that replacement cost

insurance proceeds should be viewed as corresponding to damages for lost rental income

because by funding the reconstruction of the World Trade Center Buildings, the

replacement cost payments will help Plaintiffs to eventually restore their lost rental

income stream.  But the correspondence analysis does not turn on how insurance money

is used.  The relevant inquiry for the purposes of CPLR 4545 is, "What specific category

of loss was the insurance money paid for?"

Thus, for example, in *Oden*, the Court of Appeals held that the disability pension

benefits that the plaintiff had received did not correspond to the jury's award for future

lost earnings because there was no proof that the disability pension benefits "replace[d]"

or were "duplicative" of the plaintiff's future lost earnings.  *Oden*, 87 N.Y.2d at 88-89,

637 N.Y.S.2d at 673-74.  In reaching that conclusion, the Court noted that the plaintiff's

right to collect the disability pension benefits was not contingent at all upon his being

unable to earn future income.  *Id.* ("notwithstanding his retirement as an ironworker,

plaintiff would have been free to earn income from his labor in other capacities without

loss of his disability retirement pension benefits").  Likewise, in *Bryant*, a case brought

on behalf of a woman who died while undergoing a cesarean section, the Court held that

the child survivor benefits that were paid to the woman's daughter corresponded to the

---

theoretical value of the four buildings at the expiration of the leaseholds." *In re Sept.
11th Litig.*, 590 F. Supp. 2d at 544.

jury's award for loss of the deceased woman's future earnings because "child survivor benefits are intended to compensate for a parent's lost earnings . . . If plaintiff had the benefit of her mother's earnings, she would not be entitled to Social Security survivor benefits.  Similarly, the jury award for future earnings is predicated on plaintiff's inability to reap the benefits of her mother's financial support."  93 N.Y.2d at 608, 695 N.Y.S.2d at 48.

Here, even assuming that any replacement cost insurance proceeds could be used to help Plaintiffs to resume collecting tenant rents once new buildings are built, the evidence at trial will show that those replacement cost insurance payments were only intended to compensate Plaintiffs for the cost of replacing the World Trade Center Buildings, not their lost rental income, and that Plaintiffs' right to retain those replacement cost insurance proceeds was not related to and did not depend in any way upon Plaintiffs' lost rental income.  Proposed Findings of Fact, ¶¶ 37-49; Expert Report of Professor Patrick Connors, dated Apr. 12, 2013 (JX-222), ¶¶ 3, 7, 10-12; McKinley Report (JX-173), pp. 4, 6-8, 10, 12, 26.  Under those circumstances, the Aviation Defendants cannot establish that any replacement cost insurance proceeds "duplicated," "actually replaced," or "indemnified" Plaintiffs' lost rental income, and, thus, they cannot establish correspondence with respect to any replacement cost insurance proceeds.

In essence, the Aviation Defendants are claiming that replacement cost insurance proceeds help Plaintiffs to mitigate their rental income damages.  To the extent that the Court adopts the Aviation Defendants' reasoning, Plaintiffs would have to be permitted to recover the costs of replacing the World Trade Center Buildings – something the Court has ruled Plaintiffs may not do – as mitigation damages.  *See Den Norske Ameriekalinje*

*Actiesselskabet v. Sun Printing & Publishing Ass'n*, 226 N.Y. 1, 8 (1919) ("the injured party who makes a successful effort to avoid or reduce damages will be allowed to recover the expenses necessarily incurred in so doing").

## IV.   Additional Reasons Why The Aviation Defendants Cannot Establish Correspondence

### A.   The Aviation Defendants Cannot Prove Correspondence With Respect To The Payments That Plaintiffs Received From Their Insurers For The Release Of Extra-Contractual Claims

The Aviation Defendants cannot prove correspondence with respect to payments that Plaintiffs received from their insurers for the release of extra-contractual claims, such as bad faith claims or claims for prejudgment interest, *see* Proposed Findings of Fact, ¶¶ 111, 121-22, 124, 132-33, 139-40, 159, 166, because Plaintiffs are not seeking damages for those claims against the Aviation Defendants.  Thus, the payments made for the release of extra-contractual claims do not "replace or indemnify" any category of Plaintiffs' potential tort damages.

### B.   The Aviation Defendants Cannot Prove Correspondence With Respect To The Payments For Excess Re-Tenanting Costs, Mortgage Carrying Costs, And Tenant Improvements

Because this Court has held that Plaintiffs cannot recover their (i) excess re-tenanting costs, (ii) mortgage carrying costs, or (iii) tenant improvements as damages in this litigation, *see In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448; Proposed Findings of Fact, ¶¶ 20-24, the insurance payments made to reimburse Plaintiffs for excess re-tenanting costs, mortgage carrying costs, and tenant improvements do not "replace or indemnify" any category of Plaintiffs' potential tort damages.  CPLR 4545.

### C.   There Can Be No Offset For The WTCP Plaintiffs' Initial Rent Payment Of $491.3 Million

There can be no offset for the WTCP Plaintiffs' Initial Rent Payment of $491.3 million – which is included in the $2.805 billion that this Court has held is the maximum amount of the WTCP Plaintiffs' potential damages – because that advance rent payment was not covered by insurance. *See* Proposed Findings of Fact, ¶¶ 102-03.

### D.   There Can Be No Offset Against Personal Property Damages

The Aviation Defendants will not be able to prove at trial what amount of the payments that Plaintiffs received from each of their insurers was paid to reimburse personal property losses. As a result, there can be no offset against Plaintiffs' potential personal property damages, which this Court has held are "properly recoverable in tort" and "separate from the value of the leasehold and unrelated to the replacement of the leasehold." *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449. While the amounts of those losses may be small in comparison to the enormous other losses, this category of loss is important because it puts the lie to the Aviation Defendants' proposition that all losses should be treated as just one indistinguishable "economic loss," in the words of their expert Professor Fischel.

### E.   $300,000 Of 7WTCo.'s Fine Arts Damages Are Not Subject To Offset

7WTCo. received $700,000 in insurance proceeds under a separate fine arts insurance policy that it had with AXA Nordstern that correspond to the $1,000,000 in potential damages that 7WTCo. suffered as a result of the destruction of two Frank Stella acrylic paintings. *See* Agreed Statement of Stipulated Facts, ¶ 142; Proposed Findings of Fact, ¶¶ 72-74. That leaves $300,000 in potential fine arts damages that cannot be subject to offset.

**F.    Plaintiffs' Claims For Prejudgment
<u>Interest Are Not Subject To Offset</u>**

Plaintiffs' substantial claim for prejudgment interest is for the loss of the use of

money from the date their claims arose – an entirely separate category of loss that is not

duplicated by any insurance payment and, thus, is not subject to offset.  *See Chandler v.*

*Bombardier Capital, Inc.*, 44 F.3d 80, 83 (2d Cir. 1994) ("The purpose of a prejudgment

interest award . . . is to compensate a plaintiff for the loss of use of money . . . .").  In this

case, Plaintiffs have lost the use of the money for more than 11 years.

Moreover, by the Aviation Defendants' own calculations, 7WTCo.'s damages

plus prejudgment interest would exceed its insurance recoveries by more than $77 million

when applying New York's mandatory statutory rate of 9 percent, as this Court has done

in prior 9/11-related cases.[13]  *See In re Sept. 11 Litig.*, 640 F. Supp. 2d 323, 332

(S.D.N.Y. 2009) (awarding interest on Con Edison's claim "at the statutory rate of nine

percent, from thirty days after the date of demand"), *aff'd in part, vacated in part and*

*remanding*, 435 Fed. Appx. 18, 2011 WL 2449494 (2d Cir. 2011); June 15, 2009 Order,

21 MC 101 (Docket No. 831, filed June 16, 2009), at 2 (directing payment of net

recovery "plus post-judgment interest at a rate of 9%.").  Because it is undisputed that

there can be no complete offset in this case if 7WTCo.'s entitlement to prejudgment

---

[13]   The Aviation Defendants' expert, Rajiv Gokhale, calculates prejudgment
interest at various rates that he was told to use by the Aviation Defendants, running from
the date of loss to the date that each insurance payment was received.  But in using that
methodology, Mr. Gokhale takes for granted that every insurance payment directly and
closely corresponds to a specific category of Plaintiffs' potential tort damages.  He does
not state any basis for that assumption, which, of course, must be proven by the Aviation
Defendants.  Mr. Gokhale's calculations show that even assuming total correspondence
of each and every insurance payment, depending on what interest rate is used, the WTCP
Plaintiffs' prejudgment interest plus leasehold damages would range from $3.1 billion to
$3.4 billion.

interest is governed by New York law, the Aviation Defendants will argue that this Court should depart from its own prior decisions in 9/11 cases and apply federal prejudgment interest rules. That argument depends upon a misconstruction of ATSSSA and should be rejected.

ATSSSA establishes this Court as the exclusive venue for all 9/11-related litigation to ensure that such litigation will be administered fairly, efficiently and consistently. *See Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52, 58-59 (2d Cir. 2003) ("The purpose of Section 408(b)(3), in vesting exclusive jurisdiction in the Southern District for 'all actions brought for any claim . . . resulting from or relating to' the attacks, was to ensure consistency . . . in resolving the many expected actions arising from the events of September 11" and "'to provide some sense to the litigation'") (quoting 147 Cong. Rec. S9594 (daily ed. Sept. 21, 2001) (remarks of Senator McCain)). But ATSSSA does not create any new substantive rights, other than the right (and requirement) that *state law claims* such as Plaintiffs' claims be filed in this court. *See In re Sept. 11 Litig.*, 280 F. Supp. 2d 279, 287 (S.D.N.Y. 2003) (ATSSSA "provides that those who bring suit 'for damages arising out of the hijacking and subsequent crashes' must bring their suits in the United States District Court for the Southern District of New York.").

By the statute's plain terms, any claim for damages brought under ATSSSA is governed by state substantive law, except to the extent that state law is inconsistent with or preempted by federal law. ATSSSA § 408(b)(2) ("[t]he substantive law for decision in any such [damages suit brought under ATSSSA] shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such

29

law is inconsistent with or preempted by Federal law."). Thus, because prejudgment interest is a question of substantive law, *see Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir. 1999), ATSSSA requires that Plaintiffs' claims for prejudgment interest be determined under New York law unless that law is "inconsistent with or preempted by Federal law."

New York law is not "inconsistent with" federal law. Courts have interpreted the phrase "inconsistent with" in the context of preemption clauses to require a showing "either that 'compliance with both federal and state regulations is a physical impossibility' or that 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Coal. To Defend Affirmative Action v. Granholm,* 473 F.3d 237, 251 (6th Cir. 2006) (citation omitted), *motion to vacate stay denied,* 127 S. Ct. 1146 (2007); *accord Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.,* 423 F.3d 1056, 1073 (9th Cir. 2005) ("In fact, our analysis of whether state requirements are 'inconsistent' with the federal regulations within the meaning of [the Communications Act, 47 USC] § 276(c) is substantially identical to the analysis of implied conflict preemption: whether 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . .'") (citation omitted), *aff'd,* 127 S. Ct. 1513 (2007). The Aviation Defendants cannot meet either standard here.

Federal courts in New York – *including this Court in other 9/11-related cases* – have applied New York's 9 percent statutory prejudgment interest rate under CPLR 5004. *See In re Sept. 11 Litig.*, 640 F. Supp. 2d at 332; June 15, 2009 Order, 21 MC 101 (Docket No. 831, filed June 16, 2009), at 2; *see also Taaffe v. Life Ins. Co. of N. Am.,*

769 F. Supp. 2d 530, 538 (S.D.N.Y. 2011) (applying New York's statutory prejudgment interest rate to federal question claim); *Mason Tenders Dist. Council of Greater N.Y. v. G & C Constr. Safe, Inc.,* 10 Civ. 3399, 2011 WL 744918 at *8-9 (S.D.N.Y. Feb. 8, 2011) (same), *report & rec. adopted,* 2011 WL 744914 (S.D.N.Y. Mar. 2, 2011); *Alfano v. CIGNA Life Ins. Co.,* 07 Civ. 9661, 2009 WL 890626 at *7 (S.D.N.Y. Apr. 2, 2009) (same); *Sheehan v. Metropolitan Life Ins. Co.,* No. 01 Civ. 9182, 2005 WL 1020874, *2-3 (S.D.N.Y. Apr. 29, 2005) (same); *Nipponkoa Ins. Co., Ltd. v. Watkins Motor Lines, Inc.,* 431 F. Supp. 2d 411, 420 (S.D.N.Y. 2006) (same); *Strobl v. N.Y. Mercantile Exch.,* 590 F. Supp. 875, 881-82 (S.D.N.Y. 1984) (same), *aff'd,* 768 F.2d 22 (2d Cir. 1985).[14] Neither this Court nor any other federal court would have applied New York law if it were "inconsistent" with federal law.

Accordingly, because federal law is not "inconsistent with" New York law, ATSSSA requires the application of CPLR 5001 and 5004 here. And when New York's prejudgment interest rate of 9 percent is applied, 7WTCo.'s damages plus prejudgment interest indisputably exceed its insurance recoveries.

---

[14] Even if this Court had any discretion to award prejudgment interest at a rate lower than 9 percent (which it does not), the fact that it has applied New York's prejudgment interest rate in all other 9/11 cases militates in favor of applying that same rate here in order to ensure that victims of 9/11 are all treated fairly and consistently. *Cf. In re Sept. 11 Litig.,* 567 F. Supp. 2d 611, 619 (S.D.N.Y. 2008) ("In providing for the Southern District of New York as the site of exclusive jurisdiction over litigation resulting from or related to the events of September 11, Congress evidenced an intention to have all of these cases handled in a uniform and consistent fashion. . . . Congress was concerned that recoveries, as well, should be consistent.").

**G.    Under This Court's Prior Rulings, The Amount
Of Total Insurance Recoveries Potentially Subject
To Offset Must Be Reduced By Plaintiffs'
Insurance Premiums And Claims Preparation Costs**

This Court has held that the amount of Plaintiffs' claims preparation fees and the
insurance premiums that they paid during the two-year period immediately preceding
September 11, 2001 "are proper offsets to arrive at net insurance recoveries." Sept. 30,
2009 Order, at 2.  The parties agree that the WTCP Plaintiffs paid a total of $5,898,714 in
insurance premiums for property insurance during the two-year period immediately
preceding September 11, 2001, and that 7WTCo. paid $482,793 in insurance premiums
for property insurance coverage for the 7WTC Building and $3,500.17 in insurance
premiums for fine arts coverage for paintings and other artwork at the 7WTC Building.
Agreed Statement of Stipulated Facts, ¶¶ 5, 95.  The parties also agree that 7WTCo. paid
a total of $1,587,410 in claims preparation fees, and that the WTCP Plaintiffs paid at least
$10,352,540 in claims preparation fees (exclusive of the amounts of fees and costs
associated with an appraisal involving certain of the WTCP Plaintiffs' insurers).  *See*
Agreed Statement of Stipulated Facts, ¶¶ 87, 141.

While the parties agree that the WTCP Plaintiffs paid an additional $31,030,471[15]
in fees and costs associated with the appraisal, *see* Agreed Statement of Stipulated Facts,
¶ 87a, the Aviation Defendants have reserved their right to argue that those appraisal-
related fees and costs are not claims preparation costs that reduce the amount of net
insurance recoveries subject to offset but, rather, insurance coverage litigation expenses.
The Aviation Defendants are incorrect.

---

[15]  The actual amount is much higher, but the $31,030,471 represents a
compromised lower amount for the purposes of trial.

Appraisals are integral to the claims adjustment process.  The purpose of an appraisal is to determine the amount of the insured's loss, not to determine coverage or other legal issues.[16]  Because determining the value of the loss is a prerequisite to the insurer's accepting a final proof of loss, unless the insured and insurer agree on the amount of the loss, the appraisal constitutes a necessary step in reaching a final adjustment of the claim.

The appraisal involving the WTCP Plaintiffs and certain of their insurers was consistent with these principles.  As required by New York Insurance Law, *see* N.Y. Ins. Law § 3404(e) lines 123-37 (providing that every "fire insurance policy," including property insurance policies, must include a right of appraisal), the insurers' as well as the WTCP Plaintiffs' right to an appraisal was included as part of the insurance contracts that they had with each of their insurers.  *See, e.g.,* WilProp Form (JX-38), at WTCP 0010425; Travelers Form (JX-39), at WTCP 0238603; Proposed Findings of Fact, ¶¶ 64, 132, 154.  As is the custom and practice in the insurance industry, the WTCP Plaintiffs' insurers treated appraisal-related expenses as claims preparation expenses.  *See* WilProp Form (JX-38), at WTCP 0010421 (including as "Claim Preparation Expenses"

---

[16] *See* Couch on Insurance § 209:8 (3d ed. 1995); 70A N.Y. Jur. 2d Insurance § 2239 ("[A]ppraisers are limited to determining the actual amount of the loss sustained by the insured and they are without power to determine the question of the liability of the insurer."); 1 New Appleman Insurance Law Practice Guide § 12.23[3] ("The appraiser's authority is limited to deciding the amount of loss and the value of the property in question.  The appraisers cannot make decisions outside the limited scope of the policy language."); Robert E. Keeton & Alan I. Widiss, Insurance Law 1079 (1988) ("[C]ourts have often noted that appraisal provisions – which only call for a determination of the amount of a loss – do not deprive the courts of jurisdiction of an action against the insurer . . ."); 6 Appleman's Insurance Law and Practice § 3929 (1987) ("And appraisers and arbitrators are limited to determining the actual amount of the loss sustained by the insured, and they are without power to determine the question of liability of the insurer.").

"[e]xpenses incurred by the Insured or by the insured's representatives, including . . .
Appraisers, Lawyers, Consultants, Architects or other such professionals in order to
arrive at the loss payable under this policy in the event of a claim.").  Also consistent
with New York Insurance Law, *see* N.Y. Ins. Law § 3408(c), the scope of the appraisal
involving the WTCP Plaintiffs' and certain of their insurers was narrowly limited to
fixing the amount of the WTCP Plaintiffs' loss; the appraisal did not encompass the
resolution of any legal or coverage issues.  *See S.R. Intern. Business Ins. Co. Ltd. v.
World Trade Center Properties, LLC*, 445 F. Supp. 2d 230, 330-31 (S.D.N.Y. 2006)
(noting the limited scope of the appraisal panel's authority and stating that it did not
include the authority to determine coverage issues); *see also* Stipulation and Order
Regarding World Trade Center Loss Appraisal Protocol, dated June 25, 2004 (JX-94), at
2-3.  Rather, the appraisal was an integral part of the adjustment of the WTCP Plaintiffs'
claims because the appraisal was a necessary step in arriving at the amount of the loss
payable by the WTCP Plaintiffs' insurers under the insurance contracts.  The appraisers
themselves described their work as follows:

> By the end of 2006, amounts have been determined, either by
> Panel decision or the agreements negotiated between the parties,
> for all core and shell trade costs, escalation, general conditions,
> construction manager fee, design and construction contingency,
> insurance, bonds, all other indirect costs and pre-construction and
> construction durations for core and shell.  Based on the current
> record, the Panel must still determine the replacement cost of
> tenant improvements.

Replacement Cost Determined As Of 12/31/06 (JX-95), at ALLI27A-011091.  The
matters described are all clearly part of the ordinary claims adjustment process, not
coverage litigation.  The costs related to the appraisal should, therefore, be used to reduce
the net amount of insurance recoveries potentially subject to offset.

34

## **CONCLUSION**

For all of the foregoing reasons, the Court should find that the Aviation

Defendants have not met their burden of proving correspondence.

Dated: New York, New York
       July 8, 2013

FLEMMING ZULACK WILLIAMSON ZAUDERER
LLP

By: _____
       Richard A. Williamson
       Megan P. Davis

One Liberty Plaza
New York, New York  10006-1404
(212) 412-9500

*Attorneys for Plaintiffs*
World Trade Center Properties LLC
1 World Trade Center LLC
2 World Trade Center LLC
3 World Trade Center LLC (formerly known as 5
       World Trade Center LLC)
4 World Trade Center LLC
7 World Trade Company, L.P.

# APPENDIX

15

**DECISION AFTER HEARING OF THE HONORABLE JOEL B. GEWANTER,
DATED DECEMBER 20, 1999, WITH ATTACHED SCHEDULE A [15-22]**

SUPREME COURT - STATE OF NEW YORK
NASSAU COUNTY
Present:    Honorable Joel B. Gewanter
------------------------------------------------------------------X
MARK FISHER and RANDI FISHER,
                                        Plaintiffs,

         -against-                                  INDEX No. 1995-000026

                                                    **DECISION AFTER
                                                    HEARING**

QUALICO CONTRACTING CORP. and
ACTION DEMOLITION AND CONTAINER CO., INC.,
a/k/a ACTION DEMOLITION CO., INC.,
                                        Defendant.
------------------------------------------------------------------X

This matter was referred to the undersigned for a collateral source hearing which
was commenced on October 13, 1999 and concluded on December 15, 1999 by
submissions. This hearing was necessitated by a jury verdict rendered December 9,
1998 which awarded plaintiffs Mark Fisher and Randi Fisher various sums of money for
(1) the replacement cost of their dwelling ($1,330,000.00); (2) the diminution in market
value of their dwelling ($480,000.00); and (3) special consequential damages
($362,100.00), all relating to the destruction of their home by fire on September 1,
1994. The jury determined that the defendants, Qualico Contracting Corp. (70%) and
Action Demolition and Container Co., Inc., (30%) were both liable for the fire.

Plaintiffs received approximately $1,050,000.00 from their insurance company,
the Fireman's Fund, of which $862,770.00 was for the replacement cost of their home.

CPLR §4545(c) provides that a jury award of damages for injury to property is to
be reduced by amounts received or reasonably certain to be received from a collateral
source such as insurance. The benefits to defendants of this rule has, however, been
somewhat limited by the Court of Appeals' reading of that statute in *Oden v. Chemung*

1

16

*County Industrial Development Agency*, 87 NY2d 81, 637 NYS2d 670. In *Oden*, the Court held that, rather than simply apply the total of all collateral source payments against the entire damage award, amounts received from any collateral source, such as insurance, should only be used as a set off against an award where the collateral source payments correspond directly to a category of loss awarded by the jury. The Court is aware that the amount of offset defendants are entitled to, is to be reduced by insurance premiums paid by plaintiffs. In this case, however, due to the sizeable insurance recovery which far exceeds the judgment amount, such calculation would not provide plaintiffs with any different result.

At the heart of this dispute is plaintiffs claim that the jury award of $480,000.00 (the diminution in market value) should not be off set by plaintiffs $862,770.00 recovery from their insurance company which monies were paid to compensate plaintiffs for the replacement cost of their home. This Court disagrees.

Pattern Jury Instructions 2:311, upon which the trial Court based its charge to the jury provides as follows:

"If plaintiff's (automobile, property) was damaged by the defendant's negligence, you will award to the plaintiff as damages the difference between its market value immediately before and immediately after it was damaged, or the reasonable cost of repairs necessary to restore it to its former condition, *whichever is less*.

Thus, if the reasonable cost of repairs exceeds the reduction in market value, you will award the amount by which the market value was reduced. If the reasonable cost of repairs is less than the reduction in market value, you will award to the plaintiff the reasonable cost of repairs required to restore the (automobile, property) to its condition immediately before it was damaged. " (emphasis supplied)

2

17

The commentary following PJI 2:311 goes on to explain:

"Cost of the repairs necessary to restore the property to its former condition is available as a measure of damages subject to the limitation that the cost of repairs not exceed either (1) the diminution in value or (2) the value of the property itself, *Gass v. Agate Ice Cream, Inc.*, 264 NY 141, 190 NE 323". (emphasis supplied)

It thus appears clear to this Court that replacement cost and diminution in market value are but two alternative measures of the same "economic loss" and do not represent a separate category of loss as existed in *Oden*. In the *Oden* case, the court found that the plaintiff's retirement pension benefits did not replace his lost future earnings or health and welfare benefits and that it was therefore error to deduct his pension payments form the jury's award for those amounts.

In the instant case, plaintiff's home was destroyed by a fire. That is a single economic loss. As made clear by PJI 2:311 and the commentary following, replacement cost and diminution in market value are but different measures of the same economic loss and to allow plaintiff to recover an amount under either damage measure without a set off by insurance proceeds received for the replacement cost of their home would afford plaintiffs "two or more recoveries for the same injury". (See, *Oden v. Chemung County Industrial Development Agency, supra*). As the *Oden* court pointed out, this is precisely the kind of situation the legislature sought to address when it enacted CPLR §4545(c) in the first place. Therefore, since the lower measure of damages ($480,00.00) is the measure to be used (see, PJI 2:311; *Gass v. Agate Ice Cream, Inc*, supra) and since plaintiffs received more than that ($862,700.00) from the Fireman's Fund for the loss of their home, plaintiffs are not entitled to a judgment for further sums from the defendants with respect to the loss of their home.

Plaintiffs argue that the policy providing "replacement cost" is something different

3

18

from what the jury awarded.  This Court disagrees.  The jury awarded an amount for the "reasonable cost to restore" plaintiffs' home.  It awarded $1,330,000.00 for this purpose.  This is the same coverage purchased by plaintiffs whose insurance (endorsement 120098 5-89) provides for "the cost of repair or replacement".  Plaintiffs concede as much in their memorandum of law wherein they acknowledge that insurance proceeds received must be used to offset the jury's award of $1,330,000.00.

In this Court's experience, when one purchases a home and obtains fire insurance, several choices are available.  One can purchase insurance in an amount to cover the mortgage only (as is usually required by a lender); the current market value of the property; or, for an additional premium, one can purchase "replacement cost" insurance which will pay the full increased cost of replacing the home at any time in the future when such a loss may occur.  Plaintiffs' fire insurance policy (admitted into evidence as defendants' exhibit B) clearly explains these options and reflects plaintiffs' choice of the "replacement cost" option.  Each of these choices was designed to cover plaintiffs in the event their home was destroyed by fire.  The only difference between them is the manner in which the amount of the insurance payment is to be calculated.  Each option still insures against the same loss.

A different issue is presented with respect to the consequential damages.  As appears from defendants' exhibit D in evidence (the extract of the clerk's minutes of the verdict), the jury awarded plaintiffs $362,100.00 in consequential damages as follows:

| A. | Landscaping | $25,000.00 |
| B. | Architect fees | 75,000.00 |
| C. | Driveway | 6,000.00 |
| D. | Slate patio area | 20,000.00 |
| E. | Pool area - brick, fence, coping | -0- |
| F. | Foundation | -0- |
| G. | Board up costs | 6,000.00 |

4

19

| | | |
|---|---|---|
| H. | Qualico management fees | 53,000.00 |
| I. | Cost of demolition (both prior to and after fire) | 25,000.00 |
| J. | Public adjuster's fee | 60,000.00 |
| K. | Carrying costs (RE taxes) | 27,000.00 |
| L. | Carrying costs (Mortgage interest) | 21,000.00 |
| M. | Carrying costs (Loss of use of equity) | 44,100.00 |

The parties have agreed with respect to the following set offs and balances:

| | Amount received from insurance | Amount due plaintiff |
|---|---|---|
| A. | $40,000.00 | -0- |
| B. | 45,643.95 | $29,356.05 |
| C. | 11,897.50 | -0- |
| D. | 3,211.00 | 16,799.00 |
| G. | 2,885.00 | 3,115.00 |
| I. | 25,000.00 | -0- |
| K,L,M. | 60,000.00 | 32,100.00 |

As to consequential damages, there remain two disputes. First, the trial court submitted to the jury, as an item of consequential damage, the public adjuster's fee and the jury awarded plaintiffs $60,000.00 for this item (J). Plaintiffs contend this is a proper consequential damage. The defendants claim that this item is akin to a legal fee and is not a compensable damage or cost.

The transcript presented by the parties at the time of oral argument and submission indicates that one of the defense attorneys did raise the issue prior to its submission to the jury. The Court only noted the "comment" at that time, without any ruling being made. This Court believes that the trial court did determine the question in favor of plaintiffs or it would not have submitted the item to the jury. It is, therefore, now the law of the case. In any event, if the issue were before this court now it would find,

5

20

based on the size of the claim and the complexity in presenting all of the various categories of damage to the insurance company, that the public adjuster's fee was a necessary expense of the plaintiffs and a proper item of consequential damage. Thus, this court concludes that the Item J award of $60,000.00 should stand.

The second dispute relates to Item H of the jury's verdict as to consequential damages awarding $53,000.00 for "management fees" paid to Qualico. Plaintiffs claim in their memorandum of law to have received no insurance reimbursement which corresponds specifically to this amount. Defendant Qualico alleges in its memorandum of law that plaintiffs received $97,808.46. The record, however is silent as to how this conclusion is reached . The burden of proof being on the party claiming the offset, Qualico has the burden to show that plaintiffs did in fact receive insurance reimbursement for this specific item. (See, *Oden v. Chemung County Industrial Development Agency*, *supra*. The Court finds that defendant Qualico has failed to meet its burden in this regard and, therefore, Item H of the jury's verdict also stands without any setoff. Accordingly, the Court finds that plaintiffs are entitled to a judgment against the defendants based upon the jury's verdict as follows:

|       |            |
|-------|-----------:|
| B.    | $29,356.05 |
| D     | 16,789.00  |
| G.    | 3,115.00   |
| H.    | 53,000.00  |
| J.    | 60,000.00  |
| K.L.M. | 32,100.00 |
|       | 194,360.05 |

It is therefore,

ORDERED that plaintiffs Mark Fisher and Randi Fisher have judgment against the defendants Qualico Contracting Corp. and Action Demolition & Container Co., Inc., in the amount of $194,360.05. The amount of principal to be recovered from defendant Qualico is 70% or $136,052.03; the amount of principal to be recovered from defendant Action is 30% or $58,308.02, both with interest from September 1, 1994 plus statutory

6

21

costs and disbursements as may be taxed by the clerk of the court.

The foregoing constitutes both the decision and order of this Court.   Settle judgment on notice.

Dated:       Hampstead, NY
             December 20, 1999

ENTER,

Acting J.S.C.

JBG:kmh

22

## SCHEDULE A

I.     SPECIAL VERDICT NO. 1 – REPLACEMENT VALUE

| | |
|---|---|
| Jury award | $1,330,000.00 |
| Insurance Proceeds | - 862,770.51* |
| | $ 467,229.49 |

\* Reflects payment of $1,061,407.96 and crediting with architectural fees ($45,643.95); driveway ($6,897.50); demolition ($25,000.00); patio ($3,211.00); deductible ($10,000.00); real estate tax, interest, loss of use ($60,000.00); board up ($2,885.00); landscaping ($40,000.00)

II.     SPECIAL VERDICT NO. 2 – DIMINUTION IN MARKET VALUE

Jury Award - $480,000.00

III.     SPECIAL VERDICT NO. 3 – "CONSEQUENTIAL" DAMAGES

| | Jury Award | | Insurance Received | Net Damages |
|---|---|---|---|---|
| Landscaping | $25,000 | | $40,000 | -0- |
| Architectural fees | $75,000 | | $45,643.95 | $29,356.05 |
| Driveway | $ 6,000 | | $11,897.50 | -0- |
| Patio | $20,000 | | $ 3,211.00 | $16,789.00 |
| Pool | -0- | | ----- | -0- |
| Foundation | -0- | | ----- | -0- |
| Board Up | $ 6,000 | | $ 2,885.00 | $ 3,115.00 |
| Qualico | $53,000 | | ----- | $53,000.00 |
| Demolition | $25,000 | | $25,000.00 | -0- |
| Public Adjuster | $60,000 | | ----- | $60,000.00 |
| RE tax | $27,000) | | | |
| Interest | $21,000) | $92,100 | $60,000.00 | $32,100.00 |
| Loss of use | $44,100) | | | |
| | $362,100 | | $188,637.45 | $194,360.05 |

IV.     (A)     Under VERDICT NO. 1 -- $467,229.49 + $194,360.05 =     $661,589.54

        (B)     Under VERDICT NO. 2 -- $480,000.00 + $194,360.05 =     $674,360.05