UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

IN RE SEPTEMBER 11 LITIGATION          :
        :      21 MC 101 (AKH)

------------------------------------------------------------------ X

WORLD TRADE CENTER PROPERTIES LLC, et al.,   :

               Plaintiffs,    :      08 CIV 3719 (AKH)
          v.            :

UNITED AIRLINES, INC., et al.,           :

               Defendants.   :
                         :

------------------------------------------------------------------ X

WORLD TRADE CENTER PROPERTIES LLC, et al.,   :

               Plaintiffs,    :      08 CIV 3722 (AKH)
          v.            :

AMERICAN AIRLINES, INC., et al.,         :

               Defendants.   :

------------------------------------------------------------------ X

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW FOR THE JULY 15, 2013 TRIAL

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Richard A. Williamson


*Attorneys for Plaintiffs*
World Trade Center Properties LLC
 1 World Trade Center LLC
 2 World Trade Center LLC
 3 World Trade Center LLC (formerly known as 5
    World Trade Center LLC)
 4 World Trade Center LLC
 7 World Trade Company, L.P.

# TABLE OF CONTENTS

**Page(s)**

Table Of Authorities ................................................................................................ iii

Proposed Findings Of Fact ........................................................................................1

I.     Plaintiffs' Potential Tort Recoveries ............................................................1

     A.    The Court's Limitation of Plaintiffs' Recoverable Leasehold Damages ...................................................2

     B.    The Court's Limitation Of Plaintiffs' Recoverable Consequential Damages ............................................6

     C.    Plaintiffs' Potential Personal Property Damages ...........................9

     D.    Prejudgment Interest .......................................................................9

II.    The Payments That Plaintiffs Received From Their Insurers .....................9

     A.    Property Insurance Overview ........................................................9

          1.    Property Damage And Time Element Coverages Are Fundamentally Different ...........................10

          2.    The Claims Adjustment Process ........................................12

          3.    The Settlement Of Coverage Litigation Supersedes The Claims Adjustment Process ....................16

     B.    Plaintiffs' Insurance Contracts All Covered The Loss Of Or Damage To Real And Personal Property, Lost Rental Income, Lost Business Income, And Extra Expense, Among Other Coverages .......................................17

          1.    7WTCo.'s Policy With IRI .................................................17

          2.    The WTC Insurance Program .............................................19

     C.    After 9/11, Plaintiffs Submitted Claims To Their Insurers For All Covered Losses .........................................24

          1.    The Claims Adjustment Process For 7WTCo.'s Losses ............................................................24

# TABLE OF CONTENTS

**Page(s)**

        2.    The Claims Adjustment Process For
The WTCP Plaintiffs' Losses ...........................................30

   D.    The Overwhelming Majority Of Plaintiffs' Claims
Were Resolved Outside Of The Claims Adjustment
Process, Through Litigation Settlements That Did
Not Allocate Payments To Any Particular
Categories Of Loss........................................................35

        1.    7WTCo.'s Coverage Litigation With IRI .........................35

        2.    The Coverage Litigation And Settlements
Involving The WTCP Plaintiffs And Their Insurers..........42

Proposed Conclusions Of Law....................................................................48

I.    The Aviation Defendants Must Prove To A Reasonable
Certainty That A Particular Collateral Source Payment
"Replaced Or Indemnified" A Particular Category
Of Loss For Which Plaintiffs May Be Awarded Damages.......................48

II.    The Aviation Defendants Fail To Establish That The
Payments Plaintiffs Received From Their Insurers
Were Allocated To Any Specific Categories Of Loss...............................51

III.    Any Payments Proven To Be Replacement Cost
Insurance Proceeds Do Not Correspond To Plaintiffs'
Lost Rental Income Damages ..................................................................53

IV.    Additional Reasons Why The Aviation Defendants
Have Failed To Prove Correspondence ....................................................55

V.    Conclusion ................................................................................................58

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bryant v. New York City Health & Hospitals Corp.*,
   93 N.Y.2d 592, 695 N.Y.S.2d 39 (1999) ................................................. 50

*Citizen Savings & Loan Ass'n of NY v. Proprietors Ins. Co.*,
   78 A.D.2d 377, 435 N.Y.S.2d 303 (2d Dep't 1981) ...................................... 11

*Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n*,
   226 N.Y. 1 (1919) ........................................................................ 55

*Kihl v. Pfeffer*,
   47 A.D.3d 154, 848 N.Y.S.2d 200 (2d Dep't 2007) ........................... 48, 50, 51

*Oden v. Chemung County Indus. Dev. Agency*,
   87 N.Y.2d 81, 637 N.Y.S.2d 670 (1995) ......................................... passim

*In re Sept. 11 Litig.*,
   590 F. Supp. 2d 535 (S.D.N.Y. 2008) ............................................. passim

*In re Sept. 11 Litig.*,
   889 F. Supp. 2d 616 (S.D.N.Y. 2012) .......................................... 2, 6, 51, 54

*In re Sept. 11 Litig.*,
   908 F. Supp. 2d 442 (S.D.N.Y. 2012) ............................................. passim

*In re Sept. 11 Litig.*,
   No. 21 MC 101, 2009 WL 1181057 (S.D.N.Y. Apr. 30, 2009) ........................ 2, 3, 54

*Terranova v. New York City Transit Auth.*,
   No. 13946/02, 2005 WL 2219685 (Sup. Ct. Richmond Co. Aug. 23, 2005) .............. 48

*Turnbull v. USAir, Inc.*,
   133 F.3d 184 (2d Cir. 1998) ......................................................... 49

**Statutes**

CPLR 4545 .......................................................................... passim

In accordance with Rule 3.B.iii of this Court's Individual Rules and paragraph C.1.xiii of the Joint Case Management Plan and Order, dated March 20, 2013, plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as 5 World Trade Center LLC), 4 World Trade Center LLC, and 7 World Trade Company, L.P.[1] (collectively, "Plaintiffs") submit these proposed findings of fact and conclusions of law for the July 15, 2013 trial.

## PROPOSED FINDINGS OF FACT

### I.    Plaintiffs' Potential Tort Recoveries

1.    The WTCP Plaintiffs, the lessees of the buildings known as One World Trade Center, Two World Trade Center, Four World Trade Center, and Five World Trade Center (collectively, the "Main Site Buildings"), and 7WTCo., the lessee of the building known as Seven World Trade Center (the "7WTC Building"), have asserted tort claims against the Aviation Defendants[2] to recover the damages that Plaintiffs incurred as a result of the destruction of the Main Site Buildings and the 7WTC Building[3] on September 11, 2001.

---

[1] Plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC will be referred to collectively as the "WTCP Plaintiffs," and 7 World Trade Company, L.P. will be referred to as "7WTCo."

[2] The "Aviation Defendants" refer to American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; United Continental Holdings (f/k/a UAL Corporation); US Airways, Inc.; US Airways Group, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Huntleigh USA Corporation; The Boeing Company; and Massachusetts Port Authority.

[3] The Main Site Buildings and the 7WTC Building are referred to collectively as the "World Trade Center Buildings."

(*See* Flight 11 Complaint, 08 Civ. 3722 (JX-229),[4] ¶¶ 32-68; Flight 175 Complaint, 08 Civ. 3719 (JX-230), ¶¶ 28-64).

2.      In their Complaints, the Plaintiffs seek to recover all damages that were proximately caused by the Aviation Defendants' tortious conduct prior to and on 9/11, including the damages to Plaintiffs' leasehold interests, personal property damages, and consequential damages, plus prejudgment interest.

(*See* Flight 11 Complaint, 08 Civ. 3722 (JX-229), ¶¶ 2, 4; Flight 175 Complaint, 08 Civ. 3719 (JX-230), ¶¶ 2, 4).

## A.    The Court's Limitation Of Plaintiffs' Recoverable Leasehold Damages

3.      Plaintiffs' losses resulting from the 9/11 terrorist-related aircraft crashes fall into two principal "different categories," lost rental income and the costs of replacing the destroyed World Trade Center Buildings.

(*In re Sept. 11 Litig.*, 889 F. Supp. 2d 616, 622-23 (S.D.N.Y. 2012); *see* Expert Report of Steven Shavell, Ph.D., dated Aug. 12, 2011 (JX-52) ("Aug. 12, 2011 Shavell Report"), ¶¶ 8, 18; Expert Report of Steven Shavell, Ph.D., dated Apr. 12, 2013 (JX-221) ("Apr. 12, 2013 Shavell Report"), ¶ 8a).

4.      Plaintiffs will be permitted under this Court's prior rulings to recover damages only for lost rental income and not for the costs of replacing the destroyed World Trade Center Buildings.

(*In re Sept. 11 Litig.*, 590 F. Supp. 2d 535, 543-44 (S.D.N.Y. 2008); *In re Sept. 11 Litig.*, No. 21 MC 101, 2009 WL 1181057, at *3 (S.D.N.Y. Apr. 30, 2009); *In re Sept. 11 Litig.*, 908 F. Supp. 2d 442, 447 (S.D.N.Y. 2012); *see* Aug. 12, 2011 Shavell Report (JX-52), ¶¶ 9, 21; Apr. 12, 2013 Shavell Report (JX-221), ¶¶ 7,

---

[4] Along with their respective trial briefs and proposed findings of fact and conclusions of law, the parties also are today filing a proposed pretrial order that includes an "Agreed Statement of Stipulated Facts," which is referenced herein. Additionally, at or prior to trial, the parties will be providing the Court with copies of the parties' proposed exhibits. Proposed exhibits that are included on the list of Plaintiffs' and Defendants' Joint Trial Exhibit Designations are referred to herein with the prefix "JX." Proposed exhibits on Plaintiffs' Exhibit List are referred to herein with the prefix "PX."

8a, 8b; Expert Report of Professor Patrick Connors, dated April 12, 2013 (JX-222) ("Connors Report"), ¶¶ 10n, 12, and n.2).

5.      Plaintiffs have been precluded under this Court's prior rulings from recovering any of the costs that they incurred in replacing the destroyed World Trade Center Buildings on the ground that the Aviation Defendants did not proximately cause and, therefore, cannot be held liable in tort for Plaintiffs' replacement cost damages.

> (*In re Sept. 11 Litig.*, 590 F. Supp. 2d at 543-44; *In re Sept. 11 Litig.*, 2009 WL 1181057, at *3; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447-48; *see* Aug. 12, 2011 Shavell Report (JX-52), ¶¶ 9, 21; Apr. 12, 2013 Shavell Report (JX-221), ¶¶ 7, 8a, 8b; Connors Report (JX-222), ¶¶ 10n, 12, and n.2).

6.      Any award for leasehold damages handed down by a jury in this case will not be permitted by the Court to include compensation for the costs of replacing the Main Site or the 7WTC Buildings.

> (*In re Sept. 11 Litig.*, 590 F. Supp. 2d at 543-44; *In re Sept. 11 Litig.*, 2009 WL 1181057, at *3; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447-48; Aug. 12, 2011 Shavell Report (JX-52), ¶¶ 9, 21; Apr. 12, 2013 Shavell Report (JX-221), ¶¶ 7, 8a, 8b; Connors Report (JX-222), ¶¶ 10n, 12, and n.2).

7.      Under this Court's prior rulings, any potential award for leasehold damages will reflect only compensation for the rental income that Plaintiffs lost when the World Trade Center Buildings were destroyed on September 11, 2001.

> (*In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544 (S.D.N.Y. 2008); *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447-48; Aug. 12, 2011 Shavell Report (JX-52), ¶¶ 9, 21; Apr. 12, 2013 Shavell Report (JX-221), ¶¶ 7, 8a, 8b).

8.      Under this Court's prior rulings, the total amount of Plaintiffs' potential leasehold damages are capped at $2.805 billion[5] for the WTCP Plaintiffs and $737 million for 7WTCo.

---

[5] We note that this amount has never been allocated by flight even though at a liability trial, the verdict sheet will require awards by individual defendant.

*(In re Sept. 11 Litig.*, No. 21 MC 101, 2009 WL 1181057, at *4 (S.D.N.Y. Apr. 30, 2009); *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448).

9.      The Court derived the $2.805 billion potential damages award from net present value calculations that were done in connection with the lease negotiations among the Port Authority of New York & New Jersey (the "Port Authority"), Silverstein Properties, Inc., and Westfield America, Inc. in April 2001.

> (*See* Authorization of Net Lease and Execution of Agreements and Related Documents (JX-418), at PLAINTIFFS 00513235; Investor Brochure for WTC Office Complex (JX-419), at SILV 7 000821; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

10.     In April 2001, the Port Authority's advisors estimated the then-net present value to the Port Authority of the rent Silverstein Properties, Inc. and Westfield America, Inc. proposed to pay over the term of a 99-year net lease of the WTC Complex[6] to be $3.211 billion.

> (*See* Authorization of Net Lease and Execution of Agreements and Related Documents (JX-418), at PLAINTIFFS 00513235; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

11.     The Port Authority's $3.211 billion net present value calculation was based on an Initial Rent Payment to be paid to the Port Authority at closing, a 99-year stream of fixed rental payments to be paid to the Port Authority, and a 99-year stream of participating rental payments to be paid to the Port Authority.

> (*See* Authorization of Net Lease and Execution of Agreements and Related Documents (JX-418), at PLAINTIFFS 00513235; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

---

[6] The WTC Complex included the Main Site Buildings and their respective appurtenances and subgrade space along with the World Trade Center retail areas. (Agreed Statement of Stipulated Facts, ¶ 1).

12.     The Port Authority's advisors did not report how much of their $3.211 billion net present valuation was attributable to the office and subgrade space, which was being leased by the WTCP Plaintiffs, and how much to the retail space, which was being leased by Westfield.

> (*See* Authorization of Net Lease and Execution of Agreements and Related Documents (JX-418), at PLAINTIFFS 00513235; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

13.     In April 2001, the WTCP Plaintiffs estimated the then-net present value of the rent to be paid to the Port Authority over the term of the proposed 99-year net lease of the WTC Complex to be $3.239 billion.

> (*See* Investor Brochure for WTC Office Complex (JX-419), at SILV 7 000821; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

14.     The WTCP Plaintiffs' $3.239 billion net present value calculation was based on an Initial Rent Payment to be paid to the Port Authority at closing, a 99-year stream of fixed rental payments to be paid to the Port Authority, and a 99-year stream of participating rental payments to be paid to the Port Authority.

> (*See* Investor Brochure for WTC Office Complex (JX-419), at SILV 7 000821; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

15.     The WTCP Plaintiffs allocated $2.844 billion of their $3.239 billion net present valuation to the office and subgrade portion of the WTC Complex and $395 million to the retail portion.

> (*See* Investor Brochure for WTC Office Complex (JX-419), at SILV 7 000821; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

16.     In order to arrive at the $2.805 billion potential damages figure, the Court rounded the WTCP Plaintiffs' $3.239 billion net present valuation to $3.2 billion and then subtracted the $395 million allocated to the retail portion.

(*See* Investor Brochure for WTC Office Complex (JX-419), at SILV 7 000821; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

17.     $3.2 billion also would represent a rounding of the $3.211 billion net present valuation by the Port Authority's advisors, but the advisors did not allocate their valuation between the WTCP Plaintiffs' and Westfield's portions of the WTC Complex.

(*See* Authorization of Net Lease and Execution of Agreements and Related Documents (JX-418), at PLAINTIFFS 00513235; Investor Brochure for WTC Office Complex (JX-419), at SILV 7 000821; *In re Sept. 11 Litig.*, 590 F. Supp. 2d at 537).

18.     The WTCP Plaintiffs' maximum potential leasehold damages, as determined by the Court, in the amount of $2.805 billion "fully includes the rental streams" that the WTCP Plaintiffs "reasonably expected from the property" and "the price paid by WTCP . . . reflected all the ingredients of anticipated revenue and expense."

(*In re Sept. 11 Litig.*, 590 F. Supp. 2d at 544; *In re Sept. 11 Litig.*, 889 F. Supp. 2d 616, 622 (S.D.N.Y. 2012)).

19.     The $737 million potential damages award for 7WTCo., as determined by the Court, was based on the net cash flows that 7WTCo. expected to earn over the life of its lease (*i.e.*, the operating income that 7WTCo. expected to earn from its tenant rents minus all operating and capital expenses, including the expense of rental payments due to the Port Authority), immediately prior to the events of 9/11.

(*In re Sept. 11 Litig.*, 908 F. Supp. 2d at 445).

**B.     The Court's Limitation Of Plaintiffs'
Recoverable Consequential Damages**

20.     *Excess Re-tenanting Costs.*  This Court has held that the excess re-tenanting costs that Plaintiffs have incurred or will incur as a result of the destruction of the World Trade Center Buildings, in the amounts of more than $440,000,000 and

$80,849,637 for the WTCP Plaintiffs and 7WTCo. respectively, are not recoverable by Plaintiffs as tort damages because they are a form of replacement costs.

> (*In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448; *see* Declaration of Michael L. Levy, dated Aug. 18, 2009 (JX-92) ("Aug. 18, 2009 Levy Decl."), ¶¶ 34-36; Declaration of Michael L. Levy, dated August 14, 2012 (JX-391) ("Aug. 14, 2012 Levy Decl."), ¶ 15; Apr. 12, 2013 Shavell Report (JX-221), ¶ 23).

21.     Based on the Court's prior rulings, excess re-tenanting costs cannot be a component of any potential tort damages award handed down by a jury in this case.

> (*In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448; *see* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 34-36; Aug. 14, 2012 Levy Decl. (JX-391), ¶ 15; Apr. 12, 2013 Shavell Report (JX-221), ¶ 23).

22.     *Tenant Improvements.*  This Court has held that Plaintiffs cannot recover the tenant improvements that had been made to the World Trade Center Buildings as of September 11, 2001, and that were not included in the calculation of Plaintiffs' leasehold damages, on the ground that they are replacement costs for which the Aviation Defendants cannot be held liable in tort.

> (*See* Aug. 14, 2012 Levy  Decl. (JX-391), ¶ 18; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448; Apr. 12, 2013 Shavell Report (JX-221), ¶ 24).

23.     Based on this Court's prior rulings, tenant improvements in the amount of $371,400,000 for the 7WTC Building cannot be a component of any potential damages award issued by a jury in this case.

> (Aug. 14, 2012 Levy Decl. (JX-391), ¶ 18; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448; Apr. 12, 2013 Shavell Report (JX-221), ¶ 24).

24.     *Mortgage Interest Carrying Costs.*  Based on the Court's prior rulings, any potential damages award will not include the $200,883,571.53 in mortgage interest carrying costs that 7WTCo. had to pay during the time that the new 7WTC Building was under construction.

(*See* Aug. 14, 2012 Levy Decl. (JX-391), ¶ 17; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448; Apr. 12, 2013 Shavell Report (JX-221), ¶ 23).

25.    *Costs Incurred in Pursuing Insurance Claims.*  Based on the Court's prior rulings, Plaintiffs cannot recover as damages the costs and fees that they incurred in order to obtain their insurance recoveries, but such amounts may "serve to reduce [their] net insurance recovery."

(*In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448-49; Summary Order Regarding Motion for Collateral Setoff and Summary Judgment, dated Sept. 30, 2009 ("Sept. 30, 2009 Order"), at 2).

26.    The WTCP Plaintiffs paid $41,383,011, and 7WTCo. paid $1,587,410, in claims preparation fees relating to the destruction of the World Trade Center Buildings. Of the $41,383,011 in claims preparation fees paid by the WTCP Plaintiffs, $31,030,471 was paid in fees and costs associated with an appraisal provided for in the WTCP Plaintiffs' insurance program.

(*See* Agreed Statement of Stipulated Facts, ¶¶ 87, 87(a), 141).

27.    *Insurance Premiums.*  Based on the Court's prior rulings, insurance premiums that Plaintiffs paid during the two-year period immediately preceding September 11, 2001, are not damages recoverable in tort, but, rather, the premium payments "serve to reduce [Plaintiffs'] net insurance recoveries."

(*In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449; Sept. 30, 2009 Order, at 2).

28.    During the two-year period immediately preceding September 11, 2001, the WTCP Plaintiffs paid $5,898,714 in insurance premiums for property insurance coverage, and 7WTCo. paid $482,793 in insurance premiums for property insurance coverage and $3,500.17 in premiums for fine arts insurance coverage.

(*See* Agreed Statement of Stipulated Facts, ¶¶ 5, 95).

### C.   Plaintiffs' Potential Personal Property Damages

29.     The WTCP Plaintiffs claim to have suffered at least $1 million in potential personal property damages, representing the value of furniture, computers, office supplies, equipment, tools, and other personal property items that were located in the Main Site Buildings and were destroyed on 9/11.

(*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 31-32).

30.     When the 7WTC Building was destroyed on September 11, 2001, 7WTCo. lost two paintings, together worth $1 million, that had been separately insured under a fine arts insurance policy, plus an additional $1,846,139.43 in other personal property items.

(*See* Agreed Statement of Stipulated Facts, ¶¶ 142, 124, 128; Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 31-32; Aug. 14, 2012 Levy Decl. (JX-391), ¶¶ 12-14; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449).

### D.   Prejudgment Interest

31.     Plaintiffs have asserted claims for prejudgment interest based on the Aviation Defendants' failure to make full payment for more than a decade.

(*See* Flight 11 Complaint, 08 Civ. 3722 (JX-229), ¶ 4; Flight 175 Complaint, 08 Civ. 3719 (JX-230), ¶ 4).

## II.   The Payments That Plaintiffs Received From Their Insurers

### A.   Property Insurance Overview

32.     The purpose of commercial property insurance is to protect the insured company from loss of its insurable interest in property used by the company as well as any resultant loss of income.

(*See* Expert Report of Jeffrey G. McKinley, CPCU, dated Apr. 12, 2013 (JX-173) ("McKinley Report"), p. 5).

33.     Many different property insurance forms are available for insuring commercial property.

(*See* McKinley Report (JX-173), p. 5).

34.     Used as a general term, commercial property insurance includes all types of insurance covering (a) property losses, commonly referred to as Property Damage, and (b) income loss and ongoing expense, commonly referred to as Time Element.

(*See* McKinley Report (JX-173), p. 5).

35.     The types of property covered by Property Damage forms commonly include three broad categories of property:  (a) buildings; (b) personal property of the insured; and (c) personal property of others.

(*See* McKinley Report (JX-173), p. 6).

36.     The types of income covered by Time Element forms commonly include three broad categories of income and expense:  (a) Business Income, also referred to as Business Interruption; (b) Extra Expense; and (c) Rental Income.

(*See* McKinley Report (JX-173), p. 6).

### 1.     Property Damage And Time Element Coverages Are Fundamentally Different

37.     Property Damage and Time Element coverages are fundamentally different and separate from one another.

(*See* McKinley Report (JX-173), pp. 4, 6, 7, 10, 26; Revised Expert Report of Edward R. Reilly, Jr., dated Apr. 23, 2013 (JX-1) ("Apr. 23, 2013 Reilly Report"), ¶¶ 4, 7).

38.     Property Damage and Time Element coverages insure different types of risks, are marketed, priced and rated separately by insurance companies, and are not fungible or interchangeable in that they do not insure the same losses.

(*See* McKinley Report (JX-173), pp. 4, 6, 7, 10, 26; Apr. 23, 2013 Reilly Report (JX-1), ¶¶ 4, 7).

39.     Property Damage coverage is intended to indemnify an insured for the loss of or damage to real and personal property.

(*See* McKinley Report (JX-173), p. 26; Apr. 23, 2013 Reilly Report (JX-1), ¶ 7).

40.     Time Element coverage is intended to indemnify an insured for lost rental income and other business interruption losses.

(*See* McKinley Report (JX-173), p. 26; Apr. 23, 2013 Reilly Report (JX-1), ¶ 7).

41.     Property Damage coverages do not indemnify the insured for business interruption or rental income losses and Time Element coverages do not indemnify the insured for any damage to real or personal property.

(*See* McKinley Report (JX-173), p. 6; Apr. 23, 2013 Reilly Report (JX-1), ¶ 8; *Citizen Savings & Loan Ass'n of NY v. Proprietors Ins. Co.*, 78 A.D.2d 377, 380, 435 N.Y.S.2d 303, 306 (2d Dep't 1981)).

42.     Insurance policies typically cover Property Damage and Time Element on separate forms or as separate parts of the same form.

(*See* McKinley Report (JX-173), p. 6).

43.     Policy limits can be stated separately or on a combined basis.  When policy limits are stated on a combined basis, they are commonly referred to as a Blanket Limit.

(*See* McKinley Report (JX-173), pp. 6-7).

44.     Time Element forms generally include coverage both for business income (also sometimes referred to as business interruption) losses and rental income losses.

(*See* McKinley Report (JX-173), pp. 7-8).

45.     Business income coverage generally insures the net income that would have been earned, plus incurred continuing normal operating expenses, including payroll.

(*See* McKinley Report (JX-173), p. 7).

46.     Rental income coverage generally insures the loss of anticipated rental income from the insured's tenants, as well as all charges that are the legal obligations of the insured and of those of its tenants that would otherwise be the insured's obligation, e.g., real estate taxes and charges for electrical services.

(*See* McKinley Report (JX-173), pp. 7-8).

47.     When an insured chooses to rebuild and recovers replacement cost insurance proceeds, the insured is not required to re-lease the rebuilt building to new tenants.

(*See* McKinley Report (JX-173), p.10).

48.     An insured's right to receive and retain replacement cost insurance proceeds is not dependent in any way upon its rental income losses.

(*See* McKinley Report (JX-173), p. 10).

49.     Replacement cost insurance proceeds do not "duplicate" lost rental income damages.

(*See* Connors Report (JX-222), ¶¶ 10, 12).

## 2.     The Claims Adjustment Process

50.     As part of the claims adjustment process, the insured typically submits preliminary proofs of partial losses, or interim proofs of partial losses, to the insurer.

(*See* McKinley Report (JX-173), p. 11).

51.     If the insurance provides different categories of coverages, the preliminary proofs of partial losses will commonly set forth the claims for some or all of the covered categories of loss.

(*See* McKinley Report (JX-173), p. 11).

52.     It is the insurance industry's custom and practice for policies providing Blanket Property Damage and Time Element coverage that if a category of loss, such as a Property Damage loss, exceeds the insurance policy blanket limits, an insurer will not require the insured to quantify each and every other category of covered loss, such as Time Element losses, since the Property Damage loss, by itself, exhausts the blanket policy limits.

(*See* McKinley Report (JX-173), p. 12; Apr. 23, 2013 Reilly Report (JX-1), ¶¶ 11-12).

53.     It would be an unnecessary exercise for the insured and insurer to go through the steps of quantifying every covered loss, for example, through an appraisal, when it is clear that one category of covered loss, *e.g.*, real property loss, constitutes a policy limits loss, and insurers often refrain from demanding proof and quantification of other covered losses.

(*See* McKinley Report (JX-173), p. 12; Apr. 23, 2013 Reilly Report (JX-1), ¶¶ 11-12).

54.     Commonly, policy limits loss payments include payment for all covered losses under the policy, whether or not claimed and whether or not proof and quantification have been provided.

(*See* McKinley Report (JX-173), p. 11).

55.     During the claims adjustment process, an insurer generally will advance funds to its insured based on preliminary proofs of partial losses.

(*See* McKinley Report (JX-173), p. 11).

56.     Depending on the scope of the losses, especially where it appears that total losses will exceed policy limits, unless otherwise expressly stated, advances are made without prejudice, on account, and under a reservation of rights, subject to final adjustment of the insured's losses.

(*See* McKinley Report (JX-173), p. 11).

57.     It is the custom and practice in the insurance industry that, unless the insurer and insured specifically agree that a partial payment is being made in respect of a specific covered loss or category of loss, payments made by an insurer before final adjustment of an insured's claims are not allocated by the insurer and insured to any specific category of loss.

(*See* McKinley Report (JX-173), p. 12).

58.     It is the custom and practice in the insurance industry that there is no agreed allocation of insurance payments by the insurer and insured to specific covered losses in the event of a policy limits loss, that is, where it is clear that the insured's losses exceed the stated policy limits in the insurance policy.

(*See* McKinley Report (JX-173), p. 12).

59.     The main reason why there is no agreed allocation of insurance payments by the insurer and insured to specific covered losses in the event of a policy limits loss is that it would needlessly complicate and delay the claim settlement process.

(*See* McKinley Report (JX-173), p. 12).

60.     An insurer may undertake its own an internal allocation of its loss payment to a specific category of loss for any number of reasons, including reasons related to its rates, premiums, reinsurance considerations and loss reserves.

(*See* McKinley Report (JX-173), p. 12).

61.     At times, internal allocations by an insurer may be unrelated to the actual amount of any covered loss sustained by the insured.

(*See* McKinley Report (JX-173), p. 12).

62.     Internal allocations by an insurer are rarely, if ever, communicated to the insured.

(*See* McKinley Report (JX-173), p. 12).

63.     Unless the parties otherwise resolve the insured's claims, final adjustment of the losses insured by the policy require that the insured submit and the insurer accept and approve a final proof of loss.

(*See* McKinley Report (JX-173), p. 11).

64.     If the insurer and the insured disagree about the value of a claim, property insurance policies often provide that either the insurer or the insured has the right to demand an appraisal of the loss.  Appraisals are not insurance coverage litigation.  In fact, they are not litigation at all.

(*See* McKinley Report (JX-173), p. 10).

65.     If an appraisal is initiated, unless the parties otherwise resolve the insured's claims, final adjustment of the insured's claims does not occur until the appraisal concludes.  An appraisal is part of the claims adjustment process.

(*See* McKinley Report (JX-173), p. 11).

3.   **The Settlement Of Coverage Litigation**
**Supersedes The Claims Adjustment Process**

66.   Where a claims adjustment process is not proceeding in a satisfactory manner, generally because of disputes as to coverage and/or valuation of covered losses, an insured sometimes will bring a lawsuit to resolve its claims in court, rather than through the adjustment process.

(*See* McKinley Report (JX-173), p. 13).

67.   A lawsuit by an insured against its insurer often seeks relief in addition to what the insured is entitled to under the insurance policy, such as claims for bad faith and prejudgment interest.

(*See* McKinley Report (JX-173), p. 13).

68.   Where an insurer settles with an insured outside of the claims adjustment process, for example, as part of the settlement of coverage litigation, the settlement supersedes the adjustment process and any appraisal.

(*See* McKinley Report (JX-173), p. 13; Apr. 23, 2013 Reilly Report (JX-1), ¶ 5).

69.   If there is a written settlement agreement, the terms of that agreement control.

(*See* McKinley Report (JX-173), p. 13).

70.   It is the industry's custom and practice in policy limit insurance settlements for the settlement terms to include a release of all possible claims under the policy, as well as any extra-contractual claims that may have been asserted by the insured, such as bad faith claims and claims for prejudgment interest.

(*See* McKinley Report (JX-173), pp. 13, 18).

**B.**     **Plaintiffs' Insurance Contracts All Covered The Loss Of Or Damage To Real and Personal Property, Lost Rental Income, Lost Business Income, and Extra Expense, Among Other Coverages**

        **1.**     **7WTCo.'s Policy With IRI**

71.     The property insurance policy covering 7WTCo. on September 11, 2001, was IRI policy number 31-3-67626, policy period:  June 1, 2001 to June 1, 2002 (the "7WTCo. IRI Policy").

> (*See* 7WTCo. IRI Policy (JX-175), at WTCP0389434; McKinley Report (JX-173), p. 8; Agreed Statement of Stipulated Facts, ¶ 89).

72.     7WTCo.'s fine arts losses were covered by a separate fine arts insurance policy with AXA Nordstern Art Insurance Corporation.

> (*See* Agreed Statement of Stipulated Facts, ¶ 142; McKinley Report (JX-173), p. 8 n.3).

73.     As of September 11, 2001, 7WTCo.'s fine arts insurance policy provided 7WTCo. with $700,000 in coverage for two Frank Stella acrylic paintings (the "Paintings"), which were destroyed on 9/11.

> (*See* Agreed Statement of Stipulated Facts, ¶ 142; McKinley Report (JX-173), p. 8 n.3).

74.     7WTCo.'s appraiser appraised the Paintings' value, as of September 11, 2001, to be $1 million.

> (*See* Agreed Statement of Stipulated Facts, ¶ 142).

75.     7WTCo.'s policy with IRI was a Blanket Commercial Property Policy with a combined blanket policy limit for Property Damage and Time Element (Rental Income and Extra Expense) of $860,068,000 per occurrence.

> (*See* McKinley Report (JX-173), p. 8; 7WTCo. IRI Policy (JX-175), at WTCP0389434; Agreed Statement of Stipulated Facts, ¶ 91).

76.     The Property Damage and Time Element coverages under the 7WTCo.
IRI Policy were separate and distinct types of coverage.

(*See* McKinley Report (JX-173), p.10).

77.     Under the 7WTCo. IRI Policy, 7WTCo. had coverage for the loss of or
damage to several different categories of property, including among others, real property,
personal property, and tenant improvements.

(*See* 7WTCo. IRI Policy (JX-175), at WTCP0389379-85, 0389406-07; McKinley
Report (JX-173), pp. 8-9, 23).

78.     7WTCo. paid an additional premium and purchased replacement cost
insurance, which was provided in Endorsement No. 8.

(*See* 7WTCo. IRI Policy (JX-175), at WTCP0389406-07; McKinley Report (JX-
173), p. 8; Agreed Statement of Stipulated Facts, ¶ 93).

79.     Based on the nature of 7WTCo.'s business of renting commercial office
space, 7WTCo. purchased "Rent Insurance" and "Extra Expense" coverages.

(*See* 7WTCo. IRI Policy (JX-175), at WTCP0389386-88; McKinley Report (JX-
173), p. 9).

80.     The Rent Insurance and Extra Expense coverages were provided in
Coverage Part C and Coverage Part D of the 7WTCo. IRI Policy, which were entirely
separate parts of the policy from the Part A Property Damage coverages.

(*See* 7WTCo. IRI Policy (JX-175), at WTCP0389386-88; McKinley Report (JX-
173), p. 9).

81.     The Rent Insurance coverage under Coverage Part D insured "the Rental
Value of real property," which included coverage for the loss of 7WTCo.'s anticipated
rental income from tenants.

(*See* 7WTCo. IRI Policy (JX-175), at WTCP0389388; McKinley Report (JX-
173), pp. 9-10).

82.    The Extra Expense coverage under Coverage Part C insured 7WTCo. for the "excess (if any) of the total cost incurred during the period of restoration chargeable to the operation of the Insured's business, over and above the total cost that would normally have been incurred to conduct the business during the same period had no damage occurred."

(*See* 7WTCo. IRI Policy (JX-175), at WTCP0389386; McKinley Report (JX-173), p. 10).

83.    The excess re-tenanting costs that 7WTCo. incurred as a result of the destruction of the 7WTC Building on 9/11 qualify as an Extra Expense under the 7WTCo. IRI Policy.

(*See* McKinley Report (JX-173), p. 20-21).

84.    The mortgage interest carrying costs that 7WTCo. had to pay during the time that the new 7WTC Building was under construction were covered as a continuing expense under the Time Element coverages of the 7WTCo. IRI Policy.

(*See* McKinley Report (JX-173), p. 24).

85.    The 7WTCo. policy with IRI did not cover prejudgment interest.

(*See* McKinley Report (JX-173), pp. 10-11).

## 2.    **The WTC Insurance Program**

86.    The WTCP Plaintiffs' property insurance coverage was provided by the following insurance companies in a layered program, with different insurers on the risk at different levels in different amounts (the "WTC Insurance Program"):  ACE Bermuda Insurance Ltd. ("ACE"); Allianz Global Risks US Insurance Company ("Allianz"); The Copenhagen Reinsurance Company (UK) Ltd. ("Copenhagen Re"); Employers Insurance

of Wausau ("Wausau"); Federal Insurance Company ("Federal"); Great Lakes

Reinsurance (UK) plc ("Great Lakes"); Gulf Insurance Company ("Gulf"); Hartford Fire

Insurance Company ("Hartford"); Houston Casualty Company ("Houston"); Industrial

Risk Insurers ("IRI"); Lexington Insurance Company ("Lexington"); Lloyd's syndicates

numbered 33, 79, 190, 376, 435, 506, 609, 623, 1003, 1009, 1096, 1212, 1225, 1229,

1243, 2001, 2003, 2020, 2027, 2488, and 2791; QBE International Insurance Ltd.

("QBE"); Royal Indemnity Company ("Royal") through its Royal & SunAlliance Risk

Management & Global Division ("Royal Global") and through its affiliate Royal

Specialty Underwriting Inc. ("Royal Specialty"); SR International Business Insurance

Company ("SRI"); St. Paul Fire & Marine Insurance Company ("St. Paul"); Swiss

Reinsurance Company (UK) Ltd. ("Swiss Re"); TIG Insurance Company ("TIG"); Tokio

Marine & Fire Insurance Company ("Tokio Marine"); Travelers Indemnity Company

("Travelers"); Twin City Fire Insurance Company ("Twin City"); Württembergische

Versicherung AG ("Württembergische"); XL Insurance Ltd. ("XL"); and Zurich

American Insurance Company ("Zurich").

(*See* Agreed Statement of Stipulated Facts, ¶ 7).

87.     The WTCP Plaintiffs purchased property insurance in the aggregate

amount of $3.5468 billion per occurrence.

(*See* Agreed Statement of Stipulated Facts, ¶ 4).

88.     With the exception of two insurance policies issued by Allianz – the

Allianz/SCOR policy and the Allianz direct policy (the "Allianz Policies") – none of the

insurers participating in the WTC Insurance Program had issued insurance policies by

September 11, 2001.

(*See* Agreed Statement of Stipulated Facts, ¶ 9).

89.    The insurers other than Allianz had bound coverage based on binders or slips, *i.e.*, temporary contracts of insurance.

(*See* Agreed Statement of Stipulated Facts, ¶ 9; Aug. 18, 2009 Levy Decl. (JX-92), ¶ 7).

90.    The terms and conditions of coverage provided by each insurer were set forth in one of seven separate insurance policy forms.

(*See* Agreed Statement of Stipulated Facts, ¶ 10).

91.    Most insurers, including Copenhagen Re; Wausau; Federal; Great Lakes; Hartford; Houston; Lexington; Lloyd's syndicates numbered 33, 79, 190, 376, 435, 506, 609, 623, 1003, 1009, 1096, 1212, 1225, 1229, 1243, 2001, 2003, 2020, 2027, 2488, and 2791; QBE; Royal, with respect to Royal Global; SRI; St. Paul; Swiss Re; and Württembergische, provided coverage that followed the WilProp 2000 policy form (the "WilProp Form").

(*See* Agreed Statement of Stipulated Facts, ¶ 10).

92.    Allianz, Gulf, Travelers, and Zurich followed the Travelers Insurance Companies' policy form (the "Travelers Form").

(*See* Agreed Statement of Stipulated Facts, ¶ 11).

93.    It was disputed whether ACE and XL followed the WilProp Form or the Travelers Form.  Twin City followed the Hartford Insurance Company's All Risk Form (the "Hartford Form").

(*See* Agreed Statement of Stipulated Facts, ¶¶ 12, 13).

94.    Tokio Marine and TIG followed their own respective forms (the "Tokio Marine Form" and "TIG Form," respectively).

(*See* Agreed Statement of Stipulated Facts, ¶ 14).

95.     Royal, with respect to Royal Specialty, followed the Insurance Services Office, Inc. policy form (the "ISO Form").

(*See* Agreed Statement of Stipulated Facts, ¶ 15).

96.     IRI followed its own form (the "IRI Form").

(*See* Agreed Statement of Stipulated Facts, ¶ 16).

97.     Although the specific terms and conditions of coverage varied depending upon which policy form a particular insurer followed, all of the insurers participating in the WTC Insurance Program provided coverage for the loss of or damage to several different categories of property, including among others, real property, personal property, and tenant improvements.

> (*See* WilProp Form (JX-38), at WTCP0010401-03; Travelers Form (JX-39), at WTCP0238547-53; Hartford Form (JX-40), at HA003023; Tokio Marine Form (JX-43), at TM00767; TIG Form (JX-44), at WTCP0356217; ISO Form (JX-41), at WTCP0356228; IRI Form (JX-42), at WTCP0010344).

98.     Like 7WTCo., the WTCP Plaintiffs purchased replacement cost insurance from all of their insurers.

> (*See* WilProp Form (JX-38), at WTCP0010415; Travelers Form (JX-39), at WTCP0238545, WTCP0238610-12; Hartford Binder (JX-115), at HA000230; ISO Form (JX-41), at WTCP0356239-40; IRI Form (JX-42), at WTCP0010354-55; Tokio Marine Form (JX-43), at TM00793-94; TIG Form (JX-44), at WTCP0356222; TIG Binder (JX-144), at TIG00496).

99.     Like 7WTCo., the WTCP Plaintiffs purchased various Time Element coverages from all of their insurers, which were separate and distinct from the Property Damage coverages.  Although the names of the coverages, and the specific terms and conditions, varied from insurer to insurer, the Time Element coverages in the WTC

Insurance Program included coverages for the loss of anticipated rental income from tenants, lost business profits, and extra expense.

> (*See* WilProp Form (JX-38), at WTCP0010403-09, WTCP001409-12; Travelers Form (JX-39), at WTCP0238541-42, WTCP0238561-66, WTCP0238620; Hartford Binder (JX-115), at HA 000230; ISO Form (JX-41), at WTCP 0356260-67; IRI Form (JX-42), at WTCP 0010319, WTCP 0010334, WTCP 0010339-43, WTCP 0010352-53; Tokio Marine Form (JX-43), at TM 00738, TM 00757, TM 00762-66; TIG Binder (JX-144), at TIG 00495).

100.     The excess re-tenanting costs that the WTCP Plaintiffs incurred as a result of the destruction of the Main Site Buildings on 9/11 were covered as an Extra Expense under the WTC Insurance Program.

> (*See* WilProp Form (JX-38), at WTCP0010406; Travelers Form (JX-39), at WTCP0238567-70; Hartford Binder (JX-115), at HA 000230; ISO Form (JX-41), at WTCP 0356260-61; Tokio Marine Form (JX-43), at TM 00735, TM 00765, TM 00775-76; TIG Form (JX-44), at WTCP 0356218; TIG Binder (JX-144), at TIG 00495).

101.     Only those insurers that followed the WilProp Form provided the WTCP Plaintiffs with coverage for prejudgment interest.

> (*See* WilProp Form (JX-38), at WTCP0010424-25).

102.     The insurers participating in the WTC Insurance Program provided coverage for the advance, non-refundable Initial Rent Payment in the amount of $491 million, which the WTCP Plaintiffs were required to make under the leases with the Port Authority, only if the Port Authority cancelled the leases.

> (*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶ 30; WilProp Form (JX-38), at WTCP0010407-08; Travelers Form (JX-39), at WTCP0238571).

103.     The Port Authority never cancelled the leases here.

> (*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶ 30).

**C.      After 9/11, Plaintiffs Submitted Claims
             To Their Insurers For All Covered Losses**

**1.      The Claims Adjustment Process For 7WTCo.'s Losses**

104.     7WTCo. submitted one Interim Proof of Partial Losses and one

supplement to the Interim Proof of Partial Losses, along with supporting documentation,

to IRI.

> (*See* Agreed Statement of Stipulated Facts, ¶ 118-23); McKinley Report (JX-173),
> p. 13-14).

105.     On or about March 3, 2003, 7WTCo. presented to IRI a Sworn Statement

– Interim Proof of Partial Losses, dated February 27, 2003 (the "Feb. 27, 2003 Interim

Proof of Partial Losses").

> (*See* Agreed Statement of Stipulated Facts, ¶ 118; Feb. 27, 2003 Interim Proof of
> Partial Losses (JX-209)).

106.     In the Feb. 27, 2003 Interim Proof of Partial Losses, 7WTCo. claimed that

it had "suffered and continue[d] to suffer substantial business income and other losses"

and that it had estimated its business income and time element losses would be

approximately $441,698,256.

> (*See* Agreed Statement of Stipulated Facts, ¶ 121; Feb. 27, 2003 Interim Proof of
> Partial Losses (JX-209), at WTCP0381641; WTC 7 Partial Claim Summary (JX-
> 206), at WTCP0391835).

107.     The $441,698,256 that the WTCP Plaintiffs claimed as time element

losses was supported by a Partial Claim Summary & Supporting Documentation ("WTC

7 Partial Claim Summary") that was prepared by Cambridge Horizon and submitted to

IRI and IRI's claims adjuster on or about January 23, 2002.

> (*See* Agreed Statement of Stipulated Facts, ¶¶ 99, 122; Feb. 27, 2003 Interim
> Proof of Partial Losses (JX-209), at WTCP0381641-42; WTC 7 Partial Claim
> Summary (JX-206), at WTCP0391835).

24

108.   The WTC 7 Partial Claim Summary, which was "Subject to Revision," calculated claims for Rental Value:  Period of Indemnity in the amount of $321,593,692, Rental Value:  Extended Period of Indemnity [1 Year] in the amount of $33,811,612, and Mitigating Expenses in the amount of $86,292,953.  Those three claim elements totaled $441,698,256.

(*See* Agreed Statement of Stipulated Facts, ¶¶ 100, 102; WTC 7 Partial Claim Summary (JX-206), at WTCP0391835).

109.   7WTCo. stated in the Feb. 27, 2003 Interim Proof of Partial Losses that it was "rebuilding and replacing 7 World Trade Center" and that it, therefore, was claiming replacement cost coverage.

(*See* Agreed Statement of Stipulated Facts, ¶ 20; Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP0381641).

110.   In a Supplement to WTC 7 Partial Claim Summary, Cambridge Horizon had estimated the cost of replacing the 7WTC Building, "as it existed immediately prior to the events of September 11, 2001," to be $1,053,399,635.  That estimate was based on "construction costs as of September 11, 2001."

(*See* Agreed Statement of Stipulated Facts, ¶ 101, 117; Supplement to WTC 7 Partial Claim Summary (JX-210), at WTCP0390548, WTCP0390551).

111.   In the Feb. 27, 2003 Interim Proof of Partial Losses, 7WTCo. also claimed "prejudgment interest on all amounts claimed hereunder to the maximum extent provided in the Policy or under applicable law."

(*See* Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP0381642).

112.   The Feb. 27, 2003 Interim Proof of Partial Losses contained a "Mutual Non-Waiver" clause, indicating that nothing in the Interim Proof of Partial Losses "shall

vary any of the rights or obligations" of 7WTCo. or IRI, and that the filing of the Interim Proof of Partial Losses and the payment of any amounts by IRI in response "shall be without prejudice."

(*See* Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP0381642).

113.    The Interim Proof of Partial Losses stated that it did not "prejudice the Insured's right to recover business income or other insured losses," that the Interim Proof of Partial Losses "does not address certain other losses incurred," and that "nothing herein shall prejudice any covered party's right to recover for such other losses."

(*See* Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP0381642).

114.    In the Feb. 27, 2003 Interim Proof of Partial Losses, 7WTCo. specifically reserved its rights to file additional claims, stating that it "intend[ed] to submit claims, from time to time, for specific amounts due to the Insureds in connection with the rebuilding and replacement of 7 World Trade Center," and that the "Insureds have made and will continue to make . . . claims for insured loss including without limitation such business income and other time element losses and may make future claims for certain other covered property, costs, liabilities and expenses."

(*See* Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP0381641-42).

115.    A proof of loss expressly denominated as "Interim" or "Preliminary," or one with a reservation of the right to make future claims for other losses, is universally understood not to be the complete, final, or conclusive proof of the insured's loss.

(*See* McKinley Report (JX-173), at 14).

116.    On or about March 11, 2003, 7WTCo. submitted to IRI a Sworn Statement – Supplement to Proof of Loss ("Supplement to Interim Proof of Losses").

(*See* Agreed Statement of Stipulated Facts, ¶ 123; Supplement to Interim Proof of Losses (JX-212)).

117.    The Supplement to Interim Proof of Losses supplemented the Feb. 27, 2003 Interim Proof of Partial Losses to include a claim for the cost of replacing certain personal property and other items in the amount of $1,088,135.

(*See* Agreed Statement of Stipulated Facts, ¶ 123; Supplement to Interim Proof of Losses (JX-212), at WTCP 0390510).

118.    On or about March 28, 2003, 7WTCo. submitted to IRI a Personal Property Claim Summary and Supporting Documentation, which increased 7WTCo.'s claim for personal property to $1,846,139.43.

(*See* Agreed Statement of Stipulated Facts, ¶ 124; Personal Property Claim Summary and Supporting Documentation (JX-213), at WTCP0391462).

119.    The Supplement to Interim Proof of Losses included substantially the same "Non-Waiver" language that appeared in the Feb. 27, 2003 Interim Proof of Partial Losses.

(*See* Supplement to Interim Proof of Losses (JX-212), at WTCP0390510).

120.    As with the Feb. 27, 2003 Interim Proof of Partial Losses, the Supplement to Interim Proof of Losses stated that it did "not address certain other losses incurred, and nothing herein shall prejudice any covered party's right to recover for such other losses."

(*See* Supplement to Interim Proof of Losses (JX-212), at WTCP0390510).

121.    The Interim Proof of Partial Losses incorporated all of the claims that had been set forth in the WTC 7 Partial Claim Summary prepared by Cambridge Horizon, including all of the claims that were listed as "TBD," or "To Be Determined."

(*See* Agreed Statement of Stipulated Facts, ¶¶ 103, 122; WTC 7 Partial Claim Summary (JX-206), at WTCP0391835).

122.     Among the items listed as "TBD" in the WTC 7 Partial Claim Summary was 7WTCo.'s Extra Expense losses.

> (*See* Agreed Statement of Stipulated Facts, ¶ 103; WTC 7 Partial Claim Summary (JX-206), at WTCP0391835).

123.     Before the adjustment process terminated and 7WTCo. and IRI settled, 7WTCo. had submitted and quantified claims of (i) $1,053,399,635 for replacement cost losses; (ii) $441,698,256 for time element losses; and (iii) $1,846,139 for personal property losses.  The total quantified losses claimed by 7WTCo. through the Interim Proof of Partial Losses and the Supplement were $1,496,944,030.

> (*See* Agreed Statement of Stipulated Facts, ¶¶ 125-28).

124.     Before the adjustment process terminated and 7WTCo. and IRI settled, 7WTCo. had submitted unquantified claims for Extra Expense and prejudgment interest, among other losses.

> (*See* McKinley Report (JX-173), p. 15; Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP0381642).

125.     The $1,496,944,030 in quantified losses far exceeds the policy limit of $860,068,000, and, thus, 7WTCo.'s claims constituted a policy limits loss.

> (*See* McKinley Report (JX-173), p. 15).

126.     In response to 7WTCo.'s loss claims, between October 2001 and November 2004, IRI paid 7WTCo. advances in the amount of $515,554,899.

> (*See* Agreed Statement of Stipulated Facts, ¶ 134).

127.     7WTCo. and IRI never agreed that those advances would be allocated to specific categories of loss.

> (No evidence to the contrary).

128.    The advance payments by IRI to 7WTCo. all were "without prejudice," as set forth in the Interim Proof of Partial Losses.

(*See* Feb. 27, 2003 Interim Proof of Partial Losses (JX-209), at WTCP 0381642).

129.    7WTCo.'s payment direction letters to IRI likewise included mutual reservations of rights.

(*See* Payment Direction Letters (JX-177-84, PX-518)).

130.    Certain of the payment direction letters stated that they did not constitute a waiver or release of any rights or obligations under the IRI policy.

(*See, e.g.*, Oct. 23, 2001 Payment Direction Letter (JX-176), at WTCP 0241192; Oct. 25, 2001 Payment Direction Letter (JX-518), at WTCP0398381).

131.    Other payment direction letters recited that "IRI is reserving all of its rights under the Policy, including, without limitation, its rights to question, dispute or deny any items and amounts for which any property damage claim may be made pursuant to the Policy," and that neither the payment of an advance by IRI nor the acceptance of the advance by 7WTCo. "shall constitute an election on the part of any party to treat such disbursement as having been on account of a 'replacement cost' or 'actual cash value' claim."

(*See, e.g.,* Dec. 18, 2002 Payment Direction Letter (JX-183), at WTCP 0390478; July 1, 2002 Payment Direction Letter (JX-179), at IRI 0000753)

132.    On March 28, 2003, in a letter from 7WTCo.'s counsel, Marc Wolinsky, Esq., 7WTCo. initiated an appraisal with IRI.

(*See* Agreed Statement of Stipulated Facts, ¶ 129; Mar. 28, 2003 Letter from Marc Wolinsky, Esq. (JX-215), at WTCP0389809).

133.    In addition to initiating an appraisal, in his March 28, 2003 letter, Mr.

Wolinsky accused IRI of not acting in "good faith" during the claims adjustment process

with respect to 7WTCo.'s claims.

>   (*See* Mar. 28, 2003 Letter from Marc Wolinsky, Esq. (JX-215), at
>   WTCP0389810).

134.    The appraisal was never concluded because 7WTCo. commenced

insurance coverage litigation against IRI.

>   (*See* Agreed Statement of Stipulated Facts, ¶¶ 129-30; McKinley Report (JX-
>   173), at pp. 15-16).

### 2.    The Claims Adjustment Process For The WTCP Plaintiffs' Losses

135.    As part of the claims adjustment process, the WTCP Plaintiffs submitted

to their property insurers 16 Sworn Statements – Preliminary Proofs of Partial Losses and

Proofs of Partial Losses, two supplements, and one corrected supplement.

>   (*See* Agreed Statement of Stipulated Facts, ¶ 47).

136.    Through their submissions to their insurers, the WTCP Plaintiffs claimed a

total of $1,347,805,679 for lost rental value/business income losses through December

31, 2007.

>   (*See* Apr. 23, 2013 Reilly Report (JX-1), ¶ 15).

137.    The WTCP Plaintiffs said that they "intend[ed] to rebuild or replace" the

WTC Complex and they, therefore, claimed $7,183,441,908 for replacement costs.

>   (*See* Agreed Statement of Stipulated Facts, ¶¶ 59, 61, 62; Sworn Statement – First
>   Supplement to Preliminary Proof of Partial Losses No. 2 (JX-4), at SILV 106
>   000073).

138.    The WTCP Plaintiffs' replacement cost claim was based on a replacement

cost budget estimate prepared by the WTCP Plaintiffs' construction consultant, Tishman

Construction Corporation, of the cost of replacing the WTC Complex "as it existed immediately prior to the events of September 11, 2001." That estimate was based on "construction costs as of September 11, 2001."

> (*See* Agreed Statement of Stipulated Facts, ¶ 62; Partial Claim Summary and Supporting Documentation, Books 1-4, prepared by Cambridge Horizon Consultants, Inc. (JX-5), at WTCP 0017701).

139.    The WTCP Plaintiffs claimed prejudgment interest "to the extent the Insurers delay paying the Insureds any amounts owing under the Policies or applicable law."

> (*See* Sworn Statement – First Supplement to Preliminary Proof of Partial Losses No. 2 (JX-4), SILV 106 000073).

140.    In the Cambridge Horizon Partial Claim Summary & Supporting Documentation, which accompanied the WTCP Plaintiffs' Sworn Statement – First Supplement to Preliminary Proof of Partial Losses No. 2, the WTCP Plaintiffs listed several additional losses as "TBD" or "To Be Determined," including "Business Personal Property" and "Additional Covered Costs & Expenses – Expediting Expenses; Claim Data Expenses; Tenant Move Back Expenses; Other Misc. Expenses."

> (*See* Agreed Statement of Stipulated Facts, ¶ 64).

141.    As was the case with 7WTCo., the Preliminary Proofs of Partial Losses and the Proofs of Partial Losses submitted by the WTCP Plaintiffs contained "Mutual Non-Waiver" clauses, indicating that neither the filing of the claim nor any payment in response "shall vary any of the rights and obligations" of the WTCP Plaintiffs or their insurers, and that the filing of the claim and any payment in response were "without prejudice."

(*See* Sworn Statement – Preliminary Proof of Partial Losses No. 1 (JX-2), at SILV 6 000160-61; Sworn Statement – Preliminary Proof of Partial Losses No. 2 (JX-3), at WTCP 0237996; Sworn Statement – Preliminary Proof of Partial Losses No. 3 (JX-6), at SILV 138 0000330; Sworn Statement – Preliminary Proof of Partial Losses No. 4 (JX-7), at WTCP 0356065; Sworn Statement – Preliminary Proof of Partial Losses No. 5 (JX-8), WTCP 0356078).

142.    Some of the Preliminary Proofs of Partial Losses expressly provided that any advance payments were "on an interim, on-account basis" and were "subject to final adjustment."

(*See* Sworn Statement – Preliminary Proof of Partial Losses No. 1 (JX-2), SILV 6 000160-61; Sworn Statement – Preliminary Proof of Partial Losses No. 2 (JX-3), at WTCP 0237996; Sworn Statement – Preliminary Proof of Partial Losses No. 3 (JX-6), at SILV 138 0000330; Sworn Statement – Preliminary Proof of Partial Losses No. 4 (JX-7), at WTCP 0356065; Sworn Statement – Preliminary Proof of Partial Losses No. 5 (JX-8), WTCP 0356078).

143.    Like 7WTCo., the WTCP Plaintiffs explicitly reserved their rights to file claims for additional losses in the future.  For example, in the Sworn Statement – First Supplement to Preliminary Proof of Partial Losses No. 2, the WTCP Plaintiffs said that they would "supplement their claim for business income and other losses from time to time" and that they planned to "make future claims for certain other covered property, costs and expenses."

(*See* Sworn Statement – First Supplement to Preliminary Proof of Partial Losses No. 2 (JX-4), at SILV 106 000073).

144.    The Sworn Statement – Preliminary Proof of Partial Losses No. 1 similarly stated that "[s]eparate proofs of losses with respect to other losses will be filed at a later date."

(*See* JX-2, at SILV 6 000160).

145.    In other submissions to their insurers, the WTCP Plaintiffs stated that "[s]eparate proofs of losses with respect to other business income and other losses have been separately filed and will be filed at later dates."

> (*See* JX-6, at SILV 138 0000330; JX-7, at WTCP 0356065; JX-8, at WTCP 0356078; JX-9, at WTCP 0356093; JX-10, at WTCP 0356108; JX-11, at WTCP 0356120; JX-12, at WTCP 0356133; JX-13, at WTCP 0356145; JX-14, at WTCP 0356156; JX-16, at WTCP 0356169; JX-17, at WTCP 0356182; JX-21, at WTCP 0356195).

146.    The Sworn Statement – Second Supplement to Preliminary Proof of Partial Losses No. 2 likewise said that nothing in the preliminary proof of partial losses "shall prejudice the Insureds' right to recover any other losses."

> (*See* JX-18, at WTCP0355999).

147.    In Proofs of Partial Losses Nos. 12 and 15, the WTCP Plaintiffs stated, "The Insureds intend to supplement this proof of partial losses with additional claims for Replacement and Other Costs."

> (*See* JX-15, at WTCP 0356027; JX-20, at WTCP 0356044).

148.    The WTCP Plaintiffs did not further update their claims, and further documentation was never required because early on, both the WTCP Plaintiffs and their insurers recognized that the replacement costs plus loss of rental income would far exceed the single occurrence policy limit of $3.5468 billion.

> (*See* Apr. 23, 2013 Reilly Report (JX-1), ¶¶ 11-12).

149.    Before final settlements were reached between the WTCP Plaintiffs and their insurers, some insurers paid advances to the WTCP Plaintiffs.

> (*See* Agreed Statement of Stipulated Facts, ¶¶ 52-56).

150.    The WTCP Plaintiffs and their insurers never agreed that any advances would be allocated to any specific categories of loss.

(No evidence to the contrary).

151.    Advances were "on an interim, on-account basis" and were "subject to final adjustment."

(*See* Sworn Statement – Preliminary Proof of Partial Losses No. 1 (JX-2), at SILV 6 000160; Sworn Statement – Preliminary Proof of Partial Losses No. 2 (JX-3), at WTCP 0237996; Sworn Statement – Preliminary Proof of Partial Losses No. 3 (JX-6), at SILV 138 0000330; Sworn Statement – Preliminary Proof of Partial Losses No. 4 (JX-7), at WTCP 0356065; Sworn Statement – Preliminary Proof of Partial Losses No. 5 (JX-8), at WTCP 0356078).

152.    In the payment direction letters that the WTCP Plaintiffs sent to their insurers, the WTCP Plaintiffs stated explicitly that the advances were "without prejudice to the position of any of the insurers under the subject policies as to the nature or characterization of such advances."

(*See* Oct. 30, 2001 Payment Direction Letter (JX-61), at SILV 6 000289; Apr. 11, 2002 Payment Direction Letter (JX-69), at SILV 140 0000026; June 17, 2002 Payment Direction Letter (JX-153), at WTCP 0355824; June 17, 2002 Payment Direction Letter (JX-154), at WTCP 0355831; Aug. 10, 2002 Payment Direction Letter (JX-155), at WTCP 0355838; May 19, 2003 Payment Direction Letter (JX-157), at WTCP 0355861; Aug. 6, 2003 Payment Direction Letter (JX-159), at WTCP 0355881; Dec. 5, 2003 Payment Direction Letter (JX-161), at WTCP 0355899; Apr. 26, 2005 Payment Direction Letter (JX-172), at WTCP 0355917; May 20, 2005 Payment Direction Letter (JX-163), at WTCP 0355926-27; Mar. 12, 2007 Payment Direction Letter (JX-171), at ALLI 27-020804; Apr. 5, 2007 Payment Direction Letter (JX-70), at ALLI 27-020843).

153.    In some instances, the WTCP Plaintiffs' insurers rejected the PPOPLs or IPOPLs, and said they were deficient or not applicable to a specific insurer or under review.  And when making advances, some insurers expressly stated that the payment was not being made based on the PPOPL or IPOPL.

(*See* Oct. 18, 2001 letter from Edward R. Reilly & Co., Inc. (JX-53); Oct. 18, 2001 letter from Royal Specialty (JX-54); Nov. 8, 2001 letter from Copenhagen Re (JX-55)).

154.     In 2002, the WTCP Plaintiffs proceeded to an appraisal with Allianz, Travelers, Gulf, IRI, and Royal (the "Appraising Insurers").

(*See* Agreed Statement of Stipulated Facts, ¶ 86).

155.     The Appraisal Panel was charged with determining the replacement cost of the WTC Complex, the actual cash value of the WTC Complex, and the WTCP Plaintiffs' rental value loss as a result of the destruction of the WTC Complex under any policy or form applicable to each of the Appraising Insurers.

(*See* Agreed Statement of Stipulated Facts, ¶ 86).

156.     As a result of settlements, the Appraising Insurers all withdrew from the appraisal before the Appraisal Panel reached a final determination on any of these issues.

(*See* Agreed Statement of Stipulated Facts, ¶ 86).

**D.     The Overwhelming Majority Of Plaintiffs' Claims Were Resolved Outside Of The Claims Adjustment Process, Through Litigation Settlements That Did Not Allocate Payments To Any Particular Categories Of Loss**

**1.     7WTCo.'s Coverage Litigation With IRI**

157.     On June 12, 2003, 7WTCo. filed a lawsuit against IRI in the matter of *7 World Trade Company, L.P. v. Industrial Risk Insurers and Westport Insurance Corporation*, 03 CV 4292 (S.D.N.Y.) (the "7WTCo. Coverage Litigation").

(Agreed Statement of Stipulated Facts, ¶ 130; Complaint in the 7WTCo. Coverage Litigation (JX-217)).

158.     The filing of the 7WTCo. Coverage Litigation interrupted the claims adjustment process with respect to 7WTCo.'s claims.

(*See* McKinley Report (JX-173), p. 16).

159.    The Complaint in the 7WTCo. Coverage Litigation asserted both contractual and extra-contractual claims.

(*See* Complaint in the 7WTCo. Coverage Litigation (JX-217), ¶¶ 38-49).

160.    7WTCo. asserted that IRI had breached the parties' insurance contract by, among other things, impermissibly attempting to deduct payments made for Rent Insurance losses under Coverage Part D from payments for covered losses under the Property Damage coverage provisions of Coverage Part A.

(*See* McKinley Report (JX-173), p. 16; Complaint in 7WTCo. Coverage Litigation (JX-217), ¶¶ 24-25, 31, 40-41, 45).

161.    7WTCo.'s Complaint alleged that, "[b]y letter dated January 24, 2003, IRI advised Silverstein and [7WTCo.] that IRI had determined that the ACV for the Building was only $440,800,000, and that IRI was prepared to pay that amount with deduction being made for $108,500,000 previously paid on account of Rent Insurance Coverage and property damage claims, resulting in a net payment of $332,275,000 after application of a $25,000 deductible.  IRI also stated that its ACV payment would be inclusive of any past and future claim for Rent Insurance Coverage."

(*See* Complaint in 7WTCo. Coverage Litigation (JX-217), ¶ 24).

162.    7WTCo. complained that "[t]he plain terms of the Insurance Policy require that Rent Insurance Coverage is to be paid in addition to any amounts due for property loss or damage, irrespective of whether such amounts are recovered on an ACV basis or Replacement Cost Coverage Basis."

(*See* Complaint in 7WTCo. Coverage Litigation (JX-217), ¶ 40).

163. 7WTCo. sought a declaration that payments under Coverage Part A and Coverage Part D were not for the same covered losses and that it was "entitled to receive Rent Insurance Coverage in addition to any amounts received for ACV or Replacement Cost Coverage."

(*See* Complaint in 7WTCo. Coverage Litigation (JX-217), p. 16).

164. In a December 5, 2003 stipulation entered into in the 7WTCo. Coverage Litigation, IRI eventually acknowledged "that insurance for lost rent under Coverage Part D Rent Insurance is separate from, and additional to, property damage coverage under [the] IRI insurance policy . . ., and that lost rent must therefore be calculated separately from Defendants' liability for property damage, whether such liability is measured by ACV or under the Replacement Coverage Endorsement."

(*See* December 5, 2003 Stipulation (JX-218), p. 2).

165. 7WTCo.'s claims in the 7WTCo. Coverage Litigation were not limited to only claims covered under 7WTCo.'s insurance policy with IRI.

(*See* Complaint in 7WTCo. Coverage Litigation (JX-217), ¶¶ 48-49).

166. In the 7WTCo. Coverage Litigation, 7WTCo. asserted extra-contractual claims for prejudgment interest from the date of the loss at a rate of nine percent per annum, and claims for consequential damages arising from IRI's breach of contract and wrongful conduct and delay in adjusting 7WTCo.'s losses.

(*See* Complaint in 7WTCo. Coverage Litigation (JX-217), ¶¶ 48-49).

167. On January 3, 2005, 7WTCo. and IRI entered into a Settlement Agreement and Release (the "7WTCo./IRI Settlement Agreement") resolving both the 7WTCo.

Coverage Litigation and any insurance claims arising from the destruction of the 7WTC
Building.

> (*See* Agreed Statement of Stipulated Facts, ¶ 135; 7WTCo./IRI Settlement
> Agreement (JX-205)).

168.    The 7WTCo./IRI Settlement Agreement recognized that IRI had
previously paid to 7WTCo., as an advance, $515,554,889 for property damage and rental
income losses.

> (*See* Agreed Statement of Stipulated Facts, ¶ 136; 7WTCo./IRI Settlement
> Agreement (JX-205), at WTCP0302819).

169.    As part of the 7WTCo./IRI Settlement Agreement, IRI agreed to pay
7WTCo. an additional $303,445,111, resulting in a total settlement payment of
$819,000,000.

> (*See* Agreed Statement of Stipulated Facts, ¶¶ 136, 138; 7WTCo./IRI Settlement
> Agreement (JX-205), at WTCP0302820).

170.    In accordance with industry custom and practice, the 7WTCo./IRI
Settlement Agreement included a release of all possible claims under the IRI policy as
well as any extra-contractual claims that were or could have been asserted by 7WTCo.

> (*See* 7WTCo./IRI Settlement Agreement (JX-205), at WTCP0302820-23;
> McKinley Report (JX-173), p. 18).

171.    The 7WTCo./IRI Settlement Agreement provided that the payment of
$819,000,000 "results in a complete and final settlement of all claims against IRI,
including those for property damage and rental income losses, associated with the Policy
that arise from or are related to the Destruction" of the 7WTC Building.  The settlement
of all claims associated with the IRI policy included settlement of 7WTCo.'s claims for
personal property losses.

(*See* Agreed Statement of Stipulated Facts, ¶ 137; 7WTCo./IRI Settlement
Agreement (JX-205), at WTCP0302820).

172.     The 7WTCo./IRI Settlement Agreement also required 7WTCo. to execute

a release that expressly stated that 7WTCo. "releases all claims," including claims for

damages and interest, and that the release "includes, but is not limited to, any claims

classified under the Policy as 'Property Damage,' 'Debris Removal,' or 'Rental Income'

and any other claims arising from or related in any way to IRI's handling of insurance

claims under the Policy . . . including but not limited to, claims and causes of action

asserted or [that] could have been asserted by Silverstein in the 7WTC Coverage

Litigation . . . ."

(*See* 7WTCo./IRI Settlement Agreement (JX-205), at WTCP0302823).

173.     No final proof of loss was required in connection with the settlement and,

thus, none was prepared or submitted.

(*See* Aug. 14, 2012 Levy Decl. (PX-521), ¶ 26).

174.     Consistent with industry custom and practice, the 7WTCo./IRI Settlement

Agreement did not apportion or allocate any portion of the total payment of $819,000,000

to any specific covered loss or extra-contractual claim.

(*See* Agreed Statement of Stipulated Facts, ¶ 138; 7WTCo./IRI Settlement
Agreement (JX-205); McKinley Report (JX-173), pp. 19-20).

175.     It is common practice in the insurance industry for an insurer not to

undertake reaching an agreement with the insured as to the specific allocation of

payments where the claim constitutes a policy limits loss or where the insurer makes a

payment in settlement of a loss that exceeded the policy limit.

(*See* McKinley Report (JX-173), pp. 19-20).

176.    Insurers generally do not undertake to reach an agreement with the insured as to an allocation where the claim constitutes a policy limits loss or where the insurer makes payment in settlement of a loss that exceeded the policy limit because it would create unnecessary confusion, particularly where, as here, the settlement payment was also made to resolve extra-contractual claims asserted in the coverage litigation. Commonly, insurers do not want to agree to an allocation in a settlement resolving all of the insured's claims, including bad faith and extra-contractual claims, because the insurer does not want to concede that it is paying money to release bad faith or other extra-contractual claims.  As a general rule, no insurer ever wants to admit paying any certain amount for releasing bad faith claims.

(McKinley Report (JX-173), pp. 19-20).

177.    According to Final Loss Handling Instructions that were created internally by IRI, IRI internally allocated $586,223,141.32 of the settlement payment to "PD" or Property Damage and $233,000,000 to "TE" or Time Element.

(*See* Agreed Statement of Stipulated Facts, ¶¶ 139-40; Loss Handling Instructions (JX-201)).

178.    The Final Loss Handling Instructions allocated more than 71% of the total recovery to Property Damage.

(*See* Apr. 12, 2013 Shavell Report (JX-221), Exh. S-3).

179.    The Final Loss Handling Instructions did not further allocate the $586,223,141.32 for "Property Damage" as between real and personal property.

(*See* Loss Handling Instructions (JX-201)).

180.    Based on the losses that were claimed and quantified by 7WTCo. in the

Interim Proofs of Partial Losses, 7WTCo.'s claim for personal property losses was 0.17

percent of its total claims for Property Damage.

(*See* Apr. 12, 2013 Shavell Report (JX-221), ¶ 16).

181.    The final Loss Handling Instructions include a handwritten notation

"82,917,309 shift to PD," referring to a change by IRI in its prior internal allocations.

(*See* Loss Handling Instructions (JX-201)).

182.    The $586,223,141.32 of the settlement amount that IRI internally allocated

to Property Damage includes $223,141.32 for insured losses occurring at 120 Wall Street,

a building completely separate from the 7WTC Building but also covered by the same

IRI policy, leaving a balance of $586,000,000 for losses occurring at 7 World Trade

Center.

(*See* McKinley Report (JX-173), p. 25 n.14; 7WTCo./IRI Settlement Agreement
(JX-205), at WTCP0302818-19).

183.    In the 7WTCo./IRI Settlement Agreement, IRI separately agreed, separate

from its settlement of all potential claims under the policy for $819,000,000, to pay to

7WTCo. 9.8% of any money that IRI recovered from the Aviation Defendants on its

subrogation claims to recoup the $819 million that IRI had paid to 7WTCo.  In exchange

for that agreement, 7WTCo. agreed to share, under certain circumstances, a portion of

any money it recovered from the Aviation Defendants.

(*See* 7WTCo./IRI Settlement Agreement (JX-205), at WTCP 0302826).

184.    In 2010, IRI entered into a settlement agreement with the Aviation

Defendants that settled IRI's subrogation claims.  Pursuant to the parties' sharing

agreement, IRI paid almost $12 million of its subrogation recovery from the Aviation

Defendants to 7WTCo. Those monies were not paid under the IRI insurance policy.

185.    Although Plaintiffs maintain that the almost $12 million payment is not a

collateral source payment because the Aviation Defendants themselves were the source

of the funds, paying them to IRI as part of the settlement of IRI's subrogation claims, this

Court has rejected that argument.

(*In re Sept. 11 Litig.*, 908 F. Supp. 2d at 444 and n.5).

186.    Even if the almost $12 million payment from IRI to 7WTCo. is treated as

though it were an insurance payment, there is no evidence that it was ever allocated to

any specific category or categories of loss.

### 2.    The Coverage Litigation And Settlements Involving The WTCP Plaintiffs And Their Insurers

187.    Very early on in the claims adjustment process, three of the WTCP

Plaintiffs' insurers in lower coverage levels – Hartford, Lexington, and Copenhagen Re –

acknowledged that covered losses would exceed the amount of insurance that they had

contracted to provide, whether paid on a one occurrence or two occurrence basis, and

paid their policy limits in November or December of 2001.

(*See* Agreed Statement of Stipulated Facts, ¶ 53).

188.    Hartford paid the WTCP Plaintiffs $32 million on December 4, 2001.

(*See* Agreed Statement of Stipulated Facts, ¶ 29, 53; Dec. 4, 2001 Letter (JX-62)).

189.    In the letter transmitting its $32 million payment, Hartford's counsel wrote

that the "payment [was] not made with respect to any particular element of loss incurred

by the insureds."

(*See* Dec. 4, 2001 Letter (JX-62)).

190.    Lexington and Copenhagen Re also paid their policy limits (of $5 million and $4 million, respectively) in late 2001.

(*See* Agreed Statement of Stipulated Facts, ¶¶ 24, 32, 53).

191.    There is no evidence of any agreed allocation of the payments by Lexington and Copenhagen Re to any specific categories of loss.

192.    In 2001, the WTCP Plaintiffs and those of their insurers that had not already paid their policy limits engaged in litigation in connection with WTCP's claims (the "WTCP Plaintiffs Coverage Litigation").

(*See* Agreed Statement of Stipulated Facts, ¶ 55).

193.    As was the case with 7WTCo.'s litigation with IRI, the claims adjustment process was interrupted when the WTCP Plaintiffs Coverage Litigation began.

(*See* Apr. 23, 2013 Reilly Report (JX-1), ¶¶ 5, 13).

194.    The WTCP Plaintiffs Coverage Litigation was resolved by means of settlements with individual insurers and groups of insurers.

(*See* Agreed Statement of Stipulated Facts, ¶ 83).

195.    Under the various settlement agreements (the "Settlement Agreements"), ACE paid a total of $298,000,000; Allianz paid a total of $870,157,468; Federal paid a total of $254,307,300; Wausau paid a total of $67,500,000; Great Lakes paid a total of $37,999,800; Gulf and Travelers paid a combined total of $538,501,899; Houston paid a total of $2,425,316; IRI paid a total of $474,476,800; Lloyd's syndicates numbered 33, 79, 190, 376, 435, 506, 609, 623, 1003, 1009, 1096, 1212, 1225, 1229, 1243, 2001, 2003, 2020, 2027, 2488, and 2791 paid a combined total of $665,326,583; QBE paid a total of $12,500,100; SRI and Swiss Re paid a combined total of $816,237,859; St. Paul paid a

total of $30,000,000; TIG paid a total of $21,635,000; Tokio Marine paid a total of

$3,500,000; Twin City paid a total of $6,040,000; Württembergische paid a total of

$13,541,993; XL paid a total of $66,800,000; Zurich paid a total of $95,340,000; Royal

paid a total of $50,404,557 with respect to Royal Global; and Royal paid a total of

$198,600,000 with respect to Royal Specialty.

      (*See* Agreed Statement of Stipulated Facts, ¶¶ 22-24).

      196.    Royal & SunAlliance Insurance Group plc paid $17,500,000 to the WTCP

Plaintiffs to settle a lawsuit in which the WTCP Plaintiffs sought to hold Royal &

SunAlliance Insurance Group plc liable for the obligations of its subsidiary, Royal, for

coverage written through Royal Specialty under the WTC Insurance Program.  Royal &

SunAlliance Insurance Group plc was the foreign parent of Royal.

      (Agreed Statement of Stipulated Facts, ¶ 45).

      197.    The $17,500,000 payment by Royal & SunAlliance Insurance Group plc

was made pursuant to a settlement that explicitly provided the payment was not "in

connection with any insurance contract, binder or advice of insurance issued" but rather

was "expressly for the purpose of settling and compromising" the WTCP Plaintiffs'

lawsuit.

      (Royal & Sun Alliance Insurance Group plc, RSA Overseas Holdings (No. 1 &
      No. 2) Settlement Agreement & Release, July 13, 2007 (JX-37), at
      WTCP0258116).

      198.    All of the settlement payments, plus the policy limits payments made by

Hartford, Lexington, and Copenhagen Re, total $4,581,794,675.  Of that amount,

$490,430,635 was paid to certain Westfield entities.  The WTCP Plaintiffs received the

remaining amount of $4,091,364,040.

(*See* Agreed Statement of Stipulated Facts, ¶ 46).

199.   The settlements exhausted, nearly exhausted, or exceeded, the coverage

limits to which each insurer subscribed.

(*See* JX-47, JX-48).

200.   As was the case with the 7WTCo./IRI Settlement Agreement, none of the

Settlement Agreements between the WTCP Plaintiffs and their various insurers

apportioned or allocated the settlement payments among specific categories of loss.

(*See* Agreed Statement of Stipulated Facts, ¶ 84).

201.   Almost all of the Settlement Agreements included a broad release of all

possible claims that were brought or could have been brought by the WTCP Plaintiffs,

including extra-contractual claims, such as claims for bad faith and prejudgment interest.

> (*See* Allianz Settlement Agreements (JX-34), at WTCP0015969-70; and (JX-35),
> at WTCP0016011-12; ACE Settlement Agreement (JX-22), at WTCP0257935;
> Settlement Agreement with XL (JX-23), at WTCP0257964-65; Settlement
> Agreement with Zurich (JX-30), at WTCP0258036; Settlement Agreement with
> Wausau (JX-31), at WTCP0358607-08; Settlement Agreement with TIG (JX-29),
> at WTCP0356350-51; Settlement Agreement with Twin City (JX-28), at
> WTCP0356361-62; Settlement Agreement with Travelers and Gulf (JX-32), at
> WTCP0258058-59; Settlement Agreement with SRI, Swiss Re and IRI (JX-33), at
> WTCP0258083-84; Settlement Agreement with Royal Indemnity Company (JX-
> 36), at WTCP0258146-47).

202.   Many of the Settlement Agreements explicitly recited that they

"embodie[d] the entire and complete terms and conditions" of the parties' agreement and

"supersede[d] any and all prior representations, understandings and agreements, whether

written or verbal."

> (*See* Settlement Agreement with Wausau (JX-31), at WTCP 0358613-14;
> Settlement Agreement with TIG (JX-29), at WTCP 0356353; Settlement
> Agreement with Tokio Marine (JX-27), at 0357593; Settlement Agreement with
> Twin City (JX-28), at WTCP 0356365).

203.    Any prior "on account" advance that had been paid by the insurers was only made "final and without reservation" under the broad terms of the Settlement Agreements.

> (*See* Settlement Agreement with Tokio Marine (JX-27), at WTCP0357589; Settlement Agreement with Zurich (JX-30), at WTCP0258035; Settlement Agreement with SRI, Swiss Re, and IRI (JX-33), at WTCP0258072; Settlement Agreement with Allianz (JX-34), at WTCP0015969).

204.    Final proofs of loss were not required in connection with any Settlement Agreements and, thus, were never prepared or submitted.

> (*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶ 26).

205.    Based solely on the losses that were claimed and quantified by the WTCP Plaintiffs in the Preliminary Proofs of Partial Losses and Proofs of Partial Losses, the WTCP Plaintiffs' claims for replacement cost losses represented 84.2% of those claimed and quantified losses and business income/rental value claims represented only 15.8% of those claimed and quantified losses.

> (*See* Apr. 23, 2013 Reilly Report (JX-1), ¶ 15).

206.    The fact that in their financial statements and other financial records, Plaintiffs, as a result of how they intended to use certain proceeds, may have been required to record payments that they received from their insurers as relating to "replacement costs" or "business interruption" does not constitute a declaration that the payments themselves corresponded to a specific loss or losses for purposes of CPLR 4545(c).

> (*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 23-24).

207.    Plaintiffs' method of recording insurance proceeds, based on their

intended use, was required under the income tax basis of accounting used in preparing its

tax returns and maintaining its books and records.

(*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 23-24).

208.    Under the income tax method of accounting, a taxpayer who may want to

use property insurance proceeds to rebuild has a certain period of time during which such

proceeds need not be recognized as current income, and Plaintiffs identified certain

insurance proceeds as "replacement" proceeds for that purpose.

(*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 23-24).

209.    All payments from insurers that were not identified as "replacement"

proceeds were recognized as current income and recorded under the general category of

"business interruption" proceeds.

(*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 23-24).

210.    Proceeds booked as "replacement" proceeds can be recognized as current

income at any time, upon an election not to use the funds to rebuild, and funds

categorized as "business interruption" can be (and have been) used to fund any current

expense of the Plaintiffs, including rebuilding costs.

(*See* Aug. 18, 2009 Levy Decl. (JX-92), ¶¶ 23-24).

## PROPOSED CONCLUSIONS OF LAW

I.   **The Aviation Defendants Must Prove To A Reasonable Certainty That A Particular Collateral Source Payment "Replaced Or Indemnified" A Particular Category Of Loss For Which Plaintiffs May Be Awarded Damages**[7]

1.     The Aviation Defendants bear the burden of proof at this trial. *Oden v. Chemung County Indus. Dev. Agency*, 87 N.Y.2d 81, 89, 637 N.Y.S.2d 670, 674 (1995).

2.     Under CPLR 4545, the Aviation Defendants must prove their entitlement to collateral offsets to a "reasonable certainty," a standard that requires "proof of such a high degree of certainty that it amounts to clear and convincing evidence." *Terranova v. New York City Transit Auth.*, No. 13946/02, 2005 WL 2219685, at *5 (Sup. Ct. Richmond Co. Aug. 23, 2005); *see also Kihl v. Pfeffer*, 47 A.D.3d 154, 164, 848 N.Y.S.2d 200, 207 (2d Dep't 2007) ("Each of the four judicial departments has interpreted 'reasonable certainty' as akin to the clear and convincing evidence standard"); *accord In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449.

3.     The Aviation Defendants cannot meet their heavy burden by treating all of Plaintiffs' potential damages and all of the collateral source payments that Plaintiffs received "as fungible." *Oden*, 87 N.Y.2d at 87, 637 N.Y.S.2d at 673; *see also id.* at 86, 637 N.Y.S.2d at 672 (rejecting argument that "total award for economic loss" could be reduced "by the total amount of collateral source payments").

---

[7]  Although Plaintiffs maintain that offsets may not be applied until there has been a damages award in their favor, the Court has rejected that position. *See In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449.  Since there has not yet been a jury award, the Court's analysis at the July 15, 2013 trial necessarily will focus on whether a particular collateral source payment corresponds to a category of damages that Plaintiffs hypothetically might be awarded against the Aviation Defendants when these cases ultimately proceed to an all-issues trial.

4.    CPLR 4545 requires that Plaintiffs' potential tort damages award and any collateral source payments must be broken down into categories. *Id.* at 86, 89, 637 N.Y.S.2d at 672, 674; *see also Turnbull v. USAir, Inc.*, 133 F.3d 184, 187 (2d Cir. 1998) (party seeking offset must show "that the judgment includes an award for damages that falls within a certain category of loss").

5.    Once the categories of loss and the categories of collateral source payments have been determined, then offsets may be applied only to the extent that the Aviation Defendants prove to a reasonable certainty that a particular collateral source payment "replace[s] or indemnifie[s]" a particular category of loss. CPLR 4545(c); *see also Oden*, 87 N.Y.2d at 87, 637 N.Y.S.2d at 673 ("only those collateral source payments that *actually replace* a particular category of awarded economic loss may be used to reduce the injured's judgment") (emphasis added).

6.    Because CPLR 4545 is a statute that was enacted in derogation of the common law, the New York State Court of Appeals has held that it must be "strictly construed . . . in the narrowest sense that its words and underlying purposes permit . . . ." *Oden*, 87 N.Y.2d at 86, 637 N.Y.S.2d at 672.

7.    Consistent with the principle that a statute in derogation of the common law must be strictly construed, the Court of Appeals has narrowly interpreted CPLR 4545's requirement that a collateral source payment be shown to "replace[] or indemnif[y]" a particular category of economic loss. That language, the Court of Appeals has explained, requires proof to a reasonable certainty that the collateral source payment at issue "duplicate[d]," "t[ook] the place of," "represent[ed] reimbursement for,"

was "paid in lieu of," or "match[es] up" to the particular category of economic loss. *Id.* at 84, 87-89, 637 N.Y.S.2d at 671, 673-74.

8.     Only upon proof that the collateral source payment at issue "duplicate[d]," "t[ook] the place of," "represent[ed] reimbursement for," was "paid in lieu of," or "match[es] up" to the particular category of economic loss is there the kind of "close" or "direct" correspondence that permits the application of collateral offsets. *Id.* at 84, 87-89, 637 N.Y.S.2d at 671, 673-74.

9.     Strictly construing CPLR 4545 to require proof that the collateral source payment at issue "duplicate[d]," "t[ook] the place of," "represent[ed] reimbursement for," was "paid in lieu of," or "match[es] up" to the particular category of economic loss is consistent with the goal of the statute to eliminate double recoveries for plaintiffs without providing defendants and their insurers with an "undeserved windfall." *See Bryant v. New York City Health & Hospitals Corp.*, 93 N.Y.2d 592, 607, 695 N.Y.S.2d 39, 47 (1999) ("CPLR 4545 was intended to eliminate double recoveries, not provide defendants and their insurers with an 'undeserved windfall.'"); *Kihl*, 47 A.D.3d at 167, 848 N.Y.S.2d at 210 (purpose of CPLR 4545 "is to eliminate double recoveries, not to provide defendants and their insurers with an undeserved windfall relieving them of the obligation to pay damages awards for economic loss").

10.     Subtracting from a tort damages award all collateral source payments *"regardless of whether they duplicate an awarded item of pecuniary loss . . .* would confer an undeserved windfall on tort defendants and their insurers by permitting them to obtain a credit for collateral source payments that do not correspond to the items of

economic loss that they are being called upon to reimburse." *Oden*, 87 N.Y.2d at 88, 637 N.Y.S.2d at 673 (emphasis added); *accord In re Sept. 11 Litig.*, 889 F. Supp. 2d at 622.

11.   CPLR 4545 "prefers double recoveries in favor of plaintiffs over the polar alternative of depriving plaintiffs of a compensatory award for economic losses to which the trier of fact found them entitled." *Kihl*, 47 A.D.3d at 168, 848 N.Y.S.2d at 210.

12.   As a matter of law, the Aviation Defendants have not satisfied their heavy burden here.

## II.   The Aviation Defendants Fail To Establish That The Payments Plaintiffs Received From Their Insurers Were Allocated To Any Specific Categories Of Loss

13.   The Aviation Defendants make no attempt to establish what amount of each of the payments by each individual insurer was paid to reimburse Plaintiffs for any particular category of loss.

14.   The Aviation Defendants claim that there is no need for them to prove any allocation of the payments that Plaintiffs received from their insurers because the Aviation Defendants say – but have not proven – that all of the payments were made to reimburse Plaintiffs either for the costs of replacing the World Trade Center Buildings or for their rental income losses.

15.   The Aviation Defendants have failed to prove that all of the payments that Plaintiffs received from their insurers were made to reimburse Plaintiffs only for the costs of replacing the World Trade Center Buildings or for their rental income losses because (1) all but four of the payments that Plaintiffs received from their insurers were made pursuant to Settlement Agreements almost all of which expressly covered all claims that were asserted or could have been asserted by Plaintiffs, both contractual and extra-

contractual (*see* Proposed Findings of Fact, ¶¶ 170, 201); (2) those Settlement

Agreements did not allocate the payments to specific categories of loss (*see* Proposed

Findings of Fact, ¶¶ 137, 174, 200); (3) the 7WTCo./IRI Settlement Agreement

indisputably included the settlement of 7WTCo.'s personal property claims, and, thus,

some portion of that settlement must be allocated to personal property losses (*see*

Proposed Findings of Fact, ¶ 171; Agreed Statement of Stipulated Facts, ¶ 137); (4) the

payments made by three insurers of the WTCP Plaintiffs that made policy limits

payments were not allocated to specific categories of loss (*see* Proposed Findings of Fact,

¶¶ 187-91); (5) a fourth payment was made by the foreign parent of one of the WTCP

Plaintiffs' insurers to settle a separate lawsuit, and that payment expressly was not made

in connection with any insurance contract (*see* Proposed Findings of Fact, ¶¶ 196-97);

and (6) the Settlement Agreements applied to any advance payments that were made by

Plaintiffs' insurers prior to reaching a final settlement (*see* Proposed Findings of Fact, ¶

203).

        16.     The Preliminary Proofs of Partial Losses, Proofs of Partial Losses, Interim

Proofs of Partial Losses, and payment direction letters that were submitted by Plaintiffs to

their insurers do not establish that the payments that Plaintiffs received from their

insurers all were made to reimburse Plaintiffs only for the costs of replacing the World

Trade Center Buildings or for their rental income losses because (1) except for the policy

limits payments that were made by three of the WTCP Plaintiffs' insurers and the non-

insurance payment made by the foreign parent of one of the WTCP Plaintiffs' insurers,

all of the payments by Plaintiffs' insurers were made pursuant to the Settlement

Agreements – not any prior preliminary proofs of loss or payment direction letters – and

those Settlement Agreements superseded all prior communications between Plaintiffs and their insurers (*see* Proposed Findings of Fact, ¶¶ 68, 69, 202); (2) any advance payments that were made by Plaintiffs' insurers prior to settlement were made "without prejudice," "on an interim, on-account basis," and were "subject to final adjustment" (*see* Proposed Findings of Fact, ¶¶ 112, 119, 141-42, 152); (3) Plaintiffs submitted and quantified claims in addition to claims for replacement costs and lost rental income (*see* Proposed Findings of Fact, ¶¶ 116-18, 123); (4) Plaintiffs submitted unquantified claims for other losses, both contractual and extra-contractual, and no further quantification was required since both Plaintiffs and their insurers understood early on that Plaintiffs had suffered a policy limits loss (*see* Proposed Findings of Fact, ¶¶ 52-54, 111, 121-22, 124, 132-33, 139-40, 148, 159, 165-66); and (5) the Preliminary Proofs of Partial Losses, Proofs of Partial Losses, Interim Proofs of Partial Losses, and payment direction letters all were "without prejudice," they preserved Plaintiffs' rights to make future claims, and, thus, were understood by all not to be the complete, final, or conclusive proof of Plaintiffs' losses (*see* Proposed Findings of Fact, ¶¶ 112-15, 120, 143-46).

### III.   Any Payments Proven To Be Replacement Cost Insurance Proceeds Do Not Correspond To Plaintiffs' Lost Rental Income Damages

17.    Even assuming that the Aviation Defendants had proven that some specific dollar amount of the payments that Plaintiffs received from their insurers was paid to reimburse the costs of replacing the World Trade Center Buildings, the Aviation Defendants nonetheless have not established correspondence because those payments do not "replace or indemnify" any category of loss for which this Court has held Plaintiffs may recover tort damages.  CPLR 4545(c).

18.     Plaintiffs did not suffer a single, general "economic" loss on 9/11.  Rather, Plaintiffs' losses fall into two principal "different categories" – lost rental income and the costs of replacing the destroyed World Trade Center Buildings.  *See In re Sept. 11 Litig.*, 889 F. Supp. 2d at 622-23; Proposed Findings of Fact, ¶ 3.

19.     This Court has precluded Plaintiffs, as a matter of tort law, from recovering replacement cost damages (*see In re Sept. 11 Litig.*, 590 F. Supp. 2d at 543-44; *In re Sept. 11 Litig.*, 2009 WL 1181057, at *3; *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 447-48), and, thus, any potential jury award in this case cannot include damages for the costs of rebuilding the World Trade Center Buildings (*see* Proposed Findings of Fact, ¶¶ 5-6).

20.     Looking at the "essential elements" of Plaintiffs' potential award for leasehold damages, as this Court is required to do, *see Oden*, 87 N.Y.2d at 89, 637 N.Y.S.2d at 674, any such award reflects only compensation for the rental income that Plaintiffs lost when the World Trade Center Buildings were destroyed on September 11, 2001.  *See* Proposed Findings of Fact, ¶¶ 4-7.

21.     The Aviation Defendants have failed to show that any replacement cost insurance proceeds correspond to Plaintiffs' lost rental income damages.  Although any replacement cost insurance proceeds may facilitate the replacement of the World Trade Center Buildings, which will allow Plaintiffs to again collect tenant rents, that fact does not establish the correspondence of any replacement cost insurance proceeds to Plaintiffs' lost rental income damages because any replacement cost insurance payments do not "duplicate" or "represent[] reimbursement for" Plaintiffs' lost rental income. Replacement cost insurance proceeds "duplicate" and "represent[] reimbursement for"

54

the loss of the World Trade Center Buildings. *Oden*, 87 N.Y.2d at 84, 87-88, 637

N.Y.S.2d at 671, 673; Proposed Findings of Fact, ¶¶ 37-49.

22.      If the Court were to adopt the Aviation Defendants' reasoning, and treat

any replacement cost insurance proceeds as an offset against lost rental damages on the

theory that those replacement cost insurance proceeds helped Plaintiffs to mitigate their

damages, Plaintiffs would have to be permitted to recover the costs of replacing the

World Trade Center Buildings – something the Court has ruled Plaintiffs may not do – as

mitigation damages. *See Den Norske Ameriekalinje Actiesselskabet v. Sun Printing &*

*Publishing Ass'n*, 226 N.Y. 1, 8 (1919) ("the injured party who makes a successful effort

to avoid or reduce damages will be allowed to recover the expenses necessarily incurred

in so doing").

23.      Plaintiffs will not have received a windfall if there is no offset for any

replacement cost insurance proceeds.  By contrast, permitting the Aviation Defendants

"to obtain a credit for collateral source payments that do not correspond to the items of

economic loss that they are being called upon to reimburse," *Oden*, 87 N.Y.2d at 88, 637

N.Y.S.2d at 673, "would confer an undeserved windfall" on the Aviation Defendants, *Id.*

IV.      **Additional Reasons Why The Aviation**
          **Defendants Have Failed To Prove Correspondence**

24.      The Aviation Defendants have not proven correspondence with respect to

the payments that Plaintiffs received from their insurers for excess re-tenanting costs,

mortgage carrying costs, and tenant improvements because the Court has held that

Plaintiffs cannot recover their excess re-tenanting costs, mortgage carrying costs, or

tenant improvements as damages in this litigation.  Thus, any payments proven to have

been made to reimburse Plaintiffs for excess re-tenanting costs, mortgage carrying costs,

or tenant improvements do not "replace or indemnify" any category of Plaintiffs' potential tort damages. *See In re Sept. 11 Litig.*, 908 F. Supp. 2d at 448-49; Proposed Findings of Fact, ¶¶ 20-24.

25.     The Aviation Defendants have not proven correspondence with respect to the payments that Plaintiffs received from their insurers for the release of extra-contractual claims, such as bad faith claims or claims for prejudgment interest, because Plaintiffs are not seeking damages for those claims against the Aviation Defendants. Thus, any payments proven to have been made for the release of extra-contractual claims do not "replace or indemnify" any category of Plaintiffs' potential tort damages.

26.     There can be no offset for the WTCP Plaintiffs' Initial Rent Payment of $491 million – which is included in the $2.805 billion that this Court has held is the maximum amount of the WTCP Plaintiffs' potential damages – because that advance rent payment was not covered by insurance (*see* Proposed Findings of Fact, ¶¶ 102-03).

27.     The Aviation Defendants have not proven what amount of the payments that Plaintiffs received from each of their insurers was paid to reimburse personal property losses. As a result, there can be no offset against Plaintiffs' potential personal property damages, which this Court has held are "properly recoverable in tort" and "separate from the value of the leasehold and unrelated to the replacement of the leasehold." *In re Sept. 11 Litig.*, 908 F. Supp. 2d at 449.

28.     Of the $1,000,000 in potential damages that 7WTCo. suffered as a result of the destruction of two Frank Stella acrylic paintings, only $700,000 of that amount, which was paid to 7WTCo. by its fine arts insurer AXA Nordstern under a separate fine

arts insurance policy, is subject to offset. *See* Proposed Findings of Fact, ¶¶ 72-74;

Agreed Statement of Stipulated Facts, ¶ 142.

29.    Plaintiffs' claims for prejudgment interest are not subject to offset.

Moreover, by the Aviation Defendants' own calculations, 7WTCo.'s maximum potential

damages plus prejudgment interest would exceed its insurance recoveries if New York's

mandatory statutory rate of 9 percent applies (which it does, because prejudgment interest

is a question of substantive law, and under ATSSSA, questions of substantive law are

governed by state law).

30.    Under this Court's prior rulings, any net insurance recoveries potentially

subject to offset must be reduced by the amount of Plaintiffs' insurance premiums and

claims preparation costs. *See* Sept. 30, 2009 Order, at 2.  The parties agree that the

WTCP Plaintiffs paid a total of $5,898,714 in insurance premiums for property insurance

during the two-year period immediately preceding September 11, 2001, and that 7WTCo.

paid $482,793 in insurance premiums for property insurance coverage for the 7WTC

Building and $3,500.17 in insurance premiums for fine arts coverage for paintings and

other artwork at the 7WTC Building.  Agreed Statement of Stipulated Facts, ¶¶ 5, 95.

The parties also agree that 7WTCo. paid a total of $1,587,410 in claims preparation fees,

and that the WTCP Plaintiffs paid at least $10,352,540 in claims preparation fees

(exclusive of the amounts of fees and costs associated with an appraisal involving certain

of the WTCP Plaintiffs' insurers). *See* Agreed Statement of Stipulated Facts, ¶¶ 87, 141.

The WTCP Plaintiffs also paid an additional $31,030,471[8] in fees and costs associated

---

[8]  The actual amount is much higher, but the $31,030,471 represents a
compromised lower amount for the purposes of trial.

with the appraisal, which are claims preparation costs that also should reduce Plaintiffs'

net insurance recoveries.

**V.**      **Conclusion**

31.    The Aviation Defendants have not satisfied their burden of proving

correspondence.

Dated: New York, New York
          July 8, 2013

>                                 FLEMMING ZULACK WILLIAMSON ZAUDERER
>                                 LLP
>
> By:_____
>                                      Richard A. Williamson
>                                      Megan P. Davis
>
> One Liberty Plaza
> New York, New York  10006-1404
> (212) 412-9500
>
>                *Attorneys for Plaintiffs*
>                World Trade Center Properties LLC
>                 1 World Trade Center LLC
>                 2 World Trade Center LLC
>                 3 World Trade Center LLC (formerly known as 5
>                        World Trade Center LLC)
>                 4 World Trade Center LLC
>                 7 World Trade Company, L.P.