D7FAWTC1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
                                              21 MC 101
3    In Re: September 11 Litigation           08 CV 3719 (AKH)
                                              08 CV 3722 (AKH)
4    ------------------------------x

5                                             New York, N.Y.
                                              July 15, 2013
6                                             10:45 a.m.

7

     Before:
8
                        HON. ALVIN K. HELLERSTEIN
9
                                              District Judge
10

11                          APPEARANCES

12   FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
          Attorneys for WTCP Plaintiffs
13        and 7 World Trade Co.
     BY:  RICHARD A. WILLIAMSON, ESQ.
14        CATHI BAGLIN, ESQ.
          JASON T. COHEN, ESQ.
15        MEGAN P. DAVIS, ESQ.

16   DEBEVOISE & PLIMPTON LLP
          Attorneys for Defendant American Airlines
17   BY:  ROGER E. PODESTA, ESQ.
          ERICA WEISGERBER, ESQ.
18
     CONDON & FORSYTH LLP
19        Defense Liaison Counsel for American Airlines
     BY:  DESMOND T. BARRY, ESQ.
20
     LOCKE LORD BISSELL & LIDDELL LLP
21        Attorneys for Defendant Globe Aviation
          Services Corporation
22   BY:  ANN C. TAYLOR, ESQ.
          T. PATRICK BYRNES, ESQ.
23
     O'MELVENY & MYERS LLP
24        Attorneys for Defendant Massachusetts
          Port Authority
25   BY:  WILLARD MARK WOOD, ESQ.

D7FAWTC1ps

1    APPEARANCES (Cont'd)

2    RICHARD KIBBE & ORBE LLP
          Attorneys for Defendant Boeing Co.
3    BY:  BRIAN S. FRASER, ESQ.

4    Also Present:  John N. Lieber
                    President
5                   World Trade Center Properties, LLC

6              (In open court)

7              THE COURT:  This is the trial in the September 11

8    litigation between the WTCP plaintiffs and the 7 World Trade

9    Center plaintiff against the airlines, American Airlines and

10   Globe Security and others.

11             We have Mr. Williamson, Cathi Baglin, Megan Davis, and

12   Jason Cohen for the plaintiffs.  We have Desmond Barry, liaison

13   counsel, Roger Podesta, Patrick Byrnes, Erica Weisgerber, Ann

14   Taylor, Willard Wood, and Brian Fraser for the defendants.  Did

15   I leave anyone out?

16             OK.  So I think we'll start with the defendants

17   because we are trying the defense that the insurance proceeds

18   that were covered by the plaintiffs are of such magnitude as to

19   make it impossible for plaintiffs to recover anything in a tort

20   litigation.

21             Who is going to start?

22             MR. PODESTA:  I shall, your Honor.

23             THE COURT:  Mr. Podesta.

24             MR. PODESTA:  May it please the Court, Roger Podesta

25   for all the aviation defendants, several of whose

D7FAWTC1ps                    Opening – Mr. Podesta

1    representatives are present here in the courtroom today.

2             The trial presents for decision a narrow but important

3    issue, whether the $4.9 billion in insurance recoveries that

4    plaintiffs have received for damage to their leasehold

5    interests in the WTC complex, by which I mean WTC 1, 2, 4, and

6    5, and for WTC 7 correspond to a reasonable degree of certainty

7    to their potential tort damages awards measured under the

8    "lesser of two" rule by the reduction in fair market value of

9    their leasehold interest.

10            The test for correspondence, as adopted by this court

11   from the Second Circuit decision in *Turnbull* and the New York

12   Court of appeals decision in *Oden*, is whether "the collateral

13   source payment represents reimbursement for a particular

14   category of loss that corresponds to a category of loss for

15   which tort damages were awarded.  The application of this test

16   to our circumstances presents mixed questions of fact and law

17   for which both the Court's prior rulings and the Court of

18   Appeals' decision in *Fisher v. Qualico* provide substantial

19   guidance.

20            I note that the relevant question is not whether the

21   tort award and the insurance payments are calculated in the

22   same way, but whether the tort award and the insurance payments

23   compensate or reimburse the plaintiff for the same category of

24   loss.

25            It's important to note that plaintiffs acknowledge

D7FAWTC1ps                      Opening – Mr. Podesta

1   through their expert professor Steven Shavell that any

2   insurance payments allocable, to a reasonable degree of

3   certainty, to lost rental income correspond for 4545(c)

4   purposes to a tort damage award measured by the reduction in

5   fair market value of plaintiff's leasehold interest.

6         Thus, the only correspondence issue actually in

7   dispute is whether replacement cost insurance payments

8   compensate or reimburse the plaintiffs for the same category of

9   loss as would their tort damages award.

10        To resolve this correspondence issue --

11        THE COURT:  Excuse me.  (Pause)  Sorry.

12        MR. PODESTA:  May I resume?

13        To resolve this correspondence issue, there are three

14  basic questions for the Court to decide.  First, for what type

15  of loss did the plaintiffs receive insurance payments and in

16  what amounts?  Second, for what type of claim may the

17  plaintiffs potentially obtain tort damage awards and in what

18  amount?  And finally, do the insurance recoveries and potential

19  tort damage award compensate or reimburse the plaintiffs for

20  the same category of loss, and how complete is the offset?

21        The aviation defendants will establish the answers to

22  these questions at this trial primarily through the testimony

23  of their insurance expert, Michael Beach; their economics

24  expert, Dan Fischel; cross-examination of the plaintiffs'

25  witnesses; and invocation of the Court's prior rulings.

D7FAWTC1ps                          Opening - Mr. Podesta

1              As to the first question, the insurance question, the

2       Court has already determined that WTCP received a total of

3       $4.091 billion in insurance payments and that 7 WTC Company has

4       received $831 million for WTC 7.  We plan to show that the full

5       amount of these insurance payments are properly allocable to

6       replacement costs or business interruption, lost rental income,

7       except for about $1 million that may be allocable to 7 World

8       Trade Company's claim for personal property damages as to

9       WTC 7.

10             THE COURT:  Give me that number again, please,

11      Mr. Podesta.

12             MR. PODESTA:  1.8 million.  1.846 million, I believe.

13             THE COURT:  Thank you.

14             MR. PODESTA:  In this connection, the Court has

15      already ruled, in its September 2009 order, that the aviation

16      defendants have shown that WTCP's entire $4.091 billion

17      recovery of insurance payments is allocable to replacement

18      costs and business interruption unless WTCP pleads and proves

19      specific facts supporting allocation to additional components.

20      The Court's exact words from paragraph 2 of that order were as

21      follows:  "The proofs of loss that WTCP submitted to share

22      insurers presented proofs only of business interruption and

23      replacement cost to the buildings.  Settlements with the

24      insurers follow.  I rule that the insurance proceeds that WTCP

25      received from its insurers are allocable only to business

D7FAWTC1ps                    Opening - Mr. Podesta

1     interruption and replacement costs unless WTCP pleads and

2     proves specific facts supporting allocation to additional

3     components."  The Court's 2009 order has thus effectively

4     shifted to plaintiffs the burden of coming forward with

5     evidence that they received insurance payments for something

6     other than business interruption or replacement cost.

7          In response, we expect the plaintiffs to contend that

8     their settlement agreements with their insurers made no

9     allocation of the insurance payments to any particular element

10    of loss and that the releases the insurers received broadly

11    discharged them from all claims, including those of an

12    extra-contractual nature.

13         However, these same arguments were vigorously and

14    unsuccessfully addressed by plaintiffs in response to the 2009

15    collateral offset motion that led to the ruling from which I

16    just quoted.  Even if plaintiffs are not foreclosed from

17    pursuing these previously failed arguments, they should prove

18    no more persuasive today than they were in 2013.  If the

19    silence of a settlement agreement as to allocation were

20    sufficient --

21              THE COURT:  I think you meant 2009.

22              MR. PODESTA:  2009, yes.  2009.  I'm sorry.

23         If the silence of a settlement agreement as to

24    allocation were sufficient to defeat correspondence, 4545(c)

25    would soon become a dead letter, for, as the testimony will

D7FAWTC1ps                    Opening – Mr. Podesta

1   show, insurance settlements rarely if ever make specific

2   allocation of the payment amount.  Under the case law, where

3   the settlement is silent, the proper approach is for the Court

4   to examine the underlying facts and circumstances to identify

5   the claims for which the payments were actually made.

6          Nor does the breadth of the release shed any light on

7   the identity of the paid claims.  As the witnesses will

8   acknowledge and as the Court's doubtless own experience will

9   confirm, few entities pay out tens or hundreds of millions of

10  dollars in settlement without obtaining broad protection

11  against all conceivable claims that might arise out of the same

12  loss.  Once we look at the evidence, the underlying

13  circumstances, that evidence will demonstrate, first, that

14  insurers rarely if ever make settlement payments for

15  undocumented or unquantified claims, and, second, that out of

16  the many thousands of pages of claim submissions plaintiffs

17  made to their insurers, the only claims that plaintiffs ever

18  documented or quantified were those for replacement costs or

19  its post-covenant actual cash value and business interruption,

20  lost rental income.  Plaintiffs freely admit these claims

21  represent by far the largest element of their damages.  To be

22  sure, some of plaintiffs' claim submissions to their insurers

23  did list other types of claims as TBD, or to be determined, but

24  plaintiffs never followed up, except for that $1 million

25  personal property claim for WTC 7, with any substantiation or

D7FAWTC1ps                    Opening - Mr. Podesta

1   quantification of any of the TBD claims.

2            In contrast, as to the complex, WTCP engaged in an

3   appraisal proceeding with its insurers limited solely to

4   determination of replacement costs, actual cash value, and lost

5   rental income that consumed 99 days of hearings and testimony

6   and that generated a stipulated $31 million in legal fees for

7   the appraisal hearing.

8            Under plaintiffs' approach --

9            THE COURT:  Who conducted the appraisal hearing?

10           MR. PODESTA:  For WTCP, Proskauer.

11           THE COURT:  But which judge?

12           MR. PODESTA:  Well, I believe it was Judge Mukasey, I

13   believe.  It was Judge Martin, directed the proceedings.  But

14   they were before an arbitral panel, in effect, of appraisers.

15           THE COURT:  Can you tell me?

16           MR. WILLIAMSON:  The answer is not Judge Mukasey, not

17   Judge Martin.  Umpires, appraisers provided for under the

18   statute and the policies.

19           THE COURT:  Under the insurance policies.

20           MR. WILLIAMSON:  Yes, and somebody called an umpire.

21           THE COURT:  Are you going to go into that?

22           MR. WILLIAMSON:  I peg your pardon?

23           THE COURT:  Are you going into that?

24           MR. WILLIAMSON:  Not in any detail, no.

25           THE COURT:  Mr. Podesta, could you describe what

D7FAWTC1ps                    Opening - Mr. Podesta

1    happened and in what content.

2              MR. PODESTA:  Yes.

3              THE COURT:  I don't think I've heard this before.

4              MR. PODESTA:  As I understand, the issue between WTCP

5    and its insurers was over what the proper amounts were under

6    their policies for replacement costs, actual cash value, and

7    lost rental income.  And a hearing that lasted like 99 days, I

8    think if you count deposition testimony, was performed of the

9    umpires, I believe at the direction of one of the judges I

10   mentioned, to attempt to determine those values.  And they did

11   issue some determinations.  I can't quote them exactly off the

12   top of my head, but the information is readily available.  I

13   believe that they determined that some of the elements of

14   replacement cost totaled some $4.2 billion.  But my point here

15   is really just not to get into the details of the appraisal,

16   but to demonstrate that the focus of the insurance claim

17   submission process was on replacement cost and lost rental

18   income.

19             Now, under plaintiffs' approach, because the

20   settlement agreements are silent and the leases are broad, $4.9

21   billion in insurance recoveries is by any fair interpretation

22   of the evidence --

23             THE COURT:  4.09.

24             MR. PODESTA:  4.9.  No, 4.9.  When I say 4.9, I'm

25   adding together 4.091 and 7.37.  When I refer to plaintiffs, I

1   include both WTCP and WTC 7.

2          THE COURT:  I'm being confused on numbers.

3          MR. PODESTA:  All right.

4          THE COURT:  You told me that the total insurance

5   recovery from 7 World Trade Center was .831, or 31 million, and

6   the total of recovery from all the other World Trade Center

7   Properties was 4.09 billion.

8          MR. PODESTA:  That's right.  And that adds up to

9   4.922.

10         THE COURT:  OK.

11         MR. PODESTA:  Thank you, your Honor.

12         That 4.9 billion would yield no insurance offset at

13  all under plaintiffs' approach, and we believe that such a

14  result would disregard the factual reality of the claims

15  adjustment process and provide claims with a combined tort and

16  insurance recovery of some $8.4 billion, 4.9 billion plus 2.8

17  million for the complex, plus 700 million for WTC 7, which is

18  more than two and a half times the pre-9/11 fair market value

19  of the plaintiffs' leasehold.

20         Now, as to the second question --

21         THE COURT:  What was the fair market value -- I fixed

22  the fair market value of all the towers but 7.

23         MR. PODESTA:  No, you fixed the fair market value of 7

24  as well, at 737 million, in your December 2012 opinion.

25         As to the second question, the tort damages, the Court

D7FAWTC1ps                    Opening – Mr. Podesta

1    has already ruled on the nature and amount of the plaintiffs'

2    potential tort damage award.  The Court has repeatedly held

3    that plaintiffs' tort damages are governed by the "lesser of

4    two" rule, that permits the property damage claim to recover

5    the replacement cost of its property or the reduction in the

6    property's fair market value, whichever dollar amount is lower.

7    In the complex case, the Court determined on summary judgment

8    that the fair market value of WTCP's leasehold in the complex

9    prior to 9/11 was 2.805 billion and that the replacement costs

10   sought by WTCP were substantially higher.  Accordingly, the

11   Court held that the WTCP's replacement for its tort damages, or

12   its leasehold interest in the complex, cannot exceed 2.85

13   billion.  Similarly, as to WTC 7, the Court has held that the

14   fair market value of 7 WTC Co.'s leasehold prior to 9/11 was

15   $737 million and, assuming replacement costs to be higher for

16   purposes of the summary judgment motion, capped 7 WTC Co.'s

17   potential tort damages award at $737 million.

18            So I think there really should be very little dispute

19   as to the nature and amount of the tort damage award.  And that

20   brings us to the final question, correspondence.  We expect to

21   establish that the relevant category of loss here is, as it was

22   in the *Fisher* case, lost property value, or, more precisely,

23   the economic damage in place of the leasehold interest that

24   plaintiffs sustained as a result of the destruction of their

25   lease buildings in the terrorist attacks, will show that both

D7FAWTC1ps                    Opening - Mr. Podesta

1    their insurance payments and their principal tort damage

2    awards, potential tort damage awards, compensate and reimburse

3    plaintiffs for the same category of loss for both types of

4    insurance payments.

5            As to the tort damage awards, Professor Fischel, our

6    economic expert, will explain that the award to plaintiffs of

7    the fair market value of their leasehold interest in the

8    complex of WTC 7 as they stood immediately prior to 911 will

9    fully restore to them the economic value of these leaseholds

10   that they lost as a result of the lease buildings.  Indeed, the

11   Court has already held in its December 2008 partial summary

12   judgment ruling that "the price WTCP paid for the 99-year

13   leases it acquired from Port Authority represents a full and

14   fair market price for the property."  If WTCP is entitled to

15   recover, recovery of the property's market value would fully

16   compensate.

17           That leaves us only with the question of whether

18   plaintiffs' insurance recoveries also compensate them for the

19   economic damage to their leasehold interest in the terrorist

20   tax.  In this regard, the aviation defendants agree with

21   plaintiffs' expert, Professor Shavell, that plaintiffs' two

22   types of insurance payments, replacement cost and business

23   interruption, must be separately analyzed to determine whether

24   they meet 4545(c) correspondence standards.  That inquiry is

25   quite straightforward as to the lost rental income, business

D7FAWTC1ps                    Opening - Mr. Podesta

1    interruption insurance payments.  It's undisputed that the

2    reduction in market value of plaintiffs' leasehold interest is

3    due in large part to a loss of rental income generated by

4    destroyed buildings.  As Professor Shavell acknowledges and as

5    Professor Fischel will confirm, the lost rental income

6    insurance payments compensate plaintiffs for and correspond to

7    the portion of plaintiffs' lost rental income that they

8    sustained during the period the leased buildings were being

9    replaced.

10           That brings us to the final question, replacement

11   costs.  The correspondence analysis concerning plaintiffs'

12   replacement cost payments is greatly illuminated by the Court

13   of Appeals decision in *Fisher*.  In that case, the Court

14   unanimously held that the *Fisher*'s replacement cost insurance

15   payments entirely offset their "lesser of two" tort damage

16   award measured by the reduction in the fair market value of

17   their property through the destruction of their home in a fire.

18   The Court reasoned that the relevant category of loss was the

19   *Fisher*s' lost property value and that replacement costs and

20   reduction in fair market value were merely two different ways

21   of measuring that lost property value, with the "lesser of two"

22   amounts providing full compensation for the loss.

23           To be sure, *Fisher* involved a fee simple interest in

24   residential owner-occupied housing.  But nothing in the

25   reasoning of the decision limits its principles to that

D7FAWTC1ps                    Opening – Mr. Podesta

1   particular factual circumstance.  Indeed, this Court has

2   already held that the "lesser of two" rule applies to

3   plaintiffs' long-term leaseholdings.  And Professor Shavell

4   admitted at his deposition that if the Fishers had rented out

5   their home to others, their replacement cost insurance payments

6   would still correspond to and offset their reduction in fair

7   market value tort damages.  Professor Fischel will explain that

8   the economic principles underlying the *Fisher* decision are

9   equally applicable to our circumstance.

10          Plaintiffs' principal argument against correspondence

11  that we will refute through our testimony appears to be that

12  replacement cost insurance payments can correspond only to tort

13  damage awards for replacement costs and not to award for

14  reduction in fair market value, on the theory that replacement

15  costs and fair market value represent two different categories

16  of loss.  That argument not only flies in the face of the Court

17  of Appeals' holding in *Fisher*, but it is identical to the

18  argument that the Fishers themselves unsuccessfully made to the

19  Court of Appeals.  That court summarized the Fishers' position

20  as follows:  "Rather, the Fishers contend that for the purpose

21  of the CPLR 4545(c) offset, cost of restoration and diminution

22  in market value represent two different categories of loss and

23  replacement cost insurance proceeds correspond only to the

24  first."  The Court of Appeals' response constitutes a

25  definitive rejection of this argument that replacement cost and

1    fair market value are different categories of loss.  The Court

2    said, "As recognized in our case law, however, replacement cost

3    and diminution in market value are simply two sides of the same

4    coin.  Each is a proper way to measure lost property value, the

5    lower of the two figures affording full compensation to the

6    owner.  In this case, the collateral source payment, the

7    Fishers' replacement cost insurance proceeds, thus corresponds

8    to their property loss and was properly offset against the

9    damages award.

10          Plaintiffs' efforts to portray replacement costs and

11   lost rental income during the rebuilding period as distinctly

12   separate categories of loss are especially ill founded because

13   New York law has long permitted plaintiffs seeking recovery of

14   replacement costs to recover both the physical costs of

15   reconstruction and loss of income during the reconstruction

16   period so long as the total of the two does not exceed the

17   reduction in fair market value of their property.

18          In our pretrial brief we cite cases from New York

19   taking this approach as far back as 1897 and 1908.  Rebuilding

20   a period of lost rental income is not a distinct category of

21   loss but an adjunct element of New York's traditional

22   replacement cost remedy, a remedy that is fully provided and

23   covered by a fair market value tort damages award that reflects

24   expected lost profits for the full term of the leasehold.

25          Plaintiffs and Professor Shavell secondarily

D7FAWTC1ps                    Opening - Mr. Podesta

1    advance --

2                THE COURT:  I think we're going well beyond the

3    purpose of the opening statement, Mr. Podesta.

4                MR. PODESTA:  OK.  Thank you.  I will just make two

5    more comments and then I will conclude.

6                I would like to address the issue of the contractual

7    obligation to rebuild.  We expect to show, through the

8    testimony of the witnesses, that the contractual obligation to

9    rebuild affects neither the tort side nor the insurance side of

10   the correspondence analysis.  It doesn't affect the tort side

11   because a contractual obligation to rebuild cannot give rise to

12   a tort damage award because the Court has already held --

13               THE COURT:  This is all covered already in my

14   opinions.  Why do we need to go into this again?

15               MR. PODESTA:  Well, on the insurance side, I just want

16   to make clear that we have a stipulation that the WTCP's

17   insurance policies did not condition the recovery of

18   replacement costs on any contractual obligation to rebuild, and

19   we've obtained admissions from Mr. Reilly, WTCP's claims

20   adjustor, that the contractual obligation to rebuild had

21   nothing to do with any payments made by the insurers.  And of

22   course -- and this is in the briefs and I'm sure Mr. Williamson

23   will address it as well perhaps -- but our position is that

24   your Honor has not barred plaintiffs from recovering

25   replacement costs under the "lesser of two" standard; it's

D7FAWTC1ps                    Opening - Mr. Podesta

1    simply held that they cannot recover replacement costs in

2    excess of reduction in fair market value on the basis of their

3    contractual obligation to rebuild.  But the Court has never

4    held that they were not the cause of replacement costs, that

5    they could not recover as a 99-year lessee or as the -- and

6    assuming this debt of the Port Authority as fee simple owner.

7              Finally, a few words about allocation.  The aviation

8    defendants do not believe that it's necessary to allocate

9    plaintiffs' insurance payments between replacement costs and

10   business interruption.  As Professor Fischel will explain,

11   allocation is unnecessary because there is 4545(c)

12   correspondence for both types of insurance payments.  Both of

13   them compensate the plaintiffs for the economic damages to

14   their leasehold interest caused by the destruction of the

15   leased buildings, which is the same loss for which the tort

16   damages award will compensate them.  The only minor allocation

17   issue that might arise in the case is how much of 7 WTC Co.'s

18   $831 million in insurance payments should be allocated to its

19   $1.846 million personal property claim.  There's no issue as to

20   correspondence as to personal property, but Mr. Levy, WTC Co.'s

21   corporate representative, has admitted the insurance settlement

22   covered the personal property claim, and personal property

23   insurance payments of course correspond to a personal property

24   loss.

25              As a prejudgment interest, we have a stipulation --

1          THE COURT:  It was a different insuring clause that

2     covered the personal property, wasn't it?

3          MR. PODESTA:  Yes, it was, your Honor.

4          THE COURT:  And the value of the personal property did

5     not add to the value of the building and the leasehold.

6          MR. PODESTA:  No, it did not.  It's a separate --

7          THE COURT:  Separate category.

8          MR. PODESTA:  It's a separate, relatively small

9     category of claim.

10         THE COURT:  So the recovery of that amount, which is,

11    I think you told me --

12         MR. PODESTA:  1.8 million.

13         THE COURT:  -- $1.846 million, has nothing to do with

14    the issue we have here.  It's clearly outside the

15    correspondence.

16         MR. PODESTA:  Well, there is a -- I think there is no

17    doubt that there is correspondence as to personal property.

18    The question is how much of that 831 million is to be offset to

19    the $1.8 million personal property claim, whether it's to be

20    completely offset or there has to be some method of allocation.

21         There's one other little wrinkle --

22         THE COURT:  What do you think?

23         MR. PODESTA:  Pardon me?

24         THE COURT:  What do you think?

25         MR. PODESTA:  I believe since it was an undisputed

D7FAWTC1ps                       Opening – Mr. Podesta

1    claim and there's plenty of insurance, it should be completely

2    offset.  I believe Mr. Williamson may advance a different view.

3           One final little wrinkle:  7 WTC Co. has a separate

4    fine arts claim for the destruction of two pieces of artwork at

5    WTC 7 that was covered under a different policy than the main

6    IRI policy.  The parties have stipulated that the maximum

7    recovery amount of that claim is $1 million, as to which an

8    insurance payment offset of $700,000 applies.  Thus, whatever

9    the outcome of this trial, a claim of about $300,000 on the

10   part of WTC Co. will survive, relating to fine arts.

11          The only other thing I want to --

12          THE COURT:  Were they two Frank Stella paintings?

13          MR. PODESTA:  That's correct, your Honor.

14          The only other point I want to make in my opening is

15   that we will be submitting through Professor Shavell two

16   declarations of Rajiv Gokhale as to the admissibility which the

17   parties are stipulating calculating the prejudgment interest

18   that would be owed both on the complex tort award and --

19          THE COURT:  It's silly for me to deal with that now

20   because it follows on other findings.  You can talk about it

21   later.

22          MR. PODESTA:  Fine.

23          THE COURT:  What are the components of the tort

24   recovery, in your opinion?

25          MR. PODESTA:  Well, in the "lesser of two" tort

D7FAWTC1ps                    Opening - Mr. Podesta

1    damages, which can be measured by replacement costs or

2    reduction in fair market value, in both cases, we have assumed

3    or it's been shown that replacement costs exceed reduction in

4    fair market value.  Thus, the award is measured by reduction in

5    fair market value.  But it is an award, the component is damage

6    to property interest, lost property value, as we explained in

7    *Fisher*.  So that you can characterize the 2.8 billion and the

8    700 million as a recovery of either or both replacement costs

9    or reduction in fair market value.

10          THE COURT:  Before 9/11, the WTCP interests had an

11   expectancy of cash flow over a period of time, made possible by

12   the existence of these income-producing properties.  Then the

13   properties got destroyed, and their ability to receive rental

14   income during the course of that destruction and before

15   replacement would reduce to zero their income.  And they would

16   then have, I think, the ability to be compensated in some

17   fashion for that lost income, setting off in some complicated

18   way the cost of reconstruction, the amounts of rent they

19   continue to have to pay, and the like, which I take it would be

20   the subject of expert discussion.  What's your view of things?

21          MR. PODESTA:  Yes.  Well, under *Fisher* and I believe

22   under the Court's ruling, an award of the full fair market

23   value of their leasehold interest as they stood on 9/11 would

24   fully compensate them for any future anticipated lost rental

25   income.

1           THE COURT:  So how do I measure this fair market value

2      that was reduced to zero against insurance recoveries that were

3      based on, let us say, replacement values and lost income?

4           MR. PODESTA:  Well, as to lost income it's very

5      simple, because it's basically agreed by the parties that the

6      fair market value, reduction in fair market value covers lost

7      rental income during the rental period, and of course a fair

8      market value award covers the full rental period.

9           As far as replacement costs, you don't have to find

10     anything relating specifically to the amount of replacement

11     cost because it's the same principle as in *Fisher*.  Replacement

12     costs and diminution --

13          THE COURT:  So no correspondence or full

14     correspondence?

15          MR. PODESTA:  Full correspondence under *Fisher*.

16          THE COURT:  What am I corresponding?

17          MR. PODESTA:  Well, we would say you're corresponding,

18     the correspondence is between the replacement cost and lost

19     rental income insurance recoveries to the economic damage to

20     the leasehold costs in the properties, which is in turn fully

21     compensated by a reduction in fair market value tort.

22          THE COURT:  This is the end of the replacement cost,

23     and with the benefit of the insurance for the lost rental

24     income, there would be a total restoration of the value of the

25     property.

 1              MR. PODESTA:  That's our position, your Honor.

 2              THE COURT:  Which expert is going to tell me this?

 3              MR. PODESTA:  Professor Fischel is going to testify to

 4      this.  And of course Mr. Beach, in setting forth what the

 5      payments were for, will also shed relevant factual information

 6      on this.

 7              THE COURT:  All right.  Let me hear Mr. Williamson.

 8              MR. WILLIAMSON:  Good morning, your Honor.  May I

 9      proceed?

10              THE COURT:  Please.

11              MR. WILLIAMSON:  Thank you.

12              May it please the Court:  Richard Williamson, Williams

13      Zulack Williamson & Zauderer, representing the plaintiffs.  I'd

14      like to begin by introducing Mr. John Lieber.

15              THE COURT:  How do you do.

16              MR. WILLIAMSON:  Mr. Lieber is the president of World

17      Trade Center Properties.

18              THE COURT:  Nice to have you in court, Mr. Lieber.

19              MR. WILLIAMSON:  And plaintiffs are committed to

20      completing their mission to rebuild the World Trade Center.

21      And on a personal note, I myself am honored and our firm is

22      honored to represent these plaintiffs in this trial.  We've

23      been representing them since September 17th, 2001.  And we are

24      pleased to be here today.

25              The defendants' inability to meet their burden of

D7FAWTC1ps                    Opening - Mr. Williamson

1    proving correspondence is best demonstrated by fact that they

2    do not address, they cannot address, and they did not just now

3    address your Honor's rulings and your Honor's holdings.  Your

4    Honor has held that plaintiffs have sustained different

5    categories of losses, not one loss.

6          If we take a look at what the plaintiffs have set up

7    in their pretrial brief, we can see that they have set up what

8    produces a foregone conclusion, as they must to get to their

9    desired result.  They tell your Honor, "The category of loss

10   for which plaintiffs seek recovery in tort" -- so that's the

11   tort recovery's branch of the equation -- "is the economic

12   damage to their net leasehold interests."  Then they tell the

13   Court, "The category of loss for which plaintiffs received

14   insurance payments," the second half of the equation, is -- of

15   course it has to be the same thing -- "the economic damage to

16   their net leasehold interests."

17         Well, that's obviously circular.  It's designed to be

18   circular because it's a zero-sum game.  And to get to their

19   preordained result, they have to be able to say they're

20   identical.

21         Let's take a step back and use a prism of common sense

22   to examine this proposition that is at the core and foundation

23   of their position.  If you ask a veterinarian, What are the

24   categories of animals that you treat, the veterinarian might

25   say, cats, dogs, birds.  The veterinarian would not say to you,

D7FAWTC1ps                    Opening - Mr. Williamson

1    The categories of animals that I treat are animals.  If you ask

2    a grocer, What are the categories of food that you sell in your

3    grocery store, the grocer might say, Produce, dairy, meat.  The

4    grocer would not say to you, The categories of food that I sell

5    in the grocery store are food.  One more.  If you ask a taxi

6    driver, What are the categories of economic loss you suffered

7    from the accident that you were in, the taxi driver might say,

8    Well, replacement cost of the vehicle, I have lost revenue,

9    losing fares, I have medical expenses.  The taxi driver would

10   not say to you that the categories of economic loss that I

11   suffered from the accident are economic loss.

12         Let's take a look at what the aviation defendants are

13   doing.  It's exactly that.  They, when asked, What are the

14   categories of economic loss suffered by the plaintiffs, they

15   answer, Economic loss.  As I say, it's circular.

16         We submit that this is an abuse of the CPLR 4545

17   analysis, designed to achieve a windfall for the aviation

18   defendants.  They presented a theory which, even if they are

19   found liable by a jury in this case for the destruction of the

20   World Trade Center based on their negligence, they will not pay

21   a penny and plaintiffs will be deprived of moneys needed to

22   rebuild and replace what was lost.  I submit that would be an

23   injustice, to the public policies underlying the tort system

24   and the purposes of CPLR 4545.  It would reward the tortfeasor

25   and punish the victim.

D7FAWTC1ps                    Opening – Mr. Williamson

1           Therefore, we are opposing defendants' effort to

2     deprive the plaintiffs of recovery the damages to their

3     leaseholds that your Honor has already found exist.

4           We are here to assist your Honor in determining

5     whether *any* collateral offset can be found based on payments

6     that were received from insurance or otherwise against any tort

7     damages at all.  Your Honor knows the standard, reasonable

8     certainty, is the burden of proof they must meet.  And they

9     have to prove, words that were omitted by my colleague, they

10    have to prove close and direct correspondence to the categories

11    of economic losses recoverable in tort on the one hand and the

12    categories of insurance recoveries on the other hand.  That is,

13    as was acknowledged and as your Honor has previously held, a

14    mixed question of fact and law.

15          But here we have the aviation defendants and their

16    expert, Mr. Fischel, refusing to do a breakdown, even though

17    *Oden* and *Turnbull* teach us, you must examine what are the

18    essential elements of the economic losses that are suffered.

19    You must break them down into categories, also sometimes

20    referred to as items.  Does Professor Fischel do that?  Do the

21    aviation defendants do that?  No, they do not.  They refuse, as

22    we just saw, in the slide, which is an excerpt of their brief.

23          Now let's take a look at both sides of the equation

24    here.  With respect to insurance recoveries, they tell you

25    that -- well, your Honor has previously found that World Trade

D7FAWTC1ps                    Opening - Mr. Williamson

1    Center Properties' claim mainly fell into two categories,

2    property damage, and then also the business interruption

3    insurance, to compensate for World Trade Center Property's lost

4    revenue stream, as you were just discussing, and to defray the

5    burden of a continuing obligation to pay rent, as you also just

6    mentioned.  So with regard to that, the aviation defendants do

7    not want to have those two categories that your Honor has held.

8            So we will offer the testimony of Mr. McKinley, who is

9    an insurance expert of over 40 years of experience as an

10   insurance underwriter, broker, program manager, and insurance

11   and risk management consultant.  He will explain that your

12   Honor is correct, that there are multiple categories of loss

13   triggering multiple categories of insurance coverage.

14   Mr. Reilly, who was referenced before, was the co-lead adjustor

15   for the other side, and his report will be offered to your

16   Honor.  He explains that when he was looking at the claims that

17   were coming in following 9/11, again, being co-lead adjustor

18   for the insurers, they identified multiple categories of losses

19   for which there were multiple claims.  And that's completely

20   consistent with what your Honor held in the decision we just

21   looked at.

22           Now, with regard to what are the categories of losses,

23   the other side of the equation, we will hear from Professor

24   Steven Shavell.  He's a Ph.D. economist at Harvard Law School.

25   He has analyzed all of this and found that there are two major

1    categories of economic loss that were suffered on 9/11.  One

2    was the lost rental income, which we have just talked about.

3    And the other was replacement costs.

4              And interestingly, that's exactly consistent with what

5    your Honor has found.  If you look at the slide that discusses

6    the Judge's finding, yes, your Honor found that "WTCP suffered

7    different categories of loss."  Different categories of loss.

8              THE COURT:  Can I ask you a question, Mr. Williamson?

9              MR. WILLIAMSON:  Yes, your Honor.

10             THE COURT:  How do we deal with these flashes that are

11   before me in relationship to the record?

12             MR. WILLIAMSON:  The answer is that I've thought about

13   that and I think the answer is these are demonstrative aids for

14   purpose of the opening.  I'm not offering them in evidence.

15   And I believe that's consistent, permissible with the case law,

16   in your Honor's discretion.  I can happily have a set made if

17   you wish.

18             THE COURT:  Is that OK with defendants?

19             MR. PODESTA:  Yes, I believe it is.  These are largely

20   excerpts from --

21             THE COURT:  That's fine.

22             MR. WILLIAMSON:  So what's important about this is

23   your Honor has recognized and held that WTCP suffered different

24   categories of loss, not what Mr. Fischel says, not what the

25   aviation defendants say.  And it's consistent with what

D7FAWTC1ps                    Opening - Mr. Williamson

1    Professor Shavell, our expert, says.  Also, looking at this
2    slide of your finding in this regard, you will not find it in
3    the compendium of your decisions submitted by the aviation
4    defendants last Friday night.  We've added it to what we
5    submitted this morning because it's missing.
6             Also, you won't find it in their pretrial brief.  It's
7    vanished.
8             THE COURT:  I've read my whole decision again, series
9    of decisions again.  So I assume that the excerpts that each
10   side is putting before me are included in the whole, which I
11   read.  So it really didn't make any difference.
12            MR. WILLIAMSON:  I think that's right, your Honor.
13   The point being, though, we thought it to be a complete set of
14   excerpts and this is missing.  I think that's symptomatic of
15   the problem.
16            THE COURT:  I wouldn't dwell on that.  Each side can
17   put before me that which is interesting to each side.
18            MR. WILLIAMSON:  Yes, your Honor.
19            Let me turn now to the subject of windfall, which is
20   at the core of some of the underlying tension here in the
21   points of view.  We all recognize that CPLR 4545 is designed to
22   avoid windfalls.  But it's not just windfalls to plaintiffs.
23   It's also windfalls to defendants, as the Court of Appeals has
24   taught us.
25            With regard to the first branch of that, making sure

D7FAWTC1ps                    Opening – Mr. Williamson

1    that plaintiffs don't receive any windfalls, we have the *Fisher*

2    case, where the Court of Appeals said it's designed in part "to

3    assure plaintiffs are fully compensated but not

4    overcompensated."  Well, that's what the plaintiffs seek here,

5    to be fully compensated but not overcompensated.

6              And then some years later, the Court of Appeals

7    speaking in *Bryant* explained that CPLR 4545 –– this is the flip

8    side of it –– was intended to eliminate double recoveries but

9    not to provide defendants and their insurers with an undeserved

10   windfall, which is what we submit the defendants are seeking

11   here.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D7fkwitc2                    Opening - Mr. Williamson

1        MR. WILLIAMSON:  (Continuing)  Those are the guiding

2   principles that our experts accepted.  Those are the guiding

3   principles that we accept for the purposes of this trial.

4        Our experts will discuss the fact Professor Fischel

5   will address that even if there's no offset, plaintiffs will

6   not be made whole.  So, your Honor does not need to fear the

7   possibility of a windfall for the plaintiffs, and that's

8   because the losses here are so enormous and there just wasn't

9   enough insurance to compensate the plaintiffs for all of those

10  losses.  That's known as underinsurance, which is a problem

11  that happens to many people when a catastrophic accident

12  befalls them.

13       There's another category of problem or another aspect

14  to it, and that is, uninsured losses.  And that happens when

15  you suffer losses for which there just is no insurance, so your

16  losses become even greater than, and you just can't recover

17  enough insurance or even enough in tort to compensate you for

18  them and make you whole.

19       So there's no chance in this case, in terms of the

20  equities, that the insurers will have to pay a penny more than

21  the damages that their insureds, the aviation defendants,

22  caused.

23       Turning to a different subject:  Your Honor had told

24  us in January, when you scheduled this trial, that you wanted

25  to hear, you needed to know, the claims that were made and

D7fkwitc2                    Opening - Mr. Williamson

1   their components.  So let's take a quick look at that because

2   that evidence will be before you, as you requested it to be.

3           With regard to the main site first, in World Trade

4   Center Properties, the claims, as noted, far exceeded the

5   policy limits.  Pulling up for you first, we have the

6   replacement cost claims which were just approximately

7   7.2 billion for the main site, for the actual replacement

8   costs, and then we have for the lost rental income component,

9   the claims totaled approximately 1.35 billion.  In each case

10  I'm just rounding for simplicity.

11          These amounts did not come out of thin air.  They were

12  painstakingly calculated by Deloitte --

13          THE COURT:  May I get those amounts, please?

14          MR. WILLIAMSON:  Yes, your Honor.

15          THE COURT:  These are the proofs -- did you do a proof

16  of insurance?

17          MR. WILLIAMSON:  Yes, exactly.  It's called a PPOPL;

18  it's a preliminary proof of partial loss.  That's what you're

19  looking at, one of them.  There were many of them, and they

20  will be in evidence at this trial, assuming you let them into

21  evidence.  And this is the one for --

22          THE COURT:  They were submitted to the insurance

23  company?

24          MR. WILLIAMSON:  Yes, yes, absolutely.  So,

25  $7,183,441,908.

1           THE COURT:  908?

2           MR. WILLIAMSON:  908 is correct, your Honor.

3           THE COURT:  And that was?

4           MR. WILLIAMSON:  For replacement costs for the main

5   site.

6           THE COURT:  Including 7?

7           MR. WILLIAMSON:  No, no, for the main site.  I'm going

8   to go to 7 in a minute.  I'm not merging them.  I heard

9   Mr. Podesta do that, but these are separate parties, separate

10  plaintiffs.  I'm not going to merge them.  I think it muddies

11  the analysis, frankly.  So, no, it's just the main site, just

12  World Trade Center Properties plaintiffs, your Honor.

13          THE COURT:  OK.

14          MR. WILLIAMSON:  So, that's replacement costs.

15          So, if you look at the business income component, the

16  lost rents, you have $1,347,805,679, your Honor.

17          THE COURT:  1,347,805,679?

18          MR. WILLIAMSON:  679, yes, that's correct, your Honor.

19          THE COURT:  That's the total of business interruption?

20          MR. WILLIAMSON:  For the main site, for World Trade

21  Center Properties plaintiffs, yes, correct.

22          THE COURT:  OK.

23          MR. WILLIAMSON:  So what I was pointing out was that

24  Deloitte, Tishman, Cambridge Horizon, now a part of Aon, and

25  other professionals, did all of this calculation and

D7fkwitc2                     Opening – Mr. Williamson

1   substantiation and documentation of all of these losses.  So,

2   these numbers do not just come out of a hat.

3           Now, if the proofs of losses had been submitted to the

4   insurers the way the aviation defendants and their expert,

5   Danny Fischel, would like to do it, it would have been one

6   proof of loss for one big economic loss, undifferentiated, not

7   broken down, just one big economic loss.  Or we can take it

8   from their brief, as we did earlier -- they could say, here's a

9   proof of loss for about 8.4 billion and it's for the economic

10  damage to our net leasehold interests.  Our experts will

11  testify that if that had happened, that would have been

12  rejected out of hand.  It's nonsense.  The argument defies

13  reality because it is contradicted by reality.  Economic loss

14  is not a category of loss.  It's the basket in which one finds

15  various types of economic losses or, in the words of the Court

16  of Appeals, items of economic.  And Oden and Turnbull are

17  absolutely clear that you must break it down.  You can't just

18  say, I have economic loss.  That's what they're doing.  And the

19  fact that such a claim would have been rejected, as you will

20  hear, really proves the point.

21          Now let me turn to 7, because your Honor asked about 7

22  and I will quickly give you the same quantifications.

23          First off, for replacement costs on 7, the proofs of

24  loss totaled $1,053,399,635.  I can give you copies of these

25  slides if it's actually easier for your Honor, whatever you

D7fkwitc2                    Opening - Mr. Williamson

1   prefer, but that's the number for replacement costs.  And,

2   again, you'll see this in evidence; this was the claim.

3            Do you have that amount?  Should I go to the next one?

4            THE COURT:  Please proceed.

5            MR. WILLIAMSON:  Yes, thank you.  I'll go to the next

6   one, which is for the lost rental income time element, it's

7   called under the coverage, $441,698,256.  So, $441,698,256 for

8   lost rental income.

9            Mr. McKinley will explain, where it says time element,

10  that's how the coverage was categorized for the 7 World Trade

11  Company policy.

12           And you also have extra expense, which is noted, and

13  that had not been quantified at the time this was first

14  submitted.

15           Then the next and last in the series is one you asked

16  about, which is personal property and business property.  And

17  here you have $1,846,139.43.

18           THE COURT:  Which is the main or the --

19           MR. WILLIAMSON:  This is 7, we're all on 7.  The last

20  two and --

21           THE COURT:  You didn't give me a number for that with

22  the main, though.

23           MR. WILLIAMSON:  You're correct.  I didn't break it

24  down separately, you're correct, and I'll explain why.  That's

25  because there were a whole -- let me just get you this number

D7fkwitc2                     Opening - Mr. Williamson

1    and make one point first.

2              So, you've got the 1,846,000, which Mr. Podesta had

3    given you.  If you want to go right out to the pennies, it's

4    $139.43.  You asked Mr. Podesta, is that under a different

5    insurance policy, and he said yes.  But it's a mistake --

6              THE COURT:  Different insuring agreement, I guess?

7    There are usually several insurance agreements in a particular

8    policy.

9              MR. WILLIAMSON:  This is part of the same policy, it's

10   one of the categories of coverage.

11             THE COURT:  That's how he answered.

12             MR. WILLIAMSON:  OK.

13             And with respect to this, and why I didn't give you

14   the same number on the main site, it's because there was a

15   group of claims -- and I could show them all to your Honor and

16   they're available in evidence -- called TBD, they're to be

17   determined.  And those were claims where the insured, World

18   Trade Center Properties and also 7, put the insurers on notice,

19   we have additional claims.  But there's chaos reigning, and as

20   we get to it, we will quantify those two, but we're giving you

21   what we've got so far.  So, we're putting you on notice we've

22   got other claims, and they would say TBD and if the losses had

23   been resolved, as they ultimately all were, the insured would

24   have had to be providing additional dollar amounts and

25   documentation for those, and it would have.

D7fkwitc2                       Opening - Mr. Williamson

1          But the claims adjustment process then began.

2    Mr. Reilly, again the colead adjuster for the other side but

3    now our expert witness, established that there were separate

4    categories of loss, separate claims for different categories of

5    losses, and they were being analyzed and matched up against the

6    categories of insurance coverage that existed.

7          Payments began to be made.  This is again going to get

8    into the things your Honor wanted covered back in January when

9    you said the trial would be held now.  The payments were made

10   along the way.  The lion's share of the payments come later but

11   there were payments on account.  There were payments without

12   prejudice, there were no allocations, there was disagreement as

13   to what the claims payments were being made for.  Sometimes

14   they would reject the proof of loss or the preliminary proof of

15   loss, but they'd pay some money along the way on account.  And

16   it went on like that for a while.

17         Your Honor has mentioned, and I think Mr. Podesta

18   mentioned, that all of the 4.091 billion came from insurance

19   policies or for insurance policy coverage, and there are two

20   exceptions to that.  One is that there was actually a 17-1/2

21   million that did not come from an insurance policy.  The

22   company got sued -- I can give you the exact name, a company by

23   the name of Royal, it begins with -- and they were sued for

24   fraud and other claims in New York State Supreme Court.  They

25   had a relationship to a company that had sold insurance but

D7fkwitc2                    Opening - Mr. Williamson

1    they had not sold any insurance.  And that case was litigated

2    in New York Supreme and ultimately did settle.  So they did not

3    pay that money pursuant to any insurance policy at all.

4              THE COURT:  Why do I need to know this?

5              MR. WILLIAMSON:  Because, to the extent that the

6    notion is being put forward -- and I just heard it being

7    forward -- that all of this money was for insurance policies

8    that had been purchased, that's wrong.

9              THE COURT:  All of which money?  All of the money that

10   was paid?

11             MR. WILLIAMSON:  Yes, the 4.091.

12             And then on 7, you also heard the same thing, that the

13   831 million number that's being used was all for insurance

14   proceeds, and that's not correct either.  819 of it is, and

15   11.9 -- rounded off to 12 million -- is actually 7 World Trade

16   Company's share of monies recovered from the tort feasors from

17   the aviation defendants by way of settlement with IRI.  So,

18   there are just two separate categories, and painting with too

19   broad a brush leads to errors in the analysis.  That's the

20   point.

21             Your Honor noted --

22             THE COURT:  Are you going to give me a document a

23   paper that summarizes all this?

24             MR. WILLIAMSON:  I absolutely can.  Yes, absolutely.

25   I and my colleagues will be happy to work harder on that and

D7fkwitc2                    Opening - Mr. Williamson

1   have it for you, yes, your Honor, absolutely.

2          Lawsuits:  Lawsuits broke out.  Why did they matter?

3   I'll tell you.  First, what happened?  Swiss Re and others

4   brought lawsuits, starting with the one-occurrence/

5   two-occurrence issues and segueing into other issues, as you

6   know, and they were handled by Judge Martin and then Judge

7   Mukasey.

8          World Trade Center Properties asserted counterclaims,

9   called extra-contractual claims, claiming bad faith in delaying

10  payments on policies when they knew these were policy limits

11  losses, in the insured's view, dribbling payments out rather

12  than making them all promptly.  And the underlying bad-faith

13  handling of the claims was a claim that was made in these

14  lawsuits.  Also, prejudgment interest was sought.  Why does

15  that matter?  Because when the settlement agreements were

16  arrived at, they were not just for, as Mr. Beach would have it,

17  their expert, only for documented claims listed under the

18  insurance policies.  That's the only thing Mr. Beach will tell

19  you -- and he's testified to this under oath -- that's the only

20  thing insurers will ever pay on.  Well, that's just plain

21  wrong.  We know it in a couple of ways.

22          The first way we know it for sure is -- and this will

23  come out at trial -- a number of the insurers, for the reasons

24  that I just indicated, paid more than their policy limits,

25  more.  So that proposition is put to rest.  That's just not

D7fkwitc2                      Opening - Mr. Williamson

1    possible, because they paid more than the policy limits.  And

2    Mr. McKinley will explain, it just doesn't work that way.

3          And then, third, your Honor is going to be able to

4    examine all of the settlement agreements and see for yourself.

5    They don't say what Mr. Beach says.  They say something very

6    different, not surprisingly.  They say, we wanted all of the

7    claims that have been made yet or that could be made, either

8    under the policies or in lawsuits, to all be settled.  We don't

9    want to be sued anymore, we don't want to have any claims from

10   you anymore, we want to buy peace.  So, everything was covered,

11   and that includes the ones that I just alluded to earlier --

12         THE COURT:  I understand people settle under a lease

13   that has boilerplate saying all claims made or which could be

14   made --

15         MR. WILLIAMSON:  Yes.

16         THE COURT:  -- so I understand your argument.  There's

17   no need to make aspersions against your adversary.  He made his

18   points, you make your points.

19         MR. WILLIAMSON:  Yes, your Honor.

20         THE COURT:  Your point is that the settlement covered

21   not only the claims that were codified but also other

22   categories of claims?

23         MR. WILLIAMSON:  Yes.  The "to be determined" and also

24   the extra-contractual, correct.

25         And it's a stipulated fact that there was no

D7fkwitc2                    Opening - Mr. Williamson

1    agreed-upon allocations in any of these settlement agreements.

2              Now, Mr. Podesta argued that it would make -- I think

3    his words were it would make 4545 a dead letter if your Honor,

4    were to say, well, just because there are no agreed-upon

5    allocations --

6              THE COURT:  I really would like us to focus on opening

7    statements.  It's not opening.  We're talking about arguments,

8    many of which I've heard before.  Let's focus on opening.  Tell

9    me what the experts are going to say and how this ties into

10   this case.  That's more interesting to me.

11             MR. WILLIAMSON:  Yes, your Honor.

12             So, just on that point, we deal with that in our

13   brief.  It involves collusive settlements.

14             With regard to --

15             THE COURT:  Collusive settlements?

16             MR. WILLIAMSON:  Collusive settlements.  The cases

17   they're citing, that they say you should now ignore these

18   settlement agreements based upon, were cases in which the

19   courts were discussing collusive settlements.  We discussed

20   that in our pretrial brief.  They don't apply, but it was

21   raised today, to argue that 4545 would become a dead letter.  I

22   was just alerting your Honor that we deal with that in the

23   pretrial brief.

24             THE COURT:  I'm alerted.  Thank you very much.

25             MR. WILLIAMSON:  Thank you.

D7fkwitc2                      Opening – Mr. Williamson

1              OK, now, to complete the history here, with regard to

2    7 World Trade Center, the evidence will show that they

3    commenced a lawsuit and they had to sue IRI, their carrier.

4    There are two lessons that emerge from that lawsuit which

5    inform this analysis at this trial.  One is that one of the big

6    issues that related to the claim, the gravamen of which was bad

7    faith, was that IRI was going to deduct from one category of

8    insurance coverage payments that had been made for a different

9    category of insurance coverage.  And that was part of the

10   lawsuit, and it was settled.  And in the settlement IRI had to

11   agree in a written stipulation of settlement filed in this

12   court that that wasn't proper and the amounts had to be put

13   back into the correct categories.

14              THE COURT:  I don't remember that.

15              MR. WILLIAMSON:  I'm sorry?

16              THE COURT:  I don't remember that.

17              MR. WILLIAMSON:  No, it was not before your Honor.

18   But the stipulation was filed in December 2003, and we can

19   provide it to you.  And --

20              THE COURT:  What do I learn from this?

21              MR. WILLIAMSON:  What you learn from it is that you

22   can't -- they're not fungible.  That's the point of Oden.

23              THE COURT:  What's not fungible?

24              MR. WILLIAMSON:  Insurance recoveries.  You can't just

25   say, OK, I'm IRI and I received a claim from you for property

D7fkwitc2                    Opening - Mr. Williamson

1    damage but I want to subtract from that claim because I don't

2    want to pay you that much, I'm going to subtract some money

3    that I paid you on your lost rental income claim, just switch

4    it.  That is exactly what Oden says you can't do.  It's not

5    fungible.  You can't just move it around to reach your desired

6    results.

7            And let's take a look at the final internal IRI loss

8    handling instructions.  You learn from that that -- well, a

9    couple of things.  The first thing you'll learn, we all learn,

10   is that, yes, of course you can break insurance payments, as

11   your Honor has held, into different categories of coverage.

12   And this is the IRI final internal document -- not ours,

13   theirs -- for their loss handling instructions.  And it says,

14   after final payment, please allocate to, and then you have the

15   $586,223,141.32.  And this becomes very important later for the

16   property damage claims to the property damage coverage.  And

17   this sets up a ratio that we're going to talk about in a

18   minute.  And the time element or lost rental income claims they

19   set 233 million for those.  So, it can be done, IRI did it, and

20   it informs the process.

21           Now, a foundational point of departure for this

22   analysis is that we have to accept your Honor's rulings -- and

23   we do, for the purposes of this trial -- that under tort law

24   plaintiffs will be precluded from recovering replacement cost

25   damages.

D7fkwitc2                     Opening - Mr. Williamson

1              Your Honor has held --

2              THE COURT:  I remember.

3              MR. WILLIAMSON:  OK.  That was in September.

4              And then with regard to 7 World Trade Center, in

5     December of last year, you had a similar holding, both times

6     acknowledging that you had ruled that plaintiffs cannot recover

7     in tort for their replacement costs.

8              The second point is also missing --

9              THE COURT:  Because it exceeded fair market value.

10             MR. WILLIAMSON:  Yes.

11             And with respect to these holdings, Mr. Podesta was

12    referencing Fisher and saying, well, this case is just like

13    Fisher, exactly like Fisher.  And that's argued in their

14    pretrial brief.  But your Honor has rejected that and --

15             THE COURT:  Please, opening, not legal argument.

16             MR. WILLIAMSON:  Very well.

17             THE COURT:  How many witnesses are you going to have,

18    Mr. Williamson?  Tell me about that.

19             MR. WILLIAMSON:  Yes.  I mentioned Mr. McKinley, who

20    will be our first witness.  And we have explained off the

21    record the situation with regard to Mr. Beach -- I'm sorry,

22    Mr. Reilly, I misspoke.  I don't know if you want me to go into

23    that on the record?

24             THE COURT:  No, I do not.

25             MR. WILLIAMSON:  Yes, OK.  So then we also will have

D7fkwitc2                    Opening - Mr. Williamson

1    Professor Shavell.  And I can move now to the next point.

2              We submit at the end of the evidence that when the

3    standards are proof required are enforced, the aviation

4    defendants will not meet them.

5              With regard to the conclusion that's advocated here,

6    it's very revealing that years ago our expert, Professor Steven

7    Shavell, indicated in his analysis for your Honor's

8    consideration that if your Honor found that there should be

9    some allocation, even though we believe none has been proven

10   and he argues that there should be none in his expert view from

11   an economist's standpoint, nevertheless, if you wanted to

12   create one, you could do it by setting up a ratio in regard to

13   the claims that were filed.  And your Honor discussed this in

14   the June of last year oral argument, and you discussed it in

15   your decisions.

16             Now, for the first time, the aviation defendants, by

17   the way, offered no allocation, none --

18             THE COURT:  Can we not please make rebuttals.  This is

19   not the time for that.  You'll have a closing argument.

20             MR. WILLIAMSON:  Yes, your Honor.

21             Can I just point out that the turnabout on this

22   issue --

23             THE COURT:  No.

24             MR. WILLIAMSON:  -- just quickly?

25             THE COURT:  I think you've told me all that you're

D7fkwitc2                         Opening - Mr. Williamson

1    going to tell me.  You told me that McKinley is going to talk

2    about the insurance, that Shavell is going to talk about the

3    economics.  All right, let's get the witnesses going.

4              MR. WILLIAMSON:  OK.

5              So, in conclusion, on the correspondence question:

6    We've tried to distill the analytics down to this -- that if we

7    take the recoveries from the insurers, divide them, as your

8    Honor has, into the two major categories which your Honor has

9    said exist, Professor Shavell has said exist, then we find that

10   if we match them up with what could be a potential tort

11   recovery and what can't, the conclusion inescapably is no

12   correspondence on replacement costs, possible correspondence on

13   lost rental income.  If your Honor finds that they have met

14   their burden of proof and if your Honor elects to use Professor

15   Shavell's approach, which now the aviation defendants have

16   adopted as a possible, in fact the best, method of allocation

17   or most practicable, they say --

18             THE COURT:  Let me understand this chart.

19             MR. WILLIAMSON:  Yes, your Honor.

20             THE COURT:  WTCP's recoveries from insurers?

21             MR. WILLIAMSON:  Yes.

22             THE COURT:  And then you said property damage?

23             MR. WILLIAMSON:  Yes.

24             THE COURT:  But that wasn't the insuring agreement,

25   was it?

1          MR. WILLIAMSON:  Yes, replacement costs.

2          THE COURT:  OK, but not property damage.  How much it

3     would cost to replace the property?

4          MR. WILLIAMSON:  Right.

5          THE COURT:  So, why do you write no correspondence

6     between property damage and replacement costs?

7          MR. WILLIAMSON:  Because your Honor has said, looking

8     at the left-hand --

9          THE COURT:  So this is a depiction of what I said?

10          MR. WILLIAMSON:  Yes, that's the belief, yes, your

11     Honor.

12          THE COURT:  I think I'd rather use my words than --

13          MR. WILLIAMSON:  Of course.  It's just an attempt to

14     provide graphic analytics.

15          THE COURT:  Mr. Williamson, it's not of any use.

16          MR. WILLIAMSON:  Very well.

17          Thank you, your Honor.

18          THE COURT:  OK, you're welcome.

19          First witness?

20          MS. TAYLOR:  Your Honor, Ann Taylor for Globe.  I have

21     the honor of calling the aviation defendants' first witness,

22     Mr. Michael Beach.

23          THE COURT:  Is there an agreement that the experts

24     remain in the courtroom or must they be invited out?

25          MR. PODESTA:  I have no objection to their witnesses

D7fkwitc2                    Opening - Mr. Williamson

1   staying, as long as it's on a reciprocal basis.

2           THE COURT:  It's on reciprocal?

3           MR. WILLIAMSON:  Yes, your Honor.

4           THE COURT:  The witnesses can stay.

5           I appreciate attention to the oath while it's given,

6   no notes, no shuffling of papers.

7    MICHAEL S. BEACH,

8        called as a witness by the Defendants,

9        having been duly sworn, testified as follows:

10          THE COURT:  Try to talk loudly, give the reporter your

11  full name, and spell it.

12          THE WITNESS:  Yes.  It's Michael S. Beach, B-e-a-c-h.

13          THE COURT:  You may inquire, Ms. Taylor.

14  DIRECT EXAMINATION

15  BY MS. TAYLOR:

16  Q.  Good morning, Mr. Beach.  Are you currently employed?

17  A.  I am I am employed with McLarens Global Claims Services as

18  an executive general adjuster and a vice president.

19          THE COURT:  Spell the name, please.

20          THE WITNESS:  It's McLarens, M-c-L-a-r-e-n-s.

21  Q.  And what is McLarens Global Claims Services?

22  A.  We are the largest independently owned independent

23  adjusting firm in the world.  We have some 300 offices in 80

24  countries.  We have a diverse portfolio of clientele and are

25  considered lead adjusters in the global world.

D7fkwitc2                    Beach - direct

1    Q.  Can you briefly describe for us what an adjuster does?

2    A.  Yes.  The primary function of an adjuster is to evaluate

3    losses and to make recommendations to their insurers.

4    Q.  For how long have you worked as an adjuster, Mr. Beach?

5    A.  It's been 25 years now.

6    Q.  Do you consider yourself an expert in any particular area?

7    A.  Yes.  I would say I'm an expert in the handling of claims,

8    making recommendations to insurers, primarily focusing on

9    property claims.

10   Q.  And what is involved in adjusting property losses?

11   A.  You're generally going to evaluate the losses that are

12   presented and you're going to review policy coverages, work

13   with consultants, and ultimately make recommendations to the

14   insurers.

15   Q.  I'm sure you've handled many accounts in 25 years, but as

16   examples, could you identify some significant accounts you

17   currently handle?

18   A.  Yes.  I am what they call an account adjuster.  I handle

19   claims for Cole Holdings -- they're one of the largest real

20   estate investment trust companies in the world -- I handle

21   claims for Compass Group -- which is, I believe, the fourth

22   largest employer in the world handling food service -- I work

23   for the Chicago Public School District insurers -- which is one

24   of the largest school districts in the country -- I also

25   assisted in handling claims for Federal Express, General

D7fkwitc2                    Beach - direct

1    Electric, and other property management companies, similar to

2    World Trade Center, such as C.B. Richard Ellis, Grubb & Ellis.

3    Q.  Have you had experience addressing damages claims arising

4    out of natural disasters?

5    A.  I have.  Over the years I've handled claims as a result of

6    earthquakes, floods, several hurricanes, storm losses.  In

7    fact, I'm currently handling a claim here on the East Coast as

8    a result of Superstorm Sandy which involved some 950 locations

9    for one insured.

10   Q.  Have you also had experience in adjusting losses from

11   international events?

12   A.  Yes.  As a result of the invasion of Iraq into Kuwait and

13   following Desert Storm, I was in involved handing claims

14   assessing for the royal family for some six weeks in the early

15   1990s.

16   Q.  What was the purpose of the adjustment of those property

17   claims in Kuwait?

18   A.  Obviously there was substantial damage due to the war, and

19   we were brought in to assess the damages sustained by the royal

20   family property owners in the country.  Those claims would then

21   be certified by the United Nations in attempting to recover

22   funds from the country of Iraq.

23   Q.  Mr. Beach, here in this matter what were you retained to do

24   for the aviation defendants?

25   A.  In this case, I was asked to provide expert analysis and

D7fkwitc2                     Beach - direct

1   testimony regarding the insurance claims that were asserted by

2   WTCP on both the complex claim and the World Trade Center 7

3   case as it relates to those claims asserted to the insurers.

4   Q.  And did you issue any expert reports?

5   A.  I did.  I issued one expert report on the complex claim,

6   and I issued a report on World Trade Center 7, which I had

7   supplemented twice.

8   Q.  Let me have Mr. Byrnes hand you what has been marked

9   Defendants' Exhibit A --

10          THE COURT:  I'd rather take the testimony orally.

11  There's no need to introduce the reports.  Cover what you want

12  to cover.

13          MS. TAYLOR:  Your Honor, we would tender Mr. Beach as

14  an expert on the insurance issues presented in this case.

15          THE COURT:  Is there any objection, Mr. Williamson,

16  Ms. Baglin?

17          THE WITNESS:  Your Honor, I'm going to be

18  cross-examining Mr. Beach.  We have no objection as long as

19  he's being offered as an adjuster.  That was what his reports

20  say, that's what his testimony was.  It's not clear --

21  Mr. Beach just said he was retained to --

22          THE COURT:  Do you object, Ms. Baglin?

23          MS. BAGLIN:  To anything beyond --

24          THE COURT:  Overruled.  Proceed please.  No speeches,

25  please.  If you object, the word is "objection," period.

D7fkwitc2                        Beach - direct

1          Go ahead, Ms. Taylor.

2          MS. TAYLOR:  Thank you, your Honor.

3   BY MS. TAYLOR:

4   Q.  Mr. Beach, could you describe the type of coverage World

5   Trade Center Properties had for the complex at the time of the

6   loss?

7   A.  Yes.  They acquired insurance, which primarily covered the

8   value of the buildings, the property damage, as well as any

9   losses that may occur as a result of damage to those buildings

10  in the form of business interruption or rental income losses.

11  Q.  Did World Trade Center Properties operate the complex as an

12  income-producing property?

13  A.  That is my understanding, yes.

14  Q.  And are you familiar with the scope of property insurance

15  coverage that companies which manage high-rise office buildings

16  obtain?

17  A.  It would be common to obtain coverage for both property

18  damage and business income losses.

19  Q.  And how are you familiar with that type of coverage?

20  A.  Well, I have worked for insurers on similar properties, as

21  I mentioned C.B. Richard Ellis and Grubb & Ellis, which are

22  similar large real estate management companies.

23  Q.  Why do companies that manage high-rise office buildings

24  obtain both property damage and business interruption coverage?

25  A.  Well, the coverages, as we briefly heard today, they work

D7fkwitc2                        Beach – direct

1    together.  There's property damage coverage and rental income

2    that both would respond in the event of destruction, such as

3    this case.

4    Q.  And what does property damage coverage address?

5    A.  Well, the property damage would respond to repair or

6    replace the buildings that were damaged.  Once that coverage

7    responded, it would enable the policyholder or the owner to

8    restore their income stream as a result of the building being

9    completed.

10   Q.  And what does business interruption coverage pertain to?

11   A.  That would be the coverage for their loss of revenues or

12   rental value less any noncontinuing expenses that would have

13   been incurred during that period of restitution, from the date

14   of the loss until those buildings were restored.

15   Q.  Why is business interruption coverage limited to the time

16   that it takes to repair or rebuild the building?

17   A.  Once again, the business interruption coverage covers that

18   period of time from the date of the loss until the buildings

19   are restored.  As mentioned, once the building is restored,

20   their revenue streams would be returned and they could retenant

21   those buildings; therefore, it's limited to the period of

22   repair or recovery.

23   Q.  Mr. Beach, could World Trade Center Properties have

24   asserted a business interruption claim without having physical

25   damage to the property?

D7fkwitc2                    Beach - direct

1    A.   No.   The policy requires there be physical loss or damage

2    to the building.

3    Q.   Now, we've been talking about two types of coverages here,

4    property damage and business interruption.   From an insurance

5    perspective, did World Trade Center Properties incur two losses

6    here, one for property damage and one for business

7    interruption?

8    A.   No, it's my opinion there was one loss as a result of the

9    terrorist attacks.   However, the policies did respond to two

10   separate coverages, those being property damage and business --

11             THE COURT:   Is there a difference between how many

12   losses and how many categories of losses?

13             THE WITNESS:   Well, I consider it one loss.   The --

14   this was something that was litigated and I believe --

15             THE COURT:   One occurrence?

16             THE WITNESS:   I call it -- in the insurance world,

17   it's one loss event.   And I know the Court's ruled some

18   policies had responded on a two-occurrence basis.

19             THE COURT:   That's because there were two airplanes

20   and two buildings and it depended on the definition, but do we

21   generally concern ourselves with how many losses -- we talk

22   about loss events, not losses?

23             THE WITNESS:   Well, yeah, in simplified terms, I would

24   consider it one loss to which I would have one insurance file,

25   one claim file; two coverages distinctly being property damage

D7fkwitc2                    Beach - direct

1    and rental income, but, again, one loss event, is my opinion.

2              THE COURT:  Go ahead.

3    BY MS. TAYLOR:

4    Q.  Mr. Beach, could you estimate the amount of records you

5    reviewed in connection with your analysis of the insurance

6    adjustment process for the loss associated with the complex?

7    A.  There were several thousand pages of materials that I

8    reviewed, multiple documents.

9    Q.  Let me hand you what has been marked as -- or have Mr.

10   Byrnes hand you what's been marked as Defendants' Exhibit A-4.

11             MR. BYRNES:  May I, your Honor?

12             THE COURT:  Yes.  Are we going to use the screens?

13             MS. TAYLOR:  Yes.

14             THE COURT:  So why do we need to work with paper?

15             MS. TAYLOR:  I thought it might be beneficial for

16   Mr. Beach to have the exhibit in front of him.

17             THE COURT:  OK.  He has a screen.

18             MR. BYRNES:  Would you like a paper copy or will you

19   be using the screen?

20             THE COURT:  I have one.

21             MR. BYRNES:  Yes, you do, your Honor.

22             THE COURT:  Please proceed.  Put it up on the screen.

23             There's not going to be an objection, is there,

24   Mr. Williamson or Ms. Baglin?

25             MS. BAGLIN:  Your Honor, this is a document that has

D7fkwitc2                          Beach - direct

1   been created for the litigation.  We will hear what the witness

2   is going to say about it.  We just were given it today for the

3   first time.  This was not a document that was ever produced

4   before --

5          THE COURT:  Do you object?

6          MS. BAGLIN:  It does not appear objectionable on its

7   face.  I'm not sure how it's going to be used, your Honor.

8          THE COURT:  Go ahead, please, Ms. Taylor.

9          MS. TAYLOR:  Your Honor, just to that point:  This was

10  an exhibit to Mr. Beach's expert report which was served in

11  July of 2011.

12  BY MS. TAYLOR:

13  Q.  Mr. Beach, did you create this document?

14  A.  Yes, I did.

15  Q.  What records did you review specifically to create this

16  exhibit?

17  A.  This document is labeled a summary of the proofs of loss.

18  So, the documents I relied upon would have been the proofs of

19  loss submitted by World Trade Center, the documents that were

20  submitted in support of those proofs of loss, including the

21  business income analysis as well as the property damage

22  analysis that was put forward by their expert, that being

23  Cambridge Horizon and --

24          THE COURT:  So this is a summary of various documents

25  that were submitted by the insured to the insurer?

D7fkwitc2                        Beach - direct

1              THE WITNESS:  That is correct, yes.

2              THE COURT:  Is there an objection?

3              MS. BAGLIN:  Not based on the titles across the

4    headings, no.  We agree that --

5              THE COURT:  Ms. Baglin, please, this is not a

6    deposition.  Do you object?  You've seen the document, you

7    reviewed the document.  Is it a fair summary?

8              MS. BAGLIN:  It appears to be a fair summary, your

9    Honor.

10             THE COURT:  This a fair summary of the documents that

11   are referenced on this summary?

12             THE WITNESS:  Yes.  In fact, we previously reviewed

13   some of those today.

14             THE COURT:  Objection overruled.

15             MS. TAYLOR:  Your Honor, we would like to hand

16   Mr. Beach the proofs of loss that form the basis of his

17   exhibit, which is Defendants' Exhibit A-4, to lay the

18   foundation to get the proofs of loss into evidence.

19             THE COURT:  That's not how you're going to get it into

20   evidence.  You can't use a summary as the basis for introducing

21   that which is summarized.  That's circular.

22             MS. TAYLOR:  Your Honor, we would like to hand the

23   witness the actual proofs of loss.

24             THE COURT:  Are you going to use it for any other

25   purpose than to establish these values?

D7fkwitc2                        Beach - direct

1           MS. TAYLOR:  The proofs of loss in themselves are --

2     they establish the values that are on the charts.  The proofs

3     of loss are the actual individual evidence.

4           THE COURT:  This is a summary?

5           MS. TAYLOR:  This is a summary.

6           THE COURT:  So, the use of a summary is to make

7     unnecessary the constituents of the summary.  Why complicate

8     things?  When it comes to be necessary, you can do it, but

9     don't do it until it's necessary.

10    Q.  Mr. Beach, I notice on your summary --

11          THE COURT:  I think it should be a required course,

12    for all commercial lawyers to be a public defender for a year,

13    learn how to try cases.  It's so different from depositions.

14          Please proceed.

15    BY MS. TAYLOR:

16    Q.  Now, I notice on Defendants' Exhibit A-4, a title a column

17    that's indicated titled "Title/Coverage."  And I note certain

18    items in there are in quotes and some are in parentheses.  What

19    does this denote?

20    A.  Yes, those items which are in quotations, which were

21    inserted by me, designate the method in which those proofs of

22    loss were submitted and how they were titled by WTCP.  We will

23    see, of course, under proof of loss number 2, in their

24    supplements, they did not title those proofs of loss.  What I

25    have done is identified what those proofs of loss represented

D7fkwitc2                         Beach - direct

1   and those were in parentheses, the three larger numbers

2   appearing under building and loss claim.

3   Q.   And Mr. Beach, certain of the items are titled in quotes

4   "Business Income Only" and certain are titled "Rental

5   Value/Business Income Only."

6           Is there any basis in the proofs that is different

7   between those two titles that World Trade Center Properties

8   used?

9   A.   No.   At some point in time they, WTC, had changed the

10  wording on the proofs, but, no, essentially they are the same

11  and the method in which the crimes were put forth are the same.

12  Q.   In your review of the proofs of loss, did you form any

13  opinions about what claims World Trade Center Properties

14  submitted?

15  A.   Yes.   They had asserted claims for business income or

16  rental value and business income, as was stated.   They also

17  asserted claims for property damage on both an actual cash

18  value and a replacement cost basis.

19  Q.   At some point did World Trade Center Properties also submit

20  things to the insurers identified as TBD, or to be determined?

21  A.   Yes.   There was a very large claim presentation that was

22  put forward which Cambridge Horizon.   They're a consultant --

23  that being World Trade Center's -- and several items were put

24  forth in that presentation as to be determined.

25           THE COURT:   In addition to what you have here?

D7fkwitc2                    Beach - direct

1          THE WITNESS:  That is correct.  The values as TBD were

2    never presented and claimed or valued, so they would not be

3    included on this from a value standpoint.

4    Q.  Mr. Beach, does listing an item as TBD suffice in

5    presenting a claim to an insurer?

6    A.  No.  It would suggest to me that they may have an intent to

7    file a claim but that would not be asserting a claim.

8    Q.  Could you describe for us proof of loss number 2?

9    A.  Yes.  Proof of loss number 2 was submitted or dated

10   November 7th of 2001, the value is $3,471,800,000, and WTC was

11   asserting a claim for the actual cash value of the building on

12   a one-occurrence basis.  And that value, you may note, was

13   $75 million less than their policy limits, as they had already

14   received payment of $75 million.

15   Q.  And was that --

16          THE COURT:  Can I just understand:  ACV means actual

17   cash value?  Is that what ACV means?

18          THE WITNESS:  Correct, actual cash value.

19          THE COURT:  Exceeds occurrence limit?

20          THE WITNESS:  Yes.  It was suggested in the proof of

21   loss that their -- the value of their building on an ACV basis

22   would exceed their limit of insurance, which was

23   $3,546,000,000.  They have essentially asked that insurers pay

24   policy limits less what was previously advanced when paid.

25          THE COURT:  And the number 3,471,000,000, is that your

D7fkwitc2                           Beach – direct

1   number or their number?

2              THE WITNESS:  No, that was -- all of these numbers

3   were those submitted by WTCP in the forms of proofs of loss.

4   Yes, that was essentially their policy limit value, 3.5 million

5   minus a $75 million payment that had been advanced in response

6   to proof of loss number 1.

7              THE COURT:  So, is this $3,471,000,000 the asserted

8   actual cash value?

9              THE WITNESS:  It was presented as an actual cash

10   value, yes, that their claim exceeded the policy limits on an

11   actual cash value, is what they were asserting.

12              THE COURT:  So, the 3,471,000,000 was the remainder

13   after a partial payment?

14              THE WITNESS:  That is correct, yes.

15              THE COURT:  The partial payment was what?

16              THE WITNESS:  $75 million.

17   BY MS. TAYLOR:

18   Q.  Mr. Beach, could you briefly describe for us the first

19   supplement to proof of loss number 2?

20   A.  Yes.  A few months later, on January 18th of 2002, the

21   first supplement to proof of loss number 2 was submitted.  This

22   was submitted with a large claim binder that was prepared by

23   WTC's consultant, Cambridge Horizon.  And within that proof of

24   loss and that claim summary they identified what they believed

25   to be the replacement cost value of the four structures as well

D7fkwitc2                        Beach - direct

1    as the actual cash value.

2              In parentheses I have noted that the ACV value for the

3    four buildings was quantified at 6.497 billion and the

4    replacement cost at 7.183 billion.  They also asserted that

5    they were requesting payment on the basis of there being a

6    two-occurrence limit, which would be the 3.546 plus an

7    additional 3.546.

8              THE COURT:  Actually, if that offer of getting another

9    copy is still good, I'll take it.

10   Q.  Mr. Beach, did World Trade Center Properties support the

11   first supplement to the proof of loss number 2 with any

12   supporting documentation?

13   A.  Well, yes, the supporting documentation presented related

14   to the value of the buildings at replacement cost and actual

15   cash value.  It was in excess of a 2,000-page document that was

16   prepared by Cambridge Horizon.

17             THE COURT:  Tell me again.  The $7,183,000,000 figure,

18   was that claimed to be actual cash value or replacement cost?

19             THE WITNESS:  No, if I could explain, they have valued

20   both of those numbers in their presentation.  The 7 billion

21   number being the replacement cost, and the 6.497 being their

22   actual cash value.  So, they're just showing the difference

23   there.

24             THE COURT:  Give me a moment, please.

25             Thank you.  Proceed.

D7fkwitc2                    Beach – direct

1    BY MS. TAYLOR:

2    Q.  Mr. Beach, is what is on the screen, Joint Exhibit No. 5, a

3    copy of the Cambridge Horizon report you just testified to that

4    was submitted as documentation with first supplement to proof

5    of loss number 2?

6    A.  Yes.  As you will see, this document is dated January 8th,

7    which is the date shown as their first supplement, and it is

8    titled their partial claim summary and supporting

9    documentation, which if you turn to the next few pages, it will

10   show where those values of that we're referencing of

11   7.183 billion or replacement costs and 6.497 as ACV.  Those

12   numbers shown by each of the four buildings, Trade Centers, 1,

13   2, 4 and 5.

14   Q.  Mr. Beach, can you provide us a general understanding

15   within the insurance industry of the difference between

16   replacement cost value and actual cash value, as it relates

17   here?

18   A.  Yes.  Replacement cost is the amount or cost that it would

19   be to replace the damaged buildings, the four destroyed

20   buildings, with new buildings, new materials, essentially as

21   they existed prior to the loss.  The actual cash value, on the

22   other hand, would be derived by using the replacement cost

23   value and deducting depreciation to a value but not less than

24   the market value.

25   Q.  Is there a name in the insurance industry that is referred

D7fkwitc2                         Beach - direct

1    to concerning the difference between the actual cash value and

2    replacement cost value figures?

3    A.  Yes.  The difference between these two values is commonly

4    known as the depreciation holdback.

5    Q.  For a policy that responds to a loss on a replacement cost

6    value, does the insured get the agreed replacement cost value

7    immediately?

8    A.  No.  They would be entitled to receive the agreed actual

9    cash value.  Once they had presented documentation supporting

10   that they had rebuilt the structures to a value in excess of

11   the actual cash value, they would then be entitled to recover

12   the difference or what I have termed as the depreciation

13   holdback.

14   Q.  When a destroyed property is being rebuilt, is there any

15   conceptual difference between money paid on actual cash value

16   or money paid on replacement cost value?

17   A.  No.  In the event where a building is being reconstructed,

18   whether the term is ACV or depreciation holdback, they would

19   all be considered one and the same.  The monies being funded

20   are to rebuild the structural.

21            THE COURT:  So, let me understand.  The actual cash

22   value, as you calculated, is that which is the reasonable cost

23   of restoring the building as it was a moment before the

24   catastrophe less accumulated depreciation?

25            THE WITNESS:  Well, yeah, let me clarify.  These

D7fkwitc2                        Beach - direct

1    values weren't prepared by myself.  These are those which were

2    submitted by World Trade Center, but, yes --

3              THE COURT:  I know you didn't vouch for the values,

4    but as you understand the terminology, it was the claim of the

5    insured for the actual cash value of the property measured by

6    how much it would cost to replace the building as the building

7    stood a moment before the catastrophe less accumulated

8    depreciation?

9              THE WITNESS:  Yes.  But let me just clarify:  Yes, the

10   replacement cost to replace what existed just prior to the

11   loss, with new materials of course, and then based upon that

12   condition of that value prior to the loss, they would applied

13   depreciation, and that's what I call the depreciation holdback.

14   So, yes, that would be the depreciated value due to their age,

15   condition and other factors, again, as calculated by their

16   consultants here.

17             THE COURT:  Now, the buildings had just been acquired

18   by the insured.  The leasehold at least had just been acquired

19   by the insured.

20             Is depreciation measured by the time from acquisition

21   or the time from original construction?

22             THE WITNESS:  Well, it would be measured at the time

23   of the loss event.  So, when we're creating a replacement cost

24   value, whoever that may be is replacing as it existed on

25   September 10th with new buildings --

D7fkwitc2                          Beach - direct

1          THE COURT:  2001?

2          THE WITNESS:  2001.

3          -- and at that time what was the condition of the

4   building at that time.  And based upon those various factors --

5   age, condition, was it properly maintained, well maintained --

6   that's the method you would use in applying depreciation.

7          THE COURT:  The holdback or deduction that you're

8   talking about is depreciation.  So I'm asking if the

9   depreciation is measured from a period of time from the

10  creation of the building or from the acquisition of the

11  insured's lease?

12         THE WITNESS:  It would be at the time it existed as of

13  9/11.

14         THE COURT:  Depreciation is an accumulation.  My

15  question to you is:  What is the period of accumulation?

16         If you don't know, say you don't know.

17         THE WITNESS:  I'm not sure I do.  I can only expand,

18  that if the building --

19         THE COURT:  If you don't know, don't expand.

20         THE WITNESS:  OK --

21         THE COURT:  Expansion on lack of knowledge is just a

22  larger lack of knowledge.

23         THE WITNESS:  I think I can help explain that in

24  measuring it, but from a time period, no, from the --

25         THE COURT:  Am I to understand this that when it's

D7fkwitc2                        Beach - direct

1    submitted, you're getting a figure for cash value from the

2    insured and you're getting a figure for replacement cost to the

3    insured, and the difference is supposed to be depreciation, but

4    the period of time that the depreciation has accumulated is an

5    important factor?

6              THE WITNESS:  Sure.  As an example, if the building

7    was 70 years old, as opposed to two years old at the time of

8    the loss, the depreciation values would be substantially

9    different.

10             THE COURT:  How old were the buildings in 2001?

11             THE WITNESS:  I don't know the exact --

12             THE COURT:  Approximately.

13             THE WITNESS:  20 years old, 30 years old.  I don't

14   recall exactly, but --

15             THE COURT:  And, generally speaking, depreciation

16   varies for tax purposes, for economic purposes, for insurance

17   purposes.  How do you measure depreciation?

18             THE WITNESS:  Again, it's measured based upon the

19   condition of the building -- was it well maintained, was it a

20   newer building, was it well kept.  If it was falling apart,

21   more depreciation would apply.  Had it been a well maintained

22   building, less depreciation would have been applied.

23             THE COURT:  So, it's really a figure of appraisal

24   rather than an economic measure?

25             THE WITNESS:  Yeah, I would agree --

D7fkwitc2                           Beach – direct

1          THE COURT:  Or accounting measure, it's not an

2     accounting measure, it's an appraisal measure?

3          THE WITNESS:  I would agree.  Experts would determine

4     what condition it was and apply depreciation on that factor.

5          THE COURT:  That will be the measure of depreciation?

6          THE WITNESS:  Correct.

7          THE COURT:  So, in effect, WTCP is telling you,

8     because there's not too much difference between actual cash

9     value and replacement value, that this was a spic-and-span

10    building?

11         THE WITNESS:  Well, yes, that would appear to be the

12    case.  I'm not saying that's what the insurers had valued it

13    at, but, yes, that's what they put forward here.

14         THE COURT:  This is a factor of about 12 percent?

15         THE WITNESS:  Yes.

16         THE COURT:  And the replacement materials are

17    generally much more expensive than they were at the time the

18    building was created?

19         THE WITNESS:  That would be true, yes.

20         THE COURT:  So, there might be a little bit of an

21    element of puff in these numbers?

22         THE WITNESS:  Well, I'm not an expert necessarily in

23    that field but -- but it would suggest, yes --

24         THE COURT:  You're a tough insurance adjuster.

25         THE WITNESS:  It suggests that very little

D7fkwitc2                        Beach - direct

1    depreciation was applied in this presentation, yes, I would

2    agree.

3              THE COURT:  OK, gotcha.

4              Ms. Taylor.

5    BY MS. TAYLOR:

6    Q.  And, Mr. Beach, did World Trade Center Properties, through

7    the first supplement to its proof of loss number 2, and the

8    supporting materials that you have in front of you, the

9    Cambridge report, did they seek actual cash value and

10   replacement cost value from their insurers?

11   A.  Yes, they did.

12             THE COURT:  Not both, it can't be both.

13             THE WITNESS:  They asserted those values but were

14   seeking payment, of course, for one value, not both of those

15   values combined.

16             THE COURT:  I think I got the picture.  Can we move on

17   to another document or do you still have more to go with A-4?

18             MS. TAYLOR:  No more on -- if you could turn the page.

19             THE COURT:  On this document?

20             MS. TAYLOR:  Yes.

21             THE COURT:  So what you're looking for are the

22   components of the claim?

23             MS. TAYLOR:  Yes.

24   BY MS. TAYLOR:

25   Q.  Mr. Beach, you testified earlier about some items that were

D7fkwitc2                          Beach - direct

1    TBD.  Are these the items that World Trade Center Properties
2    put forward to its insurers as TBD or to be determined?
3    A.  Yes.  Page 1, that we previously reviewed, addressed
4    strictly the building.  Pages 2, 3 and 4, if you scroll down,
5    list a number of items that were identified as TBD, or to be
6    determined.
7    Q.  Did World Trade Center Properties ever document or quantify
8    these claims, Mr. Beach?
9    A.  They did not, no.
10   Q.  Mr. Beach, in your review of the materials, did you come to
11   understand that an appraisal process took place between World
12   Trade Center Properties and certain of its insurers?
13   A.  Yes.  There was an extensive appraisal process that was
14   undertaken.  That is my understanding.
15            THE COURT:  Keep that up for a minute.
16            MS. TAYLOR:  May I proceed?
17            THE COURT:  Yes.
18   BY MS. TAYLOR:
19   Q.  Mr. Beach, we're going to put up on the screen Defendants'
20   Joint Exhibit 94.
21            Did you review this document as part of your analysis
22   of the claim adjustment process?
23   A.  I did.  It is a stipulation and order regarding the
24   appraisal process between World Trade Center and the appraising
25   insurers.

D7fkwitc2                      Beach – direct

1   Q.  And what was being appraised here?

2   A.  As shown on pages 2 and 3 of this order, there were three

3   items that were being appraised, that being a replacement cost

4   value of the destroyed World Trade Center complex buildings,

5   their actual cash value, as well as the rental value loss.

6   Q.  Was there any indication in any of the records you reviewed

7   that WTCP submitted, or even tried to document, any claims

8   other than the value of the destroyed complex on an actual cash

9   value and replacement cost value or its resulting loss of

10  rental income?

11          THE COURT:  Change the question.  You've got too much

12  in there.

13  Q.  Mr. Beach, what elements did World Trade Center Properties

14  put forward in its claim to its insurers?

15          THE COURT:  That begs the question.  You've got the

16  TBD items, so why don't you limit it to what they documented.

17          And I understand whatever documentation they had was

18  only for replacement costs and actual cash value, right?

19          THE WITNESS:  That is correct.

20          THE COURT:  OK, so that's the issue.  Can we go on.

21  BY MS. TAYLOR:

22  Q.  Mr. Beach, did WTCP also document its loss of income as a

23  result of the destroyed buildings?

24  A.  Yes, they did.  In the previous exhibit that we were

25  reviewing, A-4, they did put forth 13 separate proofs of loss,

D7fkwitc2                    Beach - direct

1    totaling a value of $1.34 billion.

2    Q.  Do you have an opinion on what claim elements World Trade

3    Center Properties insurers issued payments on concerning the

4    complex?

5            THE COURT:  Let's start with the payments that were

6    issued and then come in to the opinion.  Lay a foundation.

7            Did there come a time when the insured was paid?

8            THE WITNESS:  Yes, there was.

9            THE COURT:  Start from that and keep going.

10   BY MS. TAYLOR:

11   Q.  Mr. Beach, we've put up what has been marked as Defendants'

12   Exhibit B-4.  What is this document?

13   A.  This is a summary of the insurance program identifying the

14   insurance companies that participated in the program, the total

15   exposure that was determined, which was driven by the court

16   rulings, whether they would be responding on a one- or

17   two-occurrence basis.  It also identifies payments which were

18   made through the claims process prior to any settlement

19   agreements, and it also identifies the amount of claims paid as

20   a result of the settlement agreements.

21           THE COURT:  Let me just add something to the record,

22   which I think is undisputed:  There was litigation between the

23   insured and the set of approximately 20 insurers that made up

24   the insurance program, as to whether or not there was one

25   occurrence or two occurrences.  The insured took the position

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7fkwitc2                        Beach - direct

1    that there were two occurrences because there were two

2    airplanes and two collisions, and that added to the insurance

3    amounts mentioned by the ceilings in each insuring agreement.

4    Various of the insurers had different clauses.

5            The case came before Judge Martin.  It was finished by

6    Judge Mukasey.  There was an appeal to the Court of Appeals.

7    In some of the policies there were two-occurrence payments,

8    there were payments based on the basis of two occurrences; in

9    some of the policies there was one occurrence; and then there

10   was a settlement that I think embraced all of them or some of

11   them, I don't know.

12           Am I right so far, Ms. Taylor?

13           MS. TAYLOR:  Yes, until you got to the settlement

14   part.  I'm not quite sure what the Court meant by that.

15           THE COURT:  Mr. Williamson, am I right so far?

16           MR. WILLIAMSON:  I thought so, your Honor.

17           THE COURT:  You know better than any of us, so tell

18   us.

19           THE WITNESS:  Yes, certain policy forms, through the

20   Court's rulings, ruled that they must respond on a

21   one-occurrence basis.  That would be a large percentage of

22   insurers that prescribed to the Wilprop form.

23           Other insurers, that followed forms other than the

24   Wilprop form, were required to respond on a two-occurrence

25   basis.  So, looking at the total exposure column, the total

D7fkwitc2                          Beach - direct

available exposure was 4,678,000,000, and comparing that to the

policy limit, the one-occurrence policy limit is

$3.546 billion.  So, there was additional insurance monies as a

result of that ruling on a two-occurrence for certain insurers.

BY MS. TAYLOR:

Q.  And Mr. Beach, did certain of the insurers pay --

            THE COURT:  Excuse me.  I see the $4.6 billion column

on total exposure.  What was the other number that you gave?

            THE WITNESS:  Well, the policy limit under a

one-occurrence exposure was $3,546,000,000.

            THE COURT:  That's not shown on this chart?

            THE WITNESS:  That's not, no.  This shows the total

combined of those responding on both 1 and 2.  So, this was the

total available insurance exposure after the Court's ruling on

a one-occurrence versus two-occurrence basis.

            MS. TAYLOR:  Would your Honor like a hard copy of this

exhibit as well?

            THE COURT:  Yes, I would.

            (Continued on next page)

D7FAWTC3ps                    Beach - direct

1   Q.  Mr. Beach, did the insurers make payments to World Trade

2   Center Properties following the loss?

3   A.  Yes, they did.

4   Q.  And did you review -- what materials did you review in

5   creating this chart?

6   A.  The materials relied upon were various, but they include

7   settlement agreements of course that stated out the $3.2

8   billion paid.  They included charts that were provided as part

9   of my review that were created by WTCP.  There was proof of

10  payment, such as checks, wire transfers.  So I relied upon all

11  of that information in developing this summary of the total

12  exposure and what payments were made at what period of time.

13          THE COURT:  Was this shown to the plaintiffs,

14  Ms. Taylor?

15          MS. TAYLOR:  I gave it to them this morning.  It is a

16  compilation of a couple of charts that Mr. Beach provided with

17  his expert report.  But this is the first time we have set it

18  out in this fashion.  We offered to exchange it with them on

19  Saturday, but they declined.

20          THE COURT:  Why?

21          MS. BAGLIN:  Your Honor, they had asked us, did we

22  wish to exchange demonstrative exhibits, but by that time it

23  was so late in the process, given the start time of the trial,

24  so we said let's just do it.  So they gave it to us this

25  morning.

D7FAWTC3ps                    Beach - direct

1          THE COURT:  How do you know that this is correct?

2          MS. BAGLIN:  Your Honor, there is one minor number

3     here that we take issue with.  I can address it on

4     cross-examination of the witness.

5          THE COURT:  No.  Tell me now.

6          MS. BAGLIN:  The royal indemnity specialty payment,

7     which is listed as $216,100,000 -- it's the, I think, sixth

8     number from the end.

9          THE COURT:  I see it.

10          MS. BAGLIN:  That number includes the $17.5 million

11     payment that came from the foreign parent that Mr. Williamson

12     mentioned in his opening.  It's a payment that wasn't made

13     under any policy.  It was made by an insurer.  It was

14     considered part of the insurance payments.  But it wasn't a

15     payment under any policy provisions.

16          THE COURT:  Was it just a good-faith payment?

17          MS. BAGLIN:  No.  The foreign parent was sued because

18     I think there was some concern that perhaps the US subsidiary

19     that actually issued the insurance might be going out of

20     business.  So there was a judgment against them already from

21     Judge Mukasey, and they brought an action.

22          THE COURT:  Objection overruled.  It's fair enough.

23     All right.  So if that's the only issue, this document is

24     offered in evidence, is it not, Ms. Taylor?

25          MS. TAYLOR:  Yes, it is, your Honor.

1          THE COURT:  I accept it.  It's admitted, D-2.

2          (Defendant's Exhibit D-2 received in evidence)

3          THE COURT:  What were the payments before settlement,

4   Mr. Beach?

5          THE WITNESS:  These were advance payments that were

6   issued in response to claims brought forward in their proofs of

7   loss.  In fact, a couple of the insurers actually issued their

8   policy limits early on.  Those are identified as Copenhagen Re

9   for $4 million --

10          THE COURT:  I don't need that.

11          THE WITNESS:  OK.  So anyway, these are claims that

12   were paid as part of the normal process of the claim adjustment

13   review and, again, preceded the final settlement agreements.

14          THE COURT:  The final settlement agreement called for,

15   what?  4 billion 5 or 4 billion 1?

16          THE WITNESS:  If I could just clarify, the settlement

17   agreements alone responded to the payments of $3.27 billion, so

18   if you combine the 3.2 that related to the settlement

19   agreements, as well as the 1.3, the total payments issued under

20   the policy were $4,581,000, which is about 97 million less than

21   the total exposure column.  So I would be happy to further

22   clarify it for you if you want me to go through that a little

23   slower.

24          THE COURT:  Let me see if I understand it.  The total

25   exposure based on court rulings that the insured was entitled

D7FAWTC3ps                          Beach - direct

1    to a one-occurrence or two-occurrence basis came to $4.6

2    billion.

3              THE WITNESS:  That is correct.

4              THE COURT:  Against that, various insurers paid 1.3

5    billion prior to their -- prior to the parties' arriving a

6    settlement.

7              THE WITNESS:  That is correct.

8              THE COURT:  And following the settlement, another 3.2

9    billion was paid, making a total payment of $4,581,794,675.

10             THE WITNESS:  That is correct.

11             THE COURT:  And explain the deduction of $490 million.

12             THE WITNESS:  Yes.  There was a payment of 490 million

13   that was attributed to the Westfield retail property, which --

14             THE COURT:  The Westfield was the lessor of all the

15   retail space in the World Trade Center.  The World Trade Center

16   featured many, many stores on the first level and on a lower

17   level.  And Westfield was the lessor of all that property.  And

18   I think the history showed that Westfield was a lessee of the

19   WTCP companies, or affiliated companies, but for purposes of

20   insurance, their claim was broken out.  So the WTCP parties

21   received $4,581,794,675, and the Westfield interests received

22   $490,430,635 -- is that correct?

23             THE WITNESS:  That is correct, yes.

24             THE COURT:  -- the two insurance payments together

25   coming to $4,091,364,040.  And that compares to approximately a

D7FAWTC3ps                         Beach - direct

1    15 percent discount from the total exposure.

2             THE WITNESS:  Correct.  I just know the math.  It's

3    about $97 million less.  But the total payment --

4             THE COURT:  So it's less than that, right.

5             THE WITNESS:  The total payments were approximately 97

6    million less than the available limits.

7             THE COURT:  Right.  OK.  That's about a 4 percent, I

8    guess, difference.

9             THE WITNESS:  I'm thinking a little smaller, but it

10   could be.

11            THE COURT:  All right.  Is this a good time to break

12   for lunch?

13            MS. TAYLOR:  Certainly.

14            THE COURT:  Or your adrenaline is so high that you

15   would like to keep up?

16            Let's come back about 2:15.  Thank you.

17            THE WITNESS:  Thank you.

18            THE COURT:  Mr. Beach, you should not be discussing

19   your testimony with anyone during the lunch break.  Once you

20   start being a witness, no one should talk to you about this

21   case.

22            THE WITNESS:  Fair enough.

23            THE COURT:  Counsel, you understand?

24            MS. TAYLOR:  Yes, your Honor, I understand.

25            (Luncheon recess)

D7FAWTC3ps                        Beach - direct

1                  A F T E R N O O N    S E S S I O N

2                              2:15 p.m.

3              THE COURT:  Mr. Beach, I remind you that you remain

4    under oath.

5    MICHAEL S. BEACH, Resumed.

6              THE COURT:  Ms. Taylor?

7              MS. TAYLOR:  Yes, your Honor.

8              THE COURT:  Please continue.

9    DIRECT EXAMINATION (Cont'd)

10   BY MS. TAYLOR:

11   Q.  Mr. Beach, World Trade Center Properties insurance

12   considers the loss of the complex a policy limits loss?

13   A.  Eventually they did, yes.

14   Q.  If we could put up exhibit --

15             THE COURT:  What is the policy limits loss?

16             THE WITNESS:  Meaning a loss value that would exceed

17   their policy of insurance limit.  Their exposure.

18             MS. TAYLOR:  Mr. Campbell, could you put up Joint

19   Exhibit 95.

20   Q.  Mr. Beach, you spoke earlier today about an appraisal

21   process.  Did the appraisal panel end up making a partial final

22   determination of the replacement cost of the World Trade Center

23   complex?

24   A.  Yes, they did.  As of December 31st, 2006, they had done

25   so.

1            THE COURT:  Who is "they"?

2            THE WITNESS:  That would be the appraisal panel for

3    the insuring appraisers and WTCP complex.

4    Q.  And, Mr. Beach, is the appraisal panel finding agreed

5    amount, then, for the World Trade Center Property and for the

6    insurers that took part in the appraisal process?

7    A.  Yes.  We previously discussed three categories to which

8    they were to determine a value on, and they had come to an

9    agreement on one of those being the replacement cost value of

10   the four World Trade Center Towers.

11           THE COURT:  Who is the appraisal panel?  How is it

12   constituted?

13           When you introduce a term that uninsured people like

14   me might not understand, it's a nice idea to define the term,

15   have the witness define the term, like "appraisal panel."  How

16   do I know who the appraisal panel is, or how it's appointed, or

17   what it does?

18           THE WITNESS:  In a situation where there is a

19   disagreement as to the value --

20           THE COURT:  We're get --

21           THE WITNESS:  I'm sorry.

22           THE COURT:  We're getting some suggestion from

23   Ms. Taylor.

24   Q.  Mr. Beach, would you describe what an appraisal is under an

25   insurance policy.

D7FAWTC3                          Beach - direct

```
1     A.  Yes.  When there is a dispute as to values under the policy
2     contract, the parties can choose to have the matter appraised,
3     and in each instance, World Trade Center would assign an
4     appraiser, the insurers would assign an appraiser, and they
5     would each agreed upon an umpire in hopes of coming to
6     agreements on the three items we previously discussed --
7     replacement costs, actual cash value, and business income in
8     this instance.
9     Q.  So is the umpire considered a neutral party?
10    A.  That is correct.
11    Q.  And are the findings of the appraisal panel the three
12    appraisers, I believe you said, one for the insurers, one for
13    World Trade Center properties, and a neutral that was agreed
14    upon, are their findings binding, then, on the parties for the
15    appraisals done?
16    A.  Yes, they are.
17              MS. TAYLOR:  Mr. Campbell, if you could put up C4,
18    please.
19              THE COURT:  What about 94?  Finished with it?
20              MS. TAYLOR:  Yes, sir.
21              THE COURT:  What am I supposed to learn from 94?
22              MS. TAYLOR:  If you'll let me, I can ask the witness
23    if we can --
24              THE COURT:  Go ahead.  If you want me to learn
25    something, ask the witness.
```

D7FAWTC3                          Beach - direct

1           MS. TAYLOR:  Your Honor, do you have a screen that's
2    working?
3           THE COURT:  It works, yes.  It shows me 95.
4           MS. TAYLOR:  OK.
5           THE COURT:  Is that the document you want me to look
6    at?  Or is it 94?
7           MS. TAYLOR:  95.
8           THE COURT:  What happened to 94?  You asked me to look
9    at 94.
10          MS. TAYLOR:  No.  Defendant's Exhibit C4.
11          THE COURT:  Oh, sorry.  All right.  Now, 95.  Is there
12   something here you want me to understand?
13          MS. TAYLOR:  Yes.
14   Q.  Mr. Beach, could you describe what Defendant's Exhibit C4
15   is.
16   A.  Yes.
17          THE COURT:  We've already done C4.
18          MS. TAYLOR:  Your Honor, would you like a copy of
19   Defendant's Exhibit C4?
20          THE COURT:  You know, we've had B4.  Now this is C4?
21          MS. TAYLOR:  Correct.
22          THE COURT:  Yes.  I would like that.  I thought I had
23   it.
24          MS. TAYLOR:  May I continue, your Honor?
25          THE COURT:  Please.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

D7FAWTC3                            Beach – direct

1    Q.  Mr. Beach, are the appraisal panel's' preliminary findings

2    as to the replacement costs summarized on your exhibits C4?

3    A.  Yes, it is.  The upper section of this document identifies

4    property damage replacement cost value as determined by the

5    appraisal panel and as agreed.

6    Q.  And what was that number?

7              THE COURT:  Before you did that, you offer it into

8    evidence, right?

9              MS. TAYLOR:  Yes, your Honor.  We would like to offer

10   in Exhibit C4 into evidence, as well as A --

11             THE COURT:  One at a time.

12             MS. TAYLOR:  A4.

13             THE COURT:  One at a time.  A4 is already in.  B4 is

14   in evidence.  Now we have C4.  Any objection?

15             MS. BAGLIN:  Yes, your Honor.  This is only a partial

16   appraisal finding, and the appraisal only involved certain of

17   the defendants, not all of the defendants, your Honor.

18             THE COURT:  You can cross-examine.  Objection

19   overruled.  C4 is admitted.

20             (Defendant's Exhibit C4 received in evidence)

21   Q.  Mr. Beach, how much did the appraisal panel find that the

22   partial replacement cost value of the World Trade Center

23   complex was on the morning of September 11th, 2001?

24   A.  The appraisal panel determined that the agreed property

25   damage replacement cost value, which is limited to the core and

D7FAWTC3                         Beach - direct

1    shell, was $4,159,460,085.

2    Q.  And what was the total amount of the proofs of loss

3    submitted by World Trade Center Properties for its lost rental

4    income?

5            THE COURT:  Before you go on, it says "total agreed

6    partial property damage RCV."  What's RCV?

7            THE WITNESS:  That would be the replacement cost value

8    of the core and shell components of the World Trade Center, the

9    four buildings.

10           THE COURT:  So is this property damage, replacement,

11   what is it, core value?  Cash value?

12           THE WITNESS:  Yes.  What it is is this --

13           THE COURT:  What is RCV again?

14           THE WITNESS:  RCV would be the replacement cost value.

15   And this exhibit shows that it pertains to the core and shell

16   only.  It did not include other items, such as what we call

17   T&I, or tenant improvements.  This would just be the core and

18   shell of the four buildings and what the agreed appraisal value

19   findings were on that panel.

20           THE COURT:  And that's why it's called partial?

21           THE WITNESS:  Correct.

22           THE COURT:  So what you've done is taken an overall

23   value, you deducted for the Marriott Hotel that used to be part

24   of one of the buildings, and for the custom house.  And what's

25   Manhattan & Hudson?  That's the railroad that went inside?  Is

D7FAWTC3                         Beach - direct

1    that it?

2                THE WITNESS:  That is correct.  From the core and

3    shell value, deducted was the Marriott and custom house, and

4    they added in components from the Manhattan & Hudson

5    evaluation, which was deemed part of the World Trade Center

6    building and coverage for this loss.

7                THE COURT:  And this is the amount that's found by the

8    panel?

9                THE WITNESS:  Yes.  This is the amount that was found

10   and agreed to by the panel, and, again, not including tenant

11   improvements.

12               THE COURT:  Go ahead.

13               MS. TAYLOR:  You want me to continue, your Honor?

14               THE COURT:  Yes.

15   Q.  Mr. Beach, can you describe what tenant improvements are

16   for us.

17   A.  Yes.  So this would be costs in part of the building, such

18   as walls, floor coverings, paintings, items that go within the

19   building in individual tenant-occupied spaces.

20   Q.  And could you describe what "core and shell" would be?

21   A.  The core and shell would be the main components of the

22   building -- the steel, the concrete, the windows -- the main

23   structure itself.

24   Q.  Now, Mr. Beach, what was the total of the proofs of loss

25   submitted by World Trade Center Properties for its lost rental

1    income?

2    A.  We had reviewed these items earlier on A4, but these are

3    the values put forth for business income and rental value.

4    There were 13 proofs of loss submitted, which totaled

5    $1,347,805,679.

6    Q.  So as of, could you tell us when the appraisal panel issued

7    its preliminary finding on the replacement value of the World

8    Trade Center complex?

9    A.  Yes.  The actual report and findings were as of February of

10   2007.  What this shows is if you add the agreed appraisal value

11   of just over $4 billion plus the proofs of loss that were put

12   forward, the total undisputed property damage in business

13   income value as of February was $5.5 billion.

14   Q.  And can you remind the Court how much in total available

15   insurance was available for World Trade Center properties?

16   A.  Yes.  It was found that the total available insurance would

17   be $4.678 billion.

18        THE COURT:  The appraisal panel found $4.1 billion.

19   But the total of both property damage and business income was

20   $5.5 billion.

21        THE WITNESS:  Yes.

22        THE COURT:  Two questions.  Is property damage the

23   same as replacement cost?

24        THE WITNESS:  Yes.  If you could remove --

25        THE COURT:  Same, I can read one for the other.

1    There's nothing different in property damage than there is in

2    replacement value.  Is that correct?

3              THE WITNESS:  That is correct.

4              THE COURT:  Did the appraisal panel function at all on

5    business income?

6              THE WITNESS:  They did not complete that process, no.

7    They just completed one of the three goals.

8              THE COURT:  So they came to a final determination of

9    $4.159 billion with regard to replacement cost, and they

10   accepted the total claim for lost rental value.  Is that right?

11             THE WITNESS:  Yes.  The property value was agreed, and

12   the proofs that were submitted in my review were not disputed

13   matter, were the $1.3 billion, yes.

14             THE COURT:  Got it.

15   Q.  So, Mr. Beach, as of February 2007, was it clear that the

16   replacement cost value of the complex plus the lost business

17   income already demanded would exceed policy limits available to

18   World Trade Center Properties?

19   A.  Yes, that is correct, as of February 2007.

20   Q.  If I can refer you to Exhibit B4, Defendant's Exhibit B4

21   again, Mr. Beach, did World Trade Center Properties receive the

22   entire $4.091 billion in insurance payment in a lump sum

23   through settlement agreements?

24   A.  Not through lump sum, no.  As this exhibit shows and we

25   previously revealed, there was approximately $1.3 million paid

D7FAWTC3                          Beach - direct

1    prior to settlement agreements and some $3.27 billion paid as a

2    result of settlement agreements.

3    Q.  I want to make sure I heard you correctly.  Was that $1.3

4    billion?

5          THE COURT:  It's in the numbers.  It's in the exhibit.

6    I have it.

7    A.  Correct.

8    Q.  Do you have an opinion on what the $1.3 billion was paid

9    for by the insurers prior to any settlements?

10   A.  Yes.  A few of the insurers had issued payments on a

11   policy-limit basis.  These payments would have been made in

12   response to proofs of loss, payment directed letters relating

13   to business income and property damage.

14   Q.  Were the majority of moneys paid in response to settlement

15   agreements?

16   A.  Yes.  That would be correct.

17   Q.  In your connection with your work on this case, did you

18   review those settlement agreements?

19   A.  Yes, I did.

20   Q.  What was your purpose in reviewing the settlement

21   agreements?

22   A.  The primary purpose was to determine the amounts that were

23   paid in response to those agreements.

24   Q.  In your career as an adjustor, have you had experience

25   facilitating releases for insurers?

D7FAWTC3                           Beach - direct

1    A.  Yes, I have.

2    Q.  In your experience, when do insurers usually seek to secure

3    a release when resolving a claim?

4    A.  A release would be utilized in the event there was a

5    negotiated settlement of claims that were in dispute, as well

6    as those that were in litigation.  It would be common and

7    customary to obtain a release agreement.

8    Q.  Why is that done?

9    A.  The release agreement gives peace to the claim.  It

10   protects both parties.  And it basically states there will be

11   no further claims made and no further -- no further claims

12   asserted and no further claims paid in relation to the

13   insurance event.

14   Q.  In your experience, can you look at a settlement release

15   alone to determine why an insurer paid a claim?

16   A.  Not on its -- the settlement agreement would tell you what

17   values were paid or what amounts were paid, but you would still

18   have to rely upon the underlying documents that were submitted

19   by the insurers, negotiated, supportive of the claim.

20   Q.  Do you have an opinion on whether any portion of the $3.2

21   billion paid pursuant to the settlement agreement was paid on

22   account of any specific claim element?

23   A.  It's my opinion that all of those payments would have

24   resulted, as a result of the claims that were submitted, claim,

25   documented.  Insurers will issue payments on that basis.  In

D7FAWTC3                        Beach - direct

this case that would have been the business income claim and

the property damage claims.

Q.  Mr. Beach, have you seen any evidence in the thousands of

pages you reviewed to suggest that the insurers paid on

anything other than the actual cash value or replacement cost

value of the complex and the business interruption claims of

lost rental value?

A.  No, I have not.

Q.  Mr. Beach, I would now like to turn your attention to World

Trade Center 7.  Can you tell me why we're talking about this

property separately?

A.  Yes.  World Trade Center 7 was owned by a different entity

of Silverstein Properties.  There was one building that we're

dealing with under this situation, and one policy of insurance,

as opposed to multiple insurers.

Q.  Could you describe the insurance that was in place for

World Trade Center 7?

A.  Yes.  The policies provided coverage for property damage,

business income, also referred to as rental income value.

Q.  So was the coverage that covered World Trade Center 7

similar to that which had provided coverage for the complex?

A.  Yes.  They were similar in that the coverage was afforded

for property damage and business income, which would respond to

the claims put forth as a result of the 9/11 incident.

Q.  Mr. Beach, did you form any opinions on your review of the

D7FAWTC3                        Beach - direct

1    matter on what claims 7 World Trade Co. submitted and

2    documented in its proofs of loss and supporting documentation

3    on its claim?

4    A.   Yes.  Similar to the complex, claims were put forward for

5    the damages to the building, as well as the rental income

6    losses, one difference being that in the World Trade Center 7

7    claims, claims were actually submitted and documented for

8    personal property.

9    Q.   Did 7 World Trade Co. seek coverage for any other claim

10   elements from IRI?

11   A.   No.  Again, similar to complex claim, several claims that

12   were asserted in their documents were items to be determined,

13   but, again, there was no claim quantified document submitted

14   for these to be determined items other than the personal

15   property items I mentioned.

16        MS. TAYLOR:  Mr. Campbell, could you put up Joint

17   Exhibit 206.

18   Q.   Mr. Beach, what is this document?

19   A.   This is a partial claim summary and supporting

20   documentation that was prepared for WTC by their claim

21   consultant, Cambridge Horizon Consultants.

22   Q.   And did this documentation include a value for the World

23   Trade Center 7?

24   A.   Yes.  If you would scroll a couple pages through, yes.

25   There is a three-page partial preliminary claim summary, as it

D7FAWTC3                    Beach - direct

1    is headed, and this document provides a value of the destroyed

2    building on a replacement cost basis of $1,058,600,000.  Item

3    no. 2, which is identified as personal property, has items

4    listed as TBD.  As I've mentioned, they did subsequently claim

5    these items.

6              If you could turn to page 2, there are additional

7    to-be-determined items here, identified as "other covered

8    property," but again not documented.

9              And then if you turn to the third page, you'll see

10   that a claim was put forth for time element and extra expense,

11   which was quantified as 441 million.

12   Q.  Now, Mr. Beach, we haven't spoken about the term "time

13   element" before.  Could you tell us what "time element" is.

14   A.  Yes.  "Time element" is a common term used in the insurance

15   industry, which is to provide compensation to a policyholder

16   for their income losses as a result of a covered event or

17   damage to a building.

18             THE COURT:  Just income or revenue?

19             THE WITNESS:  Revenue as well.  It would be your

20   revenues --

21             THE COURT:  You deduct expenses.  For example, if

22   you're paying rent and receiving rent -- put it this way.  Is

23   there a difference between a business interruption clause,

24   which gives you lost revenue, and this time element, which

25   gives you lost income?

D7FAWTC3                          Beach - direct

1              THE WITNESS:  No.  Under the IRI policy, they actually

2       refer to it as rental coverage.  So it is going to be their

3       revenue losses less any expenses that don't continue plus any

4       extra expenses.  That would be the claim that was put forward

5       here.

6              THE COURT:  What would be a claim that doesn't

7       continue?  An expense that doesn't continue?

8              THE WITNESS:  Such as utility services to the

9       building, as it doesn't exist, cleaning crews that would

10      normally clean the building, and various others, but those are

11      examples.

12      Q.  Mr. Beach, did 7 WTC Co. put forward a report on the actual

13      cash value of World Trade Center 7 to its insurer?

14             THE WITNESS:  Yes, they did, at a later date.  This

15      claim summary is on a replacement cost basis.  But they did do

16      that in the future, near future.

17             MS. TAYLOR:  Mr. Campbell, if you could put up

18      Defendant's Exhibit 2.

19             THE COURT:  Let me look at this a few minutes.

20             So paragraph IV.A deals with this lost revenue called

21      "time element."  Right?

22             THE WITNESS:  Yes.

23             THE COURT:  Subparagraph A provides for rental value,

24      period of indemnity.  What was the period of indemnity?

25             THE WITNESS:  The period of indemnity would be the

1    time frame from the date of the loss to an anticipated time

2    when it would take it rebuild the structure.  So if they took

3    three years to rebuild tower 7, the period of indemnity would

4    be three years.

5         THE COURT:  And caption B is "Rental Value:  Extended

6    Period of Indemnity (1 year)."  What does that mean?

7         THE WITNESS:  Yes.  The policy has a provision we

8    refer to as EPOI, or extended period of indemnity, which would

9    compensate the insured for the difference of what their revenue

10   was prior to the loss and compared to what it was after the

11   loss.  So it gives them a time to, as I would say, catch up, to

12   return their revenue stream to the level it existed prior to

13   the loss.

14        THE COURT:  And mitigating expenses, what are they?

15        THE WITNESS:  They've been characterized in this

16   exhibit as mitigating expenses, which were retenanting costs.

17   I consider those as being extra expenses, but in this claim

18   presentation they've identified them as retenanting costs.

19        THE COURT:  So you don't accept that as an

20   administrative.  You would take that as something to be

21   deducted.

22        THE WITNESS:  I would, yes.  As an adjustor, I

23   wouldn't characterize them as mitigating but as extra expenses.

24        THE COURT:  So the total, as you would take it, would

25   be about $355 million.

D7FAWTC3                          Beach - direct

1          THE WITNESS:  Well, yes.  I state that separately

2     because there is a policy sublimit for extra expenses that

3     would limit any extra expense claim asserted.  It's a limit of

4     $1 million.  In this case the claim was put forward for $86

5     million, what has been characterized as mitigating, I consider

6     those extra expenses.  So I believe those costs would be

7     limited under the policy to $1 million.

8          THE COURT:  So you would cap this claim at something

9     like $356 million.

10          THE WITNESS:  Correct, yes, for the time element and

11     extra expense.

12          THE COURT:  Then you add the replacement cost to this.

13          THE WITNESS:  Correct, in arriving at the $1.5

14     billion.

15          THE COURT:  Do you have an extra copy of this exhibit?

16          Just the summary pages.

17          I didn't understand you were putting in this whole

18     book, just dealing with a summary.

19          MR. BYRNES:  The summary is contained within the

20     beginning of the book, but I'd be happy to give you the portion

21     of the summary, your Honor.

22          THE COURT:  Thank you.  Make this the summary portion

23     of the exhibit.  That's the whole point of a summary, as I said

24     before.  You don't have to deal with the underlying papers.

25     You can do it later.  Keep going, Ms. Taylor.

1   Q.  Mr. Beach, is this the report that 7 World Trade Center

2   Company put forward to put value on the actual cash value of

3   World Trade Center 7?

4   A.  Yes, it is.  If you turn to the pages within this exhibit,

5   it shows what those values were calculated at.  Again, they

6   have submitted a replacement cost value of World Trade Center 7

7   at 1.058 billion.  They applied depreciation of $86 million and

8   calculated the actual cash value of $958 million.

9   Q.  Did 7 World Trade Center company revise its estimates for

10  the building value?

11  A.  At some later date they did, yes.

12          MS. TAYLOR:  And, Mr. Campbell, if you could put up 2

13  exhibits.

14          THE COURT:  Leave it up for a minute.

15          And here again, the depreciation is an estimate about

16  how long the building was in operation independently of

17  whatever was done in the accounting books, but just as an

18  estimate of how much deterioration there was in the building,

19  as compared to a new building.

20          THE WITNESS:  That is correct, approximately 8 percent

21  or so of the 86 million compared to the 1.058 billion.

22          THE COURT:  One second, please.  OK.

23  Q.  Mr. Beach, I believe you were going to tell us about the

24  actual cash value and the revised estimates that were put in by

25  7 World Trade Center company.

D7FAWTC3                        Beach - direct

A.   That is correct.  This document is dated February 24th of

2003, and through this document, a revised replacement cost and

actual cash value was presented.  If we turn to the next page,

it shows those revised numbers.  Instead of 1.058, that's

revised to reappraisement cost of 1.053.  And the actual cash

value has come down proportionately, from 958 million to --

excuse me -- from 958 on the prior document to 953 million at

this point in time.

Q.   Mr. Beach, did 7 World Trade company put forward a proof of

loss on a claim?

A.   Yes, they did.

Q.   Is what's on the screen?  The proof of loss for 7 World

Trade Center?

A.   Yes, it is.

Q.   Was any support provided with this proof of loss?

A.   Yes.  The World Trade Centers had relied upon the previous

reports that had been prepared by Cambridge Horizon.  And in

this proof of loss, if you would turn to item 6, the next page,

it identifies those amounts that were claimed based on the

prior submissions.  Through this proof of loss, they were

claiming $953,205,000 for the property damage.  That's on line

3.  And at the -- correct, in that situation there.  And at the

bottom they prefer to the business income rental claim of $441

million.

Q.   You mentioned earlier that 7 World Trade company documented

D7FAWTC3                          Beach - direct

1    and quantified a personal property claim that had originally

2    been identified as TBD.  How did it do so?

3    A.   To this proof of loss that we're looking at now, they had

4    supplemented it and submitted an initial personal property

5    claim of just over a million dollars.

6              MS. TAYLOR:  Mr. Campbell, can you put up Joint

7    Exhibit 212.

8              THE COURT:  Is that against a different insuring

9    agreement?

10             THE WITNESS:  No.  This would be the same insuring

11   agreement, just a supplement to their previous proof of loss.

12   This one here shows the added value for the personal property.

13             THE COURT:  But you're already over the insurance

14   limits, aren't you?

15             THE WITNESS:  Yes.  Proofs of loss were in excess of

16   the limits.  However, they would not yet been accepted by

17   insurers.  But the claims were still put forward for the

18   personal property by WTC 7.

19             THE COURT:  What's the point of doing that?

20             THE WITNESS:  They were documenting an item as to be

21   determined that they indicated they may be putting forth a

22   claim for.  So this is the format in which they have now

23   presented it.

24             THE COURT:  How could they put forward a claim if

25   there's no insuring agreement against which it could be put

D7FAWTC3                         Beach - direct

1     forward?

2               THE WITNESS:  It could be put forth under the

3     insurance contract.  There is coverage for the building,

4     personal property, and business income.

5               THE COURT:  Separate amounts?  Separate insuring

6     amounts?

7               THE WITNESS:  No, they are not.  This is a blanket

8     policy of insurance.  There are not separate amounts called out

9     for the coverages.

10              THE COURT:  So once you exceed the ceiling, what's the

11    point of putting in more claims?

12              THE WITNESS:  I can only suspect that they were trying

13    to document those claims in that the insurance carriers had not

14    yet accepted the original.

15              THE COURT:  You don't know, though.

16              THE WITNESS:  I don't know.

17              THE COURT:  So the answer should be stricken.

18              Go ahead, Ms. Taylor.

19    Q.  Mr. Beach, is this the supplemental proof of loss that you

20    referred to earlier?

21    A.  Yes.  And, again, if you would turn to the next page, it

22    will --

23              THE COURT:  This is Joint Exhibit 212?

24              MS. TAYLOR:  Yes.

25              THE COURT:  Are you thinking to offering it into

D7FAWTC3                          Beach - direct

1    evidence?

2              MS. TAYLOR:  Yes, your Honor.  I'd be happy to offer

3    it into evidence.

4              THE COURT:  Well, you'll be happy, I don't care if

5    you're happy or sad.  Is it your intention to put it in

6    evidence?

7              MR. PODESTA:  I will offer it into evidence, your

8    Honor.

9              MS. BAGLIN:  No objection, your Honor.

10             THE COURT:  Received.

11             (Joint Exhibit 212 received in evidence)

12   Q.  Was the amount for the personal property, business personal

13   property, quantified in this proof of loss?

14   A.  Yes, it was.  As shown in item no. 6, the amount was

15   $1,088,000, and documents were presented in support of that

16   value by WTC 7.

17   Q.  Did 7 World Trade Center provide any documentation with its

18   personal property claim?

19   A.  Yes, they had.

20   Q.  And did 7 World Trade company supplement this personal

21   property claim?

22   A.  Yes, they did.  At a later date, they had supplemented it

23   and had put forth a claim of approximately $1.8 million for

24   personal property.

25             MS. TAYLOR:  Mr. Campbell, if you could put up Joint

D7FAWTC3                          Beach - direct

1    Exhibit 213.

2    Q.  Mr. Beach, is this the Cambridge Horizon claim summary in

3    which the personal property claim was supplemented?

4    A.  Yes, it is.  And, again, if you would turn to the following

5    pages, it will show in this category 28 line items identified

6    as a summary, to which the value of the personal property claim

7    is $1.846 million.

8              MS. TAYLOR:  Your Honor, we would like to offer Joint

9    Exhibit 213 into evidence.

10             MS. BAGLIN:  No objection, your Honor.

11             THE COURT:  Received.

12             (Joint Exhibit 213 received in evidence)

13   Q.  Did 7 World Trade Center Co. issue any additional proofs of

14   loss or supplements of proofs of loss with respect to World

15   Trade Center 7?

16   A.  No, they did not.

17   Q.  So to clarify, did 7 World Trade Center company ever

18   document or quantify the remain TBD items they had listed?

19   A.  No, they did not.

20   Q.  Did 7 World Trade Company demand payments from its insurer,

21   IRI?

22   A.  Yes, they did.  They had submitted the proof of loss which

23   we reviewed, and there were also various payment directive

24   letters where they were seeking payments as well.

25   Q.  If I can turn your attention to Defendant's Exhibit D4.

1          MS. TAYLOR:  And, your Honor, this is a chart.  Would

2      you like a copy?

3          THE COURT:  Yes.

4          MR. BYRNES:  Your Honor, if I may also hand you up the

5      abbreviated version of the prior exhibit, 206.

6          THE COURT:  Yes.

7          MR. BYRNES:  Thank you, your Honor.

8  Q.  Did you create this document, Mr. Beach?

9  A.  Yes, I did.  Yes, I did.

10 Q.  And could you tell us what you reviewed and relied upon in

11 creating this document?

12 A.  Yes.  In fact, this is an exhibit that was developed from

13 exhibits which were part of my expert report that was

14 presented.  I relied upon payment directive letters that were

15 submitted by WTC to their insurers.  I relied upon

16 documentation showing what payments were made in response to

17 those payment directive letters.  I also reviewed the

18 information that was supported in those letters.  There were

19 also some letters from IRI's counsel to the insured which I had

20 reviewed, as well as the final settlement agreement that is

21 listed at the bottom of the document.

22 Q.  Can you explain how you created this document, what it's

23 intended to display?

24 A.  Well, yes.  Giving a few examples, line item 1, the payment

25 directive letter for rental interruption was put forward by WTC

D7FAWTC3                         Beach - direct

1   7 on October 23rd, requesting payment of $18 million.  Shortly

2   thereafter, IRI had issued payment in that same amount through

3   four checks for $18 million.

4           A couple other examples, again, moving down to May

5   24th, 2002, a payment directive letter was issued for rental

6   interruption for $20 million.  IRI issued a payment in that

7   same amount, $20 million.  That example follows through here on

8   several occasions, including both rental interruption and

9   property damage claims requested, demanded, and paid in

10  response, by IRI.

11  Q.  Does 7 WTCP Co.'s letters demanding payment and the

12  payments made by IRI from 2001 through 2002 match up exactly?

13          THE WITNESS:  They did indeed, yes.

14  Q.  I see on this exhibit that a payment of $332,275,000 was

15  made by IRI and it's noted as "ACV payment"?  Could you tell us

16  a bit about that.

17  A.  Yes.  IRI had determined in this point in time what they

18  believed to be the ACV value of the property.  They had issued

19  a letter to World Trade Centers indicating that they would be

20  tendering payment based upon their ACV calculations.  The

21  letter suggested an ACV amount of $440 million.  At this point

22  in time, some $108 million has already been paid.  So

23  essentially IRI was going to pay them the difference, which was

24  $332 million.

25  Q.  Can you remind us again what ACV payment, how that ACV

D7FAWTC3                          Beach - direct

1    payment is defined?

2    A.  I defined ACV as the replacement cost value of the building

3    less depreciation but not less than market value.

4            THE COURT:  What kinds of property are you talking

5    about?

6            THE WITNESS:  In this case it would be the physical

7    property, the buildings that existed -- or World Trade Center

8    7.

9            THE COURT:  And that $332 million, is that subsumed in

10   what the appraisal panel found?

11           THE WITNESS:  No, sir, your Honor.  This was a

12   calculation that was prepared by IRI internally.  There was not

13   an appraisal panel ruling on the World Trade Center 7 case, at

14   least one that had been agreed upon.

15           THE COURT:  No appraisal panel function.  You just

16   took whatever was submitted, looked at it, and accepted it.

17           THE WITNESS:  For the purpose of this exhibit, yes.

18           THE COURT:  Well, forget about the exhibit.  For the

19   purpose of actually paying the insured and getting the release

20   from the insured.

21           THE WITNESS:  Yes.  At this point in time, a release

22   had not been obtained.

23           THE COURT:  Well, you aren't finished paying.

24           THE WITNESS:  Correct.

25           THE COURT:  But it was contemplated that when you

D7FAWTC3                         Beach - direct

1   finished paying, you would get a release.

2            THE WITNESS:  Yes.  That is correct.

3            THE COURT:  So this portion of the payment and all

4   preceding payments were made in the contemplation that the

5   insured would accept it and give you a release.

6            THE WITNESS:  Yes.  In fact, the payment directive

7   letters demanded payments.  Payments were issued up until this

8   January 24th date where IRI had asserted what the value was and

9   issued a payment on their own evaluation, not necessarily in

10  response to a payment directive letter in the examples

11  previously given.

12           THE COURT:  Go ahead.

13  Q.  Mr. Beach, when an insurer responds to the destruction of a

14  building, does it typically advance the actual cash value

15  amount even when the insured is rebuilding the building?

16  A.  Yes.  Actual cash value payments would be issued whether

17  they were rebuilding or not.  In this case, it appears that's

18  what IRI was doing, was paying what they had calculated the

19  actual cash value at.

20  Q.  And would World Trade Center 7 use the moneys that had been

21  advanced on an actual cash value basis in rebuilding World

22  Trade Center 7?

23  A.  That would be the intent when they're rebuilding.  In fact,

24  they were rebuilding in this instance, yes.

25  Q.  And would then 7 World Trade Company be due from IRI the

D7FAWTC3                         Beach - direct

1    difference between the actual cash value and the ultimate

2    replacement cost up to policy limits?

3    A.  Well, we previously referred to that term as the

4    depreciation holdback.  Yes.  They would be entitled to recover

5    that amount up to the agreed value or to policy limits, yes.

6    Q.  Did 7 WTC Co. initiate an appraisal proceeding and

7    litigation against IRI?

8    A.  Yes, they did.

9    Q.  When you reviewed the materials, do you have a general

10   understanding of the basis of the dispute?

11   A.  Yes.  It's my understanding that World Trade Center 7 did

12   not agree with the methodology that was used by IRI in arriving

13   at their ACV calculation and payment.

14   Q.  Were adjustors and consultants still valuing the claim

15   outside of the appraisal proceedings in litigation?

16   A.  Well, yes.  If I could clarify, after these $332 million

17   was issued, there was a request for appraisal, a suit that was

18   filed.  However, my review of the documents suggests that the

19   adjustment process continued.  Adjustors, accountants,

20   consultants were still valuing the loss.  And in fact

21   additional payments were made prior to resolution of the

22   litigation.

23   Q.  Are those additional payments set forth on Exhibit D4?

24   A.  Yes, they are.  Three additional payments that were made

25   after the $332 million payment.

D7FAWTC3                          Beach - direct

1    Q.  So is that the payment of $48 million, the payment of

2    nearly $18 million, and the payment of $8.7 million?

3    A.  That is correct, yes.

4    Q.  So by the end of November 2004, how much had IRI paid 7

5    World Trade Companies?

6    A.  At this point it was $515,554,889.

7    Q.  Mr. Beach, do you have an opinion on what claim elements

8    IRI paid the $515,554,889?

9    A.  Yes.  Those payments would have been made for the rental

10   interruption and property damage claims asserted by WTCP.

11   Q.  And the property damage claims asserted by World Trade

12   Center Company here, would that have been for the building?

13   A.  Yes, it would have been for the building.

14   Q.  Did IRI and 7 World Trade Company eventually reach an

15   agreement concerning this claim?

16          THE COURT:  Leave that up, please.

17   A.  Yes, they did.  In fact, if you look at the last entry on

18   this sheet, dated January 3rd, 2005, what references

19   "settlement agreement," additional payment was made by IRI in

20   the amount of $303,445,111.

21   Q.  Mr. Beach, do you have an opinion on what the $303,445,111

22   was paid on by IRI?

23   A.  Yes.  It's my opinion that payments were made on the claims

24   that were put forward by with the company and documented, which

25   included both rental income property damage as well as their

D7FAWTC3                         Beach – direct

1    claim for personal property that was submitted.

2    Q.  And on what do you base your opinion?

3    A.  As I've previously mentioned, insurers issue payments on

4    those claims that are submitted, documented, quantified.  In

5    that case, that would be limited to those categories I've

6    mentioned.

7    Q.  And can you remind us again the amount claim for real

8    property, the building, personal property, and a time element

9    in the rental interruption?

10             THE COURT:  That's in one of the exhibit, isn't it?

11             MS. TAYLOR:  Yes, your Honor, in the Cambridge

12   Horizon.

13             THE COURT:  Which exhibit number?

14             MS. TAYLOR:  It is in a couple different exhibits.

15             THE COURT:  Is it put together in one summary?

16             MS. TAYLOR:  No, your Honor.  If you'd like us to do

17   that, we could do that.

18             THE COURT:  Yes, you should.  Thank you.

19             If you're finished with that exhibit, D4 --

20             MS. TAYLOR:  Yes, I would like to move Exhibit D4 into

21   evidence.

22             THE COURT:  Leave it up, please.  Take out the

23   highlighting, please.

24             Rental interruption is the same thing as business

25   interruption, isn't it?

1           THE WITNESS:  Essentially, yes, it is, mm-hmm.

2           THE COURT:  And the same as lost income, right?

3           THE WITNESS:  Correct.

4           THE COURT:  And property damage is the same as

5    replacement value?

6           THE WITNESS:  Yes, either valued at replacement cost

7    or ACV, but essentially, yes, for physical value of the

8    property itself.

9           THE COURT:  And the payment of $332,275,000 on

10   February 3, 2003, that's only for property damage.

11          THE WITNESS:  Yes.  They have characterized that as an

12   ACV payment, which, based upon an evaluation conducted by IRI,

13   it was --

14          THE COURT:  Of cash value.

15          THE WITNESS:  Of a cash value, correct.

16          THE COURT:  Right.  So it's the insurer's

17   determination of cash value less than the proof of loss.  Is

18   that submitted or the same?

19          THE WITNESS:  It would be less than the total value of

20   the proofs of loss put forward.

21          THE COURT:  And then what does "recalculation" refer

22   to?

23          THE WITNESS:  IRI had continued to evaluate the

24   business income claims and determined that there was additional

25   moneys due, due to the passage of time, and issued additional

D7FAWTC3                          Beach - direct

1    payments.

2              THE COURT:  For lost income.

3              THE WITNESS:  Correct, yes.

4              THE COURT:  And that's the same as rental payment, in

5    the next two lines?

6              THE WITNESS:  Correct.  I would not characterize them

7    any differently, in being the same, yes.

8              THE COURT:  And did the settlement agreement include

9    anything other than replacement costs, lost revenue, and

10   personal property?

11             THE WITNESS:  In my opinion, it would only consider

12   compensation for those claims, as those are what were put

13   forward and documented.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D7fkwtc4                        Beach - direct

1              THE COURT:  Was that equal to or less than the amount

2     of claims?

3              THE WITNESS:  At the end of the day, it was less.

4     This total under the payment column shows that all prior

5     payments before the settlement, plus those as a result of the

6     settlement, totaled $819 million, and the claims that were put

7     forward by World Trade Center were approximately $1.5 billion,

8     total, from those three same components.

9              THE COURT:  Were any other claims rejected on the part

10    of the insurers?

11             THE WITNESS:  Well, I don't believe they originally

12    accepted the proofs of loss, but at the end of the day a

13    settlement was reached --

14             THE COURT:  Apart from the categories of claim that

15    were put forward and documented, were any other components of

16    claim rejected?

17             THE WITNESS:  No, not that I'm aware of, in my review

18    of the documents, no.

19             THE COURT:  Were any others documented?

20             THE WITNESS:  No.

21             THE COURT:  Were any others itemized in any other way

22    other than that as shown previously?

23             THE WITNESS:  No.

24             THE COURT:  That's the basis of your opinion?

25             THE WITNESS:  Yes, it is.

D7fkwtc4                          Beach - direct

1            THE COURT:  OK, thanks.

2            MS. TAYLOR:  Your Honor, the aviation defendants would

3    like to move Exhibit D-4 into evidence.

4            THE COURT:  Yes, any objection?

5            MS. BAGLIN:  No objection, your Honor.

6            THE COURT:  You have to do that before you work on the

7    exhibit, not after, right?

8            MS. TAYLOR:  Yes, your Honor.

9            THE COURT:  Let's take a short break.  Ten minutes.

10           (Recess)

11           THE COURT:  Shall we resume.  Ms. Taylor, please

12   continue.

13           And, Mr. Beach, I remind you that you are under oath.

14           THE WITNESS:  Thank you.

15   BY MS. TAYLOR:

16   Q.  Mr. Beach, do you have an opinion concerning whether IRI

17   paid monies to obtain the broad settlement release terms in the

18   settlement agreement?

19   A.  Yes.  It's my opinion that no additional payment was made

20   for that purpose, but payments were all related to the property

21   damage, business income and personal property claim that was

22   asserted.

23   Q.  Mr. Beach, did IRI allocate the $819 million that it paid

24   for the World Trade Center 7 claim?

25   A.  Yes.  They did that through a claim handling instruction

D7fkwtc4                         Beach - direct

1    sheet, which we saw earlier today.

2              MS. TAYLOR:  Can we put up, Mr. Campbell, Joint

3    Exhibit 201.  Your Honor, we would --

4              THE COURT:  I don't think we've seen this before.

5              MS. TAYLOR:  I believe Mr. Williamson showed it in

6    part of his opening.

7              THE WITNESS:  Yes.

8              MR. WILLIAMSON:  That's correct, yes.

9              THE COURT:  All right, so you need to offer it in

10   evidence?

11             MS. TAYLOR:  Yes, your Honor.  Defendants would like

12   to offer JX 201 into evidence.

13             THE COURT:  What is this document, Mr. Beach?

14             THE WITNESS:  This is an internal IRI document,

15   referred to as the loss handling instructions.  And what it

16   does is it sets out in the bottom section of this form how the

17   money was allocated and that was paid by IRI.

18             THE COURT:  Do you give this to the insured?

19             THE WITNESS:  No.  This was an internal document by

20   IRI, not -- I don't believe it was shared with WTC people.

21             THE COURT:  Any objection, Ms. Baglin?

22             MS. BAGLIN:  No objection, your Honor.

23             THE COURT:  Received.

24             (Joint Exhibit 201 marked for identification)

25             THE COURT:  I don't see the point of it, though, if

1    it's not given to the insured.

2              THE WITNESS:  What it tells me is that IRI did

3    allocate their insurance payments to the categories we have

4    been discussing today, those being property damage and time

5    element, and nothing other.

6              THE COURT:  You're not objecting?

7              MS. BAGLIN:  No, your Honor.  I'll be discussing that

8    on cross-examination, but this is a joint exhibit; we have no

9    objection to the document itself coming in.

10             THE COURT:  All right.  Proceed.

11   BY MS. TAYLOR:

12   Q.  Mr. Beach, is the manner in which IRI internally handled

13   the $819 million it paid for the 7 WTC claim, does that support

14   your opinions?

15   A.  Well, yes, it is my opinion that all of the $819 million

16   paid would have been as a result of those claims put forward

17   for property damage, business/personal property and rental

18   income, and this document supports my position that that's how

19   they have allocated it.

20             There is a -- just for clarification purposes, there

21   is an additional $223,141.32, as shown as the total amount

22   paid, but that 223,000 was for a separate building, not subject

23   to this litigation.  I think it was identified as 120 Wall

24   Street.  But to answer your question, yes, this shows that they

25   did allocate it, IRI did, to those categories of property

D7fkwtc4                          Beach - direct

1    damage, PD, and time element, which is TE.

2    Q.  And, Mr. Beach, were these the only two claim elements that

3    7 WTC Co. claimed for the loss?

4    A.  That is correct, yes.

5            THE COURT:  What about personal property?

6            THE WITNESS:  Yes, the personal property claim would

7    be included as a PD.  It's considered property damage.  There's

8    what we call real property damage, is the building, and

9    personal property, being separate but they're both considered

10   as property damage.

11   Q.  Mr. Beach, did you review the settlement agreement between

12   IRI and 7 WTC Co.?

13   A.  Yes, I had.

14           MS. TAYLOR:  Mr. Campbell, if you could put up Joint

15   Exhibit 205.

16   Q.  Mr. Beach, does the settlement agreement contain a

17   provision governing the sharing of recoveries that IRI and 7

18   WTC Co. may obtain from the aviation defendants with respect to

19   the destruction of World Trade Center 7?

20   A.  Yes, it does.  This settlement agreement, I believe, is

21   dated January 3rd of 2005.  And if you would turn to, I believe

22   it's page 9, paragraph 10, that would address your question.

23   Yes, it does.  It spells out how monies would be distributed in

24   the event of a recovery, subrogation recovery action by either

25   party.

D7fkwtc4                          Beach - direct

1    Q.  Did 7 WTC Co. ultimately receive funds from IRI pursuant to

2    this provision?

3    A.  Yes, they did.  They received approximately $11.9 million.

4    Q.  Do you have an opinion as to whether this amount was on the

5    account of any claim element?

6    A.  Yes.  It's my opinion that IRI would have only been able to

7    recover through subrogation claims, which were covered under

8    their policy and paid under their policy.  So, it is my opinion

9    that the full $11.9 million would have been for property damage

10   and rental income elements.

11   Q.  So, following from this, do you have an opinion whether the

12   $830,936,585 received by 7 WTC Co. was for property damage and

13   time element claims it made under the IRI policy?

14   A.  Yes.  It's my opinion that all of that money would have

15   been for those claim categories, yes.

16   Q.  From your perspective, did the property damage for the

17   building and loss represent income coverages address 7 WTC

18   Co.'s loss when World Trade Center 7 was destroyed?

19   A.  Yes, it does.  Again, as we've somewhat reviewed herein,

20   the property damage coverage responded to the physical loss or

21   damage to the building, which would enable them to retenant,

22   return their revenue streams, and the rental income coverage

23   would have provided compensation for the period of recovery,

24   that being from the time of the loss until the buildings were

25   reconstructed.

D7fkwtc4                              Beach - direct

1              MS. TAYLOR:  Mr. Beach, I have no further questions

2       for you at this time.

3              Your Honor, we have a couple housekeeping issues on

4       your request.  You requested the itemization of the WTC 7

5       claim, and that is in the joint stipulated facts.  If you would

6       like us to also do a chart, we're happy to do so.

7              THE COURT:  No, not necessary.

8              MS. TAYLOR:  Do you want the paragraph numbers?

9              THE COURT:  Yes.

10             MS. TAYLOR:  They're paragraph numbers 47, 48 and 49.

11             THE COURT:  Thank you.

12             Why don't you just read them into the record.

13             MS. TAYLOR:  Yes, your Honor.

14             Paragraph 47:  "The amount claimed for replacement

15      cost losses through the interim proofs of losses was

16      $1,053,399,635."

17             Paragraph 48:  "The amount claimed for time element

18      losses through the interim proofs of losses was $441,698,256."

19             Paragraph 49:  "The amount claimed for personal

20      property losses through the interim proofs of losses and

21      personal property claim summary and supporting documentation

22      was $1,846,139.43."

23             THE COURT:  1,846,139?

24             MS. TAYLOR:  Yes, your Honor.

25             THE COURT:  Thank you.

D7fkwtc4                         Beach - direct

1                MS. TAYLOR:  We would also like to move into evidence

2      Joint Exhibits 209 and 210, which I understand counsel from

3      World Trade Center Properties has no objection to.

4                MS. BAGLIN:  No objection.

5                THE COURT:  What are they?

6                MS. TAYLOR:  Exhibit 209 is the proof of loss for

7      World Trade Center 7, and 210 is the letter revising to give

8      you the final replacement cost value and actual cash value.

9                THE COURT:  Those are already in evidence.  Why do we

10     need them?  They're superfluous.

11               MS. TAYLOR:  Thank you, your Honor.

12               THE COURT:  Cross-examination?

13     Ms. Baglin?

14               MS. BAGLIN:  Good afternoon, your Honor, Mr. Beach.

15               May I begin, your Honor?

16               THE COURT:  Yes, please.

17     CROSS-EXAMINATION

18     BY MS. BAGLIN:

19     Q.  Mr. Beach, I'd like to clarify before we start:  I think

20     you were asked several questions about how you, meaning IRI,

21     handled some of the claims or payments here.

22               You were not an adjuster on either the main site

23     claims or the 7 claims; isn't that right?

24     A.  That is correct.

25     Q.  And you don't work for, or represent, any of the insurers

D7fkwtc4                        Beach - cross

1   who insured either the World Trade Center or property claims

2   for 7 World Trade Company; is that correct?

3   A.  In this case, that is correct.

4          THE COURT:  Could you please keep your voice up,

5   Ms. Baglin.

6          MS. BAGLIN:  Yes.  I'm sorry, your Honor.

7   Q.  You made no decisions about what to pay or why on any of

8   these claims; is that right?

9   A.  That's correct.

10  Q.  And you personally have attended some of the depositions in

11  this case; isn't that right?

12  A.  That is correct.

13  Q.  And other than the deposition of Mr. Reilly, were any of

14  those depositions depositions that the defendants took of any

15  of the insurers who actually were involved in the evaluation of

16  payment claims?

17  A.  Was I participating or did I sit in on those?  No.

18  Q.  Did you sit in on any of the depositions of the actual

19  insurers in this case?

20  A.  No, I did not.

21  Q.  Have you spoken to any of the actual insurers in this case?

22  A.  Not in relation to this case, no.

23  Q.  So your opinions here today are based just on your own

24  personal experience as an adjuster in the insurance business;

25  is that right?

D7fkwtc4                              Beach - cross

1    A.  Based upon my --

2              MS. TAYLOR:  Objection, your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  That would be based upon my experience

5    and the review of documents that were part of my analysis, yes.

6    Q.  Now, you say that payments for the main site were only for

7    the loss of the buildings and the rental value business income;

8    is that correct?

9    A.  Yes.

10   Q.  And you don't know how much of the payments were from each

11   of those coverages; isn't that right?

12   A.  That is correct.

13   Q.  Those are separate coverages, are they not?

14   A.  Yeah, they would be separate coverages with respect

15   policies or the coverages, correct.

16   Q.  They insure different risks; is that right?

17   A.  I guess we'd have to define risk.  The risk is the risk of

18   loss to the building and any resulting income from that damage

19   to the building, but they are two different coverages.

20   Q.  Well, doesn't business income coverage insure against the

21   risk that you won't have business income?  Isn't that the risk?

22   A.  For the period of time that it would take to restore the

23   buildings, yes, but not for an indefinite period, yes.

24   Q.  And replacement cost insurance insures against the risk

25   that the building itself might be damaged or destroyed, does it

D7fkwtc4                              Beach - cross

1    not?

2    A.   Correct, so that it is repaired and they can return their

3    revenue stream, yes, that's correct.

4    Q.   And insurers adjust claims for replacement value and for

5    business income losses separately; isn't that right?

6    A.   That's part of the overall adjustment analysis.

7    Q.   And that's whether or not it's a one-occurrence or

8    two-occurrence underlying event?

9    A.   In this case, that would be true, yes.

10   Q.   And each of those separate coverage, claims under the

11   separate coverages, on the one hand from business income and on

12   the other for replacement cost of the buildings, they require

13   different proofs, do they not?

14   A.   Well, I've heard that discussed today.  I don't know that

15   they necessarily would.  In fact, on World Trade Center 7, I

16   believe the proof of loss presented included values for both,

17   but --

18   Q.   Well, would an insured submit a copy of its rent rolls to

19   support its claim for the replacement cost of the building?

20   A.   That could be done simultaneously, yes.

21   Q.   Was that done in this case?

22   A.   No, I think separate proofs of loss were submitted.  In

23   this particular case, yes, there were proofs of loss pertaining

24   to the rental income loss and separate proofs of loss for the

25   building claim.

D7fkwtc4                         Beach - cross

1    Q.  And as we saw a little earlier when we looked at the IRI

2    loss handling instructions, that was Joint Exhibit 201, we saw

3    that insurers may account internally for payments under each

4    different coverage separately; isn't that right?

5    A.  Yes, in the case of World Trade Center 7, IRI has allocated

6    those values separately.

7    Q.  They have assigned, for their own internal purposes,

8    different amounts of money to the property damage coverage and

9    to the time element coverage; isn't that right?

10   A.  That is correct.

11   Q.  Anywhere in the loss handling instructions, did IRI break

12   out how much they were assigning to personal property versus

13   real property under the PD category?

14   A.  No, they have not spelled that out separately.

15   Q.  And it's true, isn't it, that IRI's internal allocation

16   allocations here were revised over time; isn't that right?

17   A.  Well, this particular allocation was done at this

18   particular time.  I'm not sure if I'm answering your question,

19   but the 819 plus the 223 were allocated as of the date of this

20   document.

21   Q.  But those were different allocations than the insurer had

22   originally internally put on some of this claim; isn't that

23   right?

24   A.  Yeah, that would appear to be the claim, yes.

25   Q.  Do you see the handwritten note -- under the number near

D7fkwtc4                       Beach - cross

1    the bottom, the 819 million number, do you see the handwritten

2    note there that says, "Currently on TE"?

3    A.  Yes, I see -- well --

4           MS. BAGLIN:  I'm sorry, it's up to the left,

5    Mr. McLeod, right under the number that says 819,223,141, right

6    under that, there's a hand note, "Thank you."  If you could

7    blow it up, "Currently on TE."  Do you see that?

8    A.  Yes, I do.

9    Q.  Do you see below, the 233,000 that's allocated here in

10   these final loss handling instructions, is subtracted from that

11   number, giving a difference of some $82 million?  Do you see

12   that?

13   A.  Yes, I do.

14   Q.  And do you see the notation at the bottom, the handwritten

15   note to the right of the 82 million, that says, "Shift to PD"?

16   A.  Yes, I do.

17   Q.  And do you see the handwritten note to the right of that

18   which says, "Credit off TE, put part on PD"?  Do you see that?

19   A.  That is correct, yes.

20   Q.  So IRI, in its own internal allocations, had put more money

21   on time element to begin with and then they were revising their

22   own internal allocation at the time of the final payment; is

23   that right?

24   A.  That is correct.  I do not have the support necessarily

25   showing the original 3 billion, but as of the date of this

D7fkwtc4                    Beach – cross

1    document, yes, they have been allocated to the values as shown.

2    Q.  And it appears that their final allocation to time element

3    was only 233 million; is that right?

4    A.  You say only, but, yes, 233 million and 586 million 223 for

5    the property damage, correct.

6    Q.  Well, initially it had been some $82 million higher than

7    that, hadn't it?

8    A.  Yes, that's correct.

9    Q.  And they actually shifted 82 million to property damage,

10   correct?

11   A.  Correct, yes.

12          THE COURT:  Shift from what to what?

13          THE WITNESS:  It appears they had shifted it from

14   property –– excuse me, from time element, they had shifted an

15   additional $82 million to property damage.

16          THE COURT:  What did that 82 million come from?  What

17   does it reflect?

18          THE WITNESS:  Unfortunately, I would have no way of

19   knowing.

20   Q.  That's right, you don't know why they allocated as they

21   did, only that they did these allocations; is that right?

22   A.  That's correct.

23   Q.  And you don't know why they originally allocated the time

24   element at a much higher amount than the final allocation;

25   isn't that right?

D7fkwtc4                          Beach - cross

1    A.  That is correct.

2    Q.  You don't have any information either, do you, that 7 World

3    Trade Company agreed to, or even knew about, any of these

4    internal allocations; isn't that right?

5    A.  I don't know that they did or not.

6             THE COURT:  I'm assuming that this document has zero

7    value, Ms. Baglin.  I don't know if that had occurred to you

8    yet when I suggested that you might object to it, but I don't

9    see what point there is in the document or a minute of time

10   spent on the document.

11            MS. BAGLIN:  If it's your Honor's ruling -- and we

12   agree with it -- that internal allocations don't matter, that

13   would be true.  This document does show, however, that the

14   insurer --

15            THE COURT:  Ms. Baglin, it's your cross-examination.

16   If you would like to waste your time, it's OK with me.

17   BY MS. BAGLIN:

18   Q.  Now, business income coverage, Mr. Beach, pays for

19   financial and business losses whereas property damage coverage

20   pays for building repairs to the building itself; isn't that

21   correct?

22   A.  Yeah.  Once again, that is correct, and it protects them

23   against additional revenue losses of property damage as they

24   can continue the revenue stream.  But, yes, in that sense they

25   are.

D7fkwtc4                           Beach - cross

1    Q.   Insurance proceeds for the loss of the building don't

2    duplicate lost rent, correct?

3    A.   That is correct.

4    Q.   If World Trade Center Properties or 7 World Trade Company

5    only had replacement cost insurance, I understand you testified

6    earlier that commonly building managers will get both, but if

7    they only had replacement cost insurance, not business

8    interruption, I'm correct, aren't I, that their insurers

9    wouldn't have paid them anything for business income losses

10   under their replacement cost coverage?

11   A.   That's a fair statement, yes.

12   Q.   If they didn't have the business income coverage, they

13   couldn't have gotten any payment on their business loss claims;

14   is that right?

15   A.   If they were not covered for that category, they would not

16   receive payment --

17   Q.   And similarly --

18   A.   -- that is correct.

19   Q.   -- if they only had business interruption coverage and they

20   didn't have replacement cost or ACV coverage on the building,

21   they only would have been able to recover their business income

22   losses, not any money for the loss of the buildings themselves;

23   isn't that correct?

24   A.   If that is the only coverage that they had -- and, as I've

25   testified, that would not be common, but, yeah, that would be

D7fkwtc4                        Beach - cross

1    true.  It can happen in a smaller retail establishment that may

2    only have rental income coverage, such as a small tenant in a

3    large building, but the answer is, correct, yes.

4    Q.  You have to pay for the coverage to get a response from the

5    insurer when you have a loss; is that right?

6    A.  That's true, yes.

7    Q.  Now, it's your opinion you also say that payments for 7

8    World Trade Center were only for real and personal property

9    losses and rent time element; is that correct?

10   A.  Correct.

11   Q.  And the reason why you say the insurance payments here were

12   only for property damage and rental value is because claims for

13   the loss of the buildings -- lost rental value and in the case

14   of 7, lost personal property -- are the only covered losses

15   that you say were claimed, well-founded and documented; is that

16   right?

17   A.  That is correct.

18   Q.  Those are your words, right?  They have to be claimed,

19   well-founded and documented?

20   A.  Documented and quantified, yes.

21   Q.  In your view, insurers require documentation before they'll

22   even consider paying on a claim; isn't that right?

23   A.  Yes.

24   Q.  And the required documentation would be things like

25   contractor invoices, estimates, consulting reports, rent rolls,

D7fkwtc4                          Beach - cross

1   financial documents, things like that; is that correct?

2   A.   Correct.

3   Q.   And, again, there would have to be documentation of the

4   specific covered loss being claimed?  If you want to recover

5   for business income, you have to supply rent rolls or some

6   proof specifically related to your lost rent; isn't that right?

7   A.   Yes, such as was done in the case of World Trade Center 7,

8   yes.

9   Q.   Ms. Taylor asked you a little bit about some of the TBD

10  claims.

11          MS. BAGLIN:   And if I could ask Mr. McLeod to put up

12  Joint Exhibit 5 to the summary pages.  It's the second and

13  third pages of the summary.  And go to the next page.  Thank

14  you.

15  Q.   Now, these items that are listed here and on the next page

16  as TBD, this isn't a form document, is it?

17  A.   It's a document that was created by --

18  Q.   This particular document we're looking at, it's not a form

19  document, right?

20  A.   No, I don't believe that it is.

21          If I could finish, it's a document that was created by

22  Cambridge Horizon to support the claim.

23  Q.   It appears that they specifically selected out certain

24  coverages to list here as TBD, things that they thought there

25  was a loss for but the amount had to be quantified and

1   determined at some later point; is that right?

2   A.  Yes, that had been listed as TBD.

3   Q.  And the last two things listed --

4           MS. BAGLIN:  Well, let me go to the next page, if we

5   could for a minute, Mr. McLeod.

6   Q.  Looking at the list of TBD items here -- valuable papers

7   and records, electronic data processing, data and media,

8   personal effects of officers and employees -- those are the

9   kinds of things that in a complete catastrophic loss like this,

10  you would expect there were some of those losses in some

11  amount, would you not, sir?

12  A.  Honestly, I don't know.  It's possible they did.  I don't

13  know the structure of the World Trade Center and to what

14  capacity they occupied the building and had personal property

15  in there.  I know that they've asserted claims to be

16  determined, but they didn't document a claim and quantify those

17  items.

18  Q.  Would you be surprised, sir, if in a building of the size

19  and scale of the World Trade Center complex and 7 World Trade

20  Center that there were losses of valuable papers and records

21  and some electronic data processing equipment, personal effects

22  of officers and employees?

23  A.  If they occupied that building by the insured, that would

24  be expected, yes.

25  Q.  Now, there was no time limit, was there, for submitting

1    documentation of these TBD items?

2    A.  No.  I just know that they did not do that prior to the

3    settlement, final settlement.

4    Q.  If they hadn't settled, their time to put in quantification

5    and other documentation for this wouldn't have run; is that

6    right?  They could have put it in?

7    A.  I can't say that it would be indefinite, no.

8    Q.  But you have no information that there was a time limit

9    that had run for them to do it, do you?

10   A.  No.  As of the time of the settlement, they had not done

11   that, but I'm not aware of any time limit that was put upon

12   them to do that necessarily.

13   Q.  In all the thousands of documents you looked at, you didn't

14   see any correspondence to them from their insurers saying get

15   these claims documented by X date or we're not going to

16   consider them, you didn't see anything like that, did you?

17   A.  Just as I didn't see those, I saw no supporting documents

18   for them, that's correct.

19   Q.  Am I correct, sir, that no claim for loss of the

20   buildings -- the main site buildings I'm speaking about -- was

21   documented until January 18th of 2002; is that correct?

22   A.  That's correct.  A proof of loss was put forward asserting

23   a value.  However, it was not documented, I believe, until

24   January 8th, pursuant to an exhibit we previously reviewed.

25   Q.  That's the supplement number 1 to preliminary proof of loss

D7fkwtc4                          Beach - cross

1    number 2; is that right?

2    A.   Correct.  That would be the evaluation and claim package

3    put together by Cambridge Horizon.

4              MS. BAGLIN:  At this time, your Honor, I'd like to

5    offer in evidence Joint Exhibit 4, which is the supplement

6    number 1.  It's a preliminary proof of loss number 2.

7              THE COURT:  Are you involved in this document at all,

8    Mr. Beach?

9              THE WITNESS:  I'm sorry, excuse me?

10             THE COURT:  Were you involved in this document at all?

11             THE WITNESS:  I was only involved in the reviewing of

12   this document as part of my expert analysis that's being given

13   today, but I did not create this document, no, by any means.

14             THE COURT:  What purpose did your review have with

15   regard to this document?

16             THE WITNESS:  It would put forth the claim values that

17   were asserted by World Trade Center complex that we previously

18   reviewed in an exhibit where I summarized all of the proofs of

19   loss presented, three of them which were for property damage,

20   which this one pertains to, and 13 were separately submitted

21   for income losses.

22             THE COURT:  Objection?

23             MS. TAYLOR:  No objection, your Honor.

24             THE COURT:  Received.

25             (Defendant's Exhibit 4 received in evidence)

D7fkwtc4                        Beach - cross

1    Q.  Mr. Beach, the proof of loss number 2, which this JX 4

2    supplemented, was submitted on November 7th, 2001; is that

3    right?

4    A.  I don't see the date here.  You could be correct.

5              MS. BAGLIN:  I offer at this time Joint Exhibit

6    No. 3 --

7              THE COURT:  Is that all you're going to do with this

8    document?  Exhibit 10?

9              MS. BAGLIN:  At this time, no, your Honor.  The point

10   is that this is the first time, according to this witness, that

11   this claim for loss of the building was documented.  I'm just

12   trying to establish the timeline here.

13             THE COURT:  What's the point?

14             MS. BAGLIN:  I think that will become clear as we go

15   along, your Honor.

16             THE COURT:  Maybe I'd like to know about it now.

17   What's the point of this document?

18             MS. BAGLIN:  This is relevant to Mr. Beach's opinion

19   that none of the insurance payments were made for claims that

20   had not yet been documented and submitted.

21             THE COURT:  Give me a little credit for a little

22   intelligence.  A payment is made to get a release.  So, what's

23   released are the claims that are documented and the potential

24   in the undocumented claims.  The real issue is not what the

25   release was for or what the settlement was for; it's whether I

D7fkwtc4                        Beach - cross

1    should ascribe value to these to be determined values.  That's

2    the real issue.  This document teaches me zero about that.

3              MS. BAGLIN:  Your Honor, I believe I can establish

4    with Mr. Beach that these individual payments -- many of the

5    early payments were just advances.  They weren't given for

6    releases and no releases were given in exchange for them.

7    There were no releases until the final settlements, your Honor.

8              THE COURT:  What would be interesting to me is if you

9    ever delivered any kind of quantification of these additional

10   claims.  Did you ever?

11             MS. BAGLIN:  Your Honor, that was not done because the

12   case went into litigation.  And before the documentation had to

13   be provided, the coverage litigation the claims, everything,

14   was settled apiece and none of that was required in connection

15   with the settlement.

16             THE COURT:  Thank you, Ms. Baglin.

17             MS. BAGLIN:  I'd like to offer into evidence at this

18   time Joint Exhibit No. 3 and hand a copy to the witness.

19             THE COURT:  What's the point of this document?

20             MS. BAGLIN:  Well, I had asked Mr. Beach and he didn't

21   remember when the first preliminary proof of loss number 2 was

22   submitted.

23             THE COURT:  What was the date?

24             MS. BAGLIN:  The date on the document here, which I

25   think it was submitted on November 7th of 2001.

D7fkwtc4                         Beach - cross

1          THE COURT:  Does that date --

2     Q.  Does that refresh your recollection?

3          THE WITNESS:  Yes, I --

4          THE COURT:  Who cares the first time?

5          THE WITNESS:  Yes, that's fine.

6          THE COURT:  The date is in evidence.  We don't need

7     the document.

8     BY MS. BAGLIN:

9     Q.  So, prior to January 18th, 2001, when the insurers received

10    a documented claim for the loss of the building, the only

11    documented claim that had been submitted to that point in time

12    was preliminary proof of partial losses number 1, which would

13    have been submitted back in October; is that right?

14    A.  Yeah, I believe that was submitted on October 8th for

15    approximately $136 million, to which the payment of $75 million

16    was issued.

17    Q.  And that was a preliminary proof of partial loss for

18    business income, was it not?

19    A.  That is correct.

20    Q.  Through March 31st, 2002?

21    A.  I don't recall the exact date, but that sounds correct,

22    yes.

23    Q.  By the way, Mr. Beach, were any proofs of loss ever

24    submitted for something that the insureds referred to as

25    economic loss to net leaseholds?

D7fkwtc4                        Beach - cross

1    A.  We previously reviewed the exhibit which outlined the

2    proofs of loss that were submitted, and they were identified as

3    business income.  And as I testified, and placed in quotes, I

4    don't remember that language being used.

5    Q.  The titles you put on your chart were the only titles you

6    saw in any of the proofs of loss, right?

7    A.  Those are how the proofs of loss were titled, by WTCP, as

8    we added language to those proofs that were not titled for

9    property damage claims.

10   Q.  Would you agree, sir, that most of the business income

11   losses that were claimed in preliminary proof of partial loss

12   number 1, the one submitted in October 2001, had not yet been

13   incurred at the time that preliminary proof of loss was

14   submitted?

15   A.  I think it was clear at that time that there would be an

16   income loss through the period that it covered.  But, that is

17   correct, the proof of loss was dated November 7th and carried

18   out a calculation beyond that day, so it was not just limited

19   to the 28 days, if that answers your question.

20   Q.  That proof of loss for business income was submitted on

21   October 8th, was it not?

22   A.  Excuse me, October 8th, so a month and a week after 9/11,

23   correct.

24   Q.  Is a claim for business income losses that have not yet

25   been incurred a well-founded and documented claim, in your

D7fkwtc4                         Beach - cross

1    view?

2    A.   In the case of this incident, the terrorist attacks, it was

3    very clear, there was physical damage to the building, it was

4    destroyed, and that there would be a resulting impact of

5    revenue.  So I think that was clear.  Physically tangible

6    damage made it clear in my mind that there was damage and there

7    would be a loss of revenue claim.

8    Q.   And the very first preliminary proof of loss for business

9    income losses, that was supported by rent rolls and cash flow

10   projections, correct?

11   A.   That is correct, yes.

12   Q.   And that's adequate documentation for the insurers to

13   consider and make payment?

14   A.   Correct.

15   Q.   And until the supplement to preliminary proof of loss 2 was

16   served on January 18th, the only documented claim on which the

17   insurers could have issued payments, in your view, was this

18   first preliminary proof of loss for business income; is that

19   right?

20   A.   As I previously testified, there were some insurers -- I

21   don't have the chart in front of me with the exact dates --

22   some insurers had issued payments immediately, a few insurers,

23   but, yes, prior to the submission of proof of loss number 2 and

24   supplements, the only claim that was submitted in the form of

25   proof of loss was for an income value to which insurers

D7fkwtc4                              Beach – cross

1    responded to the tune of $75 million.

2             MS. BAGLIN:  Could we put up Exhibit B4, Mr. McLeod.

3    Q.  This is the chart you created, Mr. Beach?

4    A.  Yes, it is.

5    Q.  This chart doesn't -- first, let me clarify a couple things

6    about this chart, if I may.

7             I'm looking across.  Under your column "Total

8    Exposure," it lists a number of 4.678 billion; is that correct?

9    A.  Yes, that is correct.

10   Q.  And that would be the total exposure of the insurers to

11   both Westfield and the World Trade Center Properties

12   plaintiffs; is that right?

13   A.  Yes.  I'm not sure on the Westfield, to be honest with you.

14   I know it was the total available exposure under the insurance

15   program for the World Trade Center program, yes.

16   Q.  Are you aware, sir, that Westfield had its own lease for

17   the retail space with the Port Authority?

18   A.  Yes.  And I would agree that coverage would have been

19   included as there was a setoff or an amount deducted here

20   earlier for Westfield's property.  So, I would agree that it

21   would be covered under the policy, however separate from this

22   litigation as to what payments were made to WTCP complex.

23   Q.  But you looked at the policies, the slips and binders, and

24   you saw that Westfield was a coinsured under this same

25   insurance; is that right?

D7fkwtc4                              Beach - cross

1    A.  Yes, correct.

2    Q.  And the claims that were submitted were claims on behalf of

3    both Westfield and the World Trade Center Properties

4    plaintiffs; is that right?

5    A.  That is correct.

6    Q.  So, when the 4,581,000,000 received, in your right-hand

7    column, that's insurance payments that applied to both World

8    Trade Center Property plaintiffs and Westfield; is that

9    correct?

10   A.  Yes, of that payment 490 million was attributed to

11   Westfield retail.

12   Q.  That's how much of the insurance money that Westfield got,

13   right?

14   A.  Correct, yes.

15   Q.  World Trade Center Properties only got 4 billion

16   091-some-odd million; is that right?

17   A.  That is correct, yes.

18   Q.  Now, in your B4 that you created, you did not include on it

19   or any of the other charts that were presented to us today any

20   of the individual insurer payments; is that right?

21   A.  No, that would have been included in my expert report, but

22   this is a compilation of all payments that were made as well as

23   the total exposure.

24   Q.  So, in your column that's listed "Payments Before

25   Settlement," that doesn't necessarily mean that those amounts

D7fkwtc4                           Beach - cross

1   were paid in single payments, does it?

2   A.   That is correct.  Some of them may have been; others would

3   be a combination of multiple payments.

4           MS. BAGLIN:  I ask to offer Exhibit C3 from your

5   original report.  That's, I believe, your chart that shows the

6   individual payments.

7           THE COURT:  Why do I need to know what each company

8   paid?

9           MS. BAGLIN:  Because it's Mr. Beach's opinion that

10  each and every payment was, number one, only in response to a

11  documented claim and had to be either for business interruption

12  or property damage.  And I think when we start to look at the

13  individual payments, you'll see that it's just not correct,

14  your Honor.

15          May I have a copy, please.

16  Q.   Mr. Beach, you created this summary, just as you did the

17  other charts that have been offered here in evidence today; is

18  that right?

19  A.   That is correct, yes.

20  Q.   And you believe that to be a true summary of your findings,

21  as you looked through various payment records?

22  A.   Correct, yes.

23          MS. BAGLIN:  Your Honor, I offer Exhibit C -- well, I

24  guess we should mark it here as Plaintiffs' --

25          THE COURT:  It doesn't make any difference.  It's C3.

D7fkwtc4                          Beach - cross

1    Received.

2                    MS. BAGLIN:  C3?

3                    THE COURT:  Yes.

4                    (Exhibit C3 marked for identification)

5                    MS. BAGLIN:  Your Honor, Ms. Taylor is requesting that

6    we give it a plaintiffs' number.  I have no problem with that.

7    That would be Plaintiffs' 563.

8                    THE COURT:  C3, C3.  I'm the judge.  It doesn't make

9    any difference who offers it.

10   BY MS. BAGLIN:

11   Q.  And Exhibit C3 shows all of the individual payments that

12   are somehow reported on your Exhibit B4; isn't that right?

13   A.  Did you say D4?

14   Q.  B as in boy, the chart we just looked at.

15   A.  Yes, yes.

16   Q.  The grand total you have on the last page of Exhibit C3 is

17   the same as the grand total you show on your Exhibit B4; isn't

18   that right?

19   A.  Yes, that is correct.

20   Q.  So, these are the payments that total up to the amounts you

21   have in B4; am I right?

22   A.  Yes.  Because we have one exhibit on in front of me and on

23   the screen, would it be OK to have a copy of the previous

24   exhibit that we're referring to?  The answer is yes.  If we're

25   going to go back and forth, I would like both exhibits in front

D7fkwtc4                        Beach - cross

1    of me.

2              MS. BAGLIN:  Excuse me.  Ms. Palazzolo, can you give

3    the copy witness a copy of C3.

4              THE WITNESS:  C3 I have.

5              MS. BAGLIN:  He wants the prior one.  I'm sorry.

6              THE WITNESS:  Thank you.

7    BY MS. BAGLIN:

8    Q.  Now, in your report on the main site, Mr. Beach, you said

9    that World Trade Center Properties issued its first preliminary

10   proof of partial loss for business income losses for

11   $136,758,297, in response to which the insurers agreed to

12   advance 75 million against that claim; is that right?

13   A.  That is correct.

14   Q.  And, in fact, that first preliminary proof of loss was

15   submitted by both World Trade Center Properties and Westfield,

16   wasn't it?

17   A.  Correct, yes.

18   Q.  And that $136.7 million you referred to in your report,

19   that was just World Trade Center Properties business income

20   losses, correct?

21   A.  Yes.

22   Q.  But the proof of loss itself also included Westfield's

23   claimed business income losses in the amount of about

24   $17 million; is that right?

25   A.  It very well could have.  I don't recall that exact

D7fkwtc4                        Beach - cross

1    document as I sit here today, but I wouldn't refute that.  If

2    it does, I would agree.  I know that it included Westfield as

3    an insured.

4    Q.  Do you have any reason to dispute that the total amount of

5    the preliminary proof of loss was not 136.7 million but

6    $153,950,840?

7    A.  That's my recollection --

8               MS. TAYLOR:  Objection, your Honor.

9               THE COURT:  Sustained.

10              MS. BAGLIN:  I'd like to offer at this time, your

11   Honor, a document with the Bates numbers SILV7600012 through

12   13.  It's a November 12th, 2001 letter from Adam O. Emmerich to

13   several of the insurance companies and their adjusters.

14              THE COURT:  Did you have anything to do with this

15   letter?

16              THE WITNESS:  I believe I would have reviewed it as

17   part of the thousand pages I had received, but nothing

18   personally, no.

19              THE COURT:  What does this bring out?

20              MS. BAGLIN:  I'd like to bring out, your Honor, on the

21   second page of the letter, in the last full paragraph, the

22   language -- we can highlight it there -- that, "As you know,

23   the proof of loss requested advances of 136" --

24              THE COURT:  I see it, I see it.

25              MS. BAGLIN:  That's where we get the 153 million

D7fkwtc4                        Beach - cross

1    total.

2    Q.  Do you see that, Mr. Beach?

3            THE COURT:  Objection sustained.

4    Q.  Does this document refresh your recollection as to the

5    aggregate amount of the claim in the first preliminary proof of

6    partial loss for business income?

7            MS. TAYLOR:  Objection, your Honor.

8            THE COURT:  Overruled.

9            THE WITNESS:  It's my recollection that proof of

10   loss --

11           THE COURT:  It refreshes your recollection or it

12   doesn't.  Does it help you think in any way?

13           THE WITNESS:  No, just that the amount of --

14           THE COURT:  No.  That's all you have to answer.

15           THE WITNESS:  Thank you.

16           THE COURT:  It doesn't refresh his recollection.

17           MS. BAGLIN:  I'd like to offer into evidence Joint

18   Exhibit 2, your Honor, which is the actual first preliminary

19   proof of partial loss.

20           THE COURT:  What's the point?  What are you trying to

21   prove?

22           MS. BAGLIN:  I'm trying to show that not all of the

23   first amount of money that was claimed for business income

24   related to the World Trade Center Properties; and, therefore,

25   payments did not relate just to the World Trade Center

D7fkwtc4                          Beach - cross

1    Properties claim.

2               THE COURT:  What did it relate to?

3               MS. BAGLIN:  Westfield's claims, your Honor.

4               THE COURT:  Westfield was a different category.  That

5    was deducted from the balance of the claim.

6               MS. BAGLIN:  No, this first preliminary proof of

7    loss -- this is before there was that final deduction made.

8    This was a claim by all of the insurers, including Westfield.

9               THE COURT:  Just say it and I will accept it.

10              MS. BAGLIN:  I was going to call Mr. Beach's attention

11   to the second -- first, I was going to offer it into evidence.

12              THE COURT:  If you would just say it, I'll accept it.

13              MS. BAGLIN:  I'd like to say that there were two

14   schedules to this proof of loss, one for World Trade Center

15   Properties business income losses, in the amount of

16   136,758,297, and a Schedule D, which set forth Westfield's

17   business income losses in the amount of $17,192,543, for an

18   aggregate business income loss claim in this first preliminary

19   proof of loss of $153,950,840.

20              THE COURT:  The record will so reflect.

21              MS. TAYLOR:  Objection, your Honor.  Could counsel

22   refer us to where D is in this, the page number?

23              MS. BAGLIN:  D is not attached.  It's referred to in

24   on the second page, under paragraph 5, which says --

25              THE COURT:  I accept it.  Let's move on.

D7fkwtc4                         Beach – cross

1           MS. BAGLIN:  Now, the $75 million advance that you

2      referred to in your report as having been made, was an advance

3      requested against the total claim of 153.9 million, isn't that

4      right, not just the World Trade Center portion?

5      A.   Well, it was in response to proof of loss number 1.

6      Q.   The request for the advance was made by both Westfield and

7      World Trade Center Properties plaintiffs, was it not?

8      A.   Yes, it appears it was, correct.

9      Q.   The request didn't ask for a certain amount for World Trade

10     Center Properties and a certain amount for Westfield, did it,

11     it just asked for one advance of 75 million; isn't that right?

12     A.   That is correct.  The key point here is the proof of loss

13     amounts that we are referring to were not accepted in their

14     full at that point.  $75 million was accepted at that point in

15     time in response to the proof.

16          MS. BAGLIN:  At this time, your Honor, I'd like to

17     offer into evidence Plaintiffs' Exhibit 511, which is the

18     request for the $75 million advance.

19          THE COURT:  The advance is made, right?  We don't need

20     all the documentation, Ms. Baglin.

21          MS. BAGLIN:  Well, the terms of the advance are in

22     this exhibit, your Honor.  We believe they're important.

23          Your Honor, I have offered this into evidence.

24          THE COURT:  It's not qualification for it.  Objection

25     sustained.

D7fkwtc4                          Beach - cross

1   BY MS. BAGLIN:

2   Q.  Mr. Beach, is Plaintiffs' 511 one of the documents you

3   reviewed in coming to your opinions in your report in this

4   case?

5   A.  Well, the documents I -- it could have been, I don't

6   recall.  As I indicated before, the proof of loss was

7   submitted, and in response to that proof of loss, payments of

8   $75 million were issued --

9           THE COURT:  Did this affect your opinion, this letter?

10          THE WITNESS:  Not substantially by any means, no.

11          THE COURT:  Objection sustained.

12  Q.  You, in your report, refer, do you not, refer to an request

13  for an advance for 75 million; isn't that correct?

14  A.  That may have been.  If you would like me to refer me to my

15  report, again, my --

16          THE COURT:  Just say what your memory is.

17          THE WITNESS:  I don't recall.

18  Q.  Mr. Beach, do you recall --

19          MS. BAGLIN:  If you'd like, I can show the witness his

20  report, your Honor.  We can put it up on the screen if that's

21  acceptable.

22          THE COURT:  Just show it to him.  Ask him if it

23  refreshes his recollection.

24          If it's of interest to you -- it may shorten things,

25  Ms. Baglin -- what I am prepared to understand is not so much

D7fkwtc4                         Beach - cross

1    what Mr. Beach said was his opinion as to what the insurance

2    companies paid for.  They paid for the release.  The release

3    contains a statement not only of the claims that were made but

4    also that could have been made.  Doesn't that help you?

5              MS. BAGLIN:  It does help us, your Honor.

6              THE COURT:  So, why are you pounding the obvious?

7              MS. BAGLIN:  Because Mr. Beach's entire opinion is

8    founded on his blanket view that every single payment any

9    insurer made here was based only, or was only for, a documented

10   claim.

11             THE COURT:  It's also for a release.  The release is

12   beyond the claim.

13             MS. BAGLIN:  Right now, your Honor, we're not talking

14   about releases.  We're not --

15             THE COURT:  But I am and I am making the findings and

16   that's what I will find.  I'm not helped by this, not at all.

17   You're just wasting time -- your time, my time, everybody's

18   time.  This is not a deposition, it's a trial.

19   BY MS. BAGLIN:

20   Q.  In your experience, Mr. Beach, are advance payments made

21   without prejudice to the position of anyone concerning the

22   characterization of the advances?

23   A.  Yes, that is a fair statement.

24   Q.  And that's what happened in this case, is it not?

25   A.  Correct.  Proofs of loss weren't accepted in their entirety

D7fkwtc4                          Beach - cross

1   but payments were made.  As I mentioned earlier in my

2   testimony, some insurers issued their policy limits

3   immediately, others issued advance payments, and at the end of

4   the day, final payments were issued as a result of the

5   settlement agreement.

6   Q.  And the advances that were made were expressly stated to be

7   that they wouldn't be allocated with respect to any of the

8   potential coverages or to any one part of the claim; isn't that

9   right?

10  A.  Other than a few payments that were made early on, which I

11  have identified in Exhibit C3, that they were attributed to

12  building or rental value, but, no, they did not specify what

13  they were being allocated to exactly.

14  Q.  Are you aware, sir, from your review of the file, that the

15  insurers' adjusters had actually written back to the insureds

16  about that first preliminary proof of loss for business income

17  on October 18th, 2001, before any money was ever advanced?

18  A.  Yes, I do.

19  Q.  And did you see a letter, that October 18th letter, to the

20  two adjusters, Mr. Reilly and Mr. Levin, that they wrote to

21  Willis?  Have you seen that letter?

22  A.  I probably have.  I recall that date, but if you'd like to

23  show it to me, I'd be happy to --

24          THE COURT:  No, no, no.  Don't encourage her.

25  Q.  Are you aware, sir, that at that time --

D7fkwtc4                        Beach - cross

1          THE COURT:  Isn't this the same point we have been

2     discussing up to now?

3          MS. BAGLIN:  Your Honor, the same and related points.

4     Q.  At that time, it's true, isn't it, that even though the

5     insurers said they haven't even had a chance to fully review

6     the materials submitted, that they decided on their own, in

7     principle, to make a payment to all of the insureds without

8     prejudice to anybody's rights; is that right?

9     A.  That would be a fair statement.  At that point in time, it

10    was obvious --

11         THE COURT:  It often happens, doesn't it?

12         THE WITNESS:  It surely does.

13         THE COURT:  If you have a large claim and you want to

14    show some good faith, you pay some money to advance --

15         MS. BAGLIN:  And they were really --

16         THE COURT:  -- a final resolution, right?

17         THE WITNESS:  I would agree, that is common.

18         THE COURT:  That's what happened, right?

19         THE WITNESS:  Yes, it is, sir.

20         THE COURT:  So what do I understand from this,

21    Ms. Baglin?

22    Q.  They were willing to make the advance even though they had

23    problems with the preliminary proof of loss; is that correct?

24         THE COURT:  Yes, yes, yes, they did.  Now move on.

25    Q.  And even though they hadn't been given full information

D7fkwtc4                          Beach - cross

1    that the insurers said they wanted?

2              THE COURT:  Right.  Even though the to-be-determined

3    claims had not been codified.

4              MS. BAGLIN:  Well, the to-be-determined claims weren't

5    before us here.  We're still talking --

6              THE COURT:  They're always before us.

7    Q.  The insurers, at that early time on October 18th, before

8    they made the advances, told Willis they didn't think the claim

9    was sufficiently documented; isn't that right?

10   A.  Yes.

11   Q.  And, in fact, they told Willis that the preliminary proof

12   of loss number 1 was not accepted, did they not?

13             THE COURT:  Ms. Baglin, what's the difference?  We're

14   not going through six days of depositions here.  We have three

15   days for trial.  Make use of it.

16             MS. BAGLIN:  I am trying to, your Honor.

17             THE COURT:  No, you're not.

18   Q.  And isn't it true that the insurers agreed to make that

19   advance without the need for any further supporting claim

20   documentation?

21   A.  It's my opinion that advance payments were made knowing

22   that there was a forthcoming claim and that it would be

23   conceivable to believe that they were in the process of

24   evaluating and quantifying that loss rather than accepting it

25   on its face value immediately.

D7fkwtc4                          Beach - cross

1    Q.  Am I right, sir, that before the documented claim on the

2    building, there was another $75 million advance made, not just

3    one but two; isn't that right?

4    A.  That would appear to be the case, yes.

5    Q.  And that second advance was for $75 million as well?

6    A.  Yes, again, my C4 spells out when payments were made and in

7    what amounts.  And I assume that included the 75 million in

8    here, yes.

9    Q.  And that total amount, 75 plus 75, $150 million, that's

10   somewhat less than the total amount that had been requested in

11   the first preliminary proof of loss, isn't that right, of

12   153.9?

13   A.  The 136 or the 153 has to be greater than the 136 and it

14   would be less than the 153.

15   Q.  The 153.9 is more than the 150 that was advanced, correct?

16   A.  I would agree to that, yes.

17            THE COURT:  Brilliant, brilliant.

18   Q.  And the second advance, you would agree, was on the same --

19            THE COURT:  Ms. Baglin, please stop this.  If you

20   don't, I'm going to give you a time and when you get to the end

21   of that time, you'll be finished.

22   Q.  I'd like to refer you back to your Exhibit C3, which lists

23   some of the individual payments.  I'd like to call your

24   attention to the 11/7/01 payment by Royal Specialty of

25   $2.8 million.  Do you see that?

D7fkwtc4                              Beach - cross

1    A.  Yes, I do.

2    Q.  That payment was part of the first advance?

3    A.  I know that it was a payment issued by Royal Indemnity

4    for --

5               THE COURT:  The answer is yes, no, or I don't know.

6               THE WITNESS:  I believe that it would be.

7    Q.  And payment was in the amount of Royal Specialty's

8    per-occurrence limit for loss in the first two layers; isn't

9    that right?

10   A.  Yes.

11   Q.  And that payment was for more than the amount claimed in

12   the preliminary proof of loss, was it not?

13   A.  My apologies, I'm not following you.  I thought you were

14   specifically referring to the $2.8 million.

15              THE COURT:  Repeat the question, Counsel.

16   Q.  That payment was for more than the amount claimed in the

17   first proof of loss; isn't that right?

18   A.  If I'm understanding the question --

19              MS. TAYLOR:  Objection, your Honor.

20              THE COURT:  Sustained.

21   Q.  Royal made that payment, did it not, because it wanted to

22   put the insurance into funds promptly, in view of the exigent

23   circumstances; isn't that right?

24              THE COURT:  If you know.

25              THE WITNESS:  I don't know what their underlying

D7fkwtc4                        Beach - cross

1    thought was, but it would make sense that they would issue an

2    advance payment actual to the claims that are known.

3    Q.  Even though no documented claim had been submitted,

4    correct?

5    A.  That's correct.

6            Coincidentally, I believe a proof of loss was

7    submitted but they issued payment on November 7th for

8    $2.8 million in response to the terrorist attacks and the

9    resulting damage.

10   Q.  Royal Specialty had expressly disagreed with the statements

11   in, and the format of, the proof of loss; isn't that right?

12   They made the payment anyway?

13           MS. TAYLOR:  Objection, your Honor.

14           THE COURT:  Sustained.

15   Q.  I'd like to call your attention to the December 7th, 2001,

16   payment by Copenhagen Re of $4 million.

17           THE COURT:  Are you going to do the same thing with

18   Cope Re?

19           MS. BAGLIN:  Very briefly, your Honor.

20           THE COURT:  No.

21   Q.  Now, in your Exhibit C3, you have a column that reads

22   "Memo," do you not?

23   A.  Yes, I do.

24   Q.  And under both the Copenhagen Re and Royal Specialty

25   payments --

D7fkwtc4                          Beach - cross

1          MS. BAGLIN:  If we could get rid of that box for a

2     minute, please.

3     Q.  -- you have a memo as to Copenhagen Re rental value of

4     Royal Specialty buildings -- do you see that?

5     A.  Correct, yes, I do see that.

6     Q.  And you made those entries because Copenhagen Re and Royal

7     Specialty had some kind of notation by the insurer on either a

8     check or a check stub, something related with the payment; is

9     that right?

10    A.  That would be correct.  It likely would have been noted

11    upon a payment, a wire transfer, a check, et cetera.

12    Q.  And do you see the other two payments in the middle there

13    that also both say building 1 is from Wausau in the amount of

14    2 million, one is from Tokio Marine in the amount of

15    1.6 million?

16    A.  That is correct, yes.

17    Q.  Are you claiming that in these few instances, because of

18    the notations, those payments should be considered to have been

19    allocated in accordance with the insurers' notations?

20    A.  I can tell you that is the reference that was made by those

21    individual insurers as to how they attributed that payment

22    being issued.

23    Q.  Those are notations that were made by the insurers; is that

24    correct?

25    A.  Correct.

D7fkwtc4                        Beach - cross

1    Q.  At the time that you made this note here, were you aware

2    that WTCP's coverage counsel had written a letter to Tokio

3    Marin concerning their notation on the check?

4    A.  I don't recall that.

5            MS. TAYLOR:  Objection, your Honor.

6            THE COURT:  Overruled.

7            Were you aware?

8            THE WITNESS:  I may have, I don't recall, as I sit

9    here today, on that specific document.

10   Q.  Do you recall that counsel wrote to Tokio Marin saying --

11           THE COURT:  He said he didn't recall, Ms. Baglin.

12   Q.  Do you recall that the actual notation on the check did not

13   say building, as you've written here, but explosion building?

14   A.  That very well could be the case.  Again, I'd have to see

15   the document --

16           THE COURT:  The question is:  Do you recall?

17           THE WITNESS:  I don't recall specifically, no.

18           (Continued on next page)

19

20

21

22

23

24

25

D7FKWTC5ps                    Beach - cross

1   Q.  Is it your opinion, is it not, sir, then, that those

2   payments, despite your notation here in the memo column, were

3   for rental income; is that right?

4   A.  Those that have been characterized as rent would be for

5   rental income, and those characterized as building would have

6   been for building.

7   Q.  So payments that were made in November and I guess all of

8   them in November with the notation "building" you say were made

9   for loss of the building even though there was no documented

10  claim for loss of the building made until January of the next

11  year; is that right?

12  A.  I believe insurers knew at that point in time there was

13  damage to the building.  They could have attributed these

14  payments for building.  But the notations call out that that's

15  how they referenced on their payment check or wire transfer.

16  There was a notation.

17  Q.  OK.  But the insured had not submitted a document of claim

18  for the building at that time that the payments were made;

19  isn't that right?

20  A.  That is --

21          THE COURT:  You've already established that.

22  Q.  Now, you have a notation on Exhibit 3, C3, excuse me, the

23  $32 million payment made by Hartford Fire.  Do you see that,

24  sir?

25  A.  Yes, I do.

D7FKWTC5ps                     Beach - cross

1   Q.  Was that a policy limits payment?

2   A.  I believe that it was, yes.

3   Q.  And at the time Hartford made that payment, did they state

4   expressly that the payment wasn't made with respect to any

5   particular element of loss incurred by the insurers?

6   A.  I believe that would be the case, since I've made no

7   notation there.

8   Q.  And notwithstanding that explicit statement, it's your

9   opinion, isn't it, that the Hartford payment was just for

10  property damage and rental income, nothing else?

11  A.  Yes.  Those were the known damages immediately after 9/11,

12  yes.

13  Q.  And you concede, though, that Hartford and Hartford

14  accountant does not agree with you.

15  A.  I couldn't hear that.  I'm sorry.

16          THE COURT:  He doesn't know what Hartford does with

17  that.  He stated his opinion on that.  Move on.

18  Q.  Now, you agree, don't you, sir, that most of the payments

19  by the insurers were paid pursuant to settlement?  Your chart

20  shows that, does it not?

21  A.  I would agree, yes.

22  Q.  And you agree, don't you, that there was no judicial

23  determination, no determination exchanged by the parties, none

24  by any neutral as to what claims were being honored and in what

25  amount that made up any of the settlement payments; isn't that

1    right?

2    A.  Well, it's my opinion --

3              THE COURT:  We've gone over that so many times.

4              THE WITNESS:  I'm sorry?

5              THE COURT:  Haven't we?

6              THE WITNESS:  I -- it's my --

7    Q.  You agree with that, sir?

8              THE COURT:  The sequence, proofs of claims came in.

9    Money came back.  That's the sequence.  And then release is

10   given.  How many more times do we have to put that in different

11   words and different phrases?

12   Q.  You told us, Mr. Beach, that you read all the settlement

13   agreement, right?

14   A.  Yes, I did.

15   Q.  You're aware that coverage litigations were pending against

16   the various insurers at the time the settlements were entered?

17   A.  That is correct.

18   Q.  And you're aware, are you, that the settlement included not

19   just settlement of claims under the policy but settlement of

20   the litigations over coverage and how the insurers were

21   handling the claims; isn't that right?

22   A.  Yes.

23   Q.  And the lawsuits that were being resolved under these

24   agreements were often very complicated, weren't they?

25   A.  Yes.  I'm not an attorney, but I would consider them

1    complicated and lengthy.

2    Q.  Some of the settlement agreements took several pages just

3    to describe them; isn't that right?

4    A.  That is correct, yes.

5          THE COURT:  That may be a function of the lawyers'

6    disability.

7    Q.  You haven't provided an opinion on what the various

8    settlement agreements cover; isn't that right?

9    A.  Well, I do have an opinion, if I could state that now.

10          THE COURT:  No.

11          THE WITNESS:  OK.

12          MS. BAGLIN:  Could I call Mr. Beach's attention to

13    testimony at his deposition?

14          THE COURT:  Do you want him to give his opinion?

15          MS. BAGLIN:  Put it up?

16          THE COURT:  You want him to give his opinion?

17    Q.  Well, didn't you testify at your deposition that you didn't

18    find an opinion?

19          THE COURT:  No.  Do you want him to give an opinion?

20          MS. BAGLIN:  No.  I asked him what he was retained to

21    do, not give an opinion.

22          THE COURT:  What was the question?

23    Q.  Mr. Beach, you weren't retained to provide an opinion on

24    what the various settlement agreements cover; isn't that right?

25    A.  Part of my opinion is to give expert testimony and a report

D7FKWTC5ps                    Beach - cross

1   as to what payments were made for.  And I do have an opinion as

2   to what the settlement agreements pertain to, yes, I do.

3   Q.  You weren't retained to provide expert testimony concerning

4   the coverage litigation, or the litigation of settlements, were

5   you?

6   A.  No, I -- no, I was not.

7   Q.  Your expertise is as an adjustor, correct?

8   A.  That is correct.

9   Q.  And when you've adjusted property damage claims that went

10  into litigation, you weren't directly involved in the

11  litigation or any negotiations to resolve the litigation,

12  correct?

13  A.  Through litigation.  I'm not an attorney, so no.

14  Q.  And you don't have any firsthand knowledge of the

15  negotiation or drafting of any of the settlements here; isn't

16  that correct?

17  A.  No, I only know what they speak of and what my opinions are

18  as to what payments were made for.

19  Q.  Is it your opinion here that no matter what the terms of

20  the settlement agreements are, that the payments were for

21  either property damage or rental income and nothing else?

22  A.  That is correct.  In fact, I've given that opinion earlier

23  and those settlement agreements do mention on what basis some

24  of those settlement agreements were made for, payments were

25  made for.

D7FKWTC5ps                    Beach - cross

1   Q.  I'd like to offer into evidence at this time, your Honor,

2   Joint Exhibit 22, which is the ACE Bermuda settlement

3   agreement.  And I certainly don't intend to go through all of

4   the settlement agreements, but I'd like to look at a few of

5   them just by way of illustration.

6              THE COURT:  They are questions the witness has a basis

7   to answer?

8              MS. BAGLIN:  Excuse me, your Honor?

9              THE COURT:  Are you going to ask the witness a

10  question?

11             MS. BAGLIN:  Yes.

12             THE COURT:  Yes?

13             MS. BAGLIN:  Yes.

14             THE COURT:  Does the witness know anything about this?

15             MS. BAGLIN:  The witness has reviewed all these

16  settlement agreements.  He testified to that earlier.  He also

17  gave an opinion on what they cover.

18             THE COURT:  They cover what they say they cover.  Why

19  do you need a witness, Ms. Baglin?

20             Ms. Baglin, answer me.  They say what they cover, do

21  they not?

22             MS. BAGLIN:  They do, your Honor.

23             THE COURT:  Do we need a witness to tell us what the

24  document says?

25             MS. BAGLIN:  Well, this witness has said he's read

D7FKWTC5ps                         Beach - cross

1    them, and apparently he's disregarding the language of the

2    agreement.  I just wanted to point out to be sure that --

3               THE COURT:  Point it out to me.

4               MS. BAGLIN:  -- that it is really what it is with

5    respect to the settlement.

6               THE COURT:  Point it out to me.  What does it cover?

7    Q.  You're familiar with the --

8               THE COURT:  Answer me.  What does it cover?

9               MS. BAGLIN:  This particular ACE Bermuda settlement

10   covers all settled claims, which includes actual, potential, or

11   threatened claims.  And it includes all property risks and

12   peril insured under the policy, including any losses of

13   liability of any kind under and relating to the policy.

14              THE COURT:  I have it.  Thank you very much.  What's

15   next?

16              MS. BAGLIN:  And peril, your Honor, the release

17   provisions of this agreement --

18              THE COURT:  All existing and potential.  I got that.

19              MS. BAGLIN:  But they specifically also state that

20   they're releasing claims for extra-contractual or other damages

21   or release based on alleged bad faith, breach of the duty of

22   good faith and fair dealing, unfair claim practice, unfair

23   trade practice, and any improper act or failure to act in

24   connection with ACE's investigation handling.

25              THE COURT:  How about patent infringement?  Has it

1    gotten into that?

2              MS. BAGLIN:  Only related to their handling of the

3    claims, your Honor.

4              THE COURT:  I got that.  Thank you.

5    Q.  Now, Mr. Beach, as an adjustor, you filled out some form

6    policyholder release; isn't that right?

7    A.  Yes, that is correct.

8    Q.  And in those cases in your experience with those form

9    releases the insured didn't pay anything extra to get the

10   release; isn't that right?

11   A.  That is correct.

12   Q.  And you think that maybe that's also true for claims that

13   go into litigation; am I correct?

14   A.  Yes.

15   Q.  But you never negotiated or weren't directly involved in a

16   coverage litigation settlement, so you don't know; isn't that

17   right?

18   A.  When you say "involved," the information I've developed in

19   the handling and review of the claim may have been taken into

20   consideration by the attorneys.  But I am not directly drafting

21   long-term releases such as we're referring to today.

22   Q.  You've never been directly involved in the negotiation of a

23   settlement; isn't that right?

24   A.  That's correct.

25              THE COURT:  I tell you again for the tenth time, I'm

D7FKWTC5ps                         Beach - cross

1    prepared to find that part of the money was paid for potential

2    claims.  Do you understand that?

3              MS. BAGLIN:  OK.  May I just make two other short

4    points about the settlement agreement?

5    Q.  It's true, isn't it, sir, some of these insurers paid more

6    than their policy limits?

7    A.  It is my findings that, yes, some insurers paid more.  But,

8    however, as we previously demonstrated, multiple insurers paid

9    less, to the tune of nearly 900 -- 97 -- $97 million, excuse

10   me, that is correct.

11   Q.  And those insurers who paid less included IRI in its 7

12   World Trade Center settlement; isn't that right?

13   A.  That is correct.  We've shifted gears now, but, yes, that

14   is correct, on 7.

15   Q.  And in all the documents you looked at, sir, did you see

16   the final claims report from the adjustors for IRI?

17   A.  I did, yes.

18   Q.  And you saw that they were quite concerned that the

19   appraisal was going to come in at higher than policy limits,

20   and they wanted to settle the case; isn't that right?

21   A.  They do mention that, as we've mentioned earlier.  There

22   was no final appraisal.  The adjustor does, however, comment

23   upon those values, I think, after the settlement had been

24   reached.

25   Q.  And they specifically said, did they not that, they had

D7FKWTC5ps                    Beach - cross

1  been posturing throughout the litigation so they could

2  hopefully get a settlement that was less than the policy limit.

3  Isn't that right?

4  A.  Yes.  I wouldn't be able to say it in those exact terms,

5  but yes.

6  Q.  I'd like to talk for a moment about the sharing payment

7  under the IRI settlement that Ms. Taylor asked you about.  That

8  settlement agreement provided for that sharing.  I think you

9  pointed it out to the Court in paragraph 10 on page 9.  Did it

10 not?

11 A.  Yes.  I do recall that.

12 Q.  That's a separate paragraph from paragraph 1 that addressed

13 the complete and final settlement of all claims against IRI, is

14 it not?

15 A.  I would assume that it is, yes.

16 Q.  And in that paragraph 1 but before paragraph 10, there's a

17 series of paragraphs which relate to the release or dismissal

18 of all known claims against IRI, once the $18 million was paid,

19 isn't that true?

20 A.  It very well could be.  I could review the document, but I

21 have no reason not to believe those statements.

22 Q.  And you are aware that the $11.9 million payment is an

23 amount that was agreed to in a separate settlement agreement

24 between IRI and 7 World Trade Company, are you not?

25 A.  Yes.  There was eventually a settlement agreement between

D7FKWTC5ps                        Beach - cross

1    the two parties which outlined what was being -- the amount

2    that was being paid.

3    Q.  And that settlement was entered into only after 7 World

4    Trade Company filed the demand for arbitration asserting claims

5    against IRI regarding its share of the subrogation recovery and

6    after the parties went to mediation over it; isn't that right?

7    A.  I don't know the timing of those dates and events.

8    Q.  But you know there was litigation over it?

9    A.  Correct, yes.

10   Q.  And then there was a settlement agreement that settled that

11   litigation, and it included an agreement as to an amount that

12   would be paid of $11.9 million; is that right?

13   A.  Correct.  That referred back to the original settlement

14   agreement in paragraph 10, which indicated how any recovery

15   funds would be distributed between the two parties.

16   Q.  And that $11.9 million payment was made in late December of

17   2011 or early 2012, long after the last of the $819 million had

18   been paid in 2005; isn't that right?

19   A.  I would agree, yes.

20   Q.  The $11.9 million payment was made before you issued the

21   first of your three reports on 7 World Trade Center; isn't that

22   right?

23   A.  I believe that is the case, yes.

24   Q.  But you didn't include it in your first report, right?

25   A.  Correct.

D7FKWTC5ps                    Beach - cross

```
1    Q.  And in very first report, you didn't discuss or even
2    mention paragraph 10, the sharing provisions, right?
3    A.  That is correct.
4    Q.  And it wasn't until your most recent 7 World Trade Center
5    report that you added sections discussing paragraph 10, and you
6    added the 11.9 to the $819 million, now finding that the total
7    amount of insurance is $831 million; isn't that right?
8    A.  Yes, that is correct.
9    Q.  You thought the changes would lead to a better result for
10   the aviation defendants in the dispute; isn't that right?
11               MS. TAYLOR:  Objection.
12               THE COURT:  Sustained.
13   Q.  Mr. Beach, do you recall me asking at your deposition on
14   March 15th of 2013, at page 48, line 11 through 17, the
15   following question and you giving the following answer?
16               THE COURT:  The point was sustained on objection.  So
17   this is sustained on objection also, Ms. Baglin.  Don't try to
18   get something past me, please.  OK?  Ms. Baglin?
19               MS. BAGLIN:  Yes, your Honor.
20               THE COURT:  Don't try to get something past me.  Some
21   judges get very annoyed with that.
22   Q.  Mr. Beach, you can't say, can you, that the $11.9 million
23   payment was an additional payment under the policy per se,
24   correct?
25               THE COURT:  Objection sustained.
```

D7FKWTC5ps                      Beach - cross

1    Q.   IRI wasn't trying to get the aviation defendants in their

2    subrogation action to advance moneys that IRI owed to 7 under

3    the policy, were they?

4              THE COURT:  Do you know the answer to that?

5              THE WITNESS:  I don't know the answer to that

6    specifically, no.  I only know the 11 million --

7              THE COURT:  Stop, stop, stop.

8              THE WITNESS:  No.  The answer is no.

9    Q.   And IRI had already reached a final settlement with 7 --

10             THE COURT:  He said the answer was no.  That's a no,

11   right?

12             MS. BAGLIN:  This is a different question, your Honor.

13             THE COURT:  It's different words but the same

14   question.

15   Q.   After 7 World Trade Company received the $819 million,

16   under the original settlement agreement with IRI, they couldn't

17   have submitted any additional proofs of loss under the IRI

18   policy; isn't that correct?

19   A.   That is correct.

20   Q.   Any issues regarding the sharing payments were policy

21   issues; is that right?

22   A.   I know there are mentioned in the IRI policy regarding

23   subrogation, and, again, the moneys that were paid were as a

24   result of a recovery action and in agreement that was outlined

25   in the release agreement between the two parties, under

D7FKWTC5ps                    Beach - cross

1    paragraph 10, as we've discussed.

2    Q.  A claim by 7 World Trade Company with respect to its right

3    to share in IRI's subrogation recovery wouldn't be submitted to

4    IRI for adjustment under the policy; isn't that right?

5              THE COURT:  It is what it is, Ms. Baglin.

6    Q.  I'd like to ask you briefly, sir, about one of the payments

7    you list on Exhibit B4.  It's the $216,100,000 payment that you

8    say was made by Royal Indemnity to Specialty.  Does that

9    amount, the $216 million, include a $17.5 million payment made

10   in July of 2017 by Royal and in Allianz Insurance Group PLC and

11   RSA Overseas Holdings No. 1 and No. 2?

12   A.  Yes, it does.

13   Q.  Those companies were required to make that payment under a

14   settlement agreement; is that right?

15   A.  That is correct.

16   Q.  They're foreign companies, are they not?

17   A.  I would characterize them as the parent company to the

18   Royal Indemnity insurers who participated in this program.

19   Q.  At the time they were sued, it's true, is it not, that the

20   U.S. subsidiary that had actually insured the World Trade

21   Center plaintiff had paid only a small amount of a judgment

22   that had been entered against them in the coverage litigation;

23   isn't that right?

24   A.  At a given time there was a small amount, but as you can

25   see from this schedule, yeah, they eventually paid much larger

D7FKWTC5ps                         Beach - cross

1    amounts, but yes.

2    Q.  Did the U.S. subsidiary who actually provided the insurance

3    coverage actually settle in full all of its coverage

4    obligations, did they not?

5    A.  Yes, they did, through a settlement agreement.

6              MS. BAGLIN:  I would like to offer at this time Joint

7    Exhibit 36, which is stipulation of settlement dated July 13,

8    2007.

9              THE COURT:  What's the relevance?  Does it tell me the

10   same thing you just told me before, that Royal Indemnity's

11   parents paid the deficiency that Royal Indemnity couldn't pay?

12             MS. BAGLIN:  No, that is not the case, your Honor.

13   This is the settlement agreement with the actual insurer, the

14   subsidiary.  They settled the claims in full.  And their

15   settlement provides that the coverage was being fully bought

16   out, paid, exhausted, and satisfied in full, by the

17   subsidiary's payment.

18             THE COURT:  So?

19             MS. BAGLIN:  So the settlement with the parent

20   company, which came later, was for $17.5 million.  And at this

21   time I would like to offer Joint Exhibit 37, which is that

22   settlement agreement and release, settling the suit that had

23   been brought against the foreign parents for $17.5 million.

24             THE COURT:  What about it?

25             MS. TAYLOR:  Objection, your Honor, to this line of

D7FKWTC5ps                          Beach - cross

1    questioning.

2             THE COURT:  I'll state it in a minute.  But what about

3    it?

4             MS. BAGLIN:  Your Honor, this settlement agreement

5    specifically provides -- and, again, it came after --

6             THE COURT:  What about it?

7             MS. BAGLIN:  It provides that the -- expressly

8    represented, both sides agree, the payment of 17.5 million was

9    not made pursuant to or in connection with any insurance

10   contract, binder, or advice of insurance issued, assumed, or

11   otherwise obtained through Royal Indemnity.  That's the

12   subsidiary.

13            THE COURT:  I accept what you say as the evidence.  We

14   don't need the document.  The objection to the document is

15   sustained.

16   Q.  I would just like to clear up a few other things that were

17   raised with you on direct, Mr. Beach, if you don't mind.  May I

18   have C4 put up, please.  This is the chart you created.

19            I would like to call your attention to the top part of

20   the chart, the appraisal panel findings.  I think you pointed

21   out to the Judge earlier that this was a partial evaluation,

22   that it didn't include tenant improvements.  Is that right?

23   A.  That is correct.

24   Q.  And tenant improvements can be a fairly substantial amount,

25   can they not?

D7FKWTC5ps                          Beach - cross

1          THE COURT:  It can be anything.  It can be hundreds of

2      thousands of dollars.

3      Q.  In the 7 World Trade Center claim, they were quite

4      significant, were they not?

5      A.  Could have been.  The final determination was not made of

6      that value by the appraisal panel.

7      Q.  In fact you have income rental numbers here, but the

8      appraisal panel never got to business income at all did, it?

9          THE COURT:  He said that.  He said it.

10     Q.  Going back to the appraisal itself --

11         THE COURT:  Ms. Baglin, I understand it does not

12     include personal properties, does not include tenants'

13     improvements.  I understand that.

14         MS. BAGLIN:  A different point, your Honor.

15     Q.  The appraisal proceedings, Mr. Beach, only involved

16     Allianz, Travelers, Gulf, IRI, and Royal Indemnity; isn't that

17     right?

18     A.  I have no reason to dispute that, but, yes --

19     Q.  It involved all the insurers who issued insurance for trade

20     center properties; isn't that right?

21     A.  That is correct.

22         MS. BAGLIN:  Your Honor, may I just have a minute?  I

23     think I may be done.

24         Thank you.  That's all.

25         THE COURT:  Is there any redirect or shall we excuse

D7FKWTC5ps                      Beach - cross

1    Mr. Beach?

2              MS. TAYLOR:  No, your Honor, no redirect.

3              THE COURT:  Mr. Beach, you're excused.  Thank you.

4              THE WITNESS:  Thank you, your Honor.

5              (Witness excused)

6              THE COURT:  Who's the next witness?

7              MR. PODESTA:  The next witness tomorrow morning will

8    be Mr. Fischel.  If you wish, we could take up the remaining 20

9    minutes with deposition designation readings, your Honor.

10             THE COURT:  No.  I don't think you probably even need

11   the depositions.  Let's break now.

12             All right.  10 o'clock tomorrow, Mr. Fischel.  Thank

13   you.

14             (Adjourned to 10:00 a.m., July 16, 2013)

15

16

17

18

19

20

21

22

23

24

25

```
                          INDEX OF EXAMINATION

Examination of:                            Page

MICHAEL S. BEACH

Direct By Ms. Taylor . . . . . . . . . . . . .47

Cross By Ms. Baglin  . . . . . . . . . . . . 118

                          DEFENDANT EXHIBITS

Exhibit No.                                Received

  D-2   . . . . . . . . . . . . . . . . . .76

  C4    . . . . . . . . . . . . . . . . . .83

  4   . . . . . . . . . . . . . . . . . . 131

                          JOINT EXHIBITS

Exhibit No.                                Received

  212   . . . . . . . . . . . . . . . . . 100

  213   . . . . . . . . . . . . . . . . . 101

  201                                      113

  C3                                       140
```