D7gkwtc1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                         21 MC 101
 3   In Re: September 11 Litigation      08 CV 3719 (AKH)
                                         08 CV 3722 (AKH)
 4   ------------------------------x

 5                                       New York, N.Y.
                                         July 16, 2013
 6                                       10:00 a.m.

 7
     Before:
 8
                        HON. ALVIN K. HELLERSTEIN
 9
                                           District Judge
10

11                         APPEARANCES

12   FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
          Attorneys for WTCP Plaintiffs
13        and 7 World Trade Co.
     BY:  RICHARD A. WILLIAMSON, ESQ.
14        CATHI BAGLIN, ESQ.
          JASON T. COHEN, ESQ.
15        MEGAN P. DAVIS, ESQ.

16   DEBEVOISE & PLIMPTON LLP
          Attorneys for Defendant American Airlines
17   BY:  ROGER E. PODESTA, ESQ.
          ERICA WEISGERBER, ESQ.
18
     CONDON & FORSYTH LLP
19        Defense Liaison Counsel for American Airlines
     BY:  DESMOND T. BARRY, ESQ.
20
     LOCKE LORD BISSELL & LIDDELL LLP
21        Attorneys for Defendant Globe Aviation
          Services Corporation
22   BY:  ANN C. TAYLOR, ESQ.
          T. PATRICK BYRNES, ESQ.
23
     O'MELVENY & MYERS LLP
24        Attorneys for Defendant Massachusetts
          Port Authority
25   BY:  WILLARD MARK WOOD, ESQ.
```

D7gkwtc1

1    APPEARANCES (Cont'd)

2    RICHARD KIBBE & ORBE LLP
          Attorneys for Defendant Boeing Co.
3    BY:  BRIAN S. FRASER, ESQ.
          H. ROWAN GAITHER, ESQ.
4         MARIA LAPETINA, ESQ.

5    Also Present:  John N. Lieber
                    President
6                   World Trade Center Properties, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (In open court)
 2             THE COURT:  The defendants should call their next
 3    witness.
 4             MR. PODESTA:  May it please the Court, the aviation
 5    defendants call Professor Daniel Fischel as their next witness.
 6             THE COURT:  Mr. Fischel.
 7             You got a little older.
 8             THE WITNESS:  Yes, it's sad but true, your Honor.
 9    DANIEL ROBERT FISCHEL,
10         called as a witness by the Defendants,
11         having been duly sworn, testified as follows:
12             THE COURT:  Spell your name slowly for the record.
13             THE WITNESS:  Daniel Robert Fischel, F-i-s-c-h-e-l.
14    DIRECT EXAMINATION
15    BY MR. PODESTA:
16    Q.  Professor Fischel, by whom are you currently employed?
17    A.  I'm currently employed both by the University of Chicago
18    and by a consulting firm by the name of Compass Lexecon.
19    Q.  Have you been retained to testify as an expert witness for
20    the aviation defendants in this litigation?
21    A.  Yes, I have.
22    Q.  And on what topics have you been asked to express opinions?
23    A.  On the issue of whether there is correspondence between
24    potential tort judgments -- tort payments and insurance
25    payments in connection with the destruction of the leasehold
```

D7gkwtc1                    Fischel - direct

1   interest as a result of the World Trade Center terrorist

2   attack.

3   Q.  Have you been retained to testify as an expert both as to

4   the WTC complex and as to WTC 7?

5   A.  Yes.

6           MR. PODESTA:  I'd like to offer and have marked Dan's

7   curriculum vitae as --

8           THE COURT:  Mr. Fischel's.

9           MR. PODESTA:  Professor Fischel's curriculum vitae.

10          -- and it would be Aviation Defendant Exhibit E4.

11          THE COURT:  Is this going to shorten the

12  qualifications?

13          MR. PODESTA:  I hope to do the qualifications very

14  briefly, your Honor.

15          THE COURT:  All right.

16          How about just accepting the resume?

17          MR. PODESTA:  That would be perfectly fine with me.

18  Q.  Let me just for the record ask, Professor --

19          THE COURT:  I notice down here you were born in the

20  Bronx?

21          THE WITNESS:  Actually, I was born in Manhattan,

22  although but I did live in the Bronx and go to Bronx Science

23  for high school.

24          THE COURT:  That alone is a qualification.

25          May I hold Professor Fischel qualified as a witness,

1   Mr. Williamson?

2              MR. WILLIAMSON:  Not --

3              THE COURT:  Would you like some examination?

4              MR. WILLIAMSON:  No, your Honor.  I just wanted to

5   make the point that he was identified as a witness on the issue

6   of whether there's correspondence.  That's too broad.  That's a

7   question for your Honor to decide.  That's exactly why your

8   Honor has indicated --

9              THE COURT:  If you make the appropriate objections --

10             MR. WILLIAMSON:  Yes, so I object to the offer of

11  Professor Fischel as an expert on the issue of whether there's

12  correspondence.

13             MR. PODESTA:  Actually, let me clarify that what we

14  are considering.

15             THE COURT:  Let's not clarify.  Just ask questions.

16             MR. PODESTA:  Well --

17             THE COURT:  Professor Fischel is accepted as an expert

18  witness.

19             MR. PODESTA:  We are only offering him, your Honor, as

20  an expert on economic issues relating to the issues of

21  correspondence.

22             THE COURT:  Thank you, Mr. Podesta.

23  BY MR. PODESTA:

24  Q.  Professor Fischel, I'll ask you to discuss your opinions on

25  correspondence in a few moments, but first I'd like to lay the

1    foundation by asking you about the applicable economic

2    principles.

3            What, in your view, Professor, is the nature of the

4    loss that WTCP sustained due to the terrorist attacks on 9/11?

5    A.  I believe it's a particular type of economic loss, a loss

6    of -- in the value of property, resulting from the destruction

7    of the World Trade Center buildings, which in turn resulted in

8    the destruction of the value of the leasehold interest that

9    WTCP properties held.

10   Q.  What is your basis for so characterizing the nature of

11   WTCP's loss?

12   A.  Well, I think there are a number of different types of

13   economic loss.  For example, there could be an economic loss

14   resulting from a personal injury claim for lost earnings --

15   there could be many other different types of economic loss --

16   but in this particular case I believe the issue focuses on, as

17   I said, a particular category of economic loss relating to

18   destruction of property and, in turn, a destruction of value of

19   a leasehold interest.

20   Q.  And how can an economic loss of the type that you've

21   described for WTCP -- and I will focus first on WTCP, later

22   we'll move on to WTC 7 -- how can this type of economic loss be

23   measured?

24   A.  It can be measured in two ways.  It can be measured by the

25   loss in market value of the leasehold interest.  Alternatively,

1    it can be measured by analyzing the replacement cost of the

2    buildings which would be necessary to replace the leasehold

3    interest.

4    Q.  How is market value defined, from an economic perspective?

5    A.  The generally accepted definition of market value is what a

6    willing buyer would pay a willing seller, where both are

7    adequately informed and neither is under any compulsion to buy

8    or sell.

9    Q.  From an economic perspective, Professor, how does market

10   value compensate a plaintiff for its loss?

11   A.  I think that's the clearest form of compensation.  If you

12   have something with a value of whatever it is, $100, and you

13   lose that value and you get $100 in return, then you're fully

14   compensated because you've been put in the same position as you

15   were prior to your loss.

16   Q.  Does a recovery of reduction of market value restore to the

17   plaintiff the amount he could have sold the property interest

18   for before the loss?

19   A.  Yes.  That's the idea under the willing buyer/willing

20   seller standard, that's the idea.

21   Q.  From an economic perspective, how is replacement cost

22   defined?

23   A.  Replacement cost is again generally defined as the cost to

24   replace what's lost in the context of a building, a cost to

25   replace the building, frequently minus some adjustment for wear

D7gkwtc1                          Fischel - direct

1    and depreciation.

2    Q.  How does replacement cost compensate a plaintiff or

3    property owner for its loss, from an economic perspective?

4    A.  It recreates the, in the case of property damage, the

5    physical structure that was lost and, again, therefore, puts

6    the plaintiff in the same position as they were prior to the

7    loss.

8    Q.  You mentioned depreciation.  Why is depreciation taken into

9    account in the economic definition of replacement cost?

10   A.  Because, again, the idea is to put the plaintiff in the

11   same position as they would have been in if what was destroyed

12   is something other than a brand new structure, a brand new

13   building, than if you replaced what was destroyed with

14   something that was brand new; you would put them in a better

15   position, not in the same position.  And, therefore, the

16   adjustment for depreciation adjusts for the difference between

17   a new structure and the condition of the prior structure.

18   Q.  From an economic --

19              THE COURT:  How can actual depreciation can be defined

20   in that context?

21              THE WITNESS:  Well, your Honor, it's a good

22   question --

23              THE COURT:  Thank you.

24              THE WITNESS:  -- because I'm talking about

25   depreciation in an --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7gkwtc1                        Fischel - direct

1              MR. PODESTA:  Your Honor, let me interrupt.  It's an

2      excellent question.

3              THE WITNESS:  -- in an economic sense, meaning not --

4      I'm not talking about accounting --

5              THE COURT:  That's exactly why I want you to define

6      it.

7              THE WITNESS:  I'm talking about the difference

8      basically in market value between a new structure and what the

9      old structure that was destroyed was worth, because of the

10     diminution in value, because of the age and the wear and tear

11     of the prior structure.

12             THE COURT:  Well, how is it different than the actual

13     cash value of the building the moment before the catastrophe?

14     If one would define actual cash value as what a willing buyer

15     would pay and what a willing seller would accept, is there any

16     room for depreciation?

17             THE WITNESS:  I'm not an insurance expert, your Honor,

18     but my understanding --

19             THE COURT:  Economically.

20             THE WITNESS:  Yeah, the meaning of actual cash value,

21     I think, is identical to the way I described how replacement

22     cost should be measured, of replacement cost minus

23     depreciation, provided that the value is no less than the

24     actual market value of the building.

25             THE COURT:  So, replacement value of the building as

1    it was less the depreciation is the damage?

2              THE WITNESS:  I would say that's a way -- that's a way

3    of -- one way of measuring --

4              THE COURT:  Or is the loss?

5              THE WITNESS:  Right, one way of measuring the loss

6    under the replacement cost method, exactly.

7    BY MR. PODESTA:

8    Q.  From an economic perspective, does compensation for

9    replacement of a destroyed property consist only of the cost of

10   the physical repairs of the property or building?

11   A.  I would say sometimes but not always.

12   Q.  What else might compensation for replacement of a destroyed

13   property include, from an economic perspective, in the

14   appropriate circumstances?

15   A.  Well, for example, if it's an income-producing property, if

16   it's a rental property, for example, there is going to be a gap

17   in time between the date of the loss, the date of the

18   destruction of the property and the time that the property is

19   rebuilt, so in addition to the physical costs of rebuilding the

20   property, there's going to be some interim lost rental income.

21   And I think that also should properly be considered as part of

22   replacement cost as well as other expenses, if incurred, that

23   are integral to replacing the physical structure, such as

24   getting new tenants and possibly other expenses as well that

25   are necessary to incur in order to replace the income-producing

D7gkwtc1                        Fischel - direct

1    asset.

2               THE COURT:  Mr. Podesta, could I interrupt.  I'm still

3    a little confused with the original definition, which is basic

4    to our understanding.

5               So, we take replacement cost, which is a current cost?

6               THE WITNESS:  Correct.

7               THE COURT:  And we deduct depreciation.  Is that an

8    absolute number or is that a function of some other number?

9               THE WITNESS:  I think it depends on the facts and

10   circumstances, but, again, I think the concept, your Honor, is

11   to put the plaintiff, who is the victim of the destruction of

12   property, in the same position as they would have been in prior

13   to the loss.  It's --

14              THE COURT:  It's a restoration value?

15              THE WITNESS:  It's a restoration value.  But, again,

16   if you're restoring let's say a ten-year-old building with a

17   new building, that's not putting the plaintiff in exactly the

18   same position because, all else equal, the new building is

19   worth more than the ten-year-old building.  So, there has to be

20   some adjustment.  And that's what I understand the concept of

21   actual cash value, that you asked me about a minute ago, to

22   address, of replacement cost minus depreciation provided that

23   the ultimate number is no less than the value of what the

24   building was prior to the loss.

25              THE COURT:  No more or no less?

D7gkwtc1                    Fischel - direct

1          THE WITNESS:  I believe the definition of actual cash

2     value, as I understand it, is no less.

3          THE COURT:  OK.

4     Q.  Now, you were discussing a moment ago the providing of lost

5     profits during the rebuilding period as part of the replacement

6     cost measure of damages.  Let me direct your attention now to

7     the reduction in fair market value measure of damages.

8          From an economic perspective, are lost profits during

9     the period of rebuilding or reconstruction taken into account

10    separately if the measure of damage used is reduction in fair

11    market value?

12    A.  No.  That would be --

13          MR. WILLIAMSON:  Objection, your Honor.

14          THE COURT:  Overruled.

15          THE WITNESS:  That would be double counting.

16    Q.  And what do you mean by double counting?

17    A.  Meaning that what a willing buyer is willing to pay a

18    willing seller is the present value of the profits that they

19    expect to get from the asset being purchased.  And so,

20    therefore, if you're trying to calculate market value or lost

21    market value, what you're really calculating is the present

22    value of a lost rental stream or lost profit stream resulting

23    from the loss of rental income.  And so, therefore, if there

24    was an award of both fair market value and lost rental or the

25    profits from lost rental income, you would be compensating

D7gkwtc1                          Fischel - direct

twice for the same thing.  And that's why it would be double

counting.

           THE COURT:  So let me understand that.  If you take

the fair market value of a rented building, of an income stream

from a rented building, you can do it I guess in one of two

ways -- you can find out what a willing seller would pay and

what a willing buyer would accept, or you can take a present

value of a discounted income stream of the building?

           THE WITNESS:  Yes, your Honor.  What I would say is

that what a buyer who is purchasing an income-producing asset,

what they do, either implicitly or explicitly, is perform the

present value calculation that your Honor just described, in

order to figure out how much to pay, because the determination

of how much to pay is going to be a function of what your

return on investment is going to be.  And what your return on

investment is going to be is the profit stream from the

income-producing asset that you are purchasing.  And that's why

you can't take both the purchase price and the present value of

the lost profits from the income stream that you're purchasing

and add them together because, again, that would be double

counting.

           What the market value tells you is what a willing

buyer and a willing seller have calculated implicitly or

explicitly as the present value of the profits from the income

stream that's being purchased or lost.

D7gkwtc1                          Fischel - direct

1    BY MR. PODESTA:

2    Q.  Let me just make sure I understand this:  From an economic

3    perspective, would a recovery of the full reduction in fair

4    market value of this destroyed property include any lost rental

5    income or profits during the rebuilding period?

6              MR. WILLIAMSON:  Objection, your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes, it would not only include the lost

9    rental -- the profits from the lost rental income during the

10   rebuilding period, but if the measure is diminution and fair

11   market value, it would include the present value of the profit

12   stream into perpetuity or into what the life of the asset is.

13   And the lost rental income, if you use a replacement cost

14   measure, is a subpart of the complete lost rental income

15   stream, which is what you're calculating for if you're using

16   the diminution in fair market value method.

17   Q.  Now, in this case, Professor, WTCP's property interest is a

18   99-year leasehold in the complex buildings.  From an economic

19   perspective, would receipt of the reduction in fair market

20   value of its leasehold interests in its buildings, as they

21   stood on 9/11, be a proper means of compensating WTCP for its

22   economic loss from the destruction of the leased buildings?

23   A.  Yes, absolutely --

24             MR. WILLIAMSON:  Objection.

25             THE COURT:  The question is a very difficult one to

1    deal with, Mr. Podesta.  Can you try to simplify it?

2              MR. PODESTA:  All right.

3              THE COURT:  By the time I figure out the question, I

4    fail to understand the answer.  It needs to be --

5              MR. PODESTA:  Well, then I have failed in my

6    objective.

7              THE COURT:  Get away from your notes and just have a

8    chat with Professor Fischel.  It will clarify that.

9              MR. PODESTA:  All right.

10   Q.  We're talking here about WTCP's 99-year leasehold in the

11   complex buildings.  If WTCP were to recover the full reduction

12   in the market value of its buildings, resulting from --

13             THE COURT:  Let's stop there.  You have a 99-year

14   net -- I forget what they call it, net cash flow that comes

15   into this picture.  How do you value that when you buy and sell

16   a building?

17             THE WITNESS:  I think, your Honor, a 99-year lease is

18   the functional equivalent of owning the building because --

19             THE COURT:  Why is that?

20             THE WITNESS:  Because just the nature of discounting,

21   that if you own an asset for 100 years, virtually all of the

22   value of the asset you're going to get in that 100-year

23   period -- in other words, to get a dollar 101 years from now

24   isn't worth very much today.  And that's why when you talk

25   about a long-term lease, such as a 99-year lease, it's really

D7gkwtc1                    Fischel - direct

1    the functional equivalent, from an economic perspective.  It's

2    no different than owning the entire asset because you're going

3    to capture all or, for all practical purposes, virtually all of

4    the value of the asset in that 99-year period.

5            THE COURT:  So, how does a willing buyer and a willing

6    seller measure value in the context of the buy and sale of a

7    99-year lease?

8            THE WITNESS:  I think, your Honor, they would go

9    through exactly the exercise that we discussed a few minutes

10   ago.  They would calculate the profit stream that the lease

11   would either entitle the buyer to or that the seller would be

12   giving up and discount those payments to present value over a

13   99-year period.  And what I was trying to illustrate a minute

14   ago is if you did that exercise and then you did the exercise

15   of discounting the income stream from a building where you

16   didn't own -- didn't have a 99-year lease but you owned the

17   entire building --

18           THE COURT:  It would be the same?

19           THE WITNESS:  -- it would be the same.

20   BY MR. PODESTA:

21   Q.  Professor Fischel, are you familiar with the "lesser of

22   two," rule as described by the New York Court of Appeals in the

23   Fisher v. Qualico case?

24   A.  Very familiar.

25   Q.  And what is your understanding from how the "lesser of two"

1    rule operates, from an economic perspective?

2             THE COURT:  The "lesser of two" rule, is that an

3    economic concept?

4             MR. PODESTA:  Well, that's the next question I'm going

5    to ask.

6             THE COURT:  That's the basic question, because I'm not

7    sure that Professor Fischel can testify on this.

8             Is it an economic concept?

9             THE WITNESS:  I would say it has an economic logic.

10   It's been --

11            THE COURT:  What is the economic logic?

12            THE WITNESS:  The economic logic is, again, in order

13   to put the plaintiff in the same position that they would have

14   been in prior to the injury and also to create efficient

15   incentives on the part of the injured party and to avoid the

16   injured party getting a windfall, the "lesser of two" rule

17   accomplishes that purpose.

18            THE COURT:  How does it incentivize the injured party?

19            THE WITNESS:  Because -- let me give an example, your

20   Honor.  Let's say, just to use simple numbers, you have a

21   destruction of an income-producing asset and the market value

22   of the asset was, let's say, a million dollars but to replace

23   the asset would cost $2 million.  You don't want to create an

24   incentive on the part of the injured party to spend $2 million

25   for an asset that's only worth $1 million.  And the "lesser of

1  two" rule creates the proper incentives because it only

2  compensates the injured party for the loss of market value of

3  $1 million as opposed to creating an inefficient incentive of

4  spending $2 million for something that's only worth $1 million.

5          In the same way, it also avoids providing the injured

6  party with a windfall by overcompensating them for the loss

7  that they suffered.  That's the economic rationale underlying,

8  I think, the "lesser of two" rule.

9          THE COURT:  To illustrate it, if you lose a slum

10  building, the law doesn't give you an incentive to building a

11  mansion in its place?

12          THE WITNESS:  Correct.  If you want to do that, you

13  have to do that with your own money as opposed to --

14          THE COURT:  Someone else's money?

15          THE WITNESS:  -- through the tort system.

16  BY MR. PODESTA:

17  Q.  Why do economic principles provide for compensation by way

18  of the lesser of two as opposed to the greater of two or the

19  both of two?

20          THE COURT:  He just explained that.

21  Q.  Professor Fischel, the Court of Appeals, in the Fisher case

22  made the following --

23          THE COURT:  Mr. Podesta, let me stop you right there.

24  He's here as an economist, not a lawyer.

25          MR. PODESTA:  I was just going to ask him if the

1   principles --

2              THE COURT:  Ask him economic principles, not legal

3   principles.

4   Q.  I'd like to turn your -- I'd like to now turn, Professor,

5   to your opinion about correspondence.  And for purposes of your

6   testimony, I'd like you to assume that CPLR 4545(c) --

7              THE COURT:  Mr. Podesta, again, leave out the law.

8              MR. PODESTA:  But I'm just going to ask him --

9              THE COURT:  Leave out the law.

10  Q.  From your perspective, what do you consider the category of

11  loss to be that WTCP suffered on 9/11?

12  A.  The destruction --

13             MR. WILLIAMSON:  Objection to the form of the

14  question.

15             THE COURT:  I think that question is OK.

16             Go ahead.

17             THE WITNESS:  The destruction of the value of their

18  leasehold interest.

19  Q.  And do you have an understanding of what WTCP's potential

20  tort damages award would be?

21  A.  Yes.  I analyze that in earlier phases of this litigation.

22  I believe the appropriate economic measure of tort damages

23  would be the diminution in the market value of the buildings as

24  established by the auction for the WTC properties a couple

25  months before the September 11th terrorist attacks, which, if I

D7gkwtc1                          Fischel – direct

1    remember correctly, the auction value was $2.805 billion.

2              THE COURT:  You remember correctly.

3    Q.  Now, do you have an understanding, Professor, of how that

4    $2.805 billion was derived?

5    A.  I do.  As I said, I studied this extensively in earlier

6    phases of this litigation.  I believe it was derived as

7    basically the present value of the payments that the

8    Silverstein Properties agreed to pay in order to acquire the

9    WTC properties.

10             THE COURT:  I think I've elaborated that it's a

11   question of fact, not of expert, the 2.805 billion is a

12   computation or calculation that is the sum of partial cash

13   payments plus discounted cash flows of various kinds of

14   rentals.  I don't think we need Professor Fischel for that.

15             MR. PODESTA:  Thank you, your Honor.

16             THE COURT:  What you need to do with Professor Fischel

17   is to find out the components of loss when one loses a 99-year

18   leasehold of an income stream and then the recovery in the form

19   of insurance and potentially from the tort system.

20             MR. PODESTA:  I will be addressing that.

21             THE COURT:  The tort system, I will instruct you, is a

22   system that will provide recovery for economic loss measured in

23   various ways.

24             Now, let's go into the correspondence.

25             MR. PODESTA:  All right.

D7gkwtc1                          Fischel - direct

1    BY MR. PODESTA:

2    Q.  Professor Fischel, do you have an opinion, from an economic

3    perspective, whether WTCP's recovery of $2.805 billion on the

4    basis the Court has just described, would compensate WTCP for

5    its economic loss resulting from the destruction of its leased

6    buildings in the terrorist attacks?

7               MR. WILLIAMSON:  Objection.

8               THE COURT:  Overruled.

9               THE WITNESS:  Yes.  For the reasons that I have

10   already described, I believe it would fully compensate the

11   plaintiffs for their loss.

12   Q.  And how would that award fully compensate the plaintiffs

13   for their loss?

14   A.  Because, again, it's the same principle -- if you have

15   something that's worth -- that you pay $100 for and you lose it

16   and somebody gives you $100, you're fully compensated.  It's

17   the same idea here.  If you have something that you've paid

18   $2.805 billion for and you get a recovery and you lose it and

19   you get a recovery of $2.805 billion, you're fully compensated.

20   Q.  Would that be true if the market value then increased in

21   the meantime between the purchase and the date of loss?

22              THE COURT:  I've made a finding on that.  I've

23   elicited questions, I've asked questions to elicit information.

24   No information was provided of any change in value between the

25   time of purchase and the time of catastrophe.  And so I have

1    found that the value as of 9/11/2001 was $2.805 billion, the

2    exact amount paid.

3    Q.  Let me ask you to suppose, Professor Fischel, that WTCP's

4    cost of replacement for the complex was greater than

5    $2.805 billion.  In your opinion, from an economic perspective,

6    would it be appropriate to award WTCP more than $2.805 billion,

7    based on its higher replacement cost?

8            THE COURT:  I don't think that's a proper question.

9    Rephrase.

10   Q.  Professor Fischel, have you reviewed WTCP's insurance

11   policies?

12   A.  I have.

13   Q.  And for what purposes did you review them?

14   A.  Really for purposes of analyzing the relationship between

15   potential tort recovery of $2.805 billion and the insurance

16   payments that were paid.

17   Q.  And what is your understanding of the types of insurance

18   coverage that WTCP had?

19   A.  Primarily business interruption, replacement cost, and I

20   guess actual cash value.

21   Q.  And what is your understanding of the insurance recoveries

22   that WTCP received after 9/11?

23   A.  I think approximately $4.1 billion.

24   Q.  For what?

25   A.  I think, again, for some combination of business

D7gkwtc1                        Fischel - direct

1    interruption and replacement cost.

2    Q.  Now, have you personally investigated WTCP's claims --

3           THE COURT:  I'm not taking that as a factual

4    statement.  That's out of Professor Fischel's expertise.

5           What you should be doing, Mr. Podesta, is giving him a

6    hypothetical, which he can answer --

7           MR. PODESTA:  Yes, that's what I'm --

8           THE COURT:  -- rather than asking him a fact that he

9    is not personally aware of and is outside of his expertise.

10          So, if you have insurance for business interruption --

11   which means, what, lost income?

12          THE WITNESS:  Yes.

13          THE COURT:  -- and you have insurance for replacement

14   value -- and you also added actual cash value?  Is that another

15   element of insurance?

16          THE WITNESS:  I think, your Honor, I mentioned that

17   only because when I looked at the policies, there is a

18   component of the policies that deals with actual cash value.

19   That's why I mentioned it.  But I think actual cash value, from

20   an economic perspective, the way I'm considering it, is the

21   functional equivalent of replacement cost.

22          THE COURT:  So, we have two categories.  How do you

23   relate insurance compensation in those two categories to the

24   concept of economic loss, as of September 11, 2001?

25          THE WITNESS:  Because, your Honor, I think the first

D7gkwtc1                      Fischel – direct

1    thing you have to do is analyze what is the economic loss,

2    because, as I said at the outset, there are a number of

3    different types of economic loss.  In this case, the economic

4    loss, in my opinion, is the loss of property value resulting

5    from the terrorist attack, which in turn destroyed the value of

6    the plaintiffs' leasehold interest.

7            THE COURT:  And that is the equivalent of what?  Loss

8    of property value is measured by?

9            THE WITNESS:  The loss of property value is measured

10   by, in my opinion -- again, it could be measured in two ways,

11   but in my opinion, as the Court has already stated, it's

12   measured by the diminution in market value, $2.805 billion, and

13   then --

14           THE COURT:  The loss of what you paid for it?

15           THE WITNESS:  Correct, exactly.

16           -- and then the -- so that's the tort recovery part of

17   the correspondence question.  And then the issue becomes

18   whether the insurance payments are compensation for that

19   particular type of economic loss or for something else.

20           THE COURT:  You said there were two ways to measure

21   the loss of property value?

22           THE WITNESS:  Correct.

23           THE COURT:  And you gave one, diminution or the loss

24   of what you paid for it.

25           THE WITNESS:  The other is replacement cost.

1            THE COURT:  Less the depreciation?

2            THE WITNESS:  Less the depreciation.

3            THE COURT:  And both would equal 2.805 billion?

4            THE WITNESS:  No, your Honor.  I think that's a

5     critical point.  Under the economic logic of the "lesser of

6     two" rule, the diminution in market value is $2.805 billion,

7     and then the replacement cost is something else, it's a

8     different number.  To the extent that the replacement cost

9     number is higher than the diminution in market value, it's just

10    like the slum and luxury building example that you gave before,

11    in which case the proper measure from an economic perspective

12    of tort recovery is the lesser number, the $2.805 billion, and

13    then moving to the insurance side of the --

14            THE COURT:  Let's just stop there.

15            THE WITNESS:  OK.

16            THE COURT:  Let's suppose when the Twin Towers and

17    associated other buildings were built at a higher cost than the

18    market developer would build because of the projections of

19    potential income for the property.

20            THE WITNESS:  OK.

21            THE COURT:  When it's, years later, purchased and sold

22    for a value less than that, and then destroyed, is it your

23    testimony that what can be replaced economically is not the

24    grander concept but the market concept?

25            THE WITNESS:  Well, the first thing that I would say

D7gkwtc1                        Fischel - direct

1    is what was paid originally is irrelevant except to the extent

2    that it sheds lightly on what the market value -- the

3    diminution in market value or the replacement cost is at the

4    time of loss.  In other words, if you pay a million dollars for

5    something that is only worth $100 and then what you have that's

6    worth $100 is destroyed, I would say from an economic

7    perspective, again, to create the right incentives, you're only

8    entitled to $100, not a million dollars.

9         And then with respect to the rest of your question,

10   your Honor, I think it is important to distinguish between the

11   diminution in market value, which is a market value concept,

12   what a willing buyer would pay a willing seller, which is

13   established in the auction for the World Trade Center

14   Properties, from replacement cost, which is not a market

15   value-based concept.  It's a concept based on the physical cost

16   of replacement, coupled with other related possible sources of

17   compensation such as lost interim rent payments or retenanting

18   expenses, et cetera, but those for the most part are cost

19   items, not market value, not diminution in market value items.

20        And I think it's important to separate the two.

21   Again, that's the economic logic of the "lesser of the two"

22   rule.  If your loss in market value is a different number than

23   your replacement cost number, providing a plaintiff with the

24   lesser of the two both creates the right incentives and avoids

25   windfalls.

D7gkwtc1                          Fischel - direct

1           And in this particular case there are again two

2    different numbers.  The diminution in market value number,

3    which the Court has already found, as the Court just stated,

4    and a replacement cost number which need not bear any

5    relationship to the diminution in market value number, even

6    adjusted for depreciation, it may have nothing to do with

7    diminution in market value.  And to the extent that that's the

8    case, to the extent there are two different numbers, the

9    appropriate economic measure to put the plaintiff in the same

10   position to fully compensate the plaintiff, is the lesser of

11   two, whichever is the lower number.

12          And then should I move on to the insurance side of the

13   issue, your Honor?

14          THE COURT:  Wait for the question.

15          THE WITNESS:  OK.

16   BY MR. PODESTA:

17   Q.  Let me take up on that and move to the insurance side.  Let

18   me ask you to assume, Professor, that a portion of WTCP's

19   recoveries were for replacement cost insurance payments.  From

20   an economic perspective, do you have a view, Professor, as to

21   whether WTCP's insurance recoveries for replacement costs would

22   reimburse it for the economic loss it suffered as measured by

23   the reduction in fair market value of its leasehold interest?

24   A.  Yes, I have an opinion.  I believe that would provide

25   compensation.

D7gkwtc1                      Fischel - direct

1    Q.  And would you explain briefly for us the basis for that

2    opinion?

3    A.  Yes.  Because, as I stated at the outset, a loss in

4    property value can be measured in two different ways.  It can

5    be measured by what the diminution in market value is, and it

6    can also be measured by replacement cost.  Those are basically

7    two different sides of the same coin, as I think has been

8    stated in some of the materials that I have reviewed.

9            So, therefore, any compensation from insurance that

10   compensates a plaintiff for the loss in value of property that

11   they've lost, such as compensation -- insurance payments for

12   replacement costs, that provides compensation -- not only

13   provides compensation to a plaintiff but provides compensation

14   for the exact same type of loss that potential tort damages

15   compensate the plaintiff for.

16           THE COURT:  So, the loss is the destruction of the

17   buildings, which are the income-producing asset, and the

18   replacement cost allows the insured to erect another building

19   and get his money stream back?

20           THE WITNESS:  Absolutely right, your Honor, correct.

21           THE COURT:  That's essentially what you're saying?

22           THE WITNESS:  That's right.

23   Q.  Let me just ask you to assume that -- we discussed actual

24   cash value.  Would it make any difference to the analysis you

25   just set forth if WTCP's insurance payments had been made on an

D7gkwtc1                         Fischel - direct

1    actual cash value, as opposed to replacement cost basis?

2    A.  It wouldn't make any difference -- the name of the type of

3    insurance to me is not the issue.  The relevant issue is

4    whether it's compensation for the -- whether the insurance

5    compensates a plaintiff for the loss of their value of their

6    property.  And if that comes from replacement cost insurance,

7    if it comes from actual cash value insurance, if it comes from

8    business interruption insurance, it's all the same thing.  It's

9    all compensation for the loss of the value of property, which

10   is exactly what potential tort recoveries compensate the

11   plaintiff for.

12   Q.  Now I'd like to ask you to assume, Professor, that a

13   portion of WTCP's insurance payment recoveries were for

14   business interruption for lost rental income.  Have you formed

15   an opinion, Professor, from an economic perspective, concerning

16   whether WTCP's recoveries for business interruption or lost

17   rental income would reimburse WTCP for all or part of its

18   economic loss from the reduction in value of its net

19   leasehold -- a fair market value of its net leasehold interest

20   in the complex?

21   A.  Yes, for exactly the same reasons that I just went through.

22   Whether the insurance payments are for business interruption,

23   replacement cost or actual cash value, in the economic terms,

24   doesn't make any difference provided that the insurance

25   payments are to compensate the plaintiff for the particular

D7gkwtc1                        Fischel - direct

category of economic loss, namely, the loss of the value of

property, the destruction of the value of their leasehold

interests.

Q.  Do you have a view, Professor, whether WTCP's lost rental

income insurance payments for the period of the rebuilding or

retenanting or restoration of operations of the complex would

compensate it or reimburse it, from an economic perspective,

for a portion of an award for the reduction in fair market

value of its net leasehold interest?

A.  Yes.  Again, it's the same point again.  The interim lost

profits from lost rentals during the period of replacement is

part of the concept of diminution in fair market value.

Diminution in fair market value is all the present value of all

the rental payments into perpetuity.  The sliver of that, that

is lost if the buildings are replaced from the time of the loss

until the time the buildings are replaced, is part of that

income stream, but it's again compensation for the loss of the

value of property, which is the exact same loss that potential

tort recoveries for the loss of property address.

Q.  From an economic perspective, Professor, do you consider it

appropriate to characterize the nature of WTCP's loss in the

9/11 terrorist attacks as replacement cost or lost rental

income?

A.  Again, it can be characterized that way.  Again,

replacement cost and diminution in market value, again, are

1    just two different ways to measure the same loss.  So, I think

2    it's perfectly appropriate to characterize it that way and also

3    perfectly appropriate to characterize it the alternative way,

4    or both.

5    Q.  And by the alternative way, you mean the characterization

6    is the economic damage to the leasehold interests?

7              MR. WILLIAMSON:  Objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  Yes.

10   Q.  Would your economic analysis that you just set forth over

11   the last 45 minutes be any different if the nature of the loss

12   were characterized as replacement costs, temporary loss of

13   rental income, as opposed to economic damage to the net

14   leasehold interests in the complex?

15             THE COURT:  I don't understand the question.

16   Objection sustained.

17             MR. PODESTA:  All right.

18   Q.  Does it make any difference to your analysis if the nature

19   of WTCP's loss is characterized as replacement costs or

20   temporary loss of rental income?

21             MR. WILLIAMSON:  Objection.

22             THE COURT:  Sustained.

23             Let me understand this.  We're talking about two

24   concepts of loss, the temporary loss of rental income to the

25   insured and the cost of putting the insured back into a place

1   where it can start getting rents in the normal course?

2              THE WITNESS:  Correct, your Honor.

3              THE COURT:  So, business interruption compensates the

4   insured while the building is down, and replacement value

5   allows the insured to replace the building, and at that point

6   he no longer needs the business interruption --

7              THE WITNESS:  Exactly.

8              THE COURT:  -- so he gains back his rent?

9              THE WITNESS:  Right.  The loss of an income-producing

10  asset exists only so long as the rental payments are not being

11  made.  And that's why, I think, from an economic perspective,

12  replacement cost involves not only the physical cost of

13  rebuilding but also compensation for the interim period between

14  the time of loss and the time of rebuilding.  But once

15  rebuilding occurs, there's no more business interruption;

16  business has resumed in a sense and, therefore, if you add the

17  two together, that fully compensates a plaintiff, as does

18  diminution in market value and then, again, the issue is the

19  lesser of the two.

20             THE COURT:  Now, depending on the insurance, the sum

21  of the business interruption and replacement value can be less

22  than market value or more than market value?

23             THE WITNESS:  Absolutely.  I think the -- whether

24  insurance fully compensates a plaintiff just depends on the

25  relevant facts and circumstances.  The combination of insurance

1   payments can either be more or less than what the potential

2   tort recoveries are, depending on the Court's rulings.

3   BY MR. PODESTA:

4   Q.  Now, Professor, I'd like to direct your attention to WTC 7.

5   Are your opinions concerning WTC 7, 7 WTC Co.'s claims relating

6   to WTC 7, any different from your opinions concerning WTCP's

7   claims relating to the complex?

8   A.  No, obviously the facts and circumstances are a little bit

9   different, but the analysis is exactly the same.

10  Q.  Are there any factual differences between 7 WTC Co.'s tort

11  claims and insurance recoveries for WTC 7 that materially

12  affect your analysis of the correspondence issues?

13  A.  No, the analysis is exactly the same.  Obviously, the

14  market value is different, the insurance payments are

15  different, but the analysis is exactly the same.

16  Q.  7 WTC Co., unlike WTCP, has asserted a tort claim for some

17  $1.846 million for destruction of personal property.  Does 7

18  WTC Co.'s claim for personal property affect your economic

19  analysis?

20  A.  No.

21              (Continued on next page)

22

23

24

25

D7GAWTC2ps                    Fischel - direct

1    Q.   Why not?

2    A.   Well, first, my understanding is that that claim is also

3    covered by insurance, so I guess potentially there's an

4    allocation issue for the court to try and figure out how the

5    insurance related to the destruction of real property versus

6    personal property but basically the analysis is the same.

7    Q.   Have you reviewed the expert reports submitted in this

8    litigation by WTCP and 7 WTC Co.'s expert Professor Steven

9    Shavell?

10   A.   I have.

11   Q.   Have you read his deposition testimony?

12   A.   I have.

13   Q.   By the way, do you know Professor Shavell personally?

14   A.   I know him very well.  We've been friends for probably at

15   least 25 years.  He is a very distinguished academic, who I've

16   tried numerous times to recruit to come to the University of

17   Chicago, unsuccessfully, I might add, although he did spend

18   some time with us.  Obviously I have profound differences of

19   opinion with him in this case, but I know him very well and I

20   have very, very high regard for him.

21   Q.   Did he once, when he was a young man attempt to recruit now

22   President Obama to the University of Chicago?

23   A.   Yes.  It's a famous story that's been written up --

24            THE COURT:  Tell us in a break.

25            MR. PODESTA:  Why did I sense that was coming?

1          I'd like to have put up Professor Shavell's complex

2     opinion on the screen.

3          THE COURT:  No, I would not do that.

4          MR. PODESTA:  Pardon me?

5          THE COURT:  We're not going to have one comment on

6     another expert.  We'll take each expert separately.

7          What he said on paper is really of no value to me.

8     It's what he says on the stand.

9          MR. PODESTA:  Well, I was just going -- I mean,

10    perhaps your Honor will rule this inappropriate.  But I was

11    going to point out to Professor Shavell -- Professor Fischel --

12    that Professor Shavell says that plaintiffs' insurance payments

13    for lost rental income, if proven to a reasonable certainty,

14    correspond to plaintiffs' potential tort damages award.

15         THE COURT:  I've heard Professor Fischel and I'll soon

16    hear Professor Shavell, and it will be up to the Court to make

17    the determination which to believe and which to accept.

18         Are you finished with tower 7?

19         MR. PODESTA:  Yes.  I believe -- yes, I have no

20    further questions specific to tower 7.

21         THE COURT:  OK.  So you're finished.

22         MR. PODESTA:  No.  I have a few more questions,

23    although I might be able to shorten the outline if I took a

24    break at this point.

25         THE COURT:  No, you don't have to take a break.

1  Experience teaches me that breaks only add questions.

2           MR. PODESTA:  I will defer to your experience, your

3  Honor.

4  Q.  Does it make a difference to your analysis, Professor, that

5  WTCP had a long term net leasehold in the complex, as opposed

6  to a fee simple interest in the complex?

7           THE COURT:  He's already talked about that.  By reason

8  of the nature of discounting a 99-year lease, he said it's

9  pretty much like the owner.

10 Q.  Does it make a difference to your analysis, Professor, that

11 WTCP was a commercial rental property, as opposed to a

12 residential property?

13          THE COURT:  We're talking about income streams.  It

14 makes no difference where the payments come from.

15          The Court has a little bit of intelligence too.

16          MR. PODESTA:  That's certainly true.  My concern would

17 be, does the Court of Appeals have the same degree of learning.

18          THE COURT:  Well, I have my own opinions on that.  It

19 differs when I'm reversed.

20 Q.  Let me ask you to assume two business properties,

21 Professor, one of which generates much more rental income than

22 the other.  Would that much higher rental income-generating

23 capacity be reflected in the fair market value of the

24 higher-income property?

25          MR. WILLIAMSON:  Objection.

1            THE COURT:  Overruled.

2    A.  Yes.  To the extent the higher rental income --

3            THE COURT:  Well, the more money you gain the more

4    money you pay.  Right?

5            THE WITNESS:  Yes.  I bet that's --

6            MR. PODESTA:  I want your Honor to see --

7            THE COURT:  I really do think you're finished.

8            MR. PODESTA:  Well, let's assume the higher income

9    generates --

10            THE COURT:  Mr. Podesta, you're finished.  We will

11    take a ten-minute break.

12            MR. PODESTA:  Can I just ask some questions about

13    allocation?

14            THE COURT:  Yes.

15            MR. PODESTA:  All right.  I'll move on to allocations.

16    Q.  Did you perform any analysis --

17            MR. PODESTA:  This will be short, your Honor.

18    Q.  Did you perform any analysis regarding the portion of

19    plaintiff's insurance payments that were allocable to

20    replacement costs of the buildings and the portion that was

21    allocable to business interruption, lost rental income?

22    A.  No.

23    Q.  Why not?

24            THE COURT:  There was no allocation.  He couldn't

25    allocate it.  There was no allocation.

D7GAWTC2ps                    Fischel - direct

Q.  Well, did you regard it necessary to make an allocation to
arrive at your conclusion?

A.  No, because the different category of insurance payments
all were compensation for the specific type of economic loss at
issue, namely, the loss of property value resulting from the
destruction of the buildings, which in turn destroyed the value
of the plaintiff's leasehold interest.

Q.  Let me ask you to assume, Professor, that WTCP had no
business income, lost rental income -- no business income, lost
rental income insurance, but only had replacement cost
insurance.  Would that affect your opinion?

A.  No.  Again, it would make no difference what, from my
perspective, from an economic perspective, what part of the
insurance policy the payments came from, provided that they
were compensation to the plaintiff for the loss in the value of
property, which is, again, the same loss that potential tort
recoveries are meant to address.

Q.  Does the circumstance that WTCP and 7 WTC Co. had two types
of insurance, replacement cost and business --

          THE COURT:  He just answered the question,
Mr. Podesta.

          MR. PODESTA:  But I thought this was --

          THE COURT:  Same principle for both.

          MR. PODESTA:  All right.  Thank you, your Honor.  I
have no further questions of this witness.

1          THE COURT:  Do you need a break?

2          THE WITNESS:  I don't need a break, your Honor.

3          THE COURT:  Do you need a break, Mr. Williamson?

4          MR. WILLIAMSON:  Yes, please, your Honor.

5          THE COURT:  Ten minutes.

6          (Recess)

7          THE COURT:  Mr. Fischel, you remain under oath.

8          THE WITNESS:  Thank you, your Honor.

9    CROSS EXAMINATION

10   BY MR. WILLIAMSON:

11   Q.  Good morning, Professor Fischel.

12   A.  Good morning, sir.

13   Q.  You're not an expert in insurance coverage, are you?

14   A.  No, sir.

15   Q.  Not an expert in claims adjustment?

16   A.  No, sir.

17   Q.  Not an expert in tort law?

18   A.  Correct.

19          THE COURT:  Might be.

20          THE WITNESS:  Not for this purpose.

21          THE COURT:  He might be, but he's not qualified here.

22          MR. WILLIAMSON:  Right.

23   Q.  So not an expert in real estate appraisal.

24   A.  That's right.

25   Q.  Not an expert in collateral offset?

D7GAWTC2ps                     Fischel - cross

1    A.  Correct.

2    Q.  Not an expert in insurance?

3    A.  Correct.

4    Q.  So all the opinions you've been offering are from an

5    economic perspective; isn't that right?

6    A.  That's right, sir.

7    Q.  Do you hold any editorial positions on any scholarly

8    journals of economics?

9    A.  I've certainly been a referee, but not an editor, if that's

10   what you were asking.

11   Q.  Right.  That's what I was asking.

12           What is the leading New York State Court of Appeals

13   case on correspondence?

14           THE COURT:  Mr. Williamson, I stopped Mr. Podesta from

15   asking about legal questions.  I'm stopping you.

16   Q.  I want to bring up -- you issued three reports in this case

17   before your deposition.  Isn't that correct?

18   A.  A number of reports.  I think it was three, but it might

19   have been more if you go back to the beginning of my

20   involvement in this litigation.

21   Q.  But we're talking about these actions in which World Trade

22   Center properties and 7 WTC are the plaintiffs.  You've issued

23   a total of how many reports?

24   A.  I'm happy to accept your representation that it was three.

25   Q.  You issued four reports.  And before you testified at your

1   deposition, you had issued three.  Do you accept that?

2   A.  Yes.  I'm happy to accept your representation.

3   Q.  Thank you.

4        You were deposed on January 11th this year, right?

5   A.  Earlier this year.  I don't remember the exact date.

6        THE COURT:  January is pretty early.

7   Q.  At the time that you --

8        THE COURT:  No months come before January.

9        THE WITNESS:  That's right.

10  Q.  At the time that you issued your three reports, you hadn't

11  read either the leading New York State Court of Appeals case on

12  correspondence or the leading Second Circuit case --

13       THE COURT:  Objection sustained.

14  Q.  The only case you had read was *Fisher*?

15       THE COURT:  Mr. Williamson, what are you trying to do?

16       MR. WILLIAMSON:  Trying to show, your Honor --

17       THE COURT:  You're trying to get around my ruling.

18       MR. WILLIAMSON:  No.  No.  I'm sorry.  No.

19       THE COURT:  Get away from the law.

20       MR. WILLIAMSON:  No, I'm trying to show --

21       THE COURT:  Get away from the law.  Ask an economics

22  question.

23  Q.  Isn't it true, Professor Fischel, that your analysis was

24  conducted without any framework of New York law informing it?

25  Is that true?

1   A.   Objection sustained.

2           THE COURT:  Don't be shy about getting up,

3   Mr. Podesta.

4           MR. PODESTA:  But I will wait for the next question.

5           THE COURT:  Excellent idea.

6   Q.   Isn't it true, Professor Fischel, that neither in any of

7   your four reports nor in your testimony today did you discuss

8   your opinions on correspondence in terms of whether there was a

9   direct correspondence?

10          MR. PODESTA:  Objection.

11          THE COURT:  Do you know what the question is?

12          THE WITNESS:  I don't, your Honor.  I was going to ask

13  for clarification.

14          THE COURT:  Rephrase the question.

15  Q.   I'm asking about the use of the term "direct

16  correspondence."  Here's the question:  Isn't it true that in

17  none of your reports and not in your testimony today did you

18  ever speak about whether there was a direct correspondence?

19  A.   Could you define what you mean by "direct correspondence,"

20  sir.

21  Q.   Did you or didn't you use the term "direct correspondence"?

22  That's my question.  The word "direct," "correspondence," that

23  term.

24  A.   I don't recall if I ever used the term.

25  Q.   And if I asked you the same question about "close

D7GAWTC2ps                    Fischel - cross

1    correspondence," did you discuss "close correspondence" in

2    offering your opinions at this trial on the correspondence

3    questions?

4              MR. PODESTA:  Objection.

5              THE COURT:  Overruled.

6    A.  I don't remember whether I used the word "close" or

7    "direct."  I believe I expressed the opinion from an economic

8    perspective there was complete correspondence.

9    Q.  Right.  But my question was closer to "direct

10   correspondence," is the terminology.

11             THE COURT:  Dr. Fischel, do you recall using the word

12   "direct"?

13             THE WITNESS:  I don't.

14             THE COURT:  Do you recall using the word "close"?

15             THE WITNESS:  I don't recall one way or another, your

16   Honor.

17             THE COURT:  OK.  You've answered the question.

18   Q.  In conducting your analysis of correspondence from an

19   economic perspective, were you concerned about treating any of

20   the categories of loss as fungible?

21   A.  I'm sorry, sir.  I don't understand the question.

22   Q.  In conducting your analysis from an economic perspective on

23   the question of correspondence, were you concerned about

24   treating any of the categories of insurance recoveries as

25   fungible?

D7GAWTC2ps                     Fischel - cross

A.  I'm sorry.  Respectfully, sir, I just don't understand the

question.

Q.  In conducting your correspondence analysis in this case,

did you ever discuss whether there was a particular item of

economic loss?

A.  I think, as I testified to earlier today, I focused my

analysis on a particular type of economic loss, the loss in the

value of property and the corresponding loss in the value of

the plaintiff leasehold interest in property.

Q.  In offering your opinions at this trial, did you ever

discuss whether there was a duplication of any of the insurance

recoveries with any of the categories of economic loss?

A.  I'm sorry, sir.  I just don't understand the question.

Q.  Isn't it true, Professor Fischel, that you never discussed

the concept of duplication when you testified today, using that

word?

            THE COURT:  He didn't understand the question.

Q.  Isn't it true that you never used the word "duplication"

today in your analysis of the correspondence question about

which you testified?

A.  I don't remember if I used the word "duplication."  I did

testify that compensating a plaintiff both for diminution of

fair market value and for the loss in the value of rental

payments would be double-counting.  I guess you could call that

duplication.

D7GAWTC2ps                    Fischel - cross

1    Q.  Yes.  But I was asking you about the use of the word.

2            THE COURT:  He just said that.  Double counting,

3    duplication.  Let's not make this a semantical problem.

4    Q.  You identified two main categories of insurance that you

5    told the Court about, right?

6    A.  Correct.

7    Q.  How many other types of insurance coverage were there in

8    these cases?

9    A.  I don't have an opinion on that one way or the other.

10   Q.  So you might have left some out?

11   A.  I don't think I left --

12           THE COURT:  Objection sustained.

13   Q.  Do you know whether you left any categories of insurance

14   coverage out in your --

15           THE COURT:  Objection sustained.

16   Q.  Was there insurance coverage, Professor Fischel, for extra

17   expense?  That category?

18   A.  I'm not an expert on insurance or insurance policies, so I

19   don't want to offer opinions on whether there was particular

20   insurance for extra expense or anything else.

21   Q.  You testified today that you reviewed World Trade Center

22   Properties' insurance policies, right?

23   A.  Correct.

24   Q.  At the time of your deposition, you had only reviewed two

25   policy forms.  Isn't that right?

1   A.  That's right.  That still might be the case.

2   Q.  So when you said today you reviewed all the policies of

3   WTCP for insurance, you didn't actually review all of them.

4   A.  Did not review all of them.

5   Q.  You reviewed the WilProp policy form and you reviewed the

6   Travelers policy form, right?

7   A.  Correct.

8   Q.  So the expert opinion that you gave in your reports and

9   that you gave today was based on looking at two of the policy

10  forms?

11          THE COURT:  Mr. Williamson, I'm not interested in the

12  reports.  You can't impeach him on something that is not in

13  evidence here.  If you want to impeach his testimony here by

14  something he said inconsistently in his reports, go ahead.

15  We're not using the reports in the case.

16          MR. WILLIAMSON:  Understood.

17          THE COURT:  They're not in evidence.  They won't be in

18  evidence.

19          MR. WILLIAMSON:  Understood.

20  Q.  So in testifying today about your review of WTCP's

21  insurance policies and expressing your opinions based on that

22  review, you only reviewed two out of the universe of how many

23  policy forms?

24  A.  I don't know how many.

25  Q.  Seven.  So based on looking at two out of seven, you

D7GAWTC2ps                    Fischel - cross

1    expressed your opinions?

2    A.  Correct.

3    Q.  There were two actual policies issued.  Those were Allianz

4    policies.  You didn't look at those?

5    A.  Not to the best of my recollection.

6    Q.  Isn't it true that the aviation defendants' insurance

7    walked you through the parts of the two policy forms you looked

8    at?

9    A.  I think it's fair to say --

10             MR. PODESTA:  Objection.

11   A.  -- that I just discussed --

12             THE COURT:  Overruled.

13   A.  -- when I was in preparation of my reports and preparation

14   for my deposition, I discussed -- I was directed to particular

15   parts of the insurance policies by the aviation party

16   attorneys, and I also did my own analysis.

17   Q.  So is it fair to say that the aviation attorneys walked you

18   through the Travelers policy form?

19             THE COURT:  He just said that.

20             The attorneys showed him what he was supposed to look

21   at.  That's what he said.

22             MR. WILLIAMSON:  Thank you.

23   Q.  Isn't it true that you didn't look at any of the insurance

24   binders?

25   A.  I'm not an expert on insurance.  I was trying to understand

D7GAWTC2ps                    Fischel - cross

1    the economic --

2              THE COURT:  Do you know what an insurance binder is?

3              THE WITNESS:  I'm not sure I do, your Honor.

4              THE COURT:  Tell him what an insurance binder is.

5    Q.  An insurance binder would lay out, along with insurance

6    slips, the terms of actual insurance contracts.

7              THE COURT:  He said he looked at some, he didn't look

8    at others.

9              MR. WILLIAMSON:  Actually, your Honor, I think his

10   testimony is, he didn't look at any insurance binders.

11   Q.  Did you look at any insurance binders?

12   A.  Again, I'm not completely sure what an insurance binder is,

13   but I looked at what I've already described.

14   Q.  Which were two policy forms.  Right?

15   A.  Which were two policies describing types of insurance

16   coverage.

17   Q.  Policy forms, right?

18             THE COURT:  He's answered that.  Move on,

19   Mr. Williamson.

20             MR. WILLIAMSON:  Sorry.

21             THE COURT:  Let's not argue.

22   Q.  Isn't it true that the policy forms don't tell you the

23   amount of coverage for any of the categories of losses?

24   A.  That might be true.  I'm not sure one way or the other.

25   Q.  Did you look at any of the insurance slips?

1    A.  Again, my difficulty is because I'm not an expert in this

2    area I don't understand the difference between "slips,"

3    "binders," and "forms."  I looked at what I told you I looked

4    at.

5    Q.  But nothing else.

6             THE COURT:  Let's move on.

7    Q.  Is it true, Professor Fischel, that in these cases, time

8    element insurance covered many different categories of losses?

9    A.  I don't have an opinion on that one way or the other.

10   Q.  Is it true that in these cases property damage insurance

11   covered many different categories of losses?

12   A.  Again, I don't have an opinion on that one way or the

13   other.

14   Q.  So to get the better understanding of what the insurance

15   picture was here, you looked at the two policy forms that we

16   talked about, right?

17            THE COURT:  Let's not repeat, Mr. Williamson.  We have

18   limited time.  Make use of it.

19   Q.  Who is Jeffrey McKinley?

20   A.  I think I've heard he's a possible witness in this case.

21   Beyond that I don't know who he is.

22   Q.  You don't know what his expertise is or anything?

23   A.  I do not.

24   Q.  Have you read Mr. McKinley's report?

25   A.  No.

1   Q.  Have you read his deposition?

2   A.  No.

3   Q.  If you knew that he was --

4           THE COURT:  Enough.  Let's move on.

5           MR. WILLIAMSON:  I'm sorry?

6           THE COURT:  Move on.

7           MR. WILLIAMSON:  Yes, your Honor.

8   Q.  Who is Mr. Beach?

9           THE COURT:  We're not asking him to comment on other

10  experts, OK, Mr. Williamson?  I stopped Mr. Podesta.  I'm

11  stopping you.

12          MR. WILLIAMSON:  I was trying to make a different

13  point, your Honor.  And that is that if he's gathering his

14  facts and getting ready to express his opinions, he have

15  available to him --

16          THE COURT:  Attack his opinions.  Don't attack his

17  preparation on nonexistent propositions.

18          MR. WILLIAMSON:  May I ask him, your Honor, in terms

19  of --

20          THE COURT:  Ask and I'll rule.

21          MR. WILLIAMSON:  OK.  Thank you.

22  Q.  Did you read any of Mr. Beach's reports in this case?

23  A.  No.

24  Q.  Do you know that he was the insurance adjustor offered as

25  an expert by the aviation defendants in this trial?

1    A.  I do know that.

2    Q.  At the time of your deposition, you had not read his

3    report.

4           THE COURT:  He just said that.

5           MR. WILLIAMSON:  I'm sorry?

6           THE COURT:  He just said he did not read Beach.  Move

7    on.  Pay attention to what the witness says, not only your

8    notes.

9           MR. WILLIAMSON:  Yes, your Honor.

10   Q.  Do you know who Mr. Edward Reilly is?

11   A.  Yes.

12   Q.  Who is he?

13   A.  I believe he is an expert for the plaintiffs, and I

14   commented on some of his testimony in my deposition, as I

15   recall.

16   Q.  You didn't read all of his deposition testimony, did you?

17   A.  I did not.

18   Q.  Just some excerpts that were shown to you?

19   A.  Yes, and some things that I looked at myself.

20   Q.  The attorneys for the aviation defendants selected the

21   excerpts that you looked at; isn't that true?

22   A.  Yes.  They told me what to look at and asked me if it was

23   relevant to my opinions, and I said yes.

24   Q.  Isn't it true, Professor Fischel, that if you aren't

25   breaking economic loss down into any categories and you're

1   combining the separate categories of insurance coverage, that

2   it's a preordained conclusion that there will be total

3   correspondence?

4   A.  Respectfully --

5   Q.  Isn't that the logic?

6   A.  No.  Respectfully, sir, you've mischaracterized my

7   testimony.

8   Q.  I didn't ask you about your testimony.

9        THE COURT:  Let's not argue.  You asked a question.

10  The witness has answered.

11  A.  The preface of your question was that I lumped different

12  categories of economic loss together, and that's precisely what

13  I did not do.  What I did was, I said there were several

14  different categories of economic loss, but my focus was on one

15  particular type of economic loss, which was the loss in

16  property value, the loss in value of the plaintiff's leasehold

17  interest.  And because I've focused on one particular type of

18  economic loss, I then analyzed the relationship between that

19  type of economic loss and insurance recoveries for business

20  interruption and replacement cost, and concluded they covered

21  the same thing, the loss in property value.  That was my

22  opinion.

23  Q.  Is it your testimony here today that there are a number of

24  different types of economic loss, a new position that you've

25  articulated for the first time today?

D7GAWTC2ps                    Fischel - cross

1   A.  No.

2   Q.  Doing your correspondence analysis, Professor, how did you

3   determine how much of each payment by each insurer to WTCP was

4   for any particular category of claims that had been made?

5   A.  I didn't analyze that question.  I thought it was not

6   relevant for purposes of my opinion.

7   Q.  You recognize, sir, that after your first three reports

8   came out, his Honor issued a decision in which he held, "WTCP

9   suffered different categories of loss."  Do you know that?

10  A.  You know, if you're going to ask me about an opinion of the

11  Court, I guess I'd like to see it.

12  Q.  Sure, absolutely.

13          THE COURT:  You don't have to see it.  Just answer if

14  you know it.

15          THE WITNESS:  I'm aware of it.

16          THE COURT:  OK.

17  Q.  And that came down -- can we have that up, please.

18          THE COURT:  He says he's aware of it.  Go on.

19  Q.  It came down after --

20          THE COURT:  He's aware of it.  Next question.

21  Q.  That decision was at odds with your first three reports in

22  this case, wasn't it?

23          MR. PODESTA:  Objection.

24          THE COURT:  Yes, it's objectionable.  But let the

25  witness answer it, if you have an opinion.

D7GAWTC2ps                          Fischel – cross

             THE WITNESS:  I think I would -- I think context is

important, your Honor.  Obviously I don't want to comment on --

             THE COURT:  No, you can tell me I'm wrong.

             MR. PODESTA:  Don't you dare.

             I'm sorry, your Honor.

             THE WITNESS:  I've learned from long experience that I

do that with great reluctance.

             THE COURT:  No, look, you're an economist.  I'm a

judge ruling on law.  If you feel I've misstated an application

or a concept in trying to bring economics into the law, say it.

A.  Well, I guess I would say I don't know what his Honor

meant.  What I would say is that there is one type of economic

loss at issue here, the destruction of property and the

resulting destruction of value of a leasehold interest.

They're different, they're two different ways to measure that

loss, diminution in market value or replacement cost.  You can

think of that as two different components of the loss, two

different ways to measure the loss.  If that's what's meant in

the Court's opinion by "categories."  But in terms of what the

loss was, there is only one loss, the destruction of property

and the resulting destruction of value of the leasehold

interest.  And the only issue in my opinion for my economic

analysis is whether, given that one type of economic loss, that

one very specific type of economic loss, whether potential tort

recoveries for that loss are the same as compensation from

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

1    insurance for business interruption and replacement costs for

2    the loss of value of property.  And I concluded those were the

3    same.

4            MR. WILLIAMSON:  Could you put up the Court's holding

5    again, please.  Just leave it up, please.

6    Q.  The Court was not talking about measure the loss in that

7    holding, was it?

8            THE COURT:  Let's not get into my opinion.  This is

9    not the place.  Eventually it will get to the Second Circuit.

10   That's where it will come.

11   Q.  Did you review any of the settlement agreements that were

12   reached between insurers and the plaintiffs to see what they

13   covered, what categories of claims they covered?

14   A.  I did not.

15   Q.  Did you ask to see them?

16   A.  No.

17   Q.  How did you know what categories of claims they covered?

18   A.  I had an understanding of what the particular category of

19   loss was.  I also had an understanding of -- based on various

20   filings that I read, as well as conversations with counsel

21   about what claims were made.  I also saw an analysis of that

22   issue in Professor Shavell's report.  And that was all

23   background to the opinions that I've reached.

24   Q.  In your understanding, was -- that the claims were settled

25   for 4.1 billion but that they were only for business

D7GAWTC2ps                    Fischel - cross

1   interruption and replacement costs.  Isn't that right?

2          MR. PODESTA:  Objection.  I asked --

3          THE COURT:  Sustained.

4   Q.  What was your understanding as to what claims the $4.1

5   billion settlement that you talked about covered?

6   A.  My understanding was, or is, that there were specific

7   claims for business interruption, specific claims for

8   replacement cost, and then I guess another category, to be

9   determined, that was not quantified.  That's my understanding.

10  But, again, that's just based on my general understanding from

11  factual investigation as opposed to any expertise or any really

12  detailed investigation that I've engaged in.

13  Q.  Understood.  Would looking at the settlement agreements

14  have shown you what other claims had been made and were being

15  released?

16         MR. PODESTA:  Objection.

17         THE COURT:  Overruled.

18  A.  You know, again, I saw descriptions of the settlement

19  agreements.  I didn't think it was necessary to go beyond that

20  for purposes of my analysis.  I can't really say what I would

21  have learned if I had looked at them because I didn't look at

22  them.

23  Q.  You don't think, based on your years of experience and

24  expertise, that if you had looked at the settlement agreements,

25  you might have --

D7GAWTC2ps                    Fischel – cross

1          THE COURT:  Objection sustained.  Let's not argue with

2     the witness.

3     Q.  Did you know that the plaintiffs had asserted what are

4     called extra-contractual claims, not claims under the insurance

5     policies?

6     A.  I think I saw some reference to that in a brief that I read

7     that the plaintiffs have filed.

8     Q.  And those claims included claims for bad faith, not claims

9     under the insurance policies, correct?

10    A.  Again, all I can do is accept your representation of what

11    was asserted in the brief.  I have not reviewed the claims or

12    the settlement policies myself.

13    Q.  Those claims, in the settlement agreements, also included

14    claims for prejudgment interest.

15         THE COURT:  We've gone past that now.  Let's go on to

16    the next subject.

17    Q.  Turning to 7 World Trade Company, is the same true, that

18    is, that you didn't look at any settlement agreement, with

19    regard to 7 World Trade Company?

20    A.  Yes, it's true.

21    Q.  So similarly, you don't know what claims were being

22    released, for 7 World Trade Company?

23    A.  Not with any specificity, other than, I assume if there's a

24    release -- I assume there's mutual releases, so all claims are

25    released, on both sides.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  Right.  But I was asking you whether you know what claims

2   were being released.  That was what I was asking.

3          THE COURT:  He said all claims.

4   Q.  You don't know whether there were any claims being released

5   other than claims under the insurance policy with IRI, do you?

6   A.  Again, other than just what I've read, I don't have any

7   opinion one way or another, because that's not my area of

8   expertise.

9   Q.  I'm not asking you for an opinion.  I'm asking you --

10         THE COURT:  He's answered the question he doesn't

11   know.  Next question.

12   Q.  Did you examine 7 World Trade Company's complaint against

13   IRI?

14   A.  No, I did not.

15   Q.  You read the *Fisher* case, didn't you?

16   A.  I did.

17   Q.  Talk you talked about that earlier, right?

18   A.  I it did.

19         THE COURT:  Yes, but I'm not going to let you ask a

20   question it.

21         MR. WILLIAMSON:  May I ask a question about whether he

22   read the lower-court decision, your Honor?

23         THE COURT:  Yes, you can ask that.

24         MR. WILLIAMSON:  Or better not?

25   Q.  Did you read the lower court --

1               MR. WILLIAMSON:  May I ask it?

2               THE COURT:  What's the point.  He's not here to answer

3       questions of law.  How many times do I have to say that?

4               MR. WILLIAMSON:  I understand.

5               THE COURT:  So ask him questions in his expertise.

6       One of the things you established is that he's not here as an

7       expert on law.  Law encompasses judicial opinions, even lower

8       courts'.

9               MR. WILLIAMSON:  Understood.

10      Q.  Isn't it true, sir, that one loss the plaintiffs suffered

11      is the loss or interruption of receiving rental payments?

12      A.  Yes.  That's correct.

13      Q.  Another loss plaintiffs suffered is replacement costs?  Is

14      that true?

15      A.  Well, again, I think when you describe it that way, you're

16      describing ways of measuring loss, as opposed to loss.  The

17      loss is the loss of property value.  That is the loss.  And

18      ways to measure what compensation somebody who has lost

19      property value is entitled to, there are different ways to do

20      it.  One way is replacement cost.  And another way is

21      diminution of market value, which is the functional equivalent

22      of the present value of lost rental payments, or, more

23      accurately, the profits from lost rental payments.

24      Q.  But isn't it true that when we're done comparing those to

25      the measure of the loss, if we put the measurement aside for a

1    second, there is something that is a category of loss that is

2    lost rental income or the loss or interruption of receiving

3    rental payments.  Isn't that right?

4    A.  I would say that the loss of rental payments is a

5    consequence of the destruction of property and one way to

6    measure the effects of the loss of property value.

7    Q.  I'm not asking you about measurement.  I'm moving past it,

8    in my question.  Is loss of rental income a loss to the injured

9    party?  Is that a category of loss or not?  Forget about

10   measurement of the fair market value.

11            THE COURT:  Here's the question he's asking you.  Is

12   one component of loss the income you lost?

13            THE WITNESS:  Yes.

14   Q.  And is one component of loss also replacement costs?  Apart

15   from measurement.

16   A.  I would say potentially.  There are two different ways to

17   measure loss.

18   Q.  I'm not asking you about measurement.  Is there

19   something -- if an injured party --

20   A.  I -- I'm sorry.  I didn't mean to interrupt.  Go ahead.

21   Q.  -- has their buildings destroyed and they have to replace

22   them, is that replacement cost a form of loss, separate and

23   apart from whatever impact it has on measurement of fair market

24   value?

25   A.  It's just confusing.  If property is destroyed and there's

D7GAWTC2ps                  Fischel - cross

1   a decision to replace the property, then the cost of replacing

2   the property is a way to measure the loss from the destruction

3   of property.

4   Q.  Are you aware that the Court has held, his Honor, that the

5   plaintiffs are precluded from recovering in tort the

6   replacement costs of the destroyed buildings because there is

7   no proximate cause?

8           MR. PODESTA:  Objection.

9           THE COURT:  Sustained.

10  Q.  Are you aware of any holding by the Court barring the

11  plaintiffs from recovering in tort for the replacement costs of

12  the buildings because there's no proximate cause?

13          MR. PODESTA:  Objection.

14          THE COURT:  Sustained.

15  Q.  Let me turn to a different subject, sir.  Are you familiar

16  with the $491.3 million initial rent payment?

17  A.  Yes.

18  Q.  What was that $491.3 million initial rent payment for?

19  A.  My understanding, it was a rental payment paid to the Port

20  Authority pursuant to the acquisition of the World Trade Center

21  Properties in the auction.

22          MR. WILLIAMSON:  I'm sorry.  Forgive me, your Honor.

23  There's no realtime.  I didn't catch the last part of the

24  answer.  May I just ask that the last part be read back.

25          THE COURT:  Yes.

1            MR. WILLIAMSON:  Thank you.

2    Q.  So the $491 -- I'll round it off just for efficiency and

3    speed -- the $491 million was part of the $2.805 billion price

4    that you referred to earlier?

5    A.  Correct.

6    Q.  One of your expert opinion was that you cannot add the $491

7    million to the $2.805 billion; isn't that correct?

8    A.  That's correct.

9    Q.  But no one was saying that the 491 million should be added

10   to the 2.805 billion.

11           THE COURT:  Let's not argue with the witness, please.

12   Q.  Was anyone --

13           THE COURT:  That's argument.  No.  You've got his

14   testimony.  Ask another question.  Don't argue.

15           MR. WILLIAMSON:  May I inquire whether anyone was

16   saying that or are --

17           THE COURT:  Just ask another question.

18   Q.  Was anyone saying is that the 491 million should be added

19   to the 2.805 billion?

20           THE COURT:  Objection sustained.

21   Q.  What is the issue with respect to the $491 million initial

22   rent payment for correspondence analysis?

23           MR. PODESTA:  Objection.

24           THE COURT:  If the witness can understand the question

25   he can answer.

D7GAWTC2ps                    Fischel – cross

A.  I don't understand the question.  The opinion that I gave

was in the context of my reaction to a particular part of

Professor Shavell's report.

          THE COURT:  As I understand what's gone on here, the

witness has said that part of the way of figuring the 2.805

billion price paid for the purchase of the World Trade Center

towers and leasehold was to add the cash payment and the

present value of the income stream.  Is that correct?

          THE WITNESS:  I would say not exactly, your Honor.

What I said was that there was a payment or valuation of $2.8

billion and then there was a way to pay that $2.8 billion in

the form of a series of rental payments to the Port Authority.

And the first rental payment, as I understand it, was the $491

million rental payment.

          THE COURT:  OK.

Q.  Isn't it true, sir, that there was no insurance recovery

for the $491 million?

A.  I don't know, but, again, for purposes of my opinion,

that's irrelevant.

Q.  But if I told you that there, hypothetically, let's assume

there was no insurance recovery for the $491 million --

          THE COURT:  Objection sustained.  He said it's

irrelevant.

Q.  Is it correct that in your opinion the obligation to

rebuild under the leases does not have a bearing on a

D7GAWTC2ps                          Fischel – cross

1    correspondence analysis from an economic perspective?

2    A.   First of all, I don't believe there was an obligation to

3    rebuild.  And secondly, even if there was, I don't believe it

4    has any relevance to my economic analysis of correspondence,

5    because it doesn't relate to either the tort recovery part of

6    the analysis or the insurance payment part of the analysis, for

7    reasons, if you would like, I can explain in more detail.

8    Q.   Isn't it true that, previously, you didn't express any

9    opinion as to whether or not there was an obligation to

10   rebuild?

11              THE COURT:  Sustained.

12              MR. PODESTA:  Objection.

13   Q.   Isn't it true that you said that was a legal question that

14   you weren't going to comment on?

15              MR. PODESTA:  Objection.

16              THE COURT:  Sustained.

17   Q.   Is it true that you're saying today that there was no

18   obligation to rebuild because of what you've called the

19   commercial reasonableness issue?

20              MR. PODESTA:  Objection.  Outside the scope.

21              THE COURT:  Sustained.

22              MR. WILLIAMSON:  May I inquire on the subject of his

23   opinion that he just expressed?

24              THE COURT:  Ask questions and I'll rule.

25              MR. WILLIAMSON:  Yes, your Honor.

D7GAWTC2ps                        Fischel – cross

1    Q.  What is the basis for the opinion you just expressed that

2    there was no obligation on the part of the plaintiffs to

3    rebuild under their leases?

4                MR. PODESTA:  Objection.

5                THE COURT:  Overruled.

6    A.  I looked at, first and foremost, the insurance policy

7    itself, and did not see any reference to an obligation to

8    rebuild.  I also looked at the testimony of Mr. Reilly that you

9    alluded to earlier, where he stated, I think unequivocally,

10   that there was nothing in the insurance policies that referred

11   to any obligation to rebuild.  That's what was important to me

12   in terms of my economic analysis of correspondence.  I went

13   beyond that, however.  I also looked at the language in the

14   lease itself, and I concluded, even though I don't want to

15   offer an expert opinion on what the lease said because that's

16   not within my area of expertise, but in terms of my

17   understanding of the language in the lease, it also does not

18   contain an unconditional obligation to rebuild.  But for

19   correspondence purposes what's most important is that there's

20   nothing in the insurance policies, nothing, that refers to any

21   obligation to rebuild.

22   Q.  Let me clarify.  I'm not asking you about the insurance

23   policies.  I'm asking you about the leases.  Is it your expert

24   opinion that the leases don't contain any obligation to

25   rebuild?

1            THE COURT:  He's not here to have legal

2      interpretations on contract law.

3            MR. WILLIAMSON:  I agree with your Honor, but I was

4      probing it because he just gave one.  And I thought I was

5      entitled to explore it, your Honor.

6            THE COURT:  Objection sustained.

7            MR. PODESTA:  Your Honor, may I explain my basis for

8      my objection?

9            THE COURT:  No.

10           MR. WILLIAMSON:  May I inquire further as to the basis

11     for the legal opinion he gave a few minutes ago about --

12           THE COURT:  He didn't give a legal opinion.

13           MR. WILLIAMSON:  But he said that he thinks --

14           THE COURT:  I don't care what he said about the

15     contract.  It's not in his expertise.

16           MR. WILLIAMSON:  OK.

17           THE COURT:  Is it important economically to know

18     whether or not there is a contractual obligation to rebuild?

19           THE WITNESS:  I think it would be important, your

20     Honor, if there were insurance payments for an obligation to

21     rebuild pursuant to a provision in the insurance contract for

22     purposes of my economic analysis of correspondence, because --

23           THE COURT:  And if there was no insurance obligation

24     to rebuild, then your opinion is what?

25           THE WITNESS:  Because my analysis is whether the

D7GAWTC2ps                    Fischel – cross

1   insurance payments are for the same type of loss as the

2   potential tort recoveries, the destruction of property, if, in

3   the insurance contract, there was insurance for an obligation

4   to rebuild, that would change my, at least potentially change

5   my analysis.  That's why I investigated that question and

6   concluded that there is no obligation to rebuild anywhere in

7   the insurance contracts, and that, I would say, is support for

8   my opinion about the economics of correspondence in this case.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7gkwtc3                        Fischel - cross

1    BY MR. WILLIAMSON:

2    Q.  Professor Fischel, do you recall that you testified earlier

3    this morning that if the policyholder only had replacement cost

4    coverage and no business interruption coverage, that it would

5    make no difference to you?

6    A.  It would be absolutely irrelevant to me, correct.

7    Q.  Correct, that's what you said.  Let me present a

8    hypothetical to you.  Let's assume a policyholder acquires a

9    99-year to a commercial property.  The lease requires the

10   policyholder to rebuild in the event the building is destroyed.

11   The policyholder buys replacement coverage to protect the risk

12   of that rebuilding obligation.

13          So, is it your testimony that in that circumstance the

14   tort feasor gets a credit for that amount in a tort case even

15   though the tort feasor is not liable for the rebuilding

16   obligation?

17          MR. PODESTA:  Objection.

18          THE COURT:  It's a complicated question.  Do you

19   understand it?

20          THE WITNESS:  I think I understand it.

21          But I have to ask a clarifying question --

22          THE COURT:  No, then you don't understand it.

23          THE WITNESS:  OK.

24          THE COURT:  Objection sustained.

25   Q.  Let me ask you a different hypothetical, sir.  If I own a

D7gkwtc3                         Fischel - cross

1    henhouse with chickens, those chickens lay eggs, and the

2    henhouse is destroyed, I've lost not just the value of the

3    income stream from selling the eggs but also the chickens

4    themselves; isn't that correct?

5    A.   In your hypothetical, that would be correct.

6    Q.   The chickens have some value beyond the income stream

7    alone; isn't that correct?

8    A.   Well, not necessarily, no.  I mean --

9    Q.   It would depend on the facts and circumstances of the case?

10   A.   It would depend on whether the chickens have value apart

11   from their ability to lay eggs.  The laying of eggs is

12   equivalent to, I guess, a rental stream, and it would depend

13   if --

14            THE COURT:  Let's not get involved.

15            MR. WILLIAMSON:  I'm just eliminating certain

16   sections, your Honor -- so, thank you for giving me a minute --

17   based on your Honor's rulings.

18   Q.   You don't have any opinions, sir, do you, as to what it

19   would cost the plaintiffs to restore their leaseholds once the

20   buildings giving value to them were destroyed?

21   A.   No, sir, I do not.

22   Q.   Are you aware of any rulings by his Honor holding that the

23   plaintiffs had a contractual obligation to rebuild under their

24   leases?

25            MR. PODESTA:  Objection.

```
 1              THE COURT:  Sustained.
 2   Q.  Mr. Gokhale works with you at Compass Lexecon, doesn't he?
 3   A.  Correct.  It's actually pronounced Gokhale.
 4   Q.  Gokhale?
 5   A.  Correct.
 6              THE COURT:  It won't appear from the transcript.
 7              THE WITNESS:  Right.
 8   Q.  Mr. Gokhale assisted you in some aspects of your work for
 9   this trial, right?
10   A.  Yes, sir, he did.
11   Q.  He performed various interest rate calculations, correct?
12   A.  Correct.
13   Q.  And in lieu of his testifying, the two reports he issued we
14   stipulated into evidence, and those were attached to your
15   reports.  You've seen those, right?
16   A.  Yes, sir, I have.
17   Q.  And you don't express, nor does Mr. Gokhale express, any
18   opinion as to the proper discount rate that should have been
19   used in those reports, do you?
20   A.  Correct.
21   Q.  And he doesn't either?
22   A.  Correct.
23   Q.  And similarly, in these reports an interest rate is used,
24   and neither he nor you express any opinion as to whether
25   correct interest rates were used?
```

D7gkwtc3                    Fischel – cross

A.   That's the same as the discount rate, but neither one of us

expresses any opinion on which one -- what the -- of the

various alternatives, what the correct one to use, we I think

say it's a question for his Honor.

Q.   Both nomenclatures were used in the report, so that's why I

asked it that way.

A.   That's fine.

Q.   Isn't it true that Mr. Gokhale just assumed in doing these

calculations, that there was perfect total correspondence

between each and every payment from an insurance company and

plaintiffs --

          THE COURT:  He's not here.  The witness is here.

Sometimes associates make mistakes, sometimes they're smarter

than the bosses.  It's irrelevant.

Q.   You included --

          THE COURT:  The quality of Professor Fischel's

opinions are what we're dealing with.  Examine on those.

Q.   Is it true, sir, that if there isn't total correspondence,

at least up to the amount of the permitted tort recoveries,

then Mr. Gokhale's calculations become irrelevant?

          MR. PODESTA:  Object.

          THE COURT:  Sustained.

Q.   Is it true, sir, that Mr. Gokhale ran his calculations

against a different amount for the tort damages award than

the --

D7gkwtc3                          Fischel - cross

1            THE COURT:  Objection sustained.

2    Q.  You were asked some questions on direct examination about

3    whether you had ever performed any allocations of how the

4    insurance proceeds might be divided between replacement costs

5    and business interruption recoveries.  Do you recall that?

6    A.  Yes, sir, I do.

7            MR. WILLIAMSON:  Pull that up, please.

8    Q.  You never performed any, right?

9    A.  No, because I --

10            THE COURT:  Just the answer is no.

11            THE WITNESS:  No.

12            MR. WILLIAMSON:  Page 4546, please.

13    Q.  Are you aware, sir, that in the trial brief, the aviation

14    defendants, because you had never prepared any proposed

15    allocations, have adopted the methodology and the calculations

16    of the only practicable allocation that was prepared by

17    Professor Steven Shavell?

18            MR. PODESTA:  Objection.

19            THE COURT:  Objection sustained.

20    Q.  Are you aware that the aviation defendants have adopted

21    Professor Shavell's methodology --

22            THE COURT:  Objection sustained.

23    Q.  Were you asked to consider whether Professor Shavell's

24    methodology for an allocation splitting the insurance proceeds

25    between the replacement costs and business interruption

D7gkwtc3                          Fischel – cross

1    proportionately was appropriate?

2              MR. PODESTA:  Objection.

3              THE COURT:  No, overruled.

4              THE WITNESS:  I considered it, and I concluded it was

5    completely inappropriate, for reasons I've explained and can

6    explain further if you'd like to ask me.

7    Q.  If the leasehold interest is damaged and the buildings

8    giving value to the leaseholder are destroyed, it's possible to

9    create a different income stream, isn't it?

10   A.  I'm sorry, sir, I don't understand the question.

11   Q.  If the leasehold interest is destroyed --

12             MR. WILLIAMSON:  Strike that.  Withdrawn.

13   Q.  If a leasehold interest is damaged and if the buildings

14   giving value to the leasehold are destroyed, it's possible to

15   create a different income stream, isn't it?

16   A.  Possible how?  I don't understand what you mean.

17   Q.  Building a different building, rebuilding.

18   A.  That would be a new income stream, correct.

19   Q.  A different income stream is my --

20   A.  By definition, it would be new and different.

21   Q.  Right.  It's not possible, in that circumstance, sir, to

22   create the identical income stream, is it?

23   A.  That's probably correct.

24             THE COURT:  Why not?

25             THE WITNESS:  Because there's a difference in time,

D7gkwtc3                    Fischel - cross

1    it's a different building, presumably the rents would not be

2    identical to what they were before.

3    Q.  And if the holder of the leasehold collected money from its

4    insurers, they could do any of any number of things with that

5    money or that capital, couldn't they?

6    A.  I assume that's true, if that's permitted under the

7    insurance contracts.

8    Q.  And depending on how they use that money, if they used it

9    to rebuild, to some extent, that's how they could create a

10   different income stream, right?

11   A.  Potentially, yes.

12   Q.  Isn't it true, sir, that a correspondence analysis doesn't

13   look at what you do with the money but rather what the money

14   was paid for from collateral sources?

15   A.  That's my understanding.

16            MR. PODESTA:  Objection.

17            THE COURT:  Overruled.

18   Q.  I'm sorry, I didn't know if you answered.

19   A.  I answered, yes, I agree that's my understanding.

20   Q.  Thank you.  I just hadn't heard.  Thanks.

21            MR. WILLIAMSON:  Let me just have a moment, your

22   Honor, and I'll check if I have anything further.

23            (Pause)

24   Q.  I think you testified earlier, sir, on direct that there

25   was a destruction of the property and a resulting destruction

D7gkwtc3                    Fischel - cross

1  of the leasehold interest?

2  A.  In the value of the leasehold interest, correct.

3  Q.  So, let me inquire about that a little.

4          When you say there was a destruction of the property,

5  you mean a destruction of the buildings?

6  A.  Yes, sir.

7  Q.  When you say a destruction of the leasehold interest, are

8  you aware that the Court has held the leasehold interest wasn't

9  destroyed but rather the buildings giving value to the

10  leasehold interest were destroyed?

11          MR. PODESTA:  Objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  I don't remember precisely what the

14  Court has said.  What I said was that the buildings were

15  destroyed and as a result of the buildings being destroyed, the

16  value of the leasehold interest was also destroyed.

17          MR. WILLIAMSON:  No further questions, your Honor.

18          MR. PODESTA:  No redirect, your Honor.

19          THE COURT:  Thank you, Professor Fischel.

20          THE WITNESS:  Thank you, your Honor.

21          THE COURT:  You're excused.

22          (Witness excused)

23          THE COURT:  Defendants rest?

24          MR. PODESTA:  We have no further witnesses.  We have a

25  limited number of deposition designations to read.

D7gkwtc3

1            THE COURT:  Are they important?

2            MR. PODESTA:  I cannot read your mind, your Honor.  We

3    think that they are relevant.

4            THE COURT:  Are they statements taken of other

5    experts?

6            MR. PODESTA:  They are statements only of Mr. Levy,

7    who is the corporate representative of the World Trade Center 7

8    and WTCP, and of Ms. Thompson, who is --

9            THE COURT:  OK, put them in.  Let's see where we go.

10           MR. PODESTA:  In addition, we would like to offer into

11   evidence the Gokhale declarations Mr. Williamson referred to,

12   which --

13           THE COURT:  No, no, I ruled them out.

14           MR. PODESTA:  All right.

15           And there are certain stipulations of fact --

16           THE COURT:  We'll see what we do with those

17   stipulations.  Let's proceed.

18           MR. PODESTA:  All right.

19           THE COURT:  You can sit down, Mr. Williamson.

20           MR. WILLIAMSON:  Yes, I understand.  I just didn't

21   catch what you were saying.

22           THE COURT:  Nothing important.

23           MR. WILLIAMSON:  No, that's not possible.

24           MR. PODESTA:  We'd like to read first a limited number

25   of designations from the deposition of Lois Thompson, who was

D7gkwtc3

1    the Proskauer attorney who handled the appraisal proceedings.

2    And we believe it will shed some light on the appraisal

3    proceedings that we will discuss and Mr. Gaither of Richards

4    Kibbe will be taking a lead on that and his associate, Maria

5    Lapetina --

6             MR. GAITHER:  Good morning.  H. Rowan Gaither with

7    Richard Kibbe & Orbe, on behalf of the aviation defendants.

8    With me this morning is my associate Maria Lapetina.  We will

9    be reading from the deposition of Lois Thompson.  It was taken

10   on July 2nd, 2013, pursuant to a quick agreement with the

11   plaintiffs' counsel.  I will be reading both the aviation

12   defendants' designations as well as the counterdesignations.

13            Ms. Lapetina, if you could please turn to page 5 line

14   21.

15            THE COURT:  Are they going to be put up?

16            MR. GAITHER:  No.  We were just going to read them,

17   sir.

18            THE COURT:  Do you have them to put up?

19            MR. GAITHER:  We don't.

20            THE COURT:  Do you have a deposition transcript that I

21   can follow?

22            MR. GAITHER:  Yes.

23            (Pause)

24            THE COURT:  Go ahead.

25   "Q.  Would you please state your name and business address for

D7gkwtc3                              "Thompson"

1     the record?

2     "A.  Lois D. Thompson, 2049 Century Park East, Los Angeles,

3     California."

4                MR. GAITHER:  Ms. Lapetina, please turn to page 23, a

5     counterdesignation.

6     "Q.  Do you know whether once you became involved in this

7     matter there was a different client matter number established

8     for the Silverstein Properties representation?

9     "A.  So far as I know, the number you see here was the number

10    that was used throughout.

11    "Q.  So, would it be correct to say that the number that was

12    used here --

13    "A.  76391002.

14    "Q.  Thank you.

15                "-- was used both for the coverage litigation as well

16    as the appraisal proceedings?"

17                "Mr. Ketch:  Objection to form."

18                THE COURT:  Where are we?  I'm looking at page 24.

19    This is Lois Thompson?

20                MR. GAITHER:  Lois Thompson.  And we are on page 24,

21    your Honor.

22                THE COURT:  Volume I, July 2, 2013?

23                MR. GAITHER:  Yes.

24                THE COURT:  Page 24?

25                MR. GAITHER:  Yes.

D7gkwtc3

1              THE COURT:  It's all covered by purple and yellow.

2              MR. GAITHER:  Yes.  The yellow, your Honor, are the

3    aviation defendants' designations?

4              THE COURT:  How do I read the purple?

5              MR. GAITHER:  Those are the counterdesignations.  I

6    will read them to assist your Honor.

7              THE COURT:  What are you going to bring out here?

8    What do I want to know?  What do I need to know?

9              MR. GAITHER:  Really, the subject area of

10   Ms. Thompson's testimony is the following:  First of all, the

11   appraisal proceeding continued for 99 days and was conducted in

12   a trial fashion; second, that the sole issues that were

13   addressed during the appraisal proceeding comprised replacement

14   cost, that there were personal findings that were made at the

15   end of it.  In fact, we have an exhibit that was admitted into

16   evidence yesterday --

17             THE COURT:  I know from yesterday that there's a

18   certain amount that was found at the end of the appraisal

19   proceedings.

20             MR. GAITHER:  That's correct.

21             THE COURT:  Do I need to know anything else?

22             MR. GAITHER:  Business interruption was never

23   reached --

24             THE COURT:  I know that.  Do I need to know anything

25   else about the appraisal proceedings other than the amount that

1    was found?

2              MR. GAITHER:  The final issue, your Honor, is that the

3    TBD items, which were identified in partial proofs of loss,

4    were also TBD during the appraisal and were never established.

5              THE COURT:  I know they were never quantified.

6              MR. GAITHER:  That's correct.

7              THE COURT:  What else do I need to know?

8              MR. GAITHER:  I believe that that is largely the

9    subject of Ms. Thompson's testimony.

10             THE COURT:  So, I don't need to know her.  I take the

11   facts without going into the details.

12             MR. GAITHER:  The final thing, your Honor, is that

13   Ms. Thompson actually offered her opinion on replacement costs

14   less depreciation.  It was actual cash value.  She also

15   testified that --

16             THE COURT:  I don't need it.  We already have that.

17   And she's not listed as an expert.

18             MR. GAITHER:  OK.

19             Ms. Lapetina, I think you may step down.

20             THE COURT:  You are finished, Ms. Thompson.

21             MR. GAITHER:  Thank you, your Honor.

22             THE COURT:  You're welcome.  Next?

23             MR. PODESTA:  I'd now like to read designations

24   from --

25             THE COURT:  Mr. Podesta, maybe you want to seriously

1    think about what we're doing.

2              MR. PODESTA:  Yes, your Honor.  Maybe we could just

3    think over the break for lunch if you wish and we can

4    streamline this.

5              THE COURT:  Let's do one more and see where we go.

6    Maybe it will give me a very --

7              MR. PODESTA:  We'll do a short one.  That will be Levy

8    2012.

9              THE COURT:  What's the purpose of this?

10             MR. PODESTA:  This is to establish -- I don't Ms.

11   Weisgerber will describe it.

12             THE COURT:  OK.

13             MS. WEISGERBER:  Your Honor, this is testimony from

14   the 30(b)(6) deposition of Michael Levy on behalf of 7 World

15   Trade Company --

16             THE COURT:  Don't go up.

17             MS. WEISGERBER:  This testimony is nonduplicative.  It

18   establishes that the settlement proceeds from the IRI 7 World

19   Trade Company settlement covered the personal property claims,

20   and it also establishes there was never any finding of

21   extra-contractual bad faith against IRI.

22             THE COURT:  But I know that.

23             MS. WEISGERBER:  In that case, this is duplicative

24   testimony.

25             THE COURT:  Right.  What I don't remember is whether

D7gkwtc3

1    the claim for personal property was determined to be fully

2    insured.  I think my recollection is that it was wrapped up

3    with the total payment.

4              MR. PODESTA:  I believe that is correct, your Honor.

5              MS. WEISGERBER:  It was a piece of the property damage

6    payment, yes.

7              THE COURT:  OK.  Thank you.  We're finished with that.

8              MR. PODESTA:  And I think the next is Mr. Levy 2012.

9              THE COURT:  All right, let's find out what that's on.

10             MR. PODESTA:  2002.

11             THE COURT:  What's that going to teach me?

12             MR. PODESTA:  That addresses the contractual

13   obligation to rebuild.  Mr. Levy testified that the contractual

14   obligation to rebuild was not unconditional but was subject to

15   a commercial reasonableness standard.

16             THE COURT:  That's in the lease, right?

17             MR. PODESTA:  That is in the lease, but he is the

18   corporate representative of WTCP interpreting the lease and --

19             THE COURT:  His interpretation is of no value to me.

20   I can read it myself.  We don't need that.

21             MR. PODESTA:  All right.  He also testified that in --

22             MR. WILLIAMSON:  Excuse me.  I have a general

23   objection to it.  May I lodge it first?  I don't want to

24   interrupt, but if I don't lodge it, I lose it.

25             THE COURT:  What are you objecting to?

1              MR. WILLIAMSON:  The year.  I think he said 2002.

2              THE COURT:  I'm not hearing it.  What are you

3       objecting to?  Do you want me to hear it so you can object?

4              MR. WILLIAMSON:  No.  I want to point out to your

5       Honor, it's from the SRI case, one occurrence/two occurrences,

6       taken 11 years ago, different issues, not relevant.

7              THE COURT:  Do you want me to receive it so you can

8       object to it?

9              MR. WILLIAMSON:  No.  I want you to not accept it into

10      evidence.

11             THE COURT:  I didn't accept it.

12             MR. WILLIAMSON:  I was just trying to explain why so

13      you'd explain the context for the proffer.

14             THE COURT:  I don't need the context.  I don't accept

15      it because I can read the document for myself.

16             What's next, Mr. Podesta?  I think I'm doing better

17      than you can do at lunch.

18             MR. PODESTA:  I think you're making extraordinary

19      progress.  I will let Mr. Fraser make one last attempt, and I

20      am sure he realizes the heavy burden that he has to prove.

21             THE COURT:  I like the way you're putting up other

22      people for me to knock down.

23             MR. PODESTA:  You notice Mr. Barry has hardly said a

24      word in this conflagration.

25             THE COURT:  The smartest person in the room.

1          MR. FRASER:  Your Honor, this is from the deposition

2     of Michael Levy, a 30(b)(6) witness.

3          THE COURT:  Who's Michael Levy?

4          MR. FRASER:  Mr. Levy at the time was the chief

5     financial officer and executive vice president of World Trade

6     Center Properties and 1, 2, 4 and 5 World Trade Center.

7          THE COURT:  What am I going to learn from him?

8          MR. FRASER:  He's going to testify more information

9     about the TBD items.  We know that they were never --

10          THE COURT:  I know the categories and I know they were

11     never quantified.

12          MR. FRASER:  What's more important, though, your

13     Honor, is that many of them were never incurred at all, that

14     there never was any damage or expense, which he admits.

15          THE COURT:  OK, I'll hear that.

16          MR. FRASER:  OK.  Shall I read those portions?

17          THE COURT:  Yes, that's good.

18          MR. FRASER:  I'm not as crisp as usual because we have

19     been cutting.

20          MR. WILLIAMSON:  Just give me the page.

21          MR. FRASER:  I'm going to read the whole thing.  We

22     don't need to have anybody in the witness stand.  It's page 84.

23          THE COURT:  I like this.  What's your name, sir?  I'd

24     like to commend you.

25          MR. PODESTA:  I should have put him up as our first

1    witness, your Honor.

2            MR. FRASER:  OK, page 84, beginning at line 10.

3    "Q.  Let's take additional building items, which is item II on

4    page 17690.  Do you see there's an item underneath that for

5    demolition and debris removal?

6    "A.  Yes.

7    "Q.  Did World Trade Center Properties ever have any damages

8    resulting from demolition and debris removal?

9    "A.  We did not pay any damages.

10   "Q.  So, the next number to that should be a zero; is that

11   fair?

12   "A.  At the time this was prepared, we did not know whether we

13   would or we would not.

14   "Q.  As it turned out, WTCP did not have any expense for that

15   category?

16   "A.  No, it did not."

17           MR. FRASER:  Continuing on page 85:

18   "Q.  What about for pollution cleanup --"

19           THE COURT:  Sorry?

20   "Q.  -- and removal?

21           MR. FRASER:  Sorry, I'm on page 85 now, continuing the

22   same line of questions.

23           THE COURT:  No, what's the -- go ahead, sorry.

24   "Q.  What about for pollution cleanup and removal, was there

25   any expense for that?

D7gkwtc3                          "Levy"

1    "A.  I don't believe so.

2    "Q.  Transmission antenna dishes, any expense for that?

3    "A.  We never calculated that.  Again, we never got to the

4    point where we calculated that.  I don't know if there is or

5    there is not an expense for that."

6              THE COURT:  What is that again.  Sorry?

7              MR. FRASER:  That is relating to transmission antenna

8    dishes.

9              THE COURT:  Weren't they destroyed?

10             MR. FRASER:  I'm sorry?

11             THE COURT:  Weren't they destroyed?  They were on top

12   of one of the towers.

13             MR. FRASER:  Your Honor, World Trade Center Properties

14   only took possession of these buildings in July, two months

15   before 9/11.  Much of what was in the buildings belonged to

16   somebody else.  It belonged to the Port Authority.

17             MR. WILLIAMSON:  Objection, your Honor, to that.

18             THE COURT:  Yes, I suppose but, OK.  Transmission

19   antenna issues, no value.  And the other part is objected to

20   and sustained.

21             MR. FRASER:  I'm just trying to cut some out as I go

22   here, your Honor.

23             Now turn to page 141, beginning at line 23.

24             MR. WILLIAMSON:  One second, please.

25             MR. FRASER:  141 line 23.

1        MR. WILLIAMSON:  Thank you.

2   "Q.  So, either the money that came from the insurance carriers

3   went toward replacement cost or went toward current income,

4   correct?"

5        MR. WILLIAMSON:  Your Honor, I don't know how you want

6   to handle it but he's leaving out our counterdesignations

7   because they had given us a lot of designations and we have

8   counters.  They're just being left out.

9        THE COURT:  Shocking, shocking.  This is the

10  deposition of Jim Levy, 2009?

11       MR. FRASER:  That's correct.

12       THE COURT:  What page?

13       MR. FRASER:  I'm on page 141.

14       The date is June 2nd, 2009.

15       THE COURT:  If Mr. Williamson wants to read the

16  counterdesignation later on, he can read it.  You can go ahead.

17       MR. FRASER:  Thank you, your Honor.

18       So, again, I'm on page 141 line 23.

19  "Q.  So, either the money that came from the insurance carriers

20  went toward replacement costs or it went toward current income,

21  correct?

22  "A.  No.  The way it worked for income tax purposes, when you

23  get insurance proceeds, you had to pay tax today on the amount

24  you are not going to use in the future or you have the ability

25  to use it in the future and defer tax until you do use it for

D7gkwtc3                          "Levy"

1    whatever purpose you're going to use it."

2              THE COURT:  That's not relevant.  I don't care about

3    the tax consequences.  There's nothing relevant in this.

4              MR. FRASER:  If I can read one sentence, Mr. Levy

5    testified:  "I mean there is no restriction on the use of that

6    money once it is in my accounts."

7              THE COURT:  Where is this?

8              MR. FRASER:  Page 142 line 21.  "I mean there is no

9    restriction on the use of that money once it's in my account."

10             THE COURT:  That's generally the case.  And he's not a

11   lawyer.  We don't need that point.  Objection sustained.  Hence

12   there are no counterdesignations to read.

13             MR. FRASER:  In that case, your Honor, I'm cutting

14   further.

15             (Pause)

16             MR. FRASER:  I have nothing further.

17             THE COURT:  Thank you.

18             Anything else, Mr. Podesta?

19             MR. PODESTA:  Yes.  I believe that I would like to

20   introduce the agreed stipulation of facts of the parties.  And

21   this is --

22             THE COURT:  The pretrial order?

23             MR. FRASER:  Yes.  It is attached to the pretrial

24   order.

25             THE COURT:  Give me a moment.

1              I'm returning the depositions.

2              MR. PODESTA:  It's Exhibit C to the pretrial order,

3    your Honor.

4              THE COURT:  Thank you.

5              MR. PODESTA:  And it has been, with the efforts of

6    both parties, dramatically reduced from the version that was

7    presented last week.

8              THE COURT:  Are you reading all the pages?

9              MR. PODESTA:  Well, that depends on your Honor's

10   preference.  I had hoped --

11             THE COURT:  What do you want me to take note of?

12             MR. PODESTA:  Well, I can read three or four of them

13   that I think are important.  I believe that they all -- many of

14   them provide very useful background information for the Court,

15   and some of them provide information, for example, as to the

16   amount of insurance premiums which were a deduction from the

17   net recovery and the amount of claims preparation fees.

18             THE COURT:  Go ahead, Mr. Podesta.

19             MR. PODESTA:  Do you want me to introduce these all or

20   should I read them?

21             THE COURT:  Start reading them.

22             MR. PODESTA:  All right.

23             MR. WILLIAMSON:  Your Honor, may I just offer a

24   comment so you know our position?

25             THE COURT:  What is your position?  You stipulated

D7gkwtc3                         "Levy"

1   this.

2           MR. WILLIAMSON:  Yes.  That they all come in, not just

3   selected ones.  That would be our position.  So, with the

4   understanding --

5           THE COURT:  Overruled.

6           MR. WILLIAMSON:  -- it would be this universe --

7           THE COURT:  Overruled.

8           First, tell me the number you're going to read.

9           MR. PODESTA:  Yes.  I will first read number 4.

10          "During the two-year period" -- are you with me, your

11   Honor?

12          THE COURT:  I am.

13          MR. PODESTA:  "During the two-year period immediately

14   preceding September 11, 2001, WTCP paid a total of $5,898,714

15   in insurance premiums for property insurance."

16          THE COURT:  Tell me, Mr. Podesta and Mr. Williamson,

17   how does that figure -- why is it relevant?  Why should I know

18   this?

19          MR. PODESTA:  May I?

20          THE COURT:  Yes, you go first.

21          MR. PODESTA:  Under CPLR 4545(c), the total insurance

22   recovery for WTCP of $4.091 billion would be reduced by the

23   amount of insurance premiums they paid in that two-year period

24   for purposes of calculating the statutory offset.

25          THE COURT:  But from your point of view, this would

1    really not have any significance because the amount is so much

2    larger than the loss?

3               MR. PODESTA:  It has no practical significance from

4    our point of view, but --

5               THE COURT:  But in terms of CPLR, it's a deduction?

6               MR. PODESTA:  Yes.  Your Honor has so ruled.

7               THE COURT:  OK.

8               MR. PODESTA:  Then the next item --

9               THE COURT:  I'll take 4.  I received 4, it's received.

10              MR. PODESTA:  The next item that I would like to read

11   is item 26, which relates to the appraisal decision -- I'm

12   sorry, I skipped item 6.  I'm very sorry, your Honor.  I'd like

13   to read item 6, which provides:  "The WTC insurance program

14   obligated the insurers to make payments in response to losses

15   caused by or resulting from physical loss or damage to covered

16   property.  Replacement cost coverage under the WTC insurance

17   program was not contingent on any provision in the net leases

18   requiring WTCP to rebuild the WTC buildings."

19              THE COURT:  All right.

20              MR. PODESTA:  Then the next one that I would like --

21              THE COURT:  That's received.

22              MR. PODESTA:  -- is, I believe I said number 26, which

23   relates to the appraisal proceedings that we have been

24   discussing.  It's on page 5 of the stipulations.

25              THE COURT:  I have it.

D7gkwtc3                        "Levy"

1          MR. PODESTA:  It reads:  "WTCP proceeded to an

2    appraisal with Allianz Global Risks U.S. Insurance Company,

3    Travelers Indemnity Company, Gulf Insurance Company, Industrial

4    Risk Insurers, and RIC," defined as the appraising insurers.

5    "The appraisal panel was charged with determining the

6    replacement cost of the WTC complex, the actual cash value of

7    the WTC complex, and the rental value loss as a result of the

8    destruction of the WTC complex under any policy or form

9    applicable to each of the appraising insurers.  As a result of

10   settlements, the appraising insurers all withdrew from the

11   appraisal before the appraisal panel reached a final

12   determination on any of these issues.  WTCP paid $31,030,471 in

13   fees and costs associated with the appraisal."

14          THE COURT:  And what's the relevance of this?

15          MR. PODESTA:  It shows, from our perspective, it shows

16   the heavy emphasis in the claims adjustment process on

17   replacement cost, actual cash value, and lost rental income,

18   and it also shows -- including the $31 million.  I believe from

19   WTCP's perspective, they would like to claim the $31 million as

20   a claims processing fee, which is a legal point that we

21   dispute.

22          THE COURT:  Have I ruled that the claims processing

23   fee is or is not to be included?

24          MR. PODESTA:  Your Honor has ruled that claims

25   processing fees are to be counted as a deduction against the

D7gkwtc3                          "Levy"

1    net -- total insurance recoveries for purposes of calculating

2    the 4545(c) offset, but your Honor has not ruled that the

3    $31 million in fees and expenses are or are not claims

4    processing fees for purposes of that calculation.

5              THE COURT:  They seem to be.  They seem to be directly

6    involved in the ascertainment of value and going to the final

7    numbers that were reached.

8              In terms of -- to save Mr. Williamson an objection, I

9    don't understand the fact that there was an appraisal as to

10   replacement value and not as to business interruption as

11   signifying anything except the timing of the settlement.  If

12   the settlement did not come, there would have been the same

13   kind of appraisal with regard to adjusting the business

14   interruption.

15             MR. WILLIAMSON:  I think that's correct, your Honor.

16             THE COURT:  So, there's no value in that.  But this

17   gives me some background which I think I don't need, but the

18   31 million will be an offset.

19             MR. WILLIAMSON:  Thank you, your Honor.

20             MR. PODESTA:  Then I have done a service to

21   Mr. Williamson perhaps.

22             Number 27:  This is another claims preparation fee

23   stipulation.  "After September 11, 2001, WTCP paid $10,352,540

24   in claims preparation fees, exclusive of amounts of fees and

25   costs expended in the appraisal involving certain of WTCP's

D7gkwtc3                          "Levy"

1    insurers, relating to the destruction of the WTC complex."

2            THE COURT:  How do we know we're not double counting?

3            MR. PODESTA:  Because the parties worked very

4    carefully to work out the stipulations in that regard.

5            THE COURT:  So, this would be another offset?

6            MR. PODESTA:  Yes.  That's what the language

7    "exclusive of amounts of fees and costs" --

8            THE COURT:  OK.

9            MR. PODESTA:  Then I would like to read in number 30,

10   which is a WTC 7 stipulation.

11           THE COURT:  Before you get to that, shouldn't there be

12   a stipulation with regard to business interruption?

13           MR. PODESTA:  Well, there is a stipulation -- these

14   stipulations provide information as to the amount of the claims

15   as to which -- for business interruption, actual class value

16   and replacement costs that were submitted to the insurers, but

17   your Honor has already heard testimony on that from Mr. Beach.

18   And the exhibits showing amounts have already been introduced

19   into evidence, so I did not offer them here, applying what I

20   perceived to be your duplication --

21           THE COURT:  OK.

22           MR. PODESTA:  I would next like to read in number 30,

23   which is a WTC 7 stipulation.

24           30:  "The insurance policy that 7 WTC Co. purchased

25   for WTC 7 obligated IRI to make payments in response to losses

1    caused by physical loss or damage to covered property arising

2    out of covered property damage.  IRI's obligation to pay was

3    not contingent on any provision in the WTC 7 lease requiring 7

4    WTC Co. to rebuild WTC 7."

5           THE COURT:  I accept that.

6           MR. PODESTA:  I would next like to read item 51, and

7    the principal purpose of reading this is to confirm that the

8    settlement was in the IRI's WTC 7 settlement covered personal

9    property losses, but 51 provides:  "On January 3, 2005, 7 WT

10   Co. and IRI entered into a settlement agreement and release" --

11   defined as the WTC 7/IRI settlement agreement -- "which

12   recognized that IRI had previously paid to 7 WTC Co. as an

13   advance $515,554,889 for property damage and rental income

14   losses.  As part of the settlement, IRI agreed to pay 7 WT Co.

15   an additional $303,445,111, which, in addition to all amounts

16   previously paid or advanced in respect of WTC 7, resulted in a

17   complete and final settlement of all claims against IRI,

18   including those for property damage and rental income losses

19   associated with this policy.  The settlement of all claims

20   associated with the IRI policy included settlement of 7 WTC

21   Co.'s claims for personal property losses.  The WTC 7/IRI

22   settlement agreement does not allocate the total payments of

23   $819 million."

24          THE COURT:  OK, I receive it.

25          MR. PODESTA:  The next item that I would like to read

D7gkwtc3                          "Levy"

1    is item 53, also as to WTC 7:  "After September 11, 2001, 7 WT

2    Co. paid a total of $1,587,410 in claims preparation fees

3    relating to the destruction of WTC 7."

4              THE COURT:  OK.

5              MR. PODESTA:  I would also like to read item 54, which

6    deals with this fine arts claim, which was not covered under

7    the IRI policy but under separate policy, and the stipulation

8    54 provides as follows:  "7 WT Co. owned two Frank Stella

9    acrylic paintings, defined as 'the paintings,' located at WTC

10   7.  7 WT Co.'s appraiser appraised the paintings' value as of

11   September 11, 2001, to be $1 million.  The paintings were

12   destroyed on September 11, 2001.  7 WT Co. received $700,000 in

13   insurance proceeds for the loss of the paintings under its fine

14   arts insurance policy with AXA Nordstern Art Insurance

15   Corporation.

16             "For the purposes of the correspondence trial only,

17   the parties agree that a jury could award 7 WT Co. up to

18   $1 million in damages for the loss of the paintings; and of

19   that amount, any award in excess of $700,000 would not be

20   subject to any offset or reduction."

21             If I could just look to my co-counsel for a moment and

22   ask him if there are any others that I should read.

23             (Pause)

24             MR. PODESTA:  With that, your Honor --

25             THE COURT:  Before you sit down, Mr. Podesta, how do

D7gkwtc3                          "Levy"

1   you want me to understand the last sentence of this, in terms

2   of what I have to do?

3             MR. PODESTA:  You are to understand that if your Honor

4   finds correspondence as to the claims relating to 7 WTC Co.,

5   there still survives a claim of approximately $300,000 for the

6   WTC 7 fine arts claims.

7             THE COURT:  What would be the significance of that?

8             MR. PODESTA:  The Court would -- let's presume, for

9   example, that your Honor were to find complete correspondence.

10  We would advocate to the Court that the claims as to flight 175

11  would be dismissed with prejudice because there would be

12  complete offset in the separate complaint.

13            As to flight 11, we would ask for the complete

14  dismissal with prejudice and the entry of a Rule 54(b) order as

15  to buildings 1 and 5.  And it might well be appropriate to

16  enter a Rule 54(b) order as to WTC 7 except as to the fine arts

17  claim and retain jurisdiction over the fine arts claim.

18            THE COURT:  It seems to me, if you succeeded, to the

19  degree you want -- I'm not sure on the 54(b), but if you

20  succeeded the way you want, you can give the $300,000 and wrap

21  it all up.

22            MR. PODESTA:  I would certainly think that if that

23  were all --

24            THE COURT:  You would certainly think very favorably

25  of that suggestion?

D7gkwtc3                          "Levy"

1          MR. PODESTA:  Yes, I would have to get client consent.

2     I'm not --

3          MR. BARRY:  I'm sure we'd be prepared to recommend

4     that, your Honor.

5          THE COURT:  Tell me what you mean by 54(b).

6          MR. PODESTA:  Well, I believe that if.

7          THE COURT:  Let's assume, from your point of view,

8     that I find complete correspondence.  Doesn't that wrap up all

9     the claims?

10         MR. PODESTA:  Let me explain.  There are two

11    complaints, your Honor.  There is a flight 175 complaint, which

12    relates to buildings 2 and 4.

13         THE COURT:  The southerly most tower?

14         MR. PODESTA:  Yes.  2 and 4.

15         THE COURT:  2 and 4?

16         MR. PODESTA:  Those claims would be completely

17    dismissed and a final judgment would enter if you --

18         THE COURT:  Which one was 4, the Marriott?

19         MR. PODESTA:  No, 3 was the Marriott, I think.  4 was

20    another a smaller tower.

21         THE COURT:  Where was it situated?  Do you remember?

22         MR. PODESTA:  I believe it was right next to 2, which

23    is why it's part of the flight 175 claim, such that when 2

24    fell, 4 was destroyed, I believe.

25         THE COURT:  1 was the westerly and northerly tower?

D7gkwtc3                          "Levy"

 1              MR. PODESTA:  Yes.

 2              THE COURT:  2 was the southerly tower?

 3              MR. PODESTA:  Yes.

 4              THE COURT:  My recollection is that what was adjacent

 5    to 2 was to the west and it formed the Marriott?

 6              MR. PODESTA:  Yes.  But the Marriott is not part of

 7    this case.

 8              THE COURT:  I understand, but there were buildings

 9    around the Marriott?

10              MR. PODESTA:  Yes.  WTCP's claim in its complaint is

11    that flight 175 destroyed WTC 2 and WTC 4.  So, if you find

12    correspondence -- and that's a separate complaint.  They're a

13    separate complaint for 175.  If you find correspondence as to

14    the complex, you find correspondence as to 2 and 4, and the

15    flight 175 judgment would be a final appealable 1291(a)

16    judgment.

17              THE COURT:  Right.

18              MR. PODESTA:  As to flight 11, three buildings are

19    involved -- 1, 5 and 7.  1 and 5 are among the buildings we

20    characterize as the complex.  If your Honor accepts our

21    position as to correspondence, the claims of 1 and 5 would be

22    potentially subject to dismissal with prejudice.  However,

23    dismissal of those claims, absent a Rule 54(b) order, finding

24    no just entry for delay of their dismissal, would not be

25    appealable.  And I think if the order or the judgment would go

D7gkwtc3                          "Levy"

1    up on appeal, I'm sure that all parties would want everything

2    that could to go up.

3               As to WTC 7 --

4               THE COURT:  It's the $300,000 item for the paintings?

5               MR. PODESTA:  Yes, which Mr. Barry has volunteered to

6    pay.

7               THE COURT:  OK, thank you.

8               MR. PODESTA:  Thank you.

9               THE COURT:  I understand.

10              MR. PODESTA:  And with that, your Honor, the aviation

11   defendants rest.

12              THE COURT:  OK.  Let's have lunch.  It's now ten

13   minutes to 1:00.  We'll come back at 2:15.  And Mr. Williamson

14   will start his case.

15              (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

D7GAWTC4ps

1                    A F T E R N O O N   S E S S I O N

2                              2:15 p.m.

3              THE COURT:  Mr. Williamson, you have a witness?

4              MR. WILLIAMSON:  Yes, your Honor.  We call Jeffrey

5    McKinley, please.

6              THE COURT:  Mr. McKinley, step up.

7              MR. PODESTA:  Your Honor, may I just introduce to the

8    Court Patrick Byrnes of Locke Lord, who will be handling the

9    objections and cross-examination of this.

10             THE COURT:  Thank you.

11             Pay attention to the oath, everyone.

12             Do you solemnly swear to tell the truth, the whole

13   truth, and nothing but the truth, so help you God?

14             THE WITNESS:  Yes, I do.

15             THE COURT:  Sit down, speak clearly and spell your

16   name for Paula.

17             THE WITNESS:  Jeffrey G. McKinley, M-c-k-i-n-l-e-y.

18             THE COURT:  How about the first name?

19             THE WITNESS:  Jeffrey, J-e-f-f-r-e-y.

20             THE COURT:  You may inquire.

21             MR. WILLIAMSON:  Thank you, your Honor.

22    JEFFREY G. McKINLEY,

23        called as a witness by the plaintiffs,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

D7GAWTC4ps                    McKinley - direct

1    BY MR. WILLIAMSON:

2    Q.   Good afternoon, Mr. McKinley.  What is your profession,

3    sir?

4    A.   I am an insurance consultant and expert.

5    Q.   Where do you work?

6    A.   I work for Risk Management Strategies.  It's a firm that I

7    founded in 2000.  It's located in California.

8    Q.   What is the nature of its business?

9    A.   It does insurance and risk management consulting, and also

10   provides litigation support as in expert witnesses services.

11   Q.   Have you been retained to give testimony in this lawsuit?

12   A.   Yes, I have.

13   Q.   What have you been retained to do, generally?

14   A.   Generally to provide review and analysis of the insurance

15   policies at issue in this case, and other issues.

16   Q.   Would you please describe for his Honor your educational

17   background.

18   A.   I graduated with honors from Cornell University with a

19   bachelor of arts in 1970, and I've taken insurance courses over

20   the years.

21   Q.   And briefly with respect to your employment history, what

22   line of work did you go into after you graduated from Cornell?

23   A.   Shortly after graduation I went to work for Chubb Insurance

24   Group as an underwriter for marine and international property

25   and liability insurance.

D7GAWTC4ps                    McKinley - direct

1   Q.  So after working as an underwriter, what did you do next in

2   your career in the insurance world?

3   A.  After about four years as an underwriter and manager of

4   that department, I became a retail insurance broker.

5   Q.  What was next after that?

6   A.  After retail insurance brokering, I was a wholesale

7   insurance broker with a firm that I founded with a partner that

8   specialized in risk purchasing groups for large real estate

9   owners.

10  Q.  And what was the name of that firm?

11  A.  DPW Insurance Services.

12          THE COURT:  What is risk purchasing?

13          THE WITNESS:  There was legislation during -- federal

14  legislation during the 1980s that allowed insureds who

15  previously could not combine, for the purposes of buying

16  insurance, they could start doing that.  They could buy

17  insurance, liability insurance primarily, for their risks on a

18  combined basis instead of doing it separately so they could get

19  increased buying power.

20          THE COURT:  Increased buying power means cheaper

21  paying in?

22          THE WITNESS:  Yes, it does, and broader coverage.

23          THE COURT:  And what was your area of specialization

24  in that business?

25          THE WITNESS:  So my partner and I identified property

D7GAWTC4ps                    McKinley - direct

1    owners who had a number of clients whose property they managed

2    typically, and we would then put together an insurance program

3    covering all of their managed properties.

4                THE COURT:  Thank you.

5    Q.  What were your responsibilities specifically at DPW?

6    A.  I was, along, again, along with my partner, we were the

7    brokers for that program.  We placed the insurance program for

8    these insureds, and then marketed that program to retail

9    insurance brokers.

10   Q.  And until how long did you and your partner have DPW?

11   A.  Until the year 2000, for about three years.

12   Q.  Then what happened?

13   A.  Then I formed my risk management consulting firm, called

14   Risk Management Strategies.  That was in 2000.  And I've been

15   doing that ever since.

16   Q.  What kind of business does that firm do and who are some of

17   your clients?

18   A.  It provides insurance and risk management consulting to a

19   wide variety of businesses, mainly medium and large-sized

20   institutions, companies.  I've also consulted to insurance

21   brokers, and the clientele have included the University of

22   California, a couple of different hospital organizations, real

23   estate owners, that kind of thing.

24   Q.  So how many years of experience do you have all told in the

25   insurance field?

1  A.  Just a little over 40 years.

2  Q.  In the course of those 40 years in the insurance field,

3  have you ever worked with insureds with respect to prosecuting

4  their insurance claims?

5  A.  Yes, often.

6  Q.  Have you ever worked with insurance companies in regard to

7  resolving, evaluating insurance claims that were made to the

8  company?

9  A.  All the work I've done with respect to insurance claims has

10  been by providing assistance to insureds.  I haven't ever

11  provided that same assistance to insurance companies.  But by

12  providing that assistance, yes, you're working with the

13  insurance company adjustors typically.

14  Q.  About how many times over the course of your career have

15  you provided such services?

16  A.  Hundreds of times.

17  Q.  Are you a member of any professional associations?

18  A.  Yes.  I'm a member of the CPCU Society.

19  Q.  Please tell his Honor what that stands for.

20  A.  CPCU stands for chartered property casualty underwriter.

21  Q.  What percentage of people, Mr. McKinley, in the property

22  casualty insurance underwriting field have achieved CPCU

23  status?

24  A.  It's a professional designation that less than 5 percent of

25  the total number of people working in the property casualty

1   industry have that designation.

2   Q.  Have you ever testified in a deposition or at a trial

3   before?

4   A.  Yes, I have.

5   Q.  On how many occasions?

6   A.  Excess of 50.

7   Q.  Has a court ever ruled that you were not qualified to give

8   expert testimony?

9   A.  No.

10  Q.  Have you ever given expert testimony with regard to the

11  insurance covering the World Trade Center Properties claims for

12  the main site claims that were filed?

13  A.  Technically they were the defendants, but, yes, it was for

14  the owners of the property.

15  Q.  You're right.  Plaintiffs in this case.  Thank you.  You're

16  right.  And when was that that you gave that testimony?

17  A.  Oh, gosh, ten years ago, whenever that trial took place.

18  Q.  And what was the nature of your assignment in that regard?

19  A.  Well, there were a number of them.  The principal one was

20  to provide opinions about whether there was one occurrence or

21  two occurrences, but there were also other issues that arose.

22  It was a fairly complex matter.

23  Q.  Do you remember the judge who presided over that trial?

24  A.  It was Judge Mukasey.

25  Q.  Did you review any documents in preparation for your

1    testimony in that case?

2    A.  Thousands.

3    Q.  Again, regarding World Trade Center Properties' insurance

4    coverage for the main site.

5    A.  Sure.  Thousands upon thousands of them, yes.

6    Q.  Was there a challenge to your qualifications as an expert

7    to testify in the trial before Judge Mukasey?

8    A.  Yes, there was.

9    Q.  What was the outcome?

10              THE COURT:  I don't think that's useful to me.

11              MR. WILLIAMSON:  All right.  Your Honor, I'd like to

12   have marked as plaintiffs' next exhibit in order --

13              THE COURT:  Are you offering Mr. McKinley --

14              MR. WILLIAMSON:  I was going to offer the CV first,

15   your Honor, and then offer him as an expert, yes.  I thought

16   that's what you wanted us to do.  So may we hand up the CV?

17              THE COURT:  Yes.

18              MR. WILLIAMSON:  Thank you.

19              THE COURT:  You're offering Mr. McKinley as an expert?

20              MR. WILLIAMSON:  Yes, in the field of insurance, your

21   Honor, pursuant to Rule 72, yes.

22              THE COURT:  Any objection?

23              MR. PODESTA:  No.

24              MR. BYRNES:  No objection, your Honor.

25              THE COURT:  He is qualified as an expert in the

1   insurance industry.

2           MR. WILLIAMSON:  I think Plaintiff's 702 would be the

3   correct number for the CV, I'm told.

4           MS. BAGLIN:  No, 563.

5           MR. WILLIAMSON:  563.  Sorry.  My fault.  563.  For

6   his CV.

7           Is that received, your Honor?

8           THE COURT:  Yes.  Admitted.

9           MR. WILLIAMSON:  OK.  I didn't hear.  I'm sorry.  I'm

10  checking.

11          (Plaintiff's Exhibit 563 received in evidence)

12  Q.  Mr. McKinley, would you describe, please, for his Honor the

13  nature of your assignment in this case.

14  A.  The nature of my assignment included reviewing the

15  insurance programs, specifically with respect to the coverages

16  that the policies provided, to review the claims adjusting

17  process, and to compare the coverages in this case and the

18  claims procedure to custom and practice in the industry.  And

19  then I was also asked to look at whether or not there was an

20  allocation made in the settlement of the case and to provide a

21  calculation about that.  And there were a couple other issues

22  as well.

23  Q.  What documents or materials did you review in connection

24  with carrying out this evaluation that you just described?

25  A.  They were numerous, probably over --

1   Q.  Could you give the Judge some examples of the key ones.

2   A.  Sure.  Sure.  The policies, the binders, the slips, the

3   insurance specifications that were prepared, the correspondence

4   between underwriters and insurers.  I also reviewed the proofs

5   of loss and some claims correspondence.  I reviewed the

6   complaints and many of the motions made to the Court.  I also

7   reviewed the settlement agreements.

8   Q.  Why did you review -- you mentioned binders.  Why did you

9   review insurance binders?

10  A.  I reviewed the binders as respects the main site because at

11  the time of the disaster, only I think two insurance policies

12  had been issued.  All the other policies, all the other

13  coverage was provided by binders, or slips.  These are

14  temporary insurance contracts until the policies are actually

15  issued.

16  Q.  Do the binders show or do they not show any amounts of

17  coverage for different categories of covered losses?

18  A.  Some provided that detail.  The binders would typically

19  include the limits being provided by each insurance company.

20  They would also reference policy forms, and sometimes there

21  were references to the sublimits in those forms.  But basically

22  it was the limit being provided by each insurance company.

23  Q.  I think you also mentioned -- not I think -- I know you

24  also mentioned a moment ago that you reviewed slips, insurance

25  slips.  Please tell Judge Hellerstein what are insurance slips.

A.  They are essentially a different name for a binder.  It's a

common term used in English insurance.

Q.  So is it fair to say, were you reviewing them for the same

reason?

A.  That's right.  They're the temporary insurance contracts

provided by syndicates at Lloyds and some of the Bermuda

companies that were insuring the World Trade Center Properties,

were provided by slips.  Mostly, American insurance companies

evidence of insurance was provided by binders.

Q.  You mentioned that you reviewed policy forms.  How many

policy forms did you review?

A.  So in the main site there were a number of different policy

forms.  The WilProp form was adopted by many of the

underwriters.  But others adopted their own forms or standard

forms.  So I reviewed all those.  And I also reviewed the IRI

policy that applied in the World Trade Center 7 claim.

Q.  You didn't omit any.  You reviewed them all?

A.  I reviewed them all, yes.

Q.  And with the two policies, I think you mentioned, that were

actually issued, did you review both of those?

A.  I did.  Those were All Hands policies.  I reviewed those.

Q.  You touched on settlement agreements in your answer also.

Did you review some or all of the settlement agreements that

were reached both as to the main site and 7 World Trade Center?

A.  I reviewed all of them.

D7GAWTC4ps                     McKinley - direct

Q.  Would you tell the Court, please, what are some of the key

features of the 7 World Trade Center insurance policy with IRI?

A.  7 World Trade Center was insured by IRI on a property

insurance policy that contained two broad categories of

coverage, property damage and time element coverage, or

business interruption.  There were subcategories for each of

those broad categories.  The property damage coverage was

provided on a replacement cost basis.  And the time element

coverage was provided on an actual loss sustained basis.  The

coverage was on an all-risk basis, which means they covered all

risks except those that are excluded.  The limit was provided

on a blanket basis, and blanket as opposed to schedule.  The

blanket covered -- the blanket of limit included all coverages

that were provided by the policy.  And there were, as I

mentioned, subcategories.  So the property damage section had

coverage for the building, for personal property, for tenants

improvement, some other coverages.  The time element section of

the policy included coverage for rents, for extra expense, and

some other items.

Q.  How about for the main site?  What were the key features of

the insurance program in place for that?

A.  The main site had, as we've discussed, a number of

different policy forms that applied, the WilProp form and then

others as well.  But each of them had all the same

characteristics I've just described.  The difference, key

D7GAWTC4ps                    McKinley - direct

1    difference, I suppose being that for World Trade Center 7 there

2    was only one insurance company, one blanket limit provided by

3    that one insurance company.  It was a little more complicated

4    with the main site because it had what was called a layered

5    loss limit program.

6            THE COURT:  A what?

7            THE WITNESS:  A layered loss limit program.

8    A.  So there was a tower of insurance built up by different

9    layers.  I don't remember the exact numbers, but, for instance,

10   the first layer would have been 25 --

11           THE COURT:  I'm familiar with it.  I wrote an opinion

12   on it.

13           THE WITNESS:  OK, so there we are.

14   A.  But that's really the only difference.  Otherwise the same

15   categories, etc., that I described are all the same.  It's just

16   the structure of the limits was a little different.

17   Q.  Now, there's been discussion about many separate categories

18   of loss covered by insurance under the different policies.

19   With regard to that, let me ask you, are insurance premiums

20   calculated in any way based on the coverages that the insured

21   selects?

22   A.  Yes, they are.

23   Q.  How does that work?

24   A.  When an underwriter determines the premium that they

25   provide or quote for a risk, they look at all of the coverages

1    that they will be providing.  So if they are providing property

2    damage coverage, there's a premium applicable to that.  If

3    they're providing time element business interruption, or in

4    this case rental coverage, there's a premium for that.  If

5    they're providing extended period of indemnity, there's extra

6    premium for that.  If they're providing extra expense premium,

7    there's a premium for that.  All those premiums that are being

8    provided by the policies get added together.  And that's the

9    insurance premium.  That's the insurance policy's total

10   premium.

11   Q.  Thank you.  What is extra expense coverage under the IRI

12   insurance policy?  Would you please explain to the Court what

13   that covers.  What does it mean?

14   A.  Extra expense can be provided on a policy for a variety of

15   reasons, but in this particular policy, it would have been

16   provided to compensate the insured for the extra cost of

17   retenanting the property.

18            THE COURT:  What's that category called?

19            THE WITNESS:  Extra expense.

20            MR. WILLIAMSON:  Would you pull up, please, I think

21   it's Joint Exhibit 206.  Would you go to the next page, please.

22   Q.  Now, this was previously shown, his Honor asked about the

23   line item for the mitigating expenses, approximately rounding

24   off 86 million.  Do those bear any relationship to the extra

25   expense coverage?

D7GAWTC4ps                    McKinley - direct

1   A.  My understanding of what these mitigating expenses were is

2   that they were --

3            THE COURT:  Do you know?

4            THE WITNESS:  Do I know other than my understanding?

5            THE COURT:  How do you get the understanding?

6            THE WITNESS:  Reviewing -- this is a report provided

7   by Cambridge, and there was backup documentation.

8            THE COURT:  OK.

9            THE WITNESS:  And this was retenanting expenses.  So I

10  would have considered them extra expenses, as a part of the

11  extra expense category, rather than being separately

12  identified.  But that's just insurance terminology, as opposed

13  to the appraisal that Cambridge was putting together.

14           THE COURT:  So mitigating expenses is an insurance

15  category?

16           THE WITNESS:  Yes, it is.

17           THE COURT:  Is it only retenanting expense, or is it

18  something else too?

19           THE WITNESS:  It can be used for other reasons.  These

20  policies are provided to all kinds of different businesses.  So

21  if you're a manufacturer and you have a business interruption

22  loss, you can use extra expense to help you get back in

23  business sooner.

24  Q.  So in considering the extra expense, in this case the

25  mitigating expenses of $86 million, is that an amount that gets

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7GAWTC4ps                    McKinley - direct

1   added or subtracted from the insured's claim, that is, its

2   mitigating expenses, its extra expenses?

3   A.  If extra expense is covered, and they were in this

4   instance, then it's added to the claim.

5         THE COURT:  It's really an offset, isn't it, from

6   business interruption?  It's based on the amount of time it

7   takes to retenant the building.  If it's really an expense to

8   get tenants, like getting an income stream from the tenants.

9         THE WITNESS:  That's right.

10        THE COURT:  Just the way submitting the claim is

11  considered an offset from the insurance recovery.  It costs you

12  50 cents to submit a claim and you get a dollar back.  You're

13  really only getting a net of 50 cents.

14        THE WITNESS:  And perhaps the difference here with

15  these extra expenses is that from an insurance standpoint,

16  rental income doesn't pay you to retenant the property.  It

17  just pays you for your lost rent.

18        THE COURT:  If you have business interruption.

19        THE WITNESS:  If you have business interruption or

20  rental value, all you're getting is the lost rent.  You're not

21  getting the cost of retenanting.  That's provided by extra

22  expense.  So that's why --

23        THE COURT:  If your time element is that amount of

24  time that you require to get business interruption of lost

25  income, an expense of shortening that period, of getting the

1   tenants in, can be thought of as a deduction from the income

2   you're getting.  Or it can be thought of as an extra category

3   of expense?  Maybe it doesn't make any difference.

4            THE WITNESS:  So if you're, you're -- there is little

5   extra expense until the business is completed.  Upon the

6   completion of a property, then there is some expenditure of

7   extra expense to get the property retenanted.

8            THE COURT:  OK.

9   Q.  And is that insurance coverage that IRI included in the

10  policy that 7 World Trade Company purchased or not?

11  A.  Yes, it is.

12  Q.  Could 7 World Trade Company have purchased the policy and

13  paid lower premiums and not had coverage for extra expense?

14  A.  Yes.

15  Q.  Would you please briefly summarize for his Honor what

16  conclusions you reached as a result of the analysis that you

17  explained earlier you were asked to conduct for the many issues

18  that you touched upon.

19           THE COURT:  Before you take this off -- looking at

20  what exhibit number?

21           MS. BAGLIN:  206, your Honor.

22           MR. WILLIAMSON:  Joint Exhibit 206.

23           THE COURT:  Exhibit 206, what is this exhibit?

24           Mr. McKinley?

25           THE WITNESS:  Oh, you're asking me.

1           THE COURT:  Are you familiar with this exhibit?

2           THE WITNESS:  Yes.  It's from the Cambridge report

3    that was put together as part of their preliminary proof of

4    loss.

5           THE COURT:  So what is rental value, period of

6    indemnity?

7           THE WITNESS:  The rental value, period of indemnity,

8    is the period of time from the date of loss it takes to rebuild

9    the property using due diligence.  So that's the rents that

10   were lost during that period of time.

11          THE COURT:  OK.  And rental value, extended period of

12   indemnity, one year, what does that mean?

13          THE WITNESS:  For an additional premium, the insured

14   purchase an extra year of coverage for rental value.  That year

15   started when the repair was completed.  So during -- for an

16   extra year, an extra 365 days, they got additional lost rental

17   coverage to the extent they needed it, because there would have

18   been a gradual buildup of tenants.  They all don't show up on

19   day one.

20          THE COURT:  And did you say that mitigating expenses

21   and extra expenses are the same thing, in that mitigating

22   expenses are subsumed in extra expenses?

23          THE WITNESS:  Yes.  There could have been other extra

24   expenses, I presume.  I don't know if there were or not.

25          THE COURT:  Do you know of any?

1              THE WITNESS:  I don't know of any.

2              THE COURT:  And what is off-the-premises power

3     including transmission facilities?

4              THE WITNESS:  That's another time element coverage

5     that is provided by the policy.

6              THE COURT:  What does it pertain to?

7              THE WITNESS:  If there's an interruption of power or

8     other services to the building and you cannot rent the property

9     because of that, the insurance will pay you for the lost rents.

10             THE COURT:  Do you know of any in this case?

11             THE WITNESS:  No.

12             THE COURT:  So all the known expenses are included in

13    A, B, and C.

14             THE WITNESS:  Known to me, yes.

15             THE COURT:  Thank you.

16             MR. WILLIAMSON:  Your Honor, plaintiffs offer Joint

17    Exhibit 206 in evidence.

18             THE COURT:  Is it in evidence?

19             MR. WILLIAMSON:  I don't think so.  That's what I was

20    asking and checking.

21             THE COURT:  It's received.

22             MR. WILLIAMSON:  Thank you.

23             THE COURT:  No objection, right?

24             MR. BYRNES:  No, no objection, your Honor.

25             (Joint Exhibit 206 received in evidence)

D7GAWTC4ps                    McKinley - direct

1   Q.  I think I was beginning to ask you about, if you could

2   please give the Court a brief summary of the conclusions you

3   reached on the various assignments that you had, give us an

4   overview first and then we'll go through them.

5           THE COURT:  Ask a question.

6   Q.  Would you please provide the Court with a summary of the

7   conclusions you reached as a result of your analysis.

8   A.  Yes.  There were three.  The first is that the policies at

9   issue in this case contained multiple areas of coverage,

10  categories of coverage.  The second is that the claim

11  adjustment process was interrupted before it was finished.  And

12  the third is that there was no agreed-upon allocation in the

13  settlement of this claim.

14  Q.  And which plaintiffs do the opinions you just expressed

15  your conclusions on relate to?

16  A.  Um, the --

17  Q.  Let me try to rephrase that question.  Does the testimony

18  you just gave relate to 7 World Trade Company, WTCP plaintiffs,

19  either of them or both of them?

20  A.  Both of them.

21  Q.  That covered the slot.

22  A.  Yes.

23  Q.  As to the first conclusion you just summarized with regard

24  to separate coverages under the policy, dealing first with 7

25  World Trade Company, could you expand upon that, please, and

1    explain to the Judge what you found, with regard first just to

2    IRI policy, what it covered, what it didn't cover.

3    A.   Consistent with other property insurance policies, IRI

4    provided property damage and time element, and the property

5    damage included buildings, tenant improvements, personal

6    property, machinery and equipment, and then the time element

7    coverage was provided for rental income and extra expense.

8    Q.   And how about --

9              THE COURT:  Paula, would you read that back to me,

10   please.

11             (Record read)

12             THE COURT:  Thank you.

13   Q.   What about the main site, the WTCP plaintiffs insurance

14   program?

15   A.   The same answer would apply.

16   Q.   Now, with regard to the property damage insurance coverage

17   under the IRI policy, how many different types of economic

18   losses did it cover?

19   A.   It covered damage to the building.  It covered damage to

20   the tenants improvements, the personal property, machinery and

21   equipment.  Those are all economic losses that could be added

22   up to be one property damage loss.

23   Q.   And how about, the same question with respect to the main

24   site.

25   A.   Same answer.

1    Q.   Under the IRI policy, could you please explain to the Court

2    what the difference is between coverage and limits, policy

3    limits and coverage.

4    A.   So under the IRI policy, coverage is provided for property

5    damage and business interruption, and the subcategories that

6    I've described.  So the policy insurance if the property is

7    damaged or if the business is interrupted because of that

8    damage.  That's different than the limits.  As I mentioned,

9    there's a blanket limit provided on this particular policy that

10   provided dollar amount of insurance over both the property

11   damage and time element coverages.

12   Q.   What if we had a single catastrophic event, say like the

13   destruction of the building that was subject to the leasehold?

14   What applicable insurance coverages would that trigger, in the

15   case first of 7 World Trade Company?

16   A.   If they had a policy like IRI's and there was a single

17   disaster causing damage to the building, then that triggers the

18   coverage for the categories of loss that we've been discussing,

19   the buildings, the tenant improvements, the equipment, the

20   personal property, and it could also, and commonly would if

21   it's a major disaster, trigger the business interruption

22   coverage, which would be the rental value and potentially extra

23   expense.

24   Q.   How about the same question as to the main site?

25   A.   It would be the same answer.

D7GAWTC4ps                    McKinley - direct

1   Q.  Now, as an insurance expert and broker for over 20 years --
2   withdrawn.
3        As an insurance expert with over 40 years' experience,
4   over 20 of which were as a broker, when you were working with a
5   client which had a lease for a building, what would you review,
6   in terms of helping that client place its insurance coverage?
7   A.  We commonly would review all aspects of their business, and
8   one of the documents you would review would be the lease of any
9   leased premises.
10  Q.  Why?  Why would you want to review the lease?
11  A.  There are two main reasons.  Many leases, virtually all
12  that I've reviewed, have an insurance provision to provide a
13  description of the insurance that the tenant is going to
14  provide, or sometimes it describes the insurance that the
15  landlord is going to provide, and insurance back to the tenant.
16  There's a variety of different answers to the description of
17  coverage that's called for.  But as the insurance broker you
18  want to be sure that you're providing the coverage that's
19  called out for in the lease.
20       The other thing you look at is whether or not there is
21  a requirement for the tenant to rebuild the property in the
22  event of damage, or sometimes there is a description of
23  circumstances where the lease can be canceled in the event of
24  damage.  But you're mainly looking for what the -- you're
25  looking for what the obligations are of the insured under the

D7GAWTC4ps                        McKinley - direct

1   lease contract, as it relates to insurance.

2   Q.  Why are you looking into whether the insured, in this case

3   the leaseholder, has any obligation to rebuild in the event of

4   total destruction?

5            MR. BYRNES:  Objection, your Honor.

6            THE COURT:  Overruled.

7   A.  You look at that because that affects what insurance you

8   put in place.  If you have a lease that requires the insured to

9   insure the building and they're required to rebuild the

10  property in the event of destruction, then you as the broker

11  need to be sure that the policies that you seek to obtain for

12  that client provide the necessary coverage.

13  Q.  What does the concept of insurable interest in the field of

14  insurance mean?

15  A.  Insurable interest is a very key ingredient to property

16  insurance.  In order to recover under an insurance policy, the

17  insured has to have an insurable interest in what is being

18  insured.  So an owner, for instance, has obviously an economic

19  and insurable interest in a piece of property, but also a

20  tenant can, if they are using that building to facilitate

21  income for their business.

22           THE COURT:  An onlooker who loves the way this

23  building looks does not have an insurable interest.

24           THE WITNESS:  That's right.  I can buy an insurance

25  policy insuring Chrysler Building, but I'm never going to

D7GAWTC4ps                        McKinley - direct

1    recover anything because I have no insurable interest.

2    Q.  So in the case of World Trade Center Properties, would the

3    insurers have paid for placement-cost insurance payments if

4    World Trade Center Properties did not have an obligation to

5    rebuild under their leases?

6              MR. BYRNES:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.  Based on your years of experience --

9              THE COURT:  Now "experience."  You're changing the

10   terms.  Insurance is paid where there's an insurance agreement

11   requiring payment.  An insurance agreement arises possibly from

12   a covenant in the contract, but not necessarily.  You're mixing

13   up the covenants and the insuring agreement.

14             MR. WILLIAMSON:  Let me try to cure that.

15   Q.  Is it the custom and practice in the insurance industry for

16   insurers to make replacement cost payments if the insured

17   doesn't have any insurable interest?

18   A.  No.

19             THE COURT:  The law doesn't allow it.  Right?

20             THE WITNESS:  My understanding is the law doesn't

21   allow it, and that's one of the first steps an insurance

22   investigator investigates, is, does he have an insurable

23   interest.  And if he checks the box yes, he proceeds with the

24   adjustment.  If he can't find an insurable interest, he says no

25   coverage and walks away.

1    Q.  So if you want to find the answer, as an insurance broker,

2    to this question, where do you look?  Do you look at the lease,

3    or do you look at the insurance policy, to see --

4              THE COURT:  Objection sustained.

5              MR. WILLIAMSON:  Thank you, your Honor.

6    Q.  You told his Honor that you had a second conclusion which

7    you summarized as part of your assignment.  Could you please

8    address that and tell the Judge exactly what you found and

9    determined.

10   A.  Yes.  The second finding was that the insurance adjustment

11   process was never finished.  It was begun for both WTC 7 and

12   for the main site properties.  But because there was litigation

13   in both situations --

14             THE COURT:  Whatever the reason, it didn't go to

15   conclusion.

16             THE WITNESS:  What are the reasons?

17             THE COURT:  Whatever the reason.  It didn't go to

18   conclusion.

19             THE WITNESS:  That's correct.

20             THE COURT:  The third area is no allocation to amend

21   it, among areas of coverage.

22             MR. WILLIAMSON:  That is correct, your Honor.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Are we finished?

25             MR. WILLIAMSON:  No.  That is the third area.  I'll

D7GAWTC4ps                       McKinley - direct

1    move to the next subject.

2    Q.  What is your expert opinion, Mr. McKinley, as to whether

3    payments by an insurer pursuant to a settlement agreement only

4    intend to satisfy the insurer's obligations under the insurance

5    policy and nothing else?

6              THE COURT:  Can I hear that again, Paula.

7              (Record read)

8              MR. BYRNES:  Objection, your Honor.

9              THE COURT:  Objection sustained.

10   Q.  You've heard a lot of discussion about replacement costs.

11   Is there an insurance definition of the term "replacement

12   costs"?

13   A.  Yes, there is.

14   Q.  What is that?

15   A.  The common definition, which is different than an

16   economist's definition that I heard this morning, the insurance

17   definition is, it's new for old without deduction for

18   depreciation.

19             THE COURT:  New for old without deduction for

20   depreciation?

21             THE WITNESS:  Correct.

22   Q.  And you heard questions about depreciation.  His Honor

23   asked whether it runs from the date the building is built, or

24   does it run from the date the leasehold is entered into.

25   What's the answer?

D7GAWTC4ps                    McKinley - direct

A.  A depreciation is taken for the life, over the life of the

building.  It's, see, we take it from the date of construction.

But it's not an arithmetic calculation like accounting where

you would take, say a building has a hundred years of useful

life, it's been in existence for 40 years so it has 40 percent

depreciation.  It doesn't work like that.  You actually have to

measure the physical depreciation.  And my example would be if

you had two 40-year-old buildings, one that's been maintained

impeccably and the other has been really ignored by the owner.

They didn't take care of it.  The roof leaks.  The windows are

broken.  Today those two buildings are no longer alike.  They

may have been identical at the start of the 40 years, but today

they're different and they have a different value.  And the

purpose of determining the actual cash value for insurance

purposes would take into account the physical condition of

those two buildings and how that affects their value.

        MR. WILLIAMSON:  Mr. McCleod, can you put up Joint

Exhibit 5.  Thank you.

Q.  So you could see this comes from one of the Cambridge

Horizon submissions of, in this case, the first settlement for

supporting loss no. 2.

        THE COURT:  I can't hear you.  Don't mumble.

        MR. WILLIAMSON:  I apologize.

Q.  This is Cambridge Horizon's claim submission.  It's the

summary.  The page I'm going to call attention to is "Summary

```
 1    of First Settlement."  Can you please go to that page.

 2    "Summary of First Settlement to Preliminary Proof of Partial

 3    Losses No. 2."  Thank you.

 4            So I call your attention, Mr. McKinley, to JX-5 and

 5    page 1 of 4.  And you see there are columns on the right

 6    labeled "Replacement Cost" and "Actual Cash Value"?

 7    A.  Yes.

 8    Q.  You can see the differences building by building, right?

 9    A.  Yes.

10    Q.  And then you see the difference in the amounts.

11    A.  Yes.

12    Q.  So please explain why the difference between the ACV amount

13    and the replacement cost amount is not greater.

14    A.  The difference isn't any bigger than it is?  Is that your

15    question?

16    Q.  Yes.  Why isn't --

17            THE COURT:  Is this something you developed?

18            THE WITNESS:  I understand it completely.  I didn't

19    prepare this exhibit.  This is from Cambridge.

20            THE COURT:  Did you make the review of physical

21    depreciation in each building?

22            THE WITNESS:  No.  I merely looked at their report.

23            MR. WILLIAMSON:  Cambridge Horizon, that's what I was

24    trying to indicate earlier, and I'm asking him, because there

25    was questioning about it.  Your Honor wondered why the
```

1    discrepancy.

2              THE COURT:  Please just go ahead.

3              MR. WILLIAMSON:  Yes.

4              THE COURT:  Ask a question.

5              MR. WILLIAMSON:  Yes, your Honor.

6    Q.  Please explain why the difference between the actual cash

7    value and the replacement cost is not greater.

8              THE COURT:  How does he know?

9              MR. WILLIAMSON:  Because he's in the industry.  And if

10   he's allowed to answer he'll be able to --

11             THE COURT:  He didn't know what the condition of the

12   building was.  He wasn't able to review.  He took someone

13   else's statement about actual replacement value and cash value.

14             MR. WILLIAMSON:  If he is permitted to explain, I

15   think he'll explain how he knows and does know, because he

16   knows how these are prepared and how they were calculated.

17   That's the point of the questioning.

18             MR. BYRNES:  Objection, your Honor.

19             THE COURT:  Sustained.

20   Q.  Is it true, Mr. McKinley, that the custom and practice in

21   the insurance industry is that insurers only pay claims that

22   are quantified and documented?

23   A.  Subject to some exceptions, yes, that's correct.

24   Q.  Please tell the Court what are the exceptions.

25   A.  Two common exceptions would be when there's been litigation

D7GAWTC4ps                    McKinley - direct

1     and there is a settlement agreement.  Then there are times that

2     all of the claims will not have been documented, although a

3     settlement is reached and it becomes the governing document.

4     The other circumstance is when there is a loss that exceeds the

5     policy limits and the parties, the insurance carriers and the

6     insured, agree that it has exceeded the limits, then there

7     often will not be full documentation of all the parts of the

8     claim.

9                MR. WILLIAMSON:  Your Honor, going back to the exhibit

10    I just showed Mr. McKinley, JX-5, on page 1 of 4 from the

11    Cambridge Horizon report, because there was questioning about

12    it before during this trial and now by me today, and it's a

13    Joint Exhibit, I would like to offer it in evidence so the

14    record will be complete on that.

15               THE COURT:  Just the summary part, right?

16               MR. WILLIAMSON:  At this time.  There are other pages.

17    But I'm only offering the coverage page -- the two pages I

18    showed, if that's all right.  I could hand those up.

19               THE COURT:  What I'd like you to do is all the pages

20    that were involved in the testimony so far.  I thought they

21    were already in evidence.

22               MR. WILLIAMSON:  I don't think so, according to our

23    records.  And then there were other pages, which I'm going to

24    come to now, which were shown.  So I could try to assemble it

25    all and then offer it.

1   Q.  Did either 7 World Trade Company or World Trade Center

2   Properties include claims of tenants improvements in their

3   proofs for loss that were interim or temporary?

4   A.  Yes, they did.

5          THE COURT:  Can you explain that.  Don't tenants

6   typically get their own insurance?

7          THE WITNESS:  They typically do.  But it's also

8   something that a building owner can and often does insure.

9   It's not unusual for a landlord to pay for some or all of the

10  tenants improvements when a tenant moves into the property.

11         THE COURT:  It depends on the lease.

12         THE WITNESS:  Exactly.  So it depends on the lease.

13  But potentially they have an insurable interest in the tenants

14  improvements.

15         THE COURT:  Typically don't they negotiate who pays

16  for the insurance of the tenants improvements?

17         THE WITNESS:  That's usually spelled out in the lease.

18         THE COURT:  And in the case of the World Trade Center

19  Properties, whose obligation was it, the tenant's or the

20  landlord's?

21         THE WITNESS:  Well, it was the tenant, being World

22  Trade Center Properties.  But the landlord was the New York,

23  New Jersey Port Authority.

24         THE COURT:  I'm talking about the resiting of the

25  subtenants.

1           THE WITNESS:  I didn't look at any of those leases.

2           THE COURT:  So you don't know.

3           THE WITNESS:  I don't know.

4           THE COURT:  You don't know if there was an insurable

5   interest or not on the part of the World Trade Center

6   Properties.

7           THE WITNESS:  That's correct.

8           THE COURT:  If the tenants had the obligation to

9   insure themselves, there wouldn't be an insurable interest,

10  right, on the part of the WTCP?

11          THE WITNESS:  Well, it's possible that -- one of the

12  possibilities is that the tenant was required to buy the in-

13  surance and insure the landlord as well as their own interest.

14          THE COURT:  Or vice versa.

15          THE WITNESS:  Absolutely.

16          THE COURT:  It could be anything depending on the

17  negotiation between the particular subtenant and the WTCP

18  plaintiffs.

19          THE WITNESS:  Correct.

20          MR. WILLIAMSON:  Mr. McCleod, let me ask you to pull

21  up JX Joint Exhibit 5, pages 12 to 15, please.

22  Q.  Mr. McKinley, will you take a look at this summary of --

23  this is just with regard to World Trade Center no. 1.  There

24  was discussion before about what were the findings with regard

25  to the core and shell that were made by the appraiser.

1          THE COURT:  Why do we need to know?

2          MR. WILLIAMSON:  I'm sorry?

3          THE COURT:  Why do we need to know?

4          MR. WILLIAMSON:  Because, as your Honor brought out in

5    questioning yesterday, it omitted tenant improvements because

6    they hadn't been reached by the appraisers.  This was just a

7    partial set.  So tenant improvements were missing.  And that's

8    what I'm going to try to fill in the blanks with.

9          THE COURT:  They're missing in all of these, right?

10         MR. WILLIAMSON:  No, but we're going to fill them in

11   now.

12   Q.  Was there a point in -- if I may, is there a point in time

13   where the tenant improvement allocations for the retail space

14   were quantified?

15         THE COURT:  He doesn't know who had the obligation.

16   He's never read the sublease.

17   Q.  Isn't it true, Mr. McKinley -- withdrawn.

18         Can you tell from the claim that was submitted how

19   much was submitted by the insured pursuant to its insurance

20   coverage for tenant improvements and work and other features?

21         MR. WILLIAMSON:  Can you highlight that.  Thank you.

22   Q.  How much was submitted on a replacement cost basis and how

23   much on an actual cash value basis?

24         MR. PODESTA:  Objection, leading.

25         THE COURT:  Did you read the documents?

1          THE WITNESS:  Yes.

2          THE COURT:  That's your only basis for knowledge?

3          THE WITNESS:  I've reviewed this document as part of

4     the materials I reviewed.  I knew it.  I just don't have these

5     numbers memorized without the aid of this exhibit.

6          THE COURT:  But did you do any independent work

7     outside of reading this exhibit in relationship to knowing who

8     had the obligation to insure, what the insurance was, how much

9     the claim was, and so on?

10         THE WITNESS:  No.

11    Q.  Irrespective, Mr. McKinley, of who had the obligation to

12    insure, in your review of the insurance coverage for the World

13    Trade Center Property program, did you determine whether there

14    was or was not coverage for tenant improvements?

15    A.  Yes.  I determined that there was.

16    Q.  And how about if I asked you the same question with regard

17    to 7 World Trade Company.

18    A.  Yes.

19    Q.  Was there also or not?

20    A.  Yes.  World Trade Center 7 was also, their insurance

21    policies also covered tenant improvements.

22    Q.  So given that there was that coverage, in your review of

23    the documents, in preparation for your testimony, did you

24    ascertain how much was the amount of the claim that had been

25    made for tenant improvements for the main site under the

1    coverage that you just said existed?

2              THE COURT:  The witness has no independent knowledge.

3    You don't need the witness for this.  If you want to go and

4    represent how much was claimed for each company and for the

5    total, you may.  But we don't need the witness.

6              MR. WILLIAMSON:  Your Honor, I'd like to offer -- this

7    will be included in the offer for the other pages from --

8              THE COURT:  Offer the whole book.  That way you'll be

9    covered.

10             MR. WILLIAMSON:  Yes.  Thank you.

11             THE COURT:  Proceed.  Exhibit what?

12             MR. WILLIAMSON:  Joint Exhibit 5, different pages from

13   the same Joint Exhibit, but we'll work with the defendants to

14   have us both using the same sets of Joint Exhibit 5.

15             THE COURT:  The whole book, the summary and all the

16   backup.

17             MR. BYRNES:  No objection, your Honor.

18             THE COURT:  OK.  And that's Joint Exhibit 5?

19             MR. WILLIAMSON:  Yes, Joint Exhibit 5, your Honor.

20   Q.  To close this line of inquiry, if you could pull up,

21   please, Mr. McCleod, Joint Exhibit 210.  So pursuing the same

22   questions with regard to 7 World Trade Company, we just

23   established earlier --

24             THE COURT:  Before you leave the amount, how much of

25   the total of tenants improvements?

1             MR. WILLIAMSON:  Can you go back, Mr. McCleod.

2             The replacement cost number, your Honor, is $772

3    million -- I can't read these now.  Let me start again.

4    772,380 -- I'm just having trouble reading the number.  It's 6.

5    Thank you, got it.  That's much better.  Thanks.

6             THE COURT:  Number have the number at the bench.  Why

7    don't you give me the number.  They have the number at the

8    bench.  Why don't you give me that.

9             MR. PODESTA:  I could read it.

10            MR. WILLIAMSON:  I can see it now that it's clearer,

11   the digits.  It's $773,362,403.

12            THE COURT:  Mr. Podesta, do me a favor.

13            MR. PODESTA:  $773,362,403.

14            MR. WILLIAMSON:  Right.  That, if you're using

15   replacement costs and the actual cash value number, if your

16   Honor wants it, is the $678,362,225.

17            THE WITNESS:  For World Trade Center 1.

18            MR. WILLIAMSON:  Yes, for World Trade Center 1.  Yes,

19   it's just that one.  You're correct.

20            THE COURT:  Would you like to give me an aggregate

21   number for all?

22            MR. WILLIAMSON:  Yes.  Yes, we'll do that, your Honor.

23            THE COURT:  Why don't you do it tomorrow morning.

24            MR. WILLIAMSON:  Yes.  We'll have it tomorrow morning.

25            THE COURT:  Put it on a slip of paper.

D7GAWTC4ps                    McKinley - direct

1         MR. WILLIAMSON:  Yes, your Honor.

2         THE COURT:  The number for replacement value and

3    actual cash value, the date the claim was made, and by whom.

4         MR. WILLIAMSON:  Yes.

5         OK, we're going to go, Mr. McCleod, to Joint Exhibit

6    210, please.

7    Q.  So here, I asked you before whether the IRI policy provided

8    any coverage for tenant improvements.  You told the Court yes.

9    And what is the amount of the tenant improvement claims that 7

10   World Trade Company presented to IRI for the tenant improvement

11   cost?

12   A.  On the replacement cost basis, the number is $540,862,082.

13   Q.  How about on the actual cash value basis?

14   A.  On an actual cash value basis, the tenant improvement work

15   and other finishes totaled $476,507,969.

16   Q.  Thank you.

17        MR. WILLIAMSON:  Your Honor, we offer Joint Exhibit

18   210 into evidence.  I'm not certain whether it's been received,

19   so I'm offering it.

20        MR. BYRNES:  No objection, your Honor.

21        THE COURT:  Received.

22        (Joint Exhibit 210 received in evidence) ]

23   Q.  Now, in your analysis of the categories of losses that 7

24   World Trade Company covered, other than what we've talked

25   about, did you uncover any other losses that 7 World Trade

1   Company covered?

2   A.   Yes.

3   Q.   Recount them, please.  What's one?  Give me your first one.

4   A.   I believe there were the mitigating expenses.

5   Q.   Can you give us an example of one of them.

6   A.   That would have been the retenanting expenses that we

7   talked about.

8   Q.   How much were those claims for?

9   A.   I believe for $80 million.

10  Q.   Any other expenses that 7 World Trade Company incurred for

11  losses that it suffered?

12  A.   Claim preparation expenses.

13  Q.   Those have been stipulated to.

14  A.   That's correct.

15  Q.   Any others?

16  A.   Tenant improvements.

17          THE COURT:  I think we've covered that.

18  Q.   That we just covered.

19  A.   Yes.

20  Q.   Do you remember the amount for 7 World Trade Company?

21  A.   371 thousand, not million.

22  Q.   Any others?

23  A.   There was mortgage carrying costs.

24  Q.   Do you remember how much that was?

25  A.   200 million.

1   BY MR. WILLIAMSON:

2   Q.  Any others?

3   A.  That's what I remember so far.

4   Q.  Do you remember how much the losses were that were

5   documented for personal property on 7 World Trade Company?

6   A.  Yes.  That was $1.8 billion -- $1.8 million.

7   Q.  Did you reach any conclusion about whether similar losses

8   were incurred on the main site that were covered by insurance?

9   A.  Yes, although the same categories of coverage were provided

10  by those policies and the main site had those same types of

11  claims.

12  Q.  Were there any differences?

13          MR. BYRNES:  Objection, your Honor.

14          THE COURT:  I don't understand the question.

15  Sustained.

16  Q.  With regard to prejudgment interest, was that covered under

17  7 World Trade Company's policies?

18          MR. BYRNES:  Objection.

19  Q.  Policy.

20          THE COURT:  What's prejudgment interest for?  Do you

21  understand that?

22          THE WITNESS:  Yes.

23          THE COURT:  What is it?

24          THE WITNESS:  It's the interest on the amount that

25  would be reached in a judgment.  It's the interest on that

 1    amount for the period of time from when the litigation began

 2    until there was a judgment.

 3              THE COURT:  In court?

 4              THE WITNESS:  In court.

 5              THE COURT:  That's a lawyer's issue, isn't it?

 6              THE WITNESS:  You can -- you can obtain that coverage.

 7    The World Trade Center Properties had that coverage in the

 8    Wilprop form so that you can recover your lost interest as a

 9    part of the insurance recovery.  It's not common but the

10    Wilprop form had that feature.

11              THE COURT:  Can you recover both mortgage-carrying

12    costs and prejudgment interest?

13              THE WITNESS:  You could, because the mortgage-carrying

14    costs may be unrelated to the reason that there was a lawsuit

15    and eventual judgment.  So, if there -- I can see a situation

16    where they overlap, and there you can't collect it twice, but I

17    can see situations where is no overlap and so they could.

18              THE COURT:  In any event, some of the companies gave

19    that?

20              THE WITNESS:  Those on the main property subscribed to

21    the Wilprop form did, yes.

22    BY MR. WILLIAMSON:

23    Q.  As a general matter, does replacement cost insurance

24    coverage cost extra in the way of premiums?

25              MR. BYRNES:  Objection, your Honor.

D7gkwtc5                         McKinley

1          THE COURT:  Sustained.  Extra over what?

2     Q.  If you purchase a policy that has replacement cost

3     insurance coverage in it or a policy that doesn't have

4     replacement cost coverage in it, are the premiums going to be

5     different?

6          MR. BYRNES:  Objection, your Honor.

7          THE COURT:  Sustained.  The premiums are different for

8     every kind of insurance, there's nothing standard, right?  Is

9     that right?

10         THE WITNESS:  If his question was --

11         THE COURT:  Well, if you have to say that, you don't

12    understand the question either.  OK, objection sustained.

13    Q.  If an insured wishes to purchase a policy and make sure it

14    includes replacement cost coverage, will the insurer charge any

15    different premium than if it doesn't?

16         THE COURT:  Let's say you have property damage

17    insurance and you also have another policy giving you

18    replacement -- put it this way:  Two brokers give you an

19    offering.  One is for property damage insurance, the other one

20    is for replacement costs and current costs.  Which would cost

21    more?

22         THE WITNESS:  If the one offered only actual cash

23    value and the other provided replacement cost, the replacement

24    cost policy will cost more.

25         THE COURT:  Why is that?

D7gkwtc5                          McKinley

1          THE WITNESS:  Because you have to buy more insurance

2     to be insured for replacement costs because replacement cost is

3     a higher value than actual cash value, so you're buying more

4     insurance.

5          THE COURT:  And because when you actually replace,

6     prices have gone up usually?

7          THE WITNESS:  That's also true, yep.  And you get

8     whatever it costs to replace at the time of loss.

9          THE COURT:  OK.

10    BY MR. WILLIAMSON:

11    Q.  Did the replacement cost insurance coverage under the IRI

12    policy for 7 World Trade Company apply only to the loss of the

13    building at 7 World Trade Center?

14    A.  No, it included replacement -- that policy included

15    replacement cost coverage for the building, the tenant

16    improvements, the machinery and equipment, the personal

17    property.  All of the property insured by that policy was

18    insured on a replacement cost basis.

19    Q.  If World Trade Center Properties or 7 World Trade Company

20    had submitted one proof of loss after 9/11 saying we have one

21    economic loss, damage to our leasehold interests, and submitted

22    it and said, in the case of World Trade Center Properties,

23    8.4 billion, that's the amount of our loss and that's all we're

24    going to file, what would have happened?

25          MR. BYRNES:  Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  I'll let him answer.  Go ahead.

2          THE WITNESS:  Based on my experience in dealing with

3    claims being submitted to insurance carriers, they want the

4    sufficient amount of documentation and backup to support the

5    claim being submitted.  They would not accept a proof of loss

6    for just a total amount of claim.

7    Q.  What about for 7 World Trade Center, would the same be

8    true?

9          MR. BYRNES:  Objection, your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  The answer would be the same.

12   Q.  I think you mentioned that as part of your assignment with

13   regard to 7 World Trade Company's losses, you were asked to

14   prepare a --

15          MR. WILLIAMSON:  Withdrawn.

16   Q.  With regard to your assignment for 7 World Trade Company,

17   you were asked to calculate a possible allocation based on the

18   amounts of losses that have been claimed; is that right?

19   A.  That's right.  I was asked to do a calculation.

20   Q.  And did you do that?

21   A.  Yes, I did.

22          MR. WILLIAMSON:  Can you please pull up the

23   demonstrative exhibit, Mr. McLeod.

24   Q.  Would you please explain to his Honor what the allocation

25   is that you calculated, what your methodology was?

1  A.  Yes.  I began by taking the interim proof of losses that

2  was submitted by 7 WTC --

3            THE COURT:  Is this an exhibit?

4            MR. WILLIAMSON:  It's a demonstrative I plan to offer

5  after he explains it, your Honor.

6            THE COURT:  This is a summary of the -- you've taken

7  the claims, right?

8            THE WITNESS:  Yes.

9            THE COURT:  And made an arithmetic calculation?

10           THE WITNESS:  Yes.

11           THE COURT:  We'll take it as a summary, introduce it

12  as an exhibit.

13           Any objection?

14           MR. BYRNES:  I don't believe so, your Honor.

15           THE COURT:  OK, received.

16           MR. WILLIAMSON:  There's more than comes it unfolds.

17           THE COURT:  What's the number?

18           MS. BAGLIN:  564, your Honor.

19           (Plaintiff's Exhibit 564 received in evidence)

20  Q.  So, would you please continue explaining to his Honor

21  Plaintiffs' Exhibit 564 in evidence, what your methodology was

22  and what it shows.

23  A.  Yes.  From the partial proofs of loss, I took the numbers

24  for replacement cost for the property damage, the estimated

25  actual --

D7gkwtc5                           McKinley

1          THE COURT:  Which?  All of them, including 7?

2          THE WITNESS:  Just 7, just 7.

3          -- replacement cost for the property damage, estimated

4  time element loss on an actual loss sustained basis and

5  personal property on a replacement cost basis, added those

6  three numbers together, so the total was this $1,496,944,030

7  total.  Then --

8  Q.  What's the next step?

9  A.  -- I did the simple arithmetic to see what percentage each

10  of those parts was of the total, dividing replacement cost by

11  the total, time element by the total, personal property by the

12  total, I got the percentages shown here in this exhibit.  The

13  replacement cost constituted approximately 30 -- sorry,

14  approximately 70.37 percent, time element approximately

15  29.51 percent, and personal property, .12 percent.

16          Then I multiplied those percentages times the number

17  you see.  And the number displayed here is the result of taking

18  the $819 million settlement, adding to it --

19          THE COURT:  So, leave all the numbers up, please.

20  Don't erase.

21          THE WITNESS:  -- taking the $819 million settlement,

22  adding to it the 11.9 million of shared recovery expense that

23  IRI shared with the insured, and subtracting from that total

24  the claims preparation expense and the insurance premiums, and

25  that's where I got the total of 828,886,381 as the total of all

1        those four components.

2                I then applied the ratios that I calculated, to end up

3        with the proportions shown at the bottom of the exhibit, which

4        are replacement cost at $583,287,346; time element at

5        $244,577,018, and lastly personal property at $1,022,017.

6                THE COURT:  Leave this up for a minute, please.

7                MR. WILLIAMSON:  We have a copy.  We can hand up to

8        your Honor if you'd like.  We've given a copy to counsel.

9                THE COURT:  Yes, I would like that.

10               MR. WILLIAMSON:  OK.

11               THE COURT:  Just take the arithmetical proportion of

12       each claim?

13               THE WITNESS:  That simple, yes.

14               THE COURT:  Was the replacement cost adjusted in the

15       sense that there had been appraisal finding this amount?

16               THE WITNESS:  No.  This is from the Cambridge proof of

17       loss.

18               THE COURT:  Was there an appraisal on Tower 7?

19               THE WITNESS:  No.

20               THE COURT:  But there was on the other properties?

21               THE WITNESS:  For the replacement cost, yes, for the

22       building.

23               THE COURT:  Do you happen to remember what percentage

24       markdown resulted from the claim and the appraisal after the

25       claim?

 1              THE WITNESS:  No.

 2              MR. WILLIAMSON:  Again, your Honor, that did not

 3    include the tenant improvements that we covered today because

 4    they --

 5              THE COURT:  Replacement cost includes tenants

 6    improvements?

 7              THE WITNESS:  In this exhibit, yes.

 8              THE COURT:  What's the difference between personal

 9    property and tenants' improvements?

10              THE WITNESS:  Personal property would be furniture,

11    desks, supplies, photocopy machines, that type of thing is

12    personal -- it's not permanently attached to the building.

13              THE COURT:  Tenants' improvements are like partitions

14    and walls?

15              THE WITNESS:  And paneling and carpets, anything

16    permanently attached to the building.  It's what remains when a

17    tenant moves out.

18              THE COURT:  OK.

19              MR. WILLIAMSON:  I have no further questions, your

20    Honor.

21              THE COURT:  Cross-examination?

22              MR. BYRNES:  Your Honor, if it may please the Court,

23    Patrick Byrnes on behalf of the aviation defendants.

24              THE COURT:  Yes.

25              MR. BYRNES:  Could you please put the last slide back

1   up briefly, sir.

2   CROSS-EXAMINATION

3   BY MR. BYRNES:

4   Q.  Mr. McKinley, am I correct that in preparing this slide you

5   only allocated funds to three things -- replacement cost, time

6   element, and personal property?

7   A.  Yes.  Replacement cost for the property damage, that's

8   correct.

9   Q.  And there's no allocation here to any TBD items, are there?

10  A.  That's correct.

11  Q.  And there's no allocation here to any extra-contractual

12  claims either?

13  A.  Correct.

14  Q.  Thank you.

15          Now, Mr. McKinley, you testified earlier about the

16  blanket policy, the IRI WT 7 policy, you testified that it was

17  a blanket policy; is that correct?

18  A.  I testified it was a -- the policy had a blanket limit,

19  yes.

20  Q.  Yes.

21          THE COURT:  What's a blanket?

22          THE WITNESS:  A blanket limit opposed to a schedule

23  limit.  A policy with schedule limits would have an amount of

24  insurance for the property damage, an amount of insurance for

25  time element, possibly amounts of insurance for other

D7gkwtc5                          McKinley - cross

1   categories of insurance.  That's one way you can purchase an

2   insurance policy.

3           The other is that you get one limit that provides --

4           THE COURT:  For everything?

5           THE WITNESS:  Everything, blankets it.

6           THE COURT:  And these were blanket limits?

7           THE WITNESS:  Yes.

8   Q.  You are aware, sir, that the IRI policy has a $1 million

9   sublimit, though, correct, for expense, aren't you?

10  A.  I believe that's correct.

11  Q.  It's your understanding, isn't it, that if there is a

12  sublimit, the insurers would not pay above that amount; is that

13  correct?

14  A.  That's correct.

15  Q.  So under the IRI policy, the insurers would have paid no

16  more than $1 million for an extra expense claim; is that

17  correct?

18  A.  Yes.

19  Q.  And I believe you testified earlier that you would consider

20  the mitigation expenses of $86 million as really in fact an

21  extra expense; isn't that correct?

22  A.  I believe they were.

23  Q.  Mr. McKinley, you're not aware of any evidence --

24          THE COURT:  Could I just ask a question on this.  When

25  you have a sublimit like that, is the loss included in the

1   overall submission or is it a separate application for

2   insurance?  Let's say you have a large blanket limit but a low

3   sublimit for one category of expense, and the expense is more

4   than the blanket, so, over and above the blanket limit you

5   don't get anything?

6               THE WITNESS:  That's usually the way it works.  The

7   policy will typically answer your question, but that's usually

8   the way it works.

9               THE COURT:  So, the sublimit for extra expense was

10  $1 million?

11              THE WITNESS:  Yes.

12              MR. BYRNES:  May I proceed, your Honor?

13              THE COURT:  Yes.  Sorry.

14              MR. BYRNES:  No need to apologize to me.

15  Q.  Mr. McKinley, you testified earlier about mortgage-carrying

16  costs; is that correct?

17  A.  Yes.

18  Q.  And is it correct that you are not aware of any evidence

19  that either 7 WT Co. or WTCP ever submitted a claim to its

20  insurers for mortgage-carrying costs?

21  A.  Am I aware that they did not?  Is that your question?

22  Q.  Did you -- are you aware of any evidence that they did?

23  A.  Oh, no, I'm not.

24  Q.  In fact, I think you state in your report and refer in your

25  report, on the World Trade Center 7 claim, that the evidence

1    you're aware of was a letter sent to Des Barry, liaison

2    counsel, asserting a claim for mortgage-carrying costs; is that

3    right?

4              MR. WILLIAMSON:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  Could you repeat the question, please?

7    Q.  Certainly.  The only evidence in your report pertaining to

8    a claim for mortgage-carrying costs is a letter that was sent

9    by Flemming Zulack within the last few years to Des Barry,

10   who's the aviation defendants' liaison counsel in this claim;

11   isn't that correct?

12   A.  I believe that's correct.

13   Q.  And that letter was not sent to IRI; is that correct?

14   A.  Not directly.

15   Q.  And that letter was not sent -- was sent years after the

16   IRI WTC 7 insurance claim was settled; is that correct?

17   A.  I believe that's right.

18   Q.  Sir, you're not aware of any evidence that either WTCP or 7

19   WT Co. ever submitted a claim to their insurers for claim

20   preparation costs, are you?

21   A.  I am not.

22   Q.  Directing your attention to the WTC 7 claim, we're in

23   agreement that prior to 7 WT Co. settling its insurance claim

24   with IRI, IRI had advanced 7 WT Co. $515,554,889; is that

25   correct?

D7gkwtc5                      McKinley - cross

1   A.  I don't remember the exact number but I remember a number

2   approximating that.

3   Q.  And IRI paid an additional $303,445,111 at the time it

4   settled; is that correct?

5   A.  If that adds up to 819, I believe that would be right.

6   Q.  And to be very clear, you are testifying here, as 7 WT

7   Co.'s expert retained witness, personally have no way of

8   knowing whether IRI paid any additional amount of the

9   $819 million on account of any claims identified as TBDs; is

10  that correct?

11  A.  I do not know.

12  Q.  And similarly, you have no way of knowing whether IRI paid

13  any amount of the $819 million on account of any

14  extra-contractual claims; is that correct?

15  A.  That's correct.  I have no way of knowing that.

16  Q.  And the same would be true with respect to the World Trade

17  Center Properties claim; is that correct?

18  A.  And their settlement?

19  Q.  Yes.

20  A.  I think it's the same answers, that's right.

21  Q.  Now, going back to the World Trade Center 7 claim, you do

22  know that as of the time that 7 WT Co. settled with IRI, it had

23  only documented and quantified claims for real and personal

24  property and rents as well as the extra expense slash

25  mitigating expenses; is that correct?

1                  THE COURT:  That which is shown in JX 5?

2                  MR. BYRNES:  Yes.

3       A.  So, they documented what was in that exhibit.  That was

4       their documenting exhibit.

5       Q.  So, it would be personal property, property damage to real

6       property, and then the business income and extra expense claim;

7       is that correct?

8       A.  If in real property you're including tenants' improvements,

9       yes.

10      Q.  I am, sir.

11                 THE COURT:  It's just the way you had in your exhibit?

12                 THE WITNESS:  Yes.

13                 THE COURT:  Your calculations?

14                 THE WITNESS:  Yes.

15                 THE COURT:  Replacement cost included the tenants'

16      improvements, you have the time element, and you had the

17      personal property?

18                 THE WITNESS:  That's right.

19      BY MR. BYRNES:

20      Q.  And to be very clear, you personally have no way of knowing

21      whether at the time IRI settled the claim, it paid additional

22      consideration in excess of what they owed under the policy for

23      property damage and rental loss to obtain an all-inclusive full

24      and final release; is that correct?

25                 THE COURT:  I need you to slow down, Mr. Byrnes.

D7gkwtc5                          McKinley - cross

1          MR. BYRNES:  Certainly.

2          THE COURT:  I'm having trouble absorbing the

3     information.

4     Q.  Sir, to be clear, you personally have no way of knowing

5     whether at the time IRI settled the WTC 7 insurance claim,

6     whether it paid additional consideration in excess of what was

7     owed for the property damage and rental interruption claim to

8     obtain an all-inclusive full and final release; is that

9     correct?

10         THE COURT:  I think he said, to keep it simple, that

11    all he knows is the claim that was submitted in those three

12    categories and the money that was paid.  Right?

13         THE WITNESS:  That's right, your Honor.

14         THE COURT:  OK.  I think that's all.

15    BY MR. BYRNES:

16    Q.  Sir, is it your testimony that it is the custom and

17    practice in the insurance industry to obtain a full and final

18    all-inclusive release when settling claims?

19    A.   In litigated claims, that is the custom and practice, yes.

20    Q.  And is it your testimony that the broad release language

21    contained in the IRI WTC 7 release is kind of standard or

22    boilerplate broad release language?

23    A.   It's similar to language that I've seen; I would say it's

24    fairly typical, yes.

25         MR. BYRNES:  Could you please put up on the screen

D7gkwtc5                        McKinley - cross

1    JX 34.

2    Q.  Sir, I'll represent for the record that this is -- JX 34 is

3    the Allianz Global Risks U.S. Insurance Company's settlement

4    agreement entered into with respect to the World Trade Center

5    Properties claim.  Is this a document that you reviewed before?

6    A.  Yes.

7    Q.  Can you please turn, sir, to page 5 and 6.  There's a

8    paragraph that carries over to both pages.

9            MR. BYRNES:  Can you split the screen, to have both

10   up.

11   Q.  Sir, does this release contain the type of broad release

12   language that you referenced earlier?

13   A.  You'd like me to review it in its entirety and comment on

14   that?

15   Q.  Well, is this something you've seen before, the language

16   released by the insureds?

17   A.  I have reviewed this document before.  I don't remember

18   this particular clause.

19            THE COURT:  Just look at the bottom two lines.  Causes

20   of action obligations or liabilities of whatever kind in

21   nature, past, present or future, known or unknown, asserted or

22   unasserted, in law or in equity, from the beginning of the

23   world to the day of these presents.

24   Q.  I can shortcut it this for you, Mr. McKinley.  Do you see

25   it's titled "Release By The Insureds"?

D7gkwtc5                           McKinley - cross

1    A.  Yes.

2    Q.  So, that would be --

3              THE COURT:  The point he wants to make is that it's

4    customary to not -- that when there is a settlement in the

5    insurance business for a covered obligation, the insurer gets

6    as broad a release as possible?

7              THE WITNESS:  Yes, that's common.

8    Q.  If I could just make one more brief --

9              THE COURT:  Belts-and-suspenders and ropes.

10   Q.  Belts-and-suspenders and everything else.

11             If you could just go to page 7, Mr. Campbell.  And do

12   you see that this paragraph is titled "Release by Allianz"?

13   And so in this document, not only did the insured provide a

14   broad and extensive release to the insurers but the insurers

15   gave such a release to the insured; is that correct?

16   A.  Apparently, yes.

17   Q.  Is it your testimony that the insureds would have gotten

18   some consideration for the release by Allianz?

19             THE COURT:  I think the document is what it is.

20             MR. BYRNES:  Thank you.

21   Q.  Mr. McKinley, is it your opinion that it is the custom and

22   practice of the insurance industry that there is no agreed

23   allocation of insurance payments to specific coverage losses in

24   the event of a policy limits loss?

25             THE COURT:  I couldn't get it.

D7gkwtc5                          McKinley - cross

1    Q.  Is it your opinion that it is the custom and practice of

2    the insurance industry that there is no agreed allocation of

3    insurance payments to specific covered losses in the event of a

4    policy limits loss?

5           THE COURT:  Do you understand the question?

6           THE WITNESS:  Yes, I do.

7           THE COURT:  OK.

8           THE WITNESS:  I don't know that there is a custom and

9    practice.  It would depend on the circumstances.

10   Q.  In your experience, is it rare to see an allocation when

11   there's a policy limits loss?

12   A.  At times you can -- what's your question?  In my experience

13   is it common?

14   Q.  Is it common, in your experience, to see the insured and

15   the insurer agree to an allocation of funds between claim

16   elements when there's a policy limits loss?

17   A.  My personal experience?  I don't remember there being an

18   allocation.

19   Q.  So, you would not expect to see an allocation between claim

20   elements that's agreed to by the insured and the insurer when

21   there's a policy limits loss; is that right?

22   A.  Again, it would depend on the circumstances, but I can see

23   circumstances where there would be no allocation.

24          THE COURT:  If there were limits on each category of

25   loss, you'd probably have an allocation?

1          THE WITNESS:  That would --

2          THE COURT:  Unless everything?

3          THE WITNESS:  That would be one way.

4          THE COURT:  Unless everything is over the policy

5   limits?  But if there's one policy limit covering a whole

6   policy and you're above, why waste the time and energy to

7   allocate?

8          THE WITNESS:  That's usually what happens.

9   BY MR. BYRNES:

10  Q.  Mr. McKinley, just to be clear, you didn't have any

11  personal involvement in the adjustment of the World Trade

12  Center 7 claim; is that correct?

13  A.  That is correct.

14  Q.  And, in fact, you've never worked as an independent

15  adjuster, meaning an adjuster that adjusts claims on --

16         THE COURT:  He's not here for that purpose,

17  Mr. Byrnes.

18  Q.  Mr. McKinley, have you ever worked for an insurance

19  company?

20  A.  Yes, I have.

21  Q.  And that capacity was as an underwriter in the 1970s; is

22  that correct?

23  A.  Underwriter and underwriting manager, yes.

24  Q.  And other than that, you've had no specific claims handling

25  experience within an insurance company; is that correct?

1    A.   I was not in the claims department.  I had some involvement

2    in the insurance company's claims but I wasn't the one

3    adjusting the claims on behalf of the carrier.

4    Q.   Thank you.  And you have never been employed as an

5    adjuster; is that correct?

6    A.   That's correct.

7    Q.   Thank you, Mr. McKinley.  I have no further questions for

8    you.

9              MR. WILLIAMSON:  No further questions, your Honor.

10             THE COURT:  Thank you, Mr. McKinley.

11             THE WITNESS:  Thank you.

12             THE COURT:  Next witness?  Next witness?

13             MR. WILLIAMSON:  Your Honor, plaintiffs would call as

14   the next witness Patrick Connors.  There was discussion about

15   that pretrial conference, and we understood that if the

16   defendants were to object, your Honor would sustain it.  So, I

17   don't want to waste the Court's time or Mr. Connors' time or

18   anybody's time.  I discussed it with counsel for the

19   defendants, Mr. Podesta, and I told them what we would like to

20   do is have the record that we offered to call him, they're

21   going to object, and we understand that your Honor will

22   sustain --

23             THE COURT:  His testimony is going to be on what the

24   CPLR requires?

25             MR. WILLIAMSON:  No, his testimony would be what his

D7gkwtc5

1    report said.

2           What I would propose to do, by way of offer of proof,

3    is just submit the report into evidence for the record -- your

4    Honor has already seen it -- and then not call him because I

5    understand their objection will be sustained.  That's the

6    request.

7           THE COURT:  May I look at his report?

8           MR. WILLIAMSON:  Absolutely.  It's been marked as

9    Plaintiffs' Exhibit 562.

10           THE COURT:  For identification?

11           MR. WILLIAMSON:  For identification, correct.

12           (Pause)

13           THE COURT:  I stand by my ruling.  Professor Patrick

14    Connors is a professor of law at Albany Law School,

15    concentrating on issues of civil practice and the CPLR.  He is

16    a highly regarded authority on the CPLR.  He's written numerous

17    practice commentaries appearing in the McKinney's compendia,

18    and he is carrying on Professor David Siegel's treatise.

19           He was asked to provide expert opinion on the

20    question, said to be factual, whether any replacement cost

21    insurance proceeds that the plaintiffs received from their

22    insurers -- and it's focused on Tower 7 -- would duplicate loss

23    rental income.  He says he's been asked to review the relevant

24    facts concerning the payments that 7 World Trade Center Company

25    received from IRI -- I've got several decisions -- and express

D7gkwtc5

1    an opinion how that evidence relates to the criteria or

2    applying CPLR 45.

3           He relies on the statute and prior case law, my own

4    opinions, and limits his opinions to address how the evidence

5    relates to his factual analysis.  Based on his review of the

6    evidence, he concludes that the insurance payments do not

7    duplicate any category of 7 World Trade Center Company's

8    potential tort damages.  And he reviews the testimony of

9    Mr. McKinley and Professor Shavell of Mr. Beach, Professor

10   Fischel, and comes to his conclusions.

11          So, he's doing my job as an expert on the law.  I'm

12   sure that his opinions are more learned than mine, but it's my

13   responsibility to interpret the law and apply it to the case,

14   and I cannot be helped by Professor Patrick Connors.  Of course

15   his expertise could contribute to the briefing on the part of

16   the parties that engaged him, and in that connection, he would

17   have perhaps some important things to say, maybe not, I don't

18   know.

19          So, I decline to admit PX 562, and return it to the

20   plaintiffs.  Next witness?

21          MR. WILLIAMSON:  Next, your Honor:  With respect to

22   the expert witness Edward R. Reilly, Jr., which was also

23   discussed at the final pretrial conference, I've explained to

24   Ms. Taylor and Mr. Podesta the situation and told them that our

25   proposal is that we read his report, which is about ten pages,

D7gkwtc5

1    into evidence, and that that would be in lieu of his actually

2    being here to give the same opinions, and that they would then

3    be able to read from whatever they want of his deposition

4    testimony.  And I know they've done some designations because

5    they're aware of the situation.

6         So, that's our proposal.  It's ten pages

7    double-spaced.  It would be in lieu of his taking the stand and

8    being able to say these things, given the unavailability

9    situation.  So, that would be our next witness, through the

10   report, and then the deposition designations by aviation

11   defendants, your Honor.

12        THE COURT:  Is he questioned by you at his deposition?

13        MR. WILLIAMSON:  No, your Honor, by aviation

14   defendants' counsel.

15        THE COURT:  How do the aviation defendants feel on

16   this, Mr. Podesta?

17        MR. PODESTA:  Your Honor, we are willing to agree to

18   the introduction into evidence of Mr. Reilly's report.  I was

19   hoping to spare us the burden of having to listen to a ten-page

20   double-spaced --

21        THE COURT:  I'm going to read it.  You don't have to

22   read it in.

23        MR. PODESTA:  And we would like to read in our

24   deposition designations into evidence from our

25   cross-examination of Mr. Reilly.

D7gkwtc5

THE COURT:  Let's see how we go.  Let me have his

report.  We'll mark it for identification.

MS. BAGLIN:

MR. PODESTA:  We would object to the reception of the

report without our being able to read into the record our

cross-examination.

THE COURT:  Of course.  Let me see the report.

MR. WILLIAMSON:  Yes.

So, we would like to be able to read the short report

in so that there would be the comparison for the deposition

designations that they would like to read in.

THE COURT:  Let me look at it.

(Pause)

THE COURT:  He's essentially doing, for Towers 1, 2, 4

and 5, what Mr. McKinley did for 7, right?

MR. WILLIAMSON:  That is one of the things he does,

your Honor.  He does other things but he does cover that.  And

he does have Exhibit 9, which then provides parallel

allocations, that is correct.  And then Professor Shavell

discusses those but he makes --

THE COURT:  He's with Reilly & Co., Inc., an

independent property insurance adjusting firm, he's been in

business a long time, he's obviously an expert, and I accept

his qualifications.  And they are listed in detail at

Exhibits 1 and 2.

D7gkwtc5

```
1        The second paragraph:  He was colead adjuster for the
2   property insurers of the claims made by WTCP and other insureds
3   as a result of the events of September 11, 2001.  So, he was
4   acting in a capacity of adjuster for the insurers.
5        Isn't he in conflict?
6        MR. WILLIAMSON:  No, your Honor -- that was discussed
7   with him -- no, because he's a fact witness in the sense of the
8   expert opinions he's offering are based on actual facts.  It's
9   that simple.  So, he --
10        THE COURT:  He's a fact witness, he's not an expert
11   witness?
12        MR. WILLIAMSON:  No, no, he's an expert witness who
13   happens to have also the firsthand experience of having been
14   there.
15        THE COURT:  And he's not --
16        MR. WILLIAMSON:  He brings his expertise to bear.
17        THE COURT:  3 says he submits this expert report on
18   behalf of WTCP in connection with claims by defendants that
19   property insurance payments WTCP received should be deducted
20   from WTCP's potential tort damages.  And he speaks as a fact
21   witness with regard to how the insurers handled WTCP's
22   insurance losses.
23        His comments on Mr. Beach I do not accept.
24        Paragraph 4 states what he discusses -- two main
25   categories of loss, replacement cost of the destroyed
```

D7gkwtc5

1    buildings, and loss of rental income from tenants, which he

2    says are separate and distinct coverages serving different

3    purposes and being treated separately during the claims

4    adjustment process.

5             The third bullet under paragraph 4 states -- do I mind

6    if I do this instead of you, Mr. Williamson?

7             MR. WILLIAMSON:  No, I think you're doing it better

8    than I would, so I leave it to your able hands.

9             THE COURT:  So, he states that the claims exceeded

10   both the 3,500,000,000 single per-occurrence policy limit and

11   the total $4,091,364,040 insurance payments that WTCP received

12   from its insurers.  The total claims for replacement cost and

13   rental income -- I'm summarizing -- exceeded the policy limits

14   and exceeded the amounts paid in settlement by the insurers.

15            Then he goes on to say in the fourth bullet that the

16   preliminary proofs of partial losses submitted by WTCP totaled

17   $8-1/2 billion, in two categories -- $7.2 billion or

18   84.2 percent for replacement costs, and $1.3 billion or

19   15.8 percent loss rental income.  Both submissions were without

20   prejudice and payments were on account, meaning that both sides

21   reserved full opportunity to adjust and change the amounts.

22            The fifth bullet says that WTCP's losses were not

23   resolved in the adjustment process because of the coverage

24   litigation that followed.

25            And he says, as we already know, that there were no

D7gkwtc5

1    allocations made in the payments of insurance.

2           Paragraph 5:  The ultimate purpose of property loss

3    adjustment is to reach agreement -- I would say between the

4    insurer and the insured on coverage, damages and payments.  An

5    adjustment stops when litigation begins.

6           He offers the opinion in paragraph 7:  There are two

7    types of coverages, namely, property damage and lost income,

8    called replacement cost and lost rental income -- are

9    completely separate and distinct, covered by different policy

10   coverages, separately contracted for, with losses being

11   separately adjusted.

12          He defines the terms which we've already heard.  He

13   says that lost rental income or business interruption or

14   business income coverage also may include coverage for other

15   expenses incurred because the business' location is damaged,

16   such as costs incurred in having to move, operate from a

17   temporary location, et cetera, which we're not involved with

18   here, my editorial comment.

19          I'm going to skip paragraph 8.  He states in paragraph

20   9 that they confirm that WTCP had an insurable interest in the

21   buildings, demonstrated by the fact of long-term leases with an

22   obligation under the leases to rebuild, and to insure

23   replacement costs.

24          I'll skip the rest of 9 and I will skip 10.

25          Paragraph 11 states that the adjusters concentrated on

D7gkwtc5

the major and most crucial components of the loss, replacement
cost and lost rental income.  Certain other coverages, he says,
were not addressed because there was no expectation that the
costs would be charged to WTCP.  He illustrates it by
demolition costs, debris removal costs, pollution cleanup
costs, and removal of the destroyed transmission antenna
dishes.

       Given the complete destruction of the buildings and
their contents, it was assumed that coverages for business,
personal property, including office furniture and equipment,
building maintenance equipment, machinery, supplies, and
property of others and other miscellaneous business personal
property would be included in the loss calculation.

       However, he says, those coverages were not addressed
while the adjustment process was ongoing because replacement
costs, plus lost income alone, were expected to exceed the
single-occurrence policy limit of $3,546,800,000.

       He goes on to say, similarly, although other loss
components were included in the claim presentation prepared by
Cambridge Horizon Consultants, Inc. -- which includes here
accounts receivable, valuable papers and records, electronic
data processing and media, personal effects of officers and
employees, fine arts and contractors equipment and machinery --
the amounts of such losses were designated as to be determined,
and we ended up never addressing those coverages.

D7gkwtc5

1            My editorial comment, because this has been a

2     recurrent issue, is that the indication in this report by

3     Mr. Reilly of what the adjusters considered important in terms

4     of insurance claims, given the relatively low policy cap and

5     what they considered unimportant, is a useful indication for us

6     in terms of what the insurance paid for and what it did not pay

7     for.

8            (Continued on next page)

D7GAWTC6ps

 1           THE COURT:  But this is a subject that I'm sure both

 2   counsel will be addressing in their closing statements.

 3           Now for paragraph 12.  "Comments on Mr. Beach's report

 4   stating Beach's opinion that insurers do not issue payments

 5   that are not claimed, well founded, and documented," I don't

 6   think he said it just that way on the witness stand.

 7   Mr. Reilly goes on to say, "This is true in the normal sense,

 8   but where there's a policy limit loss like here, insurers

 9   generally do not insist on complete documentation of each and

10   every item of covered loss."  And I would add, because it's

11   academic.  "The documented replacement limits and replacement

12   costs and lost income more than eat up the insurance."

13           Paragraph 13.  "Ultimately, WTCP's losses were not

14   dissolved by the usual adjustment process."  It goes on to talk

15   about the settlement that occurred.  "Payments of most of the

16   $4,091,364,004 of total insurance paid were made pursuant to

17   the terms of individual settlement agreements between WTCP and

18   its insured."  And I will ask this question:  Isn't that

19   overall settlement what Judge Martin mediated?  Mr. Williamson?

20           MR. WILLIAMSON:  No, not at all.  No.

21           THE COURT:  What did he do?

22           MR. WILLIAMSON:  These were litigated by Wachtell

23   Lipton with the insurer's counsel.  Judge Martin was not

24   involved.  He had left the bench.  And he wasn't mediating it.

25           THE COURT:  But they are individual settlement

D7GAWTC6ps

1  agreements that were comprehended.

2          MR. WILLIAMSON:  Yes.  Approximately 15.  That's

3  right.

4          Judge Martin did mediate the --

5          THE COURT:  No, that came later.

6          MR. WILLIAMSON:  Yes.  You're correct.

7          THE COURT:  It was subrogation, litigation by

8  subrogation insurers, and that was with the settlement.

9          MR. WILLIAMSON:  That's correct.

10         THE COURT:  And paragraph 14 goes into that.  There

11 were 16 separately preliminary proofs of partial losses to

12 obtain interim funding during the covered litigation.  That's

13 something different.

14         Let me read the whole paragraph.  "During the period

15 of time beginning October 10, 2001, before the litigation

16 referred to before Judge Martin and Judge Mukasey started,

17 until February 22, 2007, WTCP submitted 16 separately numbered

18 preliminary proofs of partial loss," which we've seen in the

19 summary documents that were in evidence here, "to obtain

20 interim funding during the coverage litigation, all on a

21 without-prejudice submission."

22         Paragraph 15:  "13" -- we've seen this also in the

23 preliminary proofs of partial losses, "specifically related to

24 business income rental value in the total amount of

25 $1,347,805,679."  I think I'm just repeating this because we

D7GAWTC6ps

 1    have this in the summary documents that are exhibits, so I'll

 2    skip paragraph 15.  Paragraph 16 says there's been no

 3    allocation.

 4              MR. WILLIAMSON:  Excuse me.  Paragraph 15 does give

 5    the percentages that get used later by Professor Shavell.

 6              THE COURT:  Is there any dispute about those

 7    percentages?  They're arithmetic.  It's 15.8 percent for lost

 8    rental income and 84.2 percent for replacement costs.

 9              MR. WILLIAMSON:  Right.  Those are then developed in

10    Exhibit 9 to Mr. Reilly's report.  So that's why I thought

11    paragraph 15 is important.

12              MR. PODESTA:  Your Honor, I don't think there's any

13    dispute as to the mathematics of the percentages.

14              THE COURT:  Yes.  I don't believe they're useful.

15              Let's take the summary exhibit, Exhibit 9.  We'll mark

16    it a separate number, and I'll ask Mr. Williamson to submit it

17    tomorrow morning, in lieu of my reading it.

18              Paragraph 17:  "The settlement agreements included a

19    waiver by WTCP of its claim to prejudgment interest.  WTCP had

20    asserted its legal claims for judgment interest throughout the

21    adjustment process.  These are the interest on insurance

22    payments or on third-party tort recoveries" -- withdrawn.  He

23    says, "Interest on insurance payments or on third-party tort

24    recoveries is not insured by WTCP's insurance."  So why are we

25    talking about prejudgment interest, Mr. Williamson?

D7GAWTC6ps

1          MR. WILLIAMSON:  Because they are included in the

2     settlement agreements.  Some of them very explicitly were

3     releasing that claim.  Remember we covered with Mr. McKinley

4     the --

5          THE COURT:  But they're not part of the insurance

6     program.

7          MR. WILLIAMSON:  Well, Mr. McKinley explained that on

8     the WilProp form it was -- the WilProp policy form on the main

9     site.

10          THE COURT:  Thank you.

11          MR. WILLIAMSON:  So that's why he needed to cover it,

12     for those two reasons.  Insurers wanted a claim --

13          THE COURT:  All right.  I got it.

14          MR. WILLIAMSON:  Sorry.

15          THE COURT:  And then he repeats the points and

16     conclusions.

17          All right.  That's his report.  I accept that as I

18     read it as his testimony.

19          Now we'll do the tally points.

20          Yes, Mr. Williamson.

21          MR. WILLIAMSON:  Plaintiffs would like to offer the

22     report with all of its exhibits into evidence for the record.

23     Is that acceptable?  I understand your Honor summarized.

24          THE COURT:  We'll mark them for identification, but I

25     think I've covered everything that we need.  If I missed

D7GAWTC6ps

1    something, tomorrow morning you'll add it.  OK?

2              MR. WILLIAMSON:  Yes, your Honor.

3              THE COURT:  OK.  So I think I've got it all.

4              Mr. Byrnes.

5              MR. BYRNES:  Your Honor, I have clean copies of the

6    transcript for you if you would like to follow along.

7              THE COURT:  Thank you.

8              MR. WILLIAMSON:  Your Honor, is it possible to get a

9    bathroom break?  Thank you very much.

10             (Recess)

11             THE COURT:  Ready?

12             MR. BYRNES:  Your Honor, we were not going to put a

13   witness on the stand.  Your Honor, if it's acceptable to you, I

14   will just read the Q and A, unless you would like to us put a

15   witness on the stand.

16             THE COURT:  No, it's fine.

17             (Discussion held off the record)

18             THE COURT:  On the record, Paula.

19             I have this transcript in hand, January 4, 2013.

20             MR. BYRNES:  If it pleases the Court, we will read

21   excerpts on behalf of the aviation defendants from the

22   deposition of Edward R. Reilly taken on January 24, 2013 --

23   January 4th, excuse me, 2013.

24             Your Honor, our first excerpt is on page 22, starting

25   on line 19, through line 25.

D7GAWTC6ps

1              THE COURT:  OK.

2              MR. BYRNES:  "Q.  In paragraph 2 of your report, you

3     also state that you were a co-lead adjustor for the property

4     insurers of World Trade Center Properties with respect to the

5     property insurance claims made by WTCP and other named insureds

6     as a result of the events of September 11, 2001; is that

7     correct?

8     "A.  That's correct."

9              MR. BYRNES:  Your Honor, our next designation appears

10    on page 24, lines 15 to 19.

11             THE COURT:  Yes.

12             MR. BYRNES:  "Q. Very good.  Thank you.  Just to

13    clarify a couple of points there, did your firm and you

14    represent all of the insurers on the risk or some subset of

15    those insurers?

16    "A.  All of the insurers on the risk."

17             MR. BYRNES:  Your Honor, we'll turn next to page 30,

18    lines 3 to 6.

19             THE COURT:  I know that already.

20             MR. BYRNES:  OK.  Your Honor, we will next move to

21    page 38, starting at line 16.

22             THE COURT:  I know that too.

23             MR. BYRNES:  Your Honor, 16 gives a little context.

24    I'd be happy to go to 22 and read through.  We're going to read

25    22, page 30, 22, through page 38, 10.

D7GAWTC6ps

1          THE COURT:  I know he did not have any involvement in

2     the appraisal.

3          MR. BYRNES:  Your Honor, what we also wanted to get

4     across is that he has no knowledge of why the payments were

5     made, what occurred in the settlement agreements, the reason

6     for the payments.

7          THE COURT:  He just knows that there was a settlement

8     and a payment made following settlement.

9          MR. BYRNES:  Correct.

10         THE COURT:  In the amount called for by the

11    settlement.

12         MR. BYRNES:  He is unable to give any testimony as to

13    why the settlement was made or were why the payments were made.

14         THE COURT:  Didn't give any testimony.

15         MR. BYRNES:  May I read this into the record or would

16    you like to us proceed?

17         THE COURT:  I think we're finished with it.  So far

18    there's nothing to cross.

19         MR. BYRNES:  Your Honor, if we turn to page 82, line

20    5, we designate 5 to 8 and then 11, 23.

21         THE COURT:  Go ahead.

22         MR. BYRNES:  "Q. Is it your understanding that" --

23         excuse me, line 5:

24    "Q.  Is it your understanding that WTCP's tenants, the tenants

25    in the World Trade Center complex, stopped paying rent after

D7GAWTC6ps

1 the buildings were destroyed?

2 "A. That's my understanding, yes.

3 "Q. And is it your understanding that the rental

4 value/business interruption claim that World Trade Center

5 Properties submitted to its property insurers sought to recover

6 for the amount of rents it was no longer collecting, less, of

7 course, any noncontinuing expenses?

8 "A. That was the basis of the claim."

9    MR. WILLIAMSON: Your Honor, we have an objection to

10 the next question. May I lodge it now so your Honor can have

11 it in mind?

12    THE COURT: I have it in mind. Let me read the

13 question.

14    MR. WILLIAMSON: Thank you.

15    THE COURT: The objection is overruled, but the

16 question is not meaningful.

17    MR. BYRNES: I'm sorry, your Honor. I didn't hear the

18 end.

19    THE COURT: It's not a meaningful piece of testimony.

20 So you want to read it, read it.

21    MR. BYRNES: Thank you.

22    "Under its insurance, could WTCP have recovered rental

23 value/business interruption losses spanning the entire

24 remaining 99-year term of the net lease?

25 "A. Never happen."

D7GAWTC6ps

1          THE COURT:  He defined "business interruption" as rent

2    amount that is recovered in insurance between the time of

3    destruction and the time of restoration or replacement, caused

4    by the destruction.  That covers the testimony.  And you're not

5    cross-examining.

6          MR. BYRNES:  Your Honor, we would move next to 92,

7    starting lines 4 to 12, and then picking up again at page 94.

8          THE COURT:  Go ahead.

9          MR. BYRNES:  At line 3:

10   "Q.  Thank you.  Did the property forms and binders pertaining

11   to WTCP's property damage coverage contain any specific

12   provisions reflecting the fact that WTCP was a net lessee of

13   the buildings?

14   "A.  I don't recall.

15   "Q.  As you sit here, you can't think of any instance?"

16         THE COURT:  You know, that's not necessary.

17         MR. BYRNES:  Moving on to line 24, your Honor:

18   "Q.  The question I have is, does anything in the language of

19   WTCP's insurance forms or binders, etc., condition its access

20   to replacement cost or actual cash value on it having a

21   contractual obligation to rebuild the buildings?

22   "A.  No.

23   "Q.  Are you aware of anything written in the replacement cost

24   provisions of the forms or binders that referenced a

25   contractual obligation to rebuild on the part of WTCP?

D7GAWTC6ps

1    "A.   No.

2    "Q.   Does the availability of replacement cost or actual cash

3    value payments under WTCP's coverage depend in any way on the

4    WTCP having a contractual obligation to rebuild?

5    "A.   No."

6              Your Honor, we would then move to page 129 for what I

7    believe will be our final designation.  And it would be lines

8    12 to 20.

9              THE COURT:  Go ahead.

10             MR. BYRNES:  "Q. Sir, would you agree that the

11   replacement cost" -- excuse me, line 12:

12   "Q.   Sir, would you agree that the replacement cost payments

13   would have been available to WTCP under its insurance if it

14   elected to rebuild the World Trade Center Properties, even if

15   it had no contractual obligation to do so?

16   "A.   The contractual obligation to do so had nothing to do with

17   any payments made by the insurers."

18             I believe that's all the designations we have.

19             THE COURT:  Mr. Williamson, anything?

20             MR. WILLIAMSON:  No questions, your Honor.

21             THE COURT:  Thank you.

22             I return the -- may we keep the transcript?

23             MR. BYRNES:  That is for you, your Honor.

24             THE COURT:  Thank you.

25             MR. BYRNES:  You're welcome.

D7GAWTC6ps

1           THE COURT:  Next witness.

2           MR. WILLIAMSON:  Yes, your Honor.  We would like now

3    to do the parallel to what Mr. Podesta did with respect to the

4    stipulated facts that are on the jointly agreed-to stipulated

5    facts that are part of plaintiff's case.  So we would like to

6    ask your Honor to please receive them in evidence.

7           THE COURT:  OK.  And you'll have this available

8    tomorrow morning?

9           MR. WILLIAMSON:  Yes, that is correct, your Honor,

10   first thing.

11          And if I may, I defer to my partner, Ms. Baglin, who

12   can go through the ones that we need to offer.  They're not

13   every one, just the ones we need.

14          THE COURT:  OK.  I have the agreed stips.  Starting?

15          MS. BAGLIN:  The first one is on page 2, your Honor,

16   no. 7.  "The World Trade Center insurance program provided

17   coverage for, among other things, real and personal property

18   damage, lost rental value or business income losses, and extra

19   expense."

20          THE COURT:  OK.

21          MS. BAGLIN:  The next stipulated fact we would like to

22   use is no. 8, based primarily on court decisions in the

23   coverage litigation.  "The total amount of insurance

24   potentially available under the World Trade Center insurance

25   program was $4,678,906,257, given that certain insurers were

D7GAWTC6ps

1   required to respond on a one-occurrence basis while other

2   insurers were required to respond on a two-occurrence basis."

3   THE COURT:  Try not to read that which is already in

4   the record.  This is in the record numbers of times.

5   MS. BAGLIN:  We are not sure, your Honor, that it was

6   clear that --

7   THE COURT:  Clear, clear.

8   MS. BAGLIN:  -- it was based on the coverage

9   litigation decisions.

10   THE COURT:  It was clear.

11   MS. BAGLIN:  We would also like to read the next one,

12   no. 9, your Honor.  By the way, I'm sorry, no. 8 also goes to

13   show the basis for the totally available insurance calculation

14   that the witnesses talked about earlier.

15   The next one, no. 9.  This one addresses the $17 1/2

16   million payment by the Royal parent who hadn't issued policies

17   to WTCP.

18   THE COURT:  You really don't need this.  If your heart

19   is set on it, Ms. Baglin, you can read it.

20   MS. BAGLIN:  Excuse me, your Honor?

21   THE COURT:  If your heart is set on it, you can read

22   it, but it doesn't add any information that's useful.

23   MS. BAGLIN:  I think we did cover it in --

24   THE COURT:  You did.

25   MS. BAGLIN:  -- the witness testimony.  So I'll refer,

D7GAWTC6ps

1    your Honor.

2            The next one is no. 11.  "Certain insurance

3    payments" --

4            THE COURT:  We know this too, Ms. Baglin.

5            MS. BAGLIN:  The next one is no. 14.  I think this was

6    addressed in a general way but not a specific way.  This one

7    identifies the three insurers and the amounts of their policy

8    limits.

9            THE COURT:  What's the difference, Ms. Baglin?

10           MS. BAGLIN:  These are insurers who paid early on

11   without with respect to any coverage and not pursuant to the

12   coverage.

13           THE COURT:  They got coverage for the policy and got

14   rid of it.  It went away.  What's the difference?

15           MS. BAGLIN:  The difference is that these were not

16   payments, as Mr. Beach testified, that were pursuant to

17   well-documented claims.  They weren't with respect to any

18   documented claim submissions at all.  They were just policy

19   limits.

20           THE COURT:  Because they had a current expense.  They

21   had a small amount and they put it in.  They knew it was going

22   beyond, the layer would be exceeded.  And they knew that early.

23   So they limited their expense.

24           If you want to do again -- put it in if you want to.

25   But, you know, you're just touting the obvious.  You've got

D7GAWTC6ps

1    some important points to make in this case, and you're

2    distracting my mind with nonsense.  It's not the way.

3            MS. BAGLIN:  The next one, your Honor, no. 20,

4    Mr. Williamson already gave the numbers in here.  This states

5    it in writing.  Your Honor had asked us to give you a summary

6    of those, and we will be giving you a summary of those.

7            THE COURT:  So I'll get it in the summary.

8            MS. BAGLIN:  No. 21, your Honor, this one shows that

9    the replacement cost insurance was for the building that

10   existed, not the new building.  It reads, "The replacement cost

11   claim of $7 billion some odd dollars was placed on a

12   replacement budget" --

13           THE COURT:  Read the real thing.  Put it in as it is.

14           MS. BAGLIN:  "The replacement cost claim of

15   $7,183,441,908 was based on a replacement budget estimate

16   prepared by WTCP's construction consultant, Tishman

17   Construction Corporation, of the cost of replacing the World

18   Trade Center complex 'as it existed immediately prior to the

19   events of September 11, 2001.'  All estimates were based on

20   construction costs as of September 11, 2001."

21           And the next one is 22, your Honor.  We've already

22   discussed TBD.  This lists all the items of TBD in one

23   convenient location.  If you prefer to get it from the

24   Cambridge Horizon summaries.  It's just looking to different

25   documents.  This summarizes it concisely in one place.  So if I

D7GAWTC6ps

 1    may, I'll read it in.

 2                THE COURT:  Go ahead.

 3                MS. BAGLIN:  "The WTC complex partial claim summary

 4    listed the following as to be determined ('TBD'):  II.

 5    Additional building items -- demolition and debris removal;

 6    pollution cleanup and removal; transmission antennae dishes;

 7    III. business personal property -- building management office

 8    furniture/equipment -- machinery/supplies; building maintenance

 9    equipment -- machinery/supplies; property of others; other

10    miscellaneous business personal property; IV. other covered

11    property -- accounts receivable; valuable papers/records;

12    electronic data processing -- data and media; personal effects

13    of officers/employees; fine arts; contractors' equipment --

14    machinery; and V. additional covered costs and expenses --

15    expediting expenses; claim data expenses; tenant move-back

16    expenses; other miscellaneous expenses."

17                The next one, your Honor, which I believe Mr. Podesta

18    probably intended to read but I think it was dropped, is no. 32

19    on page 6.  This relates to the insurance premiums paid for the

20    7 World Trade Center insurance policy.  "During the two-year

21    period immediately preceding September 11, 2001, 7 WTC Co. paid

22    a total of $482,793 in insurance premiums for property

23    insurance coverage for WTC 7 and paid a total of $3,500.17 in

24    insurance premiums for fine arts coverage for paintings and

25    other artwork at WTC 7."

D7GAWTC6ps

1          The next one I was going to read is no. 35, but I

2     think that has just come before your Honor in the most recent

3     testimony, so I'll skip that one.

4          36 is the concise listing of the TBD elements.  For 7,

5     it reads, "The WTC 7 partial claim summary listed the following

6     as 'to be determined' ('TBD'):  (I) building -- debris removal

7     and pollution removal; (II) personal property -- office

8     furniture/equipment/supplies; maintenance equipment/supplies;

9     personal property of officers/employees; property of others

10    while in the custody of the insured; miscellaneous personal

11    property; (III) other covered property -- valuable

12    papers/records; accounts receivable; professional fees;

13    expediting expenses for repairs; and (IV) time element and

14    extra expense -- extra expenses, off-premises power including

15    transmission facilities."

16          And the final stipulated fact, I think it's the last

17    one -- I'm sorry, two more -- no. 43 on page 7, your Honor,

18    "The February 27, 2003 interim proof of losses also stated that

19    (a) 7 WTC Co. had suffered and continued to suffer 'substantial

20    business income and other losses' and that 7 WTC Co. had

21    calculated that covered business income and other time element

22    losses were or would be approximately $441,698,256 as set forth

23    in a schedule C; (b) 7 World Trade Co. intended to submit

24    claims from time to time for specific amounts due to the

25    insured in connection with the rebuilding and replacement of

D7GAWTC6ps

WTC 7; (c) 7 WTC Co. had made and will continue to make 'claims

for insured loss including without limitation such business

income and other time element losses and may make future claims

for certain other covered property, costs, liabilities and

expenses as referred to in schedule C or in the policy'; and

(d) 7 WTC Co. was entitled to and claimed prejudgment interest

on all amounts claimed to the maximum extent provided in the

policy or under applicable law, with interest having commenced

accruing on May 15, 2002, as well as such other damages and

penalties to which 7 WTC Co. may be entitled under applicable

law."

          And finally, your Honor, stipulated fact no. 50, "On

June 12, 2003, 7 WTC Co. filed a lawsuit against IRI in the

matter of 7 *World Trade Company, L.P. v. Industrial Risk*

*Insurers and Westport Insurance Corporation,* 03 CV 4292, United

States District Court for the Southern District of New York."

          Thank you.  That's it, your Honor.

          THE COURT:  OK.

          MR. WILLIAMSON:  Your Honor, if we may, we propose to

start with Professor Shavell tomorrow morning.

          THE COURT:  Yes.  What was the last number you put in,

Ms. Baglin?

          MS. BAGLIN:  No. 50, your Honor.  Let me just

double-check.

          THE COURT:  50.  All right.  Thank you.  We'll recess

D7GAWTC6ps

1    until tomorrow morning until o10 o'clock.

2              MR. WILLIAMSON:  I thought tomorrow was 10:30 or is

3    it --

4              THE COURT:  No.  I canceled the appointment.

5              MR. PODESTA:  Your Honor, may I pose a question?

6              THE COURT:  Yes.

7              Before we go off the record.  We're on the record.

8              MR. PODESTA:  Assuming that we finish with Professor

9    Shavell tomorrow morning --

10             THE COURT:  That's exactly what I wanted to address.

11             MR. PODESTA:  I was just wondering whether we were

12   going to have closing arguments tomorrow.

13             THE COURT:  That's exactly what I wanted to address.

14             (Discussion held off the record)

15             THE COURT:  On the record -- stay off the record.

16             (Discussion held off the record)

17             THE COURT:  Back on the record, Paula.

18             We've had an off-the-record discussion about the time

19   that's necessary for completion of the case.  Mr. Shavell is

20   the remaining witness of the plaintiff, and he will start at 10

21   o'clock -- Professor Shavell -- he'll start at 10 o'clock

22   tomorrow morning.  I anticipate that we will finish with

23   Mr. Shavell in the morning, and that will be followed by

24   presentation into evidence by Mr. Williamson of certain

25   documentary evidence which he is going to review tonight

D7GAWTC6ps

because I have a strong belief that pretty much everything that
he would want to put on has already been made part of the
record.

           At any rate, we should finish, then, tomorrow.  But
Mr. Podesta does not anticipate a rebuttal case, but he
reserves the right to make a decision, before making his final
decision.

           I then suggested that we recess until Thursday
morning.  Each side will then have one hour for closing
arguments.  Mr. Podesta will go first and can reserve any part
of closing he wishes to for rebuttal.  Mr. Williamson will go
second.  Mr. Podesta will then deliver his rebuttal.  That will
probably take us through most of the morning.  We'll break for
lunch.  We'll come back at 2:30.  And I will deliver my
opinion, probably in the form of findings and conclusions.

           That's our program.  Have a good evening.  I'll see
you tomorrow at 10 o'clock.

           MS. BAGLIN:  Thank you, your Honor.

           MR. WILLIAMSON:  Thank you, your Honor.

           (Adjourned to 10:00 a.m., July 17, 2013)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    DANIEL ROBERT FISCHEL

 4    Direct By Mr. Podesta  . . . . . . . . . . . 177

 5    Cross By Mr. Williamson  . . . . . . . . . . 213

 6    JEFFREY G. McKINLEY

 7    Direct By Mr. Williamson . . . . . . . . . . 276

 8    Cross By Mr. Byrnes  . . . . . . . . . . . . 322

 9                        PLAINTIFF EXHIBITS

10    Exhibit No.                              Received

11     563  . . . . . . . . . . . . . . . . . . . 282
       564  . . . . . . . . . . . . . . . . . . . 318
12                         JOINT EXHIBITS

13    Exhibit No.                              Received

14     206  . . . . . . . . . . . . . . . . . . . 292
       210  . . . . . . . . . . . . . . . . . . . 311
15

16

17

18

19

20

21

22

23

24

25
```