D7HAWTC1ps

<pre>
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                              21 MC 101
 3    In Re: September 11 Litigation          08 CV 3719 (AKH)
                                              08 CV 3722 (AKH)
 4    ------------------------------x

 5                                            New York, N.Y.
                                              July 17, 2013
 6                                            10:05 a.m.

 7
      Before:
 8
                          HON. ALVIN K. HELLERSTEIN
 9
                                              District Judge
10

11                            APPEARANCES

12    FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
              Attorneys for WTCP Plaintiffs
13            and 7 World Trade Co.
      BY:  RICHARD A. WILLIAMSON, ESQ.
14         CATHI BAGLIN, ESQ.
           JASON T. COHEN, ESQ.
15         MEGAN P. DAVIS, ESQ.

16    DEBEVOISE & PLIMPTON LLP
              Attorneys for Defendant American Airlines
17    BY:  ROGER E. PODESTA, ESQ.
           ERICA WEISGERBER, ESQ.
18
      CONDON & FORSYTH LLP
19            Defense Liaison Counsel for American Airlines
      BY:  DESMOND T. BARRY, ESQ.
20
      LOCKE LORD BISSELL & LIDDELL LLP
21            Attorneys for Defendant Globe Aviation
              Services Corporation
22    BY:  ANN C. TAYLOR, ESQ.
           T. PATRICK BYRNES, ESQ.
23
      O'MELVENY & MYERS LLP
24            Attorneys for Defendant Massachusetts
              Port Authority
25    BY:  WILLARD MARK WOOD, ESQ.
</pre>

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7HAWTC1ps

1    APPEARANCES (Cont'd)

2    RICHARD KIBBE & ORBE LLP
          Attorneys for Defendant Boeing Co.
3    BY:  BRIAN S. FRASER, ESQ.

4    Also Present:  John N. Lieber
                    President
5                   World Trade Center Properties, LLC

6              (Trial resumed)

7              THE COURT:  Before we introduce Mr. Shavell, I was

8    thinking about what we have learned the last few days from the

9    insurance experts, and I don't think I have a good

10   understanding of what Mr. Beach meant by "actual cash value."

11   I think I know what both Mr. McKinley and Mr. Beach said about

12   depreciation, which is not an accounting term but merely an

13   estimated value of the reduced value of the building from the

14   time it was new to the time just before the catastrophe.  But I

15   have trouble in my mind putting together these two concepts.

16   And I wonder whether Mr. Podesta or Ms. Taylor, if you could

17   help me understand what Mr. Beach was saying.  And I'll ask

18   Mr. Williamson to help me with what Mr. McKinley was saying.

19             MR. PODESTA:  I think what Mr. Beach was saying was

20   not dramatically different from what Professor Shavell was

21   saying.

22             THE COURT:  No, different, because, one is talking

23   about insurance and the latter is talking about economics.

24             MR. PODESTA:  All right.  Actual cash value is the

25   recovery that you get under an insurance policy if you are not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7HAWTC1ps

1    rebuilding the building.  Actual cash value has the meaning

2    that's defined in the insurance policies.  In most insurance

3    policies, it is defined as replacement cost for the building as

4    is with new materials, minus an allowance for depreciation.

5    That depreciation is determined by the condition at the time of

6    loss.

7            THE COURT:  What is the minus taken from?

8            MR. PODESTA:  The minus is taken from what it would

9    cost to replace the building brand-new, the same building

10   brand-new, with new materials.  And say it would cost to

11   replace -- a particular structure is destroyed -- $1 million,

12   brand-new, new material, same size, same design, everything the

13   same, except of course you don't go out and find old bricks to

14   put in your new building.  That's replacement cost in the

15   insurance sense.

16           Actual cash value in the insurance sense is, in most

17   policies and I believe in the absence of a policy definition,

18   replacement cost minus depreciation, that is, the depreciation

19   that is in effect on the date of the loss.  If the building was

20   built, say, in 1995 and it had incurred depreciation such that

21   the estimated value of the building was reduced by 10 percent,

22   you would take $1 million minus 10 percent depreciation equals

23   $900,000.  Now, some policies, like the WilProp form and other

24   policies without definition in broad evidence rule states, also

25   indicate that actual cash value can never be less than the

D7HAWTC1ps

market value that would be paid by willing buyer, willing
seller.

            But the basic concept of actual cash value is that you
take -- it's a close cousin of replacement cost.  You start out
with replacement cost.  You can't determine actual cash value
unless you know what the replacement cost is.  So you first
estimate replacement cost, same building but new.  And then you
take a look, well, how old is the building, what is its
condition.  We're also looking at physical depreciation.  And
you say, all right, this building is worth 10 percent less.  So
you don't get a million, you get $900,000, if you don't
rebuild.

        THE COURT:  I understand.  You take a building as it
stood when it was new and you decline it by the percentage of
depreciation, and take that same percentage and you apply it
against the replacement cost.

        MR. PODESTA:  That's correct.  You don't take the
percentage of depreciation like you might take an IRS
depreciation schedule.

        THE COURT:  It's different from accounting.  It's
different from tax.  It's a rough percentage diminution in
value of the building owing to wear and tear.

        MR. PODESTA:  But actual cash value basically drops
out of the equation if you are rebuilding and you have a policy
that provides for replacement cost, although actual cash value

D7HAWTC1ps

1     may be the basis for advances during at judgment period.

2               THE COURT:  Actual cash value would then be the

3     equivalent of, what, market value, or cost or what?

4               MR. PODESTA:  In some policies.  But it's basically

5     replacement cost minus an allowance for depreciation.

6               THE COURT:  Now, Mr. McKinley said he doesn't think it

7     is depreciation.  I don't know what he meant by that.  Do you

8     understand what he meant by that?  Maybe Mr. Williamson can

9     help me understand.

10              MR. PODESTA:  I think Mr. Williamson would better

11    answer that.  But my impression was what he was saying was he

12    was switching to the accounting sense, and you don't figure

13    depreciation on a schedule.  You don't say this building was

14    built in 1995, it's six years old, you take 3% off for each of

15    the six years.  You look at the actual condition of the

16    building at the time of the loss.  I think he described it as

17    more like an appraisal than an accounting depreciation

18    analysis.

19              THE COURT:  Thank you.

20              Mr. Williamson.

21              MR. WILLIAMSON:  Ms. Baglin will address it, your

22    Honor.

23              MS. BAGLIN:  Your Honor, we will be offering, as we

24    discussed yesterday -- it's actually admitted but we put

25    together for your Honor Joint Exhibit 205.  That is a Cambridge

D7HAWTC1ps

1    Horizon report.  And one of the books of that analysis is the

2    actual cash value analysis, and it actually explains the

3    depreciation method that was used here in differentiating

4    actual cash value from replace cost.

5            THE COURT:  Tell me what you understand.

6            MS. BAGLIN:  What I understand is it is not an across

7    the board, a single depreciation factor.  I agree with

8    Mr. Podesta that it's not a straight-line factor based on the

9    useful life of the building.  It is based on the useful life of

10   the conditions of individual components of the building, your

11   Honor.  It recognizes that the passage of time itself may not

12   create any additional depreciation if the component is well

13   maintained and sound.

14           THE COURT:  What do you mean by "component"?

15           MS. BAGLIN:  Well, some components, for example, the

16   concrete footings, the steel beams, they look at each

17   individual component, just as the appraisal did, your Honor, in

18   deciding what the replacement cost is.  They look at, what

19   would the cost be of each actual beam of steel, each actual

20   system or mechanical equipment.

21           THE COURT:  You moon a replacement cost?

22           MS. BAGLIN:  Yes.  It's done on a

23   component-by-component basis.  And then, in figuring

24   depreciation, that's also done on a component-by-component

25   basis, your Honor.  If there are some components that may never

D7HAWTC1ps

```
1   have to be replaced, like the concrete footing, that sort of

2   thing.  So even if your building is 20 years old, that's still

3   essentially good as new, has very little depreciation.  Other

4   systems could depreciate more rapidly, for example, an air

5   conditioning system.  But they look at the condition of the

6   building at the time of the loss.  So if, for example, a

7   brand-new air conditioning system had just been put in a year

8   ago, then there isn't very much depreciation to that.  If you

9   put in a new one today --

10          THE COURT:  So did they ask how much percentage

11   decline in each of those components.

12          MS. BAGLIN:  That's right.  Some of them have very

13   little or none.  Some have more than that.

14          THE COURT:  Then come to an aggregate.

15          MS. BAGLIN:  Right.  It is not a depreciation of the

16   entire replacement of the building.  It's done very

17   specifically on a component-by-component basis and looking at

18   the actual condition of that component at the time of the loss.

19          THE COURT:  Thank you.

20          OK.  Now I'm ready for Shavell.

21          MS. BAGLIN:  That is in Joint Exhibit 205, which we'll

22   be presenting later.  It is already submitted in evidence.

23          MR. PODESTA:  If I might add, your Honor, I basically

24   agree with that.  That's why the Cambridge Horizon report is

25   like 2,000 pages long.  They do every individual component.
```

D7HAWTC1ps

1    But they ultimately come up with a total.  And actual cash

2    value wasn't much different from replacement cost in the case

3    of this building.  A few percent.

4              THE COURT:  OK.  Mr. Shavell.

5              MR. WILLIAMSON:  Good morning, your Honor.  Plaintiffs

6    call Professor Steven Shavell.

7              THE COURT:  Pay attention to the oath, please.

8              Do you swear to tell the truth, the whole truth, and

9    nothing but truth, Mr. Shavell?

10             THE WITNESS:  I do.

11             THE COURT:  Thank you.  Spell your name slowly for the

12   reporter.

13             THE WITNESS:  My first name is Steven, with a V, and

14   my last name is Shavell, S-h-a-v as in victor, e-l-l.

15             THE COURT:  No middle name.

16             THE WITNESS:  There is a middle name, Mark.

17             THE COURT:  So Steven M. Shavell.  Thank you,

18   Mr. Shavell.

19             You may inquire, Mr. Williamson.

20             MR. WILLIAMSON:  Thank you, your Honor.

21    STEVEN M. SHAVELL,

22        called as a witness by the plaintiff,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. WILLIAMSON:

Q.   Good morning, Mr. Shavell.  Please tell his Honor what your
profession is.

A.   I am an economist and a professor.

Q.   Where do you work?

A.   Harvard Law School.

Q.   What is your position at Harvard Law School?

A.   I'm a professor of law and economics.

Q.   How long have you been at Harvard?

A.   Since 1974.  I was for six years in the department of
economics at Harvard and then in 1980 moved from the economics
faculty to Harvard Law School.

Q.   Would you please describe briefly for his Honor your
educational background.

A.   I graduated from the University of Michigan in 1968, with a
degree in mathematics and a degree in economics.  And then from
1970 to '73 I was a graduate student at MIT in their Ph.D.
economics program.  I obtained a Ph.D.

            THE COURT:  With Professor Samuelson?

            THE WITNESS:  I did.  I was his research assistant.  I
even played tennis with him once.  He's a good tennis player.

            THE COURT:  I didn't know that.  I know he was the
leading economist at the time I went to school and I read his
textbook.

            THE WITNESS:  The same with me.

            THE COURT:  Sorry.  Old people tend to reminisce.

D7HAWTC1ps                    Shavell - direct

1   Q.  Can you summarize, please, briefly your employment history

2   for Judge Hellerstein.

3   A.  Yes.  Between 1968 when I graduated from the University of

4   Michigan and 1970, I was a first lieutenant in the public

5   health service at the Centers for Disease Control in Atlanta.

6   Then in my last year of graduate school I was an assistant

7   professor in the economics department at Boston College.  And

8   then in 1974, as I said, I joined the department of economics

9   at Harvard University, and I've been a professor at Harvard

10  since then but with two stints as a visiting professor

11  elsewhere over those years.

12  Q.  Do you hold any other positions at Harvard Law School?

13  A.  I am the director of what's called the center for law,

14  economics, and business.

15  Q.  What is the nature of your teaching and research?

16  A.  Since moving to Harvard Law School it's been focused on

17  legal issues.  Of course if I were not interested in the law I

18  wouldn't be at Harvard Law School.  And the subject areas in

19  which I'm interested are, they're subject areas of first-year

20  law students, namely torts and insurance, contracts, property

21  law, criminal law, and litigation and the legal process.

22  Q.  What are some of the courses that you teach at Harvard Law

23  School?

24  A.  Almost each one has the words "law and economics" in its

25  title.  One course is called economic analysis of law and it

1   deals with the basic areas of law that I just described to you

2   but from an economic perspective.

3   Q.   Professor Shavell, have you written any books?

4   A.   Yes.

5   Q.   What books have you written?

6   A.   I've authored or coauthored four books, four scholarly

7   books, and one textbook.

8   Q.   Could you give his Honor an example of one.

9   A.   The first book I wrote by myself is called *Economic*

10  *Analysis of Accident Law*, and it deals with torts and

11  insurance.

12  Q.   Have you published any articles?

13  A.   Many.

14  Q.   Roughly how many?

15  A.   Over a hundred, probably around 130.

16  Q.   On what subject?

17       THE COURT:  I think I know the subjects.  At some

18  point, when it's convenient, you can offer him as a qualified

19  expert.

20       MR. WILLIAMSON:  Yes, your Honor.

21       THE COURT:  And I will agree.

22       MR. WILLIAMSON:  Just briefly so that your Honor --

23       THE COURT:  I never like to cut anyone short in

24  hearing all of his qualifications.  There are few places in

25  life where you can just sit and agree and not feel that you're

1    boasting.

2    Q.  Have you received any honors or fellowships, just to

3    briefly finish?

4    A.   Yes.  A number of years ago I was awarded a Guggenheim

5    fellowship.  I was elected for membership in the American

6    Academy of Arts and Sciences.  Most recently, in May, it was

7    announced I would be awarded what's called the Coase Medal for

8    Scholarship in Law and Economics.  And I will be, once I'm

9    awarded the medal, the third recipient.  The other two were

10   Judge Richard Posner and Judge Guido Calabresi.

11              MR. WILLIAMSON:  Your Honor, I would like to ask to

12   have Professor Shavell's curriculum vitae marked as Plaintiff's

13   Exhibit 565.

14              MR. PODESTA:  No objection.

15              THE COURT:  Received.

16              (Plaintiff's Exhibit 565 received in evidence)

17              THE COURT:  Do you offer Professor Shavell as an

18   expert on economics?

19              MR. PODESTA:  No objection.  We will --

20              THE COURT:  He hasn't offered him.

21              MR. PODESTA:  Oh, I'm sorry.

22              THE COURT:  Mr. Williamson.

23              MR. WILLIAMSON:  Yes.  Plaintiffs offer Professor

24   Shavell as a qualified expert in the field of law and

25   economics.

1              THE COURT:  So ordered without objection.

2              MR. PODESTA:  I do want to note, though, that we will

3     have objections to the extent Professor Shavell gets into legal

4     issues.

5              THE COURT:  Of course you'll object.

6              MR. PODESTA:  Thank you.

7              THE COURT:  I don't need to be warned.

8     Q.  What's the nature of the assignment that you had in these

9     cases, Professor Shavell?

10    A.  My assignment was to apply economic analysis in considering

11    the possible correspondence between insurance payments received

12    by the plaintiffs in this matter and tort damages that they

13    might be awarded in the circumstances of the 9/11 attack on the

14    World Trade Center complex.

15    Q.  So as an economist, what is the process, please tell his

16    Honor, by which you conducted your analysis.  What was your

17    methodology?

18    A.  My methodology consisted of five elements: first, to

19    identify categories of economic loss suffered by the

20    plaintiffs; second, to identify the categories of insurance

21    payments that the plaintiffs received; third, to identify

22    categories of tort damages that they might be awarded; fourth,

23    to line up in some sense the categories of insurance payments

24    received with the categories of tort damages that might be

25    awarded and to see if there is a correspondence between

1   categories of insurance payments received and tort damages that

2   might be awarded.  It's a kind of matching exercise.  And then

3   fifth and last, to apply an economic test to the matching

4   exercise to the correspondence analysis to see if it's right by

5   means of asking the question do the correspondence conclusions

6   prevent windfalls to plaintiffs.

7   Q.  Now, Professor, did you reach a conclusion as to whether

8   there is any possible correspondence for the main site?

9   A.  Yes.

10  Q.  What was that conclusion?

11  A.  In general terms the conclusion was there is a potential

12  correspondence between insurance payments that might be deemed

13  to have been received for loss of rental income and tort

14  damages that might be awarded for loss of rental income, but no

15  correspondence between insurance payments that might be said to

16  have been received for replacement costs and possible tort

17  damages.

18  Q.  So as a result of that conclusion, did you determine what

19  was the maximum possible correspondence consistent with the

20  conclusion you just stated?

21  A.  Do you mean in dollar terms?

22  Q.  Yes, I do.

23  A.  I don't remember the exact number.  It was between 6 and 7

24  hundred million, but we'll see it very shortly in a

25  demonstrative.

D7HAWTC1ps                      Shavell – direct

1    Q.  Did you prepare an exhibit summarizing that conclusion that

2    you have stated?

3    A.  Yes.  That's what I meant by "demonstrative exhibit."

4            MR. WILLIAMSON:  Mr. McCleod, can you pull up the

5    first slide, please.

6            Your Honor, it will be a series of four slides.  We'll

7    offer them at the end.  We've given them to counsel.

8            THE COURT:  Why don't you offer them now.

9            MR. WILLIAMSON:  Offer them now, yes, your Honor.

10   Mr. Cohen will hand them up.

11           MR. COHEN:  I'll hand up the first one.

12           MR. WILLIAMSON:  Do you want them marked separately or

13   as a group, your Honor?

14           THE COURT:  Mark them each separately.

15           MR. WILLIAMSON:  These would be in order:  Plaintiff's

16   Exhibit 566, 567, 568, and 569, the first two relating to the

17   main site and the second two relating to 7 World Trade Center.

18           THE COURT:  Why don't you describe each so the record

19   will be clearer.

20           MR. WILLIAMSON:  Yes, your Honor.  Plaintiff's Exhibit

21   566 is entitled "Maximum Possible Correspondence between WTCP's

22   Insurance Recoveries and Potential Tort Damages."  And Exhibit

23   567 is entitled "Insurance Recovery by WTCP and its Possible

24   Allocation."  And Plaintiff's Exhibit 568 is entitled "Maximum

25   Possible Correspondence between 7 WTC Co. Insurance Recoveries

1    and Potential Tort Damages."  And then the last --

2              THE COURT:  So 568 and 566 are the same, covering

3    different buildings.  Same analysis, different buildings.

4              MR. WILLIAMSON:  You're exactly right.  Exactly right.

5              And then the last, similarly, parallels, one for the

6    main site.  It's Plaintiff's Exhibit 569.  It's entitled

7    "Insurance Recovery by 7 WTC Co. and its Possible Allocation."

8    So those are the four.  And we have up on the screen the first

9    of the --

10             THE COURT:  Mr. Cohen do you have another set for him?

11             MR. COHEN:  Yes, I'll give him another set, sure.

12   Q.  So, Professor Shavell, you see the one that's on the screen

13   so we're all working from the same one?  That's Plaintiff's

14   Exhibit 566?

15   A.  Yes.

16   Q.  OK.  So could you please explain to his Honor what this

17   exhibit that you prepared shows in summarizing your analysis in

18   regard to maximum possible correspondence as to the main site.

19   A.  Yes.  On the left, your Honor, which I think you can see --

20             THE COURT:  Yes.

21   A.  -- there is a bar representing insurance recoveries.  The

22   total is little over $4 billion.  I can, and will, elaborate on

23   how that number was arrived at.  It's a net insurance recovery.

24   And then in the bar, you can see two colored parts.  On the top

25   is rental income loss recovery, and the figure is $638,965,006,

1   which represents 15.8 percent of the total insurance

2   recoveries.  And again I'll explain how that breaks down, could

3   be arrived at.  And then, underneath it, is the replacement

4   cost amount of insurance recovery that could be deemed to

5   represent what plaintiffs received from their insurers for the

6   replacement cost expenses.

7          Then you can see an arrow going from rental income

8   loss on the left under Insurance Recovery to the right, where

9   there is a bar representing potential tort damages, which I am

10  assuming can be for rental income loss but, since there's no

11  bar there for replacement costs, that reflects my assumption

12  that there cannot be tort damages for replacement cost.

13         So the possible correspondence, therefore, can only be

14  between the rental income loss insurance recovery and tort

15  damages for rental income losses.

16         THE COURT:  Is the maximum possible correspondence

17  figure of $638,965,006 15.8 percent of $2 billion 805 million?

18  Is that how you get it?

19         THE WITNESS:  Your Honor, it's 15.8 percent of the

20  insurance recoveries, because on the left, the bar is supposed

21  to represent the breakdown of the insurance recovery of the 4

22  billion.

23         THE COURT:  I understand.  I misread.  I see it.

24         You're applying that.

25         THE WITNESS:  Yes.

D7HAWTC1ps                          Shavell - direct

1           THE COURT:  So in order to arrive at the same fraction

2     to come to your figure of maximum possible correspondence, you

3     then take 15.8 percent of $2,805 million?

4           THE WITNESS:  I do not, your Honor, because the -- let

5     me step back for a second.

6           THE COURT:  Let me withdraw the question and just ask

7     you to explain, what's the answer to the arrow leading to the

8     right?

9           THE WITNESS:  The answer, what I meant by the arrow

10    leading to the right is that whatever the amount of tort

11    damages might turn out to be for rental income losses, there

12    can be a subtraction of up to the full amount of insurance

13    proceeds for that same category, namely rental income loss.

14    So, for example, if there were a tort award of a billion

15    dollars for rental income loss, then there could be a set-off

16    from that $1 billion tort award of the entirety of the rental

17    income recovery of $638,965,006.  But one couldn't subtract --

18    the reason the word "maximum" is there is that one couldn't set

19    off more than the insurance payment received for rental income

20    loss from a tort award for rental income loss.  One could only

21    subtract the insurance payment deemed to have been received for

22    rental income loss.

23          THE COURT:  Whatever the tort recovery, deduct $638

24    million.  That's the maximum possible correspondence for the

25    insurance.

 1              THE WITNESS:  That's what this is supposed to

 2      represent.  Of course you can't go below zero.  But with that

 3      proviso, yes.

 4              THE COURT:  OK.

 5              THE WITNESS:  So --

 6              THE COURT:  I think you can wait for the next

 7      question.

 8      Q.  So in your analysis, what are the categories of loss

 9      suffered?  You told us your methodology had that as your first

10      step.

11      A.  Yes.

12              THE COURT:  Loss suffered, what, from an economic

13      standpoint?

14              MR. WILLIAMSON:  Yes, from an economic perspective,

15      your Honor.  Thank you.

16      A.  The two major categories of economic loss suffered by the

17      plaintiffs due to the 9/11 attack were, in my opinion,

18      replacement costs and rental income losses.

19      Q.  Following the second step in your methodology, you told us

20      you examined the categories from the insurance president.  What

21      are the major categories of the insurance proceeds that you

22      identified regarding the main site?

23      A.  The two major categories of insurance coverage were exactly

24      the categories of economic loss that I just mentioned.  The

25      category of coverage for rental income loss, that might have

1   been called business interruption in most of the policies, and

2   a category of coverage for replacement costs, which might have

3   been described under the heading of property damage in many of

4   the policies.

5   Q.  With respect to the third step in your methodology, you

6   told us that you looked to see what are the categories of

7   potential tort damages that may be awarded.  What did you

8   assume in that regard?

9   A.  I assumed that one category of potential tort damages is

10  for losses of rental income.  And I assumed that replacement

11  costs was not a category of potential tort damages.

12  Q.  Then the fourth step you told his Honor in your methodology

13  was looking to see --

14          THE COURT:  Have you finished your answer?  The

15  potential categories of tort recovery?  Only losses of rental

16  income?

17          THE WITNESS:  My testimony, your Honor, is that I

18  assumed -- this is not an expert opinion, of course, because

19  I'm not a legal expert -- I assumed that a potential category

20  of tort damages is rental income losses.  I'm not assuming that

21  there aren't other categories of tort damages.  I remember, for

22  example, reading that there might be tort damages for certain

23  personal property losses.  But I am assuming that damages for

24  rental income losses constitutes a major category of potential

25  tort damages.

 1             THE COURT:  What about the destruction of the asset

 2     that gives rise to the rental income?  Does that count as a

 3     category of loss in a potential tort recovery?

 4             THE WITNESS:  Because I'm assuming that replacement

 5     cost expenses suffered by the plaintiffs are not a potential

 6     category of tort damages, I think the answer to your question

 7     is, I'm assuming that there can't be tort damages awarded to

 8     the plaintiffs for the property damage.  My understanding is,

 9     the plaintiffs are not the owner of the property but, rather,

10     of a leasehold interest.

11             THE COURT:  A 99-year leasehold.

12             THE WITNESS:  Correct, a 99-year leasehold interest.

13     So -- well --

14             THE COURT:  So your testimony is that the loss of the

15     total stream of rental income subsumes all other categories

16     of -- withdrawn.  So you're assuming that the loss of the total

17     stream of rental income subsumes the loss of the asset giving

18     rise to that income as well.

19             THE WITNESS:  Your Honor, I'm not sitting here making

20     an assumption about what the loss of rental income subsumes.

21     I'm thinking of it in very simple, I think, in a

22     straightforward fashion, that there is a stream of rental

23     income that plaintiffs would have enjoyed if the towers had not

24     been destroyed, and because of the terrorist attack of course

25     the towers were destroyed, so this rental stream of income has

D7HAWTC1ps                          Shavell – direct

 1    been interrupted.  It will resume at some point as the towers

 2    are rebuilt.  It already has resumed, I understand, for 7 World

 3    Trade Center.  So that one component of the tort loss that I am

 4    imagining there might be an award for if there were a trial is

 5    the stream of rental income that turns out to have been lost by

 6    plaintiffs.  Wholly separate from that is the cost of replacing

 7    the towers.  And I have been told to assume that there cannot

 8    be a tort award for that contractual expense borne by

 9    plaintiffs.

10         So these are the assumptions that underlie my

11    correspondence analysis.  If the assumptions were changed of

12    course the analysis might change.  But those are my

13    assumptions.

14              THE COURT:  Continue, please.

15              MR. WILLIAMSON:  Thank you.

16    Q.  Now, with regard to the fourth step in your methodology you

17    that told his Honor about, looking to see if there's lining up

18    or a match in your correspondence analysis, what did you

19    conclude with regard to the main site and how is that shown on

20    this exhibit, Plaintiff's Exhibit 566?

21    A.  Well, it's obvious from the visual display exactly how to

22    line things up because there's only one category of potential

23    tort damages, given my assumptions, and it's colored in green.

24    So it's very easy to line it up with the same category of

25    insurance payments.  I'm not even sure I would call this part

1   of the analysis.  It's automatic in character.

2   Q.  Now, the last step in your methodology you said was testing

3   the economic correctness, I believe?

4   A.  Yes.

5   Q.  And would a windfall result -- withdrawn.

6           Did you test the economic correctness of this analysis

7   that's in Plaintiff's Exhibit 566?

8   A.  Yes.

9   Q.  Would a windfall result if the Court accepted your

10  conclusion?

11          MR. PODESTA:  Objection.

12  Q.  From an economic perspective?

13          THE COURT:  Repeat the question, please.  Rephrase it.

14          MR. WILLIAMSON:  Yes, your Honor.

15  Q.  From an economic perspective, would a windfall result if

16  the Court accepted your conclusion from your analysis that's

17  reflected on this exhibit, Plaintiff's Exhibit 566?

18          MR. PODESTA:  Objection.

19          THE COURT:  Is "windfall" an economic concept?

20          THE WITNESS:  I would say that "windfall" is not a

21  term used in the formal sense in economics.  We all know what

22  it means, but we could use a synonym for it, which would be

23  "overcompensation."  That would maybe avoid the problem here.

24          THE COURT:  I'll allow an answer.  If there were a

25  jury I might sustain an objection.  But I will let the answer

D7HAWTC1ps                    Shavell - direct

1    be given.

2    A.  The fifth and final step of my correspondence analysis is

3    to check its correctness by asking myself the question --

4              THE COURT:  Does it make sense.

5    A.  -- does it make sense from the perspective of a particular

6    economic test.  And that test is, do my correspondence

7    conclusions serve the purpose of preventing plaintiffs from

8    receiving too much compensation for a loss for which they have

9    been awarded tort damages.  That is my assumption about what

10   the economic purpose of the correspondence analysis is.

11             So here in this diagram, or in this exhibit, if -- the

12   exhibit shows that there should be a set-off of as much as 638

13   million -- I'm not going to repeat the 965,000 each time, I'll

14   call it 638 million -- the exhibit says 638 million of rental

15   income recoveries should be subtracted from a tort award for

16   rental income losses.  This is correct from the point of view

17   of my test.

18             And I would illustrate:  Suppose that there is a tort

19   award for a billion dollars.  Clearly if a billion dollars were

20   handed to plaintiffs in tort damages and they got to keep their

21   638 million in insurance payments, they would be

22   overcompensated, they would enjoy a windfall, from the

23   insurance payments, because they would have, in sum, not a

24   billion dollars, which is by assumption their loss if the tort

25   award is for a billion, but 1 billion 638 million.  So this

1    subtraction, which is what this diagram says should occur from

2    tort damages of 638 million would leave plaintiffs with exactly

3    the right amount, $1 billion, to compensate them for lost

4    rental income, because their tort award would be a billion

5    minus 638 million, and that 638 million would be received from

6    their insurer.  So, in the end, they would be made whole but

7    not more than that for their rental income loss.

8              But now let's look at --

9              THE COURT:  I'm not following you.  So they would come

10   out net, the difference would be 638 and a billion, or roughly

11   360 million.

12             THE WITNESS:  Correct, your Honor.  They would come

13   out with that amount in tort damages.  But they would be

14   retaining, of course, their insurance payments, the

15   correspondence.

16             THE COURT:  The payment of 6 hundred-some-odd million.

17             THE WITNESS:  Right.

18             THE COURT:  And they would have their net tort

19   recovery from that policy.

20             THE WITNESS:  Exactly right.

21             So as to that category of loss for which tort damages

22   in this example have been awarded in the amount 1 billion, they

23   would wind up, if you add their tort damages after the set-off

24   to their insurance proceeds, with exactly the right amount.

25             THE COURT:  $1 billion.

D7HAWTC1ps                    Shavell - direct

1          THE WITNESS:  1 billion, yes.

2          But with regard to replacement costs, the other

3    program I test is to ask the question about each component of

4    economic loss, is there a windfall occurring.

5          THE COURT:  Do you understand that the amount of

6    insurance recovery for lost income was the equivalent of the

7    total income stream that 9/11 destroyed?

8          THE WITNESS:  Your Honor, are you asking me a factual

9    question?

10          THE COURT:  Yes.  An assumption in terms of your

11    opinion.  You did not, I know you did not investigate yourself.

12          THE WITNESS:  Yes.

13          THE COURT:  You only are responding to what was given

14    to you to assume.

15          THE WITNESS:  Yes.

16          THE COURT:  So I'm asking, was one of the assumptions

17    on which you're working the equivalence of the lost income

18    stream for purposes of insurance and the lost income stream for

19    purposes of economics?  In other words, was there a time limit

20    to the insurance recovery and no comparable time limit to the

21    economic loss or potential tort recovery?

22          THE WITNESS:  I think I understand your question.

23    From an economic perspective, the lost rental income is not

24    time-limited in nature.  Potentially it could go on for 99

25    years, although --

D7HAWTC1ps                           Shavell - direct

1          THE COURT:  That's the economic loss, related to the

2     present value to that as well.

3          THE WITNESS:  Yes, your Honor.  But I do not assume

4     that in fact the loss of rental income would go on for anything

5     like 99 years, because it will end when new towers are

6     constructed and are retenanted.  So the loss will not in fact

7     go on for more than 99 years.

8          THE COURT:  So isn't that replacement cost another

9     factor to be considered in relationship both to tort recovery

10    and to economic loss?  After all, if there were no replacement,

11    the income stream would go on forever?

12         THE WITNESS:  Yes.

13         THE COURT:  But it's not going on forever because the

14    building would be replaced.

15         THE WITNESS:  Yes.  Your Honor --

16         THE COURT:  So how do you place an economic factor, in

17    relationship to what costs to replace?

18         THE WITNESS:  I'm not sure if I'm going to be

19    answering your question, but I think I am, by saying the

20    following --

21         THE COURT:  I think you are.

22         THE WITNESS:  OK.  You are making the correct

23    observation that when the building is retenanted, when a tower

24    is rebuilt and then it's retenanted, that the lost rental

25    income will no longer be suffered.  That is something that is

D7HAWTC1ps                      Shavell - direct

built in to my thinking and analysis, although it's not always

explicit or even relevant in some of these diagrams, but it's

definitely something I'm taking into account.  And one further

comment about it is that, in my thinking, if a building is

replaced in a certain year and retenanted a couple years later,

the damages for lost rental income would reflect, would reflect

that, because the damage -- I'm assuming that damages for lost

rental income would be premised on actual lost rental income

suffered.  So if a suit in the future were brought and it was

litigated, that the damage amount would be based on the period

of time in fact during which rental income could not have been

earned because of the absence of a building or because the

building was new and hadn't yet been retenanted.

          THE COURT:  But don't you have to account economically

for the cost that was entailed in maintaining the income

street?

          THE WITNESS:  Do you mean the operating costs?

          THE COURT:  No.  The cost of restoring the building so

you can keep getting income from it.

          The building was destroyed.  At set producing income

is destroyed.  So your economic damages, you testified, is the

lost income you suffered.  But at a certain time the building

can be rebuilt.  And then you no longer suffer damages after

that.  There's no more a lost income stream also.

          THE WITNESS:  Correct.

D7HAWTC1ps                    Shavell - direct

 1              THE COURT:  So my question is, don't you have to

 2     account in some fashion for the cost of doing that, the cost of

 3     restoring your income stream?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Where is that shown on 566?

 6              THE WITNESS:  Your Honor, when I described the

 7     categories of economic loss, I said there were two replacement

 8     costs.

 9              THE COURT:  You said not to be counted.

10              THE WITNESS:  Well, what I --

11              THE COURT:  No, you're right.  You said the potential

12     tort recovery not to be counted.

13              THE WITNESS:  Yes.

14              THE COURT:  But economically it is a cost.

15              THE WITNESS:  Yes, exactly.

16              THE COURT:  I think I've got it.  You can take over.

17              MR. WILLIAMSON:  Yes, your Honor.

18              Mr. McCleod, can you pull up the next slide,

19     Plaintiff's Exhibit 567.

20     Q.  His Honor asked you some questions, Professor Shavell,

21     about where some of the numbers came from.  Could you please

22     explain to his Honor the source of any and your calculations

23     for each of the numbers that are on the exhibit we were just

24     looking at, Plaintiff's Exhibit 566.  So now we have 567 up and

25     I'd like you to explain it to his Honor.

1          MR. PODESTA:  Your Honor, to simplify matters, we're

2     prepared to stipulate to the math as done correctly here.

3          MR. WILLIAMSON:  Thank you but I'd like --

4          THE COURT:  Thank you.  I was really worried about

5     that.

6          Go on, please.

7          MR. WILLIAMSON:  Thank you.

8     Q.  Yes, Professor.

9     A.  Your Honor, as you can see, the first heading is Net

10    Insurance Recovery, and the explanation of that is, first, that

11    the amount received from insurers was $4.091 billion.  I'm

12    rounding.  That's a number that I know well.  And then there

13    are three subtractions made to arrive at a net insurance

14    recovery.  The first subtraction is for insurance premiums

15    paid, I believe in the two years preceding the 9/11 event, and

16    the first of those is $5,898 thousand.  And a bit more.  Then

17    there's a second subtraction for claims preparation costs.  And

18    there's a third subtraction for appraisal costs.  When you make

19    these three subtractions, you arrive at the net insurance

20    recovery of $4,044,082,315.  And, your Honor, there are

21    footnotes here which document the source of all these figures.

22         THE COURT:  I'm familiar with them from other

23    documents.  This is not original work.  This is just, you're

24    taking numbers from other aspects of this case and you're

25    putting it all together for a handy chart.

D7HAWTC1ps                          Shavell - direct

1            THE WITNESS:  Exactly.

2   Q.  How about the next item on Plaintiff's Exhibit 567,

3   entitled "Possible Allocation of Net Insurance Recovery."

4   Could you briefly walk his Honor through that.

5   A.  Yes.  So your Honor, this refers to the possible allocation

6   illustrated on the left side of that chart where I broke down

7   the insurance recovery into two parts.  So one possible

8   insurance -- one of the two possible insurance recoveries was

9   for lost rental income.  And so now I'm going to explain -- and

10  that amount was 638,965 thousand.  So the question is, how did

11  I obtain that number.

12           THE COURT:  They're the same percentages you showed in

13  the last chart.

14           THE WITNESS:  Correct.  So now I want to say where do

15  those percentages come from.  So what I did, because it's

16  economically sensible, was, I examined the fraction of the

17  total claims that plaintiffs presented to their insurers in

18  their preliminary proofs of partial loss submissions, made up

19  by claims for lost rental income, and in parentheses --

20  actually I can see there's one part of a parenthesis missing

21  but we'll ignore that.  You can see the number 1,347

22  thousand -- 1,347,805,679.  That number is the claims made in

23  this preliminary proof for rental income losses.  The second

24  number, the 8,531 million number, represents the total claims

25  made in the preliminary proofs.  So the ratio, or the

D7HAWTC1ps                    Shavell - direct

1    percentage of the first number relative to the sum, is 15.8

2    percent.  Another way of putting that is something like one

3    sixth of all the claims submitted by the plaintiffs to their

4    insurers were for lost rental income.

5              So I applied that percentage to the actual total

6    recovery, by allocating --

7              THE COURT:  This has a breakdown of the bar on the

8    left-hand side of the previous chart.

9              THE WITNESS:  That's correct.

10             THE COURT:  We've done the arithmetic.  I think I

11   understand that, understand that methodology.

12             What you did is, you take the preliminary proof of

13   loss and you've created a proportion to the total of insurance

14   recovery.  15.8 percent is roughly claimed for lost income and

15   84.2 percent is what was claimed after the appraisal for

16   property that was valued on the basis of replacing costs.

17             THE WITNESS:  Exactly right.

18             THE COURT:  And you've come up with these numbers.

19   You came up with the numbers on the bar chart, the last

20   exhibit.  OK.  I think I understand that.

21             MR. WILLIAMSON:  Thank you.

22             Mr. McCleod, could you please put up Defendant's

23   Exhibit 568.

24             THE COURT:  One question.  An appraisal supposedly

25   shakes out the water in the application for replacement costs.

D7HAWTC1ps                    Shavell - direct

1    There never was a replacement with regard to lost income.  So

2    from an economic perspective, do you think there's potential

3    for a fair amount of water in that claim?

4                    THE WITNESS:  I haven't examined --

5                    THE COURT:  It's not your area.

6                    THE WITNESS:  Well, it's my area, but it's in the my

7    assignment.

8                    THE COURT:  Right.

9                    THE WITNESS:  However, I do remember, not the details,

10   but I remember reading the expert report of Professor Vandell,

11   who used actual data projections of rental income that World

12   Trade Center Properties expected to earn on the original

13   buildings, so what my approach would be if I were given that

14   assignment would be to look at those figures, or figures

15   computed in the same way, and to compare them to the submission

16   for lost rental income.

17                    THE COURT:  You don't know if that represent -- if

18   those figures by the other expert represented an actual study

19   by him or whether they were given to him by the clients.

20                    THE WITNESS:  I believe that -- well, I don't want to

21   speculate.  I don't remember the entire basis of his

22   calculation.

23                    (Continued on next page)

24

25

 1          THE COURT:  In any event, he's not an expert, he's not

 2    been given to us.

 3          Go ahead, Mr. Williamson.

 4          MR. WILLIAMSON:  Thank you.

 5    BY MR. WILLIAMSON:

 6    Q.  Now turning to Plaintiffs' Exhibit 568 in evidence, did you

 7    conduct the same five-step analysis using your methodology with

 8    respect to 7 World Trade Company?

 9    A.  Yes.

10    Q.  Please tell his Honor briefly:  What conclusions did you

11    reach with regard to 7 World Trade Company following that

12    five-step methodology as to maximum possible correspondence?

13    A.  Your Honor, this display is a little more complicated than

14    the other one, but there's no difference in the logic lying

15    behind it.  I first identified the categories of economic loss

16    suffered by now 7 World Trade Center.  There's a third category

17    in addition to replacement costs and rental income loss,

18    namely, personal property loss, that you can see on the left

19    under "Insurance Recovery."  It's minor, under a million

20    dollars, but since parties have discussed it, I thought I

21    should pay attention to it in my analysis.

22          On the left, the bar represents, just like in the

23    previous figure, insurance recoveries and the possible

24    allocation or breakdown of insurance recoveries into their

25    component parts.  The total recovery for 7 World Trade Center

was significantly less than for the main site and, as shown

here, it's 828,866,381.  And, again, I can explain where that

number came from.

          Now, the question is what's the breakdown of this

828 million into categories of insurance payments, and that's

shown in the bar below, the 828 million figure.

          So, the first component of insurance payments is

small, small by the standards of the numbers in this

litigation, $994,640.  That's the amount that I'll explain

could be allocated to personal property loss.

          Below that is the much larger amount, comprising

70.37 percent of all insurance recoveries, and that amount is

583,273,272 for replacement cost recovery.

          And then on the bottom we have 244,598,469 for rental

income loss recovery, constituting 29.51 percent of recoveries.

          And finally, with regard to correspondence, I again

lined up categories of potential tort damages with the

categories of insurance payments, and I found two types of

potential correspondence -- one being the rental income loss

recovery, insurance recovery, on the left, and the possible

rental income loss tort recovery on the right; and then the

other between the personal property loss insurance recovery and

a potential personal property loss tort award.  And here, I

hadn't said it, except as a comment earlier, but I am

assuming -- I did assume -- in drawing up this exhibit that

1    there may be a tort award for personal property loss.

2              So, this is a thumbnail sketch of this exhibit.

3              THE COURT:  Other than personal property, this follows

4    the same methodology as you did with the other topics exactly

5    the same?

6              THE WITNESS:  The whole methodology is the same.  The

7    personal property doesn't change the methodology.  It just

8    means there's one more element.

9              THE COURT:  I see, right.

10   BY MR. WILLIAMSON:

11   Q.  How many categories of economic loss did you identify,

12   Professor --

13             THE COURT:  It's the same, isn't it, as the last one?

14             THE WITNESS:  The logic of this is identical to the

15   logic that we discussed for the main site.

16             THE COURT:  And with the exception of personal

17   property, everything else is the same, the numbers are

18   different but the categories are the same?

19             THE WITNESS:  Yes, your Honor.

20             THE COURT:  OK, I got it.

21             MR. WILLIAMSON:  Thank you.

22   Q.  How many categories of economic loss did you identify in

23   your analysis with regard to 7 World Trade Company?

24             THE COURT:  Three.  He said it.

25   Q.  Why did you believe there were three separate --

1          THE COURT:  You've gone through this.  You've gone

2     through this exactly.  It's the same analysis.  We don't need

3     it.  It's the same.

4          MR. WILLIAMSON:  The next slide, please.

5          Thanks.

6     Q.  Calling your attention, Professor, to Plaintiffs' Exhibit

7     569 in evidence, please explain to the Court what this is and

8     how it relates to what we just walked through with regard to

9     the main site.

10    A.  Your Honor, this chart is a -- is a cousin to the other

11    chart we saw, describing the main site and, perhaps I should

12    say, how the net insurance recovery was determined -- slightly

13    different from how the net insurance recovery was determined

14    for the main site.  I began --

15         THE COURT:  It's got one more factor; that's all?

16         THE WITNESS:  Correct, but it's added.

17         THE COURT:  Yes, there was a bonus payment that came

18    in here.  IRI sued and settled for 11,936,584 in respect of the

19    portion allocable to the 7 World Trade Center Company, and you

20    deducted that -- added that, the insurance recovery --

21         THE WITNESS:  I added that.

22         THE COURT:  -- as part of the insurance recovery?

23         THE WITNESS:  I added two other deductions, correct.

24         And then the second part of this table breaks down the

25    net insurance recovery of 828 million into three parts.  And

1    the logic of it is exactly the same as was the case in the main

2    site.  I looked at the total claims submitted in what was

3    called the interim proofs of loss, and asked what proportion of

4    the total claims were made up of claims for:  First, personal

5    property, and that proportion was below 1 percent, it was

6    .12 percent; what proportion of the total claims submitted in

7    these interim proofs were for replacement costs, and that

8    percentage was 70.37 percent; and, finally, what percentage of

9    the total claims were for rental income losses, and that

10   percentage was 29.51 percent.

11          Then, your Honor, I applied those percentages to the

12   net insurance recovery amount.  So, for example, if we consider

13   replacement cost, that category of recovery, I applied the

14   percentage 70.37 to 828 million and obtained, after that

15   multiplication, 583,273,272; in other words, that 583 million

16   figure is 70.37 percent of the net insurance recovery.  So,

17   that's how I accomplished the breakdown.

18   Q.  Thank you.

19          MR. WILLIAMSON:  You can take it down.  Thank you.

20   Q.  Professor, if World Trade Center Properties, going back to

21   the main site for a second, were to receive compensation for

22   one of either replacement costs or lost rent but not both,

23   would it be made whole?

24   A.  No.

25   Q.  Why not?

A.   I think it's essentially obvious, because my belief is that

they suffered two different losses, namely, that they couldn't

make money from renting properties that no longer existed, and

that they had to spend money to reconstruct towers.  If they

received compensation for only one of those categories of loss,

how could they possibly be made whole?  If they received money

only for the rental income that they had to forego, they would

have a multibillion-dollar expense that would be uncompensated

associated with their obligation to rebuild World Trade Center

towers.

          On the other hand, if they were to receive

compensation, in your hypothetical, for the cost of replacing

the towers but nothing for the income loss, they would again be

suffering a multibillion dollar loss because a lot of money

would have been made for the -- from the World Trade Center

properties over the period between 2001 and whenever they turn

out to be fully retenanted.

Q.   Do you know, Professor, whether from 9/11/2001 to today the

World Trade Center properties have been able to collect any

rental income from the properties of the main site?

          THE COURT:  I'm not sure that's relevant.

          MR. PODESTA:  Objection; outside the scope.

          THE COURT:  Sustained.

Q.   Let me ask you a hypothetical, Professor.  Assume that a

property owner of a home with a market value of $100,000

1    suffers a total loss from a fire.  The replacement value is

2    $150,000.  What amount would be required to make that property

3    owner whole?

4    A.  If the homeowner didn't attach special idiosyncratic value

5    to his or her particular home, then $100,000 would be

6    sufficient to compensate the homeowner because that -- by

7    assumption, the market value of the house is $100,000, so the

8    homeowner could buy an essentially equivalent house for

9    $100,000 and be just as happy.

10   Q.  Let me change the hypothetical in one way.  The property

11   owner now in this hypothetical has a contractual obligation to

12   replace his home.  What amount would be required to make him or

13   her whole?

14            MR. PODESTA:  Objection.

15            THE COURT:  Overruled.

16   A.  If the assumption is that the homeowner has a contractual

17   obligation to rebuild --

18   Q.  Yes.

19   A.  -- the home that burned down, and the assumption is that it

20   cost $150,000 to do that, then the homeowner would have to be

21   given, to make him whole, obviously 150,000 in order to

22   compensate him for the replacement cost.  And then, in

23   addition, the homeowner would have to be given compensation for

24   rental expenses during the time that the home is being rebuilt,

25   on the assumption that it's going to take some months or longer

1   than that to rebuild a destroyed home.  The homeowner has to

2   live someplace.

3           So, there would be two components of economic loss for

4   the homeowner, the replacement cost and the cost of renting

5   some substitute property during construction.

6           MR. WILLIAMSON:  Thank you, Professor.

7           No further questions, your Honor.

8           THE COURT:  Cross-examination?

9   CROSS-EXAMINATION

10  BY MR. PODESTA:

11  Q.  Good morning, Professor.

12  A.  Good morning, Mr. Podesta.

13  Q.  I'd like to explore first some of the economic principles

14  and see if we can reach agreement on them, and then I'd like to

15  turn to some of the assumptions in your report, and finally to

16  the allocation methodology that you propose.

17          Isn't it correct, Professor, that plaintiffs' business

18  income, lost rental income insurance, only provided them with

19  coverage for the period their destroyed buildings were being

20  rebuilt and retenanted?

21  A.  I don't know or don't recall the details of the policies,

22  but normally a business interruption coverage would be limited

23  in time.

24  Q.  Isn't it correct -- do you agree with me then that

25  plaintiffs' business interruption rental income coverage

1    doesn't cover the full term of their leasehold?

2              THE COURT:  Keep your voice up, Mr. Podesta, please.

3              MR. PODESTA:  OK.

4              THE WITNESS:  Mr. Podesta, since I don't -- since I

5    don't know the terms of the policies --

6              THE COURT:  Let me give you that to assume, let me

7    give you that to assume.  In this case the business

8    interruption insurance covered a limited term and not the full

9    term of the leasehold.

10             THE WITNESS:  If I'm asked to assume that's true,

11   which wouldn't surprise me, because typically --

12             THE COURT:  Now Mr. Podesta is going to give you a

13   question.

14             THE WITNESS:  OK.

15   Q.  If plaintiffs' leasehold interest in the complex and WTC 7

16   were profitable rental income-generating properties before

17   9/11 --

18             THE COURT:  You need to speak up.

19             MR. PODESTA:  I'm sorry.

20   Q.  If plaintiffs' leasehold interest in the complex and WTC 7

21   were profitable rental income-generating businesses before

22   9/11, wouldn't that rental income-generating capacity have been

23   reflected in their pre-9/11 market values?

24   A.  As an economist, Mr. Podesta, I would assume that potential

25   profits from the operation of the property, commercial property

would be reflected in market value but not necessarily

perfectly because, among other things, some business

enterprises that manage commercial properties are better than

others.  So, if a very efficient and savvy enterprise manages a

property, it might be able to make a lot more money than others

bidding for the property, who might bid for the property, would

be able to make.

Q.  Isn't the rental income-generating capacity of commercial

property a major factor into the determination of its fair

market value?

        MR. WILLIAMSON:  Objection, your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  I would say yes.

Q.  And turning back to the complex in WTC 7, wouldn't the

destruction of their revenue-generating capacity in the

terrorist attacks of 9/11 be reflected in the post-9/11 market

value of the leasehold interest?

A.  I'm hesitating in my answer, but I'll answer you.

        THE COURT:  Do you understand the question?  Don't

guess the question.  Would you like the question put back to

you?

        THE WITNESS:  No, I remember the question.

        The leasehold interest includes -- I'm assuming

because I examined the lease, not the whole lease but crucial

parts of the lease for my purposes -- it includes the

1    provision, according to my understanding, that requires the

2    leaseholder to rebuild 7 World Trade Center if it's destroyed.

3    Now, after 9/11, anybody who owned that leasehold would,

4    according to my understanding, have that obligation.  And that

5    obligation would dramatically reduce the market value of the

6    leasehold.

7    Q.  Are you espousing Professor Vandell's view that the WTCP

8    leasehold had a negative market value after 9/11?

9              THE COURT:  It's not in evidence.  It only will

10   confuse me.

11             MR. PODESTA:  All right.

12   Q.  Do you agree, Professor, that reduction in fair market

13   value is an accepted method of measuring the economic loss

14   resulting from the destruction of commercial property?

15   A.  Could you repeat the question, please?

16   Q.  Do you agree, Professor, that reduction in fair market

17   value is an accepted method of measuring the economic loss

18   resulting from the destruction of commercial property?

19   A.  It is -- I don't agree that it is always an acceptable or

20   accepted method.  It might be.

21   Q.  Do you agree that replacement cost is an accepted method of

22   measuring the economic loss resulting from the destruction of

23   commercial property?

24   A.  My answer is the same.  It might be, depending on the

25   circumstances.

1    Q.  Are there circumstances when compensation for a replacement
2    of its destroyed property should consist of more than the
3    physical cost of reconstruction?
4    A.  An example in which I think that might be true would be one
5    in which it takes a very long time to replace a destroyed
6    property.  And to take an extreme example, suppose you could
7    reconstruct a property for a dollar but it would take a hundred
8    years to accomplish the reconstruction, then if you awarded the
9    party a dollar or even the dollar discounted by a hundred
10   years, which is to say almost nothing, that would not be
11   adequate compensation because the person would not be enjoying
12   whatever the benefits of having that structure would be for a
13   hundred years.
14   Q.  Well, in the case of commercial rental property, Professor,
15   should compensation for replacement cost include not only the
16   cost of reconstruction but also rental income lost during the
17   period before the property is fully rebuilt and restored to
18   operations?
19   A.  If I understand your question, Mr. Podesta, you're asking
20   me should compensation for replacement cost include
21   compensation for lost rental income during the period before
22   replacement is accomplished.  Did I understand your question?
23   Q.  I believe that's correct.
24   A.  I think the answer is no, because, in my mind, replacement
25   cost means, in a literal sense, the expenses of reconstruction.

1    Now, it is true that accompanying reconstruction there might be

2    a period during which income or some other benefit will be

3    foregone.  I would put that under a different heading because

4    it's different.  It wouldn't subsume it under the heading

5    "replacement cost."

6    Q.  You agree the property owner should receive that

7    compensation but you wouldn't call it replacement cost?

8    A.  Correct; in order to be made whole, the property owner

9    would have to receive it.

10   Q.  Are you familiar with the so-called "lesser of two" rule

11   under which a property owner whose property has been damaged or

12   destroyed may recover as tort damages the lesser of the

13   property's diminution in market value or its replacement cost?

14   A.  When you say am I familiar with the rule, I am familiar

15   with it in the sense that I've read about it and I've heard

16   testimony about it; for example, yesterday.

17   Q.  As an economist, do you accept the premise of the "lesser

18   of two" rule, that the lesser of replacement cost or diminution

19   in market value affords full compensation to the owner of

20   damaged or destroyed property?

21   A.  As an economist and as -- the question that -- one of the

22   questions that Mr. Williamson put to me illustrates the example

23   of the homeowner whose house was burned down, where the market

24   value of the house was $100,000 and replacement cost was

25   $150,000.  I fully agree, from an economic perspective, with

D7hkwtc2                            Shavell - cross

1   the "lesser of two" rule under the assumptions of that example

2   in which the party who suffers the property loss has an option,

3   a choice, between whether to replace or buy an equivalent

4   property.  So, given those assumptions, yes, I agree with it as

5   a matter of logic.

6   Q.  Now, let me just explore for a few minutes the assumptions

7   underlying your opinion.  And I'd like to have marked as -- I'd

8   like to have shown as the next exhibit your complex report.

9           THE COURT:  Are you going to impeach?

10          MR. PODESTA:  Yes.  I'm not offering this as

11  affirmative evidence.  I'm going to use it to impeach and to

12  clarify the assumptions on which his opinion is based.

13          MR. WILLIAMSON:  Objection, your Honor; no other

14  expert witness --

15          THE COURT:  Let's wait for the question,

16  Mr. Williamson.

17          MR. WILLIAMSON:  Object to the use of the expert

18  report and --

19          THE COURT:  He can do anything you want.  He can mark

20  any piece of paper he wants.  It's not in evidence.

21          MR. WILLIAMSON:  Object to cross-examination based on

22  the expert reports.

23          THE COURT:  Overruled.

24          MR. PODESTA:  Mr. Campbell, would you put JX 52 on the

25  screen.

1              THE COURT:  No, no.

2              MR. PODESTA:  What?

3              THE COURT:  It's not in evidence.

4              MR. PODESTA:  I just want --

5              THE COURT:  It's not in evidence.

6    BY MR. PODESTA:

7    Q.  Did your opinion assume, Professor, that the tort damages

8    allowed by the Court expressly exclude replacement costs on

9    legal grounds?

10             THE COURT:  Excuse me.

11             (Pause)

12             THE COURT:  By the opinion, you mean as he testified

13   here?

14             MR. PODESTA:  Yes.

15             THE COURT:  OK.  Did your opinion, as you expressed it

16   here, assume that the tort damages allowed by the Court

17   expressly excluded replacement costs on legal grounds?  The

18   answer is yes or no or I don't know.

19             THE WITNESS:  Yes.

20   BY MR. PODESTA:

21   Q.  And doesn't your opinion also assume that under the Court's

22   legal rulings WTCP plaintiffs may not recover as tort damages

23   even a single dollar for replacement costs?

24             THE COURT:  He just said that.

25             MR. PODESTA:  OK.

1   Q.  Doesn't your opinion also assume that under the Court's

2   legal rulings the plaintiffs may not recover replacement costs

3   even if they are proven to be less than the reduction in fair

4   market value of the property?

5           MR. WILLIAMSON:  Objection, your Honor.

6           THE COURT:  Sustained.

7   Q.  Doesn't your opinion also assume that insurance proceeds

8   for replacement costs can be subtracted from a tort award only

9   if that tort award is for replacement costs?

10          MR. WILLIAMSON:  Objection, your Honor.

11          THE COURT:  Sustained.

12  Q.  I'd like to refer you to paragraph 22 of your report,

13  Professor.

14          THE COURT:  Objection sustained.

15  Q.  Doesn't the logic of your opinion rest on your conclusion

16  that replacement cost insurance payments can only be subtracted

17  from a tort award if that tort award is for replacement costs?

18          MR. WILLIAMSON:  Objection, your Honor.

19          THE COURT:  Sustained.

20  Q.  Isn't your assumption that WTCP has been denied all right

21  to recover replacement costs based on the Court's ruling in its

22  December 2008 opinion that WTCP is not entitled to recover

23  replacement costs on the basis of its contractual obligation to

24  rebuild?

25          MR. WILLIAMSON:  Objection, your Honor.

D7hkwtc2                        Shavell - cross

1              THE COURT:  Sustained.

2    Q.  Is it one of the assumptions of your opinion, Professor,

3    that the aviation defendants are legally responsible for the

4    damages allegedly arising out of WTCP's contractual obligation

5    to rebuild?

6              MR. WILLIAMSON:  Objection, your Honor.

7              THE COURT:  Sustained.

8              MR. PODESTA:  May I offer up the report to show that

9    he stated these were his assumptions in his report?

10             MR. WILLIAMSON:  Objection, your Honor.

11             THE COURT:  Sustained.

12             You can get the report back, Mr. Podesta.

13   Q.  Am I correct in understanding that the reason why you

14   believe recovery of -- do you believe that recovery of the

15   reduction in fair market value of WTCP's net leasehold

16   interests would be adequate compensation for this case, in this

17   case?

18             MR. WILLIAMSON:  Objection, your Honor.

19             THE COURT:  Overruled.

20             THE WITNESS:  If you define fair market -- if you

21   define fair market value to be what would be paid for the right

22   to collect rental income --

23             THE COURT:  I'll give you a definition of fair market

24   value.  It's what a willing seller, at a certain time and

25   place, would sell for and what a willing buyer would buy for.

1              THE WITNESS:  That's a fine definition of fair market

2     value.

3              MR. PODESTA:  And I accept that for purposes of my

4     question.

5              THE COURT:  The question is:  Would a reduction in

6     that fair market value be adequate compensation, from an

7     economic perspective?

8              THE WITNESS:  Yes, I understand the question.

9              THE COURT:  What's your answer?

10             THE WITNESS:  My answer depends on what it is that you

11    are imagining is for sale.  Is it what I would call the --

12             THE COURT:  A 99-year leasehold to a certain parcel of

13    real estate that has been commercially developed.

14             THE WITNESS:  That's not a complete definition for me,

15    because what I want to know is, does the leasehold include the

16    obligation to replace the destroyed property?

17    BY MR. PODESTA:

18    Q.  Let me rephrase the question then, Professor.  Let me ask

19    you to assume that WTCP had no obligation to rebuild the WTCP

20    complex.  Let's take the contractual obligation to rebuild out

21    of the equation.  Do you understand me, Professor?

22    A.  Yes, I do.

23    Q.  On that assumption -- contractual obligation to rebuild is

24    out of the equation -- would the recovery by WTCP of the full

25    reduction in value of its leasehold interest resulting from the

D7hkwtc2                      Shavell - cross

1    9/11 terrorist attacks provide it with adequate compensation

2    for its economic loss?

3    A.  Not necessarily.

4    Q.  And please explain why not.

5    A.  The reason is twofold:  First, if the receipt of fair

6    market value would not allow the person with that money to buy

7    a truly equivalent property for that person's purposes, then

8    the person would not be able to, by that assumption,

9    necessarily restore the income flow.  So, if we're thinking of

10   the World Trade Center Properties, which are distinctive, and a

11   person were given this fair market value, would this person be

12   able to quickly buy an equivalent property, that's a big --

13   that's a real question.

14          Second, an independent reason for thinking that fair

15   market value might not compensate for the economic loss is what

16   I mentioned earlier, that some parties are able to make more

17   money from operating, from their operations, than others.  And

18   the fair market value is going to be determined by people who

19   are not the present owners of the property but by other

20   parties.  In some circumstances, in many circumstances, the

21   fair market value will approximate what the operators might

22   have made, but in other circumstances that will not be true.

23          My last comment is, after all, there are large

24   differences in the abilities of companies to make money from

25   their operations.

D7hkwtc2                          Shavell - cross

1   Q.  Now, you mentioned --

2               THE COURT:  In general, given the market, if someone

3   pays a billion dollars for real estate for the opportunity to

4   obtain a stream of income over a long period of time and that

5   economic value is entirely destroyed, would the price paid,

6   assuming that is the market, be full and fair compensation,

7   from an economic perspective, in general?

8               THE WITNESS:  I think, in general, it's a floor.  And

9   in many instances it might be the right amount to give because

10  even though it might be understood that the party might have

11  lost more money, there may not much evidence that could be

12  obtained practically, in which case --

13              THE COURT:  But if you have an auction, and that's the

14  price established in the market, replenishing what the party

15  paid at auction would be full and fair compensation, would it

16  not?

17              THE WITNESS:  I don't believe it would necessarily be.

18              THE COURT:  Because some people are better and some

19  people are worse, some people make money, some people lose

20  money?

21              THE WITNESS:  Right.  I would look at the number.

22              THE COURT:  In general, it means you average all this

23  out and you have an auction market, a sloppy person would bid

24  less, a person who could make a profit would bid more, but an

25  auction rules this out, right?  That's the purpose of an

1    auction?

2           THE WITNESS:  I think the purpose of an auction is to

3    smoke out the individuals who are willing to bid the most, who

4    are probably the savviest, but if there are not a lot of

5    participants in an auction, how --

6           THE COURT:  It may be an imperfect auction.  If you

7    have a Rembrandt and we have two people bidding, it's not as

8    good an auction as if you have 15 people bidding?

9           THE WITNESS:  Exactly.

10          THE COURT:  But if you have an auction and you take a

11   price, is that the market price?

12          THE WITNESS:  I would definitely call it the market

13   price.

14          THE COURT:  And if you lose the market price and want

15   to go out on the market and buy properties that will give you

16   the same kind of return, that would be the market price and

17   that would be the ability to replenish the market price, would

18   it not?

19          THE WITNESS:  It would.  But, again, as I mentioned,

20   it takes time, depending on the circumstances, to find roughly

21   equivalent properties.  And when you're talking --

22          THE COURT:  That's the purpose of the time value of

23   money?

24          THE WITNESS:  It's not just the time value of money,

25   your Honor.  It's the -- well, I guess it's the central purpose

1   of the time value of money.

2          THE COURT:  Right.  I think we exhausted that topic.

3   Q.  I'd like to direct your attention to Exhibit 566.

4          THE COURT:  Please put it up.  Somebody?

5          MR. PODESTA:  I'm sorry, I don't know your name.

6          MR. COHEN:  Mr. McLeod.

7          THE COURT:  It's up.

8   Q.  Now, I'd like to explore with you for a moment what WTCP's

9   total recovery from insurance payments and tort damages would

10  be if your proposed method of allocation were applied, and from

11  your own Exhibit 566, all right?

12  A.  Yes.

13          THE COURT:  We'll explore the box at the right?

14          MR. PODESTA:  Yes.

15          THE COURT:  The box at the right, "Potential Tort

16  Damages"?

17          MR. PODESTA:  Well, I can start on the right --

18          THE COURT:  What do you want to do?  I didn't hear

19  you.

20          MR. PODESTA:  I want to started first on the left.

21          THE COURT:  OK.

22  BY MR. PODESTA:

23  Q.  Am I correct that under your analysis WTCP receives

24  insurance recoveries of some 4.044 billion?

25  A.  Correct.

D7hkwtc2                        Shavell - cross

1    Q.  And am I correct that WTCP also would receive a tort

2    recovery before the setoff of 2.805 billion?

3    A.  Not necessarily.

4            THE COURT:  Potentially?

5            MR. PODESTA:  Potentially.

6            THE WITNESS:  Potentially, the assumption is that it

7    could receive as much as that.

8            THE COURT:  That's what potentially means, yes.

9    Q.  That's potentially.

10           So, the maximum potential recovery, before the offset,

11   for the insurance offset, is you add the two numbers, 4044 and

12   2805 can you get $6.849 billion; isn't that correct?

13   A.  I believe your math is correct.

14   Q.  And you would subtract from that potentially $639 million?

15           THE COURT:  I don't think we're profiting by these

16   arithmetical exercises.

17   Q.  But basically the point I want to make is, under your

18   analysis, WTCP's total recovery, after offsets, would be about

19   $6.3 billion?

20           MR. WILLIAMSON:  Objection.

21           THE COURT:  Overruled.  I can take judicial notice of

22   that.

23   Q.  Which is more than double its potential tort damages?

24   A.  Are you asking me to agree --

25           THE COURT:  No; objection sustained.

D7hkwtc2                          Shavell - cross

1    A.  -- with your numbers?

2    Q.  Now, I'd like to -- is it your assumption that -- well, let

3    me give you a hypothetical, sir.  Let me ask you to assume that

4    the WTC 7 case were tried to a jury and that the jury

5    awarded -- found that the replacement cost for the property was

6    $736 million, and that the fair market value of the property

7    was $737 million, and that the Court, applying the "lesser of

8    two" rule, determined that the damages award should be

9    $736 million.

10              Are you following me?

11              MR. WILLIAMSON:  I will object whenever the question

12   ends, your Honor.  I don't know if it's done.

13              THE COURT:  The question is, "Are you following me?"

14   That's not an objectionable question.

15              MR. WILLIAMSON:  Understood.

16              THE WITNESS:  Let me make sure, Mr. Podesta.  You're

17   saying --

18              THE COURT:  No, don't repeat.  What is the question,

19   Mr. Podesta?

20   Q.  Basically what I'm asking is if under his theory of

21   allocation if replacement costs set the measure of damages,

22   would he allow replacement cost insurance recoveries to

23   correspond to the tort award and reduce the amount of damages?

24              THE COURT:  Sustained.

25              MR. PODESTA:  Can you give me a moment?

1            THE COURT:  Of course.

2            (Pause)

3            MR. PODESTA:  Just one more question.

4    Q.  You mentioned the contractual obligation to rebuild.  You

5    yourself are just simply assuming a contractual obligation to

6    rebuild; isn't that correct?

7    A.  I'm assuming a contractual obligation to rebuild because

8    counsel told me to assume that, but I also, as I mentioned,

9    looked at parts of the lease and I examined the part of the

10   lease describing the obligation.  And I independently, even

11   though I'm not an expert on leases, read that clause as

12   amounting to an obligation to rebuild.

13   Q.  You're not a lawyer, are you, sir?

14   A.  I am not a lawyer.

15   Q.  You haven't studied the whole lease?

16   A.  Beg your pardon?

17            THE COURT:  Mr. Podesta, let's not go there.

18            MR. PODESTA:  OK.  All right, fair enough.  I have no

19   further questions.

20            THE COURT:  Mr. Williamson?

21            MR. WILLIAMSON:  No further questions, your Honor,

22   thank you very much.

23            THE COURT:  I have a few questions.

24            MR. WILLIAMSON:  Yes, your Honor.

25            THE COURT:  In terms of economic loss, you value

1    everything that a person loses, do you not?

2              THE WITNESS:  You would try.  Sometimes you're not

3    able to do.

4              THE COURT:  You can't do more than try; you use best

5    efforts.

6              So, if a person is under an obligation to rebuild,

7    that's part of that person's economic cost?

8              THE WITNESS:  Correct.

9              THE COURT:  If he has to rebuild, that's his cost?

10             THE WITNESS:  Correct.

11             THE COURT:  If he doesn't have to rebuild, it's not

12   his cost?

13             THE WITNESS:  Correct.

14             THE COURT:  So, if a person has a valuable piece of

15   property that is worth, let's say, a billion dollars and it's

16   destroyed and there's no obligation to rebuild, what would

17   fully compensate that person for his loss?

18             THE WITNESS:  Are you saying that the property was

19   worth a billion dollars?

20             THE COURT:  A billion dollars.  And it's destroyed.

21             THE WITNESS:  I would say that if the person could buy

22   an equivalent property and let's say there would be no

23   significant issue of waiting time locating the equivalent

24   property, then he could buy the equivalent property for a

25   billion, then a billion dollars would fully compensate the

D7hkwtc2                          Shavell

1   person.

2                THE COURT:  And let me ask you to assume that these

3   other factors do not play in what courts do and just measure

4   the economic loss of the property, a billion dollars would be

5   full compensation, would it not?

6                THE WITNESS:  It would seem so, yes, under those --

7                THE COURT:  So, let's say instead of losing a

8   building, instead of losing an asset, the person suffering the

9   loss loses a stream of income, which on the market auction

10  would be worth a billion dollars.  Would a billion dollars

11  provide full compensation for that loss?

12               THE WITNESS:  It would, almost by definition.

13               THE COURT:  Now, let's suppose the person wants to

14  receive -- to stay in that property and buys insurance to help

15  him stay, and it would take two years to restore fully the

16  income stream he lost and there would be a cost to restore that

17  income stream, would the cost be a factor in economic

18  measurement?

19               THE WITNESS:  Your Honor, when you say cost, are you

20  referring to the replacement cost of the building?

21               THE COURT:  Yes, the cost to restore the income

22  stream.  That would have to be accounted for in some degree?

23               THE WITNESS:  In full measure.

24               THE COURT:  In full measure, even better.

25               And an economist would have to value that?

D7hkwtc2                         Shavell

1            THE WITNESS:  Absolutely.

2            THE COURT:  So, if you have an income stream lasting,

3   let's say, 30 years and you recover two years of lost income,

4   in order to restore the balance of 28, you incur a cost to

5   replace the income-producing quality of that property.  Does an

6   accountant and an economist have to value that cost?

7            THE WITNESS:  I don't really know what accountants do,

8   but --

9            THE COURT:  An economist.

10           THE WITNESS:  An economist, of course, would attempt

11   to measure all economically relevant factors.  And how could a

12   cost of replacing a building in order to restorer stream not be

13   relevant?  It is relevant.

14           THE COURT:  It seems simple.

15           So, we have in this case lost income insurance.  And I

16   will ask you to assume that lasts a certain period of time --

17           THE WITNESS:  Yes.

18           THE COURT:  -- let us say two years.

19           THE WITNESS:  OK.

20           THE COURT:  It could be anything, but let us say two

21   years, but considerably less in duration than the lost income

22   stream that was destroyed.  I will ask you to assume that.

23           THE WITNESS:  OK.

24           THE COURT:  And there is a cost incurred to restore

25   the income stream, so that after two years it becomes as full

D7hkwtc2                          Shavell

 1  as it was before.

 2              THE WITNESS:  Understood.

 3              THE COURT:  We call that replacement cost.

 4              Would that replacement cost have to be valued in terms

 5  of valuing the lost income stream?

 6              THE WITNESS:  Well, the lost income stream is one

 7  factor.  The replacement cost is another factor.  I don't quite

 8  know what you mean by -- in valuing the lost income -- the lost

 9  income stream is one number, and the replacement cost is

10  another number because there's a connection between those two

11  numbers.

12              THE COURT:  What is the connection?

13              THE WITNESS:  Well, the connection is that you can't

14  begin to enjoy an interrupted income stream unless you fork out

15  the money for replacement.

16              THE COURT:  Exactly, exactly.

17              THE WITNESS:  So, that's the connection, but the two

18  numbers are different.

19              THE COURT:  So, if your economic damages is the loss

20  of the total income stream and you replace a small part of it

21  with insurance, and you have to spend money to replace the

22  total stream, you would have to, would you not, account for the

23  cost of restoring the full income stream?

24              THE WITNESS:  One would, but I don't quite understand,

25  when you say you have to account for the replacement cost, who

D7hkwtc2                         Shavell

1   the "you" is.  If you're asking me how would I --

2               THE COURT:  The guy who lost the property, the guy who

3   lost the property because of some negligent outside force.

4               THE WITNESS:  If you're asking me what is the economic

5   loss, setting aside issues of what a tort award might be and

6   what insurance payments might be, just what is the economic

7   loss -- and abstracting from these other issues -- suffered by

8   a party whose building is destroyed and who then rebuilds it

9   and restores at some point his income stream, my answer is I

10  think the commonsense answer -- it's also the answer of

11  economics -- that the loss involves a comparison of the

12  situation that would have obtained, which is in the absence of

13  the destruction of the property, which is to say the owner

14  would have enjoyed an uninterrupted income stream for -- you're

15  saying, 30 years, something like that?

16              THE COURT:  Yes.

17              THE WITNESS:  Now, given that there has been

18  destruction of the property and replacement, the party's

19  situation is different.  The party has an income stream for

20  only some of the 30 years, only for the period after the

21  construction of the replacement property.  So he has --

22              THE COURT:  After the destruction but before the

23  replacement?

24              THE WITNESS:  Well, that's the period when there's no

25  income, so, he's worse off there.

D7hkwtc2                        Shavell

1                THE COURT:  Yes, he loses that two years of income

2     stream?

3                THE WITNESS:  Yes.

4                THE COURT:  And he gets business interruption

5     insurance to replace that?

6                THE WITNESS:  Well, I'm leaving insurance out of the

7     picture right now because I'm --

8                THE COURT:  I'm trying to get it in.  And since I'm

9     the questioner, I've got the right.

10               THE WITNESS:  So, I will answer your question but I'll

11    say to you first that --

12               THE COURT:  The power of a judge -- it's wonderful.

13               THE WITNESS:  -- in the absence of insurance, this

14    person has lost two years of rental income and he's also spent

15    money on replacement cost.

16               THE COURT:  Those are two parts of his economic loss?

17               THE WITNESS:  Right.

18               THE COURT:  And that's what you said in your

19    testimony?

20               THE WITNESS:  Yes.  And I think that's common sense.

21               THE COURT:  So, when we get business interruption

22    insurance and we say that it corresponds to lost income, isn't

23    it the fact that it corresponds only to a section of the lost

24    income?

25               THE WITNESS:  Correct.

D7hkwtc2                         Shavell

1          THE COURT:  And if we say that we have to factor in

2     the cost of restoring that entire income stream, shouldn't

3     there be a correspondence between that cost and the full tort

4     recovery?

5          THE WITNESS:  If you're asking me -- actually, I'm not

6     sure what you're asking me.

7          THE COURT:  I'm asking you what I'm asking you.  Do

8     you want the question put back?

9          THE WITNESS:  Yes.

10         THE COURT:  Andrew, please.

11         (Record read)

12         THE WITNESS:  I would say, no, your Honor, because

13    tort recovery, if it's for foregone rental income, is going to

14    automatically reflect the replacement cost because the tort

15    recovery will be smaller because replacement cost has been --

16    because the building owner has spent money on replacement cost.

17    The period during which the foregone rental income has suffered

18    is shortened, so that tort damages will be lower, and

19    appropriately lower, when replacement costs are incurred.

20         THE COURT:  But that's part of mitigation and we're

21    allowing that in the recovery of the replacement cost in

22    exchange for a shortened recovery of total stream income?

23         THE WITNESS:  Correct.

24         THE COURT:  We start with a premise that the law tries

25    to reimburse a person suffering from tort damages for the full

D7hkwtc2                      Shavell

1   economic loss --

2              THE WITNESS:  I understand that.

3              THE COURT:  -- as of the date of the loss.

4              And we've posited that that total loss is the loss of

5   the total stream of income.  And we've posited that the

6   insurance recovery for a certain portion of that term of that

7   lost income stream corresponds to a portion of the lost income

8   recovered in the form of damages.  And now we're trying to

9   figure out how to deal with that portion of the economic cost

10  of restoring the income stream and to see if it corresponds to

11  some aspect of the balance of the tort recovery.  And that's

12  where I'm probing.

13             THE WITNESS:  If the -- if a party spends an amount of

14  money on replacement, and let's say as a result there is a

15  two-year period during which rental income is lost and there's

16  a tort award for two years of lost rental income --

17             THE COURT:  The tort award would be for the full

18  amount of lost revenue?

19             THE WITNESS:  You mean for 30 years?

20             THE COURT:  A full year -- the whole thing, the full

21  term.  That's what's been lost and that's what's the damages,

22  of course, less mitigation.

23             THE WITNESS:  Well, I'm assuming that what's meant by

24  a tort award for lost rental income is a tort award for actual

25  sustained lost rental income, so, in this example, not for 30

D7hkwtc2                          Shavell

1    years but for two years.  And if that's how tort damages are

2    determined --

3              THE COURT:  The even though what was lost is the full

4    revenue stream of 30?

5              THE WITNESS:  Well, what was -- it would be correct to

6    say that what was lost was 30 years only in the notional sense,

7    because if the building is --

8              THE COURT:  In the real sense, that's how you measure

9    damages; you measure the value of what's lost, and what's lost

10   was a total income stream discounted to present value?

11             THE WITNESS:  Well, if that is the measure of loss,

12   then that measure would exceed the actual loss because it would

13   be two years, in your example.  So...

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D7HAWTC3ps                    Shavell

1          THE COURT:  And the cost of restoration.

2          THE WITNESS:  Yes.  And the loss would include the

3     cost of restoration.  So from an economics perspective, full

4     compensation to the victim of the loss would be the sum of two

5     numbers, the two-year lost rental income and the full amount of

6     the replacement cost.  If you're saying I am --

7          THE COURT:  And then is there a correspondence between

8     both those costs, or both those economic factors, and the total

9     recovery?

10         THE WITNESS:  No.  If there were such a

11    correspondence, then a party who received tort damages for the

12    two years would not be made whole, because the issue would be a

13    set-off from that.  But if the tort damages were more than

14    enough to compensate for the actual loss of rental income, the

15    story would be more complicated.

16         THE COURT:  OK.  I think I've got it.

17         Anybody else?  Any more questions, Mr. Williamson?

18         MR. WILLIAMSON:  No, your Honor.  Thank you.

19         THE COURT:  Any more questions, Mr. Podesta?

20         MR. PODESTA:  No, your Honor.  Thank you.

21         THE COURT:  Professor Shavell, thank you so much.

22         THE WITNESS:  You're welcome, your Honor.

23         THE COURT:  It's been a pleasure to see you in action

24    and be one end of the Socratic dialogue.

25         (Witness excused)

1           All right, Mr. Williamson, what's next?

2           MR. WILLIAMSON:  Two things.  Your Honor had asked on

3      the first day of trial that we prepare a summary of some of the

4      amounts that were being identified in my opening.  And you

5      asked that we submit them in writing.  We prepared that.

6           THE COURT:  Good.

7           MR. WILLIAMSON:  Together with a collection of slides

8      that I used in the opening, in case your Honor wants any of

9      them available.  So we will make copies of those.

10          MR. PODESTA:  Am I correct that the slides are being

11     offered as demonstratives, not as evidence?

12          MR. WILLIAMSON:  Right.  So there's a record of what

13     they were.

14          So the summaries are being offered and the slide is

15     being marked as Plaintiff's Exhibit 570.

16          Next, your Honor, we went through Mr. Reilly's report

17     yesterday.  Your Honor said to identify overnight if there were

18     any passages that weren't characterized or summarized or read

19     by your Honor that I wanted to raise with you today, and there

20     were just a few.  So I would like to follow up and complete

21     that.

22          We'll get a clean copy again so that I could call your

23     attention, if I may, to just the two passages.  I'm told, your

24     Honor, that you would have it as Joint Exhibit 1.

25          THE COURT:  Just tell me what you want to add.

1              MR. WILLIAMSON:  Yes.  Thank you.  Page 3, footnote 2.

2     Can I read what it says?

3              THE COURT:  3.

4              MR. WILLIAMSON:  Thank you.  Footnote 2.  "WTCP also

5     was insured for its own initial rent payments totaling $491

6     million under its leases with the Port Authority (see sections

7     1.140, 1.142, and 5.1 of leases), but only if the Port

8     Authority canceled the leases.  See, for example, the leasehold

9     interest coverage provisions of the WilProp form (attached as

10    Exhibit R-3) and the Travelers form (exhibit R-4)."  That's the

11    end of that, your Honor.

12             Turning then to paragraph 8, at page 4, we would like

13    to offer that, if I may read it.

14             THE COURT:  Yes.

15             MR. WILLIAMSON:  Thank you.  Paragraph 8:  "Unlike a

16    commercial business, the typical homeowner does not need or

17    have insurance for lost rental income.  He insures only the

18    value of his house.  However, if the homeowner rents his home

19    to tenants, in addition to buying insurance for damage to the

20    home itself" --

21             THE COURT:  I don't need that.  That doesn't help me.

22             MR. WILLIAMSON:  Continuing to page 7, your Honor,

23    there were two sentences in different places.  At the top of

24    page 7, the sentence we would like to add is, "To my knowledge,

25    there was no final adjustment and no -- and final proofs of

D7HAWTC3ps                    Shavell

1    loss were unnecessary and were not required."  And the other

2    sentence would be, "Some expressly provided that payments were

3    on an interim on-account basis and were 'subject to final

4    adjustment.'"

5              And then the last one is at page 8, your Honor.  And

6    that's the last three sentences of paragraph 15, if I may read

7    them.

8              THE COURT:  Yes.

9              MR. WILLIAMSON:  I know you touched on it yesterday,

10   but the numbers are important for having the calculations that

11   were just discussed.

12             THE COURT:  We have these numbers in evidence.

13             MR. WILLIAMSON:  Well, because it's based on this

14   document that Professor Shavell was using these percentages and

15   verifying all the calculations.  So it's just these three

16   sentences.

17             THE COURT:  All right.

18             MR. WILLIAMSON:  "The other three preliminary proofs

19   of partial losses, including supplements, are related to the

20   $7,183,441,908 replacement cost claims.  Accordingly, business

21   income/rental value claims accounted for only 15.8 percent of

22   the total $8,531,247,587 claimed in the preliminary proofs of

23   partial losses.  The replacement cost claim of $7,183,441,908

24   represents 84.2 percent of the total."  And I've omitted the

25   footnotes.

D7HAWTC3ps                    Shavell

1           Thank you, your Honor.

2           THE COURT:  Thank you.  Anything else?

3           MR. WILLIAMSON:  Yes, your Honor.  With respect to the

4    open question that we identified at the end yesterday about any

5    remaining exhibits, having pared down as much as possible

6    overnight even further the exhibits that are on the jointly

7    agreed-to exhibit list, we would like to offer certain of them

8    into evidence.

9           THE COURT:  How many?

10          MR. WILLIAMSON:  Ms. Baglin has the exact count.

11          MS. BAGLIN:  I can go through them.

12          MR. WILLIAMSON:  And then from the plaintiff's exhibit

13   list, certain ones that have been culled and reduced to the

14   ones that we would like to offer into evidence.

15          THE COURT:  How many?

16          MR. WILLIAMSON:  Ms. Baglin will do that.  We've also

17   proofed them so your Honor can see, you know, what are all of

18   the same type.

19          MS. BAGLIN:  Your Honor, if I may begin, based on what

20   was listed as having been received in evidence in the

21   transcript of the last two days, I understand there was some

22   confusion as to what came in and what did not come in.  I would

23   just like to clarify for the record that the transcripts show

24   that the following exhibits have been received in evidence.

25          THE COURT:  Please don't read it.  If it's in the

D7HAWTC3ps                    Shavell

1    transcript, it's in the transcript.

2                MS. BAGLIN:  In addition to that, your Honor yesterday

3    had asked us if we could mark Exhibit 9 to Mr. Reilly's report

4    as a separate exhibit so it can be used for the Court.  We've

5    done that.

6                THE COURT:  That's received.

7                MS. BAGLIN:  Joint Exhibit 1-A, your Honor, the Reilly

8    Exhibit 9.

9                (Joint Exhibit 1-A's Exhibit 9 received in evidence)

10                MS. BAGLIN:  The next exhibit, your Honor, is one

11    which is Plaintiff's Exhibit 571.  It was referred to in the

12    testimony the other day.  Has Bates numbers --

13                THE COURT:  Don't read the Bates numbers.  Put it up,

14    please.

15                MS. BAGLIN:  While we're getting the technician, your

16    Honor, I'll just remind you, it's the November 12, 2001 letter

17    written by Mr. Emmerich to some of the insurers and the

18    adjustors.  And among other things, the letter alleges that the

19    insurers were engaging in unconscionable delays in making

20    payments.  It also referred to some of the advances we

21    discussed.  We would offer that in evidence.

22                THE COURT:  It's not relevant.  I'm not accepting it.

23                MS. BAGLIN:  Next, I just wanted to confirm, it's not

24    referred to in the transcript that Professor Fischel's

25    curriculum vitae, which Mr. Podesta offered as Defendant's

D7HAWTC3ps                    Shavell

1   Exhibit E-4, is in evidence.

2           MR. PODESTA:  I believe I moved it into evidence.

3           THE COURT:  Received.  If I didn't receive it before,

4   I receive it now.

5           (Defendant's Exhibit E-4 received in evidence)

6           THE COURT:  I think all the experts have their résumés

7   in evidence.

8           MS. BAGLIN:  Next, your Honor, we have some of the

9   Joint Exhibits.  These are exhibits as to which none of the

10  parties have any objection.  They've been mutually agreed to.

11  We've been through all of them and pared down the list.  The

12  first one is Joint Exhibit 2.  It is the proof preliminary

13  proof of loss on the main site.  And we offer in evidence --

14          THE COURT:  I have all these proofs of law for 16 of

15  them.  Are we going to offer each of the 16?

16          MS. BAGLIN:  No, your Honor.  I was only offering this

17  one as an exemplar primarily for the nonwaiver provision that

18  was in there that was referred to in Mister --

19          THE COURT:  I understand, without prejudice,

20  non-waiver basis.  No need to paper it up.

21          MS. BAGLIN:  OK.  The next exhibit which your Honor

22  just asked that we put together and said you would expect a

23  whole book, that's Joint Exhibit 5.  And we have it here for

24  you.  It's actually not one book, your Honor.  It is four

25  books, book 1 of 4, 2 of 4.  So we have labeled those, with

D7HAWTC3ps                    Shavell

1    counsel's consent, as Joint Exhibit 5A, B, C, D.  And I would

2    just point out to your Honor that it's book 4 or Exhibit JX-5B

3    that pertains the provisions pertaining to depreciation that we

4    discussed earlier today, and I would refer, because these are

5    large exhibits, I would refer specifically to the page number

6    WTCP 0019751.

7             THE COURT:  What does that say?

8             MS. BAGLIN:  That just tells what the depreciation

9    methodology was.  And then Section 28 --

10             THE COURT:  Tell me, what was it?

11             MS. BAGLIN:  It's what I described this morning, your

12   Honor.  Looking at the conditions and the useful life of the

13   individual components of the rebuild -- that went into the

14   rebuilt building.

15             THE COURT:  Why don't you just offer that.

16             MS. BAGLIN:  We've already all agreed to --

17             THE COURT:  You have to understand that, with all the

18   paper, you just increase the expenses of the field.  If you

19   reduce the papers to what's relevant, your field costs will be

20   less.

21             MS. BAGLIN:  Your Honor, we believe that this

22   particular exhibit is relevant.  I'm just pointing out these

23   particular pages for your Honor's convenience because you

24   specifically discussed depreciation this morning.

25             THE COURT:  Do I have to worry about any other papers?

D7HAWTC3ps                    Shavell

1             MS. BAGLIN:  The next exhibit --

2             THE COURT:  Do I have to worry about any other papers?

3             MS. BAGLIN:  Excuse me, your Honor?

4             THE COURT:  Do I have to worry about any other pages?

5             MS. BAGLIN:  Yes.  Book 1, for example, you had asked

6      us for specifically.  That contains the summary of the claim

7      which has all the different elements including --

8             THE COURT:  I understand that.  We went over that.

9             MS. BAGLIN:  It's followed by the Tishman replacement

10     cost budget on which some of the numbers are based.  Then the

11     other books in there are the actual supporting documentation

12     for those books.

13            THE COURT:  I accepted the volume, all four volumes.

14     You don't have to hand them up.

15            (Joint Exhibits 5A, 5B, 5C and 5D received in

16     evidence)

17            MS. BAGLIN:  The next exhibits that we're offering

18     into evidence, your Honor, are 14 settlement agreements as

19     Joint Exhibits 22 to 35.  And I think we don't need to offer

20     them in evidence if the Court accepts without argument that

21     what the settlement agreements show is that the settlement

22     payment covered all claims or potential claims that could have

23     been brought under policies or under the coverage litigation,

24     that there was no allocation to any individual claim or

25     potential claim, and that the advance payments that were made

D7HAWTC3ps                    Shavell

```
 1   prior to the signing of the settlement agreements only became

 2   final pursuant to terms of the settlement agreement.

 3             THE COURT:  I so accept.

 4             MS. TAYLOR:  Your Honor, we want to also note for the

 5   record that certain of these settlement agreements specifically

 6   indicate that it is being made on an actual cash value analysis

 7   and in respect to the master redevelopment plan for the

 8   complex.  So there is an indication on what the insurers were

 9   contemplating in the payment.

10             THE COURT:  Thank you.

11             MS. TAYLOR:  And mutual releases as well.

12             MS. BAGLIN:  Your Honor, that is not the case with all

13   the settlement agreements.  If there is a dispute we would like

14   to offer them in evidence.

15             THE COURT:  Offer them all in evidence.

16             MS. BAGLIN:  That's 22 through 35.  Thank you.

17             MR. BYRNES:  Your Honor, we suggest that you read

18   through 37.

19             MS. BAGLIN:  I was getting to those as a separate

20   category because I thought we would have agreement on 22

21   through 35.  I will turn now to Joint Exhibit 36, 37, and 45.

22             Exhibit 36, your Honor, is the Royal Indemnity Company

23   insurance settlement payment.  That's settled --

24             THE COURT:  Received.

25             (Joint Exhibit 36 received in evidence)
```

D7HAWTC3ps                    Shavell

```
 1            MS. BAGLIN:  And the next one, 37, is the settlement
 2   agreement with the foreign parent who had issued the policy.
 3            THE COURT:  Received.
 4            (Joint Exhibit 37 received in evidence)
 5            MS. BAGLIN:  Exhibit 45 is the actual complaint
 6   against the foreign parent showing what those claims were that
 7   the lawsuit was about.
 8            THE COURT:  I'm not taking that.
 9            MS. BAGLIN:  The next two joint exhibits we'd offer in
10   evidence, your Honor, are 94 and 95.  That's the appraisal,
11   stipulation, and order, and the partial determination on
12   replacement costs --
13            THE COURT:  Received.
14            MS. BAGLIN:  -- as of December 31, 2006.  That's the
15   one that did not include the tenant improvement component.
16   Both of those exhibits we offer in evidence at this time.
17            THE COURT:  Received.
18            (Joint Exhibits 94 and 95 received in evidence)
19            THE COURT:  Tell me about that again.
20            MS. BAGLIN:  The appraisal stipulation and order
21   basically tells who the parties were, who the umpire was, who
22   the appraisers were, the issues to be determined.  Joint
23   Exhibit 95 is a partial decision by the panel, what they had
24   determined as of December 31, 2006 on replacement cost.  It
25   shows that the values that they determined don't reflect total
```

D7HAWTC3ps                    Shavell

 1   replacement cost value because they hadn't yet determined the

 2   replacement cost value of tenant improvements that were yet to

 3   be added.  That was one of the next things they were going to

 4   turn to.  And it says they specifically contemplated issuing a

 5   later award after those were determined.

 6          Are those received in evidence, your Honor?

 7          THE COURT:  Yes.

 8          MS. BAGLIN:  The next is Joint Exhibit 101.  This is

 9   the 1 World Trade Center lease.  I don't think there's any

10   dispute that the leases for those four buildings, for 1, 2, 3,

11   and 4, all have --

12          THE COURT:  We call them 1, 2, 4, and 5.  That's how

13   they label them in the complaint.

14          MS. BAGLIN:  Yes.  The net leases for those four

15   buildings all have the same pertinent provisions.

16          THE COURT:  Received.

17          MS. BAGLIN:  So rather than putting in all four leases

18   we'll put in this one as representative.

19          THE COURT:  Received.

20          MS. BAGLIN:  Thank you.

21          (Joint Exhibit 101 received in evidence)

22          MS. BAGLIN:  The next exhibit is Joint Exhibit 203.

23   That's the IRI adjustor's final claim report on the 7 World

24   Trade Center claim.

25          THE COURT:  Received.

 1          (Joint Exhibit 203 received in evidence)

 2          MS. BAGLIN:  Thank you.  The next one is Joint Exhibit

 3     205.  That's the settlement agreement between IRI and 7 World

 4     Trade Company.

 5          THE COURT:  Received.

 6          (Joint Exhibit 205 received in evidence)

 7          MS. BAGLIN:  The next one is Joint Exhibit 209.  That

 8     is the March 27, 2003 interim proof of partial losses for 7.

 9          THE COURT:  Received.

10          (Joint Exhibit 209 received in evidence)

11          MS. BAGLIN:  The next one, Joint Exhibit 214, is a

12     March 18, 2003 letter from IRI to Mr. Levy that shows -- and

13     this is relevant to Mr. Beach's opinion -- that IRI had not

14     accepted any proof of loss at that time and didn't think that

15     the insured had submitted proper documentation.

16          THE COURT:  Why is that relevant?

17          MS. BAGLIN:  Because Mr. Beach has testified that none

18     of the insurance payments were made here except for a

19     documented claim.  And at that time the insurer hadn't accepted

20     any claim and said it had received proper documentation.  No

21     payments were made prior to this.

22          THE COURT:  Received.

23          (Joint Exhibit 214 received in evidence)

24          MS. BAGLIN:  The next exhibit is Joint 215.  It's a

25     letter from Mr. Wolinsky to IRI dated March 20, 2003.  And that

D7HAWTC3ps                    Shavell

1    is raising claims that IRI was acting in bad faith in the

2    manner of handling its claims by engaging in dilatory payment

3    tactics.

4              THE COURT:  Why is that relevant?

5              MS. BAGLIN:  It's relevant because we say, your Honor,

6    that the settlement agreement, and the settlement agreements

7    say, that they were settling all claims against the insurer.

8    And this explains the nature of some of those extra-contractual

9    claims against IRI.

10             THE COURT:  Received.

11             MS. BAGLIN:  The next is Joint Exhibit 224.  That's

12   the 7 World Trade Center.

13             THE COURT:  Received.

14             (Joint Exhibit 224 received in evidence)

15             MS. BAGLIN:  Your Honor, we would like to offer a

16   number of plaintiff exhibits.  And only objection outstanding

17   as to any of these from the aviation defendants are relevance

18   objections.  I don't know if there are any authentication

19   objections or things like that.  As a matter of fact, all of

20   them except this first one were at one time on the Joint

21   Exhibit list.  So there really shouldn't be any objection.

22             The first one, though --

23             MR. PODESTA:  I do have an objection generally to a

24   document dump of plaintiffs' exhibits that have not been

25   discussed in any of the live witnesses' testimony.

D7HAWTC3ps                    Shavell

1              THE COURT:  Make your objections one by one,

2      Mr. Podesta.

3              MR. PODESTA:  Fair enough.

4              MS. BAGLIN:  The first one that I would like to offer

5      is Plaintiff's Exhibit 501.  That's the World Trade Center

6      offering memoranda with respect to the initial bidding.  And we

7      offer that --

8              THE COURT:  You object, Mr. Podesta?

9              MR. PODESTA:  Yes, I do.

10             THE COURT:  Stenned.

11             MS. BAGLIN:  Your Honor, may I point out that one of

12     the pages of that offering memoranda shows specifically that

13     there was a recent capital improvement program, that most of

14     the major systems in the complex were by then state of the art.

15     This relates to the depreciation factor we've already

16     discussed.

17             THE COURT:  Objection sustained.

18             MS. BAGLIN:  Next we have a series of exhibits, your

19     Honor.  These all relate to advances.  This is Plaintiff's

20     Exhibit 511, 514, 515, 518, 519, 520, 522, 524, 526, 528, 536,

21     537, 542, 543, 546, 549, and 560.  I think we can forgo

22     offering the actual exhibits if we have agreement here that the

23     advances paid by the insurers were all made without

24     prejudice --

25             THE COURT:  I so understand.

D7HAWTC3ps                    Shavell

1            MS. BAGLIN:  -- without characterization of the

2      advances or allocations to any potential coverages.

3            THE COURT:  I so understand.

4            MS. BAGLIN:  Next is Exhibit, Plaintiff's Exhibit 512,

5      your Honor.  That is a December 4, 2001 letter from the

6      Hartford Insurance Company in which they make a $32 million

7      advance payment under their current terms limits.  That

8      specifically states that the payment is not made with respect

9      to any particular element of loss.

10            THE COURT:  I so understand.  But the exhibit is

11      declined.

12            MS. BAGLIN:  Plaintiff's Exhibit 556, your Honor, is

13      an April 26, 2002 letter from Zurich, accompanying their

14      payment of their single --

15            THE COURT:  Same understanding.

16            MS. BAGLIN:  -- limit.  Thank you.

17            That's it, your Honor.  Thank you.

18            THE COURT:  Thank you very much.  Anything else,

19      Mr. Williamson?

20            MR. WILLIAMSON:  Yes, your Honor.  You had asked

21      yesterday, we were discussing Joint Exhibit 95 in evidence of

22      partial decision by the appraisal panel regarding the value of

23      replacement costs, and it came up that tenant improvements were

24      not included because they hadn't reached it.  Your Honor asked

25      for a breakdown building by building of the tenant improvement

D7HAWTC3ps                    Shavell

1    amounts that were claimed.  We prepared that.

2              THE COURT:  I did ask you that?

3              MR. WILLIAMSON:  Yes.  And we can actually give you

4    the transcript cite page and line.

5              THE COURT:  No, no, no, if you say, I'll accept it.

6              MR. WILLIAMSON:  Yes.  So we said we would prepare it,

7    my colleagues would prepare it for you.

8              THE COURT:  Thank you.

9              MR. WILLIAMSON:  And they did.  And they did the same

10   for 7.

11             THE COURT:  So what's the number?

12             MR. WILLIAMSON:  So that would be Plaintiff's Exhibit

13   572 that we would like to hand up.

14             THE COURT:  Thank you.

15             MR. WILLIAMSON:  You're welcome.  And then Plaintiff's

16   Exhibit 573 takes those tenant improvement dollar amounts and

17   adds them to the replacement cost column, so you have it all

18   totaled for you, either whether you want the tenant

19   improvements alone, Exhibit 572, or you want it added together.

20   You can have it both ways.

21             THE COURT:  Thank you.

22             MR. WILLIAMSON:  Thank you very much, your Honor.

23             THE COURT:  Anything else?

24             MR. WILLIAMSON:  Not from the plaintiffs' point of

25   view, your Honor.

D7HAWTC3ps                    Shavell

1          THE COURT:  Plaintiffs rest?

2          MR. WILLIAMSON:  The aviation defendants would go

3   first.

4          THE COURT:  They already rested.

5          MR. WILLIAMSON:  Plaintiffs rest.  Yes, your Honor.

6          THE COURT:  All right.  Any rebuttal, Mr. Podesta?

7          MR. PODESTA:  Let me check with my of my colleagues.

8   We have no rebuttal case.  We rest.

9          THE COURT:  You rest.  Both sides rest.

10         All right.  We recess now until 10 o'clock tomorrow

11  morning.  We'll start closing arguments with Mr. Podesta,

12  followed by Mr. Williamson.  And if there's rebuttal by

13  Mr. Podesta, each side is limited to one hour close.

14         MR. PODESTA:  Thank you, your Honor.  I will probably

15  divide it 45, 15.

16         THE COURT:  We'll do whatever you want.  We'll keep

17  track.

18         Thank you very much.

19         MR. WILLIAMSON:  Thank you, your Honor.

20         (Adjourned to 10:00 a.m., July 18, 2013)

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   STEVEN M. SHAVELL

 4   Direct By Mr. Williamson . . . . . . . . . . 370

 5   Cross By Mr. Podesta . . . . . . . . . . . . 403

 6                       PLAINTIFF EXHIBITS

 7   Exhibit No.                            Received

 8    565  . . . . . . . . . . . . . . . . . . 374

 9                       DEFENDANT EXHIBITS

10   Exhibit No.                            Received

11    E-4  . . . . . . . . . . . . . . . . . . 436

12                         JOINT EXHIBITS

13   Exhibit No.                            Received

14    1-A's Exhibit 9  . . . . . . . . . . . . 435

15    5A, 5B, 5C and 5D  . . . . . . . . . . . 438

16    36   . . . . . . . . . . . . . . . . . . 439

17    37   . . . . . . . . . . . . . . . . . . 440

18    94 and 95  . . . . . . . . . . . . . . . 440

19    101  . . . . . . . . . . . . . . . . . . 441

20    203  . . . . . . . . . . . . . . . . . . 442

21    205  . . . . . . . . . . . . . . . . . . 442

22    209  . . . . . . . . . . . . . . . . . . 442

23    214  . . . . . . . . . . . . . . . . . . 442

24    224  . . . . . . . . . . . . . . . . . . 443

25
```