D7ikwtc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                            21 MC 101
 3   In Re: September 11 Litigation         08 CV 3719 (AKH)
                                            08 CV 3722 (AKH)
 4   ------------------------------x

 5                                          New York, N.Y.
                                            July 18, 2013
 6                                          10:10 a.m.

 7
     Before:
 8
                      HON. ALVIN K. HELLERSTEIN
 9
                                            District Judge
10

11                          APPEARANCES

12   FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
          Attorneys for WTCP Plaintiffs
13        and 7 World Trade Co.
     BY:  RICHARD A. WILLIAMSON, ESQ.
14        CATHI BAGLIN, ESQ.
          JASON T. COHEN, ESQ.
15        MEGAN P. DAVIS, ESQ.

16   DEBEVOISE & PLIMPTON LLP
          Attorneys for Defendant American Airlines
17   BY:  ROGER E. PODESTA, ESQ.
          ERICA WEISGERBER, ESQ.
18
     CONDON & FORSYTH LLP
19        Defense Liaison Counsel for American Airlines
     BY:  DESMOND T. BARRY, ESQ.
20
     LOCKE LORD BISSELL & LIDDELL LLP
21        Attorneys for Defendant Globe Aviation
          Services Corporation
22   BY:  ANN C. TAYLOR, ESQ.
          T. PATRICK BYRNES, ESQ.
23
     O'MELVENY & MYERS LLP
24        Attorneys for Defendant Massachusetts
          Port Authority
25   BY:  WILLARD MARK WOOD, ESQ.
```

D7ikwtc

1   APPEARANCES (Cont'd)

2   RICHARD KIBBE & ORBE LLP
         Attorneys for Defendant Boeing Co.
3   BY:   BRIAN S. FRASER, ESQ.

4   Also Present:   Jonathan w. Knipe
                     General Counsel
5                    Silverstein Properties

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; case called)

2          THE COURT:  Mr. Podesta, please.  Closing for the

3    defense.  It's now 10:05.

4          MR. PODESTA:  May it please the Court:  Roger Podesta

5    for the aviation defendants.

6          In Monday's opening, I identified the three questions

7    that the Court would have to decide in order to resolve the

8    correspondence issues presented by this trial:  First, for what

9    type of claim the plaintiffs potentially may obtain tort

10   damages, and in what amounts; second, for what type of loss did

11   the plaintiffs receive insurance payments, and in what amounts;

12   and, third, do the insurance recoveries and potential tort

13   damage awards compensate or reimburse plaintiffs for the same

14   category of loss, and how complete is the offset?

15         Now that the evidence is in, the aviation defendants

16   urge the Court to find that WTCP's insurance payments for the

17   complex, of $4.091 billion, correspond to, and entirely offset,

18   its maximum potential tort damages recovery of $2.805 billion,

19   and that 7 WTC Co.'s insurance recoveries of 831 million

20   correspond to, and fully offset, its maximum potential tort

21   damages award of 739 million except for its fine arts claim of

22   approximately $300,000.

23         Now, as to the first question, the nature and amounts

24   of plaintiffs' maximum potential tort damages awards -- there's

25   essentially no dispute -- the Court should find as follows:

First, that WTCP's maximum potential tort damage award for

damages to its net leasehold interest in the complex is

$2.805 billion; second, that 7 WTC Co.'s maximum potential tort

damage award for damages to its net leasehold interest in WT 7

is $737 million; and, finally, that 7 WTC Co.'s maximum

potential tort damage award for its separate lost personal

property claim is $1,846,000.

          As the Court has repeatedly held, the tort damage

awards for the leasehold are determined under the "lesser of

two" rule, whereby a property damage plaintiff is entitled to

recovery of replacement cost of its property or the reduction

of its fair market value, whichever dollar amount is lower.

          In their briefs, plaintiffs maintain that the Court

has barred them from any recovery of replacement cost

whatsoever, on legal grounds.  And Professor Shavell's

testimony, as per counsel's instruction, was based on that same

assumption.

          Plaintiffs' position appears to be based on a

misinterpretation of the Court's ruling that WTCP may not

recover tort damages based on its contractual obligation to

rebuild the complex because the aviation defendants' conduct

was not the proximate cause of the contractual covenant to

rebuild.  But this is a misunderstanding.  The Court's ruling

simply barred plaintiffs from recovering replacement cost

damages in excess of the amount of fair market value on the

1    basis of their contractual obligation to rebuild.  The aviation

2    defendants have never moved to dismiss plaintiffs' replacement

3    cost claims altogether, and plaintiffs remain free to seek

4    replacement costs under the "lesser of two" rule in their

5    capacities as long-term necessary leaseholders with the right

6    to occupy and rent the building for 99 years and with the

7    consent of the Port Authority by suing in its stead, as they

8    have, for replacement costs as in place of fee simple owner.

9              THE COURT:  The $2.805 billion price valued also the

10   obligations?

11             MR. PODESTA:  I believe it necessarily valued all the

12   obligations in the leases, yes.  That would --

13             THE COURT:  So, probably the value, without the

14   obligation of the property, was greater than 2.805 billion but

15   the plaintiffs did not avail themselves of the opportunity to

16   prove the higher value when I gave them the opportunity and,

17   therefore, it's not reflected in our calculations here.

18             MR. PODESTA:  That is correct, your Honor.

19             In both its December 2008 partial summary judgment

20   ruling that rejected plaintiffs' contractual obligation theory

21   for recovery, and in all four of its --

22             THE COURT:  Could the person in the back sit down,

23   please.

24             MR. PODESTA:  -- and in all four of its major damages

25   correspondence rulings since, the Court has repeatedly stated

1    it's applying the "lesser of two" rule to the plaintiffs'

2    claims.  In its most recent, December 2012, ruling relating to

3    WTC 7, the Court stated replacement costs would provide the

4    measure of damages for the leasehold interest in WTC 7 if they

5    were proven to be less than reduction of fair market value.

6            And it's important to note the "lesser of two" rule

7    does not prevent a property damage plaintiff from recovering

8    either replacement cost or reduction in fair market value.

9    They can seek both.  The rule simply limits the dollar amount

10   of the recovery to the lesser dollar amount proven.  This Court

11   has applied the "lesser of two" rule in the same way that the

12   Court of Appeals applied it in Fisher.

13           THE COURT:  Actually, they come together, Mr. Podesta,

14   and the expert testimony has helped me refine my view.  The

15   replacement cost is limited by replacement of the value that

16   the property had as of the date of the catastrophe; and,

17   therefore, you can collect that much replacement value, as

18   reflecting that amount.  In insurance, however, whatever the

19   replacement is, to the extent it's proveable and satisfies the

20   insurance company, that's the recovery; so, an insurance could

21   be more, but in a tort recovery, replacement cost cannot exceed

22   it.

23           MR. PODESTA:  That's correct, except there is a

24   supplement for temporary loss rental income during the building

25   period, as we discussed, but that's essentially correct.  And I

1    believe that was the situation in Fisher as well.

2          As to the second question, the nature and amounts of

3    plaintiffs' insurance recoveries --

4          THE COURT:  There are certain additional consequential

5    costs.  It's not required, in an ordinary tort recovery, to

6    plug in the costs of rebuilding.  A person who's lost an asset

7    can take his money and walk away.

8          MR. PODESTA:  That's absolutely correct.

9          THE COURT:  In an insurance setting, if you have

10   business interruption, you can collect the lost income and

11   usually in this kind of a setting it's tied together with a

12   replacement cost as well.  The two work together and in this

13   situation liquidate the obligation to rebuild.

14         MR. PODESTA:  That is correct, your Honor.  And of

15   course if they had chosen not to rebuild, they would have

16   received actual cash value, but they chose to rebuild so

17   payment was on a replacement cost basis.

18         THE COURT:  Well, they would have breached the

19   covenant, although the covenant is valued, as I said before, in

20   relationship to market value.  We never received proof of that

21   value.

22         MR. PODESTA:  That's correct.

23         THE COURT:  But it doesn't really make any difference

24   in this context.

25         MR. PODESTA:  As to the second question, the nature

1    and amounts of plaintiffs' insurance recoveries, the evidence

2    strongly supports the following findings:  That the entirety of

3    WTCP's 4.091 billion in insurance recoveries should be

4    allocated to replacement cost and business interruption lost

5    rental income, and that all of WTC 7's insurance recoveries

6    should be allocated to replacement cost and business

7    interruption lost rental income except for approximately

8    $1 million or so, to be allocated to the personal property

9    claim.

10         Now, in its September 2009 order, the Court ruled that

11   the insurance proceeds that WTCP received from its insurers are

12   allocable only to business interruption and replacement cost

13   unless WTCP pleads and proves specific facts supporting

14   allocations to additional components.  The evidence at trial

15   only confirms the Court's September 2009 finding.  The aviation

16   defendants have shown from the testimony of Mr. Beach --

17         THE COURT:  Not quite, not quite.  It really supports

18   a finding that the insured stopped calculating once the insured

19   hit the insurance caps.  Since the primary calculation was a

20   business interruption and replacement cost, leaving out for the

21   moment the personal property in Tower 7, the calculation

22   stopped.  There are other categories which we may or may not

23   value, but it's not really proper to say that there was a

24   payment in response to an allocation because there wasn't.

25         MR. PODESTA:  I'm not saying that.  What I'm saying

1    is, the evidence -- we've had shown that the only losses that

2    either WTCP or 7 WT Co. ever documented or quantified in their

3    submissions to their insurers were for replacement costs,

4    actual cash value and business interruption/lost rental income.

5    Indeed, the evidence shows that these losses were the entire

6    focus of the claims adjustment process for both properties,

7    including the 99-day appraisal hearing between WTCP and certain

8    of its insurers concerning the complex.

9         And, in response, plaintiffs have failed to come

10   forward with any specific facts that would warrant ascribing

11   any dollar amount to any items of loss.  None of the so-called

12   TBD items were ever documented or quantified.  Mr. Levy

13   admitted in his deposition that several of them were never even

14   incurred.  And plaintiffs themselves, in their proposed

15   allocations of settlement payments, in their Exhibit 766 and

16   768, allocate their insurance payments only to replacement cost

17   and business interruption.

18        The silence of the settlement agreement --

19        THE COURT:  Say, that again.

20        MR. PODESTA:  In plaintiffs' own exhibits -- 766 and

21   768, which they displayed for your Honor yesterday -- 566 and

22   568 --

23        THE COURT:  That was for the purposes of economic

24   analysis?

25        MR. PODESTA:  Well, yes, for the purpose of saying how

1    the Court should apply it.

2              THE COURT:  But in a way, it says what it says --

3              MR. PODESTA:  Yes.  And that's why I want to make the

4    point, that even at this trial the plaintiffs are unable to

5    ascribe any specific value to any item of loss other than

6    business interruption or replacement cost.

7              And the silence of the settlement agreements doesn't

8    justify a finding that determination of the actual paid losses

9    is impossible but merely requires examination of the underlying

10   factual circumstances, showing that the only documented and

11   quantified claims were for replacement cost and business

12   interruption lost rental income.  And the exchange between

13   plaintiffs and their insurers of broad mutual releases

14   discharging any and all claims from the beginning of time

15   through the end of the world is typical boilerplate language

16   that appears in any substantial settlement, or virtually any,

17   and sheds no light on the nature of the losses actually paid.

18             So, we request that the Court find that the insurance

19   payment should be allocated to business interruption and

20   replacement cost except for the small personal property claim,

21   which is the only other claim ever quantified.

22             As to the third question, the controlling legal

23   standard is whether the collateral source payment represents

24   reimbursement for a particular category of loss that

25   corresponds to a category of loss for which tort damages were

1    awarded.   The aviation defendants submit that both the

2    governing law and the expert testimony have demonstrated

3    correspondence between plaintiffs' insurance recoveries and the

4    potential tort damage awards.

5            The first step in this analysis is the identification

6    of the relevant category of loss.   The aviation defendants

7    define the category of loss as lost property value, as the

8    Court of Appeals did in Fisher; more specifically, lost

9    property value, in the form of economic damages to plaintiffs'

10   leasehold interest in the complex and WTC 7 resulting from the

11   destruction of the leased buildings in the terrorist attacks.

12           As Professor Fischel testified, this characterization

13   of the loss --

14           THE COURT:   I think I'd like to refine that and see

15   how it would work with you.   When a commercial buyer buys

16   something, he buys an asset, the asset is a long-term leasehold

17   developed to sustain rentals.   And that asset yields an

18   expectation of income over a long period of time.   So, the

19   valuation is of the income stream produced by the asset being

20   purchased?

21           MR. PODESTA:   I think that is essentially correct.

22           THE COURT:   Rather than lost property damages, I think

23   what has happened is that the plaintiffs bought an asset,

24   expected it to yield income, the asset was destroyed, allegedly

25   through the negligence of your clients destroying the income

1   flow flowing from the asset that was destroyed.

2          MR. PODESTA:  Actually, I think Professor Fischel

3   described it very similarly.  What the plaintiffs lost was that

4   they had a leasehold interest in the complex that was expected

5   to generate rental income and the leased buildings were

6   destroyed and as a result, they lost rental income.  That's

7   really the category of loss, and I think it's very similar to

8   what your Honor just described.

9          Now, Professor Shavell categorized the category of

10  loss as replacement loss and lost rental income, which matches

11  the plaintiffs' types of insurance coverage.  And if just

12  identifying the types of insurance coverage was sufficient --

13  was the right way to define the category of loss, one wonders

14  why the Court of Appeals in Fisher defined the loss there as

15  lost property value for destruction of a home rather than

16  simply replacement cost, which was the nature of the insurance

17  claim.  In any event --

18         THE COURT:  I don't follow what you said.

19         MR. PODESTA:  Well, in Fisher, the Court of Appeals

20  didn't look to the insurance payment category and say, oh, the

21  loss is replacement cost; it defined the loss as lost property

22  value, destruction of the home in a fire, and then inquired

23  whether both the insurance payments and the tort damage awards

24  corresponded to that particular category of loss.

25         THE COURT:  And concluded?

1          MR. PODESTA:  The Court concluded that replacement

2     cost insurance payments corresponded to a reduction in fair

3     market value of the Fishers' property and completely offset the

4     tort award.

5          But I don't think -- as Professor Fischel said, you

6     shouldn't put too much weight on the particular burden of how

7     the category of loss is defined.  In his view, the potential

8     tort damages awards for reduction in fair market value of the

9     leaseholds compensated/reimbursed the plaintiffs for the

10    economic damages they suffered on 9/11 under several

11    classifications.  And this is because an award with reduction

12    in fair market value reflects the value of the entire stream of

13    rental income that plaintiffs could expect over the term of

14    their net leases.  It's a one-step method, in a sense, of

15    making the plaintiffs whole.

16         THE COURT:  It creates an impediment of some sort to

17    the asset giving rise to the income stream?

18         MR. PODESTA:  The destruction does, yes.

19         THE COURT:  Yes.

20         MR. PODESTA:  And the reduction in fair market

21    value --

22         THE COURT:  And replacement is intended to restore

23    that asset so that it yields the same full income stream as

24    previously?

25         MR. PODESTA:  That's exactly correct, your Honor.  And

D7ikwtc                    Closing - Mr. Podesta

1    when you supplement the replacement cost insurance payments in

2    the case of a rental income-producing property with insurance

3    for the temporary loss of rental income during the

4    rebuilding/reconstruction period, that two-step process

5    provides complete correspondence to the one-step process of

6    returning to the plaintiffs the entire pre-9/11 value of their

7    leasehold through the recovery of the reduction in market

8    value, which is here assumed as a reduction to zero, so we

9    would award them the full pre-9/11 market values of their

10   leaseholds.

11          THE COURT:  So, what Professor Shavell said is that

12   economically the loss due to the 9/11 attack was in two

13   categories, replacement cost and rental income losses.  And I

14   think it's subject to a refinement.  You don't lose replacement

15   cost.

16          MR. PODESTA:  No.

17          THE COURT:  Replacement cost remedy is what you lose.

18   You lose the asset?

19          MR. PODESTA:  Yes.

20          THE COURT:  And the asset creates the rental income,

21   which is lost.  That's why Professor Fischel says it's one

22   loss, not two --

23          MR. PODESTA:  Right.

24          THE COURT:  -- even though it's broken down into two.

25          And then he went on to say the potential categories of

 1    tort recoveries were losses of rental income but not

 2    replacement cost or property damage.

 3              MR. PODESTA:  I disagree with that.

 4              THE COURT:  Now, what Professor Shavell was doing was

 5    speaking in effect outside of his expertise.

 6              MR. PODESTA:  I agree with that.

 7              THE COURT:  He testified as an economics expert in the

 8    two categories of loss, but in terms of deciding what a Court

 9    would do in relationship to replacement cost, he was expressing

10    a legal opinion --

11              MR. PODESTA:  Right.

12              THE COURT:  -- which is not within his expertise.

13              MR. PODESTA:  And I think he was also failing

14    adequately to distinguish between lost rental income, which is

15    for the Court to award here, under replacement cost remedy,

16    would be for the temporary rebuilding period --

17              THE COURT:  I'm sorry, you're starting to mumble,

18    Mr. Podesta.  You lose some of that fire.

19              MR. PODESTA:  All right.  Well, you know, maybe I

20    should have spent more time at the public defender's office,

21    your Honor.

22              What Professor Shavell really did not always recognize

23    in his testimony is that calling it lost rental income creates

24    confusion between whether you're talking about lost rental

25    income in the rebuilding period, which is what the insurance

1    covers, and a reduction in fair market value, which is the tort

2    remedy that covers the entire rental value of the full 99-year

3    or 85-year remaining term of the lease.

4            THE COURT:  Well, I would categorize it a little

5    differently but essentially the same.  The business opportunity

6    recovery in insurance compensates for part of what you lost but

7    not the whole stream of income.

8            MR. PODESTA:  Right.

9            THE COURT:  And in order to get the whole stream of

10   income, you've got to replace the asset or restore the asset,

11   which is the replacement cost part of it.  So, it all works

12   together, as Professor Fischel described it.

13           MR. PODESTA:  That I believe is correct.

14           Now, there's no dispute between the parties that

15   plaintiffs' business interruption/lost rental income insurance

16   payments correspond to their tort damage awards measured by a

17   reduction in fair market value.  Professor Shavell testified to

18   that, and plaintiffs' own Exhibits 566 and 568 seem to

19   acknowledge that potential.

20           THE COURT:  Would you do me a favor:  Close up your

21   notes.

22           MR. PODESTA:  OK.

23           THE COURT:  You are so much more effective without the

24   notes when you're talking to me.

25           MR. PODESTA:  OK.

1          THE COURT:  Your notes give you a long sentence and I

2     can't remember the beginning of the sentence when I hear the

3     end of the sentence.

4          MR. PODESTA:  All right.  Well, let me tell you, as to

5     correspondence, there's no doubt here that the fair market

6     value of the leaseholds will fully compensate the plaintiffs

7     for what they lost.  And the Court so found.  And I have to go

8     back to read my notes because it's a quote:  "The price WTC

9     paid for the 99-year leases it acquired from Port Authority

10    represents a full and fair market price for the property.  If

11    WTCP is entitled to recover, recovery of the plaintiffs' market

12    value would fully compensate it."  And Professor Fischel

13    testified to the same thing.

14         Now, Professor Shavell in his testimony agreed with

15    your Honor's questioning, that, generally speaking, recovery of

16    the full fair market value, pre-loss full fair market value of

17    the leasehold would compensate property owners for their loss.

18    But he tried to draw a distinction in this case based on the

19    contractual obligation to rebuild.  And, again, I think he was

20    stepping a little bit outside his expertise as an economics

21    expert because what he's overlooking -- you see what kind of

22    rants you get when you tell me to do this?

23         THE COURT:  No, I can hear you and I understand you.

24         MR. PODESTA:  All right.

25         The correspondence inquiry is between tort damage

1     awards and collateral offsets, and the problem with contractual

2     obligation to rebuild is it doesn't fit either side of that

3     equation.  It cannot support a tort damage award --

4                THE COURT:  Well, it can support insurance.  You can

5     insure a covenant.

6                MR. PODESTA:  Yes, but -- that's true, but they did

7     not insure the covenant to rebuild.  And we have a stipulation

8     to that effect, in stipulation 6 and 30, that the insurance

9     policies, nothing in the language in the insurance policies,

10    makes the payment of replacement cost or actual cash value

11    dependent in any way on a contractual obligation to rebuild.

12    And Professor Reilly, their insurance adjuster expert for the

13    complex, testified that the insurance payments had nothing

14    whatever to do with the contractual obligation to rebuild.

15               THE COURT:  It's hard for me to understand that

16    because, as I understand it, the insurance liquidated the

17    obligation.

18               The Port Authority had interest that the lessee would

19    not walk away from the property if it was destroyed, and so a

20    covenant to replace was put into that contract, and the

21    insurance made it liquid.  After all, the owners were shell

22    companies.  So, there had to be a way that the Port Authority

23    created liquidity as a form of assurance that those buildings

24    would be rebuilt should there be a destruction.

25               MR. PODESTA:  And that was done --

D7ikwtc                        Closing - Mr. Podesta

1          THE COURT:  And, therefore, I think there's a

2     connection, notwithstanding the joint stipulation.

3          MR. PODESTA:  Well, there is a connection.  But the

4     connection is, there was a covenant in the lease that WTCP and

5     7 WTC Co. obtained the insurance and they obtained the

6     insurance, and that fulfilled their contractual obligations,

7     and they are getting an offset in this proceeding for the

8     amount of the insurance payments they paid against their total

9     insurance recovery.

10          Now, plaintiffs' principal argument against

11     correspondence appears to be that replacement cost insurance

12     payments are so different in nature from a tort award for

13     reduction in fair market value, that there can be no

14     correspondence.  But both the expert testimony and a decision

15     of the Court of Appeals in Fisher demonstrate that

16     correspondence does exist.  And I'd like to put up a couple of

17     demonstratives to illustrate, put on the screen a couple of

18     demonstratives.

19          And these demonstratives are just snippets from the

20     testimony that we received over the last few days --

21          THE COURT:  Do you have an extra set?

22          MR. PODESTA:  Yes.

23          THE COURT:  We can take two copies.

24          MR. PODESTA:  And the first set of snippets -- and

25     these are just snippets from the testimony; we could have found

1    many more but you can't fit so many on the screen.  The first

2    snippet shows the agreement of Professors Fischel and Shavell

3    as to the proposition that the market value of commercial

4    rental property, such as the complex and WTC 7, is determined

5    largely by the net present value of their anticipated rental

6    income streams.  I don't think that's really much of a dispute,

7    but it's an important point in a correspondence equation.

8          Then if we can turn to the second demonstrative, which

9    relates to the fact that plaintiff -- the testimony agrees that

10   plaintiffs' replacement cost insurance proceeds provided them

11   with funds to rebuild and assist in retenanting the destroyed

12   properties.  And there you see we have testimony to this effect

13   from Mr. Beach and Professor Fischel.  And in response --

14         THE COURT:  I think this is an important point.

15   Shavell says, answering a question I put to him:  "What's the

16   connection?"

17         "Well, the connection is that you can't begin to enjoy

18   an interrupted income stream unless you fork out the money for

19   replacement."

20         MR. PODESTA:  A very practical statement by a Harvard

21   law school professor and a distinguished economist, forking out

22   the money for replacement, but that is exactly the point.

23         THE COURT:  That in effect showed the correspondence

24   both to the income stream and the replacement cost.

25         MR. PODESTA:  That's one of the reasons we put that

1    snippet up there, in the hopes of persuading your Honor, of

2    that.

3            And I'd like to show you the third -- that's generally

4    been my objective throughout.

5            And, thirdly, I'd like to show the demonstrative that

6    establishes agreement on the point that rebuilding the

7    destroyed properties would enable plaintiffs to rent out the

8    buildings once again and restore their lost rental income

9    stream.  And here we have multiple admissions of this point,

10   from statements by Mr. Beach and Professor Fischel and several

11   admissions or acknowledgments by Professor Shavell, plaintiffs'

12   expert, of precisely this point, in the course of an excellent

13   examination conducted by someone other than the defense

14   lawyers.  And I think this is a critical point:  The

15   correspondence is established -- a critical point is

16   established in correspondence is if rebuilding the destroyed

17   properties will enable the plaintiffs to rent out the buildings

18   once again and restore their rental income stream.

19           I know this is exactly the same type of

20   relationship -- between replacement cost insurance payments and

21   reduction in fair market value -- that the Court of Appeals

22   found sufficient in Fisher to support correspondence.  In that

23   case, replacement costs weren't exactly the same as reduction

24   in fair market value, but the replacement cost insurance

25   proceeds were found to correspond because they provided the

1    Fishers with most of the funds they needed to rebuild their

2    home and thereby to restore the market value of the property.

3         THE COURT:  I think, on this screen, that the Fischel

4    testimony at page 206 lines 9 to 19 and Beach's testimony at

5    page 116 line 16 to 25 express the point you're making very

6    well, namely, that the purpose of both business interruption

7    and replacement costs go hand to hand.  The replacement cost

8    restores the asset to the full income stream and until it does

9    so, business interruption compensates the insured for that lost

10   income stream.

11        MR. PODESTA:  Exactly.

12        THE COURT:  So, the combination of the two restores

13   the full value of the asset that was paid for before the

14   catastrophe.

15        MR. PODESTA:  Exactly.  That sums up the defense case

16   very well.

17        Now, Fisher -- you've heard a lot about Fisher over

18   the last five years or longer -- it does provide important

19   support for the defense case because --

20        THE COURT:  That's Fisher, the New York Court of

21   Appeals case?

22        MR. PODESTA:  Yes.  Fisher v. Qualico.

23        -- in that case the Court unanimously held that the

24   Fishers' replacement cost insurance proceeds corresponded to,

25   and entirely offset, their lesser of two tort damage award --

1          THE COURT:  The problem with Fisher is that it was not

2     an income-producing property, it was a home, and you can't

3     glean from Fisher the combination of the two.  The plaintiffs

4     have conceded that there is a correspondence between business

5     interruption and lost income --

6          MR. PODESTA:  Correct.

7          THE COURT:  -- and, therefore, the fight between the

8     two of you is whether or not there is correspondence between

9     replacement cost.  I leave out all the others.  They were not

10    valued, and if they were not valued, I can't value them.  They

11    were all wrapped together in a release -- that's true -- but

12    they were not given any value by Shavell, plaintiffs'

13    economist, and they can't be given any value by me because

14    they've never been quantified.

15         Besides the numbers are not really big, and besides,

16    also, if they were an element of loss, they could be added to

17    the market value, and, again, they weren't proved.

18         MR. PODESTA:  That's correct.

19         THE COURT:  If one loses an income-producing asset,

20    plus improvements that can increase the value of that asset,

21    then your tort recovery encompasses both.  And so all the

22    tenant fixtures and the personal property and the Frank Stella

23    paintings, all of that could have been the subject of tort

24    recovery insurance.

25         MR. PODESTA:  Well, tenant improvements were included

D7ikwtc                    Closing - Mr. Podesta

1    in replacement cost --

2              THE COURT:  I understand, I understand.

3              MR. PODESTA:  -- but otherwise, I agree with you.

4              But one of the big points -- let me move away from my

5    notes -- that we have working for us in Fisher is that Fisher

6    found correspondence between replacement cost and reduction in

7    fair market value, as the issue in dispute here.  It didn't

8    have to address, because it wasn't dealing with a rental income

9    property, correspondence between what do you do when you have

10   lost rental income.  But here we have business interruption

11   lost rental income insurance that WTCP admits corresponds to

12   their temporary loss of rental income claim and corresponds to

13   a portion of the reduction in fair market value.

14             So, I think we're not worse off on correspondence than

15   defendants were in Fisher; we're better off because we have two

16   different insurance streams that compensate for the two

17   different portions of plaintiffs' claim replacement cost and

18   business interruption lost rental income.

19             Now, if you can bear with me for a minute, I would

20   like to put up two snippets from Fisher itself.

21             Plaintiffs' argument has long been that there are two

22   different categories of loss here, replacement cost and

23   diminution in value, and they don't offset.  But if your Honor

24   looks at this snippet, the Court of Appeals is describing the

25   Fishers' argument.  It was exactly the same argument:  Cost of

D7ikwtc                    Closing - Mr. Podesta

1    restoration and diminution in market value represent two

2    different categories of loss, and replacement cost insurance

3    proceeds correspond only to the first.

4            But what was the Court of Appeals' response?  If you

5    can flash that up, Mr. Campbell.  It's measured in our case

6    law.  Replacement cost and diminution in market value were

7    simply two sides of the same coin.  "Two sides of the same

8    coin" is not phrasing consistent with two different categories

9    of loss.  Each is a proper way to measure lost property value,

10   the lower of the two figures affording full compensation to the

11   owner.  That's our case here.  And the conclusion:  The

12   collateral source payment, the replacement cost insurance

13   proceeds thus correspond to the property loss and are properly

14   offset against the damage award.

15           And I'd add only:  Look at the Court's language.  It's

16   defining the category of loss in the fourth line, highlighted

17   as lost property value and in the next to last line,

18   highlighted as property loss.

19           Now, in his opening, Mr. Williamson gently chided us

20   for paying insufficient attention to the requirement of direct

21   and close correspondence under the case law.  But the case he

22   cited for that was Fisher.  And Fisher necessarily found the

23   required direct and close correspondence between replacement

24   costs and diminution in fair market value or it would not have

25   reached the unanimous result that it did.

D7ikwtc                    Closing - Mr. Podesta

 1          Mr. Williamson also claims that we disregarded Oden,

 2     but we haven't disregarded Oden.  We've cited it for the

 3     general --

 4          THE COURT:  Disregarded what?

 5          MR. PODESTA:  Oden v. Chemung County, which is a 1995

 6     Court of Appeals decision, it's a personal injury case

 7     involving correspondence between I believe pensions and lost

 8     future earnings, and found no correspondence.

 9          But the reason we focus on Fisher is not only because

10     it helps us, which is one of our motives, but because it helps

11     us --

12          THE COURT:  Well, you're not right because you have to

13     focus not only on cases that help you but those that hurt

14     you --

15          MR. PODESTA:  And that's what I'm trying to do.

16          THE COURT:  -- like Oden.

17          MR. PODESTA:  There aren't that many that hurt us

18     here.  But Fisher important because it deals with -- at least

19     none that I would admit, your Honor -- deals with

20     correspondence in the context of real property interest, fair

21     market value, and replacement cost.

22          THE COURT:  Talk about Oden.

23          MR. PODESTA:  Moreover, the Second Circuit in Turnbull

24     rejected the proposition that Oden requires a

25     damage-item-by-damage-item analysis for correspondence

D7ikwtc                          Closing - Mr. Podesta

1    purposes.

2              THE COURT:  Tell me about Oden.

3              MR. PODESTA:  Pardon me?

4              THE COURT:  Tell me about Oden.

5              MR. PODESTA:  Oden was a case, I believe, that

6    involved a personal injury case, and there was a claim for

7    future lost earnings that it was awarded by the jury.  And the

8    defendant argued that the plaintiff's pension benefits should

9    be offset against the future lost earnings award.  And the

10   Court of Appeals said, no, he would have gotten the pension

11   benefits independent of whether he had been able to work, and

12   found no correspondence.

13             And I think that's correct.  We don't take any issue

14   with that.

15             THE COURT:  That was a disability case?

16             MR. PODESTA:  Yes, there was a disability, that was an

17   allegation.

18             Now --

19             THE COURT:  The argument was made that because he's

20   disabled he loses his earning power, and by getting the

21   pension, it's a replacement of earning power?

22             MR. PODESTA:  That's what the defendants argued.

23             THE COURT:  And in effect the Court of Appeals

24   reasoned that the two were dissimilar?

25             MR. PODESTA:  Yes, the Court of Appeals --

 1              THE COURT:  One can earn money in many different ways

 2   and it's not an offset against the pension that you earn the

 3   money, and it's not an offset against the earning of the money

 4   that you got a pension?

 5              MR. PODESTA:  For example, when I retire from

 6   Debevoise, if this case ever concludes, I will be able to

 7   collect a pension, hopefully, but I could go out and work as a

 8   professional golfer and earn money.  And if I was injured such

 9   that I could no longer putt, I would still have a claim for

10   lost future earnings as a professional golfer, if only I were

11   so fortunate as to able to prove my earnings capability in that

12   regard.

13              But Turnbull basically described the standard for

14   correspondence as a showing with reasonable certainty that the

15   judgment includes an award for damages that falls within a

16   certain category of loss and the plaintiff receives collateral

17   source payment that reimburses him for a corresponding category

18   of loss.  We believe that we have met that test.

19              THE COURT:  What kind of case is Turnbull?

20              MR. PODESTA:  Turnbull was another lost earnings case.

21   And it rejected the notion you have to look at each individual

22   item to find correspondence, and it did find correspondence

23   between the offset payment in that case -- and I forget

24   precisely which one it was -- and the plaintiffs' lost earnings

25   claim.

D7ikwtc                      Closing - Mr. Podesta

1              THE COURT:  What was the collateral source there?

2              MR. PODESTA:  Pardon me?

3              THE COURT:  What was the collateral source?

4              MR. PODESTA:  You know, frankly -- well,

5    Ms. Weisgerber is handing me the Oden decision and the

6    collateral source there -- it is a Second Circuit opinion, so

7    it requires a little bit of scrutiny -- Social Security

8    benefits.  I didn't get that from reading the opinion but

9    Ms. Weisgerber whispered me the answer, which is good.

10             I'd like to conclude with a few words about

11   allocation --

12             THE COURT:  How did Turnbull decide, no

13   correspondence?

14             MR. PODESTA:  I think it remanded to the district

15   court, saying, here's the test, you figure it out.  It was:

16   Future lost earnings award and disability claimants were

17   intended to compensate plaintiff for the same category of loss,

18   you figure out, district court, how to do it.  Judge Skretny in

19   the Western District of New York.

20             A few words about allocation and then I will sit down:

21   As Professor Fischel testified, there's no need for the Court

22   to engage in a mathematical allocation of plaintiffs' total

23   insurance recoveries between replacement cost and business

24   income payments, for a very simple reason -- they both satisfy

25   the 4545(c) correspondence standards, and the mathematical

D7ikwtc                          Closing - Mr. Podesta

1    exercise serves no real point.

2              The personal property claim for $1 million for 7 WTC

3    Co. was a little different because it's a separate type of

4    claim that's independent of the damages to the net leasehold

5    interests.  And, on the other hand, it's unquestionably covered

6    by the insurance payments.  Mr. Levy admitted that.  And no one

7    denies that personal property insurance payments correspond to

8    personal property losses.

9              THE COURT:  What should I do with the personal

10   property of Tower 7?

11             MR. PODESTA:  Well, there's two things you can do.

12   You can take my approach, which is to say, look, there's

13   $831 million in total insurance recoveries, $737 million in a

14   tort claim for the leasehold, 1.8 million for personal

15   property, there's plenty of insurance left over, even after 3

16   or 4 million in offsets for claims processing -- it's all

17   covered.  There's no doubt the personal property claim is

18   covered by the settlement, and there's no indication that IRI

19   ever raised the slightest dispute as the quantification of the

20   amount of that claim.

21             THE COURT:  Is there a correspondence with the

22   personal property?

23             MR. PODESTA:  Yes.  It's personal property insurance

24   payments for a personal property loss.  No one has ever

25   questioned correspondence on that.

1        THE COURT:  So, there is or there isn't?

2        MR. PODESTA:  There is correspondence.  There's no

3   question as to --

4        THE COURT:  What aspect of tort recovery would have

5   given you that personal property?

6        MR. PODESTA:  It would just be a straight negligence

7   claim; you can sue for damage to your personal property.

8        THE COURT:  So, it would be in addition to market

9   value of the real property?

10        MR. PODESTA:  Right, so you sue for the damage to the

11   net leasehold value for the real property and you sue for the

12   damage to your personal property.

13        THE COURT:  So, to the extent I've held that the full

14   limit of recovery was the real estate value, I've got to adjust

15   that by adding personal property?

16        MR. PODESTA:  $1.8 million, yes, that's correct.

17        THE COURT:  So, there's a perfect match, right,

18   there's a perfect match?

19        MR. PODESTA:  Yes.  The other way to do it is the way

20   plaintiffs suggest, which is to do the allocation from

21   Exhibit 766 and 768.  And by their calculation -- and if you

22   have to allocate, it's a practicable way to do it -- you would

23   wind up with the plaintiffs having still a claim of like

24   $900,000 and change for personal property that they could add

25   to their $300,000 claim in fine arts, which would survive the

1   trial as to WTC 7, but there are no such little hanging claims

2   as to the complex, so those claims would be entirely offset.

3          THE COURT:  I'm not following.  What should I do with

4   the Frank Stella paintings, hold correspondence or not?

5          MR. PODESTA:  Well, the correspondence has been

6   stipulated to.  It's a million-dollar claim and there's

7   $700,000 of insurance, so there's 300,000 left or about

8   $300,000 left.  And that claim will survive --

9          THE COURT:  And I think Mr. Barry is going to pay

10  that.

11         MR. PODESTA:  Pardon me?

12         THE COURT:  And I think Mr. Barry is going to pay

13  that.

14         MR. PODESTA:  I think I've just about persuaded him to

15  pay it out of his own pocket even if the clients don't.

16         But apart from --

17         THE COURT:  And on the personal property, there's

18  correspondence?

19         MR. PODESTA:  Yes.  Apart from that minor point, the

20  principal lesson I take from Exhibits 566 and 568 is that the

21  replacement cost insurance payments alone, whose offset was

22  approved in Fisher, are sufficient by themselves to offset all

23  of the complex claim and about 85 percent of the WTC claim with

24  the remainder of the WTC claim being offset by rental income

25  payments as to which correspondence is not disputed.

1          THE COURT:  You know, I have trouble with allocations

2     because there's dissimilarity.  In the four main properties,

3     there was an appraisal which reduced a higher number of claim

4     for replacement cost.  And there was no appraisal or any other

5     kind of adverse relationship that gave me some kind of

6     reliability with regard to the business interruption.  So, it's

7     hard to draw a ratio; and even more so in Tower 7, because

8     there never was any kind of an appraisal proceeding on anything

9     there.

10         MR. PODESTA:  That's why we believe that the most

11    appropriate course is not to allocate, because it's

12    unnecessary, there's correspondence as to all the categories of

13    loss except for the special case of fine arts, which was

14    covered by an entirely different policy and --

15         THE COURT:  You wanted to reserve 15 minutes?

16         MR. PODESTA:  Yes.  I doubt that I will take 15

17    minutes.

18         THE COURT:  You've got to stop, though.

19         MR. PODESTA:  I stop.

20         THE COURT:  OK.  We will have a ten-minute break.

21    Then we'll hear Mr. Williamson.

22         (Recess)

23         THE COURT:  It's 12:00 o'clock, Mr. Williamson.

24         You may begin.

25         MR. WILLIAMSON:  Thank you, your Honor.

1        Good morning, your Honor, Counsel.

2        We examined the evidence that's been presented at this

3   trial.  We respectfully submit that it shows the defendants

4   want it both ways -- they want to escape the replacement cost

5   damages, as replacement cost claims have been dismissed, since

6   there's no proximate cause; they want to talk plaintiffs'

7   replacement cost insurance recoveries and use them to reduce

8   their potential tort damages for lost rental income.

9        The defendants have argued vociferously for years that

10  they should not be held liable for the costs of rebuilding the

11  World Trade Center complex.  Having convinced the Court of

12  that, having convinced the Court that there's no proximate

13  cause and therefore they're not liable for the replacement

14  costs, they escaped responsibility for the rebuilding effort.

15       Now, in this trial, we submit, they want to siphon off

16  those insurance coverage recoveries for replacement costs and

17  use them, as I said, to offset lost rental income losses.  The

18  defendants want to start with the rebuilding -- it violates

19  economic principles, it violates common sense, as the trial has

20  shown, and, most importantly, as I'll discuss, it violates CPLR

21  4545.

22       Previously, your Honor, on four occasions you found

23  defendants have failed to meet their burden of proof and you

24  denied the summary judgment motion seeking total correspondence

25  finding, in total dismissal.  We submit there's been no new

D7ikwtc                         Closing – Mr. Williamson

1    evidence adduced at trial that should change that result.

2              I'd like to discuss the major flaws in defendants'

3    analysis.  First, defendants conflate distinct insurance

4    coverages.  As you'll recall, Mr. McKinley was asked, are there

5    separate categories of insurance coverage for separate

6    categories of risk, and he explained that there are.  He

7    explained you pay different premiums for those coverages

8    because they're different and they cover different risks.

9              Professor Fischel wrongly lumped the insurance

10   categories of coverage together as though they didn't matter.

11   Let's take a look at how your Honor treated them earlier last

12   year.  Your Honor took the insurance recoveries, and you

13   analyzed them and broke them into categories of insurance

14   recoveries, as you're supposed to do under the prevailing case

15   law.  And you found they mainly fell into two categories, as

16   you know, property damage insurance to defray the cost of

17   rebuilding leased properties, and then business interruption

18   insurance separately, to cover the lost revenue losses.

19             Oden says that the way your Honor did it was correct,

20   the way the defendants and their expert did it was wrong

21   because collateral sources are not to be treated as fungible.

22   You don't just move them around.

23             (Continued on next page)

24

25

1              MR. WILLIAMSON:  Your Honor is supposed to come away

2     with the impression from this trial -- and we heard it again

3     today -- that World Trade Center Properties actual economic

4     losses won't be that great, so it is not so bad if you find

5     total correspondence.

6              And you heard discussion during the trial, when that

7     was presented, that the losses really were much less.  And your

8     Honor alluded to that today, referring to the appraisal

9     findings, in an exhibit that defendants created.  As will be

10    shown, the defendants dramatically understated the real losses.

11    How did they do it?  They did it in a couple of ways.

12             First, they gave you an appraisal number for as far as

13    the appraisal panel got and said, Use that number.  That will

14    be good.  That's 4.1 billion.  Of course, as we are going to

15    see in a minute, that was only partial and it left out tenant

16    improvements.  That was the point of introducing into evidence,

17    at your Honor's request, the exhibit that showed the amount of

18    tenant improvements for each of the buildings, the main site

19    and also for 7.

20             The next way they did it was they took an artificial

21    early cutoff date for lost rents.  They only took them out to

22    the end of 2007; but this is 2013, so we have six more years of

23    lost rents.

24             So let's take a look at the slide they showed you.

25    You will see, when you add them all up, you will see that you

1    were supposed to come away with the impression that the total

2    actual losses --

3              THE COURT:  What are the six years for?

4              MR. WILLIAMSON:  I'm sorry?

5              THE COURT:  What are the six years for?

6              MR. WILLIAMSON:  From 2007 to the present is the

7    point.

8              THE COURT:  Why is that relevant?

9              MR. WILLIAMSON:  Because that's lost rent damages.

10   The jury would have to ultimately determine how much to award

11   for lost rent damages.  The computation you were given only

12   goes up to the end of 2007.  That's the point.

13             THE COURT:  This will be the tort claim?

14             MR. WILLIAMSON:  In tort, yes, the jury would decide;

15   obviously governed by your Honor's ceiling, but it is just

16   inaccurate to tell you this is all the damages.

17             THE COURT:  I don't think that's what a jury does.  I

18   don't think that's what my instructions would be.  I wouldn't

19   ask them to add up all the rental income they lost.  I would

20   ask the jury to find out what the value of the building was as

21   at 9/11/01; and, because of the failure of proof, I would say

22   it is the same as the amount that was paid at the auction.

23             But if you wanted to value the contract, I don't know

24   how I would feel with that.  The contract obligation is just,

25   in a sense, like the assumption of a mortgage.  It is a debt of

D7i2wtc2                      Summation - Mr. Williamson

 1    some type, and it has to be valued.  It might increase the

 2    value of the property without that, but you didn't take

 3    advantage of the opportunity.

 4        MR. WILLIAMSON:  Well, let me first point out that it

 5    is an economic loss.  And let me comment, because your Honor

 6    did mention that we hadn't put in evidence of certain types of

 7    damages, but that's not the purpose of this proceeding.

 8        THE COURT:  No, that's not the purpose of this

 9    proceeding, but we are working against a potential tort

10    recovery of $2.805 billion.  That's why it is relevant.

11        MR. WILLIAMSON:  So defendants would have you believe

12    that 5.5 billion is really the total amount of actual losses

13    suffered here, so there is no great injustice by finding total

14    correspondence.  Actually, when you do the math, and you add in

15    the things that they left out --

16        THE COURT:  Technically, it is the proof of claim of

17    reimbursement which was accepted by the insurance company

18    because it was in excess of the amount of insurance.

19        MR. WILLIAMSON:  Yes, and you end up with well over 8

20    billion; not 5.5, well over 8 billion.  If your Honor decides

21    to take that and subtract from it the 2.805, you still don't

22    end up with any windfall for the plaintiffs.  Actually, what

23    happened here is because of the insurance limits, the

24    plaintiffs were only able to recover less than half of their

25    actual economic losses.

1          THE COURT:  You are matching dissimilarities.

2          MR. WILLIAMSON:  I beg your pardon?

3          THE COURT:  You are matching dissimilarities.

4          MR. WILLIAMSON:  For the purposes of trying to

5    convince your Honor there are no real economic losses here that

6    don't exceed the amount of available recoveries, that's just

7    not correct.  That's what I am attempting to do, to dispel that

8    myth, if you will.

9          So what you have been given, when you add it together,

10   you get a little over $7 billion for actual, documented

11   replacement costs -- four volumes of documentation are in

12   evidence -- and then you have the lost rental income, and they

13   add it up and get it to $5.05 billion.

14         If you go back up, please, Mr. McLeod, to the top

15   part, you could see here, the panel itself, this exhibit itself

16   says "partial property damage," because they know tenant

17   improvements have been left out.  And Mr. McKinley explained

18   the tenant improvements are what remains when a tenant moves

19   out, and they have value.  If you look at Exhibits 572 and

20   573 --

21         THE COURT:  They don't necessarily add value.  They

22   sometimes diminish value.

23         MR. WILLIAMSON:  Well, but they have a value.

24         THE COURT:  Tenant improvement fits the particular

25   tenant that's in the lease; but when the tenant leaves the

1    lease, customarily many leases will require the tenant to

2    remove all those furnishings and so-called improvements and the

3    next tenant will negotiate for some kind of allowance because

4    that tenant will want to change things to fit the next tenant.

5    So it is arguable whether these are improvements or not but

6    they can be insured and we are not talk about this as a

7    component of either the recovery in tort or the insurance.  It

8    seems to be a wash that's neutral.

9             MR. WILLIAMSON:  We submit, your Honor, that actually

10   the tenant improvements are part of replacement cost.  That was

11   brought out during cross-examination.

12            THE COURT:  It's not necessarily that.  They were

13   included and they were never challenged because it was

14   academic.  They were not excepted.

15            MR. WILLIAMSON:  It's because they didn't get to it.

16            THE COURT:  That's what I am saying.  They never got

17   to it.

18            MR. WILLIAMSON:  The point is, that's another 1.8

19   billion on the main site, another 400 million on the 7 World

20   Trade Center -- 540 million, excuse me.  You had asked for

21   those numbers and we gave you those numbers.  So you see that

22   the total claim adds to a much greater amount.  So even if the

23   jury were to award the plaintiffs $2.805 billion, the point is,

24   the plaintiffs will not end up with a windfall.  And we

25   provided your Honor the same evidence --

D7i2wtc2                    Summation - Mr. Williamson

1          THE COURT:  "Windfall" is a very bad term,

2    Mr. Williamson.  It is an epithet.  It follows a legal

3    conclusion, and it is not very useful in terms of argument in

4    terms of legal analysis.

5          MR. WILLIAMSON:  Very well, your Honor.

6          With respect to 7 World Trade Center, we provided you

7    the same data and it shows the actual economic losses, when all

8    added together, come out to a little over 1.5 billion.

9          Flaw number 3, defendants wrongly claim there was only

10   a single category of loss, and you heard some discussion of

11   that.  Remember, we showed you in their brief that if you

12   define the category of economic loss the same as you define the

13   category of insurance recoveries and you force them both into

14   the exact same one category, of course you get a 1:1 ratio, and

15   that's what they did.  It creates a foregone conclusion.

16         Professor Shavell explained that his analysis revealed

17   that there were multiple categories of loss.  They were

18   distinct and additive economic losses.

19         Interestingly, in *Oden*, which your Honor asked about,

20   the court took a look at the argument being advanced here.  In

21   that case it was appellant Streeter presenting that argument.

22   As your Honor will recall, it was rejected.  They said,

23   "Relying on the view of the language and purposes of the

24   statute, Streeter" -- in this case we would submit the aviation

25   defendants -- "argues that CPLR 4545(c) requires the court to

1    reduce the total award for economic loss by the total amount of

2    collateral source payments for economic loss."

3            Then let's take a look at what the plaintiff was

4    arguing.  "In contrast" -- still *Oden* -- "plaintiff contends

5    that the award for economic loss should be broken down into

6    categories" -- just the same as we contend -- "and the

7    reduction for collateral source payments should then be made

8    only in those categories that correspond to analogous

9    collateral source categories."  And then the court found that

10   plaintiff was correct.  We submit that that's the analysis we

11   have been advocating, it is the analysis Professor Shavell

12   used.  It's not the analysis that defendants or Professor

13   Fischel have used.

14           Also, your Honor has already found that WTCP suffered

15   different categories of loss on the morning of September 11.

16   So different categories of loss have already been established,

17   and it really can't be ignored because it is your Honor's

18   holding.

19           Fundamental flaw number 4 we have identified, among

20   others, is the defendants ignore the fact that the insurance

21   recoveries were for more than just categories of replacement

22   costs and business interruption.

23           THE COURT:  Those are the only ones that were

24   quantified.

25           MR. WILLIAMSON:  Correct.  But, as your Honor said at

1    the trial, when evidence was adduced of other losses, you said,

2    "I am prepared to find that part of the settlement money was

3    paid for potential claims."  You recognized that.  You

4    recognized that as, frankly, you had to, I submit, because some

5    of the insurers, as we noted and the proof showed, paid more

6    than their policy limits.  So that --

7             THE COURT:  Weren't there defense costs involved in

8    those policies?

9             MR. WILLIAMSON:  In some of them I think prejudgment

10   interest was an issue, bad-faith claims, delay in making

11   payments.

12            THE COURT:  Bad faith would required everybody to pay,

13   and not everybody paid more than the policy limits.

14            MR. WILLIAMSON:  That is correct.

15            THE COURT:  So not all the insurance clauses in all

16   the policies were the same.  Some insurers --

17            MR. WILLIAMSON:  Correct.

18            THE COURT:  Some insurers presumably had -- and I

19   didn't study them -- some insurers had obligations to pay

20   defense costs.  Some insurers had some other components of

21   claim.  Nobody paid more than 2 percent of face value --

22            MR. WILLIAMSON:  I'm sorry.  These did not --

23            THE COURT:  -- it was *de minimus*.

24            MR. WILLIAMSON:  Sorry.  These did not involve defense

25   obligations.  These weren't defense policies.  These were

1   claims for the property damage and the business interruption

2   losses and other losses that were suffered and then led to the

3   lawsuits.

4           THE COURT:  I don't know why -- and I don't think you

5   know why -- that some insurers paid a little more.  Some threw

6   in the policies.  Some paid a little more, but never more than

7   2 percent more.

8           MR. WILLIAMSON:  But it certainly debunks the notion

9   that insurers never pay, which Mr. Beach kept saying, unless

10  the claim is documented --

11          THE COURT:  It doesn't debunk anything.

12          MR. WILLIAMSON:  -- and quantified.

13          THE COURT:  It doesn't debunk anything.  The

14  sequence -- and all we have is sequence, because there were no

15  findings -- we have a sequence that there four towers; two

16  categories that were quantified, nothing else; and for the

17  Tower 7, there were four categories.

18          MR. WILLIAMSON:  We also have --

19          THE COURT:  The other two being the Stella paintings

20  and personal property.  And then there was an insurance payment

21  of a settled insurance cap based on the -- some of the policies

22  having or being susceptible to the finding of a two-occurrence

23  loss.

24          So I don't know what I can get out of this.  I can't

25  get anything.  The insurance payments were made, and the only

1     thing that was quantified were those that I mentioned.  So

2     presumably the payments were made against those

3     quantifications.  But there was no point in going forward

4     because the quantifications exceeded the policy limits.  How

5     could I allocate if there is nobody who quantified when it

6     mattered?  I don't know --

7              MR. WILLIAMSON:  I understand -- sorry.

8              THE COURT:  I don't know how to do it.

9              MR. WILLIAMSON:  I understand the issue, but your

10    Honor had recognized and said you were prepared to find that

11    part of the monies were paid for these potential claims, and it

12    makes sense.

13             THE COURT:  Everything has a potential value in life,

14    everything.  Because we all understand there is no free lunch.

15             MR. WILLIAMSON:  That's true.

16             THE COURT:  You have to pay for it or allocate

17    something to pay for something else to go to this as well.  But

18    I can't quantify something that's not been quantified.

19             MR. WILLIAMSON:  I understand, your Honor.  And I

20    certainly learned early in life there is no such thing as a

21    free lunch, but it is their burden to show that, your Honor.

22             THE COURT:  Unless you work for somebody else, but

23    it's not free in any event.

24             MR. WILLIAMSON:  Right.  Fair enough.

25             Flaw number 5, let's examine that.  Defendants' theory

 1     is that the only loss was the World Trade Center's

 2     income-producing potential, just the loss of the income stream.

 3     That's it.  That's all we have to worry about.  The buildings,

 4     separate and apart from the loss of income stream --

 5            THE COURT:  I think I have refined my thinking on

 6     that.  This loss is the asset that is capable of producing the

 7     income stream.

 8            MR. WILLIAMSON:  We think there are two discrete --

 9            THE COURT:  So compensation can involve two different

10     aspects of it -- replacing the income stream on an absolute,

11     independent sense, and enabling the insured to restore his

12     property, restore the asset.  So you could say they are both

13     components of the same thing, you can say they are different

14     components, but I don't know that it adds to our analysis.

15            MR. WILLIAMSON:  Let me explore that if I may.  I

16     deliberately asked Professor --

17            THE COURT:  What was lost by your clients was the

18     ability to enjoy that which they paid for.  What they paid for

19     was an income stream produced by a leased asset.  The leased

20     asset was destroyed, and so they got from the insurance company

21     money that tided them over until a reasonable replacement

22     should have been put in, not 70 years, but counting from some

23     period related to the catastrophe.  And that was a totally

24     reimbursement for their loss as of 9/11/01, not later in time,

25     but then.

1              And as of the structure, that was about 25 years old

2      at the time.  That was the age of the building.  7 was even

3      older.  So that was what was restored by insurance and the

4      question is, does that correspond with what they would have

5      gotten from the law?  Frankly, it seems to me that there is

6      that correspondence because the lost income stream that is paid

7      by work by business interruption is a temporary item, as

8      Professor Shavell stated.  It's a temporary item.  And in order

9      to enjoy the full benefit of the income stream, you have to get

10     a recapture or restoration, not a recapture, restoration of the

11     property that produces that stream.  They all fit together, and

12     I think that makes for correspondence.

13             What you would get if you were a plaintiff in the

14     situation that your clients were would be the value of that

15     which was lost, and that was valued at $2.805 billion.  You

16     could take that money and you could buy other properties, you

17     could put it in the bank, you could take a sail around the

18     world, you could do anything that you wanted, but that's all

19     you would have gotten.

20             In this context, he saw fit, because of contract

21     obligations and something else, to stay with what he had and he

22     got the business interruption and the replacement cost to do

23     that and to restore the income stream that he had purchased.

24             So it seems everything matches.

25             MR. WILLIAMSON:  Let me try to pursue that.  We

D7i2wtc2                    Summation - Mr. Williamson

1    submit, as you know, that there are discrete losses.  I gave

2    Professor Fischel a hypothetical, as you will recall, about the

3    henhouse.

4                THE COURT:  He really couldn't figure that henhouse.

5                MR. WILLIAMSON:  No, he couldn't.  Let me explore it.

6    I asked him if the henhouse is destroyed, what's the loss?  He

7    said the only loss is the value of the egg-producing income

8    stream.

9                THE COURT:  In other words, to the extent the hens

10   produce eggs and to the extent that the eggs are the only

11   income stream, if you replace the hens with other hens, that

12   give birth to the same number -- not give birth, that issue the

13   same number of eggs -- you can't give birth because you can't

14   eat fertilized eggs -- then you have a replacement.

15               MR. WILLIAMSON:  But the point is --

16               THE COURT:  Then you have a match, income stream.  You

17   get insurance to tide you over until you can find all the hens

18   you want.  I don't think it helps very much.

19               MR. WILLIAMSON:  We submit that it shows that there

20   are three different categories of economic losses in that

21   example, and he only identified one, because he needs to have

22   just one for correspondence.  He left out the hens and he left

23   out the henhouse itself.  We submit that makes it a

24   self-fulfilling prophesy that you will get total

25   correspondence.

1            I think your Honor's comment on your Honor's analysis

2      that you were setting forward earlier, there really are two

3      discrete categories of losses.  Because if you have lost rental

4      income and you have insurance that you paid separate payments

5      for to get that and you file a separate loss for that, you get

6      however much you get on your insurance claim.  That's for that

7      category of loss.

8            THE COURT:  Of course it is distinct.  You pay

9      separate premiums and you are getting two values.  But let's

10     assume that you have an insurance policy that paid you total

11     lost income and an insurance policy that paid you full

12     replacement value.  You would be getting more than your loss.

13           MR. WILLIAMSON:  We submit no, because you have two

14     different categories of losses.

15           Let me pursue --

16           THE COURT:  You really don't.  You lost what you paid

17     for.  You paid $2.8 billion to get an income producing asset

18     and you lost the assets, you lost the $2.8 billion.  To get it

19     back, you would need either of loss of income -- you got $2.8

20     billion present value of lost income.  You don't care about

21     replacement value.

22           MR. WILLIAMSON:  Except here --

23           THE COURT:  And if you have got full replacement value

24     plus the income that you lost until it was replaced, you get

25     double recoveries that way.  They have to work together.  They

1    are complementary.  That's the purpose of the insurance.  You

2    buy separate insurance, but the separate insurance is

3    complementary, and that's what your argument is missing.

4           MR. WILLIAMSON:  We submit we are insuring different

5    losses.

6           If we look at flaw number 6, defendants have confused

7    tort defense issues with insurance correspondence issues, and

8    let me show you how.

9           To the extent the court is concerned -- and this may

10   have come up in your questioning of Professor Shavell -- with

11   the possibility that the 2.805 billion may be too high an

12   amount for lost rental income because it covers the full lease

13   term, the answer is that's something for the tort award to

14   decide, for the jury to decide.

15          THE COURT:  I don't understand what you are saying.

16   Say that again.

17          MR. WILLIAMSON:  There was a concern being evidenced

18   in your Honor's questioning of Professor Shavell, to the extent

19   that when you were asking him about the 2.805 billion, doesn't

20   that go out the full lease term --

21          THE COURT:  Doesn't what?

22          MR. WILLIAMSON:  Doesn't it go out the full lease

23   term.

24          THE COURT:  Not it is a present valve, not a full

25   lease term.

1          MR. WILLIAMSON:  I know.

2          THE COURT:  It's different.

3          MR. WILLIAMSON:  I know that.  But I thought your

4    Honor was expressing a concern that that may lead to too great

5    a recovery for lost rental income.

6          THE COURT:  Only if the lost rental income goes out to

7    the full term and there is a replacement as well, and that's

8    not what happens in insurance.  Business interruption is

9    limited by time.  It's even called time element insurance in

10   Tower 7.  It is limited in time, and it kicks in only until a

11   reasonable replacement period is established either by

12   definition of the contract or by operation or custom and

13   practice.

14         MR. WILLIAMSON:  So two points on this, your Honor.

15   The first is that that is not the subject of the correspondence

16   trial.  It is the subject of the tort damages trial for the

17   jury to decide if that's an issue.

18         THE COURT:  No, it is a correspondence issue.  It is

19   because what we are looking for is how do you restore a person

20   to where he was as of September 11, 2001?  That's what we are

21   trying to do.  That's what tort does.  How do you restore?  You

22   pay the value we have lost.  In insurance, you are doing it by

23   the two types of insurance -- business interruption and

24   replacement.  Replacement is limited in amount to what they

25   call the actual cash value less depreciation -- I never quite

1    figured that out, but it really is what the building is worth

2    at the time it was destroyed, given the fact that it is a

3    25-year-old building.

4            MR. WILLIAMSON:  Your Honor also commented that that

5    would be factored in in mitigation.  But mitigation would be a

6    separate recoverable form of damages if that money is taken

7    from replacement cost insurance recoveries in order to rebuild

8    the buildings, so that your Honor would say that will reduce

9    your lost rental income, then that's monies that are being used

10   for mitigation expenses, again, something that would be part of

11   the tort trial.

12           Let me go to something that I asked Professor Fischel,

13   one of my last questions, which sheds a lot of light on the

14   discussion this morning and at the trial.

15           I asked him:

16   "Q  Isn't it true, sir, that a correspondence analysis doesn't

17   look at what you do with the money but rather what the money

18   was paid for from collateral sources?"  And he confirmed that

19   was his understanding.

20           So the discussion that we are having about what did

21   you do with the money, did you rebuild, did you use it to

22   restore your income stream is not part of the correspondence

23   analysis under the statute and the case law.  In fact, it is

24   supposed to be used to determine is there a duplication between

25   your categories of losses recoverable in tort and the

D7i2wtc2                     Summation - Mr. Williamson

1       categories of insurance recoveries that you receive.  What did

2       you receive the money for, not what you did with it.

3              Flaw number 7, please.  Thank you.

4              The defendants' theory would result in a windfall for

5       defendants, we submit.  Your Honor has said that's not helpful

6       to this discussion, so I will move on to flaw number 8.  Just

7       one more after this, your Honor.

8              Flaw number 8 is the defendants want to ignore that

9       the plaintiffs bought insurance specifically to protect their

10      contractual obligation to rebuild.  There has been discussion

11      of that this morning.

12             We know that plaintiff suffered replacement cost

13      losses because they had the leases requiring them to rebuild.

14      Mr. McKinley established that the leases -- and the lease

15      themselves of course provide this -- that the leases required

16      that insurance be purchased on a replacement cost basis.

17             And then you have the discussion this morning and

18      during the trial of why they feel that it is very important

19      that the insurance policies didn't require rebuilding.  They

20      were looking for that linkage.  Professor Fischel was looking

21      for it.  The defendants have been talking about it.  As

22      Mr. McKinley explained, they are look in the wrong place.

23      That's not the way it works.  If you want to know if there is a

24      lease obligation to rebuild, you look at the lease.  He

25      explained that, as an insurance broker, decades of experience,

 1    you look at the lease provisions to *see* if there is an

 2    obligation to rebuild.  If there is, you will recall, he said

 3    you check the box, make sure you get that coverage for your

 4    insured, because it's a separate category of insurance.  That's

 5    how it works.  That's where you look, not where they were

 6    looking.  That's why they couldn't find it.

 7            So in this case, plaintiffs bought the insurance to

 8    protect themselves on their rebuilding obligations; and, as

 9    your Honor noted, the Port Authority would have wanted that

10    comfort.  But this court has held there are no tort damages

11    recoverable for that loss in tort, that is, for the obligation

12    to rebuild.  So now the aviation defendants argue we shouldn't

13    even be able to keep all of the insurance recoveries and use

14    them for rebuilding.  They should be used, as they said

15    earlier, to offset some of our tort damages.

16            The last one before I conclude, your Honor, flaw

17    number 9, we heard this discussed again this morning, for

18    defendants advance again the proposition that this case is just

19    like *Fisher*, and your Honor noted that it is not.  In fact,

20    your Honor has previously held that "unlike the plaintiffs in

21    *Fisher*" -- here you were dealing with 7 World Trade Center --

22    7WTCo.'s insurance recovery was not only compensation for lost

23    property value, but also compensation for 7WTCo.'s contractual

24    obligation to rebuild Tower 7 following its destruction."  It

25    went on to say, "Because aviation defendants are not liable in

1    tort for 7WTCo.'s contractual obligation to rebuild, 7WTCo.'s

2    insurance recovery does not perfectly correspond to aviation

3    defendants' potential tort liability."

4              THE COURT:  I can tell you, Mr. Williamson, I was

5    struggling the concepts throughout these decisions, and one of

6    the reasons I asked for this hearing and declined to give

7    summary judgment was because of that difficulty.  But the

8    benefit of listening to the experts, all four of them, helped

9    me understand the concepts.

10             MR. WILLIAMSON:  Understood, your Honor.

11             The point was made during Mr. Podesta's closing

12   argument, in discussing *Fisher*, that *Fisher* set forth some of

13   the analysis and that I used that to discuss some of the

14   analysis for correspondence; and he is right, but that was only

15   the beginning.  He left out the fact that *Oden*, importantly,

16   requires direct and close correspondence.  Also, in *Fisher*, the

17   court found there was one loss, the loss of the home, not two

18   losses, which is what your Honor found.  So big distinctions.

19             And we know, your Honor, that previously you have held

20   that the replacement cost losses that plaintiffs suffered -- go

21   to your slide, please -- are not recoverable in tort.  Your

22   Honor conducted that analysis; dismissed the claims for

23   replacement cost losses; cited *Derdiarian*; noted in that case

24   the Court of Appeals found that proximate cause analysis stems

25   from the policy considerations that serve to place manageable

1    limits upon the liability that flows from negligent conduct.

2              THE COURT:  "I know the aviation defendants are not

3    liable for the specific performance obligations of tenants and

4    owners, for such liability would be uncontrolled and

5    potentially ruinous," citing *Derdiarian*.

6              MR. WILLIAMSON:  Yes, your Honor.

7              THE COURT:  The probable consequences of the tort is

8    the destruction of the building.  The contract clauses give

9    rise to contract damages.  But if the breaches of contract or

10   the failures of contract or the obligations of contract are not

11   the natural and probable consequences of the tort, the

12   tortfeasor is not responsible for what an injured party loses

13   by way of contract, at least not yet.  Tort deals with

14   replacement of what was.  The contract deals with destruction

15   of reasonable expectations of profits.  They are different.

16             MR. WILLIAMSON:  We have here, your Honor, the ironic

17   situation that the defendants, having gotten their way and

18   succeeded in having the tort claims for replacement cost losses

19   dismissed, now turn around and say, oh, well, you could have

20   recovered in replacement cost losses if you look at it from the

21   standpoint of the measurement, and they keep saying let's

22   measure it that way, as if that somehow magically is going to

23   reinstate our tort claims for replacement costs.

24             THE COURT:  This argument "windfall" gets us nowhere.

25   The defendant airlines, under the Air Transport Safety and

1    System Stabilization Act, are limited in liability to their

2    insurance coverage.  The insurers paid out over $4 billion.

3    Your client lost a lot of money, but is limited in recovery to

4    $2.805 billion.

5              In my opinion, no one is enjoying a windfall.

6    Everyone is suffering from 9/11.  The concept of a windfall is

7    foreign to me.  This is a case about a disaster, and we are

8    hearing about a dispute between two people, who suffered

9    different aspects of the disaster, trying to sort out what one

10   may owe to the other, if anything.  To talk about a windfall in

11   this concept is obnoxious in a sense.  Nobody enjoyed a

12   windfall from 9/11.

13             MR. WILLIAMSON:  I bring it up, your Honor, for only

14   two reasons.  One is, the Court of Appeals has said that the

15   CPLR 4545 analysis has to be conducted to make sure there is no

16   windfall for the plaintiffs, but no windfall for the

17   defendants.

18             THE COURT:  Yes, but nobody is enjoying a windfall out

19   of this.

20             MR. WILLIAMSON:  I bring it up for the second reason

21   that the claim has been made by the aviation defendants for

22   years now that if you were to allow anything less than total

23   correspondence, it would be a windfall to the plaintiffs.  So I

24   was trying to address that, your Honor.

25             With respect to the methodology that's used to apply

D7i2wtc2                    Summation - Mr. Williamson

1      of CPLR 4545, I would just like to touch on that briefly.

2              THE COURT:  You know what?  I don't see windfall here.

3      I see heroism.  So it is easy to vilify developers, but the

4      fact is that Larry Silverstein, having faith in the economy of

5      Manhattan and New York, built Tower 7 on speculation that he

6      would have tenants.  I don't know how much equity money he had

7      in there, but he had his life in there.  He took a risk and he

8      put up Tower 7, and it is now wonderful that there are tenants

9      inside.

10             The Freedom Tower is all but complete.  When I look at

11     Manhattan -- and I drive down every day -- when I look at

12     Manhattan, I enjoy that Freedom Tower.  The absence of the Twin

13     Towers was like the loss of front teeth.  It was a mar and it

14     was a disgrace to the United States.  The erection of its

15     replacement in great splendor, gorgeous building, 1776 feet

16     high, is a wonderful achievement.

17             So I don't look upon this case as windfalls.  I look

18     upon this as an American story of rising out of the ashes of

19     destruction to face the world with our unbounded optimism.

20     That's how I look upon this.  Windfalls have nothing to do with

21     my analysis and how I deal with this case.

22             MR. WILLIAMSON:  I personally share your Honor's

23     sentiment.  Our offices, as you know, were right across from

24     Ground Zero.

25             THE COURT:  I know you were.

1          MR. WILLIAMSON:  We were there on 9/11 and had to

2     leave.  We were out of our offices for months.  So the blight

3     on New York, the missing two front teeth is a good metaphor.  I

4     absolutely agree.

5          Just to conclude, with regard to adding all these

6     fundamental flaws together, we see that they are fatal flaws

7     and they defeat, in our view, defendants' correspondence claims

8     when the statute is applied.

9          We know the standard of proof, your Honor.  The burden

10    of proof is on the defendants.  Reasonable certainty is

11    required by the statute.  Your Honor knows that courts have

12    construed that as clear and convincing evidence or evidence

13    showing a high probability of correspondence.  The

14    correspondence has to show under the teaching of *Oden* and

15    *Turnbull* that --

16          THE COURT:  And *Fisher*.

17          MR. WILLIAMSON:  I'm sorry?

18          THE COURT:  And *Fisher*.

19          MR. WILLIAMSON:  No, but actually this one, I think,

20    *Turnbull* and *Oden*, coming after *Fisher*, have elucidated how to

21    conduct the correspondence.  They said -- their words, not

22    mine -- "you have to duplicate the loss."  The collateral

23    source recovery has to match up, has to be in lieu of, their

24    words, "the touchstones of the analysis."

25          THE COURT:  I think I expressed my view on that when I

1   asked the questions of Professor Shavell and when I inquired of

2   both Mr. Podesta and you.

3          I'm sorry.  Go ahead.  Finish up.

4          MR. WILLIAMSON:  Thank you.

5          Are those words used in the analysis?  No.  They are

6   not.  Did Professor Fischel use them?  No, he did not.  And in

7   what was just submitted to you today, if you look at the title

8   on page 2, it doesn't say "duplicate" or "replace."  It says

9   "were the funds used to assist."  "Used to assist" is not the

10  test.  What did you with the money is not the test.  "Assist"

11  is not the test.  They are just not following the statute, just

12  not following the governing case law.

13         If you turn to page 3, they say, Did the use of the

14  monies enable the plaintiffs to do something?  That's not the

15  test.

16         We submit that Professor Shavell's methodology of

17  analyzing it was consistent with the statute.  Defendants

18  offered no analysis, no contrary recommendation.  They just

19  used words like "well, it's not related to, it's not connected

20  with, it's not connected to."  But that's not the test.  And we

21  never saw the statute come up during my colleague's closing

22  argument.

23         We submit that, based on the evidence presented to

24  your Honor in this trial, defendants' correspondence should be

25  zero.  If your Honor disagrees and finds there should be some

1   correspondence, at least our expert has offered an analysis of

2   that in precise dollar figures.  And, as your Honor knows, from

3   their pretrial brief, they have adopted that.  To be sure, they

4   want zero correspondence.  They want to pay nothing.  That's to

5   be sure.  But they have concede that, even though their expert

6   offered no possible allocation, that the most practicable

7   allocation is the one offered by Professor Shavell.  They

8   accept it.  They credit him for that.  They take all of his

9   numbers, credit them, and come out with his final conclusion

10  which, if adopted by your Honor, as he explained, would have an

11  offset of $638 million for the main site and an offset of $244

12  million for 7 World Trade Center site.

13              Thank you very much, your Honor.

14              THE COURT:  Mr. Podesta.

15              MR. PODESTA:  Your Honor, as a big firm commercial

16  lawyer, I have strong instinct to refute in detail everything

17  Mr. Williamson just said, including presenting a graphic

18  depicting an erudite analysis of the henhouse analogy.

19  However, I have decided to --

20              THE COURT:  How many roosters?

21              MR. PODESTA:  Well, you know, roosters, this is a

22  henhouse analogy.  That is beyond the scope.  Roosters are

23  beyond the scope, your Honor.  I don't know if these hens have

24  been inseminated at all.

25              But I decided to be practical.  I accede to your

1    Honor's exhortations.  The point I would make in rebuttal is

2    this:  *Fisher* was decided in 2002, seven years after *Oden*.

3    *Oden* cannot in any way be considered to supplant *Fisher*, which

4    contains an extended discussion of *Oden*.

5            With that, I waive further rebuttal.

6            THE COURT:  I want to ask you a question, and maybe I

7    will ask the question of Mr. Williamson also.

8            So replacement insurance reimburses for the cost of

9    replacement at the time of replacement up to the values that

10   were established at the time of loss.  So there's an inflation

11   factor that is covered by insurance in replacement insurance.

12           MR. PODESTA:  There can be, depending how old the

13   property is, if you compare it to actual cash value.

14           THE COURT:  It wouldn't depend on that.  Let's say you

15   lose $100,000 building, but the cost of rebuilding the building

16   as it was at the time is $125,000.

17           MR. PODESTA:  Yes, your Honor is correct.  And, of

18   course, the diminution in fair market value is similarly

19   measured as of the date of the loss.

20           THE COURT:  So I am positing that there is a $100,000

21   value of the old building as it existed at the time of the loss

22   and it costs $125,000 to rebuild that old building.

23           MR. PODESTA:  And would you get that.  You would get

24   the replacement cost insurance.

25           THE COURT:  Does that affect me on the correspondence

D7i2wtc2

1    theory?

2              MR. PODESTA:  No, it doesn't.  That's really the same

3    situation that was in place in *Fisher*, where they also had

4    replacement cost insurance present.

5              THE COURT:  You just can't get more than the value.

6              MR. PODESTA:  Yes, that's correct.

7              THE COURT:  Mr. Williamson, do you have an opinion?

8              MR. WILLIAMSON:  Yes, two comments.

9              The first is that replacement cost losses under

10   insurance of course only up to the amount of insurance

11   coverage.  If your actual replacement cost losses are greater,

12   you are not going to recover them.  You are just not going to

13   recover them because you are underinsured.

14             The second point is, to the extent we are going back

15   to *Fisher* each time, your Honor might want to consider looking

16   at the lower court's decision because in that case, with loss

17   being the single loss of a one-family home, the lower court --

18   and the jury verdict shows this -- actually allowed the jury to

19   consider several other categories of losses, several pages,

20   actually, on the jury verdict form of other categories of

21   losses.  So it wasn't just this one-dimensional analysis of the

22   diminution in fair market value versus replacement cost.  There

23   were numerous other categories of tort damages that were

24   allowed in that case.

25             THE COURT:  Thank you, Mr. Williamson.

D7i2wtc2

1              We will reassemble at 2:30.  Before we do, before I

2    forget, I want to commend both sides for the way that they have

3    presented their case.  It has been a fascinating exercise for

4    me, and it is only that way because of the brilliance and

5    cooperation of counsel.  So I have a great debt to pay to

6    counsel on both sides for this.

7              MR. PODESTA:  Thank you, your Honor.

8              MR. WILLIAMSON:  Thank you, your Honor.

9              THE COURT:  2:30.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ikwtc

AFTERNOON SESSION

2:30 PM

(In open court)

THE COURT:  The issue that I have to decide is whether
the recoveries by the plaintiffs, according to the insurance
and the categories of insurance on which they were paid,
correspond; and if they do, do they exceed to a reasonable
certainty the categories of potential tort recoveries?  My
holding is that they do, and what follows will be my findings
and conclusions to support that view.  My plan is to replace
these oral expressions with a written set of findings and
conclusions, hopefully within a two-week span, that will
restate in perhaps more literate fashion what I am expressing
orally.

        I've written extensively on different aspects of this
case and the related cases, and I'd like to believe that the
facts and rulings of law that I've expressed in those prior
decisions are familiar and will not be repeated except to the
extent that I need to do so.  I'll recite a few that are
perhaps most pertinent.  They're all called In Re:
September 11th Litigation, so I'll just give you the record
citations:  590 F.Supp.2d 535, December 11, 2008, in which I
held that WTCP could recover only the fair market value of its
leashold interests and not damages related to its contractual
obligations; 2009 WL 1181057, April 30, 2009, in which I found

D7ikwtc

1    that the fair market value of the leashold was $2,805,000,000;

2    908 F.Supp.2d 442, December 5, 2012, in which I found that for

3    Tower 7 damages were limited to the value of the leashold --

4    that value was presumptively $737 million, a number taken from

5    the report of WTCP's expert -- and, as with the others, that

6    factual findings would have to be made after a trial.

7            I always forget where the various buildings were

8    located, and there's a map in several of these decisions, but

9    I'm looking at one at 865 F.Supp.2d 370, September 23, 2011.

10   The title of that case is AEGIS Insurance Services, Inc.

11   against 7 World Trade Company L.P. and many other parties.

12           While I have that map, let me describe it into the

13   record.  The Twin Towers were numbers 1 and 2.  Number 2 was on

14   the southerly side, fairly close to the westerly corner, along

15   West Street.  Number 1 was the northerly tower, and it fronted

16   on West Street.  There was a large plaza in the center.  On the

17   southerly side, and filling out most of the southeast corner,

18   was number 4 WTC.  North of number 1 was a relatively low

19   building, number 6 WTC, and that filled most of the northwest

20   corner.

21           As I look at the map, to the right but on the

22   northeast corner was number 5 WTC, also a relatively lower

23   building.  Vesey Street bound the main property to the north.

24   On the north of Vesey Street was located 7 WTC, 7 World Trade

25   Center, or Tower 7.  I don't know what happened, I know that

D7ikwtc

1      number 6 was also destroyed, but it wasn't mentioned in this

2      litigation.

3              Mr. Williamson, why is that?  Does anyone know?

4              MR. WILLIAMSON:  Yes, your Honor.  Because the

5      plaintiffs had no lease for that.

6              THE COURT:  That remained in the Port Authority; is

7      that right?

8              MR. WILLIAMSON:  I think that's correct.

9              THE COURT:  So we're involved in two cases here,

10     Towers 1, 2, 4 and 5, and Tower 7.

11             On July 16th, 2001, the real estate developer Larry

12     Silverstein, through affiliated companies -- withdrawn.  Let me

13     start again.  I'm sorry.

14             In the early 1960s, the Port of New York was suffering

15     economically, and the States of New York and New Jersey sought

16     to revitalize the downtown area.  A compact had earlier been

17     made; and as part of that compact, and under direction of the

18     governors of the two states, the World Trade Center was to be

19     built in Lower Manhattan, with the goal of making the area a

20     center for international trade and finance.

21             Under the aegis of the Port Authority of New York &

22     New Jersey, construction began in 1965.  The Twin Towers opened

23     for tenancy, for occupancy by tenancy, in 1973.  Other towers

24     followed -- 4, 5, 6 and 7.

25             On December 31, 1980, the Port Authority entered into

D7ikwtc

a ground lease with 7 World Trade Company L.P., a company
associated with Silverstein Properties, for the development and
construction of Tower 7.

Upon its completion, in 1987, the lease between the
Port Authority and the Silverstein company involved -- 7 World
Trade Center Company became effective.

What is important here is that Silverstein, through
affiliated companies, on July 16th, 2001, executed net leases,
and the Port Authority of New York & New Jersey conveyed four
99-year net leases to Towers 1, 2, 4 and 5.  Silverstein paid,
and the Port Authority accepted, the equivalent of
$2,805,000,000 -- partly in cash, partly in the form of
continuing payments -- and that became the $2,805,000,000, the
purchase and sale price for the net leasehold.

That price was established following a worldwide
auction.  Each of the four leaseholds was by then a developed,
multifloor office building, of various heights.  The buildings
then were up to 25 years old.  The buildings were owned by
affiliated WTCP companies.

The lease agreements provided that the owner of the
leasehold had to obtain and carry at least $1.5 billion of
actual replacement cost insurance and had the obligation to
rebuild, restore, repair and replace the buildings, if
destroyed, to the extent feasible, prudent and commercially
reasonable, in accordance with the original plans and

D7ikwtc

specifications or to the extent modified by mutual consent.

I found that, as of September 11, 2001, less than two months later, that the market value was the same amount, $2,805,000,000.  The cost of replacing the towers, as they stood at the time and subject to the market value they had, was higher.

As to Tower 7, the Silverstein owning company enjoyed a market value, as of September 11, 2001, of $959 million.  And that number was taken from the plaintiffs' expert.

I think I have the wrong number there.  I think it's a lower number.  It's $737 million exclusive of any recovery associated with fine arts losses, namely, two paintings by Frank Stella, stipulated to be worth not more than $1 billion.

Towers 1, 2, 4 and 5 were insured by 24 insurers, arranged according to a tower of insurance, arranged so that one insurer would pay up to the limits before the next insurer in the tower would begin to pay, and so on.  The total of insurance was $3,546,800,000 per occurrence.  The policies provided coverage for business interruption, lost rentals, and the cost of replacing the buildings if they were damaged or destroyed.  Most of these policies were in the form of slips or very brief binders binding the insurers.  At the time of the loss, not many of them had been spread over the many insuring agreements and clauses of exclusion and exception that form an insurance policy, a commercial insurance policy, of a large

1    building.

2           As to Tower 7, Industrial Risk Insurers, or IRI, was

3    the only insurer.  That policy covered property damage, rental

4    insurance, called time element, and extra expenses.  There was

5    a blanket limit for the property damage and time element of

6    $860 million per occurrence, and there was a sublimit of

7    $1 million for extra expense.

8           On the morning of September 11, 2001, two terrorists

9    cleared security at Portland International Airport in Maine and

10   caught an early morning flight to Boston's Logan Airport.  At

11   Logan, they rendezvoused with three other terrorists, and the

12   five boarded American Airlines Flight 11, a loaded-with-fuel

13   Boeing 767 jet intended to travel to Los Angeles.  Five other

14   terrorists also cleared security at Logan Airport and boarded

15   United Airlines Flight 175, also a fuel-laden 767, also headed

16   for Los Angeles.

17          The airplanes took off from Logan at 7:59 a.m. and

18   8:14 a.m. respectively on the morning of September 11.  The

19   terrorists quickly highjacked the two planes, turned them

20   towards New York City at low level, and crashed them

21   purposefully and willfully into both towers.  Flight 11 crashed

22   into Tower 1, the northerly tower, at 8:46 a.m.  United Flight

23   175 crashed into Tower 2 at 9:03 a.m.  The crashes turned both

24   towers into infernos.  The raging fires caused the buildings to

25   collapse -- the northerly tower at 9:59 a.m., the southerly

tower at 10:28 a.m.   The falling debris caused fires to erupt

on the remaining towers in the main center and jumped across

Vesey Street into Tower 7 as well.   After burning for several

hours, each of these buildings was substantially destroyed.

The description of the destruction can be found in more detail

in 865 F.Supp.2d 370.

Shortly after the attacks, WTCP began filing claims

with its insurers, seeking to recover the losses it suffered as

a result of the attacks.   WTCP brought a lawsuit against these

insurers and claimed in that lawsuit that the insurers had

acted in bad faith in not fully compensating them.   WTCP

claimed a total loss for Towers 1, 2, 4 and 5 of

$8,053,000,000, divided into claims for replacement cost of

$7,183,000,000, constituting 84.2 percent of its claim, and

$1,347,000,000 in business interruption loss, based on the

stoppage of payments by all its sublessees.

Several of the insurers challenged the estimates,

claiming that the losses were inflated.   An appraisal panel --

consisting of one representative picked by each side and a

neutral umpire picked by the two representatives -- conducted

99 days of hearings to appraise WTCP's claimed loss.

Ultimately, the appraisal panel determined that the cost of

replacing the core and shell of the four buildings, not

including tenant improvements, defined as nonessential walls

and floor coverings, as $4,159,000,000.   The lost rental income

D7ikwtc

1    was not subject to estimate.  There was no appraisal done with

2    respect to Tower 7.

3         As this process went on, most of the insurers advanced

4    into interim payments without prejudice to either the insurers

5    or the insured.  So, all claims were reserved.

6         By July 2007, all the insurers had settled.  In total,

7    the insurers paid $4,582,000,000 to WTCP and its coinsured,

8    Westfield.  Westfield was the owner of long-term leases to the

9    shopping arcade in the main floor and the basement of the two

10   Twin Towers.

11        Most of the insurers paid the exact amounts of their

12   policy limits -- some slightly more by an order of magnitude of

13   about 2 percent, some less than their policy limits -- I'm

14   sorry, let me start again.  Some paid the policy limits, some

15   paid a bit more than the policy limits, up to an order of

16   magnitude of 2 percent.  Deducting the insurance payments that

17   went to Westfield, WTCP received from insurance $4,091,000,000.

18        This amount, of $4,091,000,000, was less than WTCP's

19   claim.  Although the insurers did not ever reach final

20   agreement on the amount of the insurable losses claimed by WTCP

21   or any allocation as between the losses claimed, the policy

22   limits, as agreed and settled, of 4,091,000,000, capped the

23   payments.  The insurers called this a policy limits loss.

24        A complete settlement agreement and releases followed,

25   again, without allocation.  And there was no allocation as

between the two categories of claim, for business interruption and for replacement cost.

Some smaller amounts are also relevant.  Claims preparation fees of $10,352,540 is a proper deduction from the amount of insurance received, as well as the costs and fees of the appraisal proceeding aggregating $31,030,471.  Another deduction are two years of premiums, of $5,898,714.  The three categories add to $47,281,725, and, after deduction, the net insurance recovery becomes $4,044,000,000.

As to Tower 7, 7 WT Co. claimed a total loss of $1,497,000,000, of which $1,053,000,000, constituting 70.4 percent of the total claim, was for the cost of replacement, and $442 million for lost rental income, less retenanting costs, constituting 29.5 percent of the claim.  In addition, less than 1 percent related to personal property of $1,800,000.

Again, a lawsuit was brought, on June 12, 2003, claiming that IRI had not sufficiently compensated 7 WT Co. for its losses.

About a year and a half later, on January 3, 2005, the parties settled.  IRI agreed to pay 7 WT Co. $819 million plus a small portion of a subrogation claim that IRI pursued against the insurers, or the aviation defendants.  That was liquidated into an additional $12 million paid to 7 WT Company, and the two payments of $819 million and $12 million adds to a payment

of $831 million, paid to WTCP and accepted by it in full

settlement of its claims.  So, again, the total of claims

exceeded the amount paid.

Again, the settlement did not make any allocation as

among the three categories of loss, and all claims and all

potential claims were settled in the broad form of release that

was exchanged.

I mentioned previously two Frank Stella paintings.

There was a separate insurance policy covering fine arts issued

by AXA Nordstern Art Insurance Corporation.  A separate claim

was filed for the two paintings, both located in Tower 7.  AXA

paid $700,000 on the claim.  Since the parties stipulate that a

jury could award up to $1 million for the loss of the two

paintings, a $300,000 balance remains to be litigated, but I

think the parties are willing to stipulate that if a judgment

is entered for the finding I have expressed at the outset,

namely, that there is no correspondence, that amount will be

paid without the need for further litigation by 7 WT Co.

against AXA.  And that would finally resolve all the claims in

these two lawsuits.

Again, there were offsets of $1,587,410 in claims

preparation fees and $482,793 in insurance premiums, reducing

the net insurance recovery to $829 million.  That recovery in

insurance exceeds the limit.  I ruled it was the fair market

value of Tower 7 immediately prior to the destruction of the

D7ikwtc

1    building on September 11, 2001.  That fair market value was

2    $737 million exclusive of the fine arts losses.  And I took

3    that number from plaintiffs' expert Terry Vandell.

4            The amounts I've stated are not the precise amounts,

5    they're rounded.  When we issue our written findings and

6    conclusions, the exact amounts will be used.

7            New York's Civil Practice Law and Rules Section 4545

8    provide that if a plaintiff has been compensated for economic

9    loss by a collateral source, such as insurance, the plaintiff

10   cannot recover compensation again in a tort lawsuit against a

11   defendant.  The written findings and conclusions will state the

12   precise terms of the statute as it was in effect at the time of

13   the loss.

14           It's important to note that Section 4545(c) does not

15   provide for a reduction in damages based on whatever

16   recoveries, whatever collateral recoveries, there exist.  A

17   reduction is authorized only when the collateral source payment

18   represents reimbursement for a particular category of loss that

19   corresponds to a category of loss for which damages were

20   awarded.  I quote from Oden against Chemung County Industry

21   Development Agency, 87 N.Y.2d 81, 84, a decision of the

22   New York Court of Appeals in 1995.

23           As I announced at the outset, the burden of proving

24   this affirmative defense is on the defendants.  The defendants

25   must prove correspondence to a reasonable certainty in order to

1  obtain an offset against potential tort recoveries.  That's a

2  decision of the Second Circuit in Turnbull versus U.S.

3  Air, Inc., 133 F.3d 184, 187 (2d Cir. 1998).

4       Fisher against Qualico Contracting Corporation, 98

5  N.Y.2d 534, 537, decided by the New York Court of Appeals in

6  2002, stated the purpose of Section 4545 to eliminate windfalls

7  and double recoveries for the same loss.  The Court cautioned

8  the Court should not subtract nonduplicative payments because

9  doing so would produce results beyond those numbers to remedy

10  the windfalls to plaintiffs at which the legislation was aimed

11  and would confer an undeserved windfall on tort defendants and

12  their insurers.  The Court cited Oden's prior decision, 87

13  N.Y.2d, 88.

14       I remarked this morning that I find the phrase

15  "windfall" as an epithet and not very useful in analysis and

16  particularly obnoxious in the case that we have.  I won't

17  repeat my remarks, but it's sad to remember our feelings on

18  September 11, 2001, not only as New Yorkers but reflecting the

19  sentiment all across the United States and indeed throughout

20  the world.  We were dealt a very severe blow.  The people who

21  came to the rescue of New York -- the first responders who

22  worked for the various construction companies, the firemen,

23  policemen, the volunteers, the construction companies, and the

24  actors involved here, including Larry Silverstein -- all were

25  heroes because they worked hard to create beauty out of the

1   ashes of destruction and expressed pride in going into Tower 7,

2   the first building that was rebuilt by Mr. Silverstein, on

3   speculation but now with tenants; and in seeing the Freedom

4   Tower -- I don't think it's called the Freedom Tower anymore

5   but I'll call it that -- 1776 feet high in beautiful splendor

6   over Lower Manhattan.  It's not easy to do these.  It takes

7   great risk, it takes great imagination, it takes great skill.

8   So, to talk about windfalls in this context is something that I

9   will not do.

10          So, how do I apply these rules?  First, as I did in

11  examination of Professor Fischel and in examination of

12  Professor Shavell, it's important very much to understand what

13  economically was the loss on September 11.  The purchases of

14  the leaseholds that constitute World Trade Center Properties

15  purchased an income-producing asset.  They valued the income

16  stream over a very long term, produced by that asset, in coming

17  to the purchase and sales price, the two prices because there

18  was different times one for four towers of the main property

19  and then for Tower 7.

20          That income-producing asset was destroyed, and two

21  categories of insurance were there to compensate the owners.

22  The owner was intent on restoring the property.  The cost of

23  replacing the asset that was destroyed, according to how it

24  stood on the morning of September 11, 2001 and according to its

25  then market value, compensated the owners for that loss but not

D7ikwtc

1    completely, because they needed to be compensated as well for

2    the period of time when they were not being paid by tenants

3    because there was no building in which they could occupy the

4    premises for their businesses.

5          That loss was compensated by business interruption

6    insurance.  We call that loosely, in the discussions with the

7    expert, lost income, but it was less in the lost income of the

8    owners of the leasholds.  The leasholds had been purchased for

9    a long-term stream of income.  The business interruption

10   compensated them for a short term of that loss, and the cost of

11   restoring the property thereafter enabled them to continue to

12   enjoy their income stream.  In that context, there was complete

13   correspondence.  The amount of insurance exceeded the fair

14   market values that went into the insurance recovery, reflecting

15   that the cost in an inflation market to purchase and install

16   the materials that were to replace the destroyed asset,

17   according to its situation and value as of 9/11/01, may have

18   cost more but the replacement, by compensating lost income and

19   by compensating the cost of replacement, were the same.

20         In Professor Fischel's view, it was one loss; it was

21   the replacement of the asset-producing income.  The purchaser

22   pays according to the income stream.  The insurance assures the

23   continuation of that income stream, both by business

24   interruption insurance and by replacement cost.  And that's

25   what he said.

D7ikwtc

1            And the same with Professor Shavell.  Fischel

2    testified:  "If you're trying to calculate market value or lost

3    market value, what you're really calculating is a present value

4    of a lost rental stream."  That's at page 186 of the

5    transcript.  "Replacement cost involves not only the physical

6    cost of rebuilding" -- and that's replacement value -- "but

7    also compensation for the interim period between the time of

8    loss and the time of rebuilding, but once rebuilding occurs,"

9    he continued, "there is no more business interruption.

10   Business has resumed in a sense and, therefore, if you add the

11   two together, that fully compensates a plaintiff."  That's at

12   206 of the transcript.

13           Michael Beach, defendants' insurance expert, testified

14   that the "Property damage coverage responded to the physical

15   loss or damage to the building, which would enable them to

16   retenant, return their revenue streams."  And that's at page

17   116.

18           Professor Shavell testified consistently:  "The

19   connection is that you can't begin to enjoy an income stream

20   unless you fork out the money for replacement."  And that's

21   exactly what the New York Court of Appeals said in Fisher.  In

22   that case, the Court held that homeowners whose home was

23   destroyed in a fire should deduct their replacement cost

24   insurance recovery from their damages.  The Court ruled that

25   replacement cost and diminution in market value are simply two

D7ikwtc

  1    sides of the same coin, each is a proper way to measure lost

  2    property value, the lower of the two figures affording full

  3    compensation to the owner.  In this case, the collateral source

  4    payment was the Fishers' replacement cost insurance proceeds,

  5    and it corresponded, the Court found, to their property loss,

  6    properly offset against the damages award.  That's at page 540

  7    of the decision.

  8            The illustration that I thought captured this -- and

  9    Professor Fischel agreed -- is that the law does not give you

 10    an incentive to put up a mansion in place of a slum.  The

 11    building that you have, if a slum, had a certain value.  If

 12    it's destroyed, and you get insurance to build a mansion,

 13    that's very nice, but it can't give you more money than you're

 14    entitled to have as of the time of destruction.

 15            The fact that plaintiffs were obligated to rebuild by

 16    contract, rather than choosing to rebuild, does not change my

 17    conclusion.  An owner of property, if suing in tort and

 18    prevailing, is entitled to the value he lost.  In this case,

 19    let's say he paid a million dollars for some asset that

 20    produces income.  That was destroyed, that asset was destroyed.

 21    He gets the million back by tort recovery, and he can do

 22    anything he wants with it -- he can squander it, he can put it

 23    in the bank, he can buy other assets, he can go on a cruise, he

 24    can do anything -- but what he's done is to replace by money

 25    the value he lost.

D7ikwtc

           In an insurance context, where the owner of the
property, the Port Authority, wants to make sure that the
lessee for the long term doesn't walk away and doesn't destroy
the value that existed, commonly there is an obligation to
rebuild.  But it doesn't change the understanding.  Instead of
money that can be the replacement cost to be used in any way it
wants, a contract obligation replaces it.  The insurance is the
same.  The insurer in this context doesn't care; it has the
same obligation.  The covenant to rebuild is for the interest
of the residual owner, but instead of labeling it just money to
pay back the million dollars, the owner is given a lost income
policy, or business interruption, for the time it takes to
rebuild by replacement, and when he restores his income stream,
he gets the income stream again.

           Both concepts go to one loss, the loss of the
income-producing asset.  The measurement can be categorized by
income or by replacement of the asset, but essentially it's one
loss, as Professor Fischel said and as Professor Shavell
recognized from an income perspective.  The distinction he
made, by which he made correspondence between the business
interruption and the component of lost income, was made
according to a legal definition.  He said that you couldn't
obtain in a tort recovery the replacement cost.  But you can,
as Fisher said, as long as it doesn't exceed fair market value,
because, as Fisher said, they're two sides of the same coin.

1              And that is what we have here, if you want to use the

2      metaphor of coin, each side capturing different aspects of

3      value.  And when we talk about correspondence, even though we

4      are corresponding according to categories of loss, economically

5      we analyze it into the very same concept, of a loss of an

6      income stream to be replaced partly by business interruption

7      and partly by replacement cost.

8              Now, there are numbers of other details that I need to

9      cover.  The plaintiff argues, what about the to-be-determined

10     components of insurance? after all, I suffered many kinds of

11     losses; if I gave a release, I gave up my right to sue for all

12     these things, shouldn't that be valued as well?

13             There's some appeal to the analytic argument, but

14     practically speaking, these points disappear, because they were

15     not quantified; and if the client didn't quantify it, the Court

16     shouldn't either -- the parties certainly did not quantify them

17     even now, when they have an opportunity to do so -- and the

18     insurance company did not value them in their payments, because

19     they valued the claims, paid the claims, a lesser amount, and

20     took a release that could claim everything else.  Another part

21     is that some of these to-be-determineds never amounted to any

22     loss.  And another part is that some of them were really

23     deductions from recoveries and already included in the loss.

24             So, let me give you some details.  One category was

25     tenant improvements, which were given a value of

1    $4,159,460,085.  To the extent that a tenant improvement adds

2    to the value of property just before it's destroyed, it can

3    become an element of claim, and it would increase the values of

4    each of the properties beyond the amounts I held were the fair

5    market value.  These amounts were not proved when the

6    plaintiffs had an opportunity to prove, and I had called for

7    these proofs.  And in my decision of April 30, 2009, finding

8    that fair market value of Towers 1, 2, 4 and 5, there was no

9    allowance for this number.

10         We know, from experience with leases, that sometimes

11   tenant improvements can be an asset if they improve the

12   property, but more often than not they're unique to the

13   particular tenant that occupies, they're a subject of

14   bargaining between the landlord and the tenant, who has the

15   obligation to take it down at the end of the lease and to put

16   them up at the beginning of the lease.  They may be an addition

17   to value; more frequently than not, they're a reduction from

18   value, and I can't value them.

19         Furthermore, to the extent that plaintiffs included

20   them in claiming loss from the insurance company, where they

21   can be an element of insurance, they've already been included.

22   In any event, I do not value them for the purpose of this case.

23         Another item was debris removal, pollution cleanup,

24   and transmission and antenna dishes.  Mr. Levy, the chief

25   financial officer of WTCP, testified by deposition that there

1    was no expense incurred by WTCP connected with that.  So, I do

2    not make any allowance for that.

3         Another category was retenanting expenses.  Well,

4    retenanting expenses are a proper cost to be netted against

5    loss of rental income.  They do not figure, as I held before,

6    in a tort recovery.  They could figure in netting out how much

7    insurance one receives, and I assume that they were so netted

8    out.  So, they become an element of a potential insurance

9    recovery as a deduction from business interruption for lost

10   income but they do not correspond to anything in a tort

11   recovery except to the extent that they've reduced the business

12   interruption recovery that is a matter of correspondence.

13        The end of it is this:  If you're looking to recover

14   the amount of your loss, you're bringing yourself to the point

15   where you get tenants after replacing the structure.  Tower 7,

16   if I recall correctly, had a one-year extension beyond that

17   point for what they call time element, or lost income.  And the

18   cost of tenanting, of retenanting, becomes an element in that

19   aspect, and that's why you get that extra insurance.

20        So, economically, one way or another, it is figured

21   in; and because it is figured in, it does not become an extra

22   element of damages but the overall figures are matters of

23   correspondence.

24        Mortgage-carrying costs, a figure that is said to be

25   part of extra expenses, and prejudgment interest, which was an

D7ikwtc

 1   element in a Wilprop form, I held before, are not elements of

 2   any recovery and not matters of correspondence.  The owners of

 3   the property, to the extent they have a mortgage on their

 4   property, continue to pay it, according to the terms of their

 5   mortgage.  That's the cost of their carrying the property.  It

 6   does not figure in their tort recovery and does not figure

 7   unless they get separate insurance for it in their insurance,

 8   and it doesn't play any part in correspondence.  And the same

 9   thing with prejudgment interest.

10          The short of it is this:  We're talking about major

11   components of insurance.  The insurers paid against claims.

12   The claims that were submitted were in excess of the insurance

13   recovered.  The insurance recovery, I found and ruled,

14   correspond against the potential tort recoveries.  Hence, if

15   this case were to go forward, WTCP Companies -- in Towers 1, 2,

16   4, 5 and 7 -- would not be able to recover anything against the

17   airlines.

18          And with respect to the artwork, because it's subject

19   to the stipulation, I suggest that would end that part of the

20   case as well.

21          Mr. Williamson, apart from your disagreement with my

22   conclusions, is there anything I missed that I should be

23   speaking about, that you can think of now?

24          MR. WILLIAMSON:  Nothing for us to address at this

25   time, your Honor.

1          THE COURT:  Thank you, Mr. Williamson.

2          Mr. Podesta?

3          MR. PODESTA:  Nothing to address, your Honor.  Thank

4   you.

5          THE COURT:  Then I think we're concluded.

6          I know there are some members of the press that are

7   here.  This is an extemporaneous form -- it's taken some time

8   and may cover some areas that have been hard to capture -- so,

9   if the press has any questions -- we don't have to be on the

10  record for this, Andrew, unless somebody wants it on the

11  record -- I can entertain any questions and either I or counsel

12  can answer them.

13         May we go off the record?

14         MR. PODESTA:  Yes, your Honor, no objection.

15         MR. WILLIAMSON:  Up to you, your Honor.

16         THE COURT:  All right, no objection, we can go off.

17         (Discussion off the record)

18         THE COURT:  Thank you all very much, and I repeat

19  again my compliments to the lawyers in this case.  Thank you

20  very much.

21         (Adjourned)

22

23

24

25