UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :

IN RE SEPTEMBER 11 LITIGATION     :  21 MC 101 (AKH)
                                              :

- - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :

CANTOR FITZGERALD & CO., et al.,    :
                                              :

                Plaintiffs,   :  04-CV-7318 (AKH)
              v.         :

AMERICAN AIRLINES, INC., and AMR  :
CORP.,                                  :
              Defendants.  :
                                              :

- - - - - - - - - - - - - - - - - - - - - - - - -x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT DISMISSING ALL PLAINTIFFS'
CLAIMS FOR LACK OF DUTY AND PROXIMATE CAUSE**

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, NY 10036
Telephone:  (212) 490-9100
Fax:  (212) 370-4453
dbarry@condonlaw.com
-and-
DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, NY 10022
Telephone:  (212) 909-6000
Fax:  (212) 909-6836
mkmonagh@debevoise.com
repodesta@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 9

ARGUMENT ............................................................................................. 12

I.    AMERICAN DID NOT OWE A LEGALLY COGNIZABLE DUTY TO CANTOR ON SEPTEMBER 11, 2001 BECAUSE AMERICAN DID NOT EXERCISE ACTUAL CONTROL OVER THE TERRORISTS' ACTIONS. ....................................................................................... 12

    A.    New York Law Requires Actual Control Over A Criminal In Order To Impose A Duty To An Unrelated Plaintiff. ........................................... 13

    B.    American Had No Relationship with the Terrorists that Provided Actual Control Over Their Actions. .................................................... 18

        1.    The Passenger Screening Systems In Place On September 11 Did Not Afford American Actual Control Over The Terrorists. ....................................................................... 19

        2.    The Checkpoint Screening System In Place On September 11, 2001 Did Not Give American Actual Control Over the Terrorists. ....................................................................... 24

        3.    Cantor's Own Witnesses Have Acknowledged That There Is No Evidence That the Flight 11 Hijackers Acted Suspiciously On the Morning of September 11. ........................ 28

        4.    The Common Strategy Further Contributed to American's lack of Actual Control. ................................................... 30

II.    THE TERRORISTS' UNFORESEEABLE INTERVENTIONS BROKE ANY CHAIN OF PROXIMATE CAUSATION. ........................................... 33

    A.    Under New York Law, Prior Experience Is The Key To Foreseeability. ..................................................................... 34

    B.    The September 11 Attacks Were Legally Unforeseeable Because Nothing Like Them Had Ever Occurred in the History of Civil Aviation or Terrorism. ................................................................ 38

    C.    The September 11 Attacks Caused Unforeseeable, Unprecedented Consequences. ................................................................... 43

    D.    The September 11 Attacks Were Legally Unforeseeable Because the FAA Did Not Foresee Them And Did Not Prescribe Any Countermeasures Designed To Address Them. .............................. 45

CONCLUSION ........................................................................................... 58

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.,*
    96 N.Y.2d 280 (2001) .........................................................................................................12

*Buchholz v. Trump 767 Fifth Ave., LLC,*
    5 N.Y.3d 1 (2005) ..............................................................................................................36

*Buckeridge v. Broadie,*
    5 A.D.3d 298 (1st Dep't 2004) ......................................................................................36, 37

*D'Amico v. Christie,*
    71 N.Y.2d 76 (1987) ......................................................................................................13, 18

*Danielenko v. Kinney Rent A Car, Inc.,*
    57 N.Y.2d 198 (1982) .........................................................................................................35

*Di Ponzio v. Riordan,*
    89 N.Y.2d 578 (1997) ....................................................................................................34, 43

*Eiseman v. New York,*
    70 N.Y.2d 175 (1987) .........................................................................................................46

*In re Fosamax Prods. Liab. Litig.,*
    924 F. Supp. 2d 477 (S.D.N.Y. 2013) ..........................................................................11, 12

*Gaines-Tabb v. ICI Explosives USA, Inc.,*
    995 F.Supp. 1304 (W.D. Okla. 1996), *aff'd,* 160 F.3d 613 (10th Cir. 1998) .............28, 37, 38

*Gross v. Empire State Bldg. Assocs.,*
    4 A.D.3d 45 (1st Dep't 2004) .............................................................................................36

*Hamilton v. Beretta U.S.A. Corp.,*
    96 N.Y.2d 222 (2001) ................................................................................................. *passim*

*Hanna v. St. Lawrence County,*
    34 A.D.3d 1146 (3d Dep't 2006) ...................................................................................27, 28

*In re N.Y.C. Asbestos Litig.,*
    5 N.Y.3d 486 (2005) ................................................................................................... *passim*

*In re Sept. 11 Litig.,*
    No. 21 MC 97 (AKH), 2003 WL 22251325 (S.D.N.Y. Oct. 1, 2003)..............................10, 46

*In re Sept. 11 Litig.,*
    280 F. Supp. 2d 279 (S.D.N.Y. 2003)................................................................5, 12, 33

*In re Sept. 11 Litig.,*
    594 F. Supp. 2d 374 (S.D.N.Y. 2009)................................................................43

*In re Sept. 11 Litig.,*
    865 F. Supp. 2d 370 (S.D.N.Y. 2011)................................................................35, 36

*In re Sept. 11 Litig.,*
    931 F. Supp. 2d 496 (2013) ................................................................8, 44

*Kush v. Buffalo,*
    59 N.Y.2d 26 (1983) ................................................................33

*Lowery v. W. Union Tel. Co.,*
    60 N.Y. 198 (1875) ................................................................33

*Maheshwari v. City of New York,*
    2 N.Y.3d 288 (2004) ................................................................5, 16, 34, 36

*Maysonet v. KFC, Nat'l Mgmt. Co.,*
    906 F.2d 929 (2d Cir. 1990)................................................................35, 36

*McCarthy v. Olin Corp.,*
    119 F.3d 148 (2d Cir. 1997)................................................................*passim*

*Nallan v. Helmsley-Spear, Inc.,*
    50 N.Y.2d 507 (1980) ................................................................14, 36

*Oppenheim v. N.Y.C. Trans. Auth.,*
    237 A.D.2d 588 (2d Dep't 1997)................................................................16, 19

*Ospina v. Trans World Airlines, Inc.,*
    975 F.2d 35 (2d Cir. 1992)................................................................19, 20

*Palka v. Servicemaster Mgmt. Servs. Corp.,*
    83 N.Y.2d 579 (1994) ................................................................12, 16

*Palsgraf v. Long Island R.R. Co.,*
    248 N.Y. 339 (1928) ................................................................46

*Port Auth. of N.Y. & N.J. v. Arcadian Corp.,*
    189 F.3d 305 (3d Cir. 1999)................................................................28

*Port Auth. of N.Y. & N.J. v. Arcadian Corp.,*
    991 F. Supp. 390 (D.N.J. 1997), *aff'd,* 189 F.3d 305 (3d Cir. 1999)................................................................37, 44

*Pulka v. Edelman,*
    40 N.Y.2d 781 (1976) ........................................................................................18

*Purdy v. Public Adm'r of Cty. of Westchester,*
    72 N.Y.2d 1 (1988) ..........................................................................................18

*Raskin v. Wyatt Co.,*
    125 F.3d 55 (2d Cir. 1997) ...............................................................................11

*Sampaio v. Atlantic-Heydt, LLC,*
    294 F. Supp. 2d 466 (S.D.N.Y. 2003) ..............................................................46

*The Lusitania,* 251 F. 715
    (S.D.N.Y. 1918) ...............................................................................................44

*United States ex rel. Touhy v. Ragen,*
    340 U.S. 462 (1951) ....................................................................................9, 10

*Ultramares Corp. v. Touche, Niven & Co.,*
    255 N.Y. 170 (1931) ........................................................................................19

*Ventricelli v. Kinney Sys. Rent A Car, Inc.,*
    45 N.Y.2d 950 (1978) ......................................................................................33

*Waters v. N.Y.C. Hous. Auth.,*
    69 N.Y.2d 225 (1987) ......................................................................................14

**Statutes**

49 U.S.C. § 44904 (2000) ...................................................................10, 11, 45

**Other Authorities**

Amy Zegart, *Spying Blind: The CIA, The FBI, and the Origins of 9/11* (2007)............................52

National Commission on Terrorist Attacks, *The 9/11 Commission Report*
    (July 24, 2004) ........................................................................................ *passim*

Peter L. Bergen, *Holy War, Inc.: Inside the Secret World of Osama bin Laden* (2001) .............7, 8

Restatement (Second) of Torts...............................................................................36

## PRELIMINARY STATEMENT

Defendants American Airlines, Inc. and AMR Corporation (collectively "American") submit this Memorandum of Law together with the Declaration of Desmond T. Barry, Jr. ("Barry Decl.") with attached exhibits, and the Declaration of Professor Martha Crenshaw ("Crenshaw Decl.") in support of their Motion for Summary Judgment dismissing all claims of Plaintiffs Cantor Fitzgerald and its affiliates (collectively, "Cantor") for lack of a legally cognizable duty and because the unprecedented intervening actions of the terrorists broke any chain of proximate causation between American's alleged negligence and the business interruption damages that Cantor seeks.

It is a bedrock principle of New York law that defendants generally do not owe a duty to protect against the consequences of intervening criminal acts, let alone the actions of fanatical terrorists engaged in a holy war against the United States. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233 (2001); *McCarthy v. Olin Corp.*, 119 F.3d 148, 156–57 (2d Cir. 1997). The New York Court of Appeals has recognized that there is an inherent "unfairness [in] imposing liability for the acts of another." *In re N.Y.C. Asbestos Litig.*, 5 N.Y.3d 486, 493 (2005) (internal quotation marks omitted). Accordingly, a duty can "arise only":

> [W]here there is a relationship either between defendant and a third-person tortfeasor that encompasses actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers.

*Id.* at 494 (internal quotation marks omitted). It is undisputed that Cantor is not American's servant, child, or – unlike the wrongful death and personal injury plaintiffs with whom American settled at an earlier stage of the litigation – its passenger. American has no relationship with

1

Cantor at all apart from the fact that both Cantor and American were victimized as part of al Qaeda's war against the United States. In the absence of any relationship between Cantor and American, the critical question under New York law, therefore, is whether American had a relationship with the Flight 11 terrorists "that encompasse[d] defendant's *actual control* of the third person's actions." *Id.* at 495.

In 2005, well after the Court had issued its preliminary decision on duty in this case (which also came before any discovery concerning the details of the federal regulatory scheme and at a time when passenger and ground victim death and injury claims were still a part of the litigation), the New York Court of Appeals issued a decision, *In re New York City Asbestos Litigation*, 5 N.Y.3d 486 (2005), that clarified what constitutes "actual control" of the type that warrants imposition of a legal duty to protect against the consequences of a third-party's actions. The Court of Appeals concluded that the defendant employer in that case lacked sufficient control over its employee to owe a legal duty to the employee's wife, who allegedly was injured from exposure to asbestos dust that her husband introduced into the family home on soiled work clothes. *See id.* at 489–90. The Court of Appeals unanimously rejected the plaintiff's argument that the Port Authority's "status as an employer placed it in a position to control or prevent [its employee] from going home with asbestos-contaminated work clothes" even though the Port Authority provided laundry service and uniforms to its employees and even though it was the employee's work for the Port Authority that gave rise to the wife's asbestos exposures. *Id.* at 494 (internal quotation marks omitted).

The "actual control" standard established by *In re New York City Asbestos Litigation* applied to the facts of this case, as developed in discovery, leaves no doubt that American had no

actual control over the Flight 11 hijackers. American's alleged failure to detect a well-hidden terrorist conspiracy does not amount to actual control over the terrorists' actions – especially after the terrorists had displaced American's pilots at the controls of the flight, which is the first moment at which Flight 11 posed any risk to Cantor. Among the critical facts and admissions that have emerged:

- Robert Cammaroto, who was the FAA's chief of commercial airports policy as of September 11, 2001, testified that the airlines were prohibited from taking any additional security measures with respect to Muslim, Arab or Middle Eastern passengers on the basis of their religion or ethnicity. Asked "As of 9/11 was it permissible for an airline ticket or gate agent to take a look at a passenger, say to themselves this guy is an Arab and he fit my idea of what a terrorist should look like, and then single this person out for special screening procedures" Mr. Cammaroto replied, "There was no such requirement and that would have been prohibited." Barry Decl. Ex. A, Excerpts from Robert Cammaroto Dep. Vol. I 110:19–111:6, Feb. 11, 2008 ("Cammaroto Dep. Vol. I").

- Mr. Cammaroto also testified that the FAA-prescribed Computer Assisted Passenger Prescreening System ("CAPPS") was the required passenger screening system American's Air Carrier Standard Security Program ("ACSSP") called for it to use before September 11 and that an airline "may not modify the selection criteria of the CAPPS system without the written approval of the administrator. Nor may an air carrier apply any supplemental system of passenger screening to select passengers for additional security measures without the approval of the administrator." *Id.* at 94:7–96:11. CAPPS did not take into account whether a passenger was Arab or Muslim and did not include any behavioral profiling element. *Id.* at 92:12–94:6.

- The consequences of CAPPS selection was that the selectee's checked bags would be screened for explosives if the airport had – as Logan did on September 11 – explosive detection equipment. *Id.* at 21:19–22:8, 62:23–63:24; *see also* Barry Decl. B, Excerpts from Christopher Bidwell[1] Dep. 45:6–17, June 7, 2012 ("Bidwell Dep."); Barry Decl. Ex. C, Excerpts from Carter Bibbey[2] Dep. 167:3–11, Sept. 12, 2006 ("Bibbey Dep."). The FAA wanted to avoid any stigmatization of CAPPS selectees, and provided for no additional security screening of their persons or carry-on bags.

---

[1]   Mr. Bidwell was the Manager of Corporate Security at American as of 9/11.

[2]   Mr. Bibbey was the Globe Duty Manager at Logan Airport Terminal B on 9/11.

- CAPPS did not include a behavioral profiling element, *see* Ex. A, Cammaroto Dep. Vol. I 34:2–35:1, but in any event, Cantor's own experts testified that they were "not aware of any evidence that any of the terrorists who walked through the walk-through metal detectors and checkpoint at Logan exhibited any sort of suspicious behavior that would alert a screener." Barry Decl. Ex. D, Excerpts from Quinten T. Johnson Dep. 109:13–19, Oct. 4, 2013 ("Johnson Dep."); Barry Decl. Ex. E, Excerpts from Glen E. Winn Dep. 139:12–140:7, Oct. 2, 2013 ("Winn Dep."). As Cantor's expert, Mr. Bergen, responded to the question "None of the hijackers of flight 11 gave any indication on the morning of 9/11 of their affiliation with al Qaeda, correct?" "People tend not to wear al Qaeda T-shirts." Barry Decl. Ex. F, Excerpts from Peter Bergen Dep. 203:18–22, Sept. 9, 2013 ("Bergen Dep."). Cantor's expert, Glen Winn, similarly agreed that the checkpoint screeners did not have any information available to them suggesting that the Flight 11 hijackers were associated with al Qaeda or another terrorist group and that there was no evidence that the hijackers behaved in a suspicious manner. Barry Decl. Ex. E, Winn Dep. 139:3–17, 244:21–245:3 (agreeing that the American ticket agents did not have any factual information suggesting that the 9/11 hijackers were affiliated with al Qaeda or another terrorist group).

- The principal weapons used by the 9/11 terrorists were small knives or other cutting or stabbing implements and both Mr. Cammaroto and two of Cantor's experts agree that such items were generally permitted inside the sterile area on 9/11. *See* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 205:15–20; Barry Decl. Ex. D, Johnson Dep. 89:10–91:15; Barry Decl. Ex. E, Winn Dep. 338:20–24.

- Claudio Manno, the FAA's director of the Office of Civil Aviation Intelligence as of September 11, 2001, testified that none of the Flight 11 terrorists appeared on the "do not board" list that the FAA provided to the airlines before September 11 and that the airlines were never provided with the much longer TIP-OFF list. Barry Decl. Ex. G, Excerpts from Claudio Manno Dep. Vol. I 247:25–248:6, 266:14–19, June 9, 2009 ("Manno Dep. Vol. I"). Nor did any of the Flight 11 terrorists appear on the FAA's list of persons permitted to fly only after receiving enhanced security procedures. *Id.* at 264:5–8.

- Michael Morse, the FAA's deputy director for security, testified that the FAA mandated that all flight crews be trained in the "Common Strategy" response to hijackings, which taught flight crews that "the best way to deal with hijackers was to accommodate their demands, get the plane to land safely, and then let law enforcement or military handle the situation." Barry Decl. Ex. H, Excerpts from Michael Morse Dep. 30:18–31:25, January 8, 2009 ("Morse Dep."). Flight crews were specifically instructed "do not try to overpower a hijacker." *Id.* at 42:18–24.

On the morning of September 11, American Airlines had no control over the terrorists' actions: they were not on any list that would have justified American in refusing to board them and they engaged in no suspicious or disruptive behavior that would have triggered heightened

4

scrutiny.   Even after the hijacking had started, the Common Strategy counseled cooperation rather than confrontation.   Moreover, unlike the employee in *In re New York City Asbestos Litigation*, the Flight 11 terrorists were committed to evading American's control in order to carry out their mission.   Because American did not have anything remotely resembling actual control over the terrorists' actions, under New York law it owed no duty to Cantor to protect it from business interruption losses that resulted when the terrorists took control of Flight 11 and deliberately crashed it into the World Trade Center.

It is also crystal clear that American's alleged negligence was not the proximate cause of Cantor's business interruption losses, because the terrorists' extraordinary intervention was a superseding intervening cause.   As the Court previously recognized, "[g]enerally, an intervening intentional or criminal act severs the liability of the original tort-feasor." *In re Sept. 11 Litig.*, 280 F. Supp. 2d 279, 302 (S.D.N.Y. 2003).   To overcome that general rule and establish proximate cause, Cantor must show that the terrorists' interventions on the morning of September 11 were "reasonably foreseeable." *See id.*; *Maheshwari v. City of New York*, 2 N.Y.3d 288, 295 (2004) ("Where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury . . . liability turns upon whether the intervening act is a normal or foreseeable consequence[.]   An intervening act may break the causal nexus when it is . . . not foreseeable in the normal course of events.").   The record that has emerged from discovery in this litigation indisputably establishes that neither the form of the terrorists' intervention nor the shocking consequences were reasonably foreseeable at all, much less "in the normal course of events."   American had no reasonable basis on which to foresee that a gang of suicidal terrorists, armed only with small knives, would take over a plane, pilot it themselves, and transform it into

a weapon of mass destruction aimed at a target of their choosing, causing what Cantor claims are hundreds of millions of dollars in business interruption losses.

The testimony of senior FAA officials and Cantor's own experts is devastating to any contention that the September 11 attacks were reasonably foreseeable.  Claudio Manno – the FAA's Director of Intelligence – testified that:

> Q.     Did you as the director of the FAA's Office of Intelligence have any factual basis for anticipating on September 10, 2001 that gangs of armed terrorists . . . armed only with short-bladed knives and capable of piloting the plane themselves, would hijack multiple commercial passenger jets and deliberately crashed them into the previously selected ground targets [?]"
>
> ***
>
> A.      We had no intelligence, specific and credible intelligence that said that.
>
> Q.     Did you have any *inkling* on September 10, 2001 that this type of attack I just described was in the offing?
>
> ***
>
> A.     No.

Barry Decl. Ex. G, Manno Dep. Vol. I 145:10–146:9 (emphasis added).  Not even Cantor's experts claim that American possessed better or more accurate information concerning the nature of the pre-9/11 terrorist threat than the FAA had.  *See* Barry Decl. Ex. E, Winn Dep. 224:8–14; Barry Decl. Ex. D, Johnson Dep. 207:5–13.  The FAA employed specialized and highly trained analysts, some of whom were embedded with the CIA and FBI in order to facilitate their receipt of intelligence relating to aviation.  As a matter of law, a factual record that the FAA, the federal regulatory agency responsible for assessing threats to civil aviation security and prescribing the countermeasures for both air carriers and airports to implement, had no "inkling" of the critical

elements of the September 11 attacks cannot create a triable issue of fact as to reasonable foreseeability on the part of American Airlines.

Cantor's experts' testimony confirms that the very elements of the September 11 attacks that caused Cantor's losses were unforeseeable. Mr. Bergen, for example, testified that it was not the terrorists' possession of knives or mace that caused significant casualties (or, of course, Cantor's losses); it was the "fact that the pilots were able to use the planes themselves as weapons against a selected target on the ground." Barry Decl. Ex. F, Bergen Dep. 103:15–18 (assenting to proposition). But Professor Zegart, another of Cantor's experts, testified that that was precisely the unprecedented aspect of the September 11 attacks because:

- Before September 11, there had never been a violent terrorist hijacking in the United States. Barry Decl. Ex. I, Excerpts from Amy Zegart Dep. 30:9–22, Sept. 13, 2013 ("Zegart Dep."); *see also* Barry Decl. Ex. E, Winn Dep. 160:15–22.

- Before September 11, there had never been a hijacking in which the hijackers themselves had the ability to pilot a commercial jet. Barry Decl. Ex. I, Zegart Dep. 32:18–33:8; *see also* Barry Decl. Ex. E, Winn Dep. 163:7–14.

- The September 11 hijackings were the first in history in which the hijackers had no demands for negotiation. Barry Decl. Ex. I, Zegart Dep. 34:15–:34:20.

- Before September 11, there had never been a violent, terrorist hijacking in which the terrorists' principal weapons were small knives and mace, or pepper spray; Indian Airlines Flight 814 is the only prior terrorist hijacking involving a knife (which may have been a long bladed knife) and there the hijackers also had pistols and grenades. Barry Decl. Ex. I, Zegart Dep. 31:21–32:17; *see also* Barry Decl. Ex. E, Winn Dep. 160:23–163:6, 163:15–19.

Mr. Bergen acknowledged that the airlines did not receive "specific tactical warnings about the modality of the 9/11 attacks." Barry Decl. Ex. J, Expert Report of Peter Bergen, ¶ 91 (June 20, 2013) ("Bergen Report"). Indeed, Mr. Bergen himself, although a preeminent expert on al Qaeda who had even interviewed Osama bin Laden before September 11, said that "[t]he September assaults came as an utter surprise." Barry Decl. Ex. K, Excerpts from Peter L.

Bergen, *Holy War, Inc.: Inside the Secret World of Osama bin Laden*, 26 (2001) ("*Holy War, Inc.*"); Barry Decl. Ex. F, Bergen Dep. 184:19–185:10. Mr. Bergen agreed with Mr. Manno that in the fifteen years prior to September 11, every single actual or planned terrorist attack (involving more than one casualty) against United States interests involved the use of explosives. Barry Decl. Ex. F, Bergen Dep. 168:2–25; *see also* Barry Decl. Ex. G, Manno Dep. Vol. I 38:11–39:9.

   Not only was the mode of the September 11 attacks unforeseeable – involving terrorists armed with small knives or other cutting implements who had the training to pilot the plane themselves and use it to strike a selected target hundreds of miles off the flight path – but the outsize consequences of the September 11 attacks were unforeseeable as well. Never before had a hijacking resulted in the mass casualties and extraordinary destruction of property of the type that occurred on September 11. As this Court has recognized with respect to a different plaintiff, Cantor's losses resulted from "a catastrophe involving massive violence, inflicted by an organization intending to attack, as bin Laden characterized it, the far enemy. . . . [N]othing found in the literature describes . . . the catastrophic devastation of lives and property of the 9/11 attacks, or the international armed conflict launched by the United States in response to the attacks." *In re Sept. 11 Litig.*, 931 F. Supp. 2d 496, 506 (2013).

   The Court was surely correct in concluding that "[t]he events of September 11 were unique, and Congress, the President and the American public treated 9/11 as unique." *Id.* at 508. Those unique events and their unique consequences were neither reasonably nor realistically foreseeable. The cause of Cantor's losses was not the failure of hard-working, early-rising, law-abiding personnel at Logan Airport to anticipate the horrors that even the FAA did not see

coming; it was the unprecedented and terrible capabilities of Mohammad Atta, Waleed Alshehri, Wail Alshehri, Satam al Suqami and Abdul al Omari and their determination to wage holy war against the United States.

## STATEMENT OF FACTS

American has submitted an accompanying Statement of Undisputed Material Facts that is derived almost entirely from the admissions of Cantor's experts and the testimony of the three senior FAA officials who testified pursuant to *United States ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951). Robert Cammaroto, the FAA's Chief of Commercial Airports Policy on September 11, 2001, testified as the FAA's 30(b)(6) witness. Claudio Manno, the Director of the Office of Civil Aviation Intelligence of the FAA on September 11, 2001, testified as the FAA's designee on pre-9/11 threat assessment. Michael Morse, the FAA's Deputy Director of Security on September 11, 2001, testified with respect to on-board security, including the so-called "Common Strategy" for addressing a hijacking.

Pursuant to the *Touhy* process, the Government chose to make these witnesses the definitive representatives of the FAA on the agreed-upon topics after a significant negotiation over the scope of their testimony and the topics upon which each witness would testify, which were spelled out in writing in advance. *See* Barry Decl. Ex. L, Letter explaining TSA Final Determinations (Oct. 12, 2007) ("TSA Final Determinations"). Each FAA witness was not only knowledgeable in his own right, but went through an extensive process of reviewing documents and meeting with other personnel within the agency in order to provide informed testimony. *See, e.g.*, Barry Decl. Ex. H, Morse Dep. 28:3–29:2, 70:15–22; Barry Decl. Ex. A, Cammaroto Dep. Vol. I 20:5–8, 24:3–5, 42:10–12, 52:11–13; Barry Decl. Ex. G, Manno Dep. Vol. I 20:17–18,

24:17–20, 228:7–8.   Notably, under *Touhy*, the deposition   testimony is the FAA's trial

testimony;  these witnesses are not available to appear at trial.  *See* Barry Decl. Ex. L, TSA Final

Determinations.

When the Court concluded that interlocutory review of Defendants' 2003 duty motion

was not appropriate, it listed a series of questions to be explored in discovery, stating that:

> [T]here are many other questions that could affect how duty might
> be formulated, in what contexts, and to whose benefit. With regard
> to the Aviation Defendants, was the nature and scope of the
> screening that took place the same at each of the three airports?
> What did federal regulations prescribe and in what circumstances?
> Did screening extend to materials brought aboard airplanes by
> maintenance people or nonpassengers, or left aboard by passengers
> in previous flights? Could certain materials pass through accepted
> methods of screening? Were different hijacking scenarios
> considered, and different dangers evaluated? What dangers were
> perceived by those establishing the procedures for screening and
> the coverage for such procedures, with regard to all those who had
> access to, or would come aboard, passenger airplanes?

*In re Sept. 11 Litig.*, 21 MC 97 (AKH), 2003 WL 22251325, at *3 (S.D.N.Y. Oct. 1, 2003).

Those are precisely the issues on which the FAA's senior officials have provided clear and

compelling testimony.

The FAA is charged by statute both with assessing the potential terrorist threats to civil

aviation and formulating the countermeasures to meet those threats.  The Aviation Security

Improvement Act of 1990 directed the FAA, working in partnership with the FBI, to assess all

current and potential terrorist threats:

> The Administrator of the Federal Aviation Administration and the
> Director of the Federal Bureau of Investigation jointly shall assess
> current and potential threats to the domestic air transportation
> system.  The assessment shall include consideration of the extent
> to which there are individuals with the capability and intent to

> carry out terrorist or related unlawful acts against that system and
> the ways in which those individuals might carry out those acts.
> The Administrator and the Director jointly shall decide on and
> carry out the most effective method for continuous analysis and
> monitoring of security threats to that system.

49 U.S.C. § 44904(a) (2000) (emphasis added).

Congress also authorized the FAA to devise and to direct the implementation of safety and security procedures for the commercial aviation system, including whatever measures the agency determined were appropriate to counteract the threat of hijacking and terrorism.  The Federal Aviation Act, at the time of the September 11 terrorist attacks, specifically authorized the FAA to promulgate "regulations to protect passengers and property on an aircraft" from acts of "criminal violence or aircraft piracy." *Id.* at § 44903(b); *see also id.* at § 44904(c) ("The Administrator shall take necessary actions to improve domestic air transportation security by correcting any deficiencies in that security discovered in the assessments, analyses, and monitoring carried out under this section.").  In furtherance of this goal, the agency was also directed to establish, "to the maximum extent practicable," "a uniform procedure for searching and detaining passengers and property." *Id.* at § 44903(b)(3).

The testimony of the FAA officials and Cantor's own experts form a particularly appropriate basis for summary judgment.  It is well settled that a party cannot create a dispute of material fact by varying its own testimony. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." (internal quotation marks omitted)); *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 488 (S.D.N.Y. 2013) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion

11

for summary judgment." (internal quotation marks omitted)).  The FAA witnesses have already given the FAA's trial testimony and will not reappear at trial.  The record has thus gelled to an even greater degree than is common at this stage of litigation.

Because the facts relevant to the duty and proximate cause arguments are different, and because those facts are better understood in the context of the legal requirements established by New York law, American will set forth the relevant facts in each Argument section rather than reciting them here.

## ARGUMENT

I.   **AMERICAN DID NOT OWE A LEGALLY COGNIZABLE DUTY TO CANTOR ON SEPTEMBER 11, 2001 BECAUSE AMERICAN DID NOT EXERCISE ACTUAL CONTROL OVER THE TERRORISTS' ACTIONS.**

New York law determines the question of whether Defendants owe a duty to Plaintiffs. *See In re Sept. 11 Litig.*, 280 F. Supp. 2d at 289.  Under New York law, courts have emphasized that "[a]bsent a duty running **directly** to the injured person there can be no liability in damages, **however careless the conduct or foreseeable the harm**." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001) (emphasis added); *see also Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 584 (1994) ("We start this part of the analysis with the proposition that a duty of reasonable care owed by a tortfeasor to an injured party is elemental to any recovery in negligence.").

Cantor here seeks to hold American liable not for harm caused directly by American but for American's alleged failure – as Cantor likes to frame the alleged obligation – to "detect and prevent" the Flight 11 hijackers from taking over the piloting of Flight 11 and deliberately crashing the plane into Tower One of the World Trade Center, causing the property damage that

Cantor alleges led to the business interruption losses it claims. *See* Barry Decl. Ex. M, Expert Report of Glen E. Winn ¶¶ 23(c), 79 (June 13, 2013); Barry Decl. Ex. E, Winn Dep. 95:2–97:4, 97:21–98:18 (asserting that Paragraph 10 of the ACSSP imposes on carriers a "detect and prevent" standard but acknowledging that ACSSP actually says "prevent or deter").   Even if the detect and prevent standard were correct (and it is not, as set forth in American's accompanying Motion for a Determination of Applicable Law Regarding the Standard of Care), New York law is crystal clear that only in very rare circumstances will a duty be imposed on a defendant to protect an unrelated party from losses directly caused by the criminal interventions of a third party.   As set forth below, it is simply not enough that a defendant fails to detect and prevent a criminal – let alone a holy warrior dedicated to the annihilation of the United States – from carrying out his criminal actions; in order to impose a duty to an unrelated plaintiff like Cantor, New York law requires that the defendant exercise actual control over the intervening criminal's actions.

**A.      New York Law Requires Actual Control Over A Criminal In Order To Impose A Duty To An Unrelated Plaintiff.**

The New York Court of Appeals has repeatedly emphasized that "a defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987).   As the Court of Appeals explained in responding to a question certified by the Second Circuit, there are two policy concerns at issue:   "This judicial resistance to the expansion of duty grows out of practical concerns ***both*** about potentially limitless liability ***and*** about the unfairness of imposing liability for the acts of another." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233 (2001) (emphasis added).   Thus,

13

> A duty may arise . . . where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's *actual control* of the third person's actions or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others.   Examples of these relationships include master and servant, parent and child, and common carriers and their passengers.

*Id.* (emphasis added).

A defendant may owe a duty to a related party in a special protective relationship to protect that party against the criminal acts of others.  *See, e.g., Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 518–20 (1980) (finding a duty on the part of landlord to protect tenants against criminal assaults).  But a defendant will not owe a duty to an unrelated party unless the defendant exercises actual control over the third party criminal's actions.  *Cf. Waters v. N.Y.C. Hous. Auth.*, 69 N.Y.2d 225, 230 (1987) (holding that there was no duty to non-tenants because "both logic and public policy weigh heavily in favor of confining the scope of defendant landowner's duty to protect against criminal acts" where the landowner had "no control over either the acts of the primary wrongdoer or the conditions of the public byways[.]").

Here, Cantor cannot and does not assert that it stands in any special protective relationship to American.  It is not American's child, its employee, or its passenger.  The only connection between Cantor and American is the terrorist attack of September 11; both were pawns in the holy war that al Qaeda chose to wage against the United States.  *See* Barry Decl. Ex. F, Bergen Dep. 23:11–13, 24:10–13, 26:23–27:10 (agreeing that the 9/11 attacks were "not just on a particular commercial airline or against commercial enterprises like Cantor Fitzgerald, but against the United States itself"); *see* Barry Decl. Ex. N, *In re Sept. 11 Litig.* Hr'g Tr. at 505, July 18, 2013 ("Everyone is suffering from 9/11 . . . This is a case about a disaster, and we are

14

hearing about a dispute between two people, who suffered different aspects of the disaster, trying to sort out what one may owe to the other, if anything."). Indeed, Cantor's offices were not even located within hundreds of miles of Flight 11's scheduled flight path. The question of whether any duty arises under New York law therefore turns exclusively on whether American had a relationship with the terrorists that encompassed "actual control" over the terrorists' actions. The New York Court of Appeals could not be clearer that theoretical control is not enough. *Hamilton*, 96 N.Y.2d at 233; *In re N.Y.C. Asbestos Litig.*, 5 N.Y.3d at 493–94.

Thus, the New York Court of Appeals and the Second Circuit have concluded that the sellers of guns and ammunition alleged to have particularly dangerous properties owe no duty to the victims of gun violence inflicted by third-party criminals. *See Hamilton*, 96 N.Y.2d at 229–31, 234 (answering question certified by the Second Circuit and establishing that defendants did not owe a duty to exercise reasonable care to a varied group of individuals who had been shot or whose relatives had been killed by gun violence, despite plaintiffs' argument that manufacturers have a "special ability to detect and guard against the risks associated with [their] products and [that special ability] warrants placing all manufacturers, including these defendants, in a protective relationship with those foreseeably and potentially put in harm's way by their products." (emphasis omitted)); *McCarthy*, 119 F.3d at 151, 156-157 (holding that defendants owed no duty to the plaintiffs to protect against injuries caused by Colin Ferguson's rampage, even though it "may have been foreseeable" that a "sadistic, unstable and criminal personalit[y]" would use flesh-ripping ammunition to inflict injury).

It is not enough for a plaintiff to assert, as Cantor does, that the defendant is in a better position than the plaintiff to avoid the harm, if the defendant did not have actual control over the

criminal intervention.   Under New York law, the question of whether a party is in the best position to avoid the harm is not a factual issue that depends on weighing the relative opportunities of plaintiff and defendant to prevent the injury.   Rather, it is a question of law that requires that the defendant have either a protective relationship with the plaintiff or a relationship with the third-party criminal that entails actual control.   Under New York law, only if one of those two relationships are present will the defendant be deemed to be in the best position to avoid the harm.   Applying this approach, the New York courts have rejected duty in case after case where the defendant was in a better position than plaintiff to protect against the harm.   *See, e.g.*, *Oppenheim v. N.Y.C. Trans. Auth.*, 237 A.D.2d 588, 589 (2d Dep't 1997) (Transit Authority in better position compared to passenger assaulted by a fellow passenger); *Maheshwari*, 2 N.Y.3d at 294 (New York City, both as owner of concert site and provider of police protection, in better position compared to plaintiff assaulted by concertgoers).   Instead, New York law is emphatic that a defendant like American will owe a duty to protect an unrelated victim like Cantor against a third-party criminal intervention only if American exercised actual control over the terrorists because only then does New York law consider the defendant to be in the best position to protect the plaintiff against the criminal actions.   *Compare Palka*, 83 N.Y.2d at 587–89 (holding that maintenance company owed a duty to contracting hospital's nurse because its agreement with hospital gave it "comprehensive and exclusive" authority), *with Hamilton*, 96 N.Y.2d at 229–31, 234 (no duty despite plaintiffs' argument that manufacturers have a "special ability to detect and guard against the risks associated with [their] products and [that special ability] warrants placing all manufacturers, including these defendants, in a protective

16

relationship with those foreseeably and potentially put in harm's way by their products." (emphasis omitted)).

In 2005, the New York Court of Appeals clarified the "actual control" standard in a way that makes it impossible to conclude that American exercised actual control over the terrorists' actions. In *In re New York City Asbestos Litigation*, the Court of Appeals explained that actual control is necessary to find that the defendant is in the best position to protect against harm:

> [A] duty may arise only where there is a relationship between defendant and a third party tortfeasor that encompasses defendant's actual control of the third person's actions . . . . The 'key' consideration critical to the existence of a duty in these circumstances is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm and that the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship.

5 N.Y.3d 493–94 (internal citations and quotation marks omitted).

The Court of Appeals flatly rejected the argument that the plaintiff's husband's employer "was in the best position to protect against the risk of harm" because it might have compelled its employee to wear clean clothes home from work, noting that the employer was "entirely dependent upon [the employee's] willingness to comply with and carry out such risk reduction measures." *Id.* at 495. Of course, the employer was in a better position than the plaintiff to avoid the risk; the Court of Appeals accepted the plaintiff's argument that the defendant knew of the risks of asbestos exposure and thus could have, at a minimum, warned the employee and his wife. Moreover, the employee in that case was surely more susceptible to inducements and penalties – including instructions concerning the risks, fines, and job termination – than the fanatical terrorists on September 11 who, far from being willing to comply with American's risk reduction measures, were actively seeking to evade them in order to carry out their mission. No

17

rational system of jurisprudence could conclude that the employer in *In re New York City Asbestos Litigation* lacked actual control over the actions of its employee, but American possessed actual control over the actions of the terrorists.

### B.   American Had No Relationship with the Terrorists that Provided Actual Control Over Their Actions.

In essence, Cantor urges that American's failure to detect a carefully hidden terrorist conspiracy amounts to actual control over the terrorists' later actions. Nothing in New York law supports such an equivalence. To the contrary, the absence of actual control over the tortfeasor's actions has led to a determination that no duty exists even where a relationship exists between the defendant and the third-party tortfeasor. New York courts have declined to impose a duty on a health-related facility to control the conduct of a resident, *see Purdy v. Public Adm'r of Cty. of Westchester*, 72 N.Y.2d 1, 8–9 (1988); on an employee association to control the conduct of its member, *see D'Amico v. Christie*, 71 N.Y.2d 76, 80–81 (1987); or on a garage to control the conduct of its patron, *see Pulka v. Edelman*, 40 N.Y.2d 781, 783–84 (1976). The undisputed material facts in this case establish that the limitations on American's screening options imposed by the FAA, the Flight 11 terrorists' successful efforts to hide their inimical plans from American's ticket agents and the Logan screeners, and the mandatory Common Strategy training to cooperate with, rather than confront, hijackers, left American with no actual control over the terrorists' actions.

Cantor ignores the realities of aviation security and the difficulties of screening. If Cantor's contention were accepted, American would be deemed to exercise actual control over every one of the millions of passengers who board its aircraft every day and would have a legal duty to prevent every one of those passengers from causing harm to any person or property, no

matter how craftily the passenger concealed his intentions or how difficult the task of detecting a well-hidden criminal conspiracy. *See Oppenheim*, 237 A.D.2d at 588 (Transit Authority owed no duty to passenger assaulted by another passenger). No rational actor would accept such a duty. *See Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 179–80 (1931) (courts should not extend the concept of duty so far that it discourages socially useful businesses and activities). The duty advocated by Cantor would impose liability for not finding the metaphorical needle in a haystack; the alleged inability to find a hidden weapon in the few seconds available for passenger screening cannot amount to actual control over the later actions of the one among millions of passengers whose bag contains it.

1. **The Passenger Screening Systems In Place On September 11 Did Not Afford American Actual Control Over The Terrorists.**

Cantor's case amounts to an argument that American had control, at most, over the Flight 11 terrorists' weapons to the extent that the terrorists attempted to bring prohibited, detectable items into the sterile area.[3] But the question under the New York law of duty is not whether American could have seized prohibited *items* (if there were any) but whether American had a relationship with the *terrorists* that encompassed actual control over the terrorists' actions. *In re N.Y.C. Asbestos Litig.*, 5 N.Y.3d, at 493–94 ("[A] duty may arise only where there is a relationship between defendant and a third-party tortfeasor that encompasses defendant's actual control of the third person's actions[.]"); *see also Ospina v. Trans World Airlines, Inc.*, 975 F.2d

---

[3] As set forth in American's accompanying Motion for Partial Summary Judgment Dismissing Certain of Plaintiffs' Claims, there is no evidence that the Flight 11 terrorists were armed with prohibited items that were readily detectable using the FAA mandated screening procedures. But even if they were, American's alleged failure to detect the terrorists' weapons does not amount to actual control over the terrorists' later actions.

35, 37 (2d Cir. 1992) ("Of course, if TWA had searched the place where the bomb was hidden, the bomb would have been discovered.  That would be true in any case involving a hidden bomb.").

American's alleged failure to detect the terrorists' small knives does not translate into actual control over the terrorists and their later actions.  An examination of the undisputed facts relating to the passenger screening process reveals that it did not provide American with anything like actual control over the terrorists' actions.  American was categorically prohibited from treating the Flight 11 terrorists any differently than any other passengers simply because they were Middle Eastern Muslims, and Cantor's experts have admitted that there is no evidence that the Flight 11 terrorists engaged in any suspicious behavior either at the ticket counter or at the checkpoint on the morning of September 11.

The preboard screening of individual passengers as of September 11 was quite limited, as the FAA readily admitted, and was circumscribed by concerns for the civil liberties of Middle Eastern, Arab and Muslim passengers.  As Mr. Cammaroto testified, there was no passenger interview for domestic flights and "the volume of traffic in the Unites States made it impossible to apply the type of intensive interview prescreening required by FAA of U.S. carriers departing from foreign locations under 'extraordinary security.'"  Barry Decl. Ex. A, Cammaroto Dep. Vol. I 76:13–77:3.  Instead, the only preboard questioning of passengers consisted of the following two baggage control questions:

> Has anyone unknown to you asked you to carry an item on this flight?
>
> Has any of the items you are traveling with been out of your immediate control since you packed them?

Barry Decl. Ex. A, Cammaroto Dep. Vol. I 70:11–23.   Mr. Cammaroto confirmed that "the purpose of these questions was to identify passengers who might unwittingly be carrying bombs or other explosive materials in their carry-on bags" and that the questions "are not specifically intended to identify someone as a terrorist" unless that terrorist coincidentally happens to be a dupe.  *Id.* at 72:6–12.  The FAA permitted airlines to pose the questions through a translator and to offer non-English speaking passengers the option of pointing to the answer to the questions on a card printed in their native language.  *Id.* at 72:13–73:10, 80:25–81:6.  Of course, the Flight 11 terrorists were not dupes but dedicated, highly trained al Qaeda operatives.

Before September 11, the FAA encouraged the airlines to rely on CAPPS, the "Computer Assisted Passenger Prescreening System" wherever it was available, both to identify selectees and to determine the additional security measures that would be applied to selectees.[4]   Mr. Cammaroto testified that in order to implement civil liberties recommendations of the Department of Justice, the FAA required that domestic air carriers that implemented CAPPS before September 11 – which included American – "obtain preapproval from the FAA before implementing any passenger screening system in addition to the screening systems prescribed by the FAA."  *Id.* at 94:17–95:15.  The FAA further mandated that "[a]n air carrier may not modify the selection criteria of the CAPPS system without the written approval of the administrator.  Nor may an air carrier apply any supplemental system of passenger screening to select passengers for additional security measures without the approval of the administrator."  *Id.* at

---

[4]    On September 11, 2001, the FAA was in the midst of the rulemaking process that would have made CAPPS the exclusive method of passenger prescreening for all airlines.  The Notice of Proposed Rulemaking had been published.  But virtually all major carriers, including American, had already implemented CAPPS before September 11 with the FAA's strong encouragement.  Barry Decl. Ex. A, Cammaroto Dep. Vol. I 43:4–19.

95:22–96:11. Indeed, the FAA was so concerned about avoiding subjective and potentially discriminatory selection criteria that it changed the name of CAPPS from the Computer Assisted Passenger *Profiling* Selection System to the Computer Assisted Passenger *Prescreening* System. *See* Barry Decl. Ex. D, Johnson Dep. 59:4–18.

CAPPS did not include race, religion or ethnicity as part of its selection criteria. Its algorithm is a closely guarded secret, but Mr. Cammaroto (and Cantor's expert, Mr. Johnson) described it as a system designed to identify passengers "about whom we didn't know enough information." Barry Decl. Ex. A, Cammaroto Dep. Vol. I 123:9–19; *see also* Barry Decl. Ex. D, Johnson Dep. 66:2–25. As Mr. Cammaroto acknowledged, the FAA expected that only an "infinitesimal amount" of the passengers selected by CAPPS would turn out to be terrorists. Barry Decl. Ex. A, Cammaroto Dep. Vol. I 123:9–19.

The airlines were absolutely prohibited not only from applying religious, ethnic or racial criteria in identifying passengers for additional scrutiny, they were barred from applying intuitive or subjective factors that might have been a product of unconscious discrimination. Mr. Cammaroto testified:

> Q.    As of 9/11, was it permissible for an airline ticket or gate agent to take a look at a passenger, say to themselves this guy is an Arab and he fit[s] my idea of what a terrorist should look like and then single this person out for special screening procedures?
>
> A.    There was no such requirement and that would have been prohibited.

*Id.* at 110:19–111:6. Mr. Cammaroto testified in no uncertain terms that American could not on September 11 apply additional screening to the Flight 11 terrorists because they were Middle Eastern, Arab or Muslim. *Id.* at 102:11–22 (noting that "[w]e didn't permit any discrimination of

any sort" and did not permit "airlines [or] security companies [to] select passengers for more intensive screening procedures simply because of their race, religion or national ethnic origin").

The FAA maintained the prohibition even in light of evidence that Middle Eastern Muslim terrorists were interested in attacking U.S. aviation targets. As Mr. Cammaroto testified, even after September 11, the FAA reaffirmed its position that airlines must not target or otherwise discriminate against passengers in security screening procedures based on race, color, religion or national or ethnic origin. Barry Decl. Ex. A, Cammaroto Dep. Vol. I 107:3–11. Prior to September 11, in the very same Information Circular in which it reported on the disrupted "Millennium Plot" by al Qaeda to plant a bomb in the public area of Los Angeles International Airport, the FAA warned air carriers not to apply different screening procedures based on a passenger's race, religion or national origin. *See* Barry Decl. Ex. O, Information Circular IC-99-13 (Dec. 23, 1999) (AAL019915–16) ("It is essential that screeners treat all passengers – regardless of race, color, ethnicity, religion, or gender – equally, both in terms of their being potential threats and of their deserving courteous, professional treatment during the conduct of security procedures.").

CAPPS was the FAA's preferred choice among the FAA-mandated passenger screening systems under American's ACSSP as of September 11, 2001. Barry Decl. Ex. A, Cammaroto Dep. Vol. I 61:25–62:7. But the consequences of CAPPS selection were limited to screening the selectee's checked baggage with explosive trace detection equipment or holding the selectee's bags off the plane until it was confirmed the selectee had boarded. Barry Decl. Ex. P, Excerpts from Nat'l Comm'n on Terrorist Attacks, *The 9/11 Commission Report*, 2 (July 24, 2004) ("9/11

Commission Report"); Barry Decl. Ex. A, Cammaroto Dep. Vol. I 63:15–23.  Mr. Cammaroto

testified that:

- The FAA made "a deliberate decision to apply special clearance procedures only to the checked bags of CAPPS selectees and not to their persons or carry-on bags."  Barry Decl. Ex. A, Cammaroto Dep. Vol. I 120:2–14.

- "The decision to apply special screening procedures only to the checked bags of CAPPS selectees and not to their persons or carry-on baggage" was "based on the intelligence threat information then available to the FAA." *Id.* at 121:2–12.

- There was no requirement that CAPPS selectees be subject to any additional questioning or interview beyond the baggage control questions. *Id.* at 75:5–15.

- CAPPS selectees were "not required to undergo any additional screening of their person or their carry on baggage at the checkpoints." *Id.* at 57:9–20.

- A person's status as a CAPPS selectee did not "make any difference in how he or she was to be processed at the security checkpoint." *Id.* at 65:9–14.

- There was no FAA requirement that checkpoint screening personnel be informed of the identity of CAPPS selectees. *Id.* at 65:15–19.

Of course, on September 11, the Flight 11 terrorists were not planning to bomb the flight using

explosives contained in their checked bags.  CAPPS profiling – the only profiling that American

was permitted to engage in absent advance approval of the FAA administrator – afforded

American no actual control over the terrorists.

### 2.    The Checkpoint Screening System In Place On September 11, 2001 Did Not Give American Actual Control Over the Terrorists.

Cantor is likely to argue that American had the necessary actual control over the terrorists

because American was required to conduct checkpoint screening and could have detected and

seized the terrorists' weapons.   But that argument misunderstands both the nature of the

checkpoint screening system in place on September 11 and New York law as to what constitutes

actual control over a third-party criminal's actions.  The FAA never designed the checkpoint

screening system to be impenetrable by any type of potential weapon, and American's role in a checkpoint screening system that was not designed to detect or prohibit small cutting implements fell far short of giving American actual control over the terrorists. As the New York cases make clear, a much higher degree of control over the instrumentality of a criminal intervention still does not amount to actual control over the criminal's actions.

The pre-9/11 checkpoint security system, as designed by the FAA, did not afford American control over the Flight 11 terrorists whose primary weapons were small knives with blades under four inches long or similar small cutting or stabbing implements. American could not stop the Flight 11 terrorists from bringing such items into the sterile area for a simple reason: short-bladed knives were generally permitted in the sterile area and the security system was not designed by the FAA with the aim of detecting them.

The Deadly and Dangerous Weapons guidelines set forth in the ACSSP prohibited only knives with blades longer than four inches or illegal under local law. Barry Decl. Ex. Q, ACSSP, [5] App'x I (AAL012413). As Mr. Cammaroto testified and Cantor's experts agreed, knives with blades under four inches long – including Swiss Army knives and the Leatherman – were generally permitted inside the sterile area and onboard commercial airliners. *See* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 205:15–20; Barry Decl. Ex. D, Johnson Dep. 89:10–91:15; Barry Decl. Ex. E, Winn Dep. 338:20–24. The FAA made this policy determination even though it was aware that such knives could be used to kill people. *See* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 217:20-218:2; Barry Decl. Ex. D, Johnson Dep. 89:10–91:15.

---

[5]    All citations to the ACSSP are to American's ACSSP in effect on 9/11.

Notwithstanding this clear regulatory standard, Cantor argues that despite the FAA regulations, screeners might have exercised "common sense" to seize certain knives with blades under four inches as "menacing." The problem with Cantor's argument is that the FAA-mandated checkpoint screening system was not structured to provide assurances that such "menacing" knives would be detected, precisely because the FAA neither prohibited them nor regarded them as a high priority threat. *See* Barry Decl. Ex. R, Knives and Sharp Objects (Sept. 16, 2001) (TSA11526); Barry Decl. Ex. A, Cammaroto Dep. Vol. I 227:23–231:14 (noting that: (1) "there was no security gain to be had by shortening the length," because similar items "could be fashioned by items either on board the plane or used for items that were already on the plane;" (2) the FAA focused instead "on the high priority threat items," *e.g.*, explosives; and (3) historically shorter knives were not used in "what could be characterized as terrorist situations").

The FAA did not design the checkpoint screening system with the aim of detecting knives with blades under four inches. As of 9/11, the FAA calibrated walk-through metal detectors using the "three-gun test" standard, which was designed to ensure detection of small handguns. *See* Defs.' Mem. of Law in Support of Motion for a Determination of Applicable Law Regarding the Standard of Care § III.C.3.(a). It was not designed to detect small knives and certainly not so-called "box cutters" with plastic handles. *See* Barry Decl., Ex. S, Walk-Through Metal Detectors Calibration and Self-Certification Standards (Sept. 16, 2001) (TSA24366) (WTMDs calibrated using the present standard would likely NOT have detected the knives allegedly used in the September 11 hijackings."); *see also* Barry Decl. Ex. T, Excerpts from Lyle Malotky Dep. 61:19–65:14, Jan 7, 2011 ("Malotky Dep.") (agreeing with the foregoing), 57:21–

25 (ceramic paring knife would not have been detected), 91:11–25 (small knives with metal, like the ones used on 9/11 would likely not have been detected).

FAA-mandated screener testing also did not focus on the detection of small knives. The test objects listed in the ACSSP consisted of simulated guns, bombs and opaque objects that could be used to obscure prohibited items – it did not include knives of any kind. *See* Barry Decl. Ex. Q, ACSSP App'x VI at 1, 3 (AAL012426–28). Similarly, the Threat Image Projection System ("TIPS") that was developed by the FAA to train and test screeners and improve screener performance did not contain images of so-called box cutters or knives with blades under four inches. *See* Defs.' Memo. of Law in Support of Motion for a Determination of Applicable Law Regarding the Standard of Care § III.B.2.

The checkpoint screening system thus was clearly not designed by the FAA to afford an airline actual control over a passenger who was carrying a short-bladed knife or other cutting implement. But even more fundamentally, New York law does not equate control over a criminal's weapon with control over the criminal's actions, as the courts have made clear in case after case. In *Hanna v. St. Lawrence County*, 34 A.D.3d 1146 (3d Dep't 2006), for example, the court held that the father and brother of a felon convicted of a prior assault against the plaintiff and under house arrest in their home did not have actual control over the assailant by virtue of the fact that they allegedly provided him with the shotgun he used to shoot the plaintiff. In *McCarthy v. Olin*, the Second Circuit held that the manufacturer of the hollow tipped bullets used by the shooter did not have actual control over the shooter's rampage. 119 F.3d at 151, 156–57. In *Hamilton*, the Court of Appeals held that gun manufacturers did not have actual control over the criminals who used their guns to commit crimes. 96 N.Y.2d at 229–31, 234. If

27

making the weapon and the ammunition used by the criminal, as in *Hamilton* and *McCarthy*, and actually providing the weapon to the criminal, as in *Hanna*, are insufficient to create actual control, then as a matter of law failing to detect and confiscate the weapons used by the terrorists cannot be the equivalent of actual control over the terrorists' later actions.

### 3.   Cantor's Own Witnesses Have Acknowledged That There Is No Evidence That the Flight 11 Hijackers Acted Suspiciously On the Morning of September 11.

As Mr. Cammarato testified, there were "no behavioral recognition requirements as of 9/11." Barry Decl. Ex. A, Cammarato Dep. Vol. I 74:19–75:4. But even if there were, Cantor's experts have admitted that the Flight 11 terrorists did nothing on the morning of September 11 to remotely suggest to American's ticket agents or screeners that they were terrorists bent on transforming the plane into a weapon of mass destruction aimed at the office tower occupied by Cantor. American had no basis on which to refuse to transport the Flight 11 terrorists or subject them to any intensified screening – and thus did not exercise actual control over their actions.

In *Gaines-Tabb v. ICI Explosives USA, Inc.*, 995 F.Supp. 1304, 1318 (W.D. Okla. 1996), *aff'd*, 160 F.3d 613 (10th Cir. 1998), the court held that defendants had no duty to prevent the 1995 Oklahoma City bombing where "[p]laintiffs have not alleged and could not allege that Defendant ICI had any reason to know of the criminal propensities of customers of Mid-Kansas Cooperative Association, of the alleged perpetrators or of their intention to use Defendant ICI's product in a weapon of mass destruction, much less specifically against the Murrah Building and its occupants in Oklahoma City." *See also Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 316 (3d Cir. 1999) ("[I]t would be grossly unfair to impose a duty on defendants to anticipate and prevent" the actions of terrorists.).

Claudio Manno, the FAA's Director of Intelligence on September 11, 2001, testified that none of the Flight 11 terrorists appeared on the FAA's do not board list (sometimes called the "no fly list") or on the list of passengers who required specialized screening procedures before flying. Barry Decl. Ex. G, Manno Dep. Vol. I 247:25–248:6. Mr. Manno also confirmed that the much longer TIPOFF list of potential terrorists was never shared with the airlines before September 11. *Id.* at 266:14–19.

As Cantor's own experts testified, the Flight 11 hijackers sought to hide, rather than advertise, their connection to al Qaeda and their intent to attack the United States. Mr. Bergen agreed that based on his knowledge of al Qaeda, the hijackers would have been trained, as the 9/11 Commission Report recounted, "to avoid appearing radical . . . Atta wore western clothing and shaved his beard." Barry Decl. Ex. F, Bergen Dep. 204:18–205:10. Mr. Bergen further testified:

> Q. On the morning of September 11[th], did American's ticket counter agents have any factual information available to them that would have linked Atta or any of the other Flight 11 hijackers to al Qaeda?
>
> A. I don't know.
>
> Q. Are you aware of any indication that the Flight 11 hijackers would have given on the morning of 9/11 that would have signaled that they were affiliated with a terrorist group?
>
> A. I doubt they would have done that.

*Id.* at 209:7–17. He agreed that none of the Flight 11 hijackers had any prior criminal records that were available to the airlines on the morning of 9/11. *Id.* at 205:15–19. And when asked "[n]one of the hijackers of Flight 11 gave any indication on the morning of 9/11 of their

affiliation with al Qaeda, correct?" Mr. Bergen replied, "People tend not to wear al Qaeda t-shirts." *Id.* at 203:19–22.

Cantor's experts, Mr. Winn and Mr. Johnson, also testified that they were aware of no evidence that the Flight 11 hijackers engaged in any suspicious or disruptive behavior. *See* Barry Decl. Ex. D, Johnson Dep. 109:13–19 (testifying that he was not aware of "evidence that any of the terrorists who walked through the walk through metal detectors and checkpoint at Logan exhibited any sort of suspicious behavior that would alert a screener"); Barry Decl. Ex. E, Winn Dep. 139:3–17 (confirming that "[o]n the morning of 9/11, as Atta and the other 9/11 hijackers for Flight 11 were in the checkpoint screening line awaiting screening, . . . the checkpoint screeners [did not have] any factual information that would suggest that Atta, or any of the other flight 11 hijackers, were associated with in any way with al-Qaeda or any other terrorist group" and that he was not "aware of any evidence that Atta, or any of the other Flight 11 hijackers, engaged at the checkpoint in any disruptive or suspicious behavior."). Mr. Johnson, a former FAA official and Federal Security Director of the TSA, testified that if a passenger exhibited no suspicious or abnormal behavior, he would not be prohibited from carrying a pocket knife with a blade under four inches long into the sterile area. Barry Decl. Ex. D, Johnson Dep. 88:21–89:7.

### 4.    The Common Strategy Further Contributed to American's lack of Actual Control.

Even after the terrorists had revealed themselves by starting the hijacking, American's crew on Flight 11 was not in a position to exercise actual control over their actions. Not only were the hijackers a violent gang of five highly trained terrorists who had trained in hand-to-hand combat and practiced slaughtering sheep and camels with Swiss Army knives, but the Common Strategy, as to which all flight crews received annual training mandated by the FAA,

counseled cooperation rather than confrontation of hijackers.   As Mr. Morse, the FAA's designated witness on the Common Strategy, testified, flight crews were taught to refrain from trying to overpower the terrorists, to discourage passengers from seeking to act as heroes, to land the aircraft as soon as possible, to communicate with the authorities and to try delaying tactics. Barry Decl. Ex. H, Morse Dep. 42:18–24, 30:18–31:4, 58:16–59:6.   As the Aviation Monograph of the 9/11 Commission Staff noted, the Common Strategy offered no guidance for confronting a suicide hijacking.   Barry Decl. Ex. U, Aviation Monograph at 81 (Aug. 26, 2004).   The goal of the strategy was to "optimize actions taken by a flight crew to resolve hijackings peacefully" through systematic delay and accommodation of the hijackers. *Id.*   The FAA believed that the longer a hijacking persisted, the more likely it was to end peacefully. *Id.*   The strategy's fundamental assumptions were that hijackers issued negotiable demands, most often for asylum or the release of prisoners, and that suicide "wasn't in the game plan." *Id.*; *see also* Barry Decl. Ex. P, 9/11 Commission Report at 85.   One aviation security commentator noted, "To the extent that the politically-motivated hijacking was even considered, it was lumped with all the others whose perpetrators had no suicidal intent, and thus could arguably be talked into a safe and non-lethal surrender, given enough time and aircrew patience."   Barry Decl. Ex. U, Aviation Monograph at 81.

Former FAA Administrator Jane Garvey testified as to the relationship between the Common Strategy and the 9/11 attacks:

> The most powerful weapon that the hijackers carried on 9/11 . . . was their knowledge that our aviation system's policy was to get the passengers on the ground, and that meant negotiation, not confrontation.   We can all share some blame in hindsight for not seeing the jeopardy of the policy.   But it was developed and

31

> continued over decades as a policy that we knew from experience
> would save lives.

*Id.* at 82.

The terrorists exploited the principles underlying the Common Strategy to keep the passengers and crew of Flight 11 in check. At least three times on Flight 11 the terrorists made transmissions to air traffic control ("ATC"), apparently mistakenly believing that they were keying the microphone to make an announcement to passengers. Shortly before 8:25 a.m., an air traffic controller heard two clicks on the frequency assigned to the flight. *Id.* at 10. Five seconds later an accented voice said, "We have some planes. Just stay quiet and you'll be okay. We're returning to the airport." *Id.* A few seconds after the first transmission, the Boston ATC Center heard the same foreign voice say, "Nobody move. Everything will be okay. If you try to make any moves, you'll endanger yourselves and the airplane. Just stay quiet." *Id.* Several minutes later, Boston ATC received another transmission from Flight 11: "Nobody move please. We are going back to the airport. Don't try to make any stupid moves." *Id.* at 12. These announcements played right into the Common Strategy and were plainly intended to assure the passengers and crew that a garden-variety hijacking – presenting opportunities for negotiation and surrender – was under way. Tragically, as we now know, it was not.

American did not exercise actual control over the terrorists' actions on September 11. Under well-established New York law, American therefore did not owe any legal duty to Cantor, an unrelated party, to prevent the business interruption losses that Cantor suffered when the terrorists, in pursuit of their own fanatical ends, took over the piloting of Flight 11 and crashed it into the World Trade Center.

## II.   THE TERRORISTS' UNFORESEEABLE INTERVENTIONS BROKE ANY CHAIN OF PROXIMATE CAUSATION.

This Motion is the first opportunity for the Court to consider the issue of proximate cause. Under New York law, Cantor must establish not only that American owed a duty to Cantor Fitzgerald, but also that American's breach of duty caused Cantor's alleged damages. "Generally, there must be cause in fact, a causal tendency (that is, a 'causal link'), and proximate cause" before a defendant is held liable. *McCarthy*, 119 F.3d at 164. To be "proximate" a cause need not be the sole cause of the plaintiff's injury; on the other hand, it is a long-established principle that "[t]he law does not undertake to hold a person who is chargeable with a breach of duty toward another, with all the possible consequences of his wrongful act." *See Lowery v. W. Union Tel. Co.*, 60 N.Y. 198, 201 (1875). That principle has particular relevance here, where Cantor's theories of recovery seek to hold American 100 percent responsible for the actions of dedicated, suicidal, fanatical terrorists. In *Ventricelli v. Kinney Sys. Rent A Car, Inc.*, the New York Court of Appeals explained:

> What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. . .

45 N.Y.2d 950, 952 (1978); *see also Arcadian*, 189 F.3d at 312 ("[T]he legal bounds of duty and of proximate cause are aspects of tort law in which issues of fairness and public policy are particularly relevant.").

As with the duty analysis, Cantor is seeking an exception to a general rule that would otherwise bar its case. As the Court has previously recognized, '[g]enerally, an intervening intentional or criminal act severs the liability of the original tort-feasor." *In re Sept. 11 Litig.*, 280 F. Supp. 2d at 302; *Kush v. Buffalo*, 59 N.Y.2d 26, 33 (1983). To overcome that general rule

33

and establish proximate cause, Cantor must show that the terrorists' acts on the morning of September 11 were "reasonably foreseeable." *See Maheshwari*, 2 N.Y.3d at 295.

The record as developed through the testimony of Cantor's own expert witnesses and the FAA witnesses is irreconcilable with any contention that the September 11 attacks were foreseeable. To the contrary, the record is compelling that the attacks were unforeseeable as a matter of law, because:

- The mode of the terrorists' attack was without historical precedent;

- The consequences of the terrorists' attack were without historical precedent;

- The FAA's own intelligence unit not only failed to foresee a 9/11 type attack but lacked even an inkling that an attack like the September 11 attacks were possible and might occur; and

- Before September 11, the FAA ordered no countermeasures to deal with an attack like the September 11 attacks, instead focusing on nonsuicidal bombing as the most lethal threat to civil aviation.

### A. Under New York Law, Prior Experience Is The Key To Foreseeability.

Of course, foreseeability means considerably more than mere conceivability. Under New York law, foreseeability is defined by what is reasonably foreseeable in light of experience — not what is merely conceivable or imaginable. As the Court of Appeals has said:

> Foreseeability of risk is an essential element of a fault-based negligence cause of action because the community deems a person at fault only when the injury-producing occurrence is one that could have been anticipated. . . . Further, although virtually every untoward consequence can theoretically be foreseen with the wisdom born of the event . . . , the law draws a line between remote possibilities and those that are reasonably foreseeable because [n]o person can be expected to guard against harm from events which are . . . so unlikely to occur that the risk . . . would commonly be disregarded.

*Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583 (1997) (internal citations and quotation marks omitted).

34

The courts have emphasized the need to guard strictly against a hindsight analysis. "Whether hindsight reveals that greater precautions could have been taken to avoid the harm that eventuated is irrelevant if the injury could not reasonably have been foreseen at the moment the defendant engaged in the activity which later proves harmful." *Danielenko v. Kinney Rent A Car, Inc.*, 57 N.Y.2d 198, 204 (1982) (citation omitted). The 9/11 Commission recognized the critical distinction between foresight and hindsight:

> In composing this narrative, we have tried to remember that we write with the benefit and the handicap of hindsight. Hindsight can see the past clearly — with 20/20 vision. But the path of what happened is so brightly lit that it places everything else more deeply into shadow. Commenting on Pearl Harbor, Roberta Wohlsetter found it "much easier *after* the event to sort the relevant from the irrelevant signals. After the event, of course, a signal is always crystal clear; we can now see what disaster it was signaling since the disaster has occurred. But before the event it is obscure and pregnant with conflicting meanings."

Barry Decl. Ex. P, 9/11 Commission Report at 339.

The September 11 attacks stunned the nation and took their place as the Pearl Harbor of our era: a shocking, unprecedented sneak attack. As this Court recognized, "the acts of the September 11 terrorists that gave rise to the chain of events leading to the destruction of Con Edison's substation were unprecedented in their scope and effect." *In re Sept. 11 Litig.*, 865 F. Supp. 2d 370, 394 (S.D.N.Y. 2011).

New York courts have held that the history (or lack thereof) of prior criminal activities is highly relevant, and can be dispositive, in determining whether a particular crime intervening between the alleged negligence of the defendant and the plaintiff's injuries is foreseeable. *See, e.g., Maysonet v. KFC, Nat'l Mgmt. Co.*, 906 F.2d 929, 931 (2d Cir. 1990) ("The New York State Court of Appeals has recognized that a history of criminal activities in a building can give rise to a duty on the part of the building's owner to take reasonable steps to minimize the danger

to persons visiting it."); *accord Nallan*, 50 N.Y.2d at 519–20. But no duty arises "unless it is shown that [the defendant] either knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons . . . which is likely to endanger the safety of the [plaintiff].'" *Nallan*, 50 N.Y.2d at 519 (quoting Restatement (Second) of Torts § 344 cmt. f). In *Gross v. Empire State Bldg. Assocs.*, the court rejected the claim of a plaintiff injured by an assailant who opened fire on the Empire State Building's observation deck. 4 A.D.3d 45, 47 (1st Dep't 2004). Acknowledging that "[o]bviously, with the benefit of 20-20 hindsight, everything is foreseeable," the court found dispositive that no comparable attack had ever taken place at the Empire State Building. *Id.*; *accord Buchholz v. Trump 767 Fifth Ave., LLC*, 5 N.Y.3d 1, 9 (2005) (death of building occupant who was pushed out an unsecured window by drunk coworkers not foreseeable because there had been "no remotely similar occurrences").

Even if prior criminal acts have occurred, those prior incidents will not make a later, significantly more serious criminal incident foreseeable unless the earlier crimes were of the same order of magnitude. In *Maheshwari v. City of New York*, the Court of Appeals held that intervening criminal acts were sufficient to sever the chain of causation. There, the plaintiff – a Hare Krishna who was handing out flyers at a concert held on land owned by the City – was assaulted by four concertgoers. The Court of Appeals noted that past crimes committed at the same concert were "of a lesser degree than criminal assault, and would not lead defendants to predict that such an attack would occur or could be prevented." 2 N.Y.3d at 294; *see also In re Sept. 11 Litig.*, 865 F. Supp. 2d at 384–85 (discussing case). Similarly, in *Buckeridge v. Broadie*, 5 A.D.3d 298, 299–301 (1st Dep't 2004), the court addressed the claims of a handyman against his homeowner employer for injuries he sustained when two robbers posing as home inspectors

36

entered the house and attacked him.  The court held that the assaults were unforeseeable, even though less violent robberies had occurred at the grocery store next door.

Terrorism is inherently less foreseeable than garden variety criminal acts.  Courts have rejected the notion that scattered, prior terrorist attacks offer any basis to foresee a new one.  In two cases involving terrorist attacks in which the terrorists used fertilizer to create explosives, the district courts granted motions to dismiss (and the appellate courts unanimously affirmed the grant of such motions), concluding that, as a matter of law, the manufacturer of the fertilizer could not have foreseen that the terrorists would misuse it to create a lethal weapon.  In the first case, addressing the 1993 bombing of the World Trade Center, the court noted the historical rarity of terrorist attacks within the United States: "No jury could reasonably conclude that one accidental explosion 50 years ago, one terrorist act in this country almost 30 years ago, and scattered terrorist incidents throughout the world over the course of the last 30 years would make an incident like the World Trade Center bombing anything more than a remote or theoretical possibility." *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 991 F. Supp. 390, 402–03 (D.N.J. 1997), *aff'd*, 189 F.3d 305 (3d Cir. 1999) (applying New York and New Jersey law).

Notably, the courts in the Tenth Circuit made the same finding in connection with the Oklahoma City attack of 1995 — even though the use of fertilizer to create a bomb and wreak mass destruction had been known as a result of the World Trade Center bombing only two years earlier.  The district court still found the misuse of the defendant's product unforeseeable as a matter of law, stating:

> Plaintiffs have made numerous allegations from which it can reasonably be inferred that the possibility that criminals or terrorists might employ [ammonium nitrate fertilizer] to make an explosive or bomb and attempt to detonate it somewhere in the United States was foreseeable to Defendant.  But the Court

agrees with Defendant ICI that this is not the level of foreseeability which would permit a finding that the acts of the person or persons who bombed the Murrah Building were reasonably foreseeable to Defendant[.]

*Gaines-Tabb*, 995 F. Supp. at 1315, *aff'd*, 160 F.3d 613 (10th Cir. 1998) (applying Oklahoma law).

### B.   The September 11 Attacks Were Legally Unforeseeable Because Nothing Like Them Had Ever Occurred in the History of Civil Aviation or Terrorism.

American had no basis to reasonably foresee that an alleged breach in checkpoint screening would result in a hijacking by terrorists who were determined not to use the aircraft for transportation or as a bargaining chip, but to transform the plane itself into a cruise missile by piloting it to a selected target, because it had never happened before.   Professor Martha Crenshaw has submitted a Declaration ("Crenshaw Decl.") in connection with this Motion summarizing the history of hijackings before September 11 from the Criminal Acts against Civil Aviation, the FAA's year by year compendium of attacks on civil aviation.   The history is crystal clear:  never before September 11 had an attack occurred that featured the key elements of the September 11 attack that led to Cantor's losses.   Never before September 11 had terrorists trained to pilot commercial jets, hijacked an aircraft not to take hostages or seek the release of prisoners but to transform it into a missile directed at a selected ground target. *See* Crenshaw Decl. ¶ 10  Never before September 11 had gangs of suicidal terrorists hijacked commercial aircraft using short-bladed knives or other small cutting implements as their sole or primary weapon. *See id.*

Although Professor Crenshaw is an expert for American, Cantor's experts do not disagree with her summary of the history of prior attacks on aviation.   As Mr. Bergen testified, the losses

that took place on September 11 "were caused by crashing the planes into the building, not by the mace or pepper spray" and then elaborated:

> Q.   [Y]ou are not aware of any successful terrorist attack by al Qaeda before September 11th that inflicted significant casualties using nothing more than small knives and/or box cutters, mace or pepper spray; correct?
>
> ***
>
> A.   But the – I mean it's – the – the number of people – when you say significant casualties, it wasn't – the knife attacks didn't cause significant casualties.   It was the – what happened afterwards.
>
> Q.   It was the fact that the pilots were able to use the planes themselves as weapons against a selected target on the ground; correct?
>
> A.   Correct.

Barry Decl. Ex. F, Bergen Dep. 103:3–18.

An ordinary hijacking of Flight 11 would not have caused any losses to Cantor; Cantor was not a passenger on Flight 11 and the World Trade Center was not on Flight 11's original flight path from Boston to Los Angeles, but hundreds of miles away.   As Mr. Bergen notes, Cantor's losses resulted from the fact that the hijackers took over the piloting of the plane and deliberately crashed it into the World Trade Center.   But Cantor's expert, Professor Zegart, acknowledged that it was precisely the unprecedented elements of the September 11 hijacking that led to Cantor's losses.   As Professor Zegart testified:

- Before September 11, there had never been a violent terrorist hijacking in the United States. Barry Decl. Ex. I, Zegart Dep. 30:9–22; *see also* Barry Decl. Ex. E, Winn Dep.160:15–22.

- Before September 11, there had never been a hijacking in which the hijackers themselves had the ability to pilot a commercial jet.   Barry Decl. Ex. I, Zegart Dep. 32:18–33:8; *see also* Barry Decl. Ex. E, Winn Dep. 163:7–14.

- The September 11 hijackings were the first in history in which the hijackers had no demands for negotiation.  Barry Decl. Ex. I, Zegart Dep. 34:15–20.

- Before September 11, there had never been a violent, terrorist hijacking in which the terrorists' principal weapons were small knives and mace, or pepper spray; Indian Airlines Flight 814 is the only prior terrorist hijacking involving a knife (which may have been a long bladed knife) and there the hijackers also had pistols and grenades.  Barry Decl. Ex. I, Zegart Dep. 31:21–32:17; *see also* Barry Decl. Ex. E,  Winn Dep. 160:23–163:6, 163:15–19.

The history of hijackings up until September 11, 2001 may have made it foreseeable that the terrorists would hold hostages, injure or kill persons on board, or damage the plane, but nothing that had occurred before September 11, 2001 warned American that a hijacker would deliberately pilot the hijacked aircraft at a target chosen by the terrorists precisely to maximize the economic damage that resulted.  Crenshaw Decl. ¶¶ 10, 32.  As a matter of New York law, events without historical precedent – and particularly events that are so startling as to throw a nation into a collective state of shock – are by definition unforeseeable.  Yet without these unique and unforeseeable elements, the 9/11 terrorist attacks could have caused no harm to Cantor.

The history of terrorist attacks against the United States similarly offered  no precedent for the September 11 attacks.  As Mr. Manno, the FAA's Director of Intelligence on September 11, testified, before September 11 there had never been a violent terrorist hijacking inside the United States.  Barry Decl. Ex. G, Manno Dep. Vol. I 35:25–36:7.  Indeed, there had been no hijackings at all in the United States in the ten years before September 11.  *Id.* at 36:8–13.  And, as Mr. Manno testified, every major terrorist attack or planned terrorist attack against United States interests, domestic or foreign, in the 15 years before September 11 involved the actual or planned use of some form of explosives.  *Id.* at 38:11–39:9; *see also* Crenshaw Decl. ¶¶ 23–26.

Cantor's expert Peter Bergen listed a series of planned or executed attacks by al Qaeda against the United States before September 11 which he opined demonstrated al Qaeda's capabilities before September 11. *See* Barry Decl. Ex. J, Bergen Report ¶¶ 55–59. Every single one involved a bombing:

- The 1993 World Trade Center bombing; Barry Decl. Ex. J, Bergen Report ¶ 56; Barry Decl. Ex. F, Bergen Dep. 165:6–17.

- The plot to bomb the UN Headquarters and the Holland and Lincoln Tunnels; Barry Decl. Ex. J, Bergen Report ¶ 57; Barry Decl. Ex. F, Bergen Dep. 165:6–17.

- The suicide bombings of the U.S. embassies in Dar es Salaam and Nairobi; Barry Decl. Ex. J, Bergen Report ¶ 17; Barry Decl. Ex. F, Bergen Dep. 106:10–25.

- The so-called Bojinka plot to explode U.S. airliners over the Pacific simultaneously; Barry Decl. Ex. J, Bergen Report ¶ 20; Barry Decl. Ex. F, Bergen Dep. 107:2–4.

- The unsuccessful plot to bomb the USS Sullivans in Aden, Yemen; Barry Decl. Ex. J, Bergen Report ¶ 21; Barry Decl. Ex. F, Bergen Dep. 111:12–25.

- The bombing of the U.S.S. Cole; Barry Decl. Ex. J, Bergen Report ¶ 59; Barry Decl. Ex. F, Bergen Dep. 111:12–25.

- The unsuccessful Millennium plot to plant a bomb in the public area of LAX; Barry Decl. Ex. J, Bergen Report ¶¶ 23, 26; Barry Decl. Ex. F, Bergen Dep. 112:5–12;

As Mr. Bergen acknowledged:

> Q.    None involved a suicidal hijacking by – and again we're talking about none of the plots or attacks you outline in paragraphs 55 to 59 of your report involved a suicidal hijacking by trained pilots armed with small knives and mace or pepper spray, or the use of aircraft as missiles against chosen targets?
>
>                                *** 
>
> A.    That's correct. But I will say if you – in paragraph 78, that what became 9/11 involved a mix of the tactical elements and targeting of the first World Trade Center attack in '93 in which – in which Ramzi Yousef planned to bring down the Twin Towers,

the Bojinka Plan, the Embassy bombings in Africa, and the Cole bombing.

Q       And all of these, again, were explosives?

A.      That's correct.  Just to pick up on that, in a sense the planes themselves became an explosive device on 9/11.

Q.      Which had never happened previously, correct?

A.      Right.

Barry Decl. Ex. F, Bergen Dep. 168:2–25.

Mr. Bergen himself was aware of an increasing threat of an al Qaeda attack in the summer of 2001.  Nonetheless, the September 11 attacks came as an "utter surprise" to him because their "modality" was, he admits, not within the category of information conveyed by prior al Qaeda attacks or, for that matter, by information provided by the FAA to American before September 11.  Barry Decl. Ex. J, Bergen Report ¶ 91; Barry Decl. Ex. F, Bergen Dep. 184:19–185:10, 186:4–187:4.  Indeed, Mr. Bergen wrote a letter to the New York Times foreign correspondent in August 2001 expressing his view that an al Qaeda attack was imminent.  The letter serves as a snapshot of what Mr. Bergen himself viewed as the likely prospects of an al Qaeda attack shortly before September 11.  The letter highlighted "very strong indications on U.S. targets in Yemen," the arrest of two men in New Delhi who planned to blow up the visa section of the U.S. embassy, and a possible bombing of the U.S. embassy in Bangladesh.  It noted that the U.S. State Department had warned that "individuals may be planning imminent terrorist actions against U.S. interests in the Arabian Peninsula."  The full text of the letter is attached as Exhibit V to the Barry Declaration.  As the Court can see, every reference in the

letter to any specific form of attack is to a bombing and all of the specific references to geography refer to an attack on U.S. interests overseas.

### C.  The September 11 Attacks Caused Unforeseeable, Unprecedented Consequences.

In addition to lacking any historical precedent for the tactics employed, the September 11 attacks were unprecedented in the extraordinary consequences that they caused, including the collapse of Tower One of the World Trade Center, which housed Cantor's offices.  The magnitude of the property damage and business losses – as well as the loss of life – that was caused by the September 11 attacks was indisputably unprecedented.

As this Court has recognized, "if [a] duty's breach leads to a harm far beyond the contemplated set, the harm is considered unforeseeable[.]"  *In re Sept. 11 Litig.*, 594 F. Supp. 2d 374, 381 (S.D.N.Y. 2009).  "[N]o liability will result when the occurrence is not one that is normally associated with such hazards."  *Di Ponzio*, 89 N.Y.2d at 584.  Here, even if the terrorists' actions were foreseeable, their consequences were not.  *See, e.g., Hamilton*, 96 N.Y.2d at 232–33 (expressing concern about potential for limitless liability for the acts of another); *In re N.Y.C. Asbestos Litig.*, 5 N.Y.3d at 493–94 (same).

Moreover, the September 11 terrorist attacks were not just criminal or terrorist acts; they were acts of war against the United States.  This Court – following the lead of Presidents Bush and Obama, Congress, NATO and the Supreme Court – concluded that the attacks were different in kind from all past terrorist attacks and constituted acts of war within the meaning of CERCLA, reasoning that:

> But nothing in the cases approaches the catastrophe of 9/11, nor was the Popular Front for the Liberation of Palestine equal in organizational scope or destructive intent to al Qaeda, nor was the

> destruction of an airplane at an airport by that group the equivalent of the destruction of the World Trade Center and the damage to the Pentagon.  Al Qaeda launched an attack on the most important commercial and political symbols of the United States—an attack that Congress and the President treated as an act of war against the United States. The events of September 11 were unique, and Congress, the President, and the American public treated 9/11 as unique.

931 F. Supp. 2d at 508.  Cantor's expert, Mr. Bergen, agreed.  He wrote a book entitled "Holy War, Inc." that described what he characterized as Osama bin Laden and al Qaeda's war against the United States. *See* Barry Decl. Ex. K, *Holy War, Inc.* at 227.   When asked if the September 11 attacks were part of that war, he responded immediately, "Yes of course."  Barry Decl. Ex. F, Bergen Dep. 24:10–13.

As the Court's act of war decision recounted, the depravity and destructiveness of the attacks were unprecedented.  Before September 11, 2001, an attack such as occurred that tragic day and the massive property damage and business interruption that resulted could only be characterized as no more than a "remote or theoretical possibility." *Arcadian*, 991 F. Supp. at 403.

In an earlier era, a New York federal court concluded that an escalation over previous hostilities was unforeseeable when plaintiffs sued the Cunard Shipping Line for damages, including the loss of 1,200 lives, that resulted from the torpedoing of The Lusitania by German submarines. *The Lusitania*, 251 F. 715, 717 (S.D.N.Y. 1918).  Plaintiffs there alleged that the shipping line was negligent for traveling through a war zone on the way from New York to Liverpool and for failing to take certain officially-recommended precautions to avoid attack. *Id.* at 727–29.  Even though there had been explicit warnings from the German government that

enemy merchant ships passing through certain waters would be destroyed, the court dismissed all

claims against the steamship company, finding:

> It is, of course, easy now, in the light of many later events, added to preceding
> acts, to look back and say that the Cunard Line and its captain should have known
> that the German government would authorize or permit so shocking a breach of
> international law and so foul an offense, not only against an enemy, but as well
> against peaceful citizens of a then friendly nation. But the unexpected character
> of the act was best evidenced by the horror which it excited in the minds and
> hearts of the American people. The fault, therefore, must be laid upon those who
> are responsible for the sinking of the vessel, in the legal as well as moral sense.

*Id.* at 736. Here, too, it would belittle the malevolence of the terrorists' unprecedented act to

hold that American could have or should have foreseen it, and would denigrate the responsibility

of the attackers to hold that American is responsible for the business interruption that Cantor

suffered due to the massive property damage that the terrorists intentionally wrought.

> **D.     The September 11 Attacks Were Legally Unforeseeable Because the FAA Did
> Not Foresee Them And Did Not Prescribe Any Countermeasures Designed
> To Address Them.**

Cantor admits that it has not identified any information provided or available to

American that was not equally available to the FAA. Barry Decl. Ex. F, Bergen Dep. 181:6–9.

Indeed, the FAA had access to much more intelligence than American, a private commercial

party. Unlike American, the FAA had direct access to aviation-related intelligence information

from the FBI, the CIA, and other U.S. intelligence agencies, and would work with the FBI and

CIA to analyze and evaluate the intelligence that was relevant to civil aviation. *See* Barry Decl.

Ex. G, Manno Dep. Vol. I 59:6–60:2. As Cantor's expert Professor Zegart admitted, American's

access to information was entirely derivative of the FAA's. Barry Decl. Ex. I, Zegart Dep. 25:8–

24. Moreover, the FAA was statutorily charged both with assessing the threats to civil aviation

and prescribing the countermeasures to meet those threats. *See* 49 U.S.C. § 44904(a) (2000). But

the FAA which received – indeed, in the vast majority of the instances, authored – the information that Cantor argues made the September 11 attacks foreseeable did not itself foresee the September 11 attacks and took no countermeasures directed at a September 11 type attack. Indeed, even after the attacks had taken place, the FAA described them as "unthinkable." *See* Berry Decl. Ex. W, Criminal Acts Against Civil Aviation 2001, at 1.

In a highly regulated industry such as aviation, what is objectively foreseeable must be measured by what is foreseeable (and foreseen) by the FAA. *See Sampaio v. Atlantic-Heydt, LLC*, 294 F. Supp. 2d 466, 471–72 (S.D.N.Y. 2003); *Eiseman v. New York*, 70 N.Y.2d 175, 191 (1987) (refusing to hold defendant "to a higher duty than society's experts"). Before September 11, 2001, the FAA exercised exclusive regulatory authority over aviation security and over the assessment of threats to civil aviation. *See* Statement of Facts, *supra*, at 11. In this statutory and regulatory context, Justice Cardozo's famous *Palsgraf* formulation has a particular application: the risk to be perceived **by the FAA** defines the duty to be obeyed, as mandated **by the FAA** in the form of required countermeasures contained in the detailed federal regulations. *See Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341–44 (1928). Cantor cannot dispute the consistent testimony of senior FAA officials: the FAA never perceived the risk of a September 11-type attack and never prescribed countermeasures designed to address that type of an attack. *See* Barry Decl. Ex. G, Manno Dep. Vol. I 125:15–126:3, 126:16–127:13.

The Court asked in 2003 "[w]hat dangers were perceived by those establishing the procedures for screening and the coverage for such procedures, with regard to all those who had access to, or would come aboard, passenger airplanes?" *In re Sept. 11 Litig.*, 2003 WL 22251325, at *3. The FAA witnesses and Cantor's experts all agree on the answer to that

question. The FAA identified bombing attacks as the most serious threat to civil aviation before September 11 (with a particular emphasis on non-suicidal bombing attacks) and issued numerous Information Circulars alerting Defendants to the possibility of an explosives attack, particularly an attack using improvised explosive devices. *See, e.g.*, Barry Decl. Ex. X, Information Circular, IC-2000-10 (Nov. 29, 2000) at 1 (warning that FAA "continue[s] to receive information that a Middle Eastern group may be planning to launch a campaign of placing improvised explosive devices (IEDs) on aircraft") (AAL011939–41); Barry Decl. Ex. Y, Information Circular IC-2001-04A (July 31, 2001) at 3 (warning that some active terrorist groups "have the capability to construct sophisticated IEDs concealed") (AAL011974–76); *see also* Barry Decl. Ex. G, Manno Dep. Vol. I 44:6–12 (before September 11, 2001, FAA considered non-suicidal bombings a greater threat domestically than any type of suicide bombing). Cantor's own expert, Mr. Johnson, fully agreed that the FAA had identified nonsuicide bombing as the most serious threat to civil aviation. Barry Decl. Ex. D, Johnson Dep. 175:4–176:20, 210:16–211:6.

Moreover, the FAA regarded the terrorist threat as located primarily overseas, *see* Manno Dep. Vol. I 110:5–111:3, and in July 2001 issued an Information Circular warning of the potential "for Middle Eastern terrorist groups or individuals to conduct terrorist operations against U.S. interests, particularly on the Arabian Peninsula and/or in Israel." Barry Decl. Ex. Y, IC-2001-04A (AAL011974); *see also* Barry Decl. Ex. G, Manno Dep. Vol. I 63:19–64:5 (Information Circulars issued in 2000 and 2001, before September 11, 2001, had a heavier focus on overseas terrorist threats than on domestic terrorist threats). Once again, Cantor's own experts agreed: Mr. Bergen and Professor Zegart both testified that the indications leading up to

September 11 were that an overseas attack was more likely.  Barry Decl. Ex. F, Bergen Dep. 133:11–16; Barry Decl. Ex. I, Zegart Dep. 44:17–24.

Of course, the FAA could not warn Defendants of an eventuality of which the agency itself was unaware.  The same July 31, 2001 Information Circular noted that the FAA "does not have any credible information regarding specific plans by terrorist groups to attack U.S. civil aviation interests."  Barry Decl. Ex. Y, IC-2001-04A (AAL011975); *see also* Barry Decl. Ex. G, Manno Dep. Vol. I 54:6–55:11.  The FAA regarded hijacking as a much lesser threat than bombing.  *See id.* at 58:10–59:5  Indeed, in 2001 the FAA advised American and the other U.S. airlines that the prospect for a domestic hijacking was remote.  In a security briefing to the airlines in the Spring of 2001, Patrick McDonnell, Director of FAA's Office of Civil Aviation Security Intelligence, advised that: "Considering everything, we assess that a terrorist hijacking of a U.S. airliner is more likely to occur overseas than in the United States."  Barry Decl. Ex. Z, Report accompanying slide presentation prepared by Patrick McDonnell ("McDonnell Report") at 10.  While the McDonnell Report stated that "[i]f . . . the intent of the hijackers is not to exchange hostages for prisoners but to commit suicide **in a spectacular explosion**, a domestic hijacking would probably be preferable," it immediately went on to expressly disavow even this bombing scenario as a realistic prospect: "Fortunately, we have no indication that any group is currently thinking in that direction."  *Id.* (emphasis added); *see also* Barry Decl. Ex. G, Manno Dep. Vol. I at 112:13–116:3;  Barry Decl. Ex. AA, Excerpts from Claudio Manno Dep. Vol. II 472:6–17, June 10, 2009 ("Manno Dep. Vol. II").

The FAA prescribed countermeasures that were consistent with its view that attacks on civil aviation were likely to take the form of a bombing.  The FAA mandated X-ray inspections

of all carry-on items at all airports, random and continual searching of carry-on bags with explosive trace detection equipment at the checkpoints at major airports such as Logan, and CTX screening of the checked bags of CAPPS selectees. It tested screeners on their ability to recognize the components of explosive devices and order retraining of screeners who failed to detect those items. These measures, of course, were aimed at reducing the risk of a bombing but had no effect at all on the September 11 terrorists.

In contrast to its recognition of the bombing threat and adoption of countermeasures to address it, the FAA never foresaw the risk of an attack in which suicidal pilot hijackers armed principally or solely with small knives would take over the piloting of a plane and crash it into a target on the ground. Barry Decl. Ex. G, Manno Dep. Vol. I 144:16–146:2 (confirming that the FAA had no credible intelligence that suggested al-Queda pilots were: (1) in the United States; (2) planning to hijack airplanes with short-bladed knives; and (3) planning to "crash them into previously selected ground targets"). Moreover, the FAA prescribed no countermeasures designed to address such a threat. *See id.* at 124:12–21, 125:15–126:3; *see also* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 22:3–17, 24:11–25:11. All of the FAA's communications to American regarding the terrorist threat before September 11, 2001 reflected the FAA's historical experience and its expert analysis of classified intelligence reports regularly reviewed from the FBI and the CIA. None warned of an attack remotely resembling those that occurred on September 11, 2001. *See* Barry Decl. Ex. G, Manno Dep. Vol. I 66:5–67:19, 158:10–25 (confirming that prior to 9/11 the FAA issued no ICs cautioning that al Qaeda planned to use planes as weapons to pilot into ground targets), 202:3–11 (FAA did not issue warnings to airlines that al Qaeda was recruiting commercial pilots at terrorists). Mr. Manno testified that prior to

September 11, 2001, no one at the FAA had ever seen any information from the FBI, CIA or other agencies of the intelligence community that "would point us to the conclusion that aircraft would be used as a weapon of mass destruction, the aircraft itself." Barry Decl. Ex. G, Manno Dep. Vol. I 73:5–11, 107:14–108:23 (confirming that FAA had never received "any reliable reporting to indicate [that] the hijackers [of Air France Flight 8689] had the ability to direct the flight into a specific target"), 72:6–73:11 (confirming 9/11 commission report testimony that the FAA did not foresee terrorists using the aircraft itself as a weapon of mass destruction), 73:20–75:11 (same), 108:24–109:16 (confirming that he is unaware "of any pre-9/11 terrorist incident anywhere in the world in which terrorists posing as passengers hijacked a commercial passenger and proceeded to fly the plane themselves"), 148:13–149:4 (confirming that there had never been a terrorist incident anywhere in the world prior to 9/11 in which a hijacked aircraft had ben crashed into ground targets); Barry Decl. Ex. AA, Manno Dep. Vol. II 462:11–463:8 (confirming testimony that there was no "specific and credible" information about a suicidal hijacking prior to 9/11); Barry Decl. Ex. BB, Facsimile attaching FAA/TSA Rebuttal to Portions of Joint Staff Statement, April 27, 2004 (UAL042365–66).

Thus, although Cantor attempts to point to documents from the FAA, including various Information Circulars and a CD-ROM presentation from Patrick McDonnell (discussed above) as evidence that the FAA warned American of the risk of the September 11 attacks, the FAA itself – the very source of the information – never concluded that an attack like the September 11 attack was a realistic possibility. Barry Decl. Ex. G, Manno Dep. Vol. I 79:11–87:25 (confirming that a 9/11 type attack was not among the FAA list of twenty-four possible terrorist scenarios the FAA contemplated); Barry Decl. Ex. AA, Manno Dep. Vol. II 465:13–466:7

50

(confirming that, while it was conceived that a terrorist might destroy a plane in mid-air with explosives, it was not conceived that the airplane itself would be used in an attack).

In late 1999, the FAA undertook a comprehensive evaluation of the terrorist threat. The FAA considered twenty-four scenarios involving possible terrorist attacks on aviation. *See* Barry Decl. Ex. CC, FAA Director of Civil Aviation Security Intelligence, *Threat Ratings by Modus Operandi* (Oct. 26, 1999) ("*Threat Ratings by Modus Operandi*"). Not one concerned the possibility of a hijacker piloting the aircraft and attacking a selected target, even though the FAA was extending its consideration to what it considered remote possibilities of attack. *See id.*; Barry Decl. Ex. G, Manno Dep. Vol. I 82:14–20. The FAA rated any scenario involving the suicide of the terrorist (other than a truck bombing at the airport) in the "least likely" category of terrorist attacks. *See id.* at 84:11–16. Even when the FAA mentioned the possibility of a suicide terrorist attack on aviation, it conceived of the attack as a bombing. *See* Barry Decl. Ex. CC, *Threat Ratings by Modus Operandi*; Barry Decl. Ex. G, Manno Dep. Vol. I 83:16–84:16.

Moreover, the FAA did not envision the necessary prerequisites for the transformation of an aircraft into an offensive weapon that could be used to attack targets such as the World Trade Center to be within the terrorists' capabilities. Critically, the FAA never foresaw that the terrorists would train as commercial jet pilots for the purpose of taking over the controls of the plane in order to crash it into a desired target. Barry Decl. Ex. G, Manno Dep. Vol. I 144:16–146:2 (confirming that the FAA had no credible intelligence that suggested al-Qaeda pilots were: (1) in the United States; (2) planning to hijack airplanes with short-bladed knives; and (3) planning to "crash them into previously selected ground targets"), 148:13–149:4 (confirming that there had never been a terrorist incident anywhere in the world prior to 9/11 in which a hijacked

aircraft was crashed into ground targets). In fact, neither the FAA nor American had knowledge of the few hints in possession of the government intelligence agencies that suggested that anything like the September 11 attacks might be possible. Neither the FAA nor American was aware that there was an "inordinate number" of Middle Eastern men "of investigative interest" due to their suspected ties to Islamic terrorism attending flight schools in the United States. *See* Barry Decl. Ex. G, Manno Dep. Vol. I 180:20–181:15 (FAA unaware of the "Phoenix Memo" until after September 11, 2001 terrorist attacks); Barry Decl. Ex. DD, FBI Memorandum, *Zakaria Mustapha Soubra; IT – Other* (*Islamic Army of the Caucasus*) (July 10, 2001) ("Phoenix Memo"). The FAA knew that al Qaeda had some pilots who transported cargo, but never contemplated that terrorist operatives might be pilots or that al Qaeda was actively training pilots in the United States to fly commercial jets. *See* Barry Decl. Ex. G, Manno Dep. Vol. I 165:25–167:19. American was never advised of the arrest of Zacarias Moussaoui, a Middle Eastern extremist who was attending flight school in Minnesota, and the FAA received only limited information regarding Moussaoui's arrest. *See id.* at 155:12–156:25, 169:15–175:14. Cantor's own expert, Professor Zegart, has characterized these failures of the intelligence agencies to share information with the FAA as "missed opportunities" and agrees with the conclusion of the Congressional committees that investigated the September 11 attacks that "the intelligence community's fragmentation, inability to set priorities, poor human intelligence capabilities, and information sharing deficiencies created a dysfunctional intelligence apparatus that was incapable of penetrating the al Qaeda plot or capitalizing on opportunities to disrupt it." Barry Decl. Ex. I, Zegart Dep. 40:9–41:21; Barry Decl. Ex. EE, Excerpt from Amy Zegart, *Spying Blind* 39, 160–62 (2007) (PDF_CANTOR0214230–557).

The FAA had no specific or credible intelligence regarding when, where and how the September 11 attacks might take place. As Mr. Manno testified, the FAA and intelligence community threat assessments concluded that al Qaeda might attack almost any U.S. target of interest: a government building, a nuclear power plant, a mall, or a commercial landmark. Mr. Manno acknowledged that before September 11, 2001, the Department of Transportation had identified "an extraordinar[il]y large range of targets for terrorist attack" including:

> National symbols such as the White House and the symbols of U.S. capitalism such as Wall Street, critical infrastructure such as power grids, communication switches, water facilities – and transportation and transportation infrastructure, including subway systems, trains, buses, commercial aviation, cruise lines and petroleum pipelines and places where large numbers of people congregate, such as large office buildings, shopping centers, sports arenas, airports and other transportation terminals.

Barry Decl. Ex. AA, Manno Dep. Vol. II 585:2–21; *see also* Barry Decl. Ex. FF, Dep't of Transp. Office of Intelligence and Security, *Terrorist Threat Overview for the United States* (2001) ("*Terrorist Threat Overview for the United States*") at 6 (AAL021018–27, AAL021023). As Mr. Manno testified, as of September 10, 2001, no more was known – to American or even to the FAA – than that Osama bin Ladin and al Qaeda might attack anywhere, anytime, anyhow. Barry Decl. Ex. G, Manno Dep. Vol. I 146:10–22.

In the absence of any credible threat information forecasting a specific attack, the FAA based its countermeasures on trend assessments. *See* Barry Decl. Ex. AA, Manno Dep. Vol. II 580:23–582:2. It is impossible to characterize the September 11 attacks as part of a trend: nothing remotely resembling them had ever occurred before. As Mr. Manno testified:

> Q.    Did you as the director of the FAA's Office of Intelligence have any factual basis for anticipating on September 10, 2001 that gangs of armed terrorists . . . armed only with short-bladed knives and capable of piloting the

plane themselves, would hijack multiple commercial passenger jets and deliberately crash them in the previously selected ground targets?

                                        ***

A.      We had no intelligence, specific and credible intelligence that said that.

Q.      Did you have any inkling on September 10, 2001, that this type of attack I just described was in the offing?

                                        ***

A.      No.

Barry Decl. Ex. G, Manno Dep. Vol. I 145:10–146:9.

Perhaps the clearest indication that the FAA never foresaw the threat of a 9/11 attack – involving suicidal pilot terrorists with the ability to crash the plane into a ground target of their choosing hundreds of miles off the airlines' flight path – is that the FAA did not adopt a single countermeasure designed to thwart such an attack. The FAA was statutorily charged not just with assessing the terrorist threat but with prescribing countermeasures that are effective to meet that threat. *See* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 194:20–197:11; Barry Decl. Ex. H, Morse Dep. 167:19–168:25; Barry Decl. Ex. G, Manno Dep. Vol. I 122:6–123:13. In crafting countermeasures, the FAA has to prioritize among threats. *See* Barry Decl. Ex. G, Manno Dep. Vol. I 128:8–19, 139:10–140:9; *see also* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 228:23–230:12. There are simply too many theoretical threat possibilities for any security system to guard against; therefore, the FAA is forced to reserve its countermeasures for those threats that are viewed as both most serious and most realistic. Cantor's experts agreed that the FAA had to prioritize among threats. Barry Decl. Ex. I, Zegart Dep. 26:2–24 (confirming that "it is not possible to fashion countermeasures against every conceivable threat").

54

A review of the FAA's countermeasures before September 11, 2001 is thus illuminating. The FAA did not prescribe a single countermeasure to address the possibility of a suicidal attack by hijackers trained as pilots. *See* Barry Decl. Ex. G, Manno Dep. Vol. I 125:15–126:3; Barry Decl. Ex. H, Morse Dep. 124:12–21; *see also* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 22:3–17, 24:11–25:11.   Instead, the FAA focused its countermeasures on the threat that had historically proven the most likely and the most lethal – bombings.   Barry Decl. Ex. A, Cammaroto Dep. Vol. I 22:3–17, 24:11–25:11, 79:23–80:12; Barry Decl. Ex. G, Manno Dep. Vol. I 119:8–23; Barry Decl. Ex. D, Johnson Dep. 182:19–183:17.   As Mr. Manno testified, every single planned or actual terrorist attack on U.S. interests in the 15 years before September 11, 2001 had involved a bombing.[6]  Barry Decl. Ex. G, Manno Dep. Vol. I 35:17–39:9. Unfortunately, countermeasures designed to meet a bombing threat are singularly ill-suited to prevent an attack like the September 11 attacks.

First and foremost, efforts to counter a bombing attack focus on a search for a bomb. *See* Barry Decl. Ex. I, Zegart Dep. 36:10–22.  To that end, the FAA introduced advanced explosives detection equipment and mandated training that taught screeners to recognize bombs and their component parts.   Barry Decl. Ex. G, Manno Dep. Vol. I 119:8–120:6; ACSSP at 134–35 (AAL012357–58).  Cantor's expert, Mr. Johnson, described the millions of dollars that the FAA expended to enhance explosives detection.  Barry Decl. Ex. D, Johnson Dep. 23:24–24:11.

---

[6]   During the fifteen years before September 11, 2001, planned or actual terrorist attacks against U.S. interests included the following: the 1988 Pam Am Flight 103 bombing; the 1993 bombing of the World Trade Center; the 1995 Oklahoma City bombing; the so-called Bojinka bomb plot in 1995; the 1998 Tanzania and Nairobi embassy bombings; the so-called Millennium bomb plot; and the 2000 explosives attack on the USS Cole. Manno Dep. Vol. I 34:20–39:9.

These types of countermeasures, however, have no effect on a terrorist plot that does not depend on explosives. Cantor's expert, Mr. Johnson, actually identified himself as the person with responsibility for the direction of countermeasures at the FAA on September 11, 2001 and testified that the FAA made no changes to the countermeasures in place before September 11 based on the information that Cantor claims warned American to take enhanced precautions. *Id.* at 181:2–183:17, 185:3–190:3. The system remained focused on the same primary threat: explosives. *See id.* at 72:3–7, 105:17–23.

Further, assuming that a nonsuicide attack is most likely leads to a focus on checked bags rather than carry-on bags. In keeping with its threat assessment, in the years leading up to September 11, 2001, the FAA introduced CTX machines capable of advanced screening of checked luggage and explosive detection equipment for screening of both checked and carry-on luggage. CAPPS, as described more fully above, limited secondary screening of selectees to their checked luggage. *See* Barry Decl. Ex. A, Cammaroto Dep. Vol. I 22:3–17, 60:6–63:24; Barry Decl. Ex. Q, ACSSP VII.B (AAL012305–06); Barry Decl. GG, Security Directive, SD-97-01 (Oct. 27, 1997); Barry Decl. Ex. E, Winn Dep. 140:17–25.

As to hijackings (which the FAA perceived as a much lesser threat than bombings, particularly domestically), the FAA prescribed countermeasures consistent with its assumption that hijackers were non-suicidal, not trained as pilots, and would bargain for an objective such as transport or release of prisoners. *See* Barry Decl. Ex. H, Morse Dep. 124:12–21, 298:9–299:13. In particular, the FAA-mandated Common Strategy, which required cooperation and accommodation of hijackers' demands, was not remotely designed for a scenario in which the hijacker's intention is to pilot the plane in a suicidal attack into a pre-selected ground target. *See*

Barry Decl. Ex. H, Morse Dep. 30:18–31:25, 298:9–299:13 ("[T]he [C]ommon [S]trategy as it was before 9/11 contemplated that the hijackers wanted an intact aircraft that was able to fly. And even the ones that were willing to die for the cause, weren't interested in dying for nothing, and to our knowledge weren't intending to use the aircraft to attack ground targets. . . . [O]ur model basically didn't include someone that got on there for the sole purpose of a 9/11 type attack."). Once again, Cantor's expert fully agreed: Mr. Winn testified that the Common Strategy presumes that the pilot remains in control of the plane and is ineffectual against a September 11-type hijacking. Barry Decl. Ex. E, Winn Dep. 207:8–12 ("The common strategy was not designed [to deal with a] suicidal pilot.").

As a matter of law, the September 11 attacks constituted an unforeseeable intervening cause of the business interruption losses Cantor claims. The attacks were novel in their tactics, unprecedented in their consequences, unforeseen by the FAA and beyond the class of risk that the FAA-mandated countermeasures were designed to address.

Prior to September 11, a hostage-taking hijacking might have been realistically foreseeable; an al Qaeda attack utilizing explosives might have been realistically foreseeable. But the 9/11 type of hijacking, involving suicidal pilots who flew the plane themselves and deliberately crashed it into preselected ground targets was not in any sense reasonably or realistically foreseeable. Nothing in the history of civil aviation nor in the intelligence information and assessments of the FAA provided any inkling of the type of attack that occurred on September 11. Moreover, it was the most unique aspects of the September 11 attacks — the ones for which the FAA prescribed no countermeasures — that caused Cantor's damages. An ordinary hostage-taking hijacking would not have resulted in injuries to Cantor. Even a bombing

of Flight 11 would not have resulted in any harm to Cantor, which was located several hundred miles off the planned flight path.   The damage that Cantor suffered was the result of unforeseeable, unprecedented innovations by the terrorists that severed any chain of proximate causation.

## CONCLUSION

Defendants' Motion for Summary Judgment dismissing all Plaintiffs' claims for lack of duty and proximate cause should be granted in all respects.

Dated: New York, New York
       October 25, 2013

                                    Respectfully submitted,

                                    CONDON & FORSYTH LLP

                                    By:_____
                                        Desmond T. Barry, Jr. (DB 8066)
                                    7 Times Square
                                    New York, NY  10036
                                    Telephone:  (212) 490-9100
                                    Fax:  (212) 370-4453
                                    dbarry@condonlaw.com

                                        -and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000
Fax: (212) 909-6836
repodesta@debevoise.com
mkmonagh@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

*Of Counsel:*

John T. Pierpont, Jr.
Wendy Reilly
Johanna N. Skrzypczyk
Jacob Stahl
DEBEVOISE & PLIMPTON LLP

59