UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

IN RE SEPTEMBER 11 LITIGATION   :

------------------------------------------------------------ x

WORLD TRADE CENTER PROPS. LLC, 1 :
WORLD TRADE CENTER LLC, 2 WORLD :
TRADE CENTER LLC, 3 WORLD TRADE :
CENTER LLC, and 4 WORLD TRADE CENTER :
LLC,

                  Plaintiffs,

   -against-

CERTAIN UNDERWRITERS AT LLOYD'S,   :
LONDON SYNIDICATES NUMBERED 1212,
79, 2791, QBE INSURANCE (EUROPE) LTD.
f/k/a QBE INTERNATIONAL INSURANCE
LTD.,

                  Defendants.

------------------------------------------------------------ X

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

21 MC 101 (AKH)

10 Civ. 1642 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

       This is a contest between insurers and insureds for a portion of a settlement ending subrogation litigation. It is the last case before me dealing with the massive property losses caused by the terrorist attacks of September 11, 2001. Plaintiffs, the insureds, are owners of the long-term leases of the World Trade Center Properties.[1] Plaintiffs settled with their insurers[2] for their loss, and also made a settlement with the tortfeasors (the "Aviation

---

[1] Plaintiffs include World Trade Center Props. LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC (collectively "Plaintiffs").

[2] The insurers are QBE Insurance (Europe) LTD, Certain Underwriters at Lloyd's, and London Syndicates Numbered 1212, 79, and 2791 (collectively, "QBE"). Defendants Great Lakes Reinsurance (UK) PLC and Certain Underwriters at Lloyd's, London Syndicates Numbered 33, 1003, 2003, 1208, 1243, 0376, 506 and 1225 were dismissed with prejudice by stipulation on November 20, 2012. ECF 138. Defendant Industrial Risk Insurers was dismissed with prejudice by stipulation on June 5, 2018. ECF 196.

Defendants"). The insurers, exercising their subrogation rights, also settled with the tortfeasors. Plaintiffs now want a portion of QBE's settlement with the tortfeasors, citing a provision of the insurance contract which they argue grants them that right.[3] QBE now moves for summary judgment dismissing the complaint in this case. For the reasons that follow, the motion is granted.[4]

## Background

The Court assumes the parties' familiarity with the facts and procedural history of these cases, which are set forth in *In re Sept. 11 Litig.*, 906 F. Supp. 2d 295, 299 (S.D.N.Y. 2012), *In re Sept. 11 Litig.*, No. 10 CIV. 1642, 2013 WL 5979670, at *2 (S.D.N.Y. Sept. 18, 2013), and *World Trade Ctr. Props. LLC v. QBE Int'l Ins. Ltd.*, 627 F. App'x 10, 13 (2d Cir. 2015). What follows is an abbreviated summary.

"On July 16, 2001, less than two months before September 11, Plaintiffs paid $2.805 billion to the Port Authority of New York and New Jersey for 99–year net leases to World Trade Center Towers One, Two, Four and Five." *In re Sept. 11 Litig.*, 906 F. Supp. 2d at 299. Through a series of contractual provisions that insured against the actual replacement cost of the Towers as well as lost revenue caused by business interruptions, Plaintiffs obtained insurance coverage from QBE and other insurers totaling $3,546,800,000 "per occurrence." *See, e.g.*, Agreement of Lease: One World Trade Center, § 14.1.1–.2. "After the Towers were destroyed, and following extensive litigation focused on whether the September 11 terrorist-related crashes of American Airlines Flight 11 and United Airlines Flight 175 constituted one or

---

[3] Specifically, Plaintiffs claim priority to a share of the subrogation settlement proceeds and seek a declaratory judgment under 28 U.S.C. § 2201 to that effect.

[4] I have already held that the Court has supplemental jurisdiction over Plaintiffs' claims, *see In re Sept. 11 Litig.*, 906 F. Supp. 2d 295, 300–01 (S.D.N.Y. 2012), and the Second Circuit affirmed, *see World Trade Ctr. Props. LLC v. QBE Int'l Ins. Ltd.*, 627 F. App'x 10, 12 n.1 (2d Cir. 2015).

two occurrences, Plaintiffs settled their claims against their insurers, including Defendants, for approximately $4.1 billion." *In re Sept. 11 Litig.*, 906 F. Supp. 2d at 299; *see also In re Sept. 11 Litig.*, 590 F. Supp. 2d 535, 539 (S.D.N.Y. 2008).

Having become subrogated to Plaintiffs' claims as a result of the settlement, the insurers, including QBE, filed tort claims against the Aviation Defendants to recover the amount of their insurance payments to Plaintiffs. In February 2010, the insurers entered into a settlement with the Aviation Defendants, resolving their aggregate claims for $1.2 billion. *In re Sept. 11 Litig.*, 906 F. Supp. 2d at 299 (S.D.N.Y. 2012). Over Plaintiffs' objection, I approved the settlement "as the 'fair and reasonable' result of 'hard-fought, arms-length, and good faith negotiations.'" *Id.* (quoting *In re Sept. 11 Litig.*, 723 F. Supp. 2d 534, 543 (S.D.N.Y. 2010)). The Second Circuit affirmed on April 8, 2011. *In re Sept. 11 Prop. Damage Litig.*, 650 F.3d 145 (2d Cir. 2011). However, believing that the insurance settlement did not fully compensate their losses, Plaintiffs also filed tort claims against the Aviation Defendants (the "Tort Action") and this declaratory judgment action against its insurers, claiming priority over the insurers' subrogation settlement with the Aviation Defendants (the "Subrogation Action").

Several of my prior rulings in these cases are relevant to resolving the instant motion. Beginning first with the Tort Action, I held that under CPLR § 4545, Plaintiffs' tort recovery would be offset by the approximately $4.1 billion insurance recoveries and that "any tort recovery . . . would be limited to the lesser of the loss in the fair market value of the leaseholds (from their value immediately prior to the Towers' destruction) or the leaseholds' replacement costs, and that the loss in fair market value was the lesser of these amounts." *In re Sept. 11 Litig.*, 906 F. Supp. 2d at 300. After holding a bench trial to determine "whether the $4.091 billion in insurance recoveries that Plaintiffs received for the main site of the World

3

Trade Center (comprising almost entirely of payments for loss rental income and replacements costs for rebuilding the site) compensated Plaintiffs for the same categories of losses that Plaintiffs might have recovered from the Aviation Defendants," *In re Sept. 11 Litig.*, 2013 WL 5979670, at *2, I held that Plaintiffs' insurance coverage "correspond[ed] completely to Plaintiffs' potential tort recoveries related to the lost value of their leaseholds, and that the insurance recoveries should be set off against such potential tort recoveries, reducing them to zero." *In re Sept. 11 Litig.*, 957 F. Supp. 2d 501, 507 (S.D.N.Y. 2013).

Meanwhile, Plaintiffs and the insurers continued to litigate the Subrogation Action. QBE insured Plaintiffs under a WilProp 2000 policy form (the "WilProp Form"), which provided in relevant part that "[i]f any amount is recovered as a result of [subrogation] proceedings, the net amount recovered after deducting the costs of recovery shall be distributed first to the insured in reimbursement for the deductible amount retained and for any uninsured loss or damage resulting from the exhaustion of limits under this policy or primary or excess policy(ies)." In an Opinion and Order dated November 27, 2012, I held that the term "uninsured loss or damage" unambiguously referred to "legally recoverable tort damages" and that, as such, "Plaintiffs gain priority with respect to WilProp Defendants' Settlement Proceeds (after deducting the costs of recovery and aside from the deductible amount retained) *only if* Plaintiffs have legally recoverable tort damages *exceeding* Plaintiffs' insurance recovery." *In re Sept. 11 Litig.*, 906 F. Supp. 2d at 304 (emphasis added). This holding, affirmed by the Court of Appeals, intertwined the Subrogation Action with the Tort Action, in which Plaintiffs were litigating that same issue.[5] After resolving the question against Plaintiffs in the Tort Action following a bench

---

[5] Because the question of whether Plaintiffs could demonstrate legally recoverable tort damages exceeding their insurance coverage was unresolved, the November 27, 2012 Opinion and Order denied the parties' cross-motions for summary judgment pending resolution of the underlying issues in the Tort Action, where those issues were being actively litigated.

4

trial, I applied that ruling to the Subrogation Action and held that Plaintiffs had "no right to the Defendants' settlement proceeds" under the priority provision of the WilProp Form. *In re Sept. 11 Litig.*, 2013 WL 5979670, at *2. On the basis of these decisions, both the Tort and Subrogation Action were dismissed.

Plaintiffs appealed both of these rulings. With respect to the Tort Action, the Second Circuit agreed that "Plaintiffs' compensable damages [were] limited to the diminution in the market value of their leasehold interests," but vacated portions of my prior decisions concerning how to calculate the value of the lease. *See In re Sept. 11 Litig.*, 802 F.3d 314, 334–38 (2d Cir. 2015). As to the Subrogation Action, the Second Circuit affirmed my interpretation of the WilProp form—that is, that Plaintiffs were entitled to priority to the insurers' subrogation settlement with the Aviation Defendants only if Plaintiffs suffered legally recoverable tort damages exceeding their insurance recovery. *World Trade Ctr. Props.*, 627 F. App'x at 13. But because the Tort Action was remanded, and it was therefore "conceivable" that Plaintiffs had suffered "legally recoverable tort damages in excess of [their] insurance settlement," the Subrogation Action was also remanded for further proceedings pending resolution of the Tort Action. *Id.* at 12.

On remand, the Subrogation Action sat dormant pending resolution of the Tort Action, which proceeded into discovery. In November 2017, the Tort Action was settled by the Aviation Defendants paying Plaintiffs approximately $95 million. I approved the settlement as fair and reasonable on December 21, 2017. *See In re Sept. 11 Litig.*, 21-MC-101 (S.D.N.Y. Dec. 21, 2017), dkt. 1953.

The litigation between Plaintiffs and the Aviation Defendants having been resolved, QBE now moves for summary judgment in this case.

5

## Discussion

### A. Legal Standards

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, I must "view the evidence in the light most favorable to the party opposing summary judgment, . . . draw all reasonable inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004).

The contract at issue here is governed by New York law, under which interpretation of an insurance policy is generally a question of law for the Court. *See, e.g., CGS Indus., Inc. v. Charter Oak Fire Ins. Co.,* 720 F.3d 71, 76 (2d Cir. 2013). As the Second Circuit has explained:

> The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control. Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided. As we have stated before, the meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes.

*World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted); *see also 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.,* 634 F.3d 112, 119 (2d Cir. 2011) (internal quotation marks omitted) (instructing that

6

courts must give "unambiguous provisions of an insurance contract . . . their plain and ordinary meaning"). "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 90 (2d Cir. 2010) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

### B. Plaintiffs Are Not Entitled to Priority

"Subrogation is the principle by which an insurer, having paid losses of its insured, is placed in the position of its insured so that it may recover from the third party legally responsible for the loss." *Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577, 581 (1995). By allowing the insurer (rather than the insured) to sue the alleged tortfeasor, "subrogation forecloses insureds from recovering twice for the same injury while also preventing tortfeasors from escaping liability." *World Trade Ctr. Props.*, 627 F. App'x at 13; *see also Fasso v. Doerr*, 12 N.Y.3d 80, 87 (2009) (explaining that subrogation ensures (1) "that the party who causes injury or damage should be required to bear the loss by reimbursing the insurer for payments made on behalf of the injured party," and (2) "that the injured party should not recover twice for the same harm—once from its insurer and again from the wrongdoer"). "Although subrogation is an equitable doctrine, parties to insurance policies frequently include subrogation provisions in their policies, in which case their 'rights must be governed by the terms of the policy.'" *World Trade Ctr. Props.*, 627 F. App'x at 13 (quoting *J & B Schoenfeld, Fur Merchs., Inc. v. Albany Ins. Co.*, 492 N.Y.S.2d 38, 41 (1985)). Nonetheless, it is well settled that "when giving meaning to contractual subrogation provisions, courts appropriately rely on equitable subrogation

7

principles on the assumption that, absent an evident intention to the contrary, the parties meant to incorporate those principles." *Id.*; *see also Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency Inc.*, 644 F.3d 166, 169–70 (2d Cir. 2011) (holding that "boilerplate subrogation clauses incorporate default common law subrogation rules, and do not modify or abrogate them").

Equitable subrogation is limited by the "made whole" rule, under which "the insurer may seek subrogation against only those funds and assets that remain after the insured has been compensated." *Fasso*, 12 N.Y.3d at 87. "This designation of priority interests . . . assures that the injured party's claim against the tortfeasor takes precedence over the subrogation rights of the insurer." *Id.* at 87. The made whole rule complements the doctrine of equitable subrogation by allowing the insurer to step into the shoes of the insured and hold the tortfeasor responsible for the loss, while still ensuring that the actual victim—the insured—is the first to recover in full. Plaintiffs' claim rests entirely on the application of the made whole rule to this case.

But under New York law, the made whole rule is triggered only when "the sources of recovery ultimately available are inadequate to fully compensate the insured for its losses." *Winkelmann*, 85 N.Y.2d at 581; *see also id.* at 584 (holding that the subrogated insurer may maintain an action against the alleged tortfeasor regardless of whether the insured had pursued its own claim and noting that "[i]t will be time enough to determine plaintiffs' rights vis-a-vis defendant's when and if it is determined that the third-party tortfeasor is unable to pay the remainder of their loss"). Only when the tortfeasor is judgment proof or lacks available insurance coverage is "the insurer—who has been paid by the insured to assume the risk of loss—[barred from] shar[ing] in the proceeds of the insured's recovery from the tortfeasor." *Id.* In other words, the made whole rule is designed to secure the insured's rights vis-à-vis the

8

insurer, prioritizing the insured so that when the actual tortfeasor lacks the funds to compensate both, the insured should first be made whole. But it does not apply unless, for one reason or another, an insurer is competing with its insured for a limited pool of money available from the tortfeasor. No such inequity is presented here. Plaintiffs elected to settle their claims against the Aviation Defendants without exhausting the sources of recovery available to them and without resolving the underlying issues in the Tort Action. Because the made whole rule does not apply, Plaintiffs cannot claim priority to QBE's subrogation recovery.

Several decisions of the New York courts reinforce this point. In *Fasso v. Doerr*, the plaintiff suffered complications after receiving medical treatment from the defendant, Dr. Doerr, "requiring her to undergo a liver transplant." 12 N.Y.3d at 85. After Fasso's insurance carrier reimbursed her medical expenses, totaling $780,000, Mrs. Fasso and her husband filed a malpractice claim "against Dr. Doerr and the hospital where he treated her." *Id*. The insurance carrier then intervened in the medical malpractice action, without objection from the parties, to assert its equitable subrogation claim to the medical expenses it had paid on Mrs. Fasso's behalf. *Id*. Shortly after the trial began, "the attorneys for plaintiffs and the doctor advised the court that a settlement had been reached," under which the "plaintiffs would receive $900,000, Dr. Doerr would not admit wrongdoing[,] and [the insurance carrier's] equitable subrogation claim would be dismissed on the basis that Mrs. Fasso was not 'made whole' since the settlement payment was less than her actual damages." *Id*. at 86. Not having participated in the negotiated settlement, the insurance carrier did not object to the monetary award the plaintiffs would receive, but did "contest the dismissal of its equitable subrogation claim because, after Dr. Doerr paid the $900,000 settlement, there remained $1.1 million in potential insurance coverage" held by the defendants that could be used to repay the carrier's insurance payments. *Id*. The trial

court and Appellate Division accepted the settlement and dismissed the carrier's intervention complaint. On appeal, the Fassos and Dr. Doerr argued "that the 'made whole' rule preclude[d] [the insurance carrier] from pursuing equitable subrogation against the doctor . . . because plaintiffs settled for less than the total damages caused by Dr. Doerr's alleged negligence.'" *Id.* at 87. Rejecting this argument, the New York Court of Appeals emphasized that the made whole rule is triggered only when "the recovery the injured party receives, *whether determined by settlement or verdict*, is greater than the wrongdoer's assets and available insurance coverage." *Id.* (emphasis added). But "because the settlement between the Fassos and Dr. Doerr left a potential source of recovery—$1.1 million in remaining insurance coverage," the made whole doctrine presented no obstacle to the insurer's subrogation claim. *Id.* at 87–88. Similarly here, the crucial question is not simply whether Plaintiffs' uninsured loss or damage exceeds their own insurance recoveries, as Plaintiffs maintain, but also whether Plaintiffs' loss exceeds the tortfeasor's "assets and available insurance coverage." *Id.* at 87. Without the latter, the made whole rule does not apply.

*Erlich v. American International Group Insurance*, 981 N.Y.S.2d 634 (Sup. Ct. 2013), also supports this understanding of the made whole rule. In *Erlich*, the plaintiffs purchased a water cooler, manufactured by a third party, that malfunctioned and caused a fire that damaged the plaintiffs' home. The damage was covered by a homeowners' insurance policy, which was promptly paid after deducting the plaintiffs' deposit and depreciation. By way of assignment, the holder of the insurer's subrogation rights then filed a lawsuit against the third-party manufacturer that caused the fire, eventually settling its claim for less than the insurance payments received by the plaintiffs. The plaintiffs thereafter filed a putative class action against the insurance company, claiming entitlement to "some or all of the proceeds from the settlement

of the Subrogation Action." *Id.* In dismissing the complaint, the New York Supreme Court explained that New York's made whole rule, on which the plaintiffs relied, applies only "if the tortfeasor lacks the funds to compensate the policyholder." *Id.* But "where the tortfeasor is not judgment proof (e.g. where it is a multinational company)," the court held that "the policyholder must commence its own action against the tortfeasor to recover its uninsured losses." A policyholder cannot, as the plaintiffs attempted to do, "piggyback on the insurer's lawsuit" without first exhausting available recovery from the tortfeasor itself. *Id.* The same principle applies here.[6]

Plaintiffs do not dispute these principles of equitable subrogation. Instead, Plaintiffs argue that the WilProp Form modifies the equitable rule. "It is true, of course, that parties are free to contract around equitable subrogation principles," *World Trade Ctr. Props.*, 627 F. App'x at 14, and the WilProp Form could have been drafted explicitly to avoid the made whole rule's limited application to circumstances in which the sources of recovery—here, the funds available from the Aviation Defendants—are inadequate to fully compensate Plaintiffs' uninsured loss or damage. But nothing in the WilProp Form suggests that the parties did so. The WilProp Form's subrogation provision provides that:

> If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery shall be distributed first to the Insured in reimbursement for the deductible amount retained and for any uninsured loss or damage resulting

---

[6] *Couch on Insurance* also supports this understanding of the made whole rule. In his introduction to equitable subrogation, Couch explains that "[i]n many instances, the insurer and insured both have rights of recovery against the third party primarily liable for the loss, *yet the amount recoverable from the third party is insufficient to completely satisfy the claims of both*," thereby triggering the made whole rule. 16 Couch on Insurance § 223:133 (3d Ed. 2000). Although the precise situation of the case before me appears not to have arisen in New York, the principles underlying the made whole rule illustrate that its application is limited to situations in which the insurer and the insured are competing for a limited source of recovery, whether because the tortfeasor is judgment proof, has exhausted its own insurance coverage, or otherwise.

11

>from the exhaustion of limits under this policy or primary or excess policy(ies).

Nothing in this language conveys an intention to depart from New York's equitable made whole rule, and Plaintiffs' arguments to the contrary are unconvincing. Plaintiffs primarily contend that the WilProp Form expressly makes the existence of any "uninsured loss or damage" contingent *exclusively* on "exhaustion" of the limits of the QBE insurance policy itself, rather than exhaustion of recovery available from the tortfeasor—here, the Airline Defendants. *See* Plaintiffs' Opposition, ECF 198, at 14. This argument misses the mark. Nowhere in the relevant portion of the WilProp Form can the word "exclusively" be found. And drawing an inference that the contractual subrogation clause diverges from the equitable rule based solely on what is missing from the contract's terms is inconsistent with the maxim that equitable subrogation principles apply "absent an evident intention to the contrary." *World Trade Ctr. Props.*, 627 F. App'x at 13. I have already held, and the Second Circuit has agreed, that this exact provision "merely restate[s]" the equitable rule. *Id.* at 14; *see also In re Sept. 11 Litig.*, 906 F. Supp. 2d at 304.[7] Nothing in the text of the WilProp form suggests that the parties intended to contract around equitable subrogation principles. Under these settled principles of New York law, Plaintiffs' settlement with the Aviation Defendants bars further recovery here.

Moreover, by settling their claims in the Tort Action, Plaintiffs have forfeited the opportunity to litigate both the liability of the Aviation Defendants and whether Plaintiffs have suffered legally recoverable tort damages, both of which were central to the Tort Action.[8]

---

[7] In interpreting this very provision of the WilProp Form, the Second Circuit held: "[W]e we see nothing in the phrase 'any uninsured loss or damage,' *or in the rest of the WilProp Form*, to suggest that the parties here actually [contracted around equitable subrogation principles]." *World Trade Ctr. Props.*, 627 F. App'x at 14 (emphasis added).

[8] Since the beginning, the issues posed by this case have been contingent on the findings of the Tort Action. This is also plainly evident from the Second Circuit's instructions when this case was remanded in 2015. *See World Trade Ctr. Props.*, 627 F. App'x at 12 ("Because it is conceivable that the district court will, *on remand in the Tort Action*,

Nonetheless, Plaintiffs now invoke Wisconsin state law for the proposition that this Court should hold a special proceeding to litigate those issues in this collateral declaratory judgment action. *See Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 264 (1982). New York law does not require such a proceeding and I decline to do so.

As an initial matter, Plaintiffs have cited no case, and the Court has not found any, in which such a proceeding was employed in New York. But even if Wisconsin law were to apply, Plaintiffs would not be entitled to a *Rimes*-type hearing, for Plaintiffs cannot demonstrate that they are competing with QBE for a limited source of recovery—i.e., that Plaintiffs' recovery exceeds the Aviation Defendants' assets or available insurance coverage. In *Rimes v. State Farm*, a subrogated insurer filed suit against its own insured to recover a portion of the insured's personal injury settlement with the tortfeasor. *Id.* at 264. Because the plaintiffs had already settled their claims with the tortfeasor, the trial court conducted a post-settlement trial to determine whether the insured had been made whole by their $125,000 settlement. *Id.*[9] Though troubled somewhat by the trial court's handling of the case, the Wisconsin Supreme Court begrudgingly affirmed the post-settlement procedure. *Id.* at 276–77. But Wisconsin courts have since explained that the made whole rule does not apply—and a *Rimes* hearing is not available—unless the insurer and the insured are competing for a limited source of funds from the tortfeasor. *See Muller v. Soc'y Ins.*, 309 Wis. 2d 410, 445 (2008) ("Where policy limits are sufficient to cover all related claims, the insured cannot settle for less than policy limits and then argue that 'the pie was not big enough' to make him whole. The made whole doctrine simply does not

---

find that WTCP has legally recoverable tort damages in excess of its insurance settlement, we vacate the district court's judgment in the instant case as well and remand for further proceedings." (emphasis added)).

[9] After concluding that the plaintiffs' actual damages exceeded $300,000, the trial court held that the insurer "was entitled to no recovery whatsoever in subrogation in circumstances where the insured was not made whole for his damages." *Id.* at 265.

apply in these circumstances, inasmuch as the inequitable prospect of an insurer competing with its insured for a limited pool of funds is not present." (internal citation omitted)); *Paulson v. Allstate Ins. Co.*, 263 Wis. 2d 520, 532 (2003) (finding that the "made whole rule is inapplicable" where the insured "settled [with the tortfeasor] before there was any finding of the extent of damages" and "made no assertion that there was an insufficient pool of money"); *see also Gabe's Const. Co. Inc. v. Holly Pipe Corp.*, No. 12-CV-0122, 2015 WL 1014624, at *3 (E.D. Wis. Mar. 9, 2015) (holding that "when adequate funds are available to cover both claims and the insured still settles for less than a made-whole amount, it should not be allowed to argue that it was not made whole"). Because Plaintiffs and QBE are not competing for a limited source of recovery from the Aviation Defendants, Plaintiffs would not be entitled to priority under Wisconsin law, were it applicable.

  Finally, Plaintiffs also suggest that granting summary judgment is inconsistent with the judicial policy favoring settlement and judicial economy. *See In re Tronox Inc.*, 855 F.3d 84, 106 (2d Cir. 2017). But I am required to apply the law, not a policy goal of encouraging settlement in defiance of rules of law. The principal goal of the equitable subrogation doctrine is to hold the tortfeasor, not the insurer, responsible for injuries incurred by the insured. *See Fasso*, 12 N.Y.3d at 87; *Winkelmann*, 85 N.Y.2d at 581. Applying the made whole rule here, after Plaintiffs have settled their claims against the alleged tortfeasors and are not competing with QBE for a limited source of recovery, is wholly inconsistent with the goals that underlie subrogation.

## Conclusion

For the reasons stated herein, the motion for summary judgment is granted. The clerk is instructed to terminate the motion (ECF 190), enter judgment dismissing the complaint, tax costs as appropriate, and close the file.

SO ORDERED.

Dated: August 2, 2018
New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge